# EXHIBIT A

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form | ENTER CHARGE NUMBER<br>[ X ] EEOC<br>420 2006 05107 |
|---|---|

_____ and EEOC
(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.)<br><br>Linda Thornton | | H OME TELEPHONE NO.<br>(Include Area Code)<br>334-693-4488 |
|---|---|---|
| STREET ADDRESS<br>100 Armstrong Street | CITY, STATE AND ZIP<br>Headland, AL 36345 | COUNTY<br>Henry |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>Flavor House Products, Inc. | NO. OF<br>EMPLOYEES/MEMBERS<br>Over 15 | TELEPHONE NO. (Include Area Code)<br>334-983-5643 |
|---|---|---|
| STREET ADDRESS<br>2700 Horace Shepard Road | CITY, STATE AND ZIP<br>Dothan, AL 36303 | COUNTY<br>Houston |
| NAME | JUL 27 2006 | TELEPHONE NO. (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es):<br>[ ] Race [ ] Color [x] Sex [ ] Religion [ ] Age [ ] Disability<br><br>[ ] National Origin [x] Retaliation [ ] Other | DATE MOST RECENT OR CONTINUING DISCRIMI-NATION TOOK PLACE<br>(Month, day, year)<br>June 16, 2006 |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):

Social Security Number: <u>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</u>   Date of Birth: <u>5-16-64</u>   Sex: <u>Female</u>   Race: <u>Caucasian</u>

I, Linda Thornton, began working for Flavor House Products, Inc. on or about June 25, 2001. While employed at Flavor House, I suffered sexual discrimination and retaliation. The sexual discrimination started during my first year of employment with Flavor House and continued throughout my employment. I was forced to resign my position with Flavor House on or about June 21, 2006, following my complaints to management of sexual discrimination and harassment.

| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>09-15-06   _Linda Thornton_<br>Date      Charging Party<br>           (Signature) | SIGNATURE OF COMPLAINANT<br>_Linda Thornton ._<br><br>SUBSCRIBED AND SWORN TO BEFORE ME<br>THIS DATE<br>(Day, month, and year) _Marla B Driver_<br>                    11-8-06 |

LINDA THORNTON V. FLAVOR HOUSE -
PLAINTIFF'S RFP DOCS 0147

Page 2 EEOC Charge

Name: _Linda Thornton_

Social Security #: _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_

Date: _9-15-06_

So much has happened that I cannot possibly set out everything, but the following is a brief summary of the sexual discrimination and/or harassment that I was subjected to while employed at Flavor House Products, Inc.

During my first year of employment, I repeatedly tried to get a promotion to "Label Operator". I was passed over several times and the position was given to temporary male employees with less or no experience. Unlike the male employees, I was required to provide a resume listing my mechanical experience before I was given the position. The discrimination continued even after I received the position in that I did not receive the training that the male operators/employees received. Additionally, the mechanics, all male, and other male employees made derogatory comments about me working "in a man's job." The mechanics did not like for me to make adjustments to my machine. If I took longer than 5 minutes to make adjustments, they would push me out of the way and make the adjustments or they would call the male supervisor over to make the adjustments. However, the male operators made adjustments that took longer than five minutes and nothing was said. I suffered this discriminatory treatment from the time I was put in the Label Operator position until I was forced to resign. My supervisor was aware of the discriminatory treatment; however, he did nothing to stop the discrimination. I also made numerous complaints to Marianne Boyer, Director of Operations, about the sexually discriminatory work environment that the female employees, including myself, were forced to work in on a daily basis. I told her that the mechanics, who are all male, cursed at and yelled at the female employees and that they called the female employees derogatory names. I reported to her that the mechanics would not allow the female operators to make minor repairs on their machines, but did not say anything when male employees made the same or similar repairs. However, Boyer's typical response to my complaints was to tell me that I would have to "deal with it" as she had learned to "deal with it" and then gave me two examples of discrimination she had do "deal with" in the company.

The first time I worked with Frank Williams was sometime in 2003. He was supposed to help me learn how to run his machine. I worked with him for three to four weeks. During that time, he yelled at me and cursed me. He also called me a "fucking stupid bitch". I complained to Melvin Hutchins, a member of management, but Hutchins told me that Williams was the only one that knew how to run the machine so I would just have to get along with him. I didn't work with Williams again until the beginning of 2006. I applied for a position as Line 3 Label Operator and received the position. Williams was not in the department when I applied; however, he was moved to the department shortly afterwards as the Team Leader. From then until I was forced to resign, Williams treated me in a discriminatory and demeaning manner. He yelled at me and cursed at me every day. Williams constantly talked about his sex life with his wife. He talked about how often he had sex, how they had sex, where they had sex, and how often they had sex. He even said he could tell his wife was cheating on him because of the way she "felt" when they had sex. Williams was also very vocal about the fact that he was a registered sex offender. I complained about Williams and his discriminatory treatment many times. I complained to Hutchins and Chris Jordan, Supervisor. They told me it would be taken care of, but to my knowledge, nothing was ever done as Williams' discrimination continued. A few months before I was forced to leave my employment, I was written up for telling another employee that Williams was a registered sex offender even though Williams made this statement himself almost every day. At first I was called in and told not to discuss Williams history although he discussed it everyday. I was told that the matter would be dropped, but if I discussed his criminal history again, I would be written up. A few days later, another female employee told me that Williams was making threats to hurt me. I reported these threats to management and was written up for discussing Williams history after being told not to talk about it. The employee that told me about the threats was fired shortly afterwards. Williams was the reason I was forced to resign my position with Flavor House.

On or about June 14, 2006, I was operating the label machine on Line Three, my usual position. Williams took over my machine during my break. When I came back, Williams was re-loading my machine with labels. I saw that the

paperwork had not been done while I was on break so I started on it to get caught up. There was also an overflow of re-work that needed to be done and a box full of bad labels that had to be re-done. As the company was having an important audit done that day, I asked Williams to help me with the re-work when he walked by. Williams turned around and shouted at me that he had "better mother-fucking things to do than fucking re-work." Williams continued to yell at me and kept repeating, "God damn mother fucker" at me. I tried to ignore him. Williams walked to the outside of the line and continued to yell at me. While still yelling "God damn mother-fucker" at me, he began picking up pallets and slamming them down. He also picked up a large bag of trash and threw it. By this time, a line mechanic had walked up and I asked him several times to call a supervisor on the radio. He tried to call a couple of supervisors and was told "it will be one minute." Donald Coty, the Mechanic Supervisor, walked by and I asked him to call Melvin Hutchins. By the time Hutchins arrived, Williams had quit yelling and cursing at me, but was still throwing pallets around and glaring at me. Hutchins asked me what the problem was, and I told him that I knew it was not a good time for this because the audit was going on, but this was the last time Williams was going to lose his temper and "go off on me" by cursing and yelling at me and calling me a "God damn mother-fucker" for no apparent reason. Hutchins called Chris Jordan, Packaging Supervisor, and he came over to my line. Jordan inventoried my tool bag and then told me to come to his office that afternoon and write out a statement of what happened. I began crying as I told him about Frank's discriminatory treatment and that I was tired of having to deal with Williams. Jordan assured me the situation would be resolved. Hutchins and Jordan then left to go back to the audit. From the time they left until three o'clock when I went to the front office, Williams stood at my re-work table and glared at me. I was extremely uncomfortable. At three o'clock, I went to Jordan's office and wrote out a statement. I was still very upset and told Jordan that I didn't know what Williams' problem was and he said he didn't care what Williams' problem was and that he would turn in my statement in the morning. I also told Jordan that Williams went and asked Catherine Long, a nearby co-worker, if she thought he had yelled at me, and Ms. Long told him twice that she thought he had yelled at me.

On or about June 15, 2006, I returned to work and tried to do my job while avoiding Williams. My co-workers were called in to the office to provide statements regarding the incident. Williams returned to my re-work table and glared at me the same way he had the day before. He would also walk up close to my machine and stop and stare at me. Williams' demeanor was very intimidating and because I knew that he had a history of violence against women, I was afraid he was going to hurt me. I was so scared of Williams that I took a screwdriver out of my tool bag and began carrying it around in my back pocket. When he was not standing at my re-work table or next to my machine, he would go to the filler machine and talk to Stephanie. He would turn around and glare at me from time to time during his conversation. Melvin Hutchins walked by and I told him that I was not comfortable working with Williams and that I did not feel safe around Williams. Hutchins told me that he had read my statement and agreed that he would not feel safe either. He reassured me that the situation would be resolved. He told me not to let it get me down and to "pray on it". Later that day, I was moved to the Line 5 label machine; however, this was still in the same department with Williams and only a few feet away. This move afforded me no protection from Williams.

On June 16, 2006, I reported back to work and heard over the radio that Williams was not going to be at work that day. I called Jordan and asked if I was going to be moved back to my regular line, Line 3, since Williams was not going to be there. He said "no". I saw Hutchins later that morning and asked him if the move to Line 5 was permanent. He told me that he needed me on Line 5 right then and could not answer if the move was permanent. I then asked Ricky Smothers, the Supervisor over all Supervisors, if the move was permanent and he told me I would have to talk to Tommy (LNU) in PR. I asked Ricky if he was aware of what happened to me the day before. He said that he had heard bits and pieces of what happened. I asked him if he had read my statement and he said "no". I realized at that point that Williams was not going to be disciplined for his discriminatory behavior and that I was not going to be protected from him. I was so

Page 4 EEOC Charge
Name: Linda Thornton
Social Security #: 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
Date: 09-15-06

upset that I had to clock out and go outside to calm down. Hutchins and Ricky followed me outside and told me to leave the property and come back in an hour to meet Tommy. I told them that I was too upset to drive so they told me I should wait in the car for Tommy to get there so I could talk to him. They did not want the other employees to see me crying and upset. I waited and spoke with Tommy and Marianne Boyer, CEO, about the situation with Williams. Despite my statement and statements from witness, they concluded that I had "baited" Williams. I tried to explain to them again that I did not feel safe working with Williams and that I had started carrying a screwdriver in my back pocket. Recognizing that they were not going to resolve the situation with Frank, I placed my badge on Tommy's desk. Boyer asked me not to quit and to think about it over the weekend. I repeatedly told Boyer that I did not feel safe working with Williams to which she responded several times that if this was a court of law the action they had taken would be acceptable. She accused me of having an issue with sexual discrimination, and even though she told me that the law required them to provide a safe work environment, she told me that Williams would not be terminated. She said I would be moved to Line 5 and Williams would be on Line 3 and that we would stay that way for three months to see which of us had a conflict first. There was no mention of a write up during this conversation. However, it was later stated that if I had returned to work following this incident, I would have been written up although I had done nothing wrong.

The next three scheduled work days I called in sick because I was too afraid to go in and face Williams. A female employee told me that the first two days I was out, Williams asked her where I was. On the third day, Flavor House called back and left a message that I would have to have a doctor's excuse to return to work. I called Leah Allums in Personnel Resources and told her that I would not be returning because I did not feel I would be safe working with Williams. I learned that after my employment ended, Williams was written up for cursing at another female employee.

I believe that I suffered from sexual discrimination, harassment, and retaliation while employed with Flavor House Products, Inc., and that I was discriminated against because of my sex, female. I have been discriminated against because of my sex in job assignments, training, promotions, wages, discipline, discharge, and other terms, conditions, and privileges of employment; and retaliated against in that the conduct was wilful, malicious, and in wanton disregard of my federally protected rights.

Linda Thornton
Charging Party

09-15-06
Date

LINDA THORNTON V. FLAVOR HOUSE -
PLAINTIFF'S RFP DOCS 0150

# EXHIBIT B

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| ⌐ ¬<br>**Department of Human Resources**<br>FLAVOR HOUSE PRODUCTS, INC.<br>2700 Horace Shepard Road<br>Dothan, AL 36303<br>L ⌐ | **Linda Thornton** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**420-2006-05107** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act    [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act    [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **26-OCT-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **11-OCT-06** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033** If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Deidre J. Rivers,**
**ADR Assistant**

EEOC Representative

Telephone **(205) 212-2146**

**Birmingham District Office**
**Ridge Park Place, Suite 2000**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

FILE COPY

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| September 26, 2006 | **Bernice Williams-Kimbrough,**<br>**District Director** | |

**LINDA THORNTON V. FLAVOR HOUSE -**
**PLAINTIFF'S RFP DOCS 0146**

# EXHIBIT C

## (Part 1 of 2)

# FREEDOM COURT REPORTING

**1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3        SOUTHERN DIVISION
4
5   CIVIL ACTION NUMBER  107cv-712-WKW
6   LINDA THORNTON,
7
8      Plaintiff(s),
9   v.
10  FLAVOR HOUSE PRODUCTS, INC.,
11
12     Defendant(s).
13
14     DEPOSITION TESTIMONY OF:
15         TOMMY NANCY
16
17
18
19
20  Commissioner:
21  Renny D. McNaughton
22  June 10, 2008
23  Dothan, Alabama

**3**

1   oral testimony taken the 10th day of June,
2   2008, along with exhibits.
3        Please be advised that this is the
4   same and not retained by the Court Reporter,
5   nor filed with the Court.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**2**

1        S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3   between the parties through their respective
4   counsel that the deposition of Tommy Nance,
5   may be taken before Renny D. McNaughton,
6   Court Reporter and Notary Public, State at
7   Large, at the offices of Bobbie Crook,
8   Dothan, Alabama, on the 10th day of June,
9   2008, commencing at approximately 9:00 a.m.
10     IT IS FURTHER STIPULATED AND AGREED
11  that it shall not be necessary for any
12  objections to be made by counsel to any
13  questions, except as to form or leading
14  question and that counsel for the parties
15  may make objections and assign grounds at
16  the time of trial or at the time said
17  deposition is offered in evidence, or prior
18  thereto.
19     In accordance with Rule 5(d) of the
20  Alabama Rules of Civil Procedure, as
21  amended, effective May 15, 1988, I, Renny D.
22  McNaughton, am hereby delivering to Ms.
23  Robertson the original transcript of the

**4**

1        I N D E X
2   EXAMINATION BY:              PAGE NO.
3   Ms. Robertson            9
4
5        E X H I B I T S
6   No. 1              17
7   No. 2              48
8   No. 3              52
9   No. 4              66
10  No. 5              67
11  No. 6              68
12  No. 7              72
13  No. 8              95
14  No. 9              125
15  No. 10             103
16  No. 11             103
17  No. 12             104
18  No. 13             137
19  No. 14             140
20
21
22
23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

5

```
 1        A P P E A R A N C E S
 2   FOR THE DEFENDANT (S):
 3   Jennifer F. Swain
 4   Baker, Donelson, Bearman, Caldwell &
 5   Berkowitz, PC
 6   Wachovia Tower, 420 North Twentieth Street,
 7   Suite 1600
 8   Birmingham, Alabama 35203-5202
 9   J. Scott Clark
10   Senior Counsel
11   Ralcorp Holdings, Inc.
12   P.O. Box 618
13   St. Louis, Missouri 63188
14   FOR THE PLAINTIFF (S):
15   Ann C. Robertson
16   Wiggins, Childs, Quinn & Pantazis, LLC
17   The Kress Building
18   301 Nineteenth Street North
19   Birmingham, Alabama 35203
20   Also Present: Linda Thornton
21
22
23
```

6

```
 1        I, Renny D. McNaughton, a Court
 2   Reporter of Greenville, Alabama, and a
 3   Notary Public for the State of Alabama at
 4   Large, acting as Commissioner, certify that
 5   on this date, pursuant to the Alabama Rules
 6   of Civil Procedure, and the foregoing
 7   stipulation of counsel, there came before me
 8   at the offices of Bobbie Crook, Dothan,
 9   Alabama, commencing at approximately 9:00
10   a.m. on the 10th day of June, 2008, Tommy
11   Nance, witness in the above cause, for oral
12   examination, whereupon the following
13   proceedings were had:
14
15        THE VIDEOGRAPHER: This begins
16   videotape number 1 in the deposition of
17   Tommy Nance in the matter of Linda
18   Thornton versus Flavor House Products
19   and Franklin D. Williams, Jr., case
20   number 107-CV-712-WKW. We are on the
21   record at 9:02 a.m. June the 10th, 2008.
22   This deposition is taking place at the
23   office of Bobbie S. Crook, PC, in
```

7

```
 1   Dothan, Alabama. My name is Joey
 2   McClain, representing Freedom Court
 3   Reporting. And would counsel identify
 4   yourself and state whom you represent.
 5        MS. ROBERTSON: Ann Robertson. I
 6   represent the plaintiff, Linda Thornton.
 7        MS. SWAIN: Jennifer Swain. I
 8   represent defendant Flavor House
 9   Products, Inc.
10        THE COURT REPORTER: Usual
11   stipulations?
12        MS. SWAIN: Yeah, that's fine.
13        MS. ROBERTSON: Plus our -- our
14   agreed-to stipulation about the
15   relatives.
16        MS. SWAIN: That's fine. Let me
17   ask --
18        MS. ROBERTSON: Yeah, we'd better
19   ask -- I was about to say we'd better
20   ask him since he's not a party to these
21   proceedings.
22        MS. SWAIN: Yeah. You can, if
23   you want to, ask for the opportunity to
```

8

```
 1   read your deposition transcript and make
 2   any changes you feel are necessary and
 3   then sign off on it, so that's your
 4   choice.
 5        THE WITNESS: Okay.
 6        MS. ROBERTSON: And -- and, also,
 7   we have a -- we have a -- the lawyers
 8   and I have an agreement. Ordinarily, I
 9   would sit here and ask you about all
10   your relatives in the middle district of
11   Alabama.
12        THE WITNESS: Okay.
13        MS. ROBERTSON: Now, you may have
14   none or you may have a bunch. But --
15   it's a waste of time, but it's necessary
16   if we get to the point of having a jury.
17        THE WITNESS: Okay.
18        MS. ROBERTSON: So what we just
19   agreed to is I won't do that here today.
20   If we get to the point where we're going
21   to court, then you will provide her a
22   list of your relatives --
23        THE WITNESS: Okay.
```

2 (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

9

1    MS. ROBERTSON: -- and their
2  spouses and -- and where they live and
3  where -- where they work. Okay?
4    THE WITNESS: Okay.
5    MS. ROBERTSON: And that's not so
6  I can go around and knock on the door
7  and say, Do you know that man? It's so
8  that I can make sure I don't put your
9  auntie on the jury. Okay?
10   THE WITNESS: I understand.
11   MS. SWAIN: Would you like to
12 reserve the right to read and sign your
13 deposition transcript?
14   THE WITNESS: Yes, please.
15   MS. ROBERTSON: Is that agreement
16 all right with you about the relatives?
17   THE WITNESS: Yes.
18   THE VIDEOGRAPHER: Excuse me.
19 Off the record.
20   (Off the record.)
21      EXAMINATION
22 BY MS. ROBERTSON:
23   Q   State your name, please, sir.

10

1    A   Thomas Alan Nance.
2    Q   And do you live here in the area
3  of Dothan?
4    A   Yes, ma'am.
5    Q   Where do you live?
6    A   107 Sterling Ridge Court.
7    Q   And how long have you lived
8  there?
9    A   Two and a half years.
10   Q   Where did you live before that?
11   A   Before that, I was in Gadsden,
12 Alabama.
13   Q   Doing what?
14   A   I was unemployed at that time
15 doing freelance work, HR work.
16   Q   How long did you do freelance
17 work?
18   A   Six months, eight months.
19   Q   Where did you work before that?
20   A   CF Gomma G-O-M-M-A. CF Gomma --
21   Q   And then --
22   A   -- in Jacksonville, Florida.
23   Q   Okay. And -- and what did you do

11

1  in that facility or place?
2    A   Human resources manager, training
3  and development manager.
4    Q   And why did you leave there?
5    A   We closed the plant.
6    Q   How long did you work there?
7    A   Two years.
8    Q   Now, what were your duties there?
9    A   Start-up of an automotive
10 facility, hiring, general HR duties,
11 training, development.
12   Q   Well, what -- what -- what does
13 general HR duties entail or did it entail
14 for that facility or that --
15   A   Interviewing new potential
16 employees, hiring, training, orientation,
17 issuing disciplinary actions, terminations.
18   Q   Did you do any training?
19   A   Yes. All new employee
20 orientation training, general training for
21 supervision. I would have to look at the
22 schedule to see what exactly to train,
23 specific classes.

12

1    Q   Now, they opened a place and
2  closed in two years?
3    A   Yes, ma'am.
4    Q   What -- what -- did they make a
5  automobile or an automobile part?
6    A   Made automotive brake lines for
7  GM and Chrysler.
8    Q   Okay. And what caused you to go
9  to Jacksonville -- Gadsden, Alabama?
10   A   That's my hometown. I moved back
11 there after the plant closed.
12   Q   And what did you do when you say
13 you freelanced?
14   A   I worked with a couple of
15 companies for safety evaluation, safety
16 program evaluations, benefits evaluations.
17   Q   And how did you get the job at
18 Flavor House?
19   A   Applied through the online ad,
20 sent in my application.
21   Q   And after your -- after you
22 applied, what happened?
23   A   There were several rounds of

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

13

1  interviews. I interviewed. Phone
2  interviews and then face-to-face interviews
3  in Dothan.
4      Q   Who did you interview with?
5      A   Initially, the recruiter out of
6  Ralcorp, the phone interview. I forget her
7  name.
8      Q   Okay. And here is what I want to
9  ask. Since Flavor House had several
10 different owners, we just all call it Flavor
11 House.
12     A   Flavor House. Okay.
13     Q   Yeah. Okay. And you don't know
14 what her position was?
15     A   Not right off the top of my head.
16 She was the person in charge of the primary
17 database for candidates and applicants.
18     Q   And then after you had a phone
19 interview with her, you went -- did you say
20 you had a face-to-face?
21     A   If I recall, we went -- after the
22 phone interview, there was a face-to-face
23 interview in -- in Dothan with the -- with

14

1  the group, the management group there.
2      Q   And those -- which -- made up by
3  whom?
4      A   Mary Ann Boyer, Ricky Smothers.
5  I don't recall. It was a four or five
6  person, six-person interview.
7      Q   Was --
8      A   QA manager, logistics manager. I
9  forget all the names. Mark Samulotscki.
10     Q   Was Melvin Hutchins one of the
11 people?
12     A   Yes, ma'am.
13     Q   Do you remember about how many
14 people it was?
15     A   It was a full day of interviews,
16 five or six. I don't recall exactly how
17 many.
18     Q   Did you interview face to face
19 with each individual or --
20     A   Yes, ma'am. Face to face
21 individually.
22     Q   All right. Let me finish the
23 question because -- or did you have any

15

1  group interviews?
2      A   Not that I recall. Group
3  interviews, no.
4      Q   Okay. And then after that, what
5  happened?
6      A   I was made a job offer shortly
7  after that.
8      Q   As -- what was -- what -- what
9  was your title?
10     A   Human resources manager.
11     Q   Did you have a written job
12 description?
13     A   Yes, ma'am.
14     Q   And what were your duties as the
15 HR manager?
16     A   I'd have to refer to the written
17 job description. Just general HR duties,
18 hiring, terminations. I don't recall the
19 specific duties without seeing that written
20 job description.
21     Q   I don't think I have a job
22 description, but I have a -- what's called a
23 business and development goals. Maybe I

16

1  will give you that also. I don't have but
2  one copy.
3      MS. SWAIN: Okay. Can I look at
4  it before you show it to him?
5      MS. ROBERTSON: Huh?
6      MS. SWAIN: Can I take a quick
7  look at it before you show it to him?
8      MS. ROBERTSON: Sure.
9  Absolutely.
10     MS. SWAIN: I think this is
11 part -- excuse me -- part of a document
12 as opposed to the entire document.
13     MS. ROBERTSON: All right. See
14 if I can make it complete. Would that
15 help?
16     MS. SWAIN: I think this is,
17 like, section four and there should be
18 --
19     MS. ROBERTSON: See if that's
20 part of it. We will put it all together
21 and staple it.
22     MS. SWAIN: This looks like the
23 same type of document for another time

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

17

1  period.
2      MS. ROBERTSON: Well --
3      MS. SWAIN: Oh, okay. So it is
4  -- okay.
5      MS. ROBERTSON: Because I --
6  yeah. What -- that's not using --
7      MS. SWAIN: Yeah.
8      MS. ROBERTSON: Okay.
9      MS. SWAIN: It does -- I does
10  note it on this. It says goal setting
11  document on it.
12      MS. ROBERTSON: Okay.
13      (Plaintiff's Exhibit Number
14  1 was marked for identification
15  and attached to the deposition.)
16  BY MS. ROBERTSON:
17      Q  Plaintiff's Exhibit Number 1, for
18  the record, the second page of the document
19  has a sticker on it. Will you take a look
20  at that, please, sir.
21      A  Okay.
22      Q  And see if that helps you with
23  your job duties or refreshes your memory

18

1  about what your job duties were.
2      A  These were specific goals set.
3  This is not an all encompassing job
4  description, no.
5      Q  Yes, sir. I understand that.
6  And I -- and I -- I didn't represent that it
7  was.
8      A  Okay.
9      Q  It -- but it looks like to me
10  that it may suggest at least some of the
11  areas that you were responsible for as the
12  HR manager at Flavor House; is that correct?
13      A  That's correct.
14      Q  And I thought maybe it would help
15  you for us to discuss those areas that
16  you're responsible for.
17      A  Okay.
18      Q  Okay. And does it help you?
19      A  Yes.
20      Q  Okay. Can you give me a little
21  more specifics now as to what your job
22  duties were at Flavor House?
23      A  Well, let me see. You can go by

19

1  the goals here, maintain FTE, full-time
2  employee count. Minimize turnover.
3      Q  Well, let's -- let's start with
4  that one. What does that mean?
5      A  Keep the -- keep the employees
6  hired. If there's turnover, then hire back
7  employees.
8      Q  Was there a problem at -- at
9  Dothan Flavor House keeping a full
10  complement of full-time employees.
11      A  Not -- not a problem that I know
12  of. It was just general turnover. So
13  basically when there was turnover, not
14  allowing that turnover to -- allowing the
15  position to be unmanned for a long period of
16  time, making sure they were filled back.
17      Q  Okay. What else?
18      A  Training process, general
19  training process for hourly and salary
20  employees.
21      Q  What kind of training were you
22  responsible for at Flavor House?
23      A  Salary to -- it was mainly

20

1  supervisory training, general supervisory
2  skills, employee training. We had safety
3  training. It was delegated to a safety
4  manager. Again, not having the training
5  schedule, I don't know specifically what we
6  trained during that period I was there.
7      Q  Did -- was the training on some
8  sort of schedule? In other words, like you
9  said, general supervisory skills, was there
10  a package or a scheduled kind of training?
11      A  There were training topics
12  scheduled monthly, bimonthly, quarterly,
13  yes.
14      Q  And -- and, like, do you remember
15  the topics that were in those --
16      A  No, I do not.
17      Q  -- packages? What -- did you
18  teach the classes yourself?
19      A  I don't recall teaching the
20  classes myself, no.
21      Q  Who would teach the classes?
22      A  Depending on what training it
23  was, specialists in that field, whether it

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

21

1  was a supervisor or a safety person --
2      Q   Well, I'm talking about --
3      A   And an outside counsel or outside
4  person.
5      Q   I'm sorry.  I'm talking about
6  specifically the general supervisory skills
7  classes.  It sounds like --
8      A   Some of those were taught by
9  myself.  Some of them were taught by outside
10  sources.
11      Q   All right.  And do you remember
12  which ones you taught?
13      A   Not without seeing the schedule,
14  no, ma'am.
15      Q   Did you teach any sexual
16  harassment training?
17      A   I don't recall if I taught it or
18  if it was taught by someone else.  It would
19  be on the sign-in sheets.
20      Q   Was it taught while you were
21  there?
22      A   I don't recall if it was.  It
23  would be in the training schedule if it was.

22

1      Q   For what period of time were you
2  there?
3      A   October of '05 until December of
4  '06.
5      Q   And you don't recall whether
6  your -- you personally taught a sexual
7  harassment or anti-sexual harassment course?
8      A   Not from memory, no, ma'am.
9  There would be a training record there if it
10  was taught, yes.
11      Q   All right.  And did you have
12  any -- while you were there, did you have
13  videos or anything, tools to use for that
14  particular kind of training?
15      A   I -- I don't recall.
16      Q   You don't recall whether or not
17  you had that kind of -- those kind of tools?
18      A   Not from memory, no, ma'am.
19      Q   Under what circumstances would
20  one receive anti-sexual harassment training
21  at Flavor House?
22      A   An individual or as a group?
23      Q   I'm talking about at -- what

23

1  would trigger one being offered or -- or --
2  or required to take anti-sexual harassment
3  training at Flavor House?
4      A   Sexual harassment training --
5          MS. SWAIN:  I'm going to object.
6      A   -- is part of our training
7  process.
8      Q   Okay.
9      A   There was annual training that
10  was listed as annual training.
11  Specifically, an incident.  If there was an
12  instance involved, we may have retrained,
13  but it would have been part of our original
14  training process.
15      Q   You said you were there from
16  October to October --
17      A   October to December.
18      Q   Okay.  So if there had been some
19  training, it would have been within that
20  period of time; right?
21      A   There should have been annual
22  training, yes.
23      Q   What qualified you to give that

24

1  training?
2      A   My previous experience, my
3  previous training.  I've had various
4  training courses, supervisory training
5  courses.  Train -- the trainer courses
6  throughout my career.
7      Q   Did you have any such training at
8  Flavor House?
9      A   Specific to sexual harassment
10  training?
11      Q   Yes.
12      A   Within our supervisory training
13  program, I believe there was sexual
14  harassment training.  Whether I received
15  that specifically separate, I don't recall.
16      Q   Would there be something in your
17  personnel file that would indicate whether
18  you received it or not?
19          MS. SWAIN:  Objection.
20      A   I don't recall if our training
21  records were kept separately or in our
22  files.
23      Q   Well, when you say your "training

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

25

1  records," would they have been kept by
2  individuals, named? Say Ann Robertson,
3  would she have a training file?
4      A  I don't recall how -- there was a
5  record kept. I don't recall how it was --
6  it was --
7      Q  So -- but what I'm asking you,
8  sir, is if it wasn't put in the personnel
9  file, some documentation that you received
10  the training, correct, would it have been
11  kept in a separate file with that person's
12  name on it?
13      A  It could have.
14      MS. SWAIN: Objection.
15      A  It could have, yes, ma'am. I do
16  not recall.
17      Q  Well, where else would it have
18  been kept if it wasn't kept in the personnel
19  file? How -- how else would it have been
20  kept?
21      MS. SWAIN: Objection.
22      A  I don't know. It's a speculation
23  question. I don't know the answer to that.

26

1      Q  Well, I mean, you were -- weren't
2  you in charge of -- of keeping records of
3  these training sessions?
4      A  There was a record, a sign-in
5  sheet, for each training. Now, how that was
6  filed, I'm not aware. I don't recall if it
7  was filed individually or in a training file
8  or in a personnel file. I don't recall how
9  it was filed, no.
10      Q  Well, how did you decide whether
11  a person needed that kind of training? Did
12  you not need to know whether or not they had
13  had it before?
14      MS. SWAIN: Objection.
15      A  We had an annual training
16  program.
17      Q  A what?
18      A  An annual training program that
19  had topics listed. Everyone received
20  training in specific courses throughout the
21  year, the entire plant.
22      Q  So you're telling for -- telling
23  me for every year there would have been

27

1  training on each specific topic?
2      MS. SWAIN: Objection.
3      A  I -- I don't know how to answer
4  that. Again, relative to what the topics
5  were for that year would have been trained.
6      Q  Well, you said there was annual
7  training, and what I'm trying to find out is
8  are you saying that for each year there was
9  repetitive -- the same topics taught?
10      A  Not necessarily the same topics.
11      Q  That's what I'm asking you. How
12  would you know if a person had received the
13  -- say it was time --
14      A  By the training record.
15      Q  Okay. So how would you check the
16  training record if you have no idea where
17  they kept it?
18      MS. SWAIN: Objection.
19      Q  Sir?
20      A  I don't recall how it was kept.
21      Q  Well, do you --
22      A  I would have -- I would have
23  checked training records to see if training

28

1  was needed for an individual or to ensure
2  they had training.
3      Q  Uh-huh.
4      A  An annual training program, we go
5  by the topics and we teach those topics.
6      Q  Okay. And -- and -- but you
7  don't recall how you would check?
8      A  I would look at the training
9  sign-in sheets.
10      Q  Okay. But you don't recall where
11  they were kept or --
12      A  I don't recall how they were
13  kept, if individual or in a training file.
14  Do not know.
15      Q  Is there something that would
16  refresh your memory?
17      A  Probably not.
18      Q  There's nothing that would
19  refresh your memory?
20      MS. SWAIN: Objection. He's
21  answered that.
22      Q  Can you explain to me why you
23  would have no memory of that even if I could

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

29

1  produce, like, say, a personnel file with a
2  training record in it?
3       MS. SWAIN: Objection.
4    A  I've had multiple jobs and we
5  store files multiple ways. So as an HR
6  manager, I've had various companies that
7  store files in different ways. I don't
8  recall specifically how Flavor House stores
9  their training records, no.
10     Q  No. I'm asking -- and there's
11  nothing that would refresh your memory?
12    A  No.
13     Q  Okay. What else did you do
14  besides training?
15    A  Disciplinary actions.
16     Q  Before we go on to disciplinary
17  actions, tell me did you do any training on
18  how to investigate anti -- investigate a
19  sexual or racial or what have you harassment
20  complaint?
21    A  I don't recall.
22     Q  Anything that would -- would
23  refresh your memory on that?

30

1    A  The training topics in our
2  training schedule. If it was there, then it
3  was taught if there's a sign-in sheet.
4     Q  Well, did you have a methodology
5  for -- for investigating such a complaint?
6    A  Yes.
7     Q  Would you tell me what it was?
8       MS. SWAIN: Objection.
9    A  I collected the documents from
10  individuals and investigated those
11  documents.
12     Q  What do you mean you collected
13  the documents?
14    A  Receive written statements from
15  anyone involved, question those individuals
16  about the situation, collect any additional
17  information, interview additional applicants
18  or additional persons that were named in the
19  investigation.
20     Q  Okay. When you would collect the
21  documents of -- or the written statements,
22  who would get the -- who would decide who
23  would get the written statements?

31

1       MS. SWAIN: Objection.
2    A  I don't understand that question.
3     Q  Well, if there was a complaint of
4  sexual harassment that did not come directly
5  to you but came to a supervisor, who would
6  -- would that person decide which people to
7  take the written statements from?
8       MS. SWAIN: Objection.
9    A  Anyone could report harassment to
10  a member of management, supervision, myself,
11  or another member of management, whoever
12  they were comfortable reporting it to. And
13  at that point, it would be investigated by
14  that process.
15     Q  Yes, sir. That was a good
16  answer, but it wasn't an answer to the
17  question I asked. My question was: If the
18  report came to someone other than you, who
19  decided which statements would be -- or who
20  would get -- be asked to give statements?
21       MS. SWAIN: Objection.
22    A  I don't know how to answer that
23  question.

32

1     Q  Okay. Well, you said you would
2  collect the documents and that documents
3  would include written statements of the
4  people that was -- that knew something about
5  the complaint; is that right?
6    A  Yes.
7     Q  Who would decide which people
8  gave the written statements?
9       MS. SWAIN: Objection.
10    A  I don't see how anyone could
11  decide who gives a written statement.
12     Q  Did you hold up a banner, We've
13  had a sexual harassment complaint; anybody
14  who wants to come give a written statement,
15  please do it? Is that how you got your
16  written statements?
17    A  If -- if -- if someone brought a
18  claim of harassment to me --
19     Q  Yeah.
20    A  -- I would ask for personnel or
21  individuals involved that I should interview
22  that had relevance to that from the person
23  bringing the accusation.

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

33

1    Q    Okay.
2    A    And from that, we would
3  investigate those persons, receive their
4  statements if they knew anything of the
5  situation. So, again, it's -- we didn't
6  broadcast that there had been a sexual
7  harassment claim of any sort or any
8  harassment claim.
9    Q    Well, did -- but you told me at
10  one point that you would collect the
11  documents which would usually include the
12  written statements of people that had some
13  knowledge of the complaint.
14    A    Correct, that had been identified
15  either by the person bringing the complaint
16  or by a supervisor who was aware that the
17  person is bringing the complaint.
18    Q    Okay. So that's what I'm saying.
19  So the supervisor would get the statements
20  and bring them to you; right?
21        MS. SWAIN: Objection.
22    A    That could happen, yes. Not
23  necessarily in that order.

34

1    Q    And then what would you do?
2    A    We would investigate the
3  complaint.
4    Q    Okay. And how would you
5  investigate the complaint?
6    A    Take the statements and interview
7  the individuals.
8    Q    All right. Did you make notes of
9  the interviews of the individuals?
10    A    Yes.
11    Q    Where were they -- where are
12  they?
13        MS. SWAIN: Objection.
14    A    Notes are either kept in a file
15  --
16    Q    I'm not talking about
17  hypothetically. I'm talking about in --
18  when you were doing it in -- at Flavor
19  House.
20        MS. SWAIN: Are you talking about
21  on a specific occasion?
22        MS. ROBERTSON: I'm talking
23  about -- no. I'm just talking about how

35

1  he kept the records of -- of -- of -- of
2  investigating a sexual harassment
3  complaint. He said he would take notes
4  of the people he interviewed.
5    Q    Did you ever -- did you ever have
6  a sexual harassment complaint?
7    A    I would have to look at my notes
8  to see. I don't recall yes or no.
9    Q    Okay. Well, let me ask you this.
10  Let's assume that this is some kind of
11  grievance or some kind of complaint that may
12  or may not have been sexual harassment.
13  Would it be investigated the same way?
14        MS. SWAIN: Objection.
15    A    Any complaint brought forward,
16  any statement, was investigated, yes.
17    Q    Okay. Well, for instance, in the
18  case where Linda alleged that Frank Williams
19  cursed her and threw a bag of cans, not at
20  her but threw it, and was yelling and
21  always, you know, acting out, did you
22  interview the witnesses involved in that --
23  that allegation?

36

1        MS. SWAIN: Objection.
2    A    I would have taken the
3  statements -- any statement that I had, I
4  would have interviewed the persons
5  identified, yes.
6    Q    Okay. And you would have taken
7  notes of those -- those --
8    A    Yes.
9    Q    Where are those notes? Where did
10  you keep those notes?
11    A    Those notes were filed in my
12  desk.
13    Q    Okay.
14    A    Separate file.
15    Q    A separate file in your desk?
16    A    Yes, ma'am. Personal notes taken
17  during an investigation.
18    Q    And were they -- how -- how did
19  you keep them, like alphabetically according
20  to the complaint and alphabetically
21  according to the --
22    A    I don't recall if it was by the
23  person or by the date that it occurred in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

37

1   the -- in the -- it was in a desk drawer.
2   It may have been by the incident name. It
3   might have been by the -- either the
4   person's name or by the date. I believe I
5   kept those chronological by the date of the
6   occurrence.
7       Q    And that would be the only
8   institutional memory of, say, a complaint
9   against, let's just say, Joe Blow, would be
10  this -- this number of notes in your desk?
11      MS. SWAIN: Objection.
12      A    There would be written
13  documentation of the complaint --
14      Q    Yeah, but where would it --
15      A    -- in the -- in the personnel
16  file.
17      Q    Okay. Well --
18      A    Because they had filed a
19  complaint.
20      Q    In whose personnel file?
21      A    In the individual's.
22      Q    So that would be the
23  institutional memory?

38

1       MS. SWAIN: Okay.
2       A    I'm not sure an institutional
3   memory, what that means.
4       Q    Well, obviously you are no
5   there -- longer there; right?
6       A    I'm no longer at Flavor House,
7   no.
8       Q    Okay. And -- and so if -- if
9   somebody else complained about Joe Blow, you
10  know, throwing acid in their face, where
11  would be the institutional memory that he
12  had done that before?
13      MS. SWAIN: Objection.
14      Q    Because you're not there to
15  remind them, oh, remember he -- like last
16  year he threw acid.
17      A    Again, my -- my -- my -- my
18  personal notes on the investigation are not
19  necessarily the outcome of the
20  investigation. It's my notes that I took.
21  The decisions that were made, any
22  disciplinary or nondisciplinary, any actions
23  that were taken, were part of the personnel

39

1   file.
2       Q    Okay. And the only -- the only
3   institutional memory would be in the
4   personnel file of the complainant?
5       MS. SWAIN: Objection.
6       Q    Or the -- the person against whom
7   the complaint was made?
8       A    Any -- any action taken would be
9   in the personnel file regardless of who was
10  involved in the action, if there was action
11  taken.
12      Q    What if there was no action
13  taken?
14      A    There's no action taken? The
15  statements would go in the personnel files
16  showing --
17      Q    Of whom?
18      A    Of whoever the statement was --
19  whoever wrote the statement, the copy would
20  be in the personnel file.
21      Q    So let me get this straight.
22  There's a complaint of, say, sexual
23  harassment against Joe Blow in 19 -- I

40

1   mean -- excuse me -- 2005. And there's
2   statements taken by Jane Doe, Carol Smo, and
3   others, and there's inconclusive proof that
4   Joe -- Joe Blow did sexual harassment. All
5   right? What would happen would be Jane
6   Doe's statement would go in her personnel
7   file?
8       MS. SWAIN: Objection.
9       A    I believe individual statements
10  were put into individual files. There may
11  have been -- the whole incident may have
12  been put into individual files. I don't
13  recall. But they -- the statements would
14  have been in the personnel files, either in
15  the -- in the person initially bringing the
16  complaint, maybe the entire -- all
17  statements there, perhaps. I don't recall.
18  But the individual statements were kept in
19  the individual personnel file.
20      Q    And my question is: Then how
21  would one after you left, if somebody
22  complained about Joe Blow in December of
23  '07, know that he had had prior complaints

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

41

1  that -- that -- that could not be proven one
2  way or the other?
3  　　　MS. SWAIN: Objection.
4  　　A   Statements would have been in the
5  personnel files.
6  　　Q   Of whom because you're not
7  sure --
8  　　A   The person making the statement.
9  　　Q   You're not sure whether they --
10  they would put it -- why would you put it in
11  the person against whom the allegations had
12  not --
13  　　A   There would have been a statement
14  from the person that the allegations were
15  made against as well. So, therefore, a copy
16  would have been in their personnel file as
17  well.
18  　　Q   Tell me what the -- what the
19  reason or the purpose for that particular
20  method is.
21  　　A   Because many times you have
22  instances where you have multiple instances
23  over a period of time that lead to a

42

1  perpetual problem. Therefore, you want
2  record of that problem as it's happened in
3  the past. One singular instance may not
4  negate action. Multiple instances over a
5  period of time may require action.
6  　　Q   Okay. Be you're not -- you're
7  not sure that that -- that it's -- that the
8  statements are put in each person's file or
9  are you?
10  　　　MS. SWAIN: Objection.
11  　　A   I don't recall.
12  　　Q   Now, tell me, do you know what
13  happened to your -- your notes where you
14  interviewed the people that gave the written
15  statements?
16  　　A   I do not know.
17  　　Q   Can you tell me why those notes
18  were not maintained in -- in whatever
19  fashion everybody else -- all the other
20  stuff was maintained in?
21  　　A   They would have been filed either
22  chronologically or by the person's name in
23  that investigations file.

43

1  　　Q   No. What I'm talking about is
2  you -- you get a written statement from Joe
3  Blow. You question Joe Blow and not only is
4  his written statement incorrect or
5  inaccurate, it's incomplete.
6  　　A   How do I know a statement is
7  incomplete? It's a statement.
8  　　Q   Well, after you interviewed him,
9  you determined that it was incomplete
10  because he told you some more stuff. That's
11  what I'm saying. Then how do you -- how did
12  you document that?
13  　　　MS. SWAIN: Objection.
14  　　Q   The additional stuff, the
15  misstatements, whatever.
16  　　A   The original statement is a
17  statement. My investigative notes are
18  separate from that initial statement.
19  　　Q   But as I'm saying, suppose you
20  bring the person in and over the course of
21  your interviewing him, it turns out that --
22  that he has additional information. He has
23  different information that you learned that

44

1  is pertinent to the investigation. Why
2  would you not maintain that also in his
3  personnel file?
4  　　　MS. SWAIN: Objection.
5  　　A   The initial statement was
6  maintained in the file.
7  　　Q   Well, how --
8  　　A   If they give additional
9  statements, they would be maintained in the
10  file as well.
11  　　Q   Well, how do you -- how did they
12  go -- how did the people that would gather
13  these written statements get the statements?
14  　　　MS. SWAIN: Objection.
15  　　A   I don't know the answer to that.
16  　　Q   I mean, would they sit down with
17  a series of questions and ask them and tell
18  them to put the stuff in there? Would they
19  say there's been an allegation that thus and
20  so was done; tell us what you know about
21  that?
22  　　A   From my recollection, anyone that
23  had a statement to give was given the form

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

45

1    and told to complete that -- to write their
2    statement. There was no questioning in the
3    statement -- statement process. It was
4    collection of the statements.
5    Q    Well, I mean, I'm working on the
6    line. You walk up to me and say, We think
7    you have information about something; write
8    a statement. Is that what they would do?
9         MS. SWAIN: Objection.
10    Q    I mean, what was done to inform
11    the person about what they should write the
12    statement?
13         MS. SWAIN: Objection.
14    A    They weren't told to write a
15    statement unless they offered to write a
16    statement. We never asked for additional
17    statements unless they were identified as
18    someone who would have a statement. If a
19    person bringing a complaint mentioned John,
20    Jane, and Mary, we would go to John, Jane,
21    and Mary and say, Would you write a
22    statement about what you saw? They did not
23    have to write a statement. It was at

46

1    their -- if they wanted to, they could. If
2    they didn't, they didn't.
3    Q    That's what I'm getting at. So
4    if -- in the instance where Ms. Thornton
5    complained that he yelled and screamed and
6    cursed and generally pitched a fit, and she said, I know X, Y, and Z were
7    a fit, and she said, I know X, Y, and Z were
8    in -- in range. I don't know what they saw
9    or what they heard, but they should have
10    heard or seen something.
11    A    Uh-huh.
12    Q    You would walk up to the person
13    and say, Here's a written form. If you --
14    did -- Linda said you saw something that
15    Frank Williams did. Would you please write
16    a statement? Is that what -- basically what
17    would happen?
18         MS. SWAIN: Objection.
19    A    If someone bringing a complaint
20    mentioned certain people or mentioned names,
21    I would ask those persons to give a
22    statement of what events they saw, yes.
23    Q    Okay. And -- but no specifics

47

1    were asked them -- for them to address?
2    A    Other than were you aware that an
3    incident happened? Please write your
4    statement.
5    Q    Okay.
6    A    They were given no direction of
7    what happened, no.
8    Q    All right. Now, in the case --
9    I'm using the case involving Linda and Frank
10    Williams, that one. It's kind of involved
11    in this case.
12    A    The case, the specific incident?
13    Q    The one where Frank Williams, you
14    know, supposedly threw the cans and was
15    cursing her and yelling and --
16    A    Okay.
17    Q    All right. Did -- do you
18    remember the statement that Frank Williams
19    gave?
20    A    Not from memory, no.
21    Q    Do you remember if he admitted to
22    doing any of that, the things she said he
23    did.

48

1         MS. SWAIN: Are you talking about
2    in his -- whether he admitted it in his
3    statement?
4         MS. ROBERTSON: Yeah.
5    A    I don't -- I don't recall.
6    Again, from memory, I don't recall.
7    Q    Okay.
8         MS. ROBERTSON: Let's take a
9    break I need to get the documents.
10         THE VIDEOGRAPHER: We are off at
11    9:41.
12    (Whereupon, a short break was taken.)
13         THE VIDEOGRAPHER: This the
14    beginning of tape 2. The time is
15    9:53 a.m. We're back on.
16         (Plaintiff's Exhibit Number
17    2 was marked for identification
18    and attached to the deposition.)
19    BY MS. ROBERTSON:
20    Q    Plaintiff's Exhibit Number 2. We
21    were -- I was referring to that statement a
22    few minutes ago before we took a break.
23    Have you ever -- have you seen that?

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

49

1          (Brief pause.)
2      A   I believe this was Frank's
3   statement.  Yes.  I -- I -- I'm sure I saw
4   this at the time of the investigation.
5      Q   His statement about the incident
6   about the continually describing about the
7   yelling, the screaming, the cursing, and
8   throwing cans?
9          MS. SWAIN:  Objection.
10     A   The June 14th incident, yes.
11     Q   Now, tell me where you see that
12  he addresses any of those allegations, for
13  instance, the cursing at her.
14         MS. SWAIN:  Objection.
15     A   This is Frank's statement.  I
16  don't see him saying he cursed at her in
17  this statement, no.
18     Q   Well, do you see where he
19  addresses it at all?  Does he deny it?
20     A   I don't see that he denies
21  cursing.
22     Q   He just doesn't address it;
23  right?

50

1      A   This is his statement of what
2   happened at the time.
3      Q   Is it -- does it appear to be
4   true?
5          MS. SWAIN:  Objection.
6      A   I don't decide who -- what --
7   what's -- what's true on the statements
8   until -- it's just a statement.  Until the
9   investigation is concluded, any --
10     Q   Well --
11     A   -- any additional notes that I
12  made.  And then we determine the outcome of
13  the -- of the investigation.
14     Q   I understand.  But if -- if Frank
15  -- if Linda Thornton had accused Frank of
16  cursing repeatedly at her, yelling,
17  hollering and throwing cans, would you have
18  expected a person -- the supervisor to at
19  least have asked him to address those
20  issues?
21         MS. SWAIN:  Objection.
22     Q   Whether he agreed with them,
23  denied them, what have you?

51

1      A   I'm sorry.  Repeat that question.
2      Q   I said would you have ask --
3   thought the supervisor would have asked him
4   to address those allegations, whether he
5   agreed with them, denied them, or had some
6   explanation for agreeing with them?
7      A   Are you asking about the
8   statement?
9      Q   Yeah.
10     A   Would a supervisor have asked
11  Frank about the statement?  No.  This is
12  just a statement given.  There's no
13  questions asked at the statement process.
14     Q   So -- so he -- he just said,
15  Describe the incident involving you and
16  Linda Thornton?
17     A   Correct.  Please write a
18  statement concerning this incident on this
19  date.
20     Q   Okay.
21     A   That would have been the gist of
22  it.
23     Q   Now, did you have a conversation

52

1   with Frank Williams later about that
2   statement?
3      A   I'm sure I did.
4      Q   Do you remember having it?
5      A   Not from memory specifically, no.
6      Q   What would refresh your memory?
7      A   Reading over the statement.  I
8   remember the incident.  I don't remember the
9   individual conversations I had during the
10  investigation, no.
11         (Plaintiff's Exhibit Number
12     3 was marked for identification
13     and attached to the deposition.)
14  BY MS. ROBERTSON:
15     Q   Okay.  Let me show you what's
16  been marked as Plaintiff's Exhibit Number 3
17  and ask you to take a look at this.
18         MS. SWAIN:  Is this your --
19         MS. ROBERTSON:  Yeah.  And the
20  date it was served on the defendant or
21  the respondent.
22     Q   Now, the Flavor House in Dothan
23  is at 2700 Horace Shepard Road; right?

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

53

1    A   I believe so, yes.
2    Q   Did you ever see Plaintiff's
3  Exhibit Number 3 or were you aware that it
4  even existed?
5    A   I believe we did receive a copy
6  of this.
7    Q   Okay. And what did you do with
8  it when you received it?
9        MS. SWAIN: Objection.
10   A   When we receive complaints, I
11 forward those on to our corporate counsel.
12   Q   Anything else that you do?
13   A   Anything I would have done would
14 have been at the direction of the corporate
15 counsel.
16   Q   You do -- there's a piece of
17 paper that comes with that thing telling you
18 to preserve all the pertinent documents and
19 not to spoil them and do away with them; is
20 that right?
21   A   I don't recall what came with
22 this. This is just one document.
23   Q   Look at the charge and -- and see

54

1  if you don't see where it's discussed at
2  length, this incident involving the yelling
3  and the cursing and the throwing of cans.
4        MS. SWAIN: Objection. Are you
5    referring to the June 14th statement by
6    Linda in here?
7        MS. ROBERTSON: Yeah.
8    A   I see her statement, yes.
9    Q   Okay. What -- when you -- when
10 you received the charge from -- about Linda
11 Thornton did you do to preserve your
12 personal notes or the notes that you took in
13 your investigation of that incident so that
14 it would be preserved for litigation, if
15 necessary?
16       MS. SWAIN: Objection.
17   A   All of my investigation notes are
18 filed in my desk.
19   Q   So --
20   A   That's -- that's the only --
21   Q   Did you tell anybody about those
22 notes in your desk when you received --
23   A   I don't know if anyone is aware

55

1  of those notes, anyone other than the HR
2  manager. I don't know if anyone else is
3  aware of those. If there's any notes that
4  would have been pulled out, I -- I don't
5  know where they -- where they would have
6  been -- they were in the desk at the time I
7  was working there, yes.
8    Q   Was there any investigation done
9  of that charge when Flavor House received
10 it?
11   A   I don't recall the specific
12 investigation done.
13   Q   I'm not asking about the
14 specifics. I said was any done?
15   A   I don't recall what action we
16 took on this charge. It would have been,
17 again, at the direction of the corporate
18 counsel.
19   Q   So you don't remember if there
20 was any investigation?
21   A   I don't recall, no. I don't
22 recall yes or no.
23   Q   Okay. So you don't have any

56

1  independent knowledge of talking to Frank
2  Williams about Plaintiff's Exhibit Number 2?
3    A   I'm sure I investigated and
4  talked with the individuals. I don't recall
5  the specific conversation, no.
6    Q   And would the conversation or
7  notes concerning that conversation be
8  included in your notes surrounding the
9  investigation of Ms. Thornton's allegations?
10   A   All the notes for the 6/14
11 incident would have been included in my
12 notes in the desk.
13   Q   So -- so your notes concerning
14 what Mr. Williams did or didn't say when you
15 interviewed him would be in those notes?
16   A   Yes.
17       MS. ROBERTSON: Off the record.
18       (Whereupon, an
19       off-the-record discussion was
20       held.)
21 BY MS. ROBERTSON:
22   Q   Well, what -- when you called
23 Mr. Williams in to interview him, what would

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1 have been the purpose of having him come in
2 there?
3    A   During any investigation, the
4 purpose is to reiterate and bring out
5 anything that's in addition to the
6 statements to help make a decision as to
7 what occurred relative to the statements.
8    Q   Do you recall whether you learned
9 anything new from Mr. Williams?
10    A   I don't recall from memory, no.
11    Q   Well, do you remember that
12 Mr. Williams was written up for cursing
13 Ms. Thornton?
14        MS. SWAIN:  Objection.
15    A   I believe there's documentation
16 on any write-ups that occurred.
17    Q   Do you remember whether he
18 admitted to you that he did curse her?
19    A   I don't recall if he admitted
20 that or not from memory, no.  I don't recall
21 that.
22    Q   Do you remember if he denied --
23    A   I don't recall, no.

58

1    Q   Because if he denied it and you
2 have Ms. Thornton's representation and
3 several other witnesses, then not only did
4 he curse her; he lied, did he not?
5        MS. SWAIN:  Objection.
6    A   I can't assume that.  I don't
7 recall.
8    Q   Because you don't have any notes;
9 right?
10    A   I had notes.  I don't have them
11 now, no.
12    Q   And -- and whatever out there is
13 producing all this memory loss from these
14 people and the deponents, you've got --
15 apparently got a bad case of it; right?
16        MS. SWAIN:  Objection.  Ann,
17    that's not necessary.
18    A   Excuse me?
19    Q   I think -- I think --
20        MS. ROBERTSON:  Off the record.
21        (Wherefore, an
22    off-the-record discussion was
23    held.)

59

1 BY MS. ROBERTSON:
2    Q   So it is unfortunate, is it not,
3 that we don't have those notes here today to
4 help you refresh your memory?
5        MS. SWAIN:  Objection.
6    A   The documentation that we have is
7 what we -- what is presented.
8    Q   To get at the truth, it's
9 unfortunate that we do not have those
10 records that you made.
11        MS. SWAIN:  Objection.  Is there
12    a question for him?
13    Q   Well, you were the one who
14 ultimately made the decision, right, as to
15 what to do about it?
16    A   Based on the investigation, there
17 was a collaborative decision, more than
18 likely, made between myself and the general
19 manager, a recommendation for this very
20 action if necessary, yes.
21    Q   Okay.  And she -- are we talking
22 about Mary Ann Boyer?
23    A   Yes, ma'am.

60

1    Q   She didn't sit in on any of these
2 interviews, did she?
3    A   Not on the investigation process,
4 no.
5    Q   Okay.  So whatever you learned in
6 the investigation -- investigative process
7 would be the important thing; right?
8    A   What I learned in the
9 investigation --
10    Q   In terms of --
11    A   -- process would have determined
12 the outcome of the investigation, yes.
13    Q   Mr. Nance, why did you leave
14 Flavor House?
15    A   I was asked to leave.
16    Q   Did it have anything to do with
17 missing gift cards at or about the
18 Christmastime that were supposed to go to
19 employees but were missing?
20        MS. SWAIN:  Objection.
21    A   I -- not that I recall.  I don't
22 know that.
23    Q   You -- you -- you don't recall

15  (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

61

1 whether stealing might have been implied or
2 --
3     A    Stealing was never implied when I
4 left Flavor House, no.
5     Q    All right.  Was there a problem
6 with missing gift cards?
7     A    There were two gift cards that
8 were taken from the front office off of a --
9 off of gift baskets.  Once that was
10 discovered, the baskets were moved into my
11 office from a -- an extra office.
12     Q    When did that happen?
13     A    I don't recall.
14     Q    How long after were you fired?
15         MS. SWAIN:  Objection.
16     A    I don't recall the date I left
17 employment.  First of December.
18     Q    Well, what were the gift baskets
19 for or the -- the gift basket?
20     A    Originally, the gift baskets were
21 for drawings at the Peanut Festival.  When
22 the winners did not pick those gift baskets
23 up, I believe we had two or three or four

62

1 left that were given away to the employees
2 because the original persons that won the
3 gift baskets did not pick those up.
4     Q    How much were these gift cards
5 that were missing?  How much were they for?
6     A    I don't recall.  20 or 25 dollars
7 probably would be my guess.
8     Q    Well, what was the reason that
9 you were -- that was given when they asked
10 you to leave?
11     A    That my management style was
12 not -- did not match with what Flavor House
13 wanted at that time.
14     Q    And were you given any more
15 specifics than that?
16     A    Specifically, some tasks that
17 were not completed.
18     Q    Such as?
19     A    Such as the issuance of the new
20 employee handbook.
21     Q    All right.  What else?
22     A    I don't remember specific --
23 specifically past that.

63

1     Q    Were you given a severance
2 package?
3     A    I believe there was a week or two
4 of severance.  I don't recall exactly what
5 it was.
6     Q    Were you terminated -- were you
7 involuntarily terminated or did they ask you
8 to resign or -- with the -- with the --
9     A    I was involuntarily terminated.
10     Q    You were involuntarily terminated
11 and you were given a severance package?
12     A    Yes, ma'am.
13     Q    Did you draw unemployment?
14     A    Yes, ma'am.
15     Q    Was there any investigation
16 concerning these gift cards, these missing
17 gift cards?
18     A    I believe we reviewed the tapes
19 of the corridor leading to the office, but
20 there was never any conclusive evidence of
21 who -- who would have taken those because
22 they were in the room for several weeks that
23 they could have been taken.  I don't recall

64

1 who all was in and out of that vacant office
2 at the time.
3     Q    Was -- was that office -- did it
4 have -- was it locked, unlocked?
5     A    I don't recall.
6     Q    Did you leave an unpaid credit
7 card bill that -- that was a Flavor House
8 credit card?
9     A    I believe there was a bill, yes.
10     Q    And what was that credit card
11 supposed to be used for?
12     A    That was used for company
13 purchases.
14     Q    Such as?
15     A    Travel, miscellaneous HR
16 expenses.
17     Q    And were you supposed to pay it
18 or was Flavor House supposed to pay it?
19     A    I was responsible for paying that
20 bill monthly.
21     Q    And so -- and why was it unpaid?
22 Did you take the money and use it for
23 something else?

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

1    A    I don't recall having to pay that
2  bill at the end when I left employment.
3    Q    Well, my question is: What was
4  the reason you hadn't paid it at the time?
5    A    The credit card was current when
6  I left. There may have been an outstanding
7  balance beyond that.
8    Q    Were you ever asked to pay it
9  back?
10    A    Pay it back or pay the bill?
11    Q    Pay the bill.
12    A    I don't recall being asked to pay
13  the -- pay any monies back, no.
14    Q    Were you asked to pay the bill?
15    A    I don't recall being asked to pay
16  the bill. I don't -- I don't recall.
17    Q    Was there any discussion about
18  there being some irregularities with the --
19  the bill?
20    A    Not to my knowledge, no.
21    Q    In other words, you're saying not
22  with you?
23        MS. SWAIN: Objection.

66

1    A    I don't understand.
2    Q    Didn't have any conversations
3  with you about any irregularities?
4    A    Not to my knowledge, no.
5    Q    Well, if you had had the
6  conversation, you would have knowledge of it
7  so I don't understand that answer.
8    A    I don't ever -- I never recall
9  any charges that I made coming into question
10  on the company credit card, no.
11        (Plaintiff's Exhibit Number
12        4 was marked for identification
13        and attached to the deposition.)
14  BY MS. ROBERTSON:
15    Q    Plaintiff's Exhibit Number 4, can
16  you tell me -- tell me what this is, please,
17  sir.
18        THE WITNESS: Jennifer, can you
19    see that?
20        MS. ROBERTSON: I'm sorry.
21        MS. SWAIN: Yeah, that's fine.
22    A    This appears to be Linda's
23  statement on the June 14th incident.

67

1    Q    All right. Do you recall what
2  Mr. Williams said about whether or not he
3  was throwing cans during the incident that
4  Ms. Thornton describes in that exhibit?
5    A    I don't recall other than Frank's
6  statement. From memory, no.
7    Q    And do you recall whether you
8  asked any other witnesses whether or not
9  they saw -- could see whether or not he was
10  throwing cans?
11    A    Not from memory. Again, my notes
12  had, you know, the investigation of what
13  occurred. I don't recall if anyone else
14  said there was cans being thrown or there
15  was anything going on. I don't recall that,
16  no.
17        (Plaintiff's Exhibit Number
18        5 was marked for identification
19        and attached to the deposition.)
20  BY MS. ROBERTSON:
21    Q    Plaintiff's Exhibit Number 5.
22        MS. SWAIN: Which one is that?
23    Q    Do you remember having an

68

1  interview with Katherine Long?
2    A    I don't recall the interview, no,
3  investigation. Not from memory.
4    Q    Now, in her statement she -- she
5  says she heard Frank using the F word and --
6  I'm not looking at the document. I think
7  she said something about not being able to
8  do every damn thing; is that right?
9    A    That is her statement, yes.
10    Q    And then it said except he was
11  doing a lot of yelling, etcetera, etcetera,
12  etcetera. Do -- do you -- did you ask her
13  to expound on that etcetera, etcetera,
14  etcetera when you had an interview with her?
15    A    I probably would have. I don't
16  recall what that would have been without my
17  notes. From memory, I don't recall that.
18        (Plaintiff's Exhibit Number
19        6 was marked for identification
20        and attached to the deposition.)
21  BY MS. ROBERTSON:
22    Q    Plaintiff's Exhibit Number 6,
23  this is the Tamekia Cook statement. Do you

17  (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**69**

1  remember interviewing Tamekia Cook?
2      A   Not from memory, no.
3      Q   Do you think you took notes on
4  that?
5      A   I'm sure I would have, yes.
6      Q   Well, now, Ms. Cook addresses
7  Frank using the F word also and doing a lot
8  of yelling. Katherine Jones --
9          MS. SWAIN: Long.
10     Q   -- Long addresses the fact that
11 Frank Williams was using the F word and
12 cursing and saying he couldn't do every damn
13 thing. Of course, Ms. Thornton addresses it
14 along with some other things. Do you have
15 any -- do you have any memory now as we sit
16 here as to why Mr. Williams, when he
17 addressed the issue in his statement, didn't
18 mention any of that?
19         MS. SWAIN: Objection.
20     A   Again, his statement was his
21 statement. No. I don't tell people what
22 statements to write.
23     Q   But after you find out that they

**70**

1  just either lied or avoided the issue, do
2  you -- do you address that also?
3          MS. SWAIN: Objection.
4      A   If there were any questions
5  raised in another person's statements, I
6  would have asked those questions of the
7  individuals being questioned, yes.
8      Q   And when he -- why -- why didn't
9  you discipline him for that?
10         MS. SWAIN: Objection.
11     A   At the end of the investigation,
12 the -- the appropriate disciplinary actions,
13 if needed or if warranted, would have been
14 taken.
15     Q   Did you do any -- did you talk to
16 anybody else in that investigation other
17 than the people I've -- the -- the witnesses
18 I've put in front of you?
19     A   I wouldn't recall from memory who
20 I talked with.
21     Q   Well, would there be a written
22 documentation form -- it's not called
23 written. It's called documentation form --

**71**

1  for anybody that you interviewed or had any
2  information concerning or surrounding the
3  incident that -- that's outlined in these
4  documents, Plaintiff's 6 and 5 and --
5      A   Not that I recall.
6      Q   Well, at -- at the unemployment
7  compensation hearing, you testified that my
8  client, Linda Thornton, was going to be
9  written up for this same -- involving --
10 surrounding this incident. Do you remember
11 that?
12     A   I remember the -- the
13 unemployment hearing.
14     Q   Yeah. Does that mean you don't
15 remember telling those people under oath
16 that she was about to -- that had she
17 returned to work, she would have been
18 written up before Frank Williams for
19 yelling and screaming and cursing and
20 throwing cans?
21         MS. SWAIN: Objection to the
22 characterization of his testimony.
23     A   If I made a statement that she

**72**

1  would have been written up, I don't know
2  what it would have been for specifically.
3      Q   Well, what if you said for
4  baiting him, or words to that effect, for --
5  that caused him to pitch this fit?
6          MS. SWAIN: Objection to the
7  characterization.
8      A   I don't recall using those words.
9      Q   Well, what words do you recall
10 using?
11     A   From memory, I don't recall any.
12 If you have a written document, I would be
13 happy to go over my testimony at that time.
14     Q   Well, maybe there is some, but
15 they apparently have disappeared.
16         MS. SWAIN: Objection.
17         MS. ROBERTSON: Let's take a
18 break.
19 (Whereupon, a short break was taken.)
20         THE VIDEOGRAPHER: Okay. We're
21 back on at 10:38 a.m.
22         (Plaintiff's Exhibit Number
23 7 was marked for identification

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

73

1    and attached to the deposition.)
2  BY MS. ROBERTSON:
3    Q  I'll show you what's been marked
4  as Plaintiff's Exhibit Number 7 and
5  represent to you it's a transcript of the
6  unemployment compensation hearing of Linda
7  Thornton.  Now, the first page I want to
8  direct your attention to is page 51.  Now,
9  you can read as much of it as you need to
10  ahead to get context of it.  I will tell you
11  it's your describing the investigation of
12  the incident we've been -- well, been
13  talking about.  And -- and -- and you -- on
14  page 50 you say, Okay.  But the -- in the
15  final investigation, Ms. Parrish -- that was
16  her maiden name -- make a formal complaint
17  against Mr. Williams?  Will you read your
18  answer and just keep reading until you get
19  to that little blue sticker.
20    (Brief pause.)
21    Q  And you understand the Qs are
22  what I -- what the compensation lady is
23  asking and the As are what you're saying;

74

1  right?
2    A  Now, what's the question again?
3  That this is --
4    MS. SWAIN:  I think you're -- I
5  think she wanted you to --
6    MS. ROBERTSON:  Read it.
7    MS. SWAIN:  -- read --
8    THE WITNESS:  Read through here?
9    MS. SWAIN:  What are you asking
10  him to read, Ann?
11    Q  Here.  Let's do it this way.  I
12  will read.  Okay.  This is on page 50
13  starting with line 7.  Did she complain that
14  he had called her a derogatory name?  And
15  your answer?
16    A  My answer:  Not -- not at this
17  time.  Previous altercations -- this is a
18  previous altercation.
19    Q  All right.  Number 11.  Okay.
20  But in the final investigation, did
21  Ms. Parrish make a formal complaint against
22  Mr. Williams?
23    A  My answer was:  Let's see.  She

75

1  did make the statement that he was cursing,
2  yelling at -- yelling at her, calling her
3  MF, GD, MF.  Those were her -- that is in
4  her statement.
5    Q  Okay.  Did you get any other
6  employees to come who came forward that
7  witnessed -- come -- the -- Mr. Williams
8  making those derogatory comments to
9  Ms. Parrish?
10    A  Yes, ma'am.  We had other
11  employees involved in the investigation.
12    Q  Okay.  Did they witness -- did
13  they hear the -- him calling her names?
14    A  They heard yelling.  They did not
15  hear specific cursing occur.
16    Q  Okay.  So the witnesses said they
17  did hear yelling, but they did not hear
18  specifically that Mr. Williams called
19  Ms. Parrish names?
20    A  Yes, ma'am, that's correct.
21    Q  All right.  Now, where did you --
22  where in those statements did you determine
23  that?  I'm talking about the statements that

76

1  we've been talking about.
2    A  What is this in reference to?
3  What incident is this in reference to?
4  There are multiple incidents.
5    Q  The one we've been talking about
6  for the last 30 minutes, the one involved --
7  where she said he was screaming and cursing
8  and you've got Tamekia Cook saying the label
9  3 machine operator -- machine messed up and
10  we had bad labels on the work area and we
11  cleaned some and when Linda got back,
12  some -- some was left on the table and she
13  asked Frank what about this mess and Frank
14  walked off saying curse words.  Exact, I
15  don't know.  So Linda said something to him.
16  He threw up his hands and said --
17    MS. SWAIN:  Ignore that wording.
18    THE WITNESS:  Okay.
19    Q  All right.  I'm talking about
20  this -- these statements are the ones you're
21  referencing.  Where does it say that -- that
22  she -- that she didn't -- that you had
23  nobody saying that he cursed?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

77

1     A   I may have been mistaken on this.
2   I don't --
3     Q   I see.
4     A   My statement is they heard
5   yelling. They did not hear specific cursing
6   at her, specifically directed at Linda.
7   That is my statement.
8     Q   What does that mean? They
9   told -- he said fuck it and -- I hear --
10    A   I believe -- I believe the
11  cursing in the statements was cursing. It
12  did not say that he cursed her specifically.
13    Q   I hear Frank say the F word and I
14  can't do every damn thing. Who do you think
15  he was saying when he said I -- I can't do
16  every damn thing? Was he talking to the --
17  Mr. --
18    A   I can't -- I can't answer what
19  his -- what -- who he was directing that at.
20        MS. SWAIN: I'm going to object
21  to the question.
22    Q   He was talking to Linda; right?
23        MS. SWAIN: Objection.

78

1     A   If that's your assumption.
2     Q   Well, I mean, that's what she
3   said; right?
4     A   That is -- that is her statement.
5     Q   Did anybody -- and -- and this
6   lady said she heard it; right?
7         MS. SWAIN: Objection.
8     A   This statement says that they
9   heard cursing, yes.
10    Q   That he -- they -- they heard
11  him -- him say I can't do every damn thing.
12    A   That is their statement, yes,
13  ma'am.
14    Q   And in the -- in the context of
15  the conversation with Linda Thornton.
16        MS. SWAIN: Objection.
17    Q   Where in there is there any
18  statement that -- that -- that he -- those
19  curse words were not directed at Linda
20  Thornton?
21        MS. SWAIN: Objection.
22    A   Again, you assume they were
23  directed at her. I did not assume that.

79

1     Q   Okay. Well, why did you -- why
2   did you assume otherwise? As -- in other
3   words, if he's -- if he's yelling at her and
4   says I can't do every damn thing, would you
5   think he was, as I say it, talking to his
6   imaginary grandmother? I mean, who else
7   would he have been talking to?
8         MS. SWAIN: Objection.
9     A   There are instances when
10  employees curse in the plant.
11    Q   Yeah. But --
12    A   That has occurred.
13    Q   But -- but not in -- in that
14  context.
15        MS. SWAIN: Objection.
16    A   That's an assumption.
17    Q   All right. Well, you've got her
18  saying he was cursing at her. You've got
19  other employees saying that he was
20  definitely cursing. And it would have only
21  made sense or it -- that he was definitely
22  cursing. Where is it that you have that --
23  that anybody said that he -- that she -- he

80

1   wasn't cursing at her?
2         MS. SWAIN: Objection.
3         (Brief pause.)
4         MS. SWAIN: Is there a question
5   on the table, Ann?
6         MS. ROBERTSON: Yeah.
7     Q   Where is it that -- in the
8   investigation that anybody said that those
9   curse words were not addressed at her?
10        MS. SWAIN: Objection.
11    A   This is a statement that they
12  heard curse words. I -- again, their
13  statement states they heard curse words.
14    Q   Yes, sir.
15    A   It did not say where -- who they
16  were directed towards as --
17    Q   But Linda said they were directed
18  at her; right?
19    A   That's Linda's statement, yes,
20  ma'am.
21    Q   Okay. So my question is: Linda
22  said they were directed at her. Other
23  people said they heard him cursing over the

20   (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

1  labels and -- and -- and saying things
2  that -- very much in the same context that
3  Linda reported that he said. Where is it in
4  your investigation that -- that anybody said
5  that he didn't direct his curse words at
6  her?
7      MS. SWAIN: Objection.
8      A  I don't assume any direction of
9  curse words. I take these statements as
10 given and then make my decisions based off
11 of that.
12     Q  So you assumed Linda lied?
13     MS. SWAIN: Objection.
14     A  There's no assumption in my
15 investigation.
16     Q  Well, you told the -- the -- the
17 lady that there was no -- that he didn't
18 curse at Linda. Linda told you he had
19 cursed at her; right?
20     MS. SWAIN: Objection.
21     A  That is Linda's statement, yes.
22     Q  Okay. And everybody -- the other
23 witnesses said they heard the curse words;

82

1  correct? Where in your investigative
2  information is there anybody saying that
3  what -- that his cursing was not directed at
4  Linda?
5      MS. SWAIN: Objection.
6      A  These statements are the
7  individual statements.
8      Q  So where did you come up with
9  that conclusion since you had no evidence
10 that the cursing was not at Linda?
11     A  I can only make a decision or
12 a -- an outcome to an investigation based on
13 the facts that are presented to me.
14     Q  Yeah.
15     A  The employees did not
16 specifically say in their statements that
17 the cursing was directed toward Linda.
18 Therefore, I cannot assume that the cursing
19 was directed towards Linda.
20     Q  Nobody --
21     A  I cannot make that assumption.
22     Q  And there -- and -- but you do
23 know that these statements were not --

83

1  everybody was -- it was just said write down
2  what you saw or heard. Nobody asked them do
3  you believe that the stuff was addressed to
4  Linda, did they?
5      A  Again, that's an assumption.
6      Q  Well --
7      A  They heard cursing. The cursing
8  is the statement here. It is in the
9  statement. They did heard -- they did hear
10 cursing. I mean, if you follow that line of
11 thinking, Frank's statement does not include
12 that he cursed. The outcome of the
13 investigation is that Frank did curse. He
14 was disciplined for cursing.
15     Q  Okay.
16     A  Therefore, again, following the
17 line of facts, cursing occurred. He was
18 disciplined for cursing. It was not
19 determined in these statements that the
20 cursing was directed towards Linda.
21     Q  On what did you base that
22 decision?
23     A  On the statements given by the

84

1  employees.
2      Q  Linda said -- Linda said that the
3  cursing was directed at her. Did you just
4  completely disbelieve her after you had
5  corroborating evidence that there was indeed
6  cursing?
7      MS. SWAIN: Objection.
8      A  These statements do not say that
9  the cursing was directed at Linda.
10     Q  No, sir. But I'm saying that her
11 statement was that it was directed at her.
12     A  I agree.
13     Q  Did you disbelieve her?
14     A  I believe that her perception was
15 that it was directed at her in her
16 statement, yes.
17     Q  And -- and was there -- was there
18 anybody that had a different perception?
19     MS. SWAIN: Objection.
20     A  The other employees did not state
21 the cursing was directed towards Linda.
22     Q  They weren't asked, were they?
23     MS. SWAIN: Objection.

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1    A    I don't recall one way or the
2 other.
3    Q    Did you interview Linda Thornton
4 during the investigation of this incident?
5    A    I'm sure I did.
6    Q    When? When did you interview
7 her?
8    A    I don't recall the date.
9 Sometime during the course of the
10 investigation after the initial complaint
11 and before the conclusion.
12    Q    Did you take one of the -- did
13 you take, like, the 13th or 14th off? Were
14 you gone that day?
15    A    Myself?
16    Q    Uh-huh.
17    A    I don't recall.
18    Q    Did you have a child at or about
19 this time, not you but you and your wife?
20    A    My wife did have a child on
21 May 16th, yes.
22    Q    May 16th?
23    A    Yes.

86

1    Q    Do you think you were off
2 during -- on June for something?
3    A    I don't recall being off during
4 this investigation, no.
5    Q    Did -- now that we've discussed
6 it, did -- did Frank Williams specifically
7 deny that he -- or first of all, did Frank
8 Williams admit that he cursed?
9        MS. SWAIN: I'm going to object.
10 Asked and answered.
11    A    I don't recall if Frank admitted
12 or not.
13    Q    Okay.
14    A    Not from memory. No, I don't
15 recall that.
16    Q    Look at page 54 and start
17 reading -- read that right there
18 (indicating).
19    A    Okay.
20        MS. SWAIN: Starting with -- here
21 at line 18?
22        MS. ROBERTSON: Yeah, at or about
23 where that sticker is.

87

1        (Witness reviewing document.)
2    A    Okay.
3    Q    Do you see where you say that if
4 she returned, she would have been
5 disciplined also?
6    A    Yes, ma'am.
7    Q    What were you going to discipline
8 her for?
9    A    If Linda would have received
10 discipline for that action, more than likely
11 it would have been for general employee
12 conflict.
13    Q    I see. General employee
14 conflict.
15    A    The same type of conflict as
16 documented in previous disciplinary actions,
17 an ongoing issue.
18    Q    So she -- she reports to her
19 supervisor that this -- the convicted child
20 molester is over there pitching a fit,
21 kicking cans -- or excuse me -- throwing
22 cans, dog cussing her, and she was going to
23 be written up for general conflict?

88

1        MS. SWAIN: Objection.
2    A    Yeah. I'd have -- she did not
3 return to work. There was no disciplinary
4 action issued.
5    Q    Well -- but you told the
6 unemployment compensation lady that if she
7 had come back, she would have been written
8 up; right?
9    A    That is what I said, yes, ma'am.
10    Q    And so -- and -- and so you were
11 -- and on what were you basing that she
12 needed to be written up?
13        MS. SWAIN: Objection. Asked and
14 answered.
15    A    Again, general -- general
16 conflict. You know, an ongoing issue that's
17 not resolved.
18    Q    So let me see -- get this -- see
19 if I get this right. If Christ is work --
20 walking along and somebody comes up and
21 starts dog cussing him and reaches out and
22 punches him and this is not the first time
23 he has been punched because some people

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

89

1  didn't agree with him, he would have been --
2  and he stood there and took it and said, I'm
3  sorry, sir. That would -- he would have
4  been written up for general conflict, too,
5  because he was involved?
6          MS. SWAIN: Objection. What are
7  you talking about?
8          MS. ROBERTSON: I'm talking about
9  what would Christ do. He just said
10  if -- if she's involved in the conflict
11  with an employee that she's going to be
12  written up for general conflict. That's
13  incredible and I'm just wanting to make
14  sure I get it straight.
15         MS. SWAIN: Okay. Well, if you
16  have a question about the case, ask him.
17  We're not going on to what would Christ
18  do in a deposition.
19         MS. ROBERTSON: Off the record.
20         (Whereupon, an
21  off-the-record discussion was
22  held.)
23    Q    If somebody is involved in

90

1  conflict because their ideas or -- or
2  whatever are not welcomed and somebody
3  pitches a fit and yells at them and curses,
4  stomps on the ground, kicks cans or throws
5  cans, because she's involved, she's also
6  going to get the same discipline?
7          MS. SWAIN: Objection.
8      A   Any disciplinary actions that
9  would have been taken against Linda would
10  have been based on the facts. If
11  disciplinary had been taken, it would have
12  been based on the fact that she was involved
13  or instigating the conflict, which is a
14  previous disciplinary action showed that
15  Linda was involved in a lot of conflict and
16  lot of -- lot of instigation of conflict.
17     Q   So based -- all right. Page 56,
18  you -- read starting on line 9.
19         (Witness reviewing document.)
20     A   Okay.
21     Q   All right. Did -- you -- again,
22  you said she was equally at fault in this
23  incident; right?

91

1          MS. SWAIN: Objection.
2      A   No, ma'am, I didn't say that.
3      Q   Well, read what you said, please.
4      A   I said they were equally involved
5  in the altercation.
6      Q   Okay.
7      A   They were both involved. They
8  were not necessarily both at fault.
9      Q   But she was going to be written
10  up also. Was she getting some lesser -- was
11  she going to be written up some lesser way
12  than a write-up? I mean, what could be
13  lesser?
14     A   I don't recall Linda ever
15  receiving disciplinary action in this
16  case --
17     Q   Well --
18     A   -- in this specific instance.
19     Q   What you told the unemployment
20  compensation lady was the reason she didn't
21  get written up was because she didn't come
22  back to work. So you couldn't give her the
23  write-up; right? That was the only reason,

92

1  at least according to what you told the
2  lady, to keep my client from getting her
3  pennies.
4          MS. SWAIN: Objection. Is there
5  a question --
6          THE WITNESS: There's a question,
7  yeah.
8      Q   Yeah. Isn't that what you
9  told -- the only reason she wasn't written
10  up, at least according to you under oath to
11  the unemployment compensation lady, was
12  because she didn't come back to work; right?
13     A   What you're saying is the only
14  reason she didn't get written up is because
15  she didn't come back to work?
16     Q   Isn't that what you said in your
17  testimony, Plaintiff's Exhibit Number 7,
18  page 54, line 20? All right. Let's start
19  at 18. The lady said, Okay. What were the
20  reasons you -- you needed to term -- were --
21  was there any reason you needed to terminate
22  him? No, ma'am. We disciplined both
23  employees equally as well as she would have

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

93

1  received disciplinary action had she
2  returned to work that Monday.
3      So the only reason she didn't return --
4  that she didn't receive this same discipline
5  was because she didn't come back to work.
6  Isn't that right?
7      A   I didn't say they would receive
8  the same discipline.  I said they would be
9  disciplined equally.  Both of them would
10  have been addressed and the disciplinary --
11  if warranted, the disciplinary action would
12  have been issued.  There -- it -- it could
13  have been as simple as her receiving a
14  counseling or a discussion or a memo to
15  file.  Not necessarily the same disciplinary
16  action, no.
17      Q   We disciplined both employees
18  equally.
19      A   My -- my -- what I mean by
20  discipline them equally is they were both
21  disciplined relevant to the facts equally.
22  One wasn't given harsher discipline and one
23  given less discipline.  They were

94

1  disciplined equally based on the facts in
2  the case.  In other words, there was no
3  preference given to one or the other.
4  That's what I mean by equally.
5      Q   And he received the write-up so
6  she was going to receive a write-up; right?
7          MS. SWAIN:  Objection.
8      A   I -- I don't recall.  I believe
9  he received a -- a write-up for his -- you
10  would have to look at the document.  I don't
11  recall.
12      Q   For cursing and intimid --
13      A   Okay.
14      Q   -- breaking the policy of
15  intimidating, threatening an employee --
16  another employee.
17          MS. SWAIN:  Objection.
18      A   I don't recall what the write-up
19  was for.  You'd have to show that to me.
20      Q   Okay.  I should have known that.
21      A   I prefer to rely on the facts in
22  the statements versus memory.
23      Q   Well, that's -- it's apparent

95

1  that that's a good thing given that you have
2  no memory.
3          MS. SWAIN:  Objection.  Ann,
4      that's not necessary.
5          (Plaintiff's Exhibit Number
6      8 was marked for identification
7      and attached to the deposition.)
8  BY MS. ROBERTSON:
9      Q   While I'm looking for that, look
10  at Plaintiff's Exhibit Number 8.  I will ask
11  you a question about that in a minute.
12          (An off-the-record
13      discussion was held.)
14      Q   While she's making a copy, let's
15  look at Plaintiff's Exhibit Number 8.  Can
16  you tell me what this is, please?
17      A   It appears to be a training
18  documentation for Frank Williams.
19      Q   Okay.  And do you know what those
20  codes are?
21      A   No, ma'am, I don't.
22      Q   But if -- if Frank Williams had
23  received any sexual harassment training,

96

1  there would be something equivalent to this
2  in his personnel file?  It appears now that
3  we know that that's where the -- the
4  documentation is kept.
5          MS. SWAIN:  Objection.
6      A   I'm not familiar with this
7  training documentation form at all.  This
8  was signed in January after I left in
9  December.
10      Q   Okay.
11          (Plaintiff's Exhibit Number
12      9 was marked for identification
13      and attached to the deposition.)
14  BY MS. ROBERTSON:
15      Q   Plaintiff's 9, what's that?
16      A   This appears to be a first step
17  counseling for Frank Williams dated
18  June 16th --
19      Q   All right.
20      A   -- for an incident that occurred
21  on 6/14.
22      Q   And it says on June 14th, 2006,
23  you used profanity in the presence of other

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

97

1 coworkers. This is a violation of plant
2 rule number 16, fighting, threatening,
3 intimidating, coercing, interfering with
4 fellow associates, or any other acts of
5 violence on company property.
6     Now, does -- now, what was it, now,
7 that you thought that the disciplinary that
8 -- that Linda Thornton was going to receive
9 was going to be for?
10     MS. SWAIN: I'm going to object
11 to asked and answered at least twice
12 now, maybe three times.
13     A  You know, I don't recall.  It
14 would be general conflict or instigational
15 if -- if she received a write-up.
16     Q  Well -- and we have determined,
17 at least under oath you told the lady at the
18 unemployment, that she would have returned
19 one -- a write-up had returned to work.
20     A  No, ma'am, I didn't.  I said they
21 would be disciplined equally, as in one
22 would be disciplined equally.
23     Q  Well, what other -- what other

98

1 discipline below a write-up --
2     A  There are -- there are counseling
3 sessions.  There are discussions, memos to
4 file.
5     Q  What effect does a write-up -- a
6 written step one counseling form have?
7     A  It's a record of counseling.
8 It's a record of our step process in
9 disciplinary actions.
10     Q  What -- is there anything -- does
11 -- would that have rolled off, as they say,
12 after a year?
13     A  I don't recall the specific
14 rolling off and on period of the
15 disciplinary steps.  I believe there was a
16 one-year period that steps would be reduced
17 for -- as specifically written in the
18 documentation in our policy.
19     Q  Well, how many steps do you have
20 to get before you get fired?
21     MS. SWAIN: Objection.
22     A  I don't recall if it's step
23 three, step four, or what leads to

99

1 termination within a certain period of time.
2 It's in the disciplinary policy.
3     Q  So apparently at Flavor House if
4 you paced it right, you could intimidate
5 another employee or interfere with an
6 employee's work about twice a year and not
7 ever get fired; right?
8     MS. SWAIN: Objection.
9     Q  If you just took your medication
10 sometime --
11     MS. SWAIN: Objection.
12     A  Well, we follow the disciplinary
13 process, the step process, and it's -- it's
14 a written disciplinary process that's
15 followed for all employees throughout the
16 plant.
17     Q  But if all -- so if all of them
18 only took their medication some of the time,
19 they could get by with pitching a fit once
20 or twice a year and not have -- get fired;
21 right?
22     MS. SWAIN: Objection.
23     Q  I guess you don't have an answer

100

1 to that, which brings up another issue.  Did
2 Flavor House have a policy against hiring
3 felons?
4     MS. SWAIN: Objection.  During
5 his employment there what was their
6 policy in regard to hiring convicted --
7     MS. ROBERTSON: When he was
8 employed there -- all right.
9     A  I don't know of a policy
10 prohibiting the hire of anyone at Flavor
11 House.
12     Q  What about lying?  Are you asked
13 if you have been convicted of a felony on
14 the application?
15     A  I would have to look at an
16 application to see what it asks.  I don't
17 recall.  Over the course of years at Flavor
18 House and business for 18 years, there have
19 been multiple applications so --
20     Q  Well, let -- let's assume without
21 --
22     A  I don't assume.
23     Q  Well, would you please assume for

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

101

1 me and you can take it that there was a
2 policy of asking if a person had been
3 convicted of a felony on the application.
4 Was it -- do you know if it would have been
5 repercussions for not telling the truth
6 about it?
7      MS. SWAIN: Objection.
8      A   Again, I can't make a speculation
9 or an assumption.
10     Q   Well, you know there was a
11 complaint by my client, do you not, that
12 Frank Williams was a convicted felon?
13     A   I don't recall a complaint about
14 someone's felony status or conviction
15 status.
16     Q   Or that he was a -- either a sex
17 offender or a child molester?
18     A   Again, I don't recall a complaint
19 being filed that someone was a -- a felon or
20 had been convicted of a crime.
21     Q   Well, what -- what -- do you
22 recall anything about that?
23     A   There were statements taken

102

1 during investigations about discussions
2 within the plant about Frank's status as a
3 convicted sex offender, yes.
4      Q   Okay. Do you remember how that
5 -- the -- in the context, how that
6 investigation came up?
7      A   I would have to refer back to the
8 statements to find out who initiated that --
9 that investigation.
10     Q   And, sir, how would you figure
11 that out?
12     A   You should have the statements.
13     Q   Yeah. But I'm asking how -- how
14 can you tell from the statements who
15 initiated the -- the complaint?
16     A   It would be who initially brought
17 the statement in.
18     Q   Well, what if -- and -- and there
19 was some way to -- to denote that on the --
20 on the statement?
21     A   (No response.)
22     Q   Sir?
23     A   When you read the statements,

103

1 you -- you can see who brought the statement
2 is basically someone who's making an
3 accusation, that's generally the person
4 that's bringing the statement or bringing
5 the accusation.
6      THE VIDEOGRAPHER: Let me go
7 ahead and change tape real quick.
8      MS. ROBERTSON: All right, let's
9 take a little break.
10 (Whereupon, a short break was taken.)
11     THE VIDEOGRAPHER: Okay. We're
12 back on the record at 11:35. This is
13 the beginning of tape 3.
14     (Plaintiff's Exhibit Number
15 11 was marked and attached to the
16 deposition.)
17 BY MS. ROBERTSON:
18     Q   Can you tell me what Plaintiff's
19 Exhibit Number 11 is, please, sir?
20     MS. ROBERTSON: I'm sorry,
21 Jennifer.
22     MS. SWAIN: It's okay. Okay.
23     A   This is Linda Thornton's

104

1 statement on 2/16.
2      (Plaintiff's Exhibit Number
3 12 was marked and attached to the
4 deposition.)
5 BY MS. ROBERTSON:
6      Q   Okay. Tell me what Plaintiff's
7 Exhibit Number 12 is.
8      MS. ROBERTSON: Sorry, Jennifer.
9      A   This is Frank Williams' statement
10 of 2/16.
11     Q   All right. Tell me which one of
12 these made a complaint.
13     A   I don't recall which one made the
14 first complaint.
15     Q   Well, I thought you testified
16 before the break that you could tell me by
17 looking at the documents who initiated the
18 complaint. Now, can -- is that still your
19 statement?
20     MS. SWAIN: Objection.
21     A   I believe I said usually you
22 could tell from the documents that you
23 can -- who initiated the complaint.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

105

1    Q   All right.
2    A   Regardless of who put the
3  complaint in first, it's -- it's a statement
4  about the situation. This is not a
5  complaint, per se. This is a statement of
6  the occurrences.
7    Q   Did you ask Melvin Hutchins to
8  give a statement about anything that -- do
9  you see where Linda references that she had
10  a conversation shortly before with Melvin
11  Hutchins about Frank Williams and issues
12  with the work with him?
13    MS. SWAIN: Objection.
14    A   I'm sure I would have talked with
15  Frank -- with Melvin Hutchins. Anyone
16  mentioned in the statement I would have
17  discussed, you know, what their involvement
18  or recollection or what was -- what was
19  questioned in the statement. Yes, I would
20  have asked that.
21    Q   Would there be a document form
22  from him?
23    A   There could have been. I don't

106

1  recall if there was specifically, no. I
2  don't -- I don't recall that.
3    Q   Do you recall if you followed up
4  with Linda Thornton to find out what the
5  issues that she had discussed with Melvin
6  Hutchins were?
7    A   During the investigation, I'm
8  sure I asked anything relevant to the
9  statement.
10    Q   And do you have any independent
11  memory of that?
12    A   Again, I would have had notes on
13  that. I don't recall from memory.
14    Q   No, sir. I asked you do -- as we
15  sit here today, do you have any independent
16  memory of having a conversation with Linda
17  Thornton about what the issues she's
18  referring to about -- that she had with
19  Melvin Hutchins about Frank Williams?
20    A   I don't rely on memory of
21  specific investigations, no.
22    Q   Well, whether you rely -- you
23  know -- whether you --

107

1    A   I -- I take -- I take notes based
2  on investigations, and I make determinations
3  based off of those notes.
4    Q   Because, like, I rely on my -- I
5  can remember stuff that we've talked about
6  in depositions that I've taken before even
7  though I have a court reporter that -- so I
8  can rely on what's written down. You know,
9  just by nature, I have -- sometimes my mind
10  absorbs stuff that actually happens to me.
11    A   That's correct.
12    Q   Do you have any independent
13  memory of having a conversation with Linda
14  Thornton about the issues she's referring to
15  that she had discussed with Melvin Hutchins
16  about Frank Williams?
17    A   I recall having multiple
18  conversations with Linda Thornton throughout
19  the course of my employment with Flavor
20  House in regards to multiple issues.
21    Q   Uh-huh.
22    A   Now, to tell you specifically
23  what memory relates to what issue, I can't

108

1  rely on my memory for that, no. That's why
2  I have notes.
3    Q   Okay. And where are those notes,
4  sir?
5    A   Again, I've already answered that
6  question. My notes were in my desk drawer
7  when I left Flavor House.
8    Q   Did you maintain a copy of those
9  notes for yourself when you left?
10    A   No, ma'am, I did not.
11    Q   Did you -- did you turn them over
12  to Mary Ann or anybody else when you left?
13    A   No, I did not.
14    Q   Had you turned them over to
15  anyone else who might have been
16  investigating the -- the allegations that
17  Ms. Thornton had made in her EEOC charge?
18    A   I did not turn over notes unless
19  requested by corporate counsel. Any
20  documentation we had was sent to them.
21    Q   I don't want to know whether or
22  not -- you know, the conversations you may
23  or may not have had with corporate counsel.

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

109

1  Did anybody ask you to turn over those notes
2  during the course of an investigation
3  involving my client's EEOC charge? Well,
4  strike that.
5      Did you turn over any notes that you
6  referred to concerning this investigation
7  that we're talking about now or the one
8  where Ms. Thornton said that Frank was
9  yelling and pitching a fit? Did you turn
10 those over during the time that --
11 immediately after the EEOC charge came in
12 from Ms. Thornton?
13     MS. SWAIN: Objection.
14     A  Any request for documentation
15 would have been honored.
16     Q  Okay. Do you recall any -- do
17 you recall turning over any documents to
18 anybody, whether it was corporate counsel or
19 Donald Duck?
20     A  Again, I don't recall
21 specifically what documents were turned over
22 in what case on what dates two years ago.
23 No, I don't.

110

1      Q  Now, on Plaintiff's Exhibit
2  Number 12, since you can't remember who
3  initiated this conversation concerning
4  Mr. Williams and his felonious past,
5  Plaintiff's 12, it says Jewel -- this is
6  Mr. Williams' statement; correct?
7      A  It appears to be, yes.
8      Q  Jewel Sidely came up to me in the
9  hallway and told me that Linda Thornton was
10 outside telling everyone that I was a child
11 molester and my brother's wife's daughter
12 was my girlfriend. I haven't done a family
13 tree, but that's intriguing. This is
14 harassment and I don't like it. I don't
15 start trouble. What happened 15 years ago
16 is none of her business.
17     Do you take that as a confession that
18 he is a child molester; he just doesn't like
19 it that my client was talking about it?
20     MS. SWAIN: Objection.
21     A  I don't take this as a admittance
22 of anything. It's a statement that there
23 was evidently something that occurred 15

111

1  years ago. Until I complete an
2  investigation, I don't know what that is.
3      Q  Well, other than that he was a
4  child molester or that his brother's wife's
5  daughter was his girlfriend, what else would
6  he have been saying was none of her
7  business?
8      MS. SWAIN: Objection.
9      A  Any personal business is not
10 another employee's personal business.
11     Q  You think being a child molester
12 is somebody's -- other -- is -- is their
13 personal business?
14     MS. SWAIN: Objection.
15     A  It's a matter of public record.
16     Q  Yes. It would be -- at least the
17 State of Alabama takes the position that
18 it's the public's business to -- to know
19 convicted sex offenders; right?
20     MS. SWAIN: Objection.
21     A  It is a public knowledge, yes.
22     Q  And I -- other -- other than the
23 public -- the State of Alabama makes it a

112

1  law that it be public knowledge, it would be
2  those mommas and daddies of those babies he
3  was molesting, wouldn't it?
4      MS. SWAIN: Objection.
5      A  The discussion of a person's
6  business is not proper workplace discussion.
7  It had no -- no bearing on working at Flavor
8  House, a person's past, a person's personal
9  convictions or anything else. And another
10 employee discussing those openly is a
11 violation of that person's ability to work
12 in a harassment free environment.
13     Q  When you -- did you talk to
14 Mr. Williams about whether or not he had in
15 fact been convicted of child molestation?
16     A  I would have asked Mr. Williams
17 in an investigation anything relevant to
18 this statement, yes.
19     Q  All right. And do you remember
20 what he told you, whether in fact -- whether
21 or not he had been convicted of child
22 molestation?
23     A  I recall there was a discussion

28  (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

113

1    about his past conviction.
2        Q    Okay.
3        A    Specifically what it was, I do
4    not recall other than it was involved in a
5    -- in a either child molestation or some --
6    some type of sex-related offense.
7        Q    Did he -- did he admit that he
8    had been involved with that?
9        A    He did say there was a past
10    conviction, yes.
11        Q    A conviction?
12        A    I don't recall specifically what
13    the conviction was, no.
14        Q    Did he tell you he had been
15    convicted of forgery and was on probation
16    when he was -- pled guilty to multiple
17    charges of child molestation?
18        MS. SWAIN:  Objection.
19        MS. ROBERTSON:  Look at the
20    probation record.  Yeah.  He was on
21    probation.
22        A    I don't recall that coming up
23    specifically, no.

114

1        Q    Did he tell you that he had spent
2    four years of a ten-year sentence in a
3    prison, Kilby I think?
4        A    Again, I don't recall
5    specifically what the conversation was is
6    why I took notes.
7        Q    Did you ask him about that?
8        A    I would have asked anything
9    relevant to the statement that was given.
10        Q    Did he tell you that he was on
11    probation for those convictions of having --
12    of sodomizing a 10-year-old child --
13        A    I don't recall.
14        Q    -- and having sexual intercourse
15    with a 13-year-old child and a 14-year-old
16    child and a 15-year-old child?  Did he tell
17    you that he was on probation when he got the
18    job with Flavor House for those -- that --
19    those convictions?
20        MS. SWAIN:  Objection.
21        A    I don't recall the issue of
22    probation coming up.
23        Q    Well, what did he tell you that

115

1    you told him to go on his merry way?
2        MS. SWAIN:  Objection.  He's
3    already answered the question.
4        A    Again, if -- if there was
5    anything additional to add, it would have
6    been in my notes that I took.
7        Q    That's no longer -- nobody knows
8    where they are.  They -- somebody --
9    everybody has forgotten where they were;
10    right?
11        MS. SWAIN:  Objection.
12        Q    And that dust strikes again.  Did
13    you ask Frank if he had ever told anybody at
14    the workplace that he had been in prison?
15        A    I don't recall asking Frank
16    specifically if he had been in prison --
17        Q    No, I didn't ask you that.
18        A    -- or if he had told someone he
19    had been in prison.  I don't remember the
20    exact conversation we had, again, two years
21    ago.
22        Q    Did you ask him if he had ever
23    told anybody at the workplace that he had

116

1    been convicted as a sex offender or a child
2    molester?
3        A    I recall during the conversations
4    that I had with the individuals involved
5    here that some of the discussion was
6    involving who has said what Frank had told
7    individuals, what Linda had told
8    individuals.  I don't recall who said
9    specifically I was in prison, I wasn't in
10    prison.  I don't recall specifically who
11    said those, no.
12        Q    Well, would it be important to --
13    to you to know if in fact Frank had been
14    telling people that he had been in prison
15    before and that Frank had told people he had
16    been convicted for child molestation?
17        A    What was the question?
18        Q    Would it have been important in
19    conducting this investigation for you to
20    know whether or not Frank had been telling
21    people the very same things he said she was
22    telling people?
23        A    It would have probably been

29  (Pages 113 to 116)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

117

1  relevant as in if he's discussing it, it's
2  open knowledge, yes.
3      Q   Do you know that Frank Williams
4  was still telling people he had been in
5  prison after Linda Thornton was no longer
6  working there?
7          MS. SWAIN: Objection.
8      A   I don't know what individual
9  conversations Frank would have had with
10 other employees.
11     Q   Do you think it would have been
12 appropriate for him to tell people that but
13 inappropriate for Linda to be -- tell people
14 that?
15         MS. SWAIN: Objection.
16     A   It's inappropriate for an
17 employee to discuss other employees' past,
18 present, future if it's a derogatory nature.
19     Q   What if they were discussing it
20 in the context about the way they were being
21 treated as a female?
22         MS. SWAIN: Objection.
23     A   I don't see the relevance of that

118

1  question. I don't see how that -- redefine
2  your question. Maybe I can answer it
3  better.
4      Q   Do you understand that child
5  molestation is a -- of the opposite sex is,
6  among other things, a -- a sign of complete
7  disrespect for the other sex?
8          MS. SWAIN: Objection.
9      A   I believe that's your opinion.
10     Q   You don't think -- you don't
11 think that's correct?
12         MS. SWAIN: Objection.
13     A   I said I believe that's your
14 opinion.
15     Q   No. I'm asking you do you think
16 that. Do you have an opinion?
17     A   I believe that each individual
18 occurrence has to be looked at individually
19 based on the circumstances of that case, a
20 determination made as to why that occurred.
21     Q   Well, sir, tell me, your -- then,
22 your definition of a sexually hostile
23 environment.

119

1          MS. SWAIN: Objection.
2      A   That could be a multitude of
3  things.
4      Q   Well, are you -- are you
5  understanding or are you familiar with the
6  concept of the totality of the
7  circumstances?
8      A   Yes.
9      Q   That you don't pars the ax, that
10 you don't pars the circumstances, that you
11 take everything as a whole?
12     A   Yes, I do.
13         MS. SWAIN: Objection.
14     Q   Then why would you have just
15 testified that you take each incident
16 individually?
17         MS. SWAIN: He's not talk -- you
18 didn't ask him that. When he said that,
19 he wasn't responding to a question about
20 a sexually hostile work environment.
21         MS. ROBERTSON: I had asked --
22         MS. SWAIN: You had asked him
23 about child molestation.

120

1          THE WITNESS: Yes.
2      Q   I had asked you about if -- if
3  she had been talking about him being a child
4  molester in the context of what was
5  happening to her and her belief that he -- I
6  didn't say this, but her belief that he had
7  total disrespect for women, why would you
8  take that out of the context of the other
9  kinds of -- of behavior?
10     A   That wasn't the question you
11 asked.
12         MS. SWAIN: No.
13     Q   All right. Well, tell me -- now
14 that I've rephrased it, tell me why would
15 you not have taken that?
16         MS. SWAIN: No, wait, wait. What
17 is the question? Ask it again.
18     A   Ask the question, please.
19     Q   The question is: Did you not
20 think it was important to find out what
21 context that Linda Thornton was saying that
22 Frank Williams had been a child molester and
23 to find out if she was talking about it in

30  (Pages 117 to 120)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

121

1　the context of the way she was being treated
2　by Frank Williams?
3　　　MS. SWAIN: Objection.
4　　A　This investigation involved
5　statements being made, assumed statements
6　being made by Linda, that she was stating
7　that she had been telling people private
8　business, personal business, of Frank's,
9　whether it's public or private. That was
10　what this investigation initiated as, as an
11　investigation based on statements that she
12　was stating that -- private information or
13　personal information.
14　　Q　No. Because you don't know who
15　initiated it. She -- she -- she says that
16　she was -- that he was going around telling
17　people that -- that she came up -- that
18　people were being told by her that he was a
19　child molester and she said that was in the
20　context of after the discussion she had had
21　with Melvin Hutchins about the way Frank --
22　her -- Frank Williams and his conduct on
23　line 3. Right?

122

1　　　MS. SWAIN: Objection.
2　　Q　But you don't know what those
3　discussions were --
4　　　MS. SWAIN: Objection.
5　　Q　-- that she had had with Melvin
6　Hutchins. Do you know that --
7　　　MS. SWAIN: Objection. There's
8　no evidence of any discussions.
9　　　MS. ROBERTSON: Of course there
10　are.
11　　A　Again, I don't -- I don't
12　understand. That's -- I mean, her statement
13　said there were discussions.
14　　Q　All right. And did -- and did
15　you know that the discussions were that he
16　was upset because he was having marital
17　problems and he was talking dirty about what
18　was going on with his wife and that he
19　wasn't attending to his work because of --
20　of his marital problems and that she did not
21　like it and she wanted it to stop? And the
22　next thing you know he's going around saying
23　that she's saying he's a child molester. Do

123

1　you know that she told Melvin Hutchins she
2　was concerned about the way he was treating
3　her because he was a child molester?
4　　　MS. SWAIN: Objection.
5　　A　I can't speak to what discussion
6　she had Melvin Hutchins. You'd have to ask
7　Melvin that.
8　　Q　Because you didn't ask Melvin
9　Hutchins and you didn't ask her; right?
10　　　MS. SWAIN: Objection.
11　　Q　Sir?
12　　A　Again, what's the question?
13　　Q　Did you ask her what discussions
14　she was referring to in Plaintiff's 11 when
15　she says, Immediately I met with Melvin
16　Hutchins and Chris Jordan with -- about this
17　matter. This is after a previous meeting
18　with Melvin Hutchins on the topic of many
19　concerns with Frank and line three work
20　situation. Did you ask her what she was
21　talking about?
22　　A　At the time of the investigation,
23　I probably did. Do I recall that --

124

1　　Q　But you don't have your notes --
2　　A　Do I recall that, no.
3　　Q　-- and you don't recall it.
4　　A　You have to realize, Linda had
5　multiple meetings with multiple people all
6　the time.
7　　Q　And --
8　　A　This was not a new occurrence for
9　Linda.
10　　Q　And she would get in trouble
11　every time she --
12　　A　No, she wouldn't.
13　　Q　Well, did she --
14　　A　We would investigate any
15　allegations that she brought forward and
16　then the correct -- correcting disciplinary
17　actions, if necessary or if warranted, would
18　be taken.
19　　Q　Who got in trouble about this
20　child molesting business?
21　　　MS. SWAIN: Objection.
22　　Q　Didn't you ultimately write her
23　up about it?

31　(Pages 121 to 124)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

125

1     A    You mean about the discussion of
2   the employee's private --
3     Q    The child molestation.
4     A    -- or personal business?
5     Q    Since when is a convicted -- a
6   felony --
7     A    I said personal business. I
8   corrected myself.
9     Q    A felony conviction is his
10  personal business?
11    A    It is personal to him, yes.
12        (Plaintiff's Exhibit Number
13        10 was marked for identification
14        and attached to the deposition.)
15  BY MS. ROBERTSON:
16    Q    Plaintiff's Exhibit Number 10,
17  look at that. What is that, please, sir?
18    A    This appears to be an employment
19  application for Frank Williams.
20    Q    What in the world is Flavor House
21  asking Frank Williams about his personal
22  business when they ask him has he ever been
23  convicted of a felon?

126

1         MS. SWAIN: Objection.
2     A    That's public information --
3   public conviction -- public conviction
4   record.
5     Q    That's what Linda Thornton was
6   talking about. How is it not personal when
7   she's -- wait -- personal when she's talking
8   about it and not personal when Flavor House
9   is asking him about it?
10    A    It's disruptive to the
11  environment to discuss personal issues in
12  the environment, in -- in the workplace.
13  There's an issue of disruption that it
14  causes to the work force. It's not an issue
15  of public knowledge. It's an issue that it
16  is public knowledge as it is. It's personal.
17  But her discussing that is his personal
18  business and it's causing disruption within
19  the work force.
20    Q    What kind of disruption was it
21  causing?
22    A    It can cause loss of
23  productivity. Specifically what did it

127

1   cause disruption-wise? Investigations and
2   pulling employees off of lines to do
3   investigations, to discuss allegations. So
4   it does cause a lot of disruption. How you
5   quantify that? Specifically, lost
6   productivity.
7     Q    Anything else?
8     A    Again, how do you want it
9   quantified?
10    Q    Did you happen to check Frank
11  Williams' -- I mean his application,
12  Plaintiff's Exhibit Number 10, when this
13  issue about whether he was a child molester
14  came up?
15    A    I would have probably pulled his
16  personnel file in any investigation that I
17  did --
18    Q    Okay.
19    A    -- with any employee.
20    Q    And what -- did -- what did you
21  read there?
22    A    Relative to?
23    Q    To whether or not he was a

128

1   convicted felon.
2     A    He checked yes.
3     Q    Okay. And -- and what did he say
4   he had been convicted of?
5     A    On this application he stated
6   statutory rape.
7     Q    And you understand -- and then
8   what did he say?
9     A    His statement here is my
10  girlfriend was two years younger than me
11  when --
12    Q    When I was 18.
13    A    -- I was 18.
14    Q    Did you do a background check at
15  the time to see if he told you the truth
16  about that?
17        MS. SWAIN: Objection.
18    Q    Because over here on
19  Plaintiff's -- Plaintiff's 10, see the
20  back -- see the bottom there? It says
21  you -- they're going to do a background
22  check.
23    A    I'm not sure of the policies that

32 (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

129

1  were in place in 2000.
2      Q   No, no, no. Excuse me. Read --
3  I'm talking about the bottom of the
4  application. You have -- you may not can
5  read it. It's a trial. But see at the very
6  bottom?
7      A   It says, I understand that
8  consideration for employment in this
9  position is contingent upon the results of a
10  reference and a background check.
11      Q   I'm sorry. He has to type it.
12  If you could read it a little slower,
13  please. Slower.
14      A   I understand that consideration
15  for employment in this position is
16  contingent upon a reference and a background
17  check.
18      Q   All right. Does it say anything
19  else?
20      A   I mean, I can read the entire
21  statement, if you'd like me to.
22      Q   Anything to do with the
23  background check or anything about not

130

1  telling the truth on the application?
2      A   The first statement, I
3  acknowledge that the information I have
4  supplied is correct to the best of my
5  knowledge and belief without any omission of
6  any kind whatsoever.
7      Q   Up here where it says, I
8  acknowledge that the information that I have
9  supplied is correct to the best of my
10  knowledge and belief without any omissions
11  of any kind whatsoever; I understand that
12  any falsification, misrepresentation, or
13  omission of fact may be grounds for
14  rejection of my application or discharge of
15  any time of my employment, did -- did you --
16  at the time that there was this issue about
17  whether or not Frank was a child molester --
18  and apparently -- did you have -- institute
19  a background check to find out if he had
20  completely told the truth about his felony
21  background?
22      A   I did not perform a background
23  check on Frank Williams, no.

131

1      Q   Why not?
2      A   I did not see the need to based
3  on his five years of employment with the
4  company and his admittance of the charges
5  previously. There was no question as to
6  whether he was guilty or convicted.
7      Q   Of -- of what he said? That's
8  not true, though, what he said. Do you know
9  that --
10      MS. SWAIN: Objection.
11      Q   -- now?
12      A   I don't know Frank's background.
13  I never ran a background check.
14      Q   Never did anything to find out
15  about it?
16      A   I did not run a background check
17  on Frank based on his acknowledgement that
18  he was convicted previously.
19      Q   Okay. Of child molestation?
20      MS. SWAIN: Objection.
21      A   I don't recall the specific
22  conviction he stated to me or specifically
23  what's on the form.

132

1      Q   In Plaintiff's 12, it says, I
2  don't like it -- I don't start trouble.
3  What happened 15 years ago is none of her
4  business. And the -- he says she said that
5  he -- that she was saying he was a child
6  molester. So he admitted to being a child
7  molester?
8      MS. SWAIN: Objection. You don't
9   need to answer that.
10      Q   Well, let me just -- just for my
11  own edification, would you consider
12  having -- sodomizing a 10-year-old as child
13  molestation?
14      MS. SWAIN: Objection.
15      A   I'm not a court of law. I'm not
16  going to determine what is or is not a
17  conviction or -- or --
18      Q   No. I didn't ask you was it a
19  conviction. I asked you would you consider
20  your -- if you had a 10-year-old daughter
21  that a 27-year-old man had oral sex with,
22  would you consider that child molestation?
23      MS. SWAIN: Objection.

33  (Pages 129 to 132)

# FREEDOM COURT REPORTING

133

1    A    Again, it's not my call. That's
2  my -- I don't write the laws.
3    Q    And you would have no opinion of
4  that as a -- as a father of a child?
5    A    As an opinion, I can give you an
6  opinion, yes.
7    Q    That's what I'm asking for.
8    A    But opinions aren't -- is not the
9  law.
10    Q    Oh. And I -- I didn't remember
11  on your -- on your -- your resume saying
12  got -- that you had gotten a law degree.
13    A    That's correct.
14    Q    And you -- and you just told me
15  --
16    A    And I don't.
17    Q    -- you don't know -- well, then,
18  why would you tell me that your opinion is
19  not the law? I asked you for your own
20  opinion as to whether --
21    A    My opinion is irrelevant. The
22  facts are the facts.
23    Q    Okay. Now -- but do you have an

134

1  opinion?
2    A    On what?
3    Q    On whether having oral sex with a
4  10-year-old is child molestation.
5    MS. SWAIN: Objection.
6    A    My opinion would -- would be
7  based on the facts determined in an
8  investigation.
9    Q    Assume that Frank Williams pled
10  guilty.
11    A    Again, I'm not assuming anything.
12    Q    Are you refusing to answer my
13  question?
14    A    No, ma'am.
15    Q    Well, then, assume that Frank
16  Williams was convicted of having oral sex
17  with a 10-year-old. Would you, Mr. Tommy
18  Nance, consider that child molestation?
19    MS. SWAIN: Objection.
20    A    I would abide by what the courts
21  decided. If they convicted him of a
22  specific crime, then that is their opinion
23  as the courts.

135

1    Q    I'm not asking about what their
2  opinion is. I'm asking your opinion.
3    A    Again, based on the -- an
4  individual situation if I independently
5  evaluated a situation and I had an opinion
6  on it.
7    Q    Okay. Well -- all right. Tell
8  me, sir, circumstances under which having
9  oral sex with a 10-year-old if you're 20 --
10  over 20 --
11    MS. SWAIN: Can we take a break?
12    MS. ROBERTSON: Sure.
13    THE VIDEOGRAPHER: We're off at
14  12:05.
15    (Whereupon, a short break was taken.)
16    THE VIDEOGRAPHER: Okay. We are
17  back on at 12:14.
18    MS. ROBERTSON: Is there a
19  question on the table, Mr. court
20  reporter?
21    (Whereupon, the court
22  reporter read the pending
23  question.)

136

1    MS. ROBERTSON: And then he asked
2  --
3    THE COURT REPORTER: Can we take
4  a break.
5    MS. ROBERTSON: I kindly let him
6  have a break in the middle of a
7  question.
8  BY MS. ROBERTSON:
9    Q    Okay. I'll withdraw that
10  question and start over. Tell me,
11  Mr. Nance, under what circumstances can you
12  imagine that it would ever be all right or
13  not child molestation for a 20-something
14  person to have oral sex with a 10-year-old.
15    MS. SWAIN: Objection.
16    A    I do not believe that child
17  molestation is a good thing, but
18  determination of what child molestation is,
19  again, is a legal issue, the definition of
20  it.
21    Q    Okay. But all I'm asking you is
22  can -- you had said immediately before I let
23  them take a break and take you outside

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

137

1  that -- that you had to look at each
2  individual circumstance and make a decision
3  when I was asking for your opinion, not the
4  laws of -- and you said you had to look at
5  each individual situation. And I want you
6  to tell me, in your wildest imagination can
7  you imagine or can you think of a situation
8  where a 20-something year old having oral
9  sex with a 10-year-old would not be child
10  molestation.
11        MS. SWAIN: Objection.
12     A  Again, in my opinion, if that
13  occurred, would it be child molestation?
14  I -- I couldn't tell you yes or no,
15  determined on what the court case determines
16  is whether it's declared as child
17  molestation or not.
18     Q  I got you.
19        (Plaintiff's Exhibit Number
20        13 was marked for identification
21        and attached to the deposition.)
22  BY MS. ROBERTSON:
23     Q  Tell me what this is, sir.

138

1     A  This is Linda Thornton's
2  statement from March 1st, '06. It's got a
3  statement of threats being made, comments
4  being made, to another employee.
5     Q  By Frank Williams?
6     A  Linda states that the team leader
7  made -- has told comments against her to
8  another employee.
9     Q  And threats?
10     A  She states very serious comments
11  and threats made, yes.
12     Q  Okay. I just want this to be
13  over with, which I believe is what it would
14  be after last week's meeting with Tommy in
15  HR. These threats and comments were made to
16  an employee in the front office.
17     Did you receive this? I guess Chris
18  Jordan took the statement. What did you do
19  when you received Plaintiff's Exhibit Number
20  13?
21     A  Again, form an investigation as
22  usual, question Linda, I'm sure, question
23  the other employee, whoever was mentioned,

139

1  the person in the front office.
2     Q  Well, why didn't you get
3  documentation forms from these people?
4     A  Again, if they gave statements,
5  they -- they would have given statements.
6     Q  All right. Well, are there any
7  statements that you can think of that --
8  that you would have gotten?
9        MS. SWAIN: Objection.
10     A  I -- I don't have records that
11  were kept. I don't know.
12     Q  Well, would ordinarily Chris
13  Jordan have gone and given the documentation
14  forms to anybody that my client said was a
15  witness?
16     A  A member of management would have
17  given the documentation form and asked for a
18  statement from anyone identified, but they
19  do not have to give a statement.
20     Q  Well, where -- can you think of
21  any place that document -- that statement
22  would be, if not in -- in Linda's file?
23     A  Statements were kept in

140

1  individuals' files so I don't know of any
2  other place, no.
3        (Plaintiff's Exhibit Number
4        14 was marked for identification
5        and attached to the deposition.)
6  BY MS. ROBERTSON:
7     Q  Plaintiff's Exhibit Number 14,
8  what is this, sir?
9     A  This is the memo to file,
10  disciplinary action for Linda Thornton
11  related to the February 16th comments.
12     Q  What is the date on it?
13     A  This was issued on March 7th.
14     Q  What, six days after Plaintiff's
15  Exhibit Number 13 came in from Linda
16  Thornton?
17     A  It appears that's when it was
18  signed, yes, when it was issued.
19     Q  Well, tell me how it was that
20  Linda makes a complaint on March the 1st and
21  she ends up getting written up for something
22  that happened in February.
23        MS. SWAIN: Objection.

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

141

1  A  I don't recall the specific time
2  frame for the investigation that occurred.
3  It could have been later due to vacations or
4  absences, due to key people I was talking
5  with. I don't know why the lapse between
6  2/16 and March 7th. I can't tell you
7  specifically why that occurred, no.
8     Q  Well, it -- it says here in her
9  Plaintiff's Exhibit Number 13 that --
10 that -- that there had been some meetings
11 with Tommy and HR about this allegation of
12 this child molestation. Do you recall those
13 meetings?
14     MS. SWAIN: Objection.
15    A  The assumption may be she's
16 referring to the investigative meetings.
17 I -- I don't know what meeting she's
18 referring to.
19    Q  Well, when you said you had
20 determined that -- that she had acted in an
21 inflammatory and -- and I must criticize
22 your English -- I have determined that you
23 acted in a way that was inflammatory and

142

1  instigationally. What did she instigate?
2     A  Disruptive behavior.
3     Q  Disruptive behavior which
4  instigated what, Frank making threats?
5     MS. SWAIN: Objection.
6     A  Linda's discussion of personal
7  business caused conflict in the work force.
8     Q  Did it cause Frank to make her
9  threats?
10    MS. SWAIN: Objection.
11    A  Again, just the disruptions of
12 the work force is noted. It's --
13    Q  No, no, no, no. She complained
14 that he was making threats about what --
15 about what he was going to do to her and
16 then --
17    A  Which complaint are you referring
18 to there? Tell me.
19    Q  I'm referring to Plaintiff's
20 Exhibit Number 13. Repeatedly has been told
21 of comments that team leader has made
22 against me after -- one after investigation.
23 Various serious comments and threats made.

143

1     She was complaining that Frank was
2  making threats about what he was going to do
3  to her; right?
4     MS. SWAIN: Objection.
5     A  I don't -- I don't know what
6  those allegations were, what her --
7     Q  You don't remember --
8     A  -- comments were.
9     Q  -- any -- any of -- did you have
10 a conversation with her?
11    A  I investigate every statement
12 that comes in, every documentation form,
13 yes.
14    Q  My question is, did you have a
15 conversation with her after you received
16 Plaintiff's 13 about what kind of threats
17 were being made?
18    A  I don't recall specific
19 conversations I've had about the
20 investigations.
21    Q  I didn't ask you about the
22 specifics. I asked you did you have a
23 conversation.

144

1     A  We probably did. If a statement
2  was turned in, then there was a follow-up
3  investigation.
4     Q  But you don't remember anything
5  about it?
6     A  That's why I have notes.
7     Q  Which we don't have; is that
8  right?
9     A  (No response.)
10    Q  You don't remember any -- you
11 need to answer out loud for this court
12 reporter.
13    A  There was no answer. The notes
14 aren't here.
15    Q  And you have no memory?
16    A  I don't rely on my memory to
17 differentiate between which specific
18 conversation I had on which specific day
19 over a multitude of a year and multiple
20 conversations but --
21    Q  Well, my -- whether you can
22 remember whether it had anything to do
23 with -- did you ever have a conversation

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

145

1  with Linda about whether Frank was making
2  threats against her?
3      A   I'm sure I did.
4      Q   Okay. And why are you sure you
5  did?
6      A   During the course of the
7  investigation, if she said there are threats
8  being made, I would have questioned her on
9  what those threats were.
10     Q   So you're sure you did but it's
11 not because you remember any conversation,
12 whether it was then or any time. You just
13 are sure you did because she made a
14 complaint and you would have investigated
15 it?
16     A   I would have investigated
17 anything in the statement, yes.
18     Q   Okay. Do you remember what she
19 said the threats were?
20     A   Not from memory, no.
21     Q   Do you remember that he was going
22 around saying he was going to fuck her up if
23 she -- if he lost his job by her saying that

146

1  he was a child molester?
2          MS. SWAIN: Objection.
3      A   I don't recall those specific --
4  it's not in statements.
5      Q   You have no recollection of -- of
6  her complaining about that?
7      A   No, I do not.
8          MS. ROBERTSON: That's all I
9  have.
10         MS. SWAIN: Can we take a short
11 break? I may have a few questions.
12         THE VIDEOGRAPHER: We're off at
13 12:34.
14 (Whereupon, a short break was taken.)
15         DEPOSITION CONCLUDED
16
17
18
19
20
21
22
23

147

1              CERTIFICATE
2
3  STATE OF ALABAMA:
4  COUNTY OF BUTLER:
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers
9  thereto were transcribed by means of
10 computer-aided transcription, and that the
11 foregoing represents a true and correct
12 transcript of the testimony given by said
13 witness upon said hearing.
14     I further certify that I am neither of
15 counsel, nor of kin to the parties to the
16 action, nor am I in anywise interested in
17 the result of said cause.
18
19
       RENNY MCNAUGHTON
20     Certified Court Reporter
21     License Number: ACCR #:411
22
23

37  (Pages 145 to 147)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**A**

abide 134:20
ability 112:11
able 68:7
absences 141:4
Absolutely 16:9
absorbs 107:10
ACCR 147:21
accusation 32:23 103:3,5
accused 50:15
acid 38:10,16
acknowledge 130:3,8
acknowledge... 131:17
acted 141:20,23
acting 6:4 35:21
action 1:5 39:8 39:10,10,12,14 42:4,5 55:15 59:20 87:10 88:4 90:14 91:15 93:1,11 93:16 140:10 147:16
actions 11:17 29:15,17 38:22 70:12 87:16 90:8 98:9 124:17
acts 97:4
ad 12:19
add 115:5
addition 57:5
additional 30:16 30:17,18 43:14 43:22 44:8 45:16 50:11 115:5
address 47:1 49:22 50:19 51:4 70:2
addressed 69:17

80:9 83:3 93:10
addresses 49:12 49:19 69:6,10 69:13
admit 86:8 113:7
admittance 110:21 131:4
admitted 47:21 48:2 57:18,19 86:11 132:6
advised 3:3
ago 48:22 109:22 110:15 111:1 115:21 132:3
agree 84:12 89:1
agreed 2:2,10 8:19 50:22 51:5
agreed-to 7:14
agreeing 51:6
agreement 8:8 9:15
ahead 73:10 103:7
Alabama 1:2,23 2:8,20 5:8,19 6:2,3,5,9 7:1 8:11 10:12 12:9 111:17,23 147:3
Alan 10:1
allegation 35:23 44:19 141:11
allegations 41:11,14 49:12 51:4 56:9 108:16 124:15 127:3 143:6
alleged 35:18
allowing 19:14 19:14

alphabetically 36:19,20
altercation 74:18 91:5
altercations 74:17
amended 2:21
Ann 5:15 7:5 14:4 25:2 58:16 59:22 74:10 80:5 95:3 108:12
annual 23:9,10 23:21 26:15,18 27:6 28:4
answer 25:23 27:3 31:16,16 31:22 44:15 66:7 73:18 74:15,16,23 77:18 99:23 118:2 132:9 134:12 144:11 144:13
answered 28:21 86:10 88:14 97:11 108:5 115:3
answers 147:8
anti 29:18
anti-sexual 22:7 22:20 23:2
anybody 32:13 54:21 70:16 71:1 78:5 79:23 80:8 81:4 82:2 84:18 108:12 109:1,18 115:13,23 139:14
anywise 147:16
apparent 94:23
apparently

58:15 72:15 99:3 130:18
appear 50:3
appears 66:22 95:17 96:2,16 110:7 125:18 140:17
applicants 13:17 30:17
application 12:20 100:14 100:16 101:3 125:19 127:11 128:5 129:4 130:1,14
applications 100:19
applied 12:19,22
appropriate 70:12 117:12
approximately 2:9 6:9
area 10:2 76:10
areas 18:11,15
asked 31:17,20 45:16 47:1 50:19 51:3,10 51:13 60:15 62:9 65:8,12 65:14,15 67:8 70:6 76:13 83:2 84:22 86:10 88:13 97:11 100:12 105:20 106:8 106:14 112:16 114:8 119:21 119:22 120:2 120:11 132:19 133:19 136:1 139:17 143:22
asking 25:7 27:11 29:10 51:7 55:13

73:23 74:9 101:2 102:13 115:15 118:15 125:21 126:9 133:7 135:1,2 136:21 137:3
asks 100:16
assign 2:15
associates 97:4
assume 35:10 58:6 78:22,23 79:2 81:8 82:18 100:20 100:22,23 134:9,15
assumed 81:12 121:5
assuming 134:11
assumption 78:1 79:16 81:14 82:21 83:5 101:9 141:15
attached 17:15 48:18 52:13 66:13 67:19 68:20 73:1 95:7 96:13 103:15 104:3 125:14 137:21 140:5
attending 122:19
attention 73:8
auntie 9:9
automobile 12:5
automotive 11:9 12:6
avoided 70:1
aware 26:6 33:16 47:2 53:3 54:23 55:3

# FREEDOM COURT REPORTING

ax 119:9
**a.m** 2:9 6:10,21
48:15 72:21

---

**B**

**B** 4:5
**babies** 112:2
**back** 12:10 19:6
19:16 48:15
65:9,10,13
72:21 76:11
88:7 91:22
92:12,15 93:5
102:7 103:12
128:20 135:17
**background**
128:14,21
129:10,16,23
130:19,21,22
131:12,13,16
**bad** 58:15 76:10
**bag** 35:19
**baiting** 71:18
72:4
**Baker** 5:4
**balance** 65:7
**banner** 32:12
**base** 83:21
**based** 59:16
81:10 82:12
90:10,12,17
94:1 107:1,3
118:19 121:11
131:2,17 134:7
135:3
**basically** 19:13
46:16 103:2
**basing** 88:11
**basket** 61:19
**baskets** 61:9,10
61:18,20,22
62:3
**bearing** 112:7
**Bearman** 5:4

**beginning** 48:14
103:13
**begins** 6:15
**behavior** 120:9
142:2,3
**belief** 120:5,6
130:5,10
**believe** 24:13
37:4 40:9 49:2
53:1,5 57:15
61:23 63:3,18
64:9 77:10,10
83:3 84:14
94:8 98:15
104:21 118:9
118:13,17
136:16 138:13
**benefits** 12:16
**Berkowitz** 5:5
**best** 130:4,9
**better** 7:18,19
118:3
**beyond** 65:7
**bill** 64:7,9,20
65:2,10,11,14
65:16,19
**bimonthly** 20:12
**Birmingham** 5:8
5:19
**Blow** 37:9 38:9
39:23 40:4,22
43:3,3
**blue** 73:19
**Bobbie** 2:7 6:8
6:23
**bottom** 128:20
129:3,6
**Box** 5:12
**Boyer** 14:4
59:22
**brake** 12:6
**break** 48:9,12
48:22 72:18,19
103:9,10

104:16 135:11
135:15 136:4,6
136:23 146:11
146:14
**breaking** 94:14
**Brief** 49:1 73:20
80:3
**bring** 33:20
43:20 57:4
**bringing** 32:23
33:15,17 40:15
45:19 46:19
103:4,4
**brings** 100:1
**broadcast** 33:6
**brother's** 110:11
111:4
**brought** 32:17
35:15 102:16
103:1 124:15
**Building** 5:17
**bunch** 8:14
**business** 15:23
100:18 110:16
111:7,9,10,13
111:18 112:6
121:8,8 124:20
125:4,7,10,22
126:18 132:4
142:7
**BUTLER** 147:4

---

**C**

**C** 5:1,15
**Caldwell** 5:4
**call** 13:10 133:1
**called** 15:22
56:22 70:22,23
74:14 75:18
**calling** 75:2,13
**candidates**
13:17
**cans** 35:19 46:6
47:14 49:8

50:17 54:3
67:3,10,14
71:20 87:21,22
90:4,5
**card** 64:7,8,10
65:5 66:10
**cards** 60:17 61:6
61:7 62:4
63:16,17
**career** 24:6
**Carol** 40:2
**case** 6:19 35:18
47:8,9,11,12
58:15 89:16
91:16 94:2
109:22 118:19
137:15
**cause** 6:11
126:22 127:1,4
142:8 147:17
**caused** 12:8 72:5
142:7
**causes** 126:14
**causing** 126:18
126:21
**certain** 46:20
99:1
**CERTIFICA...**
147:1
**Certified** 147:20
**certify** 6:4 147:6
147:14
**CF** 10:20,20
**change** 103:7
**changes** 8:2
**characterizati...**
71:22 72:7
**charge** 13:16
26:2 53:23
54:10 55:9,16
108:17 109:3
109:11
**charges** 66:9
113:17 131:4

**check** 27:15
28:7 127:10
128:14,22
129:10,17,23
130:19,23
131:13,16
**checked** 27:23
128:2
**child** 85:18,20
87:19 101:17
110:10,18
111:4,11
112:15,21
113:5,17
114:12,15,16
114:16 116:1
116:16 118:4
119:23 120:3
120:22 121:19
122:23 123:3
124:20 125:3
127:13 130:17
131:19 132:5,6
132:12,22
133:4 134:4,18
136:13,16,18
137:9,13,16
141:12 146:1
**Childs** 5:16
**choice** 8:4
**Chris** 123:16
138:17 139:12
**Christ** 88:19
89:9,17
**Christmastime**
60:18
**chronological**
37:5
**chronologically**
42:22
**Chrysler** 12:7
**circumstance**
137:2
**circumstances**

| | | | | |
|---|---|---|---|---|
| 22:19 118:19 119:7,10 135:8 136:11 | Commissioner 1:20 6:4 | computer-aided 147:10 | 143:10,15,23 144:18,23 145:11 | correcting 124:16 |
| Civil 1:5 2:20 6:6 | companies 12:15 29:6 | concept 119:6 | conversations | corridor 63:19 |
| claim 32:18 33:7 33:8 | company 64:12 66:10 97:5 131:4 | concerned 123:2 | 52:9 66:2 107:18 108:22 | corroborating 84:5 |
| Clark 5:9 | compensation | concerning 51:18 56:7,13 63:16 71:2 109:6 110:3 | 116:3 117:9 143:19 144:20 | counsel 2:4,12 2:14 5:10 6:7 7:3 21:3 53:11 |
| classes 11:23 20:18,20,21 21:7 | 71:7 73:6,22 88:6 91:20 92:11 | concerns 123:19 | convicted 87:19 100:6,13 101:3 101:12,20 | 53:15 55:18 108:19,23 |
| cleaned 76:11 | complain 74:13 | concluded 50:9 146:15 | 102:3 111:19 112:15,21 | 109:18 147:15 |
| client 71:8 92:2 101:11 110:19 139:14 | complainant 39:4 | conclusion 82:9 85:11 | 113:15 116:1 116:16 125:5 | counseling 93:14 96:17 98:2,6,7 |
| client's 109:3 | complained 38:9 40:22 46:5 142:13 | conclusive 63:20 | 125:23 128:1,4 131:6,18 | count 19:2 |
| closed 11:5 12:2 12:11 | complaining 143:1 146:6 | conduct 121:22 | 134:16,21 | COUNTY 147:4 |
| codes 95:20 | complaint 29:20 | conducting 116:19 | conviction 101:14 113:1 | couple 12:14 |
| coercing 97:3 | 30:5 31:3 32:5 32:13 33:13,15 | confession 110:17 | 113:10,11,13 125:9 126:3,3 | course 22:7 43:20 69:13 |
| collaborative 59:17 | 33:17 34:3,5 35:3,6,11,15 | conflict 87:12,14 87:15,23 88:16 89:4,10,12 | 131:22 132:17 132:19 | 85:9 100:17 107:19 109:2 |
| collect 30:16,20 32:2 33:10 | 36:20 37:8,13 37:19 39:7,22 | 90:1,13,15,16 97:14 142:7 | convictions 112:9 114:11 | 122:9 145:6 |
| collected 30:9 30:12 | 40:16 45:19 46:19 73:16 | consider 132:11 132:19,22 | 114:19 | courses 24:4,5,5 26:20 |
| collection 45:4 | 74:21 85:10 101:11,13,18 | 134:18 | Cook 68:23 69:1 69:6 76:8 | court 1:1 2:6 3:4 3:5 6:1 7:2,10 |
| come 31:4 32:14 57:1 75:6,7 | 102:15 104:12 104:14,18,23 | consideration 129:8,14 | copy 16:2 39:19 41:15 53:5 | 8:21 10:6 107:7 132:15 |
| 82:8 88:7 91:21 92:12,15 | 105:3,5 140:20 142:17 145:14 | context 73:10 78:14 79:14 | 95:14 108:8 | 135:19,21 136:3 137:15 |
| 93:5 | complaints | 81:2 102:5 | corporate 53:11 53:14 55:17 | 144:11 147:20 |
| comes 53:17 88:20 143:12 | 40:23 53:10 | 117:20 120:4,8 120:21 121:1 | 108:19,23 109:18 | courts 134:20,23 |
| comfortable 31:12 | complement 19:10 | 121:20 | correct 18:12,13 | coworkers 97:1 |
| coming 66:9 113:22 114:22 | complete 16:14 45:1 111:1 | contingent 129:9,16 | 25:10 33:14 51:17 75:20 | credit 64:6,8,10 65:5 66:10 |
| commencing 2:9 6:9 | 118:6 | continually 49:6 | 82:1 107:11 110:6 118:11 | crime 101:20 134:22 |
| comments 75:8 138:3,7,10,15 | completed 62:17 | conversation 51:23 56:5,6,7 | 124:16 130:4,9 133:13 147:11 | criticize 141:21 |
| 140:11 142:21 142:23 143:8 | completely 84:4 130:20 | 66:6 78:15 105:10 106:16 107:13 110:3 114:5 115:20 | corrected 125:8 | Crook 2:7 6:8 6:23 |
| | | | | current 65:5 |
| | | | | curse 57:18 58:4 76:14 78:19 79:10 80:9,12 |

# FREEDOM COURT REPORTING

81:18,23 83:13
**cursed** 35:19
46:6 49:16
76:23 77:12
81:19 83:12
86:8
**curses** 90:3
**cursing** 47:15
49:7,13,21
50:16 54:3
57:12 69:12
71:19 75:1,15
76:7 77:5,11
77:11 78:9
79:18,20,22
80:1,23 82:3
82:10,17,18
83:7,7,10,14
83:17,18,20
84:3,6,9,21
94:12
**cussing** 87:22
88:21

――――――
**D**
――――――
**D** 1:21 2:5,21
4:1 6:1,19
**daddies** 112:2
**damn** 68:8
69:12 77:14,16
78:11 79:4
**database** 13:17
**date** 6:5 36:23
37:4,5 51:19
52:20 61:16
85:8 140:12
**dated** 96:17
**dates** 109:22
**daughter** 110:11
111:5 132:20
**day** 2:8 3:1 6:10
14:15 85:14
144:18
**days** 140:14

**December** 22:3
23:17 40:22
61:17 96:9
**decide** 26:10
30:22 31:6
32:7,11 50:6
**decided** 31:19
134:21
**decision** 57:6
59:14,17 82:11
83:22 137:2
**decisions** 38:21
81:10
**declared** 137:16
**defendant** 5:2
7:8 52:20
**Defendant(s)**
1:12
**definitely** 79:20
79:21
**definition**
118:22 136:19
**degree** 133:12
**delegated** 20:3
**delivering** 2:22
**denied** 50:23
51:5 57:22
58:1
**denies** 49:20
**denote** 102:19
**deny** 49:19 86:7
**Depending**
20:22
**deponents** 58:14
**deposition** 1:14
2:4,17 6:16,22
8:1 9:13 17:15
48:18 52:13
66:13 67:19
68:20 73:1
89:18 95:7
96:13 103:16
104:4 125:14
137:21 140:5

146:15 147:7
**depositions**
107:6
**derogatory**
74:14 75:8
117:18
**Describe** 51:15
**describes** 67:4
**describing** 49:6
73:11
**description**
15:12,17,20,22
18:4
**desk** 36:12,15
37:1,10 54:18
54:22 55:6
56:12 108:6
**determination**
118:20 136:18
**determinations**
107:2
**determine** 50:12
75:22 132:16
**determined** 43:9
60:11 83:19
97:16 134:7
137:15 141:20
141:22
**determines**
137:15
**development**
11:3,11 15:23
**different** 13:10
29:7 43:23
84:18
**differentiate**
144:17
**direct** 73:8 81:5
**directed** 77:6
78:19,23 80:16
80:17,22 82:3
82:17,19 83:20
84:3,9,11,15
84:21

**directing** 77:19
**direction** 47:6
53:14 55:17
81:8
**directly** 31:4
**dirty** 122:17
**disappeared**
72:15
**disbelieve** 84:4
84:13
**discharge**
130:14
**disciplinary**
11:17 29:15,16
38:22 70:12
87:16 88:3
90:8,11,14
91:15 93:1,10
93:11,15 97:7
98:9,15 99:2
99:12,14
124:16 140:10
**discipline** 70:9
87:7,10 90:6
93:4,8,20,22
93:23 98:1
**disciplined**
83:14,18 87:5
92:22 93:9,17
93:21 94:1
97:21,22
**discovered**
61:10
**discuss** 18:15
117:17 126:11
127:3
**discussed** 54:1
86:5 105:17
106:5 107:15
**discussing**
112:10 117:1
117:19 126:17
**discussion** 56:19
58:22 65:17

89:21 93:14
95:13 112:5,6
112:23 116:5
121:20 123:5
125:1 142:6
**discussions** 98:3
102:1 122:3,8
122:13,15
123:13
**disrespect** 118:7
120:7
**disruption**
126:13,18,20
127:4
**disruptions**
142:11
**disruption-wise**
127:1
**disruptive**
126:10 142:2,3
**district** 1:1,2
8:10
**DIVISION** 1:3
**document** 16:11
16:12,23 17:11
17:18 43:12
53:22 68:6
72:12 87:1
90:19 94:10
105:21 139:21
**documentation**
25:9 37:13
57:15 59:6
70:22,23 95:18
96:4,7 98:18
108:20 109:14
139:3,13,17
143:12
**documented**
87:16
**documents** 30:9
30:11,13,21
32:2,2 33:11
48:9 53:18

71:4 104:17,22
109:17,21
**Doe** 40:2
**Doe's** 40:6
**dog** 87:22 88:21
**doing** 10:13,15
34:18 47:22
68:11 69:7
**dollars** 62:6
**Donald** 109:19
**Donelson** 5:4
**door** 9:6
**Dothan** 1:23 2:8
6:8 7:1 10:3
13:3,23 19:9
52:22
**draw** 63:13
**drawer** 37:1
108:6
**drawings** 61:21
**Duck** 109:19
**due** 141:3,4
**dust** 115:12
**duties** 11:8,10
11:13 15:14,17
15:19 17:23
18:1,22

————— **E** —————

**E** 4:1,5 5:1,1
**edification**
132:11
**EEOC** 108:17
109:3,11
**effect** 72:4 98:5
**effective** 2:21
**eight** 10:18
**either** 33:15
34:14 37:3
40:14 42:21
70:1 101:16
113:5
**employed** 100:8
**employee** 11:19

19:2 20:2
62:20 87:11,13
89:11 94:15,16
99:5 112:10
117:17 127:19
138:4,8,16,23
**employees** 11:16
19:5,7,10,20
60:19 62:1
75:6,11 79:10
79:19 82:15
84:1,20 92:23
93:17 99:15
117:10,17
127:2
**employee's** 99:6
111:10 125:2
**employment**
61:17 65:2
100:5 107:19
125:18 129:8
129:15 130:15
131:3
**encompassing**
18:3
**ends** 140:21
**English** 141:22
**ensure** 28:1
**entail** 11:13,13
**entire** 16:12
26:21 40:16
129:20
**environment**
112:12 118:23
119:20 126:11
126:12
**equally** 90:22
91:4 92:23
93:9,18,20,21
94:1,4 97:21
97:22
**equivalent** 96:1
**etcetera** 68:11
68:11,12,13,13

68:14
**evaluated** 135:5
**evaluation** 12:15
**evaluations**
12:16,16
**events** 46:22
**everybody** 42:19
81:22 83:1
115:9
**evidence** 2:17
63:20 82:9
84:5 122:8
**evidently** 110:23
**exact** 76:14
115:20
**exactly** 11:22
14:16 63:4
**examination** 4:2
6:12 9:21
**excuse** 9:18
16:11 40:1
58:18 87:21
129:2
**exhibit** 17:13,17
48:16,20 52:11
52:16 53:3
56:2 66:11,15
67:4,17,21
68:18,22 72:22
73:4 92:17
95:5,10,15
96:11 103:14
103:19 104:2,7
110:1 125:12
125:16 127:12
137:19 138:19
140:3,7,15
141:9 142:20
**exhibits** 3:2
**existed** 53:4
**expected** 50:18
**expenses** 64:16
**experience** 24:2
**explain** 28:22

**explanation**
51:6
**expound** 68:13
**extra** 61:11

————— **F** —————

**F** 5:3 68:5 69:7
69:11 77:13
**face** 14:18,18,20
14:20 38:10
**face-to-face** 13:2
13:20,22
**facility** 11:1,10
11:14
**fact** 69:10 90:12
112:15,20
116:13 130:13
**facts** 82:13
83:17 90:10
93:21 94:1,21
133:22,22
134:7
**falsification**
130:12
**familiar** 96:6
119:5
**family** 110:12
**fashion** 42:19
**father** 133:4
**fault** 90:22 91:8
**February**
140:11,22
**feel** 8:2
**fellow** 97:4
**felon** 101:12,19
125:23 128:1
**felonious** 110:4
**felons** 100:3
**felony** 100:13
101:3,14 125:6
125:9 130:20
**female** 117:21
**Festival** 61:21
**field** 20:23

**fighting** 97:2
**figure** 102:10
**file** 24:17 25:3,9
25:11,19 26:7
26:8 28:13
29:1 34:14
36:14,15 37:16
37:20 39:1,4,9
39:20 40:7,19
41:16 42:8,23
44:3,6,10
93:15 96:2
98:4 127:16
139:22 140:9
**filed** 3:5 26:6,7,9
36:11 37:18
42:21 54:18
101:19
**files** 24:22 29:5
29:7 39:15
40:10,12,14
41:5 140:1
**filled** 19:16
**final** 73:15
74:20
**find** 27:7 69:23
102:8 106:4
120:20,23
130:19 131:14
**fine** 7:12,16
66:21
**finish** 14:22
**fired** 61:14
98:20 99:7,20
**first** 61:17 73:7
86:7 88:22
96:16 104:14
105:3 130:2
**fit** 46:7 72:5
87:20 90:3
99:19 109:9
**five** 14:5,16
131:3
**Flavor** 1:10 6:18

# FREEDOM COURT REPORTING

7:8 12:18 13:9
13:10,12 18:12
18:22 19:9,22
22:21 23:3
24:8 29:8
34:18 38:6
52:22 55:9
60:14 61:4
62:12 64:7,18
99:3 100:2,10
100:17 107:19
108:7 112:7
114:18 125:20
126:8
**Florida** 10:22
**follow** 83:10
99:12
**followed** 99:15
106:3
**following** 6:12
83:16
**follow-up** 144:2
**force** 126:14,19
142:7,12
**foregoing** 6:6
147:7,11
**forgery** 113:15
**forget** 13:6 14:9
**forgotten** 115:9
**form** 2:13 44:23
46:13 70:22,23
96:7 98:6
105:21 131:23
138:21 139:17
143:12
**formal** 73:16
74:21
**forms** 139:3,14
**forward** 35:15
53:11 75:6
124:15
**four** 14:5 16:17
61:23 98:23
114:2

**frame** 141:2
**Frank** 35:18
46:15 47:9,13
47:18 50:14,15
51:11 52:1
56:1 68:5 69:7
69:11 71:18
76:13,13 77:13
83:13 86:6,7
86:11 95:18,22
96:17 101:12
104:9 105:11
105:15 106:19
107:16 109:8
115:13,15
116:6,13,15,20
117:3,9 120:22
121:2,21,22
123:19 125:19
125:21 127:10
130:17,23
131:17 134:9
134:15 138:5
142:4,8 143:1
145:1
**Franklin** 6:19
**Frank's** 49:2,15
67:5 83:11
102:2 121:8
131:12
**free** 112:12
**Freedom** 7:2
**freelance** 10:15
10:16
**freelanced** 12:13
**front** 61:8 70:18
138:16 139:1
**FTE** 19:1
**fuck** 77:9 145:22
**full** 16:15 19:9
**full-time** 19:1,10
**further** 2:10
147:14
**future** 117:18

| G |
|---|
**Gadsden** 10:11
12:9
**gather** 44:12
**GD** 75:3
**general** 11:10,13
11:20 15:17
19:12,18 20:1
20:9 21:6
59:18 87:11,13
87:23 88:15,15
89:4,12 97:14
**generally** 46:6
103:3
**getting** 46:3
91:10 92:2
140:21
**gift** 60:17 61:6,7
61:9,18,19,20
61:22 62:3,4
63:16,17
**girlfriend**
110:12 111:5
128:10
**gist** 51:21
**give** 16:1 18:20
23:23 31:20
32:14 44:8,23
46:21 91:22
105:8 133:5
139:19
**given** 44:23 47:6
51:12 62:1,9
62:14 63:1,11
81:10 83:23
93:22,23 94:3
95:1 114:9
139:5,13,17
147:12
**gives** 32:11
**GM** 12:7
**go** 9:6 12:8
18:23 28:4
29:16 39:15

40:6 44:12
45:20 60:18
72:13 103:6
115:1
**goal** 17:10
**goals** 15:23 18:2
19:1
**going** 8:20 23:5
67:15 71:8
77:20 86:9
87:7,22 89:11
89:17 90:6
91:9,11 94:6
97:8,9,10
121:16 122:18
122:22 128:21
132:16 142:15
143:2 145:21
145:22
**Gomma** 10:20
10:20
**good** 31:15 95:1
136:17
**gotten** 133:12
139:8
**grandmother**
79:6
**Greenville** 6:2
**grievance** 35:11
**ground** 90:4
**grounds** 2:15
130:13
**group** 14:1,1
15:1,2 22:22
**guess** 62:7 99:23
138:17
**guilty** 113:16
131:6 134:10
**G-O-M-M-A**
10:20

| H |
|---|
**H** 4:5
**half** 10:9

**hallway** 110:9
**handbook** 62:20
**hands** 76:16
**happen** 33:22
40:5 46:17
61:12 127:10
**happened** 12:22
15:5 42:2,13
47:3,7 50:2
110:15 132:3
140:22
**happening**
120:5
**happens** 107:10
**happy** 72:13
**harassment**
21:16 22:7,7
22:20 23:2,4
24:9,14 29:19
31:4,9 32:13
32:18 33:7,8
35:2,6,12
39:23 40:4
95:23 110:14
112:12
**harsher** 93:22
**head** 13:15
**hear** 75:13,15,17
75:17 77:5,9
77:13 83:9
**heard** 46:9,10
68:5 75:14
77:4 78:6,9,10
80:12,13,23
81:23 83:2,7,9
**hearing** 71:7,13
73:6 147:13
**held** 56:20 58:23
89:22 95:13
**help** 16:15 18:14
18:18 57:6
59:4
**helps** 17:22
**hire** 19:6 100:10

hired 19:6
hiring 11:10,16
  15:18 100:2,6
hold 32:12
Holdings 5:11
hollering 50:17
hometown 12:10
honored 109:15
Horace 52:23
hostile 118:22
  119:20
hourly 19:19
House 1:10 6:18
  7:8 12:18 13:9
  13:11,12 18:12
  18:22 19:9,22
  22:21 23:3
  24:8 29:8
  34:19 38:6
  52:22 55:9
  60:14 61:4
  62:12 64:7,18
  99:3 100:2,11
  100:18 107:20
  108:7 112:8
  114:18 125:20
  126:8
HR 10:15 11:10
  11:13 15:15,17
  18:12 29:5
  55:1 64:15
  138:15 141:11
Huh 16:5
Human 11:2
  15:10
Hutchins 14:10
  105:7,11,15
  106:6,19
  107:15 121:21
  122:6 123:1,6
  123:9,16,18
hypothetically
  34:17

I
idea 27:16
ideas 90:1
identification
  17:14 48:17
  52:12 66:12
  67:18 68:19
  72:23 95:6
  96:12 125:13
  137:20 140:4
identified 33:14
  36:5 45:17
  139:18
identify 7:3
Ignore 76:17
imaginary 79:6
imagination
  137:6
imagine 136:12
  137:7
immediately
  109:11 123:15
  136:22
implied 61:1,3
important 60:7
  116:12,18
  120:20
inaccurate 43:5
inappropriate
  117:13,16
incident 23:11
  37:2 40:11
  47:3,12 49:5
  49:10 51:15,18
  52:8 54:2,13
  56:11 66:23
  67:3 71:3,10
  73:12 76:3
  85:4 90:23
  96:20 119:15
incidents 76:4
include 32:3
  33:11 83:11
included 56:8,11

incomplete 43:5
  43:7,9
inconclusive
  40:3
incorrect 43:4
incredible 89:13
independent
  56:1 106:10,15
  107:12
independently
  135:4
indicate 24:17
indicating 86:18
individual 14:19
  22:22 28:1,13
  40:9,10,12,18
  40:19 52:9
  82:7 117:8
  118:17 135:4
  137:2,5
individually
  14:21 26:7
  118:18 119:16
individuals 25:2
  30:10,15 32:21
  34:7,9 56:4
  70:7 116:4,7,8
  140:1
individual's
  37:21
inflammatory
  141:21,23
inform 45:10
information
  30:17 43:22,23
  45:7 71:2 82:2
  121:12,13
  126:2 130:3,8
initial 43:18
  44:5 85:10
initially 13:5
  40:15 102:16
initiated 102:8
  102:15 104:17

104:23 110:3
  121:10,15
instance 23:12
  35:17 42:3
  46:4 49:13
  91:18
instances 41:22
  41:22 42:4
  79:9
instigate 142:1
instigated 142:4
instigating
  90:13
instigation
  90:16
instigational
  97:14
instigationally
  142:1
institute 130:18
institutional
  37:8,23 38:2
  38:11 39:3
intercourse
  114:14
interested
  147:16
interfere 99:5
interfering 97:3
interview 13:4,6
  13:19,22,23
  14:6,18 30:17
  32:21 34:6
  35:22 56:23
  68:1,2,14 85:3
  85:6
interviewed
  13:1 35:4 36:4
  42:14 43:8
  56:15 71:1
interviewing
  11:15 43:21
  69:1
interviews 13:1

13:2,2 14:15
  15:1,3 34:9
  60:2
intimid 94:12
intimidate 99:4
intimidating
  94:15 97:3
intriguing
  110:13
investigate
  29:18,18 33:3
  34:2,5 124:14
  143:11
investigated
  30:10 31:13
  35:13,16 56:3
  145:14,16
investigating
  30:5 35:2
  108:16
investigation
  30:19 36:17
  38:18,20 44:1
  49:4 50:9,13
  52:10 54:13,17
  55:8,12,20
  56:9 57:3
  59:16 60:3,6,9
  60:12 63:15
  67:12 68:3
  70:11,16 73:11
  73:15 74:20
  75:11 80:8
  81:4,15 82:12
  83:13 85:4,10
  86:4 102:6,9
  106:7 109:2,6
  111:2 112:17
  116:19 121:4
  121:10,11
  123:22 127:16
  134:8 138:21
  141:2 142:22
  144:3 145:7

investigations
42:23 102:1
106:21 107:2
127:1,3 143:20
investigative
43:17 60:6
82:1 141:16
involuntarily
63:7,9,10
involved 23:12
30:15 32:21
35:22 39:10
47:10 75:11
76:6 89:5,10
89:23 90:5,12
90:15 91:4,7
113:4,8 116:4
121:4
involvement
105:17
involving 47:9
51:15 54:2
71:9 109:3
116:6
irregularities
65:18 66:3
irrelevant
133:21
issuance 62:19
issue 69:17 70:1
87:17 88:16
100:1 107:23
114:21 126:13
126:14,15
127:13 130:16
136:19
issued 88:4
93:12 140:13
140:18
issues 50:20
105:11 106:5
106:17 107:14
107:20 126:11
issuing 11:17

___ J ___

J 5:9
Jacksonville
10:22 12:9
Jane 40:2,5
45:20,20
January 96:8
Jennifer 5:3 7:7
66:18 103:21
104:8
Jewel 110:5,8
job 12:17 15:6
15:11,17,20,21
17:23 18:1,3
18:21 114:18
145:23
jobs 29:4
Joe 37:9 38:9
39:23 40:4,4
40:22 43:2,3
Joey 7:1
John 45:19,20
Jones 69:8
Jordan 123:16
138:18 139:13
Jr 6:19
June 1:22 2:8
3:1 6:10,21
49:10 54:5
66:23 86:2
96:18,22
jury 8:16 9:9

___ K ___

Katherine 68:1
69:8
keep 19:5,5
36:10,19 73:18
92:2
keeping 19:9
26:2
kept 24:21 25:1
25:5,11,18,18
25:20 27:17,20

28:11,13 34:14
35:1 37:5
40:18 96:4
139:11,23
key 141:4
kicking 87:21
kicks 90:4
Kilby 114:3
kin 147:15
kind 19:21
20:10 22:14,17
22:17 26:11
35:10,11 47:10
126:20 130:6
130:11 143:16
kindly 136:5
kinds 120:9
knew 32:4 33:4
knock 9:6
know 9:7 13:13
19:11 20:5
25:22,23 26:12
27:3,12 28:14
31:22 35:21
38:10 40:23
42:12,16 43:6
44:15,20 46:7
46:8 47:14
54:23 55:2,5
60:22 67:12
72:1 76:15
82:23 88:16
95:19 96:3
97:13 100:9
101:4,10
105:17 106:23
107:8 108:21
108:22 111:2
111:18 116:13
116:20 117:3,8
121:14 122:2,6
122:15,22
123:1 131:8,12
133:17 139:11

140:1 141:5,17
143:5
knowledge
33:13 56:1
65:20 66:4,6
111:21 112:1
117:2 126:15
126:16 130:5
130:10
known 94:20
knows 115:7
Kress 5:17

___ L ___

L 2:1
label 76:8
labels 76:10
81:1
lady 73:22 78:6
81:17 88:6
91:20 92:2,11
92:19 97:17
lapse 141:5
Large 2:7 6:4
law 112:1
132:15 133:9
133:12,19
laws 133:2 137:4
lawyers 8:7
lead 41:23
leader 138:6
142:21
leading 2:13
63:19
leads 98:23
learned 43:23
57:8 60:5,8
leave 11:4 60:13
60:15 62:10
64:6
left 40:21 61:4
61:16 62:1
65:2,6 76:12
96:8 108:7,9

108:12
legal 136:19
length 54:2
lesser 91:10,11
91:13
let's 19:3,3
35:10 37:9
48:8 72:17
74:11,23 92:18
95:14 100:20
103:8
License 147:21
lied 58:4 70:1
81:12
Linda 1:6 5:20
6:17 7:6 35:18
46:14 47:9
50:15 51:16
54:6,10 71:8
73:6 76:11,15
77:6,22 78:15
78:19 80:17,21
81:3,12,18,19
82:4,10,17,19
83:4,20 84:2,2
84:9,21 85:3
87:9 90:9,15
91:14 97:8
103:23 105:9
106:4,16
107:13,18
110:9 116:7
117:5,13
120:21 121:6
124:4,9 126:5
138:1,6,22
140:10,15,20
145:1
Linda's 66:22
80:19 81:21
139:22 142:6
line 45:6 74:13
83:10,17 86:21
90:18 92:18

# FREEDOM COURT REPORTING

121:23 123:19
**lines** 12:6 127:2
**list** 8:22
**listed** 23:10
　26:19
**litigation** 54:14
**little** 18:20
　73:19 103:9
　129:12
**live** 9:2 10:2,5
　10:10
**lived** 10:7
**LLC** 5:16
**locked** 64:4
**logistics** 14:8
**long** 10:7,16
　11:6 19:15
　61:14 68:1
　69:9,10
**longer** 38:5,6
　115:7 117:5
**look** 11:21 16:3
　16:7 17:19
　28:8 35:7
　52:17 53:23
　86:16 94:10
　95:9,15 100:15
　113:19 125:17
　137:1,4
**looked** 118:18
**looking** 68:6
　95:9 104:17
**looks** 16:22 18:9
**loss** 58:13
　126:22
**lost** 127:5
　145:23
**lot** 68:11 69:7
　90:15,16,16
　127:4
**loud** 144:11
**Louis** 5:13
**lying** 100:12

**M**

**machine** 76:9,9
**maiden** 73:16
**maintain** 19:1
　44:2 108:8
**maintained**
　42:18,20 44:6
　44:9
**making** 19:16
　41:8 75:8
　95:14 103:2
　142:4,14 143:2
　145:1
**man** 9:7 132:21
**management**
　14:1 31:10,11
　62:11 139:16
**manager** 11:2,3
　14:8,8 15:10
　15:15 18:12
　20:4 29:6 55:2
　59:19
**March** 138:2
　140:13,20
　141:6
**marital** 122:16
　122:20
**Mark** 14:9
**marked** 17:14
　48:17 52:12,16
　66:12 67:18
　68:19 72:23
　73:3 95:6
　96:12 103:15
　104:3 125:13
　137:20 140:4
**Mary** 14:4 45:20
　45:21 59:22
　108:12
**match** 62:12
**matter** 6:17
　111:15 123:17
**ma'am** 10:4 12:3
　14:12,20 15:13

21:14 22:8,18
25:15 36:16
59:23 63:12,14
75:10,20 78:13
80:20 87:6
88:9 91:2
92:22 95:21
97:20 108:10
134:14
**McClain** 7:2
**McNaughton**
　1:21 2:5,22 6:1
　147:19
**mean** 19:4 26:1
　30:12 40:1
　44:16 45:5,10
　71:14 77:8
　78:2 79:6
　83:10 91:12
　93:19 94:4
　122:12 125:1
　127:11 129:20
**means** 38:3
　147:9
**medication** 99:9
　99:18
**meeting** 123:17
　138:14 141:17
**meetings** 124:5
　141:10,13,16
**Melvin** 14:10
　105:7,10,15
　106:5,19
　107:15 121:21
　122:5 123:1,6
　123:7,8,15,18
**member** 31:10
　31:11 139:16
**memo** 93:14
　140:9
**memory** 17:23
　22:8,18 28:16
　28:19,23 29:11
　29:23 37:8,23

38:3,11 39:3
47:20 48:6
52:5,6 57:10
57:20 58:13
59:4 67:6,11
68:3,17 69:2
69:15 70:19
72:11 86:14
94:22 95:2
106:11,13,16
106:20 107:13
107:23 108:1
144:15,16
145:20
**memos** 98:3
**mention** 69:18
**mentioned**
　45:19 46:20,20
　105:16 138:23
**merry** 115:1
**mess** 76:13
**messed** 76:9
**met** 123:15
**method** 41:20
**methodology**
　30:4
**MF** 75:3,3
**middle** 1:2 8:10
　136:6
**mind** 107:9
**Minimize** 19:2
**minute** 95:11
**minutes** 48:22
　76:6
**miscellaneous**
　64:15
**misrepresenta...**
　130:12
**missing** 60:17
　60:19 61:6
　62:5 63:16
**Missouri** 5:13
**misstatements**
　43:15

**mistaken** 77:1
**molestation**
　112:15,22
　113:5,17
　116:16 118:5
　119:23 125:3
　131:19 132:13
　132:22 134:4
　134:18 136:13
　136:17,18
　137:10,13,17
　141:12
**molester** 87:20
　101:17 110:11
　110:18 111:4
　111:11 116:2
　120:4,22
　121:19 122:23
　123:3 127:13
　130:17 132:6,7
　146:1
**molesting** 112:3
　124:20
**mommas** 112:2
**Monday** 93:2
**money** 64:22
**monies** 65:13
**monthly** 20:12
　64:20
**months** 10:18,18
**moved** 12:10
　61:10
**multiple** 29:4,5
　41:22 42:4
　76:4 100:19
　107:17,20
　113:16 124:5,5
　144:19
**multitude** 119:2
　144:19

**N**

**N** 2:1 4:1 5:1
**name** 7:1 9:23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

13:7 25:12
37:2,4 42:22
73:16 74:14
**named** 25:2
30:18
**names** 14:9
46:20 75:13,19
**Nance** 2:4 6:11
6:17 10:1
60:13 134:18
136:11
**NANCY** 1:15
**nature** 107:9
117:18
**necessarily**
27:10 33:23
38:19 91:8
93:15
**necessary** 2:11
8:2,15 54:15
58:17 59:20
95:4 124:17
**need** 26:12 48:9
73:9 131:2
132:9 144:11
**needed** 26:11
28:1 70:13
88:12 92:20,21
**negate** 42:4
**neither** 147:14
**never** 45:16 61:3
63:20 66:8
131:13,14
**new** 11:15,19
57:9 62:19
124:8
**Nineteenth** 5:18
**nondisciplinary**
38:22
**North** 5:6,18
**Notary** 2:6 6:3
**note** 17:10
**noted** 142:12
**notes** 34:8,14

35:3,7 36:7,9
36:10,11,16
37:10 38:18,20
42:13,17 43:17
50:11 54:12,12
54:17,22 55:1
55:3 56:7,8,10
56:12,13,15
58:8,10 59:3
67:11 68:17
69:3 106:12
107:1,3 108:2
108:3,6,9,18
109:1,5 114:6
115:6 124:1
144:6,13
**number** 1:5 6:16
6:20 17:13,17
37:10 48:16,20
52:11,16 53:3
56:2 66:11,15
67:17,21 68:18
68:22 72:22
73:4 74:19
92:17 95:5,10
95:15 96:11
97:2 103:14,19
104:2,7 110:2
125:12,16
127:12 137:19
138:19 140:3,7
140:15 141:9
142:20 147:21

——— **O** ———

**O** 2:1
**oath** 71:15 92:10
97:17
**object** 23:5
77:20 86:9
97:10
**Objection** 24:19
25:14,21 26:14
27:2,18 28:20

29:3 30:8 31:1
31:8,21 32:9
33:21 34:13
35:14 36:1
37:11 38:13
39:5 40:8 41:3
42:10 43:13
44:4,14 45:9
45:13 46:18
49:9,14 50:5
50:21 53:9
54:4,16 57:14
58:5,16 59:5
59:11 60:20
61:15 65:23
69:19 70:3,10
71:21 72:6,16
77:23 78:7,16
78:21 79:8,15
80:2,10 81:7
81:13,20 82:5
84:7,19,23
88:1,13 89:6
90:7 91:1 92:4
94:7,17 95:3
96:5 98:21
99:8,11,22
100:4 101:7
104:20 105:13
109:13 110:20
111:8,14,20
112:4 113:18
114:20 115:2
115:11 117:7
117:15,22
118:8,12 119:1
119:13 121:3
122:1,4,7
123:4,10
124:21 126:1
128:17 131:10
131:20 132:8
132:14,23
134:5,19

136:15 137:11
139:9 140:23
141:14 142:5
142:10 143:4
146:2
**objections** 2:12
2:15
**obviously** 38:4
**occasion** 34:21
**occur** 75:15
**occurred** 36:23
57:7,16 67:13
79:12 83:17
96:20 110:23
118:20 137:13
141:2,7
**occurrence** 37:6
118:18 124:8
**occurrences**
105:6
**October** 22:3
23:16,16,17
**offender** 101:17
102:3 116:1
**offenders**
111:19
**offense** 113:6
**offer** 15:6
**offered** 2:17
23:1 45:15
**office** 6:23 61:8
61:11,11 63:19
64:1,3 138:16
139:1
**offices** 2:7 6:8
**off-the-record**
56:19 58:22
89:21 95:12
**oh** 17:3 38:15
133:10
**okay** 8:5,12,17
8:23 9:3,4,9
10:23 12:8
13:8,12,13

15:4 16:3 17:3
17:4,8,12,21
18:8,17,18,20
19:17 23:8,18
27:15 28:6,10
29:13 30:20
32:1 33:1,18
34:4 35:9,17
36:6,13 37:17
38:1,8 39:2
42:6 46:23
47:5,16 48:7
51:20 52:15
53:7 54:9
55:23 59:21
60:5 72:20
73:14 74:12,19
75:5,12,16
76:18 79:1
80:21 81:22
83:15 86:13,19
87:2 89:15
90:20 91:6
92:19 94:13,20
95:19 96:10
102:4 103:11
103:22,22
104:6 108:3
109:16 113:2
127:18 128:3
131:19 133:23
135:7,16 136:9
136:21 138:12
145:4,18
**old** 137:8
**omission** 130:5
130:13
**omissions**
130:10
**once** 61:9 99:19
**ones** 21:12 76:20
**one-year** 98:16
**ongoing** 87:17
88:16

# FREEDOM COURT REPORTING

158

online 12:19
open 117:2
opened 12:1
openly 112:10
operator 76:9
opinion 118:9
 118:14,16
 133:3,5,6,18
 133:20,21
 134:1,6,22
 135:2,2,5
 137:3,12
opinions 133:8
opportunity
 7:23
opposed 16:12
opposite 118:5
oral 3:1 6:11
 132:21 134:3
 134:16 135:9
 136:14 137:8
order 33:23
ordinarily 8:8
 139:12
orientation
 11:16,20
original 2:23
 23:13 43:16
 62:2
Originally 61:20
outcome 38:19
 50:12 60:12
 82:12 83:12
outlined 71:3
outside 21:3,3,9
 110:10 136:23
outstanding
 65:6
owners 13:10

**P**
P 2:1 5:1,1
paced 99:4
package 20:10

63:2,11
packages 20:17
page 4:2 17:18
 73:7,8,14
 74:12 86:16
 90:17 92:18
paid 65:4
Pantazis 5:16
paper 53:17
Parrish 73:15
 74:21 75:9,19
pars 119:9,10
part 12:5 16:11
 16:11,20 23:6
 23:13 38:23
particular 22:14
 41:19
parties 2:3,14
 147:15
party 7:20
pause 49:1
 73:20 80:3
pay 64:17,18
 65:1,8,10,10
 65:11,12,13,14
 65:15
paying 64:19
PC 5:5 6:23
Peanut 61:21
pending 135:22
pennies 92:3
people 14:11,14
 31:6 32:4,7
 33:12 35:4
 42:14 44:12
 46:20 58:14
 69:21 70:17
 71:15 80:23
 88:23 116:14
 116:15,21,22
 117:4,12,13
 121:7,17,18
 124:5 139:3
 141:4

perception
 84:14,18
perform 130:22
period 17:1
 19:15 20:6
 22:1 23:20
 41:23 42:5
 98:14,16 99:1
perpetual 42:1
person 13:16
 14:6 21:1,4
 26:11 27:12
 31:6 32:22
 33:15,17 36:23
 39:6 40:15
 41:8,11,14
 43:20 45:11,19
 46:12 50:18
 101:2 103:3
 136:14 139:1
personal 36:16
 38:18 54:12
 111:9,10,13
 112:8 121:8,13
 125:4,7,10,11
 125:21 126:6,7
 126:8,11,17
 142:6
personally 22:6
personnel 24:17
 25:8,18 26:8
 29:1 32:20
 37:15,20 38:23
 39:4,9,15,20
 40:6,14,19
 41:5,16 44:3
 96:2 127:16
persons 30:18
 33:3 36:4
 46:21 62:2
person's 25:11
 37:4 42:8,22
 70:5 112:5,8,8
 112:11

pertinent 44:1
 53:18
phone 13:1,6,18
 13:22
pick 61:22 63:3
piece 53:16
pitch 72:5
pitched 46:6
pitches 90:3
pitching 87:20
 99:19 109:9
place 6:22 11:1
 12:1 129:1
 139:21 140:2
plaintiff 5:14
 7:6
Plaintiff's 17:13
 17:17 48:16,20
 52:11,16 53:2
 56:2 66:11,15
 67:17,21 68:18
 68:22 71:4
 72:22 73:4
 92:17 95:5,10
 95:15 96:11,15
 103:14,18
 104:2,6 110:1
 110:5 123:14
 125:12,16
 127:12 128:19
 128:19 132:1
 137:19 138:19
 140:3,7,14
 141:9 142:19
 143:16
Plaintiff(s) 1:8
plant 11:5 12:11
 26:21 79:10
 97:1 99:16
 102:2
please 3:3 9:14
 9:23 17:20
 32:15 46:15
 47:3 51:17

66:16 91:3
 95:16 100:23
 103:19 120:18
 125:17 129:13
pled 113:16
 134:9
Plus 7:13
point 8:16,20
 31:13 33:10
policies 128:23
policy 94:14
 98:18 99:2
 100:2,6,9
 101:2
position 13:14
 19:15 111:17
 129:9,15
potential 11:15
prefer 94:21
preference 94:3
presence 96:23
present 5:20
 117:18
presented 59:7
 82:13
preserve 53:18
 54:11
preserved 54:14
previous 24:2,3
 74:17,18 87:16
 90:14 123:17
previously 131:5
 131:18
primary 13:16
prior 2:17 40:23
prison 114:3
 115:14,16,19
 116:9,10,14
 117:5
private 121:7,9
 121:12 125:2
probably 28:17
 62:7 68:15
 116:23 123:23

# FREEDOM COURT REPORTING

127:15 144:1
**probation**
113:15,20,21
114:11,17,22
**problem** 19:8,11
42:1,2 61:5
**problems**
122:17,20
**Procedure** 2:20
6:6
**proceedings**
6:13 7:21
**process** 19:18,19
23:7,14 31:14
45:3 51:13
60:3,6,11 98:8
99:13,13,14
**produce** 29:1
**producing** 58:13
**productivity**
126:23 127:6
**Products** 1:10
6:18 7:9
**profanity** 96:23
**program** 12:16
24:13 26:16,18
28:4
**prohibiting**
100:10
**proof** 40:3
**proper** 112:6
**property** 97:5
**proven** 41:1
**provide** 8:21
**public** 2:6 6:3
111:15,21,23
112:1 121:9
126:2,3,3,15
126:16,16
**public's** 111:18
**pulled** 55:4
127:15
**pulling** 127:2
**punched** 88:23

**punches** 88:22
**purchases** 64:13
**purpose** 41:19
57:1,4
**pursuant** 6:5
**put** 9:8 16:20
25:8 40:10,12
41:10,10 42:8
44:18 70:18
105:2
**P.O** 5:12

—————
**Q**
**QA** 14:8
**Qs** 73:21
**qualified** 23:23
**quantified** 127:9
**quantify** 127:5
**quarterly** 20:12
**question** 2:14
14:23 25:23
30:15 31:2,17
31:17,23 40:20
43:3 51:1
59:12 65:3
66:9 74:2
77:21 80:4,21
89:16 92:5,6
95:11 108:6
115:3 116:17
118:1,2 119:19
120:10,17,18
120:19 123:12
131:5 134:13
135:19,23
136:7,10
138:22,22
143:14
**questioned** 70:7
105:19 145:8
**questioning**
45:2
**questions** 2:13
44:17 51:13

70:4,6 146:11
147:8
**quick** 16:6 103:7
**Quinn** 5:16

—————
**R**
**R** 5:1
**racial** 29:19
**raised** 70:5
**Ralcorp** 5:11
13:6
**ran** 131:13
**range** 46:8
**rape** 128:6
**reaches** 88:21
**read** 8:1 9:12
73:9,17 74:6,7
74:8,10,12
86:17 90:18
91:3 102:23
127:21 129:2,5
129:12,20
135:22
**reading** 52:7
73:18 86:17
**real** 103:7
**realize** 124:4
**reason** 41:19
62:8 65:4
91:20,23 92:9
92:14,21 93:3
**reasons** 92:20
**recall** 13:21 14:5
14:16 15:2,18
20:19 21:17,22
22:5,15,16
24:15,20 25:4
25:5,16 26:6,8
27:20 28:7,10
28:12 29:8,21
35:8 36:22
40:13,17 42:11
48:5,6 53:21
55:11,15,21,22

56:4 57:8,10
57:19,20,23
58:7 60:21,23
61:13,16 62:6
63:4,23 64:5
65:1,12,15,16
66:8 67:1,5,7
67:13,15 68:2
68:16,17 70:19
71:5 72:8,9,11
85:1,8,17 86:3
86:11,15 91:14
94:8,11,18
97:13 98:13,22
100:17 101:13
101:18,22
104:13 106:1,2
106:3,13
107:17 109:16
109:17,20
112:23 113:4
113:12,22
114:4,13,21
115:15 116:3,8
116:10 123:23
124:2,3 131:21
141:1,12
143:18 146:3
**receive** 22:20
30:14 33:3
53:5,10 93:4,7
94:6 97:8
138:17
**received** 24:14
24:18 25:9
26:19 27:12
53:8 54:10,22
55:9 87:9 93:1
94:5,9 95:23
97:15 138:19
143:15
**receiving** 91:15
93:13
**recollection**

44:22 105:18
146:5
**recommendati...**
59:19
**record** 6:21 9:19
9:20 17:18
22:9 25:5 26:4
27:14,16 29:2
42:2 56:17
58:20 89:19
98:7,8 103:12
111:15 113:20
126:4
**records** 24:21
25:1 26:2
27:23 29:9
35:1 59:10
139:10
**recruiter** 13:5
**redefine** 118:1
**reduced** 98:16
**refer** 15:16
102:7
**reference** 76:2,3
129:10,16
**references** 105:9
**referencing**
76:21
**referred** 109:6
**referring** 48:21
54:5 106:18
107:14 123:16
141:16,18
142:17,19
**refresh** 28:16,19
29:11,23 52:6
59:4
**refreshes** 17:23
**refusing** 134:12
**regard** 100:6
**regardless** 39:9
105:2
**regards** 107:20
**reiterate** 57:4

# FREEDOM COURT REPORTING

rejection 130:14
related 140:11
relates 107:23
relative 27:4
  57:7 127:22
relatives 7:15
  8:10,22 9:16
relevance 32:22
  117:23
relevant 93:21
  106:8 112:17
  114:9 117:1
rely 94:21
  106:20,22
  107:4,8 108:1
  144:16
remember 14:13
  20:14 21:11
  38:15 47:18,21
  52:4,8,8 55:19
  57:11,17,22
  62:22 67:23
  69:1 71:10,12
  71:15 102:4
  107:5 110:2
  112:19 115:19
  133:10 143:7
  144:4,10,22
  145:11,18,21
remind 38:15
Renny 1:21 2:5
  2:21 6:1
  147:19
Repeat 51:1
repeatedly
  50:16 142:20
repercussions
  101:5
repetitive 27:9
rephrased
  120:14
report 31:9,18
reported 81:3
reporter 2:6 3:4

6:2 7:10 107:7
  135:20,22
  136:3 144:12
  147:20
reporting 7:3
  31:12
reports 87:18
represent 7:4,6
  7:8 18:6 73:5
representation
  58:2
representing 7:2
represents
  147:11
request 109:14
requested
  108:19
require 42:5
required 23:2
reserve 9:12
resign 63:8
resolved 88:17
resources 11:2
  15:10
respective 2:3
respondent
  52:21
responding
  119:19
response 102:21
  144:9
responsible
  18:11,16 19:22
  64:19
result 147:17
results 129:9
resume 133:11
retained 3:4
retrained 23:12
return 88:3 93:3
returned 71:17
  87:4 93:2
  97:18,19
reviewed 63:18

reviewing 87:1
  90:19
Ricky 14:4
Ridge 10:6
right 9:12,16
  13:15 14:22
  16:13 21:11
  22:11 23:20
  32:5 33:20
  34:8 38:5 40:5
  47:8,17 49:23
  52:23 53:20
  58:9,15 59:14
  60:7 61:5
  62:21 67:1
  68:8 74:1,19
  75:21 76:19
  77:22 78:3,6
  79:17 80:18
  81:19 86:17
  88:8,19 90:17
  90:21,23 91:23
  92:12,18 93:6
  94:6 96:19
  99:4,7,21
  100:8 103:8
  104:11 105:1
  111:19 112:19
  115:10 120:13
  121:23 122:14
  123:9 129:18
  135:7 136:12
  139:6 143:3
  144:8
Road 52:23
Robertson 2:23
  4:3 5:15 7:5,5
  7:13,18 8:6,13
  8:18 9:1,5,15
  9:22 16:5,8,13
  16:19 17:2,5,8
  17:12,16 25:2
  34:22 48:4,8
  48:19 52:14,19

54:7 56:17,21
  58:20 59:1
  66:14,20 67:20
  68:21 72:17
  73:2 74:6 80:6
  86:22 89:8,19
  95:8 96:14
  100:7 103:8,17
  103:20 104:5,8
  113:19 119:21
  122:9 125:15
  135:12,18
  136:1,5,8
  137:22 140:6
  146:8
rolled 98:11
rolling 98:14
room 63:22
rounds 12:23
rule 2:19 97:2
Rules 2:20 6:5
run 131:16

_____
S
_____

S 2:1 4:5 5:1,2
  5:14 6:23
safety 12:15,15
  20:2,3 21:1
salary 19:19,23
Samulotscki
  14:9
saw 45:22 46:8
  46:14,22 49:3
  67:9 83:2
saying 27:8
  33:18 43:11,19
  49:16 65:21
  69:12 73:23
  76:8,14,23
  77:15 79:18,19
  81:1 82:2
  84:10 92:13
  111:6 120:21
  122:22,23

132:5 133:11
  145:22,23
says 17:10 68:5
  78:8 79:4
  96:22 110:5
  121:15 123:15
  128:20 129:7
  130:7 132:1,4
  141:8
schedule 11:22
  20:5,8 21:13
  21:23 30:2
scheduled 20:10
  20:12
Scott 5:9
screamed 46:5
screaming 49:7
  71:19 76:7
se 105:5
second 17:18
section 16:17
see 11:22 16:13
  16:19 17:22
  18:23 27:23
  32:10 35:8
  49:11,16,18,20
  53:2,23 54:1,8
  66:19 67:9
  74:23 77:3
  87:3,13 88:18
  88:18 100:16
  103:1 105:9
  117:23 118:1
  128:15,19,20
  129:5 131:2
seeing 15:19
  21:13
seen 46:10 48:23
Senior 5:10
sense 79:21
sent 12:20
  108:20
sentence 114:2
separate 24:15

# FREEDOM COURT REPORTING

25:11 36:14,15
43:18
**separately** 24:21
**series** 44:17
**serious** 138:10
142:23
**served** 52:20
**sessions** 26:3
98:3
**set** 18:2
**setting** 17:10
**severance** 63:1,4
63:11
**sex** 101:16 102:3
111:19 116:1
118:5,7 132:21
134:3,16 135:9
136:14 137:9
**sexual** 21:15
22:6 23:4 24:9
24:13 29:19
31:4 32:13
33:6 35:2,6,12
39:22 40:4
95:23 114:14
**sexually** 118:22
119:20
**sex-related**
113:6
**sheet** 26:5 30:3
**sheets** 21:19
28:9
**Shepard** 52:23
**short** 48:12
72:19 103:10
135:15 146:10
146:14
**shortly** 15:6
105:10
**show** 16:4,7
52:15 73:3
94:19
**showed** 90:14
**showing** 39:16

**Sidely** 110:8
**sign** 8:3 9:12
118:6
**signed** 96:8
140:18
**sign-in** 21:19
26:4 28:9 30:3
**simple** 93:13
**singular** 42:3
**sir** 9:23 17:20
18:5 25:8
27:19 31:15
66:17 80:14
84:10 89:3
102:10,22
103:19 106:14
108:4 118:21
123:11 125:17
135:8 137:23
140:8
**sit** 8:9 44:16
60:1 69:15
106:15
**situation** 30:16
33:5 105:4
123:20 135:4,5
137:5,7
**six** 10:18 14:16
140:14
**six-person** 14:6
**skills** 20:2,9
21:6
**slower** 129:12
129:13
**Smo** 40:2
**Smothers** 14:4
**sodomizing**
114:12 132:12
**somebody** 38:9
40:21 88:20
89:23 90:2
115:8
**somebody's**
111:12

**someone's**
101:14
**sorry** 21:5 51:1
66:20 89:3
103:20 104:8
129:11
**sort** 20:8 33:7
**sounds** 21:7
**sources** 21:10
**SOUTHERN**
1:3
**speak** 123:5
**specialists** 20:23
**specific** 11:23
15:19 18:2
24:9 26:20
27:1 34:21
47:12 55:11
56:5 62:22
75:15 77:5
91:18 98:13
106:21 131:21
134:22 141:1
143:18 144:17
144:18 146:3
**specifically** 20:5
21:6 23:11
24:15 29:8
52:5 62:16,23
72:2 75:18
77:6,12 82:16
86:6 98:17
106:1 107:22
109:21 113:3
113:12,23
114:5 115:16
116:9,10
126:23 127:5
131:22 141:7
**specifics** 18:21
46:23 55:14
62:15 143:22
**speculation**
25:22 101:8

**spent** 114:1
**spoil** 53:19
**spouses** 9:2
**St** 5:13
**staple** 16:21
**start** 19:3 86:16
92:18 110:15
132:2 136:10
**starting** 74:13
86:20 90:18
**starts** 88:21
**Start-up** 11:9
**state** 2:6 6:3 7:4
9:23 84:20
111:17,23
147:3
**stated** 128:5
131:22
**statement** 32:11
32:14 35:16
36:3 39:18,19
40:6 41:8,13
43:2,4,6,7,16
43:17,18 44:5
44:23 45:2,3,3
45:8,12,15,16
45:18,22,23
46:16,22 47:4
47:18 48:3,21
49:3,5,15,17
50:1,8 51:8,11
51:12,13,18
52:2,7 54:5,8
66:23 67:6
68:4,9,23
69:17,20,21
71:23 75:1,4
77:4,7 78:4,8
78:12,18 80:11
80:13,19 81:21
83:8,9,11
84:11,16
102:17,20
103:1,4 104:1

104:9,19 105:3
105:5,8,16,19
106:9 110:6,22
112:18 114:9
122:12 128:9
129:21 130:2
138:2,3,18
139:18,19,21
143:11 144:1
145:17
**statements**
30:14,21,23
31:7,19,20
32:3,8,16 33:4
33:12,19 34:6
36:3 39:15
40:2,9,13,17
40:18 41:4
42:8,15 44:9
44:13,13 45:4
45:17 50:7
57:6,7 69:22
70:5 75:22,23
76:20 77:11
81:9 82:6,7,16
82:23 83:19,23
84:8 94:22
101:23 102:8
102:12,14,23
121:5,5,11
139:4,5,7,23
146:4
**states** 1:1 80:13
138:6,10
**stating** 121:6,12
**status** 101:14,15
102:2
**statutory** 128:6
**stealing** 61:1,3
**stenotype** 147:8
**step** 96:16 98:6
98:8,22,23
99:13
**steps** 98:15,16

98:19
**Sterling** 10:6
**sticker** 17:19
73:19 86:23
**STIPULATED**
2:2,10
**stipulation** 6:7
7:14
**stipulations**
7:11
**stomps** 90:4
**stood** 89:2
**stop** 122:21
**store** 29:5,7
**stores** 29:8
**straight** 39:21
89:14
**Street** 5:6,18
**strike** 109:4
**strikes** 115:12
**stuff** 42:20
43:10,14 44:18
83:3 107:5,10
**style** 62:11
**suggest** 18:10
**Suite** 5:7
**supervision**
11:21 31:10
**supervisor** 21:1
31:5 33:16,19
50:18 51:3,10
87:19
**supervisory**
20:1,1,9 21:6
24:4,12
**supplied** 130:4,9
**suppose** 43:19
**supposed** 60:18
64:11,17,18
**supposedly**
47:14
**sure** 9:8 16:8
19:16 38:2
41:7,9 42:7

49:3 52:3 56:3
69:5 85:5
89:14 105:14
106:8 128:23
135:12 138:22
145:3,4,10,13
**surrounding**
56:8 71:2,10
**Swain** 5:3 7:7,7
7:12,16,22
9:11 16:3,6,10
16:16,22 17:3
17:7,9 23:5
24:19 25:14,21
26:14 27:2,18
28:20 29:3
30:8 31:1,8,21
32:9 33:21
34:13,20 35:14
36:1 37:11
38:1,13 39:5
40:8 41:3
42:10 43:13
44:4,14 45:9
45:13 46:18
48:1 49:9,14
50:5,21 52:18
53:9 54:4,16
57:14 58:5,16
59:5,11 60:20
61:15 65:23
66:21 67:22
69:9,19 70:3
70:10 71:21
72:6,16 74:4,7
74:9 76:17
77:20,23 78:7
78:16,21 79:8
79:15 80:2,4
80:10 81:7,13
81:20 82:5
84:7,19,23
86:9,20 88:1
88:13 89:6,15

90:7 91:1 92:4
94:7,17 95:3
96:5 97:10
98:21 99:8,11
99:22 100:4
101:7 103:22
104:20 105:13
109:13 110:20
111:8,14,20
112:4 113:18
114:20 115:2
115:11 117:7
117:15,22
118:8,12 119:1
119:13,17,22
120:12,16
121:3 122:1,4
122:7 123:4,10
124:21 126:1
128:17 131:10
131:20 132:8
132:14,23
134:5,19
135:11 136:15
137:11 139:9
140:23 141:14
142:5,10 143:4
146:2,10

---

**T**

**T** 2:1,1 4:5
**table** 76:12 80:5
135:19
**take** 16:6 17:19
23:2 31:7 34:6
35:3 48:8
52:17 64:22
72:17 81:9
85:12,13 101:1
103:9 107:1,1
110:17,21
119:11,15
120:8 135:11
136:3,23,23

146:10
**taken** 2:5 3:1
36:2,6,16
38:23 39:8,11
39:13,14 40:2
48:12 61:8
63:21,23 70:14
72:19 90:9,11
101:23 103:10
107:6 120:15
124:18 135:15
146:14 147:7
**takes** 111:17
**talk** 70:15
112:13 119:17
**talked** 56:4
70:20 105:14
107:5
**talking** 21:2,5
22:23 34:16,17
34:20,22,23
43:1 48:1 56:1
59:21 73:13
75:23 76:1,5
76:19 77:16,22
79:5,7 89:7,8
109:7 110:19
120:3,23
122:17 123:21
126:6,7 129:3
141:4
**Tamekia** 68:23
69:1 76:8
**tape** 48:14 103:7
103:13
**tapes** 63:18
**tasks** 62:16
**taught** 21:8,9,12
21:17,18,20
22:6,10 27:9
30:3
**teach** 20:18,21
21:15 28:5
**teaching** 20:19

**team** 138:6
142:21
**tell** 29:17 30:7
41:18 42:12,17
44:17,20 49:11
54:21 66:16,16
69:21 73:10
95:16 102:14
103:18 104:6
104:11,16,22
107:22 113:14
114:1,10,16,23
117:12,13
118:21 120:13
120:14 133:18
135:7 136:10
137:6,14,23
140:19 141:6
142:18
**telling** 26:22,22
53:17 71:15
101:5 110:10
116:14,20,22
117:4 121:7,16
130:1
**ten-year** 114:2
**term** 92:20
**terminate** 92:21
**terminated** 63:6
63:7,9,10
**termination**
99:1
**terminations**
11:17 15:18
**terms** 60:10
**testified** 71:7
104:15 119:15
**testimony** 1:14
3:1 71:22
72:13 92:17
147:12
**thereto** 2:18
147:9
**thing** 53:17 60:7

# FREEDOM COURT REPORTING

68:8 69:13
77:14,16 78:11
79:4 95:1
122:22 136:17
**things** 47:22
69:14 81:1
116:21 118:6
119:3
**think** 15:21
16:10,16 45:6
58:19,19 68:6
69:3 74:4,5
77:14 79:5
86:1 111:11
114:3 117:11
118:10,11,15
120:20 137:7
139:7,20
**thinking** 83:11
**Thomas** 10:1
**Thornton** 1:6
5:20 6:18 7:6
46:4 50:15
51:16 54:11
57:13 67:4
69:13 71:8
73:7 78:15,20
85:3 97:8
106:4,17
107:14,18
108:17 109:8
109:12 110:9
117:5 120:21
126:5 140:10
140:16
**Thornton's** 56:9
58:2 103:23
138:1
**thought** 18:14
51:3 97:7
104:15
**threatening**
94:15 97:2
**threats** 138:3,9

138:11,15
142:4,9,14,23
143:2,16 145:2
145:7,9,19
**three** 61:23
97:12 98:23
123:19
**threw** 35:19,20
38:16 46:6
47:14 76:16
**throwing** 38:10
49:8 50:17
54:3 67:3,10
71:20 87:21
**thrown** 67:14
**throws** 90:4
**time** 2:16,16
8:15 10:14
16:23 19:16
22:1 23:20
27:13 41:23
42:5 48:14
49:4 50:2 55:6
62:13 64:2
65:4 72:13
74:17 85:19
88:22 99:1,18
109:10 123:22
124:6,11
128:15 130:15
130:16 141:1
145:12
**times** 41:21
97:12
**title** 15:9
**today** 8:19 59:3
106:15
**told** 33:9 43:10
45:1,14 77:9
81:16,18 88:5
91:19 92:1,9
97:17 110:9
112:20 115:1
115:13,18,23

116:6,7,15
121:18 123:1
128:15 130:20
133:14 138:7
142:20
**Tommy** 1:15 2:4
6:10,17 134:17
138:14 141:11
**tools** 22:13,17
**top** 13:15
**topic** 27:1
123:18
**topics** 20:11,15
26:19 27:4,9
27:10 28:5,5
30:1
**total** 120:7
**totality** 119:6
**Tower** 5:6
**train** 11:22 24:5
**trained** 20:6
27:5
**trainer** 24:5
**training** 11:2,11
11:16,18,20,20
19:18,19,21
20:1,2,3,4,7,10
20:11,22 21:16
21:23 22:9,14
22:20 23:3,4,6
23:9,10,14,19
23:22 24:1,3,4
24:4,7,10,12
24:14,20,23
25:3,10 26:3,5
26:7,11,15,18
26:20 27:1,7
27:14,16,23,23
28:2,4,8,13
29:2,9,14,17
30:1,2 95:17
95:23 96:7
**transcribed**
147:9

**transcript** 2:23
8:1 9:13 73:5
147:12
**transcription**
147:10
**Travel** 64:15
**treated** 117:21
121:1
**treating** 123:2
**tree** 110:13
**trial** 2:16 129:5
**trigger** 23:1
**trouble** 110:15
124:10,19
132:2
**true** 50:4,7
131:8 147:11
**truth** 59:8 101:5
128:15 130:1
130:20
**trying** 27:7
**turn** 108:11,18
109:1,5,9
**turned** 108:14
109:21 144:2
**turning** 109:17
**turnover** 19:2,6
19:12,13,14
**turns** 43:21
**Twentieth** 5:6
**twice** 97:11 99:6
99:20
**two** 10:9 11:7
12:2 61:7,23
63:3 109:22
115:20 128:10
**type** 16:23 87:15
113:6 129:11

_____ U _____

**U** 2:1
**Uh-huh** 28:3
46:11 85:16
107:21

**ultimately** 59:14
124:22
**understand** 9:10
18:5 31:2
50:14 66:1,7
73:21 118:4
122:12 128:7
129:7,14
130:11
**understanding**
119:5
**unemployed**
10:14
**unemployment**
63:13 71:6,13
73:6 88:6
91:19 92:11
97:18
**unfortunate**
59:2,9
**UNITED** 1:1
**unlocked** 64:4
**unmanned**
19:15
**unpaid** 64:6,21
**upset** 122:16
**use** 22:13 64:22
**usual** 7:10
138:22
**usually** 33:11
104:21

_____ V _____

**v** 1:9
**vacant** 64:1
**vacations** 141:3
**various** 24:3
29:6 142:23
**versus** 6:18
94:22
**VIDEOGRAP...**
6:15 9:18
48:10,13 72:20
103:6,11

# FREEDOM COURT REPORTING

135:13,16
146:12
**videos** 22:13
**videotape** 6:16
**violation** 97:1
112:11
**violence** 97:5

---

**W**

**Wachovia** 5:6
**wait** 120:16,16
126:7
**walk** 45:6 46:12
**walked** 76:14
**walking** 88:20
**want** 7:23 13:8
42:1 73:7
108:21 127:8
137:5 138:12
**wanted** 46:1
62:13 74:5
122:21
**wanting** 89:13
**wants** 32:14
**warranted**
70:13 93:11
124:17
**wasn't** 25:8,18
31:16 80:1
92:9 93:22
116:9 119:19
120:10 122:19
**waste** 8:15
**way** 35:13 41:2
74:11 85:1
91:11 102:19
115:1 117:20
121:1,21 123:2
141:23
**ways** 29:5,7
**week** 63:3
**weeks** 63:22
**week's** 138:14
**welcomed** 90:2

**went** 13:19,21
**weren't** 26:1
45:14 84:22
**we're** 8:20 48:15
72:20 89:17
103:11 109:7
135:13 146:12
**we've** 32:12
73:12 76:1,5
86:5 107:5
**whatsoever**
130:6,11
**wife** 85:19,20
122:18
**wife's** 110:11
111:4
**Wiggins** 5:16
**wildest** 137:6
**Williams** 6:19
35:18 46:15
47:10,13,18
52:1 56:2,14
56:23 57:9,12
67:2 69:11,16
71:18 73:17
74:22 75:7,18
86:6,8 95:18
95:22 96:17
101:12 104:9
105:11 106:19
107:16 110:4,6
112:14,16
117:3 120:22
121:2,22
125:19,21
127:11 130:23
134:9,16 138:5
**winners** 61:22
**withdraw** 136:9
**witness** 6:11 8:5
8:12,17,23 9:4
9:10,14,17
66:18 74:8
75:12 76:18

87:1 90:19
92:6 120:1
139:15 147:13
**witnessed** 75:7
**witnesses** 35:22
58:3 67:8
70:17 75:16
81:23
**women** 120:7
**won** 62:2
**word** 68:5 69:7
69:11 77:13
**wording** 76:17
**words** 20:8
65:21 72:4,8,9
76:14 78:19
79:3 80:9,12
80:13 81:5,9
81:23 94:2
**work** 9:3 10:15
10:15,17,19
11:6 71:17
76:10 88:3,19
91:22 92:12,15
93:2,5 97:19
99:6 105:12
112:11 119:20
122:19 123:19
126:14,19
142:7,12
**worked** 12:14
**working** 45:5
55:7 112:7
117:6
**workplace** 112:6
115:14,23
126:12
**world** 125:20
**wouldn't** 70:19
112:3 124:12
**write** 45:1,7,11
45:14,15,21,23
46:15 47:3
51:17 69:22

83:1 124:22
133:2
**write-up** 91:12
91:23 94:5,6,9
94:18 97:15,19
98:1,5
**write-ups** 57:16
**written** 15:11,16
15:19 30:14,21
30:23 31:7
32:3,8,11,14
32:16 33:12
37:12 42:14
43:2,4 44:13
46:13 57:12
70:21,23 71:9
71:18 72:1,12
87:23 88:7,12
89:4,12 91:9
91:11,21 92:9
92:14 98:6,17
99:14 107:8
140:21
**wrote** 39:19

---

**X**

**X** 4:1,5 46:7

---

**Y**

**Y** 46:7
**yeah** 7:12,18,22
13:13 17:6,7
32:19 37:14
48:4 51:9
52:19 54:7
66:21 71:14
79:11 80:6
82:14 86:22
88:2 92:7,8
102:13 113:20
**year** 26:21,23
27:5,8 38:16
98:12 99:6,20
137:8 144:19
**years** 10:9 11:7

12:2 100:17,18
109:22 110:15
111:1 114:2
115:20 128:10
131:3 132:3
**yelled** 46:5
**yelling** 35:20
47:15 49:7
50:16 54:2
68:11 69:8
71:19 75:2,2
75:14,17 77:5
79:3 109:9
**yells** 90:3
**younger** 128:10

---

**Z**

**Z** 46:7

---

**0**

**05** 22:3
**06** 22:4 138:2
**07** 40:23

---

**1**

**1** 4:6 6:16 17:14
17:17
**1st** 138:2 140:20
**10** 1:22 4:15
125:13,16
127:12 128:19
**10th** 2:8 3:1 6:10
6:21
**10-year-old**
114:12 132:12
132:20 134:4
134:17 135:9
136:14 137:9
**10:38** 72:21
**103** 4:15,16
**104** 4:17
**107** 10:6
**107cv-712-W...**
1:5
**107-CV-712-...**

6:20
**11** 4:16 74:19
 103:15,19
 123:14
**11:35** 103:12
**12** 4:17 104:3,7
 110:2,5 132:1
**12:05** 135:14
**12:14** 135:17
**12:34** 146:13
**125** 4:14
**13** 4:18 137:20
 138:20 140:15
 141:9 142:20
 143:16
**13th** 85:13
**13-year-old**
 114:15
**137** 4:18
**14** 4:19 140:4,7
**14th** 49:10 54:5
 66:23 85:13
 96:22
**14-year-old**
 114:15
**140** 4:19
**15** 2:21 110:15
 110:23 132:3
**15-year-old**
 114:16
**16** 97:2
**16th** 85:21,22
 96:18 140:11
**1600** 5:7
**17** 4:6
**18** 86:21 92:19
 100:18 128:12
 128:13
**19** 39:23
**1988** 2:21

___

**2**

**2** 4:7 48:14,17
 48:20 56:2

**2/16** 104:1,10
 141:6
**20** 62:6 92:18
 135:9,10
**20-something**
 136:13 137:8
**2000** 129:1
**2005** 40:1
**2006** 96:22
**2008** 1:22 2:9
 3:2 6:10,21
**25** 62:6
**27-year-old**
 132:21
**2700** 52:23

___

**3**

**3** 4:8 52:12,16
 53:3 76:9
 103:13 121:23
**30** 76:6
**301** 5:18
**35203** 5:19
**35203-5202** 5:8

___

**4**

**4** 4:9 66:12,15
**411** 147:21
**420** 5:6
**48** 4:7

___

**5**

**5** 4:10 67:18,21
 71:4
**5(d)** 2:19
**50** 73:14 74:12
**51** 73:8
**52** 4:8
**54** 86:16 92:18
**56** 90:17

___

**6**

**6** 4:11 68:19,22
 71:4
**6/14** 56:10 96:21

**618** 5:12
**63188** 5:13
**66** 4:9
**67** 4:10
**68** 4:11

___

**7**

**7** 4:12 72:23
 73:4 74:13
 92:17
**7th** 140:13 141:6
**72** 4:12

___

**8**

**8** 4:13 95:6,10
 95:15

___

**9**

**9** 4:3,14 90:18
 96:12,15
**9:00** 2:9 6:9
**9:02** 6:21
**9:41** 48:11
**9:53** 48:15
**95** 4:13

# EXHIBIT C

## (Part 2 of 2)

PLAINTIFF'S
EXHIBIT

GOAL SETTING                                    SECTION 4

## BUSINESS/DEVELOPMENTAL GOALS

Goals are to be developed by the individual and the supervisor. Goals should be measurable, obtainable, and challenging and should cascade from those goals established at the corporate and departmental level. The individual and the supervisor must mutually agree to the derived goals. Goals must be developed in coordination with corporate, departmental, and individual business/developmental views in mind. Goals should be modified if they are changed during the review process.

You and your supervisor should discuss the relative importance goal attainment and skill set performance and development will have in determining our overall performance rating for this review period.

### 1. GOAL

> Maintain a level FTE (Full Time Employee) base that keeps temps minimized to 10-20, excluding gift pack.

### ACTION STEPS

> Working with Production maintains a staffing grid that is monitored weekly that shows where openings exist. Trigger hiring to keep up with the level of attrition.
> Monitor the employees that are "at risk", due to attendance or performance as part of the hiring trigger.
> Develop a relationship with several community venues beyond the Unemployment office to tap into employees; Career Services, Work Release program, University Career offices, Hispanic, etc...

### 2. GOAL

> Primary coordinator for the employee training process, both hourly and Salaried.

### ACTION STEPS

> Develop a training program for new salaried hires to cover basic job knowledge. This needs to be completed by QF2 for Sasha, Harrel, Fred, Wiley, Jeff and Donald.
> Pick up information already collected by David Helms, solicit more information from the Dept. Managers and submit the training grant application that is available from the Career Services Office.
> Enhance the current new employee orientation.
> Working with Production creates a cross training/back up training process for critical positions; Roaster, Label machine, Filler, etc...

**CONFIDENTIAL**                                    FH000737

## GOAL

Assess and then develop the current HR department into what is best for the Dothan site.

### ACTION STEPS

Assess and review both the roles currently filled by Leigh and Vera.
Ensure that all duties that are needed at this site are performed by the department.
Complete the job description assessment, including review of Grade level and discuss with incumbents by Jan 2006.

## 4. GOAL

Development of an hourly incentive program ready to implement Oct 2006/fiscal 07.

### ACTION STEPS

Working as a team with Finance, Operations and Divisional develop an incentive program that will be paid out quarterly and be tied directly to budgeted performance.
This must be drafted and ready for presentation for approval by the end of F'06 QF3.

## 5. GOAL

Ensure that all Bremner/Ralcorp policy and procedure is implemented at the Dothan facility

### ACTION STEPS

Working with Alice Clark and Steve Smith will get an understanding of what has/has not been implemented in the last year. Complete the implementation of those still in place and ensure that administration of existing policy is correct.

## GOAL

Achievement of Plant Safety goals

### ACTION STEPS

Vernon James, Plant Safety Manager reports to HR and will have primary responsibility to ensure that all proactive programs are being executed as targeted.
Ensure that appropriate follow up is being conducted on all existing accidents and challenges are being made where possible to keep WC costs minimal.

7. GOAL

| Complete all activities as outlined on HR Dothan Action Plan |

**ACTION STEPS**

| See attached document.<br>A few of the items on this document are separately listed as goals above. |

EMPLOYEE SIGNATURE _____ DATE 12/15/05

MANAGER SIGNATURE _____ DATE 12-15-205

**CONFIDENTIAL**                                                      **FH000739**



# RALCORP HOLDINGS, INC.

### F'06 Goals

## EMPLOYEE INFORMATION

**NAME OF EMPLOYEE:**   Tommy Nance

**BUSINESS UNIT/DEPARTMENT:**   Dothan Operations

**JOB TITLE:**   HR Manager

**DATE OF LAST REVIEW:**   None This is a goal setting document only

Revised:  7/98 - Final

**CONFIDENTIAL**

FH000740

**GOAL SETTING**                                     **SECTION 4**

## BUSINESS/DEVELOPMENTAL GOALS

Goals are to be developed by the individual and the supervisor. Goals should be measurable, obtainable, and challenging and should cascade from those goals established at the corporate and departmental level. The individual and the supervisor must mutually agree to the derived goals. Goals must be developed in coordination with corporate, departmental, and individual business/developmental views in mind. Goals should be modified if they are changed during the review process.

You and your supervisor should discuss the relative importance goal attainment and skill set performance and development will have in determining our overall performance rating for this review period.

### 1. GOAL

Maintain a level FTE (Full Time Employee) base that keeps temps minimized to 10-20, excluding gift pack.

### ACTION STEPS

Working with Production maintains a staffing grid that is monitored weekly that shows where openings exist. Trigger hiring to keep up with the level of attrition.
Monitor the employees that are "at risk", due to attendance or performance as part of the hiring trigger.
Develop a relationship with several community venues beyond the Unemployment office to tap into employees; Career Services, Work Release program, University Career offices, Hispanic, etc…

### 2. GOAL

Primary coordinator for the employee training process, both hourly and Salaried.

### ACTION STEPS

Develop a training program for new salaried hires to cover basic job knowledge. This needs to be completed by QF2 for Sasha, Harrel, Fred, Wiley, Jeff and Donald. *same x*
Pick up information already collected by David Helms, solicit more information from the Dept. Managers and submit the training grant application that is available from the Career Services Office.
Enhance the current new employee orientation.
Working with Production creates a cross training/back up training process for critical positions; Roaster, Label machine, Filler, etc…     *QF3↑     End of June*

3. **GOAL**

Assess and then develop the current HR department into what is best for the Dothan site.

**ACTION STEPS**

Assess and review both the roles currently filled by Leigh and Vera.
Ensure that all duties that are needed at this site are performed by the department.
Complete the job description assessment, including review of Grade level and discuss with incumbents by
Jan 2006.

*Database Aug 1st*

4. **GOAL**

Development of an hourly incentive program ready to implement Oct 2006/fiscal 07.

**ACTION STEPS**

Working as a team with Finance, Operations and Divisional develop an incentive program that will be
paid out quarterly and be tied directly to budgeted performance.
This must be drafted and ready for presentation for approval by the end of F'06 QF3. — *MAB needs to
initiate*

5. **GOAL**

Ensure that all Bremner/Ralcorp policy and procedure is implemented at the Dothan facility

**ACTION STEPS**

Working with Alice Clark and Steve Smith will get an understanding of what has/has not been
implemented in the last year. Complete the implementation of those still in place and ensure that
administration of existing policy is correct.

*Handbook Aug 15th*

5. **GOAL**

Achievement of Plant Safety goals

**ACTION STEPS**  *Tracking well.*

Vernon James, Plant Safety Manager reports to HR and will have primary responsibility to ensure that all
proactive programs are being executed as targeted.
Ensure that appropriate follow up is being conducted on all existing accidents and challenges are being
made where possible to keep WC costs minimal.

*Training Session for Supervision*

*Emergency Action Plan
Roll out*

**CONFIDENTIAL**                                    **FH000742**

7. **GOAL**

Complete all activities as outlined on HR Dothan Action Plan

— Refer to Action Plan

**ACTION STEPS**

See attached document.
A few of the items on this document are separately listed as goals above.


EMPLOYEE SIGNATURE _____ DATE _____

MANAGER SIGNATURE _____ DATE _____

**CONFIDENTIAL**                                                    FH000743

**EMPLOYEE'S ASSESSMENT**
**(Optional)**

Employees are encouraged to provide their candid assessment of the evaluation and the evaluation process. Please be specific. Forward the completed Assessment form to your locations' HR Dept (29R for St. Louis based employees).

How well do you believe the evaluation accurately reflects your performance during the review period?

Overall reaction to the performance review process. (*Please note those areas which you believe to be strengths and those where improvement is needed.*)

**EMPLOYEE SIGNATURE:** _____    **DATE:** _____

*An Employee may appeal the results of the performance review. The appeal may be made with your Manager, Manager's Supervisor, Department Head or a member of the Human Resource staff.*

**CONFIDENTIAL**

FH000744

# Dothan
## Human Resources
## Action Plan
## FY06

| Category | Item | Action Steps | Target Complete Date | Status | Comments | Update Comments 04/17/06 |
|---|---|---|---|---|---|---|
| Safety | Conduct Safety Inspections | All employees complete one per week | 1/1/06 | Ongoing | | Per Venon - now at 100%, but will be an ongoing process |
| | Implement Safety Observations | All managers complete one per week | 1/1/06 | Ongoing | Some teams participating | STOP will start April 13 |
| | Develop Master Training agenda | Venon conducts 'Train the Trainer with supervisors who train their employees | 12/5/05 | Complete | Must ensure quality of training as passed on. Venon to supplement with training videos/material from other locations | Complete |
| | Tool box talks | Conducted weekly on all teams | 12/5/05 | Complete | | Complete |
| | Disciplinary Action | Utilize disciplinary action to drive seriousness of safety violations | 12/5/05 | Ongoing | | Ongoing |
| | Emergency Responders | Identify and train Responders. Treat minor injuries on site. | 2/1/06 | Complete | Team trained in First Aid during November. Will train in CPR by February 1, 06 | Complete |
| | Accident response procedure | Detailed procedure to manage the relationship with the physicians and ER to minimize recordability | 12/5/05 | Complete | Have met with common medical providers regarding company expectations and light duty program. Member of management accompanies all Dr. visits. | Complete |
| | Safety Committee | Re-establish the plant safety committee. Drive interest and participation from all areas of the plant. | 12/5/05 | Ongoing | Currently posting for new members to serve specific teams - specifically hourly teams. Have committees for 1st and 2nd shifts. They meet once/month. Involve them in accident investigations and JIT development, | Ongoing |
| | Accident reviews - management team | Accident investigations completed within 24 hours of incident. Management review within 48 hours. | 12/5/05 | Ongoing | Involve them in accident investigations immediately. | Always ongoing |
| | Management Involvement | Participate in observations, inspections, and accident investigations | 12/5/05 | Ongoing | | Ongoing |

CONFIDENTIAL

FH000745

**Dothan**
**Human Resources**
**Action Plan**
**FY06**

| Category | Item | Action Steps | Target Complete Date | Status | Comments | Update Comments |
|---|---|---|---|---|---|---|
| | Emergency Action Plan | | 2/20/05 | Complete | | Complete will revise and review |
| | Plant Security | | 2/15/06 | Complete | | Completed with Glenn Warren |
| | Revised hourly handbook | Policies revised and communicated | 1/31/06 | In progress | | Targeted Reprint by May |
| Culture | Scorecards | Develop an action | 2/28/06 | In progress | | Working on communication and training / ONGOING |
| | | Share results from last meeting | 2/28/06 | Complete | | Complete |
| | Buddy system | Implement formal Buddy system for new hires | | In progress | Model off Princeton program | Still Developing Program |
| | Improve facilities where possible | Break room, housekeeping, etc. | 9/30/06 | In progress | | On going |
| | Communications | Update/Replace bulletin boards, conduct monthly communication meetings | 1/31/06 | In progress | | On going |

**CONFIDENTIAL**

FH000748



# RALCORP HOLDINGS, INC.

### F'06 Goals

## EMPLOYEE INFORMATION

**NAME OF EMPLOYEE:**     Tommy Nance

**BUSINESS
UNIT/DEPARTMENT:**     Dothan Operations

**JOB TITLE:**     HR Manager

**DATE OF LAST REVIEW:**     None This is a goal setting document only

Revised:  7/98 - Final

**CONFIDENTIAL**

PLAINTIFF'S
EXHIBIT

2

## DOCUMENTATION FORM

Employee Name: ~~████~~  ~~████~~ Frank Williams

Investigating Supervisor: _____ Date: _____

Present: Mary Brooks _____

_____

Who was involved: me & Linda Thurton _____

Witness (s): _____

Date of incident: 6/14-06 _____

Where did it take place: Line 3 _____

When did it take place (time and day): ~~██~~ 11:15 Am wed.

What happened: Linda was having problems out of ___
Lable machine so she just told me she was going
to Break. I let her go But I was still having trouble
with the machine. I finally got it fixed and chris
came around and told me to take out a Big Bag
of Cans that was sitting on Line 3. had a lot
of Bad Lables But was trying to work them in
Linda came Back off Break. I was going to
do what Chris had said then go Back and (over)

_____

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped?  If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

**CONFIDENTIAL**

FH000804

nick and help with the table. But when I went to go Linda yelled at me to help her get the rework. I told her that chris had already told me to do something else and I would help her when I got through. She told me that was my rework and I need to stay and help get it done. I told her I could not I had to do something I was told to do. She got an attitude. I put my hand in the air turned around and walked off. I had got very upset so instead of saying something that would get me in trouble I walked away

FH000804 a

Confidential

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | |
|---|---|
| Department of Human Resources<br>FLAVOR HOUSE PRODUCTS, INC<br>2700 Horace Shepard Road<br>Dothan, AL 36303 | **PERSON FILING CHARGE**<br><br>**Linda Thornton** |

**PLAINTIFF'S EXHIBIT 3**

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**420-2006-05107**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act     [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act     [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **26-OCT-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **11-OCT-06** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033** If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Deidre J. Rivers,**
**ADR Assistant**
_____
*EEOC Representative*

*Telephone* **(205) 212-2146**

Enclosure(s): [X] Copy of Charge

**Birmingham District Office**
**Ridge Park Place, Suite 2000**
**1130 22nd Street, South**
**Birmingham, AL 35205**

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

**See enclosed copy of charge of discrimination.**

FILE COPY

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| September 26, 2006 | Bernice Williams-Kimbrough,<br>District Director | |

LINDA THORNTON V. FLAVOR HOUSE -<br>PLAINTIFF'S RFP DOCS 0146

| CHARGE OF [  ]RIMINATION<br>This form is affected by the Privacy Act of 19/4; see Privacy Act Statement on reverse before completing this form | ENTER CHARGE NUMBER<br>[ X ] EEOC<br>420 2006 05107 |
|---|---|

_____ and EEOC
(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.)<br><br>Linda Thornton | H OME TELEPHONE NO.<br>(Include Area Code)<br>334-693-4488 |
|---|---|

| STREET ADDRESS<br>100 Armstrong Street | CITY, STATE AND ZIP<br>Headland, AL 36345 | COUNTY<br>Henry |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>Flavor House Products, Inc. | NO. OF<br>EMPLOYEES/MEMBERS<br>Over 15 | TELEPHONE NO. (Include<br>Area Code)<br>334-983-5643 |
|---|---|---|

| STREET ADDRESS<br>2700 Horace Shepard Road | CITY, STATE AND ZIP<br>Dothan, AL 36303 | COUNTY<br>Houston |
|---|---|---|

| NAME | OCT 2 3 2006 | TELEPHONE NO. (Include<br>Area Code) |
|---|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es):<br>[ ] Race [ ] Color [x] Sex [ ] Religion [ ] Age [ ] Disability<br><br>[ ] National Origin [x] Retaliation [ ] Other | DATE MOST RECENT OR CONTINUING DISCRIMI-NATION TOOK PLACE<br>(Month, day, year)<br>June 16, 2006 |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):

Social Security Number:__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__ Date of Birth: __5-16-64__ Sex: __Female__ Race: __Caucasian__

   I, Linda Thornton, began working for Flavor House Products, Inc. on or about June 25, 2001. While employed at Flavor House, I suffered sexual discrimination and retaliation. The sexual discrimination started during my first year of employment with Flavor House and continued throughout my employment. I was forced to resign my position with Flavor House on or about June 21, 2006, following my complaints to management of sexual discrimination and harassment.

| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>09-15-06    _Linda Thornton_<br>Date     Charging Party<br>          (Signature) | SIGNATURE OF COMPLAINANT<br>_Linda Thornton_ .<br><br>SUBSCRIBED AND SWORN TO BEFORE ME<br>THIS DATE<br>(Day, month, and year)    11-8-06 |

Page 2 EEOC Charge.
Name: Linda Thornton
Social Security #: 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
Date: 9-15-06

So much has happened that I cannot possibly set out everything, but the following is a brief summary of the sexual discrimination and/or harassment that I was subjected to while employed at Flavor House Products, Inc.

During my first year of employment, I repeatedly tried to get a promotion to "Label Operator". I was passed over several times and the position was given to temporary male employees with less or no experience. Unlike the male employees, I was required to provide a resume listing my mechanical experience before I was given the position. The discrimination continued even after I received the position in that I did not receive the training that the male operators/employees received. Additionally, the mechanics, all male, and other male employees made derogatory comments about me working "in a man's job." The mechanics did not like for me to make adjustments to my machine. If I took longer than 5 minutes to make adjustments, they would push me out of the way and make the adjustments or they would call the male supervisor over to make the adjustments. However, the male operators made adjustments that took longer than five minutes and nothing was said. I suffered this discriminatory treatment from the time I was put in the Label Operator position until I was forced to resign. My supervisor was aware of the discriminatory treatment; however, he did nothing to stop the discrimination. I also made numerous complaints to Marianne Boyer, Director of Operations, about the sexually discriminatory work environment that the female employees, including myself, were forced to work in on a daily basis. I told her that the mechanics, who are all male, cursed at and yelled at the female employees and that they called the female employees derogatory names. I reported to her that the mechanics would not allow the female operators to make minor repairs on their machines, but did not say anything when male employees made the same or similar repairs. However, Boyer's typical response to my complaints was to tell me that I would have to "deal with it" as she had learned to "deal with it" and then gave me two examples of discrimination she had do "deal with" in the company.

The first time I worked with Frank Williams was sometime in 2003. He was supposed to help me learn how to run his machine. I worked with him for three to four weeks. During that time, he yelled at me and cursed me. He also called me a "fucking stupid bitch". I complained to Melvin Hutchins, a member of management, but Hutchins told me that Williams was the only one that knew how to run the machine so I would just have to get along with him. I didn't work with Williams again until the beginning of 2006. I applied for a position as Line 3 Label Operator and received the position. Williams was not in the department when I applied; however, he was moved to the department shortly afterwards as the Team Leader. From then until I was forced to resign, Williams treated me in a discriminatory and demeaning manner. He yelled at me and cursed at me every day. Williams constantly talked about his sex life with his wife. He talked about how often he had sex, how they had sex, where they had sex, and how often they had sex. He even said he could tell his wife was cheating on him because of the way she "felt" when they had sex. Williams was also very vocal about the fact that he was a registered sex offender. I complained about Williams and his discriminatory treatment many times. I complained to Hutchins and Chris Jordan, Supervisor. They told me it would be taken care of, but to my knowledge, nothing was ever done as Williams' discrimination continued. A few months before I was forced to leave my employment, I was written up for telling another employee that Williams was a registered sex offender even though Williams made this statement himself almost every day. At first I was called in and told not to discuss Williams history although he discussed it everyday. I was told that the matter would be dropped, but if I discussed his criminal history again, I would be written up. A few days later, another female employee told me that Williams was making threats to hurt me. I reported these threats to management and was written up for discussing Williams history after being told not to talk about it. The employee that told me about the threats was fired shortly afterwards. Williams was the reason I was forced to resign my position with Flavor House.

On or about June 14, 2006, I was operating the label machine on Line Three, my usual position. Williams took over my machine during my break. When I came back, Williams was re-loading my machine with labels. I saw that the

Page 3 EEOC Charge
Name: Linda Thornton
Social Security #: 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
Date: 09-15-06

paperwork had not been done while I was on break so I started on it to get caught up. There was also an overflow of re-work that needed to be done and a box full of bad labels that had to be re-done. As the company was having an important audit done that day, I asked Williams to help me with the re-work when he walked by. Williams turned around and shouted at me that he had "better mother-fucking things to do than fucking re-work." Williams continued to yell at me and kept repeating, "God damn mother fucker" at me. I tried to ignore him. Williams walked to the outside of the line and continued to yell at me. While still yelling "God damn mother-fucker" at me, he began picking up pallets and slamming them down. He also picked up a large bag of trash and threw it. By this time, a line mechanic had walked up and I asked him several times to call a supervisor on the radio. He tried to call a couple of supervisors and was told "it will be one minute." Donald Coty, the Mechanic Supervisor, walked by and I asked him to call Melvin Hutchins. By the time Hutchins arrived, Williams had quit yelling and cursing at me, but was still throwing pallets around and glaring at me. Hutchins asked me what the problem was, and I told him that I was tired of this because the audit was going on, but this was the last time Williams was going to lose his temper and "go off on me" by cursing and yelling at me and calling me a "God damn mother-fucker" for no apparent reason. Hutchins called Chris Jordan, Packaging Supervisor, and he came over to my line. Jordan inventoried my tool bag and then told me to come to his office that afternoon and write out a statement of what happened. I began crying as I told him about Frank's discriminatory treatment and that I was tired of having to deal with Williams. Jordan assured me the situation would be resolved. Hutchins and Jordan then left to go back to the audit. From the time they left until three o'clock when I went to the front office, Williams stood at my re-work table and glared at me. I was extremely uncomfortable. At three o'clock, I went to Jordan's office and wrote out a statement. I was still very upset and told Jordan that I didn't know what Williams' problem was and he said he didn't care what Williams' problem was and that he would turn in my statement in the morning. I also told Jordan that Williams went and asked Catherine Long, a nearby co-worker, if she thought he had yelled at me, and Ms. Long told him twice that she thought he had yelled at me.

On or about June 15, 2006, I returned to work and tried to do my job while avoiding Williams. My co-workers were called in to the office to provide statements regarding the incident. Williams returned to my re-work table and glared at me the same way he had the day before. He would also walk up close to my machine and stop and stare at me. Williams' demeanor was very intimidating and because I knew that he had a history of violence against women, I was afraid he was going to hurt me. I was so scared of Williams that I took a screwdriver out of my tool bag and began carrying it around in my back pocket. When he was not standing at my re-work table or next to my machine, he would go to the filler machine and talk to Stephanie. He would turn around and glare at me from time to time during his conversation. Melvin Hutchins walked by and I told him that I was not comfortable working with Williams and that I did not feel safe around Williams. Hutchins told me that he had read my statement and agreed that he would not feel safe either. He reassured me that the situation would be resolved. He told me not to let it get me down and to "pray on it". Later that day, I was moved to the Line 5 label machine; however, this was still in the same department with Williams and only a few feet away. This move afforded me no protection from Williams.

On June 16, 2006, I reported back to work and heard over the radio that Williams was not going to be at work that day. I called Jordan and asked if I was going to be moved back to my regular line, Line 3, since Williams was not going to be there. He said "no". I saw Hutchins later that morning and asked him if the move to Line 5 was permanent. He told me that he needed me on Line 5 right then and could not answer if the move was permanent. I then asked Ricky Smothers, the Supervisor over all Supervisors, if the move was permanent and he told me I would have to talk to Tommy (LNU) in PR. I asked Ricky if he was aware of what happened. He said that he had heard bits and pieces of what happened. I asked him if he had read my statement and he said "no". I realized at that point that Williams was not going to be disciplined for his discriminatory behavior and that I was not going to be protected from him. I was so

Page 4 EEOC Charge
Name: Linda Thornton
Social Security #: 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
Date: 09-15-06

upset that I had to clock out and go outside to calm down. Hutchins and Ricky followed me outside and told me to leave the property and come back in an hour to meet Tommy. I told them that I was too upset to drive so they told me I should wait in the car for Tommy to get there so I could talk to him. They did not want the other employees to see me crying and upset. I waited and spoke with Tommy and Marianne Boyer, CEO, about the situation with Williams. Despite my statement and statements from witness, they concluded that I had "baited" Williams. I tried to explain to them again that I did not feel safe working with Williams and that I had started carrying a screwdriver in my back pocket. Recognizing that they were not going to resolve the situation with Frank, I placed my badge on Tommy's desk. Boyer asked me not to quit and to think about it over the weekend. I repeatedly told Boyer that I did not feel safe working with Williams to which she responded several times that if this was a court of law the action they had taken would be acceptable. She accused me of having an issue with sexual discrimination, and even though she told me that the law required them to provide a safe work environment, she told me that Williams would not be terminated. She said I would be moved to Line 5 and Williams would be on Line 3 and that we would stay that way for three months to see which of us had a conflict first. There was no mention of a write up during this conversation. However, it was later stated that if I had returned to work following this incident, I would have been written up although I had done nothing wrong.

The next three scheduled work days I called in sick because I was too afraid to go in and face Williams. A female employee told me that the first two days I was out, Williams asked her where I was. On the third day, Flavor House called back and left a message that I would have to have a doctor's excuse to return to work. I called Leah Allums in Personnel Resources and told her that I would not be returning because I did not feel I would be safe working with Williams. I learned that after my employment ended, Williams was written up for cursing at another female employee.

I believe that I suffered from sexual discrimination, harassment, and retaliation while employed with Flavor House Products, Inc., and that I was discriminated against because of my sex, female. I have been discriminated against because of my sex in job assignments, training, promotions, wages, discipline, discharge, and other terms, conditions, and privileges of employment; and retaliated against in that the conduct was wilful, malicious, and in wanton disregard of my federally protected rights.

Linda Thornton
Charging Party

09-15-06
Date

LINDA THORNTON V. FLAVOR HOUSE -
PLAINTIFF'S RFP DOCS 0150



PLAINTIFF'S EXHIBIT
4

**DOCUMENTATION FORM**

Employee Name: _Linda Thornton._

Investigating Supervisor: _Chris Jordan_  Date: _6-14-06_

Present: _Melvin Hutchins, Frank Hall_

Who was involved: _Frank Williams._

Witness (s) _Catherine Long, Wesley, Tamekia Cook_

Date of incident: _____

Where did it take place: _Line 3_

When did it take place (time and day): _11⁰⁰ - 11⁰⁵?_

What happened: Today on line 3 when I came back from second break, ( Frank Williams had Relieved me.) I noted that the paperwork had not been done while I was on break, so I was catching up on the paperwork. Frank was reloading the machine with labels. There was re-work in a box full of cans, and the table was over-flowing with cans with bad labels. When Frank reloaded the machine he went to walk away - I asked him to help with the re-work - (The audit was going on ) He started yelling at me that he had better "mother fucking things to do than worry about that fucking re-work. He continued to holler at me, and I told him to quit yelling & cussing at me. At this time he went from inside of the line to the outside of the line. The entire time, yelling at me continued to yell mother fucker. God damn mother fucker. Throwing a large bag of cans, as he continued to yell an cuss at me - I continued to request that wesley would please call for a supervisor. at this time frank

Did this result in down time? _NO_  If yes how much?

Did this result in product being scrapped? If yes how much? _NO_

Attach an additional sheet if needed for witness statements following the same format.

was still yelling & cussing and I continued to ignore him. Donald Coty walked by and I requested that he please get a supervisor, please call Melvin Hutchins.

more→

**CONFIDENTIAL**                          **FH000802**

Finally Frank went on his way. When Melvin came I told him about the situation at hand. Catherine ~~Long~~ was standing there and Wesley, And I honestly do not know who else. I ignored Frank Williams yelling God Damn Mother Fucker — whether he was calling me that name or just yelling it at me. Regardless — I won't take it again. No One else talks to me that way and he sure won't again. I don't have to tolerate that level of abusive language or name calling. Tameaka asked me later what was he shaking a fist about.

Also, stated to Catherine "Did I holler at you", She stated "yeah"

FH000803

PLAINTIFF'S
EXHIBIT
5

## DOCUMENTATION FORM

Employee Name: __Catherine Long__

Investigating Supervisor: __Chris Jordan__          Date: __6-15-06__

Present: _____

_____

Who was involved: __Frank Williams and Linda Thornton__

Witness (s): _____

Date of incident: __6-14-06__

Where did it take place: __Line 3 Label Machine__

When did it take place (time and day): __Before 1200 Noon__

What happened: __Well Linda just had
Came from Brake and she
asked Frank to help her clean
off the table By Line 3 label
Machine. I hear Frank said
the F word and I cant
do every dam thing.
that all I heard except he
was doing a lot of yelling and
ʒ ʌ ɕ ʈ. ɛ x ɕ ʈ. ɛ x ɕ ʈ.__

_____

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped?   If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

**CONFIDENTIAL**

PLAINTIFF'S
EXHIBIT

## DOCUMENTATION FORM

6

Employee Name: _Lauckia Cooke_

Investigating Supervisor: _Chris_    Date: _6-15-06_

Present: _____

_____

Who was involved: _Frank Williams + Linda Thornton_

Witness (s): _____

Date of incident: _6-14-06_

Where did it take place: _Line 3 label Machine_

When did it take place (time and day): _Before lunch_

What happened: line 3 label machine messed up & we had
bad labels on the work area & we cleaned some
& when Linda got back from back some was
left up there and she asked Frank what about this
mess and Frank walked off saying curse words
exact I don't know so Linda said something to
him. ~~the at ~~ ~~was~~ He threw his hands
up & said fuck it and went threw the curtains.
~~She~~ She was ignoring him but it was words still
being said from him.

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped?   If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

# FREEDOM COURT REPORTING

FREEDOM COURT REPORTING

PLAINTIFF'S EXHIBIT

7

AUDIOTAPE TRANSCRIPTION

IN RE:

LINDA THORNTON VS. FLAVOR HOUSE PRODUCTS
and FRANKLIN D. WILLIAMS, JR.

CASE NO.: 1:07-CV-712-WKW

COPY

1   2   3   4   5   6   7   8   9   10   11   12   13   14   15   16   17   18   19   20   21   22   23   24

1

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

2

1              UNIDENTIFIED SPEAKER:  Law

2    office?

3              MS. COOK:  May I speak to Linda

4    Parrish?

5              UNIDENTIFIED SPEAKER:  Hold on

6    just a moment.

7              MS. PARRISH:  Hello?

8              MS. COOK:  This is the State of

9    Alabama Unemployment Office.

10            MS. PARRISH:  Yes, ma'am.

11            MS. COOK:  I'm calling regarding

12    the appeals hearing for Linda Parrish.

13            MS. PARRISH:  Yes.

14            MS. COOK:  Okay.  Is this Linda?

15            MS. PARRISH:  Yes, it is.

16            MS. COOK:  Okay.  Hold on one

17    second.  The employer representative, I

18    need to give them a call.  I think

19    there's more than one person.

20            MS. PARRISH:  Okay.

21            MS. COOK:  Just a second.  Let

22    me get that party.

23            MR. TAYLOR:  Good morning, this

## FREEDOM COURT REPORTING

3

1    is Tracy Taylor.  Can I help you?

2        MS. COOK:  Yes, Mr. Taylor, this

3    is Ann Cook, State of Alabama

4    Unemployment Office.  I'm --

5        MR. TAYLOR:  How are you today?

6        MS. COOK:  Fine, thank you.  I'm

7    calling regarding Linda A. Parrish.

8    She's on the other line, and I need to

9    call Tommy Mance and Frank Williams.

10        MR. TAYLOR:  Yes, ma'am.

11        MS. COOK:  Okay.  Hold on a

12    second.  Let me get the other parties on

13    the phone.

14        MR. TAYLOR:  Thank you, ma'am.

15        RECORDING:  Thank you for

16    calling Nutcracker Brands, formerly

17    Flavor House Products.  If you know your

18    party's extension, you may dial it at

19    any time.  For consumer affairs, press

20    four or hang up and dial 1-866-770-1157.

21    For sales and marketing, press five.

22    For all other options, press six.

23        To dial your party by last name,

# FREEDOM COURT REPORTING

4

1    press one.  For shipping and receiving,

2    press two.  For purchasing, press three.

3    For accounting, press four.  For human

4    resources, press five.  For parts

5    delivery, press six.  For the operator,

6    press zero.  Please wait.

7        Thank you for calling Nutcracker

8    Brands, formerly Flavor House Products.

9    If you know your party's extension, you

10   may dial it at any time.  For consumer

11   affairs, press four or hang up and dial

12   1-866-770-1197.  For sales and

13   marketing, press five.  For all other

14   options, press six.  Transferring to an

15   operator; please wait.

16       UNIDENTIFIED SPEAKER:

17   Nutcracker Brands.  May I help you?

18       MS. COOK:  Yes.  This is the

19   State of Alabama Unemployment Office.

20   I'm trying to get exten- --

21       UNIDENTIFIED SPEAKER:  Yes,

22   ma'am.

23       MS. COOK:  -- extension 222.

# FREEDOM COURT REPORTING

5

1            UNIDENTIFIED SPEAKER:  Okay,

2   that's Tommy Mance.  His door is -- it

3   hasn't been open yet this morning.  I am

4   thinking he's either with someone in

5   there or -- or not in yet.

6            MS. COOK:  Well, he's expecting

7   a phone call from the State of --

8            UNIDENTIFIED SPEAKER:  Do you

9   have an appointment with him or --

10           MS. COOK:  He's expecting --

11   yes, ma'am.  He's expecting a phone call

12   from the State of Alabama Unemployment

13   Office.

14           UNIDENTIFIED SPEAKER:  Okay.

15   Let me walk down there and see -- and

16   see if he's coming in.  I'm going to

17   stick you on hold for a minute, okay?

18           MS. COOK:  All right.

19           UNIDENTIFIED SPEAKER:  Ma'am?

20           MS. COOK:  Yes?

21           UNIDENTIFIED SPEAKER:  Okay.

22   Hold on just one second.  I'm going to

23   transfer you over to him, okay?  We have

## FREEDOM COURT REPORTING

6

1    a terrible connection, though; I can

2    barely hear you.  I hope it's better

3    when he picks up.  Hold on.

4         MR. MANCE:  Tommy Mance.

5         MS. COOK:  Mr. -- this is the

6    State of Alabama Unemployment Office.

7    I'm calling regarding the appeals

8    hearing for Linda Parrish.  I have Ms.

9    Parrish on the other line along with --

10   who is that?  Tracy Taylor.

11        MR. MANCE:  Okay.  I have Frank

12   Williams here with me as a witness.

13        MS. COOK:  Okay.  Okay.  Ms.

14   Linda Parrish, are you there?

15        MS. PARRISH:  Yes.

16        MS. COOK:  Okay.  Do you have

17   someone else with you?

18        MS. PARRISH:  Yes.

19        MS. COOK:  Who is it?

20        MS. PARRISH:  My attorney.

21        MS. COOK:  Would you mind giving

22   me the name?

23        MS. CROOK:  I don't represent

# FREEDOM COURT REPORTING

7

1    you.

2        MS. PARRISH:  She's not

3    representing me in this right here.

4    Bobby Crook.

5        MS. COOK:  Are you tape

6    recording the hearing?  It's not allowed

7    if you are.  And no other tape is legal

8    except the State of Alabama.  So if

9    you're tape recording, you cannot do

10   that.

11       MS. PARRISH:  We're not tape

12   recording.

13       MS. COOK:  Okay.  Well, I have

14   on the other line Tracy Taylor, Tommy

15   Mance, and Frank Williams, a witness.

16       Let me explain this procedure.

17   The hearing is tape recorded.  The State

18   of Alabama, it requires that all

19   unemployment hearings are tape recorded,

20   and we're on the record now for appeals

21   case number 088858206.  This hearing is

22   being conducted by teleconference.

23   Today's date is August 23rd, 2006.  My

## FREEDOM COURT REPORTING

8

1    name is Ann Cook.  I'm an administrative

2    hearing officer for the State of Alabama

3    Department of Industrial Relations,

4    Hearings and Appeals Division, and I

5    will be making the decision in this

6    unemployment case.  The claimant is

7    present, Linda Parrish.  The employee is

8    Flavor House Products, Incorporated,

9    represented by Tracy Taylor, Tommy

10    Mance, and the witness Frank Williams.

11         Ms. -- Ms. Parrish unemploy- --

12    her unemployment claim was filed through

13    the Alabama counsel the week of June

14    25th, 2006.  This claim has been

15    approved for payment of unemployment

16    benefits and the State of Alabama was

17    notified, Flavor House of this eligible

18    determination and advised them if they

19    disagree they have the right to appeal.

20    They must file their appeal within 15

21    calendar days of the date the notice was

22    sent to them.  The note was mailed to

23    Flavor House Products, Incorporated on

# FREEDOM COURT REPORTING

9

1    July 19th, '06.  They did file a timely

2    appeal.  Under Alabama law, section

3    254782, which is the issue regarding

4    voluntary quit, the law states that if

5    you voluntarily leave your last bona

6    fide work without a good work-connected

7    cause, the unemployment claim is denied

8    indefinitely.  Good work-connected cause

9    means it stands to reason, just grounds

10   for such action, adequate excuse that

11   would bear the test of reason and

12   knowledge, element of good faith, and to

13   be good cause the reason for leaving has

14   to be job connected.  The law requires

15   that if you voluntarily leave you must

16   -- you're denied benefits until you

17   return to other insured or acceptable

18   work and earn ten times the weekly

19   unemployment rate established on this

20   claim.

21           This is the procedure we will

22   follow, Ms. Parrish:  I'll let you give

23   your statement first.  I'm going to ask

## FREEDOM COURT REPORTING

10

1   you some questions, after which the

2   employer representative, Mr. Taylor, and

3   Mr. Mance will be allowed to ask you

4   some questions.  After that, I'll take

5   your testimony.

6          Mr. Taylor, are you a

7   representative, or are you giving

8   testimony?

9          MR. TAYLOR:  Ma'am, I'm acting

10  only as a representative.

11         MS. COOK:  Okay.  Mr. Mance,

12  I'll take your testimony, and Ms.

13  Parrish will be allowed to ask you some

14  questions, and then we will allow Mr.

15  Taylor to ask Mr. Mance some questions

16  also before Ms. Parrish then.  And, Mr.

17  Williams, we'll take your testimony, and

18  Mr. Mance and Mr. Taylor will be allowed

19  to ask you some questions as well as Ms.

20  Parrish.  After that, if there -- if

21  there is any other information that you

22  need to present to me to be considered

23  that is relevant, you will be allowed to

## FREEDOM COURT REPORTING

11

1    present that.

2           Are there any questions about

3    this process?  Okay.  Well, you must be

4    under oath before I take your testimony.

5    I'll --

6           MS. PARRISH:  Yes, ma'am.

7           MS. COOK:  -- administer that to

8    you now.  Do you solemnly --

9           MS. PARRISH:  Will you tell me

10   if there is a lawyer present for them?

11          MS. COOK:  I told you there

12   were.  Tracy Taylor is a rep.

13          Mr. Taylor, you work with Talk

14   UC Express; is that correct?

15          MR. TAYLOR:  Yes, ma'am.  I'm a

16   lay representative employed by Talk UC

17   Express.

18          MS. COOK:  Okay.

19          MR. TAYLOR:  That's related to

20   and handles unemployment patterns.

21          MS. COOK:  Okay.  I understand.

22   Well, no, there is no attorney as far as

23   I know, Ms. Parrish.  He's a

# FREEDOM COURT REPORTING

12

1    representative with the employer

2    representative company, and the name of

3    the company, Talk UC Express.  And the

4    other two individuals are Mr. Williams

5    is the witness and, Mr. Mance, what's

6    your title?

7         MR. MANCE:  I'm the human

8    resources manager.

9         MS. COOK:  Okay.  Okay.  You

10   must be under oath before I -- well, is

11   there another question?

12        MS. PARRISH:  No, ma'am.

13        MS. COOK:  Okay.  You must be

14   under oath before I take your testimony.

15   Do you solemnly swear to tell the truth,

16   the whole truth, nothing but the truth,

17   so help you God, Ms. Parrish?

18        MS. PARRISH:  I do.

19        MS. COOK:  And Mr. Mance?

20        MR. MANCE:  I do.

21        MS. COOK:  And Ms. Will- -- Mr.

22   Williams?

23        MR. WILLIAMS:  I do.

**FREEDOM COURT REPORTING**

13

1          MS. COOK:  Okay.

2

3     EXAMINATION OF MS. PARRISH BY MS. COOK:

4          Q.    Ms. Parrish, are you working

5     now?

6          A.    No, ma'am.

7          Q.    Okay.  When you worked for

8     Flavor House Products, Incorporated,

9     where -- where did you work?  What

10    location?

11         A.    On the label machine.

12         Q.    I -- where did you work?  What

13    location did you work?  Where?

14         A.    It's in Alabama.

15         Q.    Where did you work, Ms. Parrish?

16    What city did you work?

17         A.    Dothan, Alabama.

18         Q.    Okay.  All right.  Your job

19    title, what was that?

20         A.    Label operator.

21         Q.    I'm sorry; you said label

22    operator?

23         A.    Yes, ma'am.

# FREEDOM COURT REPORTING

14

1   Q. That's L-A-B-E-L?

2   A. Yes, ma'am.

3   Q. Okay.  And how long did you work

4 for this company?

5   A. Five years.

6   Q. Could you give me your hire

7 date?

8   A. June, 2001.

9   Q. And what was your last day at

10 work?

11   A. June 16th, 2006.

12   Q. Okay.  Were you discharged from

13 this job?

14   A. Yes, ma'am.

15   Q. Okay.  Who terminated you, Ms.

16 Parrish?

17   A. Maryann Boyer.

18   Q. I'm sorry; I can't hardly

19 understand you.

20   A. Maryann Boyer.

21   Q. And what was her title?  What is

22 her title?

23   A. CEO.

# FREEDOM COURT REPORTING

15

1    Q.    And why did she terminate you?

2    A.    I had no other choice but to be

3    discharged.

4    Q.    Then what -- tell me what did

5    she tell you when she told you were dis-

6    -- you were fired?  What reason did she

7    give?

8    A.    There was no action taken

9    against Frank Williams; he would

10   continue to work there.

11   Q.    Okay.  No, ma'am.  I asked you

12   what reason did she give you?  You said

13   -- you said you were fired by the CEO,

14   and what reason did she give you for

15   terminating you?

16   A.    I felt like I was forced to

17   leave --

18   Q.    No, you said you were

19   terminated, and I need you to tell me

20   what did she say when she told you you

21   were fired?  What reason did she say?

22   A.    I said I was constructively

23   terminated, which meant I felt unsafe to

# FREEDOM COURT REPORTING

16

1  work there.  I had no other choice but

2  to leave.

3      Q.  Okay.  Well, you first -- I

4  first understood you to say you were

5  fired by -- I don't recall the lady's

6  name but you said the CEO.  So you're

7  saying now that you were constructively

8  terminated?

9      A.  Yes, ma'am.

10      Q.  Okay.  What does that mean?

11  What do you mean by that?

12      A.  I felt unsafe to work with a

13  registered sex offender that had already

14  threatened me.

15      Q.  Okay.  What did -- who is -- who

16  are you speaking of, Ms. Parrish?

17      A.  Frank Williams.

18      Q.  Okay.  How did he threaten you?

19      A.  He cussed me out, he physically

20  thrown things at me.

21      Q.  When did that happen?

22      A.  On June 14th.

23      Q.  Okay.  What -- you say Mr.

## FREEDOM COURT REPORTING

17

1  Williams cursed you out and he threw

2  something at you.  What did he throw at

3  you?

4      A.    He threw pallets and a large

5  garage bag full of cans.

6      Q.    Did he throw it at you or in

7  your direction?

8      A.    In my direction.

9      Q.    Okay.  So what did he say to you

10  when he threw it in your direction?

11      A.    He called me a God damn

12  motherfucker.

13      Q.    Were you and him having a

14  disagreement?

15      A.    I asked him to help with rework,

16  and he proceeded to call me a God damn

17  motherfucker.

18      Q.    Okay.  Who was your supervisor?

19      A.    Chris Jordan.

20      Q.    And did you report this to your

21  supervisor?

22      A.    Yes, ma'am.

23      Q.    When did you report it?

## FREEDOM COURT REPORTING

18

1    A.    Immediately.  As -- I tried for

2    10 to 15 minutes to get a hold of a

3    supervisor through a mechanic radio.

4        Q.    Okay.  Did you have -- this was

5    the first time you had a disagreement

6    with Mr. Williams?

7        A.    No, ma'am.

8        Q.    Okay.  Had you made a formal

9    complaint or report that you were having

10   difficulty working with him?

11       A.    Yes, ma'am.

12       Q.    Well, what authority, if any,

13   did Mr. Williams have over you?

14       A.    He was my team leader.

15       Q.    Okay.  And where did you get the

16   information that he was a registered sex

17   offender?

18       A.    He freely spoke about it.

19       Q.    I mean, do you have firsthand

20   knowledge that that is correct?

21       A.    Yes, ma'am.

22       Q.    Okay.  Where did you get it

23   from?

**FREEDOM COURT REPORTING**

19

1   A. Off of the public safety

2 information center of Alabama.

3   Q. Okay. So how did that affect

4 you in working with him?

5   A. He was sexually harassing me.

6   Q. Okay. How did he do that?

7   A. He continuously cussed me; he

8 continuously talked about his past.

9   Q. And who did you say you reported

10 all of this to?

11   A. I reported it to Chris Jordan,

12 Melvin Hutchins. I wrote out statements

13 and turned in to the PR department.

14   Q. And what -- when did you do

15 that, Ms. Parrish?

16   A. When the incident happened and

17 before the incident happened, probably a

18 month before.

19   Q. I mean, what did you report

20 before the incident happened?

21   A. That he was harassing me.

22   Q. Well, that is the incident, is

23 it not?

**FREEDOM COURT REPORTING**

20

1    A.    This is a continuous incident.

2    Q.    Well, did you get a response

3    from your employer about your complaint?

4    A.    No.  The first -- the first time

5    they said we would just have to work

6    together.

7    Q.    What was your first complaint?

8    A.    When I was called in there I was

9    reprimanded -- reprimanded for saying

10   that he was a convicted sex offender.

11   Q.    Okay.  Did you have a

12   documentation of that complaint or that

13   allegation?

14   A.    No, ma'am.  They said they

15   pulled it up.

16   Q.    Well, did you have any

17   documentation to substantiate your

18   allegations against Mr. Williams?

19   A.    Yes, ma'am.

20   Q.    And what -- where did you get

21   your information from?

22   A.    From the computer.

23   Q.    Okay.  So you have a copy of it?

## FREEDOM COURT REPORTING

21

1          A.    Yes, ma'am.

2          Q.    Okay.  So what did that have to

3    do with him working with you?

4          A.    He continuously put down

5    females.

6          Q.    But how did that keep you from

7    being able to work with him?

8          A.    Because I -- I was called a God

9    damn motherfucker every day.

10         Q.    Well, did he call you that, or

11   did he use that terminology?

12         A.    He called me that.

13         Q.    He did that to your face

14   directly; is that correct?

15         A.    Yes, ma'am.

16         Q.    And what reason did he call you

17   a name?

18         A.    Because I was a female.

19         Q.    So he would come directly to

20   your face and use the derogatory term to

21   you?

22         A.    Yes, ma'am.

23         Q.    Okay.  Does your company have a

# FREEDOM COURT REPORTING

22

1      policy against harassment and behavior

2      of that nature?  Ms. Parrish?

3          A.    Ma'am?

4          Q.    Does your company have a written

5      policy against workplace violence and

6      harassment?

7          A.    Yes, ma'am.

8          Q.    Okay.  Did you follow the

9      procedure in filing the complaint per

10     your handbook?

11         A.    I was told to report it, and

12     that's what I did.

13         Q.    I said, did you follow the

14     procedure in the handbook?

15         A.    I don't have a written procedure

16     in a handbook.

17         Q.    Did you not get a copy of an

18     employee handbook?

19         A.    Yes, ma'am.

20         Q.    What happened to your copy?

21         A.    I have my copy.

22         Q.    Okay.  I asked you, did you

23     follow the procedure from your handbook?

# FREEDOM COURT REPORTING

23

1    A.    Yes, ma'am, and that was to

2    report it to my supervisor.

3    Q.    Okay.  So did you make a written

4    report that you had been sexually

5    harassed by Mr. Williams?

6    A.    Yes, ma'am.

7    Q.    Do you have a copy of that

8    complaint?

9    A.    Ma'am?  Hello?

10   Q.    Do you have a copy of that

11   complaint, Ms. Parrish?

12   A.    No, ma'am.

13   Q.    Okay.  Do you have a copy of any

14   of your complaints to the employer?

15   A.    Yes, ma'am.

16   Q.    Okay.  What's the date on the

17   one you have?

18   A.    I don't have it with me.

19   Q.    Okay.  What --

20   A.    I wrote it and gave it to them

21   on June 14th.

22   Q.    Okay.  That was the only

23   complaint you have?

## FREEDOM COURT REPORTING

24

1    A.    No, ma'am.

2    Q.    I mean a written complaint.  Is

3    that the only one you made?

4    A.    No, ma'am.

5    Q.    Okay.  Do you have copies of any

6    of them?

7    A.    Not with me.

8    Q.    Okay.  What happened when you

9    made your complaint to Flavor House?

10   What happened with the complaint?

11   A.    Well, our handbook, number one,

12   does not say that we have to have a

13   written complaint.

14   Q.    What I'm asking you, what

15   happened when you made your complaint?

16   You told me you made written complaints,

17   so did you make verbal complaints also?

18   A.    Yes, ma'am.

19   Q.    Okay.  What happened with your

20   verbal and written complaints?  What

21   action was taken by the employer?

22   A.    None.

23   Q.    There was --

## FREEDOM COURT REPORTING

25

1    A.    I was moved.

2    Q.    Okay.  They moved you to another

3    area?

4    A.    Twenty feet away.

5    Q.    Okay.  Did you have to work with

6    Mr. Williams then?

7    A.    Yes, ma'am.

8    Q.    They moved you but you still

9    worked with him; is that what you're

10   saying?

11   A.    Yes, ma'am.

12   Q.    Okay.  You say he was a lead

13   person working with you?

14   A.    Yes, ma'am.

15   Q.    Okay.  Did you -- was there

16   anywhere else that you -- they could

17   move you to?

18   A.    No, ma'am.  I run -- yes, there

19   was.  I run label machines, and he was

20   the relief person for them label

21   operators when they go on break.

22   Q.    When you reported the

23   threatening behavior, alleged

## FREEDOM COURT REPORTING

26

1  threatening behavior you felt from Mr.

2  Williams, did your employer tell you

3  they had taken some type of action in

4  regard to your complaint?

5       A.    No, ma'am.

6       Q.    What did they tell you?  How did

7  they resolve this problem?

8       A.    That I would have to get over

9  it.

10      Q.    Okay.  So Mr. Williams used

11  profanity in your presence, and you felt

12  that he disliked women; is that correct?

13      A.    Yes, ma'am.  And throwing

14  things.

15      Q.    Okay.  What happened when you

16  felt you could no longer --

17      A.    Ma'am?

18      Q.    When you felt you could no

19  longer work with Mr. Williams, what did

20  you do?

21      A.    Left.

22      Q.    Did you give a formal notice of

23  resignation?

**FREEDOM COURT REPORTING**

27

1    A.    I asked them to remove him when

2  he continued working there and they told

3  me yes.

4    Q.    I said, did you give a notice of

5  resignation?

6    A.    I'm able and willing to come

7  back to work when he leaves.

8    Q.    Did you give a notice of

9  resignation?

10    A.    I told them I could no longer

11  work there as long as he works there.

12    Q.    Did you give a two-week notice?

13    A.    No, ma'am.

14    Q.    Okay.  So you -- who did you --

15    A.    I was not allowed that

16  opportunity.

17    Q.    Okay.  How did they stop you

18  from giving a two-week notice?

19    A.    They continued to keep Frank

20  Williams there.  It was to the point

21  where I had a screwdriver in my back

22  pocket.

23    Q.    Okay.  Did you file any charges

**FREEDOM COURT REPORTING**

28

1    with him with the police department?

2        A.    No, ma'am.  I wish I would have

3    but at that -- that -- you're -- we

4    cannot get out on the phones that are at

5    the plant.

6        Q.    Well, when you got off work,

7    could you have filed charges then?

8        A.    No, ma'am.  I was so upset, I

9    wasn't thinking.

10       Q.    Okay.  So you voluntarily quit

11   on June 16th; is that the day you

12   terminated your employment?

13       A.    I did not voluntarily quit; I

14   was forced to quit.

15       Q.    Okay.  You were -- you felt

16   forced to quit on 6/16/06; is that

17   correct?

18       A.    Yes, ma'am.

19       Q.    Okay.  If one of you has a cell

20   phone, would you mind turning it off so

21   it won't interrupt the hearing?

22       A.    Yes, ma'am, we have that.

23       Q.    Okay.  And you say you felt

## FREEDOM COURT REPORTING

29

1  forced to quit on June 16, '06, because

2  Mr. Frank Williams who was your lead

3  person, you had to continue to work with

4  him and he made derogatory remarks

5  toward you and he threw things in your

6  direction; is that correct?

7      A.    Yes, ma'am.

8      Q.    And, also, did you say the

9  employer, after you reported this to the

10 employer, you felt that they did not

11 resolve the problem and you could not

12 continue to work with him; is that

13 correct?

14     A.    Yes, ma'am.

15     Q.    Were you the only person working

16 with Mr. Williams?

17     A.    No, ma'am.

18     Q.    Were you the only female working

19 with him?

20     A.    No, ma'am, but I understand that

21 he's had more write-ups after me.

22     Q.    I said, were you the only female

23 that worked with him?

## FREEDOM COURT REPORTING

30

1    A.    No, ma'am.

2    Q.    Did anyone else -- did you --

3    did they experience, as far as you know,

4    the same problem at that time?

5    A.    Yes, ma'am, and since I've been

6    gone also.

7    Q.    Okay.  How do you know what

8    happened after you left the business?

9    A.    I worked with -- at Flavor House

10    for five years.

11    Q.    I said, how would you know what

12    happened after you left the business?

13    A.    I have friends at Flavor House.

14    Q.    Well, this is your firsthand

15    direct knowledge; not -- not what, you

16    know, someone told you.  I was asking

17    for your knowledge of what happened.

18    A.    Okay.

19    Q.    Okay.  So your -- you volun- --

20    you say you were constructively

21    terminated because you felt you worked

22    in an unsafe work environment because of

23    Mr. Frank Williams, and on June 14th you

# FREEDOM COURT REPORTING

31

1   made a formal complaint on him and you

2   felt that this complaint was not

3   resolved to your satisfaction and you

4   could not work with him because of

5   information you received about his past

6   and you felt threatened because he used

7   profanity and threw things.  So on June

8   16th, '06, you felt forced to leave your

9   job; is that correct?

10       A.   Yes, ma'am, and he continuously

11   talked about his conviction as being a

12   sex offender.

13       Q.   Was he speaking to you, Ms.

14   Parrish?

15       A.   Yes, ma'am.

16       Q.   Were you involved in a

17   conversation with him?

18       A.   Yes, ma'am -- no.  He spoke of

19   his conviction freely out loud in the

20   break room to me, to anyone.

21       Q.   Okay.  So could you not get up

22   and leave that conversation?

23       A.   Not if I'm at my machine I

**FREEDOM COURT REPORTING**

32

1    cannot leave.

2        Q.    Okay.    Anything else, Ms.

3    Parrish, you want to add to the reason

4    you felt constructively terminated?

5        A.    Yes, ma'am.    I would not have

6    quit my job if I did not feel unsafe.    I

7    have stayed there for five years.    I've

8    tolerated discrimination throughout

9    those five years, including being hit in

10   the chest with a jar of peanuts.

11       Q.    Okay.    Ms. -- Ms. Parrish, we're

12   asking about your termination, your

13   separation.    So did all that happen when

14   you were separated?    Were you hit with

15   peanuts, a jar of peanuts?

16       A.    No, ma'am, it led up to it, the

17   discrimination.

18       Q.    Okay.    Did you file an EEOC

19   discrimination charge?

20       A.    I'm going to.

21       Q.    Okay.    But as far as this final

22   incident that led to your separation

23   from the company, it involved working

**FREEDOM COURT REPORTING**

33

1    with Mr. Frank Williams and you felt you

2    were in an unsafe work environment and

3    could not continue; is that correct?

4        A.    Yes, ma'am, and I would also

5    like to note that the position that

6    Frank Williams is in, he freely walks

7    around the plant; so, therefore, moving

8    me anywhere did not accomplish anything.

9        Q.    Okay.  So you wanted them to

10   terminate him or to --

11       A.    Yes, ma'am.

12       Q.    You wanted the company to

13   terminate Mr. Williams?

14       A.    Yes, ma'am.  He -- he freely

15   walks around the plant.

16       Q.    Was that not part of his job?

17       A.    No, ma'am, unless he's relieving

18   for break.

19       Q.    Okay.  Okay.  Ms. Parrish,

20   anything else?

21       A.    No, ma'am.

22       MS. COOK:  Okay.  Mr. Taylor, do

23   you have any questions for Ms. Parrish?

# FREEDOM COURT REPORTING

34

1    MR. TAYLOR: Yes, ma'am, I do.

2 Thank you.

3

4 EXAMINATION OF MS. PARRISH BY

5 MR. TAYLOR:

6    Q.   Ms. Parrish, you've testified

7 that you were discriminated against.

8 How were you discriminated against?

9    A.   I was talked down to. I was

10 called names. In one incident I was

11 even told this is a man's job. And the

12 CEO had told me that just to put up with

13 it; that she also has to deal with it in

14 meetings that she has.

15    MS. COOK: Okay. Any other

16 questions, Mr. Taylor?

17    MR. TAYLOR: Yes, ma'am.

18    Q.   (BY MR. TAYLOR:) Mr. Parr -- or

19 Ms. Parrish, you testified that Mr.

20 Williams was harassing you because you

21 were a female. Mr. -- did Mr. Williams

22 tell you that?

23    A.   Mr. Williams would not have

## FREEDOM COURT REPORTING

35

1    talked to a man that way.

2        Q.    How do you know that?

3        A.    Because I worked with him.

4        Q.    So you base this testimony on

5    your assumption that he was harassing

6    you because you were a female?

7        A.    Yes.

8        Q.    You said he used profanity when

9    he spoke to you.  Were you using

10   profanity in the workplace?

11       A.    Yes.

12       Q.    Why is your profanity acceptable

13   and his is not?

14       A.    I have never called anybody a

15   God damn motherfucker.

16       Q.    The choice of the words that he

17   used made it more egregious than your

18   use of profanity?

19       A.    Oh, no.  Maybe the choice of him

20   having a fit, throwing things, and his

21   uncontrollable actions.

22       Q.    Well, ma'am, you testified that

23   he threw things.  He threw them at you?

## FREEDOM COURT REPORTING

36

1   A. In my direction.

2   Q. So he was trying to hit you?

3   A. That would be a question for

4 him.

5   Q. Do you believe he was trying to

6 hit you?

7   A. Yes.

8   Q. So, ultimately, that's why you

9 felt threatened; because he was throwing

10 things, trying to hit you?

11   A. Yes.  And prior to this

12 incident, he had told somebody that he

13 would get me back.

14   Q. How do you know that?

15   A. Because the person, he told me

16 that -- told that to told me.  If you'll

17 look right there in my file --

18   Q. Well, ma'am, how do you know

19 that person was telling the truth?

20   A. See my complaint and talk with

21 that person.

22   Q. So you testified you fired --

23 filed a prior complaint, final

**FREEDOM COURT REPORTING**

37

1    complaint, on June 14.  When did you

2    file those complaints?

3        A.    Which one?

4        Q.    It talks about all the

5    complaints you filed.  When did you file

6    your first complaint against --

7            MS. CROOK:  That's irrelevant.

8    I'm going to enter an objection at this

9    point.  This is all irrelevant.  We

10   couldn't get into her past complaints.

11           MS. COOK:  Okay.  Ms. -- hold on

12   a second, Ms. -- I didn't get your last

13   name.  What's your last name?

14           MS. CROOK:  Crook.

15           MS. COOK:  Bobby what?

16           MS. CROOK:  Crook.

17           MS. COOK:  I can't understand

18   you.

19           MS. CROOK:  C-R-O-O-K.

20           MS. COOK:  Okay.  Did I not

21   understand you to say you were not

22   participating in the hearing, that you

23   were just going to listen?

**FREEDOM COURT REPORTING**

38

MS. CROOK:  I'm here to protect her interest in the case, so I am representing her in this.

MS. COOK:  Okay.  But you told me you were not participating.  Now, it's okay if you want to be a representative in the hearing, but we have to have your identity and know whether you're participating.  Are you participating?

MS. CROOK:  At this point I guess I'm going to have to participate if he's going to go into all of her past complaints, which she wasn't allowed to go into.

MS. COOK:  Okay.  But you cannot be disruptive to the hearing, and if you're going to participate be nondisruptive and just -- you can -- this is an informal hearing, it's not in court, so it's not the same.  So --

MS. CROOK:  I'm just --

MS. COOK:  Go ahead, Mr. Taylor,

## FREEDOM COURT REPORTING

39

1    with your questions.

2         MR. TAYLOR:  Thank you.

3      Q.    (BY MR. TAYLOR:)  Ma'am, when

4    did you file your first complaint?

5      A.    I'm not answering that.  I told

6    you I did not have my copies with me.

7      Q.    Well, ma'am, let's step away

8    from it and go to that date.  On or

9    about when did you file your first

10    complaint?

11      A.    Two to three months prior.

12      Q.    So about March?

13      A.    This is on Frank.  Then there

14    was one the year before.

15         MS. COOK:  Okay.

16      A.    So I don't --

17         MS. COOK:  Okay.  Mr. -- Mr.

18    Taylor, be more specific about these

19    questions you're asking her.

20         MR. TAYLOR:  Yes, ma'am.

21      Q.    (BY MR. TAYLOR:)  You filed your

22    first complaint against Mr. Williams in

23    March of '06?

**FREEDOM COURT REPORTING**

40

1        A.    No.

2        Q.    When did you file your first

3    complaint about Mr. Williams?

4        A.    '05 --

5        Q.    The month?

6        A.    That was not my first complaint

7    on Frank.  I filed the first of the year

8    before.  I've got several.

9        Q.    Ma'am, isn't it true that in the

10    end of '05, probably the last quarter,

11    you had been working on a line, you got

12    into an altercation with another

13    employee?

14        A.    Who might that be?

15        Q.    Have you been in an altercation

16    with another employee besides Mr.

17    Williams?  I'm sorry; I didn't hear your

18    answer.

19        A.    Are you talking about when a

20    mechanic hit me with a jar?

21        Q.    Ma'am, I'm not giving you any

22    specifics.  Have you had an altercation

23    with another employee?

## FREEDOM COURT REPORTING

41

A.    I can't give you --

MS. COOK:  Okay.  Mr. Taylor --
Mr. Taylor, that appears to be
immaterial that -- what you're asking at
this point.  I don't understand why you
want to know that.

MR. TAYLOR:  Yes, ma'am.  I'll
move to my next question.

MS. COOK:  Okay.

MR. TAYLOR:  Thank you.

Q.    (BY MR. TAYLOR:)  Ms. Parrish,
is it true that at the end of '05 you
were moved to line three, the line
supervised by Mr. Williams as the team
lead?

A.    Yes.

Q.    That move to that line was a
result of an altercation with another
employee?

A.    No.

Q.    You were moved off the line that
Mr. Williams supervised as a result of
this final altercation; is that true?

## FREEDOM COURT REPORTING

42

1      A.    Under investigation.

2      Q.    And isn't it true that the

3   employer addressed your concerns by

4   moving you from his supervision?

5      A.    No.

6      Q.    So he was supervising the line

7   you were now working on or going to be

8   working on?

9      A.    He could, yes.

10     Q.    There was a team lead assigned

11   to the line that you were going to be

12   working on?

13     A.    Frank Williams is put where they

14   need him.

15          MS. COOK:  Ms. Parrish, could

16   you -- did you understand his question?

17          MS. PARRISH:  Yes, ma'am.

18          MS. COOK:  Okay.  Could you

19   respond to his question, please?

20          MS. PARRISH:  Frank Williams

21   goes in that plant --

22          MS. COOK:  That's not what he

23   asked you, Ms. Parrish.  Would you

## FREEDOM COURT REPORTING

43

1   restate your question?

2        MS. PARRISH:  The team leader on

3   line three --

4        MS. COOK:  Would you restate

5   your question, Mr. Taylor?

6        MR. TAYLOR:  Thank you.

7   Q.   (BY MR. TAYLOR:)  And the line,

8   ma'am, that you were working on, is

9   there a team leader assigned to that

10  line?

11  A.   No.

12  Q.   So, in fact, Mr. Williams would

13  not be your supervisor on that line

14  because there is no team leader on that

15  line; is that correct?

16  A.   Yes.

17       MR. TAYLOR:  I don't have any

18  further questions.  Thank you.

19       MS. COOK:  So, Mr. Mance, do you

20  have any questions?

21       MR. MANCE:  I have no questions.

22       MS. COOK:  Okay.  And, Ms.

23  Crook, since I did not know you were

# FREEDOM COURT REPORTING

44

1    going to represent Ms. Parrish in this

2    hearing until a few minutes ago, I

3    didn't put you in the line to ask

4    questions because I was unaware.  Do you

5    have any questions now?

6             MS. CROOK:  No, ma'am.

7             MS. COOK:  Pardon me?

8             MS. CROOK:  No, ma'am.

9             MS. COOK:  Okay.  Mr. -- Mr.

10   Mance, do you have any -- well, let me

11   ask you a few questions, Mr. Mance.

12

13   EXAMINATION OF MR. MANCE BY MS. COOK:

14        Q.   Ms. Parrish said that she worked

15   for Flavor House for five years; her

16   hire date was June of 2001.  Can you

17   give me a specific date?

18        A.   Yes, ma'am.  June 25th, 2001.

19        Q.   And her -- when she retired,

20   what was her job title?

21        A.   She was hired in as a laborer

22   position.  She had several changes while

23   employed.

## FREEDOM COURT REPORTING

45

1        Q.    Okay.

2        A.    Most recent title was a label

3  operator.

4        Q.    Okay.  And what is the very last

5  day Ms. Parrish worked for your company?

6        A.    That would have been 6/16; she

7  came in and turned out actually worked

8  that day.  She came in that morning,

9  spoke with Maryann Boyer, our director

10  of operations, and spoke with myself.

11        Q.    And spoke to you about what?

12        A.    About her concerns with the

13  investigation and working on the line

14  with Frank Williams.

15        Q.    Why is she no longer employed

16  with -- what -- does your company have

17  another name at this time?

18        A.    Nutcracker Brands.

19        Q.    Okay.

20        A.    And then --

21        Q.    Okay.  Why was Ms. -- what is

22  the reason Ms. Linda Parrish no longer

23  works for your company?

**FREEDOM COURT REPORTING**

46

1    A.    She voluntarily resigned on the

2    21st of June.

3    Q.    Okay.  You -- your statement is

4    that she came in on June 16th, which was

5    on a Friday, and she spoke to you and

6    who is the other person?

7    A.    Maryann Boyer, our director of

8    operations.

9    Q.    Okay.  And what was the nature

10   of the conversation?

11   A.    The investigation concerning

12   herself and Frank; the altercation they

13   had had on the 14th.

14   Q.    Okay.  Why did Ms. Parrish not

15   work on Friday, June 16th?

16   A.    She felt she was too upset to

17   work.  We offered her the opportunity to

18   go home and think about it over the

19   weekend.  We expected her to be back at

20   work on Monday.  She voluntarily left on

21   Friday but she could not work -- we gave

22   her the rest of that day off and

23   expected her back to work on Monday.

### FREEDOM COURT REPORTING

47

1    Q.    And what was Mr. -- what was Mr.

2    Williams's job title or position over

3    Ms. Parrish?

4    A.    Mr. Frank Williams is our team

5    leader on line three.

6    Q.    Okay.  Had you received

7    complaints from Ms. Parrish about

8    working with Mr. Williams?

9    A.    Not complaints.  There has been

10   altercations previously mentioned, March

11   the --

12   Q.    Are you -- what -- okay.  You

13   say you had not received any complaints

14   from Ms. Parrish?

15   A.    Not complaints about working

16   with him, no.  There had been

17   altercations between the two individuals

18   previously.

19   Q.    Okay.  But her statement I

20   understood earlier was that she had

21   filed verbal complaints about him.  So

22   are you --

23   A.    No, ma'am.

## FREEDOM COURT REPORTING

48

1    Q.    You're not characterizing them

2    as formal complaints?

3    A.    No, ma'am, it's not formal

4    complaints.  It's documentation about

5    comments that were made between the two

6    of them or among the two among other

7    employees that were investigated.  And

8    Ms. Parrish did receive a disciplinary

9    action concerning her involvement in the

10   comments on March -- February 16th.

11   Q.    Okay.

12   A.    And March 7th.

13   Q.    So were they altercations or --

14   or verbal conflicts between --

15   A.    Verbal conflicts, yes, ma'am.

16   Q.    Okay.  Between Ms. Parrish and

17   Mr. Williams there were verbal conflicts

18   and alter- -- verbal --

19   (Side A of tape ends.)

20   MS. COOK: Okay.  We're back on

21   the record.  We went off the record

22   momentarily; I ran out of tape.  But do

23   you both agree that when I stopped and

## FREEDOM COURT REPORTING

49

1    changed my tape, that no testimony took

2    place when I asked Mr. Mance to hold on

3    a second?

4          MR. MANCE:  I agree.

5       Q.   (BY MS. COOK:)  Okay.  Okay.

6    You said there was no formal complaints,

7    but there were allegations and verbal

8    conflicts with Ms. -- between Ms.

9    Parrish and Mr. Williams?

10      A.   Yes, ma'am.  She had made

11   comments, inflammatory nature, about his

12   past and about him in the work force.

13   After investigating that we come to the

14   conclusion that she had made the

15   comments of an inflammatory nature, and

16   she did receive a disciplinary action

17   for the comment.

18      Q.   Okay.  What did Ms. -- when you

19   investigated Ms. Parrish, what did she

20   say about those inflammatory comments

21   she made about Mr. Williams?

22      A.   She was -- let's see.  Let me

23   read her statement here.  She said

## FREEDOM COURT REPORTING

50

1  another employee had came to her telling

2  her the information about Frank.  Again,

3  she did repeat that information to other

4  employees.

5       Q.    Okay.

6       A.    Information --

7       Q.    Did she complain that he had

8  called her a derogatory name?

9       A.    Not at this time, no.  This is a

10  previous altercation.

11      Q.    Okay.  But in the final

12  investigation, did Ms. Parrish make a

13  formal complaint against Mr. Williams?

14      A.    Let's see.  She did make the

15  statement that he was cursing, yelling

16  at -- yelling at her, calling her MF --

17  GDMF.  Those were her -- that is in her

18  statement.

19      Q.    Okay.  Did you get any other

20  employees to come -- who came forward

21  that witnessed come -- the -- Mr.

22  Williams making those derogatory

23  comments to Ms. Parrish?

## FREEDOM COURT REPORTING

51

A.    Yes, ma'am.  We had other employees involved in the investigation.

Q.    Okay.  Did they witness -- did they hear him calling her names?

A.    They heard yelling; they did not hear specific cursing at her.

Q.    Okay.  So the witnesses said they did hear yelling but did not say specifically that Mr. Williams called Ms. Parrish names?

A.    Yes, ma'am, that's correct.

Q.    Okay.  Did any witnesses witness Mr. Williams throwing things in Ms. Parrish's direction?

A.    No, ma'am.

Q.    Did you move Ms. Parrish to another area so she would not be under his direct supervision?

A.    Yes, ma'am.

Q.    And where -- where did you move her to?

A.    Moved her to line five label operator.  She retained the same pay,

**FREEDOM COURT REPORTING**

52

1   same position, just in a different line

2   away from Mr. Williams so that there

3   would not be any future altercation.

4        Q.    Now, when -- when did that move

5   take place?

6        A.    The move would have taken place

7   on that Friday that was the termination

8   that we had given her; she felt she

9   could not work and decided to go home

10  that day on the 16th.

11       Q.    So the move would have take --

12  took place on June 16th, but she did not

13  work?

14       A.    Exactly.

15       Q.    Okay.

16       A.    She -- to my knowledge, she

17  actually worked in a different position

18  on the 15th after the altercation

19  happened on the 14th.  So she was not

20  working with Frank on the 15th.  The day

21  she did work, on the 16th when she came

22  in, she did not report to work on the

23  line; she stayed in the office

# FREEDOM COURT REPORTING

53

1    discussing it with myself and Maryann

2    Boyer and left from there to go home.

3        Q.    Did she -- did Ms. Parrish tell

4    you she was not returning the next

5    workday?

6        A.    She attempted to turn her badge

7    in; we asked her to take the weekend to

8    think about it.  We did not want her to

9    resign at that point.  We wanted her to

10   have a chance to understand our

11   investigation process, what we had done.

12   We did not want her to resign on that

13   Friday.  We'd offered her the

14   opportunity to think about it over the

15   weekend.  She called in Monday stating

16   she was sick.  She called in again on

17   Tuesday stating she was sick following

18   our call-in procedure.  Wednesday she

19   called in and resigned.

20       Q.    Okay.  Okay.  So after Ms.

21   Parrish did report the conflict she had

22   with Mr. Williams you attempted to

23   resolve the problem by moving her to

**FREEDOM COURT REPORTING**

54

1   another position, same pay, with no loss

2   in benefits, but she did not report to

3   that position; is that correct?

4        A.    That is correct.

5        Q.    Okay.  And in that new position

6   she would not have been under his

7   supervision?  Under Mr. Williams's

8   supervision?

9        A.    That is correct.

10       Q.    Did Ms. Parrish tell you that

11  she wanted Mr. Williams to be terminated

12  from the job completely so she would

13  have no --

14       A.    She did --

15       Q.    Pardon me?

16       A.    She did make that statement.

17  She did make that statement, yes, ma'am.

18       Q.    Okay.  Was there any reason you

19  needed to terminate him?

20       A.    No, ma'am.  We disciplined both

21  employees equally, as well as she would

22  have received disciplinary action had

23  she returned to work that Monday.  Mr.

## FREEDOM COURT REPORTING

55

1    Williams did receive a disciplinary

2    action and then we separated the two.

3    We only have one team lead in the plant

4    that's on line three.  It was not

5    feasible to move Frank to another

6    position, so we gave Linda one

7    additional chance after being moved from

8    line one initially in September to line

9    five due to similar altercations with

10   employees - other employees, not Frank.

11   We gave her the opportunity this time to

12   move to line -- I'm sorry, from line

13   three to line five in order to hopefully

14   alleviate those issues with employee

15   conflict.

16       Q.   Okay.  All right.  Your

17   handbook, your manual.  Do you have an

18   employee handbook that you gave Ms.

19   Parrish?

20       A.   Yes, ma'am.

21       Q.   And does it have any section in

22   there that explains how to -- the action

23   to take to resolve conflicts with

## FREEDOM COURT REPORTING

56

1    employees, coworkers?

2    A.    Yes, ma'am, we have a workplace

3    harassment policy.

4    Q.    Okay.  And did Ms. Parrish

5    follow that policy?

6    A.    Yes, ma'am, she did.  She did

7    fill out the paperwork for a

8    documentation about the conflict itself.

9    Q.    Okay.  And in your

10    investigation, did you say that you

11    found some merit to the allegation and

12    you did attempt to resolve the conflict

13    by moving Ms. Parrish to the other

14    position, which she did not report to?

15    A.    Yes, ma'am.  We felt both were

16    equally involved in the altercation,

17    both arguing, both employees argued,

18    both were involved equally, so they were

19    disciplined equally as well as separated

20    so that there would not be any future

21    altercations hopefully.

22    Q.    Did you find Ms. Parrish's

23    safety to be in jeopardy in any way?

## FREEDOM COURT REPORTING

57

1      A.    No, ma'am.

2      Q.    Okay.  Is it correct you said

3  you found that she had been harassed or

4  that there was some type of personal

5  conflict between the two of them?

6      A.   I did not determine any

7  harassment to be taking place.  I did

8  determine the conflict between the two

9  in the form of an argument,

10  disagreement, had taken place.

11     Q.    Okay.  All right.  And was there

12  a worker there before Ms. Parrish when

13  she stopped reporting to work?

14     A.    Yes, ma'am.

15     Q.    On the third day when Ms.

16  Parrish did not report to work, did I

17  understand you to say she called in to

18  say she had -- did she say she had quit?

19     A.    Yes, ma'am, she called in and

20  resigned.

21     Q.    Okay.  Did she put it in

22  writing, or was it verbal?

23     A.    Verbal in our call-in line.

## FREEDOM COURT REPORTING

58

1      Q.    Okay.  That was -- that would be
2   Wednesday, June the 14th?

3      A.    21st.

4      Q.    The 21st; I'm sorry.

5      A.    21st, yes, ma'am.

6      Q.    Okay.  Okay.  Mr. Mance, is
7   there anything additional you want to
8   add to the information regarding the
9   separation?

10     A.    No, ma'am.

11          MS. COOK:  Okay.  Mr. Taylor, do
12   you have any questions for Mr. Mance?

13          MR. TAYLOR:  Yes, ma'am, I do.
14   Thank you.

15

16   EXAMINATION OF MR. MANCE BY MR. TAYLOR:

17     Q.    Mr. Mance, when was the claimant
18   moved from line one to line three?

19     A.    That would have been in
20   September, 2005.

21     Q.    What was the reason for that
22   move?

23     A.    Altercations with other

## FREEDOM COURT REPORTING

59

1     employees, just general conflict on the

2     line.

3          Q.    How many altercations took

4     place?

5          A.    One final altercation led to the

6     separation of the two.  Previous to

7     that, just general argument, conflict.

8          Q.    How many women work on Mr.

9     Williams's line?

10          A.    I know it would be five.

11          Q.    How many complaints regarding

12     harassment or inappropriate behavior

13     have you received from those ladies?

14          A.    None.

15          Q.    How many altercations with other

16     employees has Mr. Williams been involved

17     in?

18          A.    Mr. Williams has one additional

19     argument with another employee that did

20     result in a disciplinary action between

21     those two employees.

22          Q.    Did the claimant make any

23     allegation that Mr. Williams was trying

## FREEDOM COURT REPORTING

60

1    to strike her by throwing objects at

2    her?

3       A.    She did make the statement that

4    -- just a moment; let me look at her

5    statement here.  No, ma'am, I do not see

6    -- no, sir, I do not see anything in her

7    statement stating that he threw objects

8    at her; just a verbal altercation.  In

9    her original statement she completed on

10   6/14, the alteration happened.

11       MR. TAYLOR:  Thank you.  I don't

12   have any further questions for --

13       MS. COOK:  Okay.  Ms. Crook, do

14   you have any questions for Mr. Mance?

15       MS. CROOK:  Yes, ma'am, I do.

16

17   EXAMINATION OF MR. MANCE BY MS. CROOK:

18       Q.    The altercation that resulted in

19   her being moved in September, according

20   to your testimony -- well, I take that

21   back.  I don't want to get to that yet.

22       You said that she had complained

23   about Frank Williams once before, and

## FREEDOM COURT REPORTING

61

1    when she did she was written up and he

2    was written up; is that correct?

3        A.    No, ma'am, she had not

4    complained about Frank.  There was an

5    altercation about inflammatory comments

6    that had been made.  Investigating that,

7    we had statements from all employees

8    involved in those inflammatory comments

9    about Frank.  It was one of the

10    employees involved.  There was not a

11    complaint made about any type of

12    harassing or anything.  It was an issue

13    of conflict, again, between employees;

14    no official complaint that Frank had

15    said anything or done anything to Linda.

16        Q.    Isn't that when she came in and

17    told you guys that he had threatened her

18    and that she was afraid; the first time,

19    during that complaint she made to you,

20    he is a registered sex offender and I'm

21    afraid?

22        A.    That was not her statement, no,

23    ma'am.  Her statement -- that's not a

62

1    proper statement.

2        Q.    That's not part of her statement

3    that when she first came in and talked

4    to you and she was written up for saying

5    he was a registered sex offender?

6        A.    No, ma'am.  On February 16th,

7    I'll be happy to read her statement for

8    you.

9        Q.    Okay.

10        A.    At approximately 10:50 employee

11    came to me stating that Frank Williams

12    had come to them this a.m. stating that

13    I had been telling people that Frank

14    Williams is a child molester.

15    Immediately I met with Melvin Hutchins,

16    Chris Jordan with this matter.  This is

17    after a previous meeting with Melvin

18    Hutchins on the topic of many concerns

19    with Frank in line three work

20    situations.

21            That's her statement on February

22    16th concerning the issue of

23    inflammatory comments made by Linda.

## FREEDOM COURT REPORTING

63

1    Q.    So she came in and said to you

2    that he was upset because she had told

3    somebody he was a registered sex

4    offender?  He didn't come in and

5    complain about that, correct?

6    A.    I do have his statement as well.

7    Q.    Who came in and talked to you

8    about it first is what I'm asking you?

9    A.    When the supervisor brought this

10   to my attention after Linda had spoken

11   with Melvin Hutchins and Chris Jordan,

12   according to the statement here.

13   Q.    And you didn't consider this a

14   complaint by Linda?

15   A.    No, ma'am.

16   Q.    Exactly how far is line five

17   from line three where she was working?

18   A.    It's separated; just an open

19   area within the plant, 20 feet, 30 feet.

20   Q.    So when you say she wouldn't be

21   working with Frank Williams, that's not

22   true.  She would still be working with

23   him?

**FREEDOM COURT REPORTING**

64

A.    No, ma'am, the lines -- the lines are situated in a -- in a fashion that -- that they do not involve each over.    Each line is separate.

Q.    Is it true that Frank is supposed to fill in on lines when people go to break?

A.    No, ma'am.    He does fill in some breaks within his line as a floater on line three.

Q.    So he would never ever go to line five or line one?

A.    It -- it could be possible but not -- not standard, no.

Q.    Then when she came in to complain again that he was cursing at her, calling her names and throwing things, she, again, was going to be written up; is that correct?

A.    Yes, ma'am, she was involved in that altercation as well.

Q.    In your sexual harassment policy in your handbook, is there any

# FREEDOM COURT REPORTING

65

1    protection against people who are

2    complaining of sexual harassment?

3        A.    Yes, ma'am.

4        Q.    What is that protection?

5        A.    There's no retaliation allowed

6    for any harassment complaint.

7        Q.    Okay.

8        A.    And, again, realize no -- no

9    complaint has been formally made at this

10    point; it's been altercations and

11    conflicts.

12        Q.    Isn't that a matter of

13    interpretation?

14        A.    During the investigation it was

15    found that Linda was equally involved in

16    the conflict with other employees.  In

17    several instances she was the instigator

18    in those conflicts.

19        Q.    The incident that happened on

20    June -- yeah, June 14th, who were the

21    witnesses that you talked to?

22        MS. COOK:  That's not necessary,

23    Ms. Crook.  We don't need those names.

## FREEDOM COURT REPORTING

66

1    Q.   Well, did Linda give you any

2    names of witnesses she wanted you to

3    talk to?

4    A.   I did the investigation and

5    talked with all witnesses presented.

6    Q.   Did Linda give you the names of

7    witnesses that she wanted you to talk

8    to?

9    A.   Let's see.  She did write down

10   names of witnesses on her statement,

11   yes.

12   Q.   And you did talk to all the

13   people whose names she gave you?

14   A.   Yes, ma'am, I have their

15   statements as well.

16   Q.    And were you mistaken when you

17   said that she called the call-in line

18   that she wouldn't be coming back to

19   work?

20   A.   No, ma'am, she called in each

21   day, Monday and Tuesday.

22   Q.   I'm talking about on the 6 -- on

23   the 20 -- I think it was 25th you said

## FREEDOM COURT REPORTING

67

1    she called in and talked -- called the

2    call-in line?

3        A.    On the 21st she may have called

4    Lee Allen Smith, called the call-in

5    line.  I'm not sure.

6        Q.    If she called Lee, that would be

7    personnel resources, correct?

8        A.    That is human resources.

9    Personnel resources is our temporary

10   agency.

11       Q.    Okay.  Human resources.  And

12   when she called -- assuming that's who

13   she called, did you ask her what Linda

14   said to her?

15       A.    I have here that Linda, a

16   voluntary quit, no notice given.

17       Q.    You have that from where?

18       A.    Is what Lee Allen wrote on the

19   employee status change for the

20   termination.

21       Q.    Did Linda tell you she was

22   afraid to come back to work?

23       A.    She made the statement on Friday

# FREEDOM COURT REPORTING

68

1    when talking with myself and Maryann

2    Boyer that she could not work in the --

3    she could not work with Frank Williams.

4    We informed her at that time that we

5    were transferring her to a different

6    line to hopefully alleviate the

7    situation to separate that conflict.  We

8    did not find any fault with Frank as far

9    as his ability to work in the plant.

10    Hopefully received disciplinary equally.

11        Q.    Has he ever been written up for

12    cursing at other people?

13        MS. COOK:    That's not relevant,

14    Ms. Crook, about the other person.  This

15    is only an employment hearing, and I'm

16    just trying to determine whether or not

17    there is good cause for separating from

18    this employment.

19        Q.    (BY MS. CROOK:)  Okay.  Just a

20    minute.  Could you tell me what you were

21    going to write Linda up for if she had

22    come back to work?

23        A.    She would have been written up

## FREEDOM COURT REPORTING

69

1    for, again, conflict on the line.

2    Causing conflict on the line.

3    Q.   Did you not believe her when she

4    told you she was asking for help and he

5    just went off on her?

6    A.   Could you clarify that for me?

7    Asking for help meaning?

8    Q.   Well, earlier she testified that

9    she asked him to help her with some

10    redos and he just started cursing at

11    her, calling her names, and throwing

12    things.  Did you not believe her when

13    she said that?

14    A.   I believe there was an argument

15    when she came back from break that she

16    had, once again, instigated an argument

17    because of rework left on the table.

18    She was involved in yelling at Frank and

19    asking him to stay and do his rework

20    when he had been instructed by a

21    supervisor to cover the break and then

22    do additional duties beyond that

23    covering of the break.  And he actually

## FREEDOM COURT REPORTING

70

1   informed Linda at the time that he would

2   come back and do that rework once he had

3   finished what the supervisor had told

4   him to do.

5      Q.   And that's what his statement

6   was?

7      A.   Yes, ma'am.

8      Q.   Did he -- did you have witnesses

9   that heard him say that to Linda?

10     A.   I don't know if anyone -- I

11  don't know if anyone was in earshot to

12  hear the exact words.

13     Q.   So it was his word against her

14  word as to what was said; is that right?

15     A.   We have witnesses; I asked them

16  specifically what they said.

17     Q.   You earlier testified that they

18  couldn't hear what was being said; they

19  just heard yelling.

20     A.   Correct.

21     Q.   Are you --

22     A.   I'm looking through the notes

23  now.

# FREEDOM COURT REPORTING

71

1    Q.    Okay.

2    A.    Just an altercation, just

3    yelling, yelling, could hear.  Frank's

4    statement was that he was concerned and

5    the rework and he had been told by his

6    supervisor to get out some trash and do

7    some additional duties once he had

8    finished covering the break.

9    Q.    Whose statement are you reading

10   now?

11   A.    This would be from Frank

12   Williams.

13          MS. CROOK:  Okay.  That's all I

14   have.

15          MS. COOK:  Okay.  Mr. Mance, you

16   brought Mr. Williams in to give

17   testimony?

18          MR. MANCE:  If necessary, yes,

19   ma'am.

20          MS. COOK:  I don't think I have

21   any questions for Mr. Williams because

22   this case is a case of whether or not

23   Ms. Parrish voluntarily quit and her

## FREEDOM COURT REPORTING

72

1  reasons if she voluntarily quit, and she

2  stated she felt constructively

3  terminated so I don't believe I have any

4  questions for Mr. Williams.  Any from

5  you Mr. Taylor?

6          MR. TAYLOR:  No, ma'am, we have

7  no questions for Mr. Williams.  Don't

8  believe it's necessary for him to

9  testify.

10          MS. COOK:  Okay.  Do you, Ms.

11  Parrish?  Do you have any questions for

12  Mr. Williams?

13          MS. PARRISH:  No, ma'am.

14          MS. COOK:  Do you, Ms. Crook?

15          MS. CROOK:  No, ma'am.

16          MS. COOK:  So this hearing is

17  adjourned.  Is there -- is there

18  anything else either party wants to say?

19          MR. TAYLOR:  The employer has

20  nothing further.  Thank you.

21          MS. COOK:  Okay.

22          MS. CROOK:  No, ma'am.

23          MS. COOK:  Well, thank you all

# FREEDOM COURT REPORTING

73

1    -- thank you all for your time.  I have

2    tape recorded the testimony.  We will

3    use this tape later and make a decision

4    on Mrs. Parrish's eligibility for

5    unemployment benefits.  Mail that

6    decision to both of you as soon as

7    possible; hopefully within the next two

8    to three weeks.  You have to right to

9    appeal if you disagree.  Thank you all

10   and have a good day.

11          MS. CROOK:  Thank you.

12          MR. TAYLOR:  Thank you.

13    (Whereupon, the hearing was adjourned.)

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

74

**A**

ability 68:9
able 21:7 27:6
acceptable 9:17
  35:12
accomplish 33:8
accounting 4:3
acting 10:9
action 9:10 15:8
  24:21 26:3
  48:9 49:16
  54:22 55:2,22
  59:20
actions 35:21
add 32:3 58:8
additional 55:7
  58:7 59:18
  69:22 71:7
addressed 42:3
adequate 9:10
adjourned 72:17
  73:13
administer 11:7
administrative
  8:1
advised 8:18
affairs 3:19 4:11
affect 19:3
afraid 61:18,21
  67:22
agency 67:10
ago 44:2
agree 48:23 49:4
ahead 38:23
Alabama 2:9 3:3
  4:19 5:12 6:6
  7:8,18 8:2,13
  8:16 9:2 13:14
  13:17 19:2
allegation 20:13
  56:11 59:23
allegations
  20:18 49:7
alleged 25:23

Allen 67:4,18
alleviate 55:14
  68:6
allow 10:14
allowed 7:6 10:3
  10:13,18,23
  27:15 38:14
  65:5
alter 48:18
alteration 60:10
altercation
  40:12,15,22
  41:18,23 46:12
  50:10 52:3,18
  56:16 59:5
  60:8,18 61:5
  64:21 71:2
altercations
  47:10,17 48:13
  55:9 56:21
  58:23 59:3,15
  65:10
Ann 3:3 8:1
answer 40:18
answering 39:5
anybody 35:14
appeal 8:19,20
  9:2 73:9
appeals 2:12 6:7
  7:20 8:4
appears 41:3
appointment 5:9
approved 8:15
approximately
  62:10
area 25:3 51:17
  63:19
argued 56:17
arguing 56:17
argument 57:9
  59:7,19 69:14
  69:16
asked 15:11
  17:15 22:22

27:1 42:23
  49:2 53:7 69:9
  70:15
asking 24:14
  30:16 32:12
  39:19 41:4
  63:8 69:4,7,19
assigned 42:10
  43:9
assuming 67:12
assumption 35:5
attempt 56:12
attempted 53:6
  53:22
attention 63:10
attorney 6:20
  11:22
**AUDIOTAPE**
  1:3
August 7:23
authority 18:12
a.m 62:12

**B**

back 27:7,21
  36:13 46:19,23
  48:20 60:21
  66:18 67:22
  68:22 69:15
  70:2
badge 53:6
bag 17:5
barely 6:2
base 35:4
bear 9:11
behavior 22:1
  25:23 26:1
  59:12
believe 36:5
  69:3,12,14
  72:3,8
benefits 8:16
  9:16 54:2 73:5
better 6:2

beyond 69:22
Bobby 7:4 37:15
bona 9:5
Boyer 14:17,20
  45:9 46:7 53:2
  68:2
Brands 3:16 4:8
  4:17 45:18
break 25:21
  31:20 33:18
  64:7 69:15,21
  69:23 71:8
breaks 64:9
brought 63:9
  71:16
business 30:8,12

**C**

calendar 8:21
call 2:18 3:9 5:7
  5:11 17:16
  21:10,16
called 17:11
  20:8 21:8,12
  34:10 35:14
  50:8 51:9
  53:15,16,19
  57:17,19 66:17
  66:20 67:1,1,3
  67:4,6,12,13
calling 2:11 3:7
  3:16 4:7 6:7
  50:16 51:4
  64:17 69:11
call-in 53:18
  57:23 66:17
  67:2,4
cans 17:5
case 1:9 7:21 8:6
  38:2 71:22,22
cause 9:7,8,13
  68:17
Causing 69:2
cell 28:19

center 19:2
CEO 14:23
  15:13 16:6
  34:12
chance 53:10
  55:7
change 67:19
changed 49:1
changes 44:22
characterizing
  48:1
charge 32:19
charges 27:23
  28:7
chest 32:10
child 62:14
choice 15:2 16:1
  35:16,19
Chris 17:19
  19:11 62:16
  63:11
city 13:16
claim 8:12,14
  9:7,20
claimant 8:6
  58:17 59:22
clarify 69:6
come 21:19 27:6
  49:13 50:20,21
  62:12 63:4
  67:22 68:22
  70:2
coming 5:16
  66:18
comment 49:17
comments 48:5
  48:10 49:11,15
  49:20 50:23
  61:5,8 62:23
company 12:2,3
  14:4 21:23
  22:4 32:23
  33:12 45:5,16
  45:23

# FREEDOM COURT REPORTING

complain 50:7 63:5 64:16
complained 60:22 61:4
complaining 65:2
complaint 18:9 20:3,7,12 22:9 23:8,11,23 24:2,9,10,13 24:15 26:4 31:1,2 36:20 36:23 37:1,6 39:4,10,22 40:3,6 50:13 61:11,14,19 63:14 65:6,9
complaints 23:14 24:16,17 24:20 37:2,5 37:10 38:14 47:7,9,13,15 47:21 48:2,4 49:6 59:11
completed 60:9
completely 54:12
computer 20:22
concerned 71:4
concerning 46:11 48:9 62:22
concerns 42:3 45:12 62:18
conclusion 49:14
conducted 7:22
conflict 53:21 55:15 56:8,12 57:5,8 59:1,7 61:13 65:16 68:7 69:1,2
conflicts 48:14 48:15,17 49:8

55:23 65:11,18
connected 9:14
connection 6:1
consider 63:13
considered 10:22
constructively 15:22 16:7 30:20 32:4 72:2
consumer 3:19 4:10
continue 15:10 29:3,12 33:3
continued 27:2 27:19
continuous 20:1
continuously 19:7,8 21:4 31:10
conversation 31:17,22 46:10
convicted 20:10
conviction 31:11 31:19
Cook 2:3,8,11 2:14,16,21 3:2 3:3,6,11 4:18 4:23 5:6,10,18 5:20 6:5,13,16 6:19,21 7:5,13 8:1 10:11 11:7 11:11,18,21 12:9,13,19,21 13:1,3 33:22 34:15 37:11,15 37:17,20 38:4 38:16,23 39:15 39:17 41:2,9 42:15,18,22 43:4,19,22 44:7,9,13 48:20 49:5 58:11 60:13

65:22 68:13 71:15,20 72:10 72:14,16,21,23
copies 24:5 39:6
copy 20:23 22:17,20,21 23:7,10,13
correct 11:14 18:20 21:14 26:12 28:17 29:6,13 31:9 33:3 43:15 51:11 54:3,4,9 57:2 61:2 63:5 64:19 67:7 70:20
counsel 8:13
court 38:21
cover 69:21
covering 69:23 71:8
coworkers 56:1
Crook 6:23 7:4 37:7,14,14,16 37:16,19 38:1 38:11,22 43:23 44:6,8 60:3 60:15,17 65:23 68:14,19 71:13 72:14,15,22 73:11
cursed 17:1
cursing 50:15 51:6 64:16 68:12 69:10
cussed 16:19 19:7
C-R-O-O-K 37:19

D

D 1:7
damn 17:11,16 21:9 35:15

date 7:23 8:21 14:7 23:16 39:8 44:16,17
day 14:9 21:9 28:11 45:5,8 46:22 52:10,20 57:15 66:21 73:10
days 8:21
deal 34:13
decided 52:9
decision 8:5 73:3,6
delivery 4:5
denied 9:7,16
department 8:3 19:13 28:1
derogatory 21:20 29:4 50:8,22
determination 8:18
determine 57:6 57:8 68:16
dial 3:18,20,23 4:10,11
different 52:1 52:17 68:5
difficulty 18:10
direct 30:15 51:18
direction 17:7,8 17:10 29:6 36:1 51:14
directly 21:14 21:19
director 45:9 46:7
dis 15:5
disagree 8:19 73:9
disagreement 17:14 18:5 57:10

discharged 14:12 15:3
disciplinary 48:8 49:16 54:22 55:1 59:20 68:10
disciplined 54:20 56:19
discriminated 34:7,8
discrimination 32:8,17,19
discussing 53:1
disliked 26:12
disruptive 38:17
Division 8:4
documentation 20:12,17 48:4 56:8
door 5:2
Dothan 13:17
due 55:9
duties 69:22 71:7

E

earlier 47:20 69:8 70:17
earn 9:18
earshot 70:11
EEOC 32:18
egregious 35:17
either 5:4 72:18
element 9:12
eligibility 73:4
eligible 8:17
employed 11:16 44:23 45:15
employee 8:7 22:18 40:13,16 40:23 41:19 50:1 55:14,18 59:19 62:10 67:19

# FREEDOM COURT REPORTING

employees 48:7
50:4,20 51:2
54:21 55:10,10
56:1,17 59:1
59:16,21 61:7
61:10,13 65:16
employer 2:17
10:2 12:1 20:3
23:14 24:21
26:2 29:9,10
42:3 72:19
employment
28:12 68:15,18
ends 48:19
enter 37:8
environment
30:22 33:2
equally 54:21
56:16,18,19
65:15 68:10
established 9:19
exact 70:12
Exactly 52:14
63:16
EXAMINATI...
13:3 34:4
44:13 58:16
60:17
excuse 9:10
expected 46:19
46:23
expecting 5:6,10
5:11
experience 30:3
explain 7:16
explains 55:22
Express 11:14
11:17 12:3
exten 4:20
extension 3:18
4:9,23

**F**
face 21:13,20

fact 43:12
faith 9:12
far 11:22 30:3
32:21 63:16
68:8
fashion 64:2
fault 68:8
feasible 55:5
February 48:10
62:6,21
feel 32:6
feet 25:4 63:19
63:19
felt 15:16,23
16:12 26:1,11
26:16,18 28:15
28:23 29:10
30:21 31:2,6,8
32:4 33:1 36:9
46:16 52:8
56:15 72:2
female 21:18
29:18,22 34:21
35:6
females 21:5
fide 9:6
file 8:20 9:1
27:23 32:18
36:17 37:2,5
39:4,9 40:2
filed 8:12 28:7
36:23 37:5
39:21 40:7
47:21
filing 22:9
fill 56:7 64:6,8
final 32:21
36:23 41:23
50:11 59:5
find 56:22 68:8
Fine 3:6
finished 70:3
71:8
fired 15:6,13,21

16:5 36:22
first 9:23 16:3,4
18:5 20:4,4,7
37:6 39:4,9,22
40:2,6,7 61:18
62:3 63:8
firsthand 18:19
30:14
fit 35:20
five 3:21 4:4,13
14:5 30:10
32:7,9 44:15
51:22 55:9,13
59:10 63:16
64:12
Flavor 1:6 3:17
4:8 8:8,17,23
13:8 24:9 30:9
30:13 44:15
floater 64:9
follow 9:22 22:8
22:13,23 56:5
following 53:17
force 49:12
forced 15:16
28:14,16 29:1
31:8
form 57:9
formal 18:8
26:22 31:1
48:2,3 49:6
50:13
formally 65:9
formerly 3:16
4:8
forward 50:20
found 56:11
57:3 65:15
four 3:20 4:3,11
Frank 3:9 6:11
7:15 8:10 15:9
16:17 27:19
29:2 30:23
33:1,6 39:13

40:7 42:13,20
45:14 46:12
47:4 50:2
52:20 55:5,10
60:23 61:4,9
61:14 62:11,13
62:19 63:21
64:5 68:3,8
69:18 71:11
FRANKLIN 1:7
Frank's 71:3
freely 18:18
31:19 33:6,14
Friday 46:5,15
46:21 52:7
53:13 67:23
friends 30:13
full 17:5
further 43:18
60:12 72:20
future 52:3
56:20

**G**
garage 17:5
GDMF 50:17
general 59:1,7
give 2:18 9:22
14:6 15:7,12
15:14 26:22
27:4,8,12 41:1
44:17 66:1,6
71:16
given 52:8 67:16
giving 6:21 10:7
27:18 40:21
go 25:21 38:13
38:15,23 39:8
46:18 52:9
53:2 64:7,11
God 12:17 17:11
17:16 21:8
35:15
goes 42:21

going 5:16,22
9:23 32:20
37:8,23 38:12
38:13,18 42:7
42:11 44:1
64:18 68:21
good 2:23 9:6,8
9:12,13 68:17
73:10
grounds 9:9
guess 38:12
guys 61:17

**H**
handbook 22:10
22:14,16,18,23
24:11 55:17,18
64:23
handles 11:20
hang 3:20 4:11
happen 16:21
32:13
happened 19:16
19:17,20 22:20
24:8,10,15,19
26:15 30:8,12
30:17 52:19
60:10 65:19
happy 62:7
harassed 23:5
57:3
harassing 19:5
19:21 34:20
35:5 61:12
harassment 22:1
22:6 56:3 57:7
59:12 64:22
65:2,6
hear 6:2 40:17
51:4,6,8 70:12
70:18 71:3
heard 51:5 70:9
70:19
hearing 2:12 6:8

# FREEDOM COURT REPORTING

7:6,17,21 8:2
28:21 37:22
38:7,17,20
44:2 68:15
72:16 73:13
**hearings** 7:19
8:4
**Hello** 2:7 23:9
**help** 3:1 4:17
12:17 17:15
69:4,7,9
**hire** 14:6 44:16
**hired** 44:21
**hit** 32:9,14 36:2
36:6,10 40:20
**hold** 2:5,16 3:11
5:17,22 6:3
18:2 37:11
49:2
**home** 46:18 52:9
53:2
**hope** 6:2
**hopefully** 55:13
56:21 68:6,10
73:7
**House** 1:6 3:17
4:8 8:8,17,23
13:8 24:9 30:9
30:13 44:15
**human** 4:3 12:7
67:8,11
**Hutchins** 19:12
62:15,18 63:11

## I

**identity** 38:8
**immaterial** 41:4
**Immediately**
18:1 62:15
**inappropriate**
59:12
**incident** 19:16
19:17,20,22
20:1 32:22

34:10 36:12
65:19
**including** 32:9
**Incorporated**
8:8,23 13:8
**indefinitely** 9:8
**individuals** 12:4
47:17
**Industrial** 8:3
**inflammatory**
49:11,15,20
61:5,8 62:23
**informal** 38:20
**information**
10:21 18:16
19:2 20:21
31:5 50:2,3,6
58:8
**informed** 68:4
70:1
**initially** 55:8
**instances** 65:17
**instigated** 69:16
**instigator** 65:17
**instructed** 69:20
**insured** 9:17
**interest** 38:2
**interpretation**
65:13
**interrupt** 28:21
**investigated**
48:7 49:19
**investigating**
49:13 61:6
**investigation**
42:1 45:13
46:11 50:12
51:2 53:11
56:10 65:14
66:4
**involve** 64:3
**involved** 31:16
32:23 51:2
56:16,18 59:16

61:8,10 64:20
65:15 69:18
**involvement**
48:9
**irrelevant** 37:7
37:9
**issue** 9:3 61:12
62:22
**issues** 55:14

## J

**jar** 32:10,15
40:20
**jeopardy** 56:23
**job** 9:14 13:18
14:13 31:9
32:6 33:16
34:11 44:20
47:2 54:12
**Jordan** 17:19
19:11 62:16
63:11
**JR** 1:7
**July** 9:1
**June** 8:13 14:8
14:11 16:22
23:21 28:11
29:1 30:23
31:7 37:1
44:16,18 46:2
46:4,15 52:12
58:2 65:20,20

## K

**keep** 21:6 27:19
**know** 3:17 4:9
11:23 30:3,7
30:11,16 35:2
36:14,18 38:8
41:6 43:23
59:10 70:10,11
**knowledge** 9:12
18:20 30:15,17
52:16

## L

**label** 13:11,20
13:21 25:19,20
45:2 51:22
**laborer** 44:21
**ladies** 59:13
**lady's** 16:5
**large** 17:4
**law** 2:1 9:2,4,14
**lawyer** 11:10
**lay** 11:16
**lead** 25:12 29:2
41:15 42:10
55:3
**leader** 18:14
43:2,9,14 47:5
**leave** 9:5,15
15:17 16:2
31:8,22 32:1
**leaves** 27:7
**leaving** 9:13
**led** 32:16,22
59:5
**Lee** 67:4,6,18
**left** 26:21 30:8
30:12 46:20
53:2 69:17
**legal** 7:7
**let's** 39:7 49:22
50:14 66:9
**Linda** 1:6 2:3,12
2:14 3:7 6:8,14
8:7 45:22 55:6
61:15 62:23
63:10,14 65:15
66:1,6 67:13
67:15,21 68:21
70:1,9
**line** 3:8 6:9 7:14
40:11 41:13,13
41:17,21 42:6
42:11 43:3,7
43:10,13,15
44:3 45:13

47:5 51:22
52:1,23 55:4,8
55:8,12,12,13
57:23 58:18,18
59:2,9 62:19
63:16,17 64:4
64:9,10,12,12
66:17 67:2,5
68:6 69:1,2
**lines** 64:1,2,6
**listen** 37:23
**location** 13:10
13:13
**long** 14:3 27:11
**longer** 26:16,19
27:10 45:15,22
**look** 36:17 60:4
**looking** 70:22
**loss** 54:1
**loud** 31:19
**L-A-B-E-L** 14:1

## M

**machine** 13:11
31:23
**machines** 25:19
**Mail** 73:5
**mailed** 8:22
**making** 8:5
50:22
**man** 35:1
**manager** 12:8
**Mance** 3:9 5:2
6:4,4,11 7:15
8:10 10:3,11
10:15,18 12:5
12:7,19,20
43:19,21 44:10
44:11,13 49:2
49:4 58:6,12
58:16,17 60:14
60:17 71:15,18
**manual** 55:17
**man's** 34:11

# FREEDOM COURT REPORTING

**March** 39:12,23
47:10 48:10,12
**marketing** 3:21
4:13
**Maryann** 14:17
14:20 45:9
46:7 53:1 68:1
**matter** 62:16
65:12
**ma'am** 2:10 3:10
3:14 4:22 5:11
5:19 10:9 11:6
11:15 12:12
13:6,23 14:2
14:14 15:11
16:9 17:22
18:7,11,21
20:14,19 21:1
21:15,22 22:3
22:7,19 23:1,6
23:9,12,15
24:1,4,18 25:7
25:11,14,18
26:5,13,17
27:13 28:2,8
28:18,22 29:7
29:14,17,20
30:1,5 31:10
31:15,18 32:5
32:16 33:4,11
33:14,17,21
34:1,17 35:22
36:18 39:3,7
39:20 40:9,21
41:7 42:17
43:8 44:6,8,18
47:23 48:3,15
49:10 51:1,11
51:15,19 54:17
54:20 55:20
56:2,6,15 57:1
57:14,19 58:5
58:10,13 60:5
60:15 61:3,23

62:6 63:15
64:1,8,20 65:3
66:14,20 70:7
71:19 72:6,13
72:15,22
**mean** 16:10,11
18:19 19:19
24:2
**meaning** 69:7
**means** 9:9
**meant** 15:23
**mechanic** 18:3
40:20
**meeting** 62:17
**meetings** 34:14
**Melvin** 19:12
62:15,17 63:11
**mentioned**
47:10
**merit** 56:11
**met** 62:15
**MF** 50:16
**mind** 6:21 28:20
**minute** 5:17
68:20
**minutes** 18:2
44:2
**mistaken** 66:16
**molester** 62:14
**moment** 2:6
60:4
**momentarily**
48:22
**Monday** 46:20
46:23 53:15
54:23 66:21
**month** 19:18
40:5
**months** 39:11
**morning** 2:23
5:3 45:8
**motherfucker**
17:12,17 21:9
35:15

**move** 25:17 41:8
41:17 51:16,20
52:4,6,11 55:5
55:12 58:22
**moved** 25:1,2,8
41:13,21 51:22
55:7 58:18
60:19
**moving** 33:7
42:4 53:23
56:13

## N

**name** 3:23 6:22
8:1 12:2 16:6
21:17 37:13,13
45:17 50:8
**names** 34:10
51:4,10 64:17
65:23 66:2,6
66:10,13 69:11
**nature** 22:2 46:9
49:11,15
**necessary** 65:22
71:18 72:8
**need** 2:18 3:8
10:22 15:19
42:14 65:23
**needed** 54:19
**never** 35:14
64:11
**new** 54:5
**nondisruptive**
38:19
**note** 8:22 33:5
**notes** 70:22
**notice** 8:21
26:22 27:4,8
27:12,18 67:16
**notified** 8:17
**number** 7:21
24:11
**Nutcracker** 3:16
4:7,17 45:18

## O

**oath** 11:4 12:10
12:14
**objection** 37:8
**objects** 60:1,7
**offender** 16:13
18:17 20:10
31:12 61:20
62:5 63:4
**offered** 46:17
53:13
**office** 2:2,9 3:4
4:19 5:13 6:6
52:23
**officer** 8:2
**official** 61:14
**Oh** 35:19
**okay** 2:14,16,20
3:11 5:1,14,17
5:21,23 6:11
6:13,13,16
7:13 10:11
11:3,18,21
12:9,9,13 13:1
13:7,18 14:3
14:12,15 15:11
16:3,10,15,18
16:23 17:9,18
18:4,8,15,22
19:3,6 20:11
20:23 21:2,23
22:8,22 23:3
23:13,16,19,22
24:5,8,19 25:2
25:5,12,15
26:10,15 27:14
27:17,23 28:10
28:15,19,23
30:7,18,19
31:21 32:2,11
32:18,21 33:9
33:19,19,22
34:15 37:11,20
38:4,6,16

39:15,17 41:2
41:9 42:18
43:22 44:9
45:1,4,19,21
46:3,9,14 47:6
47:12,19 48:11
48:16,20 49:5
49:5,18 50:5
50:11,19 51:3
51:7,12 52:15
53:20,20 54:5
54:18 55:16
56:4,9 57:2,11
57:21 58:1,6,6
58:11 60:13
62:9 65:7
67:11 68:19
71:1,13,15
72:10,21
**once** 60:23
69:16 70:2
71:7
**open** 5:3 63:18
**operations**
45:10 46:8
**operator** 4:5,15
13:20,22 45:3
51:23
**operators** 25:21
**opportunity**
27:16 46:17
53:14 55:11
**options** 3:22
4:14
**order** 55:13
**original** 60:9

## P

**pallets** 17:4
**paperwork** 56:7
**Pardon** 44:7
54:15
**Parr** 34:18
**Parrish** 2:4,7,10

# FREEDOM COURT REPORTING

79

2:12,13,15,20
3:7 6:8,9,14,15
6:18,20 7:2,11
8:7,11 9:22
10:13,16,20
11:6,9,23
12:12,17,18
13:3,4,15
14:16 16:16
19:15 22:2
23:11 31:14
32:3,11 33:19
33:23 34:4,6
34:19 41:11
42:15,17,20,23
43:2 44:1,14
45:5,22 46:14
47:3,7,14 48:8
48:16 49:9,19
50:12,23 51:10
51:16 53:3,21
54:10 55:19
56:4,13 57:12
57:16 71:23
72:11,13
**Parrish's** 51:14
56:22 73:4
**part** 33:16 62:2
**participate**
38:12,18
**participating**
37:22 38:5,9
38:10
**parties** 3:12
**parts** 4:4
**party** 2:22 3:23
72:18
**party's** 3:18 4:9
**patterns** 11:20
**pay** 51:23 54:1
**payment** 8:15
**peanuts** 32:10
32:15,15
**people** 62:13

64:6 65:1
66:13 68:12
**person** 2:19
25:13,20 29:3
29:15 36:15,19
36:21 46:6
68:14
**personal** 57:4
**personnel** 67:7,9
**phone** 3:13 5:7
5:11 28:20
**phones** 28:4
**physically** 16:19
**picks** 6:3
**place** 49:2 52:5
52:6,12 57:7
57:10 59:4
**plant** 28:5 33:7
33:15 42:21
55:3 63:19
68:9
**please** 4:6,15
42:19
**pocket** 27:22
**point** 27:20 37:9
38:11 41:5
53:9 65:10
**police** 28:1
**policy** 22:1,5
56:3,5 64:22
**position** 33:5
44:22 47:2
52:1,17 54:1,3
54:5 55:6
56:14
**possible** 64:13
73:7
**PR** 19:13
**presence** 26:11
**present** 8:7
10:22 11:1,10
**presented** 66:5
**press** 3:19,21,22
4:1,2,2,3,4,5,6

4:11,13,14
**previous** 50:10
59:6 62:17
**previously** 47:10
47:18
**prior** 36:11,23
39:11
**probably** 19:17
40:10
**problem** 26:7
29:11 30:4
53:23
**procedure** 7:16
9:21 22:9,14
22:15,23 53:18
**proceeded** 17:16
**process** 11:3
53:11
**Products** 1:6
3:17 4:8 8:8,23
13:8
**profanity** 26:11
31:7 35:8,10
35:12,18
**proper** 62:1
**protect** 38:1
**protection** 65:1
65:4
**public** 19:1
**pulled** 20:15
**purchasing** 4:2
**put** 21:4 34:12
42:13 44:3
57:21

_____ **Q** _____

**quarter** 40:10
**question** 12:11
36:3 41:8
42:16,19 43:1
43:5
**questions** 10:1,4
10:14,15,19
11:2 33:23

34:16 39:1,19
43:18,20,21
44:4,5,11
58:12 60:12,14
71:21 72:4,7
72:11
**quit** 9:4 28:10
28:13,14,16
29:1 32:6
57:18 67:16
71:23 72:1

_____ **R** _____

**radio** 18:3
**ran** 48:22
**rate** 9:19
**read** 49:23 62:7
**reading** 71:9
**realize** 65:8
**reason** 9:9,11,13
15:6,12,14,21
21:16 32:3
45:22 54:18
58:21
**reasons** 72:1
**recall** 16:5
**receive** 48:8
49:16 55:1
**received** 31:5
47:6,13 54:22
59:13 68:10
**receiving** 4:1
**record** 7:20
48:21,21
**recorded** 7:17
7:19 73:2
**recording** 3:15
7:6,9,12
**redos** 69:10
**regard** 26:4
**regarding** 2:11
3:7 6:7 9:3
58:8 59:11
**registered** 16:13

18:16 61:20
62:5 63:3
**related** 11:19
**Relations** 8:3
**relevant** 10:23
68:13
**relief** 25:20
**relieving** 33:17
**remarks** 29:4
**remove** 27:1
**rep** 11:12
**repeat** 50:3
**report** 17:20,23
18:9 19:19
22:11 23:2,4
52:22 53:21
54:2 56:14
57:16
**reported** 19:9
19:11 25:22
29:9
**reporting** 57:13
**represent** 6:23
44:1
**representative**
2:17 10:2,7,10
11:16 12:1,2
38:7
**represented** 8:9
**representing** 7:3
38:3
**reprimanded**
20:9,9
**requires** 7:18
9:14
**resign** 53:9,12
**resignation**
26:23 27:5,9
**resigned** 46:1
53:19 57:20
**resolve** 26:7
29:11 53:23
55:23 56:12
**resolved** 31:3

# FREEDOM COURT REPORTING

resources 4:4
12:8 67:7,8,9
67:11
respond 42:19
response 20:2
rest 46:22
restate 43:1,4
result 41:18,22
59:20
resulted 60:18
retained 51:23
retaliation 65:5
retired 44:19
return 9:17
returned 54:23
returning 53:4
rework 17:15
69:17,19 70:2
71:5
right 5:18 7:3
8:19 13:18
36:17 55:16
57:11 70:14
73:8
room 31:20
run 25:18,19

_____

## S

safety 19:1
56:23
sales 3:21 4:12
satisfaction 31:3
saying 16:7 20:9
25:10 62:4
screwdriver
27:21
second 2:17,21
3:12 5:22
37:12 49:3
section 9:2
55:21
see 5:15,16
36:20 49:22
50:14 60:5,6

66:9
sent 8:22
separate 64:4
68:7
separated 32:14
55:2 56:19
63:18
separating
68:17
separation
32:13,22 58:9
59:6
September 55:8
58:20 60:19
sex 16:13 18:16
20:10 31:12
61:20 62:5
63:3
sexual 64:22
65:2
sexually 19:5
23:4
shipping 4:1
sick 53:16,17
Side 48:19
similar 55:9
sir 60:6
situated 64:2
situation 68:7
situations 62:20
six 3:22 4:5,14
Smith 67:4
solemnly 11:8
12:15
somebody 36:12
63:3
soon 73:6
sorry 13:21
14:18 40:17
55:12 58:4
speak 2:3
SPEAKER 2:1
2:5 4:16,21 5:1
5:8,14,19,21

speaking 16:16
31:13
specific 39:18
44:17 51:6
specifically 51:9
70:16
specifics 40:22
spoke 18:18
31:18 35:9
45:9,10,11
46:5
spoken 63:10
standard 64:14
stands 9:9
started 69:10
State 2:8 3:3
4:19 5:7,12 6:6
7:8,17 8:2,16
stated 72:2
statement 9:23
46:3 47:19
49:23 50:15,18
54:16,17 60:3
60:5,7,9 61:22
61:23 62:1,2,7
62:21 63:6,12
66:10 67:23
70:5 71:4,9
statements
19:12 61:7
66:15
states 9:4
stating 53:15,17
60:7 62:11,12
status 67:19
stay 69:19
stayed 32:7
52:23
step 39:7
stick 5:17
stop 27:17
stopped 48:23
57:13
strike 60:1

substantiate
20:17
supervised
41:14,22
supervising 42:6
supervision 42:4
51:18 54:7,8
supervisor
17:18,21 18:3
23:2 43:13
63:9 69:21
70:3 71:6
supposed 64:6
sure 67:5
swear 12:15

_____

## T

table 69:17
take 10:4,12,17
11:4 12:14
52:5,11 53:7
55:23 60:20
taken 15:8 24:21
26:3 52:6
57:10
talk 11:13,16
12:3 36:20
66:3,7,12
talked 19:8
31:11 34:9
35:1 62:3 63:7
65:21 66:5
67:1
talking 40:19
66:22 68:1
talks 37:4
tape 7:5,7,9,11
7:17,19 48:19
48:22 49:1
73:2,3
Taylor 2:23 3:1
3:2,5,10,14
6:10 7:14 8:9
10:2,6,9,15,18

11:12,13,15,19
33:22 34:1,5
34:16,17,18
38:23 39:2,3
39:18,20,21
41:2,3,7,10,11
43:5,6,7,17
58:11,13,16
60:11 72:5,6
72:19 73:12
team 18:14
41:14 42:10
43:2,9,14 47:4
55:3
teleconference
7:22
tell 11:9 12:15
15:4,5,19 26:2
26:6 34:22
53:3 54:10
67:21 68:20
telling 36:19
50:1 62:13
temporary 67:9
ten 9:18
term 21:20
terminate 15:1
33:10,13 54:19
terminated
14:15 15:19,23
16:8 28:12
30:21 32:4
54:11 72:3
terminating
15:15
termination
32:12 52:7
67:20
terminology
21:11
terrible 6:1
test 9:11
testified 34:6,19
35:22 36:22

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 69:8 70:17 | 51:13 60:1 | **Tuesday** 53:17 | **upset** 28:8 46:16 | **Williams** 1:7 3:9 |
| **testify** 72:9 | 64:17 69:11 | 66:21 | 63:2 | 6:12 7:15 8:10 |
| **testimony** 10:5,8 | **thrown** 16:20 | **turn** 53:6 | **use** 21:11,20 | 10:17 12:4,22 |
| 10:12,17 11:4 | **time** 3:19 4:10 | **turned** 19:13 | 35:18 73:3 | 12:23 15:9 |
| 12:14 35:4 | 18:5 20:4 30:4 | 45:7 | _____ | 16:17 17:1 |
| 49:1 60:20 | 45:17 50:9 | **turning** 28:20 | **V** | 18:6,13 20:18 |
| 71:17 73:2 | 55:11 61:18 | **Twenty** 25:4 | **verbal** 24:17,20 | 23:5 25:6 26:2 |
| **thank** 3:6,14,15 | 68:4 70:1 73:1 | **two** 4:2 12:4 | 47:21 48:14,15 | 26:10,19 27:20 |
| 4:7 34:2 39:2 | **timely** 9:1 | 39:11 47:17 | 48:17,18 49:7 | 29:2,16 30:23 |
| 41:10 43:6,18 | **times** 9:18 | 48:5,6 55:2 | 57:22,23 60:8 | 33:1,6,13 |
| 58:14 60:11 | **title** 12:6 13:19 | 57:5,8 59:6,21 | **violence** 22:5 | 34:20,21,23 |
| 72:20,23 73:1 | 14:21,22 44:20 | 73:7 | **volun** 30:19 | 39:22 40:3,17 |
| 73:9,11,12 | 45:2 47:2 | **two-week** 27:12 | **voluntarily** 9:5 | 41:14,22 42:13 |
| **things** 16:20 | **today** 3:5 | 27:18 | 9:15 28:10,13 | 42:20 43:12 |
| 26:14 29:5 | **Today's** 7:23 | **type** 26:3 57:4 | 46:1,20 71:23 | 45:14 47:4,8 |
| 31:7 35:20,23 | **told** 11:11 15:5 | 61:11 | 72:1 | 48:17 49:9,21 |
| 36:10 51:13 | 15:20 22:11 | _____ | **voluntary** 9:4 | 50:13,22 51:9 |
| 64:18 69:12 | 24:16 27:2,10 | **U** | 67:16 | 51:13 52:2 |
| **think** 2:18 46:18 | 30:16 34:11,12 | **UC** 11:14,16 | **VS** 1:6 | 53:22 54:11 |
| 53:8,14 66:23 | 36:12,15,16,16 | 12:3 | _____ | 55:1 59:16,18 |
| 71:20 | 38:4 39:5 | **ultimately** 36:8 | **W** | 59:23 60:23 |
| **thinking** 5:4 | 61:17 63:2 | **unaware** 44:4 | **wait** 4:6,15 | 62:11,14 63:21 |
| 28:9 | 69:4 70:3 71:5 | **uncontrollable** | **walk** 5:15 | 68:3 71:12,16 |
| **third** 57:15 | **tolerated** 32:8 | 35:21 | **walks** 33:6,15 | 71:21 72:4,7 |
| **THORNTON** | **Tommy** 3:9 5:2 | **understand** | **want** 32:3 38:6 | 72:12 |
| 1:6 | 6:4 7:14 8:9 | 11:21 14:19 | 41:6 53:8,12 | **Williams's** 47:2 |
| **threaten** 16:18 | **topic** 62:18 | 29:20 37:17,21 | 58:7 60:21 | 54:7 59:9 |
| **threatened** | **Tracy** 3:1 6:10 | 41:5 42:16 | **wanted** 33:9,12 | **willing** 27:6 |
| 16:14 31:6 | 7:14 8:9 11:12 | 53:10 57:17 | 53:9 54:11 | **wish** 28:2 |
| 36:9 61:17 | **TRANSCRIP...** | **understood** 16:4 | 66:2,7 | **witness** 6:12 |
| **threatening** | 1:3 | 47:20 | **wants** 72:18 | 7:15 8:10 12:5 |
| 25:23 26:1 | **transfer** 5:23 | **unemploy** 8:11 | **wasn't** 28:9 | 51:3,12 |
| **three** 4:2 39:11 | **transferring** | **unemployment** | 38:14 | **witnessed** 50:21 |
| 41:13 43:3 | 4:14 68:5 | 2:9 3:4 4:19 | **way** 35:1 56:23 | **witnesses** 51:7 |
| 47:5 55:4,13 | **trash** 71:6 | 5:12 6:6 7:19 | **Wednesday** | 51:12 65:21 |
| 58:18 62:19 | **tried** 18:1 | 8:6,12,15 9:7 | 53:18 58:2 | 66:2,5,7,10 |
| 63:17 64:10 | **true** 40:9 41:12 | 9:19 11:20 | **week** 8:13 | 70:8,15 |
| 73:8 | 41:23 42:2 | 73:5 | **weekend** 46:19 | **women** 26:12 |
| **threw** 17:1,4,10 | 63:22 64:5 | **UNIDENTIFI...** | 53:7,15 | 59:8 |
| 29:5 31:7 | **truth** 12:15,16 | 2:1,5 4:16,21 | **weekly** 9:18 | **word** 70:13,14 |
| 35:23,23 60:7 | 12:16 36:19 | 5:1,8,14,19,21 | **weeks** 73:8 | **words** 35:16 |
| **throw** 17:2,6 | **trying** 4:20 36:2 | **unsafe** 15:23 | **went** 48:21 69:5 | 70:12 |
| **throwing** 26:13 | 36:5,10 59:23 | 16:12 30:22 | **we'll** 10:17 | **work** 9:6,18 |
| 35:20 36:9 | 68:16 | 32:6 33:2 | **we're** 7:11,20 | 11:13 13:9,12 |
| | | | 32:11 48:20 | |

# FREEDOM COURT REPORTING

13:13,15,16
14:3,10 15:10
16:1,12 20:5
21:7 25:5
26:19 27:7,11
28:6 29:3,12
30:22 31:4
33:2 46:15,17
46:20,21,23
49:12 52:9,13
52:21,22 54:23
57:13,16 59:8
62:19 66:19
67:22 68:2,3,9
68:22
**workday** 53:5
**worked** 13:7
25:9 29:23
30:9,21 35:3
44:14 45:5,7
52:17
**worker** 57:12
**working** 13:4
18:10 19:4
21:3 25:13
27:2 29:15,18
32:23 40:11
42:7,8,12 43:8
45:13 47:8,15
52:20 63:17,21
63:22
**workplace** 22:5
35:10 56:2
**works** 27:11
45:23
**work-connected**
9:6,8
**wouldn't** 63:20
66:18
**write** 66:9 68:21
**write-ups** 29:21
**writing** 57:22
**written** 22:4,15
23:3 24:2,13

24:16,20 61:1
61:2 62:4
64:19 68:11,23
**wrote** 19:12
23:20 67:18

--- **Y** ---
**yeah** 65:20
**year** 39:14 40:7
**years** 14:5 30:10
32:7,9 44:15
**yelling** 50:15,16
51:5,8 69:18
70:19 71:3,3

--- **Z** ---
**zero** 4:6

--- **0** ---
**05** 40:4,10 41:12
**06** 9:1 29:1 31:8
39:23
**088858206** 7:21

--- **1** ---
**1-866-770-1157**
3:20
**1-866-770-1197**
4:12
**1:07-CV-712-...**
1:9
**10** 18:2
**10:50** 62:10
**14** 37:1
**14th** 16:22 23:21
30:23 46:13
52:19 58:2
65:20
**15** 8:20 18:2
**15th** 52:18,20
**16** 29:1
**16th** 14:11 28:11
31:8 46:4,15
48:10 52:10,12
52:21 62:6,22

**19th** 9:1

--- **2** ---
**20** 63:19 66:23
**2001** 14:8 44:16
44:18
**2005** 58:20
**2006** 7:23 8:14
14:11
**21st** 46:2 58:3,4
58:5 67:3
**222** 4:23
**23rd** 7:23
**25th** 8:14 44:18
66:23
**254782** 9:3

--- **3** ---
**30** 63:19

--- **6** ---
**6** 66:22
**6/14** 60:10
**6/16** 45:6
**6/16/06** 28:16

--- **7** ---
**7th** 48:12

# **Training Documentation**

I, _Frank Williams_ have received training on ccp#WICCP00300, ccp #WICCP 1100, WICCP00400, and WICCP01000. I have received a copy and clearly understand the work instructions.

Signed _[signature]_ Date _1-11-07_

**PLAINTIFF'S EXHIBIT**

_8_



PLAINTIFF'S EXHIBIT

9

**DATE:** June 16, 2006

**TO:** Frank Williams

**FR:** Melvin Hutchins

**RE:** **Written Counseling – 1st Step**

> **INCIDENT OCCURRED ON 06/14/06**

On June 14, 2006 you used profanity in the presence of other co-workers.  *This is a violation of plant work rule #16, fighting, threatening, intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property.*

Failure to follow the company policy has resulted in you receiving this **1st Step – Written Counseling.**  Any future violations will result in additional disciplinary action up to and including termination

_Melvin Hutchins_

Melvin Hutchins

Production Manager

_Frank Williams_

 Frank Williams

(Signature acknowledges

Receipt of this document

only.)

# Nutcracker Brands Inc.



# EMPLOYMENT APPLICATION

**PERSONAL** (RESUME MAY BE ATTACHED)                                                   DATE 09-22-00

NAME: LAST  Williams          FIRST  Frank          MIDDLE INITIAL  D

TEMPORARY ADDRESS                          CITY          STATE          ZIP CODE

PERMANENT ADDRESS  2271 South St, Hwy          CITY  Newton          STATE  AL          ZIP CODE

AREA CODE-TEMPORARY PHONE NUMBER  334  692-3079          AREA CODE-PERMANENT PHONE NUMBER  334 692-4334          SOCIAL SECURITY NUMBER  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

WERE YOU EVER EMPLOYED BY RALSTON PURINA, RALCORP HOLDINGS, OR ANY OF THEIR SUBSIDIARIES/AFFILIATES?   ☐ YES   ☐ NO   IF YES, WHEN - WHERE

HAVE YOU EVER BEEN CONVICTED OF ANY FELONY? IF YES, DESCRIBE IN DETAIL (CONVICTIONS WILL NOT AUTOMATICALLY DISQUALIFY JOB CANDIDATES)
☑ YES ☐ NO  Statutory Rape my Girlfriend was 3 years younger than me when I was 18

FOR WHAT POSITION ARE YOU APPLYING?          SALARY EXPECTATIONS  open          DATE AVAILABLE  09-25-00

HOW DID YOU BECOME AWARE OF THE POSITION?  Bruce Cassidy

ARE YOU RELATED TO ANYONE EMPLOYED BY THE COMPANY? IF YES, WHO AND WHAT IS YOUR RELATIONSHIP?   ☐ YES   ☑ NO

WILL YOU WORK OVERTIME, IF REQUIRED?   ☑ YES   ☐ NO          WILL YOU WORK WEEKENDS, IF REQUIRED?   ☑ YES   ☐ NO

## EDUCATION

Achieved High School Diploma/GED?   ☑ YES   ☐ NO

| (Include Education in Progress.) | FROM MO. YR. | TO MO. YR. | DIPLOMA DEGREE DATE | MAJOR | CLASS STANDING OR GRADE POINT AVERAGE |
|---|---|---|---|---|---|
| HIGH SCHOOL/LOCATION  JFI Ingram |  |  | Ged |  |  |
| TECHNICAL SCHOOL/COLLEGE LOCATION  JFI Ingram | 3-92 | 4-94 | AA | Business | 3.4 |
|  |  |  |  |  |  |

PLEASE LIST SPECIAL SKILLS, CERTIFICATIONS OR QUALIFICATIONS YOU POSSESS (SUCH AS FOREIGN LANGUAGE FLUENCY, CPA, COMPUTER SKILLS, ETC.)

N/A



PLAINTIFF'S EXHIBIT

10

PERIENCE

se list all past work history including military and summer work. Use additional paper if necessary. (Please complete fully even if submitting resume.)
RT WITH PRESENT/LAST EMPLOYER

| SENT/LAST EMPLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | DATES OF EMPLOYMENT |
|---|---|---|---|
| Temps of Dothan | 2256 Reeves St. | | FROM: 08-00 TO: |

| T SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | | DATES OF EMPLOYMENT |
|---|---|---|---|---|
| Mike | N/A | | | |

| TING SALARY | PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) |
|---|---|---|---|
| 6.00 | 18.50 hr. | | Pipefitter |

SCRIBE YOUR DUTIES AND RESPONSIBILITIES
Connected Pipe, grinded

| PLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER |
|---|---|
| Personal Resources for Dairy Fresh | |

| ST SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | DATES OF EMPLOYMENT |
|---|---|---|
| Dennis Ellis | Better Job | FROM: 06-00 TO: 08-00 |

| RTING SALARY | PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) |
|---|---|---|---|
| 7.50 | 7.50 | | |

SCRIBE YOUR DUTIES AND RESPONSIBILITIES
Send milk, pull orders

| PLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER |
|---|---|
| Marven Packhand | Baker hill |

| ST SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | DATES OF EMPLOYMENT |
|---|---|---|
| Jerry Wheeler 687-7790 | Moved | FROM: 09-98 TO: 06-00 |

| TARTING SALARY | PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) |
|---|---|---|---|
| 6.50 hr. | 28,000 year | | First Sanitizian, Supervisor |

ESCRIBE YOUR DUTIES AND RESPONSIBILITIES
oversee all production lines & make sure People
where doing their jobs; Payroll check of all
my employees

PLEASE PROVIDE THREE BUSINESS REFERENCES OTHER THAN THOSE LISTED ABOVE.

| NAME | TITLE | PHONE NUMBER | LENGTH OF TIME KNOWN |
|---|---|---|---|
| Bruce Cassidy | Supervisor | Flavor House | 3 Years |
| Butch Cassidy | Supervisor | (   ) | 3½ Years |
| Cecil Feitman | Supervisor | Coca Cola | 12 Years |

PLEASE READ THE FOLLOWING VERY CAREFULLY BEFORE SIGNING.

I acknowledge that the information I have supplied is correct to the best of my knowledge and belief without any omissions of any kind whatsoever. I understand that any falsifications, misrepresentations or omissions of fact may be grounds for rejection of my application or discharge at any time during my employment.

I understand that consideration for employment in this position is contingent upon the results of a reference and background check. I authorize the Company to investigate all statements made on my application for employment and to discuss the results of its investigations with those responsible for hiring. I further authorize the Company to contact my former employer(s) and any listed references or other persons who can verify information, and I give my consent for former employer(s) and other contacted persons to respond to questions pertaining to information on this application. Further, I release from liability such former employer(s) or other persons contacted by and providing information to the Company.

I understand that nothing in this application is intended to imply or create a contract of employment. I further understand that, if hired, my employment is at-will and can be terminated at any time for any reason, by the Company or me, with or without notice.

I acknowledge and agree that employment in the position for which I have applied may be contingent upon completion of a Company-paid physical examination. In addition, I understand that employment in this position is contingent upon successful completion of a test for the presence of illegal substances.

| 09-22-00 | Frank Wilken |
|---|---|
| DATE (MONTH & YEAR) | APPLICANT'S SIGNATURE |

CONFIDENTIAL

**DOCUMENTATION FORM**

Employee Name: _Linda Thornton_

Investigating Supervisor: _Chris Jordan_    Date: _2-16-06_

Present: _Melvin Hutchins_

Who was involved: _Frank Williams_

Witness (s): _____

Date of incident: _2-16-06_

Where did it take place: _In hallway of Plant._

When did it take place (time and day): _2-16-06 Am._

What happened: _At approximately 10:50AM an employee came to me stating that Frank Williams had came to them this am, stating that I had been telling people that Frank Williams was a child molester. Immediately I met with M. Hutchins / Chris Jordan with this matter. This is after a previous meeting with M. Hutchins on the topic of many concerns with Frank and line 3 work situations._

Did this result in down time? _No_    If yes how much? _____

Did this result in product being scrapped?    If yes how much?    _No_

Attach an additional sheet if needed for witness statements following the same format.

_Mark Beard - present in smoking area_



FH000005

213

## DOCUMENTATION FORM

Employee Name: _Frank Williams_

Investigating Supervisor: _Chris Jordan_    Date: _2-16-06_

Present: _N/A_

Who was involved: _Linda Thornton_

Witness (s): _Jewell Silvey & Tracey Brantley_

Date of incident: _2-16-06_

Where did it take place: _Hall way_

When did it take place (time and day): _2-9-06_

What happened: _Jewell Silvey came up to me
in the Hall way + told me that
Linda thorton was out side telling everyone
that I was a child molester + my
Brother's wife's Daughter was my
Girlfriend this is harrassment
and I don't Like it I
don't start trouble. what
happen 15 years ago is none of
her Bushess_

Did this result in down time? _No_    If yes how much?

Did this result in product being scrapped? _No_ yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S
EXHIBIT
12

FH000003

211

Tracey Brantley
Jewell Silenry
Jackie Ward
Vickie Cook

**DOCUMENTATION FORM**

Employee Name: _Linda Thornton_

Investigating Supervisor: _Chris Jordon_    Date: _3-01-06_

Present: _M. Hutchins_

Who was involved: _Frank Williams_

PLAINTIFF'S EXHIBIT

13

Witness (s): _N/A_

Date of incident: _Linda was told 2/28/06_

Where did it take place: _Break Area_

When did it take place (time and day): _After work_

What happened: _Repeatly I have been told of comments that team leader has made against me. One after investigation. Very serious comments and threats made._

_I just want this to be over with, which I believed it would be after last weeks meeting with Tommy in HR. These threats & comments were made to an employee in the front office._

Did this result in down time? _N/A_    If yes how much?

Did this result in product being scrapped?    If yes how much? _N/A_

Attach an additional sheet if needed for witness statements following the same format.

22

**MEMORANDUM**

**DATE:**    March 7, 2006

**TO:**    Linda Thornton

**FR:**    Tommy Nance

**RE:**    Memo to File

> INCIDENT
> OCCURRED ON
> 2/16/06

After investigating the events surrounding the allegations made on 2/16/06, I have determined that you acted in a way that was inflammatory and instigational.  This is not the first altercation that has occurred between yourself and Frank Williams.  Any continued comments of an inflammatory nature or comments meant to incite controversy will be dealt with in a similar fashion.

Failure to follow the proper procedures has resulted in you receiving this **Memo to File.**

Any future violations will result in additional disciplinary action up to and including termination.

_Tommy Nance_ (signature)

Tommy Nance

Human Resources Manager

_Linda Thornton_ (signature)

Linda Thornton

(Signature acknowledges

Receipt of this document

only.)

_I disagree with entire situation and who made comments. also with my record 4 years of employment this should show._

**PLAINTIFF'S EXHIBIT**

*14*

FH000002

*22*

# EXHIBIT D



Ralcorp Holdings, Inc.
P.O. Box 618
St. Louis,
Missouri 63188-0618

October 16, 2006

Ms. Bernice Williams-Kimbrough, District Director
Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street, South
Birmingham, Alabama  35205

|      | Re: | Charging Party: | Linda Thornton |
|------|-----|-----------------|----------------|
|      |     | Respondent:     | Flavor House Products, Inc. |
|      |     | EEOC Charge No.:| 420-2006-05107 |

Dear Ms. Williams-Kimbrough:

I represent Flavor House Products, Inc., a subsidiary of Ralcorp Holdings, Inc. with respect to the above-captioned charge of discrimination.  Please refer any further inquiries or correspondence regarding this matter to me.

Given the lengthy nature of the charge as well as my work schedule, I hereby request until November 27, 2006 to provide the Company's response.

Thank you for your consideration in this matter.  If you have any questions, please contact me.

Sincerely,

J. Scott Clark
Senior Counsel and
Director of Labor Relations
314-877-7106

For Flavor House Products, Inc.

cc:    Mary Ann Boyer
       Tommy Nance

S:\EmployeeFolders\JSCOTT\EEOC ltr re Thornton 101606.doc

**LINDA THORNTON V. FLAVOR HOUSE -
PLAINTIFF'S RFP DOCS 0158**

# EXHIBIT E

## SEPARATION AGREEMENT AND GENERAL RELEASE

This is a Separation Agreement and General Release (referred to as "Agreement") entered into this 4th day of December 2006, by and between Thomas A. Nance (referred to as "EMPLOYEE") and Flavor House Products, Inc. (referred to as "COMPANY").

In consideration of the mutual promises contained in this Agreement, the COMPANY and the EMPLOYEE agree as follows:

1.    EMPLOYEE and the COMPANY agree that EMPLOYEE'S employment with the COMPANY will terminate on December 4, 2006 and he will be removed from the payroll.

2.    The COMPANY agrees:

a.    to pay EMPLOYEE a lump sum settlement payment in the amount of $2,581.25, less legally required deductions. The COMPANY will pay EMPLOYEE this payment within two (2) weeks of EMPLOYEE coming off the payroll or two (2) weeks of EMPLOYEE signing this Agreement, whichever is later;

b.    to provide EMPLOYEE with up to two (2) months of health and dental insurance continuation from the date of EMPLOYEE'S termination of employment. These benefits shall be provided pursuant to COBRA; in order to receive these benefits, EMPLOYEE shall make any necessary elections to continue such benefits as required by the health insurance plan and COBRA; and

c.    to pay EMPLOYEE for accrued vacation not yet taken in accordance with COMPANY policy, less legally required deductions, within two (2) weeks of EMPLOYEE'S last day on the payroll; and

d.    to provide outplacement assistance.

3.    EMPLOYEE and the COMPANY understand and agree that if EMPLOYEE obtains and begins employment with another company that offers benefits equivalent to those provided under Paragraph 2b prior to the end of the benefit continuation period set forth in Paragraph 2b, the COMPANY will immediately terminate EMPLOYEE'S benefits under Paragraph 2b. EMPLOYEE agrees to notify the COMPANY of this position if EMPLOYEE begins that job before the end of the benefit continuation period set forth in Paragraph 2b.

4.    EMPLOYEE agrees:

a.    to waive all claims to future employment with the COMPANY;

b.    to cooperate with and assist the COMPANY whenever reasonably possible, so that all EMPLOYEE'S duties, responsibilities and pending matters can be transferred in an orderly way;

c.    to return all the COMPANY materials that may have been issued to EMPLOYEE, including, but not limited to, draft books, office equipment, credit cards, cash advances and, if necessary, to file any outstanding final expense report;

d.    not to use or to disclose, either directly or indirectly, to anyone not connected with the COMPANY any confidential information or trade secrets which EMPLOYEE obtained during the term of EMPLOYEE'S employment with the COMPANY;

e.    not to make any copies for use outside of the COMPANY of any client lists or any memoranda, books, records, or documents which contain confidential information or trade secrets belonging to the COMPANY;

f.    not to apply for unemployment compensation benefits until EMPLOYEE actually is removed from the COMPANY'S payroll; and

g.    to provide the COMPANY with reasonable cooperation and assistance, upon the COMPANY'S request, including testifying at all trials, when EMPLOYEE might have relevant information. The COMPANY shall pay EMPLOYEE for any reasonable and necessary expenses and any loss of wages or salary, which EMPLOYEE incurs because of EMPLOYEE'S requested cooperation with and assistance to the COMPANY.

5.    It is understood and agreed that only the vacation payment identified in Paragraph 2c will be considered benefit earnings for applicable benefit plans of the COMPANY. Any other monies paid to EMPLOYEE pursuant to this agreement shall not constitute earnings for benefit plan purposes.

6.    The promises and payments contained in Paragraphs 2 and 3 above are in addition to any wages, bonuses and commissions to which EMPLOYEE already is entitled because of EMPLOYEE'S work for the COMPANY. EMPLOYEE agrees to accept the promises and terms in Paragraphs 2 and 3 above in consideration for the settlement, waiver and release and discharge of any and all claims or actions against the COMPANY arising under any federal, state, or local statute, law, or regulation pertaining to employment discrimination on the basis of sex, race, color, religion, creed, national origin, handicap or disability, marital status, or any other reason established by law, including any claim of wrongful discharge, with the exception of age discrimination.

2

7.    EMPLOYEE Makes The Following Promises Not To Sue:

a.    EMPLOYEE releases, settles and forever discharges the COMPANY, including its agents and employees, from any and all claims, causes of action, rights, demands, debts, or damages of whatever nature, whether or not EMPLOYEE currently knows of them, which might have arisen from EMPLOYEE'S employment with and subsequent termination from the COMPANY and which may be brought by EMPLOYEE or another person or agency on EMPLOYEE'S behalf. This includes, but is not limited to, any claim EMPLOYEE might raise for wrongful discharge as well as any other claim raised under contract or tort law except those types of claims which the parties specifically have excluded from this release of claims and identified in Paragraph 8 below.

b.    EMPLOYEE expressly releases the COMPANY from any and all legal liability and waives all claims, demands, or causes of action which EMPLOYEE may have against the COMPANY, its agents, representatives, and employees under all federal, state, and/or local laws regulating employment, including but not limited to, all discrimination claims under the Civil Rights Acts of 1964, as amended, the Americans with Disabilities Act, Civil Rights Act known as 42 USC 1981, the Handicap Discrimination Act and the Family and Medical Leave Act. By signing this Agreement, EMPLOYEE is not releasing any claims under the Age Discrimination in Employment Act.

8.    This Agreement shall not affect EMPLOYEE'S right to raise any claims based on any Social Security or Workers' Compensation laws, or based on the terms of any employee pension or welfare benefit plans or programs of the COMPANY, including its subsidiaries and affiliated companies, which may involve benefits that should be paid to EMPLOYEE now or in the future.

9.    This Agreement is intended to finally and fully conclude the employment relationship between EMPLOYEE and the COMPANY and shall not be interpreted as an admission by either the EMPLOYEE or the COMPANY of any wrongdoing or any violation of federal, state or local law, regulation, or ordinance. The COMPANY specifically denies that it, or its employees, supervisors, representatives, or agents has ever committed any wrongdoing whatsoever against EMPLOYEE.

10.    EMPLOYEE agrees not to talk about, write about, or otherwise disclose the existence of this Agreement, the terms of this Agreement, or any fact concerning its negotiation, execution, or implementation to any person, firm, or corporation, other than the EMPLOYEE'S spouse or attorney, unless EMPLOYEE is required to do so by federal, state, or local law, or by a court of competent jurisdiction.

3

**CONFIDENTIAL**

FH000716

11.    The Parties understand and agree that for purposes of this Agreement, the term "COMPANY" as used herein, shall include not only Flavor House Products, Inc., but also Bremner, Inc. and Nutcracker Brands, Inc., the subsidiary, affiliated and predecessor companies of any of them, and all officers, directors, agents, and employees of any of the foregoing.

12.    This Agreement will be governed by and construed and enforced under the laws of the State of Alabama, without regard to its conflict of law rules.

13.    In the event that any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

14.    EMPLOYEE expressly acknowledges that the COMPANY has given him a reasonable period of time to consider this Agreement and that EMPLOYEE has had the opportunity to discuss all aspects of this Agreement with an attorney before signing this Agreement. EMPLOYEE states that he has discussed this Separation Agreement and General Release or, in the alternative, has freely elected to waive any further opportunity to discuss this Agreement with an attorney before signing it.

15.    EMPLOYEE expressly acknowledges that he understands all the terms and effect of this Agreement and is entering voluntarily into this Separation Agreement and General Release.

FLAVOR HOUSE PRODUCTS, INC.

_____          By: _____
Thomas A. Nance                        Mary Ann Boyer
                                       Director of Operations

Signed this _8ᵉᵉ_ day of              Signed this _4th_ day of
_December_, 2006                       _December_, 2006

Witness: _Brandi Nance_

Dated: _12-8-06_

4

**CONFIDENTIAL**

**FH000717**

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDA THORNTON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: |
| | * | 1:07 cv-712-WKW |
| FLAVOR HOUSE PRODUCTS, INC., and | * | |
| FRANKLIN D. WILLIAMS, JR., | * | |
| | * | |
| Defendants. | * | JURY DEMAND |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT FLAVOR HOUSE PRODUCTS, INC.

The plaintiff requests that the defendant produce and permit the plaintiff's representatives to inspect and copy the following documents at a mutually convenient place, and/or produce a copy of said documents to the law firm of Wiggins, Childs, Quinn & Pantazis, LLC, within the time set forth by the Court for the production of documents.

### DEFINITIONS

A.    As used herein, the definitions for the term "document" means without limitation, the following items, whether printed, recorded or reproduced by any other mechanical means or process, or written or produced by hand: agreements; contracts; communications; correspondence; letters; telegrams; tape recordings; memoranda; notes; summaries or other recordings of telephone conversations, personal conversations, or meetings; agenda of meetings; notices; records; bid records; personal memoranda; photographs; photographic slides; motion picture films; charts; graphs; diagrams; reports; statement of witnesses; findings of investigations; files; reports of experts; reports of consultants; papers; books; records; summaries; and any and every other writing or other graphic means by which human intelligence is in any

way transmitted or reported.

B.      As used herein, the term "person" includes natural persons, governments (or agencies thereof), quasi-public entities, corporations, partnerships, ventures, and all other forms of organization, association or business entities.

C.      If any document requested to be produced was in the defendant's possession, but is no longer in defendant's possession, or subject to defendant's control state what disposition was made of it, the reason for such disposition, the identity of the person currently having possession or control and the date that possession or control was relinquished by the defendant or any one of them.

D.      "Personnel Information" shall include data or information which pertains to employees, applicants for employment, persons seeking employment, or former employees, and includes, but is not limited to, information on any individual or aggregate of individuals concerning applicant flow, residence, interviews, tests, evaluations, referrals from referral agencies, discipline, length of service, absences, tardiness, educational level, selection, job assignment and/or duties, performance, training, qualifications, validation of tests, promotion, health, and/or safety, vacancies, job applications, test results, marital status, sex, age, race, family status, recruitment, etc.

E.      As used herein the term "discipline" shall include any action taken in regard to an employee which is intended to punish and/or correct some aspect of the employee's behavior conduct or performance, including, but not limited to, the following actions: verbal warning, written warning, verbal reprimand, written reprimand, suspension, demotion, placement or probation, fine, etc.

2

F.     As used herein, the term "termination" shall include any one or more of the following actions which interrupt an employee's service of employment with the defendant: layoff, discharge, quit, resignation, terminated, fired, etc.

## DOCUMENTS REQUESTED TO BE PRODUCED

The following documents are requested to be produced:

## REQUESTS FOR PRODUCTION

1.     The personnel file and any and all personnel information and pay information wherever maintained by the defendant of Linda Thornton.

2.     The personnel file and any and all personnel information and pay information wherever maintained by the defendant of Franklin D. Williams, Jr.

3.     The personnel file and any and all personnel information wherever maintained by the defendant of Kim Perkins.

4.     The personnel file and any and all personnel information wherever maintained by the defendant of Mary Ann Boyer.

5.     The personnel file and any and all personnel information wherever maintained by the defendant of Melvin Hutchins.

6.     The personnel file and any and all personnel information wherever maintained by the defendant of Chris Jordan.

7.     The personnel file and any and all personnel information wherever maintained by the defendant of Ricky Smothers.

3

8.    The personnel file and any and all personnel information wherever maintained by the defendant of Leigh Allums.

9.    The complete personnel file and any other personnel information wherever maintained by the defendant of every employee who participated in, oversaw, or concluded the conducting of an investigation of the complaint(s) of sexual harassment/discrimination and/or retaliation made by the plaintiff.

10.    All documents used or produced to the EEOC during the investigation of the plaintiff's EEOC charge(s), including, but not limited to, all answers to questionnaires, position statements, correspondence, and interview notes.

11.    Any employee and/or personnel handbook or policies or procedures manual in effect at any time during the plaintiff's employment. If different versions of these documents exist, all versions should be produced.

12.    All documents that reflect and/or describe the policies, practices, procedures, rules, training or criteria of the defendant regarding hiring, promotions, temporary employees, operator machine maintenance, transfers, discipline, profanity, threatening behavior or conduct, performance evaluations, orientation, training, sexual harassment, sex discrimination, and/or retaliation.

13.    Any document, including but not limited to letters, memoranda, e-mail messages, calendar entries, diary entries, or notes, daytimer entries, and/or any written statements or affidavits, that relate in any way to the defendant's employment, discipline and evaluation of the plaintiff and the cessation of employment of the plaintiff with the defendant.

14.    All documents that reflect or relate in any way to any sexual harassment/discrimination policy that was in place at any time during the employment of the plaintiff, including but not limited to the

4

policies themselves, any documents related to the distribution of the policies, documents relating to or reflecting any training on sexual harassment/discrimination conducted by or for employees of the defendant at any time from January 1, 2001, to the present, and any documents related to the protocol regarding the handling and/or investigation of complaints of sexual harassment/discrimination, including, but not limited to, log books reflecting training, training material(s), sign up sheets, videos, etc. If the policies are part of a handbook, manual, etc., please produce the entire underlying documents(s).

15.    All documents that reflect or relate in any way to any retaliation policy that was in place at any time during the employment of the plaintiff, including but not limited to the policies themselves, any documents related to the distribution of the policies, documents relating to or reflecting any training on retaliation conducted by or for employees of the defendant at any time from January 1, 2001, to the present, and any documents related to the protocol regarding the handling and/or investigation of complaints of racial harassment/discrimination, including, but not limited to, log books reflecting training, training material(s), sign up sheets, videos, etc. If the policies are part of a handbook, manual, etc., please produce the entire underlying documents(s).

16.    Please produce any and all documents relating to any reports of sexual harassment, sexual discrimination or retaliation made against employees of defendant since January 1, 2000, including verbal and written complaints and/or EEOC charges; or to any investigation into such complaints, including but not limited to any notes, correspondence, tapes, transcripts, or other documents relating to any interviews conducted in response to the allegations; or relating to the result of the investigation, whether or not the complaints were investigated or not investigated and regardless of the findings of same, including lawsuits that have been filed against the defendant alleging racial harassment and/or race discrimination.

5

17.    Any and all video and/or audio recordings pertaining in any way to the plaintiff's claims in this litigation and/or the defenses asserted by the defendant in response thereto.

18.    Any statements obtained from the plaintiff or from any individual regarding the allegations made by the plaintiff in the Complaint.

19.    Provide a copy of the job description for each of the following positions at the defendant's Houston, County, Alabama facilities during the time period of the plaintiff's employment:

(a) Label Operator

(b) Team Leader

(c) Production Manager

(d) Packaging Supervisor, and

(e) Director of Operations.

If different versions have been in existence, please provide a copy of each.

20.    All documents that reflect, record, make reference to or otherwise relate in any way to or allegedly support the reasons that the plaintiff was subjected to discipline while employed with the defendant.

21.    Please produce any and all documents reflecting, referencing, or otherwise related to communications made between or among Franklin D. Williams, Jr., Mary Ann Boyer, Melvin Hutchins, Kim Perkins, Chris Jordan, Ricky Smothers, Tommy [LNU] of Personnel Relations, and/or Leigh Allums regarding the plaintiff. This request includes any documentation of phone messages, e-mails, instant messages, text messages, correspondence, memoranda, and other forms of communication between and/or among these individuals regarding the plaintiff.

6

22.    Any document, including but not limited to letters, memoranda, electronic mail (e-mail) messages, calendar entries, diary entries, notes, daytimer entries, and/or any written statements, declarations or affidavits, that relate in any way to the defendant's employment, evaluation, discipline, receipt or investigation of complaints of discrimination, and/or cessation of employment of the plaintiff.

23.    Operational chart(s) of the defendant reflecting all offices, branches and installations operated by the defendant within Houston County, Alabama, during the time of the plaintiff's employment.

Respectfully submitted,

Ann C. Robertson
Temple D. Trueblood
Counsel for Plaintiff

**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**CO- COUNSEL:**
Bobbie Crook
367 S. St. Andrews St.
Dothan, Alabama 36301
334-681-8062

7

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following via facsimile and first class U.S. Mail, postage pre-paid and properly addressed to:

Christopher W. Weller
Capell & Howard, P.C.
150 South Perry Street
Montgomery, Alabama 36104
Facsimile: (334) 241-8266

Anderson B. Scott
Christine E. Howard
Fisher & Phillips, LLP
945 East Paces Ferry Road
Atlanta, Georgia 30326
Facsimile: (404) 240-4249

on this the 23rd day of October, 2007.

OF COUNSEL

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA THORNTON,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.:** |
| | * | **1:07 cv-712-WKW** |
| **FLAVOR HOUSE PRODUCTS, INC., and** | * | |
| **FRANKLIN D. WILLIAMS, JR.,** | * | |
| | * | |
| **Defendants.** | * | **JURY DEMAND** |

**PLAINTIFF'S MOTION TO STRIKE AFFIRMATIVE DEFENSES**
**OF DEFENDANT, FLAVOR HOUSE PRODUCTS, INC.**

COMES NOW the Plaintiff, Linda Thornton, and respectfully moves this Honorable Court to strike the affirmative defenses of Defendant, Flavor House Products, Inc., in the above styled cause due to spoilation of evidence by the Defendant. In support whereof, the Plaintiff submits the following:

1.      On or about September 18, 2006, Plaintiff timely filed a charge of employment discrimination with the Equal Employment Opportunities Commission, the "EEOC", (Charge # 420-2006-05107), in which she complained that the Defendants subjected her to sexual discrimination, sexual harassment, and retaliation in relation to the terms, conditions and benefits of her employment. [Ex. A].

2.      The Notice of Charge was mailed by the EEOC to Flavor House on September 26, 2006. [Ex. B].

3.      Human Resources Director, Tommy Nance, received a copy of the plaintiff's EEOC Charge and forwarded it to corporate counsel. [Ex. C, pp. 52-53 and Exhibit 3].  At this time, while Nance was employed with Flavor House, all of his investigative notes were located in his desk. [Ex.

C, pp. 54-55].

4.    As of October 16, 2006, Flavor House's legal counsel had received the plaintiff's EEOC Charge and was put on notice of the plaintiff's claims. [Ex. D].

5.    Nance was involuntarily terminated by Flavor House on December 4, 2006. [Ex. C].

6.    On August 6, 2007, the plaintiff filed her Complaint in this action, asserting claims against defendant, Flavor House, Inc. ("Flavor House"), of sexual harassment, sex discrimination and retaliation under Title VII; invasion of privacy; outrage; and negligent and/or wanton hiring, supervision, training and retention. [Doc. 1, Counts I - IV].

7.    With regard to her Title VII claims against Flavor House, the plaintiff specifically alleged that she repeatedly complained of the sexual harassment and sex discrimination to members of management including MaryAnn Boyer, Melvin Hutchins, and Chris Jordan, and also to Tommy Nance of Human Resources; but no corrective action was taken and the sexual harassment and discrimination continued. [Doc. 1, ¶¶ 13, 20-22, 24, 27, 30, 37-40, 43, 48-50, 57).

8.    With regard to her state law claims of invasion of privacy and outrage against Flavor House, the plaintiff specifically alleged that the defendant condoned, authorized or ratified the conduct of Franklin Williams and that it knew or should have known of William's tortious conduct against her and failed to stop the conduct. [Doc. 1, Counts II-III].

9.    With regard to her state law claim of negligent and/or wanton hiring, supervision, training and retention against defendant Flavor House, the plaintiff specifically alleged that the defendant negligently and/or wantonly hired, supervised, trained and/or retained Franklin Williams and other employees. [Doc. 1, Count IV].

10.    On August 28, 2007, defendant Flavor House submitted an Answer to the Complaint, in which the defendant asserted the following relevant affirmative defenses to plaintiff's claims:

- While defendant expressly denies that it or any employee under its supervision acted in any manner which would constitute a violation of plaintiff's rights, if plaintiff's rights were violated, such violation occurred outside the scope of such persons' employment and with out the consent of defendant. Defendant neither knew nor had reason to know of any such circumstance. Defendant did not condone, ratify, or tolerate any such conduct but instead prohibited such conduct [Doc. 5, Tenth Defense];

- To the extent that plaintiff failed to give timely notice to defendant that she believed she suffered the alleged conduct, a reasonable opportunity to investigate and/or remedy the alleged conduct, Plaintiff's claims are barred by the doctrines of unclean hands and laches [Doc 5, Eleventh Defense];

- To the extent that plaintiff failed to follow defendant's published policies and procedures prohibiting harassment, plaintiff's claims are barred by the doctrines of estoppel and waiver [Doc. 5, Twelfth Defense];

- Plaintiff's claims are barred to the extent that defendants exercised reasonable care to prevent and correct promptly any harassing behavior and plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant or to avoid harm otherwise [Doc. 5, Seventeenth Defense]; and

- Defendant may not be held vicariously liable for punitive damages under Title VII based on unlawful employment actions made by its agents, if any are proven, because any such unlawful actions were contrary to defendant's policies and good faith efforts to comply with Title VII [Doc. 5, Twenty-Eighth Defense].

11.    While conducting discovery in this matter, it was found that the defendant had failed to maintain or had otherwise despoiled evidence which is clearly and directly relevant to factual matters which have direct bearing on the affirmative defenses set out above. Specifically,  the defendant has despoiled evidence of the plaintiff's complaints of sexual harassment and/or sex discrimination; evidence of what, if any, investigation was conducted in response to these complaints; evidence of what, if any, determinations were made as a result of the investigation; and

evidence of what, if any, remedial and/or corrective action was taken by the defendant in response to these complaints.

12.     Plaintiff submitted Requests for Production to Flavor House seeking, in pertinent part, the following items:

> 16.     Please produce any and all documents relating to any reports of sexual harassment, sexual discrimination or retaliation made against employees of defendant since January 1, 2000, including verbal and written complaints and/or EEOC charges; or to any investigation into such complaints, including but not limited to any notes, correspondence, tapes, transcripts, or other documents relating to any interviews conducted in response to the allegations; or relating to the result of the investigation, whether or not the complaints were investigated or not investigated and regardless of the findings of same, including lawsuits that have been filed against the defendant alleging racial harassment and/or race discrimination.

[Ex. F, Request No. 16].

13.     As set out in detail below, during Nance's deposition it was discovered that: (1) he had no independent recollection of any components of the investigations he allegedly conducted in response to the plaintiff's complaints; (2) that he would have to rely on the investigative notes he allegedly made at the time of the plaintiff's complaints in order to recall any aspects of the investigation; and (3) these investigative notes are purportedly "missing," and to date have not been produced by the defendant.

14.     Specifically, Nance testified that in order to conduct an investigation of a complaint, the company would collect statements from persons involved or with knowledge of the complaint and then they would investigate by taking these statements and interviewing the individuals. [Ex. C, pp. 32-34]. Nance made notes of the interviews with the individuals and these investigative notes are separate from initial written statements of employees. [Ex. C, pp. 34 and 43]. These notes were filed in his desk drawer and organized either by person,  date or incident name. {Ex. C, pp. 36-37].

4

15.    Per Nance, the purpose of these interviews was to "reiterate and bring out anything that's in addition to the statements to help make a decision as to what occurred relative to the statements." [Ex. C, pp. 56-57]. And it was what Nance learned during the "investigative process," that, "would have determined the outcome of the investigation." [Ex. C, p.60]. He does not rely on his memory of specific investigations, as he "take[s] notes based on investigations, and [he] make[s] determinations based off of those notes." [Ex. C, pp. 106-107].

16.    With regard to the defendant's actions allegedly taken in response to the plaintiff's specific complaints of harassment made against defendant Franklin Williams, Jr., Nance's deposition testimony repeatedly evidences that without his investigative notes, Nance has no memories of having a conversation with Williams about the plaintiff's accusations, of the individual conversations he had during the investigation, or of who he spoke to during the investigation:

> Q. Okay. So you don't have any independent knowledge of talking to Frank Williams about Plaintiff's Exhibit Number 2?
> A.  I'm sure I investigated and talked with individuals. I don't recall the specific conversation, no.
> Q.  And would that conversation or notes concerning your conversation be included in your notes surrounding the investigation of Ms. Thornton's allegations?
> A.  All the notes for the 6/14 incident would have been included in my notes in the desk.
> Q.  So–so your notes concerning what Mr. Williams did or didn't say when you interviewed him would be in those notes?
> A.  Yes.
> [Ex. C, pp. 55-56]
>
> *   *   *
>
> Q.  Do you recall whether you learned anything new from Mr. Williams?
> A.  I don't recall from memory, no.
> [Ex. C, p. 57]
>
> *   *   *
>
> Q.  Do you remember whether he admitted to you that he did curse her?
> A.   I don't recall if he admitted that or not from memory, no. I don't recall that.
> Q.  Do you remember if he denied–
> A.  I don't recall, no.

5

[Ex. C, p. 57; and see also p. 86]

\* \* \*

Q.  All right. Do you recall what Mr. Williams said about whether or not he was throwing cans during the incident that Ms. Thornton describes in that Exhibit?

A.  I don't recall other than Frank's statement. From memory, no.

Q.  And do you recall whether you asked any other witnesses whether or not they saw–could see whether or not he was throwing cans?

A.  Not from memory. Again, my notes had, you know, the investigation of what occurred. I don't recall if anyone else said there was cans being thrown or there was anything going on. I don't recall that, no.

[Ex. C, p. 67]

\* \* \*

Q.  Do you remember having an interview with Katherine Long?

A.  I don't recall the interview, no, investigation. Not from memory.

Q.  Now in her statement she – she says she heard Frank using the F word and – I'm not looking at the document. I think she said something about not being able to do every damn thing; is that right?

A.  That is her statement, yes.

Q.  And then it said except he was doing a lot of yelling, etcetera, etcetera, etcetera, etcetera. Do – do you – did you ask her to expound on that etcetera, etcetera, etcetera when you had an interview with her?

A.  I probably would have. I don't recall what that would have been without my notes. From memory, I don't recall that.

[Ex. C, pp. 67-68].

\* \* \*

Q.  Plaintiff's Exhibit Number 6 is the Tamekia Cook statement. Do you remember interviewing Tamekia Cook?

A.  Not from memory, no.

Q.  Do you think you took notes on that?

A.  I'm sure I would have, yes.

[Ex. C, pp. 68-69]

\* \* \*

Q.  Did you do any -- did you talk to anybody else in that investigation other than the people I've – the – witnesses I've put in front of you?

A.  I wouldn't recall from memory who I talked with.

[Ex. C, p. 70].

\* \* \*

A.  The other employees did not state the cursing was directed towards Linda.

Q.  They weren't asked, were they?

Ms. SWAIN: Objection.

A.  I don't recall one way or the other.

[Ex. C, pp. 84-85].

\* \* \*

6

Q. Do you recall if you followed up with Linda Thornton to find out what the issues that she discussed with Melvin Hutchins were?

A. During the investigation, I'm sure I asked anything relevant to the statement.

Q. And do you have any independent memory of that?

A. Again, I would have had notes on that. I don't recall from memory.

[Ex. C, p. 106].

[See also, Ex. C, pp. 112-117 (reflecting Nance's inability, absent his notes, to recall discussion with Williams regarding his convictions for sex-related offenses).

17.     Nor does Nance have any independent memory of the substance of the plaintiff's complaints to him, without the aid of his missing notes:

Q.  Do you have any independent memory of having a conversation with Linda Thornton about the issues she's referring to that she discussed with Melvin Hutchins about Frank Williams?

A. I recall having multiple conversations with Linda Thronton throughout the course of her employment with Flavor House in regards to multiple issues.

Q. Uh-huh.

A. Now, to tell you specifically what memory related to what issue, I can't rely on my memory for that, no. That's why I have notes.

Q. Okay. And where are those notes, sir?

A. Again, I've already answered that question. My notes were in my desk drawer when I left Flavor House.

[Ex. C, pp. 107-108].

*  *  *

Q. She was complaining that Frank was making threats about what he was going to do to her; right?

MS. SWAIN: Objection.

A. I don't – I don't know what those allegations were, what her –

Q. You don't remember –

A. – comments where.

Q. –any–any of– did you have a conversation with her?

A. I investigate every statement that comes in, every documentation form, yes.

Q. My question is, did you have a conversation with her after you received Plaintiffs 13 about what kind of threats were being made?

A. I don't recall specific conversations I've had about the investigation.

Q. I didn't ask you about the specifics. I asked did you have a conversation.

A.  We probably did. If a statement was turned in, then there was a follow-up investigation.

Q. But you don't remember anything about it?

7

A. That's why I have notes.
Q. Which we don't have; is that right?
A. (No response.)
Q. You don't remember any – you need to answer out loud for the court reporter.
A. There was no answer. The notes aren't here.
[Ex. C, pp. 143-144].

\* \* \*

Q. Okay. Do you remember what she said the threats were?
A. Not from memory, no.
Q. Do you remember that he was going around saying he was going to fuck her up if she – if he lost his job by her saying that he was a child molester?
MS. SWAIN: Objection
A. I don't recall those specific – it's not in the statements.
Q. You have no recollection of – of her complaining about that?
A. No, I do not.
[Ex. C, p. 145].

18.    Without looking at his notes, Nance cannot recall if he ever even received a complaint of sexual harassment while at Flavor House. [Ex. C, p. 35].

19.    As of the time of his deposition, Nance no longer had his notes and did not know what happened to his investigative notes from when he had interviewed people that has given written statements. [Ex. C, pp. 42, 58].

20.    When Nance received the plaintiff's EEOC Charge in 2006 all of his investigative notes were filed in his desk. [Ex. C, pp. 52-55]. Nance has testified that he did not turn over these notes to anyone when he left the employment of Flavor House, **"unless requested by corporate counsel. Any documentation we had was sent to them."** [Ex. C, p. 108](emphasis added).

21.    Despite the plaintiff's specific Request for Production to the defendant requesting such investigation notes and materials, to date the notes allegedly made by Nance in response to the plaintiff's complaints have not been produced or made available by the defendant and it is the plaintiff's understanding that these materials are simply nowhere to be found. No further explanation

8

has been given.

22.    As of September 2006, Nance as the Human Resources Director was put on notice of the plaintiff's pending EEOC claims against FlavorHouse. As of October 16, 2006, Flavor House's legal counsel was put on notice of the plaintiff's pending EEOC claims against FlavorHouse.  Nance's employment with Flavor House was not terminated until December 4, 2006. The defendant was placed on notice of plaintiff's claims well before Nance's termination and thus had an obligation to preserve and maintain all relevant documentation and evidence related to same. See Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala.2000)(spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary), quoting May v. Moore, 424 So.2d 596, 603 (Ala.1982).

23.    While Nance was employed by Flavor House, his investigative notes were still maintained and filed in his desk. Nance has testified he did not take these notes with him, and did not turn them over to anyone, "unless requested by corporate counsel." Nance was the individual who allegedly took some of the plaintiff's complaints of sexual harassment and discrimination, who allegedly took responsive action and investigated these complaints, and who allegedly made determinations about the plaintiff's complaints based upon his investigation.  Yet, he has no independent recollection of any of these matters and his investigation notes, upon which he needs to rely, are nowhere to be found.

24.    While federal law governs the imposition of spoliation sanctions as an evidentiary matter, the federal law in the Eleventh Circuit does not set forth specific guidelines and this Circuit takes direction from applicable state law factors. Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005). In Alabama, the courts analyze spoliation issues in terms of four factors: the

importance of the evidence destroyed; the culpability of the offending parties; fundamental fairness; and alternative sources of information. Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc., 901 So.2d 84, 94-95 (Ala. 2004).

25.    As to the first factor, the importance of the evidence destroyed or otherwise lost is paramount to the defendant's affirmative defenses, the plaintiff's ability to rebut same, and to plaintiff's claims for punitive damages.  How is the plaintiff to prove the defendant failed to take effective remedial measures if she cannot obtain discovery as to what those investigative measures actually were?  Nor can the defendant assert that the plaintiff failed to take advantage of their policies or to mitigate the circumstances if there is no evidence of her complaints and their substance.  The defendant is also attempting to prove that it did not condone or otherwise ratify defendant William's conduct, yet cannot produce evidence as to whether or not they investigated the complaints against him, whether Williams may have admitted to the conduct alleged, or what other evidence may have been unearthed during the alleged investigation. All of these matters are paramount to plaintiff's claims and the affirmative defenses asserted in response thereto.

26.    The culpability of the defendant is also a factor to weigh in this matter. The defendant, and it's legal counsel, knew of the plaintiff's pending EEOC charges as early as September 2006 and either one of two things occurred: (1) the defendant took no steps whatsoever to preserve the investigative notes and files of the Human Resources Director regarding the plaintiff's complaints and destroyed them; or (2) Nance provided the investigative notes and files to corporate counsel at their request and the documents have since disappeared with no explanation given.  Culpability exists in both scenarios.

27.     When viewed from the plaintiff's perspective, the fundamental fairness of this matter is specifically askew.  The plaintiff repeatedly complained to her employer in an attempt to stop the sexual harassment and discrimination to which she was subjected. The plaintiff alleges the defendant did nothing to stop the sexual harassment and discrimination and instead retaliated against her. Now, as the plaintiff seeks recourse in the court system, the very evidence of her complaints and attempts to resolve this matter absent legal action is simply gone. The plaintiff has no way to reproduce or otherwise locate such items and is faced with the claim that the defendant's institutional memory regarding her complaints has simply been wiped clean, with no explanation from the defendant as to why this occurred.

28.     And lastly, the plaintiff has no alternative means by which she may acquire the "lost" information as the only individual involved in investigation her complaints, interviewing witnesses, compiling investigative notes, and making determinations from those notes now has no independent recollection of the matter, as evidenced by Nance's deposition testimony.  There simply is no alternative means by which the plaintiff can discover the substance of Nance's alleged investigation and upon what his determinations were based.

29.     Based on the foregoing, the plaintiff now seeks  sanctions against Flavor House, including the striking of the defendant's affirmative defenses as set out above.  Nance's inability to independently recall information regarding the plaintiff's complaints and his investigations regarding same coupled with his inability to account for his missing notes serves as sufficient basis for spoilation sanctions.  Additionally, the defendant FlavorHouse has provided no explanation for the disappearance of Nance's investigative files regarding the plaintiff. See Continental Cas. Co. v. Compass Bank, 2006 WL 533510, 1-2 (S.D.Ala. 2006). The defendant's actions have served only

to thwart the plaintiff's efforts to uncover the truth regarding Flavor House's handling of and response to the plaintiff's complaints of sexual harassment and discrimination such that the plaintiff is placed at a disadvantage in properly responding to the defendant's inevitable summary judgment motion and to otherwise prepare for trial. Additionally, Nance's utter lack of memory and the unexplained erasure of the defendant's institutional memory place the plaintiff in a position where she is denied her Constitutionally protected due process rights as she is unable to effectively cross examine Nance, or a corporate representative, on such matters or to elicit evidence essential to a credibility determination.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff respectfully moves this Honorable Court to order sanctions by striking the affirmative defenses of the defendant Flavor House, as set out herein, for both the purposes of summary judgment and trial.

Respectfully submitted,

s/ Temple D. Trueblood
Ann C. Robertson (ROB016)
(TRU014)
Attorneys for Plaintiff

OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAIZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

CO-COUNSEL:
Bobbie S. Crook, Esq.
367 South St. Andrews Street
Dothan, Alabama 36301
(334) 671-8062

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this the 23rd day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 North Twentieth Street
Birmingham, Alabama 35203
(205) 328-0480

Steadman S. Shealy, Jr.
Richard E. Crum
M. Russ Goodman
Shealy, Crum & Pike, P.A.
P.O. Box 6346
Dothan, AL 36302-6346
(334) 677-3000

<u>s/ Temple D. Trueblood</u>
OF COUNSEL