**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| LINDA THORNTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 1:07-cv-712-WKW |
| FLAVOR HOUSE PRODUCTS, INC. | ) | |
| and FRANKLIN D. WILLIAMS, JR., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT FLAVOR HOUSE PRODUCTS, INC.'S BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION TO STRIKE AFFIRMATIVE DEFENSES**

Defendant Flavor House Products, Inc. ("Flavor House") hereby states its opposition to

the motion to strike affirmative defenses filed by Plaintiff Linda Thornton ("Thornton"). For all

of the reasons stated herein, Thornton's motion is not factually or legally supported and should

be denied.

## I.    INTRODUCTION

Thornton alleges in her motion to strike that Flavor House has committed spoliation of

investigation notes regarding incidents involving Thornton. Specifically, Tommy Nance, the

former Human Resources Manager for the Flavor House facility where Thornton was employed,

testified in deposition that he made notes during his investigation of two incidents, one in

February/March 2006 and one in June 2006, involving Thornton and another Flavor House

employee, Frank Williams. *See* Deposition of Tommy Nancy [sic] (herein "Nance Depo.")[1], pp.

35:17-21; 54:9-55:7; 56:10-16; 105:14-106:13; 107:17-109:23; 143:14-144:14. Nance was

terminated from his position with Flavor House and left his employment on December 4, 2006.

---

[1] All portions of the Deposition of Tommy Nancy [sic] cited herein are attached hereto as **Exhibit A**.

*See* Nance Depo., p. 22:1-4; Declaration of Deanna M. Lake[2] ("Lake Dec."), ¶ 2.  Nance testified in deposition that he put the notes that he had taken during his investigation of the incidents in his desk drawer in his office and that is where they were located when he was terminated.  *See* Nance Depo., pp. 54:56:10-16; 108:3-10.  Nance also testified that he would have given any documentation that he had, including his notes, to Flavor House's corporate counsel upon request and that any documentation he had was sent to corporate counsel.  *See* Nance Depo., pp. 108:11-109:15.  To date, however, the only notes written by Nance relating to any incident involving Thornton or any complaint raised by her that Flavor House has located (and produced to Thornton) are contained in a one type-written page document regarding the June 2006 incident titled "Investigation Notes."  *See* Declaration of Scott Clark[3] ("Clark Dec."), ¶¶ 9-10, 14-17, and Exhibit 1 thereto.  Because Flavor House cannot locate any notes written by Nance during his investigations of the February/March 2006 and June 2006 incidents other than the "Investigation Notes," Thornton has accused Flavor House of spoliation and requests that this Honorable Court sanction Flavor House.  Specifically, Thornton requests that certain of Flavor House's affirmative defenses be stricken for the purposes of summary judgment and trial.  *See* Ct. Doc. 63-2, ¶ 29.

To allege that one's adversary is a spoliator of evidence is a very serious charge. "'Spoliation' is the 'intentional destruction, mutilation, alteration, or concealment of evidence.'" BLACK'S LAW DICTIONARY 1437 (8th Ed. 2004); *see also Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So 2d. 84, 93 (Ala. 2004) ("Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary."); *Wal-Mart Stores, Inc. v. Goodman*, 789 So. 2d 166, 176 (Ala. 2000) ("One can prove spoliation by showing that a party

---

[2] The Declaration of Deanna M. Lake is attached hereto as **Exhibit B**.
[3] The Declaration of Scott Clark is attached hereto as **Exhibit C**.

purposefully or wrongfully destroyed a document that the party knew supported the interest of the party's opponent."). As demonstrated below, there is no evidence that the investigation notes allegedly despoiled were purposefully lost, discarded or destroyed. Nor is there any evidence of bad faith by Flavor House. Likewise, the absence of the documents does not prejudice Thornton to any degree.

With the exception of the notes about which Nance testified, Flavor House has produced to Thornton all requested and discoverable documents that are relevant to Thornton's claims. The documents include multiple witness statements regarding the February/March 2006 and June 2006 incidents that were written by the witnesses to the incidents and the parties involved.[4] If Thornton wishes to discover what such witnesses might have told Nance during his investigation, she may ask them. Contrary to Thornton's inflammatory accusations, there is no basis upon which any sanction, much less the severe sanction of striking affirmative defenses, should be imposed.

There was no spoliation, and the parties' claims and defenses should be judged on the merits without any sanction against Flavor House. As to the merits of Thornton's claims, Flavor House's contemporaneously filed motion for summary judgment demonstrates that Thornton's case against it is not well-founded. Given the paucity of support for Thornton's motion to strike and the strength of Flavor House's defenses, Flavor House respectfully submits that the observation of Magistrate Judge Brown of the United States District Court for the Southern District of Florida is apt here: "It seems that the 'new frontier' of litigation is the spoliation

---

[4] The documents produced also include notes written by Nance regarding his investigations of complaints of sexual harassment by other Flavor House employees. As such, whether Nance can (without the benefit of his investigation notes regarding the February/March 2006 and June 2006 incidents) recall having received a complaint of sexual harassment, *see* Ct. Doc. 63-2, ¶ 18, is immaterial.

3

arena; find some evidence in the case that is not preserved exactly, and try to win the case on that basis." *Hickman v. Carnival Cruise Corp.*, 2005 WL 3675961, *1 (S.D. Fla. July 11, 2005).

## II.    ARGUMENT

### A.    No Spoliation Has Occurred.

Spoliation is not mere negligence in losing or destroying documents. *See Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("In this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.").    Instead, spoliation is the intentional destruction, mutilation, alteration or concealment of evidence. *See* BLACK'S LAW DICTIONARY 1437 (8th Ed. 2004). "Classic spoliation involves the idea that the offending party 'purposefully and wrongfully" destroyed evidence 'he knew was supportive of the interest of his opponent.'" *Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So. 2d 84, 96 (Ala. 2004); *see also Alabama Power Co. v. Murray,* 751 So. 2d 494, 501 (Ala. 1999) (Houston, J., concurring) ("It has long been the rule that for the spoliation-of-evidence doctrine to apply, there must be proof of a party's purposeful and wrongful attempted or actual destruction of, tampering with, or suppression of material evidence.") (citing *McCleery v. McCleery*, 75 So. 316, 318 (1917).  As demonstrated by the facts discussed herein, there is absolutely no reason to conclude that spoliation has occurred.  At worst, the evidence indicates that documents were possibly, without any wrongful intent or purpose, inadvertently lost.

The evidence shows as follows:  Nance, Flavor House's former Human Resources Manager for its Dothan facility, where Thornton was employed, testified in deposition that he took notes during his investigation of February/March 2006 and June 2006 incidents involving Thornton and another Flavor House employee, co-defendant Frank Williams. *See* Nance Depo.,

pp. 54:56:10-16; 108:3-10.  On or about September 26, 2006, Flavor House received from the United States Equal Employment Opportunity Commission a copy of a charge of employment discrimination filed by Thornton and relating to, among other things, the February/March 2006 and June 2006 incidents involving Williams.  *See* Clark Dec., ¶¶ 2, 6.  Pursuant to Flavor House's document retention policy, all employees of Flavor House having custody or control over any document or item of any description relevant to the EEOC charge and the allegations raised by Thornton were required to preserve and maintain such documents and items.  *See id.* at ¶ 2.

On or about October 31, 2006, Scott Clark, the in-house counsel of Flavor House's corporate parent, traveled to the Dothan facility, where he met with Tommy Nance and collected documents from the personnel files of Frank Williams and Linda Thornton.  *See id.* at ¶ 5.  The documents that Clark gathered from the personnel files concerned the February/March 2006 and June 2006 incidents involving Thornton and Williams, as well as a subsequent incident involving Williams and another Flavor House employee.  *See id.* at ¶ 6.  Shortly after his visit to the Dothan facility in late October 2006, Clark received from Nance Thornton's personnel file and other documents that might be relevant to her EEOC charge and the allegations raised by her.  *See id.* at ¶ 7.  Clark understood that he had received from Nance each and every document in Thornton's personnel file and all other documents that might be relevant to her EEOC charge and the allegations raised by her.  *See id.* at ¶ 8.  Among the documents that Clark received from Nance was one type-written page bearing the title "Investigation Notes," which documented the resolution of the June 2006 incident.  *See id.* at ¶ 9.  The documents that Clark received from Nance did not contain any other document or item that appeared to be notes written by Nance.  *See id.* at ¶ 10.  Since the time that Clark received the documents from Nance, he has kept all of

5

them, including those gathered on-site in Dothan in a file stored in his office. *See id.* at ¶ 11. None of the documents that Clark gathered or received from Nance have been discarded, destroyed, or lost. *See id.* at ¶ 12.

On three separate occasions, Clark has looked carefully through the documents that he gathered and received from Nance relating to Thornton's EEOC charge and the allegations raised therein for any other document that might be notes written by Nance relating to any investigation of any complaint or matter raised by or relating to Thornton during her employment with Flavor House. *See id.* at ¶ 14. The only document or item that Clark has ever found that appears to be notes written by Nance is the one page document titled "Investigation Notes." *See id.* at ¶ 14. Clark has also searched his office thoroughly and carefully for any other document that might be notes written by Nance relating to any investigation of any complaint or matter raised by or relating to Thornton during her employment with Flavor House and has located only the one page document titled "Investigation Notes." *See id.* at ¶ 15. With the exception of that document, Clark has never seen any document or item that might be notes written by Nance relating to any investigation of any complaint or matter raised by or relating to Thornton during her employment with Flavor House. *See id.* at ¶ 17. To Clark's knowledge, no documents or items of any description written by Nance regarding any matter involving Thornton have been discarded, destroyed, or lost. *See id.* at ¶ 18.

Nance testified in deposition that he put the notes that he had taken during his investigation of the incidents in his desk drawer in his office and that is where they were located when he was terminated. *See* Nance Depo., pp. 54:56:10-16; 108:3-10. Deanna Lake, who took over Tommy Nance's responsibilities as Human Resources Manager and inherited his office on the day after Nance was terminated, has searched Nance's desk, files and office thoroughly and

carefully on multiple occasions and has not located any notes regarding any investigation of any incidents involving Thornton or any complaints raised by her. *See* Lake Dec., ¶¶ 5, 9, 11-12. Since the day that Lake arrived at the Dothan facility, she has not discarded, destroyed or lost any papers that were located in the desk drawers or cabinets in Nance's former office or any where else in the Dothan facility that appeared to relate to any personnel matter or to any investigation of a personnel matter. *See id.* at ¶ 7. Lake inquired of Leigh Allums, a human resources department employee who had some responsibility for filing during Nance's tenure, whether she has ever seen any documents or items of any description that appear to be notes written by him regarding any matter involving Thornton. *See id.* at ¶ 13. Allums informed Lake that she had never seen any such document or item. *See id.* at ¶ 13. Lake further has directed a search by Allums and another human resources department employee of the offices of the human resources department for any documents or items of any description that appeared to be notes written by Nance regarding any matter involving Thornton, but no documents or items were found. *See id.* at ¶ 14. To Lake's knowledge, since the day that she arrived at the Dothan facility, no documents or items of any description written by Nance regarding any matter involving Thornton have been discarded, destroyed, or lost. *See id.* at ¶ 15.

In sum, while Nance's testimony points to the existence of notes in addition to the one page document titled "Investigation Notes," Flavor House has not located any notes regarding the February/March 2006 and June 2006 incidents, despite the careful and consistent efforts of Flavor House to locate and preserve any and all documents relevant to Thornton, her EEOC charge and her allegations against Flavor House. There is no reason, however, to believe that the notes about which Nance testified were purposefully or wrongfully destroyed or that they were concealed. Moreover, for the reasons discussed below, to the extent that any party is prejudiced

by the fact that the notes cannot be found, it is Flavor House that would suffer that prejudice and most benefit by finding them. The evidence shows that this is simply and merely a case where documents may have been inadvertently lost.[5] There was no spoliation.

**B.     Even If There Were Evidence of Spoliation, No Sanction Would Be Appropriate.**

As demonstrated in Part II.A. above, there was no spoliation of evidence. Even if Flavor House were guilty of spoliation, however, as a matter of law, no sanction is appropriate.

While federal law governs the imposition of spoliation sanctions, *see Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), to the extent that Alabama state law spoliation principles are wholly consistent with federal ones, this Court may recognize them. *See id.* at 944 (finding that Georgia state law on spoliation is wholly consistent with federal spoliation principles and applying such state law principles in analysis notwithstanding application of federal law). Alabama courts consider four factors in determining what sanctions, if any, are appropriate where spoliation of evidence has allegedly occurred: (1) the importance of the evidence destroyed; (2) the culpability of the offending parties; (3) fundamental fairness; and (4) the existence of alternative sources of information. *See Cincinnati Ins. Co. v. Synergy Gas, Inc.*, 585 So. 2d 822, 824-25 (Ala. 1991) (cited in *Vesta Fire Ins.*, 901 So. 2d at 94-95). Overarching these principles, however, is the rule applied by the Eleventh Circuit that an adverse inference is drawn from a party's failure to preserve evidence *only* when the absence of that evidence is predicated on bad faith. *See Bashir*, 119 F.3d at 931 (citing *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)); *see also Continental Cas. Co. v. Compass Bank*, 2006 WL 533510, * 14 (S.D. Ala. March 3, 2006) (because there was no basis to

---

[5] If Thornton doubts that the documents were inadvertently lost, she might consider that she has confessed to losing documents in her personal possession relevant to her claims in this litigation. (Deposition of Linda Thornton, February 19, 2008, pp. 36: 8-37:10.) (All portions of the Deposition of Linda Thornton cited herein are attached hereto as **Exhibit D**.)

find bad faith, there was no basis to impose a sanction for alleged spoliation) (citing *Flury*, 427 F.3d at 944-45)).  In the Eleventh Circuit, "'[m]ere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'"  *Id.*  Because bad faith is required for the lesser sanction of an adverse inference, it is certainly required for the more severe sanction of striking Flavor House's affirmative defenses that Thornton requests.  *See Hickman*, 2005 WL 3675961 at *1 ("[I]t is more than logical that if bad faith is needed to create a negative inference, it certainly is needed to strike pleadings, which is a far more severe sanction.").

      1.    <u>The investigation notes are not critically important.</u>

The first factor under Alabama's spoliation analysis – the importance of the evidence (allegedly) destroyed – must be evaluated in the context of the importance of the evidence that was preserved and is otherwise available.  *See Vesta Fire Ins.*, 901 So. 2d at 95.  The evidence that Thornton claims was despoiled is Nance's notes regarding his investigation of two incidents involving Thornton and Williams that occurred in February/March 2006 and June 2006.  According to Nance, the notes documented his conversations with Thornton, Williams and others regarding the incidents.  *See* Nance Depo., pp. 35:17-36:17; 143:14-144:6.  Here, Flavor House produced to Thornton witness statements written by Thornton, Williams, and witnesses to the February/March 2006 and June 2006 incidents[6].  Thornton may use the witness statements to identify persons having knowledge of the incidents with whom Nance may have spoken and may seek evidence directly from the witnesses regarding what they witnessed and what they told Nance.  Of course, Thornton and Williams themselves are also available to testify regarding the incidents and what they told Nance.

---

[6] *See* Bates Label Documents FH000003-10 and FH000023-30, which are attached hereto as **Exhibit E**.

Thornton turns spoliation principles on their head by requesting that certain of Flavor House's affirmative defenses be stricken as a sanction for spoliation of evidence that is allegedly "clearly and directly relevant to factual matters which have direct bearing on the affirmative defenses." Ct. Doc. 63-2, p. 3. Spoliation sanctions are appropriately imposed where evidence crucial to the movant's *prima facie* case or defenses – matters on which the movant bears the burden of proof – were destroyed or concealed. *See Victor v. Makita U.S.A., Inc.*, 2007 WL 3334260, *2 (M.D. Fla. Nov. 9, 2007) (citing Florida principles consistent with federal spoliation law). If the missing notes have any direct bearing on Flavor House's affirmative defenses, the harm is to Flavor House, which must proffer evidence in support of its defenses, not Thornton, who has no burden to *disprove* them. Therefore, by Thornton's own arguments in support of her motion, the documents cannot be important to her but may be important to Flavor House.

In fact, the missing notes are not critically important to the affirmative defenses that Thornton requests the Court strike. The relative unimportance of the investigative notes to those defenses is clear when their possible probative value is considered in the context of the evidence that is available and in view of the affirmative defenses that Thornton requests this Court strike:

> (1)  Tenth Defense:  While defendant expressly denies that it or any employee under its supervision acted in any manner which would constitute a violation of plaintiff's rights, if plaintiff's rights were violated, such violation occurred outside the scope of such person's employment and with out the consent of defendant. Defendant neither knew nor had reason to know of any such circumstance. Defendant did not condone, ratify, or tolerate any such conduct but instead prohibited such conduct.

> (2)  Eleventh Defense:  To the extent that plaintiff failed to give timely notice to defendant that she believed she suffered the alleged conduct, a reasonable opportunity to investigate and/or remedy the alleged conduct, Plaintiff's claims are barred by the doctrine of unclean hands and laches.

> (3)  Twelfth Defense:  To the extent plaintiff failed to follow defendant's published policies and procedures prohibiting harassment, plaintiff's claims are barred by the doctrines of estoppel and waiver.

(4)    Seventeenth Defense:   Plaintiff's claims are barred to the extent that defendants exercised reasonable care to prevent and correct promptly any harassing behavior and plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by defendant or to avoid harm otherwise.

and

(5)  Twenty-Eighth Defense:  Defendant may not be held vicariously liable for punitive damages under Title VII based on unlawful employment actions made by its agents, if any are proven, because such unlawful actions were contrary to defendant's policies and good faith efforts to comply with Title VII.

Ct. Doc. 63-2, p. 3.  Taking each affirmative defense in turn, it is clear that ample critical evidence on such issues was preserved and is available.

As to the Tenth and Seventeenth Defenses, there are numerous witnesses, including Flavor House supervisors and witnesses to the February/March 2006 and June 2006 incidents, who may provide testimony regarding what Flavor House knew of the alleged violations of Thornton's rights and the subsequent actions taken by Flavor House.   For example, Nance testified in his deposition that Williams received a "first step counseling" in relation to the June 2006 incident, because William had "used profanity in the presence of coworkers."  *See* Nance Depo., pp. 96:16-97:5 and Exhibit 9 thereto.  There are numerous documents, particularly the witness statements attached hereto as Exhibit E and the contents of the personnel files of Thornton and Williams that Flavor House produced to Thornton that provide evidence regarding the February/March 2006 and June 2006 incidents and the actions taken by Flavor House.  *See, e.g.,* Bates Label Documents FH000002[7] (memorandum to Thornton regarding incident that occurred on February 16, 2006).

As to the Eleventh Defense, witness testimony and the written statements given by Thornton and others relating to the February/March 2006 and June 2006 incidents and the

---

[7] 3/7/08 Memorandum, attached hereto as **Exhibit F**.

contents of the personnel files of Thornton and Williams provide ample critical evidence of the chronology and nature of notice to Flavor House and of subsequent actions taken by it.

Likewise, as to the Twelfth and Twenty-Eighth Defenses, witness testimony and the written statements given by Thornton and others relating to the February/March 2006 and June 2006 incidents will provide ample critical evidence of the conduct of Thornton and Williams.

In sum, it is entirely unclear what, if any, evidence favorable to Thornton that is otherwise unavailable could be supplied by Nance's notes regarding the February/March 2006 and June 2005 incidents.[8]

### 2.    Flavor House is not culpable.

As set forth above, there is no evidence that Flavor House permitted evidence that it knew or should have known would be favorable to Thornton to be discarded or destroyed. Instead, the evidence is that Nance and Flavor House took affirmative steps to preserve all evidence relevant to this case.   Thornton has adduced no evidence that the missing notes contained evidence favorable to her[9] that might support an inference that Flavor House had a motive to destroy or conceal the notes.   The mere fact that notes that Nance testified he took regarding his investigations of the February/March 2006 and June 2006 incidents cannot be found does not supply a basis to conclude that Flavor House is culpable or acted in bad faith.

---

[8] As to the relative importance of the missing notes, it must be considered that they relate to two incidents involving Thornton and Williams that occurred in 2006, while Thornton's EEOC charge cites alleged wrongful conduct allegedly occurring in the first year of her employment, 2001, and "throughout" her employment. *See* Ct. Doc. 61-2, Ex. A.  Thornton's motion attempts to blur this fact, claiming that Nance (who was only employed by Flavor House from October 2005 through December 2006) "had no independent recollection of any components of the investigations he allegedly conducted in response to plaintiff's complaints."  Ct. Doc. 63-2, p. 4.  In fact, there has been no allegation by Thornton that any other notes taken by Nance or documents of any kind relating to any other complaint or incident raised by Thornton, except for the February/March 2006 and June 2006 incidents, have been despoiled.

[9] For instance, Thornton has not provided evidence of a witness who is otherwise unavailable who may have provided information to Nance orally that would be favorable to Thornton.

*See Bashir*, 119 F.3d at 932 (considering all of the circumstances, wholly unexplained loss of speed tape following deadly train accident was not evidence of bad faith or tampering).

    3.    <u>Fundamental fairness does not require imposition of any sanction.</u>

Because there are written statements by Thornton, Williams and multiple witnesses, and those persons are available to testify, Flavor House and Thornton have an equal opportunity to adduce evidence regarding the February/March 2006 and June 2006 incidents. Accordingly, fundamental fairness does not require the imposition of any sanction. *See, e.g., Cincinnati Ins. Co.*, 585 So. 2d at 824 (opportunity to draw conclusions on basis of remaining evidence key to fundamental fairness). Moreover, as argued above, the additional investigative notes about which Nance testified are not critically important in the context of other available evidence, and, even if they were, the fact that they cannot be located by Flavor House prejudices Flavor House, not Thornton. This is especially so because Nance claims that, without his notes, he cannot recall what he was told orally during his investigations. *See* Nance Depo., pp. 66:22-67:16; 143:14-144:6. For instance, if Thornton testifies that she informed Nance of facts that are not found in the written statements that she provided, Flavor House is handicapped in its ability to proffer testimony by Nance in rebuttal. Under such circumstances, where the alleged spoliator is handicapped by its alleged spoliation, fundamental fairness does not require the imposition of any sanction.

    4.    <u>A wealth of alternative sources of information survives.</u>

Flavor House has produced approximately 3,000 pages of documents in this case. While the parties have had discovery disputes, the parties have resolved such disputes, and Thornton has never filed a motion to compel. With specific regard to the February/March 2006 and June 2006 incidents, Flavor House has produced multiple contemporaneous witness statements and

business records documenting Flavor House's personnel actions following those incidents. In addition, crucial witnesses having personal knowledge of the incidents are available to testify. Under such circumstances, even if this was a case involving spoliation, no sanction would be appropriate.

      5.    <u>There is no bad faith.</u>

In this case, no spoliation sanction is appropriate, because there is no bad faith. *See Bashir*, 119 F.3d at 931 (bad faith required for adverse inference); *see also Flury*, 427 F.3d 939 at 945 (bad or good faith as element of spoliation). Thornton's motion points to no probative evidence to indicate that Flavor House purposefully lost or destroyed any notes that Nance may have taken regarding any matter related to Thornton. At worst, the evidence supports a finding that, to the extent additional notes[10] regarding the February/March 2006 and June 2006 incidents existed, Flavor House inadvertently lost them. In light of all of the considerations discussed at length above, particularly the availability of alternative evidence, Flavor House's mere negligence in losing the notes does not sustain any sanction for spoliation. *See Bashir*, 119 F.3d at 933 (citing *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (drawing no adverse inference where there was no evidence that records were lost in bad faith and there was other evidence proving the point)).

---

[10] Flavor House has produced the "Investigation Notes" written by Nance regarding the June 2006 incident.

## III.     CONCLUSION

For all of the reasons set forth herein, Plaintiff's Motion to Strike Affirmative Defenses

of Defendant, Flavor House Products, Inc. is due to be denied.

/s/ Jennifer F. Swain

JENNIFER F. SWAIN
Attorney for Defendant
Flavor House Products, Inc.

OF COUNSEL:

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 20th Street North
Birmingham, AL  35203
Telephone:  (205) 244-3863
Facsimile:  (205) 488-3863

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been filed electronically, with copies served thereby, on August 8, 2008.

Ann C. Robertson, Esq.
Temple D. Trueblood, Esq.
Wiggins, Childs, Quinn & Pantazis, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama  35203

Bobbie S. Crook, Esq.
367 South Saint Andrews Street
Dothan, Alabama  36301

Richard E. Crum
Steadman S. Shealy, Jr.
M. Russ Goodman
Shealy, Crum & Pike, P.A.
P.O. Box 6346
Dothan, Alabama  36302-6346


/s/ Jennifer F. Swain_____
JENNIFER F. SWAIN
Attorney for Defendant
Flavor House Products, Inc.

# Exhibit A

# FREEDOM COURT REPORTING

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3      SOUTHERN DIVISION
4
5  CIVIL ACTION NUMBER  107cv-712-WKW
6  LINDA THORNTON,
7
8      Plaintiff(s),
9  v.
10 FLAVOR HOUSE PRODUCTS, INC.,
11
12     Defendant(s).
13
14     DEPOSITION TESTIMONY OF:
15         TOMMY NANCY
16
17
18
19
20 Commissioner:
21 Renny D. McNaughton
22 June 10, 2008
23 Dothan, Alabama

---

1  oral testimony taken the 10th day of June,
2  2008, along with exhibits.
3      Please be advised that this is the
4  same and not retained by the Court Reporter,
5  nor filed with the Court.

---

1      S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of Tommy Nance,
5  may be taken before Renny D. McNaughton,
6  Court Reporter and Notary Public, State at
7  Large, at the offices of Bobbie Crook,
8  Dothan, Alabama, on the 10th day of June,
9  2008, commencing at approximately 9:00 a.m.
10     IT IS FURTHER STIPULATED AND AGREED
11 that it shall not be necessary for any
12 objections to be made by counsel to any
13 questions, except as to form or leading
14 question and that counsel for the parties
15 may make objections and assign grounds at
16 the time of trial or at the time said
17 deposition is offered in evidence, or prior
18 thereto.
19     In accordance with Rule 5(d) of the
20 Alabama Rules of Civil Procedure, as
21 amended, effective May 15, 1988, I, Renny D.
22 McNaughton, am hereby delivering to Ms.
23 Robertson the original transcript of the

---

                I N D E X
2      EXAMINATION BY:              PAGE NO.
3      Ms. Robertson          9
4
5          E X H I B I T S
6  No. 1                17
7  No. 2                48
8  No. 3                52
9  No. 4                66
10 No. 5                67
11 No. 6                68
12 No. 7                72
13 No. 8                95
14 No. 9                125
15 No. 10               103
16 No. 11               103
17 No. 12               104
18 No. 13               137
19 No. 14               140

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

21

1 was a supervisor or a safety person --
2     Q   Well, I'm talking about --
3     A   And an outside counsel or outside
4 person.
5     Q   I'm sorry.  I'm talking about
6 specifically the general supervisory skills
7 classes.  It sounds like --
8     A   Some of those were taught by
9 myself.  Some of them were taught by outside
10 sources.
11     Q   All right.  And do you remember
12 which ones you taught?
13     A   Not without seeing the schedule,
14 no, ma'am.
15     Q   Did you teach any sexual
16 harassment training?
17     A   I don't recall if I taught it or
18 if it was taught by someone else.  It would
19 be on the sign-in sheets.
20     Q   Was it taught while you were
21 there?
22     A   I don't recall if it was.  It
23 would be in the training schedule if it was.

22

1     Q   For what period of time were you
2 there?
3     A   October of '05 until December of
4 '06.
5     Q   And you don't recall whether
6 your -- you personally taught a sexual
7 harassment or anti-sexual harassment course?
8     A   Not from memory, no, ma'am.
9 There would be a training record there if it
10 was taught, yes.
11     Q   All right.  And did you have
12 any -- while you were there, did you have
13 videos or anything, tools to use for that
14 particular kind of training?
15     A   I -- I don't recall.
16     Q   You don't recall whether or not
17 you had that kind of -- those kind of tools?
18     A   Not from memory, no, ma'am.
19     Q   Under what circumstances would
20 one receive anti-sexual harassment training
21 at Flavor House?
22     A   An individual or as a group?
23     Q   I'm talking about at -- what

23

1 would trigger one being offered or -- or --
2 or required to take anti-sexual harassment
3 training at Flavor House?
4     A   Sexual harassment training --
5         MS. SWAIN:  I'm going to object.
6     A   -- is part of our training
7 process.
8     Q   Okay.
9     A   There was annual training that
10 was listed as annual training.
11 Specifically, an incident.  If there was an
12 instance involved, we may have retrained,
13 but it would have been part of our original
14 training process.
15     Q   You said you were there from
16 October to October --
17     A   October to December.
18     Q   Okay.  So if there had been some
19 training, it would have been within that
20 period of time; right?
21     A   There should have been annual
22 training, yes.
23     Q   What qualified you to give that

24

1 training?
2     A   My previous experience, my
3 previous training.  I've had various
4 training courses, supervisory training
5 courses.  Train -- the trainer courses
6 throughout my career.
7     Q   Did you have any such training at
8 Flavor House?
9     A   Specific to sexual harassment
10 training?
11     Q   Yes.
12     A   Within our supervisory training
13 program, I believe there was sexual
14 harassment training.  Whether I received
15 that specifically separate, I don't recall.
16     Q   Would there be something in your
17 personnel file that would indicate whether
18 you received it or not?
19         MS. SWAIN:  Objection.
20     A   I don't recall if our training
21 records were kept separately or in our
22 files.
23     Q   Well, when you say your "training

6  (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

33

1    Q    Okay.
2    A    And from that, we would
3    investigate those persons, receive their
4    statements if they knew anything of the
5    situation. So, again, it's -- we didn't
6    broadcast that there had been a sexual
7    harassment claim of any sort or any
8    harassment claim.
9    Q    Well, did -- but you told me at
10   one point that you would collect the
11   documents which would usually include the
12   written statements of people that had some
13   knowledge of the complaint.
14   A    Correct, that had been identified
15   either by the person bringing the complaint
16   or by a supervisor who was aware that the
17   person is bringing the complaint.
18   Q    Okay. So that's what I'm saying.
19   So the supervisor would get the statements
20   and bring them to you; right?
21        MS. SWAIN: Objection.
22   A    That could happen, yes. Not
23   necessarily in that order.

34

1    Q    And then what would you do?
2    A    We would investigate the
3    complaint.
4    Q    Okay. And how would you
5    investigate the complaint?
6    A    Take the statements and interview
7    the individuals.
8    Q    All right. Did you make notes of
9    the interviews of the individuals?
10   A    Yes.
11   Q    Where were they -- where are
12   they?
13        MS. SWAIN: Objection.
14   A    Notes are either kept in a file
15   --
16   Q    I'm not talking about
17   hypothetical. I'm talking about in --
18   when you were doing it in -- at Flavor
19   House.
20        MS. SWAIN: Are you talking about
21   on a specific occasion?
22        MS. ROBERTSON: I'm talking
23   about -- no. I'm just talking about how

35

1    he kept the records of -- of -- of -- of
2    investigating a sexual harassment
3    complaint. He said he would take notes
4    of the people he interviewed.
5    Q    Did you ever -- did you ever have
6    a sexual harassment complaint?
7    A    I would have to look at my notes
8    to see. I don't recall yes or no.
9    Q    Okay. Well, let me ask you this.
10   Let's assume that this is some kind of
11   grievance or some kind of complaint that may
12   or may not have been sexual harassment.
13   Would it be investigated the same way?
14        MS. SWAIN: Objection.
15   A    Any complaint brought forward,
16   any statement, was investigated, yes.
17   Q    Okay. Well, for instance, in the
18   case where Linda alleged that Frank Williams
19   cursed her and threw a bag of cans, not at
20   her but threw it, and was yelling and
21   always, you know, acting out, did you
22   interview the witnesses involved in that --
23   that allegation?

36

1        MS. SWAIN: Objection.
2    A    I would have taken the
3    statements -- any statement that I had, I
4    would have interviewed the persons
5    identified, yes.
6    Q    Okay. And you would have taken
7    notes of those -- those --
8    A    Yes.
9    Q    Where are those notes? Where did
10   you keep those notes?
11   A    Those notes were filed in my
12   desk.
13   Q    Okay.
14   A    Separate file.
15   Q    A separate file in your desk?
16   A    Yes, ma'am. Personal notes taken
17   during an investigation.
18   Q    And were they -- how -- how did
19   you keep them, like alphabetically according
20   to the complaint and alphabetically
21   according to the --
22   A    I don't recall if it was by the
23   person or by the date that it occurred in

9 (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

53

1    A   I believe so, yes.
2    Q   Did you ever see Plaintiff's
3   Exhibit Number 3 or were you aware that it
4   even existed?
5    A   I believe we did receive a copy
6   of this.
7    Q   Okay. And what did you do with
8   it when you received it?
9        MS. SWAIN: Objection.
10    A   When we receive complaints, I
11   forward those on to our corporate counsel.
12    Q   Anything else that you do?
13    A   Anything I would have done would
14   have been at the direction of the corporate
15   counsel.
16    Q   You do -- there's a piece of
17   paper that comes with that thing telling you
18   to preserve all the pertinent documents and
19   not to spoil them and do away with them; is
20   that right?
21    A   I don't recall what came with
22   this. This is just one document.
23    Q   Look at the charge and -- and see

54

1   if you don't see where it's discussed at
2   length, this incident involving the yelling
3   and the cursing and the throwing of cans.
4        MS. SWAIN: Objection. Are you
5     referring to the June 14th statement by
6     Linda in here?
7        MS. ROBERTSON: Yeah.
8    A   I see her statement, yes.
9    Q   Okay. What -- when you -- when
10   you received the charge from -- about Linda
11   Thornton did you do to preserve your
12   personal notes or the notes that you took in
13   your investigation of that incident so that
14   it would be preserved for litigation, if
15   necessary?
16        MS. SWAIN: Objection.
17    A   All of my investigation notes are
18   filed in my desk.
19    Q   So --
20    A   That's -- that's the only --
21    Q   Did you tell anybody about those
22   notes in your desk when you received --
23    A   I don't know if anyone is aware

55

1   of those notes, anyone other than the HR
2   manager. I don't know if anyone else is
3   aware of those. If there's any notes that
4   would have been pulled out, I -- I don't
5   know where they -- where they would have
6   been -- they were in the desk at the time I
7   was working there, yes.
8    Q   Was there any investigation done
9   of that charge when Flavor House received
10   it?
11    A   I don't recall the specific
12   investigation done.
13    Q   I'm not asking about the
14   specifics. I said was any done?
15    A   I don't recall what action we
16   took on this charge. It would have been,
17   again, at the direction of the corporate
18   counsel.
19    Q   So you don't remember if there
20   was any investigation?
21    A   I don't recall, no. I don't
22   recall yes or no.
23    Q   Okay. So you don't have any

56

1   independent knowledge of talking to Frank
2   Williams about Plaintiff's Exhibit Number 2?
3    A   I'm sure I investigated and
4   talked with the individuals. I don't recall
5   the specific conversation, no.
6    Q   And would the conversation or
7   notes concerning that conversation be
8   included in your notes surrounding the
9   investigation of Ms. Thornton's allegations?
10    A   All the notes for the 6/14
11   incident would have been included in my
12   notes in the desk.
13    Q   So -- so your notes concerning
14   what Mr. Williams did or didn't say when you
15   interviewed him would be in those notes?
16    A   Yes.
17        MS. ROBERTSON: Off the record.
18        (Whereupon, an
19        off-the-record discussion was
20        held.)
21   BY MS. ROBERTSON:
22    Q   Well, what -- when you called
23   Mr. Williams in to interview him, what would

14   (Pages 53 to 56)

# FREEDOM COURT REPORTING

105

1    Q  All right.
2    A  Regardless of who put the
3  complaint in first, it's -- it's a statement
4  about the situation.  This is not a
5  complaint, per se.  This is a statement of
6  the occurrences.
7    Q  Did you ask Melvin Hutchins to
8  give a statement about anything that -- do
9  you see where Linda references that she had
10  a conversation shortly before with Melvin
11  Hutchins about Frank Williams and issues
12  with the work with him?
13    MS. SWAIN:  Objection.
14    A  I'm sure I would have talked with
15  Frank -- with Melvin Hutchins.  Anyone
16  mentioned in the statement I would have
17  discussed, you know, what their involvement
18  or recollection or what was -- what was
19  questioned in the statement.  Yes, I would
20  have asked that.
21    Q  Would there be a document form
22  from him?
23    A  There could have been.  I don't

106

1  recall if there was specifically, no.  I
2  don't -- I don't recall that.
3    Q  Do you recall if you followed up
4  with Linda Thornton to find out what the
5  issues that she had discussed with Melvin
6  Hutchins were?
7    A  During the investigation, I'm
8  sure I asked anything relevant to the
9  statement.
10    Q  And do you have any independent
11  memory of that?
12    A  Again, I would have had notes on
13  that.  I don't recall from memory.
14    Q  No, sir.  I asked you do -- as we
15  sit here today, do you have any independent
16  memory of having a conversation with Linda
17  Thornton about what the issues she's
18  referring to about -- that she had with
19  Melvin Hutchins about Frank Williams?
20    A  I don't rely on memory of
21  specific investigations, no.
22    Q  Well, whether you rely -- you
23  know -- whether you --

107

1    A  I -- I take -- I take notes based
2  on investigations, and I make determinations
3  based off of those notes.
4    Q  Because, like, I rely on my -- I
5  can remember stuff that we've talked about
6  in depositions that I've taken before even
7  though I have a court reporter that -- so I
8  can rely on what's written down.  You know,
9  just by nature, I have -- sometimes my mind
10  absorbs stuff that actually happens to me.
11    A  That's correct.
12    Q  Do you have any independent
13  memory of having a conversation with Linda
14  Thornton about the issues she's referring to
15  that she had discussed with Melvin Hutchins
16  about Frank Williams?
17    A  I recall having multiple
18  conversations with Linda Thornton throughout
19  the course of my employment with Flavor
20  House in regards to multiple issues.
21    Q  Uh-huh.
22    A  Now, to tell you specifically
23  what memory relates to what issue, I can't

108

1  rely on my memory for that, no.  That's why
2  I have notes.
3    Q  Okay.  And where are those notes,
4  sir?
5    A  Again, I've already answered that
6  question.  My notes were in my desk drawer
7  when I left Flavor House.
8    Q  Did you maintain a copy of those
9  notes for yourself when you left?
10    A  No, ma'am, I did not.
11    Q  Did you -- did you turn them over
12  to Mary Ann or anybody else when you left?
13    A  No, I did not.
14    Q  Had you turned them over to
15  anyone else who might have been
16  investigating the -- the allegations that
17  Ms. Thornton had made in her EEOC charge?
18    A  I did not turn over notes unless
19  requested by corporate counsel.  Any
20  documentation we had was sent to them.
21    Q  I don't want to know whether or
22  not -- you know, the conversations you may
23  or may not have had with corporate counsel.

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

109

1  Did anybody ask you to turn over those notes
2  during the course of an investigation
3  involving my client's EEOC charge? Well,
4  strike that.
5      Did you turn over any notes that you
6  referred to concerning this investigation
7  that we're talking about now or the one
8  where Ms. Thornton said that Frank was
9  yelling and pitching a fit? Did you turn
10  those over during the time that --
11  immediately after the EEOC charge came in
12  from Ms. Thornton?
13      MS. SWAIN: Objection.
14  A  Any request for documentation
15  would have been honored.
16  Q  Okay. Do you recall any -- do
17  you recall turning over any documents to
18  anybody, whether it was corporate counsel or
19  Donald Duck?
20  A  Again, I don't recall
21  specifically what documents were turned over
22  in what case on what dates two years ago.
23  No, I don't.

110

1  Q  Now, on Plaintiff's Exhibit
2  Number 12, since you can't remember who
3  initiated this conversation concerning
4  Mr. Williams and his felonious past,
5  Plaintiff's 12, it says Jewel -- this is
6  Mr. Williams' statement; correct?
7  A  It appears to be, yes.
8  Q  Jewel Sidely came up to me in the
9  hallway and told me that Linda Thornton was
10  outside telling everyone that I was a child
11  molester and my brother's wife's daughter
12  was my girlfriend. I haven't done a family
13  tree, but that's intriguing. This is
14  harassment and I don't like it. I don't
15  start trouble. What happened 15 years ago
16  is none of her business.
17      Do you take that as a confession that
18  he is a child molester; he just doesn't like
19  it that my client was talking about it?
20      MS. SWAIN: Objection.
21  A  I don't take this as a admittance
22  of anything. It's a statement that there
23  was evidently something that occurred 15

111

1  years ago. Until I complete an
2  investigation, I don't know what that is.
3  Q  Well, other than that he was a
4  child molester or that his brother's wife's
5  daughter was his girlfriend, what else would
6  he have been saying was none of her
7  business?
8      MS. SWAIN: Objection.
9  A  Any personal business is not
10  another employee's personal business.
11  Q  You think being a child molester
12  is somebody's -- other -- is -- is their
13  personal business?
14      MS. SWAIN: Objection.
15  A  It's a matter of public record.
16  Q  Yes. It would be -- at least the
17  State of Alabama takes the position that
18  it's the public's business to -- to know
19  convicted sex offenders; right?
20      MS. SWAIN: Objection.
21  A  It is a public knowledge, yes.
22  Q  And I -- other -- other than the
23  public -- the State of Alabama makes it a

112

1  law that it be public knowledge, it would be
2  those mommas and daddies of those babies he
3  was molesting, wouldn't it?
4      MS. SWAIN: Objection.
5  A  The discussion of a person's
6  business is not proper workplace discussion.
7  It had no -- no bearing on working at Flavor
8  House, a person's past, a person's personal
9  convictions or anything else. And another
10  employee discussing those openly is a
11  violation of that person's ability to work
12  in a harassment free environment.
13  Q  When you -- did you talk to
14  Mr. Williams about whether or not he had in
15  fact been convicted of child molestation?
16  A  I would have asked Mr. Williams
17  in an investigation anything relevant to
18  this statement, yes.
19  Q  All right. And do you remember
20  what he told you, whether in fact -- whether
21  or not he had been convicted of child
22  molestation?
23  A  I recall there was a discussion

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

141

1    A   I don't recall the specific time
2  frame for the investigation that occurred.
3  It could have been later due to vacations or
4  absences, due to key people I was talking
5  with. I don't know why the lapse between
6  2/16 and March 7th. I can't tell you
7  specifically why that occurred, no.
8    Q   Well, it -- it says here in her
9  Plaintiff's Exhibit Number 13 that --
10  that -- that there had been some meetings
11  with Tommy and HR about this allegation of
12  this child molestation. Do you recall those
13  meetings?
14    MS. SWAIN: Objection.
15    A   The assumption may be she's
16  referring to the investigative meetings.
17  I -- I don't know what meeting she's
18  referring to.
19    Q   Well, when you said you had
20  determined that -- that she had acted in an
21  inflammatory and -- and I must criticize
22  your English -- I have determined that you
23  acted in a way that was inflammatory and

142

1  instigationally. What did she instigate?
2    A   Disruptive behavior.
3    Q   Disruptive behavior which
4  instigated what, Frank making threats?
5    MS. SWAIN: Objection.
6    A   Linda's discussion of personal
7  business caused conflict in the work force.
8    Q   Did it cause Frank to make her
9  threats?
10    MS. SWAIN: Objection.
11    A   Again, just the disruptions of
12  the work force is noted. It's --
13    Q   No, no, no, no. She complained
14  that he was making threats about what --
15  about what he was going to do to her and
16  then --
17    A   Which complaint are you referring
18  to there? Tell me.
19    Q   I'm referring to Plaintiff's
20  Exhibit Number 13. Repeatedly has been told
21  of comments that team leader has made
22  against me after -- one after investigation.
23  Various serious comments and threats made.

143

1    She was complaining that Frank was
2  making threats about what he was going to do
3  to her; right?
4    MS. SWAIN: Objection.
5    A   I don't -- I don't know what
6  those allegations were, what her --
7    Q   You don't remember --
8    A   -- comments were.
9    Q   -- any -- any of -- did you have
10  a conversation with her?
11    A   I investigate every statement
12  that comes in, every documentation form,
13  yes.
14    Q   My question is, did you have a
15  conversation with her after you received
16  Plaintiff's 13 about what kind of threats
17  were being made?
18    A   I don't recall specific
19  conversations I've had about the
20  investigations.
21    Q   I didn't ask you about the
22  specifics. I asked you did you have a
23  conversation.

144

1    A   We probably did. If a statement
2  was turned in, then there was a follow-up
3  investigation.
4    Q   But you don't remember anything
5  about it?
6    A   That's why I have notes.
7    Q   Which we don't have; is that
8  right?
9    A   (No response.)
10    Q   You don't remember any -- you
11  need to answer out loud for this court
12  reporter.
13    A   There was no answer. The notes
14  aren't here.
15    Q   And you have no memory?
16    A   I don't rely on my memory to
17  differentiate between which specific
18  conversation I had on which specific day
19  over a multitude of a year and multiple
20  conversations but --
21    Q   Well, my -- whether you can
22  remember whether it had anything to do
23  with -- did you ever have a conversation

36   (Pages 141 to 144)

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LINDA THORNTON,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        Civil Action No.:
                                         )        1:07-cv-712-WKW
FLAVOR HOUSE PRODUCTS, INC.              )
and FRANKLIN D. WILLIAMS, JR.,           )
                                         )
        Defendants.                      )

### DECLARATION OF DEANNA M. LAKE

1.      I am the human resources manager of the Flavor House Products, Inc. ("Flavor

House") facility in Dothan, Alabama.  I am over the age of eighteen and have personal

knowledge of all matters stated herein.

2.      I have been the human resources manager for the Dothan, Alabama Flavor House

facility since December 5, 2006, when I took over that position from Tommy Nance, who left his

employment with Flavor House on December 4, 2006.

3.      In addition to taking over Mr. Nance's position as human resources manager, I

inherited Mr. Nance's office at the Dothan facility.

4.      Since the day that I arrived at the Dothan facility, which was the day after Mr.

Nance left his employment, I have used Mr. Nance's office and his desk.

5.      Since the day that I arrived at the Dothan facility, there have been files and

various documents stored in the desk drawers of the desk in Mr. Nance's former office.  None of

the documents or files that I have found in the desk was the personnel file of Linda Thornton.

None of the documents or files that I have found in the desk related to the EEOC charge filed by

Ms. Thornton in 2006 or to any complaint or allegation made by her or to any investigation of such complaints or allegations.

      6.     Since the day that I arrived at the Dothan facility, there have been investigation files related to investigations of personnel matters stored in the file cabinet next to the desk in the office formerly occupied by Mr. Nance.

      7.     Since the day that I arrived at the Dothan facility, I have not discarded, destroyed, or lost any papers that I found in the desk drawers or cabinets in Mr. Nance's former office or any where else in the Dothan facility that appeared to relate to any personnel matter or to any investigation of a personnel matter.

      8.     I understand that Mr. Nance has testified in his deposition in the above-captioned litigation that he would have taken notes during his investigation of one or two incidents involving Linda Thornton, a former Flavor House employee.

      9.     Since the day that I arrived at the Dothan facility, I have not seen or located any documents or items of any description that appeared to be notes written by Mr. Nance regarding any matter involving Ms. Thornton.

      10.     I understand that Mr. Nance has testified in his deposition that any notes that he may have taken regarding any incident involving Ms. Thornton would have been stored in his desk drawers in his office at the Dothan facility.

      11.     Since the day that I arrived at the Dothan facility, I have thoroughly searched the desk formerly used by Mr. Nance many times and have not found any documents or items of any description that appeared to be notes written by Mr. Nance regarding any matter involving Ms. Thornton.

12.    I have also thoroughly searched the filing cabinets in the office formerly used by Mr. Nance at least twice and have not found any documents or items of any description that appeared to be notes written by Mr. Nance regarding any matter involving Ms. Thornton.

13.    On or about June 18, 2008, I inquired of Leigh Allums, a human resources department employee who had some responsibility for filing during Mr. Nance's employment with Flavor House, whether she has ever seen any documents or items of any description that appeared to be notes written by Mr. Nance regarding any matter involving Ms. Thornton.  Ms. Allums informed me that she had never seen any such document or item.

14.    On June 18, 2008, I directed Ms. Allums and another employee of the human resources department at the Dothan facility to search the offices of the human resources department for any documents or items of any description that appeared to be notes written by Mr. Nance regarding any matter involving Ms. Thornton, but no documents or items were found.

15.    To my knowledge, since the day that I arrived at the Dothan facility, no documents or items of any description written by Mr. Nance regarding any matter involving Ms. Thornton have been discarded, destroyed, or lost.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on August 7 , 2008, at Dothan, Alabama.

DEANNA M. LAKE

3

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LINDA THORNTON,                        )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        Civil Action No.:
                                       )        1:07-cv-712-WKW
FLAVOR HOUSE PRODUCTS, INC.            )
and FRANKLIN D. WILLIAMS, JR.,         )
                                       )
            Defendants.                )

## DECLARATION OF SCOTT CLARK

Under penalty of perjury, I, Scott Clark, state and declare as follows:

1.      I am in-house counsel for Ralcorp Holdings, Inc., which is the parent corporation
of Flavor House Products, Inc. ("Flavor House"). I am over the age of eighteen and have
personal knowledge of all matters stated herein.

2.      On or about September 26, 2006, Flavor House received from the United States
Equal Employment Opportunity Commission a copy of a charge of employment discrimination
filed by a former Flavor House employee, Linda Thornton. Pursuant to Ralcorp Holdings, Inc.'s
document retention policy, all employees of Flavor House having custody or control over any
document or item of any description relevant to the EEOC charge and the allegations raised by
Ms. Thornton were required to preserve and maintain such documents and items.

3.      The copy of the EEOC charge was received by Flavor House's human resources
department at the Dothan, Alabama plant, which is the facility where Ms. Thornton was
employed by Flavor House.

4.      I received a copy of Ms. Thornton's EEOC charge from the Dothan facility at my
office in St. Louis, Missouri shortly after it was received by the Dothan facility.

5.      On or about October 31, 2006, I traveled to the Dothan facility, where I met with a number of individuals, including Tommy Nance, who was the Human Resources Manager of the Flavor House Dothan facility from October 2005 through December 2006.

6.      During my visit to the Dothan facility in late October 2006, I collected documents from the personnel files of Frank Williams and Linda Thornton. Mr. Williams was a Flavor House employee about whom Ms. Thornton made allegations in her EEOC charge. The documents that I gathered from their personnel files concerned February/March 2006 and June 2006 incidents involving Ms. Thornton and Mr. Williams and a subsequent incident involving Mr. Williams and another Flavor House employee.

7.      Shortly after my visit to the Dothan facility in late October 2006, I received from Mr. Nance Ms. Thornton's personnel file and other documents that might be relevant to her EEOC charge and the allegations raised by Ms. Thornton.

8.      It was my understanding that I received from Mr. Nance each and every document in Ms. Thornton's personnel file and all other documents that might be relevant to her EEOC charge and the allegations raised by Ms. Thornton.

9.      Among the documents that I received from Mr. Nance was one type-written page bearing the title "Investigation Notes." A true and correct copy of that document is attached hereto as **Exhibit 1**.

10.     The documents that I received from Mr. Nance did not contain any other document or item that appeared to be notes written by Mr. Nance.

11.     Since the time that I received the documents from Mr. Nance, I have kept all of the documents, including those that I gathered on-site in Dothan from Mr. Williams' and Ms. Thornton's personnel files, in a file stored in my office.

2

12.     None of the documents that I gathered or received from Mr. Nance have been discarded, destroyed or lost. To my knowledge, each and every one of the documents that I gathered or received remains in the file in my office.

13.     Flavor House has produced the document titled "Investigation Notes" to counsel for Ms. Thornton in response to requests for production served in this litigation.

14.     On three separate occasions, I have looked carefully through the documents that I gathered and received from Mr. Nance relating to Ms. Thornton's EEOC charge and the allegations raised therein for any other document that might be notes written by Mr. Nance relating to any investigation of any complaint or matter raised by or relating to Ms. Thornton during her employment with Flavor House. The only document or item that I have found that appears to be notes written by Mr. Nance is Exhibit 1 hereto.

15.     I have also searched my office more than once thoroughly and carefully for any other document that might be notes written by Mr. Nance relating to any investigation of any complaint or matter raised by or relating to Ms. Thornton during her employment with Flavor House. The only document or item that I have ever found that appears to be notes written by Mr. Nance relating to any investigation of any complaint or matter raised by or relating to Ms. Thornton during her employment with Flavor House is Exhibit 1 hereto.

16.     I understand that Dee Lake, the Human Resources Manager for the Dothan facility, has looked carefully in the human resources department's office space, including in Mr. Nance's former office and files, for any and all notes that may have been written by Mr. Nance relating to any investigation of any complaint or matter raised by or relating to Ms. Thornton during her employment with Flavor House. As a result of those searches, no document or item has been found that might be notes written by Mr. Nance relating to any investigation of any

3

complaint or matter raised by or relating to Ms. Thornton during her employment with Flavor House.

17.     With the exception of Exhibit 1 hereto, which was produced to Ms. Thornton's counsel, I have never seen any document or item that might be notes written by Mr. Nance relating to any investigation of any complaint or matter raised by or relating to Ms. Thornton during her employment with Flavor House.

18.     To my knowledge, no documents or items of any description written by Mr. Nance regarding any matter involving Ms. Thornton have been discarded, destroyed, or lost.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on August ___, 2008, at St. Louis, Missouri.

SCOTT CLARK

4

# EXHIBIT 1

# INVESTIGATION NOTES

Incident:  Frank Williams and Linda Thornton

Date:  6/14/06

Resolution:

Frank Williams was given a disciplinary warning.  Linda Thornton was moved to Line 5
Label Operator.

**FH000022**

# Exhibit D

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                     SOUTHERN DIVISION

 4    LINDA THORNTON,          )

 5             Plaintiff,      )

 6    VS.                      ) CIVIL ACTION NO:

 7    FLAVOR HOUSE PRODUCTS,)

 8    INC., et al.,            ) DEPOSITION OF:

 9             Defendants.  )  LINDA THORNTON

10

11            S T I P U L A T I O N S

12         IT IS STIPULATED AND AGREED, by and

13    between the parties through their respective

14    counsel, that the deposition of:

15                  LINDA THORNTON,

16    may be taken before Cathy A. DeBardeleben,

17    Commissioner and Notary Public, State at

18    Large, at the Law Offices of Baker, Donelson,

19    Bearman, Caldwell & Berkowitz, P.C., 1600

20    Wachovia Tower, 420 North 20th Street,

21    Birmingham, Alabama 35203, on the 19th day of

22    February, 2008, commencing at approximately

23    10:00 a.m.
```

10                                                                    (Pages 34 to 37)

Page 34

1  Q    So, this would suggest that you had
2  talked to Mary Ann Boyer about Fannie Ash
3  prior to the date of this documentation form?
4      MS. ROBERTSON:  Object.
5  A    Not necessarily.
6  Q    Excuse me.  What other issues had you
7  spoken to Mary Ann about?
8  A    The sexual discrimination.
9  Q    Was Fannie Ash sexually
10  discriminating against you?
11  A    No.
12  Q    Why would Fannie Ash -- well, let me
13  ask you this:  What was the nature of your
14  complaint about Fannie Ash?
15  A    What is written right here.
16  Q    That you felt like she was nit-
17  picking you?
18  A    Yes, ma'am.
19  Q    And what does that have to do with
20  your speaking to Mary Ann about sexual
21  discrimination?
22      MS. ROBERTSON:  Object,
23  argumentative.  Are you familiar with the

Page 35

1  term "retaliation"?
2      MS. SWAIN:  Ann, I would appreciate
3  it if you would let me ask the questions of
4  the witness and not interfere, please?
5      MS. ROBERTSON:  All right.
6  Q    (By Ms. Swain) What does your talking
7  to Mary Ann about sexual discrimination have
8  to do with Fannie Ash nit-picking you?
9  A    When I -- whenever I complained, I
10  was always retaliated -- usually retaliated
11  against in one fashion or another.
12  Q    So, is it your allegation that --
13  well, let me back up.
14      Who were you complaining was sexually
15  discriminating against you?
16  A    On which account?
17  Q    In the occasion that you are
18  referencing here on this Exhibit 1.
19  A    I don't understand your question.
20  Q    Well, you've indicated earlier that
21  when you write here on the second to last
22  sentence, "This harassment has increased
23  since I have spoken to Mary Ann about other

Page 36

1  issues," that the other issues you had been
2  talking to Mary Ann about were sexual
3  discrimination; is that right?
4  A    It -- I'm not quite sure.  I would
5  have to look back at the records.
6  Q    What records?
7  A    With my complaints.
8  Q    What records are you talking about?
9  A    The complaints in the personnel file
10  or what had happened.  I'm not quite sure.
11  Where I have put, "I have spoken to Mary Ann
12  about other issues," there was always
13  retaliation when I made a complaint.
14  Q    Well, let me ask you a couple of
15  questions.  Do you have records of complaints
16  that you made?
17  A    I'm not quite sure I do.  I have
18  moved.  If I have them, I don't know I have
19  them.  I'm not aware of it.
20  Q    So, you at one time had records of
21  your complaints and you don't know where they
22  are now?  Is that what you're telling me?
23  A    I have documented things, and I don't

Page 37

1  know where they are now.
2  Q    Have you looked for them?
3  A    I've looked where I thought they
4  were, and they weren't there.  I have several
5  boxes since we've moved.
6  Q    Have you gone through all of your
7  boxes?
8  A    Yes.
9  Q    And you can't find them?
10  A    No, ma'am.
11  Q    You're aware that if you intend to
12  use those documents you need to find them now
13  and we need to have an opportunity to
14  question you about those documents?
15  A    Yes, ma'am.
16  Q    Okay.  So, going back to this form.
17  I'm going to ask you the question again.
18  When you say on this form, "The harassment
19  has increased since I have spoken to Mary Ann
20  about other issues," what other issues are
21  you talking about?
22  A    I'm not sure.  I don't recall.
23  Q    Is it your allegation in this lawsuit

# Exhibit E

## DOCUMENTATION FORM

Employee Name: _Frank Williams_

Investigating Supervisor: _Chris Jordan_    Date: _2-16-06_

Present: _N/A_

Who was involved: _Linda Thornton_

Witness (s): _Jewell Silvey & Tracey Brantley_

Date of incident: _2-16-06_

Where did it take place: _Hall way_

When did it take place (time and day): _2-9-06_

What happened: _Jewell Silvey came up tome
in the Hall way & told me that
Linda Thornton was outside telling everyone
that I was a child molester & my
Brother's Wife's Daughter was my
girlfriend this is harrassment
and I don't like it I
don't start trouble. what
happen 15 years ago is none of
her Bushess_

Did this result in down time? _No_    If yes how much?

Did this result in product being scrapped? _if_ yes how much?

Attach an additional sheet if needed for witness statements following the same format.

Tracey Brantley

Jewell Silerry

Jackie Lang

Vickie Cook

FH000004

## DOCUMENTATION FORM

Employee Name: _Linda Thornton_

Investigating Supervisor: _Chris Jordan_    Date: _2-16-06_

Present: _Melvin Hutchins_

_____

Who was involved: _Frank Williams_

Witness (s): _____

Date of incident: _2-16-06_

Where did it take place: _In hallway of Plant._

When did it take place (time and day): _2-16-06 Am._

What happened: _At approximately 10:50Am an employee came to me stating that Frank Williams had came to them this am, stating that I had been telling people that Frank Williams was a child molester. Immediately I met with M. Hutchins / Chris Jordan with this matter. This is after a previous meeting with M. Hutchins on the topic of many concerns with Frank and line & work situations._

_____

_____

_____

Did this result in down time? _No_    If yes how much? _____

Did this result in product being scrapped?    If yes how much?    _No_

Attach an additional sheet if needed for witness statements following the same format.

_Mark Beard - present in smoking area_

## DOCUMENTATION FORM

Employee Name: _Vickie Cook._____

Investigating Supervisor: _____ Date: _____

Present: _____

_____

Who was involved: _____

Witness (s): _____

Date of incident: _____

Where did it take place: _____

When did it take place (time and day): _____

What happened: _Linda Told Me Frank is not a_
_Supervisor he's A Team leader. And Should_
_help rotate Breaks Out. and help More on_
_The line And Frank Says Linda need's_
_to Ask For help when needed. She's_
_To PrideFul. I Thought They got_
_along Fine._

_____

_____

_____

_____

Did this result in down time? _____ If yes how much? _____

Did this result in product being scrapped?  If yes how much? _____

Attach an additional sheet if needed for witness statements following the same format.

**DOCUMENTATION FORM**

Employee Name: Tracey Brantley

Investigating Supervisor: _____ Date: _____

Present: _____

_____

Who was involved: Linda J Jewel

Witness (s): Tracey

Date of incident: _____

Where did it take place: _____

When did it take place (time and day): _____

What happened: Jewel told me that Linda said that She wanted Jewel to look on the Python Eagle web site and make a copy of Frank picture and put it in the suggest boxe Then I heard Linda said it myself us she was telling Jovel in the Smoking area. I did not know if she was joking or not.

_____

_____

_____

_____

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped?   If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

**DOCUMENTATION FORM**

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordon    Date: 3-01-06

Present: M. Hutchins

Who was involved: Frank Williams

Witness (s): N/A

Date of incident: Linda was told 2/28/06

Where did it take place: Break Area

When did it take place (time and day): After work

What happened: Repeatly have been told of comments
that team leader has made against me.
One after investigation. Very serious comments
and threats made.

I just want this to be over with,
which I believed it would be after
last weeks meeting with Tommy in HR,
These threats & comments were made to an employee
in the front office.

Did this result in down time? N/A    If yes how much?

Did this result in product being scrapped?    If yes how much? N/A

Attach an additional sheet if needed for witness statements following the same format.

**DOCUMENTATION FORM**

Employee Name: _Jewell Silvey_

Investigating Supervisor: _____    Date: _2-23-06_

Present: _____

_____

Who was involved: _Linda Thoren_

Witness (s): _Jewell Silvey, Tracy, Vickie Jackie_

Date of incident: _15th, 16th_

Where did it take place: _smoking area_

When did it take place (time and day): _before work, After work_

What happened: _Linda told me Frank has been in prison for being a sex afender. I asked if the company knew about it. Then Linda said I could look it up on Dothan, Con. Sex offerers and make a copy to put in the suggestion box. I did state that at a certain age it would be child malesting. When Franks little boy came to see him_

_____

Did this result in down time? _____ If yes how much? _____

Did this result in product being scrapped?   If yes how much? _____

Attach an additional sheet if needed for witness statements following the same format.

FH000009

Vickie thought he the little boy was a little girl. Frank turned around and said thats my baby. Apartley Franks little boy came to see him a different day than when everything was said. Vickie just said that because she thought it was funny when Frank turned and said thats my baby. Linda turned the statement around and said, the little one must of been his girlfreend. She was tatking lound enough for everyone to hear.

Jewell Silvey

FH000010

## DOCUMENTATION FORM

Employee Name: Linda Thornton.

Investigating Supervisor: Chris Jordan          Date: 6-14-06

Present: Melvin Hutchins, Frank Hall

Who was involved: Frank Williams.

Witness (s): Catherine Long, Wesley, Tamekia Croll

Date of incident: _____

Where did it take place: Line 3

When did it take place (time and day): 11:00 - 11:05?

What happened: Today on line 3 when I came back from second break, (Frank Williams had Relieved me.) I noted that the paperwork had not been done while I was on break, so I was catching up on the paperwork. Frank was re-loading the machine with labels. There was re-work in a box full of cans, and the table was over-flowing with cans with bad labels. When Frank reloaded the machine he went to walk away — I asked him to help with the re-work. (The audit was going on) He started yelling at me that he had better "mother fucking things to do than worry about that fucking re-work. He continued to holler at me, and I told him to quit yelling & cussing at me. At this time he went from inside of the line to the outside of the line. The entire time, yelling at me continued to yell mother fucker, God damn mother fucker, Throwing a large bag of cans, as he continued to yell an cuss at me — I continued to request that Wesley would please call for a supervisor, at this time Frank

Did this result in down time? NO    If yes how much? _____

Did this result in product being scrapped?    If yes how much? NO

Attach an additional sheet if needed for witness statements following the same format.

was still yelling & cussing and I continued to ignore him. Donald Coty walked by and I requested that he please get a supervisor, please call Melvin Hutchins.

FH000023

Finally there were on his way. When Mervin came I told him about the situation at hand. Catherine ~~Long~~ was standing there and Wesley, nd I honestly do not know who else. I ignored Frank Williams yelling God Damn mother fucker — nether he was calling me that name or just lling it at me. Regardless — I won't take it in, No one else talks to me that way d he sure won't again. I don't have to lerate that level of abusive language or me calling, Tameaka asked me later what was he shaving a fit about.

Also, stated to Catherine "Did I holler at Linda? She stated "yeah".

## DOCUMENTATION FORM

Employee Name: ~~[scribbled]~~ ~~[scribbled]~~ Frank Williams

Investigating Supervisor: _____ Date: _____

Present: Mary Brooks _____

_____

Who was involved: me + Linda Thurton _____

Witness (s): _____

Date of incident: 6-14-06 _____

Where did it take place: Line 3 _____

When did it take place (time and day): ~~[scribble]~~ 11:15 Am wed.

What happened: Linda was having problems out of
Ladle machine so she just told me She was going
to Break. I Let her go But I was still having trouble
with the machine. I finally got it fixed and Chris
came around and told me to take out a Big Bag
of cans that was sittin on Line 3. had a lot
of Bad Lables But was trying to work them in
Linda came Back off Break. I was going to
do what Chris had said then go Back and (over)

_____

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

FH000025

back and help with the table but when I went to go Linda
yelled at me to help her get the rework. I told her that chris had
already told me to do something else and I would help her when I got through
he told me that was my rework and I need to stay and help
get it done. I told her I could not I had to do something I
was told to do. She got an attitude. I put my hand in the air
turned around and walked off. I had got very upset so instead of saying
something that would get me in trouble I walked away

FH000026

## DOCUMENTATION FORM

Employee Name: _Wesley McInnis_

Investigating Supervisor: _Chris Scanlan_ Date: _6-15-06_

Present: _____

_____

Who was involved: _Frank Williams + Linda Thornton_

Witness (s): _No witness Wesley knows of._

Date of incident: _6-14-06_

Where did it take place: _Line 3 label machine_

When did it take place (time and day): _About 10:30-11:00_

What happened: _____

_I Heard some yelling From Frank Williams Could_

_not make out Everything He said. The only words_

_I could make out was that He Was not_

_going to put up with this._

_____

_____

_____

_____

_____

Did this result in down time? _No_ If yes how much? _____

Did this result in product being scrapped? If yes how much? _____
_No_

Attach an additional sheet if needed for witness statements following the same format.

FH000027

## DOCUMENTATION FORM

Employee Name: Catherine Long

Investigating Supervisor: Chris Jordan          Date: 6-15-06

Present: _____

_____

Who was involved: Frank Williams and Linda Thornton

Witness (s): _____

Date of incident: 6-14-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): Before 1200 Noon

What happened: Well Linda Just had
Came from Break and She
asked Frank to help her Clean
off the table By Line 3 label
Machine I hear Frank said
the F word and I Cant
do every dam thing.
that all I heard except he
was doing alot of Yelling and
_____

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

FH000028

## DOCUMENTATION FORM

Employee Name: _Mary Brooks_

Investigating Supervisor: _Chris Jordan_     Date: _6-15-06_

Present: _____

_____

Who was involved: _Frank Williams + Linda Thornton_

Witness (s): _____

Date of incident: _6-14-06_

Where did it take place: _Line 3 label machine_

When did it take place (time and day): _Before lunch_

What happened: _She came back from break (Linda
did paperwork) Mary walked off and did not
witness anything. She did state they argue
and fuss everyday not just yesterday._

_Mary Brooks_

_____

_____

_____

_____

_____

Did this result in down time? _N/A_ If yes how much?

Did this result in product being scrapped?   If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

FH000029

## DOCUMENTATION FORM

Employee Name: _Lauratia Cooke_

Investigating Supervisor: _Chris_ Date: _6-15-06_

Present: _____

Who was involved: _Frank Williams + Linda Thornton_

Witness (s): _____

Date of incident: _6-14-06_

Where did it take place: _Line 3 label Machine_

When did it take place (time and day): _Before lunch_

What happened: line 3 label machine messed up & we had bad labels on the work area & we cleaned some & when Linda got back from back some was left up there and she asked (Frank) what about this mess and Frank walked off saying curse words exact I don't know so Linda said something to him. ~~at a later~~ He threw his hands up & said Fuck it and went threw the curtains. She was ignoring him but it was words still being said from him.

Did this result in down time? _____ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

FH000030

# Exhibit F

## MEMORANDUM

**DATE:** March 7, 2006

**TO:** Linda Thornton

**FR:** Tommy Nance

**RE:** Memo to File

> INCIDENT
> OCCURRED ON
> 2/16/06

After investigating the events surrounding the allegations made on 2/16/06, I have determined that you acted in a way that was inflammatory and instigational. This is not the first altercation that has occurred between yourself and Frank Williams. Any continued comments of an inflammatory nature or comments meant to incite controversy will be dealt with in a similar fashion.

Failure to follow the proper procedures has resulted in you receiving this **Memo to File.**

Any future violations will result in additional disciplinary action up to and including termination.


_Tommy Nance_

Tommy Nance

Human Resources Manager

_Linda Thornton_

Linda Thornton

(Signature acknowledges

Receipt of this document

only.)

_I disagree with entire situation and who made comments. also with my record 4 years of employment this should show._

FH000002