**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA THORNTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.: 1:07cv712-WKW** |
| **v.** | ) | |
| | ) | |
| **FLAVOR HOUSE PRODUCTS, INC., and** | ) | |
| **FRANKLIN D. WILLIAMS, JR.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**BRIEF IN SUPPORT OF DEFENDANT FLAVOR HOUSE PRODUCTS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiff Linda Thornton's attempt to convert a workplace conflict with a co-worker into actionable sexual harassment, constructive discharge, outrage and invasion of privacy claims fails.  The conduct about which she complains does not rise to the level required by either Title VII or Alabama common law.  Her retaliation claim is similarly meritless because she cannot demonstrate any adverse employment action or that the alleged retaliatory conduct was causally related to any complaint about conduct prohibited by Title VII.  Her gender discrimination claims relating to pay and promotions are both time-barred and factually unsupported.  And her negligence claims fail because she cannot establish any underlying tortuous conduct on which to predicate them.  Defendant Flavor House Products, Inc. ("Flavor House") is entitled to summary judgment as to each of the Plaintiff's claim.

**II.    STATEMENT OF FACTS**

      **A.    Thornton's Employment With Flavor House**

            **1.    Thornton's Hiring And Promotion To Label Operator**

Linda Thornton began working at Flavor House's Dothan, Alabama plant in June 2001. (Thornton Dep. p. 25 ll. 5-7). Thornton worked as a temporary employee for 90 days before Flavor House hired her as a regular employee. (Thornton Dep. p. 25 ll. 8-13). Thornton began her employment with Flavor House as a laborer working on line 2. (Thornton Dep. p. 26 ll. 10-13, p. 26 l. 23 – p. 27 l. 8).

After working at Flavor House for approximately a year, Thornton sought and received a position as a label operator. (Thornton Dep. p. 27 ll. 19-21). By this time, Thornton had transferred to line 1. (Thornton Dep. p. 27, lines 10-12, p. 28, lines 7-12). Thornton worked on line 1 until 2005, when she moved to a label operator position on line 3. (Thornton Dep. p. 239 l. 12 – p. 240 l. 4).

The business of Flavor House's Dothan facility is the processing and packaging of nuts. (Thornton Dep. p. 29 ll.1-4). As a label operator, Thornton ran a machine that put labels on jars or cans that contained nuts. (Thornton Dep. p. 28 ll. 13-23).

## 2.    Conflicts With Employees On Line 1

During the time that she worked on line 1, Thornton had conflicts other employees. (Thornton Dep. p. 30 l. 19 – p. 31 l. 5, p. 47 ll. 20-23; Boyer Dep. Vol. 2 p. 73 ll. 12-16). On March 31, 2005, Thornton filled out a Documentation Form complaining that her supervisor, Fannie Ash, was "deliberately knit (sic) picking" her. (Thornton Dep. p. 32, lines 13-23, p. 33, lines 1-16, Ex. 1). Thornton also complained that Ash was "harassing" her, and that the alleged harassment had increased since she had spoken to Director of Operations Mary Ann Boyer about "other issues." (Thornton Dep. p. 33, ll. 17-23, Ex. 1; Boyer Dep. Vol. 1 p. 16 ll. 15-18). Thornton does not recall what "other issues" she had discussed with Boyer. (Thornton Dep. p. 37, ll. 16-23).

During this same time frame, Thornton also submitted to someone in the office at Flavor House a two and one-half page typed document further detailing her complaints about Ash's alleged "harassment" of her.  (Thornton p. 38 l. 22 – p. 39 ll. 1-8, p. 40 ll. 11-16).  According to Thornton, Ash had called the whole line in one by one.  (Thornton Dep. p. 43 ll. 19-20).  During her meeting with Thornton, Ash spoke to Thornton about her breaks, cleaning, helping others and disappearing off the line.  (Thornton Dep. p. 44 ll. 2-6).  Thornton felt that the concerns Ash expressed to her were not fair.  (Thornton Dep. p. 44 ll. 7-9).  Thornton also complained in her type written complaint that she had to go to another supervisor to get a vacation day, and that "there is a difference in how certain other ones are treated."  (Thornton Dep. p. 44 ll. 21-23, p. 45 ll. 1-4, Ex. 2).  Thornton concedes that she does not know how others were treated by Ash.  (Thornton Dep. 46 ll. 5-16).  Again, Thornton claims that Ash was retaliating against her for previous complaints to Boyer but, again, Thornton cannot recall what other issues she had complained about that allegedly led to retaliation.  (Thornton p. 41 ll. 19-21, p. 42 ll. 2-10).

Although Thornton claims that she was retaliated against any time she made a complaint of discrimination, Thornton concedes that she never complained that Fannie Ash, who is female, discriminated against her.  (p. 37. l. 23 – p. 38 l. 18).  Thornton suggests that Ash was possibly acting on the instructions of male supervisors in "picking on" her, but acknowledges that this is merely speculation on her part and that she never heard any supervisor give Ash instructions to "nit-pick" her.  (Thornton Dep. p. 45 ll. 9-23 – p. 46, ll. 1-4).

In addition to Fannie Ash, Thornton had a conflict with fellow hourly employee Kim Perkins during the time that she worked on line 1.  (Thornton Dep. p. 47 ll. 10-23).  This conflict continued after Thornton moved to line 3 in late 2005.  (Thornton Dep. p. 52 ll. 19-22; p. 253 ll.

22-23). On April 12, 2006, Thornton filled out a Documentation Form after a conflict with

Perkins. (Thornton Dep. p. 52 ll. 4-10, Ex. 4). Thornton wrote on the Documentation Form that:

> …As I was changing out the labels, Kim came up to me and raised her voice saying "Do you have a problem with me?" I stated "no I do not, I haven't said two words to you all day." She said "that's the problem. I have noticed." She then asked again "What's your problem?" I stated I do not have a problem – you stay pissed off at everyone on the line and I want no part of it!" The reason I have chosen not to conversate with Kim Perkins is because of her attitude towards other co-workers including myself. Also this morning I heard her holler to Linda Parker on the capper about a mechanic in her (Kims) words she stated "Don't worry he can't help you, he's not worth a fuck.["] This immediately told me what mood & attitude Kim was in. Also one of the O.C. that was in the lab this a.m. when Kim Perkins came in stated – that Kim came in the lab and stated outloud (sic) that "Those mother-fucking people are getting on my nerves. (Debra Stuart O.C.) -- This is the attitude that Kim carries. Not every once in a while/ But every day. – When people off my line (line 3) had to come to line 1 / same problems occurred. Another reason for not conversating with Kim Perkins other than her attitude, is because of situations <u>as this one</u>. Always starting something and then running to tell a lie. Always trying to get someone in trouble other than herself. She's the problem. She's the main reason I left line 1.

(Thornton Dep. p. 52 l. 23 – p. 56 l. 19, Ex. 4).

In 2005, Thornton moved to a label operator position on line 3. (Thornton Dep. p. 50 l. 21 – p. 51 l. 1, p. 239 l. 12 – p. 240 l. 4). According to Director of Operations Mary Ann Boyer, Flavor House moved Thornton to line 3 because of conflicts with Kim Perkins and other employees on line 1. (Boyer Dep. Vol. 2 p. 41 ll. 2-9). Thornton claims that her move to line 3 occurred after she bid on an open line 3 label operator position. (Thornton Dep. p. 50 ll. 12-18). Thornton acknowledges, however, that her conflict with Perkins was the main reason she left line 1. (Thornton Dep. p. 56 ll. 13-19).

### 3.  Conflict With Frank Williams

Some time after Thornton moved to line 3, Flavor House posted a newly created team leader position for line 3. (Thornton Dep. p. 57 ll. 4-16, 23 – p. 58 ll. 1-2). Line 3 was the only line that had a team leader. (Thornton Dep. p. 57 ll. 20-22; Boyer Dep. Vol. 1 p. 42 l. 14 – p. 43

l. 5). Frank Williams, who was working as a roaster operator, applied for and received the team leader position on November 28, 2005. (Thornton Dep. p. 57 ll. 4-19; Boyer Dep. Vol. 1 p. 45 ll. 4-16). As a team leader, Williams was an hourly employee of Flavor House and did not have the authority to hire, fire or discipline other employees. (Thornton Dep. p. 58 ll. 3-11; Smothers Dep. p. 78 l. 9 – p. 79 l. 15).

From the beginning, Williams and Thornton did not get along and had a conflict. (Thornton Dep. p. 58 ll. 12-17, p. 101 ll. 18-22). Thornton claims that Williams had trained her for approximately three weeks at some previous time, which she believes was in 2003. (Thornton Dep. p. 58 ll. 18-23 – p. 59 l. 1). Thornton initially testified that their relationship during this period was cordial. (Thornton Dep. p. 61 ll. 11-21). However, she later claimed that Williams cussed at her "if not everyday, every other day at least" and "constantly" threw cans, once at her, during this time. (Thornton Dep. p. 66 ll.2-8, p. 79 l. 23 – p. 80 ll. 1-19). Thornton alleges that she complained to production supervisor Fannie Ash and superintendent Melvin Hutchins about Williams, and claims that she told Ash that she could not train under Williams. (Thornton Dep. p. 60 ll. 19-21, p. 62 ll. 14-19, p. 78 ll. 2-4). Thornton claims that after other confrontations between herself and Williams, Ash exchanged James Porter for Williams and Porter trained her. (Thornton Dep. p. 63 l. 22 – p. 63 l. 6, p. 78 l. 18 – p. 79 l. 1). Thornton claims Ash later brought Williams back to train. (Thornton Dep. p. 81 ll. 1-6). According to Thornton, Ash told her that Williams ran the machine better, and they would just have to get along. (Thornton Dep. p. 81 ll. 1-6). Thornton does not recall whether she and Williams had any further conflicts during the weeks that he trained her in 2003. (Thornton Dep. p. 81 l. 23 – p. 82 ll. 1-5).

Between the time that Williams trained Thornton in 2003 and Williams becoming team leader on line 3 in November 2005, Thornton did not have any problems with Williams. (Thornton Dep. p. 100 ll. 16-23 – p. 101 ll.1-8).  However, after Williams became team leader, he and Thornton again had a conflict.  (Thornton Dep. p. 101 ll. 11-22).  Thornton believes that this conflict included a complaint by her that Williams, who she claims was the only one who could relieve her for break, stayed on the telephone in the break room or outside smoking, and then would come back and tell her that he was going to break and would relieve her whenever he got back.  (Thornton Dep. p. 23 l.1 – p. 24 ll. 1-6).  According to Thornton, when she complained to management about Williams, he would then go to management and complain to management that she was leaving the line or was not taking her break when she was supposed to. (Thornton Dep. p. 104 ll. 7-14, p. 105 ll. 1-11).

On January 31, 2006, supervisor Chris Jordan and superintendent Melvin Hutchins met with Thornton to discuss ongoing issues with Thornton quickly calling for a mechanic when she had a problem with a label machine, continuing to run the machine with the labels not properly aligned and ongoing friction between Thornton and Frank Williams.  (Jordan Dep. p. 78 ll. 6-9, p. 79 l. 4 – p. 80 l. 16, Exh. 19; Thornton Dep. p. 108, l. 18 – p. 109, l. 1; p. 100 ll. 11-19, p. 111, ll. 2-8, ll. 15-18).  In his documentation of this meeting, Jordan noted that "I explained that in the future I would like to see more teamwork and less friction between the two of them.  She said she understood and agreed to work on this issue."  (Jordan Dep. p. 80, ll. 10-16, Exh. 19; Thornton Dep. p. 111 ll. 15-18).

Shortly after this meeting, in February 2006, Thornton told at least two other employees, including Jewell Silvey and Catherine Long, that Williams was a registered sex offender.[1]

---

[1] Williams is required to register as a sex offender due to a conviction fourteen years prior to this incident, in 1992.

(Thornton Dep. p. 112 l. 23 – p. 113 l. 7; p. 114 ll. 1-9). Thornton also discussed that Williams was a registered sex offender with another employee, Tom Beard. (Thornton Dep. p. 112 ll. 1-7). Thornton is not sure whether she also told Stephanie Lampley that Williams was a convicted sex offender. (Thornton Dep. p. 114 ll. 1-7).

Another employee, whose identity Thornton cannot recall, allegedly told Thornton that Silvey had told Williams that Thornton was spreading the word that he was a convicted sex offender, and that Williams was "irate" about this. (Thornton Dep. p. 119 ll. 14-23). Williams went to Chris Jordan and Melvin Hutchins regarding the situation, and filled out a Documentation Form complaining about Thornton. (Williams Dep. p. 144 ll. 9-16 Jordan Dep. Exh. 16). On the Documentation Form, Williams stated:

> Jewell Silvey came up to me in the hallway and told me that Linda Thornton was outside telling everyone that I was a child molester and my brother's wife's daughter was my girlfriend. This is harassment and I don't like it. I don't start trouble. What happen 15 years ago is none of her business.

(Jordan Dep. Exh. 16).

Upon hearing that Williams was "irate," Thornton likewise went to Melvin Hutchins and Chris Jordan and completed a Documentation Form. (Thornton Dep. p. 119 ll. 11-18, p. 120 ll. 5-13, Exh. 11). Jewell Silvey and Tracey Brantley also filled out Documentation Forms regarding Thornton's telling others that Williams was a registered sex offender. (Boyer Decl. ¶ 7, Exh. C). Jewell Silvey indicated in her Documentation Form that "Linda told me that Frank has been in prison for being a sex offender…. Then Linda said I could look it up on Dothan.com. sex offenders and make a copy to put in the suggestion box." (Boyer Decl. Exh. C). Silvey went on to state that, when Williams' child came to see him at work, Thornton suggested in loud voice that "the little one must have been his girlfriend." (Boyer Decl. Exh. C). Brantley stated in his Documentation Form that "Jewel told me that Linda said that she wanted

Jewel to look on the Dothan Eagle web site and make a copy of Frank's picture and put in the suggest (sic) box. Then I heard Linda said it myself as she was telling Jewel in the smoking area." (Boyer Decl. Exh. C). Thornton claims that "everybody" was aware of Williams' sex offender status and that Williams told "everybody" that he had to register every year. (Thornton Dep. p. 114 ll. 10-15, p. 116 l. 18 – p. 117 l. 1).

Some time after Thornton completed her Documentation Form, Human Resources Manager Tommy Nance met with Thornton. (Thornton Dep. p. 120 l. 14 – p. 121 l. 6). Nance told Thornton not to be talking about Williams's criminal history or personal history at work. (Thornton Dep. p. 123 ll. 3-8). Thornton believes that Nance also told her during the same meeting that if she talked about Williams again, she would be "written up." (Thornton Dep. p. 124 ll. 10-15). Thornton had the feeling after the meeting that Nance wanted her and Williams to "get along … not to have any problems, just to work on it." (Thornton Dep. p. 125 ll. 8-11).

Thornton admits that after the meeting with Nance, she told a front office employee, Leigh Taylor, that Williams was a registered sex offender. (Thornton Dep. p. 133 ll. 15-19, p. 134 ll. 14-22, p. 399 ll. 8-13). Thornton claims that she told Taylor that Williams was a registered sex offender in response to Taylor telling her that Williams had threatened to "fuck [Thornton] up" if he lost his job because of her. (Thornton Dep. p. 133 l. 15 – p. 134 l. 9). Taylor denies that Williams ever made any threatening remarks about Thornton.[2] (Taylor Decl. ¶ 6). In any event, Thornton completed another documentation form on March 1, 2006 stating that "Repeatedly have been told of comments that team leader has made against me … very serious

---

[2] Thornton's claim as to what she was told by Taylor is hearsay in any event, and cannot be considered. **Error! Main Document Only.**See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)("Non-moving party...cannot meet the burden of coming forward with relevant competent evidence by simply relying on ... evidence which would be inadmissible at trial"), cert. denied, 502 U.S. 1048 (1992).

comments and threats made …. These threats and comments were made to an employee in the front office." (Thornton Dep. p. 145 ll. 5-8, p. 146 ll. 12-16, Exh. 13).

Nance called Taylor into his office and questioned her about Thornton's claim that Williams had made threatening remarks to Taylor about Thornton. (Taylor Decl. ¶ 7). Taylor told Nance that she had not heard Williams make any threatening remarks about Thornton or anyone else. (Taylor Decl. ¶ 7). Nance then told Thornton that after speaking to Leigh Taylor, he had determined that Thornton had discussed Williams after he had told her not to. (Thornton Dep. p. 139 ll. 12-17). On March 7, 2006, Nance issued Thornton a "Memo to File" dated March 7, 2006. (Thornton Dep. p. 129 ll. 1-6, p. 130 l. 22 – p. 131 l. 1, Exh. 12). Nance indicated in this document that

> After investigating the events surrounding the allegations made on 2/16/06, I have determined that you acted in a way that was inflammatory and instigational. This is not the first altercation that has occurred between yourself and Frank Williams. Any continued comments of an inflammatory nature or comments meant to incite controversy will be dealt with in a similar fashion.

(Thornton Dep. Exh. 12).

### 4.    The June 14, 2006 Conflict

On June 14, 2006, Thornton and Williams had another conflict that began when Williams relieved Thornton so that she could take a break. (Thornton Dep. pp. 151 ll. 22 – p.152 ll. 3; pp. 152 ll. 21-23 – p. 153 l. 1). When Thornton returned from break, there was "rework" that needed to be done in Thornton's work area. (Thornton Dep. p. 153 ll. 6-13). However, supervisor Chris Jordan had directed Williams to take care of other issues when Thornton returned from break. (Williams Dep. p. 192 l. 8 – p. 193 p. 3; Smothers Dep. Exh. 1). According to Thornton, she asked Williams to help her with the rework, and he became angry and yelled at her, using profanity. (Thornton Dep. pp. 153 l.14 – p. 154 l.2). Thornton also claims that Williams threw a

bag of cans and a wooden pallet down on the ground. (Thornton Dep. p. 183 l. 21 – p. 185 l. 21). Thornton claims that she asked a supervisor in the area to call her supervisor, and superintendent Melvin Hutchins and supervisor Chris Jordan came to her area. (Thornton Dep. p. 19 l. 19 – p. 155 l.10). Jordan asked Thornton to come to his office and write out a statement later in the day. (Thornton Dep. p. 157 l. 2 – 5).

After speaking with Hutchins and Jordan, Thornton continued working for several hours. (Thornton Dep. p. 157 l. 10 – p. 158 l. 6). Thornton claims that Williams paced and stared at her, but admits that he did not say anything to her for the rest of the day. (Thornton Dep. p. 158 ll. 7-12). After completing her shift, Thornton went to Jordan's office and completed a Documentation Form regarding the incident earlier that day with Williams. (Thornton Dep. p. 157 ll. 13 – 22; p. 158 ll. 13-17, Exh. 14). Thornton then went home for the day. (Thornton Dep. p. 159 ll. 3-5).

The following day, June 15, 2006, Thornton and Williams both worked on line 3 without incident. (Thornton Dep. p. 159 l. 17 – p. 160 l. 19). Thornton claims that Williams "glared" at her, but admits that he did not say anything to her. (Thornton Dep. p. 159 l. 17 – p. 160 l. 19). Nonetheless, Thornton reported to Melvin Hutchins at some point during the day that she did not feel safe working with Williams, and Thornton was moved to line 5 pending the investigation. (Thornton Dep. p. 160 l. 19 – p. 161 l. 17). She did not speak to Williams that day, and he did not speak to her because "it was under investigation." (Thornton Dep. p. 337 ll. 13-23).

Thornton continued to work on the same shift and in the same position, as a label operator, on line 5. (Thornton Dep. p. 162 ll. 16-18; p. 163 ll. 2-3). Thornton's pay also remained the same on line 5. (Thornton Dep. p. 165 ll. 10-15).

10

In her Documentation Form describing the June 14 incident, Thornton indicated that co-workers Catherine Long, Wesley McInnis and Tameika Cooke were in the area during the incident with Williams. (Thornton Dep. p. 158 ll. 18-23, Exh. 14). Frank Williams also completed a Documentation Form, in which he indicated that co-worker Mary Brooks had witnessed the incident. (Smothers Dep. Exh. 1). On June 14 and 15, Jordan asked Long, McInnis and Cooke to write statements describing what they saw on June 14. (Jordan Dep. p. 26 l. 10 – p. 27 l. 7, p. 29 l. 5 – p. 30 l. 16, p. 32 ll. 5-7, Exh. 5; Smothers Dep. Exhs. 3, 4). Brooks reported that she did not see anything during this particular incident but that Thornton and Williams "argue and fuss" every day. (Boyer Decl. ¶ D). Cooke indicated that when Thornton asked Williams to help with the rework, he "walked off saying curse words … so Linda said something to him. He threw his hands up and said fuck it and went threw (sic) the curtains. She was ignoring him but it was words still being said." (Smothers Dep. Exh. 3). Long confirmed that Williams yelled and said the "F word" and "I can't do every dam (sic) thing." (Smothers Dep. Exh. 4). McInnis also confirmed that Williams yelled and said he "was not going to put up with this." (Jordan Dep. Exh. 5).

After collecting the statements, Jordan turned them over to Tommy Nance. (Jordan Dep. p. 25, ll. 8-12, p. 35 ll. 10-12). Nance informed Boyer that he had decided to issue Williams a counseling, and Boyer agreed with this plan. (Boyer Dep. Vol. 1 p. 65 ll. 2-11). On June 16, 2006, Nance documented a 1st Step Written Counseling to Williams for using "profanity in the presence of other co-workers." (Boyer Dep. Vol. 1 p. 48 l. 12 – p. 49 l. 7, Exh. 4).

In addition to disciplining Williams, Nance consulted with Boyer and they decided to separate Thornton and Williams. (Boyer Dep. Vol. 2 p. 17 l. 18 – p. 18 l. 3). They decided to keep Thornton on line 5 because line 3 was the only line that utilized a team leader (Williams'

position).  (Boyer Dep. Vol 1 p. 42 l. 14 – p. 43 l. 5, Boyer Vol. 2 p. 40 l. 23 – p. 41 l. 14).

Boyer also considered the fact that Thornton had a history of conflicts with other employees, and

Boyer believed it would be good to give Thornton a "fresh start" with a new group.  (Boyer Dep.

Vol. 2 p. 40 l. 23 – p. 41 l. 14; p. 72 l. 19 – p. 73 l. 21).

### 5.    Thornton's Resignation

On June 16, Thornton came to work on line 5.  (Thornton Dep. p. 163 ll. 14-16, p. 169 ll.

2-4).  Although Williams was not at work that day, Thornton worked "not long at all" before

calling for a supervisor to come relieve her.  (Thornton Dep. p. 169 ll. 2-8, 19-22).  Thornton

then clocked out and went outside.   (Thornton Dep. p. 170 l. 1).   Melvin Hutchins and

maintenance and production manager Ricky Smothers came outside to talk to Thornton, and

Hutchins suggested that she go home until Nance and Boyer came in to work.  (Thornton Dep. p.

171 ll. 3-17).  When Thornton reported that she was too upset to be driving, Hutchins told her

she could sit in her car until Nance and Boyer arrived.  (Thornton Dep. p. 171 ll. 8-17).

When Nance and Boyer arrived at the plant, Thornton met with them in the office.

(Thornton Dep. p. 172 ll. 3-6).  Boyer told Thornton that her move to line 5 was permanent.

(Thornton Dep. p. 172 ll. 7-13).  By her own report, Thornton was hysterical during the meeting,

and told Boyer and Nance that she was carrying a screwdriver in her pocket "to defend" herself

from Williams since she "had had it."[3]  (Thornton Dep. p. 175 ll. 15- 22).  Thornton attempted to

resign by putting her badge on Nance's desk, but Boyer told Thornton that she did not want her

to quit and asked her to think about it over the weekend.  (Thornton Dep. p. 176 l. 21 – p. 177 l.

2; p. 177 ll. 9-14).  Thornton agreed to take her badge back and think about it, but suggested that

---

[3] Thornton also told "[a]nybody that would listen" to her that she was carrying a screwdriver in her pocket after the
June 14, 2006 conflict with Frank Williams.  (Thornton Dep. p. 271 l. 21 – p. 273 l. 6).  Thornton does not think it
would be reasonable to consider her conduct in carrying a screwdriver to be considered threatening.  (Thornton Dep.
p. 273 l. 20 – p. 274 l. 1).

she actually took her badge back only because she needed it to get out of the building. (Thornton Dep. p. 177 l. 17 – p. 178 l. 178). The following week, Thornton called in sick her next two scheduled work days. (Thornton Dep. p. 178 l. 22 – p. 179 l. 2). On the third or fourth scheduled work day, Thornton called and informed an office employee that she quit because she could not work with Williams anymore. (Thornton Dep. 179 ll. 3-11, p. 181 ll. 11-15). Thornton claims that she was forced to leave because Flavor House did not terminate Williams. (Thornton Dep. p. 237 l. 17 – p. 238 l. 3).

  **B.**  **Thornton's Claims**

    **1.**  **EEOC Charge and Lawsuit**

  On September 21, 2006, Thornton filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). (Thornton Dep. p. 166 ll 16-20, Exh. 15). In her charge, Thornton stated claims for sexual harassment, discrimination and retaliation. (Thornton Dep. Exh. 15). Thornton's attorney requested a Right to Sue notice from the EEOC, and the EEOC issued a Notice of Right to Sue on May 8, 2007. (Thornton Dep. p. 299 ll. 15-18, Exh. 23). Thornton then filed this lawsuit on August 6, 2007 stating claims against Flavor House for sexual discrimination, sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as state law tort clams for invasion of privacy, outrage and negligent and/or wanton hiring, supervision, training and retention. (Complaint). She also brought claims against Williams for invasion of privacy and outrage. (Complaint).

    **2.**  **Alleged Sexual Harassment**

  Thornton's sexual harassment claim is based primarily on her allegations about Frank Williams. In addition to their work-related conflicts, culminating in the June 14, 2006 incident, Thornton claims that Williams called women "girlfriend," and that she asked him not to use that

term.  (Thornton Dep. p. 188 ll. 3-6).  She also claims that he frequently cussed and called her a "bitch."  (Thornton Dep. p. 183 ll. 7-10, p. 188 ll. 3-6, p. 243 ll. 12-14).  Thornton claims that Williams would tap her upper arm to get her attention, and that she found this conduct aggravating and offensive, but acknowledges that Williams never touched her in any other way.  (Thornton Dep. p. 189 ll. 5-23).  Williams never asked Thornton on a date, never propositioned her for sex and never asked her about her sex life.  (Thornton Dep. p. 190 ll. 1-8).

Thornton also claims that Williams talked about his sex life with his wife while he, Thornton and others were on the patio to smoke during breaks.  (Thornton Dep. p. 140 ll. 20-23 – p. 141 ll. 11).  Thornton claims that Williams made these comments "several times," but does not recall the number of occasions.  (Thornton Dep. p. 333 ll. 4-11, p. 334 ll. 5-13).  Thornton claims that Leigh Taylor was also present and heard these comments.  (Thornton Dep. p. 134 ll. 10-15, p. 141 ll.15-20).  However, Taylor denies ever having heard any sexual remarks by Williams.  (Taylor Decl. ¶ 5).

Additionally, Thornton complains that during the time she worked as a label operator, male mechanics would attempt to assist her if her machine was down for more than five minutes.  (Thornton Dep. p. 202 ll. 6-11, p. 227 ll. 8-14).  Thornton was bothered by this, although she admits that the mechanics worked on the machines of other employees as well.  (Thornton Dep. p. 202 ll. 12-13, p. 229 ll. 11-13).  Thornton also claims that some of the male mechanics used profanity and pushed her out of the way so that they could get to her machine.  (Thornton Dep. p. 229 l. 14 – p. 230 l. 6, p. 230 ll. 14-19).  She claims that Wesley McInnis, a mechanic, called her a "fucking asshole" on one occasion.  (Thornton Dep. p. 231 l. 20 – p. 232 l. 3).  McInnis was written up for this incident.  (Thornton Dep. p. 232 ll. 1-3, l. 19 – p. 233 l. 1).  However,

Thornton believes that he should have been fired.  (Thornton Dep. p. 233 ll. 1-3, p. 233 l. 14 – p. 234 l. 1).

Thornton admits that she also "cussed" at work, including using the word "fuck" and telling Williams to "get the hell away from" her and to "fuck off."  (Thornton Dep. p. 48 ll. 19-21, p. 75 ll. 7-9, p. 278 l. 1-8, p. 357 ll. 3-10).  Thornton admits that she does not have a problem using vulgar language, and acknowledges that "in casual conversation people cuss.  It's a factory."  (Thornton Dep. p. 76 ll. 15-16, p. 358, ll. 7-9).  She also acknowledged to various managers at Flavor House management that she "cussed."  (Thornton Dep. p. 278 ll. 9-12).  Thornton concedes that this language was "not appropriate."  (Thornton Dep. p. 357 ll. 15).

Thornton also admits that other female employees cussed at work.  (Thornton Dep. p. 48, ll. 10-15).  Kim Perkins, a friend of Thornton and also a former Flavor House employee, made clear in her deposition that she cussed while working at Flavor House.  (Perkins Dep. p. 9 ll. 18-20, p. 11 ll. 3-6, p. 25 l. 18, p. 31 ll. 3-14).  Perkins admits that she yelled at other employees, called employees "dumbassess," "stupid," and "MF" and used the word "fuck."  (Perkins Dep. p. 37 l. 19 – p. 38 l. 7, p. 56 ll. 5-15, p. 60 l. 15 – p.61 l. 13, p. 62 ll. 18-19, p. 64 l. 21, p. 65 l. 4, Exhs. 1, 5, 6).  Thornton admits that Perkins cussed at her.  (Thornton Dep. p. 48 ll. 14-18).  Although Thornton believes it was sexual harassment when male employees cussed, she did not believe it was sexual harassment when female employees cussed.  (Thornton Dep. p. 71 ll. 12-18).  Thornton claims that the female employees cussed and "turn[ed] on each other" because of the cussing and name calling by male employees.  (Thornton Dep. p. 74 ll. 5-9).

Thornton claims that she complained to Hutchins, Chris Jordan, Ricky Smothers, Bruce Cassidy and Mary Ann Boyer regarding the mechanics moving her away from her machine when she was making adjustments and about their language.  (Thornton Dep. p. 239 ll. 19-22, p. 241 ll.

20-22, p. 242 ll. 8-15, p. 245 l. 17 – p. 246 l. 1, p. 262 ll. 20-22, p. 248 ll. 10-14, p. 248 l. 20 – p.

249 l. 1). Thornton does not know how many times she complained or when the complaints took

place. (Thornton Dep. p. 242 ll. 16-21, p. 246 ll. 2-19, p. 248 ll. 1-9, p. 249 ll. 2-19). In fact,

Thornton claims that she complained all the time, although not necessarily about alleged illegal

discrimination or harassment:

> I complained all the time. I complained after being there trying to apply for a
> label operator position and being denied. I complained when I had to do a
> resume. Before I had to do a resume, I was told that they were waiting on a
> mechanical aptitude test that I had to take. That never surfaced. … And finally I
> got the opportunity to learn the label machine, and I complained about not having
> sufficient training. … I complained about the guys making nitrogen bombs, liquid
> nitrogen bombs, and throwing them at me. … I complained all the time about the
> way they treated me as a female. I complained about Fannie Ashe not giving this
> one a point, but I get a point. I complained about I'm scrubbing this sink that I
> don't even use. I'm scrubbing brushes that was used on my day off. … I
> complained about Fannie throwing my vacation paper in the garbage and me
> having to get another one. … I complained about the guys leaving the line and
> leaving me there and other females there to run it, but it was okay that they left….

(Thornton Dep. p. 256 l. 13 – p. 257 l. 4). In fact, Thornton testified that "if necessary," she

complained every day and sometimes twice a day. (Thornton Dep. p. 260 l. 6 – p. 261 l. 15).

Thornton received a copy of Flavor House's employee handbook when she began

working at Flavor House in 2001 and again in 2005, Flavor House issued a new handbook.

(Thornton Dep. p. 85 ll. 16-18, p. 85 l. 19 – p. 86 l. 4, p. 89 ll. 18-21, Exh. 6). Flavor House's

employee handbook contains an equal employment opportunity policy and a policy prohibiting

sexual harassment. (Thornton Dep. p. 91 l. 18 – 92. l. 5, p. 93 ll. 5-21, Exhs. 7, 8). Both of these

policies contain toll-free numbers to which complaints of harassment could be made, and also

provide that such complaints may be brought to the attention of the Equal Employment Manager

of Flavor House's parent corporation. (Thornton Dep. p. 93 l. 9 – p. 94 l. 9, Exhs. 7, 8).

Thornton never contacted the Equal Employment Manager and never called the toll-free hotline concerning her complaints about Williams and other employees. (Thornton Dep. p. 94 ll. 10-17).

### 3.    Alleged Retaliation

Thornton claims that she was retaliated against for her many complaints to management. (Thornton Dep. p. 274 ll. 6 – 22). In particular, Thornton claims that whenever she complained, she was "always either written up or called into the office and it was turned around as my fault...." (Thornton Dep. p. 275 ll. 3-5). While Thornton claims to have complained every day, she acknowledges that she was not called into the office and verbally warned every day. (Thornton Dep. p. 275 ll. 3-19). Thornton does not recall how many times she was called into the office and verbally warned. (Thornton Dep. p. 276 ll. 2-8). Indeed, despite her many alleged complaints about Frank Williams, the only formal discipline issued to Thornton during the time she worked with Williams on line 3 was the March 7, 2006 Memo to File. Thornton admits that she had told Leigh Taylor that Williams was a sex offender after being instructed by Tommy Nance to stop talking about this issue at work. (Thornton Dep. p. 133, 11. 15-19, p. 134 ll. 14-22, p. 399 ll. 8-13). She nonetheless claims that the Memo to File was retaliatory. (Thornton Dep. p. 280 ll. 2-5).

Similarly, Thornton claims that every other write up she received while at Flavor House was retaliatory. (Thornton Dep. p. 280 ll. 2-5). In late March or early April 2002, Thornton received a counseling report for raising her voice or "hollering" to another employee, Shavonne Townsend. (Thornton Dep. p. 281 l. 21 – p. 282 l. 6, Exh. 20). Thornton admits that she raised her voice at Townsend because she was "irritated with her," but nonetheless claims that the counseling report was retaliatory because, in Thornton's view, she was justified in yelling at Townsend. (Thornton Dep. p. 282 l. 7 – p. 283 l. 9).

Thornton received another counseling report on June 24, 2004 for using offensive language towards co-worker John Millsaps.  (Thornton Dep. p. 283 l. 12 – p. 284 l. 1, Exh. 21). Thornton claims that Millsaps had thrown a bottle of peanuts that hit her in the chest, and that she "cussed him out."  (Thornton Dep. p. 70, ll. 11-19, Exh. 21).  Millsaps also received a counseling report for his part in the incident.  (Boyer Decl. ¶ 6, Exh. B).

### 4.    Alleged Gender Discrimination With Respect To Pay

Thornton makes a generalized claim in her complaint that Flavor House discriminated against her based on her gender with respect to "promotions, wages, training, discipline, and other terms, conditions and privileges of her employment."  (Complaint ¶ 57).  With respect to her pay, Thornton complains about a "pay for skills" rating that Flavor House assigned to her in 2004.  (Thornton Dep. p. 212 l. 18 – p. 213 l. 7).  In 2004, Flavor House introduced the "pay for skills" program in an effort to create consistency in pay rates among its hourly employees and provide incentive for employees to improve their skill level.  (Boyer Decl. ¶ 2).  Under the pay for skills program, Flavor House assigned employees an initial skill rating of between 1 and 4 (with 1 being the lowest and 4 the highest skill level) based on their demonstrated abilities, experience and skill level, with each skill level being tied to a progressively higher hourly pay rate.  (Boyer Decl. ¶ 2; Thornton Dep. p. 203 ll. 6-12).  Employees could progress to a higher pay for skill level by demonstrating competency at the next level and passing a written test. (Boyer Decl. ¶ 2; Thornton Dep. p. 203 ll. 6-21).

At the time Flavor House introduced the pay for skills program, Thornton was assigned as a level 1 label operator.  (Thornton Dep. p. 212 l. 18 – p. 213 l. 5; Boyer Decl. ¶ 3).  However, her hourly rate of pay was higher than the hourly rate assigned to level 1 and higher skill levels. (Thornton Dep. p. 203 l. 22 – p. 204 l. 4; Boyer Decl. ¶ 3).  Thus, Thornton elected not to test for

higher skill levels, despite being encouraged to do so. (Thornton Dep. p. 210 ll. 1-10, p. 216 ll. 15-20).

In March 2006, Thornton appealed the pay for skills rating she was initially assigned in 2004, asking to be assigned as a level 4 operator despite the fact that she had not taken the tests to advance from level 1 to level 4 and despite the fact that her level 1 pay for skills rating did not affect her pay at the time of her appeal. (Thornton Dep. p. 203 l. 22 – p. 204 l. 12; p. 205 ll. 5-10, p. 207 ll. 3-23, p. 209 ll. 16-18, p. 214 l. 22 – p. 215 l. 5, Exh. 16). Thornton's appeal was based on her belief that her skill level was higher than a level 1 at the time the initial assignments were made. (Thornton Dep. p. 212 l. 18 – p. 213 l. 5, p. 213 ll. 15-22). Additionally, due to how Flavor House allocated wage increases, Thornton would eventually fall behind with respect to pay if her skill level was not increased. (Thornton Dep. p. 207 ll. 19-23, p. 209 l. 19 – p. 210 l. 15, p. 215 ll. 10-16; Boyer Decl. ¶ 3).

In response to her appeal, Tommy Nance permitted Thornton to take the tests and demonstrate competencies required to move to higher skill levels without having to wait the normally required 6 months between tests. (Thornton Dep. p. 203 ll. 14-21, p. 213 l. 23 – p. 214 l. 13, Exh. 18; Boyer Decl. ¶ 4). Thornton took and passed the tests between April 20 and May 10, 2006 and Flavor House assigned her a level 4 skill rating in May 2006. (Thornton Dep. p. 214 ll. 16-21; Boyer Decl. ¶ 4).

Thornton believes that her initial 2004 level 1 skill rating was based on her gender because she disagreed with the rating. (Thornton Dep. p. 217 l. 21 – p. 218 l. 12). Of the label operators employed by Flavor House at the time the initial pay for skills ratings were assigned, all were assigned to level 1 except for two who were assigned to level 2 and two who were assigned to level 3. (Boyer Decl. ¶ 5). The individuals assigned to levels 2 and 3 had been

employed by Flavor House longer than Thornton, and were believed to have greater experience and competency as label operators. (Boyer Decl. ¶ 5). Moreover, Thornton was being paid a higher hourly rate than two of the four who had higher pay for skill ratings. (Boyer Decl. ¶ 5).

### 5. Alleged Gender Discrimination With Respect To Denial Of Promotions

Thornton also claims that she was discriminated against with respect to promotions when she did not receive a label operator position in 2001. (Complaint ¶ 14; Thornton Dep. p. 195 ll. 1-12, p. 284, ll. 8-18). Specifically, Thornton claims that she was passed over for the label operator position several other times in 2001, but does not recall who received the positions she sought. (Thornton Dep. p. 196 l. 3- p. 197 l. 1).

Additionally, Thornton claims that, during 2001, Melvin Hutchins and another supervisor, Kenneth Tew, asked her to bring in a resume before considering her for the label operator position. (Thornton Dep. p. 194 l. 7-18). After bringing in the resume, Thornton was placed in the label operator position. (Thornton Dep. p. 195 ll. 14-21).

## III.    ARGUMENT

### A.    Summary Judgment Standard

Rule 56(c) of the *Federal Rules of Civil Procedure* provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). While all reasonable doubts must be resolved in the non-movants's favor, the trial court is not required to "resolve all doubts in such a manner." *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987). Further, summary judgment is proper unless

there is sufficient evidence favoring the non-movant for the finder of fact to find for that party. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

Although the movant has the initial responsibility of informing the Court of the basis for its motion and identifying the evidence that demonstrates the absence of any genuine issue of material fact, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

**B.    Flavor House Is Entitled To Summary Judgment on Thornton's Sexual Harassment Claim**

Thornton's sexual harassment claim fails because, even viewing the evidence in the light most favorable to Thornton, she cannot establish all of the elements required to state a claim for hostile work environment sexual harassment.    To prevail on this claim, Thornton must demonstrate that:

      a.     She belongs to a protected group;

      b.     She was subjected to unwelcome harassment;

      c.     The harassment complained of was based on her sex;

      d.     The harassment complaint of affected a "term, condition, or privilege" of employment, in that it was sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment; and

      e.     Employer liability.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068 (2000).  Flavor House is entitled to summary judgment on Thornton's sexual harassment claim because none of the conduct about which she complains was based on her sex.  Even if it were based on her sex, her sexual harassment claim would nonetheless fail because the alleged

21

harassment was not, as a matter of law, sufficiently severe or pervasive to create a hostile work environment.

### 1.    Thornton was not subjected to a work environment charged with sexual hostility.

It is axiomatic that to establish a claim for sexual harassment under Title VII, Thornton must prove that the alleged harassment was because of her sex. *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1981). The Eleventh Circuit has held that to prove a sexually hostile environment claim under Title VII, "the statements and conduct must be of a sexual or gender-related nature—sexual advances, requests for sexual favors, [or] conduct of a sexual nature—before they are considered in determining whether the severe or pervasive requirement is met." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

Thornton cannot get her sexual harassment claim out of the starting gate, as the conduct about which she complains was not based on her sex. Thornton admits that Williams never made sexual advances toward her, never propositioned her for sex or sexual favors, and never touched her in a sexual way. (Thornton Dep. p. 189 ll. 5-23, p. 190 ll. 1-8). She further admits that Williams never asked her for a date or about her sex life or otherwise gave her unwanted sexual attention. (Thornton Dep. p. 190 ll. 1-8). Lacking any allegations of inappropriate conduct based on her sex, Thornton's sexual harassment claim instead relies entirely on the use of profanity that was, on occasion, directed at her,[4] Williams' comments about his sex life, and petty conflicts with her co-workers, instances which are merely the "ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* Such conduct either amounts only to "boorish" comments that should not be

---

[4] In her deposition, Thornton admitted that she and other female employees also "cussed" at work. (Thornton Dep. p. 48 ll. 19-21, p. 75 ll. 7-9, p. 278 l. 1-8, p. 357 ll. 3-10).

considered or does rise to the level of actionable conduct under Title VII. *See Id.* ("[i]nnocuous statements or conduct, or boorish ones that do not relate to sex of the actor or of the offended party (the plaintiff), are not counted."). Because Thornton was not subjected to inappropriate conduct based on her sex, she cannot survive summary judgment on her sexual harassment claim. *See Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (reversing jury verdict on plaintiff's sexual harassment claim based on evidence that alleged harasser never touched the plaintiff, never invited her, explicitly or by implication, to have sex with him, or to go out on a date with him); *Shabica v. Engineering Sales Associates of Southeast, Inc.*, No. 97-2184, 1999 WL 17819, *3 (4th Cir. 1999) (affirming judgment as a matter of law on sexual harassment claim when plaintiff did not allege that she was "inappropriately touched, propositioned, flirted with, taunted, or even ogled").

2.     **The harassment alleged by Thornton was not sufficiently severe or pervasive.**

Even if Thornton could somehow overcome her failure to demonstrate that the alleged harassment was based on her sex, her sexual harassment claim would nonetheless fail because the conduct about which she complains is not sufficiently severe or pervasive to state an actionable sexual harassment claim. In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57 (1986), the Supreme Court stated that "[f]or . . . harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." In *Harris v. Forklift Systems, Inc.*, 114 S. Ct. 367, 370 (1993), the Supreme Court further explained that Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

23

"The requirement that conduct be severe or pervasive tests the mettle of most sexual harassment claims." *Scott v. Publix Supermarkets*, No. 07-60624-CIV, 2008 WL 2940672, *4 (S.D. Fla. July 28, 2008) (*citing Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), cert. denied 531 U.S. 1076 (2001), abrogated on other grounds in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The test has both an objective and subjective component, both of which must be satisfied. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (*citing Harris*, 510 U.S. at 21-22). Objective severity or pervasiveness of conduct is judged by considering "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1145-46 (11th Cir. 2008). With respect to the fourth element, the "employee must subjectively perceive the harassment as sufficiently severe and pervasive as to alter the terms and conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1245.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. The reasonable person inquiry therefore "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, (1998). In determining whether a reasonable person would find Thornton's work environment hostile or abusive, the conduct about which she complains must be evaluated in the context of a blue collar environment where "indelicate forms of expression are accepted or endured as normal

human behavior" and crude language is commonly used by male and female employees. *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995) ("Speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments.").

Relying exclusively on Thornton's description of events, Thornton alleges that Williams discussed his sex life with his wife, often called women at the facility "girlfriend," yelled at her, called her a "bitch" and often used profanity. (Thornton Dep. p. 140 ll. 20-23 – p. 140 l. 11, p. 188 ll. 3-6, p. 183 ll. 7-10, p. 243 ll. 12-14, p. 66 ll. 2-8, p. 79 l. 23 – p. 80 ll. 1-19). Thornton admits that both male and female co-workers used profanity.[5] (Thornton Dep. p. 229 l. 14 – p. 230 l. 6, p. 230 ll. 14-19, p. 48 ll. 10-15). Although she points to this conduct as proof that her work environment was abusive and hostile, Thornton admits that she used profanity, including the work "fuck," that she does not have a problem using vulgar language, and that her co-workers cussed in casual conversations. (Thornton Dep. p. 48 ll. 19-21, p. 75 ll. 7-9, p. 278 l. 1-8, p. 357 ll. 3-10, p. 76 ll. 15-16, p. 358 ll. 7-9). Thornton obviously believes the profanity and crude language was an accepted and normal part of her workplace when she acknowledged that, in response to being asked whether she cussed at work, "It's a factory."

Even if Thornton subjectively perceived her working environment to be hostile and abusive, certainly this perception is not objectively reasonable. Title VII is not a general civility code and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998); *see also Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (Title VII was "not designed to purge the workplace of

---

[5] Flavor House questions whether much of the conduct cited by Thornton is of a sexual or gender-related nature, and doubts whether it is even pertinent when determining whether the severe or pervasive requirement is established.

vulgarity."). Viewed objectively, and in context, Thornton's allegations are not extremely serious incidents of harassment that would independently remove Thornton's claim from the "boorish statements or conduct" or "isolated incident" categories and into the severe and pervasive harassment category. At most, Thornton's allegations establish merely that her allegedly turbulent work environment was the result of personality clashes with some of her co-workers.[6] *See Vore v. Indiana Bell Telephone Co., Inc.,* 32 F.3d 1161, 1162 (7th Cir. 1994) ("[P]ersonality conflicts between employees are not the business of the federal courts.").

Indeed, Thornton's harassment allegations fall far below the level of severity in cases where a hostile work environment claim was rejected. *See, e.g., Webb-Edwards v. Orange County Sheriff's Office,* 525 F.3d 1013, 1027 (11th Cir. 2008) (finding conduct not sufficiently severe or pervasive where comments that Plaintiff "looked hot," should wear tighter clothing, and that "women who dye their hair have issues at home" were "taunting and boorish" rather than "physically threatening or humiliating."); *Mendoza,* 195 F.3d at 1247 (ruling that a supervisor's conduct in making sexual comment toward the plaintiff, rubbing up against the plaintiff, making a sniffing sound in the plaintiff's presence, and constantly following and staring at the plaintiff was insufficient to affect the plaintiff's terms and conditions of employment); *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("verbal barrage of profanity" that was not sexually suggestive in any way or otherwise related to or caused by plaintiff's gender was insufficient); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998) (summary judgment affirmed for employer where supervisor told plaintiff she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand"); *Puno v. Mount Desert Island Hosp.,* No. 06-106-B-W, 2007

---

[6] *See* (Thornton Dep. p. 58 ll. 12-17, p. 101 ll. 18-22).

26

WL 1875830, *8 (D. Me. Jun. 28, 2007) (rejecting hostile work environment claim where plaintiff was called a "fucking Asian bitch," a "fucking cunt," and a "Filipino bitch."); *Fry v. American Italian Pasta Co.*, 2007 WL 1113673, *4 (D. S.C. Apr. 12, 2007) (finding that co-worker calling plaintiff a "stupid fucking bitch [who didn't] know how to do anything in here" insufficient); *Hall v. South Cent. Conn. Reg'l Water Auth.*, 28 F. Supp. 2d 76, 80, 86-87 (D. Conn. 1998) (one supervisor asking plaintiff about her menstrual period, calling her a "bimbo" and "stupid woman," and another supervisor telling plaintiff that he found his wife in bed with a black woman, was insufficient "to support a finding that [plaintiff] was subjected to abuse of sufficient severity or pervasiveness so as to alter the conditions of her employment"); *Nolan v. Epifanio,* 96 Civ. 2562, 1998 WL 665131 at *3-4 (S.D.N.Y. Sept. 28, 1998) (supervisor telling plaintiff that "if she couldn't do her 'fucking job' the company should hire a man that could and that she should stay home where she belonged"). Viewed in context, the evidence refutes Thornton's allegation that she was subjected to a sexually hostile work environment and Thornton's claim of sexual harassment should be summarily dismissed.

### C.    Thornton's Retaliation Claim Fails as a Matter of Law

Thornton's retaliation claim likewise fails. Thornton's retaliation claim is governed by the analytical framework established in *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under that framework, the plaintiff must first prove, by a preponderance of the evidence, a prima facie case of retaliation. *Burdine*, 450 U.S. at 252-53. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, non-retaliatory reason for the adverse employment action. *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004); *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). If the employer meets its burden, the plaintiff must prove that the employer's proffered

explanation is a pretext for retaliation. *Cooper*, 390 F.3d at 740; *Holifield*, 115 F.3d at 1566. As in all discrimination cases, the plaintiff retains the ultimate burden of proof at all times. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Thornton cannot even establish the minimal requirements of a *prima facie* case of retaliation, which requires her to show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relation between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Even if Thornton can demonstrate that her many complaints were based on a reasonable, good faith belief that the conduct about which she was complaining violated Title VII, which is questionable at best, Thornton cannot meet the second or third requirements of her *prima facie* case.

### 1.    Thornton did not suffer any adverse employment action.

Thornton's retaliation claim fails at the outset because she cannot demonstrate that she suffered an adverse employment action as required for a *prima facie* case. To satisfy the adverse employment action requirement, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington N*, 548 U.S. at 68. A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotation marks omitted).

Thornton claims that she was called into the office and verbally warned every time she complained. (Thornton Dep. p. 274 ll. 6-22). Given that Thornton admits that she was not verbally warned every day while claiming that she complained on a daily basis, Thornton's retaliation claim appears devoid of factual support. (Thornton Dep. p. 275 ll. 3-19). That the verbal warnings were insufficient to have "dissuaded a reasonable worker from making a

discrimination charge," *Burlington*, 548 U.S. at 63, is further demonstrated by the fact that such verbal warnings did not, in actuality, dissuade Thornton from continuing her frequent complaints. (Thornton Dep. p. 256 l. 13 – p. 257 l. 4, p. 260 l. 6 – p. 261 l. 15). "The adverse-employment-action standard focuses not on the nature of the discrimination but whether the employer has taken actions that would result in employees not reporting discrimination." *McMillian v. Ala. Dept. of Youth Services*, 2008 WL 2441043, *6 n. 7 (M.D. Ala. June 16, 2008). These verbal warnings cannot constitute an adverse employment action.

Moreover, despite Thornton's allegation that she complained constantly about Williams, the only formal disciplinary action taken against Thornton during the time that she worked with Williams was the March 7, 2006 "Memo to File." Thornton did not lose any pay or status as a result of this Memo to File, nor did it cause any other injury or harm to her. This single disciplinary action is insufficient to constitute a materially adverse employment action because it had no impact on Thornton's employment and did not deter her from making additional complaints. *Cf. Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (finding unfavorable performance review that affected plaintiff's eligibility for merit pay increase was materially adverse action because "it clearly might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one"); *see also Cain v. Green*, 261 Fed. Appx. 215, 217 (11th Cir. 2008) (performance review giving employee second highest rating instead of highest rating was not a materially adverse action because it had no impact on employee's employment); *Davenport v. City of Columbus, Ga.*, 2008 WL 2902077, *20 (M.D. Ga. July 23, 2008) (finding desk report detailing employee's outburst on the job was not materially adverse employment action where plaintiff pointed to no evidence regarding what effect, if any, the

report had upon her). The absence of any materially adverse employment action prevents Thornton from establishing a *prima facie* case of retaliation.

###     2.    There is no causal connection.

Nor can Thornton establish that any discipline she received was causally related to her complaint of harassment. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F.3d at 590. Thornton has offered nothing to suggest that either any verbal warning or the March 7, 2006 Memo to File was related to any complaints she made of conduct prohibited by Title VII. To the contrary, Thornton admits having engaged in the conduct that led to the Memo to File. (Thornton Dep. p. 133 ll. 15-19, p. 134 ll. 14-22, p. 399 ll. 8-13). Thornton's admission that she complained frequently while receiving only one formal discipline during the time that she worked with Williams negates any inference that the two events were in any way related.

Because Thornton has failed to establish a causal link between her complaints and the alleged acts of retaliation, Flavor House is entitled to summary judgment on her retaliation claim. *See McAdams v. Harvey*, No. 04-16263, 2005 U.S. App. LEXIS 13609, at *3-4 (11th Cir. July 6, 2005) (affirming summary judgment for defendant where plaintiff failed to establish causal connection between protected activity and alleged retaliation).

###     3.    Flavor House can establish a legitimate, non-retaliatory reason
###          for the discipline and there is no evidence of pretext

Even if Thornton's failure to establish a *prima facie* case could somehow be overlooked, her retaliation claim would nonetheless fail because the only formal reprimand she received was based on legitimate, non-retaliatory reasons and there is no evidence of pretext. Nance issued Thornton the Memo to File because her conduct in continuing to discuss Williams's sex offender

status was disruptive to the workplace. (Nance Dep. p. 124 l. 22 – p. 127 l. 6). This is a legitimate, non-retaliatory reason for a disciplinary action. *See Cooper*, 390 F.3d at 1543 (employer's burden is "exceedingly light" and employer "need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof").

In the face of Flavor House's legitimate, non-retaliatory reason for Thornton's discipline, Thornton must produce sufficient evidence of pretext to avoid summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (*quotation omitted*). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. "Moreover, a mere 'scintilla' of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough." *Phillips v. Aaron Rents, Inc.*, 262 Fed. Appx. 202 (11th Cir. 2008) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)); *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (speculation and conclusory allegations insufficient to show employer's proffered reasons for termination were mere pretext for retaliation).

There is no evidence of pretext with respect to Thornton's discipline. Thornton admits that Nance had warned her not to discuss Williams's personal history at work, and had told her that if she did so, she would be written up. (Thornton Dep. p. 123 ll. 3-8, p. 124 l. 10-15). Thornton also admits that after this admonition, she discussed Williams's personal history with co-worker Leigh Taylor. (Thornton Dep. p. 133 ll. 15-19, p. 134 ll. 14-22, p. 399 ll. 8-13).

Nance subsequently issued the March 7, 2006 Memo to File. (Thornton Dep. p. 129 ll. 1-6., p. 130 l. 22 – p. 131 l. 1, Exh. 12). Thornton can hardly demonstrate that the reasons for the discipline were pretextual when she admits that they are true.

Thornton's opinion that she should have been free to discuss Williams's sex offender status with other employees at work does not help her to demonstrate pretext. Indeed, even if Thornton could somehow show that Nance's decision to discipline Thornton for discussing this issue was unreasonable or unfair, it would not help her to prove retaliation. The Eleventh Circuit has made clear that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [law] does not interfere." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

That the Memo to File was issued after Thornton's March 1, 2006 Documentation Form alleging that she was told of threatening remarks allegedly made by Williams is equally unavailing. Given the fact that the person Thornton claims told her of the alleged threatening remarks told Tommy Nance that she did not hear any threatening remarks, it is questionable that Thornton's March 1, 2006 Documentation Form could constitute protected activity under Title VII. In any event, it is well established that timing alone is insufficient to establish pretext. *See Jackson v. Hennessy Auto*, 190 Fed. Appx. 765, 768 (11th Cir. 2006) (affirming summary judgment for employer and noting that "temporal proximity alone does not establish pretext."); *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir.2001) (finding summary judgment appropriate as close proximity between protected activity and termination alone was insufficient to establish pretext); *Palmer v. Stewart County Sch. Dist.*, 178 Fed. Appx. 999, 1003 (11th Cir. 2006) (temporal "proximity does not conclusively prove retaliation in light of the other

circumstances surrounding [a plaintiff's] termination"); *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240-41 (10th Cir. 2004) ("we have stated that close temporal proximity . . . is not alone sufficient to defeat summary judgment"); *Gilham v. Athens Land Trust, Inc.*, 510 F. Supp. 2d 1349, 1361 (M.D. Ga. 2007) (granting summary judgment for employer where plaintiff's only evidence of pretext was short time between filing EEOC complaint and termination, finding that "temporal proximity alone in this case is not enough to create a genuine issue of material fact as to pretext"); *Hooker v. Fulton Co., Ga.*, No. CIV-A-105CV982-GET, 2006 WL 2617142, *18 (N.D. Ga., Sept. 12, 2006) (noting other courts in the circuit have held "any inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established").

Thornton cannot make out a *prima facie* case of retaliation because she cannot demonstrate that she suffered any adverse employment action or that any alleged adverse employment action was motivated by retaliation. Flavor House's decision to discipline Thornton was based on a legitimate, non-retaliatory reason. Finally, Thornton cannot establish that the single formal reprimand she received was a pretext for discrimination. Accordingly, Thornton's retaliation claim fails as a matter of law.

**D.    Thornton's Pay Claim Is Due to be Dismissed**

**1.    Thornton's pay claim is time-barred.**

Thornton's claim that Flavor House subjected her to pay discrimination based on gender borders on the frivolous. As an initial matter, the pay claim is time-barred. Before filing an action under Title VII[7], a plaintiff must file a charge of discrimination with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred[.]"    42

---

[7] Thornton's claim for pay discrimination is brought under Title VII. (Complaint ¶ 1). She does not bring a claim under the Equal Pay Act. *Id.*

U.S.C. § 2000e-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Thornton filed her charge of discrimination with the EEOC on September 21, 2006.  Thus,

Thornton's claims are time-barred to the extent that the alleged discrimination occurred prior to

March 25, 2006.  *See Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1525 (11th Cir.

1983) ("[A]ll Title VII procedural requirements to suit are henceforth to be viewed as conditions

precedent to suit rather than as jurisdictional requirements.").

 Thornton's complaint regarding her pay is based on the "pay for skills" rating assigned to

her in 2004, long before the actionable period under Title VII.  (Thornton Dep. p. 212 l. 18 – p.

213 l. 7).  Her pay claim is, therefore, due to be dismissed.  *Ledbetter v. Goodyear Tire &*

*Rubber Co.*, 127 S.Ct. 2162, 2175 (2007).

   **2.**  **Thornton's pay claim is without factual support.**

 Thornton's pay discrimination claim is also without factual support.  Because Thornton

has not alleged any direct evidence of discriminatory intent or statistical proof of pay disparities,

the *McDonnell Douglas* framework applies to her pay discrimination claim as well.  *See*

*McDonnell Douglas*, 411 U.S. 792; *Burdine*, 450 U.S. 248; *Nix v. WLCY Radio/Rahall*

*Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).

 To satisfy the *prima facie* elements of intentional pay discrimination, a plaintiff must

establish that (1) she belongs to a protected class; (2) she "received low wages"; (3) "similarly

situated comparators outside the protected class received higher compensation"; and (4) she "was

qualified to receive the higher wage."  *Beard v. 84 Lumber Co.*, 206 Fed.Appx. 852 (11th Cir.

2006); *see also Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528-29 (11th Cir.

1992).  Although Thornton belongs to a protected class, she cannot establish the remaining

elements of her prima facie case.

As an initial matter, Thornton admits that her pay was not currently affected by the rating she was assigned in 2004. Thus, by her own admission, Thornton was not receiving "low wages."

Nor has Thornton presented any evidence that similarly situated male employees received higher compensation or that she was "qualified to receive" some higher wage at the time Flavor House assigned her as a level 1 operator. Thornton claims that Mark Beard was placed at a higher pay for skill rating than she, but Beard had been employed by Flavor House for longer than Thornton and was viewed as a more experienced label operator. (Boyer Decl. ¶ 5). Thornton's failure to establish a *prima facie* case of pay discrimination renders summary judgment appropriate. *See Beard*, 206 Fed. Appx. at 858 (plaintiff failed to establish prima facie case of wage discrimination where she could not identify any similarly situated comparator, as male employee was more competent and experienced and thus not similarly situated).; *Franks v. Central Garden & Pet Co.*, No. 3:06-CV-68(CDL), 2007 WL 2320624, *3 (M.D. Ga. Aug. 10, 2007) (holding plaintiff's failure to present evidence that she received lower wages than any similar situated male comparator was fatal to Title VII gender discrimination claim).

Even if Thornton could meet the minimal threshold required to establish a *prima facie* case, her pay discrimination claim nonetheless fails because she cannot demonstrate that Flavor House's legitimate, non-discriminatory reasons for any pay disparities were pretextual. The four label operators who were not assigned to level 1 in 2004 had been employed by Flavor House longer than Thornton and had greater experience and competency as label operators. Length of service, experience and competency are all legitimate, non-discriminatory reasons for pay decisions. *Givens v. Chambers*, 548 F. Supp. 2d 1259 (M.D. Ala. 2008) (finding employer's decision to pay female employee with more qualifications, education, and experience than male

plaintiff was legitimate, non-discriminatory); *Byrd v. Auburn University at Montgomery*, No. 2:05cv835-CSC, 2007 WL 1140424, (M.D. Ala. April 17, 2007 (finding prior relevant work experience, market data, and longevity were legitimate, non-discriminatory reason for pay disparities).

There is no evidence that Flavor House's reasons for assigning Thornton as a level 1 operator were a pretext for gender discrimination. Thornton's conclusory allegations that Flavor House should have assigned her a higher pay for skill rating and that her assignment was motivated by gender are not probative. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value); *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment."); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987) ("unsubstantiated assertions alone are not enough to withstand a motion for summary judgment"); *Givens v. Chambers*, 548 F. Supp. 2d 1259, 1276 (M.D. Ala. 2008) (granting summary judgment for defendant, finding plaintiff could not raise an "inference of pay discrimination based upon unsubstantiated conclusory assertions"); *Byrd*, 2007 WL 1140424, at *11-12 (holding plaintiff's "unsubstantiated opinion that the salary decisions were somehow motivated by gender is not an appropriate proxy for evidence," granting summary judgment for defendant).

Thornton's Title VII pay discrimination claim is time-barred, she cannot present any evidence in support of a *prima facie* case of pay discrimination, and she cannot she establish that Flavor House's legitimate, non-discriminatory business decision to assign her to a level 1 pay for

skill rating in 2004 was a pretext for sexual discrimination.  Flavor House is entitled to summary judgment as a matter of law.

### E.    Thornton's Promotion Claim Is Time-Barred

Like her pay claim, Thornton's promotion claim is due to be dismissed as untimely.  Title VII requires "an employee aggrieved by discriminatory acts to file a charge of discrimination with the EEOC within 180 days 'after the alleged unlawful employment practice occurred.'"  42 U.S.C. § 2000e-5(e).  As previously discussed, Thornton filed her EEOC charge on September 21, 2006.  Thus, any conduct that occurred prior to March 25, 2006 is time-barred.

Given that the alleged denials of promotion about which Thornton complains occurred approximately five years prior to the March 25, 2006[8] statutory deadline, Thornton's promotion claim is time-barred and should be promptly dismissed.  *Stuart v. Jefferson Co. Dept. of Human Res.*, 152 Fed. Appx. 798, 801 (11th Cir. 2005) (finding that because plaintiff's claim arose more than 180 days before EEOC charge was filed, district court properly refused to consider claim); *Cantrell v. Jay R. Smith Mfg. Co.*, 248 F. Supp. 2d 1126 (M.D. Ala. 2003) (plaintiff's failure to file EEOC charge within 180 days after alleged unlawful employment practice barred action under Title VII).

### F.    Thornton Was Not Constructively Discharged as a Matter of Law

Thornton also fails to establish a constructive discharge claim.  A constructive discharge occurs when a discriminatory employer imposes working conditions that are "so intolerable that a reasonable person in [the employee's] position would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003).  The threshold for a claim of constructive discharge is "quite high." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231

---

[8] *See* (Thornton Dep. p. 195 ll. 1-12, p. 196 l. 3 – p. 197 l. 1, p. 284 ll. 8-18).

(11th Cir. 2001). "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable." *Akins v. Fulton Co., Ga.*, 420 F.3d 1293, 1302 (11th Cir. 2005).

That the conduct about which Thornton complains does not rise to the level of actionable sexual harassment eliminates any possibility that she can demonstrate constructive discharge. It is well established that the standard for proving constructive discharge is higher than the standard for proving a hostile work environment. *See Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272 (11th Cir. 2003) (standard of proof for constructive discharge claim higher than that for hostile work environment); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1251 (11th Cir. 2001) (same); *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 301 (5th Cir. 2001) (same); *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 48 (1st Cir. 1998) (plaintiff's constructive discharge claim fails because he did not succeed on predicate hostile environment claim); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment"). Because Thornton cannot even satisfy the lesser standard of conduct necessary for a sexual harassment claim, Thornton's attempt to state a constructive discharge claim fails as a matter of law.

Moreover, a constructive discharge claim imposes a duty on the employee to act reasonably before choosing to resign. *See Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) ("part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."). Following the June 14 incident, Nance issued Williams a written warning and separated Thornton and Williams by moving Thornton to a label operator position on line 5. (Boyer Dep. Vol. 2 p. 17 l. 18 – p. 18 l. 3;

Thornton Dep. p. 160 l. 19 – p. 161 l. 17).  Rather than allowing this remedial action to succeed, Thornton resigned—foreclosing any opportunity for Defendant's corrective measures to succeed.

Additionally, Thornton has admitted that although she and Williams had a conflict when he trained her in 2003, there were no problems between them when they worked on separate lines between 2003 and late 2005.  (Thornton Dep. p. 100 ll. 16-23 – p. 101 ll. 1-8).  Thus, separating Thornton and Williams after the June 14 incident was a reasonable approach to end the conflict.  Thornton's unreasonable decision to resign precludes her constructive discharge claim as a matter of law.  *See Mitchell v. Pope*, 189 Fed. Appx. 911, 914 (11th Cir. 2006) (plaintiff's failure to provide employer an opportunity to remedy the situation barred constructive discharge claim); *Van Der Meulen v. Brinker Int'l*, 153 Fed. Appx. 649 (11th Cir. 2005) (employee acted unreasonably by quitting without giving employer opportunity to respond); *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir.1996) (constructive discharge generally not viable if employer not given sufficient time to remedy the situation).

Thornton claim that she was forced to resign because Williams was not terminated following the June 14 incident is unavailing.[9]  Although Thornton may have perceived Williams's alleged comments, cursing, and name-calling to be offensive, "in light of the record evidence, a reasonable employee in Plaintiff's position would not have felt compelled to resign." *Rogers v. City County Health Dept. of Oklahoma County*, 30 Fed. Appx. 883, 888 (10th Cir. 2002) (affirming summary judgment on constructive discharge claim where plaintiff asserted co-worker "yelled or cursed at co-workers, including plaintiff, bumped into employees in the hall,

---

[9] It is well established that Title VII does not require an employer to terminate an alleged harasser.  *See Smith v. Beverly Health and Rehab. Services, Inc.*, 978 F. Supp. 1116, 1124 (N.D. Ga. 1997) (Title VII does not per se require employers to terminate employees who allegedly contribute to a hostile work environment"); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993) ("No doubt ... [the defendant] could have done more to remedy the adverse effects of [the harasser's] conduct. But Title VII only requires that the employer take steps reasonably likely to stop the harassment."); *Barrett v. Omaha Nat. Bank*, 726 F.2d 424, 427 (8th Cir. 1984); *Davis v. Tri-State Mack Distributors, Inc.*, 981 F.2d 340 (8th Cir. 1992).

hit plaintiff while they were standing near the coffee pot, [and] threw papers and pencils at plaintiff and other employees."); *Anderson v. Parkway Maint. & Mgmt. Co.*, No., 2006 WL 3360370 (M.D. Fla. Nov. 20, 2006) (granting summary judgment for employer on plaintiff's constructive discharge claim where plaintiff testified employer "often yelled, cursed and insulted him," called Plaintiff "fucking stupid," "liar," and "thief" and told him to "fucking leave" if he did not like it"); *Cross v. Southwest Recreational Indus., Inc.*, 17 F. Supp. 2d 1362, 376 (N.D. Ga. 1998) (cursing and yelling at the plaintiff and then demoting her insufficient to establish constructive discharge).

### G.   Thornton Cannot Meet The High Standard Required To Establish Outrage Under Alabama Law

Thornton's outrage claim is meritless.  The Alabama Supreme Court has made clear that recovery under the tort of outrage is limited to only the most egregious conduct and that the burden on a plaintiff "is a heavy one."  *Ex parte Crawford & Co.*, 693 So. 2d 458, 459 (Ala. 1997).  Thus, to prevail on a claim of outrage, Thornton must prove:

> (1) that the defendant [ ] either intended to inflict emotional distress or knew or should have known that emotional distress was likely to result from [his] conduct; (2) that the defendant['s] conduct was extreme and outrageous; and (3) that the defendant['s] conduct caused emotional distress so severe that no reasonable person could be expected to endure it.

*Callens v. Jefferson Co. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000).  The term "extreme" refers to "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Travelers Indem. Co. of Illinois v. Griner*, 809 So. 2d 808, 810 (Ala. 2001) (*quoting American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)) (*citations omitted*).

In evaluating outrage claims, the Alabama Supreme Court has found a jury question in only three narrow categories, including:  1) cases involving wrongful conduct in the context of

family burials; 2) cases where insurance agents employed heavy handed and barbaric means to coerce the insured into settling insurance claims; and 3) a cases involving persistent and egregious sexual harassment. *Thomas v. BSE Industrial Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993) (*emphasis added*). Mere sexual harassment, standing alone, will not present a case of outrage; the sexual harassment must be beyond all possible bounds of decency. *See Saville v. Houston Cty Healthcare Auth.*, 852 F. Supp. 1512, 1541 (M.D. Ala. 1994) (granting summary judgment on outrage claim where incidents included poking a female employee in the rib cage and touching or grabbing the employee's buttocks).

Thornton's allegations simply do not meet the heavy burden required for the tort of outrage. Even if Thornton can demonstrate that Williams' conduct was crude or inappropriate, the tort of outrage does not provide "recovery for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Inmon*, 394 So. 2d at 364-65.

Moreover, Thornton has admitted that Williams neither touched her in an offensive manner nor propositioned her for sex. Thus, Williams' alleged conduct falls far short of the type of extreme and outrageous conduct required to state an outrage claim under Alabama law. *See Cabaniss v. Coosa Valley Medical Center,* No. 93-PT-2710-E, 1995 WL 241937, *1, 29 (N.D. Ala. Mar. 20, 1995), *aff'd. by,* 116 F.3d 491 (11th Cir. 1997) (Table No. 95-6253) (granting defendant's motion for summary judgment on outrage claim where plaintiff alleged that she was yelled at, told that she was "stupid", "brain dead" and a "dumb ass," and physically moved from where she was working and told to go and stand in a corner); *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1396 (M.D. Ala. 1997) (rejecting outrage claim where plaintiff's supervisor lured plaintiff to hotel room and tried to hug and kiss her while blocking the door and thereafter made daily comments of a sexual nature about her appearance).

41

In *Brasfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438 (M.D. Ala. 1996), this court considered the outrage claims of several plaintiffs involving allegations of sexual harassment by several managers.  The court found that the following acts did not rise to the level of outrage: male manager told female employee that females were lesser persons than males, pointed his finger at female employee and pretended to "blow her away," stated that any woman wearing panties could leave work early, asked employee whether "P" on her necklace stood for "prostitute," asked another female employee whether she wore panties, called employee "stupid bitch" on several occasions and told employee he would fill her orders "when he was good and damn ready." *Id.* at 1446-47, 1453-54.  The court also found that another male manager's conduct was not extreme and outrageous as required to support an outrage claim under Alabama law: comment that he did not like women and that he was going to be sure that female employee did not remain at work, threatened employee with clenched fist while stating "If I hear one more word out of you, girl, I'm going to slap your teeth out of your head," and claimed, in front of customers and sales persons, that employee had stolen one of manager's customers. *Id.*  All of Thornton's allegations are certainly less severe than those made in *Brasfield*, *Cabaniss*, and *Johnson* where the court dismissed the outrage claims.

Thornton's allegations bear no resemblance to the few outrage cases in which sexual harassment claims were deemed to even state a jury question.  *See, e.g., Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 324 (Ala. 1989) (holding jury could find sufficient evidence of outrage where allegations included that the alleged harasser "(1) invited [plaintiffs] to swim in his pool in the nude with him; (2) told [plaintiff] that his hands were cold and asked if he could put them in her pockets to keep them warm; (3) told the plaintiffs that he would "put a stick on their machines" so they could masturbate while working; (4) said that he could perform

intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands; (9) said that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs). Because Thornton cannot approach the requisite showing to establish a claim for the tort of outrage under Alabama law, her claim is due to be dismissed.

### H.    Thornton's Allegations Do Not Support an Invasion of Privacy Claim

Thornton's invasion of privacy claim likewise fails because she cannot establish substantive liability on the part of Williams. Alabama law recognizes four limited and distinct types of "invasion of privacy":

> (1) Intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the

43

public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.

*Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997); *Phillips v. Smalley Maintenance Serv., Inc.*, 435 So. 2d 705, 708 (Ala. 1983). Sexual harassment claims are generally brought under the first type of invasion of privacy claim and, though she does not so specify, Flavor House assumes that Thornton's claim is brought pursuant to this theory.

Under this theory of invasion of privacy, there must be something in the nature of "prying or intrusion" by the defendant. In other words, the intrusion must be something which would not only be offensive or objectionable to a reasonable person but also, the thing into which there is intrusion or prying must be, and must be entitled to be, private. *Kelley v. Troy State University*, 923 F. Supp. 1494 (M.D. Ala. 1996). In *Ex parte Atmore Community Hospital*, 719 So. 2d 1190, 1194 (1998), the Alabama Supreme Court reaffirmed the standard for "a claim alleging invasion of privacy relating to sexual harassment." Specifically, Thornton must show:

> "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation."

*Id.*

With respect to invasion of privacy claims premised on sexual harassment, the Alabama Supreme Court has noted that "extensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands, constituted a wrongful intrusion into one's private activities sufficient to 'outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 826 (Ala. 1999). *See also Phillips*, 435 So. 2d at 707 (finding wrongful intrusion where harasser asked plaintiff intrusive questions about her sex life and repeatedly demanded that plaintiff engage in oral sex with him on penalty of losing her job).

Thornton's invasion of privacy claim fails because the alleged acts of harassment did not involve any intrusion into her personal affairs. Thornton admits that Williams never touched her in an improper manner, propositioned her for sex, inquired into her sex life, or otherwise made any sexual advances towards her. Even if he had, however, the Alabama Supreme Court has explained that in the context of a sexual harassment allegation, making sexual propositions typically does not constitute an invasion of privacy, even though such conduct is offensive, but that extensive inquiries into one's sex life or looking up one's skirt may constitute an invasion of privacy. *See Ex parte Atmore Community Hosp.*, 719 So. 2d 1190 (Ala. 1998).

Thornton's claim that she was offended by Williams's conduct does not somehow transform it into an invasion of her privacy. Thornton has no evidence of "extensive egregious inquiries into [Thornton's] sex life, coupled with intrusive and coercive sexual demands." *Stevenson*, 762 So. 2d at 826; *see also Durham v. Philippou*, 968 F. Supp. 648, 661 (M.D. Ala. 1997) ("[T]he plaintiffs do not allege that [the harasser] continually inquired into their sexual interests or activities. Instead, they allege a pattern of persistent propositions. While this behavior is reprehensible, it is not the demanding, intrusive questioning exhibited in *Phillips*."). Her invasion of privacy claim therefore fails as a matter of law.

### I.    The Absence of Underlying Tortuous Conduct Precludes Thornton's Negligence Claims

Thornton's claims for negligent and/or wanton hiring, supervision, training, and retention are due to be dismissed because she cannot establish an underlying tort claim upon which to base her negligence claims. Under Alabama law, no independent action for negligent supervision, training, or retention exists. Rather, such assertions are merely a means of creating *respondeat superior* liability against an employer for some underlying tort engaged in by an employee. *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 825 (Ala. 1999). Consequently, "a party

alleging negligent or wanton supervision and hiring must also prove the underlying wrongful conduct of employees." *Voyager Ins. Companies v. Whitson*, 867 So.2d 1065, 1073 (Ala. 2003); *Taylor v. Stevenson*, 820 So.2d 810, 812 (Ala. 2001) (employer could not be independently guilty of negligence or wantonness in training or supervising offending employee in the absence of some tort committed by him against plaintiff); *University Fed. Credit Union v. Grayson*, 878 So.2d 280, 291 (Ala. 2003) (*citations omitted*) (finding plaintiff must establish an underlying common-law tort in order to prevail in a claim for negligent supervision).

Because Thornton cannot establish her claims of outrage or invasion of privacy, she has no basis for her Alabama common law negligence claims. This is so because the derivative torts of negligent hiring, supervision, training, and retention cannot be used to import substantive standards of federal employment discrimination into Alabama common law. *See Lane v. Central Bank of Ala., N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983) (holding claim for negligent supervision does not arise from employee's violation of federal statue).

When confronted by a similar attempt to bootstrap Title VII liability into Alabama state law through the tort of negligent supervision, Judge Hand of the Southern District of Alabama held:

> While the Alabama Supreme Court has recognized the tort of negligent supervision and negligent hiring where injuries have resulted from the incompetence or intentional conduct of an employee, the Court has not addressed whether the torts are cognizable in the context of an employment discrimination case. This Court agrees with defendant's assessment that it is unlikely the Alabama Court would extend the negligent hiring or supervision tort to include employment discrimination claims since the extension would transform routine employment discrimination cases into state law torts and would undermine Alabama's employment-at-will doctrine.

*Hathord v. Boise Cascade Corp*, 1998 U.S. Dist. LEXIS 18113, *24-25 (S.D. Ala. 1998) (granting summary judgment for defendant employer). Other courts interpreting Alabama law

are in agreement. *See Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1438 (M.D. Ala. 1998) (holding that Alabama law of negligent supervision does not provide for liability based solely on an employer's alleged negligence in training an employee on its harassment policy).

As discussed herein, the conduct about which Thornton has complained is insufficient to establish a claim for either outrage or invasion of privacy. Absent such underlying tortuous conduct, Thornton's negligent and/or wanton hiring, supervision, training and retention claims fail as a matter of law.

## IV.   CONCLUSION

In light of the foregoing, Defendant Flavor House Products, Inc. respectfully requests that summary judgment be granted in its favor as to each of the Plaintiff's claims against it.

/s/ Jennifer F. Swain
JENNIFER F. SWAIN
Attorney for Defendant
Flavor House Products, Inc.

OF COUNSEL:

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 20th Street North
Birmingham, AL  35203
Telephone:  (205) 244-3863
Facsimile:   (205) 488-3863

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been filed electronically, with copies served thereby, on August 8, 2008.

Ann C. Robertson, Esq.
Temple D. Trueblood, Esq.
Wiggins, Childs, Quinn & Pantazis, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama  35203

Bobbie S. Crook, Esq.
367 South Saint Andrews Street
Dothan, Alabama  36301

Richard E. Crum
Steadman S. Shealy, Jr.
M. Russ Goodman
Shealy, Crum & Pike, P.A.
P.O. Box 6346
Dothan, Alabama  36302-6346


/s/ Jennifer F. Swain
JENNIFER F. SWAIN
Attorney for Defendant
Flavor House Products, Inc.