**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA THORNTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.: 1:07cv712-WKW** |
| **v.** | ) | |
| | ) | |
| **FLAVOR HOUSE PRODUCTS, INC., and FRANKLIN D. WILLIAMS, JR.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## EVIDENTIARY SUBMISSION IN SUPPORT OF DEFENDANT FLAVOR HOUSE PRODUCTS, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant Flavor House Products, Inc. files the following evidence in support of its Motion for Summary Judgment:

| | | |
|---|---|---|
| 1. | Deposition of Linda Thornton, with exhibits | Exhibit A |
| 2. | Deposition of Mary Ann Boyer, Volume 1, with exhibits | Exhibit B |
| 3. | Deposition of Mary Ann Boyer, Volume 2, with exhibits | Exhibit C |
| 4. | Deposition of Ricky Smothers, with exhibits | Exhibit D |
| 5. | Deposition of Chris Jordan, with exhibits | Exhibit E |
| 6. | Deposition of Kim Perkins, with exhibits | Exhibit F |
| 7. | Deposition of Franklin Williams, with exhibits | Exhibit G |
| 8. | Deposition of Melvin Hutchins, with exhibits | Exhibit H |
| 9. | Deposition of Bruce Cassady, with exhibits | Exhibit I |

| | | |
|---|---|---|
| 10. | Deposition of Tommy Nance, with exhibits | Exhibit J |
| 11. | Declaration of Mary Ann Boyer, with exhibits | Exhibit K |
| 12. | Declaration of Leigh Taylor | Exhibit L |

/s/ Jennifer F. Swain
JENNIFER F. SWAIN
Attorney for Defendant
Flavor House Products, Inc.

OF COUNSEL:

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 20th Street North
Birmingham, AL 35203
Telephone: (205) 244-3863
Facsimile: (205) 488-3863

**CERTIFICATE OF SERVICE**

I hereby certify that this pleading has been filed electronically, with copies served thereby, on August 8, 2008.

Ann C. Robertson, Esq.
Temple D. Trueblood, Esq.
Wiggins, Childs, Quinn & Pantazis, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203

Bobbie S. Crook, Esq.
367 South Saint Andrews Street
Dothan, Alabama 36301

Richard E. Crum
Steadman S. Shealy, Jr.
M. Russ Goodman
Shealy, Crum & Pike, P.A.
P.O. Box 6346
Dothan, Alabama 36302-6346

/s/ Jennifer F. Swain
JENNIFER F. SWAIN
Attorney for Defendant
Flavor House Products, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

LINDA THORNTON, )

Plaintiff, )

VS. ) CIVIL ACTION NO:

FLAVOR HOUSE PRODUCTS,)

INC., et al., ) DEPOSITION OF:

Defendants. ) LINDA THORNTON

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

LINDA THORNTON,

may be taken before Cathy A. DeBardeleben, Commissioner and Notary Public, State at Large, at the Law Offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., 1600 Wachovia Tower, 420 North 20th Street, Birmingham, Alabama 35203, on the 19th day of February, 2008, commencing at approximately 10:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

APPEARANCES

FOR THE PLAINTIFF:

ANN C. ROBERTSON
Attorney at Law
Wiggins, Childs, Quinn
& Pantazis, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203

BOBBIE S. CROOK
Attorney at Law
367 South St. Andrews Street
Dothan, Alabama 36301

FOR THE DEFENDANTS:

JENNIFER F. SWAIN
Attorney at Law
Baker, Donelson, Bearman,
Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203

J. SCOTT CLARK
Attorney at Law
Ralcorp Holdings, Inc.
St. Louis, Missouri 63188

RICHARD CRUM
J.D. MENDHEIM
Attorney at Law
Shealy, Crum & Pike, P.C.
P.O. Box 6346
2346 West Main Street
Suite 1
Dothan, Alabama 36302-6346

INDEX

MS. SWAIN: 8-219

EXHIBIT LIST

Defendant's Exhibit No. 1 - 32
Defendant's Exhibit No. 2 - 38
Defendant's Exhibit No. 3 - 46
Defendant's Exhibit No. 4 - 52
Defendant's Exhibit No. 5 - 84
Defendant's Exhibit No. 6 - 86
Defendant's Exhibit No. 7 - 91
Defendant's Exhibit No. 8 - 93
Defendant's Exhibit No. 9 - 96
Defendant's Exhibit No. 10 - 99
Defendant's Exhibit No. 11 - 120
Defendant's Exhibit No. 12 - 128
Defendant's Exhibit No. 13 - 145
Defendant's Exhibit No. 14 - 152
Defendant's Exhibit No. 15 - 166
Defendant's Exhibit No. 16 - 207
Defendant's Exhibit No. 17 - 210
Defendant's Exhibit No. 18 - 214

I, Cathy A. DeBardeleben, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 19th day of February, 2008, at the law offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, 1600 Wachovia Tower, 420 North 20th Street, Birmingham, Alabama 35203, commencing at approximately 10:00 a.m., LINDA THORNTON, witness in the above cause, for oral examination, whereupon the following proceedings were had:

LINDA THORNTON,

being first duly sworn, was examined and testified as follows:

THE VIDEOGRAPHER: We now commence the videotape deposition of Linda Thornton in the matter of Linda Thornton versus Flavor House Products, Incorporated and Franklin D. Williams, Jr. in the United States District

Court for the Middle District of Alabama Southern Division, case number 1:07CV-712-WKW. Today's date is February 19, 2008. We are at the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz. The time is 10:18. The witness will be sworn, the attorneys will introduce themselves and the deposition will begin.

LINDA THORNTON,

being first duly sworn,

testified as follows:

THE REPORTER: Do y'all want the usual stipulations?

MS. ROBERTSON: I think she'll read and sign.

MS. SWAIN: Jennifer Swain, outside counsel for Flavor House.

MS. CROOK: I'm Bobbie Crook, I'm attorney for the plaintiff.

MS. ROBERTSON: Ann Robertson, attorney for the plaintiff.

MR. CRUM: I'm Richard Crum, attorney for Mr. Frank Williams. This is Don Mendheim

with my office.

EXAMINATION BY MS. SWAIN:

State your name, please.

A Linda Thornton.

**Q Ms. Thornton, as I said, my name is Jennifer Swain. I'm an attorney representing Flavor House in the lawsuit that you have filed against it. I'm going to ask you questions today. I'm going to ask you to let me know if I ask you a question you don't understand. Can you do that for me?**

A Yes, ma'am.

**Q If you don't understand, then I'll try to rephrase it in a way that makes it clear for you. But if you don't tell me that you don't understand, I'll assume that you do. I'm also going to ask you to give me responses of yes or no or a narrative response instead of a "uh-huh" or "unh-unh" or a head nod. Can you do that?**

A Yes, ma'am.

**Q You can let me know if you need to take a break at any time during the day and**

**we can do that. I will ask you to answer any question that's pending before you take your break, but otherwise we can take a break any time that you need to take one.**

A Yes, ma'am.

**Q Ms. Thornton, I understand that you have also been known by the name of Linda Parrish; is that right?**

A Yes, ma'am.

**Q Is that your maiden name?**

A Yes, ma'am.

**Q And you were married -- you're currently married to Steven Thornton?**

A Yes, ma'am.

**Q And you were married once before that?**

A Yes, ma'am.

**Q What was your first husband's name?**

A Mylan Mizell Owens.

**Q And were you known as Linda Owens at one time?**

A Yes, ma'am.

**Q Does Mylan Mizell Owens still live in**

**Alabama?**
A No, ma'am. Linhaven, Florida.
**Q And you have one son with him or two?**
A Two.
**Q Two sons. One lives with you?**
A Yes, ma'am.
**Q And how old is that child?**
A 15.
**Q Okay. And then your older son is how old now?**
A 21.
**Q And where does he live?**
A With his father.
**Q In Florida?**
A Yes, ma'am.
**Q No other children?**
A No, ma'am.
**Q Do you have any stepchildren with your current husband?**
A Yes, ma'am.
**Q How old are they?**
A 15.
**Q Just one?**

A Yes, ma'am.
**Q Does that child live with you?**
A It's his child through another marriage.
**Q Right. Does the child live with you?**
**No, ma'am.**
**Q The child lives with his mother?**
A Yes, ma'am.
**Q And is Steven Thornton employed?**
A Yes, ma'am.
**Q Where?**
A At Army Fleet Support, Ft. Rucker.
**Q What does he do there?**
A He is a lead person.
**Q And when did you get married to Steven Thornton?**
A On October 1st.
**Q Of what year?**
A 2004, I believe.
**Q Now, are you still on anti-depressants?**
A Yes, ma'am.
**Q What antidepressant are you currently**

**taking?**
A Zoloft.
**Q What dosage of Zoloft are you taking?**
A Between 50 and 100 milligrams daily.
**Q Have you been on antidepressants consistently since 2003?**
A Until now?
**Q Correct.**
A No, ma'am.
**Q Was 2003 the first time that you began taking antidepressants?**
A No, ma'am.
**Q When was the first time that you took antidepressants?**
A During my divorce to my first husband.
**Q Which would have been when?**
A I don't recall the date.
**Q Do you recall what year that was?**
A No, ma'am.
**Q Was it more than 10 years ago?**
A Yes, ma'am.
**Q Were you living in Alabama at that**

**time?**
A Yes, ma'am.
**Q In Dothan?**
A Yes, ma'am.
**Q And who prescribed the anti-depressants for you at the time of your divorce from your first husband?**
A Dr. Dozier.
**Q Is he in Dothan?**
A Yes, ma'am.
**Q And how long were you on anti-depressants around that time frame?**
A I'm not sure.
**Q Was it more than a year?**
A I don't believe so.
**Q What medication were you on?**
A Prozac.
**Q All right. So, you were on Prozac at some point in the past, you don't know when. Your younger son is 15 years old, right?**
A My youngest?
**Q Correct.**
A Yes, ma'am.

Page 14

Q **And he had already been born at the time of your divorce from your first husband?**
A Yes, ma'am.
Q **So some time within 15 years ago?**
A Yes, ma'am.
Q **When was the next time that you took antidepressants?**
A I believe it was after I started working at Flavor House.
Q **Was that on the occasion in 2003 when you were diagnosed with depression?**
A I'm not sure of the date.
Q **Do you recall what antidepressants you were taking at that time?**
A No, ma'am. I believe it was Paxil, but I'm not sure.
Q **And you were taking that for depression; is that correct?**
A I can't recall at the time what it was for.
Q **Okay. Have you ever been prescribed Xanax for anxiety?**
A Yes, ma'am.

Page 15

Q **Was that in that same time frame?**
A I'm not sure.
Q **Do you recall what doctor prescribed those medications for you?**
A I presently have been prescribed Xanax by Dr. Beninger.
Q **That's now?**
A Yes, ma'am.
Q **Okay. I'm talking about earlier on when you were working at Flavor House back somewhere in the 2003 time frame.**
A I'm not sure. It could have been Dr. Rasmussen.
Q **Okay. All right. From the time that you began taking the Paxil and Xanax back with Dr. Rasmussen, how long were you on those medications in that time frame?**
MS. ROBERTSON: Object.
A I don't understand.
Q **All right. You indicated that at some time after you began working at Flavor House that you began taking antidepressants, correct?**

Page 16

A Yes, ma'am.
Q **Did you also begin taking Xanax some time in that time frame?**
A I'm not sure.
Q **How long were you on antidepressants in that time frame after you began working at Flavor House?**
A I'm not sure about that either. I would have to have my doctor's records.
Q **Okay. Well, is it safe to say that whatever your doctor's records show is the times that you were on medication?**
A Yes, ma'am.
Q **No reason to dispute their accuracy?**
A Not that I'm aware of.
Q **Other than Dr. Rasmussen and your current doctor's name is Doctor -- is it Beninger?**
A Yes, ma'am.
Q **And Dr. Dozier. Have any other doctors ever prescribed antidepressants for you?**
A Not that I can recall.

Page 17

Q **Are you on Prozac today?**
A No, ma'am.
Q **Are you on Xanax today?**
A No, ma'am.
Q **Are you on any medications today?**
A I take my nightly Zoloft.
Q **So, you're currently on Zoloft as well?**
A Yes, ma'am.
Q **How long have you been on that?**
A I'm not quite sure of the date.
Q **Did you take antidepressants back in the 2003 time frame because of stress that you were experiencing relating to a police officer taking action against your children?**
A Not that I can remember.
Q **Did you ever testify in that lawsuit that you were taking antidepressants or anti-anxiety medications for that reason?**
A I don't recall.
Q **Did you give a deposition in a case that you brought against a police officer?**
A Yes, ma'am.

**Q Did you testify truthfully in that deposition?**
A Yes, ma'am.
**Q What was the resolution of that lawsuit?**
A It was thrown out.
**Q By the Court or did you dismiss it?**
A I believe the Court.
**Q Other than you said you took Zoloft when, last night?**
A Yes, ma'am.
**Q Okay. Other than that, are you on any other medications today?**
A My Lorcet for my back pain.
**Q When did you take Lorcet?**
A When?
**Q Correct.**
A This morning, a half a one.
**Q Any other medications?**
A No, ma'am.
**Q Is there anything about the medications, the Lorcet and Zoloft that you have taken that affect your ability to**

**remember things?**
A No, ma'am.
**Q Do they effect in anyway your ability to testify here today?**
A No, ma'am.
**Q Other than the deposition you gave in the case that you brought against the police officer, have you ever given a deposition on any other occasions?**
A Not that I can remember.
**Q Did you give a deposition during your divorce from your first husband?**
A Not that I can remember.
**Q And have you ever testified at trial as a witness?**
A Yes, ma'am.
**Q And when was that?**
A I'm 43. I believe it was maybe 23 years ago.
**Q And what matter was that relating to?**
A My father had a DUI, and he was at my residence before he was pulled over.
**Q Any other occasion in which you**

**testified in a trial?**
A Not that I can recall.
**Q You were arrested for possession of marijuana in 1999?**
A I'm not sure of the year.
**Q But at some point in the past, you were arrested for the possession of marijuana; is that correct?**
A Yes, ma'am.
**Q And you pled guilty to that?**
A Yes, ma'am.
**Q And your sentence was suspended?**
A I'm not sure I understand.
**Q You were put on probation?**
A Yes, ma'am.
**Q You didn't actually go to jail?**
A No, ma'am.
**Q And you were arrested on another occasion for some kind of domestic violence charge?**
A Yes, ma'am.
**Q And you were not convicted of that; is that correct?**

A Yes, ma'am.
**Q Have you ever been arrested on any other occasions?**
A On one other domestic violence.
**Q When was that?**
A I'm not sure of the year.
**Q So, twice you were arrested for domestic violence?**
A Yes, ma'am.
**Q And did both of those -- well, did they involve husbands of yours?**
A The first one was an ex-husband.
**Q And who was that?**
A Mylan Mizell Owens.
**Q So, he was your ex-husband at the time?**
A Yes, ma'am.
**Q And do you know what the charge was against you?**
A No, ma'am.
**Q Did you enter a plea in that matter?**
A No, ma'am.
**Q What county was that in?**

A Houston.
**Q What was the resolution of that charge?**
A It was dismissed.
**Q By the Court?**
A Yes, ma'am.
**Q All right. Then the second domestic violence charge, who did that involve?**
A An ex-boyfriend.
**Q And who was that?**
A Morris Manly.
**Q Was that also in Houston County?**
A Midline City.
**Q When were you dating Morris Manly?**
A I'm not sure of the dates.
**Q About how long ago was it?**
A It's been years. I'm not quite sure.
**Q Was it before or after you were married to Mylan Mizell Owens?**
A It was after.
**Q So, it was between Owens and your current husband?**
A Yes, ma'am.

**Q And what occurred to prompt your arrest on domestic violence charges against Morris Manly?**
A I would not press charges, so he took both of us to jail.
**Q So, you were accusing him of being violent towards you?**
A I had cuts and bruises and blood.
**Q Is that a "yes"?**
A Yes.
**Q Did he accuse you of being violent towards him?**
A I'm not sure.
**Q What about with Mylan Mizell Owens? Did he accuse you of being violent towards him?**
A Yes.
**Q Had you, in fact, been violent towards him?**
A I defended myself.
**Q By doing what?**
A Protecting myself from him hitting me.

**Q And what did you do to him to protect yourself?**
A I'm not quite sure.
**Q Did he get arrested as well?**
A No.
**Q So, he was hitting you, but you were the one that got arrested?**
A Yes, ma'am.
**Q Did you give testimony in either one of those matters?**
A No.
**Q Any other arrests?**
A Not that I can recall.
**Q Do you think you would recall having been arrested?**
A Ma'am?
**Q Do you think you would recall having been arrested?**
A I would think so.
**Q Have you ever filed an EEOC charge against anyone, other than Flavor House?**
A No, ma'am.
**Q Have you ever accused anyone, other**

**than Flavor House and Frank Williams, of employment-related claims such as harassment or discrimination?**
A No, ma'am.
**Q You were hired by Flavor House in June of 2001; is that right?**
A Yes, ma'am.
**Q Now, you initially worked at Flavor House through a temporary agency?**
A Yes, ma'am.
**Q How long were you with the temporary agency?**
A Approximately 90 days.
**Q And did that 90 days begin in June of 2001 or was it the 90 days before June of 2001?**
A I'm not quite sure.
**Q And you quit on June -- well, your last day you worked was June 16th 2006; is that correct?**
A I believe so.
**Q And you actually quit on June 21st 2006?**

A I'm not sure of the date.
**Q So, some time after the 16th of June?**
A Yes, ma'am.
**Q Do you recall whether the 16th of June was a Friday?**
A I believe so, but I'm not sure.
**Q At the time that you were hired by Flavor House, you were a laborer, correct?**
A Ma'am?
**Q At the time that you were hired by Flavor House, you were hired in as a laborer; is that correct?**
A Yes, ma'am.
**Q And at some point, you became an operator?**
A Yes, ma'am.
**Q When was that? How long did you work there as a laborer before you became an operator?**
A I'm not sure how long it was.
**Q Can you give me an estimate?**
A No, ma'am.
**Q Do you recall where in the plant that you worked initially?**

A Yes, ma'am.
**Q Where was that?**
A On line two.
**Q So, you started out on line two as a laborer. And where was the next area that you worked?**
A I worked different areas on line two.
**Q Okay.**
A And I had worked on line one after line two.
**Q Okay. Do you recall when you went to line one?**
A No, ma'am.
**Q When you were working on line one, were you already an operator at that time?**
A I'm not sure the definition of the operator.
**Q All right. Let me ask you this: At what point did you become a label operator?**
A Maybe after a year of employment.
**Q Okay. And did you become a label operator still on line two or had you already moved to line one?**

A I had moved to line one.
**Q And did you remain a label operator until you left your employment with Flavor House?**
A Yes, ma'am.
**Q Okay. And I may have asked you this. And if you did, I don't remember your answer. Do you recall when you began working on line one? Was that job that you said was about a year after you began working?**
A I believe so, but I'm not sure.
**Q What were your duties as a label operator?**
MS. ROBERTSON: Object to the form.
A To set up the machine, to run the proper labels, the proper size. We have a checklist of our duties.
**Q And in a nutshell you were -- that may be a -- no pun intended. The machine you worked on put labels on jars or cans that contained nuts; is that right?**
A Yes, ma'am.

**Q Okay. And that's what Flavor House did, was they manufactured packaged nuts; is that right?**
A Yes, ma'am.
MS. ROBERTSON: It's a nut house.
**Q It's a nut house.**
**When you were working on line one, was Fannie Ash your supervisor the whole time that you were on line one?**
A No, ma'am.
**Q Okay. Was she your supervisor when you started out on line one?**
A No, ma'am.
**Q Who was?**
A Buck Perkins.
**Q Buck Perkins?**
A Yes, ma'am.
**Q And how long was Buck Perkins your supervisor?**
A I'm not quite sure.
**Q At some point, Fannie Ash became your supervisor?**
A Yes, ma'am.

**Q And did she remain your supervisor until you left line one?**
A No, ma'am.
**Q Okay. Who was after Fannie Ash?**
A They kind of rotated supervisors.
**Q Okay. So, there may have been people at the same time as Fannie Ash; is that what you're saying?**
A No, ma'am. At different times there were different supervisors.
**Q Okay. Well, what other supervisors did you have besides Fannie Ash when you were working on line one?**
A Bruce Cassidy.
**Q Okay. Who else?**
A Chris Jordan.
**Q Who else?**
A I can't remember anymore right now.
**Q And while you were working on line one, you had a conflict with Fannie Ash; is that correct?**
A I don't understand.
**Q Well, did you have difficulty getting**

**along with Fannie Ash?**
A Sometimes.
**Q Did you complain about Fannie Ash to management higher up than Fannie?**
A Yes, ma'am.
**Q Did you complain to Melvin Hutchins about Fannie Ash?**
A Yes, ma'am.
**Q And do you recall -- who was Melvin Hutchins?**
A Ma'am?
**Q Who was Melvin Hutchins?**
A The supervisor over Fannie Ash and the other supervisors.
**Q And Mary Ann Boyer was the director of operations there at the Dothan plant; is that right?**
A At what time?
**Q During the last, say, three years or so of your employment there.**
A Yes.
MS. ROBERTSON: Well, I object then because you were telling her about when she

was on line one.
**Q Well, we just clarified that the question I'm asking right now about Mary Ann Boyer was during the last three years or so of your employment; is that right?**
A Yes.
**Q And did you complain to Mary Ann Boyer about Fannie Ash?**
A I'm not sure.
**Q Did you complain that Fannie Ash was harassing you?**
A I did.
**Q I'm going to show you what I am going to mark as Defendant's Exhibit 1. And I'll ask you to take a look at that. I've got one for you two, and I've got one for you two. If everybody can look on, that would be helpful.**
**(Defendant's Exhibit No. 1 was marked for identification).**
**Is Exhibit 1 a documentation form that you filled out on March 31st 2001?**

A Yes, ma'am.
**Q And this is a documentation of a complaint you were making regarding Fannie Ash; is that right?**
A Yes, ma'am.
**Q And you indicate there -- well, let me ask you this. In this middle section of the document where it says, "What happened," is that your handwriting there?**
A Yes, ma'am.
**Q And do you say there at the beginning, "I feel like F. Ash is deliberately nit-picking with me"?**
**Is that what you say there on the form?**
A Yes, ma'am.
**Q And then there towards the end, the last couple of sentences beginning on the third to bottom line, "This harassment has increased since I have spoken to Mary Ann about other issues."**
**Do you see that?**
A Yes, ma'am.

**Q So, this would suggest that you had talked to Mary Ann Boyer about Fannie Ash prior to the date of this documentation form?**

MS. ROBERTSON: Object.

A Not necessarily.

**Q Excuse me. What other issues had you spoken to Mary Ann about?**

A The sexual discrimination.

**Q Was Fannie Ash sexually discriminating against you?**

A No.

**Q Why would Fannie Ash -- well, let me ask you this: What was the nature of your complaint about Fannie Ash?**

A What is written right here.

**Q That you felt like she was nit-picking you?**

A Yes, ma'am.

**Q And what does that have to do with your speaking to Mary Ann about sexual discrimination?**

MS. ROBERTSON: Object, argumentative. Are you familiar with the

term "retaliation"?

MS. SWAIN: Ann, I would appreciate it if you would let me ask the questions of the witness and not interfere, please?

MS. ROBERTSON: All right.

**Q (By Ms. Swain) What does your talking to Mary Ann about sexual discrimination have to do with Fannie Ash nit-picking you?**

A When I -- whenever I complained, I was always retaliated -- usually retaliated against in one fashion or another.

**Q So, is it your allegation that -- well, let me back up.**

**Who were you complaining was sexually discriminating against you?**

A On which account?

**Q In the occasion that you are referencing here on this Exhibit 1.**

A I don't understand your question.

**Q Well, you've indicated earlier that when you write here on the second to last sentence, "This harassment has increased since I have spoken to Mary Ann about other**

**issues," that the other issues you had been talking to Mary Ann about were sexual discrimination; is that right?**

A It -- I'm not quite sure. I would have to look back at the records.

**Q What records?**

A With my complaints.

**Q What records are you talking about?**

A The complaints in the personnel file or what had happened. I'm not quite sure. Where I have put, "I have spoken to Mary Ann about other issues," there was always retaliation when I made a complaint.

**Q Well, let me ask you a couple of questions. Do you have records of complaints that you made?**

A I'm not quite sure I do. I have moved. If I have them, I don't know I have them. I'm not aware of it.

**Q So, you at one time had records of your complaints and you don't know where they are now? Is that what you're telling me?**

A I have documented things, and I don't

know where they are now.

**Q Have you looked for them?**

A I've looked where I thought they were, and they weren't there. I have several boxes since we've moved.

**Q Have you gone through all of your boxes?**

A Yes.

**Q And you can't find them?**

A No, ma'am.

**Q You're aware that if you intend to use those documents you need to find them now and we need to have an opportunity to question you about those documents?**

A Yes, ma'am.

**Q Okay. So, going back to this form. I'm going to ask you the question again. When you say on this form, "The harassment has increased since I have spoken to Mary Ann about other issues," what other issues are you talking about?**

A I'm not sure. I don't recall.

**Q Is it your allegation in this lawsuit**

**that you complained to Mary Ann Boyer about some kind of sexual discrimination and that that resulted in Fannie Ash nit-picking with you?**
A I'm not sure.
**Q Why do you think Fannie Ash was nit-picking you?**
A Whenever I made a complaint of discrimination, there was retaliation.
**Q So, are you claiming that Fannie Ash was nit-picking you because you had complained about discrimination?**
A No.
**Q Did you ever complain that Fannie Ash had discriminated against you?**
A No.
**Q And Fannie Ash is a female, correct?**
A Yes, but her supervisors were not.
(Defendant's Exhibit No. 2 was marked for identification).
**Q I'm going to show you what I am going to mark as Defendant's Exhibit 2 and I'll ask**

**you to take a look at that document.**
**Did you write Exhibit 2?**
A Yes, ma'am.
**Q And, again, in Exhibit 2, you were complaining or writing a statement, I guess, suggesting that Fannie Ash was harassing you; is that correct?**
A Yes, ma'am.
**Q And in Exhibit 2, in the first page of Exhibit 2, you indicate that you had spoken to Mary Ann about some concerns and complaints you had about Fannie?**
A Yes, ma'am.
**Q And Mary Ann told you she would look into the matter; is that right?**
A Yes, ma'am.
**Q What were the concerns and complaints you had about Fannie that you were talking about in Exhibit 2?**
MS. ROBERTSON: Let her read the whole thing. Why don't you read the whole thing?
**Q Go ahead. Take your time.**

A (Witness complies).
**Q Have you had an opportunity to read Exhibit 2?**
A Yes, ma'am.
**Q And having read through Exhibit 2, tell me what the complaints and concerns about Fannie Ash that you had that you were trying to express in this document.**
A I'm not -- I still don't understand the question.
**Q Well, did you take Exhibit 2 after you wrote it and give it to somebody at Flavor House?**
A I turned it into the front office.
**Q To whom in the front office?**
A I'm not quite sure.
**Q Do you know whether this document was given to Mary Ann Boyer?**
A I'm not quite sure.
**Q So, you don't know who you gave it to?**
A Somebody had to let me in the front office.

**Q But you don't know who that was?**
A No, ma'am, I don't recall.
**Q What was your purpose in giving this document to somebody in the front office at Flavor House?**
A For documentation of after a complaint there was retaliation.
**Q So, you were trying to complain to somebody about Fannie, correct?**
A I was documenting what was occurring after I made this complaint.
**Q Because you wanted someone to know about it at Flavor House, correct?**
A Yes, ma'am.
**Q Okay. What was it that you wanted them to know?**
A That after speaking to Mary Ann, these are the things that were occurring.
**Q So, you felt like after you talked to Mary Ann that you felt like Fannie was nit-picking you, correct?**
MS. ROBERTSON: Object. The document speaks for itself.

Q You can answer the question.
A I felt like I was being retaliated after. That's why I documented, "This harassment has increased since I have spoken to Mary Ann about other issues."
Q Okay. And I'm going to go back to that. What other issues were you talking to Mary Ann about that you think prompted retaliation by Fannie?
A I'm not quite sure.
Q And when you say you felt like Fannie was retaliating against you --
A I --
Q Let me finish my question if you would, please. There on the last page of this document of Exhibit 2. There on the last page you indicate in the first sentence, "The statement that Fannie made about brakes, cleaning, helping others and disappearing off the line are so far from the facts," correct? You wrote that?
A Yes, ma'am.
Q You felt like Fannie's concerns that

she expressed to you about your behavior in the workplace were unfair; is that accurate?
A Untrue, yes, ma'am.
Q You felt that they were untrue?
A Yes, ma'am.
Q And backing up just a little bit. Fannie had sat down with you and gone over these issues, brakes, cleaning, helping others and disappearing off the line; is that right?
A Can you repeat that?
Q Yes. Fannie had sat down with you and had a meeting with you where she talked to you about those issues?
MS. ROBERTSON: Object. When are you talking about?
MS. SWAIN: Prior to her writing this document.
A Fannie had called the whole line in one by one.
Q Right. Including you?
A I believe so.
Q Yeah. And during --

A Individually she did.
Q And during her meeting with you, she had raised issues with you about your brakes, cleaning, helping others and disappearing off the line?
A Yes.
Q And you felt like her concerns that she expressed to you were not fair?
A Yes.
Q Okay. You also in the last paragraph there -- if you could stay with me on the last page there of Exhibit 2. In the last paragraph on that page you complained abou having issues about the break schedule. Do you see that?
MS. ROBERTSON: Object.
MS. SWAIN: What is the objection?
MS. ROBERTSON: Excuse me. I'm sorry.
A Yes, ma'am.
Q And you expressed concern that you had to go to Sammy to get a vacation day?
A Yes, ma'am.

Q And you complained that there is a difference in how certain ones are treated; is that correct?
A Yes, ma'am.
Q Who did you feel like was receiving -- well, strike that.
Did you feel like Fannie Ash treated some people better than she treated you?
A I feel like Fannie Ash was going by her supervisor's instructions.
Q Did you ever hear her supervisor give her instructions to nit-pick you?
A No, ma'am.
Q So, is that speculation on your part, you're assuming that someone told her to do that?
A Yes, ma'am.
Q Did you feel that there was a difference in how Fannie treated certain other employees?
A I feel there was a difference on how Fannie was instructed to treat other employees.

**Q Well, we were just -- you don't actually know what she was instructed to do, correct?**
A No.
**Q Did you, in your observations of Fannie, see her treat other people differently than she treated you?**
A I can only speak for myself. I don't --
**Q You don't know how she treated others?**
A I heard other complaints, other issues.
**Q But you don't know how she treated other employees?**
A No.
**Q I'm going to show you one additional document relating to that time frame.**
**(Defendant's Exhibit No. 3 was marked for identification).**
**Let me show you what I have marked as Defendant's Exhibit 3 and ask you if you have**

**seen that document before. Have you seen this document before, Exhibit 3?**
A Not that I can remember.
**Q Did you have a meeting with Mary Ann Boyer at some point about your complaints about Fannie?**
A I don't recall.
**Q Do you know whether you met with anyone in management at Flavor House concerning your complaints about Fannie Ash?**
A I believe it was someone in personnel -- up in the front office.
**Q But you don't recall who it was?**
A No.
**Q And is it correct that one of the issues that you complained about with Fannie was Fannie asking you to clean some brushes that had been left from the day before?**
A Yes.
**Q Now, you also had a conflict with Kim Perkins while you were working on line one, correct?**
A I believe so.

**Q And what was the nature of your conflict with Kim Perkins?**
A I can't remember.
**Q Did you ever complain about Kim Perkins to anyone in management?**
A I'm not sure.
**Q Did Kim Perkins have a tendency to yell at other employees?**
A Sometimes.
**Q Did she have occasions where she would cuss at other employees?**
A At the mechanics when they cussed at her.
**Q Did she ever cuss at you, Kim?**
A Yes.
**Q Did she ever cuss at other female employees?**
A I'm not sure.
**Q And you cussed at work too, didn't you?**
A Yes.
**Q Did you ever cuss at Kim?**
A I'm not sure.

**Q Did you ever cuss at Frank Williams?**
A Not that I remember.
**Q You could have, you just don't remember it?**
A I don't remember it.
**Q Is Kim Perkins, and your conflict with Kim Perkins, a big part of the reason why you moved to line three?**
A No.
**Q Now, you did move to line three, correct?**
A I bidded on that position.
**Q And that was in September of 2005; does that sound about right?**
A I'm not sure of the -- I'm not good with dates.
**Q Okay. Some time late 2005 sound right to you or are you just not sure?**
A I'm not sure.
**Q And you -- let's talk about that. Flavor House had a job bid procedure; is that right?**
MS. ROBERTSON: Object.

A Towards the end of my employment.
**Q Towards the end of your employment they had a job bid procedure?**
A As I recall, it wasn't there the entire time that I was there.
**Q The entire time you were there, they posted jobs, correct?**
A No, ma'am.
**Q Did they have a job posting policy the whole time you were there?**
A No, ma'am.
**Q All right. Well, going back to when you moved to line three, that job was posted?**
A Yes, ma'am.
**Q And you bid on it?**
A Yes, ma'am.
**Q And you received it?**
A Yes, ma'am.
**Q And you don't recall when that was?**
A No, ma'am.
**Q After you successfully bid on the position, you moved to line three as a -- still as a label operator, correct?**

A Yes, ma'am.
**Q And when you were working on line one, the label machine that you were working on put labels on jars; is that right?**
A Or plastic containers.
**Q Or plastic containers?**
A Yes, ma'am.
**Q When you moved to line three, you were putting labels on cans; is that correct?**
A Yes, ma'am.
**Q And that was something a little bit different for you?**
A Yes, ma'am.
**Q Is it true that Kim Perkins tells lies?**
MS. ROBERTSON: Object.
A I don't understand what you're asking.
**Q Well, did you ever tell Flavor House management that Kim Perkins lies?**
A I don't remember.
**Q I'm going to show you what I have marked as Defendant's Exhibit 4.**

**(Defendant's Exhibit No. 4 was marked for identification).**
**And I'll ask you if that's a documentation form that you filled out relating to an incident involving Kim Perkins? Is this a documentation form you filled out related to an incident involving Kim Perkins?**
A Yes.
**Q And this actually happened after you had moved to line one, correct, this particular incident?**
A I can't remember.
**Q Well, look on the back of this sheet, if you would.**
A (Witness complies.)
**Q I'm sorry. You know what, I misspoke. This incident occurred after you had moved from line one to line three; is that correct?**
A It appears to be that way.
**Q Okay. And did you indicate here that**

**Kim came up to you and raised her voice?**
A That's what I've written.
**Q And you wrote that you chose not to conversate with Kim Perkins because of her attitude towards other co-workers and you?**
A Yes.
**Q And you indicate that you heard her holler to Linda Parker about a mechanic who in Kim's words or that Kim stated about the mechanic, I guess, "Don't worry, he can't help you. He's not worth a fuck"; is that correct?**
A Uh-huh.
**Q Is that something you heard Kim say?**
MS. ROBERTSON: You need to say yes or no.
A Yes.
**Q Flipping over to the back side you indicate here that Kim came in the lab and said out loud, "Those mother fucking people are getting on my nerves."**
A Can you repeat the question?
**Q Yes. Did you indicate here that Kim**

**came in the lab and stated out loud that, "Those mother fucking people are getting on my nerves"?**

A I believe this is what the QC had repeated.

**Q So, she told you that and you put that down on the form?**

MS. ROBERTSON: Object to the form. Is everybody's form cut off on the left side?

MS. SWAIN: Yeah, but I don't think it's problematic. You can still tell what it says.

A Ma'am?

**Q I'm trying to figure out did you hear Kim say, "Those mother fucking people are getting on my nerves," or did someone else tell you that she said that?**

A It appears to me on here that a QC repeated that.

**Q To you?**

A It appears that way.

**Q And did you write on your form, "This**

**is the attitude that Kim carries, not every once and a while, but every day"?**

A Yes.

**Q So, is what you're describing here a pretty common way for Kim to act at work when you were working at Flavor House?**

A Yes.

**Q And do you also indicate that Kim was always starting something and then running to tell a lie?**

A Yes, I indicated that.

**Q Is that true?**

A On this occasion.

**Q Well, you said on here, "She is always starting something and then running to tell a lie." Was this a one-time thing or was this something she was always doing?**

A I'm not sure.

**Q Well, did you find it to be important to be truthful when you wrote out a documentation form that you were giving to management?**

MS. ROBERTSON: Objection,

argumentative.

A I wrote it down.

**Q But you don't know whether it was true?**

A I believe that's the way I felt at the time.

**Q And did you indicate on here that, "Kim was always trying to get someone in trouble, other than herself"?**

A Yes, I indicated that.

**Q Was that true?**

A I believed it at the time.

**Q And did you indicate that, "She is the main reason I left line one"?**

A I wrote that.

**Q Is that true?**

A And other reasons.

**Q Well, was she the main reason?**

A I felt that at the time.

THE VIDEOGRAPHER: The time is 11:14. This concludes tape number one and we are off the record.

(BREAK TAKEN).

THE VIDEOGRAPHER: The time is 11:33. This is the beginning of tape number two. We are back on the record.

**Q (By Ms. Swain) Ms. Thornton, when you moved to line three, Frank Williams was not on line three already; is that correct?**

A Correct.

**Q How long after you moved to line three did he come to line three?**

A I'm not sure of how long it was. He had signed up for the position.

**Q And when you say "he signed up for the position" what do you mean by that?**

A Yes, ma'am. They needed a team leader on line three. And he was a roaster operator at the time.

**Q So, he had applied for the team leader position?**

A Yes, ma'am.

**Q And line three was the only line that they had a team leader on; is that right?**

A Yes, ma'am.

**Q And that was a new position that they**

Page 58

**were going to try out?**
A I believe so.
**Q And a team leader is still an hourly employee, right?**
A Yes, ma'am. You mean they clock in and clock out?
**Q That's right.**
A Yes, ma'am.
**Q They're not a salaried member of management?**
A Right.
**Q Now, after you moved to line three -- well, after Frank moved to line three, I guess, you were already there. You and Frank had a conflict with each other; is that correct?**
A Yes, ma'am.
**Q Now, you had -- prior to moving to line three, you had done some training briefly with Frank in 2003; is that right?**
A I believe it was 2003.
**Q And Frank had trained you in 2003 to work on the label machine; is that correct?**

Page 59

A Yes, ma'am, to run the label machine.
**Q Okay. Now, you did not submit any kind of written documentation forms like this in that time frame about Frank; is that correct?**
A If we weren't doing them at that time, I didn't.
**Q Did you submit any kind of written complaint about Frank in 2003?**
A I'm not sure. We -- this right here hasn't always been --
MS. ROBERTSON: You have to tell what "this right here" is.
A The documentation form.
**Q Right. And I'm saying regardless of whether you used this particular form or not, did you submit any kind of written complaint about Frank Williams in 2003?**
A I don't recall when the time period changed. There was a long time period and the first part of my employment where everything was -- the complaints were just verbal.

Page 60

**Q My question is, did you submit any written complaint about Frank Williams in 2003?**
MS. ROBERTSON: And she's answered your question.
MS. SWAIN: No, she has not.
A I'm not sure. I know that I verbally complained to Fannie and Melvin.
**Q But you don't know whether you submitted any written complaint?**
A Yes, ma'am.
**Q Yes, you don't know?**
A I don't know.
**Q Okay. Now, you say that you verbally complained to Fannie and to Melvin in 2003 about Frank?**
A I'm not sure of the 2003. I'm not sure. I'm not good with dates.
**Q Okay. Well, at some point, did you verbally complain to Fannie Ash about Frank?**
A Yes, ma'am.
**Q And if Frank were to indicate that you and Frank's relationship was acceptable**

Page 61

**and at least reasonably friendly in that time frame, you would disagree with that?**
MS. ROBERTSON: Object, argumentative.
A I wouldn't say it was friendly.
**Q Would you say you had a pleasant relationship with Frank Williams in that time frame?**
A No, ma'am, I wouldn't say it was pleasant either.
**Q Would you say you had a cordial relationship with Frank Williams in that time frame?**
A Yes, ma'am.
MR. CRUM: Did you say cordial?
MS. SWAIN: I did.
MS. ROBERTSON: Do you know what cordial means?
THE WITNESS: That you get along with them.
**Q Yeah.**
A I was only there during that time for a short time.

**Q About how long was that, do you recall? I mean, was it weeks or months?**
A It was weeks. It was when -- it was up to Melvin and Fannie of how long I would be -- how long -- how far along they felt I was on the learning process of that machine.
**Q And so you think that took several weeks?**
A Three or four maybe.
**Q And what was the nature of the complaint you made to Fannie Ash about Frank in that time frame -- well, let me strike that.**
**Was the complaint to Fannie Ash in that time frame, the verbal complaint?**
A During the time that he was training me on the label machine?
**Q Correct.**
A Fannie and Melvin.
**Q Okay. So that was in that same time frame?**
A Yes, ma'am.
**Q Okay. What was the nature of your**

**verbal complaint to Fannie during your training on the label machine?**
A That he had -- I had turned the conveyor belt off. And he had told me that I was -- he called me a stupid, fucking bitch.
**Q All right. So you had turned the conveyor belt off and he called you a stupid, fucking bitch?**
A Yes.
**Q Anything else that you complained to Fannie about with respect to Frank in that time frame?**
A I'm not sure. There were complaints of when he was throwing cans.
**Q You're talking about later on, correct?**
A No, ma'am. During that period when I was learning the label machine also he was throwing them.
**Q Anything else you complained about to Fannie Ash about Frank in that time frame?**
A I'm not sure. But they had exchanged Frank for James to come over and

work with me on the machine.
**Q Okay. My question is, were there any other complaints that you made to Fannie Ash in that time period about Frank?**
A That I couldn't train under him. That's when she swapped out James.
**Q Okay. Any other complaints you made to Fannie Ash about Frank?**
A The way he talked, the language he used.
**Q Anything else?**
A The way he treated me. His anger.
**Q And all of this was in a period of three weeks?**
A Yes, ma'am. It was everyday with Frank Williams.
**Q I thought you just told me you all had a cordial relationship in this time frame?**
A If I kept my mouth shut we did.
**Q Well, did you keep your mouth shut?**
A I complained a lot.
**Q So, is that a "no"?**

A I complained a lot to management, but if I didn't -- I stood there and took his cussing several occasions.
**Q Well, how many times in a period of -- you said several weeks -- did you complain about Frank?**
A How many times? I can't tell you a number of times.
**Q You can't tell me a number of times?**
A No, ma'am.
**Q Was it everyday?**
A If he cussed me out that day, I did.
**Q Well, during that period of several weeks, how many times are you claiming he cussed you out?**
A Of several weeks?
**Q Correct.**
A Frank could cuss you out several times in one day.
I'm asking you in that period of several weeks, how many times are you claiming that Frank cussed you out?
A It was enough that they pulled him

off the machine and replaced him.

**Q I'm not asking you whether it was enough for them to pull him off. I'm asking how many times are you claiming that he cussed you out in that period of several weeks?**

A If not everyday, every other day at least.

**Q Okay. And where were you physically working in this time frame?**

A Physically? Is this when he was training me on three?

**Q You tell me. Yes, in the period when he was training you.**

A In 2000 -- you said three or four?

**Q Whenever it was that he did the training on you.**

A Where was I?

**Q Correct.**

A On the label machine.

**Q On what line?**

A Three.

**Q Who else was working on line three at**

**that time?**

A I'm not sure.

**Q Do you know anybody else who was working on line three in that time frame?**

A Not while I was being trained. I'm not sure. There was a girl named Stephanie that was Frank's friend. But at one point she was on night shift as a QC, and I'm not sure if it was during that time or not.

**Q All right. But whoever was working on line three in this time presumably would have heard Frank cussing you out everyday or every other day?**

A Or people around the line or the lines.

**Q And who else would have been around?**

A That's -- that's five years ago when you're asking that time period of when I trained on line three.

**Q Do you know of anybody who witnessed Frank cussing you out at least every other day when you were being trained on line three?**

A When I was being trained?

**Q Uh-huh, yes.**

A I'm not sure. I know that they witnessed arguments.

**Q Arguments between you and Frank?**

A Yes.

**Q When you say "they" witnessed arguments, who witnessed arguments?**

A I'm sure other people on the other lines. I can't remember the people that were there at that time.

**Q And in the arguments they witnessed, would they have witnessed you cussing at Frank as well?**

A No.

**Q So, according to your testimony, he was cussing at you, but you weren't cussing at him?**

A Frank would call me a goddamn mother fucking bitch, throw his hands up and walk away.

**Q I'm asking you what your language was.**

A At him?

**Q I'm talking about in the time period of your training, the three weeks with Frank, yes, what was your language like towards him?**

A I never cussed Frank.

**Q Never once?**

A Never once.

**Q During this three-week time period or several week time period, he was cussing you out you say --**

A Yes, ma'am.

**Q -- at least every other day, you never said a cuss word at him?**

A If I used the cuss words when he called me a goddamn mother fucking bitch or a stupid bitch, I would repeat that and tell him don't call me that, don't call me a stupid bitch, don't call me a fucking, stupid bitch.

**Q You had talked in a similar way to other employees before, correct?**

A I don't understand what -- I don't know.

**Q Well, you had cussed other employees before?**

MS. ROBERTSON: Object, that's not similar.

A I don't understand. I have not called them a stupid bitch or told them how I fucked all night. I did not do that.

**Q Did you cuss at other employees at work?**

A Not that I can remember.

**Q Were you ever disciplined for cussing at other employees at work?**

A Yes, when a mechanic threw a jar of peanuts and hit me in the chest with it. And I cussed him out. And I have fibrosis. And when he hit me with that jar of peanuts to get my attention, I cussed him out.

**Q And remind me who that was.**

A Johnny Metcalf.

**Q Okay. And he was given a three-day suspension; is that right?**

A That's what I was told.

**Q And it's your testimony that that's**

**the only time you ever cussed another employee at work was at Johnny Metcalf when he threw a thing of peanuts?**

A I don't recall. There were so many incidents.

**Q So many incidents of you cussing other employees?**

A So many incidents of sexual discrimination, sexual harassment, so many incidents of being cussed at, so many incidents of things being thrown.

**Q Well, let me ask you this. Did you consider it sexual harassment whenever a male employee cussed at you?**

A Yes.

**Q Did you consider it sexual harassment when a female employee cussed at you?**

A No. I consider it -- when a man brags about their past and when a man is cussing me and talking about his sex life --

**Q Okay. Let me stop you right now, because that's not responsive to anything I've asked you. I didn't ask you --**

MS. ROBERTSON: Well, she was trying to answer the question and you're not going to interrupt her. Now, she was answering your question.

MS. SWAIN: She was not answering my question.

MS. ROBERTSON: She was.

MS. SWAIN: Ann, it's my deposition.

MS. ROBERTSON: Well, she was --

MS. SWAIN: Let me ask her again.

MS. ROBERTSON: Okay. Ask her again.

MS. SWAIN: Thank you.

**Q I'm not asking you about when men bragged about their sexual past. I'm asking you about when a man cusses at you, that was my question. You claim that you think that that is sexual harassment.**

MS. ROBERTSON: Well, I object unless you characterize the cussing. If she calls him a bitch it is. If she calls him hell it's not. Cussing? Make your distinction.

MS. SWAIN: Answer the question I'm asking please. I'm going to ask counsel to

stop -- you don't have to like my questions. But I'm entitled to ask a question. You state your objection if you don't like the question. And that's your right. You may state your objection.

MS. ROBERTSON: Well, I object because --

MS. SWAIN: But you are not allowed to tell me how to ask the questions.

MS. ROBERTSON: -- they're over broad and incomprehensible.

**Q (By Ms. Swain) The question is, the question I asked earlier was, you believed it was sexual harassment if a male employee cusses at you, correct?**

A Correct.

**Q But you do not believe it was sexual harassment when a female employee cussed at you?**

A If a female cussed at me, it would be -- not name calling, not you're stupid, you're a fucking bitch. Not -- that's not -- a female -- when you say, I don't -- the

females that cuss out there, along with myself, are frustrated, are scared to step up. It's a daily basis that you have the men cussing and calling you names.

The females turn on each other. That's an occasion with Kim. We continuously -- the mechanics calling you a fucking, stupid bitch or watch her, watch what I'm going to do.

**Q So, let me get this straight. The reason why Kim was cussing at other women was because of the way the men were acting?**

A And -- if another woman was running the capper machine and the person on the capper had to keep turning it off and -- because the mechanic wouldn't fix the machine. And the mechanic would say, just run the fucker, just keep running the fucker. There's nothing wrong with it.

Then both parties were aggravated and would go at each other. You can't -- if you reported it, nothing was done.

**Q Okay. So just to make sure I'm**

**clear. It's your testimony that the reason why people like you and Kim used foul language at work was because men used foul language towards you?**

A I don't understand when you say foul language.

**Q Well, did you use the word "fuck" when you were at work?**

A I believe so.

**Q Did you use the term "mother fucker"?**

A I don't -- I'm not sure.

**Q Did you ever use the term mother --**

A I did use it when I said it back to Frank about calling me a stupid, mother fucker or a fucking bitch or I'm tired of this shit. I got to a point where I was just tired of it. I went through the chain of command. I followed the policies and procedures. I did that. And when I did that, it just got worse for me.

**Q Was it in your view acceptable for you to use the words "fuck" or "shit" or**

**"mother fucker" at work?**

A There is a difference between using those words and demeaning somebody with those words.

**Q That's your opinion, correct?**

A I assume that it is the company's opinion also when they brought up a policy of put somebody on notice if they talk to you that way. Just put them on notice. Tell them you don't appreciate that. Well, that didn't work either.

**Q My question is, is it your opinion that it was okay for you to use those words?**

A I'm not saying it's okay, but I'm saying that it's done. That in casual conversation people cuss. It's a factory. But in bringing somebody down and throwing things and cussing people, that's not right.

**Q You indicated during the several weeks that you worked or that Frank trained you on line three that he threw cans; is that right?**

A Yes, ma'am.

**Q Did he throw them at you?**

A The day that I turned the belt off he did.

**Q He threw cans at you?**

A (Witness nods head.)

**Q Is that a "yes"?**

A Yes.

**Q Is this a bag of cans or individual cans?**

A Where ever you stand, there are cans running on the line full of peanuts. When I turned the belt off, I turned the wrong belt off. It was jammed, the machine. And he pulled them out. Throwing them at me hollering, "You stupid, fucking bitch."

**Q And you, of course, said nothing, correct?**

A I turned around and left the line and went and got Fannie.

**Q And you didn't say anything to Frank?**

A I am not going to go up to a man that's enraged and cannot control his anger.

**Q So, is the answer no?**

A No, I did not go to him then.

**Q So, you told Fannie that you couldn't train under Frank; is that correct?**

A Yes, ma'am.

**Q And is it correct that --**

MS. ROBERTSON: Wait just a minute let me see if we can get a napkin or something so she can wipe her face without using her blouse. Does anybody have a tissue?

(DISCUSSION OFF THE RECORD).

**Q (By Ms. Swain) When you told Fannie that you couldn't work with or you couldn't train under Frank, was that on the same day he threw the cans?**

A When he was unjamming the machine, yes, ma'am.

**Q And you said Fannie exchanged Frank for James?**

A Not immediately.

**Q How long after that did she exchange Frank for James?**

A After other occasions of us getting

into a confrontation.

**Q And what other occasions did you all get into a confrontation?**

A Whenever Frank cussed or threw cans.

**Q So, he cussed and threw cans on a number of occasions in this time frame?**

A Yes, ma'am. The machine they had on line three was the oldest machine.

**Q How many times would he cuss and throw cans during the several weeks that you trained with him?**

A Whenever the machine jammed up.

**Q Well, how frequently was that?**

A The machine can jam up 10 times in 10 minutes.

**Q Okay. So he was basically constantly cussing and throwing cans at you?**

MS. ROBERTSON: Object. She said he only threw cans at her once.

MS. SWAIN: No, she didn't.

MS. ROBERTSON: I thought she said that once.

**Q (By Ms. Swain) How many times did he**

**throw cans at me?**

A At me once. He threw cans when the machine jammed.

**Q But he only threw them at you one time?**

A When he called me the stupid, fucking bitch.

**Q Well, tell me about the other times that he threw cans. That was constantly? He was constantly throwing cans 10 times in 10 minutes?**

A At me?

**Q No. I think you just said once at you. But you said he threw cans every time the machine jammed which you said it could be 10 times in 10 minutes. Was he just constantly standing there throwing cans?**

A On the floor if it made him angry, if it jammed, yes.

**Q Okay. All right. What other conflicts did you have with Frank in this time period until they exchanged Frank for James?**

A I don't recall. After -- a short time with James, Fannie pulled James back off the machine and put Frank back on the machine because she said Frank ran it better. And we would just have to get along. So I just abided my time.

**Q How long did you work with James on that training?**

A I'm not sure how long it was. Maybe a week.

**Q And what's James' last name?**

A Porter.

**Q Did you have any problems with James while you were working with him?**

A No.

**Q So, then Frank was brought back. And did he continue to throw cans all day while you were working with him?**

A If he -- Frank did what Frank wanted to do. I was there. I tried to just learn the machine, get my raise and go back to line one.

**Q Did you continue to have conflicts**

**with Frank during that training period after he came back and was exchanged again for James?**

A I don't remember if there are anymore incidents during that training period.

**Q And you said you complained to Fannie about it and you complained to who else, Melvin?**

A Hutchins.

**Q What conversation did you have with Melvin in that time period?**

A That I reported that Frank called me a fucking, stupid bitch. And that he was always cussing, always screaming. And I was told that I would just have to get along. He's the only one that can run the machine, work it out.

**Q Was that before or after you complained to Fannie?**

A I'm not sure. It could have been together.

**Q They may have been together when you complained?**

A Yes, ma'am.

**Q Did you talk to anybody over Melvin's head about Frank in this time frame?**

A I'm not sure that -- I'm not -- I'm not sure that the new management was in at that time.

**Q So, is the answer you don't know?**

A I'm not -- we did not have any procedures before then.

**Q Well, you always had an employee handbook during your employment with Flavor House, did you not?**

A They gave you one on the first day that was in your envelope.

**Q And you received one on your first day; is that right?**

A I believe so.

**Q And your employee handbook that you received contained a policy prohibiting discrimination; is that right?**

A I would have to look at it.

**Q Let me show you what I have marked as Exhibit 5 and ask you if that is a copy of**

**the Equal Employment Opportunity policy that was in the first handbook you received at Flavor House?**

**(Defendant's Exhibit No. 5 was marked for identification ).**

MS. ROBERTSON: Well, I object.

A I'm not sure. There is not a date on here.

MS. SWAIN: All right. Well, let's take a quick break. I'm going to get the whole handbook and let you take a look at that.

THE VIDEOGRAPHER: The time is 11:59 and we're off the record.

(BREAK TAKEN).

THE VIDEOGRAPHER: The time is 12:03. We are back on the record.

**Q (By Ms. Swain) Ms. Thornton, I'm going to hand you -- I'm not going to mark this as an exhibit. But just so that you can look at that in relation to the policy. I gave you a copy of the 1999 Flavor House**

**handbook and ask you if that is a copy of what you received.**

MS. ROBERTSON: Well, I object.

MS. CRUM: What did you say the date was?

MS. ROBERTSON: 1999.

MS. SWAIN: You object to her testifying?

MS. ROBERTSON: No, I object to you testifying.

MS. SWAIN: I'm not testifying. I asked her if this was a copy of the handbook that she received at Flavor House.

A I'm not sure if it is the same one I received.

**Q Did you receive a handbook when you started working at Flavor House?**

A Yes, ma'am.

**Q I'm going to show you what I am going to mark as Defendant's Exhibit 6 and ask you if that is an employee acknowledgment form you signed indicating receipt of the Flavor House handbook.**

**(Defendant's Exhibit No. 6 was marked for identification).**

A That's my signature.

**Q To your knowledge, were you acknowledging when you signed this form -- I'm going to ask you this.**

**If you look at the back page of the handbook I showed you, the 1999 handbook, does that appear to be the same document that you signed that we have marked as Exhibit 6?**

A Yes.

**Q And based on that, is it your belief that you signed or that you received -- I'm sorry -- the handbook that I have handed you here, but not marked, marked bates number FH000307 to 000367?**

A I believe so. Is this -- this would be a larger version of the small book?

**Q Well, this is a copy. Obviously not a --**

MS. ROBERTSON: Well, see I think she said she doesn't know if it is or not. Do

you have the handbook itself because she is saying that's bigger than the one she got?

MS. SWAIN: Ann, I'll ask you again, if you have an objection, state it. If you don't like my question or if you think you need to clarify something with the witness, at the end of --

MS. ROBERTSON: Well, I'm objecting to you not using the original. That's my objection.

MS. SWAIN: Fine. Object. And then let me ask and complete the deposition without your interference please.

MS. ROBERTSON: I'm not interfering. I'm representing my client as I think you are yours.

**Q (By Ms. Swain) Do you know whether Exhibit 10 -- I'm sorry. Exhibit 6 is acknowledgement for the handbook that I've handed you here?**

A I don't know if it is.

**Q You do not know? Is that your answer?**

A I thought it was smaller.

**Q Do you recall a policy, in whatever handbook you received, that is substantially the same as page 3 of this handbook?**

MS. ROBERTSON: I object. It's not a policy, unless it's followed.

A I know that they gave me a package, a folder when I started.

**Q Okay. Did the folder that you received when you started have an Equal Employment Opportunity policy in it?**

A I'm not sure.

**Q Did you read the packet that you received?**

A I didn't read -- it was just a folder with a small handbook that I read.

**Q Did you read the handbook?**

A Yes, ma'am.

**Q And did the handbook have an Equal Employment Opportunity policy in it?**

A I don't recall.

**Q You just don't recall one way or the other?**

A I don't.

**Q Do you recall whether the handbook you received had a workplace harassment policy in it?**

A I don't recall. It would have been one of -- if I picked it up, I read it. I put it down.

**Q Did you ever refer to your employee handbook when you were experiencing difficulty with Frank Williams as you've described it during the weeks that he trained you?**

A I don't know that we had procedures then. I went through the chain of command.

**Q My question is, did you ever refer to your employee handbook that you received?**

A I don't know.

**Q Now, at some point during your employment at Flavor House, did you receive a new or a different employee handbook?**

A I believe so.

**Q Okay. And without marking it, I'm going to show you a document that's bates**

**numbered FH000376 to FH000419 and ask you if that's a copy of the later employee handbook that you received?**

A I believe so.

**Q And were you part of a committee of employees who were involved in discussing policies with the new handbook?**

A I believe we had two meetings.

**Q When you say we, was this -- you were? Is the answer yes, you were part of a group of employees?**

A I signed up for it.

**Q And did you participate?**

A On the meetings that they did have we signed a paper -- signed if we were present for those meetings.

**Q And did you discuss in those meetings what revision, if any, there might be to the new handbook or what policies there might be in the new handbook?**

A Basically on the point system.

**Q On attendance?**

A Yes.

**Q That was the area that you were involved in discussing?**

A I remember a meeting when things were being changed.

**Q When you say things were being changed, do you mean things that were in the handbook?**

A They wanted a committee to -- as I recall -- making -- they were making revisions. But it was supposed to happen, I don't know if it was once a week, once a month. But with scheduling things, I don't think I was at maybe one or two. I don't recall.

(Defendant's Exhibit No. 7 was marked for identification).

**Q Okay. Now, just to not have an enormous, I don't want to mark that entire handbook as an exhibit. But I'm going to mark as Exhibit 7 a copy of what is page 7 of the handbook that we just looked at.**

**Ann, if you could let her have the**

**whole thing for just one moment to compare that to what I just handed her.**

**Is Exhibit 7 there a current copy of page 7 of this 2005 handbook?**

A Yes.

**Q Okay. And when I say the 2005 handbook, that was the one we were just looking at a second ago, the newer version of the handbook that you said you believe you did receive; is that right?**

A Yes.

**Q And did you receive that some time in 2005?**

A I'm not sure of the date.

**Q The date on the handbook is what, May 2005? Is that -- do you recall whether you received that handbook some time in that same time frame of May 2005?**

A I recall something being handed out.

**Q Do you recall whether it was in the time frame of May 2005?**

A I'm not sure.

**Q Okay. Now, I'm going to show you**

**what I am going to mark as Exhibit 8.**

**(Defendant's Exhibit No. 8 was marked for identification).**

**And ask if this is the Equal Employment Opportunity policy that's contained in that May 2005 handbook?**

A Yes.

**Q And in the Equal Employment Opportunity policy, what we have marked as Exhibit 8 there, the fourth paragraph down, do you see there where it discusses a toll-free number where complaints can be made?**

A Yes.

**Q And that's also mentioned in the workplace harassment policy down there at the bottom of the first page of Exhibit 7; is that correct? Is the toll-free hotline number mentioned there also on the first page of Exhibit 7?**

A Yes, it's mentioned.

**Q And also on Exhibit 7, the workplace harassment policy, that's mentioned as one**

**avenue that you could utilize for complaints of harassment, correct?**
A Yes.
**Q In addition to bringing it to the attention of your immediate supervisor, local human resources representative, local equal employment coordinator or Ralcorp's St. Louis Equal Employment manager; is that correct?**
A Yes.
**Q Did you at any time during your employment with Flavor House call the toll-free hotline?**
A No.
**Q Did you ever, during your employment with Flavor House, contact the St. Louis Equal Employment opportunity manager?**
A No.
**Q And I know we've already discussed some discussions you had with your supervisor and I know we'll probably have some others. And your local human resource representative at the time that you left was Tommy Nance, correct?**

A Yes.
**Q And who was in that position before Tommy?**
A I'm not sure if it was David Helms or Richard Holland.
**Q Richard?**
A Holland.
**Q Do you know who was in that position in 2003 during the time frame that you were training with Frank Williams?**
A I'm not sure there was anyone.
**Q Just not sure?**
A I'm not sure.
**Q Okay.**
A But I don't believe that came in until the new management came in or if it was --
**Q When you say the new management, you mean Mary Ann Boyer?**
A Yes.
**Q Do you know when Mary Ann Boyer first came to the Dothan plant?**
A I don't know the date. I know that

before they came into the plant we -- the management had a meeting with us telling us that there was about to be changes, and that a new group was coming in.
**Q But you don't recall when that was?**
A No.
**Q I'm going to show you what I have marked as Exhibit 9 and ask you whether that's a copy of another page from the employee handbook that contains the company's communication policy.**
**(Defendant's Exhibit No. 9 was marked for identification).**
**Is that a copy of another page from the 2005 employee handbook that contains the communication policy?**
A I believe so.
**Q And basically the communication policy states the company's open door policy?**
A And that was changed.
**Q What was changed?**

A The open door policy.
**Q By the time that the May 2005 handbook came out, is it correct that the company had an open door policy?**
MS. ROBERTSON: Object.
A They said they had an open door policy.
**Q Okay.**
A But then they put a lock on the door and had meetings saying we needed to go to our supervisors.
**Q They put a lock on what door?**
A To the office door. Your badge allows you to go in and out. And our badge was not activated to go into the front office. There was only certain people's badges that could go into the front office, such as management, mechanics.
**Q And if you wanted to go into the front office to talk to, say, Mary Ann Boyer how would you do that?**
A You would either beat on the door until somebody could hear you and open it or

try to call somebody's extension if you could get them and not their voice mail.
**Q Well, you spoke on any number of occasions with Mary Ann Boyer in --**
A I was told by Mary Ann--
**Q If I can finish the question, okay?**
A Yes, ma'am.
**Q Sometimes I know you know where I'm going and you try to jump in. But let me finish because she can't get us both down at once.**
**I know you talked to Mary Ann Boyer on a number of occasions in the first part of 2006 before you left; is that correct?**
A Yes, ma'am.
**Q How did you reach Mary Ann when you wanted to talk to her on those occasions?**
A If I seen her going through the plant, walking through the plant, I would ask her to come speak to me. On some occasions, I would leave a message on her voice mail that when she got the opportunity could she come to my machine.

**Q And did she then do that?**
A Sometimes and sometimes not.
**Q Were there ever times when you -- strike that.**
**In addition to the policies that we looked at, is it correct that there were postings in the plant relating to the company's equal employment opportunity and harassment policies?**
A Yes, sir, I believe it was on the wall.
(Defendant's Exhibit No. 10 was marked for Identification.)
**Q I'm going to show you what I am going to mark as Exhibit 10. And these are -- just so we don't have to have 20 different exhibits. There are different dates on these, okay?**
A Yes, ma'am.
**Q This is the Equal Employment Opportunity notice with the January 2005 date and a policy against harassment with the**

**January 2005 date. And if you will look through here, there are different dates. This is the July -- I'm sorry. January 2004 policy against harassment and notice of Equal Employment Opportunity. And then I've also got January 2001 and January 2000.**
**Are these the policies that -- obviously not all at one time, but on and after the dates at the bottom, are these the policies that you saw posted in the plant?**
A I'm not sure.
**Q You just don't know one way or the other?**
A I really don't.
**Q Okay. Good enough.**
**Now, between the time that you trained with Frank in roughly 2003 and the time that Frank became the team leader over line three when you were there and -- when was that? That was in early 2006 or late 2005?**
A I believe it was late 2005.
**Q Okay. In between those two periods,**

**you did not work with Frank; is that correct?**
A Correct.
**Q So, you didn't really have any problems with him?**
A No.
**Q No, you didn't or --**
A I don't recall having any problems with him.
**Q In between?**
A When I was away from him.
**Q Okay. And then he became team leader you said in late 2005 over at line three and that conflict began again; is that correct?**
A Yes. I'm not sure of the dates. I'm not good on dates.
**Q Yeah, I think we've got that -- we've established that.**
**But whenever it was that he became the team leader over line three, your conflict with Frank began again; is that correct?**
A Yes.
**Q And is it correct that initially the**

**conflict you had with Frank was primarily work issues?**

MS. ROBERTSON: Objection.

A Not necessarily.

**Q Okay. Did you have a meeting in January of 2006 with Chris Jordan, Melvin Hutchins and Frank Williams?**

A I believe so.

**Q And was it discussed with you during that meeting that you needed to follow the scheduled break times?**

A I don't remember that. I mean, I think they gave us a schedule. I believe they gave us a schedule.

**Q For break times?**

A Yes, ma'am.

**Q And was it discussed with you in this meeting that you needed to go by that schedule?**

A I believe so. But then it was changed at a later date.

**Q And was it discussed with you during this meeting an issue about you running two**

**pallets with wrong labels?**

A That was during my training period. I believe it was. I'm not sure.

**Q Okay.**

A There were so many incidents.

**Q You don't know whether that happened or not?**

A I know it happened. I believe it happened.

**Q You just don't know when it happened?**

A I just don't know when it happened, the circumstances. If I could read the write-up, if I could -- but I was up in that office with three men. If I say one thing one way or one thing the other way, I was always retaliated against or wrote up. If I complained, I was written up.

**Q Well, were you written up in this time frame?**

A I believe in that incident I was the one that was disciplined somehow or another.

**Q Were you --**

A I believe I complained that Frank --

Frank was -- see, Frank was the one that could relieve me for breaks, the only one. And Frank stayed on the telephone in the break room or outside smoking, and then would come back and tell me I'm going to break. I'll relieve you whenever I get back.

If I complained about that, it got worse. If I complained about that, they found something else to complain about on me.

**Q Frank did?**

A Frank would go to management and tell management that I was leaving the line or I wasn't taking my break when I was supposed to.

**Q So --**

A On the label operator, they got into this where they would give the lines break schedules on -- if you're a label operator, you can't go by those schedules. You try to go by the schedules, but you can't go by the schedules. Because if you're at the end of the order, there's no one to change out your labels.

**Q Is it correct then -- let me make sure I understand this.**

**You would go to management and complain that Frank wouldn't relieve you from break when he was supposed to and then you claim he would retaliate against you by --**

A Returning to management and telling them --

**Q Complaining that you weren't taking your breaks when you were supposed to?**

A Or other complaints.

**Q Okay. And the issue about you running two pallets of wrong labels, were you told that disciplinary action would occur if that happened again?**

A I'm sure.

**Q And were you told that loading labels should be done without stopping a line if possible?**

A Yes.

**Q Were you told that you were responsible for communicating to the filler operator for stopping the line when the**

**accumulating table fills up?**
A That's -- I don't know if I was told that. But a good filler operator watches the label machine before it fills up.
**Q Well, you don't --**
A And the only way -- you would have to holler. I whistled.
**Q You whistled to let them know?**
A (Witness nods head.)
MS. ROBERTSON: Yes?
**Q Is that yes?**
A Yes. Sorry.
**Q Were you told that at the end of the schedule it is everybody's responsibility to clean the line and complete any rework and if you had paperwork that needed to be completed at the end of the shift, it should be done after the line had finished cleaning?**
A I'm not sure. But if I was, I believed I would have had a problem with that.
**Q But you don't know whether you were told that one way or the other?**

A I don't know. Like I said, there were so many incidents.
**Q Was there another meeting with you and Chris Jordan and Melvin Hutchins and Frank on February 3rd 2006?**
A I don't know what you are referring to.
**Q Well, did Chris have a coaching session with you end of January 2006 with Melvin present?**
A A coaching -- I don't understand. A coaching session?
**Q Did he sit down and talk to you with Melvin --**
A See --
**Q -- about problems you had with work?**
A That was a continuous thing. And what those papers, for instance, that you have that you asked me have I ever seen them before?
**Q Uh-huh.**
A The reason I have not seen them before is because they've got where they

had -- during that time, they had a new system. And while you are talking, it doesn't matter if it's casually to your supervisor or management, they were told to sit there and just document everything you say. Therefore, I haven't seen what was typed up.
**Q Well, I haven't asked if you've seen anything. I just asked if you had a meeting with --**
A I don't recall unless I see if I was wrote up or if I made a complaint.
**Q So, you don't recall one way or the other whether you had a meeting in January of 2006?**
A If you could refresh my memory of what it was about.
**Q Okay. Well, did Chris Jordan discuss with you an ongoing issue that when you had a problem with the label machine that you quickly would call for a mechanic?**
A That's when they had their old label machine. And yes, I would call for a

mechanic.
**Q Were particular employees charged with downtime? In other words, if the line had to go down while something was done to a machine, if you were the one that was working on your label machine, would that be charged to you?**
A They would choose whether to put it on mechanical time or operator time.
**Q And if you called for a mechanic, it would go on their time, correct?**
A It depended on what the problem was with the machine. If you have a mechanic standing there and your machine is down, that doesn't necessarily mean that it's mechanical time. It could also be operator time.
It doesn't have -- if the mechanic was replacing a part or belt, that would be mechanical time.
**Q If you worked on the machine yourself though, it would obviously be charged to you?**
A Operator. But then you --
**Q Let me stop you. Is that a yes?**

A Yes, I'm sorry.
**Q I want to make sure I understand your answer. Okay.**
**Did you also discuss with Chris that -- a conversation you had had with Frank where you did not understand when Frank had told you that a label was not between the rails, you didn't know what he meant by "between the rails"?**
A Yes.
**Q And did Chris discuss with you that there was a time that they, the labels, were not aligned properly on the can, but you continued to run it, to run the line?**
A Yes. I did -- I didn't know what to do. I was being told to run. I was being told don't stop the machine. Then I've been told, why didn't you just stop the machine and go get a manager and report the cussing.
**Q Was it discussed with you during this meeting that you and Frank had an ongoing problem regarding problem resolution?**
A I don't understand what you're

asking.
**Q I'm asking you whether it was discussed with you during this meeting, a problem between you and Frank with resolving problems between each other?**
A I imagine we were told to handle it or I was told to handle it. To get along, you have to. Melvin Hutchins told me one day, "I hope it's a tie."
**Q "I hope it's a tie"?**
A Yes, ma'am.
**Q What was he --**
A There was no winners and no losers, "I hope it's a tie."
**Q Did Chris tell you that he in the future would like to see more team work and less friction between you and Frank?**
A I'm sure.
**Q Now, shortly after that meeting, did you begin telling co-workers or talking to co-workers about Frank being a registered sex offender?**
A I'm not sure of the time.

**Q Well, at some point, did you start talking to co-workers about Frank being a registered sex offender?**
A I spoke to a co-worker outside about Frank being a convicted sex offender.
**Q Who was that co-worker?**
A Mark Beard.
**Q And when you say "outside," you mean outside where you would go to smoke?**
A Yes, ma'am.
**Q All right. And you told some other employees as well that Frank was a convicted child molester?**
MS. ROBERTSON: Objection.
A I'm not sure.
**Q You don't know whether you did or not?**
A It was a well-known fact. It was a well-known thing. Everybody discussed it. Frank discussed it. Frank continuously told me, "As soon as we got a new governor, I'm going to be pardoned."
**Q I'm asking you whether you told any**

**other employees that Frank was a convicted child molester?**
A Mark and I were discussing it on the patio. And Jewel wanted to know what we were talking about. And we told her to look online, just look at your computer. And we said he was a convicted sex offender.
**Q Anybody else besides Jewel?**
MS. ROBERTSON: Object to the form.
A I'm not aware. That's when write-ups started happening, the harassment started happening.
MS. SWAIN: Let's stop.
MS. ROBERTSON: Is this a good time for lunch?
MS. SWAIN: Yeah.
THE VIDEOGRAPHER: The time is 12:36. This concludes tape number two and we're off the record.
(LUNCH BREAK TAKEN).
THE VIDEOGRAPHER: The time is 1:57. This is the beginning of tape number three. We are back on the record.

**Q (By Ms. Swain) Ms. Thornton we were talking before our lunch break about your conversations with other people about Frank being a registered sex offender. Did you tell Stephanie Lampley that Frank was a registered sex offender?**
A I'm not sure.
**Q Did you tell Catherine Long that?**
A I believe so.
**Q Now, you claim that Frank told -- well, let me ask you this: How did you learn that Frank was a registered sex offender? Where did you get that information from?**
A I'm not sure who it was, but everybody was aware of it.
**Q Well, you know what you were aware of, correct?**
A Ma'am?
**Q You know what you were aware of?**
A That he was a convicted sex offender.
**Q Right. You don't know what other people knew, do you?**
A That he was a convicted sex

offender? I don't understand what you're asking.
**Q In terms of who else knew about it. I'm just --**
MS. ROBERTSON: Tell her how you know they know is what she's saying. She's asking how do you know everybody knew about it.
**Q Well, I'm asking how you knew for starters.**
A I don't remember the initial person that told me.
**Q Okay. Did it strike you at all as strange that Frank would want other people to know that he was a registered sex offender?**
A It struck me as strange that he would tell that he was.
**Q But your testimony is that he, in fact, did that?**
A Ma'am?
**Q Your testimony is that he, in fact, did that?**
A Yes.
**Q Did you ever hear Frank tell someone**

**else that he was a registered sex offender?**
A Yes.
**Q Who did you hear Frank tell that to?**
A I don't know the name of the other person. It was a personal resource person in the break room.
**Q A personal --**
MS. ROBERTSON: I think she means personnel.
**Q Do you mean the temporary --**
A The temp.
**Q -- agency? So, it was a temporary employee he was telling that to?**
A Yes, ma'am.
**Q I got you. Anybody else you heard Frank tell that he was a registered sex offender?**
A I don't know who was present, but when it was time for him to register, the time of year that it was for him to register, he said he registered every year.
**Q He told you that?**
A He told everybody that when he had to

leave work early to go register.
**Q I'm asking did he tell you that?**
A Yes.
**Q What was your understanding of the nature of Frank's conviction?**
A I didn't have an understanding.
**Q Well, at some point you got on the internet, correct?**
A Yes.
**Q And did you look up that information?**
A I tried to. I had -- my son helped me do it on our computer.
**Q And was this while you were still employed at Flavor House?**
A Yes.
**Q And did you tell other employees how they could find other information about Frank on the computer?**
A No.
**Q What did you find on the computer?**
A His picture and the charges.
**Q Okay. What were the charges that you found?**

A I don't recall exactly. I recall that there was three different ages.

**Q Do you recall -- you are talking about of the alleged victims?**

A Yes.

**Q Do you recall what those ages were?**

A 13 -- I know it started at 13. I recall that.

**Q When you say 13, 13 being the youngest age?**

A Yes.

**Q So, was it your understanding that his conviction was for a sex offense against children?**

A Yes, minors.

**Q Minors. Do you know how old Frank was when he committed the crime that he was convicted for?**

A I didn't ask him.

**Q So, is your answer no?**

A No.

**Q Are you aware that Frank complained that you were harassing him by telling other**

**people that he was a registered sex offender?**

A Yes.

**Q How did you become aware of that?**

A From one of the write-ups you handed me on that occasion.

**Q What, one of the exhibits?**

A Yes.

**Q Show me which one that is.**

A Where I was wrote up -- I had a write-up on it. I documented. It should be in my file if it's not here. I had an employee come to me telling me that Frank was irate. I have it. It's in my personal file.

**Q Okay. You had an employee come to you and tell you that Frank was irate?**

A That I was spreading the word that he was a convicted sex offender, that Jewel had told him that.

**Q Okay. And then after -- well, let me strike that.**

**Who was the employee that came to you?**

A I don't recall that either.

**Q And after somebody supposedly told you this, you then went and talked to Melvin and Chris Jordan?**

A Yes.

**Q I'm going to show you what I am going to mark as Defendant's Exhibit 11 and ask you if this is a copy of documentation that you wrote up on that occasion?**

**(Defendant's Exhibit No. 11 was marked for identification).**

**Is that what this is?**

A Yes, ma'am.

**Q And at the time that you wrote this document up that we've marked as Exhibit 11, did you meet with Tommy Nance?**

MS. ROBERTSON: Object.

A I believe it was after. I'm not for sure.

**Q After you wrote this up you did?**

A Yes.

**Q Do you recall whether it was the same day you wrote this document up?**

A I don't believe it would be because things were never handled on the same day.

**Q Do you have any recollection in particular of how long it was after you wrote up this document that you met with Tommy?**

A I'm not sure.

**Q Did Tommy Nance tell you -- well, strike that.**

**Did you meet with anybody else in management regarding the situation?**

MS. ROBERTSON: You mean the -- what situation? Object.

**Q The situation where you went to go talk to Melvin and Chris about Frank telling another employee that you had come to them telling them that he was a child molester.**

A This is the meeting with Melvin.

**Q So, when you wrote this letter, you were with Melvin and Chris?**

A Right here.

**Q When you wrote this up, you were sitting physically with them?**

A In the office.

Page 122

**Q What conversation did you have with Melvin and Chris, anything other than what's on this form?**
A This right here (indicating).
**Q Did you say anything else during that meeting?**
A I'm not sure. I'm sure if I did, they documented it on the computer.
**Q Nothing else you recall?**
A Nothing I recall.
**Q Do you recall anything they said to you?**
A Whenever I documented things, it was usually the procedure that they would take care of it. And they would make their remarks on the bottom if it needed to be put down -- any questions they asked me I would tell them the answer and then they would write it on the bottom -- Chris would write it.
**Q My question was, do you recall anything that Chris or Melvin said to you during this meeting?**

Page 123

A I don't -- it was two years ago. I don't know.
**Q Okay. Some time after this meeting, were you told not to be talking about Frank's criminal history or personal history at work?**
A Yes.
**Q Who told you that?**
A Tommy Nance.
**Q Was anybody else present during that conversation with Tommy?**
A I don't believe on the first meeting.
**Q Was anything else said during that meeting by either you or Tommy, other than Tommy telling you not to go around telling people that Frank was a child molester?**
A Yes.
**Q What else was said?**
A He said he didn't need the employees conversating over this matter. And then he proceeded to tell me that his wife had their computer even hooked up to an alert system where if there's a child molester in the area it would alert them so many radius miles.

Page 124

And that he didn't want the employees talking about it because so many employees had children, and they would get worried and scared.
**Q Anything else said during the meeting?**
A (No response).
**Q Mrs. Thornton?**
A I'm sure there was.
**Q Anything else you recall that was said during the meeting?**
A I believe that he -- I believe this is the meeting, I'm not sure, that he told me if I had spoke of Frank Williams again I would be written up.
**Q Okay. Anything else?**
A Not that I recall.
**Q Did you understand that Tommy Nance believed it would be disruptive for you to be running around telling other people that Frank Williams was a child molester?**
A I found it disruptive for Frank Williams to cuss me and being a child molester.

Page 125

**Q That's not my question. My question is, is it your understanding that Tommy Nance thought it would be disruptive for you to be running around telling other employees that Frank was a child molester?**
A I wasn't running around telling other people that he was a child molester. I had the understanding after this meeting that he wanted us to get along. He wanted us not to have any problems, just to work on it.
**Q And he wanted you to not discuss Frank Williams being a child molester with other employees, right?**
A I never said child molester. I denied it then and I deny it now. And I tried to say it then.
**Q Well, all right. You were discussing with other people that Frank was a registered sex offender --**
A I wasn't --
**Q -- if that was the term you would prefer?**

A -- discussing it with other people. I was sitting there with a co-worker on the patio that was complaining of Frank Williams and that was angry because Frank Williams continued to be promoted. And he was being denied. And he -- we talked about how he was a convicted sex offender and that's all you had to be to get promoted. That's how the conversation was.

And another individual interrupted and wanted to know what we were talking about. And I told her to go online and look, she would see his picture.

**Q Do you know whether any of your former co-workers told management that you had been telling people that Frank was a registered sex offender or child molester?**

A I don't know. I know -- I mean -- I know -- I believe I told Catherine Long after the incident with Frank. But it's public knowledge that he is a sex offender. And it's knowledge in that whole plant how he treats women. Every female is a bitch.

There's just a different name before it or behind it.

**Q That's your opinion?**

A That's several people's opinion.

**Q Do you know whether there are other employees that told managers an opinion other than that?**

A Yes, that he calls them names and screams and hollers.

**Q I asked -- that's not my question. If you will listen to the question. That's your opinion you claim that there are others who hold that same opinion. Do you know whether there are others who have told management that they hold a different opinion?**

A A different opinion of Frank?

**Q That do not believe that Frank is as you've described him.**

A Well, it might be the ones that he's buddies with. I'm sure there is. The ones that bring him liquor for Christmas presents in the plant. I'm sure there is ones that

are his buddies. His wife that works there, his brother that works there. I'm sure there are people that think Frank is a good person. It's not my opinion not --

**Q We get that.**

A From the action --

**Q If you could try to answer the questions, all right?**

A Yes.

**Q Thank you.**

**Now, after you've been told not to discuss Frank's history with other employees, you were told by Tommy Nance that they had been told that you had been doing that. You had been trying to -- you had been acting in a way that was inflammatory; is that correct?**

A I'm not sure.

**Q Well, you were actually given a disciplinary notice about that, right?**

A I'll have to look at it.

(Defendant's Exhibit No. 12 was marked for identification).

**Q Let me show you what I have marked as Defendant's Exhibit 12 and ask you if that is a copy of a memo to file regarding a disciplinary discussion that Tommy Nance had with you?**

A I received this write-up.

**Q And did you receive the write-up on March 7th 2006?**

MS. ROBERTSON: I object.

A This is February.

MS. ROBERTSON: I object. This doesn't appear to be something that she did after. This appears to be he revisited the issue.

MS. SWAIN: You've stated your objection. Let's move forward.

**Q Is this something you received on March 7th 2006?**

A This is -- I received this after filing the complaint that a person told me that Frank Williams had just made harmful threats to me, and that he was going to "fuck me up," is what I was told.

**Q My question is whether you received this document on March 7th 2006.**
A I don't know the date. I know that I received this after I went to the office and said, "So and so says he has just said that he is going to fuck me up if I ever cause him to lose his job or if I ever say anything to him again. One way or another he is going to get me."
And this is when I was wrote up. This is what that's wrote up. That's why I wrote, "I disagree with entire situation."
**Q All right. Do you see the date on here is March 7th 2006?**
A I am not good with dates. I know --
**Q I'm not asking if you are good with dates. I'm asking if you see on the document --**
A I see what they have typed there.
**Q Let me finish the question please before you start your answer.**
**Do you see the date on the document is March 7, 2006?**

A Yes.
**Q Is this your signature down here --**
A Yes.
**Q -- on the right-hand side of the document? Is that a "yes"?**
A Yes.
**Q Did you actually meet with Tommy Nance at the time that this document was given to you?**
A Yes.
**Q Did Tommy tell you that he had determined that you had acted in a way that was inflammatory and instigational?**
A He told me that he had went through my file. I had not been written up before. And this was why he was giving me a first -- he referred to it as a first something.
And that, in fact, that he had found that I had discussed Frank Williams once again. And this -- he gave me this when I went and reported Frank Williams making threats on me.
**Q Is this your handwriting down at the bottom?**

A This is my handwriting (indicating).
**Q Who is it that supposedly told you that Frank was making threats against you?**
A Leigh Taylor.
**Q What was her position?**
A She worked in the front office.
**Q Doing what?**
A I'm not sure.
**Q Is she an hourly employee?**
A I'm not sure.
**Q When did Leigh Taylor tell you that Frank had made threats against you?**
A On the day that I reported this.
**Q On the day that you reported what?**
A That he made threats to me. He had made threats to me that day to her.
**Q I'm trying to -- but you don't --**
A No, I don't have a date.
**Q So, you don't know when she told you that and you don't know when you reported it?**
A I know this write-up came because of the conversation she had with me and I had

with her.
**Q That's your opinion?**
A That's what I was told.
**Q So, Tommy told you that he was giving you the write-up because you had --**
A I had --
**Q Let me finish the question, please.**
A Yes, ma'am.
**Q Did Tommy tell you that he was giving you the write-up because Leigh Taylor had told you that Frank had made a threat?**
A He told me that he was giving me the write-up because I had the conversation with Leigh Taylor.
**Q Did you tell Leigh Taylor during that conversation that Frank was a convicted sex offender?**
A After she told me of the threats he made.
**Q Do you know whether Leigh Taylor told Tommy Nance that you had told her that Frank was a registered sex offender?**
A I'm not sure.

**Q Tell me once again what the threat was that Frank supposedly made.**
A She asked me, "What have you done to him?" And I said, "Why?" And she said, "Because he just said how he was going to fuck you up," that if you cost him his job he'll get you, that I was stuck up Mary Ann's ass and Melvin's ass and he would fucking get me.
**Q Anything else that Leigh told you that Frank supposedly said?**
A She made the comment that he was always talking about sex, what -- how his sex life was, what they did together. And I told her, "He's a convicted sex offender."
**Q Anything else said during that conversation with Leigh?**
A When I referred to telling her that he's a convicted sex offender when she asked me what did I do, I told her that I was -- already told if I spoke about it again I would be fired. And that's what I did.
**Q Well, anything else discussed with**

**Leigh Taylor?**
A I'm not sure.
**Q Anything else you remember?**
A Not right now.
**Q Well, is there anything that will refresh your recollection about that conversation?**
A I'm not sure.
**Q Do you have any documents about that that would reflect that conversation?**
A I'm not sure. Like I said, I had boxes.
**Q And you've looked for them through your boxes, right?**
A Yes, ma'am.
**Q And you can't find them?**
A Yes, ma'am.
**Q So, after that conversation with Leigh, you then went to whom to complain?**
A I went to Tommy Nance.
**Q And what conversation did you have with Tommy?**
A I repeated to him what I had just

been told.
**Q Anything else discussed with Tommy at that time?**
A I told him that I had asked Leigh would she be willing to tell Tommy what she had just told me and she said yes.
**Q Did you talk to Chris Jordan and Melvin Hutchins about your conversation with Leigh?**
A I'm not sure because we were on the patio when she told me. And we have to go by -- we go by the office -- I might have even let her -- have her let me in the office. I'm not sure.
**Q So, you're saying you may have just stopped by Tommy's office right after you had the conversation with Leigh?**
MS. ROBERTSON: Using the open door policy that wasn't open.
MS. SWAIN: Ann, I'm going to ask you again to stop interfering with the deposition.
MS. ROBERTSON: Well, you stop being

rude to my client, please.
MS. SWAIN: I'm not being rude to your client.
MS. ROBERTSON: Well, the video will show it I assure you.
MS. SWAIN: That's why it is being videoed.
MS. ROBERTSON: You certainly are being rude and brusk and mean.
MS. SWAIN: Stop interfering with the deposition, please.
**Q So you may have just stopped by Tommy's office on your way back through the office; is that what you're saying?**
A It upset me that he had made threats -- physical threats.
**Q And my question is, do you think you just stopped by Tommy's office on your way back from the patio?**
A I might have. I'm not for sure.
**Q And that being the case, would that mean then that you probably would not have talked to Melvin and Chris about that**

**conversation with Leigh?**
A I might not have. I might have. Considering that she was an employee in the front office, I may not have.
**Q So, you're just not sure whether you did or not?**
A Right.
**Q Okay. Do you know whether Leigh ever told Tommy Nance about the conversation that you had with her?**
A Yes. That's when I received my write-up.
**Q Was Leigh present when you received your write-up?**
A No.
**Q When did Leigh talk to Tommy Nance?**
A I assume whenever Tommy called her in the office he told me he would speak to her after I reported the threat.
**Q Okay. So, you talked to Tommy, Tommy told you he would talk to Leigh. Were you present when Tommy talked to Leigh?**
A No.

**Q Do you know whether he, in fact, did talk to Leigh?**
A No. Because shortly after that she was no longer with the company.
**Q Okay.**
A He told me when he gave me this he had talked to --
MS. ROBERTSON: Defendant's Exhibit 12. You have to say what it is when you point to it.
THE WITNESS: Okay.
**Q (By Ms. Swain) Okay. What did he say about his conversation with Leigh?**
A After speaking to Leigh, he had decided, according to his information, that I had discussed Frank Williams after being told not to.
**Q Do you know what Leigh told Tommy?**
A She was supposedly terminated a couple of weeks later. I never seen her again.
**Q So, is your answer no?**
A No.

**Q Other than the conversations that you had -- the conversation that you had with Leigh on the patio, did you ever have any other conversation with Leigh Taylor about Frank Williams?**
MS. ROBERTSON: Put that down and listen to her.
A I'm sure. Because we were all smokers and we sat on the patio for our breaks. And he was always vocal about his sex life.
**Q Was Frank -- when you say we all were out on the patio for a break, are you including Frank or are you talking about you and Leigh?**
A Well, if Frank got up to go back inside, Leigh would look at me and say, "That's all he does is talk about his sex life."
**Q All right. Tell me about that. You claim Frank always talked about his sex life. What kinds of comments would he make?**
A "I can tell my wife is cheating

because when we fuck -- the way she feels inside is loose. I know she's cheating." When his wife left him and he started going with a girl that works at the plant, he would come in, "I haven't slept all night. We fucked four hours. We even did it in the car in the backyard where the children were inside. We didn't want the kids to see. She gave me a blow job. If my wife did this for me, we wouldn't be divorced. She's agreed on that."
**Q Anything else?**
A I'm sure there is. I just can't -- I'm nervous and I can't recall right now.
**Q And you say Leigh Taylor was present when all of these comments were made?**
A I'm not sure for all of them.
**Q But she -- Leigh heard at least some of these comments?**
A Yes.
**Q Who else was present?**
A I don't know.
**Q Do you know of anybody else that**

**would have heard these comments that you claim Frank was making all the time?**

A They would have to be asked, the people that I worked with.

**Q Well, who are the people that you worked with that you think would have been around Frank and might have heard him making these comments that you claim he was making all the time?**

A Catherine Long, Kim Perkins. If the people would tell the truth. The females there are job scared and scared of retaliation if they would tell the truth.

**Q If you can answer the questions, please, instead of just volunteering whatever you feel like saying. The question is, who else would have heard these comments?**

A I'm not sure whoever was in the listening vicinity.

**Q Do you know of any other people that were around when you heard Frank make comments of this nature?**

A I don't know.

**Q The only people you know of that might have heard him are Leigh Taylor, Catherine Long and Kim Perkins?**

A Yes.

**Q Did Leigh Taylor tell you on any other occasions about any threatening remarks by Frank Williams?**

A No.

**Q Did any other employee tell you on any other occasions about any threatening remarks by Frank Williams?**

A No, not that I'm aware of.

**Q Did Frank Williams ever make any threatening remarks directly to you?**

A Yes.

**Q Okay. What were those?**

A "Stupid, fucking bitch."

**Q Well, I understand he made comments that you did not like. My question is, did he make any comments that threatened that he was going to do something to you?**

A The throwing the pallet on the floor, the throwing the garbage bag, the "mother

fucker -- you goddamn mother fucker." And continuously picking up a pallet, throwing it on the floor. Threw the large garbage bag that's half as big as this table full of cans. Continuously calling me a goddamn mother fucker while people walked by and me begging the mechanic to please page a supervisor, please.

**Q I'm not just asking you about anything he did that you didn't like. I'm asking you specifically if he made any comments that were threatening to you in the sense of saying he was going to do something to you. Not physical actions, not just cuss words. But I'm trying to find out whether he asked you -- if he ever made any comments to you that were threatening in the sense that he was stating something that he was going to do to you.**

A That he wasn't going to put up with the fucking shit no more. That's as he was throwing the pallet, the garbage bags.

**Q Okay. Anything else?**

A Not at this moment.

(Defendant's Exhibit No. 13 was marked for identification).

**Q I'm going to show you what I'm going to mark as Defendant's Exhibit 13 and ask you if this is another documentation form that you filled out?**

MS. ROBERTSON: Another one?

A This is another --

**Q Let me see that just for a second.**

MS. ROBERTSON: This is the one she made before they wrote her up on March the 7th.

MS. SWAIN: Let her testify, please, Ann. Thank you.

MS. ROBERTSON: Well, she's already testified to it.

MS. SWAIN: We haven't discussed this document.

MS. ROBERTSON: She told you she made a complaint in writing before she was written up on March 7th. This would be it.

MS. SWAIN: Ann, I'm going to ask you one more time to stop telling her what the testimony is. She can testify about what the document is.

MS. ROBERTSON: Well, you need to listen to what the testimony is so you won't try to mislead her.

MS. SWAIN: I'm not trying to mislead her. I'm asking if this is a document that you wrote -- another documentation form that you wrote up.

**Q Is that what this is, Ms. Thornton?**

A I wrote that up.

**Q And you wrote this one on March 1st 2006?**

A Yes.

**Q And at the time that you wrote this up, it says Melvin Hutchins and Chris Jordan were present.**

A Yes.

**Q Was anybody else present?**

A Not that I'm aware of.

**Q And was this -- this is your**

**handwriting where it says what happened; is that correct?**

A Yes.

**Q And you wrote, "Repeatedly have been told of comments that have been" -- I'm sorry. "That team leader has made against me. One after investigation. Very serious comments and threats made."**

**Are you talking there about the comments that Leigh told you, Leigh Taylor?**

A I'm not sure. All I know is I documented every time I was threatened. That's why I documented like this. That's why I documented right there (indicating). I know that every time he made a threat, I documented it. I'm not good on the dates. I'm not good what happened first, what happened last. Every time I was threatened, I documented it.

**Q So, on this particular document, you're not sure what you're talking about?**

A I'm -- this is where Leigh told me about --

**Q Well, look at this at the bottom.**

MS. ROBERTSON: Wait. Do not interrupt her. Please let her answer the question.

**Q If you will look at the bottom --**

MS. ROBERTSON: Wait. Let her finish the question.

MR. CRUM: There was no question. She just started talking.

MS. SWAIN: I'm not going to have you tell me what I can ask her. I'm trying to point something out to her --

MS. ROBERTSON: All right. Let the record reflect that she interrupted her when she was trying to answer the question. Go ahead.

**Q Do you see here at the bottom of the document where it says, "These threats and comments were made to an employee at the front office"? Does that suggest to you perhaps you were talking about the comments that Leigh had told you about?**

A It might have.

**Q But you're not certain of that?**

A I am not -- all I know is I documented every time I was threatened. And I was written up and reprimanded when I complained. I did the chain of command. They weren't there to help me.

**Q Okay. My question is, you're not certain whether on Exhibit 13 whether you're talking about what Leigh told you or what you're talking about?**

A I'm not sure of what came first, what came last.

**Q Okay. I'm just asking you about this particular incident.**

A I'm not sure.

**Q Okay. That's all I'm asking.**

**Other than Exhibit 12, which is this one, did Tommy Nance ever write you up on any other occasions?**

A Probably if I had complained about something. I'm not sure.

**Q You don't know one way or the other?**

A I'm not sure.

**Q How many times did you complain to Tommy Nance?**

A I didn't count them.

**Q So, you don't know?**

A I complained to anybody that would listen. I complained to any supervisor that walked by me.

**Q How many times did you complain to Tommy Nance? Is your answer you don't know?**

A I do not know.

**Q Okay. And you also complained to Melvin Hutchins; is that correct?**

A Yes.

**Q Do you know how many times you complained to Melvin?**

A About?

**Q Frank.**

A I do not know.

**Q Do you know how many times you complained to Chris Jordan about Frank?**

A I do not know.

**Q Do you know how many times you complained to Mary Ann Boyer about Frank?**

A I do not know.

**Q Other than those people, Mary Ann, Chris, Melvin --**

MS. ROBERTSON: Listen to her.

**Q -- and Tommy, and Fannie Ash earlier on, I guess, was there anybody else that you complained to about Frank in management or human resources?**

A Could you repeat the names?

**Q Yeah. Tommy Nance, Mary Ann Boyer, Chris Jordan, Melvin Hutchins and then earlier on Fannie Ash.**

A I'm not sure. Their supervisors came and went. I complained to anybody that would listen. Anybody I could complain to.

**Q How frequently would you say your complaints about Frank were? Was this a daily event, once a week?**

A It depended on Frank's moods and Frank's language and what was going on in Frank's life.

**Q Now, let's talk about the incident that happened on June 14th. On June 14th,**

**you had an incident or a conflict with Frank Williams; is that correct?**

A Yes.

(Defendant's Exhibit No. 14 was marked for identification).

**Q Let me show you what I have marked as Defendant's Exhibit 14 and ask you if that's a copy of the documentation form that you wrote regarding that incident?**

A Yes.

**Q Take a minute, if you would like, to read over that if you would like to.**

A (Witness complies).

MS. ROBERTSON: Do you have one that shows what that last word on the bottom is?

MS. SWAIN: I think it's "over." I'm pretty sure it just says "over." I think what's on page 2 is actually on the back on the original document.

**Q Now, on June 14th, was Frank filling in while you were on a break? Is that what was going on before this started?**

A I believe so.

MS. ROBERTSON: Can that little man with the stick come in and make it cooler?

MS. SWAIN: I'll have to ask again.

(DISCUSSION OFF THE RECORD.)

**Q Now, when you returned from your break, there was rework there that needed to be done at your station, at your machine?**

A On the rework table and on the floor and in boxes.

**Q And that would be right around where you would work; is that correct?**

A Yes, and to the left.

**Q And you asked him to help you with that?**

A Yes.

**Q And then that evolved into a conflict where he yelled at you?**

MS. ROBERTSON: Object.

A Where he flipped out on me.

**Q And did he yell at you?**

A Yes.

**Q And you claim that he yelled cuss**

**words?**
A Yes.
**Q Did Frank tell you when you came back from your break that he had been asked by Chris Jordan to do something else as soon as you got back?**
A No.
**Q Did you yell at Frank during this altercation or conflict?**
A If I did, it was to tell him to stop yelling and cussing me.
**Q Other than just saying that, your testimony is that you didn't yell anything at all at him?**
A Yes, I did not.
**Q Did you use any profanity towards Frank during this conflict?**
A No.
**Q Now, you claim that you asked -- you indicate Donald Coty walked by; is that correct?**
A Yes.
**Q And who is Donald Coty?**

A A mechanic.
**Q And you asked him to get a supervisor?**
A Donald was a supervisor. Yes, I asked him to call our supervisor.
**Q Who would have been Melvin?**
A Melvin or Chris.
**Q Okay. And eventually Chris came and Melvin came, correct?**
A Eventually both did.
**Q Okay. Now, during this conflict, as you describe on here, Frank yells at you, Frank cusses at you. And as he's walking away, he continues to yell and cuss at you basically; is that correct?**
A Yes.
**Q Was there anything about this particular incident that made it different from what you said was going on everyday when you were working with him in the training?**
A Frank -- every fit that Frank had it escalated into something worse every time. This was the worst that I had seen.

**Q How was this worse than the other occasions that you testified about earlier?**
A He physically threw things. He physically swung his arms in the air screaming, cussing, "Goddamn mother fucker." And physically picking up a pallet and slamming it back down and picking it up and slamming it back down and throwing that bag.
And when he threw the bag, the rework that was on the rework table come flying at me. And he was acting crazy walking inside the curtain, outside the curtain, inside the curtain, outside the curtain, continuously staring at me and cussing.
I stood there and ignored him and continuously asked the mechanic to please get a supervisor.
**Q Which they did?**
A Eventually.
**Q Okay. So, this was a worse incident than the incidents you had had with Frank in the past?**
A It was worst than the time before and

that time was worse than the time before.
**Q Now, when Melvin and Chris came, is it correct that Chris Jordan told you to come by his office and write out a statement?**
A At 3:00.
**Q And what time was it when this incident took place?**
A I put 11:00 to 11:05 with a question mark.
**Q Between 11:00 and 11:05 when all of this happened and then 3:00 -- well, let me go back.**
**Did you go to Chris Jordan's office at 3:00?**
A I tried to go to Chris' office before then.
**Q What time did you, in fact, go to Chris' office?**
A I'm not sure. Whenever I was relieved or the line was finished.
**Q Was that before 3:00?**
A I'm not sure.
**Q Between the time -- between 11:00 to**

**11:05 when all of this was happening and the time you went to Chris Jordan's office, did you continue to work?**

A I had to.

**Q So yes?**

A Yes.

**Q And did Frank continue to work?**

A Frank continued to pace up and down and stare at me.

**Q Did Frank say anything else to you that day?**

A No.

**Q And when you went to Chris Jordan's office, you wrote out this statement here that we've marked as Exhibit 14; is that correct?**

A Yes.

**Q And you indicated on your statement that Catherine Long, Wesley and Tomika Cook were people who were in the area?**

A Yes.

**Q Do you know Wesley's last name?**

A McInnis.

**Q Is he a mechanic?**

A Yes.

**Q And then after you wrote up this statement, did you go home for the day?**

A Yes, I believe so.

**Q Did you have any conversation with Chris Jordan when you wrote out this statement?**

MS. ROBERTSON: It's so hot in here it caused the fire alarm to go off.

THE VIDEOGRAPHER: The time is 2:43 and we're off the record.

(BREAK TAKEN).

THE VIDEOGRAPHER: The time is 3:02. This is the beginning of tape number four. We are back on the record.

**Q (By Ms. Swain) All right. Ms. Thornton, on June 15th, the day after the incident that we were discussing before our break, you were returned to work; is that correct?**

A Yes.

**Q And on June 15th, is that when you**

**began working or you worked that day anyway on line five?**

A No.

**Q No? You worked on line three still?**

A Yes.

**Q Okay. And did Frank Williams speak to you at all on June 15th?**

A No.

**Q Did he interact with you at all on that day?**

A He stood at the rework table just glaring at me. He stood in front of my machine just glaring at me. He would walk from the rework table back to my machine, back to the filler, turn around and glare at me.

**Q Any other incidents or interactions with Frank Williams on June 15th?**

A Not that I recall. I reported to Melvin that I didn't feel safe working around him.

**Q That was on the 15th that you reported that to Melvin?**

A Yes.

**Q Okay. Was that before the end of your shift?**

A Yes.

**Q How long had you worked at that point?**

A I'm not sure. Shortly after I reported that to Melvin, I was moved to line five.

**Q Do you recall how long you worked on line three before you reported that to Melvin?**

A No.

**Q So, at some point during that day of June 15th is when you were moved to line five?**

A Yes.

**Q Okay. And for those of us who have never worked at Flavor House, there are -- there's a line one, line two, line three, line four and line five, correct, kind of one after the other?**

A Yes.

**Q So, between line three and line five would be line four; is that correct?**
A Yes.
**Q Do you know what the distance is in feet, say, between line three and line five?**
A Not exact.
**Q I assume you've never actually got out there and measured it?**
A No.
**Q And when you moved to line five, Frank Williams remained on line three?**
A Frank was still in his team leader position.
**Q On line three, correct?**
A Yes.
**Q Now, when you moved to line five, were you still working as a label operator?**
A Yes.
**Q And you had the same hours as you had on line three?**
A No.
**Q What were your hours on line five?**
A Whatever the schedule was on line

five.
**Q Were you still on the same shift?**
A Yes.
**Q And when you say your hours were different, do you mean like your starting and stop times were different or the number of hours might be different?**
A Either if that line had night shift or not or if you had to stay and finish the schedule.
**Q And was the 15th of June the only day that you actually worked on line five?**
A No.
**Q You worked on line five for some period of time on the 16th?**
A Yes.
**Q And were those two days the only two days that you worked on line five?**
A No.
**Q Okay. When else did you work on line five?**
A I don't recall the dates.
**Q I guess what I'm trying to figure out**

**is, in this time frame -- I mean, I don't mean like at some prior point.**
A Okay.
**Q After you got moved to line five after the June 14th incident, the 15th for part of the day and I guess the beginning of the 16th are the only days you worked on line five, correct?**
A Yes.
**Q Do you know what your schedule would have been on line five had you continued in that role?**
A I don't understand what your -- for the rest of the day?
**Q No. I mean had you not left your employment at Flavor House and you had stayed there and you had stayed on line five, do you know what your schedule would have been on line five?**
A The schedule changes everyday for every line.
**Q Okay.**
A It goes on the orders.

**Q Do you know how many hours you would have worked each week on line five?**
A I wouldn't know how many hours on any line.
**Q Do you know whether the number of hours that you worked on line five would have been more or less than the number of hours you worked on line three?**
A I don't know.
**Q Did you receive the same amount of pay on line five as you had when you worked on line three?**
A I received my label operator pay.
**Q And that was the same?**
A Yes.
**Q Now, when you told Melvin Hutchins on the 15th that you weren't comfortable working with Frank, did Melvin tell you the situation would be resolved?**
MS. ROBERTSON: Objection. That's not what she has testified to.
**Q Did you tell Melvin Hutchins on the 15th that you were not comfortable working**

**with Frank?**

A I told him I did not feel safe working with Frank.

**Q When you told Melvin Hutchins that you did not feel safe working with Frank on the 15th, did Hutchins tell you the situation would be resolved?**

A No.

**Q Okay. What did he tell you?**

A He told me that he didn't blame me, that he had read my complaint and just to pray about it.

(Defendant's Exhibit No. 15 was marked for identification).

**Q Let me show you what I am going to mark as Defendant's Exhibit 15. Is that a copy of the charge of discrimination that you filed at the EEOC?**

A Yes.

**Q And you filed that charge on -- looking on the first page there. Is that -- it looks like it was received by the EEOC on**

**September 21st 2006. Does that sound like the right date when you filed the charge?**

A I'm not sure on the date.

**Q Did you sign it on September 15th 2006?**

A That's my handwriting.

**Q So, is that a yes, you signed it on the 15th?**

A Yes.

**Q Look, if you would, on the third page of this Exhibit 15.**

A (Witness complies.)

**Q The second paragraph from the bottom, the one at the beginning of the paragraph starts with, "On or about June 15th." Do you see that paragraph there?**

A Yes.

**Q The middle bottom of the page. Starting on the right side of that paragraph, third line from the bottom, do you see where it says, "He reassured me that the situation would be resolved." Are you talking about Melvin Hutchins right there?**

A Yes.

**Q And is that true, that Melvin Hutchins told you that this situation would be resolved?**

A Yes.

**Q Did you -- after that conversation with Melvin, how long was it before he -- well, strike that.**

**Is Melvin Hutchins the one that told you to go to line five?**

A I believe it was Chris Jordan.

**Q Okay. After your conversation with Melvin that's described here, how long after that did Chris Jordan tell you to go to line five?**

A I'm not sure. I believe they had to get another label operator to relieve me.

**Q So, you're not sure how long that took?**

A I'm not sure.

**Q So, you worked on line five until the end of your regular working time on June 15th?**

A Yes.

**Q And then on June 16th you came to work, correct?**

A Yes.

**Q How long did you work on the 16th?**

A Not long at all.

**Q And was Frank at work on the 16th?**

A No.

**Q Do you know where he was?**

A It was said over the radios that mechanics walk around with that he was on vacation.

**Q Okay. And is that how you knew he wasn't there that day?**

A Yes.

**Q But even without him there, you did not want to continue working on the 16th?**

A No.

**Q Now, did you leave your work area and go outside? Is that what happened?**

A I left my -- I called for a supervisor to come relieve me. And I went, and I had a conversation with the

supervisor. And it was Bruce Cassidy. And I told him that I could not take this anymore.

**Q And what did Bruce say or do?**

A First I asked Chris Jordan if I was going to line three since Frank was not there. And he said, "I need you on line five." Then I asked Melvin Hutchins. And he said, "I need you on line five." Then I asked Ricky Smothers if this was a permanent position. And he said he didn't know.

And then I paged Melvin. And he came and I asked him was it a permanent position. And he said he didn't know. I paged Bruce Cassidy and had him relieve me because I started crying realizing they were retaliating against -- they moved me again. They moved me after Frank did what he did and they weren't going to get rid of him.

**Q After you talked to Bruce -- I mean, at some point, you left the work area and went outside, correct?**

A I left the work area and clocked out. I told them --

**Q Was that after you talked to Bruce?**

A Yes.

**Q Okay. So, you clock out, you go outside. And then Chris Jordan and Melvin Hutchins came outside to talk to you?**

A Melvin Hutchins and -- I believe it was Ricky Smothers.

**Q Okay. And they told you that you could come back in an hour and talk to Tommy; is that right?**

A Melvin said, "Do me a favor, please, just leave and come back." And I told him, no, I was too upset to be driving. And he said, "Well, just go sit in your car until Tommy and Mary Ann get here."

**Q And is that what you did?**

A Yes.

**Q And then when Tommy and Mary Ann got there, you went and talked to them; is that correct?**

A Yes. Bruce Cassidy -- when I told him I couldn't take it anymore, he said, "You know how I feel about it. I don't understand

why they do what they do."

**Q Motion to strike as non-responsive.**

**Now, you met with Tommy Nance and Mary Ann Boyer in the office; is that correct?**

A Yes.

**Q And did they tell you that the move to line five was permanent?**

A Mary Ann told me that she did not understand why they had not told me it was a permanent move. They knew it was a permanent move. And she did not understand why they had not already spoken to me about that.

**Q Let me ask you this: Did you want the move to be permanent or you wanted the move not to be permanent?**

A I wanted to be safe. I wanted to be in the position that I bidded for, that I worked for. And I wanted to work in an environment that was safe for me. And no matter where I was in the plant, I would not be safe. Frank Williams was able to roam in the plant.

**Q So, basically it didn't make any difference what position they put you in?**

A Not if he could get to me.

**Q What else was discussed during the meeting with Tommy Nance and Mary Ann Boyer on the 16th?**

A Mary Ann told me that she was under the impression from Tommy and Melvin that I had baited Frank Williams into speaking to me that way. That ever since I -- ever since she was at the Dothan plant I had complained of sexual discrimination, I had a problem with sexual discrimination, that there wasn't one mechanic I didn't have a problem with. She went on to say that I even had a problem with Donald Coty.

**Q Did you have a problem with Donald Coty?**

A Yes, ma'am.

**Q What problem did you have with Donald Coty?**

A Him spitting dip in front of my machine.

**Q Any other problem with Donald Coty?**
A Not that I remember right now.
**Q Did you complain to Mary Ann Boyer about Donald Coty spitting dip in front of your machine?**
A I believe Mark Beard had left Mary Ann a voice mail to come out to the line. And when Mary Ann came out, she spoke to Mark Beard. And then she came to me.
**Q Was Mark Beard a co-worker, a supervisor? Who was he?**
A Another label operator.
**Q And when Mary Ann came out to the line, you spoke to her?**
A Both of us did.
**Q And what did you tell Mary Ann?**
A She asked me what I seen. And I reported what I had seen.
**Q Did you tell her you had a problem with Donald?**
A I told her that I had a problem with Donald spitting tobacco products in a food plant.

**Q Do you know what, if anything, was done?**
A I don't know.
**Q Did Mary Ann Boyer tell you that she could not tell you what action they were going to take with respect to Frank Williams?**
A When I asked if he would still be employed at Flavor House.
**Q And she said that they could not tell you that?**
A She said, "Yes, he's not terminated."
**Q Now, during that meeting -- did Tommy Nance say anything during this meeting or was it just you and Mary Ann Boyer talking?**
A It was a mixture of all three. I was upset, hysterical crying. I explained to Mary Ann that I had been carrying a screwdriver in my back pocket.
**Q Why had you been carrying a screwdriver in your back pocket?**
A To defend myself if he was to come near me again. I had had it.
**Q Did you carry -- did you have a**

**screwdriver as part of your job as a label operator?**
A In a tool bag.
**Q Did you carry that tool bag on your person normally or where did you keep it?**
A We carried it and put it on our label cart on the line.
**Q When did you begin carrying the screwdriver in your back pocket?**
A When Frank Williams threw the pallet, threw the bag and calling me "Goddamn mother fucker."
**Q So, after the 14th of June?**
A The rest of that -- the 14th and the 13th -- the Thursday and the Friday.
**Q The incident on the 14th is what prompted that?**
A Yes.
**Q Any other conversation -- well, strike that.**
**During the meeting with Mary Ann Boyer and Tommy Nance, you attempted to resign by putting your badge on Tommy's desk;**

**is that right?**
A Yes.
**Q And this meeting took place in Tommy's office; is that right?**
A Yes. It really -- it really wasn't a meeting. Nobody was sitting down. It was --
**Q A conversation?**
A Yes.
**Q Okay. And Mary Ann told you that she didn't want you to quit; is that right?**
A Yes.
**Q And she told you to think about it over the weekend?**
A Yes.
**Q Was this on a Friday?**
A Yes.
**Q Okay. And did you agree to do that?**
A I agreed to take my badge back and I agreed that I would think about it. But I have to have my badge to get out of the building.
**Q Is that why you took your badge back?**

A Yes.
**Q In other words, you weren't really going to think about it?**
A When she told me that they were going to separate us for three months and that I had baited Frank Williams into treating me that way, at that point in my mind I did not want to come back.
**Q So, you had already decided you were going to quit?**
A I decided that I would take the weekend and think about it, and get my badge that I had to have to get out of the building and leave.
**Q So, that's what you did?**
A Yes.
**Q And then on the following, I guess Monday – you didn't work on the weekends, correct?**
A That particular weekend I did not.
**Q Okay. You weren't scheduled to work. So, on your next scheduled work day or your next two scheduled work days you called**

**in sick; is that correct?**
A Yes.
**Q And on the third day you called and indicated that you were going to quit?**
A I am not sure if it was the third or the fourth day.
**Q Okay. So, it may have been after the third day?**
A (Witness nods head.)
**Q Is that a "yes"?**
A It may have been.
**Q And you spoke to Leigh? Is it Allums?**
A Allums.
**Q Allums. On the day when you quit, correct?**
A Yes.
**Q Did you actually speak to anybody other days, or were you just calling in on the call-in line?**
A You have to call in on the call-in line when you call in sick.
**Q So, you had just called the call-in**

**line the first however many days it was you called in sick?**
A Yes.
**Q And when you called the call-in line, you left a message? Is that how that worked?**
A You leave your name, the department, the date and the time and the reason you will be absent.
**Q So, when you called in on the day that you quit, you called some other numbers to directly talk to Leigh?**
A I called Leigh after Leigh left a voice mail for me to -- when I returned to work, Tommy wanted her to call me and tell me when I returned to work to bring a doctor's excuse.
**Q Because you had been out for three days?**
A Yes.
**Q And was that the company's policy with respect to absences of more than three days?**
A I believe so.

**Q When you called and talked to Leigh on -- was that on the 21st of June when you quit?**
A I'm not sure of the date.
**Q Okay. Well, whenever it was that you called and talked to Leigh, what did you tell Leigh?**
A I told Leigh that I had received her message. And she said that Tommy just wanted a doctor's excuse for me to be able to return back to work. And I told her I was not returning back to work. She asked me why. I told her I quit because I could not work with Frank Williams anymore. I cannot work for a company that defends a convicted sex offender that treats women the way he does. And that I walked around with a screwdriver in my back pocket.
**Q Did you have any other conversation with -- what was Leigh's response to that?**
A "I'm sorry. I'll tell him." And, "Well, you know I'll probably see you later."
**Q Any other conversation with Leigh**

**during that call?**
A Not that I can remember.
**Q Now, other than what you've already gone over today with me, is there any other conduct that you're claiming that Frank Williams engaged in that was sexually harassing towards you?**
A His language, his sex stories.
**Q When you say his sex stories, this is what you were talking about earlier about the comments you told me he made about his wife cheating and that testimony that you gave earlier, correct?**
A Yes.
**Q Okay. What I'm trying to do, and we can certainly go back through all of it if you would like to. I'm trying to, rather than have us go back through all of the testimony you've already given, is just ask you if there is anything you haven't told me about that Frank Williams did to you that you claim was sexual harassment?**
A He had a habit of -- when Frank

talks, he touches you. And continuously I told him not to touch me. Stop touching me. He had a habit of calling females girlfriend. I told him not to call me girlfriend.
**Q Anything else?**
A Just the threats, the harassment, the throwing, the cussing, the stares, him standing in front of my machine just glaring at me.
**Q And you are talking about on those -- on that last -- on the 15th, I guess? On June 15th?**
A He did it two days in a row. The day of the incident and the next day.
**Q Okay. So, June 14th and 15th. Okay. We've discussed that. Any other staring that we haven't discussed?**
A Not that I am aware of.
**Q All right. Any other throwing other than what we've already discussed. You claim that he was throwing pallets on top of each other and he threw a bag of cans on June 14th**

**and then you testified earlier to can throwing back during the training session. Was there any other throwing --**
A It wasn't pallets on top of each other.
**Q Okay.**
A It was one pallet picking it up and throwing it.
**Q Okay. Any other throwing incidents that we haven't discussed?**
A Not that I can remember right now.
**Q When he threw the pallets, was he throwing it at you?**
A In my direction. There was a table in between us.
**Q Did it hit you?**
A The table prevented it from hitting me.
**Q So, it hit the table?**
A The legs.
**Q It hit the legs of the table?**
A He was picking the pallet up and throwing it. And the table is right there,

and I'm to the right of the table. And hollering, "Goddamn mother fucker."
**Q I'm just trying to envision this. He throws the pallet, it hits the legs of the table; is that correct?**
A The legs are higher (indicating).
**Q Okay.**
A There is no table tops like this. The table is up here, the table top (indicating).
**Q Okay. And the pallet hits the legs of the table?**
A Hitting -- it was in my direction hitting the table, yes.
**Q What about when he threw the bag of cans? Did he throw that at you?**
A Yes. And the table stopped it, the top of the table.
**Q All right. Any other throwing incidents that we haven't discussed?**
A Not that I can remember right now.
**Q All right. We've talked about the threats that Leigh Taylor talked to you**

**about.**
A Yes.
**Q And you testified to a bunch of comments that you didn't like. Are there any other threats that you're complaining about?**
A I'm not sure. There's so much. It's hard for me -- things come up and I have flashbacks of certain things. Something will jog my memory, and I will remember it.
**Q Any other threats that you can remember?**
A No.
**Q Any other threats that you included on a documentation form at Flavor House?**
A Not unless it's in my personnel file or if I have any anywhere else that I'm not aware of.
**Q On the occasion that you heard or heard about a threatening remark that Frank made, did you always record that on a documentation form?**
A I always tried to get copies or make a copy.

**Q Well, I guess I'm saying, were there any occasions where you either heard or heard about threatening remarks by Frank Williams that you did not write out a documentation form?**
A This was not always in process.
**Q Okay. After those became --**
MS. ROBERTSON: She was pointing to Defendant's 14.
MS. SWAIN: Right.
**Q You're saying that this particular form, like Exhibit 14, was not always one that they used, right?**
A We never had one until these became --
**Q And at some point they started using those?**
A Everything was verbal.
**Q Okay. After they started using the documentation forms, were there ever any times that there were any threatening comments by Frank Williams that you either heard or heard about that you did not include**

**on a documentation form?**
A I'm not sure.
**Q Now, you've indicated that Frank calls -- refers to females as girlfriends and you asked him not do that; is that correct?**
A Yes.
**Q Were you offended by Frank using that term "girlfriend" when he talked to women.**
A Girlfriend and bitches.
**Q Okay. I'm talking about girlfriend right now. We'll get to bitches some other time. Were you offended by him using the term "girlfriend"?**
A I was offended that he talked to me the way he talked to me and then at the end referred to girlfriend or at the same time touching me.
**Q Let's just do one thing -- take one thing at a time, okay? I'm trying to figure out, did you find the term "girlfriend" offensive?**
MS. ROBERTSON: Object. She's answered that.

A I offended -- everything about Frank Williams offensive.
**Q Okay. So, that would be a "yes"?**
A Yes.
**Q When you say Frank would touch you when he talked, where would he touch you?**
A On your arm.
**Q On your lower arm up here or on the shoulder?**
A He touches you. He just touches you to get your attention.
**Q Like a tap-tap kind of touch or like while he is --**
A Just continuous, aggravating.
**Q The whole time he's talking to you he is sitting there doing this (indicating)?**
A Yes. If he wants your attention.
**Q And, again, he's doing that onto the upper part of your arm?**
A Yes.
**Q Did Frank Williams ever touch you in any other way other than that?**
A No.

**Q Did Frank ever ask you on a date?**
A No.
**Q Did Frank ever proposition you for sex?**
A No.
**Q And did Frank ever ask you about your sex life?**
A No.
**Q Did you ever talk to Frank about your sex life?**
A No.
**Q Did you ever talk about your sex life at work with other people than Frank?**
A No.
**Q Now, you indicated earlier that Frank's wife worked at the plant; is that right?**
A The first or the second?
**Q Well, he married a woman who worked at the plant, correct?**
A Yes.
**Q Okay. Did his first wife work at the plant?**

A At one time.
**Q Did she work there while you were working there?**
A Yes.
**Q Was she still working there when she and Frank got divorced?**
A No. She wasn't there very long.
**Q Okay. And then his second wife was still working at the plant when you left; is that correct?**
A Yes. I don't believe they were married at the time.
**Q They weren't married when you left?**
A No.
**Q Were they dating?**
A Yes.
**Q All right. Any other conduct by Frank or comments by Frank that you're complaining about as being sexual harassment than what we have already gone over here?**
A Not that I can remember.
**Q Was there any conduct that you are complaining of -- strike that. Let me try**

**that again.**
**Are you claiming that you were sexually harassed at Flavor House by anyone other than Frank Williams?**
A Yes.
**Q Okay. Who else at Flavor House sexually harassed you?**
A The -- not -- sexual discrimination by not protecting me.
**Q All right. We're going to talk about that too, the sexual discrimination allegations that you have. But separate from that, I'm trying to figure out if there is anyone else other than that that you think sexually harassed you.**
MS. ROBERTSON: Well, object.
A I'm not quite sure what you --
MS. ROBERTSON: You're asking her to make a distinction between sex discrimination and sexual harassment that nine of the 11th Circuit can't make, so I really don't think that's helpful for you to cut her off.
MS. SWAIN: I didn't cut her off. I

asked the question.
**Q Is there anybody else that you're claiming sexually harassed you at Flavor House?**
MS. ROBERTSON: Object.
A I'm claiming Flavor House harassed me by not protecting me, by merely slapping his hand and writing me up or coming where I couldn't even protect myself after several complaints, that I had to go home and write a resume to prove my experience as being mechanically inclined after begging for a year to get the opportunity to run a label machine, after they hired men off the street to run them.
And I was already employed there. But I had to go home and prove that I had at least eighteen months mechanical experience to even get a shot at the position.
**Q Anything else that you are claiming was sexual harassment?**
MS. ROBERTSON: Object.
A The way I was treated by management,

by the good old boy system.
**Q Okay. Anything else specific that you're talking about that you're claiming was sexual harassment in your lawsuit against Flavor House?**
A Not right now.
**Q Now, you claim that you were asked to write up a resume before you became a label operator; is that correct?**
A Yes.
**Q Okay. Who was it that asked you to give a resume?**
A Melvin Hutchins, Kenneth Tew.
**Q When did that occur?**
A Before I was able to get on the label machine.
**Q So, some time before you were a label operator; is that correct?**
A Yes.
**Q You indicated -- look on Exhibit 15 if you would, here at the beginning of it. Look, if you would, to the second page of that document, the first full paragraph. It**

**says, "During my first year of employment, I repeatedly tried to get a promotion to label operator."**
**Do you see that?**
A Yes.
**Q Is this what you're telling me about right now?**
A Yes.
**Q And did that occur during your first year of employment?**
A Yes.
**Q So, that was back in 2001?**
A Yes.
**Q And after you brought the resume, did you, in fact, receive a label operator position?**
A Yes. Temporarily I was told to see how I performed.
**Q And based on your performance, were you allowed to remain in that position?**
A Yes.
**Q And so did you remain a label operator from that time until the time that**

**you left Flavor House?**
A Yes.
**Q Now, you indicate during your charge that you were passed over several times before you became a label operator by other people. Do you see that?**
A Yes.
**Q Who were you passed over by?**
A I don't know their names. There were numerous ones through Personal Resource.
**Q So, temporary employees?**
A Temporary employees or people that come -- was hired.
**Q Regular employees?**
A Yes.
**Q Were you a regular employee at that time?**
A Yes.
**Q But you don't recall the name of anybody that received a label operator position before you did during your first year of employment?**
A I recall -- one was nicknamed Keesi.

I don't know their names.
**Q Okay. How many label operators -- you were on -- is the day shift considered first shift?**
A Yes.
**Q So, you were a first shift employee?**
A Yes.
**Q How many label operators were there on first shift?**
A I'm not sure how many is on first shift. At the time -- at the beginning of my employment or --
**Q Say at the time you left Flavor House. Would there be a label operator on each line?**
A Yes.
**Q And how many -- were there five lines or were there more than that?**
A There were five lines.
**Q So, were there five label operators?**
A Or more.
**Q So, at least five on each shift?**
A Yes. I'm not sure there was five on

the other shifts.

**Q Do you know who the other label operators were at the time that you left Flavor House?**

A Yes.

**Q Who were they?**

A I knew at the time I left.

**Q Oh. I mean, do you know now? Do you know who the people were in that position at the time you left? Are you currently aware of who those people are?**

A Mark Beard was one of them, Joanie was one of them.

**Q I'm sorry?**

A Joanie.

**Q Joanie? Is it Joanie Nickerson?**

A I'm not sure of her last name.

**Q Okay.**

A Vicki Cook, Frank Williams.

**Q Was he not a team leader at the time you left?**

A He was also a label operator.

**Q He was considered a label operator to**

**you?**

A He relieves the label operators for breaks.

**Q Okay. But I'm talking about the people who were like in the regular label operator positions.**

A I'm not sure of who was on line two at the time.

**Q What line was Mark Beard on?**

A At that time, he was on line four.

**Q What about Joanie?**

A I believe -- I'm not sure. She was either on two or five.

**Q What about Vicki?**

A She was on line one.

**Q And you had been on line three?**

A Yes.

**Q And do you know who the other person was that -- I think you said Joanie was either on two or five. Do you know who was the other person that was on the one she wasn't on?**

A I don't remember right now. I don't.

**Q Do you know who replaced you as label operator on line three?**

A I'm not certain on that. I've been told different things.

**Q Okay. You claim that a male employee or employees make comments about you working in a man's job; is that correct?**

A Yeah.

**Q Who made that comment?**

A David Wilkerson.

**Q What is his position?**

A Mechanic.

**Q When did he make that comment?**

A When I received the position on line three.

**Q Was he on line three?**

A No.

**Q Do mechanics work on a particular line?**

A They were supposed to.

**Q And what line was he on?**

A I believe he was on line five.

**Q And what was the conversation or was**

**there any conversation that led up to that? Was there anything -- were you having a conversation with him?**

A No. When he saw me on line three, he came over and asked me what were they doing putting a woman in a man's position.

**Q What did you say?**

A "You need to leave."

**Q And what did he say?**

A He just laughed and walked off.

**Q Well, you had already been a label operator before that, correct?**

A Yes.

**Q Was there any difference between being a label operator on line one and being a label operator on line three in terms of it being a, quote, "man's position"?**

A I guess just their mentality. I don't know.

**Q Did anybody, other than David Wilkerson, ever make a comment to you about working in a man's job?**

A I had to fight for the job not like

the men.

**Q I'm just asking if anybody made the comment to you besides David Wilkerson about working in a man's job.**

A Not working in a man's job.

**Q Now, you complain as well that mechanics would come and work on your machine or make adjustments if it took longer than five minutes for you to make an adjustment on your machine?**

A Yes.

**Q And that bothered you?**

A Yes.

**Q Any other complaints you have of sex discrimination?**

A Yes.

MS. ROBERTSON: Object.

**Q Okay. What else?**

A The way I was treated at Flavor House, the way with the pay scale. I had to keep on top of the pay scale. I had to take level one, two, three, four to become a level four operator compared to people that were

just assigned as level four. Men that were assigned to be a level four without taking a test.

**Q All right. Let's maybe back you up a little bit.**

**Flavor House had a pay-for-skills program; is that correct?**

A Yes, ma'am.

**Q And part of that program was that you would get a higher rate as you are able to demonstrate a higher skill level; is that correct?**

A Yes, ma'am.

**Q And to go from one skill level to another, in terms of pay, you had to take a test; is that right?**

A Yes, ma'am.

**Q And generally you had to wait at least six months between taking one test and taking the next one; is that right?**

A Yes, ma'am.

**Q Okay. And at some point, you appealed to Tommy Nance for level four pay;**

**is that correct, saying that you should be receiving level four pay?**

A I was already receiving level four pay.

**Q Then what were you complaining about?**

A Because your raise depends on what level you are.

**Q So, you were just appealing a raise?**

A I was appealing the fact that I had to take the test to be a level four when the man beside me that did the same skills that I had done did not have to take a test.

**Q Well, didn't you take the test after you appealed -- didn't you take the test after you appealed to Tommy Nance?**

A When this procedure came out about the levels, it was up to management to decide what level you were already. They placed you at a certain level.

You did not just -- everyone did not just become a level one and now you have to work your way up to a level four. It became like, well, you're a one, you're a four or

you're a two.

**Q Okay. My question was, didn't you take the test after you had appealed to Tommy Nance about your pay?**

A I would have to see that appeal. I believe I appealed to be a level four.

**Q Right.**

A Without taking a test as the man standing working beside me did not have to take a test and he was already a level four.

**Q Who was the man standing beside you?**

A Mark Beard.

**Q And how do you know whether Mark Beard took a test?**

A He told me he didn't have to take the test. He was a level four.

**Q Do you know whether he had taken the test before he became a level four?**

A I don't know.

**Q Anybody else that you --**

A I'm sorry.

**Q Anybody else that you claim did not have to take a test to receive a higher pay**

**level?**

A Not that I recall. I need to correct myself.

**Q Okay.**

A I believe I appealed the fact that I was put at a level one label operator, therefore I would have to take all four tests. If Mark was a label two, three, four -- if he was a three, he only had to take one test. Whereas I would have to take all four tests.

**Q Okay. And is it your allegation that Mark Beard didn't have to take any tests to become -- well, strike that.**

**Is it your allegation that Mark Beard didn't have to take all four tests to become a level four?**

A Mark Beard had told me that he hadn't -- he was already either a level three or level four. There were tests that he could skip over because they had put him -- assigned him at a higher level.

**Q And your knowledge of that is based**

**on what Mark Beard told you?**

A Yes.

**Q I'm going to show you what I have marked as Defendant's Exhibit 16, and ask you if that is your appeal relating to your pay.**

**(Defendant's Exhibit No. 16 was marked for identification).**

**Is that what Exhibit 16 is?**

A An appeal?

**Q Correct. Of what you were being paid.**

A Yes.

MS. ROBERTSON: Object.

A Not paid.

**Q Of what level operator you were going to be classified as?**

A From the beginning.

**Q Which affected your pay, right?**

A Eventually it would.

**Q Was it affecting your pay at the time that you submitted Exhibit 16?**

A No.

**Q In other words, did you feel like you should have been getting a higher level of pay at the time you did this document?**

A I felt like I shouldn't have to take tests after I have already taken the tests with the experience. I had already taken the tests with the experience of all the machines I ran, including training an employee, which was the last test to do, which was to train an employee.

**Q But there were actually written tests for each level, right?**

A Level one, level two, level three.

**Q And there was a written test for level four as well, correct?**

A Part of the test was being able to train another employee and them being able to function on their own.

**Q Let me make sure I understand that. You're saying that to become a level four, part of it was what you could do to demonstrate by actually doing the job and part of it was a written test?**

MS. ROBERTSON: Object.

A I'm not sure. Like I said, I had to take all of them.

**Q And your allegation was that you should have been placed directly in level four?**

A By either the -- do you have the standards -- by the standards that they had on level one, two, three and four. I had already reached that standard.

**Q So, the answer is yes, you thought they should have put you directly in level four, correct?**

A I was already making level four pay.

**Q Do you not understand the question I'm asking? Are you claiming they should have put you directly into level four?**

A Yes.

**Q Okay. And this is not an issue you're saying as to what you were being paid at that time, but your concern was that somewhere down the line it might affect your pay?**

Page 210

A Management encouraged me to -- I wasn't going to take the test. Management encouraged me that I needed to take the test because I was just getting a lump sum check every year. The others would get a raise. I would get a lump sum check. I didn't feel like there was anything wrong with that until it was explained to me in the office that it would make a difference with the cost of living raise.

**Q So that you would make more if you were in --**

A Eventually.

**Q -- a level four?**

A In the long run, eventually I would.

(Defendant's Exhibit No. 17 was marked for identification).

**Q Let me show you what I am going to mark as Defendant's Exhibit 17 and ask if that's a copy of the pay-for-skill policy or program?**

**Is Exhibit 17 a copy of the pay-for-**

Page 211

**skill program that was in place?**

A This is -- I believe this is something they hung up in the hallway.

**Q Okay.**

A When they started the levels.

**Q When was it that they started that pay-for-skill program?**

A I'm not for sure.

**Q Let me ask you this. On looking at this document, the labeler part of this over here, if you can see the middle, towards the right side. Is that the part that would apply to you?**

A Labeler, yes.

MS. SWAIN: All right. Let's take a break.

MS. ROBERTSON: Can we like take a break until later?

MS. SWAIN: Y'all don't want to go a little bit longer?

MS. ROBERTSON: Well, if I wanted to go a little bit longer, I wouldn't say can we stop now? But I will go a little bit longer.

Page 212

Obviously -- you know, but that's fine.

MS. SWAIN: I tell you what, let's take a quick break and let me make sure I am clear on this particular area and then we'll stop.

THE VIDEOGRAPHER: The time is 3:57. This ends videotape number four and we are off the record.

(BREAK TAKEN).

THE VIDEOGRAPHER: The time is 4:11. This is the beginning of tape number five. We are back on the record.

**Q (By Ms. Swain) All right. Ms. Thornton, I think I understand now what it is that you're complaining about. So, let me try this one more time.**

A Okay.

**Q At some point, all of the employees, including the operators, were placed in a particular skill level, one, two, three or four; is that correct?**

A Yes, ma'am.

**Q By management?**

Page 213

A Yes, ma'am.

**Q And what you were complaining about was the skill level that was selected for you which was one?**

A Yes, ma'am.

**Q Is that right?**

A Yes, ma'am.

**Q Okay. And Frank Beard was placed at a skill level that was higher than -- I'm sorry. Mark Beard was placed at a skill level that was higher than you were?**

A Yes.

**Q And you felt -- that's what you were complaining about?**

A Well, not only Mark Beard, but just myself.

**Q That you felt like you should have been at a higher level?**

A According to their own level skills.

**Q Okay. And so that's why you filed the appeal that we went over?**

A Right. And they --

**Q And in response to that, you received**

**what I'm about to mark as Defendant's Exhibit 18; is that correct?**

**(Defendant's Exhibit No. 18 was marked for identification).**

A Yes.

**Q Okay. And so what they did was instead of making you wait six months between taking the test, they said you can just go ahead and take all the tests and go straight to level four if you pass all the tests; is that right?**

A Yes.

**Q And you did that?**

A I had no choice, yes.

**Q I mean, you took all the tests and you passed all the tests?**

A Yes.

**Q And so then you were placed as a level four?**

A Yes.

**Q Okay. And do I understand correctly that because at the time they assessed what**

**skill level you were going to be in, your pay was already higher than others in your position, that this didn't actually affect your pay at this time, correct?**

A Correct. What it affected was me having to take time out to do these tests and prove something to them that I had been doing for quite some time.

**Q Okay.**

A And also something about the -- well, the percentage raise. It would be more of a percentage raise once a year.

**Q Instead of the lump sum?**

A The lump sum. The percentage raise would eventually be more than the lump sum ended out to be.

**Q Do you recall when it was that you and others were placed in a particular skill level?**

A No.

**Q Okay. And that was done for everybody all at one time, correct? Everybody was placed -- a list was posted**

**with what skill level each person was going to be in?**

A I'm not sure a list was posted. If there was, I don't recall it.

**Q Okay. Your recollection is that you were just told at some time you were going to be a level one?**

A I believe so. I remember asking Fannie about level one, why am I a level one. And her response was she had nothing to do with it.

**Q Okay.**

A And that Melvin made the decision of who was what level.

**Q Okay. And at some point, did Mary Ann Boyer suggest to you that you should take these written tests so that you could become a level four?**

A That's what they were all telling me. But what I was trying to say is, where does a level one come from? Where do you get that I'm a level one? I've already proven all of these things. Why would I have to

take a test to prove when other folks were immediately a level higher?

**Q Were you aware that even the people who were put at higher levels still had to take the test within a certain time frame or else they would lose their level?**

A Not all the tests they was not. Say, if I was told if you were placed at a level three, you would have to take the level four. Whereas if I was placed at a level one, I would have to take two, three and four.

**Q Okay. Other than Mark Beard, do you know what level any of the other operators were placed in?**

A I did at the time, but I don't recall now.

**Q And Mark Beard you said was placed at what level?**

A I believe he said three or four.

**Q All right. And are you claiming that you were placed as a level one because of your gender?**

A I believe so.

**Q Okay. And what is it that makes you think that your gender is what caused you to be placed in level one?**

A Because I had already proven my skills. I had already had the skills. If I had the level -- they have a paper on levels one, two, three and four what the requirement is. I had already made the requirements.

**Q So, you disagreed with the assessment basically?**

A I disagreed with the assessment.

**Q Is there anything else that makes you think that their placing you in level one was because of your gender?**

A I had the skills. And if there was, there was not an answer that was given to me.

**Q Okay.**

A Because I asked.

**Q I'm just trying -- I understand that you thought you should have been placed at a different level. I'm just asking you was there anything else that makes you think that gender was the motivating factor for that decision?**

A Other than the fact that I had to fight to get the label operator position and have to write a resume to even get a label operator position. And then after accomplishing the skills, still having to continue to prove my skills.

**Q Okay. Anything else?**

A No.

**Q Do you know who made the decision about what level you would be placed in?**

A I was told that it was Melvin Hutchins.

**Q Who told you that?**

A Fannie Ash.

MS. SWAIN: Okay. All right. This is probably a good stopping point to stop for today. And then we'll pick up again.

THE VIDEOGRAPHER: The time is 4:17. This is the end of tape number five and we are off the record.

(DEPOSITION WAS RECESSED AT THIS TIME).

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

______________________________
Cathy A. DeBardeleben, Commissioner

A

**abided** 81:6
**ability** 18:23 19:3
**able** 172:22 181:10 194:15 203:10 208:16 208:17
**absences** 180:21
**absent** 180:8
**acceptable** 60:23 75:22
**accomplishing** 219:7
**account** 35:16
**accumulating** 106:1
**accuracy** 16:14
**accurate** 43:2
**accuse** 23:11,15
**accused** 24:23
**accusing** 23:6
**acknowledgem...** 87:19
**acknowledging** 86:6
**acknowledgment** 85:21
**act** 55:5
**acted** 131:12
**acting** 6:4 74:12 128:15 156:11
**action** 1:6 17:15 105:14 128:6 175:5 220:18
**actions** 144:14
**activated** 97:15
**addition** 94:4 99:5
**additional** 46:17
**adjustment** 202:9
**adjustments** 202:8
**affect** 18:23 209:22 215:3
**age** 118:10
**agency** 25:9,12 116:12
**ages** 118:2,6
**aggravated** 74:20
**aggravating** 189:14
**ago** 12:21 14:4 19:19 22:16 67:17 92:8 123:1
**agree** 177:17
**agreed** 1:12 2:1 2:10 141:10 177:18,19
**ahead** 39:23 148:16 214:10
**air** 156:4
**al** 1:8
**Alabama** 1:2,21 3:9,14,23 4:13 6:2,3,11 7:1 10:1 12:23 220:4
**alarm** 159:10
**alert** 123:21,23
**aligned** 110:13
**allegation** 35:12 37:23 206:12,15 209:4
**allegations** 192:12
**alleged** 118:4
**allowed** 73:8 195:20
**allows** 97:14
**Allums** 179:13,14 179:15
**altercation** 154:9
**amount** 165:10
**Andrews** 3:13
**anger** 64:12 77:22
**angry** 80:18 126:4
**Ann** 3:3 7:20 31:15 32:3,7 33:20 34:2,7,20 35:2,7,23 36:2 36:11 37:19 38:1 39:11,14 40:18 41:17,20 42:5,8 47:4 72:8 87:3 91:23 95:19,21 97:20 98:4,5,12,16 136:20 145:16 146:1 150:23 151:2,10 171:15 171:18 172:4,9 173:5,7 174:3,7 174:8,13,16 175:4,14,17 176:21 177:9 216:16
**Ann's** 134:7
**answer** 9:1 28:9 42:1 72:2,22 77:23 83:7 87:23 90:10 110:3 118:20 122:18 128:7 130:21 139:22 142:14 148:3,15 150:9 209:11 218:17
**answered** 60:4 188:23
**answering** 72:3,5
**answers** 220:10
**anti** 11:20 13:5 13:11
**antidepressant** 11:23
**antidepressants** 12:5,11,14 14:7 14:13 15:22 16:5,21 17:12 17:18
**anti-anxiety** 17:19
**anxiety** 14:22
**anybody** 67:3,20 78:9 83:2 113:8 116:15 121:9 123:9 141:23 146:21 150:5 151:6,14,15 179:18 193:2 196:20 201:20 202:2 205:20,22
**anymore** 30:18 82:4 170:2 171:22 181:14
**anyway** 19:3 160:1
**anywise** 220:19
**appeal** 205:5 207:5,10 213:21
**appealed** 203:23 204:14,15 205:3 205:6 206:5
**appealing** 204:8 204:9
**appear** 86:10 129:12
**appears** 52:22 54:19,22 129:13
**applied** 57:17
**apply** 211:13
**appreciate** 35:2 76:10
**approximately** 1:22 6:12 25:13
**area** 27:6 91:1 123:22 158:20 169:19 170:20 170:22 212:4
**areas** 27:8
**argumentative** 34:23 56:1 61:4
**arguments** 68:4,5 68:8,8,12
**arm** 189:7,8,19
**arms** 156:4
**Army** 11:12
**arrest** 23:2
**arrested** 20:3,7 20:18 21:2,7 24:4,7,15,18
**arrests** 24:12
**Ash** 29:8,21 30:4 30:7,12,20 31:1 31:3,7,13 32:8 32:10 33:4,12 34:2,9,12,14 35:8 38:3,6,10 38:14,17 39:6 40:7 45:7,9 47:10 60:20 62:11,14 63:21 64:3,8 151:5,12 219:16
**asked** 28:7 71:23 73:13 85:12 107:19 108:8,9 122:17 127:10 134:3,19 136:4 142:3 144:16 153:14 154:4,19 155:2,5 156:16 170:4,7,9,12 174:17 175:7 181:12 188:5 193:1 194:7,11 201:5 218:19
**asking** 32:3 47:17 51:18 65:20 66:2,3 67:18 68:22 72:13,14 72:23 111:1,2 112:23 115:2,6 115:8 117:2 130:16,17 144:9 144:11 146:9 149:13,16 192:18 202:2 209:16 216:8 218:22
**ass** 134:8,8
**assessed** 214:23
**assessment** 218:10,12
**assign** 2:14
**assigned** 203:1,2 206:22
**assume** 8:16 76:6 138:17 162:7
**assuming** 45:15
**assure** 137:5
**attempted** 176:22
**attendance** 90:22
**attention** 70:17 94:5 189:11,17
**attitude** 53:5 55:1
**attorney** 3:4,12 3:18 4:2,8 7:19 7:21,22 8:6
**attorneys** 7:7
**avenue** 94:1
**aware** 16:15 36:19 37:11 113:10 114:15 114:16,19 118:22 119:3

143:12 146:22 183:19 186:17 198:10 217:3
**a.m** 1:23 6:12

**B**

**B** 5:5
**back** 15:10,15 17:12 18:14 35:13 36:5 37:16 42:6 50:12 52:15 53:18 57:3 75:14 81:2,3,16 81:21 82:2 84:18 86:8 104:5,6 113:23 137:13,19 140:16 152:19 154:3,6 156:7,8 157:12 159:16 160:14,15 171:9 171:12 175:18 175:20 176:9 177:18,23 178:8 181:11,12,17 182:16,18 184:2 195:12 203:4 212:12
**backing** 43:6
**backyard** 141:7
**badge** 97:13,14 176:23 177:18 177:20,22 178:12
**badges** 97:17
**bag** 77:8 143:23 144:3 156:8,9 176:3,4,11 183:23 185:15
**bags** 144:22
**baited** 173:9 178:6
**Baker** 1:18 3:19 6:9 7:4
**based** 86:13 195:19 206:23
**basically** 79:16 90:21 96:19 155:15 173:1 218:11
**basis** 74:3
**bates** 86:16 89:23
**Beard** 112:7 174:6,9,10 198:12 199:9 205:12,14 206:13,15,18 207:1 213:8,10 213:15 217:13 217:18
**Bearman** 1:19 3:19 6:9 7:5
**beat** 97:22
**began** 12:11 15:15,21,22 16:6 28:9,11 101:13,20 160:1
**begging** 144:7 193:12
**beginning** 33:12 33:18 57:2 113:22 159:15 164:6 167:14 194:21 197:11 207:18 212:11
**behavior** 43:1
**belief** 86:13
**believe** 11:19 13:15 14:8,15 18:8 19:18 25:21 26:6 28:12 43:22 47:11,23 54:4 56:5 58:2,21 73:17 75:9 83:17 86:18 89:21 90:4,8 92:9 95:15 96:18 99:10 100:22 102:8,13 102:20 103:3,8 103:20,23 114:9 120:18 121:1 123:11 124:12 124:12 126:19 127:18 153:1 159:5 168:11,16 171:6 174:6 180:23 191:11 199:12 200:22 205:6 206:5 211:2 216:8 217:20 218:1
**believed** 56:12 73:13 106:20 124:19
**belt** 63:4,7 77:2 77:12,12 109:18
**Beninger** 15:6 16:18
**Berkowitz** 1:19 3:20 6:10 7:5
**better** 45:8 81:4
**bid** 49:21 50:3,15 50:21
**bidded** 49:12 172:18
**big** 49:7 144:4
**bigger** 87:2
**Birmingham** 1:21 3:9,23 6:2 6:11
**bit** 43:6 51:11 203:5 211:20,22 211:23
**bitch** 63:5,8 68:20 69:15,16 69:18,19 70:6 72:20 73:22 74:8 75:16 77:15 80:7 82:13 126:23 143:17
**bitches** 188:9,11
**blame** 166:10
**blood** 23:8
**blouse** 78:9
**blow** 141:9
**Bobbie** 3:11 7:18
**book** 86:19
**born** 14:1
**bothered** 202:12
**bottom** 33:19 93:17 100:9 122:16,19 132:1 148:1,5,17 152:16 167:13 167:18,20
**Box** 4:10
**boxes** 37:5,7 135:12,14 153:10
**boy** 194:1
**Boyer** 31:15 32:4 32:8 34:2 38:1 40:18 47:5 95:19,21 97:20 98:4,12 150:23 151:10 172:4 173:5 174:3 175:4,14 176:22 216:16
**bragged** 72:14
**brags** 71:19
**brakes** 42:18 43:8 44:3
**break** 8:23 9:3,3 44:14 56:23 84:11,16 102:11 102:15 104:4,5 104:13,17 105:5 113:20 114:2 116:6 140:13 152:22 153:7 154:4 159:13,20 211:16,18 212:3 212:9
**breaks** 104:2 105:10 140:10 199:3
**briefly** 58:20
**bring** 127:22 180:15
**bringing** 76:17 94:4
**broad** 73:10
**brother** 128:2
**brought** 17:22 19:7 76:7 81:16 195:14
**Bruce** 30:14 170:1,3,13,19 171:1,21
**bruises** 23:8
**brushes** 47:17
**brusk** 137:9
**Buck** 29:15,16,18
**buddies** 127:21 128:1
**building** 3:7 177:21 178:13
**bunch** 186:3

**C**

**C** 3:1,3 220:2,2
**Caldwell** 1:19 3:20 6:9 7:5
**call** 68:19 69:17 69:17,18 94:11 98:1 108:21,23 155:5 179:21,22 180:14 182:1 183:4
**called** 43:19 63:5 63:7 69:15 70:6 80:6 82:12 109:10 138:17 169:21 178:23 179:3,23 180:2 180:4,9,10,12 181:1,6
**calling** 73:21 74:4,7 75:15 144:5 176:11 179:19 183:3
**calls** 72:19,20 127:8 188:4
**call-in** 179:20,21 179:23 180:4
**cans** 28:21 51:9 63:14 76:21 77:4,8,9,10 78:15 79:4,5,10 79:17,19 80:1,2 80:9,10,14,17 81:17 144:5 183:23 185:16
**capper** 74:14,15
**car** 141:6 171:14
**care** 122:15
**carried** 176:6
**carries** 55:1
**carry** 175:23 176:4
**carrying** 175:17 175:19 176:8
**cart** 176:7
**case** 7:2 17:21 19:7 137:21

**Cassidy** 30:14 170:1,14 171:21
**casual** 76:15
**casually** 108:3
**Catherine** 114:8 126:19 142:10 143:3 158:19
**Cathy** 1:16 6:1 220:22
**cause** 6:13 130:6 220:20
**caused** 159:10 218:3
**certain** 45:2,19 97:16 149:1,8 186:8 200:3 204:19 217:5
**certainly** 137:8 182:16
**certify** 6:4 220:7 220:16
**chain** 75:18 89:14 149:5
**change** 104:22
**changed** 59:20 91:4,6 96:22,23 102:21
**changes** 96:3 164:20
**characterize** 72:19
**charge** 20:20 21:18 22:3,8 24:20 166:18,21 167:2 196:3
**charged** 109:2,6 109:21
**charges** 23:2,4 117:21,22
**cheating** 140:23 141:2 182:12
**check** 210:4,6
**checklist** 28:18
**chest** 70:14
**child** 10:7 11:2,3 11:5,7 112:13 113:2 121:16 123:15,22 124:21,23 125:6 125:8,13,15 126:17
**children** 10:16 17:15 118:14 124:3 141:7
**Childs** 3:5
**choice** 214:15
**choose** 109:8
**chose** 53:3
**Chris** 30:16 102:6 107:4,8 108:18 110:4,11 111:15 120:3 121:14,19 122:2 122:19,22 136:7 137:23 146:18 150:20 151:3,11 154:5 155:7,8 157:2,3,13,15 157:18 158:2,13 159:7 168:11,14 170:4 171:4
**Christmas** 127:22
**Circuit** 192:21
**circumstances** 103:12
**City** 22:13
**Civil** 1:6 6:6
**claim** 72:16 105:6 114:10 127:12 140:21 142:2,8 153:23 154:19 182:22 183:21 194:7 200:5 205:22
**claiming** 38:10 65:14,22 66:4 182:5 192:2 193:3,6,20 194:3 209:16 217:21
**claims** 25:2
**clarified** 32:2
**clarify** 87:6
**CLARK** 4:1
**classified** 207:17
**clean** 47:17 106:15
**cleaning** 42:19 43:8 44:4 106:18
**clear** 8:15 75:1 212:4
**client** 87:15 137:1 137:3
**clock** 58:5,6 171:3
**clocked** 170:22
**coaching** 107:8 107:11,12
**come** 57:9 63:23 98:20,23 104:5 119:12,14 121:15 141:5 153:3 156:10 157:3 169:22 171:9,12 174:7 175:21 178:8 186:7 196:13 202:7 216:21
**comfortable** 165:17,23
**coming** 96:4 193:8
**command** 75:19 89:14 149:5
**commence** 6:19
**commencing** 1:22 6:12
**comment** 134:12 200:9,13 201:21 202:3
**comments** 140:22 141:16,19 142:1 142:8,17,22 143:18,20 144:12,16 147:5 147:8,10 148:19 148:21 182:11 186:4 187:22 191:18 200:6
**Commissioner** 1:17 6:4 220:22
**committed** 118:17
**committee** 90:5 91:8
**common** 55:5
**communicating** 105:22
**communication** 96:11,17,19
**company** 97:4 139:4 181:15
**company's** 76:6 96:10,20 99:8 180:20
**compare** 92:1
**compared** 202:23
**complain** 31:3,6 32:7,10 38:14 41:8 48:4 60:20 65:6 104:9 105:4 135:19 150:1,8 151:15 174:3 202:6
**complained** 35:9 38:1,12 44:13 45:1 47:16 60:8 60:15 63:10,20 64:22 65:1 82:6 82:7,19,23 103:17,23 104:7 104:8 118:22 149:5,20 150:5 150:6,11,15,20 150:23 151:7,14 173:11
**complaining** 35:14 39:5 105:9 126:3 186:5 191:19,23 204:5 212:15 213:2,14
**complaint** 33:3 34:14 36:13 38:8 41:7,11 59:9,17 60:2,10 62:11,14,15 63:1 108:12 129:20 145:22 166:11
**complaints** 36:7 36:9,15,21 39:12,17 40:6 46:12 47:5,10 59:22 63:13 64:3,7 93:13 94:1 105:11 151:17 193:10 202:14
**complete** 87:12 106:15
**completed** 106:16
**compliance** 2:5
**complies** 40:1 52:17 152:14 167:12
**computer** 113:6 117:12,18,20 122:8 123:21 220:10
**concern** 44:21 209:21
**concerning** 47:10
**concerns** 39:11 39:17 40:6 42:23 44:7
**concludes** 56:21 113:18
**conduct** 182:5 191:17,22
**conflict** 30:20 47:20 48:2 49:6 58:15 101:13,20 102:1 152:1 153:17 154:9,17 155:11
**conflicts** 80:21 81:23
**confrontation** 79:1,3
**consider** 71:13,16 71:18
**considered** 197:3 198:23
**Considering** 138:3
**consistently** 12:6
**constantly** 79:16 80:9,10,17
**contact** 94:15
**contained** 28:22 83:19 93:7
**containers** 51:5,6
**contains** 96:10,16
**continue** 81:17 81:23 158:3,7 169:17 219:8

**continued** 110:14 126:5 158:8 164:11
**continues** 155:14
**continuous** 107:17 189:14
**continuously** 74:7 112:20 144:2,5 156:13 156:16 183:1
**control** 77:22
**conversate** 53:4
**conversating** 123:19
**conversation** 76:16 82:10 110:5 122:1 123:10 126:9 132:23 133:13 133:16 134:17 135:7,10,18,21 136:8,17 138:1 138:9 139:13 140:2,4 159:6 168:6,12 169:23 176:19 177:7 181:19,23 200:23 201:1,3
**conversations** 114:3 140:1
**conveyor** 63:4,7
**convicted** 20:22 112:5,12 113:1 113:7 114:20,23 118:18 119:17 126:7 133:16 134:15,19 181:15
**conviction** 117:5 118:13
**Cook** 158:19 198:19
**cooler** 153:3
**coordinator** 94:7
**copies** 186:22
**copy** 83:23 84:23 85:1,12 86:20 90:2 91:21 92:3 96:9,15 120:7 129:3 152:9 166:18 186:23 210:21,23
**cordial** 61:11,15 61:18 64:18
**correct** 12:8 13:22 14:18 15:23 18:17 20:8,23 25:20 26:8,12 30:21 38:17 39:7 41:9 41:13,21 42:21 45:3 46:3 47:15 47:22 49:11 50:7,23 51:9 52:12,21 53:12 57:6,7 58:16,23 59:5 62:18 63:16 65:17 66:19 69:21 73:15,16 76:5 77:17 78:3,5 93:18 94:2,8,23 97:3 98:14 99:6 101:1,2,13,21 101:23 105:1 109:11 114:17 117:8 128:16 147:2 150:12 152:2 153:12 154:21 155:9,15 157:3 158:16 159:21 161:21 162:2,14 164:8 169:3 170:21 171:20 172:5 178:19 179:1,16 182:13 185:5 188:5 190:20 191:10 194:9,18 200:7 201:12 203:7,12 204:1 206:2 207:11 208:15 209:13 212:21 214:2 215:4,5,22 220:12
**correctly** 214:22
**cost** 134:6 210:9
**Coty** 154:20,23 173:16,18,21 174:1,4
**counsel** 1:14 2:11 2:13 6:7 7:17 72:23 220:17
**count** 150:3
**county** 21:23 22:12 220:5
**couple** 33:18 36:14 139:20
**course** 77:16
**Court** 1:1 2:6 6:1 7:1 18:7,8 22:5
**co-worker** 112:4 112:6 126:2 174:10
**co-workers** 53:5 111:20,21 112:2 126:15
**crazy** 156:11
**crime** 118:17
**criminal** 123:5
**Crook** 3:11 7:18 7:18
**Crum** 4:6,9 7:22 7:22 61:15 85:4 148:8
**crying** 170:15 175:16
**current** 10:19 16:17 22:22 92:3
**currently** 9:13 11:23 17:7 198:10
**curtain** 156:12,12 156:13,13
**cuss** 48:11,14,16 48:22 49:1 65:18 69:13,14 70:8 74:1 76:16 79:9 124:23 144:14 153:23 155:14
**cussed** 48:12,19 65:12,15,22 66:5 69:5 70:1 70:15,17 71:1 71:10,14,17 73:18,20 79:4,5 73:15 155:13
**cusses** 72:15
**cussing** 65:3 67:12,21 68:13 68:17,17 69:9 70:11 71:6,20 72:19,21 74:4 74:11 76:18 79:17 82:14 110:19 154:11 156:5,14 183:8
**cut** 54:9 192:22 192:23
**cuts** 23:8

**D**

**D** 5:1 6:22
**daily** 12:4 74:3 151:18
**date** 6:5 7:3 12:18 14:12 17:11 26:1 34:3 84:8 85:4 92:14 92:15 95:23 99:22 100:1 102:21 130:3,13 130:22 132:19 167:2,3 180:7 181:4 190:1
**dates** 22:15 49:16 60:18 99:18 100:2,9 101:14 101:15 130:15 130:17 147:16 163:22
**dating** 22:14 191:15
**David** 95:4 200:10 201:20 202:3
**day** 1:21 6:8 8:23 25:19 44:22 47:18 55:2 65:12,19 66:7 67:13,22 69:12 77:2 78:14 81:17 83:13,16 111:9 120:23 121:2 132:14,15 132:17 158:11 159:4,18 160:1 160:10 161:14 163:11 164:6,14 169:14 178:22 179:3,6,8,15 180:9 183:14,15 197:3
**days** 25:13,14,15 163:17,18 164:7 178:23 179:19 180:1,18,22 183:14
**DeBardeleben** 1:16 6:1 220:22
**decide** 204:17
**decided** 139:15 178:9,11
**decision** 216:13 219:2,11
**defend** 175:21
**Defendants** 1:9 3:16
**Defendant's** 5:6 5:7,8,9,10,11,12 5:13,14,15,16 5:17,18,19,20 5:21,22,23 32:14,19 38:19 38:23 46:19,23 51:23 52:1 84:4 85:20 86:1 91:15 93:2 96:12 99:12 120:6,9 128:21 129:2 139:8 145:2,6 152:4,8 166:13,17 187:9 207:4,6 210:16 210:20 214:1,3
**defended** 23:20
**defends** 181:15
**definition** 27:17
**deliberately** 33:13
**demeaning** 76:3
**demonstrate** 203:11 208:22
**denied** 125:16 126:6
**deny** 125:16
**department**

180:6
**depended** 109:12
  151:19
**depends** 204:6
**deposition** 1:8,14
  2:3,4,16 6:20
  7:8 17:21 18:2
  19:6,8,11 72:8
  87:12 136:22
  137:11 219:23
  220:8,13
**depositions** 2:7
**depressants**
  11:21 13:6,12
**depression** 14:11
  14:18
**describe** 155:12
**described** 89:11
  127:19 168:13
**describing** 55:4
**desk** 176:23
**determined**
  131:12
**diagnosed** 14:11
**difference** 45:2
  45:19,21 76:2
  173:2 201:14
  210:9
**different** 27:8
  30:9,10 51:12
  89:20 99:17,18
  100:2 118:2
  127:1,15,17
  155:18 163:5,6
  163:7 200:4
  218:22
**differently** 46:7
**difficulty** 30:23
  89:10
**dip** 173:22 174:4
**direction** 184:14
  185:13
**directly** 143:14
  180:11 209:5,12
  209:17
**director** 31:15
**disagree** 61:2
  130:12
**disagreed** 218:10
  218:12

**disappearing**
  42:19 43:9 44:4
**disciplinary**
  105:14 128:19
  129:4
**disciplined** 70:11
  103:21
**discriminated**
  38:15
**discriminating**
  34:10 35:15
**discrimination**
  25:3 34:8,21
  35:7 36:3 38:2
  38:9,12 71:9
  83:20 166:18
  173:12,13 192:8
  192:11,19
  202:15
**discuss** 90:17
  108:18 110:4,11
  125:12 128:12
**discussed** 94:18
  102:9,17,22
  110:20 111:3
  112:19,20
  131:19 134:23
  136:2 139:16
  145:19 173:4
  183:17,18,21
  184:10 185:20
**discusses** 93:12
**discussing** 90:6
  91:2 113:3
  125:18 126:1
  159:19
**discussion** 78:11
  129:4 153:5
**discussions** 94:19
**dismiss** 18:7
**dismissed** 22:4
**dispute** 16:14
**disruptive** 124:19
  124:22 125:4
**distance** 162:4
**distinction** 72:21
  192:19
**District** 1:1,2
  6:23 7:1
**Division** 1:3 7:2

**divorce** 12:15
  13:7 14:2 19:12
**divorced** 141:10
  191:6
**doctor** 15:3 16:17
**doctors** 16:21
**doctor's** 16:9,11
  16:17 180:15
  181:10
**document** 33:8
  39:1 40:8,17
  41:4,22 42:16
  43:18 46:18
  47:1,2 86:10
  89:23 108:5
  120:15,23 121:5
  130:2,18,22
  131:5,8 145:20
  146:4,9 147:20
  148:18 152:20
  194:23 208:3
  211:10
**documentation**
  32:22 33:2 34:3
  41:6 52:5,7
  55:21 59:3,14
  120:7 145:7
  146:10 152:9
  186:14,21 187:4
  187:20 188:1
**documented**
  36:23 42:3
  119:10 122:8,13
  147:12,13,14,16
  147:19 149:3
**documenting**
  41:10
**documents** 37:12
  37:14 135:9
**doing** 23:21
  55:17 59:6
  128:14 132:8
  189:16,18 201:5
  208:22 215:7
**domestic** 20:19
  21:4,8 22:7
  23:2
**Don** 7:23
**Donald** 154:20
  154:23 155:4

173:16,17,20
  174:1,4,20,22
**Donelson** 1:18
  3:19 6:9 7:5
**door** 96:20 97:1,4
  97:6,9,12,13,22
  136:18
**dosage** 12:3
**Dothan** 3:14 4:13
  13:3,9 31:16
  95:22 173:11
**downtime** 109:3
**Dozier** 13:8 16:20
**Dr** 13:8 15:6,12
  15:16 16:16,20
**driving** 171:13
**DUI** 19:21
**duly** 6:17 7:10
**duties** 28:13,18

**E**

**E** 3:1,1 5:1,5
  220:2,2
**earlier** 15:9 35:20
  73:13 151:5,12
  156:2 182:10,13
  184:1 190:15
**early** 100:20
  117:1
**EEOC** 24:20
  166:19,23
**effect** 2:4 19:3
**eighteen** 193:18
**either** 16:8 24:9
  61:10 76:11
  97:22 119:23
  123:13 163:8
  187:2,22 199:13
  199:20 206:19
  209:7
**employed** 11:9
  117:14 175:8
  193:16
**employee** 58:4
  71:2,14,17
  73:14,18 83:10
  83:18 85:21
  89:8,16,20 90:2
  96:10,16 116:13
  119:12,14,21

121:15 132:10
  138:3 143:9
  148:19 196:16
  197:6 200:5
  208:8,10,17
**employees** 45:20
  45:23 46:15
  48:8,11,17
  69:21 70:1,8,12
  71:7 90:6,11
  109:2 112:12
  113:1 117:16
  123:18 124:1,2
  125:5,14 127:6
  128:12 196:11
  196:12,14 200:6
  212:18
**employment**
  27:21 28:4
  31:20 32:5 50:1
  50:2 59:21
  83:11 84:1
  88:11,20 89:19
  93:6,9 94:7,8,11
  94:14,16 99:8
  99:21 100:5
  164:16 195:1,10
  196:22 197:12
**employment-re...**
  25:2
**encouraged**
  210:1,3
**ended** 215:16
**ends** 212:7
**engaged** 182:6
**enormous** 91:19
**enraged** 77:22
**enter** 21:21
**entire** 50:5,6
  91:19 130:12
**entitled** 73:2
**envelope** 83:14
**environment**
  172:20
**envision** 185:3
**equal** 84:1 88:10
  88:19 93:5,9
  94:6,8,16 99:8
  99:21 100:4
**escalated** 155:22

101:17
**estimate** 26:21
**et** 1:8
**event** 151:18
**eventually** 155:8 155:10 156:19 207:20 210:13 210:15 215:15
**everybody** 32:17 112:19 114:15 115:7 116:23 215:22,23
**everybody's** 54:9 106:14
**everyday** 64:15 65:11 66:7 67:12 155:19 164:20
**evidence** 2:16
**evolved** 153:17
**exact** 162:6
**exactly** 118:1
**examination** 6:14 8:2
**examined** 6:17
**exchange** 78:21
**exchanged** 63:23 78:18 80:22 82:2
**excuse** 34:6 44:18 180:16 181:10
**exhibit** 5:6,7,8,9 5:10,11,12,13 5:14,15,16,17 5:18,19,20,21 5:22,23 32:14 32:19,22 35:18 38:19,23 39:2,4 39:9,10,19 40:3 40:5,11 42:16 44:12 46:19,23 47:2 51:23 52:1 83:23 84:4,21 85:20 86:1,11 87:18,18 91:15 91:20,21 92:3 93:1,2,11,17,20 93:22 96:8,12 99:12,16 120:6 120:9,15 128:21 129:2 139:8 145:2,6 149:8 149:17 152:4,8 158:15 166:13 166:17 167:11 187:12 194:20 207:4,6,9,22 210:16,20,23 214:1,3
**exhibits** 99:18 119:6
**experience** 193:11,18 208:6 208:7
**experiencing** 17:14 89:9
**explained** 175:16 210:8
**express** 40:8
**expressed** 43:1 44:8,21
**extension** 98:1
**ex-boyfriend** 22:9
**ex-husband** 21:12,15

**F**

**F** 3:17 33:12 220:2
**face** 78:8
**fact** 23:18 112:18 115:18,20 131:18 139:1 157:17 195:15 204:9 206:5 219:3
**factor** 219:1
**factory** 76:16
**facts** 42:20
**fair** 44:8
**familiar** 34:23
**Fannie** 29:8,21 30:4,7,12,20 31:1,3,4,7,13 32:8,10 33:3 34:2,9,12,14 35:8 38:3,6,10 38:14,17 39:6 39:12,18 40:7 41:9,20 42:9,11 42:18 43:7,12 43:19 45:7,9,19 45:22 46:6 47:6 47:10,16,17 60:8,15,20 62:4 62:11,14,19 63:1,11,21 64:3 64:8 77:19 78:2 78:12,18 81:2 82:6,19 151:5 151:12 216:9 219:16
**Fannie's** 42:23
**far** 42:20 62:5
**fashion** 35:11
**father** 10:13 19:21
**favor** 171:11
**February** 1:22 6:8 7:3 107:5 129:10
**Federal** 6:5
**feel** 33:12 45:5,7 45:9,18,21 142:16 160:20 166:2,5 171:23 208:1 210:6
**feels** 141:1
**feet** 162:5
**felt** 34:16 41:19 41:20 42:2,11 42:23 43:4 44:7 56:5,19 62:5 208:4 213:13,17
**female** 38:17 48:16 71:17 73:18,20,23 126:23
**females** 74:1,5 142:11 183:3 188:4
**FH000307** 86:17
**FH000376** 90:1
**FH000419** 90:1
**fibrosis** 70:15
**fight** 201:23 219:4
**figure** 54:15 163:23 188:19 192:13
**file** 36:9 119:11 119:13 129:3 131:15 186:15
**filed** 8:8 24:20 166:19,21 167:2 213:20
**filing** 129:20
**filled** 32:23 52:5 52:8 145:8
**filler** 105:22 106:3 160:15
**filling** 152:21
**fills** 106:1,4
**find** 37:9,12 55:19 117:17,20 135:16 144:15 188:20
**fine** 87:11 212:1
**finish** 42:14 98:6 98:10 130:20 133:7 148:6 163:9
**finished** 106:18 157:20
**fire** 159:10
**fired** 134:22
**firm** 7:4
**first** 6:17 7:10 9:18 12:10,13 12:15 13:7 14:2 19:12 21:12 39:9 42:17 59:21 83:13,15 84:2 93:17,19 95:21 98:13 123:11 131:16 131:17 147:17 149:11 166:22 170:4 180:1 190:18,22 194:23 195:1,9 196:21 197:4,6 197:9,10
**fit** 155:21
**five** 67:17 160:2 161:9,16,21 162:1,5,10,16 162:22 163:1,12 163:14,18,21 164:4,8,11,17 164:19 165:2,6 165:11 168:10 168:15,21 170:7 170:8 172:8 197:17,19,20,22 197:23 199:13 199:20 200:22 202:9 212:11 219:21
**fix** 74:16
**flashbacks** 186:8
**Flavor** 1:7 6:21 7:17 8:7 14:9 15:10,21 16:7 24:21 25:1,5,8 26:8,11 28:4 29:1 40:13 41:5 41:13 47:9 49:21 51:19 55:6 83:11 84:3 84:23 85:13,17 85:22 89:19 94:11,15 117:14 161:19 164:16 175:8 186:14 192:3,6 193:3,6 194:5 196:1 197:13 198:4 202:19 203:6
**Fleet** 11:12
**flipped** 153:20
**Flipping** 53:18
**floor** 80:18 143:22 144:3 153:9
**Florida** 10:2,14
**flying** 156:10
**folder** 88:8,9,15
**folks** 217:1
**follow** 102:10
**followed** 75:19 88:6
**following** 6:14 178:17
**follows** 6:18 7:11
**food** 174:22
**force** 2:4
**foregoing** 6:6 220:8,12

**form** 2:12 28:15 32:22 33:15 34:3 37:16,18 52:5,7 54:7,8,9 54:23 55:21 59:14,16 85:21 86:6 113:9 122:3 145:7 146:10 152:9 186:14,21 187:5 187:12 188:1
**former** 126:15
**forms** 59:3 187:20
**forward** 129:16
**foul** 75:2,3,5
**found** 104:9 117:23 124:22 131:18
**four** 62:9 66:15 141:6 159:15 161:21 162:2 199:10 202:22 202:23 203:1,2 203:23 204:2,3 204:10,22,23 205:6,10,16,18 206:7,9,11,16 206:17,20 208:15,20 209:6 209:9,13,14,17 210:14 212:7,21 214:11,20 216:18 217:10 217:12,20 218:8
**fourth** 93:11 179:6
**frame** 13:12 15:1 15:11,17 16:3,6 17:13 46:18 59:4 61:2,8,13 62:12,15,21 63:12,21 64:19 66:10 67:4 79:6 83:3 92:18,21 95:9 103:19 164:1 217:5
**Frank** 7:23 25:1 49:1 57:5 58:13 58:14,20,22 59:4,9,18 60:2 60:16,20,22 61:7,12 62:11 63:11,21,23 64:4,8,16 65:6 65:18,22 67:12 67:21 68:5,14 68:19 69:3,5 75:15 76:20 77:20 78:3,14 78:18,22 79:4 80:21,22 81:3,4 81:16,19,19 82:1,12 83:3 89:10 95:10 100:17,18 101:1 101:20 102:1,7 103:23 104:1,1 104:3,10,11 105:4 107:5 110:5,6,21 111:4,17,21 112:2,5,12,20 112:20 113:1 114:3,5,10,12 115:13,23 116:3 116:16 117:17 118:16,22 119:12,15 121:14 123:15 124:14,21,22 125:6,13,19 126:3,4,16,20 127:17,18 128:3 129:21 131:19 131:21 132:4,13 133:11,16,21 134:2,11 139:16 140:5,12,14,16 140:21 142:2,7 142:21 143:7,11 143:13 150:17 150:20,23 151:7 151:17 152:1,21 154:3,8,17 155:12,13,21,21 156:21 158:7,8 158:10 160:6,18 162:11,12 165:18 166:1,3 166:5 169:7 170:5,17 172:22 173:9 175:6 176:10 178:6 181:14 182:5,21 182:23 186:19 187:3,22 188:3 188:7 189:1,5 189:21 190:1,3 190:6,9,13 191:6,18,18 192:4 198:19 213:8
**Franklin** 6:22
**Frank's** 60:23 67:7 117:5 123:4 128:12 151:19,20,21 190:16
**free** 93:13 94:12
**frequently** 79:13 151:16
**friction** 111:17
**Friday** 26:5 176:15 177:15
**friend** 67:7
**friendly** 61:1,5
**front** 40:14,15,22 41:4 47:12 97:15,17,20 132:7 138:4 148:20 160:12 173:22 174:4 183:9
**frustrated** 74:2
**Ft** 11:12
**fuck** 53:11 75:7 75:23 129:22 130:6 134:6 141:1
**fucked** 70:7 141:6
**fucker** 74:18,19 75:11,16 76:1 144:1,1,6 156:5 176:12 185:2
**fucking** 53:20 54:2,16 63:5,8 68:20 69:15,18 73:22 74:8 75:16 77:15 80:6 82:13 134:8 143:17 144:21
**full** 2:5 77:11 144:4 194:23
**function** 208:18
**further** 2:1,9 220:16
**future** 111:16

G

**garbage** 143:23 144:3,22
**gender** 217:23 218:3,15 219:1
**generally** 203:18
**getting** 30:23 53:21 54:2,17 78:23 208:2 210:4
**girl** 67:6 141:4
**girlfriend** 183:4 183:5 188:8,9 188:10,13,16,20
**girlfriends** 188:4
**give** 8:17 17:21 19:11 24:9 26:21 40:12 45:11 104:17 194:12
**given** 19:8 40:18 70:20 128:18 131:9 182:19 218:17 220:13
**giving** 41:3 55:21 131:16 133:4,9 133:12
**glare** 160:15
**glaring** 160:12,13 183:9
**go** 20:16 39:23 42:6 44:22 74:21 77:21 78:1 81:21 97:10,14,15,17 97:19 102:18 104:11,19,20,20 105:3 109:4,11 110:19 112:9 117:1 121:13 123:14 126:12 136:11,12 140:16 148:15 157:12,13,15,17 159:4,10 168:10 168:14 169:20 171:3,14 182:16 182:18 193:10 193:17 203:14 211:19,22,23 214:9,10
**goddamn** 68:19 69:15 144:1,5 156:5 176:11 185:2
**goes** 164:23
**going** 8:8,9,17 32:13,13 37:16 37:17 38:22,22 42:6 45:9 46:17 50:12 51:22 58:1 72:2,23 74:9 77:21 84:11,20,20 85:19,19 86:7 89:23 91:20 92:23 93:1 96:7 98:9,18 99:15 99:15 104:5 112:22 120:5,5 129:22 130:6,8 134:5 136:20 141:3 143:21 144:13,18,20 145:5,5 146:1 148:10 151:20 152:23 155:19 166:16 170:5,18 175:6 178:3,4 178:10 179:4 192:10 207:3,16 210:2,19 215:1 216:1,6
**good** 49:15 60:18 100:15 101:15 106:3 113:14 128:3 130:15,16 147:16,17 194:1 219:18

**governor** 112:21
**grounds** 2:14
**group** 90:11 96:4
**guess** 39:5 53:10
58:14 151:6
163:23 164:6
178:17 183:12
187:1 201:18
**guilty** 20:10

**H**

**H** 5:5
**habit** 182:23
183:3
**half** 18:18 144:4
**hallway** 211:3
**hand** 84:20 193:8
**handbook** 83:11
83:18 84:2,12
85:1,12,16,23
86:9,9,15 87:1
87:19 88:3,4,16
88:17,19 89:2,9
89:16,20 90:2,7
90:19,20 91:7
91:20,22 92:4,7
92:9,15,17 93:7
96:10,16 97:3
**handed** 86:15
87:20 92:2,19
119:4
**handle** 111:6,7
**handled** 121:2
**hands** 68:20
**handwriting** 33:9
131:23 132:2
147:1 167:6
**happen** 91:10
**happened** 33:8
36:10 52:11
103:6,8,9,10,11
105:15 147:1,17
147:18 151:23
157:11 169:20
**happening**
113:11,12 158:1
**harassed** 192:3,7
192:15 193:3,6
**harassing** 32:11
39:6 118:23

182:7
**harassment** 25:2
33:19 35:22
37:18 42:4 71:9
71:13,16 72:17
73:14,18 89:3
93:16,23 94:2
99:9,23 100:4
113:11 182:22
183:7 191:19
192:20 193:21
194:4
**hard** 186:7
**harmful** 129:21
**head** 8:20 77:5
83:3 106:9
179:9
**hear** 45:11 54:15
97:23 115:23
116:3
**heard** 46:12 53:7
53:14 67:12
116:15 141:18
142:1,7,17,21
143:2 186:18,19
187:2,2,23,23
**hearing** 220:14
**hell** 72:20
**Helms** 95:4
**help** 53:11 149:6
153:14
**helped** 117:11
**helpful** 32:18
192:22
**helping** 42:19
43:8 44:4
**he'll** 134:7
**higher** 31:4 185:6
203:10,11
205:23 206:22
208:2 213:9,11
213:18 215:2
217:2,4
**hired** 25:5 26:7
26:10,11 193:14
196:13
**history** 123:5,5
128:12
**hit** 70:14,16
184:16,19,21

**hits** 185:4,11
**hitting** 23:22
24:6 184:17
185:13,14
**hold** 127:13,15
**Holdings** 4:3
**Holland** 95:5,7
**holler** 53:8 106:7
**hollering** 77:15
185:2
**hollers** 127:9
**home** 159:4
193:10,17
**hooked** 123:21
**hope** 111:9,10,14
**hot** 159:9
**hotline** 93:18
94:12
**hour** 171:9
**hourly** 58:3
132:10
**hours** 141:6
162:19,22 163:4
163:7 165:1,3,6
165:7
**house** 1:7 6:22
7:17 8:7 14:9
15:10,22 16:7
24:21 25:1,5,9
26:8,11 28:5
29:1,5,6 40:13
41:5,13 47:9
49:21 51:19
55:6 83:12 84:3
84:23 85:13,17
85:23 89:19
94:11,15 117:14
161:19 164:16
175:8 186:14
192:3,6 193:4,6
194:5 196:1
197:14 198:4
202:20 203:6
**Houston** 22:1,12
**human** 94:6,21
151:8
**hung** 211:3
**husband** 10:19
12:16 13:7 14:2
19:12 22:22

**husbands** 21:11
**husband's** 9:18
**Hutchins** 31:6,10
31:12 82:9
102:7 107:4
111:8 136:8
146:18 150:12
151:11 165:16
165:22 166:4,6
167:23 168:3,9
170:7 171:5,6
194:13 219:14
**hysterical** 175:16

**I**

**identification**
32:21 38:21
46:21 52:3 84:6
86:3 91:17 93:4
96:14 99:14
120:11 128:23
145:4 152:6
166:15 207:8
210:18 214:5
**ignored** 156:15
**imagine** 111:6
**immediate** 94:5
**immediately**
78:20 217:2
**important** 55:19
**impression** 173:8
**incident** 52:6,8
52:13,19 103:20
126:20 149:14
151:22 152:1,10
155:18 156:20
157:7 159:19
164:5 176:16
183:15
**incidents** 71:5,6,8
71:10,11 82:5
103:5 107:2
156:21 160:17
184:9 185:20
**inclined** 193:12
**include** 187:23
**included** 186:13
**including** 43:21
140:14 208:8
212:19

**incomprehensi...**
73:11
**Incorporated**
6:22
**increased** 33:20
35:22 37:19
42:4
**indicate** 33:6
39:10 42:17
52:23 53:7,19
53:23 55:8 56:7
56:13 60:22
154:20 196:3
**indicated** 15:20
35:20 55:11
56:10 76:19
158:18 179:4
188:3 190:15
194:20
**indicating** 85:22
122:4 132:2
147:14 185:6,10
189:16
**individual** 77:8
126:10
**Individually** 44:1
**inflammatory**
128:16 131:13
**information**
114:13 117:10
117:17 139:15
**initial** 115:10
**initially** 25:8 27:1
101:23
**inside** 140:17
141:2,8 156:11
156:12
**instance** 107:18
**instigational**
131:13
**instructed** 45:22
46:2
**instructions**
45:10,12
**intend** 37:11
**intended** 28:20
**interact** 160:9
**interactions**
160:17
**interested** 220:19

**interfere** 35:4
**interference** 87:13
**interfering** 87:14 136:21 137:10
**internet** 117:8
**interrupt** 72:3 148:3
**interrupted** 126:10 148:14
**introduce** 7:7
**investigation** 147:7
**involve** 21:11 22:8
**involved** 90:6 91:2
**involving** 52:6,8
**irate** 119:13,15
**issue** 102:23 105:12 108:19 129:14 209:19
**issues** 33:21 34:6 36:1,1,12 37:20 37:20 42:5,7 43:8,14 44:3,14 46:13 47:16 102:2

**J**
**J** 4:1
**jail** 20:16 23:5
**jam** 79:14
**James** 63:23 64:6 78:19,22 80:23 81:2,2,7,11,13 82:3
**jammed** 77:13 79:12 80:3,15 80:19
**January** 99:22 100:1,3,6,6 102:6 107:9 108:14
**jar** 70:13,16
**jars** 28:21 51:4
**JEFFERSON** 220:5
**Jennifer** 3:17 7:16 8:6

**Jewel** 113:4,8 119:17
**Joanie** 198:12,15 198:16,16 199:11,19
**job** 28:10 49:21 50:3,9,13 130:7 134:6 141:9 142:12 176:1 200:7 201:22,23 202:4,5 208:22
**jobs** 50:7
**jog** 186:9
**Johnny** 70:19 71:2
**Jordan** 30:16 102:6 107:4 108:18 120:3 136:7 146:18 150:20 151:11 154:5 157:3 159:7 168:11,14 170:4 171:4
**Jordan's** 157:13 158:2,13
**Jr** 6:23
**July** 100:3
**jump** 98:9
**June** 25:6,14,15 25:18,19,22 26:2,5 151:23 151:23 152:21 159:18,23 160:7 160:18 161:15 163:11 164:5 167:15 168:22 169:2 176:13 181:2 183:13,16 183:23
**J.D** 4:7

**K**
**keep** 64:21 74:15 74:18 176:5 202:21
**Keesi** 196:23
**Kenneth** 194:13
**kept** 64:20
**kids** 141:8
**Kim** 47:20 48:2,4

48:7,14,22 49:6 49:7 51:14,20 52:6,9 53:1,4,9 53:14,19,23 54:16 55:1,5,8 56:8 74:6,11 75:2 142:10 143:3
**Kim's** 53:9
**kin** 220:17
**kind** 20:19 30:5 38:2 59:3,8,17 161:21 189:12
**kinds** 140:22
**knew** 114:22 115:3,7,8 169:13 172:11 198:7
**know** 8:10,22 13:19 21:18 36:18,21 37:1 40:17,20 41:1 41:12,16 46:2 46:10,14 47:8 52:18 56:3 60:7 60:9,12,13 61:17 67:3,20 68:3 69:23 83:7 86:23 87:17,21 87:22 88:7 89:13,17 91:11 94:18,20 95:8 95:21,23,23 98:8,8,12 100:12 103:6,8 103:10,11 106:2 106:8,22 107:1 107:6 110:8,15 112:16 113:4 114:16,19,21 115:5,6,7,14 116:4,18 118:7 118:16 123:2 126:11,14,18,18 126:19 127:5,13 130:3,3,15 132:20,21,22 133:20 138:8 139:1,18 141:2 141:22,23

142:20,23 143:1 147:11,15 149:2 149:22 150:4,9 150:10,14,18,19 150:21,22 151:1 158:22 162:4 164:10,18 165:1 165:3,5,9 169:9 170:10,13 171:23 175:1,3 181:22 196:9 197:1 198:2,8,9 199:18,20 200:1 201:19 205:13 205:17,19 212:1 217:14 219:11
**knowledge** 86:5 126:21,22 206:23
**known** 9:7,20
**Kress** 3:7

**L**
**L** 1:11 5:5
**lab** 53:19 54:1
**label** 27:20,22 28:3,13 50:23 51:3 58:23 59:1 62:17 63:2,18 66:20 104:16,18 106:4 108:20,22 109:6 110:7 162:17 165:13 168:17 174:12 176:1,6 193:13 194:8,15,17 195:2,15,22 196:5,20 197:2 197:8,14,20 198:2,22,23 199:2,5 200:1 201:11,15,16 206:6,8 219:4,5
**labeler** 211:10,14
**labels** 28:17,21 51:4,9 103:1 104:23 105:13 105:17 110:12
**laborer** 26:8,11 26:18 27:6

**Lampley** 114:5
**language** 64:9 68:22 69:4 75:3 75:4,6 151:20 182:8
**large** 1:18 6:3 144:3
**larger** 86:19
**late** 49:17 100:20 100:22 101:12
**laughed** 201:10
**law** 1:18 3:4,12 3:18 4:2,8 6:8 7:4
**laws** 2:6
**lawsuit** 8:7 17:17 18:5 37:23 194:4
**lead** 11:14
**leader** 57:15,18 57:21 58:3 100:18 101:11 101:19 147:6 162:12 198:20
**leading** 2:12
**learn** 81:20 114:11
**learning** 62:6 63:18
**leave** 98:21 117:1 169:19 171:12 178:14 180:6 201:8
**leaving** 104:12
**led** 201:1
**left** 28:4 30:2 47:18 54:9 56:14 77:18 94:22 98:14 141:3 153:13 164:15 169:21 170:20,22 174:6 180:5,12 191:9 191:13 196:1 197:13 198:3,7 198:10,21
**legs** 184:20,21 185:4,6,11
**Leigh** 132:5,12 133:10,14,15,20

134:10,17 135:1 135:19 136:4,9 136:17 138:1,8 138:13,16,21,22 139:2,13,14,18 140:3,4,15,17 141:15,18 143:2 143:5 147:10,10 147:22 148:22 149:9 179:12 180:11,12,12 181:1,6,7,8,23 185:23
**Leigh's** 181:20
**letter** 121:18
**let's** 49:20 84:10 113:13 129:16 151:22 188:18 203:4 211:15 212:2
**level** 202:22,22 203:1,2,11,14 203:23 204:2,3 204:7,10,18,19 204:21,22 205:6 205:10,16,18 206:1,6,17,19 206:20,22 207:16 208:2,12 208:13,13,13,15 208:20 209:5,9 209:12,14,17 210:14 212:20 213:3,9,11,18 213:19 214:11 214:20 215:1,19 216:1,7,9,9,14 216:18,21,22 217:2,6,8,9,10 217:14,19,22 218:4,7,14,22 219:12
**levels** 204:17 211:5 217:4 218:7
**lie** 55:10,16
**lies** 51:15,20
**life** 71:20 134:14 140:11,19,22 151:21 190:7,10 190:12
**Linda** 1:4,9,15 6:12,16,20,21 7:9 8:4 9:7,20 53:8
**line** 27:4,5,8,10 27:11,13,15,23 28:1,2,10 29:7,9 29:12 30:2,13 30:19 32:1 33:19 42:20 43:9,19 44:5 47:21 49:8,10 50:13,22 51:2,8 52:12,20,20 56:14 57:5,6,8,9 57:15,20,20 58:12,13,19 66:21,23 67:4 67:11,14,19,22 76:21 77:11,18 79:8 81:21 100:19 101:12 101:19 104:12 105:18,23 106:15,18 109:3 110:14 157:20 160:2,4 161:8 161:11,15,20,20 161:20,21,21 162:1,1,2,5,5,10 162:11,14,16,20 162:22,23 163:8 163:12,14,18,20 164:4,7,11,17 164:19,21 165:2 165:4,6,8,11,12 167:20 168:10 168:14,21 170:5 170:6,8 172:8 174:7,14 176:7 179:20,22 180:1 180:4 197:15 199:7,9,10,15 199:16 200:2,14 200:16,19,21,22 201:4,15,16 209:22
**lines** 67:15 68:10 104:17 197:17 197:19
**Linhaven** 10:2
**liquor** 127:22
**list** 215:23 216:3
**listen** 127:11 140:7 146:6 150:6 151:4,15
**listening** 142:19
**little** 43:6 51:11 153:2 203:5 211:20,22,23
**live** 9:23 10:12 11:2,5
**lives** 10:5 11:7
**living** 12:23 210:10
**LLC** 3:6
**loading** 105:17
**local** 94:5,6,21
**lock** 97:9,12
**long** 13:11 15:16 16:5 17:10 22:16 25:11 26:17,20 29:18 57:8,10 59:20 62:1,4,5 78:21 81:7,9 114:8 121:4 126:19 142:10 143:3 158:19 161:5,10 168:7,13,18 169:5,6 191:7 210:15
**longer** 139:4 202:8 211:20,22 211:23
**look** 32:15,17 36:5 39:1,14 52:15 83:21 84:12,22 86:8 100:1 113:5,6 117:10 126:12 128:20 140:17 148:1,5 167:10 194:20,22
**looked** 37:2,3 91:22 99:6 135:13
**looking** 92:8 166:22 211:9
**looks** 166:23
**loose** 141:2
**Lorcet** 18:14,15 18:22
**lose** 130:7 217:6
**losers** 111:13
**lot** 64:22 65:1
**loud** 53:20 54:1
**Louis** 4:4 94:7,15
**lower** 189:8
**lump** 210:4,6 215:13,14,15
**lunch** 113:15,20 114:2

**M**

**machine** 28:16,20 51:3 58:23 59:1 62:6,17 63:2,18 64:1 66:1,20 74:14,17 77:13 78:16 79:7,8,12 79:14 80:3,15 81:3,3,21 82:16 98:23 106:4 108:20,23 109:5 109:6,13,14,20 110:17,18 153:8 160:13,14 173:23 174:5 183:9 193:14 194:16 202:7,10
**machines** 208:7
**maiden** 9:10
**mail** 98:2,21 174:7 180:13
**main** 4:11 56:14 56:18
**making** 33:3 91:9 91:9 131:21 132:4 142:2,7,8 209:14 214:8
**male** 71:13 73:14 200:5
**man** 71:18,19 72:15 77:21 153:2 204:11 205:8,11
**management** 31:4 47:9 48:5 51:20 55:22 58:10 65:1 83:5 95:16,18 96:2 97:18 104:11,12 105:3,7 108:4 121:10 126:15 127:15 151:7 193:23 204:17 210:1,2 212:23
**manager** 94:8,16 110:19
**managers** 127:6
**Manly** 22:11,14 23:3
**manufactured** 29:2
**man's** 200:7 201:6,17,22 202:4,5
**March** 32:23 129:8,18 130:2 130:14,23 145:13,23 146:14
**marijuana** 20:4,8
**mark** 32:14 38:23 84:20 85:20 91:19,21 93:1 99:16 112:7 113:3 120:6 145:6 157:9 166:17 174:6,8 174:10 198:12 199:9 205:12,13 206:8,13,15,18 207:1 210:20 213:10,15 214:1 217:13,18
**marked** 32:20 38:20 46:20,22 51:23 52:2 83:22 84:5 86:2 86:11,16,16 91:16 93:3,10 96:8,13 99:13 120:10,15 128:22 129:1 145:3 152:5,7 158:15 166:14 207:4,7 210:17

214:4
**marking** 89:22
**marriage** 11:4
**married** 9:12,13 9:15 11:15 22:19 190:19 191:12,13
**Mary** 31:15 32:3 32:7 33:20 34:2 34:7,20 35:7,23 36:2,11 37:19 38:1 39:11,14 40:18 41:17,20 42:5,8 47:4 95:19,21 97:20 98:4,5,12,16 134:7 150:23 151:2,10 171:15 171:18 172:4,9 173:5,7 174:3,6 174:8,13,16 175:4,14,17 176:21 177:9 216:15
**matter** 6:21 19:20 21:21 39:15 108:3 123:19 172:21
**matters** 24:10
**ma'am** 8:12,21 9:5,9,11,14,17 9:22 10:2,6,15 10:17,20 11:1,6 11:8,10,22 12:9 12:12,20,22 13:2,4,10,23 14:3,5,15,23 15:8 16:1,13,19 17:2,4,9,23 18:3 18:11,20 19:2,5 19:16 20:9,11 20:15,17,21 21:1,9,17,20,22 22:6,23 24:8,16 24:22 25:4,7,10 26:3,9,13,16,22 27:2,14 28:6,23 29:4,10,13,17 29:23 30:3,9 31:5,8,11 33:1,5 33:10,16,23 34:18 37:10,15 39:3,8,13,16 40:4 41:2,14 42:22 43:3,5 44:20,23 45:4 45:13,17 50:8 50:11,14,16,18 50:20 51:1,7,10 51:13 54:14 57:14,19,22 58:5,8,17 59:1 60:11,21 61:9 61:14 62:22 63:17 64:15 65:10 69:11 76:23 78:4,17 79:7 83:1 85:18 88:18 98:7,15 99:20 102:16 111:11 112:10 114:18 115:19 116:14 120:13 133:8 135:15,17 173:19 203:8,13 203:17,21 212:22 213:1,5 213:7
**McInnis** 158:23
**mean** 57:13 58:5 62:2 91:6 95:19 102:12 109:15 112:8 116:10 121:11 126:18 137:9,22 163:5 164:1,2,15 170:19 198:8 214:16
**means** 61:18 116:8
**meant** 110:8
**measured** 162:8
**mechanic** 53:8,10 70:13 74:16,17 108:21 109:1,10 109:13,17 144:7 155:1 156:16 159:1 173:14 200:12
**mechanical** 109:9 109:15,19 193:18
**mechanically** 193:12
**mechanics** 48:12 74:7 97:18 169:11 200:18 202:7
**medication** 13:16 16:12
**medications** 15:4 15:17 17:5,19 18:13,19,22
**meet** 120:16 121:9 131:7
**meeting** 43:13 44:2 47:4 91:3 96:2 102:5,10 102:18,23 107:3 108:9,14 110:21 111:3,19 121:17 122:6,23 123:3 123:11,13 124:6 124:11,13 125:9 173:5 175:12,13 176:21 177:3,6
**meetings** 90:8,14 90:16,17 97:10
**Melvin** 31:6,9,12 60:8,15 62:4,19 82:8,11 102:6 107:4,10,14 111:8 120:2 121:14,17,19 122:2,22 136:8 137:23 146:18 150:12,15 151:3 151:11 155:6,7 155:9 157:2 160:20,23 161:8 161:12 165:16 165:18,22 166:4 167:23 168:2,7 168:9,13 170:7 170:11 171:4,6 171:11 173:8 194:13 216:13 219:13
**Melvin's** 83:2 134:8
**member** 58:9
**memo** 129:3
**memory** 108:16 186:9
**men** 72:13 74:3 74:12 75:3 103:14 193:14 202:1 203:1
**Mendheim** 4:7 7:23
**mentality** 201:18
**mentioned** 93:15 93:19,21,23
**merely** 193:7
**message** 98:21 180:5 181:9
**met** 47:8 121:5 172:3
**Metcalf** 70:19 71:2
**middle** 1:2 7:1 33:7 167:18 211:11
**Midline** 22:13
**miles** 123:23
**milligrams** 12:4
**mind** 178:7
**minors** 118:15,16
**minute** 78:6 152:12
**minutes** 79:15 80:11,16 202:9
**mislead** 146:7,8
**Missouri** 4:4
**misspoke** 52:19
**mixture** 175:15
**Mizell** 9:19,23 21:14 22:19 23:14
**molester** 112:13 113:2 121:16 123:15,22 124:21 125:1,6 125:8,13,15 126:17
**moment** 92:1 145:1
**Monday** 178:18
**month** 91:12
**months** 62:2 178:5 193:18 203:19 214:8
**moods** 151:19
**morning** 18:18
**Morris** 22:11,14 23:3
**mother** 11:7 53:20 54:2,16 68:19 69:15 75:10,13,15 76:1 143:23 144:1,6 156:5 176:11 185:2
**Motion** 172:2
**motivating** 219:1
**mouth** 64:20,21
**move** 49:10 129:16 172:7,11 172:12,15,16
**moved** 28:1,2 36:18 37:5 49:8 50:13,22 51:8 52:12,20 57:5,8 58:12,13 161:8 161:15 162:10 162:16 164:4 170:16,17
**moving** 58:18
**Mylan** 9:19,23 21:14 22:19 23:14

N

**N** 1:11 3:1 5:1
**name** 8:3,5 9:7,10 9:18 16:17 73:21 81:11 116:4 127:1 158:22 180:6 196:19 198:17
**named** 67:6
**names** 74:4 127:8 151:9 196:9 197:1
**Nance** 94:22 120:16 121:7 123:8 124:18 125:3 128:13 129:4 131:8 133:21 135:20

138:9,16 149:18 150:2,9 151:10 172:3 173:5 175:13 176:22 203:23 204:15 205:4
**napkin** 78:7
**narrative** 8:18
**nature** 34:13 48:1 62:10,23 117:5 142:22
**near** 175:22
**necessarily** 34:5 102:4 109:15
**necessary** 2:10
**need** 8:22 9:4 37:12,13 53:15 87:6 123:18 146:5 170:6,8 201:8 206:2
**needed** 57:14 97:10 102:10,18 106:16 122:16 153:7 210:3
**neither** 220:17
**nerves** 53:21 54:3 54:17
**nervous** 141:14
**never** 69:5,6,7,13 121:2 125:15 139:20 161:19 162:7 187:14
**new** 57:23 83:5 89:20 90:7,19 90:20 95:16,18 96:4 108:1 112:21
**newer** 92:8
**Nickerson** 198:16
**nicknamed** 196:23
**night** 18:10 67:8 70:7 141:5 163:8
**nightly** 17:6
**nine** 192:20
**nit** 34:16 38:6 41:20
**nit-pick** 45:12
**nit-picking** 33:13
35:8 38:3,11
**nod** 8:20
**nods** 77:5 106:9 179:9
**non-responsive** 172:2
**normally** 176:5
**North** 1:20 3:8,22 6:10
**Notary** 1:17 6:2
**notice** 76:8,9 99:22 100:4 128:19
**number** 7:2 56:21 57:2 65:8 65:9 79:6 86:16 93:13,19 98:3 98:13 113:18,22 159:15 163:6 165:5,7 212:7 212:11 219:21
**numbered** 90:1
**numbers** 180:10
**numerous** 196:10
**nut** 29:5,6
**nuts** 28:22 29:2
**nutshell** 28:19

**O**

**O** 1:11
**object** 15:18 28:15 31:22 34:4,22 41:22 43:15 44:16 49:23 51:16 54:8 61:3 70:3 72:18 73:6 79:18 84:7 85:3 85:7,9 87:11 88:5 97:5 113:9 120:17 121:12 129:9,11 153:19 188:22 192:16 193:5,22 202:17 207:14 209:1
**objecting** 87:8
**objection** 44:17 55:23 73:3,5 87:4,10 102:3 112:14 129:16
165:20
**objections** 2:11 2:14
**observations** 46:5
**obviously** 86:20 100:8 109:21 212:1
**occasion** 14:10 19:23 20:19 35:17 55:13 74:6 119:5 120:8 186:18
**occasions** 19:9 21:3 48:10 65:3 78:23 79:2,6 98:4,13,17,20 143:6,10 149:19 156:2 187:2
**occur** 105:14 194:14 195:9
**occurred** 23:1 52:19
**occurring** 41:10 41:18
**October** 11:17
**offended** 188:7 188:12,14 189:1
**offender** 111:22 112:3,5 113:7 114:4,6,12,20 115:1,14 116:1 116:17 119:1,17 125:20 126:7,17 126:21 133:17 133:22 134:15 134:19 181:15
**offense** 118:13
**offensive** 188:21 189:2
**offered** 2:16
**office** 8:1 40:14 40:15,23 41:4 47:12 97:13,16 97:17,20 103:14 121:23 130:4 132:7 136:12,14 136:16 137:13 137:14,18 138:4 138:18 148:20
157:4,13,15,18 158:2,14 172:4 177:4 210:8
**officer** 17:15,22 19:8
**offices** 1:18 6:8
**Oh** 198:8
**okay** 10:9 14:21 15:9,14 16:10 18:12 27:9,12 27:22 28:7 29:1 29:11 30:4,6,11 30:15 37:16 41:15 42:6 44:10 49:17 52:23 59:2 60:14,19 62:20 62:23 64:2,7 66:9 70:20 71:21 72:11 74:23 76:13,14 79:16 80:20 88:9 89:22 91:18 92:6,23 95:14 97:8 98:6 99:19 100:15,23 101:11 102:5 103:4 105:12 108:18 110:3 115:12 117:22 119:14,19 123:3 124:16 138:8,20 139:5,11,12 143:16 144:23 149:7,13,16 150:11 155:8,11 156:20 160:6 161:2,18 163:20 164:3,22 166:9 168:12 169:13 171:3,8 177:9 177:17 178:21 179:7 181:5 182:15 183:16 183:17 184:6,9 185:7,11 187:7 187:19 188:10 188:19 189:3 190:22 191:8 192:6 194:2,11
197:2 198:18 199:4 200:5 202:18 203:22 205:2 206:4,12 209:19 211:4 212:17 213:8,20 214:7,22 215:9 215:21 216:5,12 216:15 217:13 218:2,18 219:9 219:17
**old** 10:7,10,21 13:20 108:22 118:16 194:1
**older** 10:9
**oldest** 79:8
**once** 9:15 55:2 69:6,7 79:19,22 80:2,13 91:11 91:11 98:11 131:19 134:1 151:18 215:12
**ones** 45:2 127:20 127:21,23 196:10
**one-time** 55:16
**ongoing** 108:19 110:21
**online** 113:6 126:12
**open** 96:20 97:1,4 97:6,23 136:18 136:19
**operations** 31:16
**operator** 26:15 26:19 27:16,18 27:20,23 28:3 28:14 50:23 57:16 104:16,18 105:23 106:3 109:9,16,22 162:17 165:13 168:17 174:12 176:2 194:9,18 195:3,15,23 196:5,20 197:14 198:22,23 199:6 200:2 201:12,15 201:16 202:23 206:6 207:16

219:4,6
**operators** 197:2,8
197:20 198:3
199:2 212:19
217:14
**opinion** 76:5,7,12
127:3,4,6,12,13
127:16,17 128:4
133:2
**opportunity**
37:13 40:2 84:1
88:11,20 93:6
93:10 94:16
98:22 99:8,22
100:5 193:13
**oral** 6:14
**order** 104:22
**orders** 164:23
**original** 87:9
152:20
**outside** 7:16
104:4 112:4,8,9
156:12,13
169:20 170:21
171:4,5
**Owens** 9:19,20
9:23 21:14
22:19,21 23:14

**P**

**P** 1:11 3:1,1
**pace** 158:8
**package** 88:7
**packaged** 29:2
**packet** 88:13
**page** 39:9 42:15
42:17 44:12,13
86:8 88:4 91:21
92:4 93:17,19
96:9,15 144:7
152:19 166:22
167:10,18
194:22
**paged** 170:11,13
**paid** 207:12,15
209:20
**pain** 18:14
**pallet** 143:22
144:2,22 156:6
176:10 184:7,22

185:4,11
**pallets** 103:1
105:13 183:22
184:4,12
**Pantazis** 3:6
**paper** 90:15
218:7
**papers** 107:18
**paperwork**
106:16
**paragraph** 44:10
44:13 93:11
167:13,14,16,19
194:23
**pardoned** 112:22
**Parker** 53:8
**Parrish** 9:8
**part** 45:14 49:7
59:21 90:5,10
98:13 109:18
164:6 176:1
189:19 203:9
208:16,21,23
211:10,12
**participate** 90:13
**particular** 52:13
59:16 109:2
121:4 147:20
149:14 155:18
178:20 187:11
200:18 212:4,20
215:18
**parties** 1:13 2:13
74:20 220:18
**pass** 214:11
**passed** 196:4,8
214:17
**patio** 113:4 126:3
136:11 137:19
140:3,9,13
**Paxil** 14:15 15:15
**pay** 165:11,13
202:20,21
203:15,23 204:2
204:4 205:4,23
207:5,19,21
208:3 209:14,23
215:1,4
**pay-for** 210:23
**pay-for-skill**

210:21 211:7
**pay-for-skills**
203:6
**PC** 3:20
**peanuts** 70:14,16
71:3 77:11
**pending** 9:2
**people** 30:6 45:8
46:6 53:20 54:2
54:16 67:14
68:9,10 75:2
76:16,18 114:3
114:22 115:13
119:1 123:15
124:20 125:8,19
126:1,16 128:3
142:4,5,11,20
143:1 144:6
151:2 158:20
190:13 196:6,12
198:9,11 199:5
202:23 217:3
**people's** 97:16
127:4
**percentage**
215:11,12,14
**performance**
195:19
**performed**
195:18
**period** 59:19,20
63:17 64:4,13
65:4,13,20 66:5
66:13 67:18
69:2,8,9 80:22
82:1,5,11 103:2
163:15
**periods** 100:23
**Perkins** 29:15,16
29:18 47:21
48:2,5,7 49:6,7
51:14,20 52:7,9
53:4 142:10
143:3
**permanent** 170:9
170:12 172:8,11
172:11,15,16
**person** 11:14
74:14 115:10
116:5,5 128:4

129:20 176:5
199:18,21 216:1
**personal** 116:5,7
119:13 123:5
196:10
**personnel** 36:9
47:11 116:9
186:15
**physical** 137:16
144:14
**physically** 66:9
66:11 121:22
156:3,4,6
**pick** 219:19
**picked** 89:6
**picking** 34:17
38:7 41:21
144:2 156:6,7
184:7,22
**picture** 117:21
126:13
**Pike** 4:9
**place** 157:7 177:3
211:1
**placed** 204:18
209:5 212:19
213:8,10 214:19
215:18,23 217:8
217:10,15,18,22
218:4,21 219:12
**placing** 218:14
**plaintiff** 1:5 3:2
7:19,21
**plant** 26:23 31:16
95:22 96:1
98:19,19 99:7
100:10 126:22
127:23 141:4
172:21,23
173:11 174:23
190:16,20,23
191:9
**plastic** 51:5,6
**plea** 21:21
**pleasant** 61:6,10
**please** 8:3 35:4
42:15 72:23
87:13 130:20
133:7 137:1,11
142:15 144:7,8

145:15 148:3
156:16 171:11
**pled** 20:10
**pocket** 175:18,20
176:9 181:18
**point** 13:19 20:6
26:14 27:20
29:21 47:5
60:19 67:7
75:17 89:18
90:21 112:1
117:7 139:10
148:12 161:6,14
164:2 170:20
178:7 187:16
203:22 212:18
216:15 219:18
**pointing** 187:8
**police** 17:14,22
19:7
**policies** 75:19
90:7,19 99:5,9
100:7,10
**policy** 50:9 76:7
83:19 84:1,22
88:2,6,11,20
89:4 93:6,10,16
93:23 96:11,17
96:20,21 97:1,4
97:7 99:23
100:4 136:19
180:20 210:21
**Porter** 81:12
**position** 49:12
50:22 57:11,13
57:18,23 95:2,8
132:6 162:13
170:10,12
172:18 173:2
193:19 195:16
195:20 196:21
198:9 200:11,14
201:6,17 215:3
219:4,6
**positions** 199:6
**possession** 20:3,7
**possible** 105:19
**posted** 50:7,13
100:10 215:23
216:3

**posting** 50:9
**postings** 99:7
**pray** 166:12
**prefer** 125:23
**prescribed** 13:5
  14:21 15:3,5
  16:21
**present** 90:15
  107:10 116:18
  123:9 138:13,22
  141:15,21
  146:19,21
**presently** 15:5
**presents** 127:22
**press** 23:4
**presumably**
  67:11
**pretty** 55:5
  152:18
**prevented** 184:17
**primarily** 102:1
**print** 220:11
**prior** 2:16 34:3
  43:17 58:18
  164:2
**probably** 94:20
  137:22 149:20
  181:22 219:18
**probation** 20:14
**problem** 106:20
  108:20 109:12
  110:22,22 111:4
  173:12,14,15,17
  173:20 174:1,19
  174:21
**problematic**
  54:12
**problems** 81:13
  101:4,7 107:16
  111:5 125:11
**procedure** 6:6
  49:21 50:3
  122:14 204:16
**procedures** 75:20
  83:9 89:13
**proceeded**
  123:20
**proceedings** 6:15
**process** 62:6
  187:6

**products** 1:7 6:22
  174:22
**profanity** 154:16
**program** 203:7,9
  210:22 211:1,7
**prohibiting** 83:19
**promoted** 126:5
  126:8
**promotion** 195:2
**prompt** 23:1
**prompted** 42:8
  176:17
**proper** 28:17,17
**properly** 110:13
**proposition**
  190:3
**protect** 24:1
  193:9
**protecting** 23:22
  192:9 193:7
**prove** 193:11,17
  215:7 217:1
  219:8
**proven** 216:22
  218:5
**provided** 6:5
**Prozac** 13:17,18
  17:1
**public** 1:17 6:3
  126:20
**pull** 66:3
**pulled** 19:22
  65:23 77:14
  81:2
**pun** 28:20
**purpose** 41:3
**put** 20:14 28:21
  36:11 51:4 54:6
  76:8,9 81:3
  89:7 97:9,12
  109:8 122:16
  140:6 144:20
  157:8 173:2
  176:6 206:6,21
  209:12,17 217:4
**putting** 51:9
  176:23 201:6
**P.C** 1:19 4:9
**P.O** 4:10

**Q**

**QC** 54:4,19 67:8
**question** 8:10 9:2
  32:3 35:19
  37:14,17 40:10
  42:1,14 53:22
  60:1,5 64:2
  72:2,4,6,16,22
  73:2,4,12,13
  76:12 87:5
  89:15 98:6
  122:21 125:2,2
  127:10,11 130:1
  130:20 133:7
  137:17 142:16
  143:19 148:4,7
  148:8,15 149:7
  157:8 193:1
  205:2 209:15
**questions** 2:12,13
  8:9 35:3 36:15
  73:1,9 122:17
  128:8 142:14
  220:9
**quick** 84:11
  212:3
**quickly** 108:21
**Quinn** 3:5
**quit** 25:18,22
  177:10 178:10
  179:4,15 180:10
  181:3,13
**quite** 17:11 22:17
  24:3 25:17
  29:20 36:4,10
  36:17 40:16,19
  42:10 192:17
  215:8
**quote** 201:17

**R**

**R** 3:1 220:2
**radios** 169:10
**radius** 123:23
**rails** 110:8,9
**raise** 81:21 204:6
  204:8 210:5,10
  215:11,12,14
**raised** 44:3 53:1
**Ralcorp** 4:3

**Ralcorp's** 94:7
**ran** 81:4 208:8
**Rasmussen** 15:13
  15:16 16:16
**rate** 203:10
**reach** 98:16
**reached** 209:10
**read** 7:14 39:20
  39:21 40:2,5
  88:13,15,16,17
  89:6 103:12
  152:13 166:11
**reading** 2:2
**realizing** 170:15
**really** 100:14
  101:3 177:5,5
  178:2 192:21
**reason** 16:14
  17:19 49:7
  56:14,18 74:11
  75:1 107:22
  180:7
**reasonably** 61:1
**reasons** 56:17
**reassured** 167:21
**recall** 12:18,19
  14:13,19 15:3
  16:23 17:20
  20:2 24:13,14
  24:17 26:4,23
  27:12 28:9 31:9
  37:22 41:2 47:7
  47:13 50:4,19
  59:19 62:2 71:4
  81:1 88:2,21,22
  89:2,5 91:9,14
  92:16,19,20
  96:5 101:7
  108:11,13 118:1
  118:1,3,6,8
  119:23 120:22
  122:9,10,11,21
  124:10,17
  141:14 160:19
  161:10 163:22
  196:19,23 206:2
  215:17 216:4
  217:16
**receipt** 85:22
**receive** 85:16

89:19 92:10,12
  129:7 165:10
  195:15 205:23
**received** 50:17
  83:15,19 84:2
  85:2,13,15
  86:14 88:3,10
  88:14 89:3,16
  90:3 92:17
  129:6,17,19
  130:1,4 138:11
  138:13 165:13
  166:23 181:8
  196:20 200:14
  213:23
**receiving** 45:6
  204:2,3
**RECESSED**
  219:23
**recollection**
  121:3 135:6
  216:5
**record** 56:22 57:3
  78:11 84:15,18
  113:19,23
  148:14 153:5
  159:12,16
  186:20 212:8,12
  219:22
**records** 16:9,11
  36:5,6,8,15,20
**reduced** 220:10
**refer** 89:8,15
**referencing**
  35:18
**referred** 131:17
  134:18 188:16
**referring** 107:6
**refers** 188:4
**reflect** 135:10
  148:14
**refresh** 108:16
  135:6
**regarding** 33:3
  110:22 121:10
  129:3 152:10
**regardless** 59:15
**register** 116:19
  116:20 117:1
**registered** 111:21

112:3 114:4,6 114:12 115:14 116:1,16,21 119:1 125:19 126:17 133:22
**regular** 168:22 196:14,16 199:5
**related** 52:8
**relating** 2:6 17:14 19:20 46:18 52:6 99:7 207:5
**relation** 84:22
**relationship** 60:23 61:7,12 64:18
**relieve** 104:2,6 105:4 168:17 169:22 170:14
**relieved** 157:20
**relieves** 199:2
**remain** 28:3 30:1 195:20,22
**remained** 162:11
**remark** 186:19
**remarks** 122:16 143:6,11,14 187:3
**remember** 17:16 19:1,10,13 28:8 30:18 47:3 48:3 49:2,4,5 51:21 52:14 68:10 70:10 82:4 91:3 102:12 115:10 135:3 174:2 182:2 184:11 185:21 186:9,11 191:21 199:23 216:8
**remind** 70:18
**repeat** 43:11 53:22 69:16 151:9
**repeated** 54:5,20 135:23
**repeatedly** 147:4 195:2
**rephrase** 8:14
**replaced** 66:1 200:1
**replacing** 109:18
**report** 110:19
**reported** 74:22 82:12 131:21 132:14,15,21 138:19 160:19 160:23 161:8,11 174:18
**Reporter** 6:2 7:12
**representative** 94:6,21
**representing** 8:6 87:15
**represents** 220:12
**reprimanded** 149:4
**requirement** 218:8
**requirements** 218:9
**residence** 19:22
**resign** 176:23
**resolution** 18:4 22:2 110:22
**resolved** 165:19 166:7 167:22 168:4
**resolving** 111:4
**resource** 94:21 116:5 196:10
**resources** 94:6 151:8
**respect** 63:11 175:6 180:21
**respective** 1:13
**response** 8:19 124:7 181:20 213:23 216:10
**responses** 8:18
**responsibility** 106:14
**responsible** 105:22
**responsive** 71:22
**rest** 164:14 176:14
**result** 220:19
**resulted** 38:3
**resume** 193:11 194:8,12 195:14 219:5
**retaliate** 105:6
**retaliated** 35:10 35:10 42:2 103:16
**retaliating** 42:12 170:16
**retaliation** 35:1 36:13 38:9 41:7 42:9 142:13
**return** 181:10
**returned** 153:6 159:20 180:13 180:15
**returning** 105:7 181:12
**revision** 90:18
**revisions** 91:10
**revisited** 129:13
**rework** 106:15 153:7,9 156:9 156:10 160:11 160:14
**Richard** 4:6 7:22 95:5,6
**Ricky** 170:9 171:7
**rid** 170:18
**right** 9:8 11:5 13:18,20 15:14 15:20 22:7 25:6 27:19 28:22 29:3 30:18 31:17 32:3,5 33:4 34:15 35:5 36:3 39:15 43:10,21 49:14 49:18,22 50:12 51:4 57:21 58:4 58:7,11,20 59:10,13,15 63:6 67:10 70:21 71:21 73:4 76:18,22 80:20 83:16,20 84:10 92:10 112:11 114:21 121:20 122:4 125:14,18 128:8 128:19 130:13 135:4,14 136:16 138:7 140:20 141:14 147:14 148:13 153:11 159:17 167:2,19 167:23 171:10 174:2 177:1,4 177:10 183:20 184:11,23 185:1 185:19,21,22 187:10,13 188:11 190:17 191:17 192:10 194:6 195:7 199:23 203:4,16 203:20 205:7 207:19 208:12 211:12,15 212:13 213:6,22 214:12 217:21 219:17
**right-hand** 131:4
**roam** 172:22
**roaster** 57:15
**Robertson** 3:3 7:14,20,20 15:18 28:15 29:5 31:22 34:4 34:22 35:5 39:20 41:22 43:15 44:16,18 49:23 51:16 53:15 54:8 55:23 59:12 60:4 61:3,17 70:3 72:1,7,9,11 72:18 73:6,10 78:6 79:18,21 84:7 85:3,6,9 86:22 87:8,14 88:5 97:5 102:3 106:10 112:14 113:9,14 115:5 116:8 120:17 121:11 129:9,11 136:18,23 137:4 137:8 139:8 140:6 145:9,12 145:17,21 146:5 148:2,6,13 151:4 152:15 153:2,19 159:9 165:20 187:8 188:22 192:16 192:18 193:5,22 202:17 207:14 209:1 211:17,21
**role** 164:12
**room** 104:4 116:6
**rotated** 30:5
**roughly** 100:17
**row** 183:14
**Rucker** 11:12
**rude** 137:1,2,9
**rules** 2:6 6:5
**run** 28:16 59:1 74:18 82:16 110:14,14,16 193:13,15 210:15
**running** 55:9,15 74:13,18 77:11 102:23 105:13 124:20 125:5,7

S

**S** 1:11,11 3:1,11 5:5
**safe** 16:10 160:20 166:2,5 172:17 172:20,22
**salaried** 58:9
**Sammy** 44:22
**sat** 43:7,12 140:9
**saw** 100:10 201:4
**saying** 30:8 59:15 76:14,15 87:2 97:10 115:6 136:15 137:14 142:16 144:13 154:12 187:1,11 204:1 208:20 209:20
**says** 33:8 54:13 130:5 146:18 147:1 148:18 152:18 167:21 195:1

**scale** 202:20,21
**scared** 74:2 124:4 142:12,12
**schedule** 44:14 102:13,14,19 106:14 162:23 163:10 164:10 164:18,20
**scheduled** 102:11 178:21,22,23
**schedules** 104:18 104:19,20,21
**scheduling** 91:12
**SCOTT** 4:1
**screaming** 82:14 156:5
**screams** 127:9
**screwdriver** 175:18,20 176:1 176:9 181:17
**second** 22:7 35:21 92:8 145:11 167:13 190:18 191:8 194:22
**section** 33:7
**see** 33:22 44:15 46:6 78:7 86:22 93:12 104:1 107:15 108:11 111:16 126:13 130:13,17,19,22 141:8 145:11 148:17 167:16 167:20 181:22 195:4,17 196:6 205:5 211:11
**seen** 47:1,1 98:18 107:19,22 108:6 108:8 139:20 155:23 174:17 174:18
**selected** 213:3
**sense** 144:13,17
**sentence** 20:12 35:22 42:17
**sentences** 33:18
**separate** 178:5 192:12
**September** 49:13 167:1,4
**serious** 147:7
**session** 107:9,12 184:2
**set** 28:16
**sex** 71:20 111:21 112:3,5 113:7 114:4,6,12,20 114:23 115:14 116:1,16 118:13 119:1,17 125:20 126:7,17,21 133:16,22 134:13,13,15,19 140:11,18,21 181:15 182:8,9 190:4,7,10,12 192:19 202:14
**sexual** 34:8,20 35:7 36:2 38:2 71:8,9,13,16 72:14,17 73:14 73:17 173:12,13 182:22 191:19 192:8,11,20 193:21 194:4
**sexually** 34:9 35:14 182:6 192:3,7,15 193:3
**Shealy** 4:9
**sheet** 52:15
**she'll** 7:14
**shift** 67:8 106:17 161:3 163:2,8 197:3,4,6,9,11 197:22
**shifts** 198:1
**shit** 75:17,23 144:21
**short** 61:23 81:1
**shortly** 111:19 139:3 161:7
**shot** 193:19
**shoulder** 189:9
**show** 16:11 32:13 38:22 46:17,22 51:22 83:22 85:19 89:23 92:23 96:7 99:15 119:8 120:5 129:1 137:5 145:5 152:7 166:16 207:3 210:19
**showed** 86:9
**shows** 152:16
**shut** 64:20,21
**sick** 179:1,22 180:2
**side** 53:18 54:10 131:4 167:19 211:12
**sign** 7:15 167:4
**signature** 2:2 86:4 131:2
**signed** 57:11,12 85:22 86:6,11 86:14 90:12,15 90:15 167:7
**similar** 69:20 70:4
**sir** 99:10
**sit** 107:13 108:5 171:14
**sitting** 121:22 126:2 177:6 189:16
**situation** 121:10 121:12,13 130:12 165:18 166:6 167:21 168:3
**six** 203:19 214:8
**size** 28:17
**skill** 203:11,14 211:1 212:20 213:3,9,10 215:1,18 216:1
**skills** 204:11 213:19 218:6,6 218:16 219:7,8
**skip** 206:21
**slamming** 156:7 156:8
**slapping** 193:7
**slept** 141:5
**small** 86:19 88:16
**smaller** 88:1
**smoke** 112:9
**smokers** 140:9
**smoking** 104:4
**Smothers** 170:9 171:7
**somebody** 40:12 40:22 41:4,9 76:3,8,17 97:23 120:1
**somebody's** 98:1
**son** 10:3,9 13:20 117:11
**sons** 10:5
**soon** 112:21 154:5
**sorry** 44:19 52:18 86:15 87:18 100:3 106:12 110:1 147:6 181:21 198:14 205:21 213:10
**sound** 49:14,17 167:1
**South** 3:13
**Southern** 1:3 7:2
**speak** 46:8 98:20 138:18 160:6 179:18
**speaking** 34:20 41:17 139:14 173:9
**speaks** 41:23
**specific** 194:2
**specifically** 144:11
**speculation** 45:14
**spitting** 173:22 174:4,22
**spoke** 98:3 112:4 124:14 134:21 174:8,14 179:12
**spoken** 33:20 34:7 35:23 36:11 37:19 39:11 42:4 172:13
**spreading** 119:16
**St** 3:13 4:4 94:7 94:15
**stand** 77:10
**standard** 209:10
**standards** 209:8 209:8
**standing** 80:17 109:14 183:9 205:9,11
**stare** 158:9
**stares** 183:8
**staring** 156:14 183:18
**start** 112:1 130:21
**started** 14:8 27:5 29:12 85:17 88:8,10 113:11 113:11 118:7 141:3 148:9 152:23 170:15 187:16,19 211:5 211:6
**starters** 115:9
**starting** 55:9,15 163:5 167:19
**starts** 167:15
**state** 1:17 6:3 8:3 73:3,5 87:4 220:4
**stated** 53:9 54:1 129:15
**statement** 39:5 42:18 157:4 158:14,18 159:4 159:8
**states** 1:1 6:23 96:20
**stating** 144:18
**station** 153:8
**stay** 44:11 163:9
**stayed** 104:3 164:16,17
**stenotype** 220:9
**step** 74:2
**stepchildren** 10:18
**Stephanie** 67:6 114:5
**Steven** 9:13 11:9 11:16
**stick** 153:3
**STIPULATED** 1:12 2:1,9

**stipulation** 6:6
**stipulations** 7:13
**stood** 65:2 156:15
  160:11,12
**stop** 71:21 73:1
  109:23 110:17
  110:18 113:13
  136:21,23
  137:10 146:2
  154:10 163:6
  183:2 211:23
  212:5 219:18
**stopped** 136:16
  137:12,18
  185:17
**stopping** 105:18
  105:23 219:18
**stories** 182:8,9
**straight** 74:10
  214:10
**strange** 115:13
  115:15
**street** 1:20 3:8,13
  3:22 4:11 6:11
  193:14
**stress** 17:13
**strike** 45:6 62:12
  99:4 115:12
  119:20 121:8
  168:8 172:2
  176:20 191:23
  206:14
**struck** 115:15
**stuck** 134:7
**stupid** 63:5,7
  69:16,18,18
  70:6 73:21 74:8
  75:15 77:15
  80:6 82:13
  143:17
**submit** 59:2,8,17
  60:1
**submitted** 60:10
  207:22
**substantially**
  88:3
**successfully**
  50:21
**suggest** 34:1
  148:20 216:16

**suggesting** 39:6
**Suite** 4:12
**sum** 210:4,6
  215:13,14,15
**supervision**
  220:11
**supervisor** 29:8
  29:11,19,22
  30:1 31:13
  45:11 94:5,19
  108:4 144:8
  150:6 155:3,4,5
  156:17 169:22
  170:1 174:11
**supervisors** 30:5
  30:10,11 31:14
  38:18 97:11
  151:13
**supervisor's**
  45:10
**Support** 11:12
**supposed** 91:10
  104:13 105:5,10
  200:20
**supposedly** 120:1
  132:3 134:2,11
  139:19
**sure** 13:13 14:12
  14:16 15:2,12
  16:4,8 17:11
  20:5,13 21:6
  22:15,17 23:13
  24:3 25:17 26:1
  26:6,20 27:17
  28:12 29:20
  32:9 36:4,10,17
  37:22 38:5
  40:16,19 42:10
  48:6,18,23
  49:15,18,19
  55:18 57:10
  59:10 60:7,17
  60:18 63:13,22
  67:2,6,9 68:3,9
  74:23 75:12
  81:9 82:20 83:4
  83:5 84:8 85:14
  88:12 92:14,22
  95:4,11,12,13
  100:11 101:14

103:3 105:2,16
106:19 110:2
111:18,23
112:15 114:7,14
120:19 121:6
122:7,7 124:9
124:13 127:21
127:23 128:2,17
132:9,11 133:23
135:2,8,11
136:10,14
137:20 138:5
140:8 141:13,17
142:18 147:11
147:21 149:11
149:15,21,23
151:13 152:18
157:19,22 161:7
167:3 168:16,18
168:20 179:5
181:4 186:6
188:2 192:17
197:10,23
198:17 199:7,12
208:19 209:2
211:8 212:3
216:3
**suspended** 20:12
**suspension** 70:21
**Swain** 3:17 5:3
  7:16,16 8:2,6
  35:2,6 43:17
  44:17 54:11
  57:4 60:6 61:16
  72:5,8,10,12,22
  73:8,12 78:12
  79:20,23 84:10
  84:19 85:7,11
  87:3,11,17
  113:13,16 114:1
  129:15 136:20
  137:2,6,10
  139:12 145:15
  145:19 146:1,8
  148:10 152:17
  153:4 159:17
  187:10 192:23
  211:15,19 212:2
  212:13 219:17
**swapped** 64:6

**sworn** 6:17 7:6
  7:10
**swung** 156:4
**system** 90:21
  108:2 123:21
  194:1

**T**

**T** 1:11,11 5:5,5
  220:2,2
**table** 106:1 144:4
  153:9 156:10
  160:11,14
  184:14,17,19,21
  184:23 185:1,5
  185:8,9,9,12,14
  185:17,18
**take** 8:23 9:2,3,4
  17:6,12 18:15
  32:15 39:1,23
  40:11 84:11,12
  122:14 152:12
  170:2 171:22
  175:6 177:18
  178:11 188:18
  202:21 203:15
  204:10,12,13,14
  205:3,10,15,23
  206:7,10,10,13
  206:16 208:4
  209:3 210:2,3
  211:15,17 212:3
  214:10 215:6
  216:16 217:1,5
  217:9,11
**taken** 1:16 18:23
  56:23 84:16
  113:20 159:13
  205:17 208:5,6
  212:9 220:8
**talk** 49:20 76:8
  83:2 97:20
  98:17 107:13
  121:14 136:7
  138:16,21 139:2
  140:18 151:22
  171:5,9 180:11
  190:9,12 192:10
**talked** 34:2 41:19
  43:13 64:9

69:20 98:12
120:2 126:6
137:23 138:20
138:22 139:7
140:21 170:19
171:1,19 181:1
181:6 185:22,23
188:8,14,15
189:6
**talking** 15:9 35:6
  36:2,8 37:21
  39:18 42:7
  43:16 63:15
  69:2 71:20
  108:2 111:20
  112:2 113:5
  114:2 118:3
  123:4 124:2
  126:11 134:13
  140:14 147:9,21
  148:9,21 149:9
  149:10 167:22
  175:14 182:10
  183:11 188:10
  189:15 194:3
  199:4
**talks** 183:1
**tape** 56:21 57:2
  113:18,22
  159:15 212:11
  219:21
**tap-tap** 189:12
**Taylor** 132:5,12
  133:10,14,15,20
  135:1 140:4
  141:15 143:2,5
  147:10 185:23
**team** 57:14,17,21
  58:3 100:18
  101:11,19
  111:16 147:6
  162:12 198:20
**telephone** 104:3
**tell** 8:15 40:6
  51:19 54:12,18
  55:10,16 59:12
  65:7,9 66:13
  69:16 73:9 76:9
  80:8 104:5,11
  111:15 114:5,8

115:5,16,23
116:3,16 117:2
117:16 119:15
121:7 122:18
123:20 131:11
132:12 133:9,15
134:1 136:5
140:20,23
142:11,13 143:5
143:9 148:11
154:3,10 165:18
165:22 166:6,9
168:14 172:7
174:16,19 175:4
175:5,9 180:14
181:6,21 212:2
**telling** 31:23
36:22 96:2
105:7 111:20
116:13 118:23
119:12 121:14
121:16 123:14
123:14 124:20
125:5,7 126:16
134:18 146:2
195:6 216:19
**tells** 51:14
**temp** 116:11
**Temporarily**
195:17
**temporary** 25:9
25:11 116:10,12
196:11,12
**tendency** 48:7
**term** 35:1 75:10
75:13 125:22
188:8,13,20
**terminated**
139:19 175:11
**terms** 115:3
201:16 203:15
**test** 203:3,16,19
204:10,12,13,14
205:3,8,10,14
205:16,18,23
206:10 208:9,14
208:16,23 210:2
210:3 214:9
217:1,5
**testified** 6:18

7:11 19:14 20:1
145:18 156:2
165:21 184:1
186:3
**testify** 17:17 18:1
19:4 145:15
146:3
**testifying** 85:8,10
85:11
**testimony** 24:9
68:16 70:23
75:1 115:17,20
146:3,6 154:13
182:12,19
**tests** 206:8,11,13
206:16,20 208:5
208:5,7,11
214:10,11,16,17
215:6 216:17
217:7
**Tew** 194:13
**Thank** 72:12
128:10 145:16
**thereto** 2:17
220:10
**thing** 39:21,22
55:16 71:3 92:1
103:14,15
107:17 112:19
188:18,19
**things** 19:1 36:23
41:18 71:11
76:18 91:3,5,6
91:12 121:2
122:13 156:3
186:7,8 200:4
216:23
**think** 7:14 24:14
24:17,19 38:6
42:8 54:11 62:7
72:16 80:13
86:22 87:5,15
91:13 101:16
102:13 116:8
128:3 137:17
142:6 152:17,18
177:12,19 178:3
178:12 192:14
192:21 199:19
212:14 218:3,14

218:23
**third** 33:19
167:10,20 179:3
179:5,8
**Thornton** 1:4,9
1:15 6:13,16,20
6:21 7:9 8:4,5
9:6,13 11:9,16
57:4 84:19
114:1 124:8
146:12 159:18
212:14
**thought** 37:3
64:17 79:21
88:1 125:4
209:11 218:21
**threat** 133:11
134:1 138:19
147:15
**threatened**
143:20 147:12
147:18 149:3
**threatening**
143:6,10,14
144:12,17
186:19 187:3,21
**threats** 129:22
131:22 132:4,13
132:16,17
133:18 137:16
137:16 147:8
148:18 183:7
185:23 186:5,10
186:13
**three** 31:19 32:4
49:8,10 50:13
50:22 51:8
52:20 57:5,6,9,9
57:15,20 58:12
58:13,19 62:9
64:14 66:12,15
66:22,23 67:4
67:11,19,23
69:3 76:21 79:8
100:19 101:12
101:19 103:14
113:22 118:2
160:4 161:11,20
162:1,5,11,14
162:20 165:8,12

170:5 175:15
178:5 180:17,21
199:16 200:2,15
200:16 201:4,16
202:22 206:8,9
206:19 208:13
209:9 212:20
217:9,11,20
218:8
**three-day** 70:20
**three-week** 69:8
**threw** 70:13 71:3
76:21 77:4
78:15 79:4,5,19
80:2,4,9,14
144:3 156:3,9
176:10,11
183:23 184:12
185:15
**throw** 68:20 77:1
79:10 80:1
81:17 185:16
**throwing** 63:14
63:19 76:17
77:14 79:17
80:10,17 143:22
143:23 144:2,22
156:8 183:8,20
183:22 184:2,3
184:8,9,13,23
185:19
**thrown** 18:6
71:11
**throws** 185:4
**Thursday** 176:15
**tie** 111:9,10,14
**time** 2:15,15 7:6
8:23 9:4,21
12:10,13 13:1,6
13:12 14:2,4,6
14:14,19 15:1
15:11,14,17,21
16:3,3,6 17:13
21:16 26:2,7,10
27:16 29:8 30:7
31:18 36:20
39:23 46:18
49:17 50:5,6,10
56:6,12,19,20
57:1,16 59:4,7

59:19,20 61:1,7
61:12,22,23
62:12,15,16,20
63:12,21 64:4
64:18 66:10
67:1,4,9,11,18
68:11 69:2,8,9
71:1 79:6 80:5
80:14,22 81:2,6
82:11 83:3,6
84:14,17 92:12
92:17,18,21
94:10,22 95:9
97:2 100:8,16
100:18 103:19
108:1 109:9,9
109:11,16,16,19
110:12 111:23
113:14,17,21
116:19,20
120:14 123:3
131:8 136:3
142:2,9 146:2
146:17 147:12
147:15,18 149:3
155:22 156:23
157:1,1,6,17,23
158:2 159:11,14
163:15 164:1
168:22 180:7
188:12,16,19
189:15 191:1,12
194:17 195:23
195:23 196:17
197:11,13 198:3
198:7,10,20
199:8,10 207:21
208:3 209:21
212:6,10,16
214:23 215:4,6
215:8,22 216:6
217:5,16 219:20
219:23
**times** 16:12 30:9
65:4,7,8,9,14,19
65:21 66:4 79:9
79:14,23 80:8
80:10,16 99:3
102:11,15 150:1
150:8,14,19,22

163:6 187:21 196:4
**tired** 75:16,18
**tissue** 78:10
**tobacco** 174:22
**today** 8:9 17:1,3 17:5 18:13 19:4 182:4 219:19
**Today's** 7:3
**told** 39:14 45:15 54:6 63:4 64:17 70:6,22 78:2,12 82:15 98:5 105:14,17,21 106:2,13,23 108:4 110:7,16 110:17,18 111:6 111:7,8 112:11 112:20,23 113:5 114:10 115:11 116:22,23 119:18 120:1 123:4,7 124:13 126:12,15,19 127:6,14 128:11 128:13,14 129:20,23 131:14 132:3,20 133:3,4,11,12 133:18,20,21 134:10,14,20,21 136:1,4,6,11 138:9,18,21 139:6,16,18 145:21 147:5,10 147:22 148:22 149:9 157:3 165:16 166:2,4 166:10 168:3,9 170:2,23 171:8 171:12,21 172:9 172:10 173:7 174:21 177:9,12 178:4 181:8,11 181:13 182:11 182:20 183:2,4 195:17 200:4 205:15 206:18 207:1 216:6 217:8 219:13,15
**toll** 93:12 94:11
**toll-free** 93:18
**Tomika** 158:19
**Tommy** 94:22 95:3 120:16 121:5,7 123:8 123:10,13,14 124:18 125:3 128:13 129:4 131:7,11 133:4 133:9,21 135:20 135:22 136:2,5 138:9,16,17,20 138:20,22 139:18 149:18 150:2,9 151:5 151:10 171:9,15 171:18 172:3 173:5,8 175:12 176:22 180:14 181:9 203:23 204:15 205:3
**Tommy's** 136:16 137:13,18 176:23 177:4
**tool** 176:3,4
**top** 183:22 184:4 185:9,18 202:21
**tops** 185:8
**touch** 183:2 189:5,6,12,21
**touches** 183:1 189:10,10
**touching** 183:2 188:17
**Tower** 1:20 3:21 6:10
**train** 64:5 78:3 78:14 208:9,17
**trained** 58:22 67:5,19,22 68:1 76:20 79:11 89:11 100:17
**training** 58:19 62:16 63:2 66:12,14,17 69:3 81:8 82:1 82:5 95:10 103:2 155:20 184:2 208:8
**transcript** 220:13
**treat** 45:22 46:6
**treated** 45:2,7,8 45:19 46:7,10 46:14 64:12 193:23 202:19
**treating** 178:6
**treats** 126:23 181:16
**trial** 2:15 19:14 20:1
**tried** 81:20 117:11 125:17 157:15 186:22 195:2
**trouble** 56:9
**true** 51:14 55:12 56:4,11,16 168:2 220:12
**truth** 142:11,13
**truthful** 55:20
**truthfully** 18:1
**try** 8:14 58:1 98:1 98:9 104:19 128:7 146:7 191:23 212:16
**trying** 40:8 41:8 54:15 56:8 72:1 128:15 132:18 144:15 146:8 148:11,15 163:23 182:15 182:17 185:3 188:19 192:13 216:20 218:20
**turn** 74:5 160:15
**turned** 40:14 63:3,6 77:2,12 77:12,18
**turning** 74:15
**twice** 21:7
**two** 10:3,4,5 27:4 27:5,8,11,23 32:16,16 57:3 90:8 91:13 100:23 102:23 105:13 113:18 123:1 161:20 163:17,17 178:23 183:14 199:7,13,20 202:22 205:1 206:8 208:13 209:9 212:20 217:11 218:8
**typed** 108:7 130:19

U

**U** 1:11
**uh-huh** 8:19 53:13 68:2 107:21
**understand** 8:11 8:13,16 9:6 15:19 20:13 30:22 35:19 40:9 51:17 69:22 70:5 75:5 105:2 107:11 110:2,6,23 115:1 124:18 143:18 164:13 171:23 172:10 172:12 208:19 209:15 212:14 214:22 218:20
**understanding** 117:4,6 118:12 125:3,9
**unfair** 43:2
**unh-unh** 8:19
**United** 1:1 6:23
**unjamming** 78:16
**untrue** 43:3,4
**upper** 189:19
**upset** 137:15 171:13 175:16
**use** 37:12 75:7,10 75:13,14,23 76:13 154:16
**usual** 7:13
**usually** 35:10 122:14
**utilize** 94:1

V

**vacation** 44:22 169:12
**verbal** 59:23 62:15 63:1 187:18
**verbally** 60:7,14 60:20
**version** 86:19 92:8
**versus** 6:21
**vicinity** 142:19
**Vicki** 198:19 199:14
**victims** 118:4
**video** 137:4
**videoed** 137:7
**VIDEOGRAP...** 6:19 56:20 57:1 84:14,17 113:17 113:21 159:11 159:14 212:6,10 219:20
**videotape** 6:20 212:7
**view** 75:22
**violence** 20:19 21:4,8 22:8 23:2
**violent** 23:7,11 23:15,18
**vocal** 140:10
**voice** 53:1 98:2 98:21 174:7 180:13
**volunteering** 142:15
**VS** 1:6

W

**Wachovia** 1:20 3:21 6:10
**wait** 78:6 148:2,6 203:18 214:8
**waived** 2:3
**walk** 68:20 160:13 169:11
**walked** 144:6 150:7 154:20 181:17 201:10
**walking** 98:19 155:13 156:11
**wall** 99:11

**want** 7:12 91:19
110:2 115:13
124:1 141:8
169:17 172:14
177:10 178:8
211:19
**wanted** 41:12,15
81:19 91:8
97:19 98:17
113:4 125:10,10
125:12 126:11
172:15,17,17,19
180:14 181:9
211:21
**wants** 189:17
**wasn't** 50:4
104:13 125:7,21
136:19 144:20
169:14 173:13
177:5 184:4
191:7 199:22
210:2
**watch** 74:8,8
**watches** 106:3
**way** 8:14 52:22
54:22 55:5 56:5
64:9,12 69:20
74:12 76:9
88:22 100:12
103:15,15 106:6
106:23 108:13
128:16 130:8
131:12 137:13
137:18 141:1
149:22 173:10
178:7 181:16
188:15 189:22
193:23 202:19
202:20 204:22
**week** 69:9 81:10
91:11 151:18
165:2
**weekend** 177:13
178:12,20
**weekends** 178:18
**weeks** 62:2,3,8
64:14 65:5,14
65:16,21 66:6
69:3 76:20
79:10 89:11

139:20
**well-known**
112:18,19
**went** 27:12 75:18
77:19 89:14
120:2 121:13
130:4 131:14,21
135:19,20
151:14 158:2,13
169:22 170:21
171:19 173:15
213:21
**weren't** 37:4 59:6
68:17 105:9
149:6 165:17
170:18 178:2,21
191:13
**Wesley** 158:19
**Wesley's** 158:22
**West** 4:11
**we'll** 94:20
188:11 212:4
219:19
**we're** 84:15
113:19 159:12
192:10
**we've** 37:5 94:18
101:16,16
120:15 158:15
183:17,21
185:22
**whistled** 106:7,8
**wife** 123:20 128:1
140:23 141:3,9
182:11 190:16
190:22 191:8
**Wiggins** 3:5
**Wilkerson**
200:10 201:21
202:3
**Williams** 6:23
7:23 25:1 49:1
57:5 59:18 60:2
61:7,12 64:16
89:10 95:10
102:7 124:14,21
124:23 125:13
126:3,4 129:21
131:19,21
139:16 140:5

143:7,11,13
152:2 160:6,18
162:11 172:22
173:9 175:6
176:10 178:6
181:14 182:6,21
187:3,22 189:2
189:21 192:4
198:19
**willing** 136:5
**winners** 111:13
**wipe** 78:8
**witness** 2:3 6:13
7:6 19:15 35:4
40:1 52:17
61:19 77:5 87:6
106:9 139:11
152:14 167:12
179:9 220:14
**witnessed** 67:20
68:4,7,8,12,13
**woman** 74:13
190:19 201:6
**women** 74:11
126:23 181:16
188:8
**word** 69:13 75:7
119:16 152:16
**words** 53:9 69:14
75:23 76:3,4,13
109:3 144:15
154:1 178:2
208:1
**work** 26:17 48:19
55:5 58:23 64:1
70:9,12 71:2
75:3,8 76:1,11
78:13 81:7
82:17 101:1
102:2 107:16
111:16 117:1
123:5 125:11
153:12 158:3,7
159:20 163:20
169:3,5,7,19
170:20,22
172:19 178:18
178:22,22,23
180:14,15
181:11,12,13,14

190:13,22 191:2
200:18 202:7
204:22
**worked** 25:8,19
27:1,7,8,10
28:21 76:20
109:20 132:7
142:4,6 160:1,4
161:5,10,19
163:12,14,18
164:7 165:2,6,8
165:11 168:21
172:19 180:5
190:16,19
**working** 14:9
15:10,21 16:6
27:15 28:9,11
29:7 30:13,19
47:21 51:2,3
55:6 66:10,23
67:4,10 81:14
81:18 85:17
109:5 155:20
160:1,20 162:17
165:17,23 166:3
166:5 168:22
169:17 191:3,5
191:9 200:6
201:22 202:4,5
205:9
**workplace** 43:2
89:3 93:16,22
**works** 128:1,2
141:4
**worried** 124:3
**worry** 53:10
**worse** 75:21
104:8 155:22
156:1,20 157:1
**worst** 155:23
156:23
**worth** 53:11
**wouldn't** 61:5,9
74:16 105:4
141:10 165:3
211:22
**write** 35:21 39:2
54:23 122:19,19
149:18 157:4
187:4 193:10

194:8 219:5
**write-up** 103:13
119:10 129:6,7
132:22 133:5,10
133:13 138:12
138:14
**write-ups** 113:10
119:4
**writing** 39:5
43:17 145:22
193:8
**written** 34:15
53:2 59:3,8,17
60:2,10 103:17
103:18 124:15
131:15 145:22
149:4 208:11,14
208:23 216:17
**wrong** 74:19
77:12 103:1
105:13 210:7
**wrote** 40:12
42:21 53:3
55:20 56:2,15
103:16 108:12
119:9 120:8,14
120:20,23 121:4
121:18,21
130:10,11,12
145:13 146:10
146:11,13,14,17
147:4 152:10
158:14 159:3,7

**X**

**X** 5:1,5
**Xanax** 14:22 15:6
15:15 16:2 17:3

**Y**

**Yeah** 43:23 54:11
61:21 101:16
113:16 151:10
200:8
**year** 11:18 12:19
13:14 20:5 21:6
27:21 28:11
116:20,21
193:13 195:1,10
196:22 210:5

215:12
**years** 12:21 13:20
  14:4 19:19
  22:17 31:19
  32:4 67:17
  123:1
**yell** 48:8 153:21
  154:8,13 155:14
**yelled** 153:18,23
**yelling** 154:11
**yells** 155:12
**younger** 13:20
**youngest** 13:21
  118:10
**y'all** 7:12 211:19

**Z**

**Zoloft** 12:2,3
  17:6,7 18:9,22

**0**

**000367** 86:17

**1**

**1** 4:12 5:6 32:14
  32:20,22 35:18
**1st** 11:17 146:14
**1:07CV-712-W...**
  7:3
**1:57** 113:21
**10** 5:15 12:21
  79:14,14 80:10
  80:10,16,16
  87:18 99:13,16
**10:00** 1:23 6:12
**10:18** 7:6
**100** 12:4
**11** 5:16 120:6,10
  120:15
**11th** 192:20
**11:00** 157:8,10,23
**11:05** 157:8,10
  158:1
**11:14** 56:21
**11:33** 57:2
**11:59** 84:14
**12** 5:17 128:22
  129:2 139:9
  149:17
**12:03** 84:18

**12:36** 113:18
**120** 5:16
**128** 5:17
**13** 5:18 118:7,7,9
  118:9 145:3,6
  149:8
**13th** 176:15
**14** 5:19 152:5,8
  158:15 187:9,12
**14th** 151:23,23
  152:21 164:5
  176:13,14,16
  183:16,23
**145** 5:18
**15** 5:20 10:8,22
  13:20 14:4
  166:14,17
  167:11 194:20
**15th** 159:18,23
  160:7,18,22
  161:15 163:11
  164:5 165:17,23
  166:6 167:4,8
  167:15 168:23
  183:12,13,16
**152** 5:19
**16** 5:21 207:4,7,9
  207:22
**16th** 25:19 26:2,4
  163:15 164:7
  169:2,5,7,17
  173:6
**1600** 1:19 3:21
  6:10
**166** 5:20
**17** 5:22 210:17,20
  210:23
**18** 5:23 214:2,4
**19** 7:3
**19th** 1:21 3:8 6:7
**1999** 20:4 84:23
  85:6 86:9

**2**

**2** 5:7 38:20,23
  39:2,4,9,10,19
  40:3,5,11 42:16
  44:12 152:19
**2:43** 159:11
**20** 99:17

**20th** 1:20 3:22
  6:11
**2000** 66:15 100:6
**2001** 25:6,15,16
  32:23 100:6
  195:12
**2003** 12:6,10
  14:10 15:11
  17:13 58:20,21
  58:22 59:9,18
  60:3,15,17 95:9
  100:17
**2004** 11:19 100:3
**2005** 49:13,17
  92:4,6,13,16,18
  92:21 93:7
  96:16 97:2
  99:22 100:1,21
  100:22 101:12
**2006** 25:19,23
  98:14 100:20
  102:6 107:5,9
  108:15 129:8,18
  130:2,14,23
  146:15 167:1,5
**2008** 1:22 6:8 7:4
**207** 5:21
**21** 10:11
**21st** 25:22 167:1
  181:2
**210** 5:22
**214** 5:23
**23** 19:18
**2346** 4:11

**3**

**3** 5:8 46:20,23
  47:2 88:4
**3rd** 107:5
**3:00** 157:5,11,14
  157:21
**3:02** 159:14
**3:57** 212:6
**301** 3:8
**31st** 32:23
**32** 5:6
**35203** 1:21 3:9,23
  6:11
**36301** 3:14
**36302-6346** 4:13

**367** 3:13
**38** 5:7

**4**

**4** 5:9 51:23 52:2
**4:11** 212:10
**4:17** 219:20
**420** 1:20 3:22
  6:10
**43** 19:18
**46** 5:8

**5**

**5** 5:10 83:23 84:5
**50** 12:4
**52** 5:9

**6**

**6** 5:11 85:20 86:2
  86:11 87:18
**63188** 4:4
**6346** 4:10

**7**

**7** 5:12 91:16,21
  91:21 92:3,4
  93:17,20,22
  130:23
**7th** 129:8,18
  130:2,14 145:14
  145:23

**8**

**8** 5:13 93:1,3,11
**8-219** 5:3
**84** 5:10
**86** 5:11

**9**

**9** 5:14 96:8,13
**90** 25:13,14,15
**91** 5:12
**93** 5:13
**96** 5:14
**99** 5:15



DEFENDANT'S
EXHIBIT
1
Thornton
PENGAD 800-631-6989

**DOCUMENTATION FORM**

Employee Name: Linda Thornton

Investigating Supervisor: ______________________ Date: 03/31/05

Present: ______________________

______________________

Who was involved: F. ash / Linda Thornton.

Witness (s): ______________________

Date of incident: 03

Where did it take place: ______________________

When did it take place (time and day): ______________________

What happened: I feel like F. Ash is diliberatley knitpicking with me, I have tried to ignore this; even though my co-workers have been saying so for a couple of months now. Singling me out about breaks, clean-up, disappearing off the line vacation days, insisting that I clean up after all other people's. This harassment has increased since I have spoken to Maryann about other issues. I have went thru the chain of command on all matters. The situation is increasingly getting worse.

______________________

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.



**Harass; to tire out by continual efforts.**
**Harass; to worry or annoy with repeated attacks.**
**Harass; to annoy persistently.**

**On March 24,2005 I went to the human resource office requesting to speak to Maryann. Realizing that there were visitors, and that this would be an inconvenient time for her to meet with me, therefore I then requested that Vera leave a voice message for Maryann. March 25,2005 was a paid holiday off. March 28,2005 was a paid vacation day for myself.**

**On March 29,2005 Maryann came to line one to the label machine to speak to me. At this time Maryann listened to my concerns and complaints. Assuring me that she would look into the matter at hand. Later that day, Melvin came to me, informing myself that I did have legitimate concerns. Apologizing for the vacation that was denied due to that Fannie Ash was off. Stating that this should not have happened. At this time, I then stated to Melvin that I was sure that speaking to Maryann would anger some as it has in the past. He once again informed me that I had legitimate complaints and had done the right thing.**

**On March 30,2005 before going to first break, Fannie stopped me at line one, between the filler and label machine. She then stated "Do you see those eight oz brushes at the sink?" I then stated "I see those twelve or sixteen ounce brushes" then I replied "that were left there on my day off by others." Fannie then replied "whatever, clean them before you leave."**

**Later that day, I had went to the restroom passing Fannie in the hall way. When our line was down, the filler operator asked if the whole line could go to break. Fannie stated " yes." She then walked over to the outer side of the tunnel, hollering at me that I had already had my break right? I looked at Fannie confused asking "what?" She then did a hand motion pointing to the front, referring to seeing me in the hallway. Instead of getting angry, I just laughed and said "no."**

**Well aware of certain incidents in the past that occurred after voicing my opinion, or using the proper chain of command; I have encountered certain attitudes from certain individuals. I feel that this was the case then, and that this is the case now.**

**Therefore, I spoke to Melvin with my concerns. I informed him that I felt like Fannie was angry at me for talking to Maryann. I informed Melvin that I felt like she was knit picking with me. Melvin said he would talk to her. I then requested that he just wait. Thinking that she might stop, and that in the past it only made things worse.**

**On March 31,2005 Fannie called me upstairs, as she had others. One by one she had a meeting with us. During the meeting with myself , she had spoke about the issues of production, and the waste issues. Fannie then informed me that she never saw me sweeping, that she had noticed that when the line goes down, that I disappear. She then informed me that I did not need to stand at the label machine ,if the machine was running good. She then informed me that I need to be helping others out on the line. She then also informed me not to be warming my food before clocking out for break. She then informed me that She knew I didn't want to clean those brushes. Last but not least, she informed me that it had been said that someone had Stated "its not my job, when it comes to running the soak tests" She then stated that "you never know when your job could be displaced."**

**I asked Fannie "why are you so determined about me cleaning those brushes instead of whose responsible?" She then stated "because I asked you to." "I then told her that I thought that it was out of pure meanness." I did clean the brushes. I know That Fannie was doing this out of spite.**

The statements that Fannie made about breaks, cleaning,
helping others, and disappearing off the line are so far from the facts.
I tried thinking that Fannie was having this speech with everyone
on the line. When the others said she did not , that's when  I realized
and feel like she is once again knit picking with me.

I receive points when late, which I do not argue about. What I argue
about is the issue of others not getting points when late.  I also have had
issues about the break schedule. The ones that come in later go to
break first. I have had to go to Sammy to get a vacation day. There
Is a difference in how certain ones are treated. And there is a certain
Way of attitude once one speaks out in the chain of command.



March 31, 2005

Statement of Linda Thornton:

Fannie had individual meetings with her employees but did not have a meeting with Linda. (has done this in the past). Linda feels like Fannie is always picking on her. Fannie talked to Linda on March 31 about line efficiency, waste and Fannie questioned Linda about why she did not clean some brushes that Fannie has asked her to clean the day before. Linda asked Fannie "why do you want me to clean up night shift's mess? Fannie responded by saying "because I asked you to" Fannie also told Linda not to stay at the label machine all of the time, to help other people. Fannie told Linda that she disappears all of the time and never sweeps up. Fannie talked to the other employees about safety and the new filler. Other employees on the line are always telling Linda that Fannie is "out to get her" Linda forgot to clean the brushes but will clean them today. Linda talked to MaryAnn on March 29 and feel like Fannie has been picking on her worse since then.

DEFENDANT'S EXHIBIT 4 Thornton

PENGAD 800-631-6989

# DOCUMENTATION FORM

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordan Date: 4-12-06.

Present:

Who was involved: Kim Perkins

Witness (s):

Date of incident: 4-12-06.

Where did it take place: Line 1 Label machine.

When did it take place (time and day): 10:58

What happened: I went to break and asked adam + Wes to watch out for the label machine, I also told Barbara on the casepacker that I was going to break and if there were bad labels, just to throw the door open and holler at someone, at the end of break Kim Perkins paiged overhead that she needed a label operator on line 1 When I Returned from break, adam Hall was changing out the labels I asked adam "I thought you had my back?" adam said I did but she paiged you before asking me or telling me why she had stopped. As I was changing out the labels, Kim came up to me and raised her voice saying "Do you have a problem with me?" I stated "No I do not, I haven't said two words to you all day". She said "that's the problem - I have noticed!" She then asked again "what's your problem" I stated I do Not have a problem - you stay pissed off at everyone on the line and I want no part of it!"

The Reason I have chosen not to conversate with Kim Perkins is because of her attitude towards other co-workers including myself. also this morning I heard her holler to Linda Parker on the capper about a mechanic in her (Kims) words she stated "Don't worry he can't help you, he's not worth a fuck. This immediatley told me what mood+attitude Kim was in → over.

Did this result in down time? NO If yes how much?

Did this result in product being scrapped? If yes how much? NO

Attach an additional sheet if needed for witness statements following the same format.

# 102 EQUAL EMPLOYMENT OPPORTUNITY

The Company has a longstanding commitment to Equal Employment Opportunity and Affirmative Action. It is the Company's policy to provide equal employment for all employees and applicants on the basis of merit and without discrimination because of race, creed, color, religion, national origin, ancestry, sex, sexual orientation, age, veteran status, physical or mental disability.

In addition to providing equal employment opportunity, affirmative action will be taken at each step in the employment process, which includes but is not limited to the following: recruitment, selection, promotion, demotion or transfer, compensation and employee benefits; selection for training including internship; and social and recreation programs sponsored by the Company. It is further the policy of the Company to comply with all applicable local, state and federal laws and statutes concerning Equal Employment Opportunity.

Annual Affirmative Action Programs are developed to identify areas of concern and to implement action-oriented programs to achieve short and long-range affirmative action goals and objectives. This fundamental policy is emphasized throughout Ralcorp Holdings.

Ralcorp's St. Louis Human Resource Manager is assigned responsibility for ensuring company-wide compliance with all applicable local, state and federal laws and statues concerning equal employment opportunity and affirmative action. To assure full implementation of this policy, each business group and/or location has assigned an Equal Employment Coordinator responsibility for establishing, monitoring and evaluating the progress of its annual Affirmative Action Plan to ensure equal employment opportunity. Our Equal Employment Coordinator is our Human Resource Manager. All members of management are responsible for maintaining a discrimination free work environment by personal example and leadership.

In short, all activities of the Company reflect our full acceptance of our responsibilities as an Equal Opportunity Employer and all employees are responsible for conducting themselves in a manner consistent with this policy.

Employees are encouraged to seek assistance from their immediate supervisor, Equal Employment Coordinator, or Ralcorp's St. Louis Human Resource Manager to assure that problems are prevented or promptly resolved. Retaliation or reprisal against persons who initiate complaints or assist in the investigation of a complaint will not be tolerated.

Creative enthusiastic employees are our most important resource and the basis for our continue success. We seek an environment characterized by respect for each individual.

PENGAD 800-631-6989
DEFENDANT'S EXHIBIT
6
Thornton

# 10 EMPLOYEE ACKNOWLEDGMENT FORM

The employee handbook describes important information about **Flavor House Products, Inc., hereinafter referred to as "the Company"**, and I understand that I should consult the *Human Resource Manager* regarding any questions not answered in the handbook. I have entered into my employment relationship with **the Company** voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or **the Company** can terminate the relationship at will, with or without cause, at any time, with or without notice.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to **the Company**'s policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the *Chief Operating Officer* of **Nutcracker Brands, Inc., which Flavor House Products is a part of,** has the ability to adopt any revisions to the policies in this handbook.

I also acknowledge that this handbook, a copy of which I have received, does not create or constitute contract of employment. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

Linda Parrish
EMPLOYEE'S SIGNATURE

DATE 7/11/01

EMPLOYEE'S NAME (TYPED OR PRINTED)




WORKPLACE HARASSMENT

The Company seeks to maintain high standards of business by creating and maintaining a work environment that is free from unlawful harassment. It is the Company's policy that harassment on the basis of any legally protected category is prohibited. Any harassment based on race, creed, color, religion, national origin, ancestry, age, sex, sexual orientation, veteran status or a physical or mental disability is a violation of Company policy. All persons conducting business for the Company, whether on or off Company property, are prohibited from engaging in harassment and shall respect the rights of others to work in an environment free from harassment. This includes employees, officers, managers, supervisors, contractors and vendors of the Company. Additionally, officers, managers and supervisors are responsible for enforcing this policy and for maintaining a workplace free from unlawful harassment.

Prohibited harassment is conduct relating to an individual's race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status or status as an individual with a disability, that has the purpose or effect of:

* creating an intimidating, hostile, or offensive work environment;
* unreasonably interfering with an individual in work performance;
* adversely affecting an individual's employment opportunity.

In addition to the above, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors and conduct of a sexual nature when:

* submission to such conduct is made either explicitly or implicitly a term or condition of employment; or
* submission to or rejection of such conduct is the basis for or a factor in any employment decision affecting the individual.

Examples of inappropriate conduct/harassment include:

* <u>Verbal harassment</u> - such as epithets, derogatory or suggestive comments, demeaning jokes, slurs, threats, etc.

* <u>Physical harassment</u> - such as assault, unnecessary touching, impeding or blocking movement, physical interference with normal work or movement, etc.

* <u>Visual harassment</u> - such as derogatory or demeaning pictures, posters, cards, cartoons, graffiti, gestures, etc.

Any officer, manager or supervisor who becomes aware of unlawful harassment or inappropriate behavior must take immediate corrective action. In addition, they should consult with their Human Resources Department when investigating harassment claims of any kind.

Any employee who has a complaint, question or concern regarding any type of unlawful discrimination or harassment is encouraged to bring it to the attention of their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Equal Employment Opportunity Manager. Employees may also utilize the toll-free confidential reporting hotline to report harassment complaints.

All concerns and complaints will be thoroughly reviewed and investigated in a timely manner. Every effort will be made to conduct the investigation on a confidential basis, with disclosure made only where there is need to know. Any prohibited harassing behavior will result in disciplinary action up to and including termination of employment. Retaliation or reprisal against persons who report harassment or cooperate or assist in the investigation of a complaint of harassment is also prohibited by this policy. Persons engaging in such behavior will be subject to disciplinary action up to and including termination of employment.



EQUAL EMPLOYMENT OPPORTUNITY

The Company will not discriminate in hiring, promotion, or continued employment because of race, religion, creed, color, age, mental or physical disability, national origin, sex, or Vietnam era veteran status. The Company policies shall be interpreted to permit the reasonable accommodation of disabled persons as required by state and/or federal law, including the Americans with Disabilities Act (ADA). In the event a proposed accommodation will conflict with the express provisions of this handbook or the express provision of any policy, it is understood that any accommodation made by the Company with respect to job duties or any other term or condition of employment shall not in any way become applicable to any other individual, class or group of associates but shall apply only to the person or persons accommodated in the particular situation. The fact that such person or persons were accommodated, and the manner and method of such accommodation, shall be without precedent and, therefore, may not be used or relied upon by a person for any purpose at any time in the future.

Associates are encouraged to seek assistance from their Supervisor or Human Resources Manager to assure that problems are prevented or promptly resolved.

Nutcracker Brands, Inc. maintains a plan for Affirmative Action that further assists us in utilizing our Associates' talents. Associates are invited to review this plan in the Human Resources Office.

A confidential telephone number and voice mailbox where associates may report any situation that could adversely affect our work environment or pose a financial risk is provided. Associates may report confidentially or anonymously. The toll-free number to call is: 1-800-877-7055
Please be as specific as possible about the situation and location you are describing.

Additionally, sexual harassment of any kind by co-workers, management, vendors or other individuals will not be tolerated. Examples of inappropriate conduct/harassment include, but are not limited to: Verbal harassment such as epithets, derogatory comments, demeaning jokes, slurs, threats, etc. Physical harassment such as assault, unnecessary touching, impeding or blocking movement, physical interference with normal work or movement, etc. Visual harassment such as derogatory or demeaning posters, cards, cartoons, graffiti, gestures, etc. Associates are encouraged to keep management informed of any such concerns (see policy on Workplace Harassment). Confidentiality is assured. If it is determined that harassment in violation of this policy has occurred, Nutcracker will take immediate and appropriate disciplinary action up to and including termination of employment.



COMMUNICATIONS

Nutcracker's open door policy follows the basic principle that it is possible for any associate to speak to management on any matter which is of concern. We encourage everyone to speak at any time.

Management wants to operate this facility with input from you - our Associates. We encourage all Associates to regularly express ideas, concerns, fears, problems, or appreciation to their Supervisor or to appropriate management. No Manager is ever too busy to talk with you, so feel free to use the open door policy. If we are initially unable to answer your inquiry, we will get back to you with a response as soon as possible.

Should this procedure not resolve your concerns, a more formal complaint procedure is available. We encourage everyone to check the bulletin boards regularly. They are a vital communication tool.

JOB POSTING AND BIDDING PROCEDURE

All job openings will be posted on Monday on the plant bulletin board, located in the associate break room and will be removed at noon the following Monday. This will give all associates the opportunity to evaluate and make application for such jobs. A sign-up sheet will be placed along with the job posting for Associates to sign. It is the Associate's responsibility to check the board for open jobs or by contacting Human Resources, if they are on vacation or returning from a Leave of Absence. Jobs will be awarded based on qualification and seniority.

During this period, any person who wants to observe the posted job may do so either 15 minutes prior to or 15 minutes after their shift (off the clock). An associate with a written warning shall not be allowed to transfer or post for a job with higher pay.

1. The job bid sheet will have the following information; job posting number, date, position, hours and pay rate at the top of each posting. It will have a place for the name, dept/shift and first, second or third choice if bidding on more than one job.
2. On the eighth (8th) day, Human Resources will notify the successful candidate of his/her job transfer. The Associate awarded the job will have his/her name posted on the bulletin board.
3. Once the Associate is awarded the job after the job posting is removed from the board, the Associate is committed to this job.
4. After being informed that he/she has received the job, every attempt will be made to move the Associate to the new job within thirty (30) working days of notification of the new position. If the Associate has not been moved to the new position within sixty (60) days of being awarded the job, the Associate may choose to receive bid rights back, and refuse the job.
5. Once the Associate is placed in his/her new position they will remain in that position for one (1) year.
6. New hires will receive bid rights on their first day of hire. The first three (3) months (90 days) of employment will serve as a probationary period. Should a new hire not meet performance standards at any time during this period, he/she may be terminated.





TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.

**NOTICE OF EQUAL EMPLOYMENT OPPORTUNITY/ AFFIRMATIVE ACTION POLICY**

This notice is to reaffirm Ralcorp Holdings' longstanding commitment to Equal Employment Opportunity and Affirmative Action. It is the policy of Ralcorp Holdings and its subsidiaries and affiliates to provide equal employment for all employees and applicants on the basis of merit and without discrimination because of race, creed, color, religion, national origin, ancestry, sex, sexual orientation, age, veteran status or physical or mental disability.

In addition to providing equal employment opportunity, affirmative action will be taken at each step in the employment process, which includes but is not limited to the following: recruitment, selection, promotion, demotion or transfer; compensation and employee benefits; selection for training including internship; and social and recreation programs sponsored by the Company. It is further the policy of the Company to comply with all applicable local, state and federal statutes concerning Equal Employment Opportunity.

Annual Affirmative Action Programs are developed to identify areas of concern and to implement action-oriented programs to achieve short and long range affirmative action goals and objectives. This fundamental policy is emphasized throughout Ralcorp Holdings.

Ralcorp's St. Louis Equal Employment Opportunity Manager is assigned responsibility for ensuring company-wide compliance with all applicable local, state and federal statutes concerning equal employment opportunity and affirmative action. To assure full implementation of this policy, each division and/or location has assigned an Equal Employment Coordinator responsibility for establishing, monitoring and evaluating the progress of its annual Affirmative Action Plan to ensure equal employment opportunity. All members of management are responsible for maintaining a discrimination free work environment by personal example and leadership.

In short, all activities of Ralcorp Holdings reflect our full acceptance of our responsibilities as an Equal Opportunity employer and all employees are responsible for conducting themselves in a manner consistent with this policy.

Employees are encouraged to seek assistance from their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Equal Employment Opportunity Manager to ensure that problems are prevented or promptly resolved. All concerns and complaints will be thoroughly reviewed and investigated in a timely manner. Violations of this policy may result in disciplinary action up to and including termination of employment. Retaliation or reprisal against persons who initiate complaints or cooperate or assist in the investigation of a complaint is prohibited by this policy and will not be tolerated.

Creative enthusiastic employees are our most important resource and the basis for our continued success. We seek an environment characterized by respect for each individual.

Kevin J. Hunt
Co-Chief Executive Officer and
President

David P. Skarie
Co-Chief Executive Officer and
President

January 2005



**TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.**

**POLICY AGAINST HARASSMENT**

Ralcorp Holdings, Inc. and its subsidiaries and affiliates seek to maintain high standards of business by creating and maintaining a work environment that is free from unlawful harassment. It is Ralcorp's policy that harassment on the basis of any legally protected category is prohibited. Any harassment based on race, creed, color, religion, national origin, ancestry, age, sex, sexual orientation, veteran status or a physical or mental disability is a violation of Company policy. All persons conducting business for the Company, whether on or off Company property, are prohibited from engaging in harassment and shall respect the rights of others to work in an environment free from harassment. This includes employees, officers, managers, supervisors, contractors and vendors of the Company. Additionally, officers, managers and supervisors are responsible for enforcing this policy and for maintaining a workplace free from unlawful harassment.

Prohibited harassment is conduct relating to an individual's race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status or status as an individual with a disability, that has the purpose or effect of:

* creating an intimidating, hostile, or offensive work environment;
* unreasonably interfering with an individual in work performance;
* adversely affecting an individual's employment opportunity.

In addition to the above, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors and conduct of a sexual nature when:

* submission to such conduct is made either explicitly or implicitly a term or condition of employment; or
* submission to or rejection of such conduct is the basis for or a factor in any employment decision affecting the individual.

Examples of inappropriate conduct/harassment include:

* Verbal harassment - such as epithets, derogatory or suggestive comments, demeaning jokes, slurs, threats, etc.

* Physical harassment - such as assault, unnecessary touching, impeding or blocking movement, physical interference with normal work or movement, etc.

* Visual harassment - such as derogatory or demeaning pictures, posters, cards, cartoons, graffiti, gestures, etc.

Any officer, manager or supervisor who becomes aware of unlawful harassment or inappropriate behavior must take immediate corrective action. In addition, they should consult with their Human Resources Department when investigating harassment claims of any kind.

Any employee who has a complaint, question or concern regarding any type of unlawful discrimination or harassment is encouraged to bring it to the attention of their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Equal Employment Opportunity Manager. Employees may also utilize the toll-free confidential reporting hotline to report harassment complaints. All concerns and complaints will be thoroughly reviewed and investigated in a timely manner. Every effort will be made to conduct the investigation on a confidential basis, with disclosure made only where there is need to know. Any prohibited harassing behavior will result in disciplinary action up to and including termination of employment. Retaliation or reprisal against persons who report harassment or cooperate or assist in the investigation of a complaint of harassment is also prohibited by this policy. Persons engaging in such behavior will be subject to disciplinary action up to and including termination of employment.

Kevin J. Hunt
Co-Chief Executive Officer and
President
January 2005

David P. Skarie
Co-Chief Executive Officer and
President



**TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.**

**POLICY AGAINST HARASSMENT**

Ralcorp Holdings, Inc. and its subsidiaries and affiliates seek to maintain high standards of business by creating and maintaining a work environment that is free from unlawful harassment. It is Ralcorp's pol that harassment on the basis of any legally protected category is prohibited. Any harassment based on race, creed, color, religion, national origin, ancestry, age, sex, sexual orientation, veteran status or a physical or mental disability is a violation of Company policy. All persons conducting business for the Company, whether on or off Company property, are prohibited from engaging in harassment and shall respect the rights of others to work in an environment free from harassment. This includes employees, officers, managers, supervisors, contractors and vendors of the Company. Additionally, officers, managers and supervisors are responsible for enforcing this policy and for maintaining a workplace free from unlawful harassment.

Prohibited harassment is conduct relating to an individual's race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status or status as an individual with a disability, that has purpose or effect of:

* creating an intimidating, hostile, or offensive work environment;
* unreasonably interfering with an individual in work performance;
* adversely affecting an individual's employment opportunity.

In addition to the above, sexual harassment is defined as unwelcome sexual advances, requests for sexu favors and conduct of a sexual nature when:

* submission to such conduct is made either explicitly or implicitly a term or condition o employment; or
* submission to or rejection of such conduct is the basis for or a factor in any employmer decision affecting the individual.

Examples of inappropriate conduct/harassment include:

* Verbal harassment - such as epithets, derogatory or suggestive comments, demean jokes, slurs, threats, etc.

* Physical harassment - such as assault, unnecessary touching, impeding or block movement, physical interference with normal work or movement, etc.

* Visual harassment - such as derogatory or demeaning pictures, posters, cards, carto graffiti, gestures, etc.

Any officer, manager or supervisor who becomes aware of unlawful harassment or inappropriate behav must take immediate corrective action. In addition, they should consult with their Human Resources Department when investigating harassment claims of any kind.

Any employee who has a complaint, question or concern regarding any type of unlawful discriminatio harassment is encouraged to bring it to the attention of their immediate supervisor, their local Hu Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis E Employment Opportunity Manager. Employees may also utilize the toll-free confidential reporting hot to report harassment complaints. All concerns and complaints will be thoroughly reviewed investigated in a timely manner. Every effort will be made to conduct the investigation on a confider basis, with disclosure made only where there is need to know. Any prohibited harassing behavior result in disciplinary action up to and including termination of employment. Retaliation or reprisal aga persons who report harassment or cooperate or assist in the investigation of a complaint of harassme also prohibited by this policy. Persons engaging in such behavior will be subject to disciplinary actio to and including termination of employment.

Kevin J. Hunt
Co-Chief Executive Officer and
President
January 2004

David P. Skarie
Co-Chief Executive Officer and
President



Ralcorp

**TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.**

**NOTICE OF EQUAL EMPLOYMENT OPPORTUNITY/ AFFIRMATIVE ACTION POLICY**

This notice is to reaffirm Ralcorp Holdings' longstanding commitment to Equal Employment Opportunity and Affirmative Action. It is the policy of Ralcorp Holdings and its subsidiaries and affiliates to provide equal employment for all employees and applicants on the basis of merit and without discrimination because of race, creed, color, religion, national origin, ancestry, sex, sexual orientation, age, veteran status or physical or mental disability.

In addition to providing equal employment opportunity, affirmative action will be taken at each step in the employment process, which includes but is not limited to the following: recruitment, selection, promotion, demotion or transfer; compensation and employee benefits; selection for training including internship; and social and recreation programs sponsored by the Company. It is further the policy of the Company to comply with all applicable local, state and federal statutes concerning Equal Employment Opportunity.

Annual Affirmative Action Programs are developed to identify areas of concern and to implement action-oriented programs to achieve short and long range affirmative action goals and objectives. This fundamental policy is emphasized throughout Ralcorp Holdings.

Ralcorp's St. Louis Equal Employment Opportunity Manager is assigned responsibility for ensuring company-wide compliance with all applicable local, state and federal statutes concerning equal employment opportunity and affirmative action. To assure full implementation of this policy, each division and/or location has assigned an Equal Employment Coordinator responsibility for establishing, monitoring and evaluating the progress of its annual Affirmative Action Plan to ensure equal employment opportunity. All members of management are responsible for maintaining a discrimination free work environment by personal example and leadership.

In short, all activities of Ralcorp Holdings reflect our full acceptance of our responsibilities as an Equal Opportunity employer and all employees are responsible for conducting themselves in a manner consistent with this policy.

Employees are encouraged to seek assistance from their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Equal Employment Opportunity Manager to ensure that problems are prevented or promptly resolved. All concerns and complaints will be thoroughly reviewed and investigated in a timely manner. Violations of this policy may result in disciplinary action up to and including termination of employment. Retaliation or reprisal against persons who initiate complaints or cooperate or assist in the investigation of a complaint is prohibited by this policy and will not be tolerated.

Creative enthusiastic employees are our most important resource and the basis for our continued success. We seek an environment characterized by respect for each individual.

Kevin J. Hunt
Co-Chief Executive Officer and
President

David P. Skarie
Co-Chief Executive Officer and
President

January 2004



Ralcorp

TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.

## NOTICE OF EQUAL EMPLOYMENT OPPORTUNITY/ AFFIRMATIVE ACTION POLICY

This notice is to reaffirm Ralcorp Holdings' longstanding commitment to Equal Employment Opportunity and Affirmative Action. It is the policy of Ralcorp Holdings and its subsidiaries and affiliates to provide equal employment for all employees and applicants on the basis of merit and without discrimination because of race, creed, color, religion, national origin, ancestry, sex, sexual orientation, age, veteran status or physical or mental disability.

In addition to providing equal employment opportunity, affirmative action will be taken at each step in the employment process, which includes but is not limited to the following: recruitment, selection, promotion, demotion or transfer; compensation and employee benefits; selection for training including internship; and social and recreation programs sponsored by the Company. It is further the policy of the Company to comply with all applicable local, state and federal statutes concerning Equal Employment Opportunity.

Annual Affirmative Action Programs are developed to identify areas of concern and to implement action-oriented programs to achieve short and long range affirmative action goals and objectives. This fundamental policy is emphasized throughout Ralcorp Holdings.

Ralcorp's St. Louis Human Resources Manager is assigned responsibility for ensuring company-wide compliance with all applicable local, state and federal statutes concerning equal employment opportunity and affirmative action. To assure full implementation of this policy, each business group and/or location has assigned an Equal Employment Coordinator responsibility for establishing, monitoring and evaluating the progress of its annual Affirmative Action Plan to ensure equal employment opportunity. All members of management are responsible for maintaining a discrimination free work environment by personal example and leadership.

In short, all activities of Ralcorp Holdings reflect our full acceptance of our responsibilities as an Equal Opportunity employer and all employees are responsible for conducting themselves in a manner consistent with this policy.

Employees are encouraged to seek assistance from their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Human Resources Manager to ensure that problems are prevented or promptly resolved. Retaliation or reprisal against persons who initiate complaints or assist in the investigation of a complaint is contrary to this policy and will not be tolerated.

Creative enthusiastic employees are our most important resource and the basis for our continued success. We seek an environment characterized by respect for each individual.

January 2001

Joe R. Micheletto
Chief Executive Officer and President



Ralcorp

TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.

## NOTICE OF HARASSMENT POLICY

Ralcorp Holdings, Inc. and its subsidiaries and affiliates seek to maintain high standards of business by creating and maintaining a work environment that is free from harassment. It is Ralcorp's policy that harassment on the basis of any legally protected category is prohibited. Any harassment based on race, creed, color, religion, national origin, ancestry, age, sex, sexual orientation, veteran status or a physical or mental disability is a violation of Company policy. Managers and supervisors are responsible for enforcing this policy and for maintaining a workforce free from harassment.

All employees are prohibited from engaging in harassment and shall respect the rights of their fellow employees to work in an environment free from harassment. Such behavior may result in disciplinary action up to and including discharge.

Any supervisor or manager who becomes aware of unlawful harassment or inappropriate behavior must take immediate corrective action. In addition, managers should consult with their Human Resources Department when investigating harassment claims of any kind.

Prohibited harassment is conduct relating to an individual's race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status or status as an individual with a disability, that has the purpose or effect of:

* creating an intimidating, hostile, or offensive work environment;
* unreasonably interfering with an individual in work performance;
* adversely affecting an individual's employment opportunity.

In addition to the above, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors and conduct of a sexual nature when:

* submission to such conduct is made either explicitly or implicitly a term or condition of employment; or
* submission to or rejection of such conduct is the basis for or a factor in any employment decision affecting the individual.

Examples of inappropriate conduct/harassment include:

* Verbal harassment - such as epithets, derogatory comments, demeaning jokes, slurs, threats, etc.

* Physical harassment - such as assault, unnecessary touching, impeding or blocking movement, physical interference with normal work or movement, etc.

* Visual harassment - such as derogatory or demeaning posters, cards, cartoons, graffiti, gestures, etc.

Any employee who has a complaint, question or concern regarding any type of discrimination or harassment is encouraged to bring it to the attention of their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Human Resources Manager. All concerns will be reviewed and investigated in a timely manner. Every effort will be made to conduct the investigation on a confidential basis, with disclosure made only where there is need to know. Retaliation or reprisal against persons who initiate complaints or assist in the investigation of a complaint is prohibited by this policy.

January 2001

[signature]
Joe R. Micheletto
Chief Executive Officer and
President



Ralcorp®

TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.

## NOTICE OF HARASSMENT POLICY

Ralcorp Holdings, Inc. and its subsidiaries and affiliates seek to maintain high standards of business by creating and maintaining a work environment that is free from harassment. It is Ralcorp's policy that harassment on the basis of any legally protected category is prohibited. Any harassment based on race, creed, color, religion, national origin, ancestry, age, sex, sexual orientation, veteran status or a physical mental disability is a violation of Company policy. Managers and supervisors are responsible for enforcing this policy and for maintaining a workforce free from harassment.

All employees are prohibited from engaging in harassment and shall respect the rights of their fellow employees to work in an environment free from harassment. Such behavior may result in disciplinary action up to and including discharge.

Any supervisor or manager who becomes aware of unlawful harassment or inappropriate behavior mus take immediate corrective action. In addition, managers should consult with their Human Resources Department when investigating harassment claims of any kind.

Prohibited harassment is conduct relating to an individual's race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status or status as an individual with a disability, that has purpose or effect of:

* creating an intimidating, hostile, or offensive work environment;
* unreasonably interfering with an individual in work performance;
* adversely affecting an individual's employment opportunity.

In addition to the above, sexual harassment is defined as unwelcome sexual advances, requests for sexu favors and conduct of a sexual nature when:

* submission to such conduct is made either explicitly or implicitly a term or condition o employment; or
* submission to or rejection of such conduct is the basis for or a factor in any employmer decision affecting the individual.

Examples of inappropriate conduct/harassment include:

* Verbal harassment - such as epithets, derogatory comments, demeaning jokes, slu threats, etc.

* Physical harassment - such as assault, unnecessary touching, impeding or blocki movement, physical interference with normal work or movement, etc.

* Visual harassment - such as derogatory or demeaning posters, cards, cartoons, graffi gestures, etc.

Any employee who has a complaint, question or concern regarding any type of discrimination harassment is encouraged to bring it to the attention of their immediate supervisor, their local Hum Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Hum Resources Manager. All concerns will be reviewed and investigated in a timely manner. Every effc will be made to conduct the investigation on a confidential basis, with disclosure made only where the is need to know. Retaliation or reprisal against persons who initiate complaints or assist in t investigation of a complaint is prohibited by this policy.

January 2000

Joe R. Micheletto
Chief Executive Officer and
President


Ralcorp®

TO: ALL EMPLOYEES OF RALCORP HOLDINGS, INC.

**NOTICE OF EQUAL EMPLOYMENT OPPORTUNITY/ AFFIRMATIVE ACTION POLICY**

This notice is to reaffirm Ralcorp Holdings' longstanding commitment to Equal Employment Opportunity and Affirmative Action. It is the policy of Ralcorp Holdings and its subsidiaries and affiliates to provide equal employment for all employees and applicants on the basis of merit and without discrimination because of race, creed, color, religion, national origin, ancestry, sex, sexual orientation, age, veteran status or physical or mental disability.

In addition to providing equal employment opportunity, affirmative action will be taken at each step in the employment process, which includes but is not limited to the following: recruitment, selection, promotion, demotion or transfer; compensation and employee benefits; selection for training including internship; and social and recreation programs sponsored by the Company. It is further the policy of the Company to comply with all applicable local, state and federal statutes concerning Equal Employment Opportunity.

Annual Affirmative Action Programs are developed to identify areas of concern and to implement action-oriented programs to achieve short and long range affirmative action goals and objectives. This fundamental policy is emphasized throughout Ralcorp Holdings.

Ralcorp's St. Louis Human Resources Manager is assigned responsibility for ensuring company-wide compliance with all applicable local, state and federal statutes concerning equal employment opportunity and affirmative action. To assure full implementation of this policy, each business group and/or location has assigned an Equal Employment Coordinator responsibility for establishing, monitoring and evaluating the progress of its annual Affirmative Action Plan to ensure equal employment opportunity. All members of management are responsible for maintaining a discrimination free work environment by personal example and leadership.

In short, all activities of Ralcorp Holdings reflect our full acceptance of our responsibilities as an Equal Opportunity employer and all employees are responsible for conducting themselves in a manner consistent with this policy.

Employees are encouraged to seek assistance from their immediate supervisor, their local Human Resources representative, their local Equal Employment Coordinator or Ralcorp's St. Louis Human Resources Manager to ensure that problems are prevented or promptly resolved. Retaliation or reprisal against persons who initiate complaints or assist in the investigation of a complaint is contrary to this policy and will not be tolerated.

Creative enthusiastic employees are our most important resource and the basis for our continued success. We seek an environment characterized by respect for each individual.

January 2000

Joe R. Micheletto
Chief Executive Officer and
President

DEFENDANT'S EXHIBIT 11 Thornton

PENGAD 800-631-6989

# DOCUMENTATION FORM

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordan Date: 2-16-06

Present: Melvin Hutchins

Who was involved: Frank Williams

Witness (s):

Date of incident: 2-16-06

Where did it take place: In hallway of Plant.

When did it take place (time and day): 2-16-06 Am.

What happened: At approximately 10:50AM an employee came to me stating that Frank Williams had came to them this am, stating that I had been telling people that Frank Williams was a child molester. Immediately I met with M. Hutchins / Chris Jordan with this matter. This is after a previous meeting with M. Hutchins on the topic of many concerns with Frank and line 3 work situations.

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

Mark Beard - present in smoking area

# MEMORANDUM

**DATE:** March 7, 2006

**TO:** Linda Thornton

**FR:** Tommy Nance

**RE:** Memo to File

INCIDENT OCCURRED ON 2/16/06

After investigating the events surrounding the allegations made on 2/16/06, I have determined that you acted in a way that was inflammatory and instigational. This is not the first altercation that has occurred between yourself and Frank Williams. Any continued comments of an inflammatory nature or comments meant to incite controversy will be dealt with in a similar fashion.

Failure to follow the proper procedures has resulted in you receiving this **Memo to File.**

Any future violations will result in additional disciplinary action up to and including termination.

Tommy Nance
Human Resources Manager

Linda Thornton
(Signature acknowledges Receipt of this document only.)

I disagree with entire situation and who made comments. also with my record & years of employment this should show.



# DOCUMENTATION FORM

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordon. Date: 3-01-06

Present: M. Hutchins

Who was involved: Frank Williams

Witness (s): N/A

Date of incident: Linda was told 2/28/06

Where did it take place: Break Area

When did it take place (time and day): After work

What happened: Repeatly I have been told of comments that team leader has made against me. One after investigation. Very serious comments and threats made.

I just want this to be over with. Which I believed it would be after last weeks meeting with Tommy in HR. These threats & comments were made to an employee in the front office.

Did this result in down time? N/A If yes how much?

Did this result in product being scrapped? If yes how much? N/A

Attach an additional sheet if needed for witness statements following the same format.



DEFENDANT'S
EXHIBIT
14
Thornton
PENGAD 800-631-6989

**DOCUMENTATION FORM**

Employee Name: Linda Thornton.

Investigating Supervisor: Chris Jordan Date: 6-14-06

Present: Melvin Hutchins, Frank Hall

Who was involved: Frank Williams.

Witness (s): Catherine Long, Wesley, Tamekia Cook

Date of incident:

Where did it take place: line 3

When did it take place (time and day): 11:00 - 11:05?

What happened: Today on line 3 when I came back from second break, (Frank Williams had Relieved me.) I noted that the paperwork had not been done while I was on break, so I was catching up on the paperwork. Frank was re-loading the machine with labels. There was re-work in a box full of cans, and the table was over-flowing with cans with bad labels. When Frank reloaded the machine he went to walk away - I asked him to help with the re-work - (The audit was going on) He started yelling at me that he had better "mother fucking things to do than worry about that fucking re-work. He continued to holler at me, and I told him to quit yelling & cussing at me. At this time he went from inside of the line to the outside of the line. The entire time, yelling at me. Continued to yell mother fucker. God damn mother fucker. Throwing a large bag of cans, as he continued to yell and cuss at me - I continued to request that Wesley would please call for a supervisor. At this time Frank

Did this result in down time? NO If yes how much?

Did this result in product being scrapped? If yes how much? no

Attach an additional sheet if needed for witness statements following the same format.

was still yelling & cussing and I continued to ignore him. Donald Coty walked by and I requested that he please get a supervisor, please call Melvin Hutchins.

FH000023

finally Frank went on his way. When Melvin came I told him about the situation at hand. Catherine Long was standing there and Wesley, and I honestly do not know who else. I ignored Frank Williams yelling God Damn mother fucker — whether he was calling me that name or just yelling it at me. Regardless — I won't take it again. No one else talks to me that way and he sure won't again. I don't have to tolerate that level of abusive language or name calling. Tameaka asked me later what was he having a fit about.

Also, stated to Catherine "Did I holler at Linda". She stated "Yeah."

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form | | ENTER CHARGE NUMBER<br>[ X ] EEOC<br>420 2006 05107 |
|---|---|---|
| (State or local Agency, if any) | | and EEOC |
| NAME (Indicate Mr., Ms., or Mrs.)<br>Linda Thornton | | HOME TELEPHONE NO. (Include Area Code)<br>334-693-4488 |
| STREET ADDRESS<br>100 Armstrong Street | CITY, STATE AND ZIP<br>Headland, AL 36345 | COUNTY<br>Henry |
| NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.) | | |
| NAME<br>Flavor House Products, Inc. | NO. OF EMPLOYEES/MEMBERS<br>Over 15 | TELEPHONE NO. (Include Area Code)<br>334-983-5643 |
| STREET ADDRESS<br>2700 Horace Shepard Road | CITY, STATE AND ZIP<br>Dothan, AL 36303 | COUNTY<br>Houston |
| NAME | RECEIVED EEOC SEP 21 2006 BIRMINGHAM DISTRICT | TELEPHONE NO. (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |
| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es):<br>[ ] Race [ ] Color [x ] Sex [ ] Religion [ ] Age [ ] Disability<br>[] National Origin [x ] Retaliation [ ] Other | | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)<br>June 16, 2006 |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):

Social Security Number: 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 Date of Birth: 5-16-64 Sex: Female Race: Caucasian

I, Linda Thornton, began working for Flavor House Products, Inc. on or about June 25, 2001. While employed at Flavor House, I suffered sexual discrimination and retaliation. The sexual discrimination started during my first year of employment with Flavor House and continued throughout my employment. I was forced to resign my position with Flavor House on or about June 21, 2006, following my complaints to management of sexual discrimination and harassment.

| | |
|---|---|
| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements)<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br>09-15-06 Linda Thornton<br>Date Charging Party (Signature) | SIGNATURE OF COMPLAINANT Linda Thornton<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) [signature] 11-8-06 |

DEFENDANT'S EXHIBIT 15 Thornton

PENGAD 800-631-6989

Name: Linda Thornton
Social Security #: 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
Date: 9-15-06

So much has happened that I cannot possibly set out everything, but the following is a brief summary of the sexual discrimination and/or harassment that I was subjected to while employed at Flavor House Products, Inc.

During my first year of employment, I repeatedly tried to get a promotion to "Label Operator". I was passed over several times and the position was given to temporary male employees with less or no experience. Unlike the male employees, I was required to provide a resume listing my mechanical experience before I was given the position. The discrimination continued even after I received the position in that I did not receive the training that the male operators/employees received. Additionally, the mechanics, all male, and other male employees made derogatory comments about me working "in a man's job." The mechanics did not like for me to make adjustments to my machine. If I took longer than 5 minutes to make adjustments, they would push me out of the way and make the adjustments or they would call the male supervisor over to make the adjustments. However, the male operators made adjustments that took longer than five minutes and nothing was said. I suffered this discriminatory treatment from the time I was put in the Label Operator position until I was forced to resign. My supervisor was aware of the discriminatory treatment; however, he did nothing to stop the discrimination. I also made numerous complaints to Marianne Boyer, Director of Operations, about the sexually discriminatory work environment that the female employees, including myself, were forced to work in on a daily basis. I told her that the mechanics, who are all male, cursed at and yelled at the female employees and that they called the female employees derogatory names. I reported to her that the mechanics would not allow the female operators to make minor repairs on their machines, but did not say anything when male employees made the same or similar repairs. However, Boyer's typical response to my complaints was to tell me that I would have to "deal with it" as she had learned to "deal with it"and then gave me two examples of discrimination she had do "deal with"in the company.

The first time I worked with Frank Williams was sometime in 2003. He was supposed to help me learn how to run his machine. I worked with him for three to four weeks. During that time, he yelled at me and cursed me. He also called me a "fucking stupid bitch". I complained to Melvin Hutchins, a member of management, but Hutchins told me that Williams was the only one that knew how to run the machine so I would just have to get along with him. I didn't work with Williams again until the beginning of 2006. I applied for a position as Line 3 Label Operator and received the position. Williams was not in the department when I applied; however, he was moved to the department shortly afterwards as the Team Leader. From then until I was forced to resign, Williams treated me in a discriminatory and demeaning manner. He yelled at me and cursed at me every day. Williams constantly talked about his sex life with his wife. He talked about how often he had sex, how they had sex, where they had sex, and how often they had sex. He even said he could tell his wife was cheating on him because of the way she "felt" when they had sex. Williams was also very vocal about the fact that he was a registered sex offender. I complained about Williams and his discriminatory treatment many times. I complained to Hutchins and Chris Jordan, Supervisor. They told me it would be taken care of, but to my knowledge, nothing was ever done as Williams' discrimination continued. A few months before I was forced to leave my employment, I was written up for telling another employee that Williams was a registered sex offender even though Williams made this statement himself almost every day. At first I was called in and told not to discuss Williams history although he discussed it everyday. I was told that the matter would be dropped, but if I discussed his criminal history again, I would be written up. A few days later, another female employee told me that Williams was making threats to hurt me. I reported these threats to management and was written up for discussing Williams history after being told not to talk about it. The employee that told me about the threats was fired shortly afterwards. Williams was the reason I was forced to resign my position with Flavor House.

On or about June 14, 2006, I was operating the label machine on Line Three, my usual position. Williams took over my machine during my break. When I came back, Williams was re-loading my machine with labels. I saw that the

Name: Linda Thornton
Social Security #: 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
Date: 09-15-06

paperwork had not been done while I was on break so I started on it to get caught up. There was also an overflow of re-work that needed to be done and a box full of bad labels that had to be re-done. As the company was having an important audit done that day, I asked Williams to help me with the re-work when he walked by. Williams turned around and shouted at me that he had "better mother-fucking things to do than fucking re-work." Williams continued to yell at me and kept repeating, "God damn mother fucker" at me. I tried to ignore him. Williams walked to the outside of the line and continued to yell at me. While still yelling "God damn mother-fucker" at me, he began picking up pallets and slamming them down. He also picked up a large bag of trash and threw it. By this time, a line mechanic had walked up and I asked him several times to call a supervisor on the radio. He tried to call a couple of supervisors and was told "it will be one minute." Donald Coty, the Mechanic Supervisor, walked by and I asked him to call Melvin Hutchins. By the time Hutchins arrived, Williams had quit yelling and cursing at me, but was still throwing pallets around and glaring at me. Hutchins asked me what the problem was, and I told him that I knew it was not a good time for this because the audit was going on, but this was the last time Williams was going to lose his temper and "go off on me" by cursing and yelling at me and calling me a "God damn mother-fucker" for no apparent reason. Hutchins called Chris Jordan, Packaging Supervisor, and he came over to my line. Jordan inventoried my tool bag and then told me to come to his office that afternoon and write out a statement of what happened. I began crying as I told him about Frank's discriminatory treatment and that I was tired of having to deal with Williams. Jordan assured me the situation would be resolved. Hutchins and Jordan then left to go back to the audit. From the time they left until three o'clock when I went to the front office, Williams stood at my re-work table and glared at me. I was extremely uncomfortable. At three o'clock, I went to Jordan's office and wrote out a statement. I was still very upset and told Jordan that I didn't know what Williams' problem was and he said he didn't care what Williams' problem was and that he would turn in my statement in the morning. I also told Jordan that Williams went and asked Catherine Long, a nearby co-worker, if she thought he had yelled at me, and Ms. Long told him twice that she thought he had yelled at me.

On or about June 15, 2006, I returned to work and tried to do my job while avoiding Williams. My co-workers were called in to the office to provide statements regarding the incident. Williams returned to my re-work table and glared at me the same way he had the day before. He would also walk up close to my machine and stop and stare at me. Williams' demeanor was very intimidating and because I knew that he had a history of violence against women, I was afraid he was going to hurt me. I was so scared of Williams that I took a screwdriver out of my tool bag and began carrying it around in my back pocket. When he was not standing at my re-work table or next to my machine, he would go to the filler machine and talk to Stephanie. He would turn around and glare at me from time to time during his conversation. Melvin Hutchins walked by and I told him that I was not comfortable working with Williams and that I did not feel safe around Williams. Hutchins told me that he had read my statement and agreed that he would not feel safe either. He reassured me that the situation would be resolved. H e told me not to let it get me down and to "pray on it". Later that day, I was moved to the Line 5 label machine; however, this was still in the same department with Williams and only a few feet away. This move afforded me no protection from Williams.

On June 16, 2006, I reported back to work and heard over the radio that Williams was not going to be at work that day. I called Jordan and asked if I was going to be moved back to my regular line, Line 3, since Williams was not going to be there. He said "no". I saw Hutchins later that morning and asked him if the move to Line 5 was permanent. He told me that he needed me on Line 5 right then and could not answer if the move was permanent. I then asked Ricky Smothers, the Supervisor over all Supervisors, if the move was permanent and he told me I would have to talk to Tommy (LNU) in PR. I asked Ricky if he was aware of what happened to me the day before. He said that he had heard bits and pieces of what happened. I asked him if he had read my statement and he said "no". I realized at that point that Williams was not going to be disciplined for his discriminatory behavior and that I was not going to be protected from him. I was so

Page 4 EEOC Charge
Name: Linda Thornton
Social Security #: 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
Date: 09-15-06

RECEIVED EEOC SEP 21 2006 BIRMINGHAM DISTRICT OFFICE

upset that I had to clock out and go outside to calm down. Hutchins and Ricky followed me outside and told me to leave the property and come back in an hour to meet Tommy. I told them that I was too upset to drive so they told me I should wait in the car for Tommy to get there so I could talk to him. They did not want the other employees to see me crying and upset. I waited and spoke with Tommy and Marianne Boyer, CEO, about the situation with Williams. Despite my statement and statements from witness, they concluded that I had "baited" Williams. I tried to explain to them again that I did not feel safe working with Williams and that I had started carrying a screwdriver in my back pocket. Recognizing that they were not going to resolve the situation with Frank, I placed my badge on Tommy's desk. Boyer asked me not to quit and to think about it over the weekend. I repeatedly told Boyer that I did not feel safe working with Williams to which she responded several times that if this was a court of law the action they had taken would be acceptable. She accused me of having an issue with sexual discrimination, and even though she told me that the law required them to provide a safe work environment, she told me that Williams would not be terminated. She said I would be moved to Line 5 and Williams would be on Line 3 and that we would stay that way for three months to see which of us had a conflict first. There was no mention of a write up during this conversation. However, it was later stated that if I had returned to work following this incident, I would have been written up although I had done nothing wrong.

The next three scheduled work days I called in sick because I was too afraid to go in and face Williams. A female employee told me that the first two days I was out, Williams asked her where I was. On the third day, Flavor House called back and left a message that I would have to have a doctor's excuse to return to work. I called Leah Allums in Personnel Resources and told her that I would not be returning because I did not feel I would be safe working with Williams. I learned that after my employment ended, Williams was written up for cursing at another female employee.

I believe that I suffered from sexual discrimination, harassment, and retaliation while employed with Flavor House Products, Inc., and that I was discriminated against because of my sex, female. I have been discriminated against because of my sex in job assignments, training, promotions, wages, discipline, discharge, and other terms, conditions, and privileges of employment; and retaliated against in that the conduct was wilful, malicious, and in wanton disregard of my federally protected rights.

Linda Thornton
Charging Party

9-15-06
Date

Appeal #1

PENGAD 800-631-6989
DEFENDANT'S EXHIBIT
16
Thornton

3-30-06

To whom it may concern;

On behalf of myself, I am requesting an appeal on the subject of my label operator level status. I hope that you will greatly re-consider the status that you have placed me at. I am convinced that this was greatly un-noticed when I was placed as a level one label operator, my skills are at a very high level that I am deeply proud of. I have mastered lines one and two label machine's for the past four years, at present time I run line 3 label machine which is considered the hardest of the can lines. I am able to trouble shoot, change over every machine, Even though, on the can line, I continue to always help my fellow label operators, for there will never be a label operator that never needs help, Including myself. I have had the opportunity to train Vicki Cook on line one label machine to take my position. With patience and the correct information in training Vicki has proven herself to be one of the best par line label operators,

I am requesting an appeal, and that you give me the opportunity to go directly to label operator status 4. I believe I have earned this and have the skills achieved.

Sincerelly
Linda Thornton.

FH000054



DEFENDANT'S
EXHIBIT
17
Thornton
PENGAD 800-631-6989

**PAY-FOR-SKILL**

Nutcracker offers voluntary Pay-For-Skill Programs designed to meet departmental needs. The purpose of those programs is to incentify Associates to expand their job knowledge and skill levels. Associates who choose to participate will be compensated at various levels after successfully passing a skills test

Roasters

| | |
|---|---|
| I. | $11.85 |
| II. | $12.20 |
| III. | $12.55 |
| IV. | $12.90 |

Waste
$9.50

Forklift

| | |
|---|---|
| I. | $9.75 |
| II. | $10.10 |
| III. | $10.45 |
| IV. | $10.80 |

Dumper
$9.00

Baggers

| | |
|---|---|
| I. | $10.50 |
| II. | $10.85 |
| III. | $11.20 |
| IV. | $11.55 |

Stacker
$9.00

Fillers/Sanitation

| | |
|---|---|
| I. | $9.40 |
| II. | $9.75 |
| III. | $10.20 |
| IV. | $10.55 |

Labeler
$10.50
$10.85
$11.20
$11.55

Butter Toffee
$10.85

General Production
$8.00

Data Entry/Stockroom/Shipping & Receiving

| | |
|---|---|
| I. | $11.50 |
| II. | $12.00 |
| III. | $12.50 |
| IV. | $13.00 |

**Guidelines:**

I. Associates in their probationary period will be paid .50 below level one.

II. After completing the ninety (90) day probation, they will go to rate of level one.

III. Each level will require a minimum of six (6) months between levels.

IV. Team leaders will receive .50 over and above the highest rate of those they are leading.

TRANSFERS AND TEMPORARY PAY CHANGES

An Associate may be placed into a different job due to business conditions by the company. They will maintain their rate of pay for 90 days from the date they are moved into that new job. If at the end of 90 days they have not been moved back to their previous job, their rate of pay will change to the present job. If they are moved to a different shift, they will not maintain the shift differential. Examples of this may occur during layoff or when a position is eliminated, which displaces Associates back into other positions.

If an Associate *voluntarily agrees* to work in a different job for a one day assignment and the rate of pay for that job is less than they are presently earning, they will be paid the rate of pay for that job. They *will not* be paid their normal rate of pay for performing that job. The Supervisor will complete a Temporary Pay Change for that day.

If an Associate *voluntarily agrees* to work in a different job for a one day assignment and the rate of pay for that job is more than they are presently earning, then they will be paid the rate of pay for that job. The Supervisor will complete a Temporary Pay Change for that day.

If an Associate is *forced* to work in a lower rated paying position, they will retain their higher normal rate of pay. Anyone forced into a higher rate of pay position will receive the higher rate of pay while working in that position.

This policy does not apply to probationary Associates and temporaries.

JURY DUTY

If called for Jury Duty, Associates will be reimbursed for time lost. The Associate is reimbursed the difference between jury fees and their regular hourly rate for up to forty (40) hours per week for maximum of ten (10) days per calendar year. Extensions may be granted in unusual circumstances. Associates must advise their Supervisor and Human Resources in the event they are called upon for Jury Duty. This policy does not apply to voluntary jury duty or days for which other pay (holiday, vacation, etc.) is received.

DEFENDANT'S EXHIBIT 18
PENGAD 800-631-6989

# Appeal Response

To: Linda Thornton

Re: Level 4 Operator Pay Appeal

Date: April 20, 2006

From: Tommy Nance

Linda,

We have reviewed your appeal to adjust your pay to level 4 for the Label Operator position. You were initially placed at a Level 1 at the introduction of the Pay for Skills Program. You have not taken the opportunity to advance your Level Status through testing at the various levels. You have stated that since your pay was at or above Level 4 that you did not need to test. This however does not allow you to receive annual cost of living increases due to your pay being higher than Level 1. You have been red-lined and will only receive a lump sum disbursement rather than an annual increase until the cost of living increases cause the pay for skill levels to advance beyond your current pay.

If you feel that you are a Level 4 operator, we will afford you the opportunity to test at each level without the pre-requisite 6 month period between levels. You will have to test at each level and we will assign you the level status that you are able to show competence in. Your pay will not be reduced if you fail to pass any given level. Likewise, no increase will be given until competence as a Level 4 has been achieved.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LINDA THORNTON, )
Plaintiff, )
VS. ) CIVIL ACTION NO:
FLAVOR HOUSE PRODUCTS, ) 1:07-CV-712-WKW
et al., ) DEPOSITION OF:
Defendants. ) LINDA THORNTON
) VOLUME II

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

LINDA THORNTON,

may be taken before LeAnn Maroney, Notary Public, State at Large, at the law offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, 1600 Wachovia Tower, Birmingham, Alabama, 35203, on March 3, 2008, commencing at approximately 10:30.

represent?

MS. SWAIN: Jennifer Swain representing Flavor House.

MR. CRUM: Richard Crum representing Frank Williams.

MS. ROBERTSON: Ann Robertson representing the plaintiff.

THE COURT: Court reporter, will you please swear the witness?

LINDA THORNTON,

having been first duly sworn, was examined and testified as follows:

THE REPORTER: Usual stipulations?

MS. ROBERTSON: She's still reading and signing.

EXAMINATION BY MS. SWAIN:

**Q Ms. Thornton, you will recall that I'm Jennifer Swain. I'm going to continued to ask you questions today about your employment with Flavor House and about your lawsuit. And once again, I'll ask you to let me know if I ask a question that you**

**don't understand.**

A Yes, ma'am.

**Q And also, once again, I'll ask you to give a yes or no or a narrative response as opposed to a head shake or an uh-huh or an huh-uh.**

A Yes, ma'am.

**Q We -- I think you mentioned briefly when we were here the last time the situation where you claimed that if you took too long to make an adjustment to your machine, the mechanics would come and make the adjustment for you.**

A Yes, ma'am.

**Q Who -- what mechanics are you talking about?**

A Adam Hall, Wesley McInnis, Tom Beard. Or Melvin would call Bruce Cassidy. And when Bruce would come to the machine, he would tell me just act like I'm doing something to it. "They called me and I don't know why they called me."

**Q How many times did Bruce Cassidy**

**come and make adjustments to your machine?**

MS. ROBERTSON: Object.

A He came several times, but not always did he make an adjustment to my machine. A lot of times he would come because Melvin called him, if Melvin thought I was down too long or if I was trying to work with the labels. He would think that Bruce could do something better than I could.

**Q How many times did Melvin call Bruce to your machine?**

A Whenever Melvin thought I was down too long.

**Q Do you recall how many times that occurred?**

A No, ma'am.

**Q And just to make sure I understand, if there was something that needed to be done with your machine or if your machine wasn't operating properly, you would normally attempt initially to take care of whatever the problem was?**

A Yes, ma'am. That was one of the

requirements.

**Q And then the mechanics were there to fix any problems that you were not able to fix; is that right?**

A The mechanics were there to replace parts, to do anything that was broken mechanically. They weren't there to adjust my machine or run my machine. They were there to mechanically fix it, anything that was mechanically wrong with it.

**Q And the mechanics worked on the machines other than yours, as well, correct?**

A Yes, ma'am.

**Q What was it about the way the mechanics dealt with -- with you or your machine that you felt was discriminatory?**

MS. ROBERTSON: Object.

A When I called the mechanic or had somebody call for me, when they would come, they would ask me what the fuck was the problem now, why can't you just run the mother fucker.

**Q So, your -- your concern with the**

A Yes, ma'am. I would have been.

**Q Who is the -- well, strike that. You were never fired from Flavor House, were you?**

A Yes, ma'am.

**Q When were you fired from Flavor House?**

A They called it suspended in their notes, but I was fired.

**Q When were you fired from Flavor House?**

A It was a week after I had hurt my knee.

**Q Which was when?**

A I believe it was 2005. I'm not sure of the year.

**Q What were you suspended for?**

A They claimed I had 12 points.

**Q And when you say points, you are talking about attendance points, correct?**

A Yes, ma'am.

**Q And did you dispute the number of points that you had?**

A Yes, ma'am.

**Q And ultimately you were -- your suspension was taken away?**

A After I called Mary Ann in California. And two days later I was called at home. They told me they had made an error.

**Q Who was it that suspended you?**

A David Helms.

**Q What was his position?**

A HR.

**Q What is it that makes you think you were suspended, but that was actually a termination?**

A They took my -- they took my badge and walked me to the door. I no longer had a badge.

**Q Okay. Is there anything else that made you think you were terminated on that occasion?**

A That was the sign you were terminated, when they take your badge. Then they have to walk you to the door and let you

out.

**Q Is there anything else that made you think you were terminated besides taking your badge?**

A They told me I had 12 points, and I was only supposed to have nine. That's grounds for termination.

**Q But they told you that you were suspended?**

A No. They told me the ball was in my court. "You have twelve points." And when I tried to argue it, he said I had misunderstood, not him. He wouldn't listen to me.

**Q What I'm trying to find out, Ms. Thornton, is did anybody ever actually tell you that you were terminated on that occasion, that your --**

A When they --

**Q Let me finish. That your employment was over with the company?**

A Ma'am, when they take your badge, you are fired.

**Q I understand that that was the way you interpreted that. I'm asking -- my question, though, is whether anybody ever actually told you, said to you the words "you are fired" or "you are terminated"?**

A David Helms said let go. He didn't say fired or terminated. He said, "I'm letting you go." And Fannie took my badge and walked me to the door.

**Q All right. Any other occasions when you were terminated, in your opinion, from Flavor House?**

A Any other times I was terminated?

**Q Correct.**

A No, ma'am, except for when -- the very last day on Friday. I feel like I was forced out of the plant.

**Q And how were you forced out of the plant?**

A I could no longer work in an unsafe environment.

**Q So, in your view, by not**

**present when Ricky met with the mechanics?**
A No, ma'am.
**Q Do you know what was said during that meeting?**
A No, ma'am. All I know is Wesley came and said, "You've started some shit again, haven't you?"
**Q Did you ever complain to anyone in management at Flavor House about the mechanics pushing you or using cuss words towards you on any other occasions?**
A Yes, ma'am.
**Q When else?**
A I complained to Mary Ann Boyer about them pushing me away from my machine.
**Q Okay. When did you complain to Mary Ann?**
A It was sometime while I was on line three.
**Q Do you recall when?**
A No, ma'am.
**Q And what did you tell Mary Ann?**
A I told her I was tired of being

moved out of the way when -- when I had to work on my machine or adjust my machine. And she referred to it as the southern thing, the gentleman thing. Her daughter -- it would make her daughter mad when her daughter's date would open the door for her, the car door for her.
**Q Anything else said during that conversation with Mary Ann?**
A I complained about the way they talked to me.
**Q And what did you say about that?**
A The cussing, Frank Williams cussing me.
**Q Okay. Was anything else said during that conversation?**
A I complained about how the mechanics didn't treat the other male label operators that way.
**Q Do you know whether any of the other female label operators ever complained to management about the way they were treated by the mechanics?**

A Yes, ma'am.
**Q Who else complained?**
A Joanie.
**Q Anybody else?**
A I'm not sure.
**Q How do -- how do you know that Joanie complained?**
A Because there were different occasions that you -- I witnessed her having arguments with them.
**Q With the mechanics?**
A Yes, ma'am.
**Q How do you know she complained about the mechanics was my question.**
A Because we talked.
**Q So, Joanie told you that?**
A She was being treated the same way.
**Q So, Joanie told you that she complained?**
A She told me she was fed up with the mechanics.
**Q Did Joanie ever tell you that she**

**complained about the mechanics? I don't mean complained to you. I mean complained to someone in management.**
A I'm not sure.
**Q Do you know whether she ever complained to someone in management?**
A I'm -- I was worried about myself. I'm not sure if she complained for herself or not.
**Q Going back to your conversation with Mary Ann about the mechanics, was there anything else that was discussed between you and Mary Ann during that conversation?**
A During that conversation?
**Q Correct.**
A Not that I recall.
**Q Okay. Other than your complaint to Melvin that we talked about and your complaint to Mary Ann, were there any other complaints that you made about the mechanics pushing you out of the way or using bad language?**
A I made the same complaints to

**mean.**

A Right.

**Q So, no one else in management?**

A Not that I'm aware of.

**Q And other than the things that we've discussed here, the pushing you out of the way, the bad language, the things that you've mentioned here just now, was there anything else about the way the mechanics treated you that you had a problem with?**

A In general, I mean, they felt like a woman could not do the man's job.

**Q And you told me about a particular mechanic who made that comment to you, correct?**

A Right. And the others agreed.

**Q How do you know that they agreed?**

A Because of the way they treated me, shoving me out of the way, calling me names, "Get your ass back to your machine. Oh, hell, just run the son of a bitch."

**Q Was there anything other than those things that you've described for me**

**else that you felt that the mechanics did to you that you had a problem with?**

A I don't understand what you are asking me.

**Q Well, I'm trying to -- I mean, you've sued the company for the way you were treated. And I'm trying to find out what treatment it is you are complaining about. Okay?**

A Right.

**Q And you've described for me some things that you didn't like about the way the mechanics treated you. I'm trying to make sure that you've described for me all of those things, if there are some things that I'm missing. Are there any other things that the mechanics did that you had a problem with?**

A Not that I can think of right now. I had a problem with Tom Beard.

**Q What problem did you have with Tom Beard?**

A He would come in in the morning

times -- and it wasn't every day. But he would come in, and if I wasn't smiling, he would ask me what was wrong, did I not have somebody that morning to lick me from head to toe, to turn me over and lick me from my back side down in between all your crevices.

**Q How many times did Tom Beard make that kind of comment to you?**

A At least 15. And I reported it to Melvin Hutchins.

**Q When did these comments occur?**

A Probably in the last year, two years that I worked there, it got worse. When I went to the can line, that was where Tom was. Not the last year, but --

**Q So, you were --**

A At some point he went on leave, and it was before he went on leave.

**Q Before Tom went on leave?**

A Yes, ma'am.

**Q Did Tom ever return from leave before you left?**

A I'm not sure.

**Q But after he went on leave, you didn't have problems with him anymore. Your problems with him were before he went on leave?**

A Yes, ma'am.

**Q You said this was on the can line. Which -- which line was that? Was that line three?**

A It all -- they moved me from three, four and five. It depended on the schedule, what lines were running.

**Q Okay.**

A If line three was running, I was on -- normally I was on line three. That was my position.

**Q What I'm trying to find out is you were on line one for a period of time, correct?**

A Yes, ma'am.

**Q And you said you bid on a position and then moved to line three?**

A I went to line three in -- I believe it was the end of '05.

**about Fannie, correct?**

A I complained about that. I complained about Fannie throwing my vacation paper in the garbage and me having to get another one.

MR. CRUM: Vacation what? I'm sorry.

A My vacation paper request. I complained about the guys leaving the line and leaving me there and other females there to run it, but it was okay that they left.

**Q You said you complained about guys making liquid nitrogen bombs.**

A Yes, ma'am.

**Q Who was that?**

A Chris Cassidy.

**Q Anybody else?**

A There was another one, and I -- I don't -- I don't remember his name.

**Q When did that occur?**

A Whenever I was on line two.

**Q Do you recall when you were on line two?**

A I was swapped around so often. I just went where they needed me. So, I'm not --

**Q I'm trying to figure out kind of what time frame, where that fit into the rest of your employment.**

A It was when Glenn was employed there. Because I reported it to Glenn, and he said he was going to do an investigation. And after he did an investigation, he informed me there was no foundation to it, but yet he had -- the one he had questioned was Chris' best friend. His best friend came back to me and told me Glenn had questioned him about it, and he told him no, that wasn't happening.

I complained about not being able to go to a Christmas party without Glenn getting in my face, and my husband having to step up. Shortly after that Christmas party Mary Ann, when we had a safety meeting, instructed the group that in a Christmas party, even if it's not on business property,

if your husband does something, your spouse does something, you could still be fired.

**Q Let's --**

A I complained about any man that treated me like dirt out there.

**Q Would you say that you were complaining to somebody at least once a week?**

A At least.

**Q Would you say you were complaining to somebody more than once a day?**

A If necessary.

**Q So, sometimes it was every day that you were making a complaint --**

A I went through the chain --

**Q Let me finish the question. Okay?**

A Yes, ma'am.

**Q Would you say there were times where you were actually making complaints about other employees every day?**

A Not other employees, just the men that were treating me like crap.

**Q But those were -- those men were**

**other employees, correct?**

A If they treated me like crap that day, I complained.

**Q I'm going to ask you one more time. Try really hard to let me finish my question. She can't type me and you at the same time. Okay?**

A Yes, ma'am.

**Q There were times when you were complaining every day; is that correct?**

A If they cussed me out every day, I did. If Frank Williams pushed me, cussed me out, talked about sex, talked about blow jobs, yes, ma'am, I complained every day, sometimes twice a day.

**Q Who do you -- who did you complain to about Frank Williams talking about sex or blow jobs?**

A Melvin Hutchins, Chris Jordan.

**Q Anybody else?**

A Tommy Nance.

**Q Anybody else?**

A I'm not sure. I think that's it.

**Q Was it a male or a female?**

A It was a female.

**Q White or African American?**

A African American.

**Q Was it someone that worked with you on line three?**

A I don't believe so.

**Q Was it someone that you knew and you just can't remember the name, or you never knew the person's name?**

A I'm sure I knew their name. We have our names on our shirts.

**Q So, you knew the name back then --**

A Yes, ma'am.

**Q -- at the time? And what did that person tell you?**

A That Frank was making threats on me.

**Q Anything else that they told you about things that Frank said about you?**

A That he was sick and tired of my ass.

**Q Anything else?**

A I -- I'm not sure. I went and reported it to Melvin.

(Defendant's Exhibit 19 was marked for identification.)

**Q I would like to show you what I've marked as Defendant's Exhibit 19, and ask you if that is a copy of the Complaint that was filed on your behalf in this lawsuit?**

A Yes, ma'am.

**Q Turn, if you would, to Page 3 of that document and look, if you would, at the paragraph numbered 16. It says you -- the discrimination continued even after you finally received the position. And I assume that's the label operator. Correct?**

A Yes, ma'am.

**Q Okay. That you did not receive the training that the male operators received. What training did you not receive?**

A The males had another male employee to train them, to stand up there

with them. In my training, I had it on my own. They claimed that Mark Beard was supposed to be training me, but they assigned Mark Beard to watch labels.

**Q Was there any other training that you say you did not receive?**

A I shut the machine down when it got so bad with the bad labels. I paged for Melvin. Buck Perkins came. He asked me what my problem was, and I said, "I want to know who's training me."

**Q This is in the same time period that Mark Beard was supposed to be training you?**

A Yes, ma'am.

**Q Okay. What I'm trying to figure out is not what you did about it. My question was was there any other training you didn't receive while you were employed at Flavor House?**

A Any other training?

**Q Correct.**

A Not that I'm aware of. On line

three, when I went to line -- I had a brief period where Frank Williams was supposed to be training me on the line three label machine. And after he called me a fucking stupid bitch, they assigned James Porter to work with me.

**Q All right. We discussed that last time. I will move to strike as nonresponsive.**

MR. CRUM: And I would like an objection on the record to the nonresponsive nature of the witness' answers. Almost every question she adds what she wants to add and rarely answers the question. So, I object to that as being nonresponsive. And I would like to make a continuing objection to that.

MS. ROBERTSON: Under the federal rules, you can't make a continuing objection.

MR. CRUM: Then I will object and continue to interrupt.

**Q Look, if you would, at Page 4, Paragraph 20. You said, "The plaintiff's supervisor was aware of the discriminatory**

A No, ma'am.

**Q Do you know whether Frank Williams ever complained to anyone that he felt threatened by your conduct?**

A No, ma'am.

**Q You claim in your lawsuit that you were subjected to retaliation; is that correct?**

A Yes, ma'am.

**Q What are you claiming you were being retaliated against for doing? In other words, what did you do that you believe prompted the retaliation?**

A I complained.

**Q And you are talking about all these various complaints, the daily complaints that you were making?**

A About the men.

**Q And what do you claim was done to you that was retaliatory?**

A When I complained, I was written up.

**Q You are talking about the**

**write-up for telling people about Frank Williams being a registered sex offender?**

A When I made a complaint, I was always either written up or called into the office and it was turned around as my fault. They would find something to write me up or -- or verbally warn me about. First they would say stay at the machine. Then they would say leave -- don't stay by the machine. It was always when I made a complaint.

**Q And that was pretty much every day, correct?**

MS. ROBERTSON: Object.

A If I was cussed out that day.

**Q So, were you called into the office pretty much every day and verbally warned?**

A No, ma'am.

**Q When were you called into the office and verbally warned?**

A If they had came by and I made a complaint. A lot of times it would be in the

afternoon.

**Q How many times were you called into the office and verbally warned?**

A I'm not sure.

**Q Was it more than ten times?**

A I'm not sure.

**Q Was it more than 50 times?**

A I don't believe so.

**Q Anything else that you claim was done to you that was retaliatory?**

A Yes, ma'am.

**Q What?**

A They did not take -- they did not defend me. Flavor House did not stand up for me and protect me and give me a safe environment to work in.

**Q And when you say all of that, what you are really saying is they didn't fire Frank, right?**

MS. ROBERTSON: Objection. There were other people.

MS. SWAIN: Ann, I would like for you to reserve your comments. You may state

an objection if you are not -- if you don't like the question.

MS. ROBERTSON: Well, you are -- but you mischaracter -- I object. You mischaracterize the evidence and are --

MS. SWAIN: That's not true.

MS. ROBERTSON: -- attempting to ignore the evidence.

MS. SWAIN: Okay. That's your objection. That's fine. But you are not to tell her what the testimony is.

MS. ROBERTSON: I haven't told her anything.

**Q When you say that you felt like they didn't give you a safe environment to work in, are you saying -- is what you are talking about there not firing Frank?**

A I'm talking about -- the entire time I worked there, I'm talking about if I as a female were to cuss an employee, co-worker, throw a jar at them to get their attention, shoved them out of the way, I would no longer be employed there.

Page 282

**Report you received in late March or early April 2002.**
A Yes, ma'am.
**Q And this write-up was for raising your voice or hollering at Shavonne Townsend?**
A Yes, ma'am.
**Q And you admitted on this occasion that you raised your voice to Shavonne because you were very irritated with her?**
A Yes, ma'am.
**Q Was this write-up deserved, in your opinion?**
A No, ma'am.
**Q Why -- why was it not deserved?**
A I was running the case packer and Shavonne was by the -- over at the filler, and I was hollering for her to call a mechanic. The case packer is very loud. The filler is very loud. I had -- I got irritated because I had to holler three, four times to get her attention to call a mechanic. She was talking to another employee.

Page 283

**Q So, you thought you were justified in yelling at Shavonne, correct?**
A Well, you have ear plugs in your ear. It's hard to -- you've got to holler to get somebody's attention. But after this I started whistling.
**Q My question is do you feel like you were justified in hollering at Shavonne?**
A Yes, ma'am.
(Defendant's Exhibit 21 was marked for identification)
**Q We've already talked about this situation, but I'm just going to go over the written documentation with you. This is what I've marked as Defendant's Exhibit 21. I'm going to ask you if that's a copy of the Counseling Report that was given to you for using offensive language towards John -- is it Milsap or Metcalf?**
A I'm not sure.
**Q But we are talking about the guy that you claimed threw peanuts at you, correct?**

Page 284

A Yes, ma'am, a jar.
**Q A jar of peanuts. And I think you testified the last time that John was given a suspension over this incident?**
A That's what I was told.
**Q Who told you that?**
A Melvin Hutchins.
**Q We discussed both a little bit this time and the last time you were here that when you first started at Flavor House, you were not made a label operator as quickly as you would like to have been, correct?**
A I would have liked to been given the chance before people off the street.
**Q And you claim you should have been -- you were ultimately made into a label operator, correct?**
A Yes, ma'am.
**Q And your complaint is that that should have happened earlier, in your view?**
A Yes, ma'am.
**Q Were there any other positions that you claim you should have been given or**

Page 285

**promotions you claim you should have been given at Flavor House?**
A Just the label operator was all I was seeking for.
**Q And once you received that position, you were satisfied with that position?**
A Until they came out with the levels.
**Q Right. And we talked about that before.**
A Yes, ma'am.
**Q But there were no other promotions that you didn't -- that you sought but did not receive?**
A Yes, ma'am. I tried to transfer one time to line three label machine when it became open.
**Q When was that?**
A It might have been early '05.
**Q Do you know who received that position?**
A Yes, ma'am, but I don't remember

**reason for him referring you to a mental health provider?**

A Because of the things that I -- I've told him when I visit him.

**Q What things have you told him that prompted him to refer you to a mental health provider?**

A I just go from work to home. I don't go anywhere. I don't care to go anywhere. I have difficulty with men I don't know. I call the police to check on me a lot at work.

**Q At your current job?**

A Yes, ma'am. I went to work in Dothan one night, and I had my husband stay with me until I got off. I have nightmares. My husband says I scream in my sleep. And I -- I just -- with the threats that Frank made, I think that eventually he'll come after me.

**Q Have you had any contact with Frank Williams since you left your employment at Flavor House?**

A No, ma'am.

**Q To your knowledge, has Frank ever tried to call you?**

A I changed my number.

**Q To your knowledge, has Frank ever tried to call you?**

A No, ma'am.

**Q You work at a convenience store, a gas station; is that correct?**

A Yes, ma'am.

**Q And that's there in Dothan?**

A No, ma'am.

**Q Where is it?**

A In Headland.

**Q Headland?**

A Yes, ma'am.

**Q How far is that from Dothan?**

A Maybe 10 miles.

**Q Has Frank ever come to your place of business?**

A No, ma'am.

**Q Has he ever come to your home?**

A Not that I'm aware of.

**Q Have you ever run into him when you were out shopping or at a restaurant or anything like that?**

A I don't go out.

**Q So, is the answer no?**

A Yes, ma'am.

**Q And since my question may not have been very good, you have not run into Frank; is that correct?**

A No, ma'am.

**Q I'm still not getting anywhere.**

A I have not ran into Frank.

**Q There you go. Thank you. Do you know whether Flavor House did any kind of background check on you at the time that you were hired?**

A I'm not for certain. I believe they didn't start doing background checks until the new management came in.

**Q And when you say the new management came in, you mean when Mary Ann came?**

A Yes, ma'am.

**Q Okay. Do you know Flavor House's -- well, do you know at the time of your hire what Flavor House's policy was on hiring people who had criminal convictions?**

A No, ma'am.

**Q And you had a criminal conviction at the time of your hire, correct?**

A Yes, ma'am.

**Q And that was for the marijuana possession charge?**

A Yes, ma'am.

**Q And you pled guilty to that?**

A Yes, ma'am.

**Q And your original sentence was two years' probation; is that correct?**

A Original, I believe it was one year.

**Q And then it was extended at some point?**

A Yes, ma'am.

**Q Do you know why it was extended?**

A On my request.

**Q It was extended on your request?**

**not receive unemployment benefits; is that right?**

MS. ROBERTSON: Object.

A That in the state of Alabama if you are not fired is the term, then you don't receive your unemployment.

**Q Was it your understanding that they determined that you should not receive unemployment?**

A Yes, ma'am.

**Q And did you receive a copy of what I'm going to mark as Defendant's Exhibit 22 from the state of Alabama?**

**(Defendant's Exhibit 22 was marked for identification)**

A Yes, ma'am.

**Q Did you appeal this determination?**

A No, ma'am.

**Q Have you paid back the unemployment compensation benefits that you had received prior to the -- this determination?**

A No, ma'am.

**Q Has that money been requested from you?**

A Yes, ma'am.

(Defendant's Exhibit 23 was marked for identification)

**Q I'm also going to show you what I'm going to mark as Defendant's Exhibit 23 and ask you if this is a Notice of Right to Sue that you received from the EEOC.**

A Yes, ma'am.

**Q Do you recall when you received this document?**

A No, ma'am.

**Q Are you aware that your attorney requested that the EEOC issue this determination or this document?**

A Yes, ma'am.

**Q And did you request the right to sue so that you could go ahead and file a lawsuit?**

MS. ROBERTSON: Object. She didn't request it.

A I'm not sure what you are asking.

**Q Do you know why this Notice of Right to Sue was requested from the EEOC?**

MS. ROBERTSON: Don't -- don't tell her anything you might have learned from one of us, either me or Bobbie.

**Q I'm not asking about a conversation you've had with your lawyers.**

MS. ROBERTSON: Well, how else would she learn --

MR. CRUM: Who knows.

MS. SWAIN: Let her answer the questions, Ann.

MS. ROBERTSON: All right.

MS. SWAIN: If you have an objection, you can state it. You and I have both told her not to relate to me any conversation that she's had with you or Bobbie.

MS. ROBERTSON: And I'm not making an objection. I'm asserting a privilege, which is different.

MS. SWAIN: I'm well aware of

what a privilege is, and I've asked not to let me know of any conversations she's had with you or Bobbie.

A I'm -- I'm still not sure what you're asking.

**Q What my question was is whether you know why -- and you indicated that you were aware that this -- that this Notice of Right to Sue was requested, correct? It was issued on request?**

A Yes, ma'am.

**Q Do you know why the request was made?**

MS. ROBERTSON: And don't tell her if you learned from me or Bobbie.

A All I know is I went to an attorney --

**Q Well, don't tell me --**

A -- on my behalf.

**Q -- about conversations with your attorneys. Okay? So, you don't -- you don't have any idea why this was requested besides conversations with your attorneys?**

**interrogatory responses that you -- you went to Personnel Resources in September of 2006.**
A I believe so.
**Q And you began working at A.W. Herndon Oil in October of 2006?**
A Yes, ma'am.
**Q Did you make any effort to find employment between June 21st 2006 and September of 2006?**
A Yes, ma'am.
**Q What effort did you make to find employment in that time period?**
A I went to the unemployment office and on their computer. I used a friend's computer looking for jobs. I applied continuously at Redwood in Headland.
**Q What is Redwood?**
A They make furniture.
**Q Did you apply anywhere else?**
A I applied at Red Star.
**Q What is that?**
A A yeast plant.
**Q Anywhere else you applied?**

A I can't remember them all.
**Q Did you get an interview at Redwood?**
A I don't believe it was an interview. I just met the person over HR, and he told me they were slowing down.
**Q When was that?**
MR. CRUM: I don't think it's called Redwood now, is it?
MS. ROBERTSON: Object.
MR. CRUM: Just trying to help out.
A I -- I'm not sure of the dates. I know I called the secretary like every Friday.
**Q And did you interview with anybody or speak with anybody at Red Star?**
A Yes, ma'am.
**Q Who did you speak to there?**
A I don't know his name.
**Q Was that an interview?**
A Yes, ma'am.
**Q When was your interview at Red**

**Star?**
A I'm not sure.
**Q Were you offered a job there?**
A No, ma'am.
**Q Were you told why you were not offered a job?**
A I believe I didn't have the qualifications.
**Q Now, after you began working at -- well, strike that.**
**A.W. Herndon Oil, was that a gas station, also?**
A Yes, ma'am.
**Q And you began working there in October of 2006?**
A Yes, ma'am.
**Q After you began working there, did you continue to seek employment anywhere else, or were you satisfied with your position at the gas station?**
A I didn't want to leave Headland.
**Q My question was did you continue to seek other employment after you began**

**working at A.W. Herndon Oil.**
A Just looking on the computer.
**Q Did you apply for any other positions after you started working at that gas station?**
A No, ma'am. I didn't want to leave Headland.
**Q And then you stopped working in March 2007, correct --**
A Yes, ma'am.
**Q -- at A.W. Herndon Oil? And you began working at Southeastern Oil gas station in June of 2007?**
A Yes, ma'am.
**Q And you are still employed there now?**
A Yes, ma'am.
**Q Did you leave A.W. Herndon Oil voluntarily?**
A Yes, ma'am.
**Q How long -- well, let me ask you this: Were you physically unable to work when you left your employment at A.W. Herndon**

**first gas station?**
A I believe so.
**Q What kind of company is Schwinco?**
A They make hurricane windows.
**Q How do you spell it?**
A S-C-H-W-I-N-C-O.
**Q And what did you do there? What was your job?**
A It was various things. You had to take a -- it was through the unemployment office. You had to take night classes, and then they picked certain ones out of the classes.
**Q So, did you ever actually work there, or you just went to the classes?**
A I worked there.
**Q Had you already gone to the classes when you started working there?**
A You have to go through the classes before you --
**Q First?**
A Yes, ma'am.
**Q Where did you take the classes?**

A At Schwinco.
**Q Oh, the classes were there. How long were you going to classes at Schwinco?**
A I believe it was three and a half.
**Q Weeks?**
A Nights.
MS. ROBERTSON: With that buzzing over there and my bleeping, I think sometimes it gets -- you can't hear.
**Q So, you went to classes there for three and a half nights, and then you worked there for how long?**
A I believe it was a week or a week and a half.
**Q And did you leave your employment voluntarily with Schwinco?**
A Yes, ma'am.
**Q Why did you leave your employment?**
A I was un -- one, I was unable to carry the hurricane windows, to lift the hurricane windows continuously.

**Q That was part of your job?**
A Yes, ma'am. When I finished with my job, that's what we did.
**Q Who was your supervisor at Schwinco?**
A It's family owned.
**Q Any other reasons why you left your employment at Schwinco?**
A I -- I -- I wanted to be closer at home.
**Q Have you talked to Kim Perkins about your lawsuit?**
A She knows I have a lawsuit.
**Q Because you told her that?**
A Yes, ma'am.
**Q What conversations have you had with Kim Perkins about your lawsuit?**
A Just that it's been hell and that -- I want her to make sure that she understands every time she calls me and tell me something, that I call my lawyers and tel them.
**Q Have you asked Kim Perkins to**

**testify on your behalf in this lawsuit?**
A She's volunteered to.
**Q Have you asked Bruce Cassidy to testify on your behalf in this lawsuit?**
A No, ma'am.
**Q Have you talked to him since you left your employment at Flavor House?**
A Yes, ma'am.
**Q When was that?**
A Probably a month, two months after I left, Bruce would -- I called Bruce and asked him could I put him down as a reference. And he said, "Of course," and asked me how I was doing.
**Q Have you had any other conversations with Bruce since leaving Flavor House?**
A We've had two or three different conversations.
**Q Have you talked to him at all about your lawsuit?**
A No, ma'am.
**Q What about David Helms? Have you**

Page 322

**Q Okay. When was that?**
A Probably about every two weeks.
**Q So, is she a good friend of yours?**
A Yes, ma'am.
**Q Have you talked to her about your lawsuit?**
A I've said that we are -- I'm going to court.
**Q Have you asked her to testify on your behalf?**
A Yes, ma'am.
**Q And has she agreed to do that?**
A Yes, ma'am.
**Q What testimony do you think Linda Jackson could offer?**
A She also had problems with Frank Williams at work and outside of work at the Flavor House softball games.
**Q You indicate in your interrogatory responses that he threw a bat at her?**
A Yes, ma'am.

Page 323

**Q Were you present when that occurred?**
A No, ma'am.
**Q That's something you know from Linda?**
A Yes, ma'am.
**Q Any other problems that Linda had with Frank?**
A I'm not sure what all of them were. I knew that she did -- she's told me she had problems with him, and she's told me that Melvin and the supervisors were well aware of it.
**Q But you don't know the nature of her problems?**
A No, ma'am, other than the bat and something happened at work.
**Q Have you talked to John Metcalf since leaving your employment?**
A No, ma'am.
**Q Have you talked to Glenn?**
A No, ma'am.
**Q Have you talked to David Wilkerson?**

Page 324

A No, ma'am.
**Q Have you talked to Wiley Baxter?**
A Yes, ma'am.
**Q What conversation have you had with Wiley?**
A Wiley comes into the store. And the first time he came into the store, I was smiling. And he said, "I know what you are smiling at, smiling about." And I said, "No, you don't." And he said, "Yes, I do." And I said, "What am I smiling about?" And he said, "They walked old boy to the door." And I said I -- I wasn't aware of it, and that's not what I was smiling about.
**Q Have you had any other conversation with Wiley Baxter since you've left Flavor House?**
A Yes, ma'am, when he comes into the store.
**Q Anything else that was relevant to your lawsuit?**
A He said that they gave Frank Williams the option of resigning.

Page 325

**Q Anything else?**
A No, ma'am.
**Q Have you talked to Jeff Vinson since you left Flavor House?**
A Yes, ma'am.
**Q What conversation have you had with Jeff Vinson?**
A He came into the store and said that there were -- he started laughing, and he said that there sure were a lot of lawyers out there last week.
**Q When was this?**
A I'm not sure of the date.
**Q Any other conversation with Jeff Vinson about anything relating to your lawsuit?**
A No.
**Q Did Jeff Vinson tell you whether he spoke with lawyers?**
A No, ma'am.
**Q Have you talked to Ricky Smothers since you left Flavor House?**

**Q Any other conversations with Beulah Davis about anything related to your lawsuit?**

A That she expected to be paid -- they told her she would probably be called, and she expected to be paid for the day if she missed work.

**Q Anything else?**

A No, ma'am.

MS. SWAIN: Are y'all ready to take lunch?

MS. ROBERTSON: Sure. I need about an hour and 15 minutes because I haven't been able to get them to get us some food.

VIDEOGRAPHER: We are off the record. The time is 12:27.

(Lunch break was taken)

VIDEOGRAPHER: This marks the beginning of videotape number three of volume two of the deposition of Linda Thornton. The time is now 1:45 p.m.

MS. ROBERTSON: Can you tell me

the total time that she's been being deposed, please?

VIDEOGRAPHER: An hour and 43 minutes. If you need the time from the other day --

MS. ROBERTSON: Excuse me? I mean the total time from like last time.

MS. SWAIN: By my calculations, the last time -- because I added it up before today. The last time I went three hours and 42 minutes. So, I'm still good.

MS. ROBERTSON: Okay. I just wanted to have some idea. Thank you.

**Q Ms. Thornton, when you were working at Flavor House, y'all -- y'all had training every year on safety and similar items; is that correct?**

A We had meetings.

**Q You had meetings. And how long did -- those were -- strike that.**

**How many meetings would you have each year? Because I'm trying to get a sense of how long the training was each time you**

**had it.**

A Usually they made a day out of it.

**Q And during your employment at Flavor House, during those meetings you received training, as well, on sexual harassment; is that correct?**

A They told us to put them on notice and to walk away and to report it to a supervisor.

**Q That's -- that's what they told you to do during the training sessions?**

A Yes, ma'am.

**Q Okay. Did they go over the company's policy on sexual harassment?**

A They either went over it or handed it out.

**Q Okay. And how many times did you go to meetings like that that -- where the sexual harassment policy or some discussion of sexual harassment took place?**

A I'm not sure.

**Q You testified earlier that --**

**about some comments that you claimed Frank Williams made about his sex life.**

A Yes, ma'am.

**Q On how many different occasions did Frank Williams make those types of comments to you?**

A There were several occasions when he was with his wife. And then there were several occasions when he was with his new girlfriend. And then he went back to his wife, and there were more occasions.

**Q And when you say when he was with her, you don't mean he was making the comments in her presence, do you?**

A Of the girlfriend?

**Q Either of them. In other words, when he made comments about his sex life and you said he was with his wife, you mean he made those comments during a time that he was still married to his wife, correct?**

A I'm not sure if they were still married or not.

**Q Well, let me ask it to you this**

**Q Right. There was an investigation that was being performed during that time frame?**

A That's what they said.

**Q Okay. Do you know who all they spoke to during the investigation?**

A I know that they -- I believe the only one they spoke to was Frank. And they had others, including myself, write statements.

**Q Do you know who wrote statements besides you?**

A Catherine Long, Tameaka, Mary Brooks, Frank Williams, Wesley McInnis.

**Q Anybody else?**

A Vicki Cook.

**Q Did you see any of these statements at that time? In other words, before you left your employment at Flavor House, did you see any of the statements that other employees had written?**

A No, ma'am.

**Q You've seen them since?**

A Yes, ma'am.

**Q But that was as part of the litigation, correct?**

A Yes, ma'am.

MS. SWAIN: I think that's all I've got. Richard, your witness.

MR. CRUM: You think I have any questions?

EXAMINATION BY MR. CRUM:

**Q Yes, ma'am. My name is Richard Crum, and I represent Frank Williams. Okay? I don't represent Flavor House.**

A Yes, ma'am -- sir.

**Q Do you understand that?**

A Yes, sir.

**Q Some of the things that I have heard over the day and a half of our deposition I just have some questions about, because I do not know some of those details. And I just need to ask you some things about that. Is that okay?**

A Yes, sir.

**Q I heard a moment ago that you --**

**I think the question was is that when your nursing license was revoked. Did you have a nursing license?**

A Yes, sir.

**Q Was it revoked?**

A Yes, sir.

**Q Why was that?**

A I was arrested for possession of marijuana.

**Q Is that the one from 1999 or a different one?**

A I've only had one.

**Q So, that is the one from 1999?**

A Yes, sir.

**Q How much marijuana did you have?**

A A very small amount.

**Q And what happened from there with respect to your nursing license?**

A It was suspended and revoked.

**Q Did you have a hearing?**

A No. I didn't go to the hearing.

**Q You didn't contest it in any way?**

A No.

**Q Why not?**

A Because I was ashamed of what I had done. I deserved the punishment.

**Q What had you done?**

A I was a nurse and I was smoking marijuana.

**Q On the job?**

A No.

**Q Was that the first time you had smoked marijuana?**

A No.

**Q How often would you smoke marijuana?**

A At that time I was working a job seven days on and seven days off, and I would smoke some during the seven days I had off.

**Q So, frequently?**

A Some during the seven days I had off.

**Q And you -- you were arrested for that. And you said you had probation for a year?**

A Yes.

Page 346

husband -- I'm sorry. It's not the questions. It's --

MS. ROBERTSON: That's fine. He has to believe like his client did. So, he's just being his client.

MR. CRUM: Now I'm being my client; is that right?

MS. ROBERTSON: Yeah. You are bullying her like your client did. And you are doing a good job.

MR. CRUM: Thank you very much. Do y'all want to take a break while she cries?

MS. ROBERTSON: That's up to you.

MR. CRUM: Whatever you like.

MS. ROBERTSON: That's up to you. Do you want to continue to bully her, or do you want to take a break or what?

MR. CRUM: It's your client. Whatever y'all want.

MS. ROBERTSON: Do you want to --

THE WITNESS: No. I'm fine. It's not going to stop, so --

Page 347

MS. ROBERTSON: Yeah.

A My first husband, since he's six foot seven and weighs 240 pounds, no, I didn't beat the hell out of him. I defended myself.

**Q Yes, ma'am. Tell me what happened. That's what I'm trying to find out.**

A He grabbed my son out of my arms, and I wouldn't allow him to have him. And I put him down and he slapped me and he pushed me, and that's when I fought back.

**Q You put your six foot seven husband down? Is that what you're saying?**

A No. Did I say -- I did not say I put him down. I said I fought back.

**Q Okay.**

A If that took clawing his face and ripping his shirt off, so be it. And that was thrown out of court.

**Q Okay. And that was why you were arrested that time. What was the other time?**

A They were called -- me and my

Page 348

boyfriend were having a fight, and I was covered in bruises and bloody and he had slap marks. And they asked me did I want him arrested, and I said no, and they took both of us.

I do want you to understand that I'm not crying because of the answers or the questions. It's because of a man questioning me. I do want that noted.

**Q You are crying because a man is questioning you; is that right?**

A Yes, sir.

**Q Okay. Did you ever brag to anyone at Flavor House that you had a criminal record?**

A Brag?

**Q Yes, ma'am.**

A No.

**Q Why not?**

A Like I said, I was ashamed of it.

**Q Do you think that someone else might be ashamed of their criminal record?**

A I didn't hurt anybody.

Page 349

**Q That wasn't the question, ma'am.**

A He should be ashamed of it.

**Q Do you think anybody would reasonably brag about a criminal record?**

A Frank Williams would.

**Q What about you?**

A Frank Williams did.

**Q Did you?**

A Did I?

**Q Did you? Yes, ma'am.**

A Oh, no.

**Q Why not? Did you brag to other men at the plant that you could take care of yourself?**

A I can take care of myself.

**Q Yes, ma'am. Did you tell other men at the plant that?**

A I don't understand what you're asking.

**Q Did you ever tell anyone there at the plant, other men, that you could take care of yourself if you needed to?**

A I don't understand what you are

Page 354

**Q Have you ever called the police about Frank Williams for -- for any reason at all?**
A I couldn't get to a phone.
**Q That's not the question, ma'am. Have you ever called the police for any reason about Frank Williams?**
A No.
**Q Have you ever --**
A Yes. I'm sorry. I have.
**Q You have called the police about Frank Williams?**
A Yes, I have.
**Q When was that?**
A Around the time I got word that they escorted him to the door, and then after I got word that he was no longer employed at Sara Lee.
**Q You called the police department?**
A Yes, I did.
**Q The Dothan Police Department?**
A No. The Headland Police Department.

Page 355

**Q The Headland Police Department, the same one you had sued previously?**
A Yes.
**Q And what did you ask them or say to them?**
A That police officer is no longer there. Flavor House hired him.
**Q Yes, ma'am. I understand that you have a problem with that even though you worked in a completely different part of the plant.**
**My question, however, is when you called the Headland Police Department about Frank Williams, what did you say to them?**
A I asked them to come to the store. And when they came to the store, they asked me what was up. And I told them if they didn't mind, could they keep an extra eye on me, make a couple of extra rounds, because Frank Williams had made a threat that he -- if I ever cost him his job, he was going to fuck me up. And now I got the word that I had cost him his job. So, would they

Page 356

please just keep an eye out for me.
**Q Were you hesitant about calling the Headland Police Department after having sued them?**
A No.
**Q That -- that wasn't a problem for you at all?**
A No.
**Q And am I correct in understanding you haven't spoken to or seen Frank Williams since your employment with Flavor House ended?**
A No.
**Q You haven't seen him?**
A No.
**Q And something that was touched on but I don't really think was asked is you -- you've said a number of times that Frank Williams cussed at you, correct?**
A Yes.
**Q And it's also true that you cussed at him just as frequently?**
A No.

Page 357

**Q Isn't that true?**
A No.
**Q You have cussed at Frank Williams, though, haven't you?**
A I've told him to get the hell away from me.
**Q Yes, ma'am. You've told him to fuck off before, too, haven't you?**
A To get away from me, fuck off and get away from me.
**Q Yes, ma'am. Using that word is not a problem for you, is it?**
A If it's said to me.
**Q Yes, ma'am. But --**
A It's not appropriate.
**Q Using vulgar language itself is not something you try to avoid?**
MS. ROBERTSON: Object.
A Yes, it is.
**Q Would you be surprised to learn that I have heard you described as one of the most vulgar individuals that worked at the plant?**

Page 362

**Q Well, do you think he thought you were his friend?**
A I'm not his friend. He knew I wasn't his friend. My write-ups showed that I was not considered his friend.
**Q Okay. Well, why would -- I'm trying to understand why he would tell you something like that without you asking, without you saying anything, when you are telling me you told him to shut up and go away.**
MS. ROBERTSON: Object.
A You would have to ask him.
**Q So, you don't know?**
A No.
**Q I represent Army Fleet Support. Who is it that you spoke to there about a job?**
A One person was in the unemployment office at Ozark, in Ozark.
**Q What was their name, please?**
A I don't know the name.
**Q What did you tell them?**

Page 363

A And it was a man.
**Q What did you tell them about your work at Flavor House, you didn't like it, didn't want it, didn't think you could keep doing it?**
A Oh, no. I told them all that I was in an unsafe environment and that I was cussed out.
**Q Did you tell them that you cussed, too?**
A I don't cuss people out.
**Q Did you tell them about your marijuana charge?**
A If the application asked it.
**Q Who at the Flavor House plant did you get along with? Who would you say was your friend?**
A I could have gave you a list of them if I had brought my cards.
**Q Well, you said you didn't get along with Fannie Ashe, you didn't get along with any of the mechanics. You didn't get along with --**

Page 364

MS. ROBERTSON: Object.
**Q -- Frank Williams, obviously.**
A There were certain mechanics I got along with.
**Q Would you describe yourself as difficult to get along with?**
A No.
**Q Do you think you work well with people?**
A Yes. I work with the public right now.
**Q Has anyone ever told you that you were difficult with respect to working with people?**
A I'm sure Flavor House has at one point or another.
**Q Anyone besides Flavor House? Anybody else?**
A I'm not sure.
**Q Your employer now, did you tell them anything related to your criminal convictions?**
A No.

Page 365

**Q Is your employment now going to continue? Do you plan to stay there?**
A I plan on staying in Headland.
**Q Yes, ma'am. I heard that earlier. But I'm asking if you plan to stay at that convenience store where you said you work now.**
A And I also said if I had proper therapy, I might be able to get outside of Headland.
**Q And you are telling us that you don't leave Headland to go to Dothan, about eight miles away?**
A If I go, my son or my husband is with me.
**Q Yes, ma'am. But generally you try to stay in Headland?**
A Yes, sir. And the police can tell you that.
**Q How often do you talk to the police about anything?**
A Every time they come up there.
**Q Every time they come in your**

Page 370

psychologist or a psychiatrist.

**Q How long ago was that?**

A Two or three months ago. I don't know.

**Q But you canceled it and did not keep the appointment?**

A I couldn't.

**Q Why was that?**

A Because they didn't accept my insurance.

MR. CRUM: Why don't we take a break so we can try to get somewhere with this.

VIDEOGRAPHER: We are off the record. The time is 2:15 p.m.

(Short break was taken.)

VIDEOGRAPHER: We are back on the record. The time is 2:46 p.m.

**Q I don't remember what I was asking about. Anyway, Ms. -- Ms. Thornton, where were the -- the criminal charges we've discussed, were those in Henry County?**

A Yes, sir.

Page 371

**Q All of them?**

A No, sir.

**Q Tell me where they were, what counties, please, ma'am.**

A Houston County.

**Q Which -- which ones were in Houston and which one was in Henry?**

A Houston was the domestic. And then I don't know what county Midland City is in.

**Q That's a good point. I think it's in Henry.**

MR. MENDHEIM: Dale County.

**Q But the marijuana was in Dale County?**

A Henry.

**Q In Henry County.**

A In Henry County.

**Q Okay. And both domestic violence were in Houston County?**

A One was in Midland City.

**Q Okay.**

A And one was in Houston.

Page 372

**Q Okay. Thank you. You mentioned a moment ago that you had been referred I think to a psychiatrist or a female medical provider.**

A Yes.

**Q And I thought you said that you did not go because your health insurance would not cover it. Is that right?**

A They didn't -- when I -- the nurse made the appointment. And when she came back into the room, she said, "They don't take insurance." And she had written on there how much it was for the initial visit and how much it was per hour. And I told her I was going to go home and cancel it.

**Q Was the appointment with Ann McDowell?**

A I don't -- I don't believe so.

**Q Was it a psychiatrist or a doctor, if you recall?**

A I don't know.

**Q Does your -- are you on your husband's insurance?**

A Yes, sir.

**Q Is it Blue Cross?**

A Preferred Care.

**Q With Blue Cross-Blue Shield?**

A Yes, sir.

**Q We've had discussions about mechanics and how they would you said knock you out of the way and things of that sort. Would you describe yourself as having difficulty working with men?**

A No.

**Q Do you believe that in general you do not like receiving help or instructions from men?**

A No. My best teacher was a man.

**Q So, in your opinion, you have no trouble working with men in general?**

A No.

**Q And in your opinion, you have no difficulty taking any instructions?**

A No.

**Q Either from men or women?**

Page 378

**let you start over again?**

A No.

**Q She didn't tell you anything like that?**

A No.

**Q And you don't think as you sit here today that Ms. Boyer went out of her way to listen to your issues you brought to her attention and to help you?**

A No. Ms. Boyer went out of her way to take Melvin Hutchins' word on anything.

**Q How well did you get along with Melvin Hutchins?**

A I didn't have a problem with Melvin Hutchins. I had a problem with when I went to him -- for example, when I told him before this incident happened, "It's about to come to a head, I can't take this anymore, Frank and I are about to collide because I'm not taking his cussing anymore," and he said, "Well, I hope it's a tie." I believe --

**Q Well, my question was did you**

Page 379

**like Melvin Hutchins and how well did you get along with --**

MS. ROBERTSON: I think she was telling you.

MR. CRUM: Not an example of discussions with Melvin Hutchins.

**Q Did you like Melvin Hutchins?**

A I didn't like Melvin Hutchins' skills.

**Q Are you aware that Melvin Hutchins has said that you were the most difficult employee with which he has ever had to work?**

A I am sure he did.

**Q And you would disagree that you were the most difficult?**

A Yes, I would.

**Q Even though you complained almost every day about something?**

A I'll complain when I'm being cussed at, shoved. I'll complain until somebody listens.

**Q Yes, ma'am. Isn't it true that**

Page 380

**if you felt that you were being mistreated, as you've told us here during this deposition, that at any point in time you could have left the plant and gone to work somewhere else? Isn't that true?**

A I shouldn't have to. It's my civil right to be treated properly.

**Q Yes, ma'am. What's the answer to the question, please?**

A Ask it again, please.

**Q Isn't it true that at any point in time you felt you were being mistreated as you've claimed, you could have left that plant and gone to work anywhere else you wanted to?**

A I could have, but that would have been giving up.

**Q In what -- what do you mean by that?**

A I was taught to believe in what is right and to fight for what you believe is right. And if I give up, that's not an example for my son. I want him to go by an

Page 381

example.

**Q Is that why you complained every day?**

A No. I complained every day because I was mistreated.

**Q Have you complained of being mistreated in your past jobs?**

A I'm not sure.

**Q What about when you were in school, did you complain about being mistreated there?**

A In nursing school?

**Q Well, we'll take nursing school. How about nursing school? Did you feel like you were mistreated there?**

A The only time I was mistreated in nursing school was when I had a C-section. And three days later I returned back to school, and the nursing director refused to let me in because --

**Q Who was the nursing -- I'm sorry. Go ahead.**

MS. ROBERTSON: If you will let

**terminated?**

MS. ROBERTSON: Let the record reflect that she was interrupted and wasn't allowed to complete her answer.

MR. CRUM: The answer was nonresponsive to anything asked. But that's fine.

**Q Please finish.**

A I just wonder why there's a program for them to go to anger management and there's not a program for the victims on the other end of their anger.

**Q Are you finished now so I can ask another question?**

A Go right ahead.

**Q Thank you. Do you consider yourself a victim?**

A Yes.

**Q And I guess I didn't understand the answer. You do feel that the mechanics that you had problems with should be reprimanded and terminated?**

A Yes.

**Q And what about Fannie Ashe? You felt that she should be reprimanded and terminated?**

MS. ROBERTSON: Objection. She didn't say that.

**Q That's the question. Do you feel that Fannie Ashe should have been reprimand and terminated after your involvement with her?**

A Fannie Ashe was reprimanded.

**Q And do you feel that she should have been terminated?**

A Fannie Ashe didn't throw anything at me. Fannie Ashe did not cuss me out. Fannie Ashe just harassed me I believe under direction of Melvin Hutchins.

**Q And she's a woman?**

A Yes. One time Fannie Ashe bucked the system, and she was sent home.

**Q Have you ever filed a claim for social security disability?**

A No.

**Q Do you intend to at the present**

**time?**

A No.

**Q Do you feel there's any time that vulgar language would be appropriate in the work place?**

A No.

**Q When did you find out that Mr. Williams had any type of criminal conviction in his past?**

A I don't know the exact date, but it was the first year I worked there. It was common knowledge.

**Q You worked there in 2001?**

A Yes, sir.

**Q So, in 2001 you found out that Mr. Williams had a criminal conviction or convictions in his past?**

A Yes, sir.

**Q Why did you then make it your point to tell people about his criminal convictions?**

A Because I became his victim.

**Q So, for that reason you felt it**

**appropriate for you to tell as many people as possible about his criminal past?**

MS. ROBERTSON: Objection.

A I do not tell as many people as possible.

**Q You certainly told more than a few, though, didn't you?**

A No, sir.

**Q Did you enjoy telling people about his criminal past?**

A No, sir.

**Q Why did you tell anyone about his criminal past?**

A Because at the time I was his bitch, his fucking bitch.

**Q How was that?**

A You would have to ask him.

**Q My understanding from Frank Williams is that during the initial time that you were training and he was training you, that y'all got along well for the first few weeks. But you are telling us that's not the case at all?**

Page 394

**be anyone's buddy?**
A Yes. I have friends there.
**Q Would you describe yourself as a very good label operator?**
A Yes.
**Q Do you think you were the best label operator?**
A No.
**Q Do you agree that you could take some assistance to become a better label operator?**
A I learned something new every day.
**Q And some of this -- I asked you something like this. But you did have an occasion to call my client, Frank Williams, a jack ass, correct?**
A That was the kindest word I could find, if I did.
**Q What was the unkindest word that you called him?**
A I didn't.
**Q You didn't ever call him an**

Page 395

**unkind word?**
A Huh-uh.
**Q Was there ever any point in time where you referred to him as a mother fucker?**
A No, sir.
**Q That never came out of your mouth?**
A No.
**Q Do you think there are witnesses that would disagree with you?**
MS. ROBERTSON: Objection.
A I'm sure there is.
**Q Who do you think would disagree?**
A I can't say.
**Q Are you friends with Kim Perkins now?**
A Yes.
**Q Have y'all completely patched up your differences?**
MS. ROBERTSON: Wait just a minute. Do you have a headache?
THE WITNESS: No. I'm good.
MS. ROBERTSON: Are you sure?

Page 396

THE WITNESS: Yes.
MS. ROBERTSON: I'm sorry.
MR. CRUM: No. That's fine.
MS. ROBERTSON: She's -- off the record, she's got -- her blood pressure is way up. I've told her I'm not happy that she's doing this.
**Q Certainly. If you feel your blood pressure is going up, let us know. We'll be glad to take a break. Okay?**
A Yes, sir.
**Q Kim Perkins, you said that you are now friends with her?**
A We speak on the phone.
**Q How did you come to patch up your differences with Kim Perkins?**
MS. ROBERTSON: Objection.
A There -- there was no patching up to do.
**Q There never was any point in time where you were unhappy with Kim Perkins?**
A Yes.
**Q There was a point in time?**

Page 397

A Yes.
**Q Okay. And how did you go from that, being very unhappy with her, to patching things up and now speaking to her on the phone?**
A That's what friends do.
**Q Did you work things out with her and come to speak to her on the phone simply to try to assist your lawsuit?**
A No.
**Q Who did you ever tell Frank Williams was in any way convicted of sexual misconduct?**
A Tommy Nance, Mark and I were out on the patio, and Jewell heard what we were talking about and she jumped in the conversation. Calvin Lynn told me that he had looked it up and seen it on the computer years ago. Bruce Cassidy told me.
**Q Anyone else that you told of my client's sexual conviction?**
A Catherine Long. I don't know.
**Q Even after the plant personnel**

**you want me to, I'll go through them all. But since you had so many difficulties with so many people, aren't you happier now that you are not working there?**

MS. ROBERTSON: Objection.

A I got where I was. It took me five years to get where I was at Flavor House, fighting the whole way to get up on that pole.

**Q Are you happier now than you were working there? That's all I'm asking.**

A I'm safer. I can't say I'm happier.

MR. CRUM: We are running out of tape.

VIDEOGRAPHER: This ends videotape number three of volume two of the deposition of Linda Thornton. The time is 3:15 p.m.

(Short break was taken.)

VIDEOGRAPHER: This marks the beginning of videotape number four of volume two of the deposition of Linda Thornton. The

time is now 3:33 p.m.

**Q Ms. Thornton, I have a few more questions for you. We are going to be done pretty quick. Okay?**

A Yes, sir.

**Q We talked a little bit a moment ago about my client's -- you mentioned some information about my client on the web. Do you recall that? Us discussing that is all I'm getting to.**

A I recall you -- I'm sorry.

**Q Well, let me ask you about this: Did you -- did you ever --**

MS. ROBERTSON: To explain, are you talking about Jennifer asking --

THE WITNESS: Yeah.

**Q Okay. That's fine. Did -- did you ever go to the web, worldwide web, and look for information on my client?**

A At one point I had my son do it.

**Q When was that?**

A It was in the latter part after I had left Flavor House, I believe.

**Q Okay.**

A I think. I'm not for sure.

**Q But your best recollection is that the only time you went to the worldwide web --**

A I don't -- I don't know what --

**Q -- to obtain information on Mr. --**

MS. ROBERTSON: He's talking about looking for the web site.

A I don't -- see, I don't know what -- I don't have a clue what that is, world --

**Q If I said -- if I asked you to go look up information on someone on the web, you are saying you don't know how to do that?**

A No, sir.

**Q You are not very computer savvy?**

A No, sir.

**Q And that's fine. So, there was never any point in time where you tried to print anything off, so to speak, on my client?**

A No, sir.

**Q Did you ever ask anyone else to do that?**

A No, sir.

**Q You did mention your son. Did you ask him to print off anything on it, or did you just simply ask him to go to the web site?**

A I just asked him to go to the web site.

**Q And did he do that?**

A Yes, sir.

**Q And you believe that that was done after you left Flavor House?**

A I believe so.

**Q Did you ever ask anyone at Flavor House to print off information from the Internet and either give it to you or anyone else?**

A No, sir. Jewell claimed that.

**Q Jewell claimed that?**

A Yes, sir.

**Q Claimed that you asked her to do that?**

**seemed to have trouble in a lot of different areas of the plant?**

A No.

**Q And your testimony is that you moved to line three solely at your own volition. You wanted to move to line three, and you are saying you bid on the job, not that you were transferred there to get away from controversy?**

A I was not transferred there. I -- I signed up for the position in the break room on the board.

**Q On your own you are saying, not to get away from controversy. You wanted to go on your own?**

A Well, Kim and I had already had problems. That's when she showed me the paperwork. That was a problem. And I wanted to get to the can line. I had already requested one time previously to get to the can line. And when it was up again, I tried again.

**Q Who would you describe as your**

**best teacher at work with respect to I guess teaching you about the label operator job? Who -- who do you feel was your best teacher?**

A Leonard.

**Q I'm sorry. Leonard who?**

A He's dead now.

**Q Do you know his last name?**

A No, sir.

**Q But you feel like he was your best teacher?**

A Yes, sir. He --

**Q Are you -- who would you describe as your second best teacher after Leonard?**

A I didn't have any other teachers after Leonard. The people they put -- if they put anybody with me, their motto was you tell them this much, but don't give them that last little bit, because that's called job security.

**Q Did you have any trouble with Bruce Cassidy? Did you get along well with him?**

A Yes, sir.

**Q Is it your understanding that Mr. Cassidy is in some way related to Frank Williams?**

A Yes, sir. He told me that he was his uncle.

**Q As I understand it, though, you feel that Bruce Cassidy supported you in these allegations you made?**

A I -- I believe that out of a lot of things, Bruce agreed with me.

**Q Do you know what things he agreed with you on?**

A I'm not sure. Whatever I went to him with.

**Q But you feel he was a confidant or somebody you could talk to about this?**

A Yes.

**Q You mentioned earlier something about someone throwing liquid nitrogen bombs at you.**

A Yes, sir.

**Q And I'm trying to understand. How many liquid nitrogen bombs were thrown at**

**you?**

A I didn't count them. It was -- they would throw them throughout the day.

**Q Okay. Well, I guess more than one, then. You are saying multiple liquid nitrogen bombs were thrown at you?**

A At my feet.

**Q Did you ever go to the police?**

A No, sir.

**Q Were you injured in any way as a result of this?**

A No, sir.

**Q Did you think it was funny?**

A No, sir.

**Q Did you ever report it specifically?**

A Yes, sir.

**Q Did you, yourself, ever throw liquid nitrogen bombs at anyone?**

A No, sir.

**Q Did you feel that was appropriate conduct in the plant?**

A No, sir.

females. I want to be where I can call my husband and he can be there in a minute, or I can push that button that's right there in front of me and the police will be there in half a second.

**Q What does your husband do?**

A He works at Army Fleet Support.

**Q That's right. Now, that's not half a second away, though, is it? Isn't that at Ft. Rucker?**

A Sir?

**Q Isn't that at Ft. Rucker?**

A Yes, sir.

**Q So, that's a little ways away.**

A Our shifts are -- I'm off on Thursday and Friday. I work day shift on Saturday and Sunday. And I only work three hours on Monday. And Tuesday and Wednesday, I work night shift. So, he's available at all times.

**Q And I think my original question was, though, your intention at this point is to stay working there at that convenience**

**store?**

A Until I can get help. I don't need any change right now.

**Q I'm sorry. You don't need what?**

A I don't need any change right now.

**Q And you talked about a referral to a psychologist or psychiatrist by Dr. Bendinger, but you said that you were not able to keep that appointment, correct?**

A My insurance -- they didn't except my insurance.

**Q Yes, ma'am. Have you been to any other medical provider for that -- for any help at all other than Dr. Bendinger recently?**

A Just when I had to go to the hospital with chest pains.

**Q What was that in relation to? You just started having chest pains one day?**

A They said it was anxiety.

**Q Are you attempting to blame that on your lawsuit and the allegations we are**

**here about today?**

A Yes, sir.

**Q Where did you go to the hospital?**

A At the medical center.

**Q Why didn't you go to Flowers?**

A I just didn't.

**Q Isn't it closer?**

A No, sir.

**Q You went to the medical center. And who is your doctor there, your heart doctor?**

A It was the ER doctor. It wasn't my heart.

**Q Who did you see?**

A Whoever the ER doctor was.

**Q And what was your diagnosis?**

A Anxiety.

**Q What did they do for you?**

A They ran all the tests that they were supposed to run. They said it wasn't my heart, and I went home.

**Q Did they give you any medication?**

A They -- they did, but I didn't

fill them.

**Q And when was that, please, generally?**

A I'm not quite sure. Maybe four months ago.

**Q Any other medical attention which you believe in some way is related to this situation we are here about today?**

A My high blood pressure.

**Q You believe that's related to these allegations?**

A Yes, sir.

**Q When did you first get diagnosed with high blood pressure?**

A When I was at Flavor House.

**Q And who diagnosed that?**

A Dr. Bendinger. Or they checked it at Flavor House. They checked it at Flavor House for me.

**Q Have you seen any other doctors for high blood pressure other than Dr. Bendinger?**

A No, sir.

Page 426

**Q A bat?**
A A bat.
**Q Like a baseball bat?**
A Yes, sir, and told her to get the fuck off the field.
**Q She didn't like that?**
A No, sir.
**Q Did he hit her?**
A I don't believe so.
**Q What about Linda Jackson? Or was that Linda Jackson you told me about?**
A Yes, sir.
**Q Beulah Davis, what were her problems with Frank Williams?**
A I don't know the -- I don't know.
**Q Do you know where Frank Williams lives now?**
A All I know is Cowarts.
**Q Have you been to his house?**
A No, sir.
**Q Have you tried to figure out where he lives specifically?**
A No, sir.

Page 427

**Q You haven't tried to look up his specific address or find him?**
A No, sir.
**Q Do you know where he works now?**
A I did.
**Q Where?**
A I did know that he worked at Sara Lee, but that he was a -- I was told he was a no-show and a no-call.
**Q Did you have any part to play in Mr. Williams losing his job at Sara Lee?**
A No, sir.
**Q Were you glad that he lost that job?**
A No, sir. I was more comfortable knowing where he was.
**Q But now you don't know where he works?**
A No, sir.
MR. CRUM: I think that's all I have. Let me have one second.
VIDEOGRAPHER: We are off the record. The time is 3:55 p.m.

Page 428

(Short break was taken.)
MR. CRUM: That's all we have.
VIDEOGRAPHER: We are back on the record. The time is 3:58 p.m.
MR. CRUM: We have no more questions. We appreciate y'all being here today.
VIDEOGRAPHER: This ends videotape number four of volume two of the deposition -- and the deposition of Linda Thornton. The time is 3:58 p.m.

(END OF DEPOSITION)

Page 429

SIGNATURE OF WITNESS

I, ______________________, do hereby certify that on this _____ day of _________, 2008, I have read the foregoing transcript, and to the best of my knowledge it constitutes a true and accurate transcript of my testimony taken by oral deposition on March 3, 2008.

____________________
LINDA THORNTON

Subscribed and sworn to before me this ____ day of ___________, 2008.

______________________
NOTARY PUBLIC

A

**AA** 294:16
**able** 229:3 259:17 310:2,12 311:23 330:14 365:9 419:10
**accept** 288:16 370:9
**ACCR** 430:22
**accurate** 429:7
**act** 227:20
**acting** 225:4
**action** 221:7 225:19 279:18 385:9 430:17
**Adam** 227:17 231:8 241:2,3
**add** 269:13
**added** 331:9
**address** 427:2
**adds** 269:13
**adjust** 229:7 243:2
**adjustment** 227:11,13 228:4
**adjustments** 228:1
**admitted** 278:9 282:7
**advised** 319:6,10
**afraid** 344:22
**African** 266:3,4 286:2,3
**afternoon** 276:1
**age** 423:7
**agency** 295:16
**ago** 288:2 339:23 350:17 370:2,3 372:2 375:7 382:20 397:19 403:7 421:5 423:12
**agree** 262:6 376:6 394:9
**agreed** 221:14 222:1,9 250:16 250:17 322:13 412:10,11
**ahead** 299:20 345:16 361:20 381:22 382:2 386:15 409:19
**al** 221:9
**Alabama** 221:2 221:22 223:8,16 223:23 225:2,3 225:5,18 298:4 298:13 430:3
**alcohol** 303:7
**allegation** 280:2
**allegations** 412:8 419:23 421:11 423:1
**allegedly** 334:2
**allow** 312:1 347:10
**allowed** 270:23 360:4 386:4
**allowing** 383:3
**Allum** 318:7,11
**alter** 353:18
**altered** 415:10
**alternator** 343:11 343:12
**altogether** 353:13
**amended** 302:13
**American** 266:3 266:4 286:2,3
**amount** 294:5 340:16 376:22
**anger** 385:20 386:10,12
**Ann** 223:3 224:3 226:6 235:4 242:14,17,22 243:9 245:11,13 245:19 248:21 259:21 272:2 276:22 292:21 300:13 372:17
**answer** 255:23 263:19 271:19 279:11 292:5 300:12 345:16 351:20 380:8 382:3 384:19 386:4,5,20 408:3
**answers** 269:12 269:14 348:7 430:9
**anxiety** 419:21 420:17 422:23
**anybody** 230:12 232:12 236:16 237:3 239:17 240:22 241:1,11 244:4 246:20 248:15,21 249:20,23 258:17 261:20 261:22 272:6,16 272:18,20,22,23 296:17 307:17 307:17 338:15 348:23 349:3 351:18 364:18 385:22 411:16 415:2 424:12
**anymore** 253:2 342:11 378:19 378:21
**anyone's** 394:1
**Anyway** 370:20
**anywise** 430:18
**apologize** 425:12
**apparently** 352:19
**appeal** 298:17 417:10
**appealed** 297:4 416:17 417:4,5
**application** 351:13 363:14
**applied** 287:9 306:15,20,23 310:20
**apply** 256:14 306:19 309:3
**appointment** 369:19 370:6 372:10,17 419:10
**appreciate** 428:6
**appropriate** 233:3 357:15 358:22 388:4 389:1 413:21
**approximately** 221:23 423:12
**April** 282:2
**aptitude** 256:19
**areas** 410:2
**argue** 236:12
**arguing** 368:4
**argumentative** 358:2
**arguments** 244:10
**arms** 347:9
**Army** 362:16 418:7
**arrest** 305:12
**arrested** 305:10 340:8 341:20 344:15 347:22 348:4 351:9 352:5 353:11 358:10
**ashamed** 341:2 348:20,22 349:2
**Ashe** 257:15 363:21 387:1,7 387:10,13,14,15 387:18
**aside** 231:14
**asked** 268:9 271:7 273:13 280:19 301:1 316:23 317:3,12 317:14 321:12 322:10 345:5 348:3 355:15,17 356:17 363:14 375:12 386:6 394:14 398:1,18 399:3 404:13 405:8,22 406:4 407:3 408:5 416:22
**asking** 237:2 251:4 262:16 263:9 279:6 300:1,7 301:5 342:3 345:4 349:19 350:2,3 350:6,18 362:8 365:5 367:11 370:20 392:11 399:2 402:11 403:15 408:2 409:15
**ass** 231:4,23 233:1,16 250:20 266:23 394:17
**asserting** 300:21
**assign** 222:14
**assigned** 268:3 269:5
**assigning** 424:4
**assist** 397:9
**assistance** 394:10
**assists** 422:13
**assume** 267:16 336:18
**assured** 329:4
**attempt** 228:21 417:10
**attempting** 277:7 419:22
**attend** 294:11,12 294:19
**attendance** 234:20
**attention** 277:22 282:21 283:5 378:9 421:6
**attitude** 230:2 329:21
**attorney** 223:4,12 297:12 299:15 301:17
**attorneys** 223:21 225:22 301:21 301:23
**available** 414:9 418:19
**avoid** 357:17
**aware** 250:4 268:23 269:23

411:18 424:17
424:20
**calling** 230:17
231:23 233:15
246:7 250:19
356:2 368:4,7
391:6
**calls** 316:20
**calm** 401:6
423:10
**Calvin** 397:17
**cancel** 369:20
372:15
**canceled** 370:5
**Candace** 335:9
**cans** 327:18
**capable** 382:13
**car** 243:6 312:21
313:7 319:3
343:15,16
345:22
**cards** 363:19
**care** 228:21
273:10 290:9
349:13,15,22
350:5,9,17,19
373:4 374:13
384:21
**cared** 273:12
**carried** 400:13
**carry** 315:22
400:4,5,9
**carrying** 271:22
272:7,11 273:5
273:8,16,22
399:14
**case** 231:1 282:15
282:18 366:14
389:23
**cases** 280:8
**Cassidy** 227:18
227:23 246:22
258:16 272:21
317:3 392:5
397:19 411:21
412:2,7
**Catherine** 272:19
318:21,23 319:2

319:9,18 338:13
397:22
**catheterize**
415:17
**cause** 225:9
367:16 430:19
**caused** 280:20
353:12 383:20
423:11
**center** 420:4,9
**certain** 292:17
314:12 364:3
376:11
**certainly** 389:6
396:8 414:8
**certify** 225:4
429:4 430:6,15
**chain** 248:17
260:14
**chance** 284:14
312:9 358:5
377:12
**change** 400:19
401:1 419:3,5
**changed** 263:20
291:4
**channel** 400:4
**charge** 293:10
302:2,4 305:15
345:8 363:13
383:10
**charges** 345:19
370:21
**Charlene** 326:13
326:17 327:4,6
328:4
**check** 281:12
290:11 292:15
344:4
**checked** 421:17
421:18
**checklist** 281:11
**checks** 292:18
**Chenault** 326:14
326:14
**chest** 278:3
366:21 419:18
419:20

**child** 367:14
**children** 321:17
**Childs** 223:5
**choice** 344:23
**Chris** 246:1,2,11
246:15 248:19
248:20 258:16
259:13 261:19
270:4 272:17
329:3 374:12
393:6
**Christmas**
259:18,20,22
**circumstances**
345:14
**City** 371:9,21
**civil** 221:7 225:6
225:19 380:7
**civilized** 358:22
**claim** 254:2 274:6
274:19 276:9
284:15,23 285:1
296:6,20 343:21
344:2,12 387:20
423:18
**claimed** 227:10
234:18 262:22
268:2 283:22
333:1 380:13
405:19,20,22
406:4 423:23
**claiming** 232:2
265:16 274:10
279:15
**Clark** 224:2
**classes** 314:11,13
314:15,18,20,23
315:2,3,11
**clawing** 347:18
**client** 345:1 346:4
346:5,7,9,19
352:22 383:23
391:14 394:16
403:8,19 404:22
**client's** 271:13
397:21 403:7
407:8
**close** 321:5,7

414:19
**closer** 310:18
316:9 420:7
**clue** 404:12
406:17
**CNA** 415:22,23
416:1
**codes** 281:12
**Cody** 232:21
241:2 249:5
**collect** 344:4
**collide** 378:20
**come** 227:12,19
228:1,5 229:19
247:13,16
251:23 252:2
290:19 291:19
291:22 355:15
359:14 365:22
365:23 366:6
367:15 368:9
378:19 383:3
396:15 397:8
401:17 406:16
408:11 409:9
424:10,13
**comes** 318:12
324:7,19
**comfortable**
427:15
**coming** 264:20
423:14
**command** 248:18
**commencing**
221:22
**comment** 250:14
252:8 262:5
**comments** 230:9
252:11 254:2
262:2,17,22
264:1,4 265:17
276:23 333:1,6
333:14,17,19
334:2
**commissioner**
225:4 430:21
**common** 388:12
**communicating**

406:3
**comp** 343:21
344:2,11
**company** 236:21
251:6 313:13
314:3 318:8
**company's**
332:15
**compensation**
298:21 416:18
**complain** 242:8
242:16 246:2
247:9,14,22
249:2 255:7
261:17 263:22
379:20,21
381:10
**complained**
241:14,18,20
242:14 243:10
243:17,21 244:2
244:7,13,20
245:1,2,2,6,8
246:7,11,15,20
247:6 248:2,4
248:15,22,23
249:4,8,11,12
249:18,21
254:18 256:10
256:13,14,16
257:3,9,13,15
257:19,23 258:2
258:3,9,12
259:17 260:4
261:3,14 274:3
274:14,21
375:23 379:18
381:2,4,6
390:19 407:12
407:18
**complaining**
251:8 260:7,10
261:10
**complaint** 245:17
245:19 260:13
263:16 267:8
275:3,11,23
284:19 408:9

360:22 366:3,4
367:16 374:22
379:19 381:3,4
384:15 390:2,19
394:13 400:18
401:1,2 413:3
416:13 418:16
419:20 429:4,17
**days** 235:5
341:15,15,16,18
381:18
**dead** 411:6
**dealing** 417:19
**dealt** 229:15
230:15
**dean** 382:15,15
383:13
**December** 248:14
**decide** 377:19
**decided** 376:7
401:16
**decision** 417:6
**defend** 276:14
**DEFENDANT**
223:10,18
**Defendants**
221:10
**Defendant's**
224:11,12,13,14
224:15,16 267:4
267:7 281:19,22
283:10,15
298:12,14 299:5
299:8 302:9,12
**defended** 347:4
**demeanor** 270:7
**denial** 416:18
**denied** 256:16
416:21
**department**
354:19,21,23
355:1,13 356:3
**depended** 253:10
329:21 374:11
**deposed** 331:1
**deposition** 221:9
221:16 222:3,4
222:16 225:14

289:11,16
330:21 339:18
380:3 402:18,23
428:10,10,13
429:8 430:7,12
**depositions** 222:7
**describe** 364:5
373:10 374:15
374:18 394:3
410:23 411:12
**described** 231:21
250:23 251:11
251:14 357:21
**deserved** 281:4,8
282:11,14 341:3
**details** 339:19
423:17 424:7
**determination**
298:18,23
299:17
**determine** 407:7
**determined**
297:23 298:8
**diagnosed** 287:13
287:16 421:13
421:16
**diagnosis** 420:16
**diet** 423:7
**differences**
395:19 396:16
**different** 244:8
300:22 317:18
333:4 340:11
355:10 384:3
410:1
**difficult** 342:13
364:6,13 379:12
379:16
**difficulties**
401:23 402:2
**difficulty** 290:10
373:11,21
**direction** 385:18
387:16
**director** 381:19
**dirt** 260:5
**disability** 387:21
**disagree** 376:13

376:14 379:15
395:10,13
**discharged** 384:6
**disciplined**
358:18 398:6,13
398:23 399:9
**discrimination**
256:12 257:8
267:15 270:2
376:1
**discriminatory**
229:16 230:16
269:23
**discussed** 245:12
250:6 264:22
269:7 284:8
370:22 391:16
401:12
**discussing** 403:9
409:22
**discussion** 332:20
408:22
**discussions** 373:7
379:6 406:15
**disorder** 287:17
**dispute** 234:22
361:10
**District** 221:1,2
225:17,18
**Division** 221:3
225:19
**doctor** 289:2,4,6
289:19 310:3,8
311:8 369:1,10
369:14,21
372:21 420:10
420:11,12,15
423:9
**doctors** 421:20
**doctor's** 288:23
**document** 262:18
267:13 299:13
299:17
**documentation**
283:14
**dog** 385:17
**doing** 227:20
230:5 231:3

246:10 247:17
274:11 292:18
317:14 321:12
346:10 350:23
352:19 360:7,13
363:5 383:8
396:7 400:22
**domestic** 344:16
345:8,19 367:4
371:8,19
**DON** 223:20
**Donald** 232:21
241:2 249:5
**Donelson** 221:20
223:13
**door** 235:16,23
237:9 243:6,7
280:9 296:7
324:13 327:21
354:16
**Dothan** 223:23
288:9 290:15
291:11,17
303:15 312:9,11
312:16 313:5
354:21 365:12
406:1,7,16
**Dr** 289:3,7,19
369:3,8 419:8
419:15 421:17
421:21 422:20
**drop** 383:20
**dropped** 383:17
**drug** 295:1,4,7,9
295:10,18 303:7
304:14,18,23,23
305:1,3 352:9
352:12 353:2,19
415:9
**drugs** 303:7
342:18
**duly** 226:11
**duty** 367:22,22

**E**

**E** 223:1,1 224:5
224:10 430:1,1
**Eagle** 406:1,16

**ear** 283:3,4
**earlier** 263:7,11
264:7,11,16
284:20 332:23
365:5 407:11
412:18 415:8
**early** 282:1
285:20
**easier** 256:1
**eat** 313:1,2
**EEOC** 299:10,16
300:3 383:10
**effect** 222:4
**effort** 306:7,11
**eight** 365:13
**either** 275:4
300:6 332:16
333:16 373:23
405:17
**Elizabeth** 296:11
326:7
**elses** 415:14
**else's** 353:4
**emergency** 303:8
423:9
**emotionally**
287:11
**employed** 259:7
268:19 277:23
296:1,4 309:15
354:17
**employee** 265:3,7
265:10,15,19,21
265:22 267:23
277:20 278:6
282:23 368:2,3
379:12 416:2
**employees**
238:21 239:2
260:20,21 261:1
278:2 279:2,8
279:13 338:21
409:23
**employer** 342:23
364:20
**employment**
226:21 236:21
238:1 259:6

**follows** 226:12
**food** 330:15
**foot** 347:3,13
**force** 222:4
**forced** 237:18,19 238:2 279:5,7,9
**foregoing** 225:6 429:5 430:7,11
**form** 222:12 263:16 336:7 343:7 407:21,22
**forms** 406:22
**forward** 342:9
**fought** 347:12,16
**found** 388:15 417:6 425:13
**foundation** 259:11
**four** 253:10 282:20 402:22 421:4 423:12 428:9
**frame** 259:5 338:3
**Frank** 226:5 231:11 238:1,5 238:11,12,16 243:13 256:8 261:12,17 262:2 262:23 263:23 264:12 265:17 266:18,21 269:2 273:7,10 274:2 275:1 276:19 277:17 279:10 290:18,22 291:2 291:5,19 292:9 292:12 295:23 312:7,10 320:11 322:17 323:8 324:23 327:17 333:1,5 334:2 336:5 337:1,15 338:8,14 339:11 349:5,7 354:2,7 354:12 355:14 355:20 356:10 356:18 357:3 359:6 360:8 361:3,12 364:2 366:19 375:18 376:3,7 378:20 383:23 389:18 390:7,23 392:7 392:23 393:13 394:16 397:11 398:8 399:6 400:14 401:13 407:18 408:9,13 408:21 412:2 414:3,9 424:11 424:14 425:1,2 425:10,13,19,22 426:14,16
**Franklin** 225:16
**Frank's** 399:4,10
**free** 238:12
**frequent** 374:15 374:16
**frequently** 329:23 341:17 356:22
**fresh** 377:12,14 377:23 409:12 409:16
**friction** 376:19 376:21,23
**Friday** 237:17 307:15 320:8 336:15,20,23 375:11 408:1 409:14 418:16
**friend** 259:13,13 322:3 361:22 362:2,3,4,5 363:17
**friends** 394:2 395:15 396:13 397:6
**friend's** 306:14
**front** 329:4 418:4
**froze** 368:8
**Ft** 418:10,12
**fuck** 229:20 355:22 357:8,9 426:5
**fucker** 229:22 278:17 395:4
**fucking** 231:23 233:16 269:4 278:16 361:23 368:8 389:15
**full** 222:5
**funny** 413:13 424:9
**furniture** 306:18
**further** 222:1,9 417:11 430:15

**G**

**games** 322:19
**garbage** 258:4
**gas** 291:9 308:11 308:20 309:5,12 310:14,17,21 311:6,13,17 314:1 343:3
**Gene** 326:5
**general** 250:11 373:13,18
**generally** 365:16 385:22 399:22 400:8 421:3
**gentleman** 243:4 280:8 366:15
**getting** 259:19 292:11 297:4 403:10
**girl** 296:15 327:15 329:10 368:4,16
**girlfriend** 262:9 333:10,15 334:1 334:7,23
**give** 227:4 276:15 277:15 350:11 380:22 405:17 411:17 420:22
**given** 283:17 284:4,13,23 285:2 296:23 430:12
**gives** 422:1
**giving** 257:15 351:13 380:17 392:3
**glad** 396:10 427:13
**Glenn** 259:7,8,14 259:18 323:21
**glove** 416:1,2
**go** 237:6,8 257:1 259:18 283:13 290:8,9,9 292:4 292:13 294:16 299:20 302:6 310:14 312:4,5 312:9 313:2,6 314:19 320:22 326:20 332:14 332:19 340:21 342:5 345:16 359:10 361:20 362:10 365:12 365:14 372:7,15 374:6,10 380:23 381:22 382:2 385:20 386:10 386:15 391:23 392:7 397:2 401:18,20 402:1 403:18 404:13 405:6,8 406:1,6 406:13 409:19 410:15 413:8 419:17 420:3,5
**goes** 263:16 400:7
**going** 226:19 238:10 245:10 259:9 261:4 283:13,16 287:22 298:12 299:7,8 302:11 313:7,16 315:3 322:9 326:20 344:19 346:23 355:22 365:1 366:14 372:15 374:16 375:2 390:17 393:8 396:9 403:3 408:14 409:6,12 409:17
**good** 292:8 321:13 322:3 331:11 346:10 371:11 384:22 394:4 395:22
**gotten** 320:20
**grabbed** 347:9
**grounds** 222:14 236:7
**group** 259:22
**grow** 342:17
**guess** 241:14 350:13 386:19 411:1 413:4
**guilty** 293:12 375:3
**guy** 283:21 368:6
**guys** 257:9 258:9 258:13

**H**

**H** 224:10
**half** 313:1 315:5 315:12,15 339:17 374:23 392:4 418:5,9
**Hall** 227:17 231:9 241:2
**handed** 332:17
**handled** 382:16
**happen** 254:3
**happened** 239:10 246:3,4 284:20 323:17 340:17 347:7 352:12 360:21 378:18 391:12 407:8 409:9 417:1
**happening** 259:16
**happens** 312:8
**happier** 402:3,10 402:13
**happy** 232:23 384:10 396:6
**harassed** 387:15
**harassing** 390:3

**interviewed** 329:15 385:10 385:12 407:13 407:19
**intimidating** 270:7
**investigate** 302:1
**investigation** 259:9,10 263:17 337:23 338:2,6 385:12 407:7,23 409:8
**involvement** 387:8
**involving** 231:21
**irritated** 282:9,20
**issue** 299:16
**issued** 301:10
**issues** 378:8 407:9 408:17 417:19,21 422:22 425:19
**items** 331:17

J

**J** 224:2
**jack** 394:17
**Jackson** 321:20 322:16 424:17 425:22 426:10 426:11
**jail** 342:5
**James** 269:5
**Jamie** 326:2
**jar** 249:13,15 277:21 278:4 284:1,2
**Jasmine** 296:16 423:23
**Jeff** 296:12,14 325:4,8,16,19
**JEFFERSON** 430:4
**Jennifer** 223:11 226:2,19 327:16 403:15
**Jennifer's** 327:22
**jeopardize** 303:21
**Jewell** 397:15 405:19,20 406:4 406:6,10,11,19
**Joanie** 244:3,7,16 244:19,23
**job** 250:12 290:13 294:18 308:3,6 310:14 311:10 314:8 316:1,3 341:7 341:14 344:8 346:10 355:21 355:23 359:20 360:7 362:18 376:15 377:21 383:23 384:14 384:18,22 392:16,18,19,23 410:7 411:2,18 424:14 427:11 427:14
**jobs** 261:14,18 306:15 381:7
**job-scared** 358:3
**John** 249:16 283:18 284:3 323:18
**Jordan** 246:1,12 246:15 261:19 270:4 272:17 393:7
**Jr** 225:17
**jumped** 368:7,20 397:16
**June** 305:20 306:8 309:13 336:1,12,18,19 336:19
**justified** 283:2,8

K

**keep** 230:6 355:18 356:1 359:20 361:17 363:4 366:11,17 370:6 390:9,13 391:3 398:18 399:18 414:18 414:20,22,23 419:10
**keeping** 393:17
**keeps** 271:8 422:14
**kept** 390:8,15,20 393:10,16
**Kim** 240:20 316:11,17,23 376:18,19,22 395:15 396:12 396:16,21 410:16
**kin** 430:16
**kind** 252:8 256:11 259:4 288:14 289:6 292:14 312:1 314:3 329:5,21 368:22 385:8
**kindest** 394:18
**knee** 234:13
**knew** 266:8,10,11 266:13 270:8,18 270:19,19,20 271:10 273:4,8 273:11,13,13 321:14 323:10 362:3 375:14 409:10
**knife** 414:23 415:4
**knock** 373:8
**know** 226:23 227:22 230:4 232:19 238:19 238:22,23 239:4 239:13,16,17,19 239:19 240:17 241:12 242:3,5 243:20 244:6,13 245:5 246:14,17 250:17 254:10 254:13 265:20 268:10 273:7,14 274:2 285:21 286:6,14 288:22 290:11 292:14 293:1,2,21 295:23 296:3 300:2 301:2,7 301:12,16 304:10 307:14 307:20 321:16 323:4,14 324:9 328:12 334:17 334:22 335:3,18 338:5,7,11 339:19 344:5 350:10 351:16 351:19,23 352:4 352:11 353:3 362:14,22 366:15 368:12 368:13 369:23 370:4 371:9 372:22 375:13 376:3 382:3 384:8,13,17 388:10 393:5 396:9 397:22 404:6,11,15 406:11 408:7 409:5,7 411:7 412:11 423:15 423:19,20,21 426:15,15,16,18 427:4,7,17
**knowing** 427:16
**knowledge** 291:2 291:5 388:12 425:9,21 429:6
**knows** 300:11 316:13
**Kress** 223:6

L

**L** 221:13 224:10
**label** 230:23 231:4 238:14,17 243:18,21 247:3 256:15 257:2 267:17 269:3 284:11,16 285:3 285:17 286:9,9 286:12 321:9 335:11,19 394:4 394:7,10 399:17 399:21 400:2,9 400:17 411:2
**labels** 228:8 268:4,8 280:7
**language** 230:1 233:12 245:22 250:7 283:18 357:16 358:8,11 358:14,19,22 388:4
**Large** 221:19 225:3
**late** 240:3 282:1
**laughing** 232:11 325:10
**law** 221:19 223:4 223:12,21 280:16 376:6
**laws** 222:6
**lawsuit** 226:22 267:10 274:6 299:21 316:12 316:13,17 317:1 317:4,21 318:16 319:18 320:16 321:2 322:7 324:22 325:17 326:18 328:5 329:6 330:3 383:5 397:9 419:23 424:8
**lawyers** 300:8 316:21 319:14 325:11,20 326:19,22 327:7 327:8 329:1,7 329:11,14,16,17 329:19
**lawyer's** 313:6
**leading** 222:12
**Leagh** 264:23 265:5,9 318:3 398:8 399:12
**LeAnn** 221:18 225:1 430:21

234:5,21 235:1
236:22 237:16
238:3,11 240:4
240:14,16,20
241:17 242:2,5
242:12,21 244:1
244:12 246:16
246:19 252:20
253:5,19 254:19
255:3,21 256:3
258:14 260:17
261:8,14 262:13
262:19,19 263:1
264:6,9 265:12
265:18 266:15
267:11,18
268:15 272:1,3
272:5,8,13
273:3,6 274:1,5
274:9 275:19
276:11 280:5
282:3,6,10,13
283:9 284:1,18
284:21 285:12
285:16,23 286:5
286:13 287:12
287:15,18 288:5
288:10,15 289:5
289:22 290:14
291:1,7,10,12
291:16,21 292:6
292:10,23 293:5
293:8,11,13,20
294:1,21 295:3
295:6,6,13,17
296:22 297:2,9
297:11,14,18,21
298:10,16,19
299:1,4,11,14
299:18 301:11
302:15,20 303:1
303:3,5,10,13
303:16,19,22
304:5,16,20
305:6,8,13,16
306:6,10 307:18
307:22 308:4,13
308:16 309:6,10

309:14,17,20
310:15 311:4,14
311:19 313:15
313:20 314:22
315:18 316:2,15
317:5,8,22
318:2,6,9,14,17
318:20 319:7,12
319:16,19,22
320:2,5 321:8
321:19,23 322:5
322:12,14,23
323:3,6,16,20
323:22 324:2,4
324:19 325:3,6
325:21 326:1,4
326:6,8,10,12
326:15 327:5
328:6,9,13,16
330:9 332:13
333:3 334:4,10
334:16,21 335:2
335:10 336:3,22
337:7,10,12,20
337:22 338:22
339:1,4,10,13
345:18 347:6
348:17 349:1,10
349:16 351:4,7
352:16 354:5
355:8 357:7,11
357:14 358:4
365:4,16 371:4
377:16 379:23
380:8 382:3
392:20 417:18
419:13 422:4
425:8
**McDowell** 372:18
**McInnis** 227:17
230:10,22 231:8
231:22 233:14
239:14 318:18
338:14
**mean** 241:6,7
245:1,2 248:8
250:1,11 251:5
292:21 331:7

333:13,18 336:9
344:4 368:12,13
380:18 393:6
424:23
**Meaning** 256:21
**means** 344:3
**mechanic** 229:18
230:22 241:8
250:14 282:18
282:22 287:7
**mechanical** 230:5
256:18
**mechanically**
229:7,9,10
**mechanics**
227:12,15 229:2
229:5,11,15
230:1,15 231:6
231:16 232:14
232:15 238:20
239:1,22 240:6
240:9,12,18
241:16,22 242:1
242:10 243:18
243:23 244:11
244:14,22 245:1
245:11,20
246:21 247:4,8
248:16 249:21
250:9 251:1,13
251:17 256:6
287:7 363:22
364:3 373:8
385:2 386:20
**medical** 372:3
419:14 420:4,9
421:6 422:21
**medically** 310:8
**medication**
416:10,14
420:22 422:11
422:13,18
**medications**
342:20 422:1
**meet** 294:5
**meeting** 239:20
239:21 241:21
242:4 259:21

**meetings** 294:6
294:10,13,17,19
331:18,19,21
332:5,19
**Melvin** 227:18
228:6,6,10,12
231:13,15
239:20 240:23
241:15,19,20,21
245:18 246:7
247:11,17
248:19,20
249:12 252:10
254:18,21 255:9
255:11 261:19
267:3 268:9
270:4 272:15
284:7 323:12
337:11 374:11
375:13 378:11
378:14,16 379:1
379:6,7,8,10
387:16
**men** 260:21,23
274:18 290:10
349:13,17,21
350:8 367:15
373:11,15,18,23
**MENDHEIM**
223:20 371:13
**mental** 287:14,21
288:13,18,21
289:20 290:1,6
**mention** 405:4
**mentioned** 227:8
250:8 327:12
342:21 372:1
403:7 412:18
**met** 242:1 307:5
**metal** 414:22
415:1
**Metcalf** 249:16
283:19 323:18
**Middle** 221:2
225:18
**Midland** 371:9
371:21
**miles** 291:18

365:13
**Milsap** 283:19
**mind** 310:23
355:18 392:3
**minor** 376:22
**minute** 359:23
395:21 418:2
**minutes** 330:13
331:4,11
**mischaracter**
277:4
**mischaracterize**
277:5
**misconduct**
397:13
**missed** 330:7
**missing** 251:16
343:10
**misspoke** 425:12
**mistreated** 380:1
380:12 381:5,7
381:11,15,16
383:15,18
**mistreatment**
383:2
**misunderstood**
236:13
**moment** 339:23
350:16 372:2
403:6
**Monday** 320:10
401:14 418:18
**money** 299:2
**month** 317:10
**monthly** 295:17
**months** 317:10
370:3 377:18
391:1,4 393:10
421:5 423:12
**mood** 329:22
**morning** 251:23
252:4
**mother** 229:22
270:21 278:16
395:4
**motor** 343:4,11
**motto** 411:16
**mouth** 359:20

**once** 226:22 227:3 260:7,10 285:5 312:20 320:19 344:16
**ones** 241:3 314:12 371:6
**open** 243:6 285:18
**operating** 228:20
**operator** 247:3 256:15 267:17 284:11,17 285:3 286:9,10,12 335:11,17,19 394:4,7,11 399:17 400:17 411:2
**operators** 238:17 238:21 239:2 243:19,21 267:20 399:22 400:3,9
**opinion** 237:11 281:9 282:12 373:17,20
**opportunity** 257:2 414:8
**opposed** 227:5
**option** 325:1
**oral** 225:9 429:8
**order** 393:4 414:2,6,11,11
**original** 293:14 293:16 418:21
**outside** 254:7 265:6 311:21 312:2 322:18 327:21 365:9
**owned** 316:6
**Ozark** 362:20,20

**P**

**P** 221:13 223:1,1
**packer** 231:1 282:15,18
**page** 267:12 269:21 270:6 302:18 392:5 431:3
**paged** 268:8 408:11
**paid** 298:20 330:4,6
**pain** 310:3
**pains** 419:18,20
**pallets** 280:7
**Pantazis** 223:5
**paper** 258:4,8 262:5 385:9 406:21
**papers** 407:1
**paperwork** 410:18
**paragraph** 267:14 269:22 270:6
**parole** 294:14,15 294:16
**part** 233:3 262:13 281:10 316:1 339:2 355:10 403:22 427:10
**participated** 297:10
**particular** 250:14 374:22
**parties** 221:15 222:13 430:17
**parts** 229:6
**party** 259:18,20 259:23
**patch** 396:15
**patched** 395:18
**patching** 396:18 397:4
**patient** 415:18
**patio** 254:7 397:15 398:7
**pay** 342:4
**payment** 313:7
**peanuts** 278:4 283:22 284:2
**peed** 416:1,2
**penalty** 342:1
**people** 264:20 273:1 275:1 276:21 284:14 293:4 296:9 351:1,8 358:3,4 363:11 364:9,14 368:14,14 376:20 388:20 389:1,4,9 398:1 398:3 399:3,5,9 399:11 401:23 402:3 411:15 417:23 423:13 424:10
**performed** 338:2
**period** 253:17 268:12 269:2 306:12 359:19
**Perkins** 233:9 240:20 268:9 316:11,17,23 351:10 395:15 396:12,16,21
**permanent** 375:12 408:3,6
**permanently** 240:2
**person** 266:17 287:11 307:5 320:4 327:17 362:19 382:17 399:18,23 400:10
**personality** 287:17
**personnel** 295:9 295:14 306:2 313:9,19 327:17 397:23
**person's** 266:10
**phone** 297:13,17 312:7 354:4 396:14 397:5,8
**physical** 423:3
**physically** 309:22 310:12
**pick** 312:7
**picked** 314:12 327:19
**pieces** 408:10
**pipe** 414:22 415:1
**place** 246:18 248:11 263:11 291:19 318:13 332:21 388:5 401:20
**plaintiff** 221:6 223:2 226:7 270:8
**plaintiff's** 269:22
**plan** 365:2,3,5
**plant** 237:18,20 238:12,13 306:22 349:13 349:17,21 352:1 352:3,4 355:11 357:23 361:10 361:23 363:15 380:4,14 397:23 399:3,9 410:2 413:22
**plate** 400:19
**play** 427:10
**please** 225:23 226:9 272:10 331:2 356:1 362:21 367:19 371:4 377:16 380:9,10 382:8 386:8 392:19 417:17,21 421:2
**pled** 293:12
**plugs** 283:3
**pocket** 271:22 272:9,12 399:15 414:23
**Pockets** 303:15 304:4,6,11
**point** 252:17 257:16,16 293:19 311:20 364:16 371:11 380:3,11 388:20 390:6 393:18 395:3 396:20,23 403:20 404:20 418:22
**points** 234:18,19 234:20,23 236:5 236:11
**pole** 402:9
**police** 290:11 354:1,6,11,19 354:21,22 355:1 355:6,13 356:3 365:18,21 413:8 414:19 418:4
**policy** 293:3 332:15,20
**Porter** 269:5
**position** 235:10 238:9 247:1,6 253:15,21 256:15 267:16 285:6,7,22 286:7,8,12,15 308:20 410:11
**positions** 284:22 286:22 287:2 309:4
**positive** 353:8,9
**possession** 293:10 305:14 340:8
**possible** 239:9 389:2,5
**pounds** 347:3
**practice** 289:8
**Preferred** 373:4
**prescribed** 342:20
**presence** 333:14
**present** 224:1 225:22 231:20 232:4,12 242:1 323:1 334:1 387:23 417:13
**pressure** 390:17 396:5,9 416:14 421:9,14,21 422:3,14,22
**pretend** 246:10 247:17
**pretty** 273:4 275:12,17 403:4

**relating** 222:6 325:16 326:18
**relation** 353:17 419:19
**relevant** 324:21
**relieve** 238:16 408:11
**remark** 265:1
**remember** 231:18 255:15 255:19 258:19 265:21 266:9 279:23 285:23 296:18 307:1 313:22 329:2 335:16 369:18 370:19 409:19 409:22 424:2
**remind** 249:14
**repetitive** 344:19 345:3,16
**repetitiveness** 352:15
**replace** 229:6
**report** 282:1 283:17 332:9 413:15
**reported** 252:9 259:8 267:3
**reporter** 225:2 226:8,13 256:1
**represent** 226:1 339:11,12 362:16
**representing** 226:3,5,7
**represents** 430:11
**reprimand** 387:7
**reprimanded** 385:15 386:22 387:2,10
**request** 258:8 293:22,23 294:2 299:19,23 301:10,12
**requested** 299:2 299:16 300:3 301:9,22 410:20
**requests** 256:23
**required** 294:5
**requirements** 229:1
**requires** 400:20
**Reread** 343:14
**reserve** 276:23
**resign** 238:2
**resigning** 325:1
**Resource** 295:9 313:9 327:17
**Resources** 295:15 306:2 313:19
**respect** 340:18 358:18 360:18 364:13 406:10 407:8 411:1 415:8,16
**respective** 221:15
**responded** 407:23
**responding** 271:4 271:6
**response** 227:5 233:3,7 302:17 326:21
**responses** 302:13 306:1 319:5 322:21 345:10 359:4
**rest** 259:5 401:21
**restaurant** 292:2
**restraining** 414:2 414:6,11,11
**result** 413:11 430:18
**results** 409:8
**resume** 256:17,17
**retaliated** 274:11
**retaliation** 274:7 274:13 279:16 279:19,21 280:4 280:15,18,20
**retaliatory** 274:20 276:10
**return** 239:21 252:21
**returned** 381:18
**reveal** 382:6
**revoked** 294:23 340:2,5,19
**Richard** 223:19 226:4 339:6,10
**Ricky** 241:21,23 242:1 248:23 249:2,4,11,12 249:18 325:22 375:13 408:5,8
**right** 229:4 230:13,20 231:4 231:18 232:4 237:10 241:12 249:23 250:2,16 251:10,19 254:1 254:15,17 257:5 264:5 269:7 276:19 279:23 281:15 285:10 287:4 296:18 298:2 299:9,19 300:3,14 301:9 302:23 303:4,18 304:19 305:21 312:6 320:4 336:1,12,21 338:1 343:2,5 344:13 346:7 348:11 359:8 360:3 364:11 366:15,23 372:8 374:2,3,7,10 380:7,21,22 386:15 418:3,8 419:3,5
**rights** 350:21 351:3
**rim** 353:22
**ripping** 347:19
**roamed** 240:9
**Robertson** 223:3 226:6,6,15 228:2 229:17 262:15 263:21 269:17 270:13 271:3,9,14 275:14 276:20 277:3,7,12 279:17 280:14 280:21 298:3 299:22 300:4,9 300:14,20 301:14 307:10 310:22 315:8 330:12,23 331:6 331:12 336:6 343:6,13 344:18 345:2,6,15 346:3,8,14,16 346:21 347:1 351:20 352:14 352:17 353:14 357:18 358:1,6 359:23 360:3 362:12 364:1 369:5 375:4 379:3 381:23 382:5 385:6 386:2 387:4 389:3 395:11,20 395:23 396:2,4 396:17 398:15 402:5 403:14 404:9 425:4,10
**room** 303:9 352:18 372:11 410:12 423:9
**rounds** 355:19
**Rucker** 418:10 418:12
**Rule** 225:5
**rules** 222:6 225:6 269:18
**run** 229:8,21 250:21 258:11 292:1,8 345:21 420:20
**running** 230:6 253:11,13 282:15 312:10 402:14

S

**S** 221:13,13 223:1 224:10
**safe** 276:15 277:15
**safer** 402:12
**safety** 259:21 331:16
**Sara** 354:18 427:7,11
**satisfied** 285:6 308:19
**Saturday** 418:17
**savvy** 404:17
**saw** 239:14 241:8 241:9 288:7
**saying** 254:14,22 265:8,11 276:18 277:16 342:22 347:14 350:1 362:9 393:21 400:12 404:15 407:17 409:12 410:7,13 413:5
**says** 267:14 271:9 290:17
**schedule** 253:11 281:7
**school** 381:10,12 381:13,14,17,19 382:12 383:16
**Schwinco** 313:11 313:14,17,21 314:3 315:1,3 315:17 316:5,8 327:2
**Scott** 224:2
**scream** 290:17
**screwdriver** 271:22 272:7,11 273:5,9,17,22 399:15,19 400:6 400:13,16,20,22 414:20
**screwdrivers** 399:22 400:10
**scrubbing** 257:19 257:21
**second** 232:6,15 320:16 329:14

309:4 311:5,16
314:18 325:10
361:14 368:4,7
390:3,17 391:10
408:1 419:20
**starts** 302:18
**state** 221:19
225:3,23 276:23
298:4,13 300:16
430:3
**statement** 385:11
**statements**
338:10,11,18,20
**STATES** 221:1
**station** 291:9
308:12,20 309:5
309:12 310:14
310:18,21 311:6
311:13,17 314:1
343:3
**stay** 238:6 262:10
275:8,9 290:15
365:2,5,17
367:13 382:10
392:3 418:23
**stayed** 312:21
337:16
**staying** 365:3
**stenotype** 430:8
**step** 231:14
259:20
**Stephanie** 361:22
**stepmother**
424:21 425:15
425:16
**Stewart** 296:14
**stick** 375:10
**STIPULATED**
221:14 222:1,9
**stipulation** 225:7
**stipulations**
226:14
**stock** 310:5
**stood** 232:10
368:5 375:6,6
**stop** 270:1 305:9
311:6 342:15
346:23 398:1

399:3
**stopped** 309:8
342:8
**store** 291:8
318:12 324:7,8
324:20 325:9
355:16,16 365:6
366:1,7 367:16
367:21 368:15
417:15 419:1
423:15 424:13
**stores** 280:10
**stories** 384:3
391:6,10 393:11
**straight** 312:5
**street** 223:7,22
284:14
**strike** 234:2
269:8 278:22
280:11 308:10
331:20 335:22
**stuff** 407:3
**stupid** 269:5
270:20,21,23
271:13 383:21
**subject** 344:20
**subjected** 274:7
**Subscribed**
429:16
**sue** 299:10,20
300:3 301:9
**sued** 251:6 355:2
356:4
**suffered** 344:8
**sufficient** 257:3
**Sunday** 418:17
**supervision**
430:10
**supervisor** 232:6
233:11,13 247:3
269:23 316:4
327:12 328:8
332:10 351:12
**supervisors**
323:12
**Support** 362:16
418:7
**supported** 412:7

**supposed** 236:6
268:3,13 269:2
352:20 420:20
422:7
**sure** 228:17
232:10,18
234:16 244:5
245:4,8 247:2
249:19 251:14
252:23 254:8
261:23 263:5,8
263:18 266:11
267:2 276:4,6
283:20 286:20
288:8,22 295:22
300:1 301:4
304:9 307:13
308:2 311:1
316:19 321:3
323:9 325:11,14
327:23 330:12
332:22 333:21
334:13 335:5,13
335:20 336:13
344:3 352:7
364:15,19
379:14 381:8
382:7,19 384:2
395:12,23 404:2
412:13 421:4
**surfaced** 256:20
**surprised** 357:20
**suspended** 234:8
234:17 235:8,13
236:9 340:19
**suspension** 235:3
284:4
**Swain** 223:11
224:6 226:2,2
226:17,19
276:22 277:6,9
278:22 280:11
280:17,23
300:12,15,23
305:18 330:10
331:8 339:5
**swapped** 259:1
**swear** 226:9

**sworn** 226:11
429:16
**system** 303:8
305:1,4 387:19
**S-C-H-W-I-N-...**
314:6

**T**

**T** 221:13,13
224:10,10 430:1
430:1
**tag** 423:16
**take** 228:21 231:4
235:22 236:22
256:19 276:13
279:19 312:14
314:10,11,23
330:11 346:12
346:18 349:13
349:15,21 350:5
350:9,17,19
370:11 372:12
378:11,19
381:13 394:9
396:10 422:6,12
**taken** 221:18
235:3 289:13
312:19 330:18
370:16 374:13
402:20 416:10
428:1 429:8
430:7
**talk** 270:14
295:14 319:6,11
321:4 361:2,21
365:20 369:1
399:11 412:16
**talked** 230:8
241:16 243:11
244:15 245:18
249:7 256:4,5,7
257:6,17 261:13
261:13 264:12
270:12,15
283:12 285:10
316:11 317:6,20
318:1,3,7,15,18
319:20 320:20

320:23 321:3,17
321:20 322:6
323:18,21,23
324:3 325:4,22
326:2,5,7,9,13
328:14 337:11
359:11 361:5
398:19 399:12
399:14 403:6
419:7
**talking** 227:16
230:7 234:20
261:17 270:2,11
270:18 271:8
274:15,23
277:17,18,19
282:22 283:21
294:13 295:15
328:8 350:10
361:14,17
368:23 375:15
375:19,19
397:16 398:18
403:15 404:9
406:12 407:16
**talks** 264:18
**Tameaka** 319:20
338:13
**tamper** 352:12
**tampered** 304:18
352:9 353:1
**tampering** 295:1
353:2
**tape** 382:5 402:15
**taught** 380:20
**Taylor** 264:23
318:3 398:8
399:12
**teacher** 373:16
411:1,3,10,13
**teachers** 411:14
**teaching** 411:2
**team** 393:8
**telephonic** 297:8
**tell** 227:20 231:3
236:17 242:22
244:23 246:9,23
266:17 272:6,10

361:1 418:20
**tired** 242:23
  266:22
**tobacco** 249:6,9
**today** 226:20
  331:10 360:13
  378:7 416:11
  420:1 421:8
  428:7
**toe** 252:5
**told** 230:4,22
  231:3 232:21,23
  235:6 236:5,8
  236:10 237:4
  242:23 244:16
  244:19,21
  250:13 254:22
  256:18 259:14
  259:15 262:6
  264:23 265:11
  265:16 266:20
  272:2,19 273:1
  277:12 284:5,6
  290:4,5 296:2,5
  296:8 300:17
  307:6 308:5
  316:14 319:8
  320:15 321:13
  321:14 323:10
  323:11 328:23
  329:12,13,18,20
  330:5 332:8,11
  336:10 350:16
  351:1 355:17
  357:5,7 358:13
  362:10 363:6
  364:12 366:13
  372:15 377:17
  378:17 380:2
  389:6 390:9,13
  390:22 393:6,11
  396:6 397:17,19
  397:20 398:2,6
  398:13,18 401:4
  401:5,7,13
  406:12 407:21
  408:23 412:4
  422:21 423:9

424:17,20,21
425:16 426:4,11
427:8
**tolerated** 358:15
**Tom** 227:17
  230:11 231:8
  251:20,22 252:7
  252:15,19,21
  254:2,21,23
  255:2,12 256:6
**Tommy** 261:21
  262:2,21 263:23
  264:12 272:4
  390:12,22,22
  393:6 397:14
  408:8
**tool** 320:21
**tools** 399:18
**total** 331:1,7
  334:11
**touched** 356:16
**touchy** 327:13
**Tower** 221:21
  223:15
**Townsend** 282:5
  326:11
**train** 267:23
**trained** 321:8
**training** 257:4
  267:20,21 268:1
  268:3,5,11,13
  268:18,21 269:3
  331:16,23 332:6
  332:12 335:14
  389:20,20
**transcript** 429:5
  429:7 430:12
**transfer** 285:16
**transferred**
  410:8,10
**travel** 238:12
**treat** 239:5
  243:18
**treated** 230:3,18
  243:22 244:17
  250:10,18 251:7
  251:13 257:14
  260:5 261:2

281:17,18
287:19 288:13
380:7 384:16
**treating** 260:22
**treatment** 251:8
  270:1 288:17,20
**trial** 222:15
**tried** 236:12
  285:16 288:19
  289:20 291:3,6
  393:15,19 401:3
  404:20 410:21
  426:21 427:1
**trouble** 329:5
  373:18 376:10
  376:16 377:21
  382:6 410:1
  411:20
**true** 277:6 356:21
  357:1 376:8,23
  377:4 379:23
  380:5,11 390:1
  429:7 430:11
**try** 261:5 288:20
  310:13 353:21
  357:17 365:17
  370:12 393:13
  393:21,23 397:9
  407:7
**trying** 228:7
  231:2 236:15
  247:20 251:5,7
  251:13 253:16
  254:1 256:14
  259:4 263:10
  268:16 287:5
  307:11 331:22
  345:7,10,13,19
  347:7 359:1
  362:7 412:22
**Tuesday** 320:11
  401:14 418:18
**turn** 252:5
  267:12
**turned** 246:8
  275:5
**turning** 359:16
**twelve** 236:11

**twice** 261:15
  264:2 344:15,17
**two** 225:14 235:5
  252:12 258:21
  258:23 263:12
  280:7 289:10,15
  289:16 293:15
  295:11 302:17
  310:10,13
  312:21 317:10
  317:18 322:2
  328:23 329:13
  330:21 345:11
  345:12,18 367:3
  367:20 370:3
  384:2 390:4
  402:17,23 428:9
**type** 261:6 369:21
  388:8 392:15
**types** 230:8 333:5

**U**
**U** 221:13
**uh-huh** 227:6
**ultimately** 235:2
  284:16
**un** 315:21
**unable** 309:22
  315:21
**uncle** 412:5
**understand**
  227:1 228:18
  237:1 251:3
  263:19 280:16
  339:14 342:2,7
  345:10,13,20
  348:6 349:18,23
  350:1,14 355:8
  358:21 359:3
  362:7 374:5
  384:5 386:19
  393:20 407:17
  412:6,22 416:17
**understanding**
  297:3 298:7
  356:9 383:22
  384:5 389:18
  408:20 412:1

**understands**
  316:20
**understood**
  407:11 415:12
**underwent**
  353:19
**unemployment**
  296:21 297:5
  298:1,6,9,21
  306:13 313:8
  314:10 362:20
  416:18,22 417:2
  417:7
**unhappy** 396:21
  397:3
**UNITED** 221:1
**unkind** 395:1
**unkindest** 394:20
**unsafe** 237:22
  363:7
**upset** 409:15
  422:19 423:11
**upsetting** 368:19
**urine** 353:4
  415:13,16 416:4
  416:7
**use** 257:20 305:7
  385:17 400:16
  400:21
**Usual** 226:13
**usually** 264:17
  332:2
**U.S** 225:17

**V**
**vacation** 258:3,6
  258:8
**Valentine's**
  312:22
**various** 256:5,7
  274:16 278:9
  314:9
**verbally** 275:7,17
  275:21 276:3
**versus** 225:15
**Vicki** 240:20
  319:23,23 320:3
  320:3,7,8,14,18

368:7 382:22
383:13 387:17
398:21
**women** 270:9,11
373:23
**wonder** 386:9
**wondered** 384:4
**word** 329:23
354:15,17
355:22 357:11
378:11 390:23
394:18,20 395:1
**words** 237:4
238:8,20 242:10
274:12 333:16
338:18
**work** 228:8
237:21 238:10
239:15 243:2
269:6 276:16
277:16 290:8,12
290:14 291:8
303:14 309:22
310:2 311:21
312:2 313:21
314:14 318:13
322:18,18
323:17 330:7
337:2,5 343:14
343:18 344:13
363:3 364:8,10
365:7 374:5
379:13 380:4,14
388:5 393:8
397:7 400:22,23
401:19 408:15
408:15 411:1
417:23 418:16
418:17,19
**worked** 229:11
252:13 266:5
277:19 302:21
304:3 305:19
313:8,18,23
314:16 315:12
327:2 336:11
337:6 355:10
357:22 368:16

388:11,13 424:1
424:1 427:7
**working** 278:6
294:4 304:21
306:4 308:9,14
308:17 309:1,4
309:8,12 310:9
311:5,17 314:18
331:15 341:14
342:23 364:13
367:21 368:2
373:11,18
376:10,17
377:21 384:11
384:14 400:17
402:4,11 408:16
417:14 418:23
**workmen's**
343:21 344:1,11
**works** 418:7
425:15 427:4,18
**world** 404:12
**worldwide**
403:18 404:4
**worried** 245:7
**worse** 252:13
**wouldn't** 236:13
247:15 256:23
347:10 377:1,2
**write** 275:6 338:9
**write-up** 275:1
280:3,6 281:23
282:4,11
**write-ups** 280:5
281:3 362:4
**writing** 233:2
**written** 232:3,20
233:1,19,19
274:21 275:4
280:20,22
281:13,15
283:14 338:21
372:12 385:8
417:6
**wrong** 229:10
231:1 252:3
280:13 281:6
**wrote** 232:16

262:4,20 263:6
264:4 338:11
385:11 393:7
406:17,19

**X**

**X** 224:5,10

**Y**

**Yeah** 346:8 347:1
403:16
**year** 234:16
252:12,15
293:17 312:22
313:1 331:16,22
341:22 388:11
**years** 252:13
288:2 293:15
382:20 390:4
397:19 402:7
**yeast** 306:22
**yelled** 359:7
**yelling** 283:2
359:15
**yesterday** 270:12
270:14
**Young** 383:21
**y'all** 330:10
331:15,15
346:12,20
389:21 395:18
428:6

**$**

**$1,900** 417:3

**0**

**05** 248:12,14
253:23 285:20

**1**

**1:07-CV-712-...**
221:8 225:20
**1:45** 330:22
**10** 291:18
**10,000** 280:8
**10:30** 221:23
**10:34** 225:21
**11:34** 289:12

**11:47** 289:17
**12** 234:18 236:5
262:11 263:7
264:5,11
**12:27** 330:17
**134** 430:22
**14th** 336:18
**15** 252:9 288:2
330:13
**15th** 336:1,19
**16** 267:14 383:17
**16th** 336:10,12
336:20
**1600** 221:21
223:15
**19** 224:11 267:4,7
**19th** 223:7
**1987** 302:22
**1996** 302:22
304:7
**1997** 304:7
**1999** 305:17
340:10,13

**2**

**2:15** 370:15
**2:46** 370:18
**20** 224:12 269:22
281:19,22
382:19
**2001** 388:13,15
**2002** 282:2
295:21
**2005** 234:15
240:3
**2006** 305:20
306:2,5,8,9
308:15 310:19
**2007** 309:9,13
**2008** 221:22
225:8,21 429:5
429:9,18
**21** 224:13 283:10
283:15
**21st** 305:20 306:8
**22** 224:14 298:13
298:14
**226-339** 224:6

**23** 224:15 299:5,8
**2346** 223:22
**24** 224:16 302:9
302:12
**240** 347:3
**267** 224:11
**281** 224:12
**283** 224:13
**298** 224:14
**299** 224:15

**3**

**3** 221:22 225:8
267:12 302:18
429:9
**3rd** 225:20
**3:15** 402:19
**3:33** 403:1
**3:55** 427:23
**3:58** 428:4,11
**30** 225:5
**301** 223:7
**302** 224:16
**339-428** 224:7
**35203** 221:22
223:8,16
**36302** 223:23

**4**

**4** 269:21
**42** 270:6 331:11
**43** 331:3

**5**

**50** 276:7

**8**

**8** 270:6

Case 1:07-cv-00712-WKW-WC Document 1 Filed 08/06/2007 Page 1 of 15

Ralcorp Holdings 17502.0006

v. Thornton

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RECEIVED
2007 AUG -6 P 3:27
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

LINDA THORNTON,

Plaintiff,

v.

FLAVOR HOUSE PRODUCTS, INC., and FRANKLIN D. WILLIAMS, JR.,

Defendants.

Civil Action No.: 1:07cv712-WKW

JURY DEMAND

PENGAD 800-631-6989
DEFENDANT'S EXHIBIT 19

## COMPLAINT

## I. INTRODUCTION

1. This is an action for declaratory judgment, equitable relief, and money damages, instituted to secure the protection of and to redress the deprivation of rights secured through Title VII of the Act of Congress commonly known as "The Civil Rights Act of 1964," 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a (hereinafter "Title VII"), which provides for relief against discrimination in employment on the basis of sex and unlawful retaliation in relation thereto. The Plaintiff seeks compensatory and punitive damages, and requests a jury trial pursuant to 42 U.S.C. § 1981a.

## II. JURISDICTION AND VENUE

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4); 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 2000e-5(f)(3).

Case 1:07-cv-00712-WKW-WC Document 1 Filed 08/08/2007 Page 2 of 15

3. The unlawful employment practices alleged hereinbelow were committed by the Defendant within Houston County, Alabama. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(g).

4. The Plaintiff requests a jury trial on all issues pursuant to 42 U.S.C § 1981a.

## III. PARTIES

5. Plaintiff, Linda Thornton, is a female citizen of the United States, and a resident of the State of Alabama. Ms. Thornton was a former employee of the Defendant, Flavor House Products, Inc.

6. Defendant, Flavor House Products, Inc., (hereinafter "Flavor House") is an employer within the meaning of 42 U.S.C. § 2000e(a) and (b). At all times relevant to this action, Flavor House has employed at least fifteen (15) or more employees.

7. Defendant, Franklin D. Williams, Jr., (hereinafter "Williams") at all times material to this action, was employed by Flavor House, and was Plaintiff's Team Leader and direct supervisor from 2006 until her employment with Flavor House ended in June 2006.

## IV. ADMINISTRATIVE EXHAUSTION

8. The Plaintiff has satisfied all conditions precedent required pursuant to Title VII.

9. On or about September 18, 2006, Plaintiff timely filed a charge of employment discrimination with the Equal Employment Opportunities Commission, the "EEOC", (Charge # 420-2006-05107), in which she complained that the Defendants subjected her to sexual discrimination, sexual harassment, and retaliation in relation to the terms, conditions and benefits of her employment.

10. Plaintiff subsequently received an authorization to file a private action and is timely filing this complaint within ninety (90) days of receiving this authorization.

## V. STATEMENT OF FACTS AND CLAIMS

11. Plaintiff re-alleges and incorporates by reference paragraphs 1-10 above with the same force and effect as if fully set out in specific detail hereinbelow.

12. The Plaintiff, Linda Thornton, began working for Flavor House Products, Inc., on or about June 25, 2001.

13. While employed at Flavor House, the plaintiff suffered sexual discrimination, harassment and retaliation. The sexual discrimination started during the plaintiff's first year of employment with Flavor House and continued throughout her employment until she was forced to resign her position with the defendant on or about June 21, 2006, following her complaints to management of sexual discrimination and harassment.

14. During the plaintiff's first year of employment, she repeatedly tried to get a promotion to "Label Operator," but was passed over several times and the position was given to temporary male employees with less experience than the plaintiff or with no experience.

15. Also, unlike the male employees, the plaintiff was required to provide a resume listing her mechanical experience before she was given the position.

16. The discrimination continued even after the plaintiff finally received the position in that she did not receive the training that the male operators/employees received.

17. Additionally, the mechanics, all male, and other male employees made derogatory comments about the plaintiff working "in a man's job."

18. The mechanics did not like for the plaintiff to make adjustments to her machine and

Case 1:07-cv-00712-WKW-WC Document 1-5 Filed 08/06/2007 Page 4 of 15

if she took longer than 5 minutes to make adjustments, they would physically push her out of the way and make the adjustments or they would call the male supervisor over to make the adjustments. However, the male operators made adjustments that took longer than five minutes and they were not treated this way.

19. The plaintiff suffered this discriminatory treatment from the time she was put in the Label Operator position until she was forced to resign her employment.

20. The plaintiff's supervisor was aware of the discriminatory treatment; however, he did nothing to stop the discrimination.

21. The plaintiff also made numerous complaints to Marianne Boyer, Director of Operations, about the sexually discriminatory work environment that the female employees, including herself, were forced to work in on a daily basis. The plaintiff told Boyer that the mechanics, who are all male, cursed at and yelled at the female employees and that they called the female employees derogatory names. The plaintiff reported to Boyer that the male mechanics would not allow the female operators to make minor repairs on their machines, but did not say anything when male employees made the same or similar repairs.

22. Boyer's typical response to the plaintiff's complaints of sex discrimination and harassment was to tell the plaintiff that she would have to "deal with it" as she had learned to "deal with it"and to give the plaintiff examples of discrimination that she [Boyer] had do "deal with"in the company.

23. The plaintiff first worked with Frank Williams (male) in 2003 as Williams was

supposed to help the plaintiff learn how to run his machine. The plaintiff worked with Williams for three to four weeks and during that time he treated her in a sexually derogatory manner including yelling at the plaintiff, cursing at her, and calling her a "fucking stupid bitch."

24. The plaintiff complained about this sexually derogatory treatment to Melvin Hutchins, a member of management, but Hutchins told the plaintiff that Williams was the only one that knew how to run the machine so she would just have to get along with him.

25. The plaintiff did not work with Williams again until the beginning of 2006 after she had applied for and received a position as Line 3 Label Operator. Shortly after the plaintiff applied for this position, Williams was moved to the department as the Team Leader.

26. From the time Williams became the plaintiff's Team Leader in 2006 until the end her employment, Williams treated the plaintiff in a discriminatory and demeaning manner including, but not limited to, the following: yelling at her; cursing at her every day; constantly talking to the plaintiff about his sex life with his wife; talking to the plaintiff about how often he had sex, how they had sex, where they had sex, and how often they had sex; and stating that he could tell his wife was cheating on him because of the way she "felt" when they had sex. Williams was also very vocal about the fact that he was a registered sex offender.

27. The plaintiff complained about Williams and his discriminatory treatment and harassment of her many times. She complained to Hutchins and Chris Jordan, Supervisor. They told the plaintiff it would be taken care of, but to her knowledge, nothing was ever done as Williams' sexually derogatory and harassing behavior continued.

28.     A few months before the plaintiff was forced to leave her employment, she was written up or telling another employee that Williams was a registered sex offender even though Williams made this statement himself almost every day.

29.     At first the plaintiff was called in and told not to discuss Williams' history although he discussed it everyday. The plaintiff was told that the matter would be dropped, but if she discussed his criminal history again, she would be written up.

30.     A few days later, another female employee told the plaintiff that Williams was making threats to physically hurt the plaintiff. The plaintiff reported these threats to management and was then written up for allegedly discussing Williams' criminal history.

31.     The female employee that told the plaintiff about the William's threats was fired shortly afterwards.

32.     On or about June 14, 2006, the plaintiff was operating the label machine on Line Three, in her usual position.

33.     Williams took over the plaintiff's machine during her break and when she came back, the plaintiff noticed an overflow of re-work that needed to be done and a box full of bad labels that had to be re-done.

34.     As the company was having an important audit done that day, the plaintiff asked

Williams to help her with the re-work when he walked by. Williams turned around and shouted at the plaintiff that he had "better mother-fucking things to do than fucking re-work." Williams continued to yell and curse at the plaintiff and kept repeating, "God damn mother fucker" at her.

35. Williams walked to the outside of the line and continued to yell at the plaintiff. While still yelling "God damn mother-fucker" at the plaintiff, he began picking up pallets and slamming them down. He also picked up a large bag of trash and threw it.

36. By this time, a line mechanic had walked up and the plaintiff asked him several times to call a supervisor on the radio. He tried to call a couple of supervisors and was told "it will be one minute."

37. Donald Coty, the Mechanic Supervisor, walked by and the plaintiff asked him to call Melvin Hutchins. By the time Hutchins arrived, Williams had quit yelling and cursing at the plaintiff, but was still throwing pallets around and glaring at her. The plaintiff informed Hutchins that this was the last time Williams was going to lose his temper and "go off" on her by cursing and yelling at her and calling her a "God damn mother-fucker" for no apparent reason.

38. Hutchins then called Chris Jordan, Packaging Supervisor, and he came over to the plaintiff's line. Jordan inventoried the plaintiff's tool bag and then told her to come to his office that afternoon and write out a statement of what happened.

39. The plaintiff told Jordan him about William's discriminatory and harassing treatment of her and that she was tired of having to deal with Williams. Hutchins and Jordan then left to go back to the audit.

40. At three o'clock, the plaintiff went to Jordan's office and wrote out a statement.

Case 1:07-cv-00712-WKW-WC Document 1 Filed 08/06/2007 Page 8 of 35

From the Hutchins and Jordan left until three o'clock when the plaintiff went to the front office, Williams stood at her re-work table and glared at her, making the plaintiff extremely uncomfortable.

41. On or about June 15, 2006, the plaintiff returned to work and tried to do her job while avoiding Williams. Williams returned to her re-work table and glared at the plaintiff the same way he had the day before. He would also walk up close to the plaintiff's machine and stop and stare at her. When Williams was not standing at the plaintiff's re-work table or next to her machine, he would go to the filler machine and talk to Stephanie and then turn around and glare at the plaintiff from time to time during his conversation.

42. Williams' demeanor was very intimidating and because the plaintiff knew that he had a history of violence against women, she was afraid he was going to hurt her. The plaintiff was so scared of Williams that she took a screwdriver out of her tool bag and began carrying it around in her back pocket.

43. Melvin Hutchins walked by and the plaintiff told him that she was not comfortable working with Williams and that she did not feel safe around Williams. Hutchins told the plaintiff that he had read her statement and agreed that he would not feel safe either then he reassured me that the situation would be resolved.

44. Later that day, the plaintiff was moved to the Line 5 label machine; however, this was still in the same department with Williams and only a few feet away from him. This move afforded the plaintiff no protection from Williams.

45. On June 16, 2006, the plaintiff asked Hutchins if the move to Line 5 was permanent.

He told the plaintiff that he needed her on Line 5 right then and could not answer if the move was permanent.

46.     The plaintiff then asked Ricky Smothers, the Supervisor over all Supervisors, if the move was permanent and he told the plaintiff she would have to talk to Tommy (LNU) in PR. Ricky was not fully aware of the incident that had occurred between the plaintiff and Williams or of her written statement complaining about the discriminatory and harassing treatment to which she was subjected.

47.     The plaintiff was so upset that she had to clock out and go outside to calm down. Hutchins and Ricky followed her outside and told her to leave the property and come back in an hour to meet Tommy.

48.     The plaintiff waited and spoke with Tommy and Marianne Boyer, CEO, about the situation with Williams and that she did not feel safe working with Williams and had started carrying a screwdriver in her back pocket for defense purposes. Despite the plaintiff's statement and statements from witnesses, they concluded that the plaintiff had somehow "baited" Williams and that no action was to be taken.

49.     Boyer accused the plaintiff of having an issue with sexual discrimination, and that Williams would not be terminated. Recognizing that they were not going to resolve the discrimination and harassment by Frank, the plaintiff placed her badge on Tommy's desk.

50.     It was later stated that if the plaintiff had returned to work following this incident, that the plaintiff would have been written up and disciplined.

51.     Despite Plaintiff's repeated complaints of sexual harassment and discrimination, the

defendant took no disciplinary or remedial action against Williams and instead, allowed the discrimination and harassment to continue.

52. The next three scheduled work days, the plaintiff called in sick because she was too afraid to go in and face Williams. A female employee told the plaintiff that the first two days she was out, Williams asked her where the plaintiff was. On the third day, the plaintiff called Leah Allums in Personnel Resources and told her that she would not be returning because she did not feel she would be safe working with Williams.

53. As a result of the repeated acts of sexual harassment, discrimination and retaliation to which the plaintiff was subjected, she was constructively discharged by the defendant on June 21, 2006.

54. The plaintiff resigned as she could no longer physically and/or emotionally endure the discrimination, hostile work environment and repeated acts of retaliation. The plaintiff resigned under circumstances that would have caused a reasonable person to feel compelled to resign.

55. After the plaintiff was constructively discharged, Williams was written up for cursing at another female employee.

**COUNT I: TITLE VII VIOLATIONS**
**SEXUAL DISCRIMINATION, SEXUAL DISCRIMINATION**
**AND RETALIATION**

56. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 55 above with the same force and effect as if fully set out in specific detail herein below.

57. Defendant discriminated against the Plaintiff on the basis of her sex with respect to

her promotions, wages, training, discipline, and other terms, conditions and privileges of her employment as set out above, leading up to and including her constructive discharge. Plaintiff was subjected to sexual harassment which was unwelcome and so severe or pervasive as to alter the terms and conditions of her employment. The Defendant knew, or should have known, of Williams' sexual discrimination and/or sexual harassment of the Plaintiff and/or his proclivity for sexually harassing female employees, and did not take prompt, effective, remedial action.

58. The Defendant retaliated against the Plaintiff, as set out above, for her good faith actions of reporting, opposing, and/or refusing to participate in the sexually discriminating and harassing employment practices of the Defendant.

59. The conduct of the Defendant was so severe or pervasive as to create a hostile working environment for the Plaintiff.

60. All of the discrimination, harassment, and retaliation was done wilfully and with malicious and reckless disregard for the rights of the Plaintiff.

61. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for a declaratory judgment, backpay (plus interest), an injunction, and compensatory and punitive damages is her only means of securing adequate relief.

62. Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

**COUNT II: INVASION OF PRIVACY**

63. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 62 above with the

Case 1:07-cv-00712-WKW-WC Document 1 Filed 08/08/2007 Page 12 of 15

same force and effect as if fully set out in specific detail herein below.

64. This is a claim arising under the law of the State of Alabama to redress violations by Defendant Williams of the Plaintiff's right to privacy and Defendant Flavor House's ratification of that conduct.

65. The conduct of Defendant Williams, as set out above, was an invasion of Plaintiff's privacy and proximately caused Plaintiff to suffer great emotional distress for which she claims compensatory and punitive damages from the Defendants.

66. Defendant Flavor House condoned, authorized, and/or ratified Defendant Williams' conduct in that it knew or should have known of the continuing tortuous invasion of privacy of the Plaintiff and failed to stop Defendant Williams' conduct.

**COUNT III: OUTRAGE**

67. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 66 above with the same force and effect as if fully set out in specific detail hereinbelow.

68. This is a claim arising under the law of the State of Alabama to redress Defendant Williams' outrageous conduct towards the Plaintiff and Defendant Flavor House's ratification of that conduct.

69. The conduct of Defendant Williams, and other agents, officers, and servants of Defendant Flavor House, as set out above, was extreme, outrageous and beyond the boundaries of decency in civilized society, and it proximately caused Plaintiff to suffer great emotional distress for which she claims compensatory and punitive damages from the Defendants.

70. Defendant Flavor House condoned, authorized, and/or ratified Defendant

Williams' conduct, because they knew or should have known of Defendant Williams' outrageous conduct towards Plaintiff and failed to stop Defendant Williams' conduct.

**COUNT IV: NEGLIGENT AND/OR WANTON HIRING, SUPERVISION, TRAINING, AND RETENTION**

71. The Plaintiff re-alleges and incorporates by reference paragraphs 1 - 70 above with the same force and effect as if fully set out in specific detail herein below.

72. This is a claim arising under the law of the State of Alabama to redress Defendant Flavor House's negligent and/or wanton hiring, supervision, training, and retention of Defendant Williams and other employees/agents of Flavor House.

73. Defendant Flavor House negligently, wantonly and/or inappropriately hired Defendant Williams and/or negligently, wantonly and/or inappropriately failed to adequately supervise, and train Defendant Williams and other employees/agents of Defendant Flavor House. Further, Defendant Flavor House negligently and/or wantonly retained Defendant Williams which proximately caused Defendant Williams' harassment of, discrimination of and retaliation against the Plaintiff.

74. Defendant Williams' harassment, discrimination, and retaliation of the Plaintiff caused her great emotional distress for which she seeks compensatory and punitive damages against the Defendants.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1. Grant Plaintiff a declaratory judgment holding that actions of Defendant, Flavor

House, described herein above violated and continue to violate the rights of the Plaintiff as secured by Title VII.

2. Grant Plaintiff a permanent injunction enjoining Defendant Flavor House, it agents, successors, employees, attorneys and those action in concert with Defendant Flavor House and on Defendant Flavor House's behalf from continuing to violate Title VII.

3. Grant the Plaintiff an Order requiring the Defendants to make the Plaintiff whole by awarding her the position she would have occupied in the absence of sexual harassment, sex discrimination and/or retaliation (or front pay), backpay (plus interest), compensatory, punitive, and/or nominal damages, and loss of benefits.

4. The Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses.

Respectfully submitted,

**ANN C. ROBERTSON**
**TEMPLE D. TRUEBLOOD**
**Attorneys for the Plaintiff**

**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**BOBBIE S. CROOK (CRO-040)**
**Attorney for the Plaintiff**
367 South Saint Andrews Street

Case 1:07-cv-00712-WKW-WC Document 72-5 Filed 08/18/2008 Page 15 of 37

Dothan, AL 36301
(334) 671-8062

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES TRIABLE BY A JURY.**

**OF COUNSEL**

**PLAINTIFF REQUESTS THIS HONORABLE COURT TO SERVE VIA CERTIFIED MAIL UPON EACH OF THE NAMED DEFENDANTS THE FOLLOWING : SUMMONS, COMPLAINT.**

Defendants' Addresses:

Flavor House Products, Inc.
c/o Registered Agent
The Corporation Company
2000 Interstate Park Drive Ste 204
Montgomery, Alabama 36109

Franklin D. Williams, Jr.
1408 North Broad Street
Cowarts, Alabama 36321

OF COUNSEL

DEFENDANT'S EXHIBIT 20
PENGAD 800-631-6989

FLAVOR HOUSE PRODUCTS

X Counseling Report ____ Warning Report

| Employee Linda Parrish | Emp. # | Date Submitted for Approval 3-28-02 |
|---|---|---|
| Department | Shift | Date Violation Occurred 3-27-02 |
| Shift Supervisor Buck Perkins | Department Manager | |

SITUATION IN BRIEF (State violation according to Discipline & Discharge Policy):

Unnecessary raising of her voice or hollering to other Employees

DETAILS (Be specific)(See checklist on back): | Date Discussed With Employee 3/28/02

On March 27, 2002 Linda Raised her voice to Shavonne Townsend while on the line. Linda admitted that she raised her voice to her because of being very iritated with her.

ACTION TAKEN (Recommendation)(See checklist on back):

Written Counseling

COMMENTS:

It has been discussed with Linda that she is to keep self control at all Times. She is not to holler, be rude, or disrespectful to any fellow employees

EMPLOYEE: Linda Parrish

| Shift Supervisor [signature] | Date 3/28/02 | Witness | Date |
|---|---|---|---|

| Department Manager | Date | Human Resources | Date | Plant Manager | Date |
|---|---|---|---|---|---|
| Melvin Hutchins | 4-2-02 | Leigh Allums | 4-2-02 | [signature] | 4-2-02 |

NOTICE: MUST BE APPROVED BY HUMAN RESOURCES AND PLANT MANAGER

DEFENDANT'S EXHIBIT 21
PENGAD 800-631-6989

FLAVOR HOUSE PRODUCTS

X Counseling Report

____ Warning Report

| | | | |
|---|---|---|---|
| Employee Linda Parrish | Emp. # | Date Submitted for Approval | |
| Department | Shift | Date Violation Occurred | 6-25-04 |
| Shift Supervisor Larry Hatchen | | Department Manager | Melvin Hutchins |

SITUATION IN BRIEF (State violation according to Discipline & Discharge Policy):

Group I, No. 7 - The use of offensive or abusive language that offends others.

DETAILS (Be specific)(See checklist on back):

Date Discussed With Employee

On Friday June 25, 2004 at approximatly 6:00 PM Linda was struck by a bottle of peanuts tossed by John Milsap (Maintinance). She responded by using offensive language to him. He also used offensive language.

6-30-04 - Bottle of peanuts were not "tossed" - The bottle was thrown - striking me in the chest - And then was told that "When I tell you to turn the "f....." thing off - you turn it off." Very short time to think about what words to say after being hit in the chest with a bottle of peanuts. — Linda Parrish

ACTION TAKEN (Recommendation)(See checklist on back):

Group I Warning

Linda Parrish 06-30-04

| | | | | | |
|---|---|---|---|---|---|
| Shift Supervisor Larry Hatchen | Date 6-30-04 | Witness [signature] | | Date 6-30-04 | |
| Department Manager Melvin Hutchins | Date 6-30-04 | Human Resources [signature] | Date 7/1/04 | Plant Manager | Date |

NOTICE: MUST BE APPROVED BY HUMAN RESOURCES AND PLANT MANAGER

AT-9

STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
HEARINGS AND APPEALS DIVISION
MONTGOMERY, ALABAMA 36130

## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

LINDA A PARRISH
100 ARMSTRONG ST
HEADLAND AL 36345

**EMPLOYER**

FLAVOR HOUSE PRODUCTS INC
10101 WOODFIELD LN
ST LOUIS MO 63132-2922

**APPELLANT** EMPLOYER
**LOCATION** MONTGOMERY (TELEPHONE)
**OC NO.** 00-33

**DATE MAILED** 09/01/06
**CASE NO.** 08885-AT-06
**S. S. NO.** 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
**HEARING DATE** 08/23/06

**APPEARANCES AT THE HEARING:** Claimant with attorney and employer representative with hearing representative and witness

**ISSUE(S):** Voluntarily leaving most recent bona fide work without good cause connected with such work Section 25-4-78(2) Code of Alabama 1975

**FINDINGS:** This employer, with whom the claimant had most recent bona fide work, appealed an Examiner's determination on a claim for unemployment benefits

The claimant was employed with the listed employer as a machine operator from June 25, 2001, until June 16, 2006 The claimant voluntarily resigned her job due to personal differences with a coworker The claimant had worked for the employer in a general laborer's position and was later moved to a label operator position The claimant had difficulty and conflict with other coworkers and had been moved from line 1 to line 3 in September 2005, due to altercations with others on the line involving arguments and conflicts When the claimant was moved to this position, she had a conflict with the new lead person on this job The claimant made several complaints about this lead person to the employer The employer investigated her complaints and found that there was conflict on both sides The claimant and the lead person were written up for yelling at each other and name calling The claimant was found to have used profanity, as well as the lead person In regards to the final incident, the claimant came in on June 16, 2006, and spoke to the human resource manager and the director of operations regarding an ongoing complaint she had with the lead person The claimant had heard information that the lead person had things in his past that she found to be threatening to her The claimant had no direct knowledge of this and no proof of this However, she repeated rumors she heard from other employees The employer spoke to the claimant and the lead person about her allegations then told the claimant that if she could not work with the lead person, and they found no grounds to terminate his employment, she would be moved to another position The claimant was told that she would be moved to another line where she would not be under this coworker's direct supervision The claimant disagreed with this and wanted to turn in her badge on June 16, 2006 However, the employer asked her not to turn in her badge, but to go home over the weekend and think it over and let them

DEFENDANT'S EXHIBIT 22
PENGAD 800-631-6989

know of her decision The claimant did not work that day, as she indicated that she was too upset to work On Monday and Tuesday, the claimant called in to report that she would not be in due to illness On Wednesday, she called in to report that she was resigning from her job, and the claimant did not return to work

**CONCLUSIONS:** Section 25-4-78(2) of the Law requires a disqualification if an individual voluntarily leaves her most recent bona fide work without good cause connected with such work "Good cause" is defined as substantial reason, just ground for such action, adequate excuse that will bear the test of reason, and always the element of good faith The good cause reason must be work connected The claimant is found to have voluntarily quit her job due to personal conflicts with a coworker The claimant could not resolve her personal conflicts and decided it was in her best interests to leave this employment There was work available for the claimant when she voluntarily resigned her employment Therefore, the claimant is subject to a disqualification

**DECISION:** The Examiner's determination is reversed The claimant is disqualified under the provisions of Section 25-4-78(2) of the Unemployment Compensation Law effective June 25, 2006 This disqualification remains in effect until the claimant reenters insured or other acceptable employment as specified in the Law, earns wages in such employment of not less than ten times the weekly benefit amount, and is separated from such employment under nondisqualifying conditions The maximum amount of benefits to which the claimant may later become entitled is reduced by ten times the weekly benefit amount Though the claimant may satisfy the requirements set forth in the Law, and become entitled to reduced benefits at a later date, the employer's experience rating account is relieved of charges for this period of employment

Benefits paid the claimant if any, contrary to this decision, constitute an overpayment which the claimant is required to repay as provided by Section 25-4-91(d)(1)(a) of the Law

**APPEAL RIGHTS:** This decision becomes final unless an application for leave to appeal to the Board of Appeals is received in writing at the Department address above or by fax at 334-242-0539 on or before the **FINAL DATE OF September 18, 2006**

Ann C. Cook
Ann C Cook
Administrative Hearing Officer

ACC/amr

JUL-16-2007 16:05 From:CROOK & HARRELL, LLC 334 677 2872 To:205 254 1500 P.2/2

EEOC Form 161-B (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)***

To: **Linda Thornton**
**100 Armstrong Street**
**Headland, AL 36345**

From: **EEOC**
**Ridge Park Place, Ste. 2000**
**1130 22nd Street S**
**Birmingham, AL 35205**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2006-05107 | Jean McGinnis-Barrera | (205) 212-2056 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

[signature]
Delner Franklin-Thomas, District Director

8 MAY 2007
*(Date Mailed)*

Enclosure(s

cc: **J. Scott Clark, Senior Counsel and Director of Labor Relations**
**Ralcorp Holdings, Inc.**
**P. O. Box 618**
**St. Louis, MO 63188-0618**

**Bobbie S. Cook**
**Attorney and Counselor at Law**
**367 S. St. Andrews Street**
**Dothan, AL 36301**

DEFENDANT'S EXHIBIT 23
PENGAD 800-631-6989

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

**LINDA THORNTON,** *
*
**Plaintiff,** *
*
**v.** *
*
**FLAVOR HOUSE PRODUCTS, INC., and** *
**FRANKLIN D. WILLIAMS, JR.,** *
*
**Defendants.** *

**Civil Action No.:**
**1:07 cv-712-WKW**

**PLAINTIFF'S AMENDED RESPONSES TO FLAVOR HOUSE PRODUCTS, INC.'S FIRST INTERROGATORIES TO PLAINTIFF**

The plaintiff objects to each discovery request and/or interrogatory to the extent that it may be interpreted to call for the production of information that is privileged, including information protected by the attorney/client privilege and the "work product" privilege. The only information not produced for these reasons in response to Flavor House Products, Inc.'s First Interrogatories to Plaintiff includes:

1. Those documents that include correspondence or similar communications from the plaintiff to her counsel, documents prepared at the request of counsel for the plaintiff for the purpose of this litigation, and correspondence and documents created by counsel for the plaintiff and sent to the plaintiff as a part of this litigation; and,

2. Documents obtained by the plaintiff's counsel from sources other than the plaintiff that constitute attorney work product.

These answers are made by the plaintiff subject to, and without in any way waiving, or intending to waive any of the following:

i. The confidentiality of answers and/or documents produced;

ii. All questions as to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of any of the documents referred to or answers given, or the subject matter thereof, in any subsequent proceeding in or at the trial of this action or any other action.

iii. The right to object to other discovery procedures involving or relating to the subject matter of the interrogatories herein responded to; and

iv. The right at any time to revise, correct, or clarify any of the answers set forth herein or documents produced or referred to herein.

As a general matter, the plaintiff states that she is withholding any communications, such as letters, notes or memoranda, between her attorneys and her, on the basis of attorney-client and/or work product privileges. Any documents withheld on this basis would have been created after her consultation with her current attorneys or other attorneys regarding the matter, and the recipients would include only the attorneys and staff people in the attorneys' offices, and the plaintiff.

**SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES**

1. State the name, address, and telephone number of each employer (whether or not for wages, and including self-employment and independent contracting) to whom Plaintiff applied for employment of from whom Plaintiff sought employment during or subsequent to her employment with Flavor House; for each such employer, specify the date of each application or interview, the identity of the person to whom Plaintiff submitted the application and/or who conducted the interview, whether Plaintiff was offered a position, whether Plaintiff accepted a position, and the starting pay of the position for which Plaintiff applied or was offered.

**RESPONSE: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**I applied to work at Army Fleet Support, Ft. Rucker, Alabama while employed for Flavor House sometime during 2004 or 2005. I applied for this position at the unemployment office.**

**Personnel Resources, 3230 Ross Clark Circle, Dothan, AL 36303, (334) 673-3892, I worked here during September 2006, the work was temporary in nature where I may work one day and not the next. I was not even getting 30 hours per week. I left to get more stable employment with a steady income.**

**AW Herndon Oil, 1817 Montgomery Highway, Dothan, AL 36303, (334) 793-0699, cashier, $6.50 per hour x 40 hours per week, October 2006 - March 2007, the reason I left this job was that I hurt my back trying to put an alternator in my car and my doctor felt it was best for me to take some time to get better; my supervisor was Joe (LNU);**

**Southeastern Oil Gas Station, Main Street, Headland, AL, June 2007 - present, $7.00 per hour x 40 hours per week, Delle Gore is supervisor, I am a cashier.**

2. For each employer (whether or not for wages, and including self-employment and independent contracting) prior to, during or subsequent to Plaintiff's employment with Flavor House, please state the name and address of the employer, Plaintiff's supervisor(s), the dates of her employment, job title, rate of pay, the total gross interim earnings for each employer or from self-employment, and if Plaintiff is still not employed, the reason for her separation from employment.

**RESPONSE: Plaintiff objects to this interrogatory to the extent that is overly broad, unlimited in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**Flowers Hospital, 3470 West Main Street, Dothan, AL 36305, 1987-1996, LPN, supervisor was Karen Workman, rate of pay was approximately $9.00 per hour, I was terminated because I had gone to the ER as a result of a physical altercation with my boyfriend, and a drug test showed alcohol/drugs in my system.**

**Pockets, Lounge, Dothan, AL, 1996. My supervisor was the owner, Ronald Reddy. I**

**earned minimum wage + tips. My job title was bartender. I left this job because I did not like the hours (nighttime) and I was forced to walk out on this job due to drugs being done there. I was on probation at the time and did not want to jeopardize that.**

**Henry County Nursing Home, 212 Dothan Road, Abbeville, AL 36310, approximately 1997. I cannot remember my supervisor's name. My rate of pay was approximately $10.00 per hour. I was terminated because I failed a drug test.**

**Cutler Egg Products, Inc., P.O. Box 489, Abbeville, AL 36310, 2001. I did assembly line work and earned approximately $7.00 per hour. I cannot remember my supervisor's name. I was only there about 2 months and left because this job was not for me.**

**Things & Wings, 2312 S. Oates Street, Dothan, AL 36301. I worked here in 2001 immediately before working for Flavor House Products, Inc. I was a waitress and do not remember my supervisor's name. I earned $2.25 per hour + tips. I left this job because I did not like split shifts and needed to make more money.**

**Personnel Resources, P.O. Box 8186, Dothan, AL 36304, June 2001, I worked 90 days here as a temp for Flavor House Products, Inc. and then was hired on directly at Flavor House Products, Inc. When I left this job my job title was Line 3 Label Operator. Chris Jordan was my supervisor when I left. I was earning $11.90 per hour when I left and working 40-60 hours per week.**

**Flavor House Products, Inc. , June 2001 - June 21, 2006. When I left this job my job title was Line 3 Label Operator. Chris Jordan was my supervisor when I left. I was earning $11.90 per hour and working 40-60 hours per week.**

**Personnel Resources, Dothan, AL - September 2006. I did some temporary work not even getting 30 hours per week. It was a day here and a day there. I left because I needed more stable income.**

**AW Herndon Oil, cashier, $6.50 per hour x 40 hours per week, October 2006 - March 2007. I left this job because I had injured my back trying to put an alternator in my car and was on medication. My doctor felt it was best for me to take some time to get better. My supervisor was Joe (LNU).**

**Southeastern Oil Gas Station, Main Street, Headland, AL, June 2007 - present. I am a cashier and earn $7.00 per hour x 40 hours per week. Delle Gore is my supervisor.**

**I have provided this information to the best of my recollection at this time.**

3. If, during or subsequent to her employment with Flavor House, Plaintiff received

unemployment compensation, social security benefits, disability benefits, workers' compensation benefits, or any other governmental or private welfare benefit payments, state the date when the benefits were received, the total amount of benefits, and identity the person or entity providing the benefits.

**<u>RESPONSE</u>: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**I received unemployment compensation from the State of Alabama after my employment with Flavor House ended, but I have to repay it as Flavor House appealed the decision for me to receive unemployment and the decision was overturned. The approximate amount I received was $1980.00. I am not sure the dates on which I received payments. However, I am trying to locate my paperwork regarding this, and will produce it immediately if, and when located.**

4. If, during or subsequent to her employment with Flavor House, Plaintiff received any income, compensation, salary, wages, tips, gifts, winnings, revenue, renumeration of any kind other than the income described in the answers to the preceding Interrogatories and income received from Flavor House, identify each source of income, and, with respect to each source, state the total amount of income received.

**<u>RESPONSE</u>: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**I received $7,610.72 from Vanguard Fiduciary Trust Company, from my 401k savings less federal and state taxes of $1,902.68.**

5. State the full name, phone number, and last known address, giving the street number, city, state and zip code, of every person known to Plaintiff or to her attorneys who has any knowledge, or is believed to have knowledge, regarding the facts and circumstances surrounding the

incidents referred to in the Complaint and Plaintiff's alleged damages. For each person identified, provide a brief description of the information known or believed to be known by that person.

**<u>RESPONSE</u>: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence and to the extent it seeks to invade and violate the attorney client privilege and/or work product doctrine. The plaintiff objects to this interrogatory to the extent that it purports to require the plaintiff to speculate, or predict, the substance of a witness's testimony or to guess what any person knows. The plaintiff objects to this interrogatory to the extent it seeks to require the plaintiff to provide the substance of plaintiff's or plaintiff's counsel's interviews with each witness, as such would violate the work product privilege. Without waiving said objections, Plaintiff responds as follows:**

**Please see those individual set forth in the plaintiff's Initial Disclosures, as previously produced. In supplement thereto, the plaintiff provides the following:**

**Kenneth Tew, Progressive Insurance, 111 Teal Trail, Dothan, AL 36303 - Tew is the previous superintendent at Flavor House. He has knowledge about my qualifications and him making me write up a resume when I applied for the position of label operator.**

**Melvin Hutchins, c/o Defendant Flavor House; Hutchins was a supervisor and he and Tew made me write up a resume when I applied for position of label operator, I complained to him about this sexually derogatory treatment by Williams and he told me that Williams was the only one who knew how to run the machine so I would just have to get a long with him. Melvin Hutchins walked by me after I had made the written statement about the incident with Williams, and I told him that I was not comfortable working with Williams and that I did not feel safe around him. Hutchins told me that he had read my statement and agreed that he would not feel safe either. He reassured me that the situation would be resolved. One of his responses to my complaints was for me to "pray"about it and that he would not feel safe either. When I was moved to Line 5 (which was within twenty feet of Williams) I asked him if this was permanent, because I still did not feel safe. He told me that he needed me on Line 5 right then and could not answer if the move was permanent.**

**Chris Jordan c/o Defendant Flavor House, Jordan was my supervisor at the time I left. I complained to him about Williams and his discriminatory treatment and harassment many times. He told me it would be taken care of, but nothing was ever done.**

**Tommy Nance, Address Unknown; HR Department - Nance wrote me up for saying that Williams was a convicted sex offender after he had been saying it to myself and other employees;**

Marianne Boyer, c/o Defendant Flavor House; Boyer is the CEO of plant; the day I quit (Boyer been there 3 years at that time) she said all I had done during that time was complain about sexual discrimination; Thornton said she hadn't done a thing about it. She said that I "bated" Williams into talking to me that way. I told Boyer that the mechanics, who were all male, cursed at and yelled at the female employees and that they called the female employees derogatory names. I told her that the male mechanics would not allow the female operators to make minor repairs on their machines, but did not say anything when male employees made the same or similar repairs. Boyer's typical response to my complaints of sex discrimination and harassment were to tell me that she would have to "deal with it" as she had learned to "deal with it"and she would give me examples of discrimination that she had to "deal with"in the company. I spoke with Tommy and Marianne Boyer, CEO, about the situation with Williams and that I did not feel safe working with Williams and told them that I had started carrying a screwdriver in my back pocket for defense purposes. Despite my statement and statements from witnesses, they concluded that I had somehow "baited" Williams and that no action was to be taken. Boyer accused me of having an issue with sexual discrimination, and that Williams would not be terminated. Recognizing that they were not going to resolve the discrimination and harassment by Frank, I placed her badge on Tommy's desk.

Bruce Cassidy, c/o Defendant Flavor House; Cassidy is a former supervisor who became maintenance manager. He is the uncle of Frank Williams. He witnessed they way that Williams talked to me and how he treated me. He did not understand why they let Williams get away with that type of behavior. He also knew what kind of workers I was.

David Helms, Address Unknown; Helms fired me once; I had fallen over broken pallet, snagged my pants, and they sent me to a doctor. I had to have a knee brace put on and was sent back to work. Helms said that I had exceeded the he points on attendance according to the policy, so he walked me to door, took my badge and called me two days later and told me to come back to work and they paid me for those two days I was off. This was around the end of 2005 or beginning of 2006.

Leagh Taylor, Address Unknown - Taylor was fired two weeks after she told them of threats that Frank Williams made towards myself. Williams said he was going to "get" me. I was written up for talking about it. The reason they used for firing Taylor was "points."

Leagh Allum, c/o Defendant Flavor House; Allum works in the office and knows about my complaints and I had left upset on the Friday before I was forced to quit. I was told to go home and think about everything over the weekend because I wanted to quit. I called in sick Monday, Tuesday, and Wednesday and Allum left a message for me that they needed a doctor's excuse for me to come back to work. I called her and said I was quitting and could not work for a company that defended people who treated their employees that way and also a company that hires sex offenders.

Kim Perkins, 4010 Mance Newton Road, Lot 609 D, Midland City, AL 36350, (334) 983-

8347, Perkins may have witnessed Williams' behavior towards me and Perkins did witness his general inappropriate behavior. She was fired approximately 5 months ago.

Wesley McInnis, c/o Defendant Flavor House; McInnis was a mechanic at Flavor House that was written up for calling me ugly names.

Catherine Long, c/o Defendant Flavor House; Long is a witness who was about 10 feet from me when Williams was harassing me. She had been advised not to talk to me when I called her husband, who is a mechanic, to repair my car. Long is not a manager.

Tameaka (LNU), c/o Defendant Flavor House; Tameaka was at back of line and came to me after the incident happened with Williams and asked me what was Williams flipping out about. I was too upset to say anything. I had to write a statement about the incident.

Vicki Cook or Vicki Lewis, c/o Defendant Flavor House; Vickie goes by two names. I am not sure why. Perkins may have witnessed Williams' behavior towards me and Perkins did witness his general inappropriate behavior She called me after I quit telling me that Frank Williams came to her twice asking about my whereabouts. He said he was going to get me.

Linda Jackson, 307 Jeff Street, Dothan, AL 36303, 334-792-2753; Jackson had worked for Flavor House for 12 years and then had to have hip surgery. She was fired her while she was out for that. She was a witness to Frank Williams' behavior. He threw a bat at her during company softball.

John Metcalf, c/o Defendant Flavor House; Metcalf threw jar of peanuts and hit me in the chest. He was suspended for 3 days. I was given a written warning for cussing when the jar hit my chest.

Glenn (LNU), c/o Defendant Flavor House; Glenn is the previous HR/Safety person. He approached me at Christmas Party one time while I was smoking cigarette and got in my face, irate, screaming at me, saying we were not supposed to be smoking. My husband witnessed this display of how I was treated. Glenn made me sign something regarding codes saying that if I made that mistake again that I would voluntarily resign my employment.

David Wilkerson, c/o Defendant Flavor House; He is a mechanic that asked "what are they doing putting a woman in a man's job?" He thought the whole thing was funny.

Wiley Baxter, Broad Street, Headland, AL; Baxter used to be a mechanic at Flavor House. He was in a relationship with Leagh Allums and reported to me that there were lawyers at Flavor House because of me. He said that they gave Frank Williams the choice of quitting or being fired.

Frank Williams, 1408 North Broad Street, Cowarts, Alabama 36321, I first worked with Williams in 2003 as he was supposed to help me learn how to run my machine. I worked with him 3-4 weeks and during that time he treated me in a sexually derogatory manner including yelling at me, cursing at me, and calling me a "fucking stupid bitch." From the time Williams became my Team Leader in 2006 until the end my employment, he treated me in a discriminatory and demeaning manner including, but not limited to, the following: yelling at me; cursing at me every day; constantly talking to me about his sex life with his wife; talking to me about how often he had sex, how they had sex, where they had sex; and stating that he could tell his wife was cheating on him because of the way she "felt" when they had sex. Williams was also very vocal about the fact that he was a registered sex offender, which really scared me. Frank Williams was fired right after Flavor House was served with the complaint in this matter. I have heard Williams has done this to two women since I left. On or about June 14, 2006, I was operating the label machine on Line Three, in my usual position. Williams took over my machine during my break and when I came back, I noticed an overflow of re-work that needed to be done and a box full of bad labels that had to be re-done. As the company was having an important audit done that day, the I asked Williams to help me with the re-work when he walked by. Williams turned around and shouted at the me that he had "better mother-fucking things to do than fucking re-work." Williams continued to yell and curse at me and kept repeating, "God damn mother fucker" at me. Williams walked to the outside of the line and continued to yell at the plaintiff. While still yelling "God damn mother-fucker" at me, he began picking up pallets and slamming them down. He also picked up a large bag of trash and threw it. By this time, a line mechanic had walked up and I asked him several times to call a supervisor on the radio. He tried to call a couple of supervisors and was told "it will be one minute." Donald Coty, the Mechanic Supervisor, walked by and I asked him to call Melvin Hutchins. By the time Hutchins arrived, Williams had quit yelling and cursing at the me, but was still throwing pallets around and glaring at me. I informed Hutchins that this was the last time Williams was going to lose his temper and "go off" on me by cursing and yelling at me and calling me a "God damn mother-fucker" for no apparent reason. Hutchins then called Chris Jordan, Packaging Supervisor, and he came over to my line. Jordan inventoried the my tool bag and then told me to come to his office that afternoon and write out a statement of what happened. I told Jordan about William's discriminatory and harassing treatment of me and that I was tired of having to deal with his behavior. Hutchins and Jordan then left to go back to the audit. At three o'clock, I went to Jordan's office and wrote out a statement. From the time Hutchins and Jordan left until three o'clock when I went to the front office, Williams stood at my re-work table glaring at me, making me extremely uncomfortable. Williams' demeanor was very intimidating and because I knew that he had a history of violence against women, I was afraid he was going to hurt me. I was so scared of Williams that I took a screwdriver out of my tool bag and began carrying it around in my back pocket.

Jeff Vinson, c/o Defendant Flavor House; He was the first one I heard from regarding about lawyers being out at Flavor House. He is an employee and supervisor over mechanics.

Ricky Smothers, c/o Defendant Flavor House; I asked Ricky Smothers, the Supervisor



**over all Supervisors, if the move to Line 5 (after incident where I had to write statement about Williams) was permanent and he told me I would have to talk to Tommy (LNU) in PR. Smothers was not fully aware of the incident that had occurred between myself and Williams or of my written statement complaining about the discriminatory and harassing treatment to which I had been subjected. I was so upset that I had to clock out and go outside to calm down. Hutchins asked me to leave because he did not want people to see me crying. Hutchins and Smothers followed me outside and told me to leave the property and come back in an hour to meet Tommy.**

**Janie Courtney, 561 Granger Street, Cottonwood, AL 36320, 334-691-4309. She was in Quality Control at Flavor House, and complained about Frank Williams filthy mouth. He had screamed and yelled at her, too.**

**Jean (LNU), Address Unknown; She was in Quality Control at Flavor House. She is a witness to Williams' behavior.**

**Elizabeth (LNU), Address Unknown; She was in Quality Control at Flavor House. She is a witness to Williams' behavior. She is no longer employed at Flavor House.**

**Shavone (LNU), Address Unknown; Shavone had a lawsuit 2-3 years ago against Flavor House and won. Her supervisor was harassing her.**

**Charlene Chenault, Address Unknown. I have been told that Chenault has or had a sexual harassment case against Flavor House. She currently works for Mike Schmidt's Car Dealership in Dothan.**

**Beaulah Davis, 600 County Road 79, Headland, AL 36345, 334-983-5813, 334-791-8786. Davis witnessed Frank Williams behavior towards myself.**

6. Please state the name, address, and telephone number of every medical doctor, psychologist, psychiatrist, counselor, therapist or other similar health professional, and of every hospital, clinic, or other institution, from whom Plaintiff received treatment within the last ten years preceding the date of service of these interrogatories up through the date of trial in this case.

**<u>RESPONSE</u>: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**Dr. Niel Rasmusen, Headland Family Practice, 204 Holman Drive, Headland, AL -**

**general practitioner;**

**Dr. Richard L. Bendinger, Jr., 217 Dothan Road, Abbeville, AL 36310, (334) 585-6101; I began seeing Dr. Bendinger two years ago.**

**Southeastern Medical Center, 1108 Ross Clark Circle, Dothan, AL 36301, I went there in October 2007 for chest pains which were a result of anxiety due to this case.**

7. Identify each physician, psychiatrist, psychologist, therapist, counselor, other health care professional, or other care provider who examined, treated, diagnosed, consulted, or otherwise attended to Plaintiff on account of any injury she claims to have received as a result of any conduct alleged in the Complaint, and state as to each individual identified the dates and duration of examination, treatment, diagnosis, consultation or other attention, the complaints Plaintiff presented, the conduct to which Plaintiff attributed her complaint, the diagnosis provided to Plaintiff, and the prognosis provided to Plaintiff.

**RESPONSE: Dr. Richard L. Bendinger, Jr., 217 Dothan Road, Abbeville, AL 36310, (334) 585-6101; I began seeing Dr. Bendinger in 2005. I do not know the exact dates of all of my visits. He knows about the harassment I suffered at Flavor House. He knows about my stress, anxiety, and waking up crying with nightmares about Frank Williams, etc. Dr. Bendinger wants to refer me to a psychologist.**

**Southeastern Medical Center, 1108 Ross Clark Circle, Dothan, AL 36301, I went there in October 2007 for chest pains which were a result of anxiety due to this case.**

8. Identify all prescription medications or other drugs that Plaintiff has taken within the ten years preceding the date of service of these interrogatories, and state for each prescription medication identified who prescribed it, the condition for which the medication was prescribed, and the duration of the prescription and all refills.

**RESPONSE: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor**

**reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**The medications that I have taken are: Nexium (Gastric Reflux), Klonopin (medication prescribed for anxiety since this case has stirred up), Zoloft (anti-depressant that I have begun taking since my hospitalization in October 2007), Zanaflex (muscle relaxer for back that I have been taking since 2006), Durahist (medication for sinus problems that I have been prescribed twice), Paxil (anti-depressant that I took while working for Flavor House; when I stopped working there I got off of this), Lorcet (pain medication for back - I began taking this in 2006), Benacar (blood pressure medication that I began taking in 2006 and that I have not needed since I stopped working for Flavor House). All of these medications have been prescribed by Dr. Bendinger.**

9. Please provide the names, address, and telephone number of each person that Plaintiff or her attorneys have communicated with or interviewed concerning the facts and circumstances surrounding the incidents referred to in the Complaint, Plaintiff's alleged damages, Plaintiff's employment with Flavor House, or any other matter related to this lawsuit.

**<u>RESPONSE</u>: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence and to the extent it seeks to invade and violate the attorney client privilege and/or work product doctrine. Without waiving said objections, Plaintiff responds as follows:**

**Kim Perkins, 4010 Mance Newton Road, Lot 609 D, Midland City, AL 36350, (334) 983-8347.**

10. Please identify every document which Plaintiff contends support her claims.

**<u>RESPONSE</u>: Plaintiff objects to this interrogatory to the extent that is overly broad in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence and to the extent it seeks to invade and violate the attorney client privilege and/or work product doctrine. Without waiving said objections, Plaintiff responds as follows:**

**Please see documents provided in Plaintiff's Initial Disclosures, which were previously produced and bates labeled: 0001-0119.**

11.    Please identify each expert who may be called as a witness on Plaintiff's behalf at the trial of this case, or any expert used for consultation who is not expected to be called as a witness at trial if the consulting expert's work product forms a basis, either in whole or in part, of the opinions of an expert who is to be called as a witness. With respect to each expert, provide full disclosure of the information set forth in Rule 26(a)(2)(B).

**RESPONSE: The plaintiff objects to this interrogatory to the extent that it purports to require the plaintiff to predict the substance of a witness's testimony or to guess what any person knows. The plaintiff objects to this interrogatory to the extent it seeks to require the plaintiff to provide the substance of plaintiff's or plaintiff's counsel's interviews with each witness, as such would violate the work product privilege. The plaintiff will provide the defendant expert witness disclosures for trial pursuant to Rule 26 at the appropriate time according to the scheduling orders of the court; the defendant may not require the plaintiff to provide one before that time Without waiving this objection, the plaintiff states as follows:**

**None at this time.**

11.    Identify all documents and tangible things, including all tangible reports, physical models, compilations of data, demonstrative exhibits and other material prepared by an expert in anticipation of the expert's trial and/or deposition testimony in this case.

**RESPONSE: The plaintiff objects to this interrogatory to the extent that it purports to require the plaintiff to predict the substance of a witness's testimony or to guess what any person knows. The plaintiff objects to this interrogatory to the extent it seeks to require the plaintiff to provide the substance of plaintiff's or plaintiff's counsel's interviews with each witness, as such would violate the work product privilege. The plaintiff will provide the defendant expert witness disclosures for trial pursuant to Rule 26 at the appropriate time according to the scheduling orders of the court; the defendant may not require the plaintiff to provide one before that time Without waiving this objection, the plaintiff states as follows:**

**None at this time.**

12.    List each specific item of damages Plaintiff contends she is entitled to recover in this lawsuit. Include the type of damages (i.e., lost wages, medical expenses, liquidated damages, etc.), the amount, the source, (e.g., medical expense owed or paid to a particular hospital), and the date(s)

the alleged item of damage was incurred.

**RESPONSE: The plaintiff objects to this interrogatory in that it is vague, overly broad, and to the extent it seeks to invade and violate the attorney client privilege and/or work product doctrine. Notwithstanding and without waiving said objections, Plaintiff responds as follows:**

**I will seek my lost wages (backpay) from the date I was constructively discharged and the value of corresponding benefits. A preliminary backpay chart is submitted herewith. I will also seek compensatory damages for the emotional and mental suffering I have experienced as a result of the unlawful actions of the defendant and will seek punitive damages in relation to the unlawful actions of the defendant in amounts to be determined by the jury. I will also seek reasonable attorneys' fees and expenses incurred on my behalf in this matter.**

13. If Plaintiff has been a party, a witness, or debtor, to any other lawsuit, mediation, arbitration, administrative proceeding, or charge, please state the name(s) of the plaintiff(s) and defendant(s), the court or agency in which the lawsuit or charge was filed, the date it was filed, and the nature of the lawsuit or charge.

**RESPONSE: Plaintiff objects to this interrogatory to the extent that is overly broad, unlimited in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**The present suit.**

**I was a plaintiff in lawsuit (around 2002) against Officer Jameson and the Headland Police Department for holding my children on ground at nighttime with shotgun. The officer thought my children had a gun, but they were shooting bottle rockets. Jameson cannot be a police officer ever again. The case was dismissed after depositions. The case was filed in Headland County.**

**I have been sued by two creditors, Chase Credit & Army Aviation, both in Houston County for debts. My credit was good when I worked for Flavor House, but since then I have been unable to pay all of my bills on time.**

14. If plaintiff has ever been arrested or convicted for a misdemeanor or felony, state the date, place and charges made in connection with each such arrest, and the ultimate disposition or current status of the charges.

**RESPONSE: Plaintiff objects to this interrogatory to the extent that is overly broad, unlimited in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**I was arrested for possession of marijuana (misdemeanor) approximately ten years ago in Henry County, Alabama. I was on probation for a year, and had to pay fines of approximately $100 or a little more.**

**I was arrested for domestic violence charge with my ex-husband, Mylan Owens. This was over then years ago, but I cannot remember exactly when. It was thrown out of court.**

15. Please state whether, at any time during or after her employment with Flavor House, Plaintiff ever recorded information in any form, including, but not limited to, diaries, journals, logs, calendars, notes, or memoranda, referring and/or relating to her claims and/or employment with Flavor House, and identify for each such record:

(a) the format of the record;

(b) the date the record was made;

(c) the facts contained in the record;

(d) the current location of the record.

**RESPONSE: Plaintiff objects to this interrogatory to the extent that is overly broad, unlimited in temporal scope and seeks information which is not relevant or material to the case at hand nor reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving said objections, Plaintiff responds as follows:**

**During my employment at Flavor House, I kept random notes about things that were going on. I do not know where these notes are, or if I still even have them, but am looking for them.**

16. Please identify all persons who have either answered or assisted in answering these Interrogatories. As to each individual identified, indicate the interrogatories he or she answered, or with respect to which he or she participated in answering, or provide factual information used in

answering.

**RESPONSE: Plaintiff objects to this interrogatory to the extent it seeks to invade and violate the attorney client privilege and/or work product doctrine. Without waiving said objections, Plaintiff responds as follows:**

**My attorneys and their office staff helped type up my answers.**

As to the Interrogatory Responses,

Linda Thornton

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE 12th DAY OF November, 2007.

Notary Public
My Commission Expires:

SEAL

As to the objections,
Respectfully submitted,

Ann C. Robertson
Temple D. Trueblood
Counsel for Plaintiff

**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**CO- COUNSEL:**
Bobbie Crook
367 S. St. Andrews St.
Dothan, Alabama 36301
334-681-8062

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon the following via e-mail correspondence and via first class U.S. Mail, postage pre-paid and properly addressed to:

Anderson B. Scott
Christine E. Howard
Fisher & Phillips, LLP
945 East Paces Ferry Road
Atlanta, GA 30326

Christopher W. Weller
Capell & Howard, P.C.
150 South Perry Street
Montgomery, AL 36104

on this the 14th day of November, 2007.

OF COUNSEL

# FREEDOM COURT REPORTING

1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 1:07-CV-712-WKW

LINDA THORNTON,
Plaintiff(s),

vs.

FLAVOR HOUSE PRODUCTS, INC., and FRANKLIN D. WILLIAMS, JR.,
Defendant(s).

VIDEOTAPED DEPOSITION OF:
MARY ANN BOYER
March 4, 2008
10:00 a.m.
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 - 19th Street North
Birmingham, Alabama 35203

2

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Shannon L. Carroll, am hereby delivering to Ms. Ann C. Robertson the original transcript of the oral testimony taken on the 4th day of March 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

STIPULATION

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of MARY ANN BOYER may be taken before SHANNON L. CARROLL, CCR, RPR, at the Law Offices of Wiggins, Childs, Quinn & Pantazis, LLC, The Kress Building, 301 - 19th Street North, Birmingham, Alabama 35203, on the 4th day of March 2008.

3

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of deposition by commissioner is waived.

4

INDEX

| EXAMINATION BY | PAGE NUMBER |
|---|---|
| Ms. Robertson | 9 - 93 |

| EXHIBITS | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| Plaintiff's: | | |
| No. 1 | Deposition Notice | 8 |
| No. 2 | Personnel Action Summary | 44 |
| No. 3 | Employee Status Change | 47 |
| No. 4 | Memorandum | 48 |
| No. 5 | Memorandum | 49 |
| No. 6 | Documentation Form | 52 |
| No. 7 | Documentation Form | 57 |
| No. 8 | Documentation Form | 73 |
| No. 9 | Documentation Form | 74 |
| No. 10 | Employment Application | 78 |
| No. 11 | Sex Offender Posting | 80 |
| No. 12 | Documentation Form | 88 |

APPEARANCES

BEFORE:

SHANNON L. CARROLL, CCR, RPR

APPEARING ON BEHALF OF THE PLAINTIFF(S):

MS. ANN C. ROBERTSON
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 - 19th Street North
Birmingham, Alabama 35203

APPEARING ON BEHALF OF THE DEFENDANT(S):

MS. JENNIFER F. SWAIN
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 - 20th Street North
Birmingham, Alabama 35203

APPEARANCES
(Continued)

ALSO PRESENT:

MS. LYNNE SULLIVAN, VIDEOGRAPHER
MR. SCOTT CLARK
MS. DEE LAKE
MS. LINDA THORNTON

I, Shannon L. Carroll, acting as Commissioner, certify that on this date as provided by Rule 30 of the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at the Law Offices of Wiggins, Childs, Quinn & Pantazis, LLC, The Kress Building, 301 - 19th Street North, Birmingham, Alabama 35203, on the 4th day of March 2008, commencing at approximately 10:00 a.m., MARY ANN BOYER, witness in the above cause for oral examination, whereupon the following proceedings were had:

THE REPORTER: Will this be usual stipulations?

MS. SWAIN: No. Read and sign.

THE REPORTER: Send it to you, Jennifer?

MS. SWAIN: I'm sorry?

THE REPORTER: You want me to

send it to you?

MS. SWAIN: Yes. That will be fine.

THE REPORTER: Okay.

Whereupon,

MARY ANN BOYER,

being first duly sworn, was examined and testified as follows:

(Whereupon, Plaintiff's Exhibit No. 1 was marked for identification, and same is attached hereto.)

MS. ROBERTSON: While we were off the record, we had marked as Plaintiff's Exhibit No. 1 to Ms. Boyer's deposition, it's our -- the Plaintiff's 30(b)(6). And as I understand it, not only am I going to be taking her in her individual capacity, but as to the things circled on Plaintiff's Exhibit No. 1, she will be the corporate representative to

# FREEDOM COURT REPORTING

give the 30(b)(6) testimony; is that right?
MS. SWAIN: That's correct. Subject to our objections.
MS. ROBERTSON: Okay.

EXAMINATION BY MS. ROBERTSON:
Q. State your name, please, ma'am?
A. Mary Ann Boyer, B-O-Y-E-R. Mary Ann is two words. No E at the end of Ann.
Q. No surplusage, that's what I always say.
A. There's several different ways to spell it.
Q. Yeah. But my name is Ann too --
A. Oh, is it?
Q. -- and I always say no surplusage.
A. That's a good way to say it.
Q. And where do you live, Ms.

Boyer?
A. I live in Dothan, Alabama currently.
Q. And how long have you lived there, please, ma'am?
A. It will be four years this coming September.
Q. And where in Dothan do you live? What's your street address?
A. 3203 North County Road 9, Dothan, Alabama. My permanent residence is four years -- I was actually in an apartment, so it will be four years in July including my apartment. Let me correct that.
Q. Okay. And where did you live before Dothan?
A. Hopkinsville, Kentucky.
Q. And how did you -- how long did you live there?
A. Approximately three years.
Q. And before that?
A. Hilo, Hawaii.

Q. Can you spell that first name?
A. H-I-L-O.
Q. And how long did you live in Hawaii?
A. Approximately three years.
Q. During these -- during this time you've just recited, were you always with Flavor House?
A. Ralcorp is the parent company, and I was actually with them in both Hopkinsville, Kentucky and in Dothan, Alabama.
Q. And where -- who were you with in Hawaii?
A. Mauna Loa Macadamia Nuts.
Q. Will you spell that for me and the Court Reporter?
A. M-A-U-N-A, second word Loa, L-O-A, Macadamia, M-A-C-A-D-E-M-A (sic).
Q. And how did you come -- what is the corporate name of -- of Flavor House?

A. Ralcorp is the parent company.
Q. All right. For my own information, I'm just going to call it Flavor House.
A. That's fine.
Q. Or -- and meaning its subsidiaries or whatever.
A. That's our tax identity --
Q. Okay.
A. -- for the division I'm with.
Q. How did you come to be employed at Flavor House?
A. I was out there with Mauna Loa Macadamia, C. Brewer was the parent company, and they divested the business to a venture capital company, so that allowed me to seek other employment.
Q. Did -- did they go out of business or they just laid off people or --
A. They sold to a venture capital company. And when they -- you

sell to a venture capital company -- I got a very good parachute deal, was released senior management.
Q. And how did you hear about the Flavor House job?
A. Actually, through Monster dot com, believe it or not. Kind of crazy, but --
Q. That's a search engine that -- that has job sites, jobs on it?
A. Um-hum (positive response).
Q. Is that right? You need to say yes or no.
A. That is correct.
Q. Okay. And -- and so when you found it on Monster dot com, then what happened?
A. I posted my resume and I went through the interview process.
Q. Who were you -- who hired you?
A. Rich Coloris was actually the person I reported to, so he would be the

person who hired me.
Q. And I assume he was one of the people that you interviewed with?
A. Yes. That is correct.
Q. When you were hired, what year was that?
A. Let's see. It was seven years in -- 2001.
Q. And were you hired -- was there a background check done on you before you were hired?
A. Yes. I believe so.
Q. And do you know what that background check entailed?
A. No, not specifically.
Q. Do you know if they did a criminal background on you?
A. I believe so.
Q. Do you know if they did a credit check on you?
A. Yes, I believe they did.
Q. Anything else you can think of that they -- that they told you that

they were going to do?
A. The usual boilerplate drug screen.
Q. Okay. Now, when you were hired in 2001 at Flavor House, what was your position?
A. Director of operations for the Princeton, Kentucky site.
Q. And what did they do at Princeton, Kentucky?
A. Crackers. A little bit of cookies, but mostly crackers. It's a manufacturing site.
Q. How many -- do you know how many locations Flavor House has?
A. There is really only one Flavor House, but our division has several locations. In the nut business, we have a location in Massachusetts, one in Pennsylvania and one in Dothan, Alabama.
Q. Was -- was the Princeton, Kentucky in your division that you are

currently in?
A. It is now. They merged the two divisions. They merged the nut division and the cracker and cookie division. It's now called Bremner Food Groups.
Q. And what other divisions does the parent company have?
A. They have a frozen bakery division. They have Carriage House, which is condiments, peanut butter. And they also have a cereal division.
Q. All right. Do -- you are the director of operations in Princeton, Kentucky, and as I understand it, you are now the director of operations in Dothan; is that accurate?
A. That is correct.
Q. Were your job descriptions -- are your job descriptions the same or basically the same in Kentucky and Alabama?
MS. SWAIN: Objection.

A. Yes.
Q. Can you tell me what your job -- your job description is or was or --
MS. SWAIN: I'm going to object just to the term job description.
Q. Or job duties?
A. I basically have responsibility for the site, the manufacturing site.
Q. Can you be a little more specific in terms of what your responsibilities are?
A. At a job site such as that, there is department managers of all basic functions, human resources, maintenance, engineering, production, QA, warehousing, logistics, finance. All those heads of those departments report in to me.
Q. You said maintenance, finance, HR, what else?
A. Quality assurance, production.
Q. When you got to Dothan, who

was the head of maintenance? Who was the department head?
A. Ricky Smothers.
Q. Is that still true today?
A. Yes. Ricky straddles both worlds of maintenance and production currently.
Q. At the time you went to -- to Alabama, was -- was he just the maintenance department head?
A. Yes. That is correct.
Q. And when did he become also the production department head?
A. He moved into maintenance at 5 -- or he moved into production at May 1st, '06.
Q. And who did he replace in the production function?
A. Richard Holland was in that function for about a year prior to Ricky.
Q. Holland?
A. Yes.
Q. Did he -- was he let go or

did he leave?
A. No. Richard moved back up to the Princeton site.
Q. Who was the head of finance when you went there to Alabama?
A. A gentleman named Larry Stein came about the same time I did.
Q. Is he still there?
A. No. He went back to the St. Louis corporate office.
Q. And who does his function now?
A. Deborah Nettles.
Q. Was she already with Flavor House when she took over that position?
A. No. We hired her from the outside.
Q. What -- what about the HR department head when you got there?
A. Glen Warren came in at the same time I did.
Q. Who did he replace?
A. There really was no head of

HR at that site. HR reported in to the Massachusetts plant.
Q. Were there any HR people there at the time that you came?
A. Yes. Leigh Allums was there and she's still there.
Q. Is that A-L-L-U-M-S?
A. I believe so.
Q. And what was her title?
A. I'm not sure of her exact title. But she handled HR almost more on a clerical versus managerial level.
Q. Was Leigh Taylor there at that time?
A. Not when I initially came, no.
Q. Was she hired later in personnel or HR?
A. She was not in HR. She was accounts payable.
Q. Who is the head of accounts payable?
A. That reports to finance. It

was -- was a gentleman named Bravin Helms at the time.
Q. And is Glen Warren still there?
A. No. He got promoted to the head of safety for the entire Ralcorp parent company in St. Louis.
Q. And who took his place?
A. Initially a gentleman named David Helms.
Q. Is he still there?
A. No. David is no longer with us.
Q. When did he leave?
A. I don't know the exact date. David moved back home due to personal family issues.
Q. How long was he at Flavor House?
A. Probably close to a year.
Q. And who took his place?
A. Tommy Nance.
Q. Was he hired from the outside

or was he --
A. Yes, he was.
Q. Is he still there?
A. No, he is not.
Q. Was he involuntarily released?
A. Yes. We released Tommy.
Q. And what was the reason?
A. Tommy's skills and talents didn't match the expectations of the corporation.
Q. Was there also some problem with his credit card use?
A. He had a corporate credit card, yes, that he didn't pay us back the balance on. But that was -- had nothing to do with why he was released.
Q. Can you tell me what his performance problems were?
MS. SWAIN: Objection. Go ahead.
A. There are a lot of deadlines that an HR manager is expected to meet

that divisional HR sets upon any plant, updating safety programs, and Tommy had a problem with the timeliness of his completion of a lot of those tasks.
Q. And who took his place?
A. Dee Lake.
Q. D-E-E?
A. Yeah. Deanna is her formal name, but we call her Dee.
Q. Do you remember when Mr. Nance left?
A. I believe it was around October.
Q. Do you remember any of the other deadlines that he had not met?
MS. SWAIN: Objection.
A. It was primarily the deadlines for the safety, updating the program, revision on a handbook policy, those type of things.
Q. Was one of the -- he -- well, had he failed to or meet the deadline of disseminating a new policy manual? Was

that one of his deadline problems?
MS. SWAIN: I object to the form.
A. There was a deadline to issue the policy manual and Tommy got hung up with selecting a printer and some mechanical issues of the issue of the policies mainly, yes.
Q. Who -- who was the head of quality assurance when you came?
A. Sammy Lightsey.
Q. Lightsey?
A. Yes. Like light and then S-E-Y on the end.
Q. Is that -- is that a he or a she?
A. It's a he.
Q. And is he still there?
A. Yes, he is.
Q. Do you know Leigh Allums' educational background?
A. No, I do not specifically.
Q. But is it fair to say that at

the time you came in 2004, she -- whatever HR function was being performed, it was done by her?
MS. SWAIN: Objection.
A. She did it with the support of a person from Billerica.
Q. From where?
A. Billerica, Massachusetts. The senior management team at that time prior to my coming on board was out of the Massachusetts plant.
Q. And is -- and was that her direct report to -- to the -- the Billerica fellow?
A. It was a woman.
Q. Or woman?
A. Um-hum (positive response). She reported in to the -- Dan Ruiz was the plant -- I'm not sure of his title. He was acting as site manager, and Dan reported in to somebody at Massachusetts. Leigh actually kind of reported to him, a dotted line, I believe, to a person in

Massachusetts.
Q. Who was the plant manager when you got there?
A. Dan Ruiz. I'm not sure that was exactly his title, but --
Q. Is he still there?
A. No.
Q. When did he leave in relation to when you came?
A. Probably about three or four months after I came on board.
Q. And what was the reason for him leaving?
A. There was just no place for him once they created a new structure at the plant.
Q. And so they didn't replace him in terms of his job position, is that what you are saying?
A. Basically I took his duties, plus a wider scope of duties.
Q. Did they -- did -- does Flavor House then or now have a --

somebody called a plant manager?
A. Director of operations is basically glorified plant manager.
Q. Okay.
A. They are a plant manager, plus they might handle things in a broader business sense.
Q. Under the -- the director or the department manager in maintenance, were there any other positions other than maintenance people?
A. When I came, there were no supervisors, but there were team leads. Within about a year, we created a structure where there were truly supervisors on each shift. And so in most cases, the team leads became supervisors. There was one shift where another person was chosen.
Q. Do you remember who the supervisors were or -- in 2005?
A. Donald Coty was on first shift. I believe we still had Wiley

Baxter on second shift, and Harrel Mixon on third shift.
Q. Harold Mixon?
A. Um-hum (positive response). H-A-R-R-E-L is Harrel.
Q. Harrel, okay.
A. Yeah, Harrel. And Mixon is like Nixon only with an M.
Q. And at or about the time -- well, in about 2005, these fellows were team leaders and were converted to supervisors; is that right?
MS. SWAIN: Objection.
A. I think in 2005 they were supervisors.
Q. Okay.
A. I don't remember the exact date, but it was more around the 2004 time frame I think we made them supervisors.
Q. All right. In production, who reported to Richard Holland?
A. Melvin Hutchins, the

superintendent, and Larry Hatcher, who was the second shift superintendent.
Q. And what was Melvin Hutchins' title?
A. Superintendent.
Q. Is that -- is that what he is now?
A. Yes.
Q. Was he something else prior to becoming a superintendent?
A. His official title in payroll is production manager. We refer to him as superintendent.
Q. Did he get a demotion or a change in title at some time?
A. Not that I'm aware of.
Q. And who did you say the other man was besides Melvin Hutchins?
A. Larry Hatcher has second shift.
Q. Is he still there?
A. Yes, he is.
Q. What does Leigh Allums do now

that you have an HR head?
MS. SWAIN: Objection.
A. Leigh focuses -- her primary responsibility is benefits, helping employees with, you know, getting their benefits filed, claimed.
Q. Is that what she did before?
A. That was a portion of her job, yes.
Q. What else did she do besides benefits before?
MS. SWAIN: Object to the form.
Q. Before she got an HR manager --
A. I wasn't --
Q. -- on-site?
A. Yeah, I wasn't there at that time, so I'm not sure I could comment completely on it.
Q. In your position as the director of operations, do you do hiring?
A. Not directly, no. I am --

they will come to me -- depending on the position, I may interview, I may not. But before anyone is hired in the administrative ranks, let me clarify that, they will come to me with a recommendation and discuss with me what kind of salary offer they want to make. In the hourly ranks, I don't have that much interaction.
Q. Do you know how the hiring is done?
MS. SWAIN: Objection. Of what?
Q. Of -- of the hourly people?
A. They either evaluate temps they have on board that come in through personnel resources and determine if, you know, they are keepers, they are good workers, and then make them an offer when an opening comes. Or sometimes we have job fairs. We are using several different venues now, employment ads, through the employment office, et

cetera. And they are doing team interviews.
Q. Are background checks done on the hourlies?
A. Yes.
Q. And has that always been the way it is?
MS. SWAIN: Objection.
A. No.
Q. All right. Do you know when the background checks began?
A. Not exactly.
Q. Were they being done when you came to Alabama?
A. I know they've been done since I've been there. I can make a statement to that.
Q. Well, did you -- did you direct that they be done when you came there?
A. Part of what I was doing when I came there, the new management team was to set -- make sure our procedures were

consistent with other plants. So if it did not exist, we made sure it did exist. But I can't clearly state on that one.
Q. Is --
A. I don't believe it was all the time prior to my arrival.
Q. Before you came to Alabama, are you saying -- are you saying that background checks were done in other locations in your division?
A. I can tell you they were at Princeton. That's the only one I can speak to.
Q. When a -- at Flavor House in Alabama, when a hiring is done, do they have to notify somebody in the central -- in -- say in Billerica?
MS. SWAIN: Objection.
Q. Is that where the home office is?
A. It was just a senior management staff.

Q. Well, is there -- is there somebody there that has to approve the hiring in Alabama?
A. No, not that I'm aware of.
Q. Is there anybody that reviews whether or not the policies were being complied with in Alabama?
MS. SWAIN: Objection.
A. There's audits of any department, you know, within our corporation. When one was done at Dothan prior to my arrival, I can't clearly state.
Q. When you came, did you undertake to see if background checks had been done on the current employees?
A. Glen Warren came in at the same time I did and Glen was very competent and I left it up to Glen to assess what gaps may be in that department that we needed to make any changes on.
Q. Well, my question is: Did

you undertake to --
A. I did not personally, no. I left that up to Glen Warren.
Q. Did you ask him to do it?
A. Glen --
MS. SWAIN: Objection.
A. Glen knew what our objective was, was to make sure we were consistent with other sites.
Q. Do you know, is there a policy that Flavor House has in terms of providing references for former employees?
A. For former employees?
Q. Right.
A. I don't understand. Why would you want a reference for former employees?
Q. No. I mean, is there -- is there a policy that Flavor House has about whether -- whether personnel at Flavor House can be references for former employees?

MS. SWAIN: Objection to the form.
A. Not that -- I'm not sure there's any stipulation on a reference.
Q. Does Flavor House have a policy if -- if -- in terms of if a former employee puts Flavor House as their last employee or -- what information will be given out if -- if a respective new employer calls?
MS. SWAIN: Objection.
A. It's pretty much they were employed from these dates.
Q. When you say pretty much, is there -- is there a restriction or is that just a --
A. We don't -- we don't want to bias one way or the other. We say they were employed from this date to this date. We can confirm their employment.
Q. Now, since you have been at Flavor House, have you had any supervising training courses done at

Flavor House?

A. Yes.

Q. And -- and who is responsible for doing that training?

MS. SWAIN: Objection.

A. It would come from a variety of sources. It could be canned material that we buy, a DVD to review. We could have people come in from other sites with some kind of specialty area they want to train on. We actually did some training ourselves as department managers on like how to determine the grade of nuts or, you know, how to read the DME that -- you know, direct manufacturing expense.

Q. Do you -- when you do supervisor training, is it -- is it like a classroom setting?

A. Um-hum (positive response).

Q. You need to say yes or no.

A. Yes.

Q. And do you have like an agenda or an outline as to what will be

discussed in a --

MS. SWAIN: I'm going to object.

Q. -- at a supervisor training meeting?

MS. SWAIN: I'm going to object. Are you talking about any particular meetings?

MS. ROBERTSON: Well, I'm just talking about -- she said they had -- I will get down to more specific.

Q. But I'm just saying whenever they do supervisor -- supervisor training and call it that, do you have an agenda or an outline as to what will be taught on that particular session?

MS. SWAIN: Objection.

A. Usually. There may be materials handed out. We've had books handed out. Then an instructor may come in. Or there may be a two or three-page handout that says these are the things we hope you will learn.

Q. And do you maintain -- and when I say you, I mean you or the company. Does -- is -- are there -- is there some place where the agenda or the background -- the outline or the books and materials were maintained to demonstrate what was taught at any given session?

MS. SWAIN: Objection.

A. At one time the supervisors were given a three-ring notebook that they put some of this in so they could use it for reference.

Q. But, I mean, like in my office, because I tend to throw documents around, we maintain a pristine copy so there's always a way we can refer what was done or what we have. Is there something like that done?

MS. SWAIN: Objection.

A. The HR department most likely would have some reference of those materials.

Q. Now, when you have supervisor -- supervising -- supervisor training, what class or what titles are included in that? I mean, are the -- are the lead people included or just the supervisors, the supervisors and the department heads?

A. Some --

MS. SWAIN: Objection. I mean, Ann, I mean, I'm not sure that there's necessarily -- it's always going to be the same.

MS. ROBERTSON: I -- well --

MS. SWAIN: And you are asking very general questions.

MS. ROBERTSON: Well, she can tell me that. But I don't want you testifying. And -- and I'm getting to the different things.

Q. Are you -- are you -- your lawyer wants me to know whether or not different supervisor training are given to different classes of people?

A. Sometimes team leaders were

included if the topic was appropriate to what they might do.
Q. And for instance, have you had supervisor training on equal opportunity issues?
A. We do harassment training.
Q. And I -- and I don't mean -- I'm not -- this is not a pejorative. But just harassment or are -- are there other discrimination issues included in the harassment training?
A. Without having the material here in front of me, I don't want to speak specific. But it would talk about, you know, labor laws and rights and --
Q. And how often is the harassment, or whatever this training, how often is it given?
A. It's either annually or every two years.
Q. Is there any program where if a person is named as supervisor in the -- in between sessions, are they given

training on their own?
A. Depending on the background they might come from, there's usually some type of orientation when you bring somebody -- somebody into a position.
Q. Is -- is there a place where that would be recorded as to what kind of orientation training was done?
MS. SWAIN: Objection.
A. I can't speak to that specifically.
Q. Do you still have lead men or lead people at -- at Flavor House?
A. There is only one line that has a lead person. So there's one per shift. We have two shifts of production. And we do have one in the warehouse.
Q. All right. What line has a lead person?
A. Line three.
Q. And why does that line have a lead person?

A. It's a more complex line. It runs mixed nuts, so there's more moving parts, you might say, that require monitoring. The other lines are not quite as complex.
Q. Does the lead person make more money than, say, an operator?
A. Yes.
Q. Is there -- how much more money does that person make?
A. I don't know the specific amount. But it was so much over the operator pay.
Q. How is a lead person selected?
MS. SWAIN: Objection.
A. There is an interview process. They post it and they have to turn in a resume and there is an interview process.
Q. How is an acting supervisor selected?
MS. SWAIN: Objection.

A. They are interviewed.
Q. Are these interviews -- I mean, is there some recordation or some notes about the interview?
MS. SWAIN: Objection.
A. I can't speak to that.
Q. Are there any -- any requirements about becoming an acting supervisor or that -- in terms of disciplinaries or abilities?
MS. SWAIN: Objection.
A. We are looking for people to have some background that they can bring into the position, hopefully some prior supervisory experience or some demonstration of leadership or problem-solving skills.

(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification, and same is attached hereto.)

Q. Plaintiff's Exhibit No. 2 to

your deposition, will you take a look at that and tell me what it is, please, ma'am?

A. Appears to be something out of the personnel file of Frank Williams. It looks like his increases over the time he has been employed.

Q. And it looks like he was -- for some period of time was made a temporary supervisor in October 10th of '05; correct?

A. Yes. That is correct.

Q. And then he was -- bid and was made a team leader on November 28th of '05; correct?

A. Yes. That is correct.

Q. And then in July of '07 he was made a temporary supervisor; correct?

A. Yes. That is correct.

Q. Do you know if -- if before he was made a temporary supervisor any assessment of his disciplinaries or his ability to get along with -- with his

subordinates were made?

MS. SWAIN: Objection.

A. The temporary supervisor positions refer to gift pack. We run a small line called gift pack only about three months out of the year. And we interview a person. A person is interviewed to take that interim supervisor spot. And so Frank would have been interviewed and chosen.

Q. Well, that's interesting. But my question was: Is -- is -- before a person is made a temporary supervisor, is any assessment done of their disciplinaries or their ability to get along with subordinates?

MS. SWAIN: Objection.

A. The supervisors interview these candidates and the supervisors have knowledge of how they have interacted on the line and what their personnel history is.

(Whereupon, Plaintiff's Exhibit No. 3 was marked for identification, and same is attached hereto.)

Q. I'll show you what's been marked as Plaintiff's Exhibit No. 3 and ask you to tell me what this is?

A. Looks like an employee status change document.

Q. For Tommy Nance?

A. That's what it appears to be, yes.

Q. And it says down there he was involuntarily let go for performance issues. And then it says: See separation agreement. Do you know what that -- what that means?

A. Separation agreement would just be the terms of his separation, was he given any severance or the date of it, et cetera.

Q. All right. So the separation agreement is not supposed to outline the

performance issues; is that -- is that correct?

MS. SWAIN: Objection.

A. I don't -- you would have to show me the document, I guess. I don't believe so.

(Whereupon, Plaintiff's Exhibit No. 4 was marked for identification, and same is attached hereto.)

Q. I'll show you what's been marked as Plaintiff's Exhibit No. 4 to your deposition and ask you to take a look at this and tell me what this is, please, ma'am?

A. This is a disciplinary step that was issued to Frank Williams.

Q. And it says it was a violation of plant rule number sixteen; right?

A. That is correct.

Q. Fighting, threatening,

intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property. Do you know what this written counseling refers to?

A. I believe it is the response to the complaint that Linda filed.

(Whereupon, Plaintiff's Exhibit No. 5 was marked for identification, and same is attached hereto.)

Q. Okay. Now I will show you what's been marked as Plaintiff's Exhibit No. 5 to your deposition and ask you to take a look at this, please?

A. It's a disciplinary step.

Q. For whom?

A. Frank Williams.

Q. And it's, what, about two months after the one I just handed you, Plaintiff's No. -- was it 4?

A. Yes.

Q. And it says: You must learn to control your temper and direct the employees on the line without displaying actions that could be construed as rude, intimidating, or disrespectful. Now, do you know what this write-up is about?

A. I believe this is in response to a complaint by Jonnie Nickerson.

Q. Is Jonnie Nickerson a female?

A. Yes, she is.

Q. And what was her complaint?

A. That in dealing with her he used some profanity.

Q. Did she also say he wouldn't let her adjust her own machine?

A. I don't remember that specifically.

MS. SWAIN: When you get to a good stopping point, let's take a break so we can get the Videographer set up, please.

MS. ROBERTSON: Sure. That's fine.

(Brief recess.)

(Whereupon, the following portion of testimony was videotaped.)

THE VIDEOGRAPHER: This deposition is being taken March the 4th, 2008. The approximate time is 11:12 a.m. The deposition is being taken of Mary Ann Boyer in the case of Linda Thornton versus Flower House --

MS. ROBERTSON: Flavor House.

MS. SWAIN: Flavor House.

THE VIDEOGRAPHER: Oh, Flavor -- I'm sorry. Flavor House Products, Inc. and Franklin D. Williams, Jr. This case is set in the U.S. District Court, Middle District of Alabama, Southern Division. The case number, 1:07-CV-712-WKD (sic).

At this time, will counsel present

please state their names and whom they represent?

MS. ROBERTSON: Ann Robertson, for the Plaintiff.

MS. SWAIN: Jennifer Swain, for Defendant, Flavor House.

THE VIDEOGRAPHER: And the -- the deponent has already been sworn in on the record. Counsel may proceed.

(Whereupon, Plaintiff's Exhibit No. 6 was marked for identification, and same is attached hereto.)

Q. (By Ms. Robertson) You were about to look at Plaintiff's Exhibit No. 6, please, ma'am. Can you tell me what that is?

A. It looks like a complaint form from Jonnie Nickerson.

Q. And will you look at the second page where it says -- at the top of the page?

A. My -- I can't tell specifically what this says. But it appears that it would be notes Tommy Nance made as he did the investigation.

Q. And remember I asked you if she also complained that she was not allowed to adjust her machine?

A. Yes, you asked that question in your --

Q. And is that -- do you understand that is what is indicated on page two of Plaintiff's Exhibit No. 6?

A. Yes. There's another statement that appears Frank made that he just wants her to load the labels. It's hard to conjecture what full discussion was here. But sometimes if a label operator isn't fully trained, they work them up slowly to making adjustments. But we can only conjecture, can't we, based on just these statements?

Q. Well, and you've heard that that was one of my client's complaints,

that -- that Frank Williams and others would not let her -- would push her out of the way when she was trying to make adjustments to her machine; correct?

MS. SWAIN: Objection.

A. Ms. Thornton has made that claim.

Q. Okay. Now, I notice you are saying to me that on Plaintiff's Exhibit No. 6, the second page appears to be notes by Tommy Nance; correct?

A. I would -- that is what I believe they would be.

Q. Can you tell me how an investigation of -- of a -- of a complaint like this is made?

MS. SWAIN: Objection.

Q. Is there a protocol for it?

MS. SWAIN: Objection.

A. If someone has a complaint, we -- we request them to fill out a form so we clearly understand what the complaint is, and then the HR manager

will involve other people as noted is appropriate.

Q. Well, the reason I ask is it appears Ms. Nickerson may not be the most articulate in -- in her writing. Is that a fair statement?

MS. SWAIN: Objection.

A. My dad was an English teacher; I'm not. But -- so I don't want to quote on somebody's English.

Q. Well, I mean, it says: Jonnie N. was on the label and Frank W. came out on the line and said to me overtime. I came back. The fucking label --

A. My guess is the word machine.

Q. -- machine is fuck up and saying is to me. I told him I didn't put my hand on the label machine. Now, do you know if Mr. Nance or if it's the protocol to -- to -- to take a statement from someone who perhaps may not be as articulate in explaining what their

problem is?

MS. SWAIN: Objection.

A. When people have the capability to write, we ask them to write so there's no question that their words were construed. So we always -- you know, we try to overlook the absolute correct grammar and try to get people to write their statements in their own handwriting.

Q. Well, is -- are you interested in making sure you get every complaint and -- and all the details?

MS. SWAIN: Objection.

A. I think that's why they have a conversation and interview in addition to the complaint.

Q. And tell me what would next be done after a complaint like this would come forward.

MS. SWAIN: Objection.

A. They would try to determine if there was witnesses that can

collaborate what the complaint is, substantiate it. They would talk to the person that the complaint was made against.
Q. And you say they would talk with them. What do you mean they would talk with them?
A. Well, they would try to get them to write a statement, let them know what complaint has been made, try to get their side of the story I guess would be the way to say it.

(Whereupon, Plaintiff's Exhibit No. 7 was marked for identification, and same is attached hereto.)

Q. Plaintiff's Exhibit No. 7, what is that, please, ma'am?
A. It appears to be the statement from Frank Williams that correlates to the statement that Jonnie made.

Q. Well, do you see anywhere in -- in Mr. Williams' statement where he admits to using the F-word and -- and -- to Ms. Nickerson?
A. It is not in the written statement. But the discipline tends to support that he probably used language that wasn't appropriate.
Q. Right. But -- but Mr. Williams did not admit it in his statement; correct?
A. It does not appear in his written statement.
Q. Would you consider that his statement was then untruthful?
MS. SWAIN: Objection.
A. I think he states the facts related to what he did to try to make the adjustments. I can't say that those are untruthful.
Q. Well, would -- would he have been told the matter under investigation when Mr. Jordan talked with him?

MS. SWAIN: Objection.
A. I can't -- you mean Tommy Nance, Chris Jordan?
Q. Well --
A. Whoever?
Q. -- it's got investigating supervisor, Chris Jordan?
A. They would basically -- I can't say what was told to him at the point he was asked to write his version of the story. But he might have been told that Jonnie complained about their interaction. We try not to give them facts to lead them into anything. So I can't tell you what was told to him at the point he was handed this paper and asked to sit down and write it.
Q. But he does not mention having used profanity toward him, does he?
A. It does not appear so.
Q. Do -- do you see where there's any -- any response to the

allegation that he won't let her make adjustments?
MS. SWAIN: Objection.
A. No, I don't see that. But we don't try to give them the facts of the complaint because we don't want to lead them.
Q. Well, how can you investigate something without asking them whether or not an allegation is true?
MS. SWAIN: Objection.
A. I was not there, and I'll repeat that again. But it might have started out with there has been a complaint from Jonnie Nickerson on how you interacted with her on the label machine on this date. It might have been as basic as that to start the opportunity for Frank to explain what happened that day. But without being there, I can't tell you exactly what was said.
Q. Well, look on the second page of Plaintiff's Exhibit No. 7. See in the

middle where it says: A lot of the problems I am having with my employees is my supervisor tell me to tell them something to do. I tell them and if they don't like it, they turn around and tell something on me because I told them to do their job. So I get in trouble. Do you take from that that he is saying that Jonnie was lying about what she said?

MS. SWAIN: Objection.

A. I can't tell what to make out of that basically, to be real honest. I don't want to conjecture something.

Q. Well, he -- it certainly doesn't appear that he's taking any blame for what -- what he did, does it?

MS. SWAIN: Objection.

A. Sounds like he's confused.

Q. Now, on Plaintiff's Exhibit No. 5, it says it's a second step, written warning. As a result of this written warning, was Mr. Williams -- well, strike that. Look on the -- on the

document that's dated June 16th, please.

MS. SWAIN: Are you talking about Exhibit No. 5?

A. Which exhibit number is it, Ann?

Q. It's -- I think it's 5.

A. 4?

Q. 4. Yeah, 4.

MS. SWAIN: Are you talking about the memorandum?

A. No. 4?

Q. Plaintiff's Exhibit No. 4, yes. Look at 4.

MS. SWAIN: Do you have an extra copy of 4, Ann? I don't have a copy of that one.

MS. ROBERTSON: I thought I gave you a copy. That's why they are not --

MS. SWAIN: That's the only one I didn't get a copy of.

MS. ROBERTSON: Oh, here you go.

MS. SWAIN: Thank you.

MS. ROBERTSON: You are right. I didn't give -- I didn't hand it over to you.

Q. Now, Plaintiff's Exhibit No. 4 is a written counseling; is that correct?

A. Yes. First step is referred to as that.

Q. And that's for fighting, threatening, intimidating or coercing or interfering with fellow associates; right?

MS. SWAIN: Objection.

A. That is a -- that is a quote of the plant rule. But it doesn't specifically say what part of the plant rule was violated in this specific instance.

Q. Okay. Do you know what -- what -- what was the allegation?

A. An interaction that was inappropriate between Frank Williams and

Linda out on the line.

Q. Well, it doesn't say an interaction that was inappropriate. It says intimidating, coercing, threatening, interfering with fellow associates, or any other act of violence?

A. I believe --

MS. SWAIN: Objection. She just testified that's a quote of the plant rule, not of what his conduct was.

Q. You can go ahead.

A. I believe the one item that was confirmed upon the investigation was that a curse word was used.

Q. A curse word?

A. I am not going to tell you the exact dialogue. I don't have the file in front of me. I didn't participate in the investigation personally.

Q. Okay. Well, did you do any inquiry about the -- the appropriateness of the disciplinary that was handed out

to Frank Williams?
A. Tommy kept me appraised as he went through the investigation.
Q. Did you do any independent assessment of the appropriateness of it?
A. I --
MS. SWAIN: Objection.
A. I went -- had discussions with Tommy, and based on the information Tommy gave me, I felt the action was appropriate.
Q. All right. Now, as a result of Plaintiff's Exhibit No. 4, did Mr. Williams lose any money? Was he docked any pay?
A. No, I don't believe so.
Q. Was he suspended for any time?
A. I don't recollect that.
Q. Was he demoted?
A. I do not recollect that.
Q. And was he terminated?
A. No.

Q. Now, look at Plaintiff's Exhibit No. 5. This happened just a little over a month later, correct, Plaintiff's Exhibit No. 5?
A. It appears from the dates, that is correct.
MS. SWAIN: I'm going to object to the time. The dates are what they are.
MS. ROBERTSON: Okay.
Q. Well, June the 14th is when the first one occurred; correct?
A. That is correct.
Q. And July the 22nd is when the second one occurred; correct?
A. 27th, I believe.
Q. Did I say 2nd? I meant --
A. Yeah.
Q. And so it was a month and some days; correct?
A. That is correct on those dates.
Q. And so for apparently a very

similar act that Mr. Williams committed just a little over a month later he was given a written warning; correct?
MS. SWAIN: Objection.
A. That is what this document is.
Q. All right. Did he lose his team leader's position because of the second written warning?
A. No.
Q. Was he docked any pay?
A. I do not believe so.
Q. Was he suspended for any time?
A. I do not believe so.
Q. And was he fired?
A. No.
Q. Okay. Now, where is that piece of paper with -- showing that he was promoted?
MS. SWAIN: Objection to the characterization. She needs the --
MS. ROBERTSON: Plaintiff's

Exhibit No. --
MS. SWAIN: 2?
A. This exhibit (indicating)?
Q. Yeah.
A. Exhibit No. 2?
Q. 2. It looks like that a little less than a year later he was made temporary supervisor; correct?
A. That is what this payroll document shows.
Q. So can we conclude from that that these write-ups concerning his loss of temper and his use of profanity had no effect on his ability to become a supervisor at Flavor House?
MS. SWAIN: Objection.
A. Write-ups drop off in an employee's file within a year's time if there's no repeat incidents or any further incidents, number one. Number two, Frank had performed that temporary supervisor's job in prior years and was seen as doing an excellent job in that

position.
Q. Well, that may be true, but -- let me see if I've got this straight. Are you saying that if an individual is written up for sexual harassment in year 2006 and he doesn't sexually harass anybody again until 2007, you don't look at the first sexual harassment violation?
A. I don't believe --
MS. SWAIN: Objection. That's not what she said.
A. I don't believe this write-up was for sexual harassment, Ann.
Q. I'm not -- I'm not saying that. I'm just saying you said any write-up drops off after a year, and I'm asking you is that what you are saying?
A. Depending on --
MS. SWAIN: Objection.
A. Depending on the severity of an incident, a sexual harassment case that was confirmed probably would not be a first step write-up. It would go to a

more severe action that would be appropriate for the situation. You are dealing with Frank being confirmed using profanity, much different than sexual harassment.
Q. Is there anything that -- do you look back -- does Flavor House look back to see a person's behavior before they put them in a supervisory role? Do they -- do they review the file for any write-ups or what have you?
MS. SWAIN: Objection.
A. They do look at how they've performed. Anything in their personnel file would be part of that. But as I stated earlier, Frank had performed in considerably a exemplary role when he did the gift pack interim supervisor in the prior year.
Q. In that position, does he -- does he supervise people?
A. Yes, he does.
Q. So you say he was a temporary

supervisor --
A. I said interim supervisor for a couple --
Q. Interim --
A. -- for a couple of month.
Q. I'm sorry. Interim supervisor in '06?
A. Let me look at the document again. I know he did at a prior time. It looks like he did it in '05 and it looks like he did it in '07.
Q. Right. And so in between '05 and '07 he got these two write-ups; correct?
A. I believe that's where the dates fall. That is correct.
Q. And do you consider he performed in an exemplary fashion when he got write-ups 5 and 4?
MS. SWAIN: Objection.
A. I don't think anybody getting disciplined would be considered performing exemplary. It obviously

indicated we were not -- he violated a plant rule.
Q. Is physical violence something that -- what kind of write-up would you expect a person to get for committing physical violence?
MS. SWAIN: Objection.
A. Any type of physical confrontation once confirmed in the investigation would probably be a termination.
Q. So if it was confirmed that someone either threw at or tossed peanuts toward Linda Thornton, you would expect him to have been fired?
MS. SWAIN: Objection.
A. I believe in that situation, her statements were not confirmed by other witnesses.
Q. Okay. So do you know if he was suspended?
MS. SWAIN: Objection.
Q. The individual --

MS. SWAIN: Which time are you talking about?
Q. The individual, when she alleged that he threw peanuts at her?
A. This is the incident on June 14th?
Q. About the peanuts?
A. I don't know.
Q. I'm talking about the other gentleman she said threw the peanuts at her?
A. I don't know which situation you are talking about there, Ann.

(Whereupon, Plaintiff's Exhibit No. 8 was marked for identification, and same is attached hereto.)

Q. I'll show you what's been marked as Plaintiff's Exhibit No. 8 and ask you to take a look at this.
MS. SWAIN: Mary, why don't you hand me those other exhibits just to

get them out of your way? Can --
THE WITNESS: If I have to refer back to them.
MS. SWAIN: Can I get a copy of that one? I'll pass them to you.
MS. ROBERTSON: Oh, sure.
MS. SWAIN: Thank you.
Q. Now, do you know what Plaintiff's Exhibit No. 8 is?
A. It is the complaint form that Linda filed.
Q. Okay. And -- and do you know what happened after she filed it?
A. Tommy Nance conducted an investigation.
Q. How do you know it was Tommy Nance?
A. Tommy Nance was HR at that time.

(Whereupon, Plaintiff's Exhibit No. 9 was marked for identification, and same is attached hereto.)

Q. Take a look at Plaintiff's Exhibit No. 9 for me, please? What is that, please?
A. This is a form that was filled out by Tamekia Cooke as, I'm sure, part of the investigation.
Q. Well, it says that the investigating supervisor was Chris. Who is Chris?
A. Chris Jordan is the supervisor over the line and he would assist Tommy Nance in the investigation. But as you saw on some of the other forms, Ann, you can see the HR person and the supervisor's name both at the top.
Q. Do you know what order this is done to -- in -- in -- in usual circumstances? Is the -- the person against whom the complaint is -- is made, is he called in first or how does that work?
A. I can't speak specifically to that, Ann. It may be based -- sometimes

it may be based on the availability.
Q. The availability --
A. Sometimes it's based on availability to get -- to get to the people they feel are critical to complete the investigation.
Q. Well, like Tamekia Cooke, is she -- can you tell if that's her handwriting or not?
A. No, I really can't.
Q. Do you know if -- if Tamekia Cooke was told what the allegations were and asked what she saw and heard or was -- how -- how would that have been conducted?
MS. SWAIN: Objection.
A. Like I told you earlier, Ann, without being there, I don't know how they brought forward the person or what they said to them when they requested them to fill out a form.
Q. Because Ms. Thornton said that Mr. Williams was throwing cans, a

large bag of cans. Do you know if anyone asked Tamekia Cooke if she saw him throw the cans?

MS. SWAIN: Objection.

A. I can't speak specifically to that. I wasn't involved in the investigation, Ann.

Q. Would you be concerned if she wasn't asked about that?

A. She would have been asked about it, I feel fairly confident, but I can't state specifically.

Q. Well, I thought you told me a few minutes ago that what would happen is they would just be asked to write what they knew about the situation and nothing would be given away about the allegations?

MS. SWAIN: Objection.

A. But then they would be asked questions about specific details.

Q. Oh.

A. You initially might want them

just to write their statement. But without being there, Ann, I'm not going to conjecture.

(Whereupon, Plaintiff's Exhibit No. 10 was marked for identification, and same is attached hereto.)

Q. I'll show you what's been marked as Plaintiff's Exhibit No. 10 to your deposition. Can you tell me what that is, please, ma'am?

A. This appears to be the employment application of Frank Williams.

Q. Do you know -- at the time do you -- do you -- do you know now or have you learned who hired Mr. Williams?

A. No, I don't know specifically. It was before my time.

Q. Because I think on the -- the 30(b)(6) you are the person who is supposed to say all facts surrounding the employment of Frank Williams. Do you, in

fact, not know who hired him?

A. The company hired him. Which person --

Q. Well --

A. -- specifically, no, I don't know.

MS. SWAIN: And I think, Ann, we qualified in our objections that we would produce somebody who could testify generally about his employment and about the information that's in his personnel file.

MS. ROBERTSON: Okay. Well, this is in his personnel file and I just --

MS. SWAIN: But it doesn't -- that doesn't reflect the information you are asking for.

Q. Do you -- it says -- it says: Have you ever been convicted of a felony? Do you see that?

A. Yes.

Q. And it says: Yes. And it

says: Statutory rape. My girlfriend was two years younger than me when I was eighteen.

A. Yes, that's what it states here.

Q. And is that supposed to be an explanation of the felony that he was convicted of?

MS. SWAIN: Objection.

A. It appears. But I can't be for sure. Perhaps he was trying to explain the circumstances.

(Whereupon, Plaintiff's Exhibit No. 11 was marked for identification, and same is attached hereto.)

Q. Take a look at Plaintiff's Exhibit No. 11, please?

MS. SWAIN: Ann, I'm -- I'm going to object to Exhibit No. 11. Richard Crum has filed a motion for protective order --

MS. ROBERTSON: Yes.
MS. SWAIN: -- regarding this information and that it be kept out of the case and not be discoverable.
MS. ROBERTSON: Well, are you going to direct her not to answer? Because --
MS. SWAIN: I --
MS. ROBERTSON: -- this is one of the many reasons that I can have this. I can impeach him. And since he lied on his application, I can impeach him with his criminal convictions. And so if you would direct her not to answer, then that's fine.
MS. SWAIN: Okay. I haven't directed her not to answer your question because I'm going to wait and see what your questions are.
MS. ROBERTSON: Okay.
MS. SWAIN: I'm just objecting now to --
MS. ROBERTSON: Okay. I

mean --
MS. SWAIN: -- the inclusion of this exhibit.
MS. ROBERTSON: In -- in my view, his -- his -- his -- it's perhaps the most ridiculous motion I've ever seen, because this is discovery. Whether or not it's ultimately admissible is a whole other thing. But in this case, I think it would probably be admissible.
Q. All right. Would you look -- does -- would you look at this Plaintiff's Exhibit No. 11. Does that -- can you check out -- this appears to be a document that's posted on the web by the Public Safety Commission as required by life -- law for sex offenders?
A. Yeah. But because of how blacked out that is, Ann, I'm not sure what the document is.
Q. Well --
A. The copy is not clear.
Q. It certainly says his name

and his address; correct?
A. It says -- it says his name, yes.
Q. All right.
A. But I'm not sure where the source of the document because I can't read it clearly.
Q. Which -- which word can't you read? Oh, okay.
A. I see safety.
Q. Public safety. All right. I'll -- I'll get a better copy. I'm sorry.
A. Okay.
Q. But it's the Department of --
A. I don't know if the seal is the same as what's there.
Q. Oh, see where -- see the seal, it says Public Safety?
A. Yeah.
Q. All right. But down there -- and you see it says Franklin Delnor Williams, Jr.; right?

A. That is --
MS. SWAIN: Ann, let me ask you, because Mr. Williams has objected to this information, and if we allow Mary Ann Boyer to respond to questions regarding this document --
MS. ROBERTSON: Um-hum (positive response).
MS. SWAIN: -- to which we have objected --
MS. ROBERTSON: No. No. No. You haven't -- this is off the web. This is not anything he objected to. He objected to -- he called himself objecting to the subpoenas I have. He didn't move -- he didn't move to quash them. He also didn't even direct his -- his argument toward the Circuit Court subpoena I sent out.
MS. SWAIN: All right. Let me finish. Allowing Ms. Boyer to answer questions regarding this information, I do not want it to be construed in any way

as any kind of waiver of the rights of either Flavor House or Mr. Williams to keep out the information regarding the details of Mr. Williams' criminal history.

MS. ROBERTSON: Okay.

Q. Look down there where it says sex crimes.

A. All right.

Q. And it says: Rape in the second, three counts, sodomy in the first, two counts. And the crime location was in Barbour County. It says: Williams engaged in sexual intercourse with a thirteen, fourteen and sixteen-year-old; correct?

A. That is what it states.

Q. Now, on his application, he said he had sex with his girlfriend who was two years younger when he was eighteen, is that what it says?

A. That is correct.

Q. That does not appear to be

true, does it?

MS. SWAIN: Objection.

A. There is not a match between those pieces of information, that is correct.

Q. So he -- so he apparently lied on his application; correct?

MS. SWAIN: Objection.

A. I think one person was his girlfriend. I think he didn't go into the detail of the others. I think that is correct.

Q. Do you know why a background check was not conducted on Mr. Williams when he provided information that he had been convicted of a felony involving rape of an underaged child?

MS. SWAIN: Objection.

A. That was prior to my time, Ann, so I can't speak to that period.

Q. Well, you know the issue of his being a sex offender was raised sometime when you were there, don't you?

A. Yes, I do know that.

Q. Do you -- did anybody bother to check his application at the time to see what he had marked?

MS. SWAIN: Objection to the characterization.

A. I believe Tommy Nance looked at his application.

Q. Do -- do you know if he did a background check then?

A. No, I do not believe so.

Q. Why not?

MS. SWAIN: Objection.

A. He had been a good employee. Other than some profanity, there had been no indications that there was any problem with Frank in this area. Background checks were not done at the point he was hired. To our recollection, therefore, we didn't see the need to proceed.

Q. To proceed with what, with his background check?

A. It was -- it -- what would it

have been? He was already hired. He had a good record. There was no indications that any behavior related to this statement on his application had ever appeared in the workplace.

Q. The fact that he didn't tell the truth was not significant to anybody?

MS. SWAIN: Objection.

A. We didn't know he had not told the truth, Ann.

Q. And you didn't try to find out, did you?

MS. SWAIN: Objection.

A. (No response.)

(Whereupon, Plaintiff's Exhibit No. 12 was marked for identification, and same is attached hereto.)

Q. I'll show you what's been marked as Plaintiff's Exhibit No. 12. Can you tell me what that is, please?

A. This is a documentation form

related to the incident there in June.
It looks like it was completed by Catherine Long.
Q. Have you looked at -- okay. And what -- do you know why Catherine Long was interviewed?
A. I believe she worked on the line that day, so she would have been in the area.
Q. Did -- did you ever see Frank's statement about the incident that occurred?
A. You just --
Q. With -- involving Ms. Thornton?
A. You just showed it to me, and I do believe at the time Tommy brought me all the documents when he talked to me about his recommendation and discipline.
Q. Do you recall whether or not Frank admitted to having yelled and used profanity and -- and threw -- thrown cans?

MS. SWAIN: Objection to the form.
A. I can't --
Q. Or thrown a bag of cans. Excuse me.
A. Yeah, I can -- I can tell you that there was no confirmation of any physical, such as the bag of cans or throwing pallets. There was confirmation of the cursing.
Q. I didn't ask you that. I asked did he confirm any of it? Did he admit to any of it?
A. I cannot -- I can tell you what Tommy Nance related to me.
Q. And what was that?
A. Not what Frank -- that he could not confirm any of the throwing of the pallets or the throwing the cans. He could confirm that there were curse words used and that Frank lost his temper.
Q. Well, he had confirmation from Linda, didn't he?

A. If it's one --
MS. SWAIN: Objection.
A. -- person against another, it's a he said/she said. That's not confirmation. Confirmation in my mind is someone validates another person's statement. We did not have any confirmation, despite the fact there were several people in the area that were witnesses, eyewitnesses to the situation. They did not confirm that, Ann.
Q. Well, there's no indication that they were ever asked about it, is there?
MS. SWAIN: Objection.
A. They would have been asked about it, Ann.
Q. Do you see anywhere on Ms. Long's statement where she said, I did not see any cans being thrown?
A. The investigation is not just the written statements. It's interviews

and discussion.
Q. Well, then I assume there would be notes concerning the interviews and discussions. Where would I find those, please, ma'am?
MS. SWAIN: Objection. There's no testimony about any notes.
A. I would say that Tommy Nance and Chris Jordan were probably present on both -- all the investigation comments and they would be your best source to validate what actual discussion that is not documented occurred.
Q. So is it not -- in a protocol for doing an investigation, do you not document the -- the oral -- the oral statements also to make sure you have got all the information?
MS. SWAIN: Objection.
A. They do at times. I cannot specifically state exactly what was done at this time since I didn't do it. I didn't do the investigation, Ann, so.

MS. ROBERTSON: I've got to take a break for just a minute. Well, it's time to take lunch. Let's go --

MS. SWAIN: You want to do lunch?

MS. ROBERTSON: Yeah. Because my --

THE VIDEOGRAPHER: Going off the record. The time is 11:50 a.m. This is the end of tape one.

(Lunch recess.)

(Whereupon, the deposition was in recess and shall be continued at a date and time mutually agreed upon by all parties.)

END OF PROCEEDINGS.

CERTIFICATE

STATE OF ALABAMA
JEFFERSON COUNTY

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

____________________________
SHANNON L. CARROLL, CCR, RPR
Certification Number:
AL-CCR-484

A

**abilities** 44:10
**ability** 45:23 46:15 68:14
**absolute** 56:7
**accounts** 20:20 20:21
**accurate** 16:17
**act** 64:6 67:1
**acting** 7:1 25:20 43:21 44:8
**action** 4:10 65:10 70:1 94:16
**actions** 50:4
**acts** 49:2
**actual** 92:12
**addition** 56:16
**address** 10:9 83:1
**adjust** 50:15 53:7
**adjustments** 53:19 54:4 58:19 60:2
**administrative** 31:4
**admissible** 82:8 82:10
**admit** 58:10 90:13
**admits** 58:3
**admitted** 89:21
**ads** 31:22
**advised** 2:9
**agenda** 37:23 38:14 39:4
**ago** 77:14
**agreed** 2:15 3:1 3:10 93:16
**agreement** 47:16,18,23
**ahead** 22:21 64:11
**Alabama** 1:2,23 2:2,22 5:12,21 7:3,9 10:2,11 11:13 15:21 16:22 18:9 19:5 32:14 33:8,16 34:3,7 51:20 94:3
**allegation** 60:1 60:10 63:21
**allegations** 76:12 77:18
**alleged** 73:4
**allow** 84:4
**allowed** 12:18 53:7
**Allowing** 84:21
**Allums** 20:5 24:20 29:23
**AL-CCR-484** 94:23
**amended** 2:3
**amount** 43:12
**Ann** 1:17 2:5,18 5:7 7:11 8:7 9:10,11,12,17 40:9 51:10 52:3 62:5,15 69:13 73:13 75:14,23 76:17 77:7 78:2 79:8 80:20 82:19 84:2,5 86:20 88:10 91:12,18 92:23
**annually** 41:19
**answer** 81:6,14 81:17 84:21
**answers** 94:9
**anybody** 34:5 69:7 71:21 87:2 88:7
**anywise** 94:17
**apartment** 10:13,14
**apparently** 66:23 86:6
**appear** 58:12 59:21 61:15 85:23
**appeared** 88:5
**APPEARING** 5:6,15
**appears** 45:4 47:11 53:3,14 54:10 55:4 57:20 66:5 78:13 80:10 82:14
**application** 4:18 78:14 81:12 85:18 86:7 87:3,8 88:4
**appraised** 65:2
**appropriate** 41:1 55:2 58:8 65:11 70:2
**appropriateness** 64:22 65:5
**approve** 34:2
**approximate** 51:8
**approximately** 7:11 10:21 11:6
**area** 37:10 87:17 89:9 91:9
**argument** 84:18
**arrival** 33:7 34:12
**articulate** 55:5 55:23
**asked** 53:5,8 59:10,17 76:13 77:2,9,10,15 77:20 90:12 91:14,17
**asking** 40:14 60:9 69:17 79:18
**assess** 34:20
**assessment** 45:22 46:14 65:5
**assign** 3:6
**assist** 75:12
**associates** 49:2 63:12 64:5
**assume** 14:2 92:2
**assurance** 17:21 24:10
**attached** 8:13 44:21 47:3 48:10 49:11 52:13 57:16 73:17 74:23 78:7 80:16 88:18
**audits** 34:9
**availability** 76:1 76:2,4
**aware** 29:16 34:4
**A-L-L-U-M-S** 20:7
**a.m** 1:19 7:11 51:9 93:9

B

**back** 19:2,9 21:16 22:15 55:14 70:7,8 74:3
**background** 14:10,14,17 24:21 32:3,11 33:10 34:15 39:5 42:2 44:13 86:13 87:10,17,22
**bag** 77:1 90:4,8
**Baker** 5:17
**bakery** 16:9
**balance** 22:16
**Barbour** 85:13
**based** 53:21 65:9 75:23 76:1,3
**basic** 17:14 60:18
**basically** 16:21 17:7 26:20 27:3 59:8 61:12
**Baxter** 28:1
**Bearman** 5:17
**becoming** 29:10 44:8
**began** 32:11
**BEHALF** 5:6,15
**behavior** 70:8 88:3
**believe** 13:7 14:12,18,21 20:8 23:12 25:23 27:23 33:6 48:6 49:6 50:7 54:13 64:7,12 65:16 66:16 67:12,15 69:9,12 71:15 72:17 87:7,11 89:7,17
**benefits** 30:4,6 30:11
**Berkowitz** 5:18
**best** 92:11
**better** 83:12
**bias** 36:18
**bid** 45:13
**Billerica** 25:6,8 25:14 33:18
**Birmingham** 1:23 2:22 5:12 5:21 7:9

**bit** 15:11
**blacked** 82:19
**blame** 61:15
**board** 25:10 26:11 31:16
**boilerplate** 15:2
**books** 38:19 39:5
**bother** 87:2
**Boyer** 1:17 2:18 7:11 8:7 9:10 10:1 51:10 84:5,21
**Boyer's** 8:17
**Bravin** 21:1
**break** 50:19 93:2
**Bremner** 16:5
**Brewer** 12:15
**Brief** 51:1
**bring** 42:4 44:13
**broader** 27:7
**brought** 76:19 89:17
**Building** 1:21 2:21 5:10 7:8
**business** 12:16 12:20 15:18 27:7
**butter** 16:11
**buy** 37:8
**B-O-Y-E-R** 9:10

C

**C** 2:5 5:1,7 6:1 12:15
**Caldwell** 5:17
**call** 12:4 23:9 38:14
**called** 16:5 27:1 46:5 75:20 84:14
**calls** 36:10
**candidates** 46:19
**canned** 37:7
**cans** 76:23 77:1 77:3 89:23 90:4,8,19 91:21
**capability** 56:4
**capacity** 8:21
**capital** 12:17,23 13:1
**card** 22:13,15
**Carriage** 16:10
**Carroll** 2:4,19 5:3 7:1 94:21
**case** 1:5 51:10 51:19,21 69:21 81:4 82:9
**cases** 27:17
**Catherine** 89:3 89:5
**cause** 7:12 94:18
**CCR** 2:19 5:3 94:21
**central** 33:17
**cereal** 16:12
**certainly** 61:14 82:23
**CERTIFICA...** 94:1
**Certification** 94:22
**certify** 7:2 94:6 94:14
**cetera** 32:1 47:21
**change** 4:11 29:15 47:9
**changes** 34:22
**characterizati...** 67:22 87:6
**check** 14:10,14 14:20 82:14 86:14 87:3,10 87:22
**checks** 32:3,11 33:10 34:15 87:18
**child** 86:17
**Childs** 1:20 2:20 5:8 7:7
**chosen** 27:19 46:10
**Chris** 59:3,7 75:8,9,10 92:9
**circled** 8:22
**Circuit** 84:18
**circumstances** 75:18 80:12
**Civil** 2:2 7:4
**claim** 54:7
**claimed** 30:6
**clarify** 31:4
**CLARK** 6:7
**class** 40:3
**classes** 40:22
**classroom** 37:18
**clear** 82:22
**clearly** 33:3 34:12 54:22 83:7
**clerical** 20:12
**client's** 53:23
**close** 21:20
**coercing** 49:1 63:11 64:4
**collaborate** 57:1
**Coloris** 13:22
**com** 13:7,16
**come** 11:21 12:12 31:1,5 31:16 37:6,9 38:20 42:3 56:20
**comes** 31:20
**coming** 10:7 25:10
**commencing** 7:10
**comment** 30:19
**comments** 92:10
**Commission** 82:16
**commissioner** 3:12 7:2
**committed** 67:1
**committing** 72:6
**company** 11:11 12:2,16,17,23 13:1 16:8 21:7 39:3 49:3 79:2
**competent** 34:19
**complained** 53:6 59:12
**complaint** 49:7 50:8,11 52:19 54:16,20,23 56:13,17,19 57:1,3,10 60:6 60:15 74:10 75:19
**complaints** 53:23
**complete** 76:5
**completed** 89:2
**completely** 30:20
**completion** 23:4
**complex** 43:1,5
**complied** 34:7
**computer-aided** 94:10
**concerned** 77:8
**concerning** 68:12 92:3
**conclude** 68:11
**condiments** 16:11
**conduct** 64:10
**conducted** 74:14 76:15 86:14
**confident** 77:11
**confirm** 36:20 90:12,18,20 91:11
**confirmation** 90:7,9,22 91:5 91:5,8
**confirmed** 64:13 69:22 70:3 72:9,12,18
**confrontation** 72:9
**confused** 61:18
**conjecture** 53:16,20 61:13 78:3
**consider** 58:14 71:17
**considerably** 70:17
**considered** 71:22
**consistent** 33:1 35:8
**construed** 50:4 56:6 84:23
**continued** 6:2 93:15
**control** 50:2
**conversation** 56:16
**converted** 28:11
**convicted** 79:20 80:8 86:16
**convictions** 81:13
**Cooke** 75:5 76:7 76:12 77:2
**cookie** 16:4
**cookies** 15:12
**copy** 39:16 62:15,16,18,21 74:4 82:22 83:12
**corporate** 8:23 11:22 19:10

22:14
**corporation** 22:11 34:11
**correct** 9:3 10:15 13:14 14:4 16:18 18:11 45:11,12 45:15,16,18,19 48:2,22 54:4 54:11 56:8 58:11 63:7 66:3,6,12,13 66:15,20,21 67:3 68:8 71:14,16 83:1 85:16,22 86:5 86:7,12 94:12
**correlates** 57:22
**Coty** 27:22
**counsel** 2:17 3:3 3:5 7:5 51:23 52:9 94:15
**counseling** 49:4 63:6
**counts** 85:11,12
**County** 10:10 85:13 94:4
**couple** 71:3,5
**courses** 36:23
**Court** 1:1 2:10 2:11 11:18 51:19 84:18
**cracker** 16:4
**crackers** 15:11 15:12
**crazy** 13:7
**created** 26:15 27:14
**credit** 14:20 22:13,14
**crime** 85:12
**crimes** 85:8
**criminal** 14:17 81:13 85:4
**critical** 76:5
**Crum** 80:22
**current** 34:16
**currently** 10:3 16:1 18:7
**curse** 64:14,15 90:20
**cursing** 90:10

**D**

**D** 1:13 4:1 51:18
**dad** 55:8
**Dan** 25:18,20 26:4
**date** 7:2 21:15 28:18 36:19,20 47:20 60:17 93:15
**dated** 62:1
**dates** 36:13 66:5 66:8,22 71:16
**David** 21:10,12 21:16
**day** 2:7,23 7:10 60:20 89:8
**days** 66:20
**deadline** 23:22 24:1,4
**deadlines** 22:22 23:15,18
**deal** 13:2
**dealing** 50:12 70:3
**Deanna** 23:8
**Deborah** 19:13
**Dee** 6:8 23:6,9
**Defendant** 52:6
**Defendant(s)** 1:14 5:15
**delivering** 2:4
**Delnor** 83:22
**demonstrate** 39:7
**demonstration** 44:16
**demoted** 65:20
**demotion** 29:14
**department** 17:14 18:2,10 18:13 19:19 27:9 34:10,21 37:12 39:21 40:6 83:15
**departments** 17:18
**depending** 31:1 42:2 69:18,20
**deponent** 52:8
**deposition** 1:16 2:17 3:8,11 4:9 8:18 45:1 48:14 49:15 51:7,9 78:11 93:14 94:7
**description** 4:7 17:3,5
**descriptions** 16:19,20
**despite** 91:8
**detail** 86:11
**details** 56:13 77:21 85:4
**determine** 31:17 37:13 56:22
**dialogue** 64:17
**different** 9:15 31:22 40:18,21 40:22 70:4
**direct** 25:13 32:19 37:15 50:2 81:6,14 84:17
**directed** 81:17
**directly** 30:23
**director** 15:7 16:14,16 27:2 27:8 30:22
**disciplinaries** 44:10 45:22 46:15
**disciplinary** 48:17 49:17 64:23
**discipline** 58:6 89:19
**disciplined** 71:22
**discoverable** 81:4
**discovery** 82:7
**discrimination** 41:10
**discuss** 31:6
**discussed** 38:1
**discussion** 53:16 92:1,12
**discussions** 65:8 92:4
**displaying** 50:3
**disrespectful** 50:5
**disseminating** 23:23
**District** 1:1,2 51:19,20
**divested** 12:16
**division** 1:3 12:11 15:17,23 16:4,5,10,12 33:11 51:21
**divisional** 23:1
**divisions** 16:3,7
**DME** 37:14
**docked** 65:14 67:11
**document** 47:9 48:5 62:1 67:5 68:10 71:8 82:15,20 83:6 84:6 92:16
**documentation** 4:14,15,16,17 4:20 88:23
**documented** 92:13
**documents** 39:15 89:18
**doing** 32:1,21 37:4 68:23 92:15
**Donald** 27:22
**Donelson** 5:17
**dot** 13:6,16
**Dothan** 10:2,8 10:11,17 11:13 15:20 16:16 17:23 34:11
**dotted** 25:23
**drop** 68:17
**drops** 69:16
**drug** 15:2
**due** 21:16
**duly** 8:8
**duties** 17:6 26:20,21
**DVD** 37:8
**D-E-E** 23:7

**E**

**E** 4:1 5:1,1 6:1,1 9:11
**earlier** 70:16 76:17
**educational** 24:21
**effect** 68:14
**effective** 2:3
**eighteen** 80:3 85:21
**either** 31:15 41:19 72:13 85:2
**employed** 12:13 36:13,19 45:7
**employee** 4:11 36:7,8 47:8

87:14
**employees** 30:5 34:16 35:13,14 35:18,23 50:3 61:2
**employee's** 68:18
**employer** 36:10
**employment** 4:18 12:18 31:22,23 36:20 78:14,23 79:10
**engaged** 85:14
**engine** 13:9
**engineering** 17:16
**English** 55:8,10
**entailed** 14:14
**entire** 21:6
**equal** 41:4
**et** 31:23 47:21
**evaluate** 31:15
**evidence** 3:9
**exact** 20:10 21:15 28:17 64:17
**exactly** 26:5 32:12 60:21 92:21
**examination** 4:3 7:13 9:7
**examined** 8:8
**excellent** 68:23
**Excuse** 90:5
**exemplary** 70:17 71:18,23
**exhibit** 8:11,17 8:22 44:19,23 47:1,6 48:8,13 49:9,14 52:11 52:16 53:12 54:9 57:14,18 60:23 61:19 62:3,4,12 63:5 65:13 66:2,4 68:1,3,5 73:15 73:20 74:9,21 75:2 78:5,10 80:14,19,21 82:3,13 88:16 88:21
**exhibits** 2:8 4:7 73:23
**exist** 33:2,3
**expect** 72:5,14
**expectations** 22:10
**expected** 22:23
**expense** 37:15
**experience** 44:15
**explain** 60:19 80:12
**explaining** 55:23
**explanation** 80:7
**extra** 62:15
**eyewitnesses** 91:10

F

**F** 5:16
**fact** 79:1 88:6 91:8
**facts** 58:17 59:14 60:5 78:22
**failed** 23:22
**fair** 24:23 55:6
**fairly** 77:11
**fairs** 31:21
**fall** 71:16
**family** 21:17
**fashion** 71:18
**feel** 76:5 77:11
**fellow** 25:14 49:2 63:12 64:5
**fellows** 28:10
**felony** 79:21 80:7 86:16
**felt** 65:10
**female** 50:9
**fighting** 48:23 63:10
**file** 45:5 64:18 68:18 70:10,15 79:12,14
**filed** 2:11 30:6 49:7 74:11,13 80:22
**filing** 3:11
**fill** 54:21 76:21
**filled** 75:5
**finance** 17:17,20 19:4 20:23
**find** 88:11 92:4
**fine** 8:3 12:6 50:23 81:15
**finish** 84:21
**fired** 67:16 72:15
**first** 8:8 11:1 27:22 63:8 66:12 69:8,23 75:20 85:12
**Flavor** 1:12 11:9 11:22 12:5,13 13:5 15:5,15 15:17 19:14 21:18 26:23 33:15 35:11,20 35:22 36:5,7 36:22 37:1 42:13 51:12,14 51:16,17 52:6 68:15 70:7 85:2
**Flower** 51:11
**focuses** 30:3
**following** 7:13 51:3
**follows** 8:9
**Food** 16:5
**foregoing** 7:5 94:7,11
**form** 3:4 4:14,15 4:16,17,20 24:3 30:13 36:2 52:20 54:21 74:10 75:4 76:21 88:23 90:2
**formal** 23:8
**former** 35:12,14 35:17,22 36:7
**forms** 75:14
**forward** 56:20 76:19
**found** 13:16
**four** 10:6,12,13 26:10
**fourteen** 85:15
**frame** 28:19
**Frank** 45:5 46:9 48:18 49:19 53:14 54:1 55:12 57:21 60:19 63:23 65:1 68:21 70:3,16 78:14 78:23 87:17 89:21 90:17,21
**Franklin** 1:12 51:18 83:22
**Frank's** 89:11
**front** 41:13 64:18
**frozen** 16:9
**fuck** 55:17
**fucking** 55:14
**full** 53:16
**fully** 53:18
**function** 18:18 18:20 19:11 25:2
**functions** 17:15
**further** 3:1,10 68:20 94:14
**F-word** 58:3

G

**gaps** 34:20
**general** 40:14
**generally** 79:10
**gentleman** 19:6 21:1,9 73:10
**getting** 30:5 40:17 71:21
**gift** 46:4,5 70:18
**girlfriend** 80:1 85:19 86:10
**give** 9:1 59:13 60:5 63:3
**given** 36:9 39:7 39:11 40:21 41:18,23 47:20 67:3 77:17 94:12
**Glen** 19:20 21:3 34:17,18,19 35:3,5,7
**glorified** 27:3
**go** 12:19 18:23 22:20 47:14 62:23 64:11 69:23 86:10 93:3
**going** 8:20 12:4 15:1 17:4 38:2 38:6 40:10 64:16 66:7 78:2 80:21 81:6,18 93:8
**good** 9:22 13:2 31:18 50:19 87:14 88:2
**grade** 37:13
**grammar** 56:8

grounds 3:7
Groups 16:6
guess 48:5 55:16 57:11

H

hand 55:19 63:3 73:23
handbook 23:19
handed 38:19,20 49:21 59:16 64:23
handle 27:6
handled 20:11
handout 38:22
handwriting 56:10 76:9
happen 77:14
happened 13:17 60:19 66:2 74:13
harass 69:6
harassment 41:6 41:9,11,17 69:5,8,13,21 70:5
hard 53:16
Harold 28:3
Harrel 28:1,5,6 28:7
Hatcher 29:1,19
Hawaii 10:23 11:5,15
head 18:1,2,10 18:13 19:4,19 19:23 20:21 21:6 24:9 30:1
heads 17:17 40:6
hear 13:4
heard 53:22 76:13
hearing 94:13
Helms 21:1,10
helping 30:4
hereto 8:13 44:21 47:3 48:10 49:11 52:13 57:16 73:17 74:23 78:7 80:16 88:18
Hilo 10:23
hired 13:20 14:1 14:5,9,11 15:5 19:16 20:17 21:23 31:3 78:17 79:1,2 87:19 88:1
hiring 30:22 31:10 33:16 34:3
history 46:21 85:5
Holland 18:19 18:21 28:22
home 21:16 33:20
honest 61:12
hope 38:23
hopefully 44:14
Hopkinsville 10:18 11:12
hourlies 32:4
hourly 31:8,14
House 1:12 11:9 11:23 12:5,13 13:5 15:5,15 15:17 16:10 19:15 21:19 26:23 33:15 35:11,20,22 36:5,7,22 37:1 42:13 51:11,13 51:15,17 52:6 68:15 70:7 85:2
HR 17:20 19:18 20:1,1,3,11,18 20:19 22:23 23:1 25:2 30:1 30:14 39:21 54:23 74:18 75:14
human 17:15
hung 24:5
Hutchins 28:23 29:3,18
H-A-R-R-E-L 28:5
H-I-L-O 11:3

I

identification 8:12 44:20 47:2 48:9 49:10 52:12 57:15 73:16 74:22 78:6 80:15 88:17
identity 12:9
impeach 81:11 81:12
inappropriate 63:23 64:3
incident 69:21 73:5 89:1,11
incidents 68:19 68:20
included 40:3,5 41:1,10
including 10:14
inclusion 82:2
increases 45:6
independent 65:4
indicated 53:11 72:1
indicating 68:3
indication 91:13
indications 87:16 88:2
individual 8:21 69:4 72:23 73:3
information 12:4 36:9 65:9 79:11,17 81:3 84:4,22 85:3 86:4,15 92:18
initially 20:15 21:9 77:23
inquiry 64:22
instance 41:3 63:19
instructor 38:20
interacted 46:20 60:16
interaction 31:9 59:13 63:22 64:3
intercourse 85:14
interested 56:12 94:17
interesting 46:11
interfering 49:1 63:12 64:5
interim 46:8 70:18 71:2,4,6
interview 13:19 31:2 43:17,20 44:4 46:7,18 56:16
interviewed 14:3 44:1 46:8 46:10 89:6
interviews 32:2 44:2 91:23 92:3
intimidating 49:1 50:5 63:11 64:4
investigate 60:8
investigating 59:6 75:8
investigation 53:4 54:15 58:22 64:13,19 65:3 72:10 74:15 75:6,12 76:6 77:7 91:22 92:10,15 92:23
involuntarily 22:5 47:14
involve 55:1
involved 77:6
involving 86:16 89:14
issue 24:4,7 86:21
issued 48:18
issues 21:17 24:7 41:5,10 47:15 48:1
item 64:12

J

JEFFERSON 94:4
Jennifer 5:16 7:21 52:5
job 13:5,10 16:19,20 17:2 17:3,5,6,13 26:18 30:9 31:21 61:7 68:22,23
jobs 13:10
Jonnie 50:8,9 52:20 55:12 57:22 59:12 60:15 61:9
Jordan 58:23 59:3,7 75:10 92:9
Jr 1:13 51:18 83:23

**July** 10:14 45:17 66:14
**June** 62:1 66:11 73:5 89:1

K

**keep** 85:3
**keepers** 31:18
**Kentucky** 10:18 11:12 15:8,10 15:23 16:15,21
**kept** 65:2 81:3
**kin** 94:15
**kind** 13:7 25:22 31:7 37:10 42:7 72:4 85:1
**knew** 35:7 77:16
**know** 14:13,16 14:19 15:14 21:15 24:20 30:5 31:10,18 32:10,15 34:10 35:10 37:14,15 40:20 41:15 43:11 45:20 47:16 49:4 50:6 55:20 56:7 57:9 63:20 71:9 72:20 73:8,12 74:8,12,16 75:16 76:11,18 77:1 78:15,16 78:18 79:1,6 83:16 86:13,21 87:1,9 88:9 89:5
**knowledge** 46:20
**Kress** 1:21 2:21 5:10 7:8

L

**L** 2:4,13,19 5:3 7:1 94:21
**label** 53:17 55:12,15,19 60:16
**labels** 53:15
**labor** 41:15
**laid** 12:20
**Lake** 6:8 23:6
**language** 58:7
**large** 77:1
**Larry** 19:6 29:1 29:19
**law** 2:19 7:6 82:17
**laws** 41:15
**lawyer** 40:20
**lead** 40:4 42:12 42:13,15,20,23 43:6,14 59:14 60:6
**leader** 45:14
**leaders** 28:11 40:23
**leadership** 44:16
**leader's** 67:8
**leading** 3:4
**leads** 27:13,17
**learn** 38:23 50:1
**learned** 78:17
**leave** 19:1 21:14 26:8
**leaving** 26:13
**left** 23:11 34:19 35:3
**Leigh** 20:5,13 24:20 25:22 29:23 30:3
**let's** 14:7 50:19 93:3
**level** 20:12
**lied** 81:12 86:7
**life** 82:17
**light** 24:13
**Lightsey** 24:11 24:12
**Linda** 1:7 6:9 49:7 51:10 64:1 72:14 74:11 90:23
**line** 25:23 42:14 42:19,21,22 43:1 46:5,21 50:3 55:13 64:1 75:11 89:8
**lines** 43:4
**little** 15:11 17:10 66:3 67:2 68:7
**live** 9:23 10:2,9 10:16,20 11:4
**lived** 10:4
**LLC** 1:20 2:21 5:9 7:7
**Loa** 11:16,19 12:15
**load** 53:15
**location** 15:19 85:13
**locations** 15:15 15:18 33:11
**logistics** 17:17
**long** 10:4,19 11:4 21:18 89:3,6
**longer** 21:12
**Long's** 91:20
**look** 45:1 48:15 49:16 52:16,21 60:22 61:23 62:13 66:1 69:7 70:7,7,13 71:8 73:21 75:1 80:18 82:11,12 85:7
**looked** 87:7 89:4
**looking** 44:12
**looks** 45:6,8 47:8 52:19 68:6 71:10,11 89:2
**lose** 65:14 67:7
**loss** 68:12
**lost** 90:21
**lot** 22:22 23:4 61:1
**Louis** 19:10 21:7
**lunch** 93:3,5,12
**lying** 61:9
**LYNNE** 6:6
**L-O-A** 11:20

M

**M** 28:8
**Macadamia** 11:16,20 12:15
**machine** 50:15 53:7 54:4 55:16,17,19 60:17
**maintain** 39:1 39:16
**maintained** 39:6
**maintenance** 17:15,19 18:1 18:6,10,14 27:9,11
**making** 53:19 56:12
**man** 29:18
**management** 13:3 25:9 32:22 33:23
**manager** 22:23 25:20 26:2 27:1,3,5,9 29:12 30:15 54:23
**managerial** 20:12
**managers** 17:14 37:12
**manual** 23:23 24:5
**manufacturing** 15:13 17:9 37:15
**March** 1:18 2:7 2:23 7:10 51:7
**marked** 8:12,16 44:20 47:2,6 48:9,13 49:10 49:14 52:12 57:15 73:16,20 74:22 78:6,10 80:15 87:4 88:17,21
**Mary** 1:17 2:18 7:11 8:7 9:10 9:11 51:10 73:22 84:4
**Massachusetts** 15:19 20:2 25:8,11,21 26:1
**match** 22:10 86:3
**material** 37:7 41:12
**materials** 38:19 39:6,23
**matter** 58:22
**Mauna** 11:16 12:14
**ma'am** 9:9 10:5 45:3 48:16 52:17 57:19 78:12 92:5
**mean** 35:19 39:2 39:14 40:4,9,9 41:7 44:3 55:11 57:6 59:2 82:1
**meaning** 12:7
**means** 47:17 94:9
**meant** 66:17

**mechanical** 24:7
**meet** 22:23 23:22
**meeting** 38:5
**meetings** 38:8
**Melvin** 28:23 29:3,18
**memorandum** 4:12,13 62:10
**men** 42:12
**mention** 59:18
**merged** 16:2,3
**met** 23:15
**middle** 1:2 51:20 61:1
**mind** 91:5
**minute** 93:2
**minutes** 77:14
**mixed** 43:2
**Mixon** 28:1,3,7
**money** 43:7,10 65:14
**monitoring** 43:4
**Monster** 13:6,16
**month** 66:3,19 67:2 71:5
**months** 26:11 46:6 49:21
**motion** 80:22 82:6
**move** 84:16,16
**moved** 18:14,15 19:2 21:16
**moving** 43:2
**mutually** 93:16
**M-A-C-A-D-E...** 11:20
**M-A-U-N-A** 11:19

**N**

**N** 2:13 4:1 5:1 6:1 55:12
**name** 9:8,17 11:2,22 23:9 75:15 82:23 83:2
**named** 19:6 21:1 21:9 41:22
**names** 52:1
**Nance** 21:22 23:11 47:10 53:4 54:11 55:20 59:3 74:14,17,18 75:12 87:7 90:15 92:8
**necessarily** 40:10
**necessary** 3:2
**need** 13:12 37:20 87:20
**needed** 34:21
**needs** 67:22
**neither** 94:15
**Nettles** 19:13
**new** 23:23 26:15 32:22 36:10
**Nickerson** 50:8 50:9 52:20 55:4 58:4 60:15
**Nixon** 28:8
**North** 1:22 2:22 5:11,20 7:9 10:10
**notebook** 39:11
**noted** 55:1
**notes** 44:4 53:3 54:11 92:3,7
**notice** 3:11 4:9 54:8
**notify** 33:17
**November** 45:14
**number** 1:5 4:3 4:7 48:20 51:21 62:4 68:20,20 94:22
**nut** 15:18 16:3
**nuts** 11:16 37:13 43:2

**O**

**O** 2:13
**object** 17:5 24:2 30:12 38:3,7 66:8 80:21
**objected** 84:3,10 84:13,14
**objecting** 81:22 84:15
**Objection** 16:23 22:20 23:16 25:4 28:13 30:2 31:12 32:8 33:19 34:8 35:6 36:1 36:11 37:5 38:17 39:9,20 40:8 42:9 43:16,23 44:5 44:11 46:2,17 48:3 54:5,17 54:19 55:7 56:2,14,21 58:16 59:1 60:3,11 61:10 61:17 63:14 64:8 65:7 67:4 67:21 68:16 69:10,19 70:12 71:20 72:7,16 72:22 76:16 77:4,19 80:9 86:2,8,18 87:5 87:13 88:8,13 90:1 91:2,16 92:6,19
**objections** 3:3,6 9:4 79:8
**objective** 35:7
**obviously** 71:23
**occurred** 66:12 66:15 89:12 92:13
**October** 23:13 45:10
**offender** 4:19 86:22
**offenders** 82:17
**offer** 31:7,19
**offered** 3:8
**office** 19:10 31:23 33:20 39:15
**Offices** 2:20 7:6
**official** 29:11
**Oh** 9:19 51:16 62:22 74:6 77:22 83:9,18
**okay** 8:4 9:5 10:16 12:10 13:15 15:4 27:4 28:6,16 49:13 54:8 63:20 64:21 66:10 67:18 72:20 74:12 79:13 81:16,20 81:23 83:9,14 85:6 89:4
**once** 26:15 72:9
**on-site** 30:17
**opening** 31:20
**operations** 15:7 16:14,16 27:2 30:22
**operator** 43:7 43:13 53:18
**opportunity** 41:5 60:18
**oral** 2:6 7:12 92:16,16
**order** 75:16 80:23
**orientation** 42:4 42:8
**original** 2:5
**outline** 37:23 38:15 39:5 47:23
**outside** 19:17 21:23
**overlook** 56:7
**overtime** 55:14

**P**

**P** 2:13 5:1,1 6:1 6:1
**pack** 46:4,5 70:18
**page** 4:3,7 52:22 52:23 53:12 54:10 60:22
**pallets** 90:9,19
**Pantazis** 1:20 2:21 5:8 7:7
**paper** 59:16 67:19
**parachute** 13:2
**parent** 11:10 12:1,15 16:8 21:7
**part** 32:21 63:17 70:15 75:6
**participate** 64:19
**particular** 38:8 38:16
**parties** 2:16 3:6 93:17 94:16
**parts** 43:3
**pass** 74:5
**pay** 22:15 43:13 65:15 67:11
**payable** 20:20 20:22
**payroll** 29:11 68:9
**PC** 5:18

**peanut** 16:11
**peanuts** 72:13 73:4,7,10
**pejorative** 41:8
**Pennsylvania** 15:20
**people** 12:20 14:3 20:3 27:11 31:14 37:9 40:5,22 42:13 44:12 55:1 56:3,8 70:21 76:5 91:9
**performance** 22:19 47:14 48:1
**performed** 25:2 68:21 70:14,16 71:18
**performing** 71:23
**period** 45:9 86:20
**permanent** 10:11
**person** 13:23 14:1 25:6,23 27:19 41:22 42:15,20,23 43:6,10,14 46:7,7,13 57:3 72:5 75:14,18 76:19 78:21 79:3 86:9 91:3
**personal** 21:16
**personally** 35:2 64:20
**personnel** 4:10 20:18 31:17 35:21 45:5 46:21 70:14 79:12,14
**person's** 70:8
91:6
**physical** 72:3,6 72:8 90:8
**piece** 67:19
**pieces** 86:4
**place** 21:8,21 23:5 26:14 39:4 42:6
**Plaintiff** 52:4
**Plaintiff's** 4:8 8:11,17,18,22 44:19,23 47:1 47:6 48:8,13 49:9,14,22 52:11,16 53:12 54:9 57:14,18 60:23 61:19 62:12 63:5 65:13 66:1,4 67:23 73:15,20 74:9,21 75:1 78:5,10 80:14 80:18 82:13 88:16,21
**Plaintiff(s)** 1:8 5:6
**plant** 20:2 23:1 25:11,19 26:2 26:16 27:1,3,5 48:20 63:16,17 64:10 72:2
**plants** 33:1
**please** 2:9 9:8 10:5 45:2 48:16 49:16 50:21 52:1,17 57:19 62:1 75:2,3 78:12 80:19 88:22 92:5
**plus** 26:21 27:6
**point** 50:19 59:10,16 87:18
**policies** 24:8
34:6
**policy** 23:19,23 24:5 35:11,20 36:6
**portion** 30:8 51:3
**position** 15:6 19:15 26:18 30:21 31:2 42:5 44:14 67:8 69:1 70:20
**positions** 27:10 46:4
**positive** 13:11 25:17 28:4 37:19 84:8
**post** 43:18
**posted** 13:18 82:15
**Posting** 4:19
**present** 6:5 51:23 92:9
**pretty** 36:12,14
**primarily** 23:17
**primary** 30:3
**Princeton** 15:8 15:10,22 16:14 19:3 33:13
**printer** 24:6
**prior** 3:9 18:20 25:10 29:9 33:7 34:12 44:14 68:22 70:19 71:9 86:19
**pristine** 39:16
**probably** 21:20 26:10 58:7 69:22 72:10 82:10 92:9
**problem** 22:12 23:3 44:16 56:1 87:16
**problems** 22:19 24:1 61:2
**Procedure** 2:2 7:4
**procedures** 32:23
**proceed** 52:9 87:20,21
**proceedings** 7:14 93:19
**process** 13:19 43:18,20
**produce** 79:9
**production** 17:16,22 18:6 18:13,15,18 28:21 29:12 42:17
**Products** 1:12 51:17
**profanity** 50:13 59:19 68:13 70:4 87:15 89:22
**program** 23:19 41:21
**programs** 23:2
**promoted** 21:5 67:20
**property** 49:3
**protective** 80:23
**protocol** 54:18 55:21 92:14
**provided** 7:3 86:15
**providing** 35:12
**Public** 82:16 83:11,19
**push** 54:2
**put** 39:12 55:18 70:9
**puts** 36:7

**Q**

**QA** 17:16
**qualified** 79:8
**quality** 17:21 24:10
**quash** 84:16
**question** 34:23 46:12 53:8 56:5 81:17
**questions** 3:4,5 40:14 77:21 81:19 84:5,22 94:8
**Quinn** 1:20 2:20 5:8 7:7
**quite** 43:5
**quote** 55:10 63:15 64:9

**R**

**R** 5:1 6:1
**raised** 86:22
**Ralcorp** 11:10 12:1 21:6
**ranks** 31:4,8
**rape** 80:1 85:10 86:16
**read** 7:18 37:14 83:7,9
**real** 61:12
**really** 15:16 19:23 76:10
**reason** 22:8 26:12 55:3
**reasons** 81:10
**recall** 89:20
**recess** 51:1 93:12,14
**recited** 11:8
**recollect** 65:19 65:21
**recollection** 87:19
**recommendati...** 31:6 89:19

**record** 8:16 52:9 88:2 93:9
**recordation** 44:3
**recorded** 42:7
**refer** 29:12 39:17 46:4 74:3
**reference** 35:17 36:4 39:13,22
**references** 35:12 35:22
**referred** 63:8
**refers** 49:4
**reflect** 79:17
**regarding** 81:2 84:6,22 85:3
**related** 58:18 88:3 89:1 90:15
**relation** 26:8
**released** 13:3 22:6,7,17
**remember** 23:10 23:14 27:20 28:17 50:16 53:5
**repeat** 60:13 68:19
**replace** 18:17 19:22 26:17
**report** 17:18 25:13
**reported** 13:23 20:1 25:18,21 25:22 28:22
**Reporter** 2:11 7:16,20,23 8:4 11:18
**reports** 20:23
**represent** 52:2
**representative** 8:23
**represents** 94:11
**request** 54:21
**requested** 76:20
**require** 43:3
**required** 82:16
**requirements** 44:8
**residence** 10:11
**resources** 17:15 31:17
**respective** 2:17 36:10
**respond** 84:5
**response** 13:11 25:17 28:4 37:19 49:6 50:7 59:23 84:8 88:14
**responsibilities** 17:12
**responsibility** 17:8 30:4
**responsible** 37:3
**restriction** 36:15
**result** 61:21 65:12 94:17
**resume** 13:18 43:19
**retained** 2:10
**review** 37:8 70:10
**reviews** 34:5
**revision** 23:19
**Rich** 13:22
**Richard** 18:19 19:2 28:22 80:22
**Ricky** 18:3,5,20
**ridiculous** 82:6
**right** 9:2 12:3 13:12 16:13 28:12,21 32:10 35:15 42:19 47:22 48:21 58:9 63:3,13 65:12 67:7 71:12 82:11 83:4,11,21,23 84:20 85:9
**rights** 41:15 85:1
**Road** 10:10
**Robertson** 2:5 4:4 5:7 8:15 9:5,7 38:9 40:12,15 50:22 51:12 52:3,4 52:15 62:17,22 63:2 66:10 67:23 74:6 79:13 81:1,5,9 81:20,23 82:4 84:7,11 85:6 93:1,6
**role** 70:9,17
**RPR** 2:19 5:3 94:21
**rude** 50:4
**Ruiz** 25:18 26:4
**rule** 2:1 7:3 48:20 63:16,18 64:10 72:2
**Rules** 2:2 7:4
**run** 46:4
**runs** 43:2

**S**

**S** 2:13 5:1 6:1
**safety** 21:6 23:2 23:18 82:16 83:10,11,19
**said/she** 91:4
**salary** 31:7
**Sammy** 24:11
**saw** 75:13 76:13 77:2
**saying** 26:19 33:9,9 38:12 54:9 55:18 61:8 69:4,14 69:15,17
**says** 38:22 47:13 47:15 48:19 50:1 52:22 53:2 55:11 61:1,20 64:4 75:7 79:19,19 79:23 80:1 82:23 83:2,2 83:19,22 85:7 85:10,13,21
**scope** 26:21
**SCOTT** 6:7
**screen** 15:3
**seal** 83:16,19
**search** 13:9
**second** 11:19 28:1 29:2,19 52:22 54:10 60:22 61:20 66:15 67:9 85:11
**see** 14:7 34:15 47:15 58:1 59:22 60:4,23 69:3 70:8 75:14 79:21 81:18 83:10,18 83:18,22 87:4 87:20 89:10 91:19,21
**seek** 12:18
**seen** 68:23 82:7
**selected** 43:15 43:22
**selecting** 24:6
**sell** 13:1
**send** 7:20 8:1
**senior** 13:3 25:9 33:22
**sense** 27:7
**sent** 84:19
**separation** 47:16,18,19,22
**September** 10:7
**session** 38:16 39:8
**sessions** 41:23
**set** 32:23 50:20 51:19
**sets** 23:1
**setting** 37:18
**seven** 14:7
**severance** 47:20
**severe** 70:1
**severity** 69:20
**sex** 4:19 82:17 85:8,19 86:22
**sexual** 69:5,8,13 69:21 70:4 85:14
**sexually** 69:6
**Shannon** 2:4,19 5:3 7:1 94:21
**shift** 27:16,18,23 28:1,2 29:2,20 42:16
**shifts** 42:16
**show** 47:5 48:5 48:12 49:13 73:19 78:9 88:20
**showed** 89:16
**showing** 67:19
**shows** 68:10
**sic** 11:20 51:22
**side** 57:11
**sign** 7:19
**significant** 88:7
**similar** 67:1
**sit** 59:17
**site** 15:8,13 17:8 17:9,13 19:3 20:1 25:20
**sites** 13:10 35:9 37:9
**situation** 70:2

72:17 73:12 77:16 91:11
**sixteen** 48:20 85:15
**skills** 22:9 44:17
**slowly** 53:19
**small** 46:5
**Smothers** 18:3
**sodomy** 85:11
**sold** 12:22
**solving** 44:17
**somebody** 25:21 27:1 33:17 34:2 42:5,5 79:9
**somebody's** 55:10
**sorry** 7:22 51:17 71:6 83:13
**Sounds** 61:18
**source** 83:6 92:11
**sources** 37:7
**Southern** 1:3 51:20
**speak** 33:14 41:14 42:10 44:6 75:22 77:5 86:20
**specialty** 37:10
**specific** 17:11 38:11 41:14 43:11 63:18 77:21
**specifically** 14:15 24:22 42:11 50:17 53:2 63:17 75:22 77:5,12 78:19 79:5 92:21
**spell** 9:16 11:1 11:17
**spot** 46:9
**St** 19:9 21:7
**staff** 33:23
**start** 60:18
**started** 60:14
**state** 9:8 33:3 34:13 52:1 77:12 92:21 94:3
**stated** 70:16
**statement** 32:17 53:14 55:6,21 57:9,21,22 58:2,6,11,13 58:15 78:1 88:4 89:11 91:7,20
**statements** 53:21 56:9 72:18 91:23 92:17
**states** 1:1 58:17 80:4 85:17
**status** 4:11 47:8
**Statutory** 80:1
**Stein** 19:6
**stenotype** 94:8
**step** 48:17 49:17 61:20 63:8 69:23
**STIPULATED** 2:15 3:1,10
**stipulation** 7:5 36:4
**stipulations** 7:17
**stopping** 50:19
**story** 57:11 59:11
**straddles** 18:5
**straight** 69:3
**street** 1:22 2:22 5:11,20 7:8 10:9
**strike** 61:23
**structure** 26:15 27:15
**Subject** 9:4
**subordinates** 46:1,16
**subpoena** 84:19
**subpoenas** 84:15
**subsidiaries** 12:8
**substantiate** 57:2
**SULLIVAN** 6:6
**Summary** 4:10
**superintendent** 29:1,2,5,10,13
**supervise** 70:21
**supervising** 36:23 40:2
**supervisor** 37:17 38:4,13 38:13 40:1,2 40:21 41:4,22 43:21 44:9 45:10,18,21 46:3,9,13 59:7 61:3 68:8,15 70:18 71:1,2,7 75:8,11
**supervisors** 27:13,16,18,21 28:12,15,20 39:10 40:5,6 46:18,19
**supervisory** 44:15 70:9
**supervisor's** 68:22 75:15
**support** 25:5 58:7
**supposed** 47:23 78:22 80:6
**sure** 20:10 25:19 26:4 30:19 32:23 33:2 35:8 36:3 40:9 50:22 56:12 74:6 75:5 80:11 82:19 83:5 92:17
**surplusage** 9:13 9:21
**surrounding** 78:22
**suspended** 65:17 67:13 72:21
**Swain** 5:16 7:18 7:22 8:2 9:3 16:23 17:4 22:20 23:16 24:2 25:4 28:13 30:2,12 31:12 32:8 33:19 34:8 35:6 36:1,11 37:5 38:2,6,17 39:9,20 40:8 40:13 42:9 43:16,23 44:5 44:11 46:2,17 48:3 50:18 51:14 52:5,5 54:5,17,19 55:7 56:2,14 56:21 58:16 59:1 60:3,11 61:10,17 62:2 62:9,14,20 63:1,14 64:8 65:7 66:7 67:4 67:21 68:2,16 69:10,19 70:12 71:20 72:7,16 72:22 73:1,22 74:4,7 76:16 77:4,19 79:7 79:16 80:9,20 81:2,8,16,21 82:2 84:2,9,20 86:2,8,18 87:5 87:13 88:8,13 90:1 91:2,16 92:6,19 93:4
**sworn** 8:8 52:8
**S-E-Y** 24:14

T

**T** 2:13,13
**take** 45:1 46:8 48:14 49:16 50:19 55:21 61:8 73:21 75:1 80:18 93:2,3
**taken** 2:6,18 51:7,9 94:7
**talents** 22:9
**talk** 41:14 57:2,5 57:7
**talked** 58:23 89:18
**talking** 38:7,10 62:2,9 73:2,9 73:13
**Tamekia** 75:5 76:7,11 77:2
**tape** 93:10
**tasks** 23:4
**taught** 38:15 39:7
**tax** 12:9
**Taylor** 20:13
**teacher** 55:9
**team** 25:9 27:13 27:17 28:11 32:1,22 40:23 45:14 67:8
**tell** 17:2 22:18 33:12 40:16 45:2 47:7 48:15 52:17

53:1 54:14 56:18 59:15 60:21 61:3,3,4 61:5,11 64:16 76:8 78:11 88:6,22 90:6 90:14
**temper** 50:2 68:13 90:21
**temporary** 45:10,18,21 46:3,13 68:8 68:21 70:23
**temps** 31:15
**tend** 39:15
**tends** 58:6
**term** 17:5
**terminated** 65:22
**termination** 72:11
**terms** 17:11 26:18 35:11 36:6 44:9 47:19
**testified** 8:9 64:9
**testify** 79:10
**testifying** 40:17
**testimony** 2:6 9:1 51:4 92:7 94:12
**Thank** 63:1 74:7
**thereto** 3:9 94:9
**thing** 82:9
**things** 8:21 23:20 27:6 38:22 40:18
**think** 14:22 28:14,19 56:15 58:17 62:6 71:21 78:20 79:7 82:10 86:9,10,11
**third** 28:2
**thirteen** 85:15
**Thornton** 1:7 6:9 51:11 54:6 72:14 76:22 89:15
**thought** 62:17 77:13
**threatening** 48:23 63:11 64:4
**three** 10:21 11:6 26:10 42:21 46:6 85:11
**three-page** 38:21
**three-ring** 39:11
**threw** 72:13 73:4,10 89:22
**throw** 39:15 77:2
**throwing** 76:23 90:9,18,19
**thrown** 89:22 90:4 91:21
**time** 3:7,8 11:8 18:8 19:7,21 20:4,14 21:2 25:1,9 28:9,19 29:15 30:19 33:7 34:18 39:10 45:6,9 51:8,23 65:18 66:8 67:14 68:18 71:9 73:1 74:19 78:15,19 86:19 87:3 89:17 92:22 93:3,9 93:16
**timeliness** 23:3
**times** 92:20
**title** 20:9,11 25:19 26:5 29:4,11,15
**titles** 40:3
**today** 18:4
**told** 14:23 55:18 58:22 59:9,12 59:15 61:6 76:12,17 77:13 88:10
**Tommy** 21:22 22:7 23:2 24:5 47:10 53:3 54:11 59:2 65:2,9,10 74:14,16,18 75:12 87:7 89:17 90:15 92:8
**Tommy's** 22:9
**top** 52:22 75:15
**topic** 41:1
**tossed** 72:13
**Tower** 5:19
**train** 37:11
**trained** 53:18
**training** 36:23 37:4,11,17 38:4,13 40:2 40:21 41:4,6 41:11,17 42:1 42:8
**transcribed** 94:9
**transcript** 2:6 94:12
**transcription** 94:10
**trial** 3:7
**trouble** 61:7
**true** 18:4 60:10 69:2 86:1 94:11
**truly** 27:15
**truth** 88:7,10
**try** 56:7,8,22 57:8,10 58:18 59:13 60:5
88:11
**trying** 54:3 80:11
**turn** 43:19 61:5
**two** 9:11 16:3 38:21 41:20 42:16 49:20 53:12 68:21 71:13 80:2 85:12,20
**type** 23:20 42:4 72:8

**U**

**U** 2:13
**ultimately** 82:8
**Um-hum** 13:11 25:17 28:4 37:19 84:7
**underaged** 86:17
**understand** 8:19 16:15 35:16 53:11 54:22
**undertake** 34:15 35:1
**UNITED** 1:1
**untruthful** 58:15,20
**updating** 23:2 23:18
**use** 22:13 39:13 68:13
**usual** 7:17 15:2 75:17
**usually** 38:18 42:3
**U.S** 51:19

**V**

**validate** 92:12
**validates** 91:6
**variety** 37:6
**venture** 12:17 12:22 13:1
**venues** 31:22
**version** 59:10
**versus** 20:12 51:11
**Videographer** 6:6 50:20 51:6 51:16 52:7 93:8
**videotaped** 1:16 51:4
**view** 82:5
**violated** 63:18 72:1
**violation** 48:20 69:8
**violence** 49:3 64:6 72:3,6
**vs** 1:10

**W**

**W** 55:12
**Wachovia** 5:19
**wait** 81:18
**waived** 3:12
**waiver** 85:1
**want** 7:23 31:7 35:17 36:17 37:10 40:16 41:13 55:9 60:6 61:13 77:23 84:23 93:4
**wants** 40:20 53:15
**warehouse** 42:18
**warehousing** 17:16
**warning** 61:21 61:22 67:3,9
**Warren** 19:20 21:3 34:17 35:3
**wasn't** 30:16,18

58:8 77:6,9
**way** 9:22 32:7 36:18 39:17 54:3 57:12 74:1 84:23
**ways** 9:16
**web** 82:15 84:12
**went** 13:18 18:8 19:5,9 65:3,8
**We've** 38:19
**wider** 26:21
**Wiggins** 1:20 2:20 5:8 7:7
**Wiley** 27:23
**Williams** 1:13 45:5 48:18 49:19 51:18 54:1 57:21 58:2,10 61:22 63:23 65:1,14 67:1 76:23 78:14,17,23 83:23 84:3 85:2,4,14 86:14
**witness** 7:12 74:2 94:13
**witnesses** 56:23 72:19 91:10
**WKD** 51:22
**woman** 25:15,16
**word** 11:19 55:16 64:14,15 83:8
**words** 9:11 56:5 90:20
**work** 53:18 75:21
**worked** 89:7
**workers** 31:19
**workplace** 88:5
**worlds** 18:6
**wouldn't** 50:14
**write** 56:4,4,9 57:9 59:10,17 77:15 78:1
**write-up** 50:6 69:12,16,23 72:4
**write-ups** 68:12 68:17 70:11 71:13,19
**writing** 55:5
**written** 49:4 58:5,13 61:21 61:22 63:6 67:3,9 69:5 91:23

**X**

**X** 4:1

**Y**

**Yeah** 9:17 23:8 28:7 30:18 62:8 66:18 68:4 82:18 83:20 90:6 93:6
**year** 14:6 18:20 21:20 27:14 46:6 68:7 69:5 69:16 70:19
**years** 10:6,12,13 10:21 11:6 14:8 41:20 68:22 80:2 85:20
**year's** 68:18
**year-old** 85:16
**yelled** 89:21
**younger** 80:2 85:20

**0**

**05** 45:11,15 71:10,12
**06** 18:16 71:7
**07** 45:17 71:11 71:13

**1**

**1** 4:9 8:11,17,22
**1st** 18:16
**1:07-CV-712** 51:21
**1:07-CV-712-...** 1:5
**10** 4:18 78:5,10
**10th** 45:10
**10:00** 1:19 7:11
**11** 4:19 80:14,19 80:21 82:13
**11:12** 51:8
**11:50** 93:9
**12** 4:20 88:16,21
**14th** 66:11 73:6
**15** 2:3
**16th** 62:1
**1600** 5:19
**19th** 1:22 2:22 5:11 7:8
**1988** 2:3

**2**

**2** 4:10 44:19,23 68:2,5,6
**2nd** 66:17
**20th** 5:20
**2001** 14:8 15:5
**2004** 25:1 28:18
**2005** 27:21 28:10,14
**2006** 69:6
**2007** 69:7
**2008** 1:18 2:7,23 7:10 51:8
**22nd** 66:14
**27th** 66:16
**28th** 45:14

**3**

**3** 4:11 47:1,6
**30** 7:3
**30(b)(6)** 8:19 9:1 78:21
**301** 1:22 2:21 5:11 7:8
**3203** 10:10
**35203** 1:23 2:23 5:12,21 7:9

**4**

**4** 1:18 4:12 48:8 48:13 49:22 62:7,8,8,11,12 62:13,15 63:6 65:13 71:19
**4th** 2:7,23 7:10 51:7
**420** 5:20
**44** 4:10
**47** 4:11
**48** 4:12
**49** 4:13

**5**

**5** 4:13 18:15 49:9,15 61:20 62:3,6 66:2,4 71:19
**5(d)** 2:1
**52** 4:14
**57** 4:15

**6**

**6** 4:14 52:11,17 53:12 54:10

**7**

**7** 4:15 57:14,18 60:23
**73** 4:16
**74** 4:17
**78** 4:18

**8**

**8** 4:9,16 73:15 73:20 74:9
**80** 4:19
**88** 4:20

**9**

**9** 4:4,17 10:10 74:21 75:2
**93** 4:4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDA THORNTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 1:07 cv-712-WKW |
| FLAVOR HOUSE PRODUCTS, INC., and | ) | |
| FRANKLIN D. WILLIAMS, JR., | ) | |
| | ) | |
| Defendants. | ) | |

**FED R. CIV. P. 30 (b)(6) DEPOSITION RE-NOTICE OF FLAVOR HOUSE PRODUCTS, INC.**

**PLEASE TAKE NOTICE** that the plaintiff, Linda Thornton, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the deposition of the designated corporate representative or representatives of Flavor House Products, Inc., on Monday, March 10, 2008, at a mutually agreeable location in Nashville, Tennessee, and continuing day-to-day until completed, before a reporter authorized to administer oaths, at the law offices of Wiggins, Childs, Quinn & Pantazis, L.L.C., located in The Kress Building, 301 19th Street North; Birmingham, Alabama 35203. Plaintiff will examine the designee(s) on the following matters:

MAB 1. All facts surrounding the employment of Linda Thornton. The designee(s)should know all facts surrounding plaintiff's employment, including but not limited to, the duties assigned to plaintiff during her employment; the position(s) held by plaintiff during her employment; any promotions she may have applied for and/or received; the quality of plaintiff's job performance; any training she received, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation; all complaints and/or grievances made by the plaintiff to the defendant; all discipline she received; compensation and any

PLAINTIFF'S
EXHIBIT
1
3/4/08
Boyer

benefits and/or bonuses she received; payment of her wages; and the facts and circumstances surrounding any discipline received by the plaintiff; and the facts and circumstances surrounding the cessation of her employment with the defendant.

MAB 2. All facts surrounding the employment of Kim Perkins. The designee(s)should know all facts surrounding Perkins' employment, including but not limited to, the duties assigned to her during her employment; the position(s) held by her during her employment; any promotions she may have applied for and/or received; the quality of her job performance; any training she received, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation; all complaints and/or grievances made by her to the defendant; all discipline she received; compensation and any benefits and/or bonuses she received; payment of her wages; and the facts and circumstances surrounding any discipline received by her; and the facts and circumstances surrounding the cessation of her employment with the defendant.

MAB 3. All facts surrounding the employment of Franklin D. Williams, Jr. The designee(s)should know all facts surrounding his employment; the duties assigned him during his employment; the position(s) held by him during his employment; his disciplinary history; his supervisory status and/or authority with the defendant; any benefits, bonuses, and/or promotions he received; payment of his wages; any complaints and/or grievances made against him of sexual harassment, sex discrimination and/or retaliation and the investigation of such complaints; any complaints and/or grievances made against him of workplace violence and the investigation of such complaints; any complaints and/or grievances made against him regarding the use of profanity and/or inappropriate language and the investigation of such complaints; and any training he received from the defendant, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation.

m AM 4. All facts surrounding the employment of Melvin Hutchins. The designee(s)should know all facts surrounding his employment; the duties assigned him during his employment; the position(s) held by him during his employment; his supervisory status and/or authority with the defendant; his disciplinary history; any benefits, bonuses, and/or promotions he received; payment of his wages; his involvement in investigation of sexual harassment, sex discrimination and/or retaliation complaints made by employees of the defendant; and any training he received from the defendant, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation.

mA 5. All facts surrounding the employment of Chris Jordan. The designee(s)should know all facts surrounding his employment; the duties assigned him during his employment; the position(s) held by him during his employment; his supervisory status and/or authority with the defendant; his disciplinary history; any benefits, bonuses, and/or promotions he received; payment of his wages; his involvement in investigation of sexual harassment, sex discrimination and/or retaliation complaints made by employees of the defendant; and any training he received from the defendant, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation.

6. All facts surrounding the employment of Mary Ann Boyer. The designee(s)should know all facts surrounding her employment; the duties assigned her during her employment; her supervisory status and/or authority with the defendant; the position(s) held by her during her employment; her disciplinary history; any benefits, bonuses, and/or promotions she received; payment of her wages; her involvement in investigation of sexual harassment, sex discrimination and/or retaliation complaints made by employees of the defendant; and any training she received from the defendant, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation.

7. All facts surrounding the employment of Ricky Smothers. The designee(s)should know all facts surrounding his employment; the duties assigned him during his employment; the position(s) held by him during his employment; his supervisory status and/or authority with the defendant; his disciplinary history; any benefits, bonuses, and/or promotions he received; payment of his wages; his involvement in investigation of sexual harassment, sex discrimination and/or retaliation complaints made by employees of the defendant; and any training he received from the defendant, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation.

8. All facts surrounding the employment of Leigh Allums. The designee(s)should know all facts surrounding her employment; the duties assigned her during her employment; her supervisory status and/or authority with the defendant; the position(s) held by her during her employment; her disciplinary history; any benefits, bonuses, and/or promotions she received; payment of her wages; her involvement in investigation of sexual harassment, sex discrimination and/or retaliation complaints made by employees of the defendant; and any training she received from the defendant, including but not limited to training regarding sexual harassment, sexual discrimination and retaliation.

9. The policies, procedures, criteria, standards, rules, or regulations utilized by the defendant for the following matters: promotions; evaluations; job assignments; transfers; job training; discipline; termination; criminal background checks; sexual harassment; sex discrimination; retaliation; workplace violence and/or threats; profanity in the workplace; employee complaints and/or grievances; the defendant's grievance procedures; and training/orientation of employees and/or supervisors.

10. The nature, history and status of all charges and/or complaints (whether oral or written), investigations and/or audits of sexual harassment, sexual discrimination or retaliation made within

the defendant involving Franklin D. Williams, Jr., and/or the decision makers applicable in this case, including the following: (a) who made the charge and/or complaint; (b)who conducted the investigation(s) or audit(s); (c) the facts or contentions involved in the charges and/or complaints, investigations or audit; (d) the disposition or status of the charges and/or complaints, investigation or audit; and, (e) the remedies, if any, provided or agreed upon to dispose of the charge and/or complaints, investigation(s) or audit(s), etc.

mab 11. The "investigation" held by the defendant regarding the internal complaints and subsequent EEOC charge of the plaintiff regarding complaints of sexual harassment, sex discrimination and retaliation. Designee(s) should know who designed the "investigation", who conducted the "investigation", documents produced as a result of the investigation, documents compiled during the investigation, who was questioned, statements provided and all other particulars which led to the conclusion of the "investigation."

mAB 12. Information regarding the plaintiff's allegations of sexual harassment, discrimination, and retaliation as outlined in the Complaint.

mAB 13. The identity and last known whereabouts of all persons employed by the defendant who made decisions regarding the plaintiff's employment, including but not limited to compensation, promotions, training, performance appraisals, reporting responsibilities, transfer, discipline; work assignments; training; and termination.

mB 14. The contents and dates of all decisions regarding the plaintiff's compensation, promotions, training, performance appraisals, reporting responsibilities, transfer, discipline; work assignments; training; and termination.

15. The organizational and operational structure of the defendant throughout the relevant time period, including but not limited to: the chain of command and division of responsibilities of all lead persons,

supervisors, managers, officers and executives; the division of responsibilities for EEO compliance; and the identity and last known whereabouts of management and executive personnel who worked directly with the plaintiff.

16. Information regarding the recent net worth, revenues and profitability of the defendant.

17. The number of employees who work for the defendant.

18. Any other matters within the personal knowledge of the witness.

**DOCUMENT REQUEST**

YOU ARE HEREBY FURTHER NOTIFIED, pursuant to Rule 30(b)(5), Federal Rules of Civil Procedures, that said designated deponent(s) shall bring to the deposition the following documents which plaintiff requests shall be available for plaintiff to examine and copy:

1. Any and all notes or other writings or recordings said deponent(s) may have made in connection with or in any way related to the claims asserted in this action;

2. All documents which said deponent(s) have utilized to prepare for testimony or to refresh said deponent(s) recollection as to any of the subjects set forth herein; and

3. All documents not yet produced by defendant which are responsive to Plaintiff's First Request for Production of Documents.

The term "document" as used herein and the full extent of its meaning as provided in Rule 34, Federal Rules of Civil Procedure, including but not limited to any written, drawn, recorded, transcribed, filed, computer-stored, or graphic matter of any sort whatsoever, however produced or reproduced, and further includes any drafts, revisions, additions, attachments, exhibits, or amendments.

Respectfully submitted,

Temple D. Trueblood
Counsel for Plaintiff

**OF COUNSEL:**
Wiggins, Childs, Quinn & Pantazis, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**CO-COUNSEL:**
Bobbie S. Crook
367 South St. Andrews Street
Dothan, Al 36301
(334) 671-8062

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing on counsel by mailing same, via first class U.S. mail, to the following:

Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1600 Wachovia Tower
420 North Twentieth Street
Birmingham, Alabama 35203

Steadman S. Shealy, Jr.
Richard E. Crum
M. Russ Goodman
Shealy, Crum & Pike, P.A.
P.O. Box 6346
Dothan, Alabama 36302-6346

This 18th day of January, 2008.

OF COUNSEL

# PERSONNEL ACTION SUMMARY

NAME: FRANK D. WILLIAMS EMPLOYEE #: ______

SOCIAL SECURITY #: 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

| PAN # | DATE | ACTION | RATE |
|---|---|---|---|
| | 09/25/00 | NEW HIRE | $8.50/HR. |
| | 10-1-01 | Increase | 8.67 |
| | 11/5/01 | Increase | 9.00 |
| | 5/27/02 | INCREASE | 9.50 |
| | 9/30/02 | Annual Increase | 9.79 |
| | [illegible] | [illegible] | [illegible] |
| | 1-27-03 | INCREASE | 10.25 |
| | 6-23-03 | INCREASE | 10.75 |
| | 9/29/03 | Increase | 11.07 |
| | 5/31/04 | Increase | 11.70 |
| | 8/22/05 | Job bid - Roaster Op. | 11.85 |
| | 10/10/05 | Transfer to Temp. Supv. | 14.42 |
| | 11/28/05 | Job Bid - Team Leader | 12.50 |
| | 7/23/07 | Temp. Supv. | 14.86 |

PLAINTIFF'S EXHIBIT 2 3/4/08 Boyer

EMPLOYEE STATUS CHANGE

*Please check applicable box*

- [ ] New Hire
- [ ] Transfer (Lateral)
- [ ] Certification
- [ ] Promotion
- [X] Termination
- [ ] Salary Adjustment
- [ ] Title/Grade Change
- [ ] Other ______
- [ ] Leave of Absence

Effective Date of this Action: 12/4/06    New Department Salary Account No.: ______

| Employee Name (Last) | | First | | Middle |
|---|---|---|---|---|
| Nance | | Tommy (Thomas) | | A. |

**CURRENT STATUS**

| Job Title | Grade | Department | Location | Reports To: |
|---|---|---|---|---|
| HR mgr II | 16 | HR | Dothan | M. Boyer |
| [X] Exempt / [ ] Non Exempt | [ ] F/T Regular / [ ] P/T Regular | | [ ] Temporary | |

**NEW STATUS**

| Job Title | Grade | Department | Location | Reports To: |
|---|---|---|---|---|
| | | | | |
| [ ] Exempt / [ ] Non Exempt | [ ] F/T Regular / [ ] P/T Regular | | [ ] Temporary | |

**Salary Adjustment**

Current Salary Range

| Minimum | Midpoint | Maximum |
|---|---|---|
| ~~33,946~~ 70,846 | ~~42,108~~ 90,334 | 109,822 ~~50,258~~ |

| Current Salary (or Salary for New Employee) | Amount of Change | Percentage | New Salary |
|---|---|---|---|
| Per Month $ ____ | Per Month $ ____ | Merit ____ % | Per Month $ ____ |
| Per Year $ 67,112.50 | Per Year $ ____ | Promotional ____ % | Per Year $ ____ |
| Hourly (if Applicable) $ ____ | Hourly (if Applicable) $ ____ | | Hourly (if Applicable) $ ____ |

**Termination**

| | Reason for Separation | Last Day Worked |
|---|---|---|
| [ ] Voluntary / [X] Involuntary | Performance | 12/4/06 |

**Comments**

Performance Issues
- see seperation agreement

| Approval: Steven E. Smith 12/15/06 | | |
|---|---|---|
| Requesting Department Manager/Date | Department Head/Date | Corporate Officer/Date |

**Human Resources Use Only - Do Not Complete This Section**

| Social Security No. | Job Number | EEO Code - Job Group | Census Code | Department Name |
|---|---|---|---|---|
| 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 | 045255 | 1-03 | 013 | HR |
| Company # / Floor # | Source Code / W/C Code | Rate Code | Job Posting # | Replaced |
| C93 | 8810 | H [ ] M [X] | | |
| Separation Pay | Vacation Pay | Term Code | Last Day Paid | Payroll Entry Date |
| [X] Y / [ ] N | [ ] Y / [ ] N | 1151 | | |

| Olive Clark | | Entered 12/15/2006 |
|---|---|---|
| H.R. Manager Approvals/ Date | Compensation Analyst/Date | H.R. Data Specialist/Date |

HR Forms.xls Revised 7/04

PLAINTIFF'S EXHIBIT 3 3/4/08 Boyer

# MEMORANDUM

INCIDENT OCCURRED ON 06/14/06

**DATE:** June 16, 2006

**TO:** Frank Williams

**FR:** Melvin Hutchins

**RE:** **Written Counseling – 1st Step**

On June 14, 2006 you used profanity in the presence of other co-workers. *This is a violation of plant work rule #16, fighting, threatening, intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property.*

Failure to follow the company policy has resulted in you receiving this **1st Step – Written Counseling**. Any future violations will result in additional disciplinary action up to and including termination

Melvin Hutchins
Production Manager

Frank Williams
(Signature acknowledges Receipt of this document only.)

PLAINTIFF'S EXHIBIT 4 Boyer 3/4/08

# MEMORANDUM

**DATE:** August 1, 2006
**TO:** Frank Williams
**FR:** Tommy Nance
**RE:** **2nd Step – Written Warning**

INCIDENT OCCURRED ON 7/27/06

On July 27, 2006, there was an incident involving yourself and another employee. You acted in a way not consistent with the expectations of a Team Leader. You must learn to control your temper and direct the employees on the line without displaying actions that could be construed as rude, intimidating, or disrespectful. In order to remain in the Team Leader position, we must see improvement in your employee relations skills.

Failure to follow the company policy has resulted in you receiving this **Written Warning – 2nd Step**. Any future violations will result in additional disciplinary action up to and including termination.

[signature] 8/2/06
Tommy Nance
Human Resources Manager

[signature]
Frank Williams
(Signature acknowledges Receipt of this document only.)

PLAINTIFF'S EXHIBIT
5 3/4/08 Boyer

# DOCUMENTATION FORM

Employee Name: Jonnie Nickerson

Investigating Supervisor: Chris Jordan / Eugene A Date: 7-27-06

Present:

Who was involved: Frank Williams

Witness (s): No witness as far as she knows.

Date of incident: 7-27-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): 9:40am.

*What happened: Jonnie N. was on the label and Frank W. Came out on The line and sed To me over Time I come back The Fucking label michsen is fuck up and saying is To me I Told Him I did't put My Hand on The label meshine

PLAINTIFF'S EXHIBIT 6 Boyer 3/4/08

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

* He will not let her make any adjustments.
* Just wants her to load labels.

file- Frank Williams (FW)

# DOCUMENTATION FORM

Employee Name: Frank Williams

Investigating Supervisor: Chris Jordan / ~~Frank~~ Eugene Date: 7-27-06

Present:

Who was involved: Jonnie Nickerson

Witness (s):

Date of incident: 7-27-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day):

What happened: The Lable machine was messing up really Bad. me & Bruce was working on it I turned around and asked Johnie to help with the rework that was Bad Lables she told me to hold up so I asked her to please go and help. I seen that she was way Behind on her Lable checklist sheet so I left it alone. I explained to her that to keep the Lable machine

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S
EXHIBIT
7
3/4/08
Boyer

running She would have to push the table and help keep the Cans running. She told me that She Could not do more than one thing at a time I explained that it would help But she will not do it. It has cause alot of problems with the table Staying full. Alot of the Problems I am having with my Employees is. My Supervisor tell me to tell them somethings to do I tell them and If they don't Like It they turn around and tell Somethings on me Because I told them to do their Job. So I get in trouble

DOCUMENTATION FORM

Employee Name: Linda Thornton.

Investigating Supervisor: Chris Jordan Date: 6-14-06

Present: Melvin Hutchins, Frank Hall

PLAINTIFF'S EXHIBIT 8 3/4/08 Boyer

Who was involved: Frank Williams.

Witness (s): Catherine Long, Wesley, Tamekia Cook

Date of incident:

Where did it take place: line 3

When did it take place (time and day): 11⁰⁰ - 11⁰⁵?

What happened: Today on line 3 when I came back from second break. (Frank Williams had Relieved me.) I noted that the paperwork had not been done while I was on break, so I was catching up on the paper work. Frank was re-loading the machine with labels. There was re-work in a box full of cans, and the table was over-flowing with cans with bad labels. When Frank reloaded the machine he went to walk away - I asked him to help with the re-work - (The audit was going on) He started yelling at me that he had better "mother fucking things to do than worry about that fucking re-work. He continued to holler at me, and I told him to quit yelling & cussing at me. At this time he went from inside of the line to the outside of the line. The entire time, yelling at me, Continued to yell mother fucker. God damn mother fucker Throwing a large bag of cans. As he Continued to yell an cuss at me - I Continued to request that Wesley would please call for a supervisor. At this time Frank

Did this result in down time? NO If yes how much?

Did this result in product being scrapped? If yes how much? no

Attach an additional sheet if needed for witness statements following the same format.

was still yelling & cussing and I Continued to ignore him. Donald Coty walked by and I requested that he please get a supervisor, please call Melvin Hutchins.

over →

Finally Frank went on his way. When Melvin came I told him about the situation at hand. Catherine ~~[illegible]~~ Long was standing there and Wesley, and I honestly do not know who else. I ignored Frank Williams yelling God Damn mother Fucker — whether he was calling me that name or just yelling it at me. Regardless — I won't take it again. No one else talks to me that way and he sure won't again. I don't have to tolerate that level of abusive language or name calling. Tameaka asked me later what was he having a fit about.

Also, stated to Catherine "Did I holler at Linda". She stated "Yeah".

**DOCUMENTATION FORM**

Employee Name: Tamekia Cooke

Investigating Supervisor: Chris Date: 6-15-06

Present:

Who was involved: Frank Williams + Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 label Machine

When did it take place (time and day): Before lunch

What happened: line 3 label machine messed up & we had bad labels on the work area & we cleaned some & when Linda got back from back some was left up there and she asked Frank what about this mess and Frank walked off saying curse words exact I don't know so Linda said something to him. ~~[illegible]~~ He threw his hands up & said fuck it and went threw the curtains. ~~[illegible]~~ She was ignoring him but it was words still being said from him.

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT 9 3/4/08 Boyer

*Nutcracker Brands Inc.*

Nutcracker®

SOUTHERN ROASTED

# EMPLOYMENT APPLICATION

DATE 09-22-00

PERSONAL (RESUME MAY BE ATTACHED)

NAME: LAST williams FIRST Frank MIDDLE INITIAL D

TEMPORARY ADDRESS CITY STATE ZIP CODE

PERMANENT ADDRESS 2271 South St. Hwy CITY Newton STATE AL ZIP CODE

AREA CODE-TEMPORARY PHONE NUMBER 334 692-3079 AREA CODE-PERMANENT PHONE NUMBER 334692-4334 SOCIAL SECURITY NUMBER 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

WERE YOU EVER EMPLOYED BY RALSTON PURINA, RALCORP HOLDINGS, OR ANY OF THEIR SUBSIDIARIES/AFFILIATES? ☐ YES ☐ NO IF YES, WHEN - WHERE

HAVE YOU EVER BEEN CONVICTED OF ANY FELONY? IF YES, DESCRIBE IN DETAIL (CONVICTIONS WILL NOT AUTOMATICALLY DISQUALIFY JOB CANDIDATES)

☑ YES ☐ NO Sautory Rape my girlfriend was 2 years younger than me when I was 18

FOR WHAT POSITION ARE YOU APPLYING? SALARY EXPECTATIONS open DATE AVAILABLE 09-25-00

HOW DID YOU BECOME AWARE OF THE POSITION? Bruce Cassidy

ARE YOU RELATED TO ANYONE EMPLOYED BY THE COMPANY? IF YES, WHO AND WHAT IS YOUR RELATIONSHIP?

☐ YES ☑ NO

WILL YOU WORK OVERTIME, IF REQUIRED? ☑ YES ☐ NO

WILL YOU WORK WEEKENDS, IF REQUIRED? ☑ YES ☐ NO

## EDUCATION

Achieved High School Diploma/GED? ☑ YES ☐ NO

| (Include Education in Progress.) | FROM MO. YR. | TO MO. YR. | DIPLOMA DEGREE DATE | MAJOR | CLASS STANDING OR GRADE POINT AVERAGE |
|---|---|---|---|---|---|
| HIGH SCHOOL/LOCATION JFI Ingram | | | Ged | | |
| TECHNICAL SCHOOL/COLLEGE LOCATION JFF Ingram | 3 92 | 4-94 | A A | Business | 3. 4 |
| | | | | | |
| | | | | | |

PLEASE LIST SPECIAL SKILLS, CERTIFICATIONS OR QUALIFICATIONS YOU POSSESS (SUCH AS FOREIGN LANGUAGE FLUENCY, CPA, COMPUTER SKILLS, ETC.)

PLAINTIFF'S EXHIBIT 10 3/4/08 Boyer

PERIENCE

se list all past work history including military and summer work. Use additional paper if necessary. (Please complete fully even if submitting resume.)
RT WITH PRESENT/LAST EMPLOYER

| SENT/LAST EMPLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | |
|---|---|---|---|
| Temps of Dothan | 2256 Reeves St. | | |
| T SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | DATES OF EMPLOYMENT |
| Mike | N/A | | FROM: 08-00 TO: |
| RTING SALARY / PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) | |
| $6.00 / $8.50 hr. | | Pipe fitter | |

CRIBE YOUR DUTIES AND RESPONSIBILITIES
Connected pipe, grinded

| PLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | |
|---|---|---|---|
| Personal Resource for Dairy Fresh | | | |
| ST SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | DATES OF EMPLOYMENT |
| Dennis Ellis | Better Job | | FROM: 06-00 TO: 08-00 |
| RTING SALARY / PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) | |
| 7.50 / 7.50 | | | |

SCRIBE YOUR DUTIES AND RESPONSIBILITIES
Send milk, pull orders

| IPLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | |
|---|---|---|---|
| Charoen Pokhand | Baker hill | | |
| ST SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | DATES OF EMPLOYMENT |
| Terry Wheeler 687-7790 | moved | | FROM: 04-98 TO: 06-00 |
| TARTING SALARY / PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) | |
| 6.50hr. / $28,000 year | | Sanitation / first Supervisor | |

ESCRIBE YOUR DUTIES AND RESPONSIBILITIES
overseed all production lines & make sure People where doing their jobs; Payroll check of all my employees

PLEASE PROVIDE THREE BUSINESS REFERENCES OTHER THAN THOSE LISTED ABOVE.

| NAME | TITLE | PHONE NUMBER | LENGTH OF TIME KNOWN |
|---|---|---|---|
| Bruce Cassidy | Supervisor | Flavor House | 3 1/2 Years |
| Butch Cassidy | Supervisor | " " | 3 1/2 Years |
| Cecil Feldman | Supervisor | Coca Cola | 12 years |

PLEASE READ THE FOLLOWING VERY CAREFULLY BEFORE SIGNING.

I acknowledge that the information I have supplied is correct to the best of my knowledge and belief without any omissions of any kind whatsoever. I understand that any falsifications, misrepresentations or omissions of fact may be grounds for rejection of my application or discharge at any time during my employment.

I understand that consideration for employment in this position is contingent upon the results of a reference and background check. I authorize the Company to investigate all statements made on my application for employment and to discuss the results of its investigations with those responsible for hiring. I further authorize the Company to contact my former employer(s) and any listed references or other persons who can verify information, and I give my consent for former employer(s) and other contacted persons to respond to questions pertaining to information on this application. Further, I release from liability such former employer(s) or other persons contacted by and providing information to the Company.

I understand that nothing in this application is intended to imply or create a contract of employment. I further understand that, if hired, my employment is at-will and can be terminated at any time for any reason, by the Company or me, with or without notice.

I acknowledge and agree that employment in the position for which I have applied may be contingent upon completion of a Company-paid physical examination. In addition, I understand that employment in this position is contingent upon successful completion of a test for the presence of illegal substances.

09-22-00
DATE (MONTH & YEAR)

APPLICANT'S SIGNATURE Frank Willis



Search for Sex Offender by City [ ] Go ADVANCED SEARCH

**Navigation**

- Home
- Amber Alerts
- Fugitives
- Missing Adults
- Missing Children
- Missing Child Media Alerts
- Sex Offenders

**Archives**

- Amber Alerts
- Missing Child Media Alerts

**Information**

- Agencies
- Contact
- Legal Information

Criminal Sex Offender Information

| | |
|---|---|
| **Name:** | WILLIAMS Jr, , FRANKLIN DELNOR |
| **Race:** | White |
| **Sex:** | Male |
| **Date Of Birth:** | 5/25/1971 |
| **Height:** | 6' 3" |
| **Weight:** | 187 |
| **Eye Color:** | Brown |
| **Hair Color:** | Brown |

Current Picture

Current Physical Address

| | |
|---|---|
| **Address:** | 1408 North Broad Street Cowarts, AL 36321 Houston County |
| **Registration Date:** | 9/9/2002 |
| **Release Date:** | 2/14/1992 |
| **MapQuest Map:** |  |

Crime Information

| | |
|---|---|
| **Sex Crime:** | UCR_Code: 1199 CrimeLocation: Barbour Case_Number: TrialLocation: Barbour ORICode: AL0380000 Offense Description: Rape 2nd (3 counts), Sodomy 1st (2 counts) |
| **Crime Location:** | Barbour County, AL |
| **Description:** | Williams engaged in sexual intercourse with a 13, 14 and 16 year old. |

Special Notes

Due to time delays in processing sex offender data, this information should be verified with the appropriate Sheriff's Office or Chief of Police.

**Amber Alerts**

There are no active alerts.

**Missing Child Media Alerts**

There are no active alerts.

**Safety Tips**

Instruct your children to always inform you of their whereabouts. Tell them to ask permission before leaving their play area or going into a neighbor's yard.

PLAINTIFF'S EXHIBIT
11 Boyer

Printer-Friendly

**All Contents Property of**



Search for Sex Offender by City Go ADVANCED SEARCH

**Navigation**

**Home**

**Amber Alerts**

**Fugitives**

**Missing Adults**

**Missing Children**

**Missing Child Media Alerts**

**Sex Offenders**

**Archives**

**Amber Alerts**

**Missing Child Media Alerts**

**Information**

**Agencies**

**Contact**

**Legal Information**

**Sex Offenders**

If you have questions regarding Sex Offenders you see on our web site, contact the agency listed in our database or contact the Alabama Bureau of Investigation directly at (334) 353-1172. Our business hours are 8:00am cst - 5:00pm cst, Monday - Friday. Please limit after hour calls to emergencies only. Our E-MAIL: **sexoffenders@dps.state.al.us**.

**Total Sex Offenders found: 1**

Offender

**Address:** 1408 North Broad Street Cowarts, AL 36321 Houston County, AL

**Name:** WILLIAMS Jr, , FRANKLIN DELNOR

**Race:** White

**Gender:** Male

**Amber Alerts**

There are no active alerts.

**Missing Child Media Alerts**

There are no active alerts.

**Safety Tips**

Check inside your car before getting in.

**All Contents Property of The Alabama Department of Public Safety**

# DOCUMENTATION FORM

Employee Name: Catherine Long

Investigating Supervisor: Chris Jordan Date: 6-15-06

Present:

Who was involved: Frank Williams and Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): Before 1200 Noon

What happened: well Linda just had came from Brake and she asked Frank to help her clean off the table By Line 3 label machine. I hear Frank said the F word and I cant do every dam thing. that all I heard except he was doing alot of yelling and exct. exct. exct

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT 12 3/4/08 Boyer

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
MARY ANN BOYER

Commissioner:
Renny D. McNaughton
May 13, 2008
Dothan, Alabama

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Mary Ann Boyer, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 13th day of May, 2008, commencing at approximately 1:00 p.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms.

Robertson the original transcript of the oral testimony taken the 13th day of May, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

I N D E X

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Robertson | 9 |

E X H I B I T S

| Exhibit | Page |
|---|---|
| No. 13 | 13 |
| No. 14 | 23 |
| No. 15 | 24 |
| No. 16 | 34 |
| No. 17 | 36 |
| No. 18 | 57 |
| No. 19 | 63 |
| No. 20 | 64 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202
205-328-0480

FOR THE PLAINTIFF (S):
Ann C. Robertson
Temple D. Trueblood
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314-0500

Also Present:
Linda Thornton
Dee Lake

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 1:00 p.m. on the 13th day of May, 2008, Mary Ann Boyer, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins videotape one in the deposition of Mary Ann Boyer in the matter of Linda Thornton versus Flavor House Products, Inc., and Franklin D. Williams, case 107-CV-712WKW in the court of U.S. District Court for the Middle District of Alabama, Southern Division. We're on record at 1:15 p.m. on Tuesday,

May 13th, 2008, in the law office of Bobbi S. Crowe. Would Counsel please identify yourself and state whom you represent.

MS. ROBERTSON: I'm Ann Robertson for the plaintiff and Temple Trueblood, who's not right here -- is not here right now, will be here in a minute and she's for the plaintiff also.

MS. SWAIN: And I'm Jennifer Swain, attorney for the defendant, Flavor House.

THE VIDEOGRAPHER: The witness is already sworn in.

MARY ANN BOYER

having been previously sworn, was examined and testified as follows:

EXAMINATION

BY MS. ROBERTSON:

Q Ms. Boyer, remind me when you started at Flavor House. I know I asked you last time, but I can't remember.

A It will be four years this coming

July.

Q And so that would be two thousand --

A 2004.

Q And when you came to Flavor House, can you tell me when someone was disciplined, say a team leader, who participated in the decision as to what the discipline would be?

A Well, we didn't have team leaders when I first came. Okay?

Q Okay.

A But in any kind of discipline procedure, HR would be involved, human resources.

Q And -- and -- and when you say "HR would be involved," were they the people that would make the decision as to what the --

A They -- they would conduct the -- what we call the investigation. You know, a supervisor or anybody could bring a complaint forward, even an employee. But HR

would handle the investigation and HR would work with whoever needed to be interviewed, consulted, etcetera, and then they would usually come forward with their recommendation to me.

Q All right. Now, when you say HR, who are you talking about in -- in the period between 2004 and 2007?

A Okay. Can't tell you the exact dates. I don't want to give you any information that I don't know off the top of my head. But in sequence, Glen Warren came exactly the same time I did in July of 2004.

Q And he was an HR person?

A Yes.

Q Not an attorney?

A No, no. Glen is an HR person with a kind of safety specialist. He's at our corporate now.

Q All right.

A And then we had David. I'm trying to think of David's last name.

Q Helms?

A Helms, David Helms. And then we had Tommy Nance. And that was who would have been there when Linda left. Now we have Dee.

Q All right. That would have been when Linda left. And when did Mr. Nance leave?

A It was in the fall of that same year.

Q Was it --

A I don't know the exact date.

Q Was it fall or winter? Was --

A It might have been early winter, late fall.

Q Of 2006?

A Yes, the same year Linda left.

Q Was Mr. Franklin Williams still there at the time that Mr. Nance left?

A Yes, I believe so.

Q And who took over after Mr. Nance left in terms of the HR function?

A Dee Lake, who you see sitting right over there (indicating).

Q All right. Now, when you say that HR would be involved, are you saying that HR would make the decision as to what the discipline should be as to -- at -- at -- after an investigation?

A They would make a recommendation, yes, and they would base that off precedence, how things have been handled in the past, what our policy handbook said, what all the evidence might lead up to.

Q And -- and they would make recommendations to you?

A If it was a termination, yes. I was not involved in every disciplinary act, but it was a rule with terminations that they would have to come to me.

Q But short of termination, they -- the HR person would make the decision by him or herself?

A I don't look at every discipline. That's correct.

Q All right. Well, so an HR decision -- an HR person could keep someone

on indefinitely that should have been terminated, but as long as they never brought it to you, you wouldn't have any input?

MS. SWAIN: Objection.

Q Is that right?

A I think you're trying to lead me into something --

Q I'm just --

A -- and, you know, HR --

Q I'm stunned is what I am.

A Well, I'm not sure why you should be but --

MS. SWAIN: I object.

A That's okay. But, you know, I think the situation is these HR people are professionals.

Q Uh-huh.

A They have divisional resources to use for guidance and they know it's their performance to make good, solid decisions, so I believe they do as a rule.

Q And -- and they wouldn't ask

about the person who supervised, say, the team leader for any input about what the discipline should be?
MS. SWAIN: Objection.
Q Is that what you're saying?
A They would get facts from everybody they felt pertinent in any situation.
Q Well, I'm not asking about facts. I'm talking about a recommendation for a disciplinary.
A They don't let people's personal objective opinions lead to things.
(Plaintiff's Exhibit Number 13 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q All right. I will show you what's been marked as 13 to your deposition and ask you --
MS. ROBERTSON: And I'm not saying we haven't already marked this in a earlier deposition. We're just going

to pretend like.
Q Can you tell me what this is?
MS. SWAIN: Can you give me a copy, Ann?
MS. ROBERTSON: Yeah. You had a copy from yesterday.
MS. SWAIN: Okay.
MS. ROBERTSON: I probably have to get another copy for you but --
MS. SWAIN: I've got it.
THE WITNESS: I think we looked at it last time. I'm pretty sure we did.
A This is a documented disciplinary step.
Q All right. And did you have any input into that documented disciplinary step?
A I believe Tommy worked with Melvin on this.
Q I'm sorry. What?
A Tommy Nance, the HR manager, made the recommendation on this step.

Q Okay. And --
A I was aware the step was being taken.
Q All right. And I will show you what's been marked as Plaintiff's Exhibit Number 6. Are you -- did you see that or are you aware of that, Plaintiff's Exhibit Number 6 to Ricky Smothers' deposition?
A I'm not sure whose that is. I can't tell by the document.
Q Well, it says investigation notes.
A Uh-huh.
Q Is that your understanding of what the resolution of the -- of the -- of the situation was? That is the situation in which --
A No. This is a written counseling. It's not a warning. So whether they got their terminology wrong or something, but this is truly a written counseling.
Q All right. Is that different

from a warning?
A Uh-huh.
Q How is it different?
A A warning could be a --
Q And just for the record, you need to say yes or no. I know we've got it on videotape, but he's having to write it down --
A Oh, okay.
Q -- so it's better to say yes or no instead of uh-huh or huh-uh.
A Sorry.
Q Okay.
A Say it again.
Q Tell me the difference between a warning and a counseling.
A This is a written counseling. Okay?
Q Right.
A So a warning could be given and it's not following the progressive steps. You might give someone a warning if it's a minor violation, okay, and they have nothing

else on the record.
Q All right. So do you know did Tommy Nance recommend a warning and you override that and -- and recommend a written --
A No.
Q -- counseling? And you don't know where this particular document came from or what -- who generated it?
A No. It doesn't have a signature. Because it's typed, I can't look at any handwriting.
Q Were you -- and you were consulted before Plaintiff's Exhibit Number 13 was done; is that right?
A I was aware that they were issuing it.
Q Were you consulted about Linda Thornton being moved to line 15?
A It's line five.
Q Line five. Excuse me. I'm sorry.
A Yeah. Yes, I was.

Q All right. And did you agree with that?
A Yes.
Q And -- and after that, was there any plan to do anything different or more relative to the situation involving Linda Thornton and Frank Williams?
A I believe the written counseling was given once all statements were taken by all employees who witnessed the situation and this was seen as appropriate action.
Q All right. Well, the data on Plaintiff's Exhibit Number 6 is -- is 6/14. I will show you what's been marked as Plaintiff's Exhibit Number 1 to Richard -- Ricky Smothers' deposition and ask you do you think that Plaintiff's Exhibit Number 1 had been taken before or after Plaintiff's Exhibit Number 6?
A You can't tell --
Q All right.
A -- because there's no date. There's a date of the incident.

Q Right.
A That line will tell you what date the incident occurred that they're going to have them write a statement on, but there's no date of when this was actually written so I can't tell you.
Q All right. Plaintiff's Exhibit Number 2 to Ricky Smothers' deposition, can you tell when that was taken?
A This would appear -- and I wasn't here when the statement was taken. So just assuming this from looking at the writing on the paper, it appears this was taken on 6/14.
Q All right. Plaintiff's Exhibit Number 3, when was that taken, to the Ricky -- Ricky Smothers' deposition?
A Okay. Once again, I wasn't here when it was taken, but assuming by looking at what information was filled out, I would say they were referring to the incident that occurred on the 14th. I would assume that that is the date that the statement was

taken, the 15th.
Q Were you shown those by Tommy Nance at any period before the written warning was issued?
A Yes, I believe I was.
Q What is the next step after a written counseling form?
A It depends on what happens. I mean, there's some things that could happen that would automatically take you out the door, there's some things where we follow progressive discipline each step at a time, and there's some things where we'll skip a step.
Q All right. Have we got all of those?
A You've got 3, 2, 1, 6.
Q I'm looking for the one that -- that Mr. Williams --
A This is 13 so you're missing 4 and 5, if you're wanting --
Q Right. There should be -- we marked his.

MS. SWAIN: There was more than six yesterday.

MS. ROBERTSON: Yeah. Do you --off the record.

(An off-the-record discussion was held.)

Q Do we have Plaintiff's 1?

A Yes.

Q Okay. Looking at Plaintiff's Exhibit 1, did you see it before Mr. Williams was given his write-up?

A Like I say, I believe so.

Q Do you see anywhere in there where he admits to having used profanity?

A Let me read it. No, I don't see it in this text.

Q Do you see any evidence of anyone asking him if he used profanity?

A You've got to realize the intent of these documents. The investigation that HR conducts is where questions will be asked that may try to bring out something that is in a different person's statement. When we put this document in front of somebody, we

don't want to lead them or prod them into saying something. We put it in front of them and say, I want you -- you're in here because an incident occurred on this date. I want you to write down in your words what happened. So he would not have been asked at the point he was writing this did you cuss at anybody. Okay? So --

Q Would he ever have been asked that?

A Yes, he would have in the investigation.

Q Would there have been notes taken that he was -- that he was asked that?

A There should have been, yes.

Q And where would those notes be?

A Should have been in the HR manager's file.

Q Okay. And -- and would that have been where the things you have in front of you, would that have -- where they would have been?

A They've changed the filing system

a couple times and I think you've got to ask HR. But they had a disciplinary file at one time and they moved it to put it in individual files. So each HR manager created their own file, so I'm not sure where Tommy would have put it.

Q Well --

MS. ROBERTSON: Off the record.

(An off-the-record discussion was held.)

BY MS. ROBERTSON:

Q Do you know if Frank Williams ever admitted to having used profanity?

A I wasn't in the room when they did the one-on-one investigations, so I can't -- I can't really answer that for you.

(Plaintiff's Exhibit Number 14 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q All right. I will show you what's been marked as Plaintiff's Exhibit Number 14 to your deposition and ask you what this is.

(Witness reviewing document.)

A It appears to be Frank's statement related to an incident on July 27th.

Q And -- of '06?

A Uh-huh.

Q A little over a month after the incident reported by Linda Thornton; correct?

A Uh-huh.

Q You need to say yes or no.

A Yes.

(Plaintiff's Exhibit Number 15 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q I will show you what's been marked as Plaintiff's Exhibit Number 15 and ask you what that is.

MS. SWAIN: Can I --

MS. ROBERTSON: Sorry.

A This appears to be Jonnie's statement, but the two attachables behind it

don't appear to be the same handwriting. They look like Tommy Nance's, so I would assume they're some notes Tommy wrote.

Q All right. Do you think that Plaintiff's -- did you ever see Plaintiff's Exhibit Number 15 to your deposition?

A I can't say for sure that I did or not, Ann.

Q Did you ever see Plaintiff's Exhibit Number 14 to your deposition?

A If I'd have seen them, I'd have seen them together because normally if they showed them to me, they would bring the whole group in with their recommendation.

Q Once again, Mr. Nance -- I mean Mr. Williams does not mention that he used cursing toward Jonnie in the incident he detailed, did he?

A No, he does not.

Q Does it appear that he was being untruthful about what happened in the event?

MS. SWAIN: Objection.

A I think you've got to say is it

untruthful? Did he not give a complete statement? I don't know. You know, lots of times it's not unusual in -- in situations with an employee that unfortunately if we don't have a witnesses, we get a he said/she said situation. But I do think there were witnesses in this situation that heard Frank curse.

Q Well, we know, based on Plaintiff's Exhibit Number 1 to Ricky Smothers', that in Linda Thornton situation there were several witnesses that heard him use curse words, including fuck and damn, don't we?

A I believe that's what the statement says.

Q Okay. But Mr. Williams did not mention that he had said those words, did he?

A No, he did not in his statement.

Q And -- and, in fact, Mr. Williams said, I put my hand in the air and turned around and walked off. I had got very upset

so instead of saying something that would set -- get me in trouble, I walked away.

In fact, he basically lied, saying he didn't say anything that should have gotten him in trouble, didn't he?

MS. SWAIN: Objection.

A These statements start out an investigation, Ann, and so I know that he was brought back in and questioned and I believe in the questioning of Mr. Williams, he did not deny that those words were said. So, you know, to say somebody lied, if we take them all the way through an investigation and we -- they boldface lie, they can be terminated. But in this case, I would say his statement -- he didn't bring out everything in the statement, but during the investigation I believe it was brought out, not only by the other statements but by him being asked directly so and so says you said that. I don't believe at that point he denied it.

Q He specifically said in his

initial statement that he had gotten upset and he specifically walked away rather than say something that could get him in trouble, did he not?

MS. SWAIN: Objection.

Q I mean, you -- it's right there, Plaintiff's Exhibit Number 1 to Smothers. Read it again. I want you to make sure that you've read it so that you understand what he says.

A Yes. That's what the last sentence says.

Q Okay. And -- and so are you telling me that at the time he wrote the statement, he didn't think saying mother fucking thing do -- what -- I had better get the mother fucking thing to do that and that he had said -- called her a mother fucker and was yelling God damn, that he didn't think those things were the kinds of things that would get him trouble?

MS. SWAIN: Objection.

A What I can't say, Ann, is what

his other statement that he walked away without saying is.

Q Well, are you telling me when he said that he -- he said that he walked away without saying anything that would get him in trouble, that he did not think saying God damn, mother fucker, and fucking would get him in trouble? Is that what you're telling me?

MS. SWAIN: Objection.

A Profanity is a violation of the plant rules, so he knows. He has a handbook policy the same as all -- all employees do, Ann.

Q So he lied when he -- in Plaintiff's Exhibit Number 1 when he said he walked saying -- without saying something he thought would get him in trouble?

MS. SWAIN: Objection.

A He walked away before he said something, so there was something else on his mind that he didn't say that he refrained from saying. I don't know what it

is. Perhaps you'd have to ask Frank that.

Q Well, let me ask you something. Would you believe Frank Williams under oath?

MS. SWAIN: Objection.

A I probably would. I would hope to believe anybody under oath, but maybe that's just me.

Q So you believe when he -- when he pled guilty under oath to having deviant sexual intercourse with a 10 year old he was telling the truth?

MS. SWAIN: Objection.

A I can't refer to his court case.

Q You would believe -- you can't refer to it? You don't know that? You haven't seen that? You haven't heard that?

MS. SWAIN: Objection.

A Ann, it's not relevant to what I'm dealing with sitting here with you right now.

Q You don't think that a person that has been convicted of multiple felonies, that his word under oath is not as

good as someone who, say, has not?

MS. SWAIN: Objection.

A I think that's a very prejudice and biased statement. I think there's a lot of people that are convicted of things that have opportunities to change their life. That's a very sad statement to make, Ann. It really is.

Q Well -- what? That -- when my client said that he was a child molester and he said that was none of her business?

A I think there's a lot of people that have been convicted of things that have the ability to turn their life around. And I think --

Q And you think Frank Williams is one of them?

A -- to make a statement, Ann, that once they've been convicted, they can never be trusted again in their life is very biased and it's mean.

Q Well, that would explain why you are sitting here today, then, I suspect.

MS. SWAIN: Objection.

A That was real professional, Ann.

Q I'm just saying if you don't think that -- that it has something to do with why you're sitting here today, you just told me it wasn't relevant.

A Well, I just think we use judgment that is prevalent to the case in situations, and I think you're trying to dredge stuff up. But that's your job. Go for it.

Q Did you -- well, so you think that -- that Frank was telling the truth when he said he walked away before he said anything that would get him in trouble?

MS. SWAIN: Objection. Asked and answered.

Q Or that his perception was that?

A I said the statement once. You'll have to ask Frank what he refrained from saying.

Q All right. Was -- what happened to him when he said those words to Jonnie --

A Jonnie's her name.
Q -- Jonnie in a -- in a -- a month later?
A There was an investigation. Frank was given disciplinary action.
Q And do you remember what that was?
A I believe it was another written step.
Q Another written step. On -- on this first step when he was warned, did he lose any money?
A Not that I can remember.
Q Was not docked any pay?
A We don't do that with disciplinary action unless someone gets disqualified --
Q Was he --
A -- which is usually not necessarily discipline. It's their ability to perform on a machine.
Q Was he suspended for any time?
A Not that I remember.

Q Was his team leadership job taken away from him?
A No.
Q What exactly did the effect of getting a written counseling form have on Mr. Williams?
MS. SWAIN: Objection.
A It puts him at a disciplinary step and you don't have a step fall off for a year. So that means if he has other steps, it put him out the door.
Q All right. Well, let's see what he -- on Plaintiff's Exhibit Number --
MS. ROBERTSON: Where are we with these?
MS. SWAIN: 16.
Q -- 16 to your deposition, tell me about this, please, ma'am.
(Plaintiff's Exhibit Number 16 was marked and attached to the deposition.)
A That's the second disciplinary step that was issued August 1st that is in

relation to the Jonnie incident back in July.
Q All right. And so within a month he was disciplined for doing essentially the same thing he did to Ms. Thornton and he got another piece of paper put in his file. Is that what happened?
MS. SWAIN: Objection.
A That is correct. It's a disciplinary step.
Q Was his team leadership position taken away from him?
A No, it was not.
Q Was he docked any pay?
A No, he was not.
Q Was he suspended at all?
A No, he was not. He was handled in accordance with other people who had similar acts, including your client.
Q Do you know if -- if -- how Mr. Williams would have been told about Plaintiff's Exhibit Number 16 to your deposition?

A He would have been brought in the office to be there with, let's see, Melvin the superintendent --
Q Right.
A -- and/or Tommy Nance.
Q Right. And what would have happened?
A They would have told him that he was being disciplined, they would have told him why, and they would have had him -- request for him to sign it. You can see his signature and you can see Tommy's, so Tommy was obviously present.
(Plaintiff's Exhibit Number 17 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q I'll show you what's been marked as Plaintiff's Exhibit Number 17 to your deposition and ask you what this is, please, ma'am.
(Witness reviewing document.)
A This is an e-mail from Chris

Jordan to Tommy Nance. It's copying Ricky and Melvin. It's talking about Frank's attitude. It appears it is sent the day -- let's see. Let's get our dates straight.
Q The day after he got his second warning for cussing Jonnie; right?
A Right.
Q And what does it say down here? It says, At this point it appears that the issues addressed the previous day were on issue today.
A I think what Chris is referring to -- and it's not unusual that when somebody gets disciplined and they feel they might have been done wrong or they didn't like the fact they got disciplined, that they have to be talked to about you take your discipline, you take it for what's worth, and you don't let it carry over. And I think that's what Chris is referring to. Frank needed to go on, accept his discipline, and move on and learn from it and correct his behavior.

Q Well, it says down here, Melvin then added that whenever we tried to address an issue -- any issues, that Frank would show in his expressions and actions that he was never in the wrong just like he was doing now.
Does that mean that he -- he had expressed when he got his written warning number 1 and written warning number 2 about cursing females that he didn't think he had done anything wrong?
MS. SWAIN: Objection.
A I wasn't in the sessions when the discipline was issued so I can't answer that.
Q Did you see Plaintiff's Exhibit Number 17 to your deposition?
A I just read this one that you just handed me.
Q Did you --
A And it doesn't say he didn't think he was wrong. It sounds like they weren't happy with his carefree attitude and

they're assuming it relates to the fact he got disciplined the day before. But there's nothing in this statement that states he said that he didn't believe he did wrong.
Q It says, Melvin then added that whenever we tried to address any issues, that Frank would show in his expressions and actions that he was never in the wrong just like he was doing now. How is that different?
A And I -- and I -- and I believe that refers to Frank is trying to say some of the problems on the line are not something he's responsible for.
Q Well, they -- he -- both Chris Jordan and Melvin are referring specifically to the day before when he received his warning; right?
A They're also -- Chris starts the e-mail out because Frank called him over and wanted to know what was wrong with the capper. So my assumption would be his reference is more to Frank wants to know

what Chris is going to do about the mechanical problems on the capper, when in reality, as a team leader, Frank has some responsibilities to call maintenance. So they're trying, I believe, to refer to Frank has to show some responsibility for his team leadership by taking action on the capper, not calling over a supervisor and having a carefree attitude and expecting them to do it.
Q All right. So --
A That's what I read from this document, Ann.
Q So we -- we're clear that -- that -- never mind. Okay.
Now, just so I -- I have this straight, and I want to make sure I have it straight in my mind, when Frank Williams was given the warning on step one and my client was sent to line five, was that the end of the matter with -- that -- as far as you were concerned?
A When Linda was initially sent to

line five, it was to separate them once the investigation concluded. Once the investigation concluded, it was deemed to leave Linda on line five because Frank cannot be moved to another line because there's only one team leader position and Linda had been moved prior because she had problems getting along with the team on line one. So Linda was told this is your chance to get a fresh start.

Linda had problems other people on line three. There was a pattern with Linda. With whatever team she was on, trouble seemed to brew.

Q All right. Let me make --

A So Linda is not scot-free on this.

Q Okay.

A And I think you fully understand that.

Q Okay. I -- I --

A So this was a chance for Linda to have a clean start and work with a team

where she didn't have problems with other people.

Q Well, I just want to make sure that she -- was she going to be written up?

A No.

Q So --

A She was given a new crew to work with.

Q So there was not a decision made that when she came back to work that she was going to be written up?

A No.

Q Because -- and there was not a decision --

A Well, no.

Q There was not a decision made that when she came back to work, that it had been decided that she had been baiting Frank and therefore she was going to be written up; is that right?

A There was -- there was an investigation ongoing because Linda was making comments to people that didn't belong

in the workplace.

Q And what were those comments?

A She went out of her way to tell people to get onto the website and log on to -- in fact, she informed one person to print it off and pass it off in the lunch room about Frank Williams being a child molester.

Q Now, that was an ongoing investigation?

A It was -- some people came forward to us because they were uncomfortable because Linda was talking about it that much and in situations where there was no reason for it to be brought up.

Q Well, you understand that -- that she was talking to Mike -- Mark Beard about it one day when he was saying that he didn't understand why Frank Williams got the team leader and she was saying he talks about sex to me and he's a sex offender?

A Mark -- Mark Beard --

MS. SWAIN: Objection.

A Mark Beard wanted the team leader position himself, and it was between Frank and Mark and Frank was chosen. So Mark had some hard feelings on why he wasn't chosen, and I think some of that spilled over in Mark's comments.

Q And you understand that -- that at one point she was talking to Mark Beard and he was complaining about that and she was complaining about the way Frank Williams behaved toward her and she said that he's a child molester or a sex offender?

MS. SWAIN: Objection.

A It was more people than Frank -- than Mark Beard that she talked to.

Q Well, you understand that as a matter of law, sex offenders have to be posted so that people can find out about it.

A But is it a matter of law or is it appropriate in the workplace that a person goes around and unsolicited brings up in conversation encouraging other people to go pull up this and in fact print it out and

bring it to the workplace? I'm not a lawyer, Ann, but knowing what law I know, that's almost slanderous.

Q I believe you need to take a break and you need to go talk to your lawyer about the definition of slander. Slander, my -- you must understand, is a -- something that is spoken that is untrue.

A But you know, Ann --

Q There is an absolute defense to slander that is true.

A -- there's no reason to bring that up in the workplace.

Q If she believes that he's -- he's sexually harassing her and that he is a --

A She had -- she had a format to make a formal complaint.

MS. SWAIN: Let's stop the arguing over the issue.

MS. ROBERTSON: Yeah. That's fine. Let's take a break.

THE VIDEOGRAPHER: We're off the record at 1:49 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: We're back on the record at 2:11 p.m.

BY MS. ROBERTSON:

Q After Mr. Williams was written up and given his warning and Linda Thornton was sent to line five, were you and/or Tommy Nance contemplating any further action on that particular activity?

A On the -- on the Frank Williams?

Q Or Linda Thornton. Were you going to write her up for anything?

A There was an investigation on Linda Thornton that didn't really have anything to do with Frank Williams.

Q Well, when was that -- when was that done? When was that done?

A Yeah, Linda left before the investigation was concluded, but it was initiated, I believe, by other employees coming forward and being uncomfortable in conversations Linda would enter into with

them.

Q And -- and -- and so there should be evidence in the file of this investigation, I take it?

MS. SWAIN: Objection.

A I would think so, but --

Q Okay. And where would I find the evidence of the investigation?

A It would have been in Tommy Nance's file.

MS. ROBERTSON: Okay. Once again off the record.

(An off-the-record conversation was held.)

BY MS. ROBERTSON:

Q And can you tell me the employees who initiated this?

A I can't remember the name. It was -- it was female and it was a -- conversations that occurred out in the smoke area. That's about all I can remember.

Q All right. Now -- now, you know that -- that she was written up once before about mentioning that he had -- was a sex

offender?

A I believe there was a write-up in the spring --

Q I got you.

A -- about I think it was things that were inappropriate in the workplace is how it was deemed or something. I'm sure you've got the write-up.

Q Inappropriate in the workplace?

A We'll get the --

Q Well, let me --

A Get the write-up --

Q Yeah, let me get the write-up.

A -- because I can't remember from memory.

Q And while I'm looking for it, you said that -- that -- that you thought Frank Williams had turned his life around or --

A I'm not saying that. I'm saying anyone who has an arrest at some point, I think, has to be given the opportunity in the future that their life might have changed.

Q Well, I --
A I don't think --
Q Was it your understanding that he had just been arrested?
MS. SWAIN: Objection.
A No.
Q He had been arrested and he had pled guilty and he had gone to prison for four years; right?
MS. SWAIN: Objection.
A I was aware there was a conviction.
Q Were you aware that he was in prison for four years?
MS. SWAIN: Objection.
A I didn't delve into it.
Q Were you aware that after he was released from prison, he was put on probation to run to 2001?
MS. SWAIN: Objection.
A I didn't look into the details of it, Ann.
Q And were you aware that in 1998

after he had been out of prison for two years, his probation officer moved to revoke his probation because he was having sex with a 15 year old when he was 26?
MS. SWAIN: Objection.
A I was unaware of that, Ann.
Q Did you know that he had a baby by the woman that he -- 15 year old that he was having sex with?
MS. SWAIN: Objection.
A I was not aware of that either.
Q Did you know he married her and her name was Ronnie?
MS. SWAIN: Objection.
A I wasn't aware of that. I don't look into the personal life of every employee.
Q Well, as -- as I recall, when -- when I took your deposition last time, you told me one of the reasons that -- that you were hired and sent to Dothan was to make sure that people were complying with the procedures such as doing background checks

on new employees; is that right?
MS. SWAIN: Objection.
A And Frank was hired before I came, Ann.
Q But weren't you -- wasn't that one of the reasons you said you were hired, to make sure background checks were being done?
MS. SWAIN: Objection.
A When I came down there in July of 2004, Glen Warren and myself were brought there and part of what we were asked to do is put policies and procedures in place consistent with the other plants, which hiring with background checks was part of it. But we didn't go back to all the employees that were currently hired and do retro back -- background checks.
Q But tell me, if -- if -- if you will, what is the purpose of doing a background check before you hire somebody at Flavor House?
A Because we have a practice of not

hiring felons.
Q A practice of not hiring felons?
A Since we put that practice in place. And it was not in place when Frank was hired because that was prior to us putting it in place.
Q Okay. Well, tell me what the -- why the practice of not hiring felons is in place now.
MS. SWAIN: Objection.
A It's just a corporate policy.
Q Is one of the reasons that felons are believed to potentially not be truthful?
MS. SWAIN: Objection.
A It's a corporate policy, Ann. That's about the only answer I can give you for that.
Q And you have no idea why they have the policy, even though they sent you down to see that it was enforced?
MS. SWAIN: Objection.
A Ann, I don't sit and question everything. I try to do what the corporate

requires me to do.
Q Well, if -- when you became aware that Mr. Williams was a convicted felon, did you ask Mr. Nance to run a background check on him then?
A I don't remember that.
Q Did you call anybody in corporate and say, We have a fellow working here that's in violation of our current policy. What should I do?
MS. SWAIN: Objection.
A He was hired before that policy was in place, though. We were not sent down here to do background checks on all current employees and terminate anybody based on a background check retro their hiring.
Q Even if it turned out that there were people that were uncomfortable with his background and that he -- that they were afraid of him because of his background?
MS. SWAIN: Objection.
A We took any complaint and took it through its due process, Ann.

Q Let me ask you something. You said that my client was passing around at the workplace things that came off the website about Mr. Williams. Is that right?
MS. SWAIN: Objection.
A No. She encouraged someone to print it off and bring it in to work and pass it around.
Q And you didn't say that she also was passing it around herself?
A No.
Q Did you in fact go on the website to see what in fact was on the website?
A No, I personally did not.
Q Okay. And as you sit here today, you have no -- no understanding at all of why the corporate policy exists not to hire convicted felons; is that right?
MS. SWAIN: Objection. She's already answered that question.
MS. ROBERTSON: I just want to make sure I -- she has no understanding at all.

A It is a corporate policy and I abide by the corporate policies, Ann.
Q And you don't have any idea why the policy exists?
MS. SWAIN: Objection.
A We do a lot of things to try to retain a good work force.
Q My question is, do you have any understanding of why the policy exists?
A No more than what I've already told you, Ann. It exists because people at corporate deemed it was a good guideline to try to follow.
Q Okay. But you don't know why they deemed it a good guideline?
A Not exactly, no.
Q Were you -- was Mr. Williams asked to resign because he was a convicted child molester?
A No.
Q Why was he asked to resign?
A He was asked to resign because it was deemed he did put back at the point he

was hired that he was a felon but he didn't state the severity of the felony, number one. Number two, when he was asked about his prior convictions, he was not truthful in that investigation.
Q He lied; is that right?
MS. SWAIN: Objection.
A In that particular setting, yes, Ann.
Q When did he lie about that?
MS. SWAIN: Objection.
A It was right before he was released.
Q So who asked him about that?
A Dee Lake.
Q Dee Lake. Is that her right here?
A Uh-huh. That's Dee.
Q And is that the first time anyone asked him about that?
MS. SWAIN: Objection.
A That I'm aware of.
MS. ROBERTSON: What have I done

with my documents, the ones that were from yesterday? There they are.
Q Tell me, if you will, what precipitated Dee Lake asking him that.
MS. SWAIN: Objection.
A I don't really remember exactly, Ann.
Q Did it have anything to do with the lawsuit?
A I don't know -- I don't know if it's a EEOC case or what. Dee had just come on board. She was fairly new. Some discussion came up.
Q Was -- did you -- did -- when the EEOC charge came, did you ask Mr. -- Mr. Williams anything about his felony background then?
A I wasn't directly involved in the EEOC case.
Q Okay.
A I don't know what you want me to do with that.
(Plaintiff's Exhibit Number

18 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q I -- I will show you. Plaintiff's Exhibit Number 18, what is that, please, ma'am?
A It appears to be a document that shows the different job bids and any compensation changes that would have occurred with Frank Williams.
Q And -- and who made the decision to make Frank Williams a temporary supervisor in July of '07?
A The temporary supervisor position -- I think we went over this the first time -- is for gift pack, which is a seasonal business, and so it only runs a couple months out of the year. And when that opportunity comes up, people bid on it and the supervisors do an interview process.
Q All right. And -- and are you given a supervisor position if you have write-ups and warnings in your file for

cursing subordinates?
MS. SWAIN: Objection.
A I -- I think what you see here, Ann, is when he had those write-ups in his file, that was '06 and there was a temporary supervisor job awarded in the fall of '06 which Frank did not get because he had disciplinary actions in his file. This was awarded in the following year. And as I told you earlier, disciplinary actions fall off after a year so --
Q Yes.
A -- when they hit their year anniversary date -- so at the point he would have interviewed for this one, the disciplinary actions would have dropped off.
Q Oh, really? I thought he got his second warning on August the 1st, did he not?
A But the first one would have dropped off because --
Q Well he -- he --
A -- it's June.

Q He still had a second warning for cursing a female on August the 1st of '06 within the year; correct?
MS. SWAIN: Objection.
A But I believe Frank went incident-free of anything for that entire year.
Q Oh. Well, what about Plaintiff's Exhibit Number 17, where the day after he got the incident he was -- he was having to be corrected?
MS. SWAIN: Objection.
Q When he was taking an attitude like he never did anything wrong and wouldn't take ownership of problems?
A We -- we talked about this right before the break, and this is in reference to Frank wanting Chris to correct things instead of Frank taking it on himself.
Q And it was -- it was a problem with his leadership that occurred a day after a write-up; correct?
MS. SWAIN: Objection.

A Five days away from being a year old from the point he's awarded that and he would go back into supervision. And I wasn't part of the team that awarded him the bid, but they wouldn't have done it if he wouldn't have demonstrated better performance before that.

Q But which is it? Does it roll off after a year or does it just -- they can decide whatever they want to?

MS. SWAIN: Objection.

A It rolls off after a year.

Q All right. So he had at least one major disciplinary in his file short of a year before he was made a temporary supervisor; is that -- is that correct?

A He would have one step.

Q Well, just how many times do you -- does a team leader get to curse female subordinates before he is considered not supervisory material?

MS. SWAIN: Objection.

A You know, profanity is a

violation of the policy whether you're a team leader or anybody else, Ann. And I don't think there's a difference between profanity being used on a male or a female.

Q Well, never mind. We talked about that last time. Tell me exactly what the little things like Plaintiff's Exhibit Number 17 are.

A Well, it's an e-mail, a printed-out e-mail.

Q Well, I -- but if it's put in your personnel file?

A Tommy Nance had instructed or encouraged or allowed -- I'm not sure which would be the right verb -- that if they wanted Tommy to be aware of something and sometimes they don't cross paths, especially for the off-shift supervisor, that they just shoot him an e-mail.

Q Do you see where Mr. Williams is -- oh. So Mr. Nance is -- is -- is made aware of it; is that right?

A Yeah. Chris is sending this to

Mr. Nance and he's copying Ricky and Melvin.

Q You said you didn't have any role in the -- in responding to the EEOC charge. Did you see the EEOC charge at any time?

A Yes. I believe it was mailed directly to me because I'm plant director. And then when I get those, I pass them on to HR.

Q To Tommy Nance?

THE WITNESS: Was it Tommy or you, Dee?

A I think it might have been Dee.

Q All right. And -- and then what happens to it?

A They basically work with corporate legal and -- to make sure that they draft the reply and get it submitted.

Q What exactly is a coaching section -- session?

A A coaching session, when you sit down and you talk with somebody.

(Plaintiff's Exhibit Number 19 was marked and attached to the

deposition.)

BY MS. ROBERTSON:

Q All right. I'll show you what's been marked as Plaintiff's 19. And it looks like that -- that Frank Williams had a coaching session in May of '07. Does that have any effect on his being selected as a supervisor two months later?

MS. SWAIN: Objection.

A Sometimes it -- and, you know -- and this is what I read into this. Sometimes a coaching session is to say I want to make sure you understand these are the priorities. It almost sounds like he was trying to start up blind and he was putting the paperwork in a different priority position. They're saying no. Do the paperwork and they're just telling him --

(Plaintiff's Exhibit Number 20 was marked and attached to the deposition.)

BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 15, what do you make of that? That -- that's an October of 2006 --
A This -- this is 20.
Q Plaintiff's Exhibit Number 20 to your deposition.
MS. SWAIN: What was -- I'm sorry. What was the question?
MS. ROBERTSON: I'm asking her what that is because she said that Mr. Williams' record was clean from August of '01 until he was made temporary supervisor. And it looks like to me that in October of '06 he had some kind of coaching or something.
MS. SWAIN: I'm going to object to the characterization of this, of her testimony.
MS. ROBERTSON: Well, okay. Whatever. I just want to make sure I understand the -- the status of this stellar employee.

A Yeah, when we --
MS. SWAIN: Objection.
A When we don't award people bids or don't allow them to be candidates for jobs, we base it on formal documentation, not coaching.
Q I see. So you don't -- you don't pay any attention to these coaching sessions?
A Sure, we pay attention to coaching sessions but, you know, what would be relevant is how many other people might have had coaching sessions similar to Frank's. And they're not considered disciplinary.
Q I got you.
A We tend to like to coach our people. They's how they improve their performance. Coaching is a more positive approach to get people to elevate their behavior.
Q Now, I still want to make sure I'm clear on this. Was Linda Thornton going

to be written up for anything should she have returned to work after she -- after she was sent to line five?
MS. SWAIN: Objection. Stop for a minute, if you would. And this is like the third or fourth time --
MS. ROBERTSON: Well, she never answered. She said there --
MS. SWAIN: She's under investigation.
MS. ROBERTSON: -- was an investigation. Well, okay.
MS. SWAIN: And she left before they could conclude it, so, I mean, that's the answer.
A That's the answer.
Q And -- and -- and did it have anything to do her baiting Frank Williams?
A There were complaints from other employees that they felt uncomfortable that -- the discussions Linda was entering in with them regarding Frank.
Q And what were these discussions

supposed to be?
A It was around his previous conviction. And they were brought up in venues that people felt they didn't want to hear it. They didn't want to have to listen to it.
Q And -- and you don't have any memory of the people's names?
A I can't remember the exact name, but it was female and it was in the smoking area.
Q And there's no -- and there's no documentation?
A You know, there is a document somewhere.
Q Okay. Well, I want to stop this deposition and I want you to find it before -- oops -- before I finish it.
MS. SWAIN: Ann, we're not -- we don't need to stop the deposition. We have searched for the document. They have searched for the document. It -- we cannot find any such document so, I

mean, if you want to --
MS. ROBERTSON: Well, the reason I -- I say is Tommy Nance testified under oath that had my client returned to work, she was going to be written up.
MS. SWAIN: But you're going to --
MS. ROBERTSON: -- because of this incident.
MS. SWAIN: -- with Tommy next month so you can certainly talk to him about it.
MS. ROBERTSON: Which, of course, proves just what I have always -- that -- my client said that anytime she complained she was gotten in trouble for it.
MS. SWAIN: Okay. Well, and again, you can question Tommy about that when you -- when you take his deposition.
BY MS. ROBERTSON:
Q And -- was it --

A You might flip it out.
Q Was it ever about the time that -- that my client took leave that she was going to be written up?
MS. SWAIN: Objection.
A I don't remember your client taking leave. She --
Q Or that she -- that she had sick leave and then she didn't come back; right?
A She -- I don't think she took sick leave.
Q Or that she was sick. She did -- she missed a few days --
A Linda left on a Friday. She wanted to quit. We gave her her -- I handed her badge back, instructed her she needed to settle down, try to calm down and think about, and then Linda never came back to work.
Q Okay. Do you know --
A She just --
Q -- if she called in and she was sick?

A I know she took points and then she just didn't come back.
Q All right. Well --
A But that's -- that's not a leave.
Q Well, when she missed the days after -- when she left when she was upset, was she going to be written up if she had come back on that Monday?
MS. SWAIN: Objection.
A I think you need to ask Tommy that question. I know there was an investigation.
Q Okay. And had -- do you know if my client had been informed of the investigation?
A I'm not aware if she had or not.
Q Isn't it part of the investigation to take a statement from the alleged doer, if you will?
MS. SWAIN: Objection.
A It would be. And perhaps Tommy would have done that if she would have returned. You'll have to ask Tommy that

question.
Q So he -- if he said under oath that he was going to write her up if she had returned, he was going to write her up without taking a statement from her; is that right?
MS. SWAIN: Objection.
A You'll have to ask Tommy these questions, Ann. I can't speak for Tommy.
Q Was -- was my client upset when she came in on Friday and gave her badge to y'all?
A Yes, she was.
Q Why was she upset?
MS. SWAIN: Objection.
A She --
Q Or what did she say was why she was upset?
A If I remember correctly, she said she couldn't work with Frank Williams. We said, You're not working with Frank. You're on line five. We said, We've separated you and Frank. She wanted to know why she was

on line five. I believe that's when I talked to her about Linda, this gives you a whole new team to work with, you know. You need to get out there and prove you're a valuable asset to this team and you've got a whole new group of people to work with. And that's the key points, I guess, I remember from it.

Q Well, was there some -- did you have some doubt that she was a valuable asset?

A I did point out to Linda that she had been on line one when I first came there and Linda and some other employees had frequent conflicts, Kim Perkins in particular. And then when we moved Linda to line three, there was conflicts and not only with Frank Williams, with some other employees. So Linda, in her personality, I think her intentions were good, just tended to rub people the wrong way.

Q Who -- who were the people that she had a conflict with on line three? Was

she written up for any of these conflicts?

A I can't remember. And the one lady is now out for cancer. But a filler operator. There were other people that --

Q Well, was -- was any investigation done about -- around these other conflicts?

A Yes, there was.

Q All right. So they would be in these papers that I have?

MS. SWAIN: Objection.

A If a disciplinary action wasn't written, I -- you might not be able to trace back to it. I don't know how you would.

Q Well, I mean, what do you mean by conflicts because I've -- the only conflict I've seen about Kim Perkins was Kim Perkins was written up for -- for cursing somebody else.

A Linda herself came up into my office and complained about Kim Perkins --

Q Well, so --

A -- because her and Kim would have

disagreements and not get along and --

Q So -- so she was going to be written up when she complained about Kim Perkins; is that right?

MS. SWAIN: Objection. That's not what her testimony was.

A That wasn't what I said.

Q All right. Well, other people had trouble with Kim Perkins; correct?

A Yes.

Q All right. And as I understand it, that -- there was -- Frank Williams had trouble with Kim Perkins; right?

MS. SWAIN: Objection.

A I don't directly remember that one.

Q Okay. Well -- so -- but you're attributing the problem to Linda Thornton; is that right?

A There was a pattern, it appeared. I mean, if you could keep one thing constant with a team -- because when Linda left line one, even though Kim Perkins remained there,

there seemed to be less conflict on the team when it was Kim and the rest of the people. So there was a little bit of a pattern, and I told Linda that. And I said, Linda, this is your chance to really show people that that pattern doesn't resolve around you.

Q Well, did you tell Jonnie that too when she came less than a month late -- or just a little over a month later and said that Frank was doing the same thing to her that my client had complained about?

MS. SWAIN: Objection.

A Jonnie's a very soft-spoken person and I don't have any recollection of anybody having conflict with Jonnie Nickerson.

Q And yet Frank Williams did the same thing to her that he did -- that my client complained of; correct?

MS. SWAIN: Objection.

A Frank Williams has a document in his file -- we've reviewed it -- that relates to Jonnie. But did Jonnie have a

pattern of conflict with other people like Linda? I think that's what you asked me. The answer is no.

Q Well, I'm just trying -- make sure I -- I want to understand was Linda going to be disciplined for what happened when -- concerning this incident?

MS. SWAIN: Objection. Don't -- don't answer that. We've -- she's asked -- answered the question like five different times.

MS. ROBERTSON: Okay. I'm finished with her. I'm finished with her. Take her away.

THE VIDEOGRAPHER: The deposition is over at 2:36 p.m.

DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

______________________________
RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

**A**

**abide** 55:2
**ability** 31:14 33:20
**able** 74:13
**absolute** 45:10
**accept** 37:21
**ACCR** 78:21
**act** 11:14
**acting** 6:4
**action** 1:5 18:11 33:5,16 40:7 46:9 74:12 78:16
**actions** 38:4 39:8 59:8,10 59:16
**activity** 46:10
**acts** 35:19
**added** 38:2 39:5
**address** 38:2 39:6
**addressed** 37:10
**admits** 21:13
**admitted** 23:12
**advised** 3:4
**afraid** 53:20
**agree** 18:1
**AGREED** 2:2 2:11
**air** 26:22
**Alabama** 1:2,23 2:8,21 5:9,18 6:2,3,5,9,22 78:3
**alleged** 71:19
**allow** 66:4
**allowed** 62:14
**amended** 2:22
**and/or** 36:5 46:8
**Ann** 1:15 2:4 5:13 6:10,17 7:5,15 14:4 25:8 27:8 28:23 29:14 30:18 31:7,18 32:2 40:13 45:2,9 49:22 50:6 51:4 52:15,22 53:23 55:2,11 56:9 57:7 59:4 62:2 68:19 72:9
**anniversary** 59:14
**answer** 23:15 38:14 52:16 67:15,16 77:3 77:9
**answered** 32:17 54:20 67:8 77:10
**answers** 78:8
**anybody** 8:22 22:8 30:6 53:7 53:15 62:2 76:15
**anytime** 69:15
**anywise** 78:16
**appear** 19:10 25:1,20
**appeared** 75:20
**appears** 19:13 24:2,22 37:3,9 58:7
**approach** 66:20
**appropriate** 18:11 44:20
**approximately** 2:10 6:9
**area** 47:20 68:11
**arguing** 45:19
**arrest** 48:20
**arrested** 49:4,7
**asked** 7:21 21:20 22:6,9 22:14 27:20 32:16 51:12 55:18,21,22 56:3,14,20 77:2,9
**asking** 13:9 21:17 57:4 65:10
**asset** 73:5,11
**assign** 2:16
**assume** 19:22 25:3
**assuming** 19:12 19:19 39:1
**assumption** 39:22
**attachables** 24:23
**attached** 13:15 23:17 24:14 34:20 36:15 58:1 63:23 64:21
**attention** 66:8 66:10
**attitude** 37:3 38:23 40:9 60:13
**attorney** 7:11 9:16
**attributing** 75:18
**August** 34:23 59:18 60:2 65:13
**automatically** 20:10
**award** 66:3
**awarded** 59:6,9 61:2,4
**aware** 15:2,7 17:16 49:11,13 49:17,23 50:11 50:15 53:2 56:22 62:16,22 71:16

**B**

**B** 4:5
**baby** 50:7
**back** 27:9 35:1 42:10,17 46:3 51:16,18 55:23 61:3 70:9,16 70:18 71:2,8 74:14
**background** 50:23 51:7,15 51:18,21 53:4 53:14,16,19,20 57:17
**badge** 70:16 72:11
**baiting** 42:18 67:18
**Baker** 5:5
**base** 11:7 66:5
**based** 26:9 53:15
**basically** 27:3 63:15
**Beard** 43:17,22 44:1,8,15
**Bearman** 5:5
**begins** 6:15
**behaved** 44:11
**behavior** 37:23 66:21
**believe** 10:19 12:22 14:19 18:8 20:5 21:11 26:15 27:10,18,21 30:3,6,8,14 33:8 39:4,11 40:5 45:4 46:21 48:2 60:5 63:5 73:1
**believed** 52:13
**believes** 45:14
**belong** 42:23
**Berkowitz** 5:6
**better** 16:10 28:16 61:6
**biased** 31:4,21
**bid** 58:19 61:5
**bids** 58:8 66:3
**Birmingham** 5:9 5:18
**bit** 76:3
**blind** 64:15
**board** 57:12
**Bobbi** 7:2
**Bobbie** 2:8 6:8
**boldface** 27:14
**Boyer** 1:15 2:5 6:11,17 7:15 7:20
**break** 45:5,21 46:1 60:17
**brew** 41:14
**bring** 8:22 21:21 25:13 27:16 45:1,12 54:7
**brings** 44:21
**brought** 12:3 27:9,18 36:1 43:15 51:11 68:3
**Building** 5:16
**business** 31:11 58:17
**BUTLER** 78:4

**C**

**C** 5:1,13
**Caldwell** 5:5
**call** 8:21 40:4 53:7
**called** 28:18 39:20 70:22
**calling** 40:8
**calm** 70:17
**cancer** 74:3
**candidates** 66:4

**capper** 39:22 40:2,7
**carefree** 38:23 40:9
**carry** 37:19
**case** 6:19 27:15 30:13 32:8 57:11,19
**cause** 6:11 78:17
**certainly** 69:11
**CERTIFICA...** 78:1
**Certified** 78:20
**certify** 6:4 78:6 78:14
**chance** 41:9,22 76:5
**change** 31:6
**changed** 22:23 48:23
**changes** 58:9
**characterizati...** 65:18
**charge** 57:15 63:3,4
**check** 51:21 53:4,16
**checks** 50:23 51:7,15,18 53:14
**child** 31:10 43:7 44:12 55:19
**Childs** 5:15
**chosen** 44:3,4
**Chris** 36:23 37:12,20 39:15 39:19 40:1 60:18 62:23
**Civil** 1:5 2:21 6:6
**clean** 41:23 65:12
**clear** 40:14 66:23
**client** 31:10 35:19 40:19 54:2 69:4,15 70:3,6 71:14 72:10 76:11,19
**coach** 66:17
**coaching** 63:18 63:20 64:6,12 65:16 66:6,8 66:11,13,19
**come** 9:4 11:16 57:11 70:9 71:2,8
**comes** 58:19
**coming** 7:23 46:22
**commencing** 2:9 6:9
**comments** 42:23 43:2 44:6
**Commissioner** 1:20 6:4
**compensation** 58:9
**complained** 69:16 74:21 75:3 76:11,19
**complaining** 44:9,10
**complaint** 8:23 45:17 53:22
**complaints** 67:19
**complete** 26:1
**complying** 50:22
**computer-aided** 78:10
**concerned** 40:22
**concerning** 77:7
**conclude** 67:14
**concluded** 41:2 41:3 46:20 77:17
**conduct** 8:20
**conducts** 21:20
**conflict** 73:23 74:16 76:1,15 77:1
**conflicts** 73:15 73:17 74:1,7 74:16
**considered** 61:20 66:14
**consistent** 51:14
**constant** 75:21
**consulted** 9:3 17:14,18
**contemplating** 46:9
**conversation** 44:22 47:13
**conversations** 46:23 47:19
**convicted** 30:22 31:5,13,19 53:3 54:18 55:18
**conviction** 49:12 68:3
**convictions** 56:4
**copy** 14:4,6,9
**copying** 37:1 63:1
**corporate** 9:19 52:11,15,23 53:7 54:17 55:1,2,12 63:16
**correct** 11:21 24:9 35:9 37:23 60:3,18 60:22 61:16 75:9 76:19 78:11
**corrected** 60:11
**correctly** 72:19
**counsel** 2:4,13 2:15 6:7 7:2 78:15
**counseling** 15:19,22 16:16 16:17 17:7 18:8 20:7 34:5
**COUNTY** 78:4
**couple** 23:1 58:18
**course** 69:13
**court** 1:1 2:6 3:5 3:6 6:1,20,21 30:13 78:20
**created** 23:5
**crew** 42:7
**Crook** 2:8 6:8
**cross** 62:17
**Crowe** 7:2
**current** 53:9,14
**currently** 51:17
**curse** 26:8,13 61:19
**cursing** 25:17 38:10 59:1 60:2 74:18
**cuss** 22:8
**cussing** 37:6

**D**

**D** 1:21 2:5,22 4:1 5:14 6:1,19
**damn** 26:13 28:19 29:7
**data** 18:12
**date** 6:5 10:11 18:22,23 19:2 19:5,23 22:4 59:14
**dates** 9:10 37:4
**David** 9:21 10:1
**David's** 9:22
**day** 2:9 3:2 6:10 37:3,5,10 39:2 39:17 43:18 60:9,21
**days** 61:1 70:13 71:5
**dealing** 30:19
**decide** 61:10
**decided** 42:18
**decision** 8:8,18 11:3,18,23 42:9,14,16 58:11
**decisions** 12:21
**Dee** 5:22 10:4,22 56:15,16,18 57:4,11 63:11 63:12
**deemed** 41:3 48:7 55:12,15 55:23
**defendant** 5:3 7:11
**Defendant(s)** 1:12
**defense** 45:10
**definition** 45:6
**delivering** 2:23
**delve** 49:16
**demonstrated** 61:6
**denied** 27:22
**deny** 27:11
**depends** 20:8
**deposition** 1:14 2:4,18 6:16 13:16,19,23 15:8 18:16 19:8,17 23:18 23:22 24:15 25:6,10 34:17 34:21 35:23 36:16,20 38:17 50:19 58:2 64:1,22 65:7 68:17,20 69:21 77:15,17 78:7
**detailed** 25:18

FREEDOM COURT REPORTING

**details** 49:21
**deviant** 30:9
**difference** 16:15 62:3
**different** 15:23 16:3 18:5 21:22 39:10 58:8 64:16 77:11
**directly** 27:20 57:18 63:6 75:15
**director** 63:6
**disagreements** 75:1
**disciplinary** 11:14 13:11 14:14,17 23:2 33:5,16 34:8 34:22 35:10 59:8,10,16 61:14 66:15 74:12
**discipline** 8:9,13 11:4,20 13:3 20:12 33:20 37:18,22 38:14
**disciplined** 8:7 35:4 36:9 37:14,16 39:2 77:6
**discussion** 21:5 23:9 57:13
**discussions** 67:21,23
**disqualified** 33:17
**District** 1:1,2 6:21,21
**Division** 1:3 6:22
**divisional** 12:19
**docked** 33:14 35:14
**document** 15:10 17:8 21:23 24:1 36:22 40:13 58:7 68:14,21,22,23 76:21
**documentation** 66:5 68:13
**documented** 14:14,17
**documents** 21:19 57:1
**doer** 71:19
**doing** 35:4 38:6 39:9 50:23 51:20 76:10
**Donelson** 5:5
**door** 20:11 34:11
**Dothan** 1:23 2:8 6:8 50:21
**doubt** 73:10
**draft** 63:17
**dredge** 32:10
**dropped** 59:16 59:21
**due** 53:23

E

**E** 4:1,5 5:1,1
**earlier** 13:23 59:10
**early** 10:13
**EEOC** 57:11,15 57:19 63:3,4
**effect** 34:4 64:7
**effective** 2:22
**either** 50:11
**elevate** 66:20
**employee** 8:23 26:4 50:17 65:23
**employees** 18:10 29:13 46:21 47:15 51:1,17 53:15 67:20 73:14,19
**encouraged** 54:6 62:14
**encouraging** 44:22
**enforced** 52:20
**enter** 46:23
**entering** 67:21
**entire** 60:6
**especially** 62:17
**essentially** 35:4
**etcetera** 9:3
**event** 25:21
**everybody** 13:7
**evidence** 2:18 11:10 21:16 47:3,8
**exact** 9:9 10:11 68:9
**exactly** 9:13 34:4 55:16 57:6 62:6 63:18
**examination** 4:2 6:12 7:18
**examined** 7:16
**Excuse** 17:21
**Exhibit** 13:14 15:5,7 17:14 18:13,15,17,19 19:7,15 21:9 23:16,21 24:13 24:18 25:6,10 26:10 28:7 29:16 34:13,19 35:22 36:14,19 38:16 57:23 58:5 60:9 62:7 63:22 64:20 65:2,6
**exhibits** 3:3
**exists** 54:17 55:4 55:9,11
**expecting** 40:9
**explain** 31:22
**expressed** 38:8
**expressions** 38:4 39:7
**e-mail** 36:23 39:20 62:9,10 62:19

F

**F** 5:4
**fact** 26:21 27:3 37:16 39:1 43:5 44:23 54:12,13
**facts** 13:6,9
**fairly** 57:12
**fall** 10:8,12,14 34:9 59:6,10
**far** 40:21
**feel** 37:14
**feelings** 44:4
**fellow** 53:8
**felon** 53:3 56:1
**felonies** 30:23
**felons** 52:1,2,8 52:12 54:18
**felony** 56:2 57:16
**felt** 13:7 67:20 68:4
**female** 47:18 60:2 61:20 62:4 68:10
**females** 38:10
**file** 22:18 23:2,5 35:6 47:3,10 58:23 59:5,8 61:14 62:12 76:22
**filed** 3:6
**files** 23:4
**filing** 22:23
**filled** 19:20
**filler** 74:3
**find** 44:18 47:7 68:17,23
**fine** 45:21
**finish** 68:18
**finished** 77:13 77:13
**first** 8:11 33:11 56:19 58:16 59:20 73:13
**five** 17:20,21 40:20 41:1,4 46:8 61:1 67:3 72:22 73:1 77:10
**Flavor** 1:10 6:18 7:12,21 8:5 51:22
**flip** 70:1
**follow** 20:11 55:13
**following** 6:12 16:21 59:9
**follows** 7:17
**force** 55:7
**foregoing** 6:6 78:7,11
**form** 2:14 20:7 34:5
**formal** 45:17 66:5
**format** 45:16
**forward** 8:23 9:4 43:12 46:22
**four** 7:23 49:9 49:14
**fourth** 67:6
**Frank** 18:7 23:11 26:7 30:1,3 31:16 32:13,20 33:5 37:21 38:3

# FREEDOM COURT REPORTING

39:7,12,20,23 40:3,5,18 41:4 42:18 43:7,19 44:2,3,10,14 46:11,16 48:17 51:3 52:4 58:10,12 59:7 60:5,18,19 64:5 67:18,22 72:20,21,23 73:18 75:12 76:10,17,21
**Franklin** 6:19 10:17
**Frank's** 24:2 37:2 66:14
**frequent** 73:15
**fresh** 41:10
**Friday** 70:14 72:11
**front** 21:23 22:2 22:20
**fuck** 26:13
**fucker** 28:18 29:7
**fucking** 28:16 28:17 29:7
**fully** 41:19
**function** 10:21
**further** 2:11 46:9 78:14
**future** 48:22

**G**

**generated** 17:9
**getting** 34:5 41:8
**gift** 58:16
**give** 9:10 14:3 16:22 26:1 52:16
**given** 16:20 18:9 21:10 33:5 40:18 42:7
46:7 48:21 58:22 78:12
**gives** 73:2
**Glen** 9:12,17 51:11
**go** 32:10 37:21 44:23 45:5 51:16 54:12 61:3
**God** 28:19 29:6
**goes** 44:21
**going** 13:23 19:3 40:1 42:4,11 42:19 46:13 65:17 66:23 69:5,6 70:4 71:7 72:3,4 75:2 77:6
**good** 12:21 31:1 55:7,12,15 73:20
**gotten** 27:4 28:1 69:16
**Greenville** 6:2
**grounds** 2:16
**group** 25:14 73:6
**guess** 73:7
**guidance** 12:20
**guideline** 55:12 55:15
**guilty** 30:9 49:8

**H**

**H** 4:5
**hand** 26:22
**handbook** 11:9 29:12
**handed** 38:19 70:15
**handle** 9:1
**handled** 11:8 35:17
**handwriting**
17:12 25:1
**happen** 20:9
**happened** 22:6 25:21 32:22 35:7 36:7 77:6
**happens** 20:8 63:14
**happy** 38:23
**harassing** 45:15
**hard** 44:4
**head** 9:12
**hear** 68:5
**heard** 26:7,12 30:16
**hearing** 78:13
**held** 21:5 23:9 47:13
**Helms** 9:23 10:1 10:1
**hire** 51:21 54:17
**hired** 50:21 51:3 51:6,17 52:5 53:12 56:1
**hiring** 51:15 52:1,2,8 53:16
**hit** 59:13
**hope** 30:5
**House** 1:10 6:18 7:12,21 8:6 51:22
**HR** 8:14,17,23 9:1,6,14,17 10:21 11:2,3 11:18,22,23 12:10,16 14:22 21:20 22:17 23:2,4 63:8
**huh-uh** 16:11
**human** 8:14

**I**

**idea** 52:18 55:3
**identify** 7:3
**improve** 66:18
**inappropriate** 48:6,9
**incident** 18:23 19:3,21 22:4 24:3,8 25:17 35:1 60:10 69:9 77:7
**incident-free** 60:6
**including** 26:13 35:19
**indefinitely** 12:1
**indicating** 10:23
**individual** 23:4
**information** 9:11 19:20
**informed** 43:5 71:14
**initial** 28:1
**initially** 40:23
**initiated** 46:21 47:16
**input** 12:4 13:2 14:17
**instructed** 62:13 70:16
**intent** 21:18
**intentions** 73:20
**intercourse** 30:10
**interested** 78:16
**interview** 58:20
**interviewed** 9:2 59:15
**investigation** 8:21 9:1 11:5 15:11 21:19 22:12 27:8,14 27:18 33:4 41:2,3 42:22 43:10 46:14,20 47:4,8 56:5 67:10,12 71:12 71:15,18 74:6
**investigations** 23:14
**involved** 8:14,17 11:2,14 57:18
**involving** 18:6
**issue** 37:11 38:3 45:19
**issued** 20:4 34:23 38:14
**issues** 37:10 38:3 39:6
**issuing** 17:17

**J**

**Jennifer** 5:4 7:10
**job** 32:10 34:1 58:8 59:6
**jobs** 66:5
**Jonnie** 25:17 32:23 33:2 35:1 37:6 76:7 76:15,23,23
**Jonnie's** 24:22 33:1 76:13
**Jordan** 37:1 39:16
**judgment** 32:8
**July** 8:1 9:13 24:4 35:2 51:10 58:13
**June** 59:23

**K**

**keep** 11:23 75:21
**key** 73:7
**Kim** 73:15 74:17 74:17,21,23 75:3,9,13,23 76:2
**kin** 78:15
**kind** 8:13 9:18 65:16
**kinds** 28:20

**know** 7:21 8:21 9:11 10:11 12:10,15,20 16:6 17:2,8 23:11 26:2,2,9 27:8,12 29:23 30:15 35:20 39:21,23 45:2 45:9 47:21 50:7,12 55:14 57:10,10,21 61:23 64:10 66:11 68:14 70:20 71:1,11 71:13 72:23 73:3 74:14 70:3,7,9,11 71:4
**knowing** 45:2
**knows** 29:12
**Kress** 5:16

L

**L** 2:1
**lady** 74:3
**Lake** 5:22 10:22 56:15,16 57:4
**Large** 2:7 6:4
**late** 10:14 76:8
**law** 7:1 44:17,19 45:2
**lawsuit** 57:9
**lawyer** 45:2,5
**lead** 11:10 12:7 13:13 22:1
**leader** 8:7 13:2 40:3 41:6 43:20 44:1 61:19 62:2
**leaders** 8:10
**leadership** 34:1 35:11 40:7 60:21
**leading** 2:14
**learn** 37:22
**leave** 10:7 41:4 70:3,7,9,11 71:4
**left** 10:3,6,16,18 10:21 46:19 67:13 70:14 71:6 75:22
**legal** 63:16
**let's** 34:12 36:2 37:4,4 45:18 45:21
**License** 78:21
**lie** 27:14 56:10
**lied** 27:3,12 29:15 56:6
**life** 31:6,14,20 48:18,22 50:16
**Linda** 1:6 5:21 6:17 10:3,6,16 17:18 18:6 24:8 26:11 40:23 41:4,7,9 41:11,12,16,22 42:22 43:13 46:7,12,15,19 46:23 66:23 67:21 70:14,18 73:2,12,14,16 73:19 74:20 75:18,22 76:4 76:4 77:2,5
**line** 17:19,20,21 19:2 39:13 40:20 41:1,4,5 41:8,11 46:8 67:3 72:22 73:1,13,17,23 75:22
**listen** 68:5
**little** 24:7 62:7 76:3,9
**LLC** 5:15
**log** 43:4
**long** 12:2
**look** 11:20 17:11 25:2 49:21 50:16
**looked** 14:11
**looking** 19:12,19 20:18 21:8 48:16
**looks** 64:4 65:14
**lose** 33:12
**lot** 31:4,12 55:6
**lots** 26:2
**lunch** 43:6

M

**machine** 33:21
**mailed** 63:5
**maintenance** 40:4
**major** 61:14
**making** 42:23
**male** 62:4
**manager** 14:22 23:4
**manager's** 22:18
**Mark** 43:17,22 43:22 44:1,3,3 44:8,15
**marked** 13:15 13:19,22 15:5 18:14 20:23 23:17,21 24:14 24:18 34:20 36:15,18 58:1 63:23 64:4,21
**Mark's** 44:6
**married** 50:12
**Mary** 1:15 2:4 6:10,16 7:15
**material** 61:21
**matter** 6:17 40:21 44:17,19
**ma'am** 34:18 36:21 58:6
**McNaughton** 1:21 2:6,23 6:1 78:19
**mean** 20:9 25:15 28:6 31:21 38:7 67:14 69:1 74:15,15 75:21
**means** 34:10 78:9
**mechanical** 40:2
**Melvin** 14:20 36:2 37:2 38:1 39:5,16 63:1
**memory** 48:15 68:8
**mention** 25:16 26:18
**mentioning** 47:23
**Middle** 1:2 6:21
**Mike** 43:17
**mind** 29:22 40:15,18 62:5
**minor** 16:23
**minute** 7:8 67:5
**missed** 70:13 71:5
**missing** 20:20
**molester** 31:10 43:8 44:12 55:19
**Monday** 71:8
**money** 33:12
**month** 24:7 33:2 35:3 69:11 76:8,9
**months** 58:18 64:8
**mother** 28:15,17 28:18 29:7
**move** 37:22
**moved** 17:19 23:3 41:5,7 50:2 73:16
**multiple** 30:22

N

**N** 2:1 4:1 5:1
**name** 9:22 33:1 47:17 50:13 68:9
**names** 68:8
**Nance** 10:2,6,18 10:20 14:22 17:3 20:3 25:15 36:5 37:1 46:9 53:4 62:13,21 63:1 63:9 69:3
**Nance's** 25:2 47:10
**necessarily** 33:20
**necessary** 2:12
**need** 16:5 24:11 45:4,5 68:20 71:10 73:4
**needed** 9:2 37:21 70:16
**neither** 78:14
**never** 12:2 31:19 38:5 39:8 40:15 60:14 62:5 67:7 70:18
**new** 42:7 51:1 57:12 73:3,6
**Nickerson** 76:16
**Nineteenth** 5:17
**normally** 25:12
**North** 5:7,17
**Notary** 2:6 6:3
**notes** 15:12 22:13,16 25:3
**number** 1:5 13:14 15:6,8 17:14 18:13,15 18:17,19 19:8 19:16 23:16,22 24:13,18 25:6

25:10 26:10
28:7 29:16
34:13,19 35:22
36:14,19 38:9
38:9,17 56:2,3
57:23 58:5
60:9 62:8
63:22 64:20
65:2,6 78:21

**O**

**O** 2:1
**oath** 30:3,6,9,23
69:4 72:2
**object** 12:14
65:17
**Objection** 12:5
13:4 25:22
27:6 28:5,22
29:10,19 30:4
30:12,17 31:2
32:1,16 34:7
35:8 38:12
43:23 44:13
47:5 49:5,10
49:15,20 50:5
50:10,14 51:2
51:9 52:10,14
52:21 53:11,21
54:5,19 55:5
56:7,11,21
57:5 59:2 60:4
60:12,23 61:11
61:22 64:9
66:2 67:4 70:5
71:9,20 72:7
72:15 74:11
75:5,14 76:12
76:20 77:8
**objections** 2:13
2:16
**objective** 13:13
**obviously** 36:13
**occurred** 19:3

19:22 22:4
47:19 58:10
60:21
**October** 65:4,15
**offender** 43:21
44:12 48:1
**offenders** 44:17
**offered** 2:18
**office** 7:1 36:2
74:21
**officer** 50:2
**offices** 2:7 6:8
**off-shift** 62:18
**off-the-record**
21:5 23:9
47:13
**oh** 16:9 59:17
60:8 62:21
**okay** 8:11,12 9:9
12:15 14:7
15:1 16:9,13
16:18,23 19:18
21:8 22:8,19
26:17 28:13
40:15 41:18,21
47:7,11 52:7
54:15 55:14
57:20 65:20
67:12 68:16
69:18 70:20
71:13 75:17
77:12
**old** 30:10 50:4,8
61:2
**once** 18:9 19:18
25:15 31:19
32:19 41:1,2
47:11,22
**ones** 57:1
**one-on-one**
23:14
**ongoing** 42:22
43:9
**oops** 68:18

**operator** 74:4
**opinions** 13:13
**opportunities**
31:6
**opportunity**
48:21 58:19
**oral** 3:2 6:11
**original** 3:1
**override** 17:4
**ownership**
60:15

**P**

**P** 2:1 5:1,1
**pack** 58:16
**PAGE** 4:2
**Pantazis** 5:15
**paper** 19:13
35:6
**papers** 74:10
**paperwork**
64:16,18
**part** 51:12,15
61:4 71:17
**participated** 8:8
**particular** 17:8
46:10 56:8
73:16
**parties** 2:3,15
78:15
**pass** 43:6 54:8
63:7
**passing** 54:2,10
**paths** 62:17
**pattern** 41:12
75:20 76:3,6
77:1
**pay** 33:14 35:14
66:8,10
**PC** 5:6
**people** 8:17
12:16 31:5,12
35:18 41:11
42:2,23 43:4

43:11 44:14,18
44:22 50:22
53:18 55:11
58:19 66:3,12
66:18,20 68:4
73:6,21,22
74:4 75:8 76:2
76:5 77:1
**people's** 13:12
68:8
**perception**
32:18
**perform** 33:21
**performance**
12:21 61:7
66:19
**period** 9:8 20:3
**Perkins** 73:15
74:17,17,21
75:4,9,13,23
**person** 9:14,17
11:18,23 13:1
30:21 43:5
44:21 76:14
**personal** 13:12
50:16
**personality**
73:19
**personally** 54:14
**personnel** 62:12
**person's** 21:22
**pertinent** 13:7
**piece** 35:6
**place** 51:13 52:4
52:4,6,9 53:13
**plaintiff** 5:12
7:6,9
**Plaintiff's** 13:14
15:5,7 17:14
18:13,15,17,18
19:7,15 21:6,8
23:16,21 24:13
24:18 25:5,5,9
26:10 28:7

29:16 34:13,19
35:22 36:14,19
38:16 57:23
58:5 60:8 62:7
63:22 64:4,20
65:2,6
**Plaintiff(s)** 1:8
**plan** 18:5
**plant** 29:12 63:6
**plants** 51:14
**please** 3:4 7:2
34:18 36:20
58:6
**pled** 30:9 49:8
**point** 22:7 27:21
37:9 44:8
48:20 55:23
59:14 61:2
73:12
**points** 71:1 73:7
**policies** 51:13
55:2
**policy** 11:9
29:13 52:11,15
52:19 53:9,12
54:17 55:1,4,9
62:1
**position** 35:11
41:6 44:2
58:15,22 64:17
**positive** 66:19
**posted** 44:18
**potentially**
52:13
**practice** 51:23
52:2,3,8
**precedence** 11:8
**precipitated**
57:4
**prejudice** 31:3
**present** 5:20
36:13
**pretend** 14:1
**pretty** 14:12

**prevalent** 32:8
**previous** 37:10 68:2
**previously** 7:16
**print** 43:6 44:23 54:7
**printed-out** 62:10
**prior** 2:18 41:7 52:5 56:4
**priorities** 64:14
**priority** 64:17
**prison** 49:8,14 49:18 50:1
**probably** 14:8 30:5
**probation** 49:19 50:2,3
**problem** 60:20 75:18
**problems** 39:13 40:2 41:8,11 42:1 60:15
**procedure** 2:21 6:6 8:14
**procedures** 50:23 51:13
**proceedings** 6:13
**process** 53:23 58:20
**prod** 22:1
**Products** 1:10 6:18
**profanity** 21:13 21:17 23:12 29:11 61:23 62:4
**professional** 32:2
**professionals** 12:17
**progressive** 16:21 20:12
**prove** 73:4
**proves** 69:14
**Public** 2:7 6:3
**pull** 44:23
**purpose** 51:20
**pursuant** 6:5
**put** 21:23 22:2 23:3,6 26:22 34:11 35:6 49:18 51:13 52:3 55:23 62:11
**puts** 34:8
**putting** 52:6 64:16
**p.m** 2:10 6:10,23 45:23 46:4 77:16

**Q**

**question** 2:15 52:22 54:20 55:8 65:9 69:19 71:11 72:1 77:10
**questioned** 27:9
**questioning** 27:10
**questions** 2:14 21:20 72:9 78:8
**Quinn** 5:15
**quit** 70:15

**R**

**R** 5:1
**read** 21:14 28:8 28:9 38:18 40:12 64:11
**real** 32:2
**reality** 40:3
**realize** 21:18
**really** 23:15 31:8 46:15 57:6 59:17 76:5
**reason** 43:15 45:12 69:2
**reasons** 50:20 51:6 52:12
**recall** 50:18
**received** 39:17
**recollection** 76:14
**recommend** 17:3,4
**recommendati...** 9:5 11:6 13:10 14:23 25:14
**recommendati...** 11:12
**record** 6:23 16:5 17:1 21:4 23:8 45:23 46:4 47:12 65:12
**refer** 30:13,15 40:5
**reference** 39:23 60:17
**referring** 19:21 37:12,20 39:16
**refers** 39:12
**refrained** 29:23 32:20
**regarding** 67:22
**related** 24:3
**relates** 39:1 76:23
**relation** 35:1
**relative** 18:6
**released** 49:18 56:13
**relevant** 30:18 32:6 66:12
**remained** 75:23
**remember** 7:22 33:6,13,23 47:17,20 48:14 53:6 57:6 68:9 70:6 72:19 73:7 74:2 75:15
**remind** 7:20
**Renny** 1:21 2:5 2:22 6:1 78:19
**reply** 63:17
**reported** 24:8
**Reporter** 2:6 3:5 6:2 78:20
**represent** 7:4
**represents** 78:11
**request** 36:11
**requires** 53:1
**resign** 55:18,21 55:22
**resolution** 15:15
**resolve** 76:6
**resources** 8:15 12:19
**respective** 2:3
**responding** 63:3
**responsibilities** 40:4
**responsibility** 40:6
**responsible** 39:14
**rest** 76:2
**result** 78:17
**retain** 55:7
**retained** 3:5
**retro** 51:18 53:16
**returned** 67:2 69:4 71:23 72:4
**reviewed** 76:22
**reviewing** 24:1 36:22
**revoke** 50:2
**Richard** 18:15
**Ricky** 15:8 18:16 19:8,17 19:17 26:10 37:1 63:1
**right** 7:7,8 9:6 9:20 10:5,23 11:1,22 12:6 13:18 14:16 15:4,23 16:19 17:2,15 18:1 18:12,21 19:1 19:7,15 20:15 20:22 23:20 25:4 28:6 30:19 32:22 34:12 35:3 36:4,6 37:6,7 39:18 40:11 41:15 42:20 47:21 49:9 51:1 54:4,18 56:6,12,16 58:21 60:16 61:13 62:15,22 63:13 64:3 70:9 71:3 72:6 74:9 75:4,8,11 75:13,19
**Robertson** 3:1 4:3 5:13 7:5,5 7:19 13:17,21 14:5,8 21:3 23:8,10,19 24:16,21 34:14 36:17 45:20 46:5 47:11,14 54:21 56:23 58:3 64:2 65:1 65:10,20 67:7 67:11 69:2,8 69:13,22 77:12
**role** 63:2
**roll** 61:8
**rolls** 61:12
**Ronnie** 50:13
**room** 23:13 43:7

**rub** 73:21
**rule** 2:20 11:15 12:22
**rules** 2:21 6:5 29:12
**run** 49:19 53:4
**runs** 58:17

**S**

**S** 2:1 4:5 5:1,3 5:12 7:2
**sad** 31:7
**safety** 9:18
**said/she** 26:5
**saying** 11:2 13:5 13:22 22:2 27:1,3 28:15 29:2,5,6,17,17 29:23 32:3,21 43:18,20 48:19 48:19 64:17
**says** 15:11 26:16 27:20 28:10,12 37:9 38:1 39:5
**scot-free** 41:16
**searched** 68:21 68:22
**seasonal** 58:17
**second** 34:22 37:5 59:18 60:1
**section** 63:19
**see** 10:22 15:6 21:9,12,14,16 25:5,9 34:12 36:2,11,12 37:4 38:16 52:20 54:13 59:3 62:20 63:4 66:7
**seen** 18:11 25:11 25:12 30:16 74:17
**selected** 64:7
**sending** 62:23
**sent** 37:3 40:20 40:23 46:8 50:21 52:19 53:13 67:3
**sentence** 28:12
**separate** 41:1
**separated** 72:22
**sequence** 9:12
**session** 63:19,20 64:6,12
**sessions** 38:13 66:9,11,13
**set** 27:2
**setting** 56:8
**settle** 70:17
**severity** 56:2
**sex** 43:20,21 44:12,17 47:23 50:3,9
**sexual** 30:10
**sexually** 45:15
**shoot** 62:19
**short** 11:17 46:1 61:14
**show** 13:18 15:4 18:14 23:20 24:17 36:18 38:4 39:7 40:6 58:4 64:3 76:5
**showed** 25:13
**shown** 20:2
**shows** 58:8
**sick** 70:8,11,12 70:23
**sign** 36:11
**signature** 17:10 36:12
**similar** 35:19 66:13
**sit** 52:22 54:15 63:20
**sitting** 10:22 30:19 31:23 32:5
**situation** 12:16 13:8 15:16,16 18:6,10 26:6,7 26:11
**situations** 26:3 32:9 43:14
**six** 21:2
**skip** 20:13
**slander** 45:6,6 45:11
**slanderous** 45:3
**smoke** 47:19
**smoking** 68:10
**Smothers** 15:8 18:16 19:8,17 26:11 28:7
**soft-spoken** 76:13
**solid** 12:21
**somebody** 21:23 27:12 37:14 51:21 63:21 74:18
**sorry** 14:21 16:12 17:22 24:21 65:9
**sounds** 38:22 64:14
**Southern** 1:3 6:22
**speak** 72:9
**specialist** 9:18
**specifically** 27:23 28:2 39:16
**spilled** 44:5
**spoken** 45:8
**spring** 48:3
**start** 27:7 41:10 41:23 64:15
**started** 7:21
**starts** 39:19
**state** 2:7 6:3 7:3 56:2 78:3
**statement** 19:4 19:11,23 21:22 24:3,23 26:2 26:16,20 27:16 27:17 28:1,15 29:1 31:4,7,18 32:19 39:3 71:18 72:5
**statements** 18:9 27:7,19
**states** 1:1 39:3
**status** 65:22
**stellar** 65:23
**stenotype** 78:8
**step** 14:15,18,23 15:2 20:6,12 20:14 33:9,10 33:11 34:9,9 34:23 35:10 40:19 61:17
**steps** 16:21 34:11
**STIPULATED** 2:2,11
**stipulation** 6:7
**stop** 45:18 67:4 68:16,20
**straight** 37:4 40:16,17
**Street** 5:7,17
**stuff** 32:10
**stunned** 12:11
**submitted** 63:17
**subordinates** 59:1 61:20
**Suite** 5:8
**superintendent** 36:3
**supervised** 13:1
**supervision** 61:3
**supervisor** 8:22 40:8 58:13,14 58:22 59:6 61:16 62:18 64:8 65:14
**supervisors** 58:20
**supervisory** 61:21
**supposed** 68:1
**sure** 12:12 14:12 15:9 23:5 25:7 28:8 40:17 42:3 48:7 50:22 51:7 54:22 62:14 63:16 64:13 65:21 66:10,22 77:5
**suspect** 31:23
**suspended** 33:22 35:16
**Swain** 5:4 7:10 7:11 12:5,14 13:4 14:3,7,10 21:1 24:20 25:22 27:6 28:5,22 29:10 29:19 30:4,12 30:17 31:2 32:1,16 34:7 34:16 35:8 38:12 43:23 44:13 45:18 47:5 49:5,10 49:15,20 50:5 50:10,14 51:2 51:9 52:10,14 52:21 53:11,21 54:5,19 55:5 56:7,11,21 57:5 59:2 60:4 60:12,23 61:11 61:22 64:9 65:8,17 66:2 67:4,9,13 68:19 69:6,10

69:18 70:5 71:9,20 72:7 72:15 74:11 75:5,14 76:12 76:20 77:8
**sworn** 7:14,16
**system** 22:23

**T**

**T** 2:1,1 4:5
**take** 20:10 27:13 37:17,18 45:4 45:21 47:4 60:15 69:20 71:18 77:14
**taken** 2:5 3:2 15:3 18:9,18 19:9,11,13,16 19:19 20:1 22:13 34:1 35:12 46:2 78:7
**talk** 45:5 63:21 69:11
**talked** 37:17 44:15 60:16 62:5 73:2
**talking** 9:7 13:10 37:2 43:13,17 44:8
**talks** 43:20
**team** 8:7,10 13:2 34:1 35:11 40:3,6 41:6,8 41:13,23 43:19 44:1 61:4,19 62:2 73:3,5 75:22 76:1
**tell** 8:6 9:9 14:2 15:10 16:15 18:20 19:2,6,9 34:17 43:3 47:15 51:19 52:7 57:3 62:6 76:7
**telling** 28:14 29:3,8 30:11 32:13 64:18
**Temple** 5:14 7:6
**temporary** 58:12,14 59:5 61:15 65:14
**tend** 66:17
**tended** 73:20
**terminate** 53:15
**terminated** 12:2 27:15
**termination** 11:13,17
**terminations** 11:15
**terminology** 15:20
**terms** 10:21
**testified** 7:17 69:3
**testimony** 1:14 3:2 65:19 75:6 78:12
**text** 21:15
**thereto** 2:19 78:9
**They's** 66:18
**thing** 28:16,17 35:5 75:21 76:10,18
**things** 11:8 13:13 20:9,11 20:13 22:20 28:20,20 31:5 31:13 48:5 54:3 55:6 60:18 62:7
**think** 9:22 12:7 12:16 14:11 18:17 23:1 25:4,23 26:6 28:15,20 29:6 30:21 31:3,4 31:12,15,16 32:4,7,9,12 37:12,20 38:10 38:22 41:19 44:5 47:6 48:5 48:21 49:2 58:15 59:3 62:3 63:12 70:10,17 71:10 73:20 77:2
**third** 67:6
**Thornton** 1:6 5:21 6:18 17:19 18:7 24:8 26:11 35:5 46:7,12 46:15 66:23 75:18
**thought** 29:18 48:17 59:17
**thousand** 8:2
**three** 41:12 73:17,23
**time** 2:17,17 7:22 9:13 10:18 14:12 20:12 23:3 28:14 33:22 50:19 56:19 58:16 62:6 63:4 67:6 70:2
**times** 23:1 26:3 61:18 77:11
**today** 31:23 32:5 37:11 54:15
**told** 32:6 35:21 36:8,9 41:9 50:20 55:11 59:10 76:4
**Tommy** 10:2 14:19,22 17:3 20:2 23:6 25:2 25:3 36:5,12 37:1 46:8 47:9 62:13,16 63:9 63:10 69:3,10 69:19 71:10,21 71:23 72:8,9
**Tommy's** 36:12
**top** 9:11
**Tower** 5:7
**trace** 74:13
**transcribed** 78:9
**transcript** 3:1 78:12
**transcription** 78:10
**trial** 2:17
**tried** 38:2 39:6
**trouble** 27:2,5 28:3,21 29:6,8 29:18 32:15 41:13 69:16 75:9,13
**true** 45:11 78:11
**Trueblood** 5:14 7:6
**truly** 15:21
**trusted** 31:20
**truth** 30:11 32:13
**truthful** 52:13 56:4
**try** 21:21 52:23 55:6,13 70:17
**trying** 9:22 12:7 32:9 39:12 40:5 64:15 77:4
**Tuesday** 6:23
**turn** 31:14
**turned** 26:22 48:18 53:17
**Twentieth** 5:7
**two** 8:2 24:23 50:1 56:3 64:8
**typed** 17:11

**U**

**U** 2:1
**uh-huh** 12:18 15:13 16:2,11 24:6,10 56:18
**unaware** 50:6
**uncomfortable** 43:13 46:22 53:18 67:20
**understand** 28:9 41:19 43:16,19 44:7,16 45:7 64:13 65:22 75:11 77:5
**understanding** 15:14 49:3 54:16,22 55:9
**unfortunately** 26:4
**UNITED** 1:1
**unsolicited** 44:21
**untrue** 45:8
**untruthful** 25:21 26:1
**unusual** 26:3 37:13
**upset** 26:23 28:1 71:6 72:10,14 72:18
**use** 12:20 26:13 32:7
**usually** 9:4 33:19
**U.S** 6:20

**V**

**v** 1:9
**valuable** 73:5,10
**venues** 68:4
**verb** 62:15
**versus** 6:18
**VIDEOGRAP...** 6:15 7:13

45:22 46:3 77:15
**videotape** 6:16 16:7
**violation** 16:23 29:11 53:9 62:1

**W**

**Wachovia** 5:7
**walked** 26:23 27:2 28:2 29:1 29:4,17,20 32:14
**want** 9:10 22:1,3 22:5 28:8 40:17 42:3 54:21 57:21 61:10 64:13 65:21 66:22 68:4,5,16,17 69:1 77:5
**wanted** 39:21 44:1 62:16 70:15 72:23
**wanting** 20:21 60:18
**wants** 39:23
**warned** 33:11
**warning** 15:19 16:1,4,16,20 16:22 17:3 20:4 37:6 38:8 38:9 39:18 40:19 46:7 59:18 60:1
**warnings** 58:23
**Warren** 9:12 51:11
**wasn't** 19:10,18 23:13 32:6 38:13 44:4 50:15 51:5 57:18 61:4
74:12 75:7
**way** 27:13 43:3 44:10 73:21
**website** 43:4 54:4,12,13
**went** 43:3 58:15 60:5
**weren't** 38:23 51:5
**we'll** 20:13 48:10
**we're** 6:22 13:23 40:14 45:22 46:3 68:19
**we've** 16:6 72:22 76:22 77:9
**Wiggins** 5:15
**Williams** 6:19 10:17 18:7 20:19 21:10 23:11 25:16 26:17,21 27:10 30:3 31:16 34:6 35:21 40:18 43:7,19 44:10 46:6,11 46:16 48:18 53:3 54:4 55:17 57:16 58:10,12 62:20 64:5 65:12 67:18 72:20 73:18 75:12 76:17,21
**winter** 10:12,13
**witness** 6:11 7:13 14:11 24:1 36:22 63:10 78:13
**witnessed** 18:10
**witnesses** 26:5,7 26:12
**woman** 50:8
**word** 30:23
**words** 22:5 26:13,18 27:11 32:23
**work** 9:2 41:23 42:7,10,17 54:7 55:7 63:15 67:2 69:5 70:19 72:20 73:3,6
**worked** 14:19
**working** 53:8 72:21
**workplace** 43:1 44:20 45:1,13 48:6,9 54:3
**worth** 37:19
**wouldn't** 12:3 12:23 60:15 61:5,6
**write** 16:7 19:4 22:5 46:13 72:3,4
**write-up** 21:10 48:2,8,12,13 60:22
**write-ups** 58:23 59:4
**writing** 19:12 22:7
**written** 15:18,21 16:17 17:4 18:8 19:5 20:3 20:7 33:8,10 34:5 38:8,9 42:4,11,19 46:6 47:22 67:1 69:5 70:4 71:7 74:1,13 74:18 75:3
**wrong** 15:20 37:15 38:5,11 38:22 39:4,8 39:21 60:14 73:21
**wrote** 25:3 28:14

**X**

**X** 4:1,5

**Y**

**Yeah** 14:5 17:23 21:3 45:20 46:19 48:13 62:23 66:1
**year** 10:9,16 30:10 34:10 50:4,8 58:18 59:9,11,13 60:3,7 61:1,9 61:12,15
**years** 7:23 49:9 49:14 50:2
**yelling** 28:19
**yesterday** 14:6 21:2 57:2
**y'all** 72:12

**0**

**01** 65:13
**06** 24:5 59:5,6 60:2 65:15
**07** 58:13 64:6

**1**

**1** 18:15,17 20:17 21:6,9 26:10 28:7 29:16 38:9
**1st** 34:23 59:18 60:2
**1:00** 2:10 6:9
**1:15** 6:23
**1:49** 45:23
**10** 30:10
**107cv-712-W...** 1:5
**107-CV-712W...** 6:20
**13** 1:22 4:6,6 13:15,19 17:15 20:20
**13th** 2:8 3:2 6:10 7:1
**14** 4:7 23:17,22 25:10
**14th** 19:22
**15** 2:22 4:8 17:19 24:14,18 25:6 50:4,8 65:2
**15th** 20:1
**16** 4:9 34:16,17 34:20 35:22
**1600** 5:8
**17** 4:10 36:15,19 38:17 60:9 62:8
**18** 4:11 58:1,5
**19** 4:12 63:23 64:4
**1988** 2:22
**1998** 49:23

**2**

**2** 19:8 20:17 38:9
**2:11** 46:4
**2:36** 77:16
**20** 4:13 64:21 65:5,6
**2001** 49:19
**2004** 8:4 9:8,13 51:11
**2006** 10:15 65:4
**2007** 9:8
**2008** 1:22 2:9 3:3 6:10 7:1
**205-314-0500** 5:19
**205-328-0480** 5:10
**23** 4:7

**24** 4:8
**26** 50:4
**27th** 24:4

**3**
**3** 19:16 20:17
**301** 5:17
**34** 4:9
**35203** 5:18
**35203-5202** 5:9
**36** 4:10

**4**
**4** 20:20
**411** 78:21
**420** 5:7

**5**
**5** 20:21
**5(d)** 2:20
**57** 4:11

**6**
**6** 15:6,8 18:13
    18:19 20:17
**6/14** 18:13 19:14
**63** 4:12
**64** 4:13

**9**
**9** 4:3

# MEMORANDUM

INCIDENT OCCURRED ON 06/14/06

**DATE:** June 16, 2006

**TO:** Frank Williams

**FR:** Melvin Hutchins

**RE:** **Written Counseling – 1st Step**

On June 14, 2006 you used profanity in the presence of other co-workers. *This is a violation of plant work rule #16, fighting, threatening, intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property.*

Failure to follow the company policy has resulted in you receiving this **1st Step – Written Counseling**. Any future violations will result in additional disciplinary action up to and including termination

Melvin Hutchins
Melvin Hutchins
Production Manager

Frank Williams
Frank Williams
(Signature acknowledges Receipt of this document only.)

PLAINTIFF'S
EXHIBIT
Boyer 13

File- Frank Williams

(TR)

**DOCUMENTATION FORM**

Employee Name: Frank Williams

Investigating Supervisor: Chris Jordan / ~~Frank~~ Eugene Date: 7-27-06

Present:

Who was involved: Jannie Nickerson

Witness (s):

Date of incident: 7-27-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day):

What happened: The Lable machine was messing up really Bad. me & Bruce was working on it I turned around and asked Jannie to help with the rework that was Bad Lables she told me to hold up so I asked her to please go and help. I seen that she was way Behind on her Lable checklist sheet so I left it alone. I explained to her that to keep the Lable machine

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT

Boyer 14

running She would have to push the table and help keep the Cans running. She told me that she could not do more than one thing at a time I explained that it would help. But she will not do it. It has cause alot of problems with the table staying full. Alot of the problems I am having with my Employees is. My Supervisor tell me to tell them something to do I tell them and If they don't Like It they turn around and tell something on me Because I told them to do their Job. So I get in trouble

**DOCUMENTATION FORM**

Employee Name: Jonnie Nickerson

Investigating Supervisor: Chris Jordan / Eugene A Date: 7-27-06

Present:

Who was involved: Frank Williams

Witness (s): No witness as far as she knows.

Date of incident: 7-27-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): 9:40am.

*What happened: Jonnie N. was on the label and Frank W. Came out on The line and sed To me over Time I come back The Fucking label michsen is fuck up and Saying is To me I Told Him I did't put My Hand On The label meshine

PLAINTIFF'S EXHIBIT Boyer 15

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

* He will not let her make any adjustments.

* Just wants her to load labels.

# MEMORANDUM

**DATE:** August 1, 2006

**TO:** Frank Williams

**FR:** Tommy Nance

**RE:** **2nd Step – Written Warning**

INCIDENT OCCURRED ON 7/27/06

On July 27, 2006, there was an incident involving yourself and another employee. You acted in a way not consistent with the expectations of a Team Leader. You must learn to control your temper and direct the employees on the line without displaying actions that could be construed as rude, intimidating, or disrespectful. In order to remain in the Team Leader position, we must see improvement in your employee relations skills.

Failure to follow the company policy has resulted in you receiving this **Written Warning – 2nd Step**. Any future violations will result in additional disciplinary action up to and including termination.

[signature] 8/2/06
Tommy Nance
Human Resources Manager

[signature]
Frank Williams
(Signature acknowledges
Receipt of this document
only.)

PLAINTIFF'S EXHIBIT
Boyer 16





Christopher J. Jordan/NC/Ralcorp
08/02/2006 03:08 PM

To Thomas A. Nance/NC/Ralcorp@RALCORP
cc Ricky L. Smothers/NC/Ralcorp@Ralcorp, Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Frank Williams

This morning before 7:00 a.m., Eugene Andrews told me on the radio that Frank Williams needed to see me. I walked down to line 3 and he asked what I was doing about a capper on line 3. The question was not the issue but the expression and carefree attitude in which it was asked. Also, I asked him why he didn't have his radio and with the same attitude he said I'm on the label machine.

At this point it appeared that the issues addressed the previous day were an issue today. I asked Melvin Hutchins to meet with us to bring this out in the open. When I addressed them with Frank Williams he had excuses and reasons for everything. I explained to Frank that whatever happened yesterday did not need to reflect on his work today. Again, Frank explained that I was mistaken.

Melvin then added that whenever we tried to address any issues that Frank would show in his expressions and actions that he was never in the wrong just like he was doing now. He also added that we are trying to help him but he has to take ownership of the problems and show some improvement.

# PERSONNEL ACTION SUMMARY

NAME: FRANK D. WILLIAMS EMPLOYEE #: ___________

SOCIAL SECURITY #: 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

| PAN # | DATE | ACTION | RATE |
|---|---|---|---|
| | 09/25/00 | NEW HIRE | $8.50/HR. |
| | 10-1-01 | Increase | 8.67 |
| | 11/5/01 | Increase | 9.00 |
| | 5/27/02 | INCREASE | 9.50 |
| | 9/30/02 | Annual Increase | 9.79 |
| | [illegible] | [illegible] | [illegible] |
| | 1-27-03 | INCREASE | 10.25 |
| | 6-23-03 | INCREASE | 10.75 |
| | 9/29/03 | Increase | 11.07 |
| | 5/31/04 | Increase | 11.70 |
| | 8/22/05 | Job bid - Roaster Opr. | 11.85 |
| | 10/10/05 | Transfer to Temp. Supv. | 14.42 |
| | 11/28/05 | Job Bid - Team Leader | 12.50 |
| | 7/23/07 | Temp. Supv. | 14.86 |

PLAINTIFF'S EXHIBIT
Boyer 18



Christopher J. Jordan/NC/Ralcorp
05/12/2007 08:36 AM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Deanna M. Lake/BR/Ralcorp@Ralcorp, Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Frank Williams

Please place in his file as a coaching session:

I had a discussion with Frank Williams on May 11, 2007. The following issues were addressed:

- As a team leader he is responsible for the line starting up in the morning. When he is running a piece of equipment such as the label machine or filler he is responsible for all paperwork for the job he is doing no matter what else may come up while setting up the line. Yesterday he was trying to start up the line and run the label machine. When I came around to pick up the equipment checklist for line 2 label machine he did not have it completed.

If you have any questions please let me know.

If you are not the intended addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to internet email for messages of this kind.

PLAINTIFF'S
EXHIBIT
Bayer/19



Christopher J. Jordan/NC/Ralcorp
10/26/2006 04:32 PM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Frank Williams

Please place in personnel file:

On Tuesday, October 24, 2006 I had a meeting with Frank Williams. During this meeting I discussed how it appeared he had no since of urgency. I explained that he needed to put on his radio first thing in the morning and notify everyone of what is happening on line 3. This would keep everyone informed and we would know that he is aggressively working on the problems. He stated that he could not wear his radio first thing in the morning because they were locked up in the production office. I instructed him to keep one in the processing supervisors office because they come in the same time he does and this would eliminate that problem.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
RICKY SMOTHERS

Commissioner:
Renny D. McNaughton
May 12, 2008
Dothan, Alabama

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Ricky Smothers, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 12th day of May, 2008, commencing at approximately 1:00 p.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms.

Robertson the original transcript of the oral testimony taken the 12th day of May, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

I N D E X

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Robertson | 9 |

E X H I B I T S

| | |
|---|---|
| No. 1 | 39 |
| No. 2 | 45 |
| No. 3 | 53 |
| No. 4 | 53 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street,
Suite 1600
Birmingham, Alabama 35203-5202
205-328-0480

FOR THE PLAINTIFF (S):
Ann C. Robertson
Temple D. Trueblood
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314-0500
Also Present:
Linda Thornton
Dee Lake

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 1:00 p.m. on the 12th day of May, 2008, Ricky Smothers, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins videotape one in the deposition of Ricky Smothers in the matter of Linda Thornton versus Flavor House Products, Inc., and Frank D. Williams, Jr., Case 107CV-712-WKW in the court of U.S. District Court for the Middle District of Alabama, Southern Division. We are on record at 1:05 p.m. on Monday,

May 12, 2008, in the law office of Bobbie S. Crowe.

Would counsel please identify yourself and state whom you represent.

MS. ROBERTSON: My name is Ann Robertson and I represent the plaintiff, Linda Thornton, who needs to be in here. She doesn't even -- I guess we didn't tell her to come in here. Excuse me.

MS. TRUEBLOOD: My name is Temple Trueblood. I represent the plaintiff, Linda Thornton.

MS. SWAIN: My name is Jennifer Swain. I represent the defendant, Flavor House.

THE VIDEOGRAPHER: Would the reporter please swear in the witness.

(Witness Sworn.)

THE COURT REPORTER: Usual stipulations?

MS. SWAIN: We would like to read and sign.

MS. ROBERTSON: Yeah. And let

me -- I don't -- I think we've already said this, but can we have an agreement that -- I may ask a little bit of his kinship, but instead of us going through all of his kinfolks, if we get to the point of trial that we'll exchange anybody who's going to be witnesses' kinfolks, their spouse, and where they -- where they work?

MS. SWAIN: Yes. We can have that agreement.

MS. ROBERTSON: As I say --

MS. SWAIN: So we don't have to spend half --

MS. ROBERTSON: Yeah. I mean, I may want to know some of his kinfolks, but I don't --

MS. SWAIN: That's fine.

RICKY SMOTHERS,

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. ROBERTSON:
Q Would you state your full name, please, sir?
A Ricky Lee Smothers.
Q And where do you work, Mr. Smothers?
A BFG Dothan.
Q And is -- is that Flavor House?
A Yes, it is.
Q And how long have you worked there, please, sir?
A 22 years.
Q Do you mind giving me your address?
A It's 108 Paul Revere Run, Dothan, Alabama 36305.
Q And you said you've worked at -- at Flavor House for 22 years?
A Yes, ma'am.
Q Can you give me a rundown of the jobs you held from beginning to -- to as we sit here today?
A Yeah. I started as an

electrician. Then I was a maintenance supervisor and then maintenance manager and now maintenance and production manager.
Q When did you become the maintenance supervisor, please, sir?
A 1992. Sometime in 1992.
Q All right. And the maintenance manager, when did you become --
A I'm sorry. That was 1992, the maintenance manager. The supervisor was 1987.
Q All right. And now you're the maintenance and production manager; is that correct?
A Yes, ma'am.
Q When did that happen?
A May of 2006, I believe.
Q And did you -- how did you become the production and maintenance manager?
A Mary Ann Boyer asked me to take the job.
Q And -- and what position does she hold?

A She's the plant director of operations or director of the operations, I believe, is the title.
Q And who had been acting -- who was the production manager? I take it there was one when you took over as production manager; is that correct? They rolled -- you became the maintenance and production manager; is that right?
A Yes, ma'am.
Q Had there been a production manager prior to you taking the roll-together job, if you will?
A No. It was a different title.
Q All right. What was the title that --
A Manager of -- what's a MOMO? I forget.
Q A moo moo?
A MOMO.
Q Oh, excuse me.
A It's a manager of manufacturing operations.

Q And that had that -- the job title changed to production manager; is that what you're saying?
A Well, they restructured it.
Q And who held the -- the job that you just said, the MOMO?
A Richard Hollins.
Q And where did he go?
A He went to Princeton, Kentucky.
Q Did you take over all of the job duties that he had -- had handled?
A No.
Q You need -- and I know it's just -- if we were just talking, it would be fine, but you need to let me finish before you start because she -- he can't write both of us.
What duties did you not take that Mr. Hollins had performed?
A Warehouse, finance, and QA.
Q All right. Is there now a warehouse manager?
A Say it again, please.

Q Is there now a warehouse manager or somebody else who's over the warehouse?
A Yes.
Q And who is that?
A Mark Hall.
Q And what about the finance, do you know who does the finance function now?
A Debra Nettles.
Q And the Q and A -- QA, excuse me?
A Samuel Lyson.
Q Now, as the maintenance and production manager, about how many people do you supervise?
A About 240.
Q 240 people?
A Yes, ma'am.
Q And what -- these people that you supervise, what do they do?
A They run the operations of the plant involving the production and -- and maintenance and repair.
Q Can you tell me the titles of those people, please, sir, like maintenance

operator, that kind of thing?
A Well, it's -- for me, it's a -- it's like an organizational chart down.
Q All right. Who is your direct -- who reports directly to you?
A Melvin Hutchins and Larry Hatcher and Jeff Vinson.
Q Say that last name for me, please, sir.
A Vinson. And Donna Sin.
Q All right. Now, what is -- has Melvin Hutchins reported to you directly since 2006?
A Yes, ma'am.
Q All right. And what is his title now?
A Production superintendent, first shift.
Q And Larry Hutchins, he's a production supervisor second shift?
A Larry Hatcher.
Q Larry Hatcher. Excuse me.
A Yes, ma'am.

Q And what about Donna Sin?
A She's the MRO buyer.
Q And what about Vincent?
A He's currently standing in for the maintenance manager. We have an open position.
Q And who was the maintenance manager before Vincent?
A Me.
Q All right. And -- and the production supervisor, Melvin Hutchins, does -- who -- who reports to him directly?
A Eugene Andrews.
Q And what is his title?
A Production supervisor. Sammy Stuart is also a production supervisor. Bruce Cassady.
Q All right. Is he a --
A Production supervisor. And John Perry is a production supervisor.
Q Say that last name again for me.
A Perry.
Q Do you know if Sammy Stuart is

currently under investigation for sexual harassment?
A No.
Q Was he recently under investigation for sexual harassment?
A Not to my knowledge.
Q Would you have known that if that were the case?
MS. SWAIN: Objection.
Q I mean, would that have been something that would have been reported to you?
MS. SWAIN: Objection.
A No. Not always.
Q How long has Mr. Andrews been a production supervisor?
A I don't know when he started.
Q But he -- has he held that job since you were the -- became the production and -- and maintenance manager?
A Yes, ma'am.
Q What about Mr. Stuart, how long has he been a production supervisor?

A I don't know.
Q Was he a production supervisor when you became maintenance and production manager?
A Yes, ma'am.
Q Mr. Cassady?
A He's held it approximately six months.
Q What did he do before -- before he was a production supervisor?
A I'm trying to think of his title. Maintenance planner.
Q Was production supervisor a promotion, a lateral or a promotion?
A More lateral.
Q Do you know how that came about?
A He requested it.
Q Of -- of you?
A Yes.
Q Now, Chris Jordan, was he ever a production supervisor?
A Yes.
Q When did -- when was Chris Jordan

a production supervisor?
A From the time I took over in 2006 until about December of '07.
Q And who took his place?
A Bruce Cassady.
Q And does -- is Mr. Jordan still employed at Flavor House?
A Yes.
Q And what does he do now?
A He's the production scheduler.
Q Now, is -- is the production scheduler a -- was that a lateral, a demotion or --
A Lateral.
Q And what does -- does he supervise people as a production scheduler?
A One person.
Q How many people did he supervise as a production supervisor?
A Three production lines.
Q Three production lines?
A Yes, ma'am.
Q How many -- about how many people

are on the line?
A About 12.
Q What does a production scheduler do?
A Schedules production.
Q Uh-oh. I bet you used to get B minuses in spelling. Have you ever heard don't define the word with the word?
A No.
Q Okay. Tell me what does that mean, he schedules productions?
A We have a -- we have a lot of customers. He decides who goes first.
Q Now, how did he go from being a production supervisor to a production scheduler?
A Our scheduler turned in his resignation.
Q All right. And who was that?
A Scott Parker.
Q And having turned in -- was it like -- was he ordained to become the production scheduler or did something else

happen besides Mr. --
A We asked him would he take the job.
Q Who -- who is "we"?
A Myself and Mary Ann Boyer.
Q Does he make the same amount of money?
A I don't know.
Q Well, when you told me that you believed it was a lateral move, what -- what factors played into you thinking it was a lateral move?
A The grade level was the same.
Q Anything else? Any other factor besides the grade level?
A He had very good computer skills.
Q Are you saying you didn't need computer skills for production supervisor? I'm -- I'm -- I'm -- let me withdraw that.
I'm trying to find out what factors you say made it a lateral, and that doesn't seem to be a factor that would make it a lateral. That just seems to make it a good idea.

A He had more of an expertise in Excel spread sheets than the other supervisors on staff.
Q But that doesn't -- again, when I say "lateral," usually when you're talking about lateral it means it's the same, like you said, grade level, same pay, same status. Do you -- is that what you're basing your idea on that it was a lateral?
MS. SWAIN: Objection to the form.
A Yes.
Q Did anyone else apply for that job?
A I don't know.
Q Now, you've -- you've been some -- a supervisor of some description at Flavor House since 1992. Is that a fair statement?
A Since 1987.
Q So you were a supervisor then. Tell me how -- have you had any training on -- on how to investigate a sexual

harassment complaint?
A Yes.
Q And when did you have that training?
A I don't know the specific dates, but it's been several times while working at BFG and before that when it was independently owned as Flavor House.
Q Okay. Well, for -- for my -- for our purposes -- I know it's had some different ownerships. Let's call it Flavor House and let's just -- the whole time you've been employed, let's just assume we're talking about Flavor House. Okay?
A Okay.
Q All right. Tell me when -- the first time you remember having training on how to investigate a sexual harassment complaint.
A Are you asking for a date or are you --
Q Well --
A What --

Q If you have the date, that would surprise me, but about when?
A Around '89 was the first time.
Q All right. And -- and you were trained on how to investigate a sexual harassment complaint?
A Yes.
Q All right. And tell me who taught you -- and if you don't remember the name of the person, I mean, were they a lawyer, were they a personnel investigator, or what were they?
A I don't remember their -- their status.
Q Okay. Can you tell me when -- the next time you remember being trained on that, how to investigate sexual harassment?
A I don't remember the dates.
Q Were you given a certificate at the time you had your training?
A I don't remember.
Q Did you have to sign a sign-up sheet of any description?

A I don't remember.
Q When is the last time you had some training on how to investigate a sexual harassment complaint?
A I just don't remember.
Q Was it in the last year?
A I would say within the last two.
Q Do you remember who taught that?
A No. I would be guessing. I've got several names in my head, but I'd be guessing.
Q Well, give me all of them and we'll talk about them.
A Alice Clark.
Q And who is Alice Clark?
A She's HR divisional -- I believe her title is like a divisional director at Princeton.
Q All right. And do you believe that Alice Clark has at some point taught you how to investigate a sexual harassment complaint, but you're just not sure whether she -- that was the person that did it the

most recently?
A Yes.
Q Who are the other names that had come to your mind?
A Mary Ann Boyer.
Q And my question about it would be the same. You know that she's taught you at some point; you're just not sure she was the last person?
A I'm -- I'm not sure of the dates --
Q Yes, sir.
A -- or if she was the last person.
Q But she has at some point taught you that; is that correct?
A Yes. Uh-huh.
Q And then the -- were there any other names that came to your mind?
A I don't remember how to pronounce her last name, but it was something like Debra Guiney or Greenich or Gingrich or --
Q Okay.
A She was from corporate. I don't

know if she came from St. Louis or where.
Q And do you remember if she was -- was she a corporate HR person? Is that what you remember?
A I don't know. I don't know what her title was.
Q And would the same -- would the question was -- are you -- do you think for sure she taught you at some point how to investigate a sexual harassment complaint, but you're just not sure if she was the last one? Is that fair?
A At some point. I don't remember the dates on any of these people.
Q Do you recall whoever was -- in the last two years when you had the training, who else was in the training with you, either by name or by title?
A Melvin Hutchins, Larry Hatcher, Donald Cody.
Q Donald Cody?
A Yes.
Q What was his title at the time?

A He was maintenance supervisor.
Q All right. Who else?
A I don't remember who all was in the position at the times that we had the training, but it was several supervisory staff.
Q Was Chris Jordan in there, to your memory?
A I don't remember.
Q When you were taught how to investigate a sexual harassment complaint, was it different from how you -- well, let's strike that.
Have you been taught generally how to investigate any kind of complaint at -- at Flavor House?
MS. SWAIN: Object to the form.
Q You know, that was not a sexual harassment complaint.
A Well, yes.
Q Was it different from how you were taught to investigate a sexual harassment complaint, procedures?

MS. SWAIN: Objection to the form.
A Repeat the question, please.
Q You said you were taught at some time how to investigate any kind of complaint that you might have had, either a -- from -- about a person, disciplinary situation, whatever. Was that -- were you taught to -- to conduct that kind of investigation in a different way than you would have been a sexual harassment complaint?
MS. SWAIN: Objection.
A With any of the complaints, I mean, you -- you immediately involve HR.
Q Okay. What do you mean you would immediately involve HR?
A I mean within minutes after you know of a complaint, you notify HR.
Q All right. Well, let's do it this way. Tell me, then, how -- and I -- I need an answer to my question. Would you do the investigation of a complaint, whether it

be sexual harassment or some other kind of complaint, in the same way? Is that --
MS. SWAIN: Objection.
A You would --
Q Is the answer yes or no?
MS. SWAIN: You can answer the question.
A What was the question again?
Q You said you were taught how to investigate just general complaints about individuals that worked at Flavor House. Were you taught to investigate them differently from, say, a sexual harassment complaint or the same?
A You would -- like I said before, you would immediately contact HR and you would follow their direction --
Q All right. Well --
A -- in how to investigate it.
Q Well, is that what --
A -- and what steps to take, that short of thing.
Q Well, when you were taught how to

investigate a sexual harassment complaint, is that what you were taught, to contact HR and -- and do whatever they said?
A Yes.
Q Is that all you were taught about it?
A No. You report it to your supervisor.
Q All right. So in this training you had, you were taught to report it to your supervisor and report it to HR; is that right?
A Yes.
Q Anything else?
A If it was -- with sexual harassment, if it was even implied and -- and you thought anything might be construed as a complaint.
Q All right. What -- what -- what?
MS. SWAIN: Objection.
Q I guess I didn't understand you. If -- if you -- you were to do what if you -- if it could be construed -- construed

as sexual harassment?
A You report it to your supervisor and HR.
Q All right. But other kinds of complaints were not necessarily handled that way?
A You reported them to HR.
Q Beyond that, were you taught how to do anything else in terms of investigating, first, a complaint of any kind?
A I'm not sure. Could you repeat that again, please?
Q Well, you -- you've told me that you had numerous trainings on how to investigate a sexual harassment complaint.
A Yes. And all of them began with notify HR and your supervisor immediately.
Q Okay. And now I want to know other than doing those two things, what else were you taught about how to investigate a complaint of sexual harassment in these numerous trainings you've had?

MS. SWAIN: Objection to the form. Go ahead.
A Follow HR's directions.
Q Anything else?
A I mean, to -- to go further with this, you know, we would get into taking statements and this sort of thing, but you would be --
Q Well, that's what I --
A You would be following HR's direction.
Q All right. So -- so what -- all I'm trying to find out, sir, is when you were receiving this training that you said you had, you were told immediately report it to HR?
A And your supervisor.
Q And your supervisor and to wait for further instructions from HR. Is that right?
MS. SWAIN: Objection to the form.
A That's it.

(Brief interruption.)
A Could you ask again? The guy with the water distracted me there.
Q Yeah. Other than immediately report the complaint to HR and immediately report it to your supervisor, were you taught in these sessions that you said you had to do anything else --
MS. SWAIN: Objection.
Q -- in terms of investigating a sexual harassment complaint?
MS. SWAIN: Objection. And I think where he may be struggling is the distinction between the following what HR said --
MS. ROBERTSON: Please don't -- please don't try to -- I will work it out. Please don't try to telegraph an answer.
MS. SWAIN: Well, I'm not trying to telegraph an answer, but I think --
MS. ROBERTSON: All right. Then --

MS. SWAIN: -- he clearly doesn't understand what the question is.
MS. ROBERTSON: Well, he can ask me if he doesn't understand.
MS. SWAIN: He has. And I think you've repeated the -- the same question, but I don't think it's become any clearer.
A Could you -- yeah. Could --
Q All right. I've asked you have you had any training on how to investigate a sexual harassment.
A Right.
Q And you said yes several times.
A Right.
Q How long did these -- these teaching sessions on how to investigate a sexual harassment complaint last?
A I don't remember.
Q Would you say more than an hour?
A I don't remember.
Q So can you tell me what else you remember about them other than that you had

them?
A Yeah.
Q All right. Well, why don't you tell me that?
A Okay. Report it to your supervisor and report it to HR. Follow their directions, which always involves statements from people involved. And then you wait for their direction.
Q So you're saying that in these sessions you were told that HR is going to always require you to take statements. Is that what you're saying?
A Yes, if I'm directly involved in the investigation.
Q All right. Did -- were you taught how to take statements?
A No.
Q You were not?
A No. What you do is send them to HR and they write their statements.
Q So you would send them to HR and they would write their statements there; is

that right?
A I'm not sure how HR does it once they get them in their office.
Q Is that how -- suppose you had a complaint of something else that a worker was complaining about. Would you do the same thing in terms of reporting it to the HR and wait for --
A Everything that you're asking is pretty vague. I mean, every -- every circumstance, depending on the degree, you know, you may take different steps.
Q Well, have you ever taken any statements in an investigation of a sexual harassment complaint or some other kind of complaint?
MS. SWAIN: Objection to the form.
A I've asked people to give statements if I was involved in the incident.
Q All right. If you were involved in the incident, what -- what does that

mean?

A It means if HR wanted me to investigate a particular incident or to get statements and turn in to them.

Q Okay. Well, would you -- were -- when you would do that, would you make a list of the questions you were going to ask?

A Usually it would be, you know, tell me your side of this incident.

Q Anything else except -- besides tell me your side of this incident?

MS. SWAIN: Objection. You can answer as best you can.

A No.

Q Suppose somebody complained that a co-worker was cursing at her and throwing things and abusing her verbally. How would you go about taking a statement from the -- from the alleged abuser or --

MS. SWAIN: Objection.

A I would take the person that was being -- the alleged abuser to HR immediately.

Q Okay. But, I mean, suppose you were involved in doing the investigation. So you would take the abuser to the -- to HR and -- and then what?

MS. SWAIN: Objection.

A I would --

Q Suppose you were told to go take the statement from the person who was supposedly doing the cussing and the -- and the throwing.

MS. SWAIN: Objection.

Q What would you do?

MS. SWAIN: Objection.

A I mean, you're using words like "suppose" and -- and it -- it don't work that way in the real world.

Q All right. Well, tell me how it works in the real world.

MS. SWAIN: Objection.

A Are you asking me to make something up or, I mean, what are you --

Q No. I'm not asking you -- what do you mean I'm not asking you how it would

-- I don't understand your answer. I'm not asking you how it would happen in the real world, what do you mean by that?

A When you have an incident where someone is saying this person is throwing things or cursing at me or this sort of thing, I mean, what you do in a plant environment is you take that person that is supposedly doing these things and you take them to HR and you let HR do their job. That's what they're trained to do. You don't -- you don't take the statement from them or do HR's job for them.

(Whereupon, Plaintiff's Exhibit Number 1 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q Plaintiff's Exhibit Number 1 to your deposition. I will ask you what this is, please, sir.

MS. SWAIN: Do you have an extra copy, Ann?

MS. ROBERTSON: Sure.

BY MS. ROBERTSON:

Q Do you know what that is?

A It's a documentation form.

Q And what exactly is a documentation form used for?

A This particular one appears to be investigating an incident.

Q And how can you tell that?

A By reading who was present, who was involved, the date, the place that it took place, and the time and what happened.

Q Do you think -- is this a form that HR would have done?

MS. SWAIN: Objection.

A I would think so.

Q So HR would have come to line three and taken the statement?

MS. SWAIN: Objection.

A They would have probably asked the supervisor to take a statement.

Q Okay. So sometimes supervisors take the statements?

A If HR directs them to.

Q All right. Can you tell me what -- what the allegation or what the incident is that was -- this documentation was addressing?
A I'm trying to read it.
Q Okay.
A The print is not too well.
MS. ROBERTSON: Can I see if I've got a better copy? I think we've got about the same.
A If you could read that second page, that will help me because I can't --
Q Yes, sir. I will read what I think it says and if you have any problem --
A I'm having -- I'm having trouble figuring out what it says on the second page.
Q Well, I think it says, Rick and help with the label but when I went to go, Linda yelled at -- at me to help her get the rework. I told her that Chris had already told me to do something else and I would help her when I got through. He told me

that was my -- and it -- I -- it says he, but it looks like to me it probably said she. It's cut off. He -- he told me that that was my rework and I need to stay and help. And the word is cut off -- get done. I told her I could not -- I had to do something I was told to do. She got an attitude. I put my hand in the air, turned around, and walked off. I had --
MS. SWAIN: Got.
Q -- got very upset so instead of saying something that would get me trouble, I walked away.
Now, can you tell me what incident that's supposed to be responding to?
MS. SWAIN: Objection.
A I don't know. I don't know if there -- if it's Mary Brooks complaining about Linda or if Mary Brooks is complaining about Chris.
Q Okay. But it's a statement by Frank Williams; right?
A Oh, I thought it was by Mary

Brooks. Who signed it? Oh, Frank. Okay. Okay. Well, that's Mary Brooks' name on it.
Q Yeah. Well, that's --
A I thought the "me" was Mary Brooks. I didn't -- I guess the me is Frank.
Q Can you imagine why whoever took this statement was taking it in front of a co-worker that would be Mary Brook?
MS. SWAIN: Objection.
A Say that again, now.
Q Well, in your vast training about how to investigate a complaint, do you ordinarily take the statement of somebody in front of another co-worker?
MS. SWAIN: Objection.
A I don't think this is what that says. I think it's just stating that Mary Brooks has something to say about the incident.
Q Oh, that she might have been a witness?
A Yeah. I wouldn't -- I mean, it

don't say that she's -- that he took it in front of her. I don't see that anywhere.
Q Okay. Well, it says present. So you think present in front -- as -- it means present at the incident?
A In front of the incident, yeah.
Q All right. Well, what do you -- what do you discern that the incident was from this statement?
A I see.
MS. SWAIN: I object again to the question.
A Okay. Now, can you ask the question again?
Q Well, let's -- I will withdraw that one. If you had been taking this statement, before you got the statement, what would you have told Mr. Williams about what you were doing?
MS. SWAIN: Objection. You can answer it if you can.
A I'm not sure what you me to ask -- to answer to here.

Q Well -- all right. Let's look at Plaintiff's Exhibit Number --

A I mean, the way -- the way I read this, at first I thought it was Mary Brooks complaining, but the way I read this with Frank, it seems like Frank was taking out a bag of cans and Linda yelled at him wanting him to stay and do some rework because some rework ran on the table while she was at break. I mean, that's -- that's the way I understand it.

(Whereupon, Plaintiff's Exhibit Number 2 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q Let's look at Plaintiff's Exhibit Number 2 and see what you think about -- tell me what -- about that. What is that?

(Brief pause.)

A Okay. What? What as the question, now?

Q Plaintiff's Exhibit Number 2, what does that appear to be?

A It appears to be Linda complaining that Frank was cussing at her.

Q Okay. Now -- now do you believe that Plaintiff's Exhibit Number 2 is a complaint that Linda Thornton made and that Plaintiff's Exhibit Number 1 is someone getting Mr. Williams' version of what happened?

MS. SWAIN: Objection.

Q Because there's no way to tell from those documentation forms, is there?

MS. SWAIN: Objection. Which question do you want him to answer?

Q The second one.

A And the second one was --

Q There's no way for you to tell who initiated the complaint because of the way the form is made?

MS. SWAIN: Objection.

A Well, I would say Frank signed this one so I'm thinking that was his statement.

Q Plaintiff's Exhibit Number 1?

A Yes. There's not a -- the -- the second one is not signed.

Q So what -- what do you make of that?

A I would think it came from Linda, but that would be guessing. I don't know. I think it would.

Q Well, does it appear to be a complaint that Linda made about the way --

A Yes.

Q -- Frank?

A That's what it appears to be, yes.

Q And does Plaintiff's Exhibit Number 1 appear to be a statement gotten from Frank to see what his version of what happened was?

MS. SWAIN: Objection.

A Yes, because they're on the same date.

Q Does it appear that anyone asked Mr. Williams whether he cursed Ms. Thornton?

MS. SWAIN: Objection.

A Does it appear that anyone asked?

Q Well, yeah, because there -- there -- there's -- nobody addresses whether or not there were any curse rendered by Mr. Williams in this statement, do they?

MS. SWAIN: Objection.

A This is not a -- from this document, it's not a question and answer form.

Q You need to say Plaintiff's Exhibit Number 2.

A Okay. Plaintiff's Number 1 or 2, both -- I mean, neither of them is a question and answer. I mean, it's just statements from the people involved.

Q Well, my question is, if you were doing an investigation of the complaint which appears to be on Plaintiff's Exhibit Number 2, in your vast training were you taught to ask questions of the other witnesses as to what they heard and saw?

MS. SWAIN: Objection. Ann, I don't know why you're -- you're getting

on to him about this. I mean, there's nothing that suggests that he did any of this.

A I mean, this is an HR --

MS. ROBERTSON: Well, I'm talking about training.

MS. SWAIN: Well, that's fine, but, I mean, you're -- you're asking him questions that he doesn't --

MS. ROBERTSON: And the person that did it was his subordinate.

MS. SWAIN: -- he has no personal knowledge of.

A No. HR don't work for me.

Q Well -- so it looks like -- are you -- so you think HR did this and not Chris Jordan? See, Plaintiff's Exhibit Number 2 says the investigating supervisor is Chris Jordan.

MS. SWAIN: Objection. Is there a question --

MS. ROBERTSON: Yeah.

MS. SWAIN: -- that he's supposed

to answer?

Q You supervised Chris Jordan and he was the investigating supervisor.

A Melvin Hutchins --

MS. SWAIN: Stop a second. Stop, stop. Objection to your question. What is the question you're asking him?

MS. ROBERTSON: Was I -- in your --

MS. SWAIN: Instead of arguing with him, ask him something.

MS. ROBERTSON: Excuse me.

Q In your line of progression, didn't you tell me that you -- you were supervising Melvin Hutchins and he supervised Chris Jordan?

A Yes.

Q And so you were the ultimate supervisor of Chris Jordan; right?

MS. SWAIN: Objection.

A You're talking about two different things here. I mean, HR directs how an investigation is done and carried

out. The documents that you're showing me are not question and answer documents. They're just hey, give me your side of the story.

Q All right.

A Chris Jordan at the time reported to Melvin Hutchins. Melvin Hutchins reported to me.

Q Well, when you were taught --

A I report to Mary Ann Boyer.

Q When you were taught how to do an investigation or take a statement, were you taught to ask questions, specific questions?

A I was taught to follow HR's directions.

Q And have you ever had an occasion to take a statement in an investigation?

A Yes, I have.

Q And when you -- and who gave you the instructions on how to take them?

A HR.

Q And who was that HR person that told you?

A It depends on the incident at the time.

Q Well, tell me the people that you can remember. Did you ever do one for Tommy Nans?

A I don't remember.

Q In -- in -- when -- in taking investigations, who would decide the punishment a person would receive, assuming there was some --

A HR.

MS. SWAIN: Let her finish her question. Okay?

A Oh, I'm sorry. I'm sorry. I apologize.

Q Assuming there was a finding that there had been some problem, who would -- who would make the decision as to what -- the punishment?

MS. SWAIN: Objection.

A It would be HR with Mary Ann's approval.

Q Would the supervisor, the

investigating supervisor, have any input?
MS. SWAIN: Objection.
A Nothing that would override HR's decision.
Q Does that mean that they might be asked after the decision was made or before the decision was made or what?
MS. SWAIN: Objection.
A I don't know.
Q If you were in -- conducting an investigation of something like Plaintiff's Exhibit Number 2 and the individual to whom -- against whom the complaint was lodged didn't tell the truth, would that also call for punishment?
MS. SWAIN: Objection.
A How would I know they didn't tell the truth? I mean --
(Whereupon, Plaintiff's Exhibit Number 3 and 4 were marked and attached to the deposition.)

BY MS. ROBERTSON:
Q Well, suppose other witnesses said that they heard him use the F word and use damn and say fuck it and -- and Plaintiff's Exhibit Number 3. Tamekia Cook said she heard him say F it and threw the curtains open and say curse words. Plaintiff's Exhibit Number 4 is a statement by Christine Long where she heard him say the F word and every damn thing.
Would you have expected Mr. Williams to have been disciplined for not telling the truth in his statement after -- after there were witnesses who heard him using those words?
MS. SWAIN: I'm going to object both to the question and to the characterization of the documents. Go ahead.
MS. ROBERTSON: Okay.
A Okay. I would expect using these curse words for there to be some form of disciplinary action from HR.

Q Yes, sir. But I'm not asking you about that. You see, Mr. Williams, when he was asked about it, do you see anywhere where he mentioned that he was using the F word and -- and saying damn and what have you?
MS. SWAIN: Objection.
A That would be an HR decision.
Q Would you agree with me that he didn't tell the truth in his statement?
MS. SWAIN: Objection. There's nothing that suggests in the statement that he was asked the question.
MS. ROBERTSON: Thank you. That was the point I was making. Nobody asked him because they're not doing an adequate investigation. And if that's -- if you'll stipulate to that, then we can leave early.
MS. SWAIN: No, I'm not stipulating to that. You're talking --
MS. ROBERTSON: Well, you said it. Thank you.

MS. SWAIN: No. You're talking about two different things, the statement itself and whatever investigation was ultimately done.
MS. ROBERTSON: I believe --
MS. SWAIN: And you're twisting what his testimony is to try to get him to say something that -- what you want him to say.
MS. ROBERTSON: I believe Mary Ann Boyer testified that they would have always asked him if he -- if he threw the cans or if anybody saw that they threw the cans or if any -- any curse words were used.
MS. SWAIN: And you've not elicited one way or the other whether anybody has asked that question because you haven't talked to anybody that was involved.
MS. ROBERTSON: But you have and you just said that nobody asked him so thank you.

MS. SWAIN: No, I did not say that.
BY MS. ROBERTSON:
Q Do you know was -- Franklin Williams, did you know he was a sex offender?
MS. SWAIN: Objection.
A At what time?
Q Well, any time during the time you worked there.
A Yes.
Q When did you learn that?
A About -- it was after Linda was gone, after Linda quit.
Q And you didn't know that before then?
A No, I did not.
Q Do you know is Bruce Cassady kin to Frank Williams?
A I don't know.
Q You don't know if he is or not?
A I don't know if he is or not.
Q When -- how did you find out that

Frank Williams is a sex offender?
A Mary Ann Boyer told me.
Q When did she tell you that?
A I don't remember the exact date. I know Linda was gone and it was after the lawsuit had started or sometime during then.
Q Was Frank Williams still there?
A Yes, he was.
Q And what was the occasion for Mary Ann Boyer telling you that Mr. Williams was a sex offender?
A HR was going to ask for Frank's resignation.
Q Do you know why they were going to ask for his resignation?
A Because he -- I don't think I was given the -- I -- I wasn't given the exact reason.
Q Were you and Ms. Boyer discussing that he was going to be asked to resign and that's when she told you he was a sex offender?
A Yes.

Q What else did she tell you in that conversation?
A That was the biggest thing that I -- that I remember. I think she gave me the date when HR was going to talk to him. And, as always, when it's a -- a supervisor, usually the next level of supervision escorts him out, which would be either Chris or Melvin or myself, whoever was available at the time.
Q Well, if -- if he had declined to resign, was he going to be fired?
A I don't know.
Q Well, do you ordinarily ask somebody to resign and then escort them out?
MS. SWAIN: Objection.
A I don't know of it happening before.
Q Ordinarily when someone is escorted out, it's after they've been terminated involuntarily; correct?
MS. SWAIN: Objection.
A No.

Q They're escorted out when they resign and give two weeks' notice?
A Yes.
Q When are they -- when are they escorted out, after the two weeks or at the time they tender --
A After the -- after the two weeks.
Q And why -- where -- how are they escorted out?
A You have certain things like badges and keys and you want to make sure that you get those things from them because if not, you have to pay to get the keys made for the lockers and all this sort of thing.
Q Well, tell me everything you can remember about the conversation that Mary Ann Boyer had when she told you that -- that Mr. Williams was going to be asked to resign and that he was a sex offender.
MS. SWAIN: Objection. You can answer.
A I think we pretty well covered it. She was -- she was giving me the date

and that he was a sex offender and that HR was going to come down and they were going to ask for his resignation.
Q Well, what date did she give you that he was a sex offender?
MS. SWAIN: Objection.
A This was a single conversation. I don't remember what day it was.
Q No. You said that she gave you the date. I may have misunderstood. The date of what?
A The date that HR was coming down to talk to him.
Q Okay. So HR from somewhere else was coming down?
A Yes.
Q Do you remember about when that was?
A No, I don't.
Q And -- and so she said HR is coming down and ask for Frank's resignation and he's a sex offender?
MS. SWAIN: Objection.

A There was more to it than that, but I don't remember the details.
Q Well, can you -- well, can you give me generally what else it was about?
A No, because I would be speculating. I don't remember.
Q Did she tell you that he had talked -- that he had said on his application that he was a sex offender?
A No, she didn't tell me that.
Q Do you know if that were true?
A I don't know. He was hired before I took the position here, you know. I would think at least a year before.
Q Okay. Do you know who hired him?
A No, I don't.
Q You -- have you -- have you ever participated in the hiring process?
A Yes, I have.
Q All right. Tell me -- tell me how -- how your participation in the hiring process has gone.
A Usually, it's with salary people.

It's not with hourly folks.
Q Okay. So have you ever participated in -- in a -- an hourly hire?
A Only the mechanics.
Q All right. Well, tell me when you would -- when would you have helped hire mechanics?
A It would have been over -- before May of 2006.
Q All right. What were you helping hire people in 2001, 2000, 2001?
A In mechanics.
Q All right. Tell me the procedure y'all followed back then.
A You notify HR you have an opening. HR gets your resume. You bring the mechanic in. They take a test, a mechanical test. If they pass the test, you bring them in for an interview and then depending on how the interview goes, you recommend to HR that they proceed with hiring. And HR does a background check and if they pass the background check, they're

hired.
Q Back in 2000, 2001, did y'all do background checks?
A I don't know.
Q Were you told that you did background checks back in 2000, 2001?
A I don't remember.
Q Do you know if you had a back -- when -- you got hired in 1987. Do you know what a background check --
A In 1986.
Q Oh. Do you know what a background check involves?
A Yes.
Q What was it? What was it --
A It's looking for a criminal record.
MS. SWAIN: You're talking about back in '86?
MS. ROBERTSON: Right. Yeah.
A '86.
Q Right. Criminal record. Anything else?

FREEDOM COURT REPORTING

A I don't know. I know that's the biggest one that I can think of.
Q Do you know what Frank Williams did in order to become a -- to be denominated or --
A No.
Q Do you know that he pled guilty to raping a 13 year old?
A No, I didn't.
Q Do you know that he pled guilty to having deviant sexual intercourse with a 10 year old?
MS. SWAIN: Objection.
A No.
Q Do you know that in 1998 there was a recommendation by his parole probation officer to revoke him --
A No.
Q -- because there was an outstanding warrant for contributing to the delinquency of a minor?
A No, I didn't.
Q Did you know he was probably

still on probation in 2001?
MS. SWAIN: Objection.
A No.
Q Did you know he served four years of a 10-year sentence?
MS. SWAIN: Objection.
A No, I didn't.
Q Did Mary Ann Boyer tell you any of that stuff when she told you that he was a sex offender?
A No.
Q Would you classify someone who had deviant sexual intercourse with a 10 year old a child molester?
MS. SWAIN: Objection.
A Personally, I would.
Q Is that somebody you would want to have working around women at Flavor House?
MS. SWAIN: Objection.
A I wouldn't want them working around children.
Q What about women?

A I wouldn't want them to, but it seems like his preference is children, if that's the case.
Q Do you know his wife, Ronnie, or one of his wives, Ronnie?
MS. SWAIN: Objection.
A No.
Q Did you know he was married to a woman name Ronnie?
A No.
Q Do you know she was the 15 year old that her mother issued the -- swore out the warrant for contributing to the delinquency of a minor?
MS. SWAIN: No.
A No.
Q That he was -- that he was having intercourse with her when he was 27 and she was 15?
MS. SWAIN: Objection.
A No. I don't know any of the details.
Q Did -- did Frank -- did Frank

Williams ever work for you?
A If you want to go through the hiearchy like we did a few minutes ago, ultimately he did.
Q When was that?
A From the time I took the job in 2006, he reported to Chris Jordan or one of the front line production supervisors and then Melvin Hutchins and then to me.
Q Now, you said when -- when you had this conversation with Mary Ann Boyer that -- that Mr. Williams was a -- a sex offender and he was going to be asked to resign, he was in your line of -- of supervision at that time. Is that a fair statement?
A He was an hourly team leader, but he was --
Q But he --
A He was three reports down.
Q But is that why she was telling you that --
A No. I think she was telling me

because she wanted me to make sure that somebody was available to escort him out.

Q Were you the person who escorted him out?

A I was.

Q All right. Tell me how -- how -- how you became the person to escort him out.

A I was the one that was available at the time.

Q Okay. And who -- who called you to escort him out?

A I don't remember. It would have been -- I don't remember which one, but it would have been either Dee Lake or Alice Clark.

Q And so what you -- tell me how that happened.

A I just get his locker key and his badge and --

Q Were you called by --

A -- escort him to the door.

Q -- these people?

A At some time. I don't remember

the details.

Q And they -- and you -- where was Mr. Williams when you escorted him out?

A He walked out of the office, out of the -- Dee Lake's office.

Q And who is Dee Lake?

A HR director, Dothan.

Q All right. And -- and were you waiting for him when he walked out?

A Yes.

Q What did you say to him and he say to you?

A I asked him was he ready to go and he said, yeah, I need to go to the bathroom. That was pretty much it.

Q Did he clean out his locker?

A He gave me the keys and his badge and I asked him did he have anything else and he said no.

Q Did he say anything else to you?

A He -- he said that -- let's see. Oh, oh. Could his wife bring him -- could I -- would I tell his wife to bring him the

truck keys.

Q Who was his wife? Did she work out there?

A Yes.

Q Who was his wife?

A Candace Williams.

Q And do you know -- did she -- did he marry her while he was working out there?

A I don't know.

Q Where did she work in -- in Flavor House, what department, section, whatever?

A At that time, I'm guessing. I think she was a -- she was a filler operator, I believe, on the production line.

Q Did you in fact go ask her for the truck keys?

A Yes.

Q What was Mr. Williams' demeanor when you escorted him out? Was he --

A He -- he was -- looked depressed.

Q And how did he look depressed? I mean, what -- what -- what caused you to

think he was depressed?

MS. SWAIN: Objection. You can go ahead and answer.

A He just lost his job.

Q No. I -- I understand. But how was he manifesting the depression?

A He just had his head down.

Q Did he say anything that made you think he was depressed?

A No.

Q Now, you said something about the lawsuit was already -- the lawsuit had already been filed. Were you -- how were you aware there was a lawsuit?

MS. SWAIN: Objection. You can answer it if it does not involve conversations with an attorney.

Q Right.

A I was notified by -- wait a minute. Say that again.

MS. SWAIN: You can answer it if it does not involve a conversation with an attorney.

A I was notified by the corporate attorney.

Q Okay. And that -- but that was sometime in advance of you and Ms. Boyer having this conversation about he was going to be asked to resign; is that correct?

A Yes.

Q Okay. Can you tell me approximately how long in advance of you being told that?

A No.

Q Like a week, a month, two --

A I just have no recollection. I don't know.

Q At the time -- do you know what an EEOC charge is?

A Yes.

Q At the time Ms. Thornton filed her EEOC charge, were you asked about that, for any information relative to her EEOC charge?

MS. SWAIN: Objection. Again, don't answer that if it involves a

conversation with the company's attorney.

MS. ROBERTSON: Well, he -- no. He can tell me that an attorney asked him. He does -- I'm not going to ask him what -- but I have a right to know if he was aware of it.

MS. SWAIN: Well, you can ask him if he was aware of it.

MS. ROBERTSON: That's what I asked him.

MS. SWAIN: Well, you -- you asked him if he -- if somebody asked him about it.

MS. ROBERTSON: Right. If he says a lawyer had asked him, I'm not going to ask him what the lawyer asked him. That's different.

MS. SWAIN: You can tell her if you became aware of it from the lawyer.

A I did become aware of it from a lawyer.

Q And that lawyer was -- what was

his name?

A Scott Clark.

Q Okay. Now, were -- did you talk to Linda on or about the day that she had the incident with Mr. Williams --

MS. SWAIN: Objection.

Q -- that we've talked about in Plaintiff's Exhibit 1 and 2 and 4 and 3?

A When did she -- when was her last day? When did she leave?

Q Well, I think it was a few days after this June the 14th incident.

A I -- I had no conversation with her about the incident.

Q Right.

A She spoke to me one time asking was she going to be left on the line or was she moved to line five, labeler, permanently.

Q Okay. And when did that conversation occur or what -- what were the circumstances of the conversation?

A I don't know. I was walking by

and she asked me that.

Q All right. Did you have anything to do with putting -- putting her -- putting her on line five?

A No, I didn't.

Q Who put her on line five?

A Either Melvin or one of the supervisors. It would have been either Melvin or I think Chris had those lines at the time.

Q And -- and -- and she asked you was she going to be permanent on line five?

A Yes.

Q And what did you tell her?

A I told her that we moved labeler people -- label operators around, that we moved mechanics around, and that I didn't know and that she could talk to Tommy about it.

Q Okay. So you -- you were not aware that she had been placed there for some reason other than just moving operators around?

A No, I didn't.
Q Is that right?
A I did not.
Q Were y'all about to get a new machine on line three for labeling in -- in June of '06?
A I thought we had already got it, but I don't -- I don't remember the time.
Q Well --
A We did get a new label machine out there.
Q Okay. And --
A We're planning to -- to get all three labelers replaced.
Q And the -- what all three? Which lines are you talking about?
A The can labelers, three, four, and five.
Q Okay. Did you get the line five new label machines before or after line three?
A We got it after line three.
Q Do you remember how long?

A It hadn't been that long ago since we got it. It's only been about -- been in the last month for line five.
Q Did -- when she asked you about whether she was going to be permanently on line five, can you tell me exactly what you remember saying?
A Not exactly, no.
Q What exactly does a team leader do?
A Your -- your team leader assists on the mixed nut line, which is, at this point, line three because you have a -- along with the peanuts, you have an assortment of tree nuts that you have to put in there and it's a more complicated line.
Q Is it -- does the --
A So you're going from processing to packaging to make sure that the line is running smooth.
Q Does the team leader make more money?
A Yes, but not much.

Q Okay. And does he make work assignments, tell people when they can go to break?
A Yeah.
Q Anything else?
A That's pretty much it.
Q Can he recommend disciplinaries?
A No.
Q Well, what if he -- if his of his workers is not doing right? What does he do?
A Call the supervisor.
Q And recommend a disciplinary?
A If he explains his side of the story and then worker explains their side.
Q How does one become a team leader?
A Have a job opening and you post for it. They post the job and then somebody is picked.
Q Does the -- does -- what about -- was Frank Williams also a temporary supervisor?

A I don't think so. I don't know. I don't remember.
Q Okay.
A I had this job, like, six weeks before all this happened or less.
Q Well, you -- and you don't know whether he was a temporary supervisor in '07?
A I think he was. I don't -- I don't recall. We would have to go back and look.
Q Would you look at somebody's disciplinaries before you would make them a team leader and/or a temporary supervisor?
MS. SWAIN: Objection.
A I had no part in making Frank Williams a team leader. He was already in the position when I got there.
Q No. I'm just talking about generally in -- if -- if you were responsible, would you be called upon to make a decision about somebody becoming a temporary supervisor?

MS. SWAIN: Objection.
A Not all the time. Sometimes maybe.
Q Well, if -- when you were involved in that, would you look at a person's disciplinary record to decide whether or not they were fit to be a supervisor?
MS. SWAIN: Objection.
A Yes.
Q And if in the course of less -- about a month they had been found guilty of cursing women, would you think that they were fit material to be a supervisor?
MS. SWAIN: Objection.
A If they're -- say that again, now.
Q Suppose you were considering somebody to become a temporary supervisor and you opened his personnel file and in -- in about a month he had been found guilty of cursing women as a team leader.
A Would he be made a supervisor

then --
Q Yeah.
A No.
Q No. Okay. Thank you.
MS. ROBERTSON: Can I have a few minutes and then we'll take a break and I -- I may be finished with him.
MS. SWAIN: Okay.
THE VIDEOGRAPHER: We're off the record at 2:18 p.m.
(Whereupon, a short break was taken.)
MS. ROBERTSON: That's all I have for him.
DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

**A**

**abuser** 37:19,22 38:3
**abusing** 37:17
**ACCR** 83:21
**acting** 6:4 11:4
**action** 1:5 54:23 83:16
**address** 9:14
**addresses** 48:3
**addressing** 41:4
**adequate** 55:17
**advance** 73:4,9
**advised** 3:4
**ago** 68:3 78:1
**agree** 55:9
**AGREED** 2:2 2:11
**agreement** 8:2 8:11
**ahead** 32:2 54:19 72:3
**air** 42:8
**Alabama** 1:2,23 2:8,21 5:9,18 6:2,3,5,9,22 9:16 83:3
**Alice** 24:14,15 24:20 69:14
**allegation** 41:2
**alleged** 37:19,22
**amended** 2:22
**amount** 20:6
**Andrews** 15:13 16:15
**and/or** 80:14
**Ann** 5:13 7:5 10:20 20:5 25:5 39:22 48:22 51:10 56:11 58:2,10 60:17 66:8 68:11
**Ann's** 52:21
**answer** 28:22 29:5,6 33:19 33:21 37:13 39:1 44:21,23 46:13 48:8,14 50:1 51:2 60:21 72:3,16 72:21 73:23
**answers** 83:8
**anybody** 8:7 56:13,18,19
**anywise** 83:16
**apologize** 52:15
**appear** 45:23 47:8,15,21 48:1
**appears** 40:6 46:1 47:12 48:18
**application** 62:9
**apply** 21:13
**approval** 52:22
**approximately** 2:10 6:9 17:7 73:9
**arguing** 50:10
**asked** 10:20 20:2 34:10 36:19 40:19 47:21 48:1 53:6 55:3,13 55:16 56:12,18 56:22 58:20 60:18 68:13 70:13,18 73:6 73:19 74:4,11 74:13,13,16,17 76:1,11 78:4
**asking** 22:20 36:9 38:20,22 38:23 39:2 49:8 50:7 55:1 75:16
**assign** 2:16
**assignments** 79:2
**assists** 78:11
**assortment** 78:15
**assume** 22:13
**assuming** 52:9 52:16
**attached** 39:16 45:14 53:21
**attitude** 42:8
**attorney** 72:17 72:23 73:2 74:2,4
**available** 59:9 69:2,8
**aware** 72:14 74:7,9,20,21 76:21

**B**

**B** 4:5 19:6
**back** 63:14 64:2 64:6,8,19 80:10
**background** 63:22,23 64:3 64:6,10,13
**badge** 69:19 70:17
**badges** 60:11
**bag** 45:7
**Baker** 5:5
**basing** 21:9
**bathroom** 70:15
**Bearman** 5:5
**becoming** 80:22
**began** 31:17
**beginning** 9:21
**begins** 6:15
**believe** 10:17 11:3 24:16,19 46:3 56:5,10 71:15
**believed** 20:10
**Berkowitz** 5:6
**best** 37:13
**bet** 19:6
**better** 41:9
**Beyond** 31:8
**BFG** 9:7 22:7
**biggest** 59:3 65:2
**Birmingham** 5:9 5:18
**bit** 8:3
**Bobbie** 2:8 6:8 7:2
**Boyer** 10:20 20:5 25:5 51:10 56:11 58:2,10,19 60:17 66:8 68:11 73:4
**break** 45:10 79:3 82:6,11
**Brief** 33:1 45:19
**bring** 63:16,19 70:22,23
**Brook** 43:9
**Brooks** 42:18,19 43:1,2,5,19 45:4
**Bruce** 15:17 18:5 57:18
**Building** 5:16
**BUTLER** 83:4
**buyer** 15:2

**C**

**C** 5:1,13
**Caldwell** 5:5
**call** 22:11 53:15 79:12
**called** 69:10,20 80:21
**Candace** 71:6
**cans** 45:7 56:13 56:14
**carried** 50:23
**case** 6:19 16:8 67:3
**Cassady** 15:17 17:6 18:5 57:18
**cause** 6:11 83:17
**caused** 71:23
**certain** 60:10
**certificate** 23:19 83:1
**Certified** 83:20
**certify** 6:4 83:6 83:14
**changed** 12:2
**characterizati...** 54:18
**charge** 73:16,19 73:21
**chart** 14:3
**check** 63:22,23 64:10,13
**checks** 64:3,6
**child** 66:14
**children** 66:22 67:2
**Childs** 5:15
**Chris** 17:20,23 27:7 41:21 42:20 49:17,19 50:2,16,19 51:6 59:8 68:7 76:9
**Christine** 54:9
**circumstance** 36:11
**circumstances** 75:22
**Civil** 1:5 2:21 6:6
**Clark** 24:14,15 24:20 69:15 75:2

**classify** 66:12
**clean** 70:16
**clearer** 34:8
**clearly** 34:1
**Cody** 26:20,21
**come** 7:9 25:4 40:16 61:2
**coming** 61:12,15 61:21
**commencing** 2:9 6:9
**Commissioner** 1:20 6:4
**company's** 74:1
**complained** 37:15
**complaining** 36:6 42:18,19 45:5 46:2
**complaint** 22:1 22:19 23:6 24:4,22 26:10 27:11,15,19,23 28:6,12,19,23 29:2,14 30:1 30:18 31:10,16 31:22 33:5,11 34:18 36:5,15 36:16 43:13 46:5,17 47:9 48:17 53:13
**complaints** 28:14 29:10 31:5
**complicated** 78:16
**computer** 20:16 20:18
**computer-aided** 83:10
**CONCLUDED** 82:14
**conduct** 28:9
**conducting** 53:10
**considering** 81:18
**construed** 30:17 30:23,23
**contact** 29:16 30:2
**contributing** 65:20 67:13
**conversation** 59:2 60:16 61:7 68:11 72:22 73:5 74:1 75:13,21 75:22
**conversations** 72:17
**Cook** 54:5
**copy** 39:22 41:9
**corporate** 25:23 26:3 73:1
**correct** 10:14 11:7 25:15 59:21 73:6 83:11
**counsel** 2:4,13 2:15 6:7 7:3 83:15
**COUNTY** 83:4
**course** 81:11
**court** 1:1 2:6 3:5 3:6 6:1,20,21 7:19 83:20
**covered** 60:22
**co-worker** 37:16 43:9,15
**criminal** 64:16 64:22
**Crook** 2:8 6:8
**Crowe** 7:2
**currently** 15:4 16:1
**curse** 48:4 54:7 54:22 56:14
**cursed** 47:22
**cursing** 37:16 39:6 81:13,22
**curtains** 54:7
**cussing** 38:9 46:2
**customers** 19:13
**cut** 42:3,5

**D**

**D** 1:21 2:5,22 4:1 5:14 6:1,19
**damn** 54:4,10 55:5
**date** 6:5 22:20 23:1 40:10 47:20 58:4 59:5 60:23 61:4,10,11,12
**dates** 22:5 23:18 25:11 26:14
**day** 2:9 3:2 6:10 61:8 75:4,10
**days** 75:11
**Debra** 13:8 25:21
**December** 18:3
**decide** 52:8 81:6
**decides** 19:13
**decision** 52:18 53:4,6,7 55:8 80:22
**declined** 59:11
**Dee** 5:22 69:14 70:5,6
**defendant** 5:3 7:14
**Defendant(s)** 1:12
**define** 19:8
**degree** 36:11
**delinquency** 65:21 67:14
**delivering** 2:23
**demeanor** 71:19
**demotion** 18:13
**denominated** 65:5
**department** 71:11
**depending** 36:11 63:20
**depends** 52:1
**deposition** 1:14 2:4,18 6:16 39:16,19 45:14 53:22 82:14 83:7
**depressed** 71:21 71:22 72:1,9
**depression** 72:6
**description** 21:17 23:23
**details** 62:2 67:22 70:1
**deviant** 65:11 66:13
**different** 11:14 22:11 27:12,21 28:10 36:12 50:22 56:2 74:18
**differently** 29:13
**direct** 14:4
**direction** 29:17 32:11 35:9
**directions** 32:3 35:7 51:15
**directly** 14:5,12 15:12 35:14
**director** 11:1,2 24:17 70:7
**directs** 40:23 50:22
**discern** 44:8
**disciplinaries** 79:7 80:13
**disciplinary** 28:7 54:23 79:13 81:6
**disciplined** 54:12
**discussing** 58:19
**distinction** 33:14
**distracted** 33:3
**District** 1:1,2 6:21,21
**Division** 1:3 6:22
**divisional** 24:16 24:17
**document** 48:8
**documentation** 40:3,5 41:3 46:11
**documents** 51:1 51:2 54:18
**doing** 31:20 38:2 38:9 39:9 44:19 48:17 55:16 79:10
**Donald** 26:20,21
**Donelson** 5:5
**Donna** 14:10 15:1
**door** 69:21
**Dothan** 1:23 2:8 6:8 9:7,15 70:7
**duly** 8:20
**duties** 12:11,18

**E**

**E** 4:1,5 5:1,1
**early** 55:19
**EEOC** 73:16,19 73:20
**effective** 2:22
**either** 26:18 28:6 59:8 69:14 76:7,8

**electrician** 10:1
**elicited** 56:17
**employed** 18:7 22:13
**environment** 39:8
**escort** 59:15 69:2,7,11,21
**escorted** 59:20 60:1,5,9 69:3 70:3 71:20
**escorts** 59:8
**Eugene** 15:13
**evidence** 2:18
**exact** 58:4,17
**exactly** 40:4 78:6,8,9
**examination** 4:2 6:12 8:22
**examined** 8:20
**Excel** 21:2
**exchange** 8:6
**excuse** 7:9 11:21 13:9 14:22 50:12
**Exhibit** 39:15,18 45:2,13,16,22 46:4,6,23 47:14 48:11,18 49:17 53:12,20 54:5,8 75:8
**exhibits** 3:3
**expect** 54:21
**expected** 54:11
**expertise** 21:1
**explains** 79:14 79:15
**extra** 39:21

F

**F** 5:4 54:3,6,10 55:4
**fact** 71:16
**factor** 20:14,22
**factors** 20:11,20
**fair** 21:18 26:12 68:15
**figuring** 41:16
**file** 81:20
**filed** 3:6 72:13 73:18
**filler** 71:14
**finance** 12:20 13:6,7
**find** 20:20 32:13 57:23
**finding** 52:16
**fine** 8:18 12:15 49:7
**finish** 12:15 52:12
**finished** 82:7
**fired** 59:12
**first** 8:20 14:17 19:13 22:17 23:3 31:10 45:4
**fit** 81:7,14
**five** 75:18 76:4,6 76:12 77:18,19 78:3,6
**Flavor** 1:10 6:18 7:15 9:8,18 18:7 21:18 22:8,11,14 27:16 29:11 66:18 71:11
**folks** 63:1
**follow** 29:17 32:3 35:6 51:14
**followed** 63:14
**following** 6:12 32:10 33:14
**follows** 8:21
**foregoing** 6:6 83:7,11
**forget** 11:18
**form** 2:14 21:11 27:17 28:2 32:2,22 36:18 40:3,5,12 46:18 48:9 54:22
**forms** 46:11
**found** 81:12,21
**four** 66:4 77:17
**Frank** 6:19 42:22 43:1,6 45:6,6 46:2,20 47:11,16 57:19 58:1,7 65:3 67:23,23 79:22 80:16
**Franklin** 57:4
**Frank's** 58:12 61:21
**front** 43:8,15 44:2,4,6 68:8
**fuck** 54:4
**full** 9:2
**function** 13:7
**further** 2:11 32:5,19 83:14

G

**general** 29:10
**generally** 27:14 62:4 80:20
**getting** 46:7 48:23
**Gingrich** 25:21
**give** 9:20 24:12 36:19 51:3 60:2 61:4 62:4
**given** 23:19 58:17,17 83:12
**giving** 9:13 60:23
**go** 12:8 19:14 32:2,5 37:18 38:7 41:19 54:18 68:2 70:13,14 71:16 72:3 79:2 80:10
**goes** 19:13 63:20
**going** 8:4,7 35:11 37:7 54:16 58:12,14 58:20 59:5,12 60:18 61:2,2 68:13 73:5 74:5,17 75:17 76:12 78:5,18
**good** 20:16,23
**gotten** 47:15
**grade** 20:13,15 21:7
**Greenich** 25:21
**Greenville** 6:2
**grounds** 2:16
**guess** 7:8 30:21 43:5
**guessing** 24:9,11 47:6 71:13
**guilty** 65:7,10 81:12,21
**Guiney** 25:21
**guy** 33:2

H

**H** 4:5
**half** 8:14
**Hall** 13:5
**hand** 42:8
**handled** 12:11 31:5
**happen** 10:16 20:1 39:2
**happened** 40:11 46:8 47:17 69:17 80:5
**happening** 59:17
**harassment** 16:2 16:5 22:1,18 23:6,17 24:4 24:21 26:10 27:11,19,23 28:11 29:1,13 30:1,16 31:1 31:16,22 33:11 34:12,18 36:15
**Hatcher** 14:6,21 14:22 26:19
**head** 24:10 72:7
**heard** 19:7 48:21 54:3,6,9 54:14
**hearing** 83:13
**held** 9:21 12:5 16:18 17:7
**help** 41:12,19,20 41:23 42:5
**helped** 63:6
**helping** 63:10
**hey** 51:3
**hiearchy** 68:3
**hire** 63:3,6,11
**hired** 62:12,15 64:1,9
**hiring** 62:18,21 63:22
**hold** 10:23
**Hollins** 12:7,19
**hour** 34:20
**hourly** 63:1,3 68:17
**House** 1:10 6:18 7:15 9:8,18 18:7 21:18 22:8,12,14 27:16 29:11 66:19 71:11
**HR** 24:16 26:3 28:15,17,19 29:16 30:2,11 31:3,7,18 32:16,19 33:5

33:15 35:6,11
35:21,22 36:2
36:8 37:2,22
38:3 39:10,10
40:13,16,23
49:4,14,16
50:22 51:21,22
52:11,21 54:23
55:8 58:12
59:5 61:1,12
61:14,20 63:15
63:16,21,22
70:7
**HR's** 32:3,10
39:13 51:14
53:3
**Hutchins** 14:6
14:12,19 15:11
26:19 50:4,15
51:7,7 68:9

**I**

**idea** 20:23 21:9
**identify** 7:3
**imagine** 43:7
**immediately**
28:15,17 29:16
31:18 32:15
33:4,5 37:23
**implied** 30:16
**incident** 36:21
36:23 37:3,9
37:11 39:4
40:7 41:3
42:14 43:20
44:5,6,8 52:1
75:5,12,14
**independently**
22:8
**individual** 53:12
**individuals**
29:11
**information**
73:20

**initiated** 46:17
**input** 53:1
**instructions**
32:19 51:20
**intercourse**
65:11 66:13
67:18
**interested** 83:16
**interruption**
33:1
**interview** 63:19
63:20
**investigate**
21:23 22:18
23:5,17 24:3
24:21 26:10
27:11,15,22
28:5 29:10,12
29:19 30:1
31:16,21 34:11
34:17 37:3
43:13
**investigating**
31:10 33:10
40:7 49:18
50:3 53:1
**investigation**
16:1,5 28:10
28:23 35:15
36:14 38:2
48:17 50:23
51:12,17 53:11
55:17 56:4
**investigations**
52:8
**investigator**
23:11
**involuntarily**
59:21
**involve** 28:15,17
72:16,22
**involved** 35:8,14
36:20,22 38:2
40:10 48:15

56:20 81:5
**involves** 35:7
64:13 73:23
**involving** 13:20
**issued** 67:12

**J**

**Jeff** 14:7
**Jennifer** 5:4
7:13
**job** 10:21 11:13
12:1,5,10
16:18 20:3
21:14 39:10,13
68:6 72:4
79:18,19 80:4
**jobs** 9:21
**John** 15:19
**Jordan** 17:20,23
18:6 27:7
49:17,19 50:2
50:16,19 51:6
68:7
**Jr** 6:19
**June** 75:12 77:6

**K**

**Kentucky** 12:9
**key** 69:18
**keys** 60:11,13
70:17 71:1,17
**kin** 57:18 83:15
**kind** 14:1 27:15
28:5,9 29:1
31:11 36:15
**kinds** 31:4
**kinfolks** 8:5,8
8:16
**kinship** 8:4
**know** 8:16 12:13
13:7 15:23
16:17 17:1,16
20:8 21:15
22:5,10 25:7
26:1,5,5 27:18

28:19 31:19
32:6 36:12
37:8 40:2
42:17,17 47:6
48:23 53:9,17
57:4,5,15,18
57:20,21,22
58:5,14 59:13
59:17 62:11,12
62:13,15 64:4
64:8,9,12 65:1
65:1,3,7,10,15
65:23 66:4
67:4,8,11,21
71:7,9 73:14
73:15 74:6
75:23 76:18
80:1,6
**knowledge** 16:6
49:13
**known** 16:7
**Kress** 5:16

**L**

**L** 2:1
**label** 41:19
76:16 77:10,20
**labeler** 75:18
76:15
**labelers** 77:14
77:17
**labeling** 77:5
**Lake** 5:22 69:14
70:6
**Lake's** 70:5
**Large** 2:7 6:4
**Larry** 14:6,19
14:21,22 26:19
**lateral** 17:14,15
18:12,14 20:10
20:12,21,22
21:5,6,9
**law** 7:1
**lawsuit** 58:6

72:12,12,14
**lawyer** 23:11
74:16,17,20,22
74:23
**leader** 68:17
78:9,11,21
79:17 80:14,17
81:22
**leading** 2:14
**learn** 57:12
**leave** 55:19
75:10
**Lee** 9:4
**left** 75:17
**let's** 22:11,12,13
27:12 28:20
44:15 45:1,16
70:21
**level** 20:13,15
21:7 59:7
**License** 83:21
**Linda** 1:6 5:21
6:17 7:7,12
41:20 42:19
45:7 46:1,5
47:5,9 57:13
57:14 58:5
75:4
**line** 19:1 40:16
50:13 68:8,14
71:15 75:17,18
76:4,6,12 77:5
77:19,20,22
78:3,6,12,13
78:16,19
**lines** 18:20,21
76:9 77:16
**list** 37:7
**little** 8:3
**LLC** 5:15
**locker** 69:18
70:16
**lockers** 60:14
**lodged** 53:14

**long** 9:10 16:15 16:22 34:16 54:9 73:9 77:23 78:1
**look** 45:1,16 71:22 80:11,12 81:5
**looked** 71:21
**looking** 64:16
**looks** 42:2 49:15
**lost** 72:4
**lot** 19:12
**Louis** 26:1
**Lyson** 13:10

**M**

**machine** 77:5,10
**machines** 77:20
**maintenance** 10:1,2,3,5,7,10 10:13,19 11:8 13:11,21,23 15:5,7 16:20 17:3,12 27:1
**making** 55:15 80:16
**manager** 10:2,3 10:8,10,13,19 11:5,7,9,12,17 11:22 12:2,22 13:1,12 15:5,8 16:20 17:4
**manifesting** 72:6
**manufacturing** 11:22
**Mark** 13:5
**marked** 39:15 45:13 53:21
**married** 67:8
**marry** 71:8
**Mary** 10:20 20:5 25:5 42:18,19 42:23 43:2,4,9 43:18 45:4 51:10 52:21 56:10 58:2,10 60:16 66:8 68:11
**material** 81:14
**matter** 6:17
**ma'am** 9:19 10:15 11:10 13:16 14:14,23 16:21 17:5 18:22
**McNaughton** 1:21 2:6,23 6:1 83:19
**mean** 8:15 16:10 19:11 23:10 28:15,16,18 32:5 36:10 37:1 38:1,14 38:21,23 39:3 39:7 43:23 45:3,10 48:13 48:14 49:1,4,8 50:22 53:5,18 71:23
**means** 21:6 37:2 44:4 83:9
**mechanic** 63:17
**mechanical** 63:18
**mechanics** 63:4 63:7,12 76:17
**Melvin** 14:6,12 15:11 26:19 50:4,15 51:7,7 59:9 68:9 76:7 76:9
**memory** 27:8
**mentioned** 55:4
**Middle** 1:2 6:21
**mind** 9:13 25:4 25:18
**minor** 65:21 67:14
**minuses** 19:7
**minute** 72:20
**minutes** 28:18 68:3 82:6
**misunderstood** 61:10
**mixed** 78:12
**molester** 66:14
**MOMO** 11:17 11:20 12:6
**Monday** 6:23
**money** 20:7 78:22
**month** 73:12 78:3 81:12,21
**months** 17:8
**moo** 11:19,19
**mother** 67:12
**move** 20:10,12
**moved** 75:18 76:15,17
**moving** 76:22
**MRO** 15:2

**N**

**N** 2:1 4:1 5:1
**name** 7:5,10,13 9:2 14:8 15:21 23:10 25:20 26:18 43:2 67:9 75:1
**names** 24:10 25:3,18
**Nans** 52:5
**necessarily** 31:5
**necessary** 2:12
**need** 12:13,15 20:17 28:22 42:4 48:10 70:14
**needs** 7:7
**neither** 48:13 83:14
**Nettles** 13:8
**new** 77:4,10,20
**Nineteenth** 5:17
**North** 5:7,17
**Notary** 2:6 6:3
**notice** 60:2
**notified** 72:19 73:1
**notify** 28:19 31:18 63:15
**Number** 1:5 39:15,18 45:2 45:13,17,22 46:4,6,23 47:15 48:11,12 48:19 49:18 53:12,20 54:5 54:8 83:21
**numerous** 31:15 31:23
**nut** 78:12
**nuts** 78:15

**O**

**O** 2:1
**object** 27:17 44:11 54:16
**Objection** 16:9 16:13 21:10 28:1,13 29:3 30:20 32:1,21 33:9,12 36:17 37:12,20 38:5 38:11,13,19 40:14,18 42:16 43:10,16 44:20 46:9,12,19 47:18,23 48:6 48:22 49:20 50:6,20 52:20 53:2,8,16 55:7 55:11 57:7 59:16,22 60:20 61:6,23 65:13 66:2,6,15,20 67:6,20 72:2 72:15 73:22 75:6 80:15 81:1,9,15
**objections** 2:13 2:16
**occasion** 51:16 58:9
**occur** 75:21
**offender** 57:6 58:1,11,22 60:19 61:1,5 61:22 62:9 66:10 68:13
**offered** 2:18
**office** 7:1 36:3 70:4,5
**officer** 65:17
**offices** 2:7 6:8
**oh** 11:21 42:23 43:1,21 52:14 64:12 70:22,22
**Okay** 19:10 22:9 22:14,15 23:15 25:22 28:16 31:19 35:5 37:5 38:1 40:21 41:6 42:21 43:1,2 44:3,13 45:20 46:3 48:12 52:13 54:20,21 61:14 62:15 63:2 69:10 73:3,8 75:3,20 76:20 77:12,19 79:1 80:3 82:4 82:8
**old** 65:8,12 66:14 67:12
**once** 36:2
**open** 15:5 54:7
**opened** 81:20

**opening** 63:16 79:18
**operations** 11:2 11:2,23 13:19
**operator** 14:1 71:15
**operators** 76:16 76:22
**oral** 3:2 6:12
**ordained** 19:22
**order** 65:4
**ordinarily** 43:14 59:14,19
**organizational** 14:3
**original** 3:1
**outstanding** 65:20
**override** 53:3
**owned** 22:8
**ownerships** 22:11

**P**

**P** 2:1 5:1,1
**packaging** 78:19
**page** 4:2 41:12 41:17
**Pantazis** 5:15
**Parker** 19:20
**parole** 65:16
**part** 80:16
**participated** 62:18 63:3
**participation** 62:21
**particular** 37:3 40:6
**parties** 2:3,15 83:15
**pass** 63:18,23
**Paul** 9:15
**pause** 45:19
**pay** 21:7 60:13
**PC** 5:6
**peanuts** 78:14
**people** 13:12,15 13:17,23 18:16 18:18,23 26:14 35:8 36:19 48:15 52:3 62:23 63:11 69:22 76:16 79:2
**performed** 12:19
**permanent** 76:12
**permanently** 75:19 78:5
**Perry** 15:20,22
**person** 18:17 23:10 24:23 25:9,13 26:3 28:7 37:21 38:8 39:5,8 49:10 51:22 52:9 69:3,7
**personal** 49:12
**Personally** 66:16
**personnel** 23:11 81:20
**person's** 81:6
**picked** 79:20
**place** 18:4 40:10 40:11
**placed** 76:21
**plaintiff** 5:12 7:6,11
**Plaintiff's** 39:14 39:18 45:2,12 45:16,22 46:4 46:6,23 47:14 48:10,12,18 49:17 53:11,19 54:5,8 75:8
**Plaintiff(s)** 1:8
**planner** 17:12
**planning** 77:13
**plant** 11:1 13:20 39:7
**played** 20:11
**please** 3:4 7:3,17 9:3,11 10:5 12:23 13:23 14:9 28:3 31:13 33:16,17 33:18 39:20
**pled** 65:7,10
**point** 8:6 24:20 25:8,14 26:9 26:13 55:15 78:13
**position** 10:22 15:6 27:4 62:13 80:18
**post** 79:18,19
**preference** 67:2
**present** 5:20 40:9 44:3,4,5
**pretty** 36:10 60:22 70:15 79:6
**Princeton** 12:9 24:18
**print** 41:7
**prior** 2:18 11:12
**probably** 40:19 42:2 65:23
**probation** 65:16 66:1
**problem** 41:14 52:17
**procedure** 2:21 6:6 63:13
**procedures** 27:23
**proceed** 63:21
**proceedings** 6:13
**process** 62:18,22
**processing** 78:18
**production** 10:3 10:13,19 11:5 11:6,8,11 12:2 13:12,20 14:17 14:20 15:11,15 15:16,19,20 16:16,19,23 17:2,3,10,13 17:21 18:1,10 18:11,16,19,20 18:21 19:3,5 19:15,15,23 20:18 68:8 71:15
**productions** 19:11
**Products** 1:10 6:18
**progression** 50:13
**promotion** 17:14,14
**pronounce** 25:19
**Public** 2:7 6:3
**punishment** 52:9,19 53:15
**purposes** 22:10
**pursuant** 6:5
**put** 42:8 76:6 78:15
**putting** 76:3,3,3
**p.m** 2:10 6:10,23 82:10

**Q**

**QA** 12:20 13:9
**question** 2:15 25:6 26:8 28:3 28:22 29:7,8 34:2,7 44:12 44:14 45:21 46:13 48:8,14 48:16 49:21 50:6,7 51:2 52:13 54:17 55:13 56:18
**questions** 2:14 37:7 48:20 49:9 51:13,13 83:8
**Quinn** 5:15
**quit** 57:14

**R**

**R** 5:1
**ran** 45:9
**raping** 65:8
**read** 7:21 41:5 41:11,13 45:3 45:5
**reading** 40:9
**ready** 70:13
**real** 38:16,18 39:2
**reason** 58:18 76:22
**recall** 26:15 80:10
**receive** 52:9
**receiving** 32:14
**recollection** 73:13
**recommend** 63:21 79:7,13
**recommendati...** 65:16
**record** 6:23 64:17,22 81:6 82:10
**relative** 73:20
**remember** 22:17 23:9,13,16,18 23:21 24:1,5,8 25:19 26:2,4 26:13 27:3,9

34:19,21,23 52:4,6 58:4 59:4 60:16 61:8,17 62:2,6 64:7 69:12,13 69:23 77:8,23 78:7 80:2
**rendered** 48:4
**Renny** 1:21 2:5 2:22 6:1 83:19
**repair** 13:21
**repeat** 28:3 31:12
**repeated** 34:6
**replaced** 77:14
**report** 30:7,10 30:11 31:2 32:15 33:5,6 35:5,6 51:10
**reported** 14:12 16:11 31:7 51:6,8 68:7
**reporter** 2:6 3:5 6:2 7:17,19 83:20
**reporting** 36:7
**reports** 14:5 15:12 68:20
**represent** 7:4,6 7:11,14
**represents** 83:11
**requested** 17:17
**require** 35:12
**resign** 58:20 59:12,15 60:2 60:18 68:14 73:6
**resignation** 19:18 58:13,15 61:3,21
**respective** 2:3
**responding** 42:15
**responsible** 80:21
**restructured** 12:4
**result** 83:17
**resume** 63:16
**retained** 3:5
**Revere** 9:15
**revoke** 65:17
**rework** 41:21 42:4 45:8,9
**Richard** 12:7
**Rick** 41:18
**Ricky** 1:15 2:4 6:10,16 8:19 9:4
**right** 10:7,12 11:9,15 12:21 14:4,11,15 15:10,18 19:19 22:16 23:4,8 24:19 27:2 28:20 29:18 30:9,12,19 31:4 32:12,20 33:22 34:10,13 34:15 35:3,16 36:1,22 38:17 41:1 42:22 44:7 45:1 50:19 51:5 62:20 63:5,10 63:13 64:20,22 69:6 70:8 72:18 74:6,15 75:15 76:2 77:2 79:10
**Robertson** 3:1 4:3 5:13 7:5,6 7:23 8:12,15 9:1 33:16,22 34:3 39:17,23 40:1 41:8 45:15 49:5,10 49:22 50:8,12 54:1,20 55:14 55:22 56:5,10 56:21 57:3 64:20 74:3,10 74:15 82:5,12
**rolled** 11:7
**roll-together** 11:13
**Ronnie** 67:4,5,9
**Rule** 2:20
**Rules** 2:21 6:5
**run** 9:15 13:19
**rundown** 9:20
**running** 78:20

**S**

**S** 2:1 4:5 5:1,3 5:12 7:2
**salary** 62:23
**Sammy** 15:15,23
**Samuel** 13:10
**saw** 48:21 56:13
**saying** 12:3 20:17 35:10,13 39:5 42:12 55:5 78:7
**says** 41:14,16,18 42:1 43:18 44:3 49:18 74:16
**scheduler** 18:10 18:12,16 19:3 19:16,17,23
**schedules** 19:5 19:11
**Scott** 19:20 75:2
**second** 14:20 41:11,16 46:14 46:15 47:2 50:5
**section** 71:11
**see** 41:8 44:2,10 45:17 47:16 49:17 55:2,3 70:21
**send** 35:20,22
**sentence** 66:5
**served** 66:4
**sessions** 33:7 34:17 35:11
**sex** 57:5 58:1,11 58:21 60:19 61:1,5,22 62:9 66:10 68:12
**sexual** 16:1,5 21:23 22:18 23:5,17 24:3 24:21 26:10 27:11,18,22 28:11 29:1,13 30:1,15 31:1 31:16,22 33:11 34:12,18 36:14 65:11 66:13
**sheet** 23:23
**sheets** 21:2
**shift** 14:18,20
**short** 29:22 82:11
**showing** 51:1
**side** 37:9,11 51:3 79:14,15
**sign** 7:22 23:22
**signed** 43:1 46:20 47:2
**sign-up** 23:22
**Sin** 14:10 15:1
**single** 61:7
**sir** 9:3,11 10:5 13:23 14:9 25:12 32:13 39:20 41:13 55:1
**sit** 9:22
**situation** 28:8
**six** 17:7 80:4
**skills** 20:16,18
**smooth** 78:20
**Smothers** 1:15 2:5 6:11,17 8:19 9:4,6
**somebody** 13:2 37:15 43:14 59:15 66:17 69:2 74:13 79:19 80:22 81:19
**somebody's** 80:12
**sorry** 10:9 52:14 52:14
**sort** 32:7 39:6 60:14
**Southern** 1:3 6:22
**specific** 22:5 51:13
**speculating** 62:6
**spelling** 19:7
**spend** 8:14
**spoke** 75:16
**spouse** 8:8
**spread** 21:2
**St** 26:1
**staff** 21:3 27:6
**standing** 15:4
**start** 12:16
**started** 9:23 16:17 58:6
**state** 2:7 6:3 7:4 9:2 83:3
**statement** 21:19 37:18 38:8 39:12 40:17,20 42:21 43:8,14 44:9,17,17 46:22 47:15 48:5 51:12,17 54:8,13 55:10 55:12 56:3 68:16
**statements** 32:7

35:8,12,17,21 35:23 36:14,20 37:4 40:22 48:15
**STATES** 1:1
**stating** 43:18
**status** 21:8 23:14
**stay** 42:4 45:8
**stenotype** 83:8
**steps** 29:21 36:12
**stipulate** 55:18
**STIPULATED** 2:2,11
**stipulating** 55:21
**stipulation** 6:7
**stipulations** 7:20
**stop** 50:5,5,6
**story** 51:4 79:15
**Street** 5:7,17
**strike** 27:13
**struggling** 33:13
**Stuart** 15:16,23 16:22
**stuff** 66:9
**subordinate** 49:11
**suggests** 49:2 55:12
**Suite** 5:8
**superintendent** 14:17
**supervise** 13:13 13:18 18:16,18
**supervised** 50:2 50:16
**supervising** 50:15
**supervision** 59:7 68:15
**supervisor** 10:2 10:5,10 14:20 15:11,15,16,19 15:20 16:16,23 17:2,10,13,21 18:1,19 19:15 20:18 21:17,21 27:1 30:8,11 31:2,18 32:17 32:18 33:6 35:6 40:20 49:18 50:3,19 52:23 53:1 59:6 79:12,23 80:7,14,23 81:8,14,19,23
**supervisors** 21:3 40:21 68:8 76:8
**supervisory** 27:5
**suppose** 36:4 37:15 38:1,7 38:15 54:2 81:18
**supposed** 42:15 49:23
**supposedly** 38:9 39:9
**sure** 24:22 25:8 25:10 26:9,11 31:12 36:2 39:23 44:22 60:11 69:1 78:19
**surprise** 23:2
**Swain** 5:4 7:13 7:14,21 8:10 8:13,18 16:9 16:13 21:10 27:17 28:1,13 29:3,6 30:20 32:1,21 33:9 33:12,20 34:1 34:5 36:17 37:12,20 38:5 38:11,13,19 39:21 40:14,18 42:10,16 43:10 43:16 44:11,20 46:9,12,19 47:18,23 48:6 48:22 49:7,12 49:20,23 50:5 50:10,20 52:12 52:20 53:2,8 53:16 54:16 55:7,11,20 56:1,6,16 57:1 57:7 59:16,22 60:20 61:6,23 64:18 65:13 66:2,6,15,20 67:6,15,20 72:2,15,21 73:22 74:8,12 74:19 75:6 80:15 81:1,9 81:15 82:8
**swear** 7:17
**swore** 67:12
**sworn** 7:18 8:20

**T**

**T** 2:1,1 4:5
**table** 45:9
**take** 10:20 11:5 12:10,18 20:2 29:21 35:12,17 36:12 37:21 38:3,7 39:8,9 39:12 40:20,22 43:14 51:12,17 51:20 63:17 82:6
**taken** 2:5 3:2 36:13 40:17 82:11 83:7
**talk** 24:13 59:5 61:13 75:3 76:18
**talked** 56:19 62:8 75:7
**talking** 12:14 21:5 22:14 49:5 50:21 55:21 56:1 64:18 77:16 80:19
**Tamekia** 54:5
**taught** 23:9 24:8 24:20 25:7,14 26:9 27:10,14 27:22 28:4,9 29:9,12,23 30:2,5,10 31:8 31:21 33:7 35:17 48:20 51:9,11,13,14
**teaching** 34:17
**team** 68:17 78:9 78:11,21 79:16 80:14,17 81:22
**telegraph** 33:18 33:21
**tell** 7:9 13:22 19:10 21:22 22:16 23:8,15 28:21 34:22 35:4 37:9,11 38:17 40:8 41:1 42:14 45:18 46:10,16 50:14 52:3 53:14,17 55:10 58:3 59:1 60:15 62:7,10 62:20,20 63:5 63:13 66:8 69:6,16 70:23 73:8 74:4,19 76:14 78:6 79:2
**telling** 54:12 58:10 68:21,23
**Temple** 5:14 7:10
**temporary** 79:22 80:7,14 80:23 81:19
**tender** 60:6
**terminated** 59:21
**terms** 31:9 33:10 36:7
**test** 63:17,18,18
**testified** 8:21 56:11
**testimony** 1:14 3:2 56:7 83:12
**thank** 55:14,23 56:23 82:4
**thereto** 2:19 83:9
**thing** 14:1 29:22 32:7 36:7 39:7 54:10 59:3 60:14
**things** 31:20 37:17 39:6,9 50:22 56:2 60:10,12
**think** 8:1 17:11 26:8 33:13,21 34:5,7 40:12 40:15 41:9,14 41:18 43:17,18 44:4 45:17 47:5,7 49:16 58:16 59:4 60:22 62:14 65:2 68:23 71:14 72:1,9 75:11 76:9 80:1,9 81:13
**thinking** 20:11 46:21

Thornton 1:6 5:21 6:17 7:7 7:12 46:5 47:22 73:18
thought 30:17 42:23 43:4 45:4 77:7
three 18:20,21 40:17 68:20 77:5,14,15,17 77:21,22 78:13
threw 54:6 56:12,14
throwing 37:16 38:10 39:5
time 2:17,17 18:2 22:12,17 23:3,16,20 24:2 26:23 28:5 40:11 51:6 52:2 57:8 57:9,9 59:10 60:6 68:6,15 69:9,23 71:13 73:15,18 75:16 76:10 77:8 81:2
times 22:6 27:4 34:14
title 11:3,14,15 12:2 14:15 15:14 17:11 24:17 26:6,18 26:23
titles 13:22
today 9:22
told 20:9 31:14 32:15 35:11 38:7 41:21,22 41:23 42:3,6,7 44:18 51:23 58:2,21 60:17 64:5 66:9 73:10 76:15
Tommy 52:4 76:18
Tower 5:7
trained 23:5,16 39:11
training 21:22 22:4,17 23:20 24:3 26:17,17 27:5 30:9 32:14 34:11 43:12 48:19 49:6
trainings 31:15 31:23
transcribed 83:9
transcript 3:1 83:12
transcription 83:10
tree 78:15
trial 2:17 8:6
trouble 41:15 42:12
truck 71:1,17
true 62:11 83:11
Trueblood 5:14 7:10,11
truth 53:14,18 54:13 55:10
try 33:17,18 56:7
trying 17:11 20:20 32:13 33:20 41:5
turn 37:4
turned 19:17,21 42:8
Twentieth 5:7
twisting 56:6
two 24:7 26:16 31:20 50:21 56:2 60:2,5,7 73:12

U

U 2:1
Uh-huh 25:16
Uh-oh 19:6
ultimate 50:18
ultimately 56:4 68:4
understand 30:21 34:2,4 39:1 45:11 72:5
UNITED 1:1
upset 42:11
use 54:3,4
Usual 7:19
usually 21:5 37:8 59:7 62:23
U.S 6:20

V

v 1:9
vague 36:10
vast 43:12 48:19
verbally 37:17
version 46:7 47:16
versus 6:18
VIDEOGRAP... 6:15 7:16 82:9
videotape 6:16
Vincent 15:3,8
Vinson 14:7,10

W

Wachovia 5:7
wait 32:18 35:9 36:8 72:19
waiting 70:9
walked 42:9,13 70:4,9
walking 75:23
want 8:16 31:19 46:13 56:8 60:11 66:17,21 67:1 68:2
wanted 37:2 69:1
wanting 45:7
warehouse 12:20,22 13:1 13:2
warrant 65:20 67:13
wasn't 58:17
water 33:3
way 28:10,21 29:2 31:6 38:16 45:3,3,5 45:10 46:10,16 46:18 47:9 56:17
week 73:12
weeks 60:2,5,7 80:4
went 12:9 41:19
we'll 8:6 24:13 82:6
we're 22:14 77:13 82:9
we've 8:1 41:9 75:7
wife 67:4 70:22 70:23 71:2,5
Wiggins 5:15
Williams 6:19 42:22 44:18 46:7 47:22 48:5 54:11 55:2 57:5,19 58:1,7,10 60:18 65:3 68:1,12 70:3 71:6,19 75:5 79:22 80:17
withdraw 20:19 44:15
witness 6:11 7:17,18 43:22 83:13
witnesses 8:7 48:21 54:2,14
wives 67:5
woman 67:9
women 66:18,23 81:13,22
word 19:8,8 42:5 54:3,10 55:5
words 38:14 54:7,15,22 56:15
work 8:9 9:5 33:17 38:15 49:14 68:1 71:2,10 79:1
worked 9:10,17 29:11 57:10
worker 36:5 79:15
workers 79:10
working 22:6 66:18,21 71:8
works 38:18
world 38:16,18 39:3
wouldn't 43:23 66:21 67:1
write 12:16 35:21,23

X

X 4:1,5

Y

yeah 7:23 8:15 9:23 33:4 34:9 35:2 43:3,23 44:6 48:2 49:22 64:20 70:14 79:4 82:2
year 24:6 62:14

65:8,12 66:14 67:11
**years** 9:12,18 26:16 66:4
**yelled** 41:20 45:7
**y'all** 63:14 64:2 77:4

**0**

**06** 77:6
**07** 18:3 80:8

**1**

**1** 4:6 39:15,18 46:6,23 47:15 48:12 75:8
**1:00** 2:10 6:9
**1:05** 6:23
**10** 65:12 66:13
**10-year** 66:5
**107cv-712-W...** 1:5 6:20
**108** 9:15
**12** 1:22 7:1 19:2
**12th** 2:8 3:2 6:10
**13** 65:8
**14th** 75:12
**15** 2:22 67:11,19
**1600** 5:8
**1986** 64:11
**1987** 10:11 21:20 64:9
**1988** 2:22
**1992** 10:6,6,9 21:18
**1998** 65:15

**2**

**2** 4:7 45:13,17 45:22 46:4 48:11,12,19 49:18 53:12 75:8
**2:18** 82:10
**2000** 63:11 64:2 64:6
**2001** 63:11,11 64:2,6 66:1
**2006** 10:17 14:13 18:2 63:9 68:7
**2008** 1:22 2:9 3:3 6:10 7:1
**205-314-0500** 5:19
**205-328-0480** 5:10
**22** 9:12,18
**240** 13:14,15
**27** 67:18

**3**

**3** 4:8 53:20 54:5 75:8
**301** 5:17
**35203** 5:18
**35203-5202** 5:9
**36305** 9:16
**39** 4:6

**4**

**4** 4:9 53:20 54:8 75:8
**411** 83:21
**420** 5:7
**45** 4:7

**5**

**5(d)** 2:20
**53** 4:8,9

**8**

**86** 64:19,21
**89** 23:3

**9**

**9** 4:3

# DOCUMENTATION FORM

Employee Name: [scribbled out] [scribbled out] Frank Williams

Investigating Supervisor: ______ Date: ______

Present: Mary Brooks

Who was involved: me + Linda Thurton

Witness (s): ______

Date of incident: 6-14-06

Where did it take place: Line 3

When did it take place (time and day): [scribbled out] 11:15 Am Wed.

What happened: Linda was having Problems out of Lable machine so she Just told me she was going to Break. I Let her go But I was still having trouble with the machine. I finally got it fixed and chris came around and told me to take out a Big Bag of cans that was sitting on Line 3. had a lot of Bad Lables But was trying to work them in Linda came Back off Break. I was going to do what Chris had said then go Back and (over)

Did this result in down time? ______ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT

1 Smothers

Rick and help with the ... when ... ...

elled at me to help her get the rework. I told her that chris had lready told me to do something else and I would help her when I got through he told me that was my rework and I need to stay and help et it done. I told her I could not I had to do something I as told to do. She got an attitude. I put my hand in the air urned around and walked off. I had got very upset so instead of saying mething that would get me in trouble I walked away

[signature]

PLAINTIFF'S EXHIBIT

2
Smothers

**DOCUMENTATION FORM**

Employee Name: Linda Thornton.

Investigating Supervisor: Chris Jordan Date: 6-14-06

Present: Melvin Hutchins, Frank Hall

Who was involved: Frank Williams.

Witness (s): Catherine Long, Wesley, Tamekia Cook

Date of incident:

Where did it take place: line 3

When did it take place (time and day): 11⁰⁰ - 11⁰⁵?

What happened: Today on line 3 when I came back from second break, (Frank Williams had Relieved me.) I noted that the paperwork had not been done while I was on break, so I was catching up on the paperwork. Frank was re-loading the machine with labels. There was re-work in a box full of cans, and the table was over-flowing with cans with bad labels. When Frank reloaded the machine he went to walk away - I asked him to help with the re-work - (The audit was going on) He started yelling at me that he had better "mother fucking things to do than worry about that fucking re-work. He continued to holler at me, and I told him to quit yelling & cussing at me. At this time he went from inside of the line to the outside of the line. The entire time, yelling at me, Continued to yell mother fucker, God damn mother fucker, Throwing a large bag of cans, as he continued to yell and cuss at me - I continued to request that Wesley would please call for a supervisor, at this time Frank

Did this result in down time? NO If yes how much?

Did this result in product being scrapped? If yes how much? no

Attach an additional sheet if needed for witness statements following the same format.

was still yelling & cussing and I continued to ignore him. Donald Coty walked by and I requested that he please get a supervisor, please call Melvin Hutchins.

Finally Frank went on his way. When Melvin came I told him about the situation at hand. Catherine ~~[illegible]~~ Long was standing there and Wesley, and I honestly do not know who else. I ignored Frank Williams yelling God Damn mother fucker — whether he was calling me that name or just yelling it at me. Regardless — I won't take it again. No one else talks to me that way and he sure won't again. I don't have to tolerate that level of abusive language or name calling. Tameaka asked me later what was he drawing a fist about.

Also, stated to Catherine "Did I holler at Linda". She stated "yeah."

**DOCUMENTATION FORM**

Employee Name: Tameka Cooke

Investigating Supervisor: Chris Date: 6-15-06

Present:

Who was involved: Frank Williams + Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 label Machine

When did it take place (time and day): Before lunch

What happened: line 3 label machine messed up & we had bad labels on the work area & we cleaned some & when Linda got back from back some was left up there and she asked Frank what about this mess and Frank walked off saying curse words exact I don't know so Linda said something to him. ~~[illegible]~~ He threw his hands up & said fuck it and went threw the curtains. She was ignoring him but it was words still being said from him.

Did this result in down time? ______ If yes how much?

Did this result in product being scrapped? If yes how much?

PLAINTIFF'S EXHIBIT 3 Smothers

Attach an additional sheet if needed for witness statements following the same format.

# DOCUMENTATION FORM

Employee Name: Catherine Long

Investigating Supervisor: Chris Jordan Date: 6-15-06

Present:

Who was involved: Frank Williams and Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): Before 12:00 Noon

What happened: well Linda just had came from Brake and she asked Frank to help her clear off the table By Line 3 label machine. I hear Frank said the F word and I cant do every dam thing. that all I heard except he was doing alot of yelling and ext. ext. ext.

Did this result in down time? ______ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT 41 Smothers

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
CHRIS JORDAN

Commissioner:
Renny D. McNaughton
May 12, 2008
Dothan, Alabama

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Chris Jordan, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 12th day of May, 2008, commencing at approximately 2:30 p.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms. Robertson the original transcript of the

oral testimony taken the 12th day of May, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Robertson | 8 |

EXHIBITS

| Exhibit | Page |
|---|---|
| No. 5 | 31 |
| No. 6 | 38 |
| No. 7 | 40 |
| No. 8 | 41 |
| No. 9 | 42 |
| No. 10 | 45 |
| No. 11 | 47 |
| No. 12 | 47 |
| No. 13 | 49 |
| No. 14 | 52 |
| No. 15 | 60 |
| No. 16 | 63 |
| No. 17 | 73 |
| No. 18 | 76 |
| No. 19 | 78 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202
205-328-0480

FOR THE PLAINTIFF (S):
Ann C. Robertson
Temple D. Trueblood
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314-0500

Also Present:
Linda Thornton
Dee Lake

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 2:30 p.m. on the 12th day of May, 2008, Chris Jordan, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins videotape 1 in the deposition of Chris Jordan in the matter of Linda Thornton versus Flavor House Products, Inc., and Franklin D. Williams, case number 107CV-712-WKW, in the court of the U.S. District Court in the Middle District of Alabama Southern Division. We are on record at 2:34 p.m. on Monday, May 12,

2008, at the law office of Bobbie S. Crowe.

Would counsel please identify yourself and state whom you represent.

MS. ROBERTSON: I'm Ann Robertson and I represent the plaintiff.

MS. TRUEBLOOD: Tempest Trueblood and I represent the plaintiff.

MS. SWAIN: Jennifer Swain. I represent the defendant, Flavor House.

THE VIDEOGRAPHER: Would the reporter please swear the witness in.

(Witness Sworn.)

THE COURT REPORTER: Usual stipulations?

MS. SWAIN: Read and sign, please.

MS. ROBERTSON: Right. And can we still have the same stipulation or agreement about the kinfolks?

MS. SWAIN: Yes.

CHRIS JORDAN

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. ROBERTSON:

Q Will you state your full name, please, sir.

A Christopher James Jordan.

Q And how old a man are you, Mr. Jordan?

A 38 years old.

Q And where do you work?

A I work at Randall Food Group.

Q And for the benefit of not having to distinguish, I understand it's had several owners, but it's basically Flavor House; is that right?

A Yes.

Q So when I ask you how long you've worked at Flavor House, you know, we're just talking about the same company even though it may have had different owners; is that right?

A Yes.
Q Okay. How long have you worked for Flavor House?
A Approximately five years.
Q And when you were hired -- who hired you?
A I do not remember.
Q What were you hired as?
A Label machine operator.
Q And had you had any experience as a label machine operator prior to being hired five years ago?
A No, I had not.
Q Have you been given a level of machine operator proficiency? Do you know what I'm talking about?
A Please explain.
Q At some point people were assigned skill levels as to their jobs. Have you ever been given a skill level?
A That was before -- I meant -- sorry. I was label machine operator before that took place.

Q Okay. And when did that take place, if you will?
A Approximately three, four years ago. I do not remember the exact time.
Q Okay. So you were hired as a label machine operator. And how long did you hold that position before you became something else?
A Approximately one year.
Q And what happened after a year?
A After that I became a supervisor.
Q And how did you become a supervisor?
A I -- I assume on-the-job proficiency.
Q Did you apply for that job?
A I do not remember filling out an application for it at that time.
Q Do you -- do you recall anything about how it came about? Did somebody just come up to you and say, Chris, you're a supervisor, or do you remember how it happened?

A I do not recall.
Q And so how long did you hold the position of supervisor?
A Until December of last year.
Q December of 2007?
A Yes.
Q And then what happened?
A I became production scheduler.
Q And how did that come about?
A I had to apply online.
Q And how did -- was -- was -- how were you made aware that there was a job opening?
A There was postings at the plant.
Q Do you consider the production scheduler a lateral promotion or a demotion from supervisor?
A Lateral.
Q Do you make more money -- did you -- strike that.
Did you make more money at the time you became a production scheduler than you did as a supervisor?

A No, I don't believe so.
Q Do you make the same or about?
A Yes.
Q And when you say you were a supervisor, what was your title when you became a supervisor, just supervisor?
A Yes.
Q And who was your -- who was your direct boss?
A Melvin Hutchins.
Q And was that the way it was the whole time you were a supervisor?
A Yes, ma'am.
Q Were you ever evaluated, your performance evaluated, by Mr. Hutchins?
A Yes, ma'am.
Q Was it a written evaluation?
A Yes.
Q How many times would you say you were evaluated by Mr. Hutchins?
A Yearly, I believe.
Q Did you -- as a supervisor, did you evaluate anybody? And I -- I'm talking

about people or positions.
A We gave out the paper skills test.
Q Now, when did that happen?
A Whenever the individual requested to be tested.
Q At some point you said that three or four years ago there started being -- was it -- is that what's called pay for skills?
A Yes, ma'am.
Q And -- and was everybody tested at that point to determine what level they would be at?
A I do not recall in the beginning if everybody was tested.
Q Were people assigned skill levels at the time it was initiated?
A I believe they were assigned -- yes, I believe they were assigned in the beginning.
Q All right. And -- and how were they -- who -- who assigned them?
A I believe it was a -- a group

meeting with the superintendents and the supervisors.
Q Were you at the meeting?
A I believe so, yes.
Q All right. And tell me about that meeting, if you will, please, sir.
A I -- each label operator was discussed.
Q And?
A As far as what level that it was thought they should be.
Q Did -- and -- and -- the -- the people that were in this meeting, were there any females in that meeting?
A I believe Betty Brown was at that time.
Q Was she a -- a label op -- I mean what was her position?
A Supervisor.
Q Of?
A Production.
Q And did -- so you discussed each label operator and assigned them a skill

level; is that right?
A Yes, ma'am.
Q And -- and when they were assigned a skill level, did that -- could that affect their pay?
A Yes, ma'am.
Q And how would it affect their pay?
A Depending on what level they were at, it would depend on what level pay they received.
Q Do you recall what level Linda Thornton received?
A No, ma'am. I don't believe I was her supervisor at that time.
Q Do you recall -- who would have been her supervisor?
A Fanny Ash, I believe.
Q Well, who decided what -- would Melvin Hutchins be the ultimate decider of who got what skill level?
A I believe it would be dependent upon him and Fanny Ash.

Q Well, what were the criteria for the skill level estimations?
A I -- without them in front of me, I cannot recall.
Q Is there a written criteria?
A Yes, ma'am.
Q And where did you see the written criteria?
A Once it started, we were each given a copy of the criteria for each one.
Q By whom?
A I believe I helped type it up, but ultimately by the superintendent.
Q And who was that?
A Melvin Hutchins.
Q Do you recall what the criteria were -- was?
A No, ma'am.
Q Well, in order to -- to get -- what were the -- what were the levels, one through what?
A One through four, I believe.
Q And -- and did -- in order to get

a four, did one have to take a test?
A Yes.
Q Everyone had to take a test?
A Each level had a test, brand or skill.
Q So if -- if I were to look at, say, Frank Williams, he was a label operator at one time; right?
A Yes, he was.
Q So I am going to find a skill level test in there for him; right?
MS. SWAIN: Objection.
A Depending upon when he was a label operator if he would take the test.
Q Well, as a team leader, was he still considered a label operator?
A He could operate a label machine.
Q Well, was he assigned a -- a skill level?
A Not that I'm aware of.
Q Well, did you assign anybody any skill levels?
A I did not assign -- I do not

assign the skill levels. After they take the test, then they would be given that skill.
Q So are you telling me that if I look in -- in a label operator that's a man's, I'm going to find skill level tests?
MS. SWAIN: Objection.
A If they are a label machine operator after the test was given, yes, you should find a skill level test.
Q I'm talking about at the -- at the get-go when y'all had the meeting and decided who was going to get what skill level.
A Not at that time. Not at the beginning.
Q So there were skill levels assigned to men without them taking the test; is that right?
MS. SWAIN: Objection.
A As I stated, they were assigned in the beginning.
Q Okay. Well, do you remember

Linda Thornton having an appeal of her skill level assignment?
A I do not recall.
Q Do you know how -- how long Linda had been a label operator at the time she got assigned a skill level?
A No, I do not.
Q But were you -- were you supervising some label operators at the time they got assignments?
A Yes, ma'am.
Q Did you have any -- did you make any recommendations as to skill levels at that meeting?
A Yes, I did.
Q Can you remember anybody's name?
A Not at that time, no, ma'am.
Q You mean not -- not now that you can remember?
A No.
Q Tell me what the criteria for skill levels were.
MS. SWAIN: Objection. Asked and

answered.
A Again, I -- I do not remember that.
Q Well, in order to get, say, a level four, did you have to have trained someone else on a label machine?
A I believe so, yes.
Q And in order to train someone else on a label machine, you would expect them to at least have been a -- a level three themselves; right?
MS. SWAIN: Objection.
A Without them -- without it in front of me, I cannot answer that question.
Q Without do what?
A Without the pay for skills in front of me, I cannot answer that question.
Q Well, have you ever known anybody to be able to train a operator who wouldn't have been a level three?
MS. SWAIN: Objection.
A Repeat that again, please.
Q Have you ever put somebody to

train a operator that wouldn't have been at least a label -- a level three skill?
MS. SWAIN: Objection.
A I do not recall.
Q Now, in the five years that you have been at Flavor House, have you ever received any training on how to investigate a complaint by an employee?
A Not to investigate.
Q All right. Have you ever investigated a complaint by a employee?
A That would be handled -- investigate a complaint?
Q Yeah.
A Yes. I have filled out documentation forms.
Q Okay. And -- and -- and when you say you filled out documentation forms, what would be the reason for you filling out documentation forms?
A If an employee come to me and had a complaint, we would fill out a documentation form.

Q All right. And what would be the purpose of filling out the documentation form?
A To turn it over to HR for them to investigate.
Q All right. So you -- have you ever participated in any investigation of a complaint?
A No more than filling out the documentation forms.
Q Of just the complainer or of other people?
A Of other people as well.
Q All right. So what would be the reason for you filling out the documentation forms of other people after you --
A To turn in -- to turn in to HR.
Q Would you do the -- would you do the filling out of the documentation before you would go to HR or after you would go to HR?
A Both.
Q Well, tell me the procedure for

investigating a complaint that you learned.
MS. SWAIN: Objection.
A Again, I would -- I do not investigate the complaint. That would be done by HR.
Q Well, you don't consider it investigating to take statements of alleged witnesses?
A I consider that documentation forms.
Q All right. Well, look at Plaintiff's Exhibit Number 1. Do you recognize that, please? This is one of -- we started at Ricky Smothers' deposition.
(Witness reviewing document.)
Q What is that, please, sir?
A Documentation form.
Q And did you have anything to do with that documentation form getting filled out?
A I don't know. My name is not on it as supervisor.
Q Well, is there any supervisor's

name on there?
A No, ma'am.
Q Well, look at Plaintiff's Exhibit Number 2 and -- and tell me what this is, Plaintiff's 2 to -- that we started with Ricky Smothers. Now, does that have your name up there?
A Yes, ma'am.
Q Do you remember that one?
A Let me read over it first, please.
(Witness reviewing document.)
A Okay.
Q Did you have anything to do with Plaintiff's Exhibit Number 2?
A Yes.
Q What did you have to do with it?
A As far as taking and writing down or giving the documentation form for Linda to state what happened.
Q All right. Well, how -- do you recall how it came about that you gave her the documentation form?

FREEDOM COURT REPORTING

A No, ma'am.
Q Do you -- was that part of your job?
A Yes, ma'am.
Q What, to give out documentation forms?
A Yes, ma'am.
Q Do you recall what you did once you took -- gave out the documentation form to Linda?
A I would have gave this to the HR department.
Q And then what?
A It was in their hands from there.
Q Okay. Well, let's look at Plaintiff's Exhibit Number 3 to your deposition.
MS. SWAIN: Do you have an extra copy of 3 and 4?
MS. ROBERTSON: I thought I gave --
MS. SWAIN: No. I just got 1 and 2.

MS. ROBERTSON: I'm sorry. I believe I've got extra copies somewhere.
Q Plaintiff's Exhibit Number 3, have you ever seen that before?
MS. SWAIN: Is 3 Tamekia Cook or Catherine Long?
MS. ROBERTSON: Tamekia Cooper. I mean Tamekia Cook. Excuse me.
A Yes, ma'am.
Q Did you have anything to do with Plaintiff's Exhibit Number 3?
A Yes, ma'am.
Q And -- and what did you have to do with it?
A I gave this to Tamekia Cook for her to fill out.
Q Well, did you -- you just walk up to Tamekia and say, Here's a piece of paper, fill it out?
A I would have gave her some reference to what it was for.
Q Well, do you remember that?
A Not exact words.

Q Well, tell me what you -- what you think you told her.
A I would have asked her to fill out a documentation form for incident.
Q What incident?
A Related to Frank Williams and to Linda Thornton.
Q Would you have asked her any questions?
A I would have asked if she would have seen something or heard anything that would have dealt with this incident.
Q Well, anything more specific than did you hear or see anything that dealt with this incident?
A No, ma'am.
Q Would you have described the incident?
A No, ma'am.
Q So you would have just said, Give me the information that you have about this incident; is that right?
A Yes.

Q Would you have asked her where she was during the incident?
A No. I do not believe so.
Q Would you have asked her whether she could see the two individuals during whatever she was reporting?
A No.
Q So you just said, Here, fill this piece of paper out. How would you have chosen Tamekia Cook for Plaintiff's Exhibit Number 3?
A She would have been somebody on that line at that time.
Q Well, do you know if somebody gave you her name?
A On this documentation form, it states Tamekia asked me later what was had in it or what was the fight about.
MS. SWAIN: Reference, if you would, Chris, the -- the document you're speaking of.
THE WITNESS: Plaintiff's Exhibit 2.

Q So you got Tamekia Cook's name from the incident report that Linda Thornton made to you?
A Yes.
Q Is that right? Look at Plaintiff's Exhibit Number 4 and tell me what your role in -- if you had any role in this.
(Witness reviewing document.)
A Okay.
Q Did you?
A Yes.
Q And -- and did you do the same thing in the case of Ms. Long, you just handed her a piece of paper and said, Here. Do you know anything?
MS. SWAIN: Objection.
A I said of -- I would have referenced the incident from the documentation form from Linda Thornton.
Q When you say you would have referenced it, what would you -- how would you have referenced it?

MS. SWAIN: Objection. Asked answered. You can go ahead.
A Would you repeat your question, please?
Q You said you would have referenced it based on Plaintiff's Exhibit Number 2. What -- how would you have referenced it?
A If she had witnessed the incident between Frank Williams and Linda Thornton.
Q Would you have asked her anything else besides that?
A No.
Q You just said, Write what you -- what -- if you witnessed the incident.
A Yes.
Q Would you have asked her where she was during the incident?
A No.
Q Would you have asked her what she could see or didn't see?
A No.
Q You just said, Here, fill this

out?
A Yes, ma'am.
Q Do you know if you did -- if you asked Tamekia Cook and Catherine Long -- well, strike that.
When did you ask them to fill that documentation form out?
A I believe it was the 15th.
Q Did you do that pursuant to anybody's instructions or request?
A I do not recall.
Q Do you recall talking with anyone else?
A I believe I asked the -- Wesley McGinnis, but he stated he did not hear or see anything.
(Plaintiff's Exhibit Number 5 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Did -- well, I'll show you what's been marked as Plaintiff's Exhibit Number --
MS. SWAIN: 5.

MS. ROBERTSON: I'm looking for the notebook. We had -- the tabs got into the --
Q Plaintiff's Exhibit Number 5. Did you take that statement from -- from Mr. McGinnis?
A Yes, ma'am.
Q Is Mr. McGinnis a supervisor?
A No, ma'am. He is a maintenance mechanic.
Q Did you ask -- did you ask Mr. McGinnis where he was standing?
A No, ma'am.
Q Did you ask him what he could see?
A No, ma'am.
Q Did you ask him about any specifics that were in Linda's complaint other than did you see the incident between Frank and Linda?
A That's all.
Q Did you have -- but you didn't -- you didn't take the statement from

Mr. Williams; is that right -- what you're telling me?
MS. SWAIN: Objection.
Q Remember, it didn't have your name on it, Plaintiff's Exhibit Number 1.
A I'm not sure if I did or not.
Q Well, would you -- would you have under ordinary circumstances taken the statements of everybody but the accused?
MS. SWAIN: Objection.
A Repeat that, please.
Q Plaintiff's Exhibit Number 1, Mr. -- Mr. Williams is the person that Linda Thornton made the complaint against; correct?
A Yes.
Q Would you -- in conducting an investigation, would you have conducted the -- given the documentation forms to everybody but the accused?
MS. SWAIN: Objection.
A Normally, I would give it to everybody.

Q All right. Do you -- do you see on Plaintiff's Exhibit Number 1 anywhere where Mr. Williams says he used curse words, the F word or damn or any of the other words that Ms. Thornton said he used?
A I don't see any reference to cuss words, no.
Q All right. Do you know if anybody asked him if he used any curse words?
A I'm not sure. I did not.
Q You're now sure that you did not ask him about the incident?
MS. SWAIN: Objection to the characterization.
Q Or are you just saying that you didn't ask him specifics?
MS. SWAIN: Objection.
Q I mean, I'm just -- I'm just trying to find out if you were trying to investigate the -- what Ms. Thornton said happened and -- and Mr. Williams did not address whether or not he cursed her. Would

you have asked him specifically?
MS. SWAIN: Objection.
A The documentation forms would have been turned over to the HR department.
Q Is that a -- is -- are you telling me that no, you wouldn't have asked him if he had just given you a piece of paper that didn't address the issue?
MS. SWAIN: Objection.
A Again, the documentation forms would have been turned over to the HR department for the investigation.
Q So those -- so the documentation forms were not part of the investigation?
A I'm not part of the investigation. You would have to address that to Leigh.
Q Well, you see where it says Chris Jordan on Plaintiff's Exhibit Number 5? What does it say that you are?
A Investigating supervisor.
Q Okay. And on Plaintiff's Exhibit Number 2 where it says investigating

supervisor, whose name is up there?
A Chris Jordan.
Q So -- but your position is you weren't doing any investigating?
MS. SWAIN: Objection. That's not what his testimony was.
A We would fill out the documentation forms and turn them over to the HR department.
Q To what end? Why are you having those documentation forms filled out?
A You would have to address that with the HR department.
Q So you had them filled out but you didn't know why they were being filled out?
A They were being filled out for the HR department to look into the incident.
Q Okay. Do you know what happened as a result of those documentation forms being filled out?
A No, ma'am, I do not.
Q Were you asked to revisit anyone

and ask them more specific questions after you turned them in to HR?
A Not that I recall.
Q Do you know what happened as a result of Linda Thornton's complaint against Frank Williams in this case?
A No, I do not.
Q So were you in fact a supervisor of Mr. Williams at the time?
A Yes.
Q Were you in fact a supervisor of Ms. Thornton at the time?
A Yes, I was.
Q And you weren't told what had happened?
A Not that I recall.
Q So if -- if he was disciplined for doing something, you wouldn't be aware of it?
A If I was given the -- the disciplinary action form to have completed, that would be my knowledge of it.
Q What -- what would be the

disciplinary form we're talking about? Is there a form that he would have been given?
A Yes.
(Plaintiff's Exhibit Number 6 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q I'll show you what's been marked as Plaintiff's Exhibit Number -- it will be 6 if I can quit losing those little tabs.
MS. SWAIN: Do you have an extra one of those?
MS. ROBERTSON: Sure.
Q Plaintiff's Exhibit Number 6. Now, what is this, please, sir?
A First time I've seen it.
Q Okay. It says resolution. Frank Williams was given a disciplinary warning. Linda Thornton was moved to line five label operator. Were you aware that she was moved to line five?
A Yes.
Q How did you become aware of that?

A I actually took her to line five label machine.
Q Were you aware that Frank Williams was given a disciplinary warning?
A No.
Q Well, what did you tell Ms. Thornton was the reason she was being moved to line five?
A I had been instructed to move her to line five.
Q By whom?
A I believe it was Melvin Hutchins.
Q Do you know if Frank Williams was written up again for cursing at a woman about a month later?
A Repeat that question, please.
Q Do you know if Mr. Williams was written up about a month later for cursing at Jonnie?
A I do at this time, yes.
Q Okay. And how did you become aware of that?
A I -- I do not recall.

Q You don't recall how you became aware of it?
A No.
Q Did you have anything to do with getting documentation forms filled out in that incident?
A I may have.
Q Were you asked to make any recommendations about how he -- how Mr. Williams should be disciplined?
A That was not -- that was for the HR department to decide.
Q So that would have been Mr. Nance?
A I believe he was there at the time, yes.
(Plaintiff's Exhibit Number 7 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Okay. Plaintiff's Exhibit Number 7, have you seen this, please, sir?
(Witness reviewing document.)

A I do not remember this e-mail.
(Plaintiff's Exhibit Number 8 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Well, let me show you this. You -- this, Plaintiff's Exhibit Number 8.
(Witness reviewing document.)
A Yes, ma'am.
Q What is that, please, sir?
A That's an e-mail to Leigh Allums in payroll about the passing of a pay for skills test.
Q And who's the e-mail from, sir?
A Me.
Q All right. And do you know if you gave Ms. Thornton some skill test as a result of Plaintiff's Number 7?
A It says that she has passed the first three levels, yes.
Q Okay. Can you -- so now do you remember that she appealed her being assigned a level one operator?

A I do not remember seeing this. I didn't know if it came from me or went straight to somebody else in HR.
Q Okay. Well, did you know at some time that she had been given a -- given a level one operator assignment?
A According to this, she has, yes.
Q All right. And -- and -- and tell me, do you know how long she had been an operator at the time she was given level one?
A No, I do not.
(Plaintiff's Exhibit Number 9 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Well, let's look at Plaintiff's Exhibit Number 9. What's the date on that?
A 4/22/02.
Q And do you know that Linda Thornton's maiden name is Parrish?
A Yes.
Q And do you see that it says that

she was holding a job title of label operator?
A Yes, ma'am.
Q And do you see down there Ms. -- Melvin Hutchins' signature?
A Yes.
Q On 3/11/02?
A Yes.
Q And do you see where it says she had become a complete operator; she does a good job and listens very well?
A Yes.
Q So in '02 she was a complete label operator; correct?
MS. SWAIN: Objection.
Q According to Mr. Hutchins.
A According to Mr. Hutchins.
Q Do you have any idea how she got an assignment of a level one operator in 2006?
MS. SWAIN: Objection.
A Repeat your question, please.
Q Do you have any idea based on --

on the fact that Mr. Hutchins thought she was a complete operator, label operator, in 2002 and he was the person leading the group of assigning levels, how Ms. Thornton would have gotten a level one operator in 2002?
MS. SWAIN: Objection.
A When this was dated, 3/11/02, we had no pay for skills test at that time. I'm not sure what has transpired from '02 to '06.
Q Well, did you -- were you apprised of that when y'all were having this meeting about how to assign the levels?
A I was --
MS. SWAIN: Objection.
A At the time, Linda did not work for me. She worked for Fanny Ash.
Q My question is, when y'all were having the discussions in the meetings and Mr. Hutchins was there, the superintendent, did y'all discuss how you would assign skill levels?
A I do not recall.

Q Well, what was the purpose of the meeting, sir?
A Discussion of the label operators and pay for skills.
Q And -- and what did y'all discuss?
A Their skills as a label operator.
Q Was Mr. Cassady in that meeting?
A I do not recall.
(Plaintiff's Exhibit Number 10 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Because look at Plaintiff's Exhibit Number 10, please, sir. This is dated November of '02. What is that?
MS. SWAIN: Can I get a copy of that, please?
MS. ROBERTSON: I thought I just gave it to you. I'm sorry. Here it is.
A Personnel action notice.
Q That's in November of '02; right?
A Yes.

Q And she was a label operator, filler operator in '02 working for Bruce Cassady and Melvin Hutchins; right?
A That is correct.
Q Now, before she was given a level of four, she had to take tests, did she not?
A Yes.
Q Why?
A To go from a level one to a level two, you must take a test.
Q But why was she given a level one when she had been being a full and complete operator since November of '02?
MS. SWAIN: Objection. Ann, he's answered that question repeatedly to the best of his ability and told you he wasn't the one that made the decision.
MS. ROBERTSON: But he was there when the decisions were made; right?
A Yes.
Q And -- and when you received the appeal, who made the decision that she would have to take tests. When you received

Plaintiff's Exhibit Number --
MS. SWAIN: 7.
Q -- 7 appealing her getting an 01, a level one, who was the one who decided she had to take tests?
MS. SWAIN: Objection.
A I'm not sure.
Q Well, did you -- did you hear anybody decide she had to get -- take tests?
A I'm not sure.
(Plaintiff's Exhibit Number 11 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number --
MS. SWAIN: 11.
Q -- 11. Have you ever seen this, please, sir?
(Witness reviewing document.)
A The first time I've seen that.
(Plaintiff's Exhibit Number 12 was marked and attached to the deposition.)

BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 12. Is that your signature there, please, sir?
MS. SWAIN: Can I have a copy, Ann?
MS. ROBERTSON: Sure.
A Yes, ma'am.
Q Do you recall authorizing Linda Thornton to go home because of blood pressure problems in April of '06?
A I don't -- don't recall other than this is my signature for this vacation request.
Q Have you ever sent Linda Thornton to get her blood pressure taken?
A I believe we've had to take it at the plant on one occasion, maybe twice. I'm not sure.
Q And -- and how -- did -- did you take it or did someone else take it?
A I do not recall.
Q Do you recall how that came about, you had taken her blood pressure?

A No, I do not.

(Plaintiff's Exhibit Number 13 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q Plaintiff's Exhibit Number 13.

MS. ROBERTSON: I just covered up the copy.

Q Have you ever seen that before, please?

A Yes.

MS. TRUEBLOOD: Is that the same one that he has? I'm just asking because there's unmarked copies in there.

MS. ROBERTSON: Yeah.

Q It says, I spoke with Linda Thornton today about missing work and not being on the line due to her medical problem. Are you talking about her blood pressure?

A I do not recall what I referred to as her medical problem.

Q Well, look at Plaintiff's Exhibit Number 12, which is dated the same date. Maybe not. Yeah, it's the same date as the memo.

A Yes, I approved it on the same day.

Q And so was it the -- the blood pressure problem that you were discussing with her?

A Could have been. I don't remember.

Q Do you recall that she started having blood pressure problems after having complained to you about Frank Williams and -- and she said she would just not talk to him anymore?

MS. SWAIN: Objection.

Q Just -- just take his abuse?

MS. SWAIN: Objection.

A Could you repeat that, please?

Q Do you recall her having blood pressure problems after -- after having talked to you about Frank Williams?

A She had blood pressure problems. I'm not sure what they were from.

Q Do you recall having a conversation first with her about the problems that she had with Mr. Williams before April of '06?

MS. SWAIN: Objection.

A Can you repeat that, please?

Q Do you recall having any conversations with Ms. William -- I mean with Ms. Thornton about having problems with Mr. Williams and the way he talked to her prior to April of '06?

A Not that I recall.

Q Were you in a counseling meeting with Ms. Thornton in January of '06 where you also told Mr. Williams he needed -- that they needed to work on their dispute resolution? That is him screaming at her about the way she did her work.

MS. SWAIN: Objection.

A I don't recall that, no.

MS. ROBERTSON: I don't know, but I -- I only seem to have one copy of this. I must have shown it --

MS. SWAIN: Let me tell you what --

MS. ROBERTSON: Let me show it to you.

(Plaintiff's Exhibit Number 14 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q Plaintiff's 14, what is that, please, sir?

A That's another documentation form.

Q How did that documentation form come about?

A From the incident on February 16th.

Q In fact, did not Linda Thornton approach you and Mr. Hutchins and say Frank Williams has come up to me and said I'm telling people he's a sex -- a child molester and I want to report it?

A That's what it looks like, yes.
Q Okay. And -- and she said he's doing this after I had conversations with Melvin Hutchins about problems with Frank and line three work situations. Did you ask Mr. Hutchins what -- what kind of conversations he had had with -- with Ms. Thornton about Frank Williams?
A Not that I recall.
Q So you don't know what the conversation was with Mr. Hutchins?
A Not that I recall, no.
Q But what did Ms. Thornton -- when you made this documentation, what did Ms. Thornton want you to do about the fact that he was going around telling other people -- telling her that she was telling people he was a child molester?
A I don't recall.
Q What did you do?
A I turned this over to the HR department.
Q Now, did you do anything after

that relative to this situation?
A Not that I recall.
Q Is that your handwriting down at the bottom where it says Plaintiff's Exhibit 14, Mike Beard present in smoking area?
A No, ma'am. That does not look like my handwriting.
Q Do you know if -- did -- did Ms. Thornton tell you that -- anything about what Ms. Williams -- Mr. Williams was talking about when he said that she was going around telling people he was a child molester?
A Can you repeat that, please?
Q Did she tell you anything about the situate -- the circumstances around -- surrounding what Frank Williams was complaining about when he came to her and said she was telling people he was a child molester?
A Not that I recall.
Q Frank Williams is a child molester, is he not?

A That's what I've heard, yes.
Q In fact, he pled guilty to having deviant sexual intercourse with a 10 year old, did he not?
MS. SWAIN: Objection.
A I do not know the details.
Q And he pled guilty to having sexual intercourse with a 13 year old, did he not?
MS. SWAIN: Objection.
A I do not know the details.
Q Do you know he went to prison for four years?
MS. SWAIN: Objection.
A I do not know the details of it.
Q Do -- do -- do you know now that he went to prison for four years?
MS. SWAIN: Objection.
A Only what you've just told me.
Q Nobody has told you before?
A No, not that I recall.
Q Did you do any investigating at the time when he was saying that Linda

Thornton was saying he was a child molester to see if in fact he was in fact a child molester?
MS. SWAIN: Objection.
A The HR department received the documentation form.
Q So the answer to that is you -- did you do any investigation about whether or not Frank Williams was in fact a child molester?
A No more than filling out the documentation form.
Q Did you have any conversations with the HR people? I'm assuming we're talking about Tommy Nance.
A Yes.
Q What, do you just take the piece of paper and take it up to Mr. Nance and just give it to him?
A I would give it to a member of the HR department.
Q And anything else?
A No.

Q Did you -- did you ask Ms. Thornton why she was reporting this particular thing to you and Mr. Hutchins?
A Not that I recall.
Q Do you think that she was trying to tell you that she thought he was retaliating against her because she had discussed with Mr. Hutchins matters involving him previously?
MS. SWAIN: Objection.
A Not that I recall, no.
Q Did you have any conversation as to why she wanted to fill this -- why you had her fill this form out?
A Repeat that, please.
Q Well, I mean, you give her this piece of paper to fill out; is that right?
A Yes.
Q Were you just talking around and apropos of nothing handing out pieces of paper that said documentation form?
MS. SWAIN: Objection. He's already testified as to why he asked her

to fill out the form.
Q Well, why did you?
MS. ROBERTSON: Excuse me. I missed that.
Q Why did you ask her to fill out the form?
A She stated there was an incident and it was documented.
Q All right. What -- what did she -- what else -- did she just say there was an incident?
A I do not recall exact -- exactly what she said.
Q Did you make any notes about what she said to you when she came to you and said there was an incident involving Frank Williams?
A Nothing other than this documentation form.
Q So you didn't make any notes. You didn't ask any questions. You didn't try to delve into what her complaint was. Is that right?

MS. SWAIN: Objection.
A The documentation form was completed and turned in to HR.
Q And that's all that you did was hand her a piece of paper?
MS. SWAIN: Objection.
Q Is that right?
MS. SWAIN: Objection.
A A documentation form was completely filled out.
Q What did you ask her to do in terms of filling out the documentation form?
A Please explain.
Q Did you -- when you -- when she came up and -- was it you and Mr. Hutchins that she was talking to or was it just you?
A It says Melvin Hutchins was present.
Q Okay. So she comes up to you and Mr. Hutchins in the hallway of production. And what does she say?
A Apparently, there was an issue between her and Frank Williams.

Q No. I didn't ask you what apparently. I said what did she say to you?
A I do not recall.
Q Did you make any notes?
MS. SWAIN: Objection. He's already answered that.
A Nothing other than this documentation form.
Q And then when she filled it out, what, if anything, did you do?
A Turned it over to the HR department.
Q Okay. And that's all you did. You didn't talk to the HR department?
A Not that I recall.
Q Did Ms. Thornton complain to you again about something that had to do with Mr. -- Mr. Jordan -- I mean Mr. Williams and -- and the child molester incident?
MS. SWAIN: Objection.
A Repeat that again, please.
(Plaintiff's Exhibit Number 15 was marked and attached to the

deposition.)
BY MS. ROBERTSON:
Q Well, look at Plaintiff's Exhibit Number 15.
(Witness reviewing document.)
A What was your question again, please?
Q What is Plaintiff's Exhibit Number -- what did I number that?
A 15.
Q All right. Did you have anything to do with this?
A Yes. It looks like I was the supervisor.
Q Okay. And is -- is any of that your handwriting?
A The date of incident and who was involved looks like my handwriting, those four or five lines there.
Q So the date of incident, Linda was told 2/28/06, what is that talking about? Is that when she said that the threats were made?

A I do not recall.
Q But that's your handwriting?
A Yes.
Q And where it took place, is that your handwriting?
A Yes.
Q And it said, When did it take place? And you've got, After work. Is that right?
A Yes.
Q So you must have asked her some questions in order to fill those little blanks out, did you not?
MS. SWAIN: Objection.
A I can't recall.
Q Well, did you do anything to -- to memorialize what -- why you -- she came to you?
A I had her fill out the documentation form.
Q Did you ask her what the threats and comments were?
A I don't recall.

Q Can you tell me why you would ask her when it happened, where it happened and -- and not ask her what the comments were?
MS. SWAIN: Objection. He didn't testify that he asked her when it happened and where it happened.
MS. ROBERTSON: Well, he -- that's his handwriting.
Q Did someone else ask her and you just wrote it in?
MS. SWAIN: She could have just shared it.
A I do not recall.
Q Did you do anything after you received Plaintiff's Exhibit Number 15 other than just hand it to HR?
A Not that I recall.
(Plaintiff's Exhibit Number 16 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Did you ever -- Plaintiff's

Exhibit Number 16, what is that, please, sir?
(Witness reviewing document.)
A That's another documentation form.
Q Okay. How did -- how did this documentation form come about? Did you approach Mr. Williams about the complaints that Ms. Thornton had made to you that's contained in Plaintiff's Exhibit Number 14?
MS. SWAIN: Objection.
A Can you repeat that question again, please?
Q Well, how did Plaintiff's Exhibit Number 16 come about?
A I'm not sure. I'm not sure why -- how it came about as far as why we started the documentation form.
Q Well, you said -- you said that Linda came up to you and -- and -- and said she want -- that -- said that she wanted to complain about something that Mr. Williams did, and you told her to fill out

Plaintiff's 14; is that right?
MS. SWAIN: Objection.
A I do not recall whose was first as far as documentation form.
Q Well, did you not make any kind of notation that -- that -- that -- who came first?
A I don't see anything on there, no.
Q Well, do you know if you -- if you approached either one of them and asked them for their -- their version after you received the complaint from the other?
A Repeat that again, please.
Q Well, you see, it looks like -- but, you know -- on Plaintiff's Exhibit Number 14 that Ms. Thornton came to y'all and complained that Mr. Williams had come up to her and said people were saying that she had called him a child molester; is that what -- right?
A Please, again.
MS. SWAIN: I'm going to object

to the characterization.
Q Well, is that -- that's what you said before; right?
MS. SWAIN: Objection.
A I do not remember.
Q Well --
MS. SWAIN: That's not what he said before.
Q And you said that I just took it up to HR. Is that what you said?
A After they're completed, yes, I take them to HR.
Q And now it looks like on Plaintiff's Exhibit Number 16 you talked to Mr. Williams about this allegation; correct?
A On the 16th, yes.
Q Did -- did -- did he come up to you also and make that complaint or did you go back to him based on something HR told you or how did you end up having two of these things on the same date with your name on them --
MS. SWAIN: Objection.

Q -- if all you do is take it to HR?
MS. SWAIN: Objection. He's already answered that question.
A I do not recall which came first.
Q Well, down here on Plaintiff's Exhibit Number 16, Mr. Williams' documentation, he says, Jewel Sidely came up to me in the hallway and told me that Linda Thornton was outside telling everyone that I was a child molester and my brother's wife's daughter was my girlfriend. This is harassment and I don't like it. I don't start trouble. What happened 15 years ago is none of her business.
So Mr. -- Mr. Williams is -- is confessing to being a child molester. He just says because it happened 15 years ago, it's not a problem. Isn't that what he's saying?
MS. SWAIN: Objection.
A That is his statement.
Q Right. And so he's saying I'm a

child molester but it happened 15 years ago so she should -- it shouldn't be any of her business. Isn't that right?
MS. SWAIN: Objection.
A Again, that's his statement.
Q So at that point, you knew Mr. Williams was a child molester because he told you so in Plaintiff's Exhibit Number 16; right?
MS. SWAIN: Objection.
Q Isn't that right?
A It was turned over to the HR department.
Q Do you know if Mr. Williams was fired for being a child -- or asked to resign for being a child molester?
A I was not there for that.
Q Well, were you talked to about maybe having to escort him if -- when he was asked to resign?
A Repeat that again, please.
Q Were you ever talked to by Mary Ann Boyer about having to take Mr. Williams

out if -- if he was asked to resign?
A I don't believe so.
Q Okay. So do you know that Mr. Williams was asked to resign?
MS. SWAIN: Objection.
A I do know -- I know he no longer works there.
Q Do you know he was asked to resign?
MS. SWAIN: Objection.
A I do not under -- I do not recall why he was no longer employed.
Q Okay. But you knew somebody knew. HR knew because he confessed to it on February of '06 that he was a child molester. He just did it a long time ago; right?
MS. SWAIN: Objection. You don't have to answer that. I mean, she's just arguing with you.
Q Well, did -- when you read that, what was your reaction to Plaintiff's Exhibit Number 16?

A I took it to the HR department.
Q You didn't have any reaction?
A I don't recall at this time what my reaction was.
Q Are you having problems with your memory, Mr. Jordan? Did you get a good night's sleep?
MS. SWAIN: Objection.
A Yes.
Q Are you any -- on any medication that would affect your memory?
A No.
Q Do you have a lot of people reporting to you on a regular basis that they're child molesters but it -- they -- nobody should worry about it because it happened a long time ago?
MS. SWAIN: Objection.
Q Sir?
A Can you state that again, please?
Q I said do you have a lot of people at Flavor House admitting that they're child molesters except that they

don't think it's anybody's business because it happened a long time ago?
MS. SWAIN: Objection.
Q Is that something -- a regular thing that happens? Have you got a lot of child molesters out there?
MS. SWAIN: Objection.
Q Sir?
A No.
Q Okay. But you -- you kept one from 2006 to when did Mr. Williams resign?
A I'm not sure.
Q Did -- did Ms. Thornton ever tell you she was afraid of Mr. Williams?
A Not that I recall.
Q Would you have been afraid of a child molester working among you?
A Repeat that again.
Q Would you -- did you like it having a child molester working among you?
A I don't remember having an opinion on that.
Q Do you know that he went to

prison for four years?
MS. SWAIN: Objection. You've already been through that with him, Ann.
Q Do you know that now?
MS. SWAIN: He's already testified that he does from your questions. The only way he knows is from --
MS. ROBERTSON: Oh, okay.
MS. SWAIN: So we don't need to keep going over it.
MS. ROBERTSON: All right.
BY MS. ROBERTSON:
Q What -- what line is jar line? Can you tell me what a label operator on the jar -- what are the jar lines?
A Lines one and two.
Q Do you know if Ms. Thornton ever worked at line one or two?
A Yes.
Q When did she work on line one?
A That's where she was the majority of the time when she worked for Fanny Ash.

Q Okay. So -- what about a can line? Has she ever worked on a can line?
A Yes.
Q When did she work on a can line?
A I don't recall exact dates, but that's whenever I was her supervisor for line three.
Q Okay. Was it before the -- the skill test?
A The --
Q What -- that she had to take the skill test? What is Plaintiff's Exhibit --
A I believe she was on line three when she took the skills test.
Q Do you know how long she had been on that?
A I do not remember.
Q Was it -- was it like a year?
A Possibly.
(Plaintiff's Exhibit Number 17 was marked and attached to the deposition.)

BY MS. ROBERTSON:
Q What is Plaintiff's Exhibit Number 17?
MS. SWAIN: Can I get a copy of Exhibit 17?
MS. ROBERTSON: Sure.
MS. SWAIN: Thank you.
A It's a can line test for a label operator.
Q Okay. Now -- and that was given to her on May of '06?
A Yes.
Q And how long do you think she had been working on the can line under your supervision in May of '06?
A I do not know right now.
Q If she couldn't have operated the line, you would have fired her, would you not?
MS. SWAIN: Objection.
Q I mean, you wouldn't have a label operator who couldn't do the job, would you?
MS. SWAIN: Objection.

A I'm sorry. Repeat your question.
Q Well, what does a label operator do?
A Operate a label machine on the line.
Q Okay. And if somebody can't do -- the labels are important in this business, aren't they?
A Yes.
Q And so you wouldn't have somebody working over a year on the can line if she couldn't do the job, would you?
MS. SWAIN: Objection.
A They would have -- if they couldn't do the job, there would have been disciplinary actions to go with it.
Q And -- and you would have been the one who gave the disciplinary action?
A If it occurred on my line, yes.
Q Did you -- and -- and if it was -- if she couldn't do the job, you would fire her, wouldn't you?
MS. SWAIN: Objection.

A I wouldn't. The HR department might.
(Plaintiff's Exhibit Number 18 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 18, what's that?
A It's a label operator test for the jar line.
Q Were you there in June of '04?
A I believe I was.
Q What were you doing in '04?
A I do not recall if I was a label machine operator or a supervisor.
Q Were you there when somebody threw peanuts at -- a jar of peanuts at Linda Thornton?
MS. SWAIN: Objection.
A I don't recall.
Q Can you think of any reason why somebody -- that would justify somebody throwing a jar of peanuts at another line

worker?
MS. SWAIN: Objection.
A No.
Q Would you consider that dangerous?
MS. SWAIN: Objection.
A Yes.
Q Are you -- I need to ask you. Do you curse, Mr. Jordan? I mean, some people do some. Some people don't.
A Yes.
Q If somebody threw a jar of peanuts at you on the line, would you curse them?
MS. SWAIN: Objection.
A I'd have to be in that situation. I don't know.
MS. ROBERTSON: I don't know if I have more than one copy of this. I should, though.
Q I am going to show you this except I don't seem to know where my copies are. Plaintiff's --

MS. ROBERTSON: Is it over there?
(Plaintiff's Exhibit Number 19 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 19. What is that, sir?
A It's an e-mail from me to Leigh Allums.
Q Read it, please, sir.
A Excuse me?
Q Read it, please, sir.
A Out loud?
Q No. To yourself unless you just want to hear your voice.
MS. SWAIN: Ann, there's no call to be ugly to him.
MS. ROBERTSON: I'm not being ugly. I'm just saying. I don't have a copy and you don't have a copy. It might be best if he read it.
Q Would you please read it out loud?

A I had a coaching session with Linda Thornton this afternoon --
Q Wait, wait. Read it slowly.
A I'm sorry. I had a coaching session with Linda Thornton this afternoon, 1/31/06, with Melvin Hutchins present. I addressed an ongoing issue when Linda has a problem with the label machine that it's quickly pointed out that we have a mechanical problem. I explained to her that the label machine needs work and we're aware of that issue. However, just because we have mechanical problems with the label machine, it can be adjusted to keep it running. It may not be perfect, but we can still keep the line running. She stated she understood.
Also, one issue today, we was -- we was -- the labels were not aligned properly on the can and she continued to run. Frank Williams, the team leader, pointed it out to Linda. Linda did not understand that when Frank said the label machine was not between

the rails. I cleared up the misunderstanding, told her that when he said rails, it's the same as the rim of the can. Also, I explained to Frank that he cannot assume that Linda understands the terms he uses regarding the label machine. Linda has been a label operator for several years, but this is the first time she has been assigned to a can line.
At the conclusion of the meeting, I addressed an ongoing issue with her and Frank regarding the problem resolution. I explained that in the future I would like to see more team work and less friction between both of them. She said she understood and agreed to work on this issue.
Q Now, this is -- remember, I asked you about there being a coaching session. And do you recall that Ms. Thornton was complaining about the way Mr. Williams had spoken to her and screamed at her about the labels were not between the rails?
MS. SWAIN: Objection.

A I don't remember how it was referenced.

Q Okay. And -- but -- and so this is her -- this is your documentation. And do you know if you put anything in Mr. Williams' file about there being problems with dispute resolutions?

A I do not recall.

Q And -- and about him not -- not giving her proper instructions?

A I do not recall.

Q So if I found this in her personnel file but not his, we can assume he didn't have one of these things put in his file; right?

A I do not recall if there's one in his file.

Q Now, I'm a little confused here. It said I explained to her that the label machine needs to work and we are aware of the issue. The label machine was -- was a problem, was it not?

A Yes.

Q And in fact, you promised her that she would soon be getting a new labeler machine on line three; right?

A I -- we did have a new label machine --

Q And so -- and she was probably looking forward to getting the new labeling machine one line three, right, when she got sent to line five?

MS. SWAIN: Objection.

Q Right?

A I do not recall.

Q Okay. And it says -- it says, It may not be perfect, but we can still keep the line running. She stated that she understood. Also, one issue today was -- we was -- the labels were not aligned properly on the can and she continued to run. Now, which is it? Should she continue to run the machine or not continue to run the machine? It looks like you're correcting her for two -- absolutely the opposite thing.

MS. SWAIN: Objection.

A If the label is off the can, we should stop and readjust, but you can make adjustments to the label machine to keep it running.

Q Okay. Well, all right. Let's talk about a five-minute break.

THE VIDEOGRAPHER: We are off the record at 3:46 p.m.

MS. ROBERTSON: That's all I've got for you. You can go home.

DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

A

**ability** 46:16
**able** 20:19
**absolutely** 82:22
**abuse** 50:18
**ACCR** 84:21
**accused** 33:9,20
**acting** 6:4
**action** 1:5 37:21 45:21 75:18 84:16
**actions** 75:16
**address** 34:23 35:8,16 36:12
**addressed** 79:7 80:11
**adjusted** 79:14
**adjustments** 83:3
**admitting** 70:22
**advised** 3:3
**affect** 15:5,7 70:11
**afraid** 71:14,16
**afternoon** 79:2,5
**ago** 9:12 10:4 13:8 67:14,18 68:1 69:16 70:17 71:2
**agreed** 2:2,10 80:16
**agreement** 7:20
**ahead** 30:2
**Alabama** 1:2,23 2:8,20 5:9,18 6:2,3,5,9,22 84:3
**aligned** 79:19 82:17
**allegation** 66:15
**alleged** 23:7
**Allums** 41:11 78:9
**amended** 2:21
**Ann** 5:13 7:5 46:14 48:5 68:23 72:3 78:16
**answer** 20:14,17 56:7 69:19
**answered** 20:1 30:2 46:15 60:6 67:4
**answers** 84:8
**anybody** 12:23 17:21 20:18 34:9 47:9
**anybody's** 19:16 31:10 71:1
**anymore** 50:16
**anywise** 84:16
**apparently** 59:22 60:2
**appeal** 19:1 46:22
**appealed** 41:22
**appealing** 47:3
**application** 10:18
**apply** 10:16 11:10
**apprised** 44:12
**approach** 52:20 64:8
**approached** 65:11
**approved** 50:5
**approximately** 2:9 6:9 9:4 10:3,9
**April** 48:10 51:6 51:13
**apropos** 57:20
**area** 54:5
**arguing** 69:20
**Ash** 15:18,23 44:17 72:23
**asked** 19:23
27:3,8,10 28:1 28:4,17 30:1 30:11,17,20 31:4,14 34:9 35:1,6 36:23 40:8 57:23 62:11 63:6 65:11 68:15,20 69:1,4,8 80:17
**asking** 49:13
**assign** 2:15 17:21,23 18:1 44:13,21
**assigned** 9:19 13:16,18,19,22 14:23 15:4 17:18 18:18,21 19:6 41:23 80:8
**assigning** 44:4
**assignment** 19:2 42:6 43:19
**assignments** 19:10
**assume** 10:14 80:5 81:13
**assuming** 56:14
**attached** 31:18 38:5 40:18 41:3 42:14 45:11 47:12,22 49:3 52:8 60:23 63:20 73:21 76:4 78:3
**authorizing** 48:8
**aware** 11:12 17:20 37:18 38:20,23 39:3 39:22 40:2 79:11 81:20

B

**B** 4:5
**back** 66:19
**Baker** 5:5
**based** 30:6 43:23 66:19
**basically** 8:16
**basis** 70:14
**Beard** 54:5
**Bearman** 5:5
**beginning** 13:14 13:20 18:16,22
**begins** 6:15
**believe** 12:1,21 13:18,19,23 14:4,15 15:14 15:18,22 16:12 16:22 20:7 26:2 28:3 31:8 31:14 39:12 40:15 48:16 69:2 73:13 76:12
**benefit** 8:14
**Berkowitz** 5:6
**best** 46:16 78:21
**Betty** 14:15
**Birmingham** 5:9 5:18
**blanks** 62:13
**blood** 48:9,15,23 49:20 50:7,13 50:21 51:1
**Bobbie** 2:7 6:8 7:1
**boss** 12:9
**bottom** 54:4
**Boyer** 68:23
**brand** 17:4
**break** 83:6
**brother's** 67:11
**Brown** 14:15
**Bruce** 46:2
**Building** 5:16
**business** 67:15 68:3 71:1 75:8
**BUTLER** 84:4

C

**C** 5:1,13
**Caldwell** 5:5
**call** 78:16
**called** 13:9 65:20
**case** 6:19 29:14 37:6
**Cassady** 45:8 46:3
**Catherine** 26:6 31:4
**cause** 6:11 84:17
**CERTIFICA...** 84:1
**Certified** 84:20
**certify** 6:4 84:6 84:14
**characterizati...** 34:15 66:1
**child** 52:22 53:18 54:12,19 54:22 56:1,2,9 60:19 65:20 67:11,17 68:1 68:7,15,16 69:15 70:15,23 71:6,17,20
**Childs** 5:15
**chosen** 28:10
**Chris** 1:15 2:4 6:10,16 8:1 10:21 28:20 35:18 36:2
**Christopher** 8:8
**circumstances** 33:8 54:16
**Civil** 1:5 2:20 6:6
**cleared** 80:1
**coaching** 79:1,4 80:18

FREEDOM COURT REPORTING

**come** 10:21 11:9 21:21 52:16,21 64:7,15 65:18 66:17
**comes** 59:19
**commencing** 2:9 6:9
**comments** 62:22 63:3
**Commissioner** 1:20 6:4
**company** 8:21
**complain** 60:16 64:22
**complained** 50:14 65:18
**complainer** 22:11
**complaining** 54:18 80:20
**complaint** 21:8 21:11,13,22 22:8 23:1,4 32:18 33:14 37:5 58:22 65:13 66:18
**complaints** 64:8
**complete** 43:10 43:13 44:2 46:12
**completed** 37:21 59:3 66:11
**completely** 59:10
**computer-aided** 84:10
**CONCLUDED** 83:11
**conclusion** 80:10
**conducted** 33:18
**conducting** 33:17
**confessed** 69:14
**confessing** 67:17
**confused** 81:18
**consider** 11:15 23:6,9 77:4
**considered** 17:16
**contained** 64:10
**continue** 82:19 82:20
**continued** 79:20 82:18
**conversation** 51:4 53:11 57:12
**conversations** 51:10 53:3,7 56:13
**Cook** 26:5,8,15 28:10 31:4
**Cook's** 29:1
**Cooper** 26:7
**copies** 26:2 49:14 77:22
**copy** 16:10 25:19 45:17 48:4 49:8 52:1 74:4 77:19 78:20,20
**correct** 33:15 43:14 46:4 66:15 84:11
**correcting** 82:21
**counsel** 2:4,12 2:14 6:7 7:3 84:15
**counseling** 51:15
**COUNTY** 84:4
**court** 1:1 2:6 3:4 3:5 6:1,20,21 7:14 84:20
**covered** 49:7
**criteria** 16:1,5,8 16:10,16 19:21
**Crook** 2:7 6:8
**Crowe** 7:2
**curse** 34:3,9 77:9,13
**cursed** 34:23
**cursing** 39:14,18
**cuss** 34:6

**D**

**D** 1:21 2:5,21 4:1 5:14 6:1,19
**damn** 34:4
**dangerous** 77:5
**date** 6:5 42:18 50:2,3 61:17 61:20 66:21
**dated** 44:7 45:16 50:2
**dates** 73:5
**daughter** 67:12
**day** 2:8 3:1 6:10 50:6
**dealt** 27:12,14
**December** 11:4 11:5
**decide** 40:12 47:9
**decided** 15:19 18:13 47:4
**decider** 15:20
**decision** 46:17 46:22
**decisions** 46:19
**Dee** 5:22
**defendant** 5:3 7:10
**Defendant(s)** 1:12
**delivering** 2:22
**delve** 58:22
**demotion** 11:16
**department** 25:12 35:4,12 36:9,13,18 40:12 53:22 56:5,21 60:12 60:14 68:13 70:1 76:1
**depend** 15:10
**dependent** 15:22
**Depending** 15:9 17:13
**deposition** 1:14 2:4,17 6:16 23:14 25:17 31:19 38:6 40:19 41:4 42:15 45:12 47:13,23 49:4 52:9 61:1 63:21 73:22 76:5 78:4 83:11 84:7
**described** 27:17
**details** 55:6,11 55:15
**determine** 13:12
**deviant** 55:3
**different** 8:22
**direct** 12:9
**disciplinary** 37:21 38:1,18 39:4 75:16,18
**disciplined** 37:17 40:10
**discuss** 44:21 45:6
**discussed** 14:8 14:22 57:8
**discussing** 50:8
**Discussion** 45:3
**discussions** 44:19
**dispute** 51:18 81:7
**distinguish** 8:15
**District** 1:1,2 6:21,21
**Division** 1:3 6:22
**document** 23:15 24:12 28:20 29:9 40:23 41:8 47:19 61:5 64:3
**documentation** 21:16,18,20,23 22:2,10,15,19 23:9,17,19 24:19,23 25:5 25:9 27:4 28:16 29:20 31:7 33:19 35:3,10,13 36:8,11,20 40:5 52:13,15 53:14 56:6,12 57:21 58:19 59:2,9,12 60:8 62:20 64:4,7 64:18 65:4 67:8 81:4
**documented** 58:8
**doing** 36:4 37:18 53:3 76:13
**Donelson** 5:5
**Dothan** 1:23 2:8 6:8
**due** 49:19
**duly** 8:2

**E**

**E** 4:1,5 5:1,1
**effective** 2:21
**either** 65:11
**employed** 69:12
**employee** 21:8 21:11,21
**escort** 68:19
**estimations** 16:2
**evaluate** 12:23

**evaluated** 12:14 12:15,20
**evaluation** 12:17
**everybody** 13:11 13:15 33:9,20 33:23
**evidence** 2:17
**exact** 10:4 26:23 58:12 73:5
**exactly** 58:12
**examination** 4:2 6:12 8:4
**examined** 8:2
**Excuse** 26:8 58:3 78:11
**Exhibit** 23:12 24:3,15 25:16 26:3,11 28:10 28:22 29:6 30:6 31:17,22 32:4 33:5,12 34:2 35:19,22 38:4,9,14 40:17,21 41:2 41:7 42:13,18 45:10,15 47:1 47:11,15,21 48:2 49:2,6 50:1 52:7 54:4 60:22 61:3,8 63:16,19 64:1 64:10,14 65:16 66:14 67:7 68:8 69:23 73:12,20 74:2 74:5 76:3,7 78:2,6
**exhibits** 3:2
**expect** 20:9
**experience** 9:10
**explain** 9:17 59:13
**explained** 79:10 80:4,13 81:19
**extra** 25:18 26:2 38:11
**e-mail** 41:1,11 41:14 78:8

**F**

**F** 5:4 34:4
**fact** 37:8,11 44:1 52:19 53:15 55:2 56:2,2,9 82:1
**Fanny** 15:18,23 44:17 72:23
**far** 14:10 24:18 64:17 65:4
**February** 52:18 69:15
**females** 14:14
**fight** 28:18
**file** 81:6,13,15 81:17
**filed** 3:5
**fill** 21:22 26:16 26:19 27:3 28:8 30:23 31:6 36:7 57:13,14,17 58:1,5 62:12 62:19 64:23
**filled** 21:15,18 23:19 36:11,14 36:15,17,21 40:5 59:10 60:9
**filler** 46:2
**filling** 10:17 21:19 22:2,9 22:15,19 56:11 59:12
**find** 17:10 18:6 18:10 34:20
**fire** 75:22
**fired** 68:15 74:18
**first** 24:10 38:16 41:20 47:20 51:4 65:3,7 67:5 80:8
**five** 9:4,12 21:5 38:19,21 39:1 39:8,10 61:19 82:9
**five-minute** 83:6
**Flavor** 1:10 6:18 7:10 8:16,20 9:3 21:6 70:22
**following** 6:12
**follows** 8:3
**Food** 8:13
**foregoing** 6:6 84:7,11
**form** 2:13 21:23 22:3 23:17,19 24:19,23 25:9 27:4 28:16 29:20 31:7 37:21 38:1,2 52:14,15 56:6 56:12 57:14,21 58:1,6,19 59:2 59:9,12 60:8 62:20 64:5,7 64:18 65:4
**forms** 21:16,18 21:20 22:10,16 23:10 25:6 33:19 35:3,10 35:14 36:8,11 36:20 40:5
**forward** 82:7
**found** 81:12
**four** 10:3 13:8 16:22 17:1 20:5 46:6 55:13,17 61:19 72:1
**Frank** 17:7 27:6 30:10 32:20 37:6 38:17 39:3,13 50:14 50:23 52:20 53:4,8 54:17 54:22 56:9 58:16 59:23 79:20,23 80:4 80:12
**Franklin** 6:19
**friction** 80:14
**front** 16:3 20:14 20:17
**full** 8:6 46:12
**further** 2:10 84:14
**future** 80:13

**G**

**getting** 23:19 40:5 47:3 82:2 82:7
**get-go** 18:12
**girlfriend** 67:12
**give** 25:5 27:20 33:22 56:19,20 57:16
**given** 9:14,20 16:10 18:2,9 33:19 35:7 37:20 38:2,18 39:4 42:5,5,10 46:5,11 74:10 84:12
**giving** 24:19 81:10
**go** 22:20,20 30:2 46:9 48:9 66:19 75:16 83:10
**going** 17:10 18:6 18:13 53:16 54:12 65:23 72:11 77:21
**good** 43:11 70:6
**gotten** 44:5
**Greenville** 6:2
**grounds** 2:15
**group** 8:13 13:23 44:3
**guilty** 55:2,7

**H**

**H** 4:5
**hallway** 59:20 67:9
**hand** 59:5 63:17
**handed** 29:15
**handing** 57:20
**handled** 21:12
**hands** 25:14
**handwriting** 54:3,7 61:16 61:18 62:2,5 63:9
**happen** 13:4
**happened** 10:10 10:23 11:7 24:20 34:22 36:19 37:4,15 63:2,2,7,7 67:14,18 68:1 70:17 71:2
**happens** 71:5
**harassment** 67:13
**hear** 27:14 31:15 47:8 78:15
**heard** 27:11 55:1
**hearing** 84:13
**helped** 16:12
**hired** 9:5,6,8,12 10:5
**hold** 10:7 11:2
**holding** 43:1
**home** 48:9 83:10
**House** 1:10 6:18

7:10 8:17,20 9:3 21:6 70:22
**HR** 22:4,17,20 22:21 23:5 25:11 35:4,11 36:9,13,18 37:2 40:12 42:3 53:21 56:5,14,21 59:3 60:11,14 63:17 66:10,12 66:19 67:2 68:12 69:14 70:1 76:1
**Hutchins** 12:10 12:15,20 15:20 16:15 39:12 43:5,16,17 44:1,20 46:3 52:20 53:4,6 53:11 57:3,8 59:15,17,20 79:6

**I**

**idea** 43:18,23
**identify** 7:3
**important** 75:7
**incident** 27:4,5 27:12,15,18,22 28:2 29:2,19 30:9,15,18 32:19 34:13 36:18 40:6 52:17 58:7,11 58:16 60:19 61:17,20
**individual** 13:5
**individuals** 28:5
**information** 27:21
**initiated** 13:17
**instructed** 39:9
**instructions** 31:10 81:10
**intercourse** 55:3 55:8
**interested** 84:16
**investigate** 21:7 21:9,13 22:5 23:4 34:21
**investigated** 21:11
**investigating** 23:1,7 35:21 35:23 36:4 55:22
**investigation** 22:7 33:18 35:12,14,16 56:8
**involved** 61:18
**involving** 57:9 58:16
**issue** 35:8 59:22 79:7,12,18 80:11,16 81:21 82:16

**J**

**James** 8:8
**January** 51:16
**jar** 72:14,16,16 76:10,17,23 77:12
**Jennifer** 5:4 7:9
**Jewel** 67:8
**job** 10:16 11:12 25:3 43:1,11 74:22 75:12,15 75:21
**jobs** 9:19
**Jonnie** 39:19
**Jordan** 1:15 2:4 6:11,17 8:1,8 8:10 35:19 36:2 60:18 70:6 77:9
**June** 76:11
**justify** 76:22

**K**

**keep** 72:11 79:14,16 82:14 83:3
**kept** 71:10
**kin** 84:15
**kind** 53:6 65:5
**kinfolks** 7:20
**knew** 68:6 69:13 69:14,14
**know** 8:20 9:15 19:4 23:21 28:14 29:16 31:3 34:8 36:15,19 37:4 39:13,17 41:16 42:2,4,9,20 51:23 53:10 54:8 55:6,11 55:12,15,16 65:10,16 68:14 69:3,6,6,8 71:23 72:4,18 73:15 74:16 77:17,18,22 81:5
**knowledge** 37:22
**known** 20:18
**knows** 72:7
**Kress** 5:16

**L**

**L** 2:1
**label** 9:9,11,22 10:6 14:7,17 14:23 17:7,14 17:16,17 18:5 18:8 19:5,9 20:6,9 21:2 38:19 39:2 43:1,14 44:2 45:3,7 46:1 72:15 74:8,21 75:2,4 76:9,14 79:8,11,13,23 80:6,7 81:19 81:21 82:4 83:1,3
**labeler** 82:2
**labeling** 82:7
**labels** 75:7 79:19 80:22 82:17
**Lake** 5:22
**Large** 2:7 6:4
**lateral** 11:16,18
**law** 7:1
**leader** 17:15 79:21
**leading** 2:13 44:3
**learned** 23:1
**Leigh** 35:17 41:11 78:8
**let's** 25:15 42:17 83:5
**level** 9:14,20 13:12 14:10 15:1,4,9,10,12 15:21 16:2 17:4,11,19 18:6,10,14 19:2,6 20:5,10 20:20 21:2 41:23 42:6,10 43:19 44:5 46:5,9,9,11 47:4
**levels** 9:19 13:16 16:20 17:22 18:1,17 19:13 19:22 41:20 44:4,13,22
**License** 84:21
**Linda** 1:6 5:21 6:17 15:12 19:1,4 24:19 25:10 27:7 29:2,20 30:10 32:20 33:13 37:5 38:19 42:20 44:16 48:8,14 49:17 52:19 55:23 61:20 64:20 67:9 76:18 79:2,5,7,22,22 80:5,6
**Linda's** 32:18
**line** 28:13 38:19 38:21 39:1,8 39:10 49:19 53:5 72:14,14 72:19,21 73:2 73:2,4,7,13 74:8,14,18 75:5,11,19 76:10,23 77:13 79:16 80:9 82:3,8,9,15
**lines** 61:19 72:16,17
**listens** 43:11
**little** 38:10 62:12 81:18
**LLC** 5:15
**long** 8:19 9:2 10:6 11:2 19:4 26:6 29:14 31:4 42:9 69:16 70:17 71:2 73:15 74:13
**longer** 69:6,12
**look** 17:6 18:5 23:11 24:3 25:15 29:5 36:18 42:17 45:14 50:1

54:6 61:3
**looking** 32:1 82:7
**looks** 53:1 61:13 61:18 65:15 66:13 82:21
**losing** 38:10
**lot** 70:13,21 71:5
**loud** 78:13,23

**M**

**machine** 9:9,11 9:15,22 10:6 17:17 18:8 20:6,9 39:2 75:4 76:15 79:8,11,14,23 80:6 81:20,21 82:3,5,8,20,20 83:3
**maiden** 42:21
**maintenance** 32:9
**majority** 72:22
**man** 8:9
**man's** 18:6
**marked** 31:18 31:22 38:5,8 40:18 41:3 42:14 45:11 47:12,22 49:3 52:8 60:23 63:20 73:21 76:4 78:3
**Mary** 68:22
**matter** 6:17
**matters** 57:8
**ma'am** 12:13,16 13:10 15:2,6 15:14 16:6,18 19:11,17 24:2 24:8 25:1,4,7 26:9,12 27:16 27:19 31:2 32:7,9,13,16 36:22 41:9 43:3 48:7 54:6
**McGinnis** 31:15 32:6,8,12
**McNaughton** 1:21 2:5,22 6:1 84:19
**mean** 14:17 19:18 26:8 34:19 51:10 57:16 60:18 69:19 74:21 77:9
**means** 84:9
**meant** 9:21
**mechanic** 32:10
**mechanical** 79:10,13
**medical** 49:19 49:23
**medication** 70:10
**meeting** 14:1,3,6 14:13,14 18:12 19:14 44:13 45:2,8 51:15 80:10
**meetings** 44:19
**Melvin** 12:10 15:20 16:15 39:12 43:5 46:3 53:4 59:17 79:6
**member** 56:20
**memo** 50:4
**memorialize** 62:17
**memory** 70:6,11
**men** 18:18
**Middle** 1:2 6:21
**Mike** 54:5
**missed** 58:4
**missing** 49:18
**misunderstan...** 80:2
**molester** 52:23 53:18 54:13,20 54:23 56:1,3 56:10 60:19 65:20 67:11,17 68:1,7,16 69:16 71:17,20
**molesters** 70:15 70:23 71:6
**Monday** 6:23
**money** 11:19,21
**month** 39:15,18
**move** 39:9
**moved** 38:19,20 39:8

**N**

**N** 2:1 4:1 5:1
**name** 8:6 19:16 23:21 24:1,7 28:15 29:1 33:5 36:1 42:21 66:21
**Nance** 40:14 56:15,18
**necessary** 2:11
**need** 72:10 77:8
**needed** 51:17,18
**needs** 79:11 81:20
**neither** 84:14
**new** 82:2,4,7
**night's** 70:7
**Nineteenth** 5:17
**Normally** 33:22
**North** 5:7,17
**Notary** 2:6 6:3
**notation** 65:6
**notebook** 32:2
**notes** 58:14,20 60:4
**notice** 45:21
**November** 45:16 45:22 46:13
**number** 1:5 6:19 23:12 24:4,15 25:16 26:3,11 28:11 29:6 30:7 31:17,22 32:4 33:5,12 34:2 35:19,23 38:4,9,14 40:17,21 41:2 41:7,18 42:13 42:18 45:10,15 47:1,11,15,21 48:2 49:2,6 50:2 52:7 60:22 61:4,9,9 63:16,19 64:1 64:10,15 65:17 66:14 67:7 68:8 69:23 73:20 74:3 76:3,7 78:2,6 84:21

**O**

**O** 2:1
**object** 65:23
**Objection** 17:12 18:7,20 19:23 20:12,21 21:3 23:2 29:17 30:1 33:3,10 33:21 34:14,18 35:2,9 36:5 43:15,21 44:6 44:15 46:14 47:6 50:17,19 51:7,21 55:5 55:10,14,18 56:4 57:10,22 59:1,6,8 60:5 60:20 62:14 63:5 64:11 65:2 66:4,23 67:3,21 68:4 68:10 69:5,10 69:18 70:8,18 71:3,7 72:2 74:20,23 75:13 75:23 76:19 77:2,6,15 80:23 82:10,23
**objections** 2:12 2:15
**occasion** 48:17
**occurred** 75:19
**offered** 2:17
**office** 7:1
**offices** 2:7 6:8
**Oh** 72:9
**okay** 9:2 10:1,5 18:23 21:17 24:13 25:15 29:10 35:22 36:19 38:17 39:21 40:21 41:21 42:4 53:2 59:19 60:13 61:15 64:6 69:3,13 71:10 72:9 73:1,8 74:10 75:6 81:3 82:13 83:5
**old** 8:9,11 55:4,8
**once** 16:9 25:8
**ongoing** 79:7 80:11
**online** 11:10
**on-the-job** 10:14
**op** 14:17
**opening** 11:13
**operate** 17:17 75:4
**operated** 74:17
**operator** 9:9,11 9:15,22 10:6

14:7,23 17:7 17:14,16 18:5 18:9 19:5 20:19 21:1 38:20 41:23 42:6,10 43:2 43:10,14,19 44:2,2,5 45:7 46:1,2,13 72:15 74:9,22 75:2 76:9,15 80:7
**operators** 19:9 45:3
**opinion** 71:22
**opposite** 82:22
**oral** 3:1 6:11
**order** 16:19,23 20:4,8 62:12
**ordinary** 33:8
**original** 2:23
**outside** 67:10
**owners** 8:16,22

**P**

**P** 2:1 5:1,1
**PAGE** 4:2
**Pantazis** 5:15
**paper** 13:2 26:18 28:9 29:15 35:8 56:18 57:17,21 59:5
**Parrish** 42:21
**part** 25:2 35:14 35:15
**participated** 22:7
**particular** 57:3
**parties** 2:3,14 84:15
**passed** 41:19
**passing** 41:12
**pay** 13:9 15:5,8 15:10 20:16 41:12 44:8 45:4
**payroll** 41:12
**PC** 5:6
**peanuts** 76:17 76:17,23 77:13
**people** 9:18 13:1 13:16 14:13 22:12,13,16 52:22 53:17,18 54:12,19 56:14 65:19 70:13,22 77:9,10
**perfect** 79:15 82:14
**performance** 12:15
**person** 33:13 44:3
**personnel** 45:21 81:13
**piece** 26:18 28:9 29:15 35:7 56:17 57:17 59:5
**pieces** 57:20
**place** 9:23 10:2 62:4,8
**plaintiff** 5:12 7:6,8
**Plaintiff's** 23:12 24:3,5,15 25:16 26:3,11 28:10,22 29:6 30:6 31:17,22 32:4 33:5,12 34:2 35:19,22 38:4,9,14 40:17,21 41:2 41:7,18 42:13 42:17 45:10,14 47:1,11,15,21 48:2 49:2,6 50:1 52:7,11 54:4 60:22 61:3,8 63:16 63:19,23 64:10 64:14 65:1,16 66:14 67:6 68:8 69:22 73:12,20 74:2 76:3,7 77:23 78:2,6
**Plaintiff(s)** 1:8
**plant** 11:14 48:17
**please** 3:3 7:3,12 7:17 8:7 9:17 14:6 20:22 23:13,16 24:11 30:4 33:11 38:15 39:16 40:22 41:10 43:22 45:15,18 47:18 48:3 49:10 50:20 51:8 52:12 54:14 57:15 59:13 60:21 61:7 64:1,13 65:14,22 68:21 70:20 78:10,12 78:22
**pled** 55:2,7
**point** 9:18 13:7 13:12 68:6
**pointed** 79:9,21
**position** 10:7 11:3 14:18 36:3
**positions** 13:1
**Possibly** 73:19
**postings** 11:14
**present** 5:20 54:5 59:18 79:6
**pressure** 48:10 48:15,23 49:21 50:8,13,22 51:1
**previously** 57:9
**prior** 2:17 9:11 51:13
**prison** 55:12,17 72:1
**probably** 82:6
**problem** 49:20 49:23 50:8 67:19 79:8,10 80:12 81:22
**problems** 48:10 50:13,22 51:1 51:5,11 53:4 70:5 79:13 81:7
**procedure** 2:20 6:6 22:23
**proceedings** 6:13
**production** 11:8 11:15,22 14:21 59:20
**Products** 1:10 6:18
**proficiency** 9:15 10:15
**promised** 82:1
**promotion** 11:16
**proper** 81:10
**properly** 79:19 82:17
**Public** 2:6 6:3
**purpose** 22:2 45:1
**pursuant** 6:5 31:9
**put** 20:23 81:5 81:14
**p.m** 2:9 6:10,23 83:8

**Q**

**question** 2:14 20:14,17 30:3 39:16 43:22 44:18 46:15 61:6 64:12 67:4 75:1
**questions** 2:13 27:9 37:1 58:21 62:12 72:7 84:8
**quickly** 79:9
**Quinn** 5:15
**quit** 38:10

**R**

**R** 5:1
**rails** 80:1,3,22
**Randall** 8:13
**reaction** 69:22 70:2,4
**read** 7:16 24:10 69:21 78:10,12 78:21,22 79:3
**readjust** 83:2
**reason** 21:19 22:15 39:7 76:21
**recall** 10:19 11:1 13:14 15:12,16 16:4,16 19:3 21:4 24:22 25:8 31:11,12 37:3,16 39:23 40:1 44:23 45:9 48:8,11 48:21,22 49:22 50:12,21 51:3 51:9,14,22 53:9,12,19 54:2,21 55:21 57:4,11 58:12 60:3,15 62:1 62:15,23 63:14

63:18 65:3 67:5 69:11 70:3 71:15 73:5 76:14,20 80:19 81:8,11 81:16 82:12
**received** 15:11 15:13 21:7 46:21,23 56:5 63:16 65:13
**recognize** 23:13
**recommendati...** 19:13 40:9
**record** 6:23 83:8
**reference** 26:21 28:19 34:6
**referenced** 29:19,22,23 30:6,8 81:2
**referred** 49:22
**regarding** 80:6 80:12
**regular** 70:14 71:4
**Related** 27:6
**relative** 54:1
**remember** 9:7 10:4,17,22 18:23 19:16,19 20:2 24:9 26:22 33:4 41:1,22 42:1 50:11 66:5 71:21 73:17 80:17 81:1
**Renny** 1:21 2:5 2:21 6:1 84:19
**repeat** 20:22 30:3 33:11 39:16 43:22 50:20 51:8 54:14 57:15 60:21 64:12 65:14 68:21 71:18 75:1
**repeatedly** 46:15
**report** 29:2 52:23
**reporter** 2:6 3:4 6:2 7:12,14 84:20
**reporting** 28:6 57:2 70:14
**represent** 7:4,6 7:8,10
**represents** 84:11
**request** 31:10 48:13
**requested** 13:5
**resign** 68:16,20 69:1,4,9 71:11
**resolution** 38:17 51:19 80:12
**resolutions** 81:7
**respective** 2:3
**result** 36:20 37:5 41:18 84:17
**retained** 3:4
**retaliating** 57:7
**reviewing** 23:15 24:12 29:9 40:23 41:8 47:19 61:5 64:3
**revisit** 36:23
**Ricky** 23:14 24:6
**right** 7:18 8:17 8:23 13:21 14:5 15:1 17:8 17:11 18:19 20:11 21:10 22:1,6,14 23:11 24:21 27:22 29:5 33:1 34:1,8 41:16 42:8 45:22 46:3,19 57:17 58:9,23 59:7 61:11 62:9 65:1,21 66:3 67:23 68:3,9,11 69:17 72:12 74:16 81:15 82:3,8,11 83:5
**rim** 80:3
**Robertson** 2:23 4:3 5:13 7:5,5 7:18 8:5 25:20 26:1,7 31:20 32:1 38:7,13 40:20 41:5 42:16 45:13,19 46:18 47:14 48:1,6 49:5,7 49:16 51:23 52:5,10 58:3 61:2 63:8,22 72:9,12,13 74:1,6 76:6 77:18 78:1,5 78:18 83:9
**role** 29:7,7
**Rule** 2:19
**Rules** 2:20 6:5
**run** 79:20 82:18 82:19,20
**running** 79:15 79:16 82:15 83:4

**S**

**S** 2:1 4:5 5:1,3 5:12 7:1
**saying** 34:16 55:23 56:1 65:19 67:20,23 78:19
**says** 34:3 35:18 35:23 38:17 41:19 42:23 43:9 49:17 54:4 59:17 67:8,18 82:13 82:13
**scheduler** 11:8 11:16,22
**screamed** 80:21
**screaming** 51:19
**see** 16:7 27:14 28:5 30:21,21 31:16 32:15,19 34:1,6 35:18 42:23 43:4,9 56:2 65:8,15 80:14
**seeing** 42:1
**seen** 26:4 27:11 38:16 40:22 47:17,20 49:9
**sent** 48:14 82:9
**session** 79:1,5 80:18
**sex** 52:22
**sexual** 55:3,8
**shared** 63:13
**show** 31:21 38:8 41:6 52:5 77:21
**shown** 52:2
**Sidely** 67:8
**sign** 7:16
**signature** 43:5 48:3,12
**sir** 8:7 14:6 23:16 38:15 40:22 41:10,14 45:2,15 47:18 48:3 52:12 64:2 70:19 71:8 78:7,10 78:12
**situate** 54:16
**situation** 54:1 77:16
**situations** 53:5
**skill** 9:19,20 13:16 14:23 15:4,21 16:2 17:5,10,19,22 18:1,3,6,10,13 18:17 19:1,6 19:13,22 21:2 41:17 44:21 73:9,12
**skills** 13:2,9 20:16 41:13 44:8 45:4,7 73:14
**sleep** 70:7
**slowly** 79:3
**smoking** 54:5
**Smothers** 23:14 24:6
**somebody** 10:20 20:23 28:12,14 42:3 69:13 75:6,10 76:16 76:22,22 77:12
**soon** 82:2
**sorry** 9:22 26:1 45:20 75:1 79:4
**Southern** 1:3 6:22
**speaking** 28:21
**specific** 27:13 37:1
**specifically** 35:1
**specifics** 32:18 34:17
**spoke** 49:17
**spoken** 80:21
**standing** 32:12
**start** 67:14
**started** 13:8 16:9 23:14

FREEDOM COURT REPORTING

24:5 50:12 64:18
**state** 2:6 6:3 7:4 8:6 24:20 70:20 84:3
**stated** 18:21 31:15 58:7 79:16 82:15
**statement** 32:5 32:23 67:22 68:5
**statements** 23:7 33:9
**states** 1:1 28:17
**stenotype** 84:8
**STIPULATED** 2:2,10
**stipulation** 6:7 7:19
**stipulations** 7:15
**stop** 83:2
**straight** 42:3
**Street** 5:7,17
**strike** 11:20 31:5
**Suite** 5:8
**superintendent** 16:13 44:20
**superintendents** 14:1
**supervising** 19:9
**supervision** 74:15
**supervisor** 10:11,13,22 11:3,17,23 12:5,6,6,12,22 14:19 15:15,17 23:22 32:8 35:21 36:1 37:8,11 61:14 73:6 76:15
**supervisors** 14:2
**supervisor's** 23:23
**sure** 33:6 34:11 34:12 38:13 44:9 47:7,10 48:6,18 51:2 64:16,16 71:12 74:6
**surrounding** 54:17
**Swain** 5:4 7:9,9 7:16,21 17:12 18:7,20 19:23 20:12,21 21:3 23:2 25:18,22 26:5 28:19 29:17 30:1 31:23 33:3,10 33:21 34:14,18 35:2,9 36:5 38:11 43:15,21 44:6,15 45:17 46:14 47:2,6 47:16 48:4 50:17,19 51:7 51:21 52:3 55:5,10,14,18 56:4 57:10,22 59:1,6,8 60:5 60:20 62:14 63:5,12 64:11 65:2,23 66:4,7 66:23 67:3,21 68:4,10 69:5 69:10,18 70:8 70:18 71:3,7 72:2,5,10 74:4 74:7,20,23 75:13,23 76:19 77:2,6,15 78:16 80:23 82:10,23
**swear** 7:12
**sworn** 7:13 8:2

**T**

**T** 2:1,1 4:5
**tabs** 32:2 38:10
**take** 10:1 17:1,3 17:14 18:1 23:7 32:5,23 46:6,10,23 47:5,9 48:16 48:20,20 50:18 56:17,18 62:7 66:12 67:1 68:23 73:11
**taken** 2:5 3:1 33:8 48:15,23 84:7
**talk** 50:15 60:14 83:6
**talked** 50:23 51:12 66:14 68:18,22
**talking** 8:21 9:16 12:23 18:11 31:12 38:1 49:20 54:11 56:15 57:19 59:16 61:21
**Tamekia** 26:5,7 26:8,15,18 28:10,17 29:1 31:4
**team** 17:15 79:21 80:14
**tell** 14:5 19:21 22:23 24:4 27:1 29:6 39:6 42:9 52:3 54:9 54:15 57:6 63:1 71:13 72:15
**telling** 18:4 33:2 35:6 52:22 53:16,17,17 54:12,19 67:10
**Tempest** 7:7
**Temple** 5:14
**terms** 59:12 80:5
**test** 13:3 17:1,3 17:4,11,14 18:2,9,10,19 41:13,17 44:8 46:10 73:9,12 73:14 74:8 76:9
**tested** 13:6,11 13:15
**testified** 8:3 57:23 72:6
**testify** 63:6
**testimony** 1:14 3:1 36:6 84:12
**tests** 18:6 46:6 46:23 47:5,9
**Thank** 74:7
**thereto** 2:18 84:9
**thing** 29:14 57:3 71:5 82:22
**things** 66:21 81:14
**think** 27:2 57:5 71:1 74:13 76:21
**Thornton** 1:6 5:21 6:17 15:13 19:1 27:7 29:2,20 30:10 33:14 34:5,21 37:12 38:19 39:7 41:17 44:4 48:9,14 49:18 51:11,16 52:19 53:8,13,15 54:9 56:1 57:2 60:16 64:9 65:17 67:10 71:13 72:18
76:18 79:2,5 80:19
**Thornton's** 37:5 42:21
**thought** 14:11 25:20 44:1 45:19 57:6
**threats** 61:23 62:21
**three** 10:3 13:7 20:11,20 21:2 41:20 53:5 73:7,13 82:3,8
**threw** 76:17 77:12
**throwing** 76:23
**time** 2:16,16 10:4,18 11:21 12:12 13:17 14:16 15:15 17:8 18:15 19:5,9,17 28:13 37:9,12 38:16 39:20 40:16 42:5,10 44:8,16 47:20 55:23 69:16 70:3,17 71:2 72:23 80:8
**times** 12:19
**title** 12:5 43:1
**today** 49:18 79:18 82:16
**told** 27:2 37:14 46:16 51:17 55:19,20 61:21 64:23 66:19 67:9 68:8 80:2
**Tommy** 56:15
**Tower** 5:7
**train** 20:8,19 21:1
**trained** 20:5
**training** 21:7

**transcribed** 84:9
**transcript** 2:23 84:12
**transcription** 84:10
**transpired** 44:9
**trial** 2:16
**trouble** 67:14
**true** 84:11
**Trueblood** 5:14 7:7,7 49:12
**try** 58:22
**trying** 34:20,20 57:5
**turn** 22:4,17,17 36:8
**turned** 35:4,11 37:2 53:21 59:3 60:11 68:12
**Twentieth** 5:7
**twice** 48:17
**two** 28:5 46:10 66:20 72:17,19 82:22
**type** 16:12

**U**

**U** 2:1
**ugly** 78:17,19
**ultimate** 15:20
**ultimately** 16:13
**understand** 8:15 79:22
**understands** 80:5
**understood** 79:17 80:15 82:16
**UNITED** 1:1
**unmarked** 49:14
**uses** 80:6
**Usual** 7:14
**U.S** 6:20

**V**

**v** 1:9
**vacation** 48:12
**version** 65:12
**versus** 6:18
**VIDEOGRAP...** 6:15 7:11 83:7
**videotape** 6:16
**voice** 78:15

**W**

**Wachovia** 5:7
**wait** 79:3,3
**walk** 26:17
**want** 52:23 53:15 64:21 78:15
**wanted** 57:13 64:21
**warning** 38:18 39:4
**wasn't** 46:17
**way** 12:11 51:12 51:20 72:7 80:20
**went** 42:2 55:12 55:17 71:23
**weren't** 36:4 37:14
**Wesley** 31:14
**we're** 8:20 38:1 56:14 79:11
**we've** 48:16
**wife's** 67:11
**Wiggins** 5:15
**William** 51:10
**Williams** 6:19 17:7 27:6 30:10 33:1,13 34:3,22 37:6,9 38:18 39:4,13 39:17 40:10 50:14,23 51:5 51:12,17 52:21 53:8 54:10,10 54:17,22 56:9 58:17 59:23 60:18 64:8,22 65:18 66:15 67:7,16 68:7 68:14,23 69:4 71:11,14 79:21 80:20 81:6
**witness** 6:11 7:12,13 23:15 24:12 28:22 29:9 40:23 41:8 47:19 61:5 64:3 84:13
**witnessed** 30:9 30:15
**witnesses** 23:8
**woman** 39:14
**word** 34:4
**words** 26:23 34:3,4,7,10
**work** 8:12,13 44:16 49:18 51:18,20 53:5 62:8 72:21 73:4 79:11 80:14,16 81:20
**worked** 8:20 9:2 44:17 72:19,23 73:2
**worker** 77:1
**working** 46:2 71:17,20 74:14 75:11
**works** 69:7
**worry** 70:16
**wouldn't** 20:19 21:1 35:6 37:18 74:21 75:10,22 76:1
**Write** 30:14
**writing** 24:18
**written** 12:17 16:5,7 39:14 39:18
**wrote** 63:11

**X**

**X** 4:1,5

**Y**

**Yeah** 21:14 49:16 50:3
**year** 10:9,10 11:4 55:3,8 73:18 75:11
**Yearly** 12:21
**years** 8:11 9:4 9:12 10:3 13:8 21:5 55:13,17 67:14,18 68:1 72:1 80:7
**y'all** 18:12 44:12 44:18,21 45:5 65:17

**0**

**01** 47:3
**02** 43:13 44:9 45:16,22 46:2 46:13
**04** 76:11,13
**06** 44:10 48:10 51:6,13,16 69:15 74:11,15

**1**

**1** 6:16 23:12 25:22 33:5,12 34:2
**1/31/06** 79:6
**10** 4:11 45:11,15 55:3
**107cv-712-W...** 1:5 6:20
**11** 4:12 47:12,16 47:17
**12** 1:22 4:13 6:23 47:22 48:2 50:2
**12th** 2:8 3:1 6:10
**13** 4:14 49:3,6 55:8
**14** 4:15 52:8,11 54:5 64:10 65:1,17
**15** 2:21 4:16 60:23 61:4,10 63:16 67:14,18 68:1
**15th** 31:8
**16** 4:17 63:20 64:1,15 66:14 67:7 68:9 69:23
**16th** 52:18 66:16
**1600** 5:8
**17** 4:18 73:21 74:3,5
**18** 4:19 76:4,7
**19** 4:20 78:3,6
**1988** 2:21

**2**

**2** 24:4,5,15 25:23 28:23 30:7 35:23
**2/28/06** 61:21
**2:30** 2:9 6:9
**2:34** 6:23
**2002** 44:3,5
**2006** 43:20 71:11
**2007** 11:5
**2008** 1:22 2:9 3:2 6:10 7:1
**205-314-0500** 5:19
**205-328-0480** 5:10

**3**

**3** 25:16,19 26:3 26:5,11 28:11
**3/11/02** 43:7 44:7
**3:46** 83:8
**301** 5:17
**31** 4:6
**35203** 5:18
**35203-5202** 5:9
**38** 4:7 8:11

**4**

**4** 25:19 29:6
**4/22/02** 42:19
**40** 4:8
**41** 4:9
**411** 84:21
**42** 4:10
**420** 5:7
**45** 4:11
**47** 4:12,13
**49** 4:14

**5**

**5** 4:6 31:18,23 32:4 35:19
**5(d)** 2:19
**52** 4:15

**6**

**6** 4:7 38:5,10,14
**60** 4:16
**63** 4:17

**7**

**7** 4:8 40:18,22 41:18 47:2,3
**73** 4:18
**76** 4:19
**78** 4:20

**8**

**8** 4:3,9 41:3,7

**9**

**9** 4:10 42:14,18

# DOCUMENTATION FORM

Employee Name: Wesley McInnis

Investigating Supervisor: Chris Jordan Date: 6-15-06

Present:

Who was involved: Frank Williams + Linda Thornton

Witness (s): No witness Wesley Knows of.

Date of incident: 6-14-06

Where did it take place: Line 3 label Machine

When did it take place (time and day): About 10:30-11:00

What happened:

I Heard some yelling From Frank Williams Could not make out Everything He Said. The only words I Could make out Was that He Was not going to put up With this.

PLAINTIFF'S EXHIBIT

5 Jordon

Did this result in down time? No If yes how much?

Did this result in product being scrapped? No If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

# INVESTIGATION NOTES

Incident: Frank Williams and Linda Thornton

Date: 6/14/06

Resolution:

Frank Williams was given a disciplinary warning. Linda Thornton was moved to Line 5 Label Operator.

PLAINTIFF'S
EXHIBIT
6 Jordan

Appeal #1

PLAINTIFF'S EXHIBIT 7

3-30-06

To whom it may concern;

On behalf of myself, I am requesting an appeal on the subject of my label operator level status. I hope that you will greatly re-consider the status that you have placed me at. I am convinced that this was greatly un-noticed when I was placed as a level one label operator. My skills are at a very high level that I am deeply proud of. I have mastered lines one and two label machine's for the past four years. At [pr]esent time I run line 3 label machine which is considered the hardest of the can lines. I am able to trouble shoot, change over every machine. Even though, on the can line, I continue to always help my fellow label operators. For there will never be a label operator that never needs help, including myself. I have had the opportunity to train Vickie Cook on line one label machine to take my position. With patience and the correct information in training Vickie has proven herself to be one of the best par line label operators.

I am requesting an appeal and that you give me the opportunity to go directly to label operator status 4. I believe I have earned this and have the skills achieved.

Sincerely
Linda Thornton.

FH000054



Christopher J. Jordan/NC/Ralcorp
05/10/2006 02:28 PM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Melvin G. Hutchins/NC/Ralcorp@Ralcorp, Thomas A. Nance/NC/Ralcorp@RALCORP
bcc
Subject Re: Linda Thornton

As of today Linda Thornton has successfully passed the first three levels of the label operator pay for skills test. The level 4 test is a hands on training skills test and she has already proven she can successfully training Vicki Cook on line 1. I have spoken with Melvin Hutchins and we are in agreement that Linda Thornton should be considered as a Level 4 Operator. If you have any questions please let me know.

S. Leigh Allums/NC/Ralcorp

S. Leigh Allums/NC/Ralcorp
05/10/2006 01:42 PM

To Christopher J. Jordan/NC/Ralcorp@Ralcorp
cc
Subject Linda Thornton

I spoke with Tommy about Linda Thornton's pay increase. Please send me an e-mail stating her training proficiency and that she has passed all three written test. I will make her increase effective 05/15/06.

Thanks

Leigh Allums
Human Resources Coordinator
(334) 983-0209

If you are not the intended addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to internet email for messages of this kind.

PLAINTIFF'S
EXHIBIT
8
Jordan

FH000012



# Personnel Action Notice

PLAINTIFF'S EXHIBIT
9

**COMPLETE FOR ALL ACTIONS**

NAME (Last, First, Initial): Parrish Linda
BIRTHDATE: / /
DATE OF HIRE: / /
SOCIAL SECURITY NUMBER: — —
EMPLOYEE I.D.
DEPARTMENT
EXEMPT ☐ NON EXEMPT ☐ HOURLY ☐ LINE SUPV. ☐
REASON FOR ACTION

**☐ EMPLOYMENT**

HIRE ☐ REHIRE ☐ RECALL ☐ PERM. ☐ PT. TIME ☐ TEMP. ☐ SINGLE ☐ MARRIED ☐ MALE ☐ FEMALE ☐
EFFECTIVE DATE / /
FUNCTION
DEPARTMENT
JOB TITLE
SALARY GRADE
RATE OF PAY $ Per
HOME ADDRESS: Street City State Zip Phone
MAILING ADDRESS (If Different Than Above)
EEOC JOB CODE | RACE CODE | HANDICAP CODE | CITIZEN OF | MILITARY STATUS | VIET. VET | DISABLED VET

**☐ TRANSFER**

EFFECTIVE DATE / /
FROM: FUNCTION — DEPT.
TO: FUNCTION — DEPT.
TYPE: ☐Promotion ☐Lateral ☐Other
CURRENT JOB TITLE — SALARY GRADE
NEW JOB TITLE — SALARY GRADE

**☑ COMPENSATION ACTION**

EFFECTIVE DATE: ~~3-11-02~~
FUNCTION: 4/22/02
DEPARTMENT
JOB TITLE: Label Operator
SAL. GRADE
LAST ANNUAL INCREASE: Date / / 1-21-02 $ %
☐ MERIT ☐ PROMO. ☐ ADJ.
SALARY RANGE: MIN. MAX.
CURRENT ANNUAL RATE: $ 8.00 Hour
PROPOSED ANNUAL INCREASE: $ %
NEW ANNUAL RATE: $ 9.00 Hour
☐ MERIT ☐ PROMO. ☐ ADJ.

**☐ SEPARATION**

QUIT ☐ DISCHARGE ☐ TERMINATION ☐ LAYOFF ☐ RETIRE ☐ DEATH ☐ LEAVE ☐
SEPARATION ALLOWANCE: YES ☐ NO ☐
DATE NOTICE GIVEN / /
UNUSED VACATION NO. WORK DAYS:
ACCRUED VACATION NO. DAYS DUE:
EFFECTIVE DATE / /
FUNCTION
REHIRE: YES ☐ NO ☐
TYPE LEAVE
EST. DURATION
LAST DAY WORKED / /

**☐ CHANGE OF ADDRESS**

NEW: STREET CITY STATE ZIP PHONE
EFFECTIVE DATE / /

COMMENTS: She has become A Complete operator. She does A good Job And Listens very well.

| CURRENT DEPARTMENT | | NEW DEPARTMENT | |
|---|---|---|---|
| Immediate Supv.: [signature] | Date: 3/11/02 | Immediate Supv.: | Date: |
| Approved: Melvin Hutchins | Date: 3-11-02 | Approved: | Date: |
| Personnel Review: [signature] | Date: 3/1/02 | Personnel Review: | Date: |

ORIGINATOR — Retain Canary Copy For Follow-Up



Flavor
House
Products Inc.

# Personnel Action Notice

PLAINTIFF'S
EXHIBIT
Jordan
10

**COMPLETE FOR ALL ACTIONS**

| NAME (Last, First, Initial) | | | | BIRTHDATE | DATE OF HIRE |
|---|---|---|---|---|---|
| PARRISH Linda | | | | / / | / / |
| SOCIAL SECURITY NUMBER | EMPLOYEE I.D. | DEPARTMENT | EXEMPT ☐ | NON EXEMPT ☐ HOURLY ☐ | LINE SUPV. ☐ |
| — — | | | | | |
| REASON FOR ACTION | | | | | |

**☐ EMPLOYMENT**

| EFFECTIVE DATE | HIRE ☐ REHIRE ☐ RECALL ☐ | PERM. ☐ PT. TIME ☐ TEMP. ☐ | SINGLE ☐ MARRIED ☐ | MALE ☐ FEMALE ☐ |
|---|---|---|---|---|
| / / | FUNCTION | | DEPARTMENT | |
| JOB TITLE | | | SALARY GRADE | RATE OF PAY $ Per |
| HOME ADDRESS Street City State Zip Phone | | | | |
| MAILING ADDRESS (If Different Than Above) | | | | |

| EEOC JOB CODE | RACE CODE | HANDICAP CODE | CITIZEN OF | MILITARY STATUS | VIET. VET | DISABLED VET |
|---|---|---|---|---|---|---|
| | | | | | | |

**☐ TRANSFER**

| EFFECTIVE DATE | FROM | FUNCTION | DEPT. |
|---|---|---|---|
| / / | TO | FUNCTION | DEPT. |
| ☐Promotion ☐Lateral ☐Other | | CURRENT JOB TITLE SALARY GRADE | NEW JOB TITLE SALARY GRADE |

**☑ COMPENSATION ACTION**

| EFFECTIVE DATE | FUNCTION | DEPARTMENT | JOB TITLE 045233 Label Operator / Filler Operator | SAL. GRADE |
|---|---|---|---|---|
| 11/11/02 | LAST ANNUAL INCREASE Date / / $ % | ☐ MERIT ☐ PROMO. ☐ ADJ. | SALARY RANGE MIN. MAX. | |
| CURRENT ANNUAL RATE $ 10.00 HOUR | PROPOSED ANNUAL INCREASE $ 3 % | | NEW ANNUAL RATE $ 10.30 | ☐ MERIT ☐ PROMO. ☐ ADJ. |

**☐ SEPARATION**

| EFFECTIVE DATE | QUIT ☐ DISCHARGE ☐ TERMINATION ☐ LAYOFF ☐ RETIRE ☐ DEATH ☐ LEAVE ☐ | SEPARATION ALLOWANCE YES ☐ NO ☐ | DATE NOTICE GIVEN / / | UNUSED VACATION NO. WORK DAYS: | ACCRUED VACATION NO. DAYS DUE: |
|---|---|---|---|---|---|
| / / | FUNCTION | REHIRE YES ☐ NO ☐ | TYPE LEAVE | EST. DURATION<br>LAST DAY WORKED / / | |

**☐ CHANGE OF ADDRESS**

| EFFECTIVE DATE | NEW: STREET CITY STATE ZIP PHONE |
|---|---|
| / / | |

COMMENTS: Annual Increase

| CURRENT DEPARTMENT | | NEW DEPARTMENT | |
|---|---|---|---|
| Immediate Supv.: [signature] | Date: 11/7/02 | Immediate Supv.: | Date: |
| Approved: Melvin Hutchins | Date: 11-7-02 | Approved: | Date: |
| Personnel Review: [signature] | Date: 11-8-02 | Personnel Review: | Date: |

FH000206

# Appeal Response

To: Linda Thornton

Re: Level 4 Operator Pay Appeal

Date: April 20, 2006

From: Tommy Nance

Linda,

We have reviewed your appeal to adjust your pay to level 4 for the Label Operator position. You were initially placed at a Level 1 at the introduction of the Pay for Skills Program. You have not taken the opportunity to advance your Level Status through testing at the various levels. You have stated that since your pay was at or above Level 4 that you did not need to test. This however does not allow you to receive annual cost of living increases due to your pay being higher than Level 1. You have been red-lined and will only receive a lump sum disbursement rather than an annual increase until the cost of living increases cause the pay for skill levels to advance beyond your current pay.

If you feel that you are a Level 4 operator, we will afford you the opportunity to test at each level without the pre-requisite 6 month period between levels. You will have to test at each level and we will assign you the level status that you are able to show competence in. Your pay will not be reduced if you fail to pass any given level. Likewise, no increase will be given until competence as a Level 4 has been achieved.

PLAINTIFF'S
EXHIBIT
Jordan
11

Emergency

# VACATION REQUEST

EMPLOYEE Linda Thornton

DATES REQUESTED 4-13-06

*****VACATION PAY CAN ONLY BE GRANTED FOR TIME AWAY FROM WORK******

EMPLOYEE'S SIGNATURE Linda Thornton

DATE 4-17-06

APPROVED BY SUPERVISOR: YES ✓ NO ___

COMMENTS Blood Pressure problems.

SUPERVISOR'S SIGNATURE

[signature]

DATE 4-13-06

PLAINTIFF'S EXHIBIT 12 Jordan

DO NOT WRITE BELOW THIS LINE – TO BE COMPLETED BY THE HR DEPT. ONLY

*********************************************

*THIS SECTION TO BE COMPLETED BY THE HR DEPARTMENT*

DATE OF HIRE ___

ELIGIBLE FOR 48 HOURS

VERIFIED BY P

DATE 4/13/06



Christopher J. Jordan/NC/Ralcorp
04/17/2006 11:03 AM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Thomas A. Nance/NC/Ralcorp@RALCORP, Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Linda Thornton

Please place in personnel file:

I spoke with Linda Thornton today about her missing work and not being on the line due to her medical problem. I explained to her if this continued we would ask her to provide some type of doctor's certification per Tommy Nance's instruction stating she was able to perform her job. Linda Thornton stated that she is taking medication at night to prevent any more problems. Melvin Hutchins was in the meeting.

PLAINTIFF'S
EXHIBIT
Jordan
13

**DOCUMENTATION FORM**

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordan Date: 2-16-06

Present: Melvin Hutchins

Who was involved: Frank Williams

Witness (s):

Date of incident: 2-16-06

Where did it take place: In hallway of Plant.

When did it take place (time and day): 2-16-06 Am.

What happened: At approximately 10:50AM an employee came to me stating that Frank Williams had came to them this am, stating that I had been telling people that Frank Williams was a child molester. Immediately I met with M. Hutchins / Chris Jordan with this matter. This is after a previous meeting with M. Hutchins on the topic of many concerns with Frank and line & work situations.

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

Mark Beard - present in smoking area

PLAINTIFF'S EXHIBIT Jordan 14

**DOCUMENTATION FORM**

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordon. Date: 3-01-06

Present: M. Hutchins

PLAINTIFF'S EXHIBIT Jordan 13

Who was involved: Frank Williams

Witness (s): N/A

Date of incident: Linda was told 2/28/06

Where did it take place: Break Area

When did it take place (time and day): After work

What happened: Repeatly I have been told of Comments that team leader has made against me. One after investigation. Very Serious comments and threats made.
I just want this to be over with. Which I believed it would be after last weeks meeting with Tommy in HR. These threats & comments were made to an employee in the front office.

Did this result in down time? N/A If yes how much?

Did this result in product being scrapped? If yes how much? N/A

Attach an additional sheet if needed for witness statements following the same format.

**DOCUMENTATION FORM**

Employee Name: Frank Williams

Investigating Supervisor: Chris Jordan Date: 2-16-06

Present: N/A

Who was involved: Linda Thornton

Witness (s): Jewell Silvey & Tracy Brantley

Date of incident: 2-16-06

Where did it take place: Hall way

When did it take place (time and day): 2-9-06

What happened: Jewell Silvey came up to me in the Hall way & told me that Linda thorton was outside tellins everyone that I was a child molester & my Brother's wife's Daughter was my girl friend this is harrassment and I don't Like it I don't start troulble. what happen 15 years ago is none of her Bushess

Did this result in down time? no If yes how much?

Did this result in product being scrapped? no If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT
Jordan
16

Tracey Brantley
Jewell Silervy
Jackie Ward
Vickie Cook

FH000004



-3
85

# LABEL OPERATOR

**Can Line**

**ANSWERS**

1. If the lift does not raise the labels, which of the following statements could be a possible reason?
   a. Hydraulic fluid pressure is too high.
   b. Label basket is too loose.
   c. Curling bar is either loose or not tight.

2. If the label is not being picked up, which of the following is not a true statement.
   a. Hot pickup glue is too low.
   b. Hot pickup glue is too high.
   c. Too many glue rollers (wheels).
   d. Speed of machine is too fast.

3. If the label machine is running but the label table will not lift the labels up, which of the following is a possible problem?
   a. Check sensor to make sure it is blocked.
   b. Hydraulic pump not turned on.
   c. Belts are too tight.

PLAINTIFF'S
EXHIBIT
17 Jordan

4. What is the ideal air pressure for the cold glue?
   a. 10-20 psi.
   b. 30-40 psi.
   c. 60-70 psi.

5. True or False. The room temperature will affect how the label machine performs.

6. True or False. Overhead belts should not be cleaned.

7. True and False. Guide rails being too tight can cause loose labels.

8. True or False. When operating the label machine you should use as many glue rollers (wheels) as possible.

9. What does pp mean on the description of the BOM/schecule?

~~pulse per minute?~~

pre-priced

No pay change

10. How many minutes are there between label checks? I check @ 5minutes But you should always check atleast @ 15min when checking videoset.

11. How would you determine if you have the correct label for the order you are about to run? Check the schedule with your label and communicate with your filler operator.

12. If the padding on the label machine is sticky or tacky, what will this cause? tearing. or pulling of the label, loose labels, sometimes up & down with the labels.

13. True or (False) If the label is on the top or bottom rim of the can this is acceptable.

X 14. If the capper is stripping off labels as the cans go through the machine, which of the following statements is false.
   (a.) Speed of label machine is too fast.
   b. Too much cold glue.
   c. Padding needs to be replaced.

15. Which of the following statements is incorrect.
   a. If a flex rail breaks it could cause the cans to jam the machine.
   b. Improper spacing of glue wheels will cause build up of glue on the belts.
   (c.) The label machines cannot be slowed down.

16. True or (False) The hot glue needs to set at the same setting every day. Sometimes it depends on the weather

17. What are the 4 tools most commonly used on a label machine during a changeover? flat head scrwdriver allen pack. 7/16 wrench. The Big Allen wrench.

18. (True) or False. Low air pressure will cause problems with the cold glue.

X 19. How many E-stops are on the label machine? Main The red stop button / The power switch (2)

20. If the tension springs break on the rollers what could this cause? loose labels, depending where the spring is, it could cause no label pick-up; Bad labels.

Linda Thornton
Signature

05-10-06.
Date





# LABEL OPERATOR

### Jar Line
### ANSWERS

1. How many E-stops are on the Krones Canmatic?
   Seven E-stops.

2. How many safety eyes are protecting the Krones Canmatic?
   four safety eyes.

3. What two adjustments can control the amount of glue flow on the lap roller?
   Scraper, adjusting screw for the flow of glue.

4. True or False. The SET UP MODE screen is where the operator can make a height adjustment. True.

5. True or False. If the height adjustment is not in the proper placement, the lap roller will be out of timing. True.

6. What is the proper sequence (Steps 1 to 3) for timing the container handling system?

   2 Transfer stars to Bottle Table.
   3 Bottle Table to Centering Bell.
   1 Infeed Screw to Infeed Star.

7. True or False. The reservoir drain valve and plug are the same temperature as the outside of the glue pot. ?

8. True or False. To complete a changeover an operator needs a 15 mm wrench.
   False 2. Chante locks.

9. What causes a main load override malfunction?
   The speed of the machine is too high causes machine to shut off @ start up / or sudden stop / jars in front of eye.

10. True or False. The brush bristles should not penetrate more than one quarter of an inch into the container.

11. What happens if you raise one of the doors on the Krones Canmatic?
    the machine shuts off.

NO Pay change

12. True or (False) The scraper cannot be used to adjust the amount of glue on the pick-up side roller? You can control this with the scraper - also with the adjustment screw.

13. Where are the jog chords located on the Krones Canmatic?
(1) Backside/Side near line 2.
(2) one on (R) side of machine, closer to video jet.

14. True or (False) A bent container will not cause a container jam.

15. If the lap end of the label shows no adhesive pattern, it could be the result of which of the following?

(a) Mispositioned brush segments.
(b) Labels not coming to the front of the fingertips.
(c.) Lap roller out of position.
(d.) All of the above.

B + C Are correct.

16. How many minutes are there between label checks? I check the labels at least 5 minutes apart, but you should always check labels when you check videojet at least every fifteen minutes

17. How would you determine if you have the correct label for the order you are about to run? always check Schedule with the labels. and communicate with filler operator.

18. True or (False) If any safety device (guard cover, guard door, stop button, etc.) is missing, broken, or malfunctioning, the machine can still be operated. No - contact your supervisor + maintenance

19. What operator action will stop the machine?
(a.) Push a Machine Stop button.
(b) Push an E-Stop button.
(c.) Open a guard door.
d. Close the Bottle Stop.
e. All of the above.
(f.) Only A, B and C are correct.

↑ answer.

20. Which of the following are safety items that should be reported immediately?

a. Missing or broken guards/guard doors.
b. Guard door interlock switch not working.
c. Emergency Stop button does not immediately stop the machine from rotating.
d. A co-worker that is not following correct safety procedures or practices.
(e.) All the above.
f. None of the above.

Linda Thornton
*Signature*

05-08-06.
*Date*



Christopher J. Jordan/NC/Ralcorp
02/03/2006 03:33 PM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Richard W. Holland/NC/Ralcorp@Ralcorp, Melvin G. Hutchins/NC/Ralcorp@Ralcorp, Thomas A. Nance/NC/Ralcorp@RALCORP
bcc
Subject Linda Thornton

Please place this e-mail in Linda Thornton's personnel file:

I had a coaching session with Linda Thornton this afternoon (1-31-06) with Melvin Hutchins present. I addressed an ongoing issue when Linda has a problem with the label machine it is quickly pointed out that we have a mechanical problem. I explained to her that the label machine needs work and we are aware of that issue. However, just because we have mechanical problems with the label machine it can be adjusted to keep it running. It may not be perfect but we can still keep the line running. She stated she understood. Also, one issue today we was the labels were not aligned properly on the can and she continued to run. Frank Williams, the team leader, pointed it out to Linda. Linda did not understand that when Frank said the label was not between the rails. I cleared up the misunderstanding and told her that when he said rails it's the same as the rim of the can. Also, I explained to Frank that he cannot assume that Linda understands the terms he uses regarding the label machine. Linda has been a label operator for several years but this is the first time she has been assigned to a can line. At the conclusion of the meeting I addressed an ongoing issue with her and Frank regarding the problem resolution. I explained that in the future I would like to see more teamwork and less friction between both of them. She said she understood and agreed to work on this issue.

PLAINTIFF'S
EXHIBIT
Jordan
19

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
KIMBERLY PERKINS

Commissioner:
Renny D. McNaughton
June 11, 2008
Dothan, Alabama

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Kimberly Perkins, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 11th day of June, 2008, commencing at approximately 1:00 p.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at

the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms. Swain the original transcript of the oral testimony taken the 11th day of June, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

I N D E X

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Swain | 7 |

E X H I B I T S

| | |
|---|---|
| No. 1 | 35 |
| No. 2 | 43 |
| No. 3 | 48 |
| No. 4 | 50 |
| No. 5 | 55 |
| No. 6 | 58 |
| No. 7 | 63 |
| No. 8 | 68 |
| No. 9 | 79 |
| No. 10 | 91 |
| No. 11 | 92 |
| No. 12 | 96 |
| No. 13 | 93 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202

FOR THE PLAINTIFF (S):
Bobbie S. Crook
Attorney at Law
367 S. St. Andrews St.
Dothan, Alabama 36301

Also Present: Linda Thornton

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 1:00 p.m. on the 11th day of June, 2008, Kimberly Perkins, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins videotape number one of the deposition of Kim Perkins in the matter of Linda Thornton versus Flavor House Products and Franklin D. Williams, Jr., case number 107-CV-712-WKW. We're on the record at 1:04 p.m. Today's date is June the 11th, 2008. This is Wednesday. The deposition is taking place at the

offices of Bobbie S. Crook, PC, Dothan, Alabama. My name is Joey McClain representing Freedom Court Reporting. Would counsel identify yourself and state whom you represent.

MS. CROOK: I'm Bobbie Crook and I represent the plaintiff.

MS. SWAIN: Jennifer Swain representing defendant Flavor House Products, Inc.

THE VIDEOGRAPHER: Okay. You may swear the witness.

(Witness Sworn.)

THE COURT REPORTER: You are sworn. Usual stipulations?

MS. SWAIN: Yes, that's fine.

KIMBERLY PERKINS

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. SWAIN:

Q Will you state your name, please.

A Kimberly Perkins.

Q Ms. Perkins, my name is Jennifer Swain, and I'm an attorney representing Flavor House in the lawsuit that was filed against it by Linda Thornton. I'm going to ask you some questions today and ask you to give me a verbal -- either a yes or a no or a narrative response as your answer as opposed the head shakes or uh-huh or huh-uh. Can you do that for me?

A Yes.

Q I'm also going to ask you to let me know if I ask a question that you don't understand or doesn't make sense to you for some reason. If you'd let me know that I'll try to clarify my question. Can you do that?

A Yes.

Q Certainly you can let me know if you need to take a break at any time during your deposition, and I will ask you to answer whatever question is on the table, but, otherwise, you're certainly free to take one if you need one.

A Okay.
Q One of the things we've talked about in these depositions is that we understand that Flavor House, the plant here in Dothan, has been owned by some different companies over time, but we are referring to it throughout as Flavor House. Can you --
A Okay.
Q Is that okay with you?
A Yes.
Q So you know what I'm talking about when I say Flavor House, I mean the plant in Dothan.
A Yes.
Q Now, you used to be employed at Flavor House?
A Yes.
Q When did you first start working there?
A May of 2000.
Q And what position were you hired into?
A Quality control.

Q And how long did you work in quality control?
A About two and a half years.
Q And what position did you go to?
A I bounced around to different things, to picking table, cable op -- cap operator and then I went to the filler machine.
Q To what?
A Filler machine.
Q Filler machine. And were you still on the filler machine at the time that you left your employment?
A Yes.
Q How long did you work on the picking table?
A A couple weeks.
Q Okay. And then how long were you a cap operator?
A About the same amount. A couple weeks.
Q And how long were you working on the filler machine?

A From then until May the 11th of 2007.
Q And May the 11th of 2007 is when you were terminated from your employment of Flavor House?
A Yes.
Q So you worked -- were you a filler operator? Is that the correct title?
A Yes.
Q You worked as a filler operator from roughly mid-2000 until -- I'm sorry. Mid -- well, roughly 2003, did you say, until 2007? Does that sound right?
A Yes.
Q During the time that you were a filler operator, who was your direct supervisor?
A I had several of them.
Q Okay. And who was the first supervisor that you had?
A The first was Buck Perkins.
Q Okay. And was he a production supervisor?

A Yes.
Q Is that his title? And how long was Buck Perkins your supervisor?
A Around a year to a year and a half, I believe.
Q Okay. And then who was your next supervisor?
A Fannie Ash.
Q And how long was Fannie Ash your supervisor?
A Around a year.
Q And who came after Fannie?
A Chris Jordan, I believe.
Q And how long was Chris Jordan your supervisor?
A On the whole -- the rest of the time.
Q He was still your supervisor at the time you left Flavor House?
A Yes. It would switch because I would switch lines.
Q Okay.
A From Chris Jordan to Eugene

Andrews.
Q Okay.
A But Chris pretty much ruled Eugene, too.
Q Do you know what Chris Jordan's title was?
A Line supervisor.
Q Do you know what Eugene Andrews' title was?
A Same.
Q Same. When you were working as a filler operator with Buck Perkins as your supervisor, what line were you on?
A Five.
Q And then did you leave line five and move somewhere else for Fannie Ash to be your supervisor or did Buck move?
A I moved -- let me see. I moved to line one.
Q And is that when Fannie Ash became your supervisor?
A Yes.
Q Okay. And then when you were

working with Chris Jordan and Eugene Andrews at various times as your supervisor, you said you were switching lines --
A Yes.
Q -- which lines were you going between?
A I was on one, two -- actually all of them, three, four, and five.
Q Okay.
A Chris was over -- after Fannie, Chris was over one and two and then he gained three. Eugene was over four and five.
Q Okay. And who did you say was over line three?
A Chris Jordan.
Q Chris. During that period that Chris Jordan and Eugene Andrews were at times your supervisor, how long was that time frame?
A A pretty good while.
Q Would you say about a year?
A Between the both of them, on all

three, four, and five lines?
Q Correct.
A A year or two. A couple years.
Q Okay. And did you in that time frame have any line that you worked on primarily or you just floated between lines as you were needed?
A I worked on one line for a while and, like, another line was going down -- like I was on three for a while. Line four was going down and doing real bad, so they switched a couple of us over to that line. And then line five was going down and they switched us over to that line.
Q Okay. And you were still at times working on lines one and two in this time frame as well?
A Not so much one. They had permanent one on one.
Q Okay.
A But I would go back to two.
Q Okay. Who was the permanent one on two at that time?

A Stephanie. And I can't remember her last name.
Q Does Lampley sound right?
A Yes.
Q Do you recall who the other filler operators were in that time frame, besides you and Stephanie?
A There was a lot of them that come and go. And at one time on five there was Lisa Austin. They had temporary ones. There was a lot of people that came and go on filler operator. That was a hard job.
Q I'm sorry. I didn't mean to interrupt you. Any that you can remember specifically other than Stephanie -- Stephanie Lampley and Lisa Austin?
A Not right offhand. I'm sorry, I can't.
Q Now, during the time that Fannie Ash was your supervisor and you were on line one, was Linda Thornton also working on line one during that period?
A Yes.

17

Q Okay. So you all worked together --
A Yes.
Q -- during the roughly one year that Fannie Ash was your supervisor?
A Yes.
Q Okay. At some point, is it your understanding that Ms. Thornton moved to line three?
A Yes.
Q Were you still on line one at that time or where were you?
A One.
Q One. Okay. And the period you worked with Linda where y'all were both on line one, would that have been roughly in the 2004-2005 time frame?
A Yeah.
Q Do you recall when it was that Ms. Thornton moved to line three?
A No. I don't recall the exact time. No.
Q After Ms. Thornton moved to line

18

three, were you all regularly on the same line together? And I understand that --
A Occasionally.
Q Let me strike that. Let me ask you this first. There would be times even if one of you was on one line and one was on the other line that one or the other of you might be asked to work on a different line for a day and you all would be together?
A Yes.
Q Apart from that, I guess what I'm trying to get at is were there -- was there any time after both of y'all, excuse me, worked with Fannie Ash as your supervisor where you were regularly on the same line or that was your primary assignment?
A Not for a long period of time. For a few days, yes.
Q Okay. And just kind of here and there?
A Yes.
Q And did that remain the case up until the time that -- that Ms. Thornton

19

left her employment at Flavor House?
A Yes.
Q Had you known Ms. Thornton before -- because you were hired first; correct?
A Yeah.
Q Had you known her before she was hired at Flavor House?
A No.
Q So you met her through work?
A Yes.
Q Did you -- and I assume again because you were moving around lines occ -- you know, occasionally working on a different line for a day or a few days here and there, you maybe worked at times with Frank Williams; is that correct?
A Yes.
Q Were you ever regularly assigned to the same line as Mr. Williams?
A Yes.
Q When was that?
A That was on line three.

20

Q And what time frame was that?
A Up until I was fired. Well, no. When I was fired I was on line five.
Q Let me ask you this way. Was it after Ms. Thornton had left her employment with Flavor House?
A No.
Q It was while she was still there?
A Yes.
Q Okay. So sometime between the time that -- was it sometime between the time that Ms. Thornton moved to line three and the time that she left her employment?
A Yes.
Q But you can't recall specifically?
A No. Like I said, I bounced around so many lines so much, I don't recall specifically what time I moved to -- so actually I was on line three a couple of days, then I moved back over to one and two and a while later I moved back to three for several months, close to a year, and then I

moved to four -- to five, four and five.

Q Okay. And do you remember when the period was that you worked on line three for several months to a year?

A Yes.

Q When was that?

A About -- say around '06.

Q Okay.

A '05. About '06.

Q As a filler operator, did you fill out checklists or paperwork on a regular basis?

A Yes.

Q Did you have to do that every day?

A Very much. Yes.

Q What -- what kind of paperwork did you fill out each day?

A About -- oh, God. Several sheets of startup check sheets, did the weight control sheets. I kept up with the nitrogen sheets and a lot of paperwork.

Q And -- and each of those

documents you've just described were things that you had to fill out every day?

A Yes.

Q And who did you turn those into?

A A supervisor.

Q And would those documents reflect what line you were working on a particular day?

A Yes.

Q I may have asked you, but if I did I forgot your answer. Do you -- do you know when it was that Ms. Thornton moved from line one to line three?

A See, I don't remember a specific date.

Q Do you remember roughly the time frame, what year it was?

A '04, I think. See, I don't -- I spent seven years there bouncing all over the place. No, I don't remember exact dates.

Q Sure. I understand that. Was it your understanding that you -- you were

terminated from your employment at Flavor House because you basically exhausted the steps in their progressive disciplinary policy?

A Actually, I'd got to the point where I was just so -- under so much stress and pressure, I just pretty much didn't care anymore.

Q Well, is it your testimony that you were not terminated?

A Yes, I was.

Q You were terminated?

A Yes.

Q What I'm trying to figure out is whether it was your understanding that the reason for that was because you had exhausted the steps in the company's disciplinary policy?

A Yes.

Q And the final step that you received in terms of the discipline was for a performance-based reason?

A Yes.

Q Were you angry about your termination from Flavor House?

A Angry and relieved.

Q Would it be accurate to say that you bear ill will towards Flavor House?

A I can't stand the place.

Q Okay. That answers that question. Are you hoping to see Flavor House lose in this lawsuit that Linda Thornton has filed?

A It's not going to benefit me, so that don't, you know --

Q Well, would you derive satisfaction from seeing Flavor House -- bad things happen to Flavor House?

A It don't really matter to me.

Q Between the time that Linda Thornton left her employment at Flavor House and the time that you left your employment at Flavor House -- let me back up and say: Is it your understanding that Ms. Thornton left Flavor House in June of 2006?

A Yes.

Q And I think you already told me you were terminated in May of 2007?
A Yes.
Q A little -- a little less than a year; is that correct?
A Yes.
Q During that period of -- of just under a year, did you speak to Ms. Thornton about her termination?
A Not very much. I mean, what do you mean specifically?
Q Well, let me -- let me ask you a different question. During that period of just under a year, did you talk to Ms. Thornton?
A Yeah, we spoke.
Q On the phone --
A We're still friends.
Q On the phone or in person?
A On the phone.
Q Did you meet in person as well?
A No. I don't believe I've seen her, not in a while.

Q Did you talk to Ms. Thornton about her lawsuit against Flavor House?
A No.
Q Did she tell you that she had filed a lawsuit against Flavor House?
A I knew she had filed something.
Q And you knew that from her or it was another source?
A Several people.
Q Did she tell you about her lawsuit?
A No. She just -- she would call me and she would be crying, just upset between -- said things with that and she ended up having trouble at home. And that's mainly what we talked about, because I knew what she was going through at home because I had been through the same thing.
Q What was your understanding what she was going through at home?
A Her husband, a lot of problems with him and bills not getting paid. Things like that.

Q What was your understanding of the problems that Ms. Thornton had with her husband? What did she tell you the problems were?
A Communication broke down, him and her son arguing all the time. Just financial -- serious financial trouble.
Q Do you know Ms. Thornton's husband?
A I've seen him, met him once. I don't know a whole lot about him.
Q Did Ms. Thornton tell you what it was she was suing Flavor House for?
A Yes.
Q What did -- what did she tell you?
A She just said it was a sexual harassment case.
Q Have you at any time spoken with Ms. Thornton's lawyers?
A No. I came to them because I had trouble, and I went to another lawyer at Enterprise.

Q Have you retained or have you at any time retained any of the lawyers that Ms. Thornton is using to represent you?
A No.
Q Did you talk to Ms. Thornton's lawyers about her claims -- about Linda's claims?
A No, no.
Q Did Ms. Thornton's lawyers ask you whether you had witnessed anything that Ms. Thornton was complaining about?
A She asked me what did I see out there.
Q Relating --
A What was my complaints out there.
Q Did she ask you whether you had witnessed any of the things that Ms. Thornton was complaining about?
A She just asked me in general what were my complaints and what did I witness out there.
Q Okay. And was that Ms. Crook that you spoke with or a different lawyer?

A I believe it was her. I don't know. It was a while back.
Q Do you recall when that was? Do you recall when that was?
A About a year ago.
Q Okay. And you indicated you also met with or talked to an attorney in Enterprise?
A Yes.
Q Have you retained that lawyer?
A No.
Q Who is the lawyer in Enterprise that you spoke with.
A I only talked to him a couple times. I don't remember his name.
Q Have you retained any lawyer to represent you in relation to your employment?
A No.
Q During the time that -- strike that. Do you -- is it your opinion that Ms. Thornton is a truthful person?
A Yes.

Q Do you know of any occasions on which Ms. Thornton has lied?
A No.
Q Are you a truthful person?
A Yes.
Q During the time that both you and Ms. Thornton were working at Flavor House, did you all have any conflicts?
A Yes. On line one.
Q I'm sorry?
A On line one.
Q On line one you did?
A Uh-huh.
Q What kind of conflict did you have with Ms. Thornton when you all -- this is when you were both on line one?
A Yes.
Q Okay. What kind of conflict did you have with Ms. Thornton when you were both working on line?
A Just general stuff. Stuff breaking down, mechanics jumping in our faces and us both getting stressed out and

just at each other's throats. Now, the whole line was that.
Q Did you ever use profanity towards Ms. Thornton?
A What do you mean by that?
Q Did you -- did you ever cuss at her?
A What do you mean? Call her a bitch or anything like that or just --
Q Well, that would be -- that would be one example.
A Just damn or something like that? I mean, in every day language, yes, I cursed out there.
Q Did you ever call Ms. Thornton a bitch?
A No.
Q Did you ever use the term mother fucker in a conversation talking to Ms. Thornton?
A About her?
Q Let's start with that. About her.

A No.
Q Did you ever use it when talking with Ms. Thornton about someone else?
A Yes.
Q Did Ms. Thornton ever use profanity towards you during your conflict with her?
A I believe she did, but like I said, that day, which it was mainly one day, it was a highly -- very highly stressful day. And that was -- this was after a mechanic had done got all up in my face screaming and yelling and cussing me like they did all the time. But people get in high -- high stress situations, they're going to say things.
Q So is it your feeling that if you're stressed out about work or something going on at work, that that would justify using profanity towards another co-worker?
A No, it doesn't justify it. Things just happen.
Q When you had this conflict with

with Linda, did you receive any kind of disciplinary step as a result of your conduct during that --

A I was written up, I believe.

Q Do you remember who wrote you up?

A It was probably Chris Jordan, because he was over that line.

Q Are you certain that you were written up or you're sort of guessing that you were?

A See there was -- there was a time months later where Chris Jordan brought me up in the front office and laid like four things right out in a row in font of me, things dated before then.

Q Why don't we --

A I'm not sure.

Q We will certainly have an opportunity to talk about that but if we could --

A I'm not sure.

Q -- right now you're not sure I think is what you're trying to say --

A Yes.

Q -- whether or not you were written on the particular incident with Linda?

A Yes.

Q Do you recall when that incident with Linda took place?

A I don't recall a certain date.

Q Do you recall what year it was in?

A The year we were on line one together.

Q Do you know whether Linda received any disciplinary action as a result of her conduct during that conflict?

A No, I don't know.

Q Did you feel like she should have received any disciplinary action?

A No.

Q Do you feel like you should have received any disciplinary action?

A No.

(Defendant's Exhibit Number 1 was marked and attached to the deposition.)

BY MS. SWAIN:

Q I'm going to show you what I'm going to mark as Defendant's Exhibit 1 to your deposition and ask you to take a look at that document.

MS. CROOK: Let me see it.

MS. SWAIN: Yeah. Show it to -- I'm sorry, Bobbie. I don't have but these two copies.

Q Have you -- you had an opportunity to read Exhibit 1?

A Yes.

Q What is that document?

A It was a write-up that Linda made to Chris Jordan.

Q About?

A Statement.

Q Is this -- you say a write-up. I mean --

A I mean documentation. Just a

statement.

Q Okay. Is this documentation form -- do you believe this documentation form relates to the conflict with Linda that you and I were just speaking of --

A Yes.

Q -- or is this a different -- a different event?

A That day.

Q And if you could let me -- I know it's hard for you. You can kind of tell where I'm going with the question, so it's hard not to go ahead and start answering, but if you could let me finish the question before you start answering it, it will help our court reporter out because he can't type both of those at once. So we have to -- have to take turns, if you could.

And the date of this documentation form is April 12th, 2006; is that right?

A Yes.

Q And at that time Linda had already moved to line three; is that

correct?
A I believe so, yes.
Q Were you still on line one at that time?
A Yes.
Q And so she come over to line one on a -- to work on that line for a particular day? Is that --
A Yes.
Q -- what happened? If you will look at the bottom part here on the first page of Linda -- is this Linda's handwriting? Is that your understanding here on this?
A Yes.
Q The part where it says what happened?
A Yes.
Q And at the bottom part of that, do you see where it says, Also this morning I heard her holler to Linda Parker on the capper about a mechanic in her -- and it says in parentheses, Kim's words -- she

stated, quote, "Don't worry. He can't help you. He's not worth a fuck." Do you see that?
A Yes.
Q Did you -- did you make that statement to Linda Parker?
A I probably did.
Q And looking on the second page there at the top where it says, One of the OC that was in the lab this a.m., and it's cut off a little bit there on the side of the page. I think it says, then Kim Perkins came in and stated that Kim came in the lab and stated out loud that, quote, "these mother fucking people are getting on my nerves." Do you see that?
A Yes.
Q Did you make that statement?
A That I don't remember making.
Q Do you deny that you made it?
A I'm not do denying it.
Q You just don't recall it?
A Yeah.

Q Is it true that you were always starting something and then wanting to tell a lie?
A No.
Q Was Linda lying when she said that in her documentation form?
MS. CROOK: Object. You can go ahead and answer.
A That's probably the way she felt right then, but, like I said, we were all under stress that day. A lot of things were going wrong.
Q Is it true that you were always trying to get someone in trouble other than yourself?
A No.
Q Was Linda lying when she said that?
MS. CROOK: Object.
A Like I said, that might have been the way she felt at the time, but it wasn't like that.
Q Do you know whether or not -- do

you see there at the bottom part of the second page or the last --
A Yeah.
Q -- written part of that page? It says, she's the main reason I left line one.
A Yes.
Q Was it your understanding that you were the main reason why Linda left line one?
A No. The reason why I understood was because of the stress and pressure on that line and she put in a bid to go to another line.
Q On these documentation forms where it says investigating supervisor on the first page, it says Chris Jordan?
A Yeah.
Q The way these things normally would be done, is that the person that, say, Linda in this case, would be giving the documentation form to?
A Yes.
Q Do you know what would happen to

it after she would give it to, or whatever employee, would give it to the investigating supervisor?
A No.
Q Do you recall whether you filled out a documentation form relating to this particular incident?
A I believe I did.
Q Do you know whether other employees did as well?
A I don't know.
Q Do you feel like you should have been given disciplinary -- a disciplinary step for talking about a mechanic by saying "don't worry, he can't help you, he's not worth a fuck?
A Considering what he did to me that morning, no, I do not.
Q Well, what is it that you -- let me strike that. Who -- who is the mechanic that you're talking about?
A The mechanic, I believe, was Adam Hall. A lot of times on that line it was

Adam Hall and Wesley McGinnis.
Q Okay. What is it that you're claiming that Adam Hall did that, in your view, justified saying -- making the comment "he's not worth a fuck"?
MS. CROOK: Object.
A They -- anything that goes wrong with that line -- that went wrong on that line that day, they come straight to the operators -- the label operator and filler operator. They got up in my face, screamed and yelled at me, told me I needed to get the hell off that damn machine so they can get somebody else in there that can do the job and we're always fucking up these machines and they have to come behind us and fix them. All right. They always --
Q And is that what he -- is that what you're saying --
A Yes.
Q -- that Adam said on that particular day? Let me finish my question, if you would. Okay? Is that what you're

saying Adam said on that particular day?
MS. CROOK: Object.
A He said a lot that day.
Q Well, I'm trying to find out what he said that -- that prompted you to respond in this fashion.
A Yes.
(Defendant's Exhibit Number 2 was marked and attached to the deposition.)
BY MS. SWAIN:
Q Let me show you what I will mark as Defendant's Exhibit 2. Can you tell me what Defendant's Exhibit 2 is?
A It's a documentation form from me to Chris Jordan.
Q And is this also relating to the incident that occurred on April 12th, 2006?
A Yes.
Q And where it says here towards the top of the page who was involved --
A Yes.
Q -- do you see that? Is that your

handwriting there?
A Yes.
Q And who did you indicate was involved in that situation?
A Me, Linda Thornton, and Frank Williams.
Q Do you mention anything about Adam or any other mechanic being involved in this situation?
A No, I didn't, not on this.
Q In fact, did you indicate here that the mechanic had gone on break? I'm looking here on the part where it says what happened and it's about one, two, three, four, five lines down.
A Yes. He went to break without fixing anything.
Q Well, was he cussing at you from break?
A He did before he walked off.
Q Is there some reason why you didn't mention that that's what prompted you to behave the way that you did?

A I didn't mention it in here, no.
Q Right. I'm asking is there some reason that -- I mean, you're telling me here today that what prompted you to use words like fuck and mother fucker --
A When you're --
Q Let me finish the question, if I could. What prompted you to use words like fuck and mother fucker about and in front of co-workers was the way that Adam behaved, yet in the documentation form you wrote about the event you don't mention anything about him or any other mechanic. And I'm asking you is there a reason why you didn't include that in your documentation form?
A I was just writing down what happened, I mean the series of things. No, I didn't put down what Adam did. I clearly stated on here that everything was breaking down and he went to break. I was trying to handle things by myself.
Q Well, was your frustration with him -- strike that. Having read this

document, is it still your testimony sitting here today that Adam yelled and cussed at you on this occasion in April of 2006?
A Yes, he did.
Q I'm sorry?
A Yes, he did.
MS. CROOK: Yeah. You do need to wait until she gets through with the question. Okay?
Q It makes for a much easier to read transcript and it will make our court reporter here very happy. But that wasn't something that was important to you enough to include in your documentation form?
MS. CROOK: Object.
THE WITNESS: I still have to answer when you say that?
MS. CROOK: Uh-huh.
A I'm not trying to say that it wasn't important. I was just trying to hurry up and get down the sequence of event that happened.
Q Do you know whether anybody else

filled out documentation forms relating to this incident besides you and Linda?
MS. CROOK: Object.
A No, I don't know.
Q Do you know whether anybody else reported having heard anybody cuss at you that day?
A No, I don't know.
Q Did you indicate in your form on the second page here that Linda yelled at you twice during this incident?
A Yes.
Q And did she in fact yell at you twice?
A As far as I can remember, yes, she did.
Q Did she use any profanity, curse words towards you?
A Not that I remember.
Q This incident in April 2006 was not the only time that you used curse words at work; correct?
A Correct.

Q And it was not the only time that you raised your voice at work; is that right?
A Correct. Yeah.
Q And it wasn't the only time Linda raised her voice either, was it?
A No. Everybody did.
(Defendant's, Exhibit Number 3 was marked and attached to the deposition.)
BY MS. SWAIN:
Q And -- strike that. Let me show you what I marked as Defendant's Exhibit 3. Is Exhibit 3 a documentation form by Harrell McCullough?
A Yes.
Q Who is Harrell McCullough?
A I believe he was a roaster operator.
Q I'm sorry?
A I believe he was roaster operator.
Q On line one?

A Yes. I believe he was.
Q And do you see here where he wrote that Frank asked you why you stopped running the line? Do you see that there in his comments?
A Yes.
Q And where he indicates, quote, "She got smart with him saying what is it to you."
A I see it.
Q Did you do that?
A I -- no. I don't -- I don't recall doing that.
Q Well, are you saying you didn't do it or you just don't remember one way or the other?
A What I remember is Frank asking me why did I stop the line. And I said, Well, it's time to change over and I don't have a label operator.
Q So my question is then, are you denying that you said, What's it to you or are you --

A Yes.
Q -- saying you just don't remember saying it?
A No, I didn't say that.
Q And Mr. McCullough indicates here that when you made that comment that you dispute that Frank walked off?
A I'm the one that walked off.
Q So you're -- you're --
A I walked out of there and I went back on my line.
Q Do you know of any reason that Harrell McCullough would lie about the situation?
A No, I don't.
(Defendant's Exhibit Number 4 was marked and attached to the deposition.)
BY MS. SWAIN:
Q Let me show you what I'm going to mark as Defendant's Exhibit 4. Just let me know when you've had an opportunity to read Exhibit 4.

A I'm trying to make it out. Okay.
Q And is this -- is Exhibit 4 a documentation form by Frank Williams relating to the April 12th incident?
A Yes.
Q And did Frank Williams -- let's just go through this. He indicates that he walked in the QC lab to get to line 3 and you were calling for a label operator for line one. Is that -- is that accurate?
A Yes.
Q He indicates that he asked you what was wrong with the label machine because the line was not running. Is that accurate?
A Yes.
Q And that you said nothing?
A Yes.
Q That's accurate as well?
A Yes.
Q Frank indicates that he asked you were -- was the labels bad -- were the labels bad?

A Yes.
Q Is that accurate?
A Yes.
Q And you said no?
A Yes.
Q And he says that he told you to go and turn it back on. Is that accurate?
A Yes.
Q He then says, She went off on me, told me that I don't know what the -- he writes little blanks -- I am talking about and to stay out of her MF business. Is that correct?
A No. I don't recall saying nothing to him.
Q Is it possible that you did say it and you just don't recall it?
A What I do recall is him looking at me and saying, So what's your problem?
Q Let me -- let me ask the question again. Is it possible that you did make that comment to Frank Williams and you don't remember it?

A No. Frank Williams is a blue shirt. I would not have told a blue shirt to stay out of my MF business.

Q And the term "blue shirt," not everybody on the jury might know what that means. What does that mean?

A Supervisor -- acting supervisor.

Q He was a -- a team leader; correct?

A Yes.

Q And was it your understanding that a team leader was sort of like a lead -- an hourly lead person?

A Yes.

Q Frank indicates, I asked her not to raise her voice at me and stop cussing me. Is that correct?

A Yes.

Q Is that accurate?

A Yes.

Q She got madder and told me that's how a F'ing blue shirt got to -- and I don't know what that -- do you know what that last

part is?

A BL.

Q What is that?

A Blue shirt. No. I'm not sure what that is.

Q Well, is that part of his statement accurate?

A He left out some in there.

Q Well, there may be some omissions, but is the part -- is that sentence correct? Is it correct that you got madder and told him that's how a F'ing blue shirt got to something?

A What I remember is we got in that argument about the label machine. He was like, Stop cussing me, and grabbed that little microphone hanging off his shoulder like he was about to call somebody and get me in trouble when I'm going through hell out there on that line. And I was, like, You go ahead and call somebody just like a little blue shirt is. And I walked out went on the line. Now, that I don't -- like I

said, he left all that out.

Q Okay.

A But --

Q Well, again, my question is, is it correct that where he says, She got madder and told me that's how a F'ing blue shirt got to something?

A I don't exactly recall that.

Q Okay. Just not sure one way or the other?

A Yeah.

(Defendant's Exhibit Number 5 was marked and attached to the deposition.)

BY MS. SWAIN:

Q Let me show you what I'm going to mark as Defendant's Exhibit 5.

A All right.

Q Is Exhibit 5 a documentation form filled out by April Stuart relating to the April 12th, 2006, incident?

A Yes.

Q And who is Debra Stuart?

A QC.

Q And QC stands for quality control?

A Yes.

Q Am I reading this correctly? Kim Perkin -- she said Perkin. It's really Perkins, isn't it?

A Yes.

Q Used inappropriate language in the lab about employees in the line such as calling them dumbasses, stupid, MF, etcetera. Is that what she says?

A Yes.

Q Is that an accurate statement?

A Yes.

Q Do you know who initially brought this incident to the attention of a supervisor?

A No.

Q So you don't know what prompted Chris Jordan or anyone else to get involved in this?

A No.

Q Now, this April 2006 incident was not the only occasion on which you cussed at employees at work; is that correct?
A Yes.
Q And it's your allegation that other employees cussed as well?
A Oh, yes. Every day, all the time.
Q And did you cuss every day all the time?
A Not all the time, but yes. Yeah.
Q You don't strike me, Ms. Perkins, as someone who is intimidated easily. Is that -- is that correct?
A Yes.
Q Is that a correct impression of you?
A Yeah.
Q And you don't strike me as someone who gets offended easily. Is that -- is that also correct?
A Yes.
Q In August of 2006, did you have

an incident involving Adam Hall?
A I had many incidents involving Adam Hall.
Q Well, did you have a particular incident in August of 2006 in which you were spoken to about cussing Adam Hall?
A I'm sorry. You're going to have to give me more information on that one.
Q So you don't -- you don't remember a specific incident?
A No.
(Defendant's Exhibit Number 6 was marked and attached to the deposition.)
BY MS. SWAIN:
Q I'm going to show you what I'm marking as Defendant's Exhibit 6.
A Adam Hall has made a couple remarks to me over the years out there that he would say things just to intentionally push my buttons, to intentionally make me mad.
Q I know you probably haven't given

a lot of depositions before.
A No.
Q I'm just assuming that.
A No, this is the first one.
Q Okay. The way it works is I ask a question, you answer the question as opposed to just sort of making whatever comments you would like to. So if we could stick with that format, I would appreciate it.
A Okay.
THE VIDEOGRAPHER: This is the end of tape 1. The time is 2:02:50.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. This is beginning of tape 2. The time is 2:21. We're back on.
BY MS. SWAIN:
Q Ms. Perkins, before our break I had handed you Defendant's Exhibit 6 to look at. Have you had an opportunity to read that document?
A Yes.

Q And is that a statement written by Adam Hall on August 2006?
A Yes.
Q And Adam Hall was a mechanic; is that right?
A Yes.
Q Do you recall the incident he is describing?
A Yes.
Q Can you read me the first paragraph of Mr. Hall's statement, and can you read it slow enough where he can write it down as you're reading, it would be helpful.
A It says, Was zeroing out scales on line one filler when I told Harrell to send the product. Kim asked, Who sent product? And I told her, I did. She started yelling and cussing at me, I didn't zero out the fucking scales. You don't tell them to send the product. I told her, You only have to zero them once. I also told her she can't argue with someone that is

right. She told me to get out of her fucking face.

Q Is that an accurate description of that incident between you and Adam Hall on August 10th, 2006?

A Leaving a few things out but that was paraphrasing it.

Q Well, did you tell him I didn't zero out the fucking scales?

A Yes.

Q Did you tell him to get out of your fucking face?

A He was in my face. Yes, I did.

Q Okay. All right. Could you read the second paragraph?

A I never cursed at her at this whole instance. I did get loud but never cursed her in the whole thing.

Q Was that accurate?

A He got -- he was yelling at me in my face.

Q Is it correct -- is it accurate that he did not cuss?

A I don't remember if he never cursed or not because I don't remember him not cursing.

Q You just don't remember one way or the other on this particular incident?

A Yes.

Q Okay. And what do you claim was left out from this statement?

A It's not the mechanic's job to tell them to send the product. It's mine.

Q Okay.

A And I was up on top of the filler messing with the scales getting them right when he was zeroing them out. I always come down and rezero the scales before they send the product. When I asked who sent the product, he yelled at me, I sent it. I mean, like it says right here. I told him to get out of my fucking face. He gets right there and he yells and screams at you.

Q Anything else that was left out?

A No. I believe that was it.

(Defendant's Exhibit Number 7 was marked and attached to the deposition.)

BY MS. SWAIN:

Q I'm going to show you what I'm going to mark as Defendant's Exhibit Number 7.

MS. SWAIN: Ms. Crook can look at it.

Q Have you had an opportunity to read Exhibit 7.

A Yes.

Q And is Exhibit 7 a documentation form by Chris Jordan?

A Yes.

Q And is he describing what happened the day -- is he describing an incident that happened on August 10th, 2006?

A The first line is, yes.

Q And is he referring to the -- where -- do you see where it says, I was outside line one when I noticed Adam Hall and Kim Perkins arguing?

A Yes.

Q Is he referring to the same incident we discussed and described in Exhibit 6?

MS. CROOK: Object.

A I don't really know. I guess he is.

Q Okay. Do you know of any other particular arguments that you had with Adam Hall on that same day?

A There might have been more.

Q You just don't know?

A No.

Q And in fact Chris Jordan indicates this is not unusual.

A Yes.

Q And I think you've also already indicated it wasn't unusual for you and Adam Hall to -- to have arguments or conflicts; correct?

A Yes.

Q And both you and Mr. Hall, according to you, would use cuss words during those arguments?

A Yeah.
Q And both of you would yell at each other?
A Yes.
Q Chris Jordan indicates here, There have been days they would argue one minute and laughing the next; is that correct?
A Yes.
Q Did you have times you got along with Adam Hall?
A Yes.
Q And Mr. Jordan indicates after they finished arguing, she came over near me while placing the newsprint in the video jet and said, quote, "If I had a gun, I would go home and shoot him." This may not be word for word but gun and shoot him was said. I do not feel Kim was serious about her statement and she was aggravated at the time. Is that accurate?
A I don't believe so.
Q Did you make some comment to

Chris Jordan about having a gun and shooting Adam on August 10th of 2006?
A What I believe I said if I was his wife or I'm surprised his wife hadn't shot him.
Q You don't recall your having said anything about your having a gun and shooting him?
A No, because I don't have a gun. I don't own one.
Q Well, the statement that Mr. Jordan made was that you made was, If I had a gun I would go home and shoot him. But I don't think he indicated that -- that you indicated that you had a gun; is that right?
A I don't recall making that statement.
Q Did you receive any disciplinary action as a result of this incident?
A This was one of those things where they brought me in the front office and laid about four or five different

statements in front of me that -- months after the incidents took place.
Q Okay. And we will talk about that in just a few minutes.
A Oh.
Q But my question, though, right now is whether you received any disciplinary step or action as a result of Chris Jordan's documentation form here?
A Yes.
Q What step did you receive?
A Written up.
Q Do you recall what step you got?
A It was a write-up.
Q Who gave you the write-up?
A I believe it was Chris Jordan and Tommy Nance.
Q Did you sign your write-up?
A Now, from what I remember about that, I wrote a statement about how I was never able to answer to any of these when they first happened when, like, Adam Hall made his statement and a few other people

made their statements like it's customary to do. When a person makes a statement, they go to the other person involved, they make a statement. They didn't do that. So I wrote a paragraph about all of this.
Q My question is whether you signed the write-up?
A I believe I signed that.
(Defendant's Exhibit Number 8 was marked and attached to the deposition.)
BY MS. SWAIN:
Q Okay. I'm going to show you what I'm going to mark as Defendant's Exhibit 8 and ask you if this is a copy of the complaint that you were just describing? And let Ms. Crook take a look at that first. Take a look.
(Brief Pause)
Q Did you have a chance to read through Exhibit 8?
A Yes.
Q And is that the complaint that

you were referring to that you made?
A Yes.
Q And in this complaint -- well, it's a number of pages; correct?
A Yes.
Q And did you fill out this form, the front page here, and then attach the handwritten pages that follow?
A Yes.
Q Okay. And you're complaining in this document about Chris Jordan; is that right?
A Yes.
Q About -- and you -- you describe a number of things that you felt like Chris was doing that weren't fair?
A Yes.
Q Is that pretty accurate?
A Yes.
Q Look at the first page. It looks the first thing you were complaining about was that Chris telling you that if you don't have waste written on the boxes around the

filler he was going to write you up?
A Yes.
Q And then another thing you complained about was that -- let me strike that. On the first one you indicate that a different filler operator, Stephanie L. -- is that Stephanie Lampley?
A Yes.
Q -- had not been told that by Chris; is that right?
A Yes.
Q So that was why you were upset about that?
A Yes.
Q And the second thing that you raise in this letter is Chris telling you that you had to do all your rework before you could do your paperwork?
A Yes.
Q And you claim that he had not told Stephanie the same thing?
A Any other operator the same thing, yes.

Q Okay. Just you. But you -- you mentioned Stephanie in particular?
A Yes.
Q And then you mention in your complaint here that Chris had written you up and Candice up for your having M & M's on the line?
A Yes.
Q And you indicate that you knew that it was wrong to have the M & M's on the line but you claim there was another employee, Vicki Cook, who had been caught on other occasions?
A Yes.
Q Okay. And it was your understanding anyway that he had never done anything to Vicki?
A I know he didn't.
Q How do you know that?
A She told me.
Q Any other way that you know that?
A Excuse me?
Q Is there any other way that you

know whether or not Vicki was written up?
A No. Just what she said.
Q Just what Vicki told you. And then you also complain in this document that Chris had taken you to the front office a couple of weeks before you wrote this document concerning the argument between you and Adam; correct?
A Yes.
Q And also a situation with a floater named Rosie?
A Yes.
Q And then I guess that's it; is that correct?
A Yes. And with the -- where Chris saw how Adam Hall was treating me and did nothing.
Q Where are you talking about?
A Page 3 of the handwritten.
Q Let me catch up to you. All right. Which part are you referring to?
A Where it says, Adam did something I thought was way out of line and started a

argument.

Q Okay. Okay.

A And Chris was standing by the label machine and I told him, You see now what I have to put up with.

Q And when you say Adam did something you thought was way out of line, is that when you were telling me that --

A It was.

Q -- he had talked to you about zeroing out the scales?

A I'm not sure if that was one. This details a lot of instances, and this was one of the times where Adam was in my face yelling and screaming and cussing me out.

Q But you don't recall specifically the incident you're describing in your letter?

A There's several of them. Not right now.

Q I'm asking you about the one you describe right here though.

A Let's see. How long ago did I write this? I'm not exactly sure now which instance that was, but I do remember looking at Chris, Do you see what I've got to put up with? And Chris did absolutely nothing.

Q I guess what I'm getting at is whether or not you can recall what it was you were referring to when you made that comment to Chris?

A Adam cussing me out and yelling at me in my face.

Q Well, you say in your -- in the written statement here that you wrote a couple weeks after that had occurred, whatever it is you're complaining about had occurred, is that Tommy claimed several people had written reports on me. Do you see that?

A Yes.

Q One of them was an argument between me and my mechanic Adam. Adam told me Chris went to the office, told Tommy about the argument and Donald made him write

down what was said. Chris was present during the confrontation.

A Yes.

Q And then we -- you get to the part we were just discussing. It's not your understanding you're referencing here the statement that Adam wrote?

MS. CROOK: Object.

A Yeah.

Q Talking about the -- the August 10th?

A It might be.

Q And when you were complaining in the document that we marked as Exhibit 8 about Chris Jordan, you indicate on the front of this and I think also in your handwritten part, you describe Chris' conduct as being harassment; is that right?

A Yes.

Q And I understand that you didn't like things that you felt like Chris was doing; is that right?

A Right.

Q You're not claiming or you were not claiming at that time, however, that -- that Chris Jordan was sexually harassing you, were you?

A He could have been. I'm not sure why he was on me so bad.

Q Well, and the other people that you say were receiving better treatment from Chris were also female; right?

A Yes.

Q And you're not claiming that Chris Jordan ever touched you in any sexual way?

A No, he never touched me.

Q Did he ever ask you out on a date?

A He did little innuendos, but -- as far as asking me out on a date.

Q Did you mention any innuendos in the --

A No, I didn't.

Q -- five page written complaint that you made?

A No, not in this.
Q Did you mention any kind of sexual comments by Chris Jordan in this document?
A No. Not -- this was about all the write-ups that I wasn't able to respond to.
Q Okay. My question was: Did you mention anything about any kind of sexual conduct by Chris Jordan in this document?
A No.
Q After you wrote this document, did you talk to Ricky Smothers about your complaint?
A Yes, I did.
Q And did you indicate to Ricky that you didn't want to deal with Tommy since he was the one who had approached you about the -- he was usually who called you into the office about some of these statements that had been made about you?
A Yes.
Q And so is it your understanding

that's why Ricky handled your complaint instead of Tommy?
A Yes.
Q And was it your preference that Ricky handle the -- the issue instead of Tommy?
A Anybody but Tommy.
Q Okay. That's what I'm trying to get to. Was Ricky an okay person to you to handle your complaint?
A He was the only one available, I guess.
Q And do you -- excuse me. Do you know what Ricky's title was at that time?
A To be honest with you, I don't remember what his title was.
Q Okay. And Exhibit 8 is the only complaint you ever made to the company about Chris Jordan; is that right?
A Didn't do any good, so yeah.
Q My question is whether --
A Yeah.
Q -- there were any others besides

Exhibit 8?
A No.
(Defendant's Exhibit Number 9 was marked and attached to the deposition.)
BY MS. SWAIN:
Q I'm going to show you what I'm going to mark as Exhibit 9. Is Exhibit 9 Mr. Smothers' response to your complaint?
A Yes.
Q And did you receive a copy of this document from Mr. Smothers?
A I don't recall if I received one or just read over it.
Q But you've seen this document before?
A Yes.
Q And as a result of your complaint and Mr. Smothers looking into or investigating the complaint that you made, you were given the opportunity to make the written responses or statements that you felt like you didn't get the opportunity to

make; is that right?
A Yes.
Q And you wrote statements regarding both the situation with Rosie and the argument with -- with Adam Hall; is that right?
A Yes.
Q And as to the first complaint you made about being asked to write waste on the boxes around the filler when Stephanie was not required to do so, did you understand from Mr. Smothers' response that he found that Stephanie's line, which was line three, reworks, what falls in the box so the product is added in not disposed of like on lines one and two and that's why Stephanie was not directed to write waste on the boxes? Is that what your understanding was of the findings on that issue?
A That was his findings but that doesn't necessarily mean it's true.
Q Do you have any reason to believe it's not true?

A Yes.
Q What -- what makes you think that that's not correct?
A I worked on line three. I know there's a chute that comes down where excess salt, sugar, etcetera, falls down and falls into a box. Waste is supposed to be written on that box. Around the fillers cans get hung up, they fall out, they go in those boxes.
Q So you -- I'm sorry.
A Waste is required to be put on those boxes.
Q So, ultimately, you disagreed with Mr. Smothers' finding about whether or not waste was supposed to be put on the boxes?
A Yes.
Q Did you have any further discussion with Mr. Smothers about that issue?
A No.
Q And because that particular issue

was not something that resulted in documentation in your file or anything like that, there was nothing formal that was changed about that issue; correct?
A Yeah.
Q And then on number 2, the second issue that you raised about your being required to perform your rework before putting your paperwork instead working on your paperwork first, was it your understanding that Mr. Smothers found that some team members on your line were complaining that you would drag out the paperwork and assist them in performing the rework but that he was going to change it so that all fillers operators would be required to do rework first and paperwork last on all lines?
A Yes.
Q And as far as you know is that what happened?
A That's what he said, yes.
Q And do you know -- as far as you

know is that what happened?
A Yes.
Q On the situation about not being allowed to write a statement for the arguments with Rosie and Adam, he found that you admitted that you and others used profanity in the plant; is that correct?
A Yes.
Q And that's what you've told me here today; is that right?
A Yes.
Q And he indicated that he thought perhaps Tommy didn't ask for a statement because you already had been talked to about that situation in -- in the past; is that right?
A That's what he's got down.
Q And you had in fact been talked about -- talked to about using inappropriate language and improving your communication skills prior to the incident with Adam; right?
A Yes.

Q He indicated that because you in fact had -- strike that. He did allow for you to write, as we've just discussed a minute ago, statements on both of those issues for your file; correct?
A Yes.
Q And you did that?
A Yes.
Q And then he indicated because the charges were still justified because of the profanity but that he would follow up with the other team members' behavior that made you angry; is that right?
A He never did.
Q How do you know that?
A Because I asked him.
Q Asked who?
A The other people that was around.
Q What people were those?
A I asked Adam, I talked to Wesley McGinnis, talked to several people. No.
Q Who else did you talk to besides Adam and Wesley?

A They were the main ones that liked to push my button and like to get up in my face, so they were the main ones that I spoke to.
Q Okay. Are they the only ones that you spoke to? I'm sorry.
A They were the main ones the arguments and all that was with.
Q Are they the only ones you spoke to about whether or not Ricky followed up with them?
A Yes.
Q What conversation did you have with Adam Hall on that subject?
A I asked him did he ever get written up for cussing me or anything like that, and he was, like, no.
Q Did you have any other conversation with Adam on that issue?
A That was with Adam and Wesley.
Q Did you have any other conversation with Adam about that issue?
A No.

Q What conversations did you have with Wesley about whether or not Ricky had followed up with?
A I asked Wesley the same thing. No. I asked Wesley did -- did Ricky or anybody --
Q Did you ask if he was written up?
A Yeah. Did you get brought up in the front office or anybody write you up?
Q And his answer was?
A No.
Q Did you have any other conversation with Wesley on that issue?
A No.
Q When did you have the conversation with Adam?
A Right after this.
Q And the same with Wesley?
A Wesley was a couple days later. We didn't work together closely until a couple days after that.
Q So this -- this document was written on September 7th, 2006?

A Yes.
Q But do you -- do you know whether you received it that day or went over it that day?
A I'm not sure.
Q But within a couple days after that you had spoken with both Adam and Wesley?
A Yes.
Q You were told by Ricky that retaliation would not be tolerated; is that correct?
A Yes.
Q And you were told that if you were not satisfied with this response, that you could take it to the next step, which would normally be Tommy but since you weren't comfortable going to Tommy, that you could go to Alice Clark, the positional HR director; is that correct?
A Yes.
Q Did you ever ask what -- the final step after that would be to talk to

Marry Ann Boyer; is that right?
A Yeah.
Q Did you ask Ricky Smothers to set up a time for you to speak with Alice Clark?
A No, I didn't.
Q Did you ever talk to Mary Ann Boyer about your complaints that you made here in this letter?
A No, I didn't.
Q Did you ever make any -- take any further action with respect to the complaints that -- that you made in Exhibit 8 and that Ricky responded to in Exhibit 9?
A No. After -- I didn't feel like it would do any good.
Q Why did you not feel like it would do any good?
A Let's -- it's just the way it was handled and the way it was started to begin with, I just really did not feel like it would do any good.
Q Okay. So you weren't satisfied with Ricky's response?

A Not really. And several things, especially the first one, and the definition of harassment. He -- from what -- the way he made it sound like, his definition of harassment is everybody's else's definition of discrimination.
Q So did he make it sound as if for it to be harassment it had to be -- relate to your -- kind of really it's a individual's race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status, or status as an individual with a disability?
A Yes.
Q And you disagree with that?
A Yes.
Q And then you also disagree with his findings on the first issue here; is that right?
A Oh, yes.
Q Is there anything else about Ricky's response that you were not satisfied with?

A As far as the second point goes where team members complain, first of all, after you've worked all day long and then you got to go back you do rework, if somebody walks off the line to do anything, everybody else is going to complain regardless. We had a whole bunch of paperwork we had to do at the end of every shift. None of us -- no filler operator dragged our feet on it because we wanted to hurry up and get it over with and then we go out there and did the rework. They were going to complain regardless.
Q Well, in an effort to satisfy your concerns on that point, is it correct that Ricky indicated that all the filler operators would be required to do their rework first?
A Yes.
Q So that addressed your concern; right?
A Yes.
Q Anything else about this response

that you felt like you were not satisfied with?
A No. That's fine.
Q Did you ever make any other complaints to anyone at management or human resources during your employment at Flavor House?
A No.
(Defendant's Exhibit Number 10 was marked and attached to the deposition.)
BY MS. SWAIN:
Q We won't go over these in depth, but I want to mark for you and let you identify for me -- I will mark as Exhibit 10 one of the statements that you made that you were talking about that you were -- talking about they -- when you were allowed to make -- go back and make some statements about events that had happened prior. Is Exhibit 10 the statement you wrote in response to the situation with Rosie?
A Yes.

(Defendant's Exhibit Number 11 was marked and attached to the deposition.)
BY MS. SWAIN:
Q Let me show you what I marked as Defendant's Exhibit 11 and ask you if this is a copy of -- is Exhibit 11 a copy of Rosie's documentation from about the same incident?
(Brief Pause.)
Q Did you have an opportunity to read Exhibit 11?
A Uh-huh.
Q Is that a yes?
A Yes.
Q And is it your understanding that that is a statement that Rosie made about your conduct?
A Yes.
Q And then Exhibit 10, you see that is your -- your statement about the same incident; correct?
A Yes.

Q Did you have a problem with -- with Rosie?
A On this incident, yes.
Q What was your problem with Rosie?
A She flat out lied.
Q What did she lie about?
A This is -- this was not the first time we ran Great Value, and everybody in that plant new Great Value was very important. The nitrogen could not go as high as all the rest of the product. It was not supposed to go over three, and she kept letting it run. She kept getting higher numbers and didn't say anything. And everybody knew. Me and Candice reminded her every day, with the exception that one day, that it could not go above a three. And then she lied to Melvin and everybody else saying, oh, she didn't know.
Q And so just I better understand that situation. Basically she made an error by letting product run with nitrogen levels that were too high; correct?

A Yes.
Q And she was supposed to be checking the nitrogen levels?
A Yes.
Q And she was doing that but they were -- she was getting readings that were higher than was acceptable?
A Yes.
Q And she didn't let anybody know about that; is that right?
A Yes.
Q And as a result of that, you became angry with her?
A Yes, because she lied.
Q And you cussed at her?
A Not directly at her, no, I didn't.
Q You cussed but you're saying it wasn't directly --
A In her presence -- in her presence or maybe somewhere around where she was, but no, not at her.
Q Did you yell at her?

A I asked her, Why didn't you say something? Why didn't you stop the line.
Q And when you asked her that, were you yelling at her?
A I don't consider what I was doing yelling. But, yeah, it was a raised voice.
Q Did Rosie yell at you?
A She might have raised her voice a little bit but --
Q Do you recall whether she did or not?
A No, honestly.
Q Did Rosie cuss at you?
A No. I don't believe she did.
Q Did you ever hear her cuss at work?
A Yeah, every now and then.
Q When did you hear her cuss at work?
A I don't remember certain instances or days or times or whatever.
Q Do you remember any instance when you heard her using cuss words a work?

A A little bit, yes. I mean nothing real bad.
Q What -- what instances do you remember?
A It's just talking on the line.
Q What I'm trying to find out is are there any particular instances that you ever remember Rosie using curse words?
A No, not particular instances, but I do remember hearing it.
(Defendant's Exhibit Number 12 was marked and attached to the deposition.)
BY MS. SWAIN:
Q I'm going to show you what I marked as Defendant's Exhibit 12 and ask you if that is the -- the response that you made to the Adam Hall situation? Is this your statement?
A Yes.
Q Do you say anything in here about Adam cursing you?
A No, I didn't.

Q Is that because you felt like you could deal with that on your own?
A Yes.
Q Is that because Adam -- is that because cursing didn't really bother you?
A Yes. Unless somebody was up in my face.
Q You told me earlier that Adam was up in your face in this instance?
A There's been several times when he was.
Q Yeah. But you didn't mention that in your statement here, did you?
A No. But this was also taken what, a month or so afterwards.
Q Of course you remember it now, which is almost two years afterwards; right?
A I was writing, like, several of them at one time, and I was also very highly upset when I was writing this because of everything that had been laid out in front of me.
Q And that's why you didn't put

that in there?
A I just didn't write it in there.
Q Well, I -- I see that you didn't write it in there. What I'm trying to get to is did you not write it in there because it didn't bother you that much?
A Yeah, it bothered me.
Q Did you not put it in there because you felt like you could handle that by yourself?
A Yes, because I -- I stand up to them.

(Defendant's Exhibit Number 13 was marked and attached to the deposition.)

BY MS. SWAIN:
Q Okay. Let me show you what I marked as Defendant's Exhibit 13. Is Exhibit 13 a copy of the first step written counseling you were given relating to the argument with Adam Hall?
A Yes.
Q Is that your handwriting down

there at the bottom of the page?
A Yes.
Q You write, I was never given -- I was never asked to give my side of any incident in this report. I feel it's extremely one-sided and is being used to find excuses to get me trouble. Is that what you wrote?
A Yes.
Q And subsequent to this, after you made your complaint, you did make the statement -- your statement -- your side of the issue; correct?
A Yes.
Q Who did you feel like was looking for excuses to get you in trouble?
A Chris Jordan.
Q Why do you think he wanted to get you in trouble?
A I'm not really sure.
Q He just didn't like you?
A There was an incident that had happened before he became a supervisor when

he was still a label operator, and I don't know if that had something to do with it.
Q Well, what was the incident that happened before he became a supervisor?
A I was running line four filler and he was on line four label machine, and we were in the process of doing a change over. And we take a -- a tray, run it through the box crimp, everybody looks at it and signs off on it. And on the next change over I just took a black magic marker, wrote X's all the way down the side of that box where the old box print was, turned it around and ran it through the new order. He grabbed the tray. He turned around and looked and he said, This ain't right. And I the tray and I looked at it and I was, like, Yeah, it is. And he turned it around. He said, No, it's not. I said, Chris, why do you think I have all these black X's over it? And I turned the tray around and showed it to him. I guess he thought that was humiliating or what, I don't know.

Q So that was the extent of the incident you had with him?
A Yeah.
Q Do you remember when that was? I mean how long before --
A No. It was a couple of weeks or so or a week or so before he became a supervisor.
Q Do you remember when he became a supervisor?
A No, I don't. I was on line five when that happened.
Q Anything else -- any other reason why you think Chris Jordan didn't like you?
A I have no idea.
Q Okay. Other than Adam Hall and Linda Thornton, were there any other employees at Flavor House that you had significant conflicts with?
A Wesley McGinnis, David. I don't remember David's last name. He was a mechanic.
Q Was Wesley also a mechanic?

A Yes.
Q Anybody else?
A Another mechanic named Wes.
Q This is different than Wesley?
A Yes.
Q You know -- you don't know Wesley's last name?
A No, I don't.
Q Okay. Anybody else you had problems with?
A That's it.
Q Do you know where you were working -- let me strike that. Do you know whether you were at work on June 14th, 2006?
A I have no clue.
Q Do you know what line you were working on that day?
MS. CROOK: Object.
A I don't know.
Q Have you heard about a conflict between Frank Williams and Linda Thornton that happened on June 14th, 2006?
A Yes.

Q Were you present during that conflict?
A I wasn't on that line.
Q Where were you?
A To tell you the truth, I don't remember where I was. I remember walking outside on break and seeing Linda sitting outside crying.
Q So that was after the -- the conflict?
A Yeah, after it. And heard from several different people about Frank's behavior.
Q Did you personally witness that conflict on June 14th? I mean apart from seeing Linda afterwards. I mean, did you see what went on between Frank and Linda that day?
A Not that particular day.
Q And you've indicated that you spoke with Linda outside after that incident?
A Yes.

Q Do you recall what conversation you had with Linda at that time?
A I asked her what was wrong, why was she crying. She said Frank just went crazy on her just, went psycho, started throwing stuff and she was scared.
Q Any other conversation with Linda about that incident?
A I asked her how she was doing, you know, right -- she said she was nervous and she was scared of him.
Q Okay. Anything else that was said between you and Linda about that incident?
A No.
Q Have you talked to Linda on any other occasions about that incident between her and Frank?
A Not a lot about it. What I said about home life and all, that's the main thing we talk about.
Q Yeah. I'm just talking about that particular incident?

A No.

Q Did you ever talk to Frank Williams about that incident?

A Not too much because I know how Frank is.

Q Well my question is did you or did you not talk to Frank Williams about that incident?

A No, not really.

Q No what?

A No, not really.

Q Did you ever have -- did you ever talk to Frank Williams about Linda Thornton?

A I didn't speak to him personally. I heard him talking outside to other people, but as far as me, personally --

Q And who did you hear Frank Williams talk to about Linda Thornton?

A Just people sitting outside at break.

Q Do you recall who?

A What was her name? A woman that worked in the office. Lee-something.

Q Lee Taylor or Lee Allums?

A Whichever one is there now, it's the other one. I think Lee Allums is there now.

Q So you think it's Lee Taylor?

A I heard him talk to Stephanie about her, Stephanie Lampley.

Q Okay. Anybody else?

A There was just several people. It wasn't just one particular day that he spoke.

Q Okay. It can be as many people as you heard but I would like to know who those people are.

A Jewel.

Q Jewel Silby?

A I don't know. I don't know her last name.

Q Okay. Anybody else?

A Right off the bat, that's all I can remember.

Q What conversation did you hear between Jewel and Frank about Linda?

A Frank was saying, The bitch is crazy, and how this was all just bullshit and he was glad she was gone.

Q So this is actually when Linda was gone?

A Yeah.

Q Any other conversation you heard between Frank and Jewel about Linda?

A No.

Q I'm sorry?

A No.

Q What response did Jewel make to these comments?

A I couldn't hear her. She was talking real low.

Q And were all -- was all of this said during one conversation or these comments were made during different conversations?

A During different conversations.

Q Were all the con -- where did all these conversations take place? Was it the same place?

A Yeah, outside break place.

Q Okay. What conversation did you hear between Frank and Stephanie Lampley about --

A Pretty much the same thing. Crazy bitch.

Q And were these conversations also after Linda was gone?

A Yes.

Q And were they also out in the smoking area or the outdoor area, the break area?

A Yes.

Q Okay. What conversations did you hear between Frank and Lee Taylor about Linda Thornton.

A He was going to fuck her up.

Q Anything else?

A I got up and left after that one.

Q When did you hear that conversation?

A Outside on the smoking area.

Q When?

A It was after she was gone.
Q After Linda was gone?
A Yeah.
Q Do you remember how long it was after Linda was gone?
A No, not really. I mean --
Q Have you had any conversations with Linda -- let me strike that. Other than these three individuals that you told me about, have you heard Frank Taylor (sic) talk about Linda Thornton to anybody else?
A After a little while he quit talking about her.
Q Okay. My question --
A Around me.
Q Okay. Was there anybody else besides these people that you heard Frank talk to about Linda?
A He just generally talked to anybody, I mean.
Q Again, are there any other people that you know of specifically that he spoke to about Linda?

A That I can remember their names, no.
Q Or that you can remember their description or position that they worked in?
A No.
Q Other than these comments that you've described, are there any other comments that you heard even if you can't remember who they were made to?
A The main thing I heard was that -- That bitch is crazy, she ain't fucking right, that's a crazy bitch.
Q These are the comments that you told me he made --
A Yeah.
Q -- to Stephanie and Jewel?
A Yeah.
Q Is that yes?
A And several people, yeah. I think there was a group of people sitting outside --
Q But you can't recall --
A -- at the smoking table. But no,

I don't recall who all was sitting out there.
Q And all of these comments were made after Linda was already gone?
A Yes.
THE VIDEOGRAPHER: We are off at 3:21:39.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. We're back on. The time is 3:32. This is the beginning of tape 3.
BY MS. SWAIN:
Q Ms. Perkins, we were talking before the break about some comments that you heard after Ms. Thornton left Flavor House that you -- you say that Frank Williams made to some other employees; is that right?
A Yes.
Q Did you tell Ms. Thornton about those comments?
A Some of them were made before she left. Most of them were after.

Q Well, you just told me a few minutes ago they were all made after she left. Which is -- which is the truth?
A It was a while back, so remembering exact things is kind of hard. I mean, when it was done and when they were said. Some of them were before she left, but most of them was after.
Q Did you just talk during this break to Ms. Thornton about those comments?
A No. We were talking about supper.
Q Did Ms. Thornton tell you it would be more helpful to her case if you would tell me that some of those comments were made before she left?
A No. We were talking about supper. We haven't discussed this case.
Q You've never discussed this case?
A We talked about what it was about, the sexual harassment, and then we talked about her home life. But outside we were talking about supper, cooking and all

that.
Q Okay. And on your own without anybody suggesting it to you and without me asking you again when the comments were made, you suddenly decided that some of the comments were made before she left.
A No, I didn't suddenly decide. I just remembered. I mean, remembering that long ago when certain things were made and when they weren't, when you get to talk about them certain things start coming back.
Q Okay. Well, what was it that happened during a break that made you remember that?
A Nothing. Sitting in here talking to you.
Q I wasn't talking to you during this break.
A I meant before we went to break.
Q In any event, so what comments were made before Linda made -- before Linda left?
A Calling her a bitch and things

like that.
Q Any other comments besides calling her a bitch that were made before she left?
A Not that I can exactly remember at this time.
Q Okay. Did you tell Linda about these comments --
A Yeah.
Q -- either before or after she left?
A Yeah.
Q Did you tell her that Frank had called her a bitch before she left?
A Yeah.
Q And then did you call her after she left and tell her about the other comments?
A I told her a couple -- that talk was going around that he was really, really upset.
Q Okay. Did you tell her anything else?

A No. By then we had done started talking about her home life, that things started going down without her being in a job.
Q Okay. We talked about the -- the incident, the conflict between Linda Thornton and Frank Williams on June 14th and you talked to Linda about that after the fact. Did you witness any other conflict between Frank Williams and Linda Thornton?
A No.
Q Did you ever witness Frank Williams use profanity?
A Oh, yes.
Q Do you recall any specific instances when you witnessed Frank Williams use profanity?
A It was every day, literally.
Q Is that a no?
A It was every day.
Q Do you remember any specific instances that you can describe for me when Frank Williams used profanity?

A Talking about rework and having to do rework and people on the line not doing their jobs and supervisors and how he felt like supervisors wasn't treating him fair because he had to do so much.
Q Okay. Anything else?
A Them cutting our lunch time.
Q Anything else?
A Having to watch so many things at one time, train people plus watch over the line and mechanics not doing their job.
Q Okay. Anything else?
A At this time that's the main thing that I can remember.
Q Okay. Were you offended by Frank Williams using profanity?
A No.
Q Did you ever use profanity in front of Frank Williams?
A Yes.
Q Did you ever complain to anybody about Frank Williams using profanity?
A No.

Q Did you ever complain about any employees using profanity?
A No.
Q Did you ever hear Frank Williams make any comments of a sexual nature?
A Yes.
Q What comments did you hear Frank Williams make of a sexual nature?
A Just jokes, telling dirty jokes.
Q Anything else?
A Talking about women, the way they looked, certain women.
Q Okay. Anything else?
A That was -- right now that's all I can remember.
Q Do you recall any of the dirty jokes that -- that Frank Williams told?
A No. It's a factory. There's so many dirty jokes out there, you can't remember them all.
Q Did you ever tell dirty jokes at work?
A I'm sure I did.

Q Did you ever tell any dirty jokes to Frank Williams?
A Not that I recall.
Q Did you ever tell any dirty jokes to Linda Thornton?
A Not that I recall.
Q Do you recall whether Linda ever told you any dirty jokes?
A No.
Q No, she didn't or, no, you don't?
A No, she didn't.
Q I'm sorry?
A No, she didn't.
Q Do you recall anybody else who might have been present when Frank Williams told a dirty joke -- told any dirty jokes?
A Mary.
Q Is that Mary Brooks?
A Yeah. I don't remember anybody else's name.
Q And I think I asked you this but just to make sure what you said. Do you remember any dirty jokes that Frank told?

A Remember the jokes?
Q Yeah.
A I remember him telling but I don't remember the jokes.
Q But not -- but not what the joke was?
A Yeah.
Q And do you remember any dirty jokes that you told?
A No.
Q And then you indicated you had heard Frank talk about certain women and the way they looked. Do you recall what comments you heard?
A Talking about how big their butts were or -- in general how they looked.
Q Okay. Who -- who?
A Who was he talking about --
Q Correct.
A -- or who did he talk to?
Q Well, who did he talk -- let's start with who he was talking about.
A I don't know. Mainly it was

temps that was working out there or, who was it, personal resources coordinators.
Q All right. And do you recall -- well, strike that. Do you recall any specific employee that he made a comment about the way they looked?
A There was a couple coordinators out there. Talking about how fine they were and how he liked their butt and all that, but I never knew of their names. I never talked to any of them.
Q And then who were these comments made to?
A Me.
Q He talked to you?
A Yeah.
Q Okay. Anybody else that he was talking to when he made these comments?
A I don't know if he said anything to anybody else.
Q Were you offended by the comments?
A No, I wasn't.

Q All right. Any other comments of a sexual nature that you heard Frank Williams make that we haven't talked about?
A He mentioned something about why he was in jail.
Q What did he say?
A He mentioned several times about being in prison, and I asked him one time, I said, Why did you spend so long in jail? What did you do? I asked him, Was you a bad boy? What did you do? He was like, Oh, it was some sexual thing. It was all bullshit charges.
Q Did he say anything else to you about why he had been in jail?
A No, not why. But he mentioned many times about being in jail.
Q Did you ever ask him on any other occasions why he had been in jail?
A No.
Q Do you know why he had been in jail?
A I knew it was something to do

with a sexual thing. That was all I knew.
Q And other than what he told you -- told you, did you have any knowledge of that?
A No.
Q Did you ever discuss that with Linda Thornton?
A We knew that his picture was on computer along with a couple of other people that worked out there. Well --
Q Who else besides Frank?
A -- one other person's picture I saw on there that was a roaster operator. A young guy. What was his name? Billy-something.
Q Does he still work there?
A No.
Q Other than -- strike that. Did you ever -- I may have asked you this. Did you ever talk to Frank Williams about Linda?
A Yeah.
Q What conversation did you have with Frank about Linda?

A I asked him did things get straightened out between them, were things all right between them. He was like, Hell, no.
Q Was this when she was still there or after she was gone?
A When she was still there.
Q Any other conversations you had with Frank about Linda?
A No.
Q So you were aware that there was a conflict between them?
A Oh, yeah.
Q Did you know that from talking to Linda about it?
A That, talking to him about that, and just the whole plant knew it. Anybody that worked anywhere around their line knew it.
Q Was it your impression that they just didn't get along?
A They had serious personality issues, and Frank had serious personality

issues with several women. He had them with me until I -- and I tried to put a stop to him.
Q Do you get along okay with Frank?
A After me and him had a little talk.
Q What -- what did you say to Frank during your little talk?
A Well, you remember earlier I told you I went over to line three for a little bit, a few days, and then I went back over to one, then I came back to three for a lot longer time.
Q Right.
A That first time I went over there he'd get upset about something going on or I had done something wrong and he'd go to screaming and cussing and yelling at you. And when I went back over there for a long period of time, right when I got on that filler I told him flat out I was not going to deal with that. I said, If you've got a problem, we can talk about it, but this

screaming and yelling and getting in my face, that ain't gone happen again. And so he backed off. I mean he still got upset and yelled and did a bunch of other things on line but he didn't do like he had done before.

Q Did you ever witness, apart from anything that you might have already told me today, did you ever witness any kind of sexual harass -- sexually harassing conduct towards Linda?

MS. CROOK: Object.

A By who?

Q By anyone.

A Oh, yeah.

Q What kind did you witness?

A Mechanics especially.

Q Okay. What kind did you witness?

A They wouldn't hardly let her work on her machine. I mean, she'd try to work on it. They'd come out -- come up up there. I've heard them personally say, Get the hell out of the way. You don't know what you're

doing. This a man's job. I've heard that from three different mechanics.

Q Okay. Which three?

A Davis, Wesley, and Adam.

Q Okay. Anything else?

A No. They would just never let her work on the machine. They would try to shove her out of the way every time she tried to.

Q Okay. Anything else?

A That was the main thing it dealt with was her trying to operate her machine and work on her machine and nobody letting her. Screaming and yelling and all that.

Q Okay. I got that.

A Yeah.

Q I'm just trying to find out if there's something else that I'm missing. I don't want to --

A That's the main thing that I personally witnessed, that I know of.

Q Okay. Yeah. But I'm just asking you about what you personally witnessed --

A Yeah.

Q -- obviously, and you have done that? David's last name was what?

A Wilkerson, I believe.

Q And what time frame was all this?

A About the whole time.

Q Wesley McGinnis; is that right?

A Yes.

Q And Adam Hall?

A Yeah.

Q Now, you indicated earlier that you had talked to several people about -- at Flavor House about this lawsuit. Who besides Linda have you talked to about this case or about the fact that there is a case?

A Some people told me they knew it was going on. I was like, Yeah. Would be John. I can't remember John's name -- last name. I don't remember John's last name.

Q Do you remember what position he worked in?

A Supervisor.

Q Is he still there?

A Yeah. Mike Walters. That's about it. I hadn't talked to a whole lot of people since I've been gone.

Q And what conversations have you had with John about Linda's lawsuit?

A Just we both knew it was going on. That was it.

Q What about Mike Walters, what conversation have you had with him?

A That's it.

Q Are you currently employed?

A Yes.

Q Where are you working now?

A I work with Metal Recoaters of America.

Q Metal Recoaters of America?

A Yes.

Q And what do you do for them?

A I paint metal roofs.

Q And you're working in Florida right now; is that correct?

A Right now. Yeah, that's correct.

Q So you move from job site to job

site?
A Yeah.
Q Have you been working there since you left Flavor House?
A No.
Q Where else have you worked?
A I worked with Southeastern Landscape for a little while. And other than that, I've done private painting jobs here and there.
Q Is Southeastern Landscape here in Dothan?
A No. They're at Enterprise.
Q Enterprise. Do you live in Enterprise?
A No, I live in Midland City.
MS. SWAIN: That's all I have.
MS. CROOK: I've just got one little thing.

EXAMINATION

BY MS. CROOK:
Q Were you aware at any time that Linda -- while she was employed at Flavor --

THE VIDEOGRAPHER: Your, mic is not on.
MS. CROOK: Sorry.
Q Were you aware at any time while Linda was working at Flavor House that she was carrying a screw driver around with her?
A Yes.
Q Do you know why?
MS. SWAIN: Objection.
A She was scared of him.
Q Do you know why she was scared?
MS. CROOK: Objection.
A He was so mad at her for causing all the trouble. I'm not real sure if he made that threatening thing before she left or after she left.
Q What threatening thing are you talking about? The comment?
A About he was gone fuck her up. And I know he was calling her a bitch several times before she left and after she left, especially.
Q How did you know -- I'm sorry.

How did you know she was carrying a screwdriver around with her?
A She told me. I saw it.
MS. CROOK: That's all.
MS. SWAIN: Okay.
THE VIDEOGRAPHER: Okay. We're off at 3:50:46.

DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

**A**

**[a]ble** 67:21 77:6
**absolutely** 74:5
**acceptable** 94:7
**ACCR** 132:21
**accurate** 24:4 51:10,15 51:19 52:2,7 53:19 54:7 56:14 61:3,19 61:22 65:21 69:18
**acting** 6:4 53:7
**action** 1:5 34:14,18,21 66:20 67:8 88:11 132:16
**Adam** 41:22 42:1,3,21 43:1 44:8 45:10,18 46:2 58:1,3,6,18 60:2 60:4 61:4 63:21 64:8 64:17 65:11 66:2 67:22 72:8,16,22 73:6,14 74:10,21,21 75:7 80:5 83:5,21 84:20,23 85:14,19,20 85:22 86:16 87:7 96:18,22 97:4,8 98:21 101:16 126:4 127:9
**added** 80:15
**[a]ddressed** 90:20
**[ad]mitted** 83:6
**advised** 3:11
**age** 89:10
**aggravated** 65:20
**ago** 29:5 74:1 84:4 112:2 113:9
**AGREED** 2:2,11,18
**ahead** 36:13 39:8 54:21
**ain't** 100:16 110:11 125:2
**Alabama** 1:2,23 2:8 3:5 5:8,14 6:2,3,5,9 7:2 132:3
**Alice** 87:19 88:4
**allegation** 57:5
**allow** 84:2
**allowed** 83:4 91:18
**Allums** 106:1,3
**amended** 3:6
**America** 128:15,16
**amount** 10:20
**ancestry** 89:12
**Andrews** 5:13 13:1,8 14:1,18
**angry** 24:1,3 84:13 94:13
**Ann** 88:1,6
**[an]swer** 8:7,21 22:11
39:8 46:17 59:6 67:21 86:10
**answering** 36:13,15
**answers** 24:7 132:8
**anybody** 46:23 47:5,6 78:7 86:6,9 94:9 102:2,9 106:8,19 109:11,16,20 113:3 116:21 118:14,19 120:17,20 123:17
**anymore** 23:8
**anyway** 71:16
**anywise** 132:16
**apart** 18:11 103:15 125:7
**appreciate** 59:9
**approached** 77:18
**approximately** 2:10 6:9
**April** 36:20 43:18 46:3 47:20 51:4 55:20,21 57:1
**area** 108:11,11,12,22
**argue** 60:23 65:6
**arguing** 27:6 63:22 65:14
**argument** 54:15 72:7 73:1 74:20,23 80:5 98:21
**arguments** 64:8,18,23 83:5 85:8
**Ash** 12:8,9 13:16,20 16:20 17:5 18:14
**asked** 18:8 22:10 28:12 28:19 49:3 51:12,21 53:15 60:17 62:16 80:9 84:16,17,20 85:15 86:4,5 95:1,3 99:4 104:3,9 118:21 121:8,10 122:19 123:1
**asking** 45:2,14 49:17 73:22 76:18 113:4 126:22
**assign** 2:23
**assigned** 19:19
**assignment** 18:16
**assist** 82:14
**assume** 19:12
**assuming** 59:3
**attach** 69:7
**attached** 35:2 43:9 48:9 50:17 55:13 58:13 63:1 68:10 79:4 91:10 92:2 96:12 98:14
**attention** 56:17
**attorney** 5:12 8:2 29:7
**August** 57:23 58:5 60:2 61:5 63:17 66:2 75:11
**Austin** 16:10,16
**available** 78:11
**aware** 123:11 129:22 130:4
**a.m** 38:10

**B**

**B** 4:5
**back** 15:21 20:21,22 24:20 29:2 50:11 52:7 59:17 90:4 91:19 111:10 112:4 113:11 124:11,12,19
**backed** 125:3
**bad** 15:11 24:14 51:22 51:23 76:6 96:2 121:10
**Baker** 5:4
**basically** 23:2 93:21
**basis** 21:12
**bat** 106:20
**bear** 24:5
**Bearman** 5:4
**beginning** 59:16 111:11
**begins** 6:15
**behave** 44:23
**behaved** 45:10
**behavior** 84:12 103:13
**believe** 12:5,13 25:22 29:1 32:8 33:4 36:3 37:2 41:8,22 48:18 48:21 49:1 62:22 65:22 66:3 67:16 68:8 80:22 95:14 127:4
**benefit** 24:11
**Berkowitz** 5:5
**better** 76:8 93:20
**bid** 40:12
**big** 119:15
**bills** 26:22
**Billy-something** 122:15
**Birmingham** 5:8
**bit** 38:11 95:9 96:1 124:11
**bitch** 31:9,16 107:1 108:6 110:11,12 113:23 114:3,14 130:20
**BL** 54:2
**black** 100:11,20
**blanks** 52:11
**blue** 53:1,2,4,22 54:4 54:13,22 55:6
**Bobbie** 2:8 5:11 6:8 7:1 7:6 35:11
**bother** 97:5 98:6
**bothered** 98:7
**bottom** 37:11,19 40:1 99:1
**bounced** 10:5 20:17
**bouncing** 22:19
**box** 80:14 81:7,8 100:9 100:12,13
**boxes** 69:23 80:10,18 81:10,13,17
**boy** 121:11
**Boyer** 88:1,7
**break** 8:19 44:12,16,19 45:20 59:14,19 103:7 105:20 108:1,11 111:8,14 112:10 113:13,18,19
**breaking** 30:22 45:19
**Brief** 68:19 92:10
**broke** 27:5
**Brooks** 118:18
**brought** 33:12 56:16 66:22 86:8
**Buck** 11:21 12:3 13:12 13:17
**bullshit** 107:2 121:12
**bunch** 90:7 125:4
**business** 52:12 53:3
**BUTLER** 132:4
**butt** 120:9
**button** 85:2
**buttons** 58:21
**butts** 119:15

**C**

**C** 5:1
**cable** 10:6
**Caldwell** 5:4
**call** 26:12 31:8,15 54:18,21 114:16
**called** 77:19 114:14
**calling** 51:9 56:11 113:23 114:3 130:20
**Candice** 71:6 93:15
**cans** 81:8
**cap** 10:6,19
**capper** 37:22
**care** 23:7
**carrying** 130:6 131:1
**case** 6:19 18:22 27:18 40:20 112:14,18,19
127:15,15
**catch** 72:20
**caught** 71:12
**cause** 6:11 132:17
**causing** 130:13
**certain** 33:8 34:8 95:20 113:9,11 117:12 119:12
**certainly** 8:18,22 33:18
**CERTIFICATE** 132:1
**Certified** 132:20
**certify** 6:4 132:6,14
**chance** 68:20
**change** 49:19 82:15 100:7,10
**changed** 82:4
**charges** 84:10 121:13
**check** 21:20
**checking** 94:3
**checklists** 21:11
**Chris** 12:13,14,23 13:3 13:5 14:1,10,11,16 14:17,18 33:6,12 35:18 40:16 43:16 56:21 63:13 64:13 65:5 66:1 67:8,16 69:11,15,22 70:10,16 71:5 72:5,15 73:3 74:4,5,9,22 75:1,15 75:17,21 76:3,9,12 77:3,10 78:19 99:17 100:19 101:14
**chute** 81:5
**City** 129:16
**Civil** 1:5 3:5 6:6
**claim** 62:7 70:20 71:11
**claimed** 74:16
**claiming** 42:3 76:1,2,11
**claims** 28:6,7
**clarify** 8:15
**Clark** 87:19 88:4
**clearly** 45:18
**close** 20:23
**closely** 86:20
**clue** 102:15
**color** 89:10
**come** 16:8 37:6 42:9,16 62:14 125:21,21
**comes** 81:5
**comfortable** 87:18
**coming** 113:11
**commencing** 2:9 6:9
**comment** 42:4 50:6 52:22 65:23 74:9 120:5 130:18
**comments** 49:5 59:8

77:3 107:13,18 110:6 110:8,13 111:3,14,21 112:10,15 113:4,6,20 114:2,8,18 117:5,7 119:14 120:12,18,22 121:1
**Commissioner** 1:20 6:4
**communication** 27:5 83:20
**companies** 9:6
**company** 78:18
**company's** 23:17
**complain** 72:4 90:2,6 90:13 116:21 117:1
**complained** 70:4
**complaining** 28:11,18 69:10,21 74:15 75:13 82:13
**complaint** 68:16,23 69:3 71:5 76:22 77:14 78:1,10,18 79:9,18,20 80:8 99:11
**complaints** 28:15,20 88:7,12 91:5
**compliance** 2:15
**computer** 122:9
**computer-aided** 132:10
**con** 107:21
**concern** 90:20
**concerning** 72:7
**concerns** 90:15
**CONCLUDED** 131:8
**conduct** 33:3 34:15 75:18 77:10 92:18 125:10
**conflict** 30:14,18 32:6 32:23 34:15 36:4 102:20 103:2,10,15 115:6,9 123:12
**conflicts** 30:8 64:18 101:19
**confrontation** 75:2
**consider** 95:5
**Considering** 41:17
**control** 9:23 10:2 21:21 56:3
**conversation** 31:19 85:13,19,22 86:13,16 104:1,7 106:22 107:7 107:17 108:2,21 122:22 128:9
**conversations** 86:1 107:19,20,22 108:7 108:14 109:7 123:8
128:4
**Cook** 71:12
**cooking** 112:23
**coordinators** 120:2,7
**copies** 35:12
**copy** 68:15 79:11 92:7 92:7 98:19
**correct** 11:8 15:2 19:5 19:17 25:5 37:1 47:22,23 48:4 52:13 53:9,17 54:11,11 55:5 57:3,14,16,21 61:22 64:19 65:8 69:4 72:8,14 81:3 82:4 83:7 84:5 87:12 87:20 90:15 92:22 93:23 99:13 119:19 128:21,22 132:11
**correctly** 56:5
**counsel** 2:4,20,22 6:7 7:4 132:15
**counseling** 98:20
**COUNTY** 132:4
**couple** 10:17,20 15:3 15:12 20:20 29:14 58:18 72:6 74:14 86:19,21 87:6 101:6 114:19 120:7 122:9
**course** 97:16
**court** 1:1 2:6,16 3:12 3:13 6:1 7:3,14 36:16 46:11 132:20
**co-worker** 32:20
**co-workers** 45:10
**crazy** 104:5 107:2 108:6 110:11,12
**crimp** 100:9
**Crook** 2:8 5:11 6:8 7:1 7:6,6 28:22 35:9 39:7 39:19 42:6 43:2 46:7 46:15,18 47:3 63:7 64:4 68:17 75:8 102:18 125:12 129:18,21 130:3,12 131:4
**crying** 26:13 103:8 104:4
**currently** 128:11
**curse** 47:17,21 96:8
**cursed** 31:13 61:16,18 62:2
**cursing** 62:3 96:22 97:5
**cuss** 31:6 47:6 57:9 61:23 64:22 95:13,15 95:18,23
**cussed** 46:2 57:2,6 94:15,18
**cussing** 32:13 44:18 53:16 54:16 58:6 60:19 73:15 74:10 85:16 124:18
**customary** 68:1
**cut** 38:11
**cutting** 116:7

**D**

**D** 1:21 2:5 3:6 4:1 6:1 6:19
**damn** 31:12 42:13
**date** 6:5,21 22:15 34:8 36:19 76:16,18
**dated** 33:15
**dates** 22:21
**David** 101:20
**David's** 101:21 127:3
**Davis** 126:4
**day** 2:9 3:9 6:10 18:9 19:15 21:15,18 22:2 22:8 31:13 32:9,9,11 36:9 37:8 39:11 42:9 42:22 43:1,3 47:7 57:7,9 63:16 64:9 87:3,4 90:3 93:16,16 102:17 103:18,19 106:10 115:18,20
**days** 18:18 19:15 20:21 65:6 86:19,21 87:6 95:21 124:11
**deal** 77:17 97:2 124:22
**dealt** 126:11
**Debra** 55:23
**decide** 113:7
**decided** 113:5
**defendant** 5:2 7:9
**Defendant's** 35:1,6 43:8,13,14 48:8,13 50:16,21 55:12,17 58:12,17 59:20 62:23 63:5 68:9,14 79:3 91:9 92:1,6 96:11,16 98:13,18
**Defendant(s)** 1:12
**definition** 89:2,4,5
**delivering** 3:7
**deny** 38:20
**denying** 38:21 49:22
**deposition** 1:14 2:4,13 2:14 3:2 6:16,23 8:20 35:3,7 43:10 48:10 50:18 55:14 58:14 63:2 68:11 79:5
91:11 92:3 96:13 98:15 131:8 132:7
**depositions** 2:17 9:3 59:1
**depth** 91:13
**derive** 24:13
**describe** 69:14 73:23 75:17 115:22
**described** 22:1 64:2 110:7
**describing** 60:8 63:15 63:16 68:16 73:18
**description** 61:3 110:4
**details** 73:13
**different** 9:5 10:5 18:8 19:15 25:13 28:23 36:7,8 66:23 70:6 102:4 103:12 107:18 107:20 126:2
**direct** 11:16
**directed** 80:17
**directly** 94:16,19
**director** 87:20
**dirty** 117:9,16,19,21 118:1,4,8,16,16,23 119:8
**disability** 89:13
**disagree** 89:15,17
**disagreed** 81:14
**disciplinary** 23:3,18 33:2 34:14,18,21 41:13,13 66:19 67:7
**discipline** 23:21
**discrimination** 89:6
**discuss** 122:6
**discussed** 64:2 84:3 112:18,19
**discussing** 75:5
**discussion** 81:20
**disposed** 80:15
**dispute** 50:7
**DISTRICT** 1:1,2
**DIVISION** 1:3
**document** 35:8,16 46:1 59:22 69:11 72:4,7 75:14 77:4,10,12 79:12,15 86:22
**documentation** 35:23 36:2,3,19 39:6 40:14 40:21 41:6 43:15 45:11,15 46:14 47:1 48:14 51:3 55:19 63:12 67:9 82:2 92:8
**documents** 22:1,6
**doing** 15:11 49:13 69:16 75:22 94:5
95:5 100:7 104:9 116:3,11 126:1
**Donald** 74:23
**Donelson** 5:4
**Dothan** 1:23 2:8 5:14 6:8 7:1 9:5,13 129:12
**drag** 82:13
**dragged** 90:10
**driver** 130:6
**duly** 7:18
**dumbasses** 56:11

**E**

**E** 4:1,5 5:1,1
**earlier** 97:8 124:9 127:11
**easier** 46:10
**easily** 57:13,20
**effect** 2:14
**effective** 3:6
**effort** 90:14
**either** 8:6 48:6 114:10
**else's** 89:5 118:20
**employed** 9:15 128:11 129:23
**employee** 41:2 71:12 120:5
**employees** 41:10 56:10 57:3,6 101:18 111:17 117:2
**employment** 10:13 11:4 19:1 20:5,13 23:1 24:18,19 29:18 91:6
**ended** 26:15
**Enterprise** 27:23 29:8 29:12 129:13,14,15
**error** 93:21
**especially** 89:2 125:17 130:22
**etcetera** 56:12 81:6
**Eugene** 12:23 13:4,8 14:1,12,18
**event** 36:8 45:12 46:21 113:20
**events** 91:20
**everybody** 48:7 53:5 90:6 93:8,15,18 100:9
**everybody's** 89:5
**evidence** 3:2
**exact** 17:21 22:20 112:5
**exactly** 55:8 74:2 114:5
**examination** 4:2 6:12 7:20 129:20

examined 7:18
example 31:11
exception 93:16
excess 81:5
excuse 18:13 71:22 78:13
excuses 99:7,16
exhausted 23:2,17
Exhibit 35:1,6,14 43:8 43:13,14 48:8,13,14 50:16,21,23 51:2 55:12,17,19 58:12,17 59:20 62:23 63:5,10 63:12 64:3 68:9,14 68:21 75:14 78:17 79:1,3,8,8 88:12,13 91:9,15,20 92:1,6,7 92:12,20 96:11,16 98:13,18,19
exhibits 3:10
extent 101:1
extremely 99:6

F

F 5:3
face 32:12 42:11 61:2 61:12,13,21 62:19 73:15 74:11 85:3 97:7,9 125:2
faces 30:23
fact 44:11 47:13 64:13 83:18 84:2 115:9 127:15
factory 117:18
fair 69:16 116:5
fall 81:9
falls 80:14 81:6,6
Fannie 12:8,9,12 13:16 13:20 14:10 16:19 17:5 18:14
far 47:15 76:18 82:20 82:23 90:1 105:16
fashion 43:6
feel 34:17,20 41:12 65:19 88:14,16,20 99:5,15
feeling 32:17
feet 90:10
felt 39:9,21 69:15 75:21 79:23 91:1 97:1 98:9 116:4
female 76:9
figure 23:14
file 82:2 84:5
filed 3:13 8:3 24:10 26:5,6
fill 21:11,18 22:2 69:6
filled 41:5 47:1 55:20
filler 10:7,10,11,12,23 11:8,10,16 13:12 16:6,12 21:10 42:10 60:16 62:12 70:1,6 80:10 90:9,16 100:5 124:21
fillers 81:8 82:16
final 23:20 87:23
financial 27:7,7
find 43:4 96:6 99:7 126:17
finding 81:15
findings 80:19,20 89:18
fine 7:16 91:3 120:8
finish 36:14 42:22 45:7
finished 65:14
fired 20:2,3
first 9:18 11:19,21 18:5 19:4 37:11 40:16 59:4 60:10 63:18 67:22 68:17 69:20,21 70:5 80:8 82:10,17 89:2,18 90:2,18 93:7 98:19 124:15
five 13:14,15 14:8,13 15:1,13 16:9 20:3 21:1,1 44:15 66:23 76:22 101:11
fix 42:17
fixing 44:17
flat 93:5 124:21
Flavor 1:10 6:18 7:9 8:3 9:4,7,12,16 11:5 12:19 19:1,8 20:6 23:1 24:2,5,8,14,15 24:18,20,22 26:2,5 27:13 30:7 91:6 101:18 111:15 127:13 129:4,23 130:5
floated 15:6
floater 72:11
Florida 128:20
follow 69:8 84:11
followed 85:10 86:3
following 6:12
follows 7:19
font 33:14
force 2:14
foregoing 6:6 132:7,11
forgot 22:11
form 2:21 36:3,4,19 39:6 40:21 41:6 43:15 45:11,15 46:14 47:9 48:14 51:3 55:19 63:13 67:9 69:6
formal 82:3
format 59:9
forms 40:14 47:1
found 80:12 82:11 83:5
four 14:8,12 15:1,10 21:1,1 33:13 44:15 66:23 100:5,6
frame 14:20 15:5,17 16:6 17:17 20:1 22:17 127:5
Frank 19:17 44:5 49:3 49:17 50:7 51:3,6,21 52:22 53:1,15 102:21 103:17 104:4,18 105:2,5,7,13,17 106:23 107:1,8 108:3 108:15 109:10,17 111:16 114:13 115:7 115:10,12,16,23 116:15,19,22 117:4,7 117:17 118:2,15,23 119:12 121:2 122:11 122:20,23 123:9,23 124:4,7
Franklin 6:19
Frank's 103:12
free 8:22
Freedom 7:3
friends 25:18
front 33:13 45:9 66:22 67:1 69:7 72:5 75:16 86:9 97:21 116:19
frustration 45:22
fuck 38:2 41:16 42:5 45:5,9 108:17 130:19
fucker 31:19 45:5,9
fucking 38:15 42:15 60:20 61:2,9,12 62:19 110:12
full 2:15
further 2:11,18 81:19 88:11 132:14
F'ing 53:22 54:12 55:6

G

gained 14:12
general 28:19 30:21 119:16
generally 109:19
getting 26:22 30:23 38:15 62:13 74:6 93:13 94:6 125:1
give 8:6 41:1,2 58:8 99:4
given 41:13 58:23 79:21 98:20 99:3 132:12
giving 40:20
glad 107:3
go 10:4 15:21 16:9,11 36:13 39:7 40:12 51:7 52:7 54:21 65:16 66:13 68:3 81:9 87:19 90:4,11 91:13,19 93:10,12,17 124:17
God 21:19
goes 42:7 90:1
going 8:4,11 14:5 15:9 15:11,13 24:11 26:17 26:20 32:16,19 35:5 35:6 36:12 39:12 50:20 54:19 55:16 58:7,16 63:4,5 68:13 68:14 70:1 79:7,8 82:15 87:18 90:6,13 96:15 108:17 114:20 115:3 124:16,21 127:17 128:6
good 14:21 78:20 88:15 88:17,21
grabbed 54:16 100:15
Great 93:8,9
Greenville 6:2
grounds 2:23
group 110:20
guess 18:11 64:5 72:13 74:6 78:12 100:22
guessing 33:9
gun 65:16,18 66:1,7,9 66:13,15
guy 122:14

H

H 4:5
half 10:3 12:5
Hall 41:23 42:1,3 58:1 58:3,6,18 60:2,4 61:4 63:21 64:9,18,21 65:11 67:22 72:16 80:5 85:14 96:18 98:21 101:16 127:9
Hall's 60:11
handed 59:20
handle 45:21 78:5,10 98:9
handled 78:1 88:19
handwriting 37:13 44:1 98:23
handwritten 69:8 72:19 75:17
hanging 54:17
happen 24:15 32:22 40:23 125:2
happened 37:10,17 44:14 45:17 46:22 63:16,17 67:22 82:21 83:1 91:20 99:23 100:4 101:12 102:22 113:13
happy 46:12
harass 125:10
harassing 76:3 125:10
harassment 27:18 75:18 89:3,5,8 112:21
hard 16:12 36:11,13 112:5
Harrell 48:14,17 50:13 60:16
head 8:8
hear 95:15,18 105:17 106:22 107:14 108:3 108:15,20 117:4,7
heard 37:21 47:6 95:23 102:20 103:11 105:15 106:6,13 107:7 109:10,17 110:8,10 111:15 119:12,14 121:2 125:22 126:1
hearing 96:10 132:13
hell 42:13 54:19 123:3 125:22
help 36:15 38:1 41:15
helpful 60:14 112:14
high 32:15,15 93:11,23
higher 93:13 94:7
highly 32:10,10 97:19
hired 9:21 19:4,8
holler 37:21
home 26:15,17,20 65:17 66:13 104:20 112:22 115:2
honest 78:15
honestly 95:12
hoping 24:8
hourly 53:13
House 1:10 6:18 7:9 8:3 9:4,7,12,16 11:5 12:19 19:1,8 20:6 23:2 24:2,5,9,14,15 24:18,20,22 26:2,5 27:13 30:7 91:7

101:18 111:16 127:13 129:4 130:5
**HR** 87:19
**huh-uh** 8:8
**human** 91:5
**humiliating** 100:23
**hung** 81:9
**hurry** 46:21 90:11
**husband** 26:21 27:3,9

**I**

**idea** 101:15
**identify** 7:4 91:15
**ill** 24:5
**important** 46:13,20 93:10
**impression** 57:16 123:20
**improving** 83:20
**inappropriate** 56:9 83:19
**incident** 34:3,6 41:7 43:18 47:2,11,20 51:4 55:21 56:17 57:1 58:1,5,10 60:7 61:4 62:5 63:17 64:2 66:20 73:18 83:21 92:9,22 93:3 99:5,22 100:3 101:2 103:22 104:8,14,17,23 105:3 105:8 115:6
**incidents** 58:2 67:2
**include** 45:15 46:14
**indicate** 44:3,11 47:9 70:5 71:9 75:15 77:16
**indicated** 29:6 64:17 66:14,15 83:12 84:1 84:9 90:16 103:20 119:11 127:11
**indicates** 49:7 50:5 51:7,12,21 53:15 64:14 65:5,13
**individual** 89:13
**individuals** 109:9
**individual's** 89:10
**information** 58:8
**initially** 56:16
**innuendos** 76:17,19
**instance** 61:17 74:3 95:22 97:9
**instances** 73:13 95:21 96:3,7,9 115:16,22
**intentionally** 58:20,21
**interested** 132:16
**interrupt** 16:14
**intimidated** 57:13
**investigating** 40:15 41:2 79:20
**involved** 43:21 44:4,8 56:21 68:3
**involving** 58:1,2
**issue** 78:5 80:19 81:21 81:23 82:4,7 85:19 85:22 86:13 89:18 99:13
**issues** 84:5 123:23 124:1

**J**

**jail** 121:5,9,15,17,19,22
**Jennifer** 5:3 7:8 8:1
**jet** 65:15
**Jewel** 106:15,16,23 107:8,12 110:16
**job** 16:12 42:15 62:9 115:4 116:11 126:1 128:23,23
**jobs** 116:3 129:9
**Joey** 7:2
**John** 127:18 128:5
**John's** 127:18,19
**joke** 118:16 119:5
**jokes** 117:9,9,17,19,21 118:1,4,8,16,23 119:1,4,9
**Jordan** 12:13,14,23 14:1,16,18 33:6,12 35:18 40:16 43:16 56:21 63:13 64:13 65:5,13 66:1,12 67:16 69:11 75:15 76:3,12 77:3,10 78:19 99:17 101:14
**Jordan's** 13:5 67:8
**Jr** 6:19
**jumping** 30:22
**June** 1:22 2:9 3:9 6:10 6:22 24:22 102:14,22 103:15 115:7
**jury** 53:5
**justified** 42:4 84:10
**justify** 32:19,21

**K**

**kept** 21:21 93:12,13
**Kim** 6:17 38:12,13 56:5 60:17 63:22 65:19
**Kimberly** 1:15 2:4 6:10 7:17,23
**Kim's** 37:23
**kin** 132:15
**kind** 18:19 21:17 30:14 30:18 33:1 36:11 77:2,9 89:9 112:5 125:9,16,18
**knew** 26:6,7,16 71:9 93:15 120:10 121:23 122:1,8 123:17,18 127:16 128:6
**know** 8:12,14,18 9:11 13:5,8 19:14 22:12 24:12 27:8,11 29:2 30:1 34:13,16 36:10 39:23 40:23 41:9,11 46:23 47:4,5,8 50:12 50:22 52:10 53:5,23 53:23 56:16,20 58:23 64:5,7,11 71:18,19 71:21 72:1 78:14 81:4 82:20,23 83:1 84:15 87:2 93:19 94:9 100:2,23 102:6 102:6,12,13,16,19 104:10 105:4 106:13 106:17,17 109:22 119:23 120:19 121:21 123:14 125:23 126:21 130:8 130:11,20,23 131:1
**knowledge** 122:3
**known** 19:3,7

**L**

**L** 2:1 70:6
**lab** 38:10,13 51:8 56:10
**label** 42:10 49:20 51:9 51:13 54:15 73:4 100:1,6
**labels** 51:22,23
**laid** 33:13 66:23 97:21
**Lampley** 16:3,16 70:7 106:7 108:3
**Landscape** 129:8,11
**language** 31:13 56:9 83:20
**Large** 2:7 6:4
**laughing** 65:7
**Law** 5:12
**laws** 2:16
**lawsuit** 8:3 24:9 26:2,5 26:11 127:13 128:5
**lawyer** 27:22 28:23 29:10,12,16
**lawyers** 27:20 28:2,6,9
**lead** 53:12,13
**leader** 53:8,12
**leading** 2:21
**leave** 13:15
**Leaving** 61:6
**Lee** 106:1,1,3,5 108:15
**Lee-something** 105:23
**left** 10:13 12:19 19:1 20:5,13 24:18,19,22 40:5,8 54:8 55:1 62:8 62:21 108:19 111:15 111:23 112:3,7,16 113:6,22 114:4,11,14 114:17 129:4 130:15 130:16,21,22
**letter** 70:16 73:19 88:8
**letting** 93:13,22 126:13
**let's** 31:22 51:6 74:1 88:18 119:21
**levels** 93:22 94:3
**License** 132:21
**lie** 39:3 50:13 93:6
**lied** 30:2 93:5,18 94:14
**life** 104:20 112:22 115:2
**liked** 85:2 120:9
**Linda** 1:6 5:16 6:17 8:4 16:21 17:15 24:9,17 33:1 34:4,7,13 35:17 36:4,22 37:12,21 38:6 39:5,17 40:8,20 44:5 47:2,10 48:5 101:17 102:21 103:7 103:16,17,21 104:2,7 104:13,16 105:13,18 106:23 107:4,8 108:8 108:16 109:2,5,8,11 109:18,23 111:4 113:21,21 114:7 115:6,8,10 118:5,7 122:7,20,23 123:9,15 125:11 127:14 129:23 130:5
**Linda's** 28:6 37:12 128:5
**line** 13:7,13,15,19 14:15 15:5,8,9,10,12 15:13,14 16:20,21 17:9,11,16,20,23 18:2,6,7,8,15 19:15 19:20,23 20:3,12,20 21:3 22:7,13,13 30:9 30:11,12,16,20 31:2 33:7 34:11 36:23 37:3,6,7 40:5,8,12,13 41:23 42:8,9 48:23 49:4,18 50:11 51:8 51:10,14 54:20,23 56:10 60:16 63:18,21
71:7,11 72:23 73:7 80:13,13 81:4 82:12 90:5 95:2 96:5 100:5 100:6 101:11 102:16 103:3 116:2,11 123:18 124:10 125:5
**lines** 12:21 14:3,5 15:1 15:6,16 19:13 20:18 44:15 80:16 82:18
**Lisa** 16:10,16
**literally** 115:18
**little** 25:4,4 38:11 52:11 54:17,22 76:17 95:9 96:1 109:12 124:5,8,10 129:8,19
**live** 129:14,16
**long** 10:1,15,18,22 12:2 12:9,14 14:19 18:17 74:1 90:3 101:5 109:4 113:9 121:9 124:19
**longer** 124:13
**look** 35:7 37:11 59:20 63:7 68:17,18 69:20
**looked** 100:16,17 117:12 119:13,16 120:6
**looking** 38:8 44:13 52:18 74:3 79:19 99:15
**looks** 69:20 100:9
**lose** 24:9
**lot** 16:8,11 21:22 26:21 27:11 39:11 41:23 43:3 59:1 73:13 104:19 124:12 128:2
**loud** 38:14 61:17
**low** 107:15
**lunch** 116:7
**lying** 39:5,17

**M**

**M** 71:6,10
**machine** 10:8,10,11,12 10:23 42:13 51:13 54:15 73:4 100:6 125:20 126:7,12,13
**machines** 42:16
**mad** 58:22 130:13
**madder** 53:21 54:12 55:6
**magic** 100:11
**main** 40:5,8 85:1,3,7 104:20 110:10 116:13 126:11,20
**making** 38:19 42:4

59:7 66:17
**management** 91:5
**man's** 126:1
**mark** 35:6 43:12 50:21 55:17 63:5 68:14 79:8 91:14,15
**marked** 35:2 43:9 48:9 48:13 50:17 55:13 58:13 63:1 68:10 75:14 79:4 91:10 92:2,5 96:12,16 98:14,18
**marker** 100:11
**marking** 58:17
**Marry** 88:1
**Mary** 88:6 118:17,18
**matter** 6:17 24:16
**McClain** 7:2
**McCullough** 48:15,17 50:5,13
**McGinnis** 42:1 84:21 101:20 127:7
**McNaughton** 1:21 2:6 3:7 6:1 132:19
**mean** 9:12 16:13 25:10 25:11 31:5,8,13 35:22,23 45:3,17 53:6 62:18 80:21 96:1 101:5 103:15,16 109:6,20 112:6 113:8 125:3,20
**means** 53:6 132:9
**meant** 113:19
**mechanic** 32:12 37:22 41:14,20,22 44:8,12 45:13 60:4 74:21 101:22,23 102:3
**mechanics** 30:22 116:11 125:17 126:2
**mechanic's** 62:9
**meet** 25:21
**Melvin** 93:18
**members** 82:12 84:12 90:2
**mention** 44:7,22 45:1 45:12 71:4 76:19 77:2,9 97:12
**mentioned** 71:2 121:4 121:7,16
**messing** 62:13
**met** 19:10 27:10 29:7
**metal** 128:14,16,19
**MF** 52:12 53:3 56:11
**mic** 130:1
**microphone** 54:17
**Mid** 11:12
**MIDDLE** 1:2
**Midland** 129:16
**mid-2000** 11:11
**Mike** 128:1,8
**mine** 62:10
**minute** 65:7 84:4
**minutes** 67:4 112:2
**missing** 126:18
**month** 97:15
**months** 20:23 21:4 33:12 67:1
**morning** 37:20 41:18
**mother** 31:18 38:15 45:5,9
**move** 13:16,17 128:23
**moved** 13:18,18 17:8 17:20,23 20:12,19,21 20:22 21:1 22:12 36:23
**moving** 19:13
**M's** 71:6,10

**N**

**N** 2:1 4:1 5:1
**name** 7:2,22 8:1 16:2 29:15 101:21 102:7 105:22 106:18 118:20 122:14 127:3 127:18,19,19
**named** 72:11 102:3
**names** 110:1 120:10
**Nance** 67:17
**narrative** 8:7
**national** 89:11
**nature** 117:5,8 121:2
**near** 65:14
**necessarily** 80:21
**necessary** 2:19
**need** 8:19,23 46:7
**needed** 15:7 42:12
**neither** 132:14
**nerves** 38:16
**nervous** 104:10
**never** 61:16,17 62:1 67:21 71:16 76:14 84:14 99:3,4 112:19 120:10,10 126:6
**new** 93:9 100:14
**newsprint** 65:15
**nitrogen** 21:21 93:10 93:22 94:3
**normally** 40:18 87:17
**North** 5:6
**Notary** 2:6 6:3
**noticed** 63:21
**number** 1:5 6:16,20 35:1 43:8 48:8 50:16 55:12 58:12 62:23 63:5 68:9 69:4,15 79:3 82:6 91:9 92:1 96:11 98:13 132:21
**numbers** 93:14

**O**

**O** 2:1
**Object** 39:7,19 42:6 43:2 46:15 47:3 64:4 75:8 102:18 125:12
**Objection** 130:9,12
**objections** 2:20,23
**obviously** 127:2
**OC** 38:10
**occ** 19:13
**occasion** 46:3 57:2
**occasionally** 18:3 19:14
**occasions** 30:1 71:13 104:17 121:19
**occurred** 43:18 74:14 74:16
**offended** 57:20 116:15 120:21
**offered** 3:2
**offhand** 16:17
**office** 33:13 66:22 72:5 74:22 77:20 86:9 105:23
**offices** 2:7 6:8 7:1
**oh** 21:19 57:7 67:5 89:20 93:19 115:14 121:11 123:13 125:15
**okay** 7:11 9:1,8,9 10:18 11:19,22 12:6,22 13:2,23 14:9,14 15:4 15:15,20,22 17:1,7 17:14 18:19 20:10 21:2,8 24:7 28:22 29:6 30:18 36:2 42:2 42:23 46:9 51:1 55:2 55:9 59:5,11,15 61:14 62:7,11 64:7 67:3 68:13 69:10 71:1,15 73:2,2 77:8 78:8,9,17 85:5 88:22 98:17 101:16 102:9 104:12 106:8,12,19 108:2,14 109:14,16 111:9 113:2,12 114:7 114:22 115:5 116:6 116:12,15 117:13 119:17 120:17 124:4 125:18 126:3,5,10,15 126:22 131:5,6
**old** 100:13
**omissions** 54:10
**once** 27:10 36:17 60:22
**ones** 16:10 85:1,3,5,7,9
**one-sided** 99:6
**op** 10:6
**operate** 126:12
**operator** 10:7,19 11:8 11:10,16 13:12 16:12 21:10 42:10,11 48:19 48:22 49:20 51:9 70:6,22 90:9 100:1 122:13
**operators** 16:6 42:10 82:16 90:17
**opinion** 29:21
**opportunity** 33:19 35:14 50:22 59:21 63:9 79:21,23 92:11
**opposed** 8:8 59:7
**oral** 3:8 6:12
**order** 100:14
**orientation** 89:11
**origin** 89:11
**original** 3:8
**other's** 31:1
**outdoor** 108:11
**outside** 63:21 103:7,8 103:21 105:15,19 108:1,22 110:21 112:22
**owned** 9:5

**P**

**P** 2:1 5:1,1
**page** 4:2 37:12 38:8,12 40:2,4,16 43:21 47:10 69:7,20 72:19 76:22 99:1
**pages** 69:4,8
**paid** 26:22
**paint** 128:19
**painting** 129:9
**paperwork** 21:11,17 21:22 70:18 82:9,10 82:14,17 90:8
**paragraph** 60:11 61:15 68:5
**paraphrasing** 61:7
**parentheses** 37:23
**Parker** 37:21 38:6
**part** 37:11,16,19 40:1,4 44:13 54:1,6,10 72:21 75:5,17
**particular** 22:7 34:3 37:8 41:7 42:22 43:1 58:4 62:5 64:8 71:2 81:23 96:7,9 103:19 104:23 106:10
**parties** 2:3,22 132:15
**Pause** 68:19 92:10
**PC** 5:5 7:1
**people** 16:11 26:9 32:14 38:15 67:23 74:17 76:7 84:18,19 84:21 103:12 105:15 105:19 106:9,12,14 109:17,21 110:19,20 116:2,10 122:9 127:12,16 128:3
**perform** 82:8
**performance-based** 23:22
**performing** 82:14
**period** 14:17 16:22 17:14 18:17 21:3 25:7,13 124:20
**Perkin** 56:6,6
**Perkins** 1:15 2:5 6:11 6:17 7:17,23 8:1 11:21 12:3 13:12 38:12 56:7 57:12 59:19 63:22 111:13
**permanent** 15:19,22
**person** 25:19,21 29:22 30:4 40:19 53:13 68:2,3 78:9
**personal** 120:2
**personality** 123:22,23
**personally** 103:14 105:14,16 125:22 126:21,23
**person's** 122:12
**phone** 25:17,19,20
**picking** 10:6,16
**picture** 122:8,12
**place** 6:23 22:20 24:6 34:7 67:2 107:22,23 108:1
**placing** 65:15
**plaintiff** 5:10 7:7
**Plaintiff(s)** 1:8
**plant** 9:4,13 83:7 93:9 123:17
**please** 3:11 7:22
**plus** 116:10
**point** 17:7 23:5 90:1,15
**policy** 23:4,18
**position** 9:21 10:4 110:4 127:20
**positional** 87:19

possible 52:16,21
reference 78:4
presence 94:20,21
present 5:16 75:1 103:1 118:15
pressure 23:7 40:11
pretty 13:3 14:21 23:7 69:18 108:5
primarily 15:6
primary 18:16
print 100:13
prior 3:2 83:21 91:20
prison 121:8
private 129:9
probably 33:6 38:7 39:9 58:23
problem 52:19 93:1,4 124:23
problems 26:21 27:2,3 102:10
Procedure 3:5 6:6
proceedings 6:13
process 100:7
product 60:17,18,21 62:10,16,17 80:15 93:11,22
production 11:22
Products 1:10 6:18 7:10
profanity 31:3 32:6,20 47:17 83:7 84:11 115:13,17,23 116:16 116:18,22 117:2
progressive 23:3
prompted 43:5 44:22 45:4,8 56:20
psycho 104:5
Public 2:7 6:3
pursuant 6:5
push 58:21 85:2
put 40:12 45:18 73:5 74:4 81:12,16 97:23 98:8 124:2
putting 82:9
p.m 2:10 6:10,21

**Q**

QC 51:8 56:1,2
quality 9:23 10:2 56:2
question 2:22 8:12,15 8:21 24:8 25:13 36:12,14 42:22 45:7 46:9 49:21 52:20 55:4 59:6,6 67:6 68:6 77:8 78:21 105:6 109:14
questions 2:21 8:5 132:8
quit 109:12
quote 38:1,14 49:7 65:16

**R**

R 5:1
race 89:10
raise 53:16 70:16
raised 48:2,6 82:7 95:6 95:8
ran 93:8 100:14
read 35:14 45:23 46:11 50:22 59:21 60:10,12 61:14 63:10 68:20 79:14 92:12
reading 2:12 56:5 60:13
readings 94:6
real 15:11 96:2 107:15 130:14
really 24:16 56:6 64:5 88:20 89:1,9 97:5 99:20 105:9,11 109:6 114:20,20
reason 8:14 23:16,22 40:5,8,10 44:21 45:3 45:14 50:12 80:22 101:13
recall 16:5 17:19,21 20:15,18 29:3,4 34:6 34:8,9 38:22 41:5 49:13 52:14,17,18 55:8 60:7 66:6,17 67:13 73:17 74:7 79:13 95:10 104:1 105:21 110:22 111:1 115:15 117:16 118:3 118:6,7,14 119:13 120:3,4
receive 33:1 66:19 67:11 79:11
received 23:21 34:14 34:18,21 67:7 79:13 87:3
receiving 76:8
Recoaters 128:14,16
record 6:21
referencing 75:6
referring 9:6 63:19 64:1 69:1 72:21 74:8
reflect 22:6
regarding 80:4
regardless 90:7,13
regular 21:12
regularly 18:1,15 19:19
relate 89:8
relates 36:4
relating 2:16 28:14 41:6 43:17 47:1 51:4 55:20 98:20
relation 29:17
relieved 24:3
religion 89:10
remain 18:22
remarks 58:19
remember 16:1,14 21:2 22:14,16,20 29:15 33:5 38:19 47:15,19 49:15,17 50:2 52:23 54:14 58:10 62:1,2,4 67:19 74:3 78:16 95:20,22 96:4,8,10 97:16 101:4,9,21 103:6,6 106:21 109:4 110:1,3,9 113:14 114:5 115:21 116:14 117:15,20 118:19,23 119:1,3,4,8 124:9 127:18,19,20
remembered 113:8
remembering 112:5 113:8
reminded 93:15
Renny 1:21 2:5 3:6 6:1 132:19
report 99:5
reported 47:6
reporter 2:6 3:12 6:2 7:14 36:16 46:12 132:20
Reporting 7:3
reports 74:17
represent 7:5,7 28:3 29:17
representing 7:3,9 8:2
represents 132:11
required 80:11 81:12 82:8,16 90:17
resources 91:6 120:2
respect 88:11
respective 2:3
respond 43:5 77:6
responded 88:13
response 8:7 79:9 80:12 87:15 88:23 89:22 90:23 91:21 96:17 107:12
responses 79:22
rest 12:16 93:11
result 33:2 34:14 66:20 67:8 79:18 94:12 132:17
resulted 82:1
retained 3:12 28:1,2 29:10,16
retaliation 87:11
rework 70:17 82:8,15 82:17 90:4,12,18 116:1,2
reworks 80:14
rezero 62:15
Ricky 77:13,16 78:1,5 78:9 85:10 86:2,5 87:10 88:3,13 90:16
Ricky's 78:14 88:23 89:22
right 11:13 16:3,17 33:14,22 36:20 39:10 42:17 45:2 48:3 55:18 60:5 61:1,14 62:13,18,20 66:16 67:6 69:12 70:10 72:21 73:21,23 75:18 75:22,23 76:9 78:19 80:1,6 83:10,16,22 84:13 86:17 88:1 89:19 90:21 94:10 97:17 100:16 104:10 106:20 110:12 111:18 117:14 120:3 121:1 123:3 124:14 124:20 127:7 128:21 128:22
roaster 48:18,21 122:13
roofs 128:19
Rosie 72:11 80:4 83:5 91:22 92:17 93:2,4 95:7,13 96:8
Rosie's 92:8
roughly 11:11,12 17:4 17:16 22:16
row 33:14
Rule 3:4
ruled 13:3
rules 2:16 3:5 6:5
run 93:13,22 100:8
running 49:4 51:14 100:5

**S**

S 2:1 4:5 5:1,2,10,11,13 7:1
salt 81:6
satisfaction 24:14
satisfied 87:15 88:22 89:22 91:1
satisfy 90:14
saw 72:16 122:13 131:3
saying 41:14 42:4,19 43:1 49:8,14 50:2,3 52:14,19 93:19 94:18 107:1
says 37:16,20,23 38:9 38:12 40:5,15,16 43:20 44:13 52:6,9 55:5 56:12 60:15 62:18 63:20 72:22
scales 60:15,20 61:9 62:13,15 73:11
scared 104:6,11 130:10 130:11
screamed 42:11
screaming 32:13 73:15 124:18 125:1 126:14
screams 62:20
screw 130:6
screwdriver 131:2
second 38:8 40:2 47:10 61:15 70:15 82:6 90:1
see 13:18 22:14,18 24:8 28:12 33:11 35:9 37:20 38:2,16 40:1 43:23 49:2,4,10 63:20 73:4 74:1,4,18 92:20 98:3 103:17
seeing 24:14 103:7,16
seen 25:22 27:10 79:15
send 60:17,21 62:10,15
sense 8:13
sent 60:17 62:16,17
sentence 54:11
September 86:23
sequence 46:21
series 45:17
serious 27:7 65:19 123:22,23
set 88:3
seven 22:19
sex 89:11
sexual 27:17 76:12 77:3,9 89:11 112:21 117:5,8 121:2,12 122:1 125:10
sexually 76:3 125:10
shakes 8:8
sheets 21:19,20,21,22
she'd 125:20
shift 90:9
shirt 53:2,2,4,22 54:4

54:13,22 55:7
**ıoot** 65:17,18 66:13
**shooting** 66:1,8
**short** 59:14 111:8
**shot** 66:5
**shoulder** 54:17
**shove** 126:8
**show** 35:5,10 43:12 48:12 50:20 55:16 58:16 63:4 68:13 79:7 92:5 96:15 98:17
**showed** 100:21
**sic** 109:10
**side** 38:11 99:4,12 100:12
**sign** 67:18
**signature** 2:12
**signed** 68:6,8
**significant** 101:19
**signs** 100:10
**Silby** 106:16
**site** 128:23 129:1
**sitting** 46:1 103:7 105:19 110:20 111:1 113:15
**situation** 44:4,9 50:14 72:10 80:4 83:3,15 91:22 93:21 96:18
**situations** 32:15
**skills** 83:21
**slow** 60:12
**smart** 49:8
**smoking** 108:11,22 110:23
**Smothers** 77:13 79:9 79:12,19 80:12 81:15 81:20 82:11 88:3
**somebody** 42:14 54:18 54:21 90:5 97:6
**son** 27:6
**sorry** 11:11 16:13,17 30:10 35:11 46:5 48:20 58:7 81:11 85:6 107:10 118:12 130:3,23
**sort** 33:9 53:12 59:7
**sound** 11:13 16:3 89:4 89:7
**source** 26:8
**Southeastern** 129:7,11
**SOUTHERN** 1:3
**speak** 25:8 88:4 105:14
**speaking** 36:5
**specific** 22:14 58:10 115:15,21 120:5
**specifically** 16:15 20:16,19 25:11 73:17 109:22
**spend** 121:9
**spent** 22:19
**spoke** 25:16 28:23 29:13 85:4,6,9 103:21 106:11 109:22
**spoken** 27:19 58:6 87:7
**St** 5:13,13
**stand** 24:6 98:11
**standing** 73:3
**stands** 56:2
**start** 9:18 31:22 36:13 36:15 113:11 119:22
**started** 60:19 72:23 88:19 104:5 115:1,3
**starting** 39:2
**startup** 21:20
**state** 2:7 6:3 7:5,22 132:3
**stated** 38:1,13,14 45:19
**statement** 35:20 36:1 38:6,18 54:7 56:14 60:1,11 62:8 65:20 66:11,18 67:20,23 68:2,4 74:13 75:7 83:4,13 91:21 92:17 92:21 96:19 97:13 99:12,12
**statements** 67:1 68:1 77:21 79:22 80:3 84:4 91:16,19
**STATES** 1:1
**status** 89:12,12
**stay** 52:12 53:3
**stenotype** 132:8
**step** 23:20 33:2 41:14 67:8,11,13 87:16,23 98:19
**Stephanie** 16:1,7,15,16 70:6,7,21 71:2 80:10 80:16 106:6,7 108:3 110:16
**Stephanie's** 80:13
**steps** 23:3,17
**stick** 59:9
**STIPULATED** 2:2,11 2:18
**stipulation** 6:7
**stipulations** 7:15
**stop** 49:18 53:16 54:16 95:2 124:2
**stopped** 49:3
**straight** 42:9
**straightened** 123:2
**Street** 5:6
**stress** 23:6 32:15 39:11 40:11
**stressed** 30:23 32:18
**stressful** 32:10
**strike** 18:4 29:20 41:20 45:23 48:12 57:12,19 70:4 84:2 102:13 109:8 120:4 122:18
**Stuart** 55:20,23
**stuff** 30:21,21 104:6
**stupid** 56:11
**subject** 85:14
**subsequent** 99:10
**suddenly** 113:5,7
**sugar** 81:6
**suggesting** 113:3
**suing** 27:13
**Suite** 5:7
**supervisor** 11:17,20,23 12:3,7,10,15,18 13:7 13:13,17,21 14:2,19 16:20 17:5 18:14 22:5 40:15 41:3 53:7 53:7 56:18 99:23 100:4 101:8,10 127:22
**supervisors** 116:3,4
**supper** 112:12,18,23
**supposed** 81:7,16 93:12 94:2
**sure** 22:22 33:17,21,22 54:4 55:9 73:12 74:2 76:5 87:5 99:20 117:23 118:22 130:14
**surprised** 66:4
**Swain** 3:8 4:3 5:3 7:8,8 7:16,21 8:2 35:4,10 43:11 48:11 50:19 55:15 58:15 59:18 63:3,7 68:12 79:6 91:12 92:4 96:14 98:16 111:12 129:17 130:9 131:5
**swear** 7:12
**switch** 12:20,21
**switched** 15:12,14
**switching** 14:3
**sworn** 7:13,15,18

**T**

**T** 2:1,1 4:5
**table** 8:21 10:6,16 110:23
**take** 8:19,23 35:7 36:18 68:17,18 87:16 88:10 100:8 107:22
**taken** 2:5 3:9 59:14 72:5 97:14 111:8 132:7
**talk** 25:14 26:1 28:5 33:19 67:3 77:13 84:22 87:23 88:6 104:21 105:2,7,13,18 106:6 109:11,18 112:9 113:10 114:19 119:12,20,21 122:20 124:6,8,23
**talked** 9:2 26:16 29:7 29:14 73:10 83:14,18 83:19 84:20,21 104:16 109:19 112:20,22 115:5,8 120:11,15 121:3 127:12,14 128:2
**talking** 9:11 31:19 32:2 41:14,21 52:11 72:18 75:10 91:17,17 96:5 104:22 105:15 107:15 109:13 111:13 112:11,17,23 113:15,17 115:2 116:1 117:11 119:15 119:18,22 120:8,18 123:14,16 130:18
**tape** 59:13,16 111:11
**Taylor** 106:1,5 108:15 109:10
**team** 53:8,12 82:12 84:12 90:2
**tell** 26:4,10 27:3,12,15 36:11 39:2 43:13 60:20 61:8,11 62:10 103:5 111:20 112:13 112:15 114:7,13,17 114:22 117:21 118:1 118:4
**telling** 45:3 69:22 70:16 73:8 117:9 119:3
**temporary** 16:10
**temps** 120:1
**term** 31:18 53:4
**terminated** 11:4 23:1 23:10,12 25:2
**termination** 24:2 25:9
**terms** 23:21
**testified** 7:19
**testimony** 1:14 3:9 23:9 46:1 132:12
**thereto** 3:3 132:9
**They'd** 125:21
**thing** 26:18 61:18 69:21 70:3,15,21,23 86:4 104:21 108:5 110:10 116:14 121:12 122:1 126:11 126:20 129:19 130:15,17
**things** 9:2 10:6 22:1 24:15 26:14,22 28:17 32:16,22 33:14,15 39:11 40:18 45:17,21 58:20 61:6 66:21 69:15 75:21 89:1 112:5 113:9,11,23 115:2 116:9 123:1,2 125:4
**think** 22:18 25:1 33:23 38:12 64:16 66:14 75:16 81:2 99:18 100:20 101:14 106:3 106:5 110:20 118:21
**Thornton** 1:6 5:16 6:18 8:4 16:21 17:8,20,23 18:23 19:3 20:5,12 22:12 24:10,18,21 25:8,15 26:1 27:2,12 28:3,11,18 29:22 30:2,7,15,19 31:4,15 31:20 32:3,5 44:5 101:17 102:21 105:13,18 108:16 109:11 111:15,20 112:10,13 115:7,10 118:5 122:7
**Thornton's** 27:8,20 28:5,9
**thought** 72:23 73:7 83:12 100:22
**threatening** 130:15,17
**three** 14:8,12,15 15:1 15:10 17:9,20 18:1 19:23 20:12,20,22 21:3 22:13 36:23 44:14 80:13 81:4 93:12,17 109:9 124:10,12 126:2,3
**throats** 31:1
**throwing** 104:6
**time** 3:1,1 8:19 9:6 10:12 11:15 12:17,19 14:20 15:4,17,23 16:6,9,19 17:12,17 17:22 18:13,17,23 20:1,11,12,13,19

22:16 24:17,19 27:6 27:19 28:2 29:20 30:6 32:14 33:11 36:22 37:4 39:21 47:21 48:1,5 49:19 57:8,10,11 59:13,16 65:21 76:2 78:14 88:4 93:8 97:19 104:2 111:10 114:6 116:7,10,13 121:8 124:13,15,20 126:8 127:5,6 129:22 130:4
**times** 14:2,19 15:16 18:5 19:16 29:15 41:23 65:10 73:14 95:21 97:10 121:7,17 130:21
**title** 11:8 12:2 13:6,9 78:14,16
**today** 8:5 45:4 46:2 83:10 125:9
**Today's** 6:21
**told** 25:1 42:12 52:6,10 53:2,21 54:12 55:6 60:16,18,21,22 61:1 62:18 70:9,21 71:20 72:3 73:4 74:21,22 83:9 87:10,14 97:8 109:9 110:14 112:1 114:19 117:17 118:8 118:16,16,23 119:9 122:2,3 124:9,21 125:8 127:16 131:3
**tolerated** 87:11
**Tommy** 67:17 74:16,22 77:17 78:2,6,7 83:13 87:17,18
**top** 38:9 43:21 62:12
**touched** 76:12,14
**Tower** 5:6
**train** 116:10
**transcribed** 132:9
**transcript** 3:8 46:11 132:12
**transcription** 132:10
**tray** 100:8,15,17,21
**treating** 72:16 116:4
**treatment** 76:8
**trial** 3:1
**tried** 124:2 126:9
**trouble** 26:15 27:7,22 39:14 54:19 99:7,16 99:19 130:14
**true** 39:1,13 80:21,23 132:11
**ruth** 103:5 112:3
**truthful** 29:22 30:4
**try** 8:15 125:20 126:7
**trying** 18:12 23:14 33:23 39:14 43:4 45:20 46:19,20 51:1 78:8 96:6 98:4 126:12,17
**turn** 22:4 52:7
**turned** 100:13,15,18,21
**turns** 36:18
**Twentieth** 5:6
**twice** 47:11,14
**two** 10:3 14:7,11 15:3 15:16,21,23 20:21 35:12 44:14 80:16 97:17
**type** 36:16

**U**

**U** 2:1
**uh-huh** 8:8 30:13 46:18 92:13
**ultimately** 81:14
**understand** 8:13 9:4 18:2 22:22 75:20 80:11 93:20
**understanding** 17:8 22:23 23:15 24:21 26:19 27:1 37:13 40:7 53:11 71:16 75:6 77:23 80:18 82:11 92:16
**understood** 40:10
**UNITED** 1:1
**unusual** 64:14,17
**upset** 26:13 70:12 97:20 114:21 124:16 125:3
**use** 31:3,18 32:2,5 45:4 45:8 47:17 64:22 115:13,17 116:18
**Usual** 7:15
**usually** 77:19

**V**

**v** 1:9
**Value** 93:8,9
**various** 14:2
**verbal** 8:6
**versus** 6:18
**veteran** 89:12
**Vicki** 71:12,17 72:1,3
**video** 65:15
**VIDEOGRAPHER** 6:15 7:11 59:12,15 111:6,9 130:1 131:6
**videotape** 6:16
**view** 42:4
**voice** 48:2,6 53:16 95:6 95:8

**W**

**Wachovia** 5:6
**wait** 46:8
**waived** 2:13
**walked** 44:20 50:7,8,10 51:8 54:22
**walking** 103:6
**walks** 90:5
**Walters** 128:1,8
**want** 77:17 91:14 126:19
**wanted** 90:10 99:18
**wanting** 39:2
**wasn't** 39:21 46:12,20 48:5 64:17 77:6 94:19 103:3 106:10 113:17 116:4 120:23
**waste** 69:23 80:9,17 81:7,12,16
**watch** 116:9,10
**way** 20:4 39:9,21 40:18 44:23 45:10 49:15 55:9 59:5 62:4 71:21 71:23 72:23 73:7 76:13 88:18,19 89:3 100:12 117:11 119:13 120:6 125:23 126:8
**Wednesday** 6:22
**week** 101:7
**weeks** 10:17,21 72:6 74:14 101:6
**weight** 21:20
**went** 10:7 27:22 42:8 44:16 45:20 50:10 52:9 54:22 74:22 87:3 103:17 104:4,5 113:19 124:10,11,15 124:19
**weren't** 69:16 87:18 88:22 113:10
**Wes** 102:3
**Wesley** 42:1 84:20,23 85:20 86:2,4,5,13,18 86:19 87:8 101:20,23 102:4 126:4 127:7
**Wesley's** 102:7
**we're** 6:20 25:18 42:15 59:17 111:9 131:6
**we've** 9:2 84:3
**Whichever** 106:2
**wife** 66:4,4
**Wilkerson** 127:4
**Williams** 6:19 19:17,20 44:6 51:3,6 52:22 53:1 102:21 105:3,7 105:13,18 111:17 115:7,10,13,16,23 116:16,19,22 117:4,8 117:17 118:2,15 121:3 122:20
**witness** 2:13 6:11 7:12 7:13 28:20 46:16 103:14 115:9,12 125:7,9,16,18 132:13
**witnessed** 28:10,17 115:16 126:21,23
**woman** 105:22
**women** 117:11,12 119:12 124:1
**word** 65:17,18
**words** 37:23 45:5,8 47:18,21 64:22 95:23 96:8
**work** 10:1,15 18:8 19:10 32:18,19 37:7 47:22 48:2 57:3 86:20 95:16,19,23 102:14 117:22 122:16 125:19,20 126:7,13 128:14
**worked** 11:7,10 15:5,8 17:1,15 18:14 19:16 21:3 81:4 90:3 105:23 110:4 122:10 123:18 127:21 129:6 129:7
**working** 9:18 10:22 13:11 14:1 15:16 16:21 19:14 22:7 30:7,20 82:9 102:13 102:17 120:1 128:13 128:20 129:3 130:5
**works** 59:5
**worry** 38:1 41:15
**worth** 38:2 41:16 42:5
**wouldn't** 125:19
**write** 60:12 70:1 74:2 74:23 80:9,17 83:4 84:3 86:9 98:2,4,5 99:3
**writes** 52:11
**write-up** 35:17,21 67:14,15,18 68:7
**write-ups** 77:6
**writing** 45:16 97:18,20
**written** 33:4,9 34:3
40:4 60:1 67:12 69:23 71:5 72:1 74:13,17 76:22 79:22 81:7 85:16 86:7,23 98:19
**wrong** 39:12 42:7,8 51:13 71:10 104:3 124:17
**wrote** 33:5 45:11 49:3 67:20 68:4 72:6 74:13 75:7 77:12 80:3 91:21 99:8 100:11

**X**

**X** 4:1,5
**X's** 100:12,20

**Y**

**yeah** 17:18 19:6 25:16 35:10 38:23 40:3,17 46:7 48:4 55:11 57:11,18 65:1 75:9 78:20,22 82:5 86:8 88:2 95:6,17 97:12 98:7 100:18 101:3 103:11 104:22 107:6 108:1 109:3 110:15 110:17,19 114:9,12 114:15 118:19 119:2 119:7 120:16 122:21 123:13 125:15 126:16,22 127:1,10 127:17 128:1,22 129:2
**year** 12:4,4,11 14:22 15:3 17:4 20:23 21:4 22:17 25:5,8,14 29:5 34:9,11
**years** 10:3 15:3 22:19 58:19 97:17
**yell** 47:13 65:2 94:23 95:7
**yelled** 42:12 46:2 47:10 62:17 125:4
**yelling** 32:13 60:19 61:20 73:15 74:10 95:4,6 124:18 125:1 126:14
**yells** 62:20
**young** 122:14
**y'all** 17:15 18:13

**Z**

**zero** 60:20,22 61:9
**zeroing** 60:15 62:14

73:11

**0**

**04** 22:18
**05** 21:9
**06** 21:7,9

**1**

**1** 4:6 35:2,6,14 59:13
**1:00** 2:10 6:9
**1:04** 6:21
**10** 4:15 91:10,15,21 92:20
**10th** 61:5 63:17 66:2 75:11
**107cv-712-WKW** 1:5
**107-CV-712-WKW** 6:20
**11** 1:22 4:16 92:2,6,7 92:12
**11th** 2:8 3:9 6:10,22 11:1,3
**12** 4:17 96:12,16
**12th** 36:20 43:18 51:4 55:21
**13** 4:18 98:14,18,19
**14th** 102:14,22 103:15 115:7
5 3:6
**1600** 5:7
**1988** 3:6

**2**

**2** 4:7 43:9,13,14 59:16 82:6
**2:02:50** 59:13
**2:21** 59:16
**2000** 9:20
**2003** 11:12
**2004-2005** 17:17
**2006** 24:22 36:20 43:18 46:3 47:20 55:21 57:1,23 58:5 60:2 61:5 63:17 66:2 86:23 102:14,22
**2007** 11:2,3,13 25:2
**2008** 1:22 2:9 3:9 6:10 6:22

**3**

**3** 4:8 48:9,13,14 51:8 72:19 111:11
**3:21:39** 111:7
**3:32** 111:10
**3:50:46** 131:7
5 4:6
**35203-5202** 5:8
**36301** 5:14
**367** 5:13

**4**

**4** 4:9 50:17,21,23 51:2
**411** 132:21
**420** 5:6
**43** 4:7
**48** 4:8

**5**

**5** 4:10 55:13,17,19
**5(d)** 3:4
**50** 4:9
**55** 4:10
**58** 4:11

**6**

**6** 4:11 58:13,17 59:20 64:3
**63** 4:12
**68** 4:13

**7**

**7** 4:3,12 63:1,6,10,12
**7th** 86:23
**79** 4:14

**8**

**8** 4:13 68:10,14,21 75:14 78:17 79:1 88:13

**9**

**9** 4:14 79:4,8,8 88:13
**91** 4:15
**92** 4:16
**93** 4:18
**96** 4:17

DEFENDANT'S EXHIBIT
1

# DOCUMENTATION FORM

Employee Name: Linda Thornton

Investigating Supervisor: Chris Taylor Date: 4-12-06.

Present:

Who was involved: Kim Perkins

Witness (s):

Date of incident: 4-12-06.

Where did it take place: Line 1 Label machine.

When did it take place (time and day): 10:58

What happened: I went to break and asked adam + Wes to watch out for the label machine, I also told Barbara on the casepacker that I was going to break and if there were bad labels, just to throw the door open and holler at someone, at the end of break Kim Perkins paiged overhead that she needed a label operator on line 1 When I Returned from break, adam Hall was changing out the label I asked adam "I thought you had my back!" adam said I did but she paiged you before asking me or telling me why she had stopped. As I was changing out the labels, Kim came up to me and raised her voice saying "Do you have a problem with me?" I stated "no I do not, I haven't said two words to you all day" She said "that's the problem - I have noticed!" She then asked again "what's your problem" I stated I do not have a problem - you stay pissed off at everyone on the line and I want no part of it!

The Reason I have chosen not to converse with Kim Perkins is because of her attitude towards other co-workers including myself. also this morning I heard her holler to Linda Parker on the capper about a mechanic in her (Kims) words she stated "Don't worry he can't help you, he's not worth a fuck. This immediately told me what mood+attitude Kim was in → over.

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

Also one of the D.C. that now in the lab this am -
en Kim Perkins came in Stated - that Kim came in
( lab and stated outloud that " Those mother-fucking people
e getting on my nerves. (Debra Stuart O.C.) ——
This is the attitude that Kim carries. Not every
once in awhile) But everyday, - when people off my line
ine 3) had to come to line 1 / same problems occurred.

~~Other~~ Anther Reason for not conversating with Kim Perkins other than her attitude, is because of situations as this one.

always starting something and then running to tell a lie. always trying to get someone in ~~trouble~~ other than herself. She's the problem. She's the main Reason I left line 1.

DEFENDANT'S EXHIBIT

2

# DOCUMENTATION FORM

Employee Name: Kim Parker

Investigating Supervisor: Chris Jordan Date: 4-12-06

Present:

Who was involved: me, Linda Thornton, Frank Williams

Witness (s):

Date of incident: 4-12-06

Where did it take place: filler, QC lab

When did it take place (time and day): 4-12-06, 7:00 - 11:11 Am

What happened: I was having trouble w/weights and descrambler. I was trying to catch low weights, work on filler, and straighten out jam the descrambler was bucking over & putting out upside down all by myself. Mesh. had gone to break. We went down again for descrambler so I went to see how many more was left on order, luckily we had 5 more trays to go. I changed over but needed a label op. She was gone. She didn't say

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

ything about going to break, label room, nothing. I told [illegible] bout the situation and I was mad. Frank was in the [illegible] and asked me if there was labels in the mach. I said yes, but I needed the op. He said "So what's your point" and that made me even madder. I paged for a label op [illegible] line 1. When she got there I asked her if I had done something I didn't know about to make her mad, she yelled at me "I didn't say anything to you" twice. I worked as hard as I could to [illegible] all of this after I [illegible] keep the line going with no help

CONFIDENTIAL

FH002175

DEFENDANT'S EXHIBIT
3

# DOCUMENTATION FORM

Employee Name: Harrell ~~[illegible]~~ McCullough

Investigating Supervisor: Chris Jordan / Eugene Andrews Date: 4-12-06

Present:

Who was involved:

Witness (s): Harrell ~~[illegible]~~ McCullough

Date of incident: 4-12-06

Where did it take place: LAB QC

When did it take place.(time and day): 4-12-06

What happened: FRANK WILLAMS ASK KIM (FILLER OPERATOR) ON LINE ONE WHY SHE STOP RUNNING THE LINE AND SHE GOT SMART ~~[illegible]~~ WITH HIM. "SAYING - WHAT IS IT TO YOU" AND FRANK WALK OFF.

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

DEFENDANT'S EXHIBIT

4

# DOCUMENTATION FORM

Employee Name: Frank Williams

Investigating Supervisor: Chris Jordan Date: 4-17-06

Present:

Who was involved: Kim Perkins

Witness (s): Harold McCollough

Date of incident: 4-12-06

Where did it take place: QC Lab

When did it take place (time and day): mid day

What happened: I walked in the QC Lab to get to Line 3 Kim was Calling for a Lable op. for Line One. I asked her what was wrong with the Lable machine Because the line was not running she said nothing I asked her was the Lables Bad She said no I told her to go and turn it Back on and she went off on me. Told me that I don't know what the ---- I am talking about and to Stay out of her m---- f---- Buisness. I asked her not to

Did this result in down time? yes If yes how much? don't know

Did this result in product being scrapped? If yes how much? no

Attach an additional sheet if needed for witness statements following the same format.

raise her voice at me and stop cussing me she got madder and told me that that's how a f---- ---- shirt got to be

DEFENDANT'S EXHIBIT

5

# DOCUMENTATION FORM

Employee Name: Debra Stewart

Investigating Supervisor: ______________________ Date: __________

Present: ______________________

Who was involved: ______________________

Witness (s): ______________________

Date of incident: 04-12-06

Where did it take place: Lab

When did it take place (time and day): ______________________

What happened: Kim Parker used unappropriated language in Lab about employees on the Line, such as calling them dumb asses, stupid (MF) etc. I asked her was she having a bad day. I informed her & Linda to take this matter up with Chris.

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

CONFIDENTIAL

FH002185

DEFENDANT'S EXHIBIT 6

Adam Hall

Was zeroing out scales on L-1 filler when I told Harrell to send product, Kim asked "who sent product?". When I told her I did, she started yelling and cussing at me - "I didn't zero out the fucking scales!" "You don't tell them to send product!" I told her, You only have to zero them once! I also told her she can't argue with someone that is right. She told me to get out of her fucking face!

I never cussed at her during this whole instance, I did get loud but never cussed during the whole thing.

[signature] Aug 10 06

DEFENDANT'S EXHIBIT

7

**DOCUMENTATION FORM**

Employee Name: Chris Jordan

Investigating Supervisor: ______________ Date: 8-11-06

Present: ______________

Who was involved: Kim Perkins, Adam Hall

Witness (s): Possibly line 1 packaging

Date of incident: 8-10-06

Where did it take place: Line 1 Filler

When did it take place (time and day): Not sure.

What happened: I was outside line 1 when I noticed Adam Hall and Kim Perkins arguing. This is not unusual. There have been days they will argue 1 minute and laughing the next. After they finished arguing she came over near me while placing the new print in the videojet and said "if I had a gun I would go home and shoot him." This may not be word for word but gun and shoot him were said. (over)

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

I do not feel Kim was serious about her statement and she was aggravated at the time.


DEFENDANT'S
EXHIBIT

8

# Nutcracker®

## COMPLAINT FORM

NAME: Kim Perkins

STEP 1: I am not satisfied with the ~~decision~~ Actions given to me by my supervisor on Several days, and I wish to formally complain through the Problem Resolution Procedure. The problem occurred on Line 1, and is as follows: (use additional paper if necessary)

Please see attached Statement

I am seeking the following solution:

An end to the harrassment with no retaliation

Kim Perkins 9-6-06

Team Member Signature Date

---

STEP 2: I have read the attached supervisor's response in Step 1 and:

( ) Do NOT wish to appeal this decision

( ) Wish to appeal this decision to Step 2, Human Resources Manager

Team Member Signature Date

STEP 3: I have read the attached written response in Step 2 and:

( ) Do NOT wish to appeal this decision

( ) Wish to appeal to the Director of Operations

Team Member Signature Date

**The decision reached in Step 3 will be final and binding.**

have been experiencing several problems ith Chris Jordan and sincerely believe am being harrassed. For example - around x months ago, Chris told me (in front of Melvin itchins) that if I don't have "waste" written the boxes around the filler, he was going to ite me up. I'm not the person that puts the oxes around the filler. I don't even know hen the boxes are put on the back and side. he person that runs the descrambler pours caps the capper and then puts the boxes around the ller. I don't even touch them and Chris nows this. Since then, I have made sure er descrambler op. has "waste" written on boxes. day (9-6-06), another filler op, Stephany L., is our escrambler op. Chris has never told her that oxes had to have "waste" written on them and e's never threatened to write her up if it's not one.

Another example - about 2-3 weeks ago, Chris ld my label op., Candie B, that I had to elp with all rework before I could do my aperwork. I told Chris I didn't understand ecause I come in earlier than most of the line,

and stay later than most the line doing paperwork. In my opinion, it would be better and cheaper if I leave the line, do paperwork, then come back to do re-work. That way, I wouldn't be on the clock so long. But, he said no. that was the way it was going to be done. Today, I asked Stephany if he told her she had to finish the rework (I'm speaking of pallets being brought from rework area from all lines) before she did her paperwork. She told me no, he hasn't told her that and she always does paperwork first.

About a month ago, Chris saw M+M's on the line when I was sick and had to go sit in the breakroom. He wrote me and Candice up for it. I went to speak to Mary Ann Boyers about that situation. I knew it was wrong to have another product on the line, but my main problem was that I knew, for a fact, he caught Vicki Cook atleast two times with them in her tool bag. He never did anything to her. Nobody (Chris or Mary Ann) seemed concerned about the fact that he writes people up for things other people do and gets away with.

A couple of weeks ago, Chris took me to the front office saying Tommy wanted to talk to me. Tommy claimed several people had written reports on me. One of them was an argument between me and my mech, Adam. Adam told me Chris went to the office, told Tommy about the argument, and Donald made him write down what was said. Chris was present during the confrontation. Adam did something that I thought was way out of line and that started the argument. I looked over at Chris, standing by the label machine, and said something to the effect of "now you see what I have to put up with". He just looked at me and asked if I wanted to fill out a report, very nonchalantly.... And they take Adam to the office?? Tommy also mentioned another situation with our floater, Rosie. I had gotten a little upset that our nitro. was bad, but the QC and floater let it go on for a few hours without saying anything (we were running Great Value). Melvin told me ~~to~~ not to be so negative when I was asking why didn't

anyone say anything. After we started back running and Melvin came out of the lab, I told him I was so upset because our floater was lieing. I don't know what other "reports" Tommy has. Chris never told me anyone had a problem. I was under the impression both ~~part~~ parties wrote a statement about the problem. I also talked to several other supervisors, they agree that what Chris and Tommy did to me was wrong. I wasn't even given the chance to respond to anything when I was talking to Tommy. The only thing I was able to do was write a comment on the write-up they gave me.

One other thing about the argument with my mechanic. Chris said I told ~~I~~ him I needed to go home, get the gun, and shoot Adam. I don't even own a gun, so why would I say that? He said he knew I wasn't serious, but he thought it was serious enough to goto Tommy. If it was that serious, why didn't he say anything about it to me? Why didn't I get to write a statement then? Why

didn't he go to Tommy that day and bring me in the office that day, not 1-2 weeks later? I don't even remember saying that, especially after this much time.

There's been smaller things and comments his made, but this is the most recent and, I feel, the worst. I have the biggest problem with the last situation

Thank you,
Kim Perkins
9-6-06



9

FROM; Ricky Smothers
TO; Kim Perkins
SUBJECT; Complaints
DATE; 9/7/06

I have reviewed your listed complaints in which you stated you are seeking to have the harassment stopped. As we discussed, I think you have confused the company's definition of harassment with your perception of mistreatment or being singled out. Company definition of Harassment; Conduct related to an individuals race, religion, color, age, sex, sexual orientation, national origin, ancestry, veteran status, or status as an individual with a disability. However we take any type of mistreatment very seriously and that will not be tolerated either. After our discussion I have listed the issues left pending and my findings.

1) You were directed to write waste on the boxes around the filler, Stephanie who's also a filler operator on line 3 is not required to do this. Failure to carry this out would result in a write up per Chris Jordan.
My findings; Line 3 (Stephanie's line) reworks what falls in the box so the product is added in not disposed of like on line 1 and 2. Line 4, 5, and 12 also rework what falls in the boxes, this is why Stephanie is not directed to write waste on the boxes. (There is no mention of this in your file, so nothing formal was issued).

2) You were directed to work with the team members performing rework before completing your paper work. Stephanie is allowed to finish her paperwork first.
My findings; Some of the team members on your line were complaining that you would drag out the paper work and not assist them in performing rework causing them to bring this issue to the supervisor. (There is no mention of this in your file, so nothing formal was issued.)
However all filler operators from now on, will be required to do rework first and paper work last this will be all lines all shifts.

3) Being written up for an argument with Rosie and Adam. Not being allowed to write a statement.
My findings; You admitted that you and others in the plant use profanity, even though it may be a common occurrence, it is still against the rules because some people are offended by it. I would speculate that due to this being a valid handbook violation and there being several coaching sessions prior to this formal disciplinary documentation cautioning you about inappropriate language and asking you to improve your communication skills was probably the reason Tommy didn't ask for a statement. However after our discussion, you did write a statement which I have read and will put in your file. The charges are still justified because of the profanity and the manner in which it was used, but there are circumstances that I will follow up on regarding other team

members behavior that made you angry. When these things happen instead of trying to handle it yourself and getting upset, you should call your supervisor or Melvin to handle the situation.

You were also concerned about being subjected to retaliation for bringing forth a complaint. Retaliation of any kind will not be tolerated, in saying this I must also add everyone in the plant will be required to abide by all plant rules and policies.
This is a formal complaint and if you are not satisfied with my written response and findings you are welcome, to take the next step. Normally this next step would be with the plant H.R. manager, however since you voiced concern with Tommy, you may talk with Alice Clark, the divisional H.R. director, either on a conference call or in person. The 3rd and final step would be to talk to Mary Ann. She has a copy of your complaints and would be willing to speak to you after you've spoken to the divisional H.R.. If you want to speak to Alice let me know and I will set it up for you.

The situation with Rosie was about nitro. on Great Value. This is not the first time she's been a floater when we ran Great Value. Every other time, Candice B. and I reminded her the ~~test~~ level can't go above 3. We didn't remind her that time. Around 12:00, we found out the readings were 4+5. We stopped the line, went into the lab, and looked at the readings. We saw 3.5, 4.0 all the way back to 9:00. QC was there during most of the tests and signed off on them. I got upset and started asking why wasn't we told earlier. Rosie said she didn't know it couldn't go above 3. Melvin was there and told me to stop being so negative. I don't feel like I was being negative. We had alot put on hold. I went back to the line and started up. ~~He~~ Melvin came out of the lab and I told him I was upset because she was lying. She had been told several times before. He said he knew and that this wasn't the first time she had ran Great Value. I don't remember exactly what was said, this statement was taken long after the incident.

Kim Perkins - 9-8-06

DEFENDANT'S EXHIBIT

10

**DOCUMENTATION FORM**

Employee Name: Rosie Lovett

Investigating Supervisor: Chris Jordan Date: 8-9-06

Present:

Who was involved: Kim Perkins

Witness (s): Vickie (QC) Melvin, Adam

Date of incident: Ongoing issue

Where did it take place: Q.C. lab last incident

When did it take place (time and day): 8-8-06

*What happened: Starting with 8-8-06 line I had a problem with high Nitrogen I did not know product could not go over a 3.0 I thought all product was not supposed to go over a 4.0 So (QC) Vickie was in when I was doing a check it was a 5.something and I let her know so she went to line to pull some more jars

Did this result in down time? yes If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

DEFENDANT'S EXHIBIT
11

and came back to lab and someone asked was Kim still running the line she said yes so shortly Kim and Adam came into the lab to check some more jars they were also to high. Adam was looking at my Nitrogen form and stated that some of my checks from earlier were to high. So Kim started fussing or saying ~~to~~ All I want to know is why we were not told earlier and I told her because I did not know, to my knowledge everything could not go over a 4.0. Melvin then told her to stop being so negative. I said that I didn't know, I then started another Nitrogen check and it was maybe a 3.09 so I and rounded it off to a 3.1 and she then stated why are you rounding it off I replied that's how I was taught to do the checks. She then stated well I've been here however many years and I've never heard of that. I then asked QC Vickie, Mrs. Jean and Randy and they all said that I was doing it correctly. That's about all that happened yesturday but Kim has a problem with

now to talk to people. It's not just me I will not get into that but It's a way to talk to everyone and she really don't know how. When I first started on line 1 with her I never did anything right at least that's how she makes people feel. Alot of people ask me how do I put up with her this long because of her Attitude and up til now I just don't or didn't pay her any attention. Another thing certain people were mad with me yesterday because she went back to the line and lied on me saying I was ~~fun~~ letting the line run and I was getting 5. something from earlier and that was not true I do know that nothing can go over A 4.0 and up until now no one has had A problem with my work because I honestly did not know. I apologized to my supervisor, Melvin and my line for that mistake but I honestly did not know. I try to keep confusion down with everyone but when you have A person like him that makes you feel like your suppose to know

Everything even when not told it is
very difficult. I really don't feel like
we should work together because I
don't curse and I don't like to
argue And I'm trying my best not
to argue with anyone out here I just
want to come do my job and go home
without having to deal with all the
cursing and argueing. If I'm doing
something wrong speak to me in a way
you would want someone to speak to
you. As a team if I see something
hat you do wrong I'm going to tell
you in a nice way and try to straighten
t out like she filled out the wrong paper
work yesturday and said I forgot I
didn't hesitate to re copy her paperwork
or her but she don't realize she make
mistakes like everyone else and again
I am sorry for my mistake yesturday
ut I honestly didn't know and from
here on out I will not keep anything
inside because alot of people have
problems with him and they don't
speak on it but I think someone
needs to. Sign Rosie Jowett

The argument with Adam Hall was about him telling the roaster op. to send the product. We had ran out of product and I wasn't sure if that was all of it. I did the first phase of zeroing out the scales, but didn't do the next one. Adam told Harold to send the prod. For some reason (I can't remember now) there was some confusion on the line and I wasn't quite ready for the next order. I told Adam that wasn't his job, he said it was, and we started arguing. I said to Chris, "you see what I have to put up with?" He asked me if I wanted to make a report, I told him no. I was upset because I felt like Adam was overstepping his bounds. I know when the filler is ready, I'm the only one that gets it ready. I don't remember exactly what was said, this statement was taken weeks after the fact.

Kim Perkins
9-8-06

DEFENDANT'S EXHIBIT
12



DEFENDANT'S
EXHIBIT
13

# MEMORANDUM

**DATE:** August 15, 2006

**TO:** Kim Perkins

**FR:** Chris Jordan

**RE:** **1st Step – Written Counseling**

INCIDENT OCCURRED ON 8/10/06

On 8/10/06, you were involved in an argument with another employee. Your use of profanity has resulted in this counseling. You must improve in your communication with employees and respect of other employees. Also, you must not make threatening statements toward other employees, regardless of the nature or seriousness.

Failure to follow the company policy has resulted in you receiving this **Written Counseling**. Any future violations will result in additional disciplinary action up to and including termination.

Tommy Nance
Human Resources Manager

Kim Perkins
(Signature acknowledges Receipt of this document only.)

I was never asked to give my side of any incident in this report. I feel it's extremely one sided and is being used to find excuses to get me in trouble

Kim Perkins

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
FRANKLIN WILLIAMS

Commissioner:
Renny D. McNaughton
June 10, 2008
Dothan, Alabama

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Franklin Williams, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 10th day of June, 2008, commencing at approximately 2:45 p.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at

the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms. Robertson the original transcript of the oral testimony taken the 10th day of June, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Robertson | 9 |

EXHIBITS

| Exhibit | Page |
|---|---|
| No. 15 | 61 |
| No. 16 | 117 |
| No. 17 | 118 |
| No. 18 | 120 |
| No. 19 | 173 |
| No. 20 | 198 |
| No. 21 | 200 |
| No. 22 | 205 |
| No. 23 | 206 |
| No. 24 | 211 |
| No. 25 | 212 |
| No. 26 | 212 |
| No. 27 | 213 |
| No. 28 | 213 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202
J. Scott Clark
Senior Counsel
Ralcorp Holdings, Inc.
P.O. Box 618
St. Louis, Missouri 63188

FOR THE PLAINTIFF (S):
Ann C. Robertson
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203

ON BEHALF OF FRANKLIN WILLIAMS :
Richard E. Crum
Shealy, Crum & Pike, P.C.
2346 West Main Street
Dothan, Alabama 36301

Also Present: Linda Thornton

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 2:45 p.m. on the 10th day of June, 2008, Franklin Williams, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This is the beginning of videotape number 1 in the deposition of Frank Williams in the matter of Linda Thornton versus Flavor House Products and Franklin D. Williams, Jr., case 107-CV-712-WKW. We're on the record here at 2:44:10 p.m. Today's date is June the 10th, 2008. We're at the offices of Bobbie Crook, PC, in

Dothan, Alabama. My name is Joey McClain, representing Freedom Court Reporting. Would counsel identify yourself and state whom you represent.

MS. ROBERTSON: I'm Ann Robertson and I represent the plaintiff. Bobbie Crook, he represents the plaintiff.

MS. SWAIN: Jennifer Swain. I represent the defendant Flavor House Products, Inc.

MR. CRUM: Richard Crum. I represent Frank Williams.

THE COURT REPORTER: Usual stipulations?

MR. CRUM: That will be fine.

MS. ROBERTSON: And I am going to ask him about some of his family, but will you -- were you sitting in on any of those things where we agreed that -- that we wouldn't go into extensive familial backgrounds unless we wanted to?

MR. CRUM: That's fine. That's

no problem.
MS. ROBERTSON: And providing the names before the trial. Okay.
FRANKLIN WILLIAMS
having been duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. ROBERTSON:
Q Will you state your full name for the record, please, sir.
A Franklin Delanor Williams, Jr.
Q And how old a man are you, Mr. Williams?
A I am 37.
Q What's your birthday?
A 5/25/71.
Q And what's your Social?
A 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.
Q Where do you live?
A 1376 North Broad Street, Cowarts, Alabama 36321.
Q And what county is Cowarts in?
A Houston.

Q How long have you lived there?
A I just moved there this weekend.
Q Where did you live before that?
A 1408 North Broad Street, Cowarts, Alabama 36321.
Q How long did you live there?
A Five years.
Q Are you married?
A Yes, ma'am.
Q Who are you married to?
A I am married to Candace Ballew.
Q Spell her last name.
A B-A-L-L-E-W.
Q And how old a woman is she?
A She's 24.
Q Have you ever been married before Ms. Ballew?
A Yes. Yes, ma'am.
Q And to whom?
A Ronnie Williams.
Q What was Ronnie's --
A Maiden name?
Q -- maiden name?

A Carlen. Carlen, C-A-R-L-E-N.
Q And how old was she when you married her?
A 18.
Q Now, do you have any children?
A Yes, ma'am.
Q All right. Tell me about your children.
A Who they are and how old they are?
Q Yeah.
A I have a daughter that is, I think -- well, I think I have a daughter is 18. She lives in Eufaula by Leigh Ann Metcalf. Her name is Sierra.
Q What -- wait. Leigh Ann?
A Metcalf.
Q What do you mean you think you have a daughter?
A Well, we never did DNA tests.
Q Did you pay --
A It was -- it was the same time -- no, I've never paid child support. It was

just -- she --
Q Excuse me?
A Nothing.
Q Why have you never paid child support?
A Never was asked of me.
Q When -- when was this child born?
A In 1992.
Q And how old was her mother when she had this child?
A I can't remember.
Q About how old was she?
A 26, 25, somewhere around in there.
Q She was 26 or 25 when she had this child?
A Yes, ma'am.
Q And tell me her name again.
A Leigh Ann Metcalf.
Q Have you ever told anybody that you had to pay child support for -- for this child?
A No, ma'am.

Q Do you -- did you see this child during her childhood?
A Ever so often whenever I was -- when I was up there.
Q And where did -- where did they live?
A Eufaula, Alabama.
Q And how would these visits occur?
A Just whenever I seen her mother on occasions.
Q Was her mother married when she had this baby?
A Yes, ma'am.
Q Is that why you didn't pay child support?
A I have no idea.
Q Does -- did her husband think that he was the father?
A I don't know.
Q Well, did you not feel some obligation to pay child support for this child?
A I was incarcerated when she was

born.
Q Okay. She was born in '92?
A I believe that's right.
Q So when did this woman get impregnated?
A Probably in '91.
Q Now, your -- your other children besides the daughter?
A Jonathan Williams.
Q And how old is he?
A He is 10.
Q When was he born?
A In 1997.
Q When did you and -- and Ronnie get married?
A In 1999.
Q So two years after the child was born?
A That wasn't -- it's by another lady. This ain't by my wife.
Q Oh, I see. This -- this child is by someone else?
A Yes, ma'am.

Q How was -- old was the woman that this child --
A 17.
Q Is she the -- the woman who's mother is -- had a warrant issued for your arrest for contributing to the delinquency of a minor?
A No, ma'am.
Q Was that another Ronnie?
A No. That was my Ronnie -- that was my wife.
Q Yeah. But I mean she -- she's not the Ronnie that her mother had a warrant issued for your arrest?
A I don't understand the question. My wife is -- my ex-wife is the one that had -- her mother had a issue for my arrest.
Q Oh. I see. So the mother --
A -- of my oldest son.
Q -- is not --
A No. It's nothing to do with none of --
Q Okay. And -- and --

MR. CRUM: Just let her ask -- ask a question now. That's okay. It will just -- it will go better.
Q That -- all right. So Jonathan's mother is who, again?
A Elizabeth Ray Harp.
Q Now, do you pay child -- did you pay child support for this child?
A Yes, ma'am.
Q Were there DNA tests taken for this child?
A No, ma'am.
Q Why did you elect to pay?
A Because I've been there since he was born and I get to see him. And I take care.
Q So the reason you didn't pay for your daughter is because you didn't get to see her because you were in jail?
A No. Her mother didn't want me to pay child support, as far as I know. She never asked. We never brought it up.
Q All right. So Jonathan's mother

is the -- is the person who -- whose mother had a warrant issued for the arrest?
A No, ma'am.
Q Well, who was -- who was that woman?
A That was my ex-wife.
Q All right. And who was that?
A Ronnie Jean Carlen.
Q Did you have any children by her?
A Yes, ma'am.
Q And who was that?
A Taylor Williams, age 9, and Zachary Williams, age 6 -- my bad, age 7.
Q So Taylor was born --
A In 1999.
Q 1999? Are you sure it was '99?
A Yes, ma'am, because Jonathan --
MR. CRUM: Let her finish her question, though.
THE WITNESS: I'm sorry.
MR. CRUM: You're just trying to guess what she's going to ask so --
THE WITNESS: Oh.

BY MS. ROBERTSON:
Q Are you sure that -- that Ronnie was born -- I mean -- excuse me, that Taylor was born in 1999?
A Yes, ma'am.
Q All right. What happened to the warrant that -- that Ronnie's mother had issued against you?
MR. CRUM: Object to the form.
Q Were you arrested on that warrant?
A I went to a county jail.
Q So I guess you were arrested?
A Yes, ma'am.
Q How long did you serve in county jail for that?
A 45 days.
Q And that was on -- while you were on probation; right?
A Yes, ma'am.
Q Was your probation revoked?
A Yes, ma'am.
Q How long was it revoked for?

A Until I got out of the county. It was reinstated as soon as I got out of the county.
Q And then you were placed back on it until 2001?
A I think it was -- yes, ma'am, 2001.
Q Was your -- was Ronnie pregnant with Taylor while you were serving your county jail sentence?
A No, ma'am.
Q Was that afterwards that she got pregnant?
A Yes, ma'am.
Q All right. Any other children?
A I got a stepson.
Q Now, did -- when did you get a divorce from Ronnie?
A It was finalized -- I'm trying to think. We got separated January of -- two years ago, and we got -- the divorce was completed, I'm thinking, in May, if I'm not mistaken.

Q May of 2006?
A Yes. That's when it should have finalized.
Q In what county did y'all get a divorce?
A It should have been Henry County.
Q Does that mean it was Henry County or you should -- you filed in the wrong place?
A Well, she filed with her lawyer at -- I can't think of the name -- name of -- Jamie Love's office. I think that's in Henry County.
MR. CRUM: The main thing is to answer what you know. If you know the county, tell her the count. If you don't know the county, tell her you don't know the county.
THE WITNESS: Okay.
Q So you're not sure where you -- what county you got a divorce in?
A No, ma'am.
Q You were separated in January of

2006?
A Yes, ma'am.
Q And the divorce was final sometime in May of 2006?
A Yes, ma'am.
Q What was the reason for that divorce?
A Irreconcilable differences. We just went our own way.
Q Was your wife seeing someone else?
A I -- I can't -- I couldn't prove it.
Q Did you think your wife was seeing your nephew?
A Yes, ma'am.
Q And who is your nephew?
A Shane Wilson.
Q And how is Mr. Wilson related to you?
A He is my stepbrother's stepson.
Q And why did you think he was -- that your wife was seeing Mr. Wilson?

A I don't know, ma'am.
Q You don't know that -- why you thought that?
A No, ma'am.
Q Surely you had some reason to think it.
A I just figured she was, thought she was.
Q Now, did you ever confront her with the idea that she was seeing your nephew?
A No, ma'am.
Q Is that why you separated, because either she was seeing Mr. Wilson or you thought she seeing Mr. Wilson?
A We separated because she said she wanted a divorce.
Q So it was her idea?
A Yes, ma'am.
Q All right. Are you related to Bruce Cassady?
A He is my ex-wife's uncle.
Q Your ex-wife, Ronnie?

A Yes.
Q And how long have you known Mr. Cassady?
A When I started working at Nut Cracker, which was September 2000.
Q That's when you first met Mr. Cassady?
A That's when I actually first met him. I don't remember meeting him before then.
Q Did Mr. Cassady know about your convictions?
A Yes, sir -- yes, ma'am.
Q Did he know the extent of your convictions?
A He --
MR. CRUM: You just answer what you know.
A He knew what I was convicted of. That's it.
Q Did -- did he know how many counts that you were convicted of?
A I don't know.

Q Did he know you had served time in prison?
A I don't really know.
Q Take a look at Plaintiff's Exhibit Number 10 and tell me what that is, please, sir.
MR. CRUM: Let me see it.
Q What is that, first of all, Mr. Williams?
MR. CRUM: Hold on just a minute.
A Talking about what is this?
Q What? You're looking on the second page. Perhaps it would help you if you looked on the first page, but maybe you know what it is.
MR. CRUM: She's asking you if you know what that is.
A Oh, it's an application.
Q All right. When is it dated, sir?
A 2000, 9/22/2000.
Q Now, over there on references, you have Mr. Cassady listed as a reference

and it says you knew him for three and a half years. Is that right?
A That's what it says.
Q That's -- all right. Was that a lie?
A I just put it there because that's what they told me to. That's what my -- her uncle told me to do.
Q Her uncle?
A Had said that -- told me I knew him for that long.
Q Mr. Cassady?
A Yes, ma'am.
Q At the time, what was Mr. Cassady's position at Flavor House?
A I think he was just over label machines.
Q Is that manager?
A I don't know. I just know he was over the label machines, a label operator. I don't know if he was a manager or how they put it.
Q And Mr. -- Mr. Cassady told you

to lie on your application with Flavor House. Is that what you're saying?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
MR. CRUM: You need to --
THE WITNESS: He didn't -- what?
MR. CRUM: I guess she's asking you that question, but you need to --
BY MS. ROBERTSON:
Q Yeah. And they don't want you to -- they want you to avoid answering it, so they're making a bunch of noise.
MR. CRUM: And, certainly, we want you to do nothing but answer the question she's asking you.
THE WITNESS: Did he tell me to lie?
MR. CRUM: Did he tell you to lie on your application?
A No. He just said tell him -- to say I knew him. That's all. I put the three and a half years.
Q So --

A He didn't say how long or nothing. He just said tell them I knew him so I just put that long.
Q So you're the one who decided to lie?
MR. CRUM: Object to the form. But you can answer that.
A Yes.
Q And why did you decide to lie on your application about how long you had known Mr. Cassady?
A Just so I could use him as a personal reference.
Q Did you not have anybody else that you could -- that you knew that could be your reference? Was he the one lone soul in the world who you could list as a reference?
A No, ma'am.
Q So why did you decide to lie about how long you had known Mr. Cassady?
A I don't know.
Q While we're talking about it, who

interviewed you for that position at Flavor House?
A I don't recall.
Q You have no idea?
A No, ma'am. That's been a long time ago.
Q Did -- were you interviewed by one person or more than one person?
A I can't recall.
Q Now, look on the page 2 of that document, please sir, where it says Butch Cassady.
A Yes, ma'am.
Q Somebody had a messed-up momma and daddy, by the way. But had you known him at all?
A Yes, ma'am.
Q For three and a half years?
A I -- I'm saying close to that because I'd known him as long as I'd known my ex-wife.
Q Did he know about your incarceration?

A I don't know, ma'am.
Q Well, when did -- you got out of jail in late 1996; right?
A Yes, ma'am.
Q Did you know him then?
A No.
Q Now, your -- your -- Ronnie's mother put the warrant out on you in 1998; right?
A Yes, ma'am, I think.
Q Did you know him then?
A Yes, ma'am.
Q What was Butch Cassady doing at Flavor House at the time?
A I -- I really don't know. I know he ran a label machine. That's all I do know.
Q Now, for my own edification, it was at or about the time you made application to Flavor House that you met Bruce Cassady; is that right?
A Close to that.
Q Well, how -- how close are we

talking, a week, a month?
A I ain't for sure.
Q Six months?
A I ain't for sure.
Q While we've got our application out, where is JFI Ingram?
A That's in Wetumpka.
Q Did you attend JFI Ingram?
A Yes, ma'am.
Q Physically?
A Yes, ma'am. It was -- it's part of a prison college there.
Q So you were incarcerated when you attended it?
A Yes, ma'am.
Q Where were you incarcerated, Kilby?
A I started out at Kilby.
Q Where were -- where else -- where else did you serve?
A Draper --
Q Anywhere else?
A -- and Ventress.

Q I'm sorry? Where?
A Ventress.
Q Did you receive any other training besides getting your GED at JFI Ingram?
A I did some -- I did almost a year in college toward getting a business degree.
Q Where -- where is Draper?
A In Wetumpka.
Q And Kilby is where?
A Montgomery.
Q How did you get transferred from Kilby to Draper?
A I don't know that. They -- they do that.
Q There wasn't any reason?
A No.
Q Did you have any trouble in prison?
MR. CRUM: Object to the form. But you can answer. Did you --
A I -- I got in a scuffle a couple of times. That's pretty much it that I can

remember.
Q Did you have any trouble in prison because of what you were in prison for?
A No.
Q Usually, the prisoners don't like it when you have sex with little children.
MR. CRUM: Object to the form. That's not a question so don't say anything.
Q Did you have any trouble because of your convictions for having sex with children?
MR. CRUM: Did you have any trouble in prison based on your charges?
A No. No, ma'am.
Q You were convicted for having sex with a child, weren't you?
MR. CRUM: Tell her what you were convicted for.
A I was --
MS. ROBERTSON: No. I -- don't -- please. I ask him the

FREEDOM COURT REPORTING

33

questions. He answers my questions.

MR. CRUM: I don't care. Tell her what you're convicted of.

A I was convicted of rape -- two counts of rape and three counts -- two counts -- three counts of rape two and two counts of sodomy one.

Q And was one of the counts of sodomy with a 10 year old?

A That's what I was charged with, yes, ma'am.

Q And you pled guilty to it, didn't you?

A Yes, ma'am.

Q And that's having sex with a child; correct?

MR. CRUM: Asking you what sodomy is, I guess.

A If you're asking -- yes, that's -- if you're ask me if that's what it means, yes, ma'am.

Q Well, tell me any other meaning that you might have in mind.

34

MR. CRUM: Object to the form. I don't know that he can answer that unless you clarify it.

MS. ROBERTSON: Well, he seems to think there might be some other explanation for having oral sex with a 10 year old.

MR. CRUM: As much as I appreciate that, if you're asking him to define sodomy, then please ask him that. If you're asking him something else --

Q Did you have oral sex with a 10 year old?

A No, ma'am.

Q Did you plead guilty to having oral sex with --

A Yes, ma'am.

Q Why did you plead guilty if you didn't do it?

A Because my lawyer had told me I could get 50 years in jail and spend the rest of my life in jail or I could spend 10 years on each count, so I took the 10 years.

35

MR. CRUM: Just answer.

Q So you pled guilty to something you didn't do so you could go to prison for 10 years?

A Instead of 50, yes, ma'am.

Q Did you tell your probation officer you did these things that you were charged with?

MR. CRUM: Object to the form.

A I don't understand the question.

Q Did you have an interview with a probation officer before you were sentenced to the 10 years?

A Not that I -- not that I believe I did. Now, if I did, I don't -- I don't remember.

Q Well, tell me if you didn't have sex with this 10 year old why you believe this 10 year old made those allegations.

A I don't know.

Q Were there any of the other acts that you were charged with that you didn't do?

36

MR. CRUM: Object to the form.

Q Huh?

MR. CRUM: You can answer.

A Yes, ma'am.

Q All right. Tell me which ones.

MR. CRUM: You're talking about of this those five?

MS. ROBERTSON: Uh-huh, the ones that he pled guilty to.

MR. CRUM: Sure. We've established that he pled guilty. She's asking you if there's any of those other five counts that you feel that you didn't --

A Yes, ma'am. One of the sodomy -- the other sodomy one charge and one of the rape two charges.

Q So you -- you -- you -- you admit that you were guilty of two of the rape charges?

A Rape two, yes, ma'am.

Q Well, couldn't you have served -- how much time could you have served on

either of those rape counts?
MR. CRUM: Object to the form.
If you know.
A I don't know.
Q Up to 50 years? Up to life; right?
A I don't know.
Q So you -- you pled guilty without knowing what you were looking at if you had gone to trial?
MR. CRUM: I think he'd answered.
He's already answered what his lawyer told him, so object to the form.
MS. ROBERTSON: I'm just asking him.
Q Did you plead guilty without knowing what you were looking at?
A I was told by my lawyer that no matter what, I was going to get 50 years, so I did what I -- my lawyer thought was best.
Q How did these charges that you faced come about? Do you know? I mean, who first reported you?

A I really don't know who first reported me.
Q Do you have any -- you have no idea?
A No, ma'am.
Q And you don't have any idea how the others were located after the -- they came forward?
MR. CRUM: Other girls.
Q Other people.
A No, ma'am.
Q All right. How much education do you have, sir?
A I quit in ninth grade. I have a GED and I did however long I did at JFI Ingram in college.
Q All right. When -- when you said you quit in the ninth grade, where did you go to -- to the ninth grade?
A Eufaula High School.
Q And how old were you when you dropped out?
A 16.

Q Now, were you convicted of forgery?
A Yes, ma'am.
Q And how did you get convicted of forgery?
A I signed a bad check. I signed a check.
Q You mean you overdrafted?
A No, ma'am.
Q Well, tell -- tell me what you mean by you signed a bad check.
A I signed a check that wasn't mine.
Q What kind of check was it?
A It was a payroll check.
Q From where?
A I can't think of the name of the company.
Q How did you come to have the payroll check?
A The boss had gave me the checks for me and my co-worker, and I was supposed to give it to him and I didn't.

Q Where -- where did you work then?
A I can't remember the name of the company.
Q How much was the check for?
A I have no idea.
Q How old were you when that happened?
A It's been so long, ma'am, I really don't know.
Q And that was a felony; right?
A I'm guessing.
Q Because you were put on pro --
MR. CRUM: Don't guess.
A I don't know.
Q You were put on probation for two years; right?
A Yes, ma'am.
Q And you were on probation for the forgery conviction when you were convicted of these various rapes and sodomies; right?
A Yes, ma'am.
Q Plaintiff's 10, look where it says have you ever been convicted of a

felony. And what did you put?

A Yes.

Q Ma'am -- sir?

A Yes.

Q Okay. And -- and then what did you say in way of explanation?

A Statutory rape. My girlfriend was two years younger than I was.

Q That was just not true, was it?

MR. CRUM: Object to the form.

That wasn't true?

A Why wasn't it true? That's what I was convicted of.

Q Who was your girlfriend?

A Jennifer McClain.

Q And so that was one of your convictions; right?

A Yes, ma'am.

Q That wasn't the 10 year old that you had sex with or you --

MR. CRUM: Object to the form.

Q -- pled guilty to; right?

MR. CRUM: Did you -- object to

the --

MS. ROBERTSON: Excuse me.

MR. CRUM: -- compound question.

MS. ROBERTSON: We're going to go talk to the judge. I am not having you --

MR. CRUM: Talk to whoever you want to. I am not going to put up with your ridiculousness. When you ask a question that's misleading and compound and makes no sense, I'm going to object to it and I'm going to tell him not to answer it.

MS. ROBERTSON: Well, then you object and then keep your mouth shut because that's what you're supposed to do.

MR. CRUM: Well, I'm glad to hear what I'm supposed to do, but I'm not going to put up with your ridiculousness. So if you want to ask compound questions --

MS. ROBERTSON: There was nothing

ridiculous about --

MR. CRUM: -- that are misleading and mischaracterizing, I'm going to object to them and try to clarify for him.

MS. ROBERTSON: Okay.

MR. CRUM: Since you don't clarify anything when I object, I'm trying to help him to answer the questions you're asking.

MS. ROBERTSON: Well, then if you're right -- if you're right, then the question is bad; right?

MR. CRUM: Sure.

MS. ROBERTSON: If you're wrong --

MR. CRUM: But you tend to not listen and just keep going, so I'm trying to get through this.

MS. ROBERTSON: Because I know what I'm doing.

MR. CRUM: Well, that's fantastic to hear, but it doesn't appear that way.

BY MS. ROBERTSON:

Q Did you put down there about being convicted of having sex with a 10 year old?

A No, ma'am.

Q Did you put about having raping other girls?

A No, ma'am.

Q Why did you just choose to talk about your girlfriend that was two years younger than you?

A I don't know. I just put it down. I was convicted.

Q So it was a lie; right?

MR. CRUM: Object to the form.

A No, ma'am, it was not a lie because that's -- that is one of the things I was convicted of.

Q Well, it says, Have you ever been convicted of any felony? If yes, describe in detail. Well, you were convicted of five different counts of rape and/or sodomy; right?

# FREEDOM COURT REPORTING

A Uh-huh.
Q Sir?
A Yes, ma'am.
Q And you were convicted of forgery; correct?
A Yes, ma'am.
Q And your detailed description was you were convicted of statutory rape; my girlfriend was two years younger than me when I was 18. Is that right?
A Yes, ma'am.
Q Some of these girls that you had sex with that you pled guilty to, you were 20; right?
A I --
MR. CRUM: Object to the form.
A I don't remember.
Q Well, why did you elect, when it said explain about your felonies in detail, to only put one and put the one that you considered -- well, excuse me. Did you consider that a bad thing that you did when you had sex with your 16-year-old girl when

you were 18?
MR. CRUM: Object to the form.
A Yes, ma'am.
Q All right. Well, why did you elect to only put one?
A I don't know.
Q Did you discuss with anybody that you were only going to lie or that you were going to lie and only put one?
MR. CRUM: Object to the form.
A No, ma'am.
Q Why didn't you list the -- the forgery there?
A I don't know.
Q All right. Tell me where you've worked, please, sir.
A Like?
Q Starting with -- well, no. Let me go back. You dropped out of the -- the -- the school in ninth grade. Why did you drop out?
A I don't know. I just wanted to quit.

Q Were you having difficulty in school?
A No, ma'am.
Q Did you have a better something to do like a better job or --
A No, ma'am.
Q Did you win the lottery or something?
A No, ma'am.
Q So why -- why did you drop out of school in the ninth grade?
A I don't know.
Q What did you do when you dropped out of school?
A I went to work for a Phillips 76 station.
Q And how old were you when you dropped out of school?
A 16.
Q All right. And did we establish how old you were when you were convicted of forgery?
A No, ma'am.

Q How old were you?
A I don't -- I can't remember.
Q Do you -- did you have a juvenile record?
A If I did, I don't remember.
Q Did you ever spend any time in juvenile detention?
A No, ma'am.
MR. CRUM: Let her finish her question, though, just because you want to answer before she's done and it gets confusing.
THE WITNESS: I'm sorry.
MR. CRUM: That's all right.
Q What did you do from the time you -- besides -- how long did you work at Phillips whatever, the filling station?
A I don't recall.
Q What was your next job?
A I can't remember.
Q Did you support yourself with a job in Phillip -- at Phillips?
A I lived with my mom and dad for a

while.
Q And your mother and dad are who?
A Betty Williams and Frank Williams.
Q And you said you lived with them for a while?
A Yeah.
Q How long did you live with them after you dropped out of school?
A I can't remember.
Q Was it, like, a year or a month or you have no -- no idea?
A I don't know, ma'am.
Q Were they disappointed in you for dropping out of school in ninth grade?
A I don't know, ma'am.
Q They -- did they express any disappointment?
A I can't remember.
Q All right. Are your mother and father still married?
A Yes, ma'am.
Q And these two people are your

natural parents?
A No, ma'am.
Q All right. Well, which one of them is not your natural parent?
A Betty Williams.
Q Is she your stepmother?
A Yes, ma'am.
Q Where is your mother?
A She lives -- her -- she lives in Cowarts.
Q And -- and was she ever married to your father?
A Yes, ma'am.
Q How long were they married?
A I don't know.
Q Were -- well, were -- when did they get a divorce? How old were you when they got a divorce?
A I don't know.
Q You have no -- no idea?
A No, ma'am.
Q Why is it that you have no recollection of when your parents got

divorced?
A I don't know.
Q Did you live with your father the whole time after they -- after your parents got a divorce?
A Yes, ma'am.
Q All right. What is your mother's name?
A Priscilla Green.
Q And did -- did you have -- do you maintain a relationship with her?
A Yes, ma'am.
Q All right. Did -- did you have any kind of custody -- were you in both of their custodies for any period of time?
A I lived with my father.
Q Do you know did your mother give up custody or did she lose custody?
A I don't know.
Q Was there a period of time when you lived with your father alone, in other words he didn't have a wife.
A I can't remember.

Q All right. So you can't remember how long you lived with your mom -- I mean your stepmom and your dad -- step -- your dad after you dropped out of school. Do you remember the first time you lived other than with them?
A Could you repeat the question?
Q Do you remember when you first lived with someone either by yourself or someone other than your mom -- I mean your stepmom and your dad?
A Yes, ma'am.
Q When?
A I don't know the exact year or the date but --
Q About.
A I would say close to '88, maybe.
Q All right. And when did -- what year did you drop out of school?
A I -- when I was 16 so that would be --
Q You were married -- I mean you were born in '71.

MR. CRUM: Just do your best.
THE WITNESS: Okay.
MR. CRUM: No. I know. I mean just do your best with the dates.
A It could have been '88. It could have been later. I can't remember when that was.
Q I've got to see if we can do the math. If you were 16, you were born in 1971. That would have been -- you were -- 1987. Does that sound about right when you dropped out of school, 1987?
A I don't know, ma'am.
Q Why did -- did you go live by yourself?
A I lived with a friend.
Q Who was your friend?
A Brad Morris.
Q Who?
A Brad Morris.
Q And what was the reason for you leaving your parents' home and going to live with him?

A I guess we just got a place. I can't remember.
Q Do you know where you were working when you got a place?
A No, ma'am.
Q When is the next job you remember after Phillips?
A I worked at Shoney's, but I can't remember when.
Q What did you do for Shoney's?
A I was a cook, morning cook.
Q What?
A A morning cook. I cooked breakfast.
Q And where -- where was the Shoney's you worked in?
A Eufaula. Eufaula.
Q How long did you work there?
A I don't remember. I don't recall.
Q Well, did -- was it a long employment or was it more than six months?
A I can't remember.

Q All right. Where is the next place you worked that you can remember?
A It should have been -- it might have been Coca-Cola when I got out of jail. I don't remember.
Q But you can't remember where it was that you worked when you got -- forged a check for your co-worker; is that right?
A No, ma'am.
Q Was -- was your co-worker someone who needed his paycheck?
MR. CRUM: Object to the form.
A I suppose.
Q Did he work for his paycheck?
A Yes, ma'am.
MR. CRUM: Object to the form.
Q Why was it that you decided you would take his paycheck?
A I can't remember.
Q You would agree with me that forgery, signing someone's else name and stealing their money, is an act of dishonesty, would you not?

A Yes, ma'am.
Q Do you -- do you remember why it was you needed the money more than him?
MR. CRUM: Object to the form.
A No, ma'am.
Q Was he expecting you to pick up his money?
A I can't recall.
Q How did you -- you were -- do you know how it was that you came to be arrested for the forgery count?
A No, ma'am.
Q All right. So Coca-Cola, you think that's the next job you can remember?
A I think. I ain't for sure.
Q Now, when would that have been that you worked for Coke?
A Not too long after I got out of jail. I don't remember exactly the dates.
Q Do you know where you were working in 1990 when some of the activities that you were convicted of occurred?
A No, ma'am.

FREEDOM COURT REPORTING

Q What about 1999? I'm sorry. That's not right. 1991?
A No, ma'am.
Q You don't know where you were working in 1990 or '91?
A I can't remember.
Q Were you employed at all?
A Possibility. I don't recall.
Q Well, do you remember how long you worked for Coca-Cola?
A I would say for at least a year, maybe -- maybe a little bit more.
Q Sir?
A Maybe a little bit more, but I ain't for sure exactly how long.
Q What did you do for Coca-Cola?
A I'm trying to think what you would call it. Put different products on the pallet to put on the trucks.
Q And why did you leave Coca-Cola?
A I went to work at Dairy Fresh.
Q Well, was -- are you saying it was a better job or did you get fired from

Coca-Cola? I mean, why did you go -- leave Coca-Cola?
A Well, Dairy Fresh was a better opportunity.
Q Did you make more money at Dairy Fresh than you did at Coca-Cola?
A Not at first, but I knew it would pay off.
Q How much less did you work -- make at Dairy Fresh than you did at Coca-Cola?
A When I first started, it was a quarter.
Q You made 25 cents an hour less?
A When I first started.
Q Did you list on your application at Coca-Cola and/or Dairy Fresh that you were a convicted felony -- a felon?
A I can't remember.
Q And how long did you work at Dairy Fresh?
A I can't remember.
Q Was it long enough that you

experienced the upward mobility that you had anticipated when you left Coca-Cola?
A Yes, ma'am.
Q So how much more were you making at Dairy Fresh when you left?
A 10.25 when I left.
Q Well, how much more was that than you were making --
A About $3.50 more.
Q How much?
A $3.50 more.
MR. CRUM: Let her finish her question.
THE WITNESS: I'm sorry.
Q How long -- did you say -- did you tell me how long you worked at Dairy Fresh?
A No, ma'am. I can't remember.
Q Why did you leave Dairy Fresh?
A I got fired.
Q Why did you get fired from Dairy Fresh?
A From not being to work on time,

being five minutes late, 10 minutes late, whatever.
MR. CRUM: When you get to a point, it's been about an hour, I would like to take a break.
MS. ROBERTSON: Sure.
THE VIDEOGRAPHER: We're off at 3:27.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We're back on at 3:43. This is the beginning of tape 2.
BY MS. ROBERTSON:
Q Look at Plaintiff's Exhibit Number 10. Did you tell me that -- that statutory rape with your girlfriend, your girlfriend was Jennifer McClain?
A Yes, ma'am.
Q And you said she was 16 when you were 18; is that right?
MR. CRUM: Object to the form.
Q On this piece of paper?
A Yes, ma'am.

(Plaintiff's Exhibit Number 15 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q I'll show you what's been marked as Plaintiff's Exhibit Number 15 and ask you to -- I'm going to let your lawyer look at it for a second. It's marked as Plaintiff's Exhibit Number 15 and ask you what that is.

MR. CRUM: Just look at it.

A It's a warrant.

Q Right. And it says that you pled -- that -- that's one of the counts you pled guilty to; right?

A Yes, ma'am.

Q And it says that -- that Jennifer McClain was 14 when you were 18 and had sexual intercourse with her; right?

A That's what it says, ma'am.

Q So do you think you got it wrong on Plaintiff's Exhibit Number 10 that she was 14 and not 16?

A I don't remember.

Q You don't know?

A I don't remember. I mean, I must have.

Q Was Renae Lamberson ever your girlfriend?

A Yes, ma'am.

Q Was she 13 when you first had sex with her?

A I believe so.

Q How old were you when -- when you had sex with Ms. Lamberson?

A I can't remember.

Q Now, was Amber Nelson ever your girlfriend?

A No, ma'am.

Q Now, she was 14 when you had sex with her; right?

MR. CRUM: Object to the form.

A I never had sex with her.

Q Well, the -- the allegation that you pled guilty to, the sodomy, she was 14; right?

A I have no idea how old she was,

ma'am.

Q Huh?

A I don't know how old she was.

Q Do you -- do you know what the allegation?

A It was sodomy one.

Q Okay. And you don't know what -- the -- the allegation of how old she was?

A No, ma'am.

Q Okay. What -- how did you know Amber Nelson?

A She was just somebody from where I lived.

Q And do you have -- are you saying you didn't have -- you didn't sodomize Amber Nelson?

A No, ma'am.

Q Do you -- and you don't have any idea why Amber Nelson would make such a thing up; right?

A No, ma'am.

Q Do you think she just thought she would get on the train with these other two

girls that were accusing you of being a rapist?

A I don't know, ma'am.

Q What about Michelle Samford? Do you know her?

A Know of her.

Q Now, was she one of the ones that you pled guilty to that you actually did?

A No, ma'am.

Q All right. And she was 13 years -- the allegation is that she was 13 years old.

A I have no idea.

Q And you don't know why she may have made these allegations?

A No, ma'am.

Q Do you know who she was?

A I just know of her.

Q You don't even know -- you didn't have --

A I didn't --

MR. CRUM: Wait. Let her finish her question.

THE WITNESS: Oh, I'm sorry.
Q Did you talk to her, did you ride bicycles together, or are you just saying you didn't even know her?
A I just knew of her around.
Q What about Jennifer McClain? She was 12 years old the first time you had sexual intercourse with her; right?
A I don't know.
Q You don't know?
A No, ma'am.
Q Do you know a Melissa Cantley?
A Yes, ma'am.
Q Was -- were you ever charged with having any kind of -- any raping her at all?
A Any what?
Q Were you ever charged with raping her at all?
A No, ma'am, not that I realize. Not that I know of.
Q Now, how did you know Melissa -- Melissa Cantley?
A She was my -- a friend of my

brother's.
Q How much younger was she than you?
A I couldn't -- I don't remember.
Q Let's go back. You were telling me where you worked. You said you -- you got fired from Dairy Fresh for being late.
A Yes, ma'am.
Q I mean, was it once or twice or a lot?
A It was five times.
Q And were -- why were you late?
A I just couldn't wake up. It was a 1 o'clock a.m. shift.
Q Now, how long did you work there before you got fired?
A I can't remember.
Q Had you been working that same shift the whole time?
A I don't remember.
Q How long did you work there?
A I don't remember.
Q Were you on probation during the

time that you worked there?
MR. CRUM: Probation with the company or probation legally?
MS. ROBERTSON: Legally for his various and sundry rapes and sodomies.
MR. CRUM: Object to the form. Were you on criminal probation at the time?
THE WITNESS: I believe so.
Q Now, you were convicted in 1992 of these various and sundry things; right?
MR. CRUM: Object to the form.
A Yes.
Q And you were -- you were sentenced to 10 years; right?
A Yes, ma'am.
Q How many of those years did you serve?
A Four years, one month, and some days.
Q And how did you get out?
A I have no idea. For real. I really -- I mean, I know I got out on

probation. But how it went about, I have no idea.
Q Did you see a psychiatrist after you got out?
A No, ma'am.
Q You didn't have a hearing or anything?
A No, ma'am.
MR. CRUM: Hearing with the court.
A No, ma'am. I got out on probation. No, ma'am.
Q All right. So you got out. I guess that was a happy day. You wake up one day and said, Oh, go home; right?
A Yes, ma'am.
Q Were you having any communications with your mother -- I mean your stepmother and your father during this period of time?
A My mother and father came up -- tried to come up at least every week, if not every other weekend.

Q But you didn't know that anybody was trying to get you out of prison?
A Well, I knew my mother was trying, but I didn't know how she was going to do it.
Q How did you know she was trying?
A Because she said she was trying to do everything she can. I don't know what but --
Q Okay. So when you got out of prison, you were on probation; is that right?
A Yes, ma'am.
Q For the rest of your sentence?
A For five years.
Q Okay. So you were sentenced in '92 to 10 years?
A Yes, ma'am.
Q And you got out in 1996 after four years; right?
A Yes, ma'am.
Q And so if you were on probation for five more years --

A Five.
Q -- that means you got off -- you were supposed to get off probation in 2001; correct?
A Yes, ma'am.
Q Look on your application. Did you -- that was in 2000; right?
A Yes, ma'am.
Q Did you mention to anybody at Flavor House that you were still on probation for these charges?
MR. CRUM: Did he say something to somebody or is it on the application?
Q Did you -- is it on the application?
A No, ma'am.
Q Did you say anything to anybody that you were on probation?
A No, ma'am, not that I realize.
Q Did your Uncle Bruce know that you were on probation?
A I can't remember.
Q What about your -- your nephew, Butch?

A I don't know.
Q How was it that you came to talk to them about how to get a job at Flavor House?
A I had talked to my ex-wife's mother and she talked to Bruce for me.
Q Who was your ex-wife's mother?
A Ima Jean Thompson.
Q Is she the one that put the warrant out on you?
A Yes, ma'am.
Q All right. You were fired at -- at -- for -- at Dairy Fresh. Where did you work next?
A I'm trying to think. I worked through Able Body.
Q Please try not to fail to make eye contact with your lawyer.
MR. CRUM: Don't listen to her, whatever she's -- whatever she's talking about.
A I can't remember. I know I

worked through some temp jobs, but I can't remember exactly where I -- who from. You know, I -- I worked.
MR. CRUM: Do your best to answer her questions.
THE WITNESS: Yeah.
Q What do you mean you tried to work through temp jobs?
A I worked through temp jobs. I just don't remember where they were or -- it's been a long time.
Q All right. Well, did you work anywhere longer than six months after you lost your job at Dairy Fresh and before you went to work at --
A Yes, ma'am.
Q Where?
A I worked at Charoen Pokphand.
Q How long did you work there?
A I really ain't for sure.
Q And what is -- what is that place?
A It is a --

MR. CRUM: You need to tell him how to spell that, too, if you know.
THE WITNESS: Oh. Do you know how to spell it? It's C-H-A-R-O-E-N, P-O-K-H-A-N-D.
Q I can't even say it. I'm not even going to try. What did you -- what -- what is that place?
A It's a chicken plant.
Q All right. And -- and what did you do at that place?
A I started off on sanitation.
Q What does that mean? What is sanitation?
A Cleaning, cleaning the plant.
Q Do you know how you got that job?
A I applied for it.
Q How did you find out about it?
A Through the paper in Eufaula.
Q What did you make when you went to work there?
A I can't remember exactly how much.

Q How long did you work cleaning the plant?
A I'd say three months.
Q Do you remember if they asked if you had been convicted of any felonies?
A I can't remember.
Q Do you remember if they asked you if you were on probation for being convicted of felonies?
A I can't remember.
Q Where did you live when you got out of prison the -- when you first got out?
A At my mother's house.
Q Your mother, not your stepmother?
A My mother.
Q All right. And -- and who -- was she married to somebody then?
A Walter Green.
Q Walter Green. And how long before you had the warrant issued against you for contributing to the delinquency of a minor?
MR. CRUM: Object to the form.

A I don't know how long that was.
Q Does it sound about right that it was in 1998?
A I have no idea.
Q Sir?
A I don't remember.
Q Did you ever pay any restitution as part of your sentence?
A Yes, ma'am.
Q Do you remember how much it was?
A No, ma'am.
Q Do you remember when you got -- have you got it paid off?
A No, ma'am. I'm still paying it.
Q Still paying for it?
A Yes, ma'am.
Q How much do you owe?
A I don't know, ma'am.
Q Do you know what the restitution was for?
A No, ma'am.
Q Do you know if some of it was for psychological treatment for your victims?

A I don't know, ma'am.
Q You weren't told what the restitution was for?
A No, ma'am.
Q So how long did you stay living with your mother after you got out of prison?
A I think I stayed there until -- I don't -- I can't remember exactly when I left there.
Q Did -- and no one told you that they had represented to the court that they were going to get you psychological help when you got out?
A No, ma'am.
Q How much younger was Ronnie than you when you first started having sexual intercourse with her?
A I don't remember.
Q But she was young enough for her mother to have a warrant issued for contributing to the delinquency of a minor; right?

A I guess so.
Q And she was young enough for you to be convicted of that; right?
MR. CRUM: Object to the form.
A I guess. I don't really know.
Q It doesn't sound like you were fully rehabilitated when you got out of prison, does it?
MR. CRUM: Object to the form.
Q If you were still having sex with underaged girls, it doesn't seem like you were fully rehabilitated; right?
MR. CRUM: Object to the form. I don't think you can answer that, so don't.
Q Well, that's what -- that -- that you were convicted of, for contributing to the delinquency of a minor; right?
MR. CRUM: Was he convicted of contributing to the delinquency of a minor? You can answer that question.
A No, ma'am.
Q You were not?

A No, ma'am.
Q What were you -- I thought you said you served time in county jail for it for 45 days?
A I was waiting for trial.
Q You were waiting for trial. What happened?
A It was throwed out.
Q And why was it thrown out?
A Because it was wrong. I didn't do that.
Q Did you have a trial?
A I went in front of the judge and she dismissed the case.
Q You had a trial.
A I don't know. I don't know, ma'am.
Q Do you know if -- if your soon-to-be mother-in-law withdrew the charges?
A I don't know, ma'am.
Q How much did you say you had been paying along to -- in order to -- to pay

your restitution that you're still paying it back?
MR. CRUM: How much do you pay in restitution is the question.
A I pay $25 a month, usually.
Q Usually. What does that mean?
A Every month I'm supposed to $25 month.
Q Did you miss some of it?
A I haven't in a long time.
Q Did you miss some of it at some other times?
A A long time ago.
Q What was -- what was the reasons for you missing it a long time ago?
A I didn't have it.
Q Now, were you seeing Ronnie when she was 16?
A I can't recall, ma'am.
Q Were you date -- you don't recall when you started dating her?
A No, ma'am.
Q But do you -- did you -- did you

know her then, her mother, Emma Jean Thompson?
MR. CRUM: Did he know his mother -- her mother when he was dating her?
Q When you started dating her daughter.
A Yes, ma'am.
Q All right. And did she know you were a sex offender?
MR. CRUM: Object to the form.
A I don't know, ma'am.
Q Well, tell me why it is that you think she issued -- had this warrant issued against you.
MR. CRUM: Object to the form.
A I have no idea, ma'am.
Q Have you never talked to her about it?
A No, ma'am.
Q You never talked to her about it even when you -- when you -- she told you you could try to get a job by using Bruce Cassady's name?

A No, ma'am.
Q All right. Now, we're at the chicken plant. What did you -- how long did you clean the chicken plant?
MR. CRUM: How long did you work there?
A I worked there for -- I don't know -- over a year. I can't remember exactly how long.
Q I heard your lawyer whisper to you how long did you work there. I didn't ask you that. I asked you were you --
MR. CRUM: You asked him how long he cleaned the chicken plant and your unprofessional manner is simply inappropriate.
MS. ROBERTSON: Well, if -- I have a reason for asking it that way.
MR. CRUM: How long he cleaned the chicken plant? That could mean how long that day. That could mean all sorts of different things.
MS. ROBERTSON: Well, then,

object to it. Don't be telegraphing the witness by talking to him under your breath. That is what is unprofessional.
MR. CRUM: I'm not going to --
MS. ROBERTSON: Thank you very much.
MR. CRUM: -- listen to your silliness. I'm not going to let you ask questions that are inappropriate.
BY MS. ROBERTSON:
Q Did you ever change positions at the chicken plant?
A Yes, ma'am.
Q Of course. And that's why I was asking you. Your lawyer, of course, did not know and so he was trying to help you out about something. He didn't know what he was talking about. What -- when did you change positions --
MR. CRUM: Let her ask you a question.
A Say what, now?
Q When did you change positions?

A I can't remember exactly when.
Q Was it two months after you started working, a month?
A Two or three months.
Q All right. And what position did you take out of sanitation, which was in fact cleaning the chicken plant; right?
A Yes, ma'am.
Q Okay. After you cleaned the chicken plant for a while, what position did you take?
A Jumbo deboner.
Q What?
A Jumbo deboner.
Q And what did that involve?
A Just cutting the chicken to the size, what you're supposed to cut them to.
Q All right. Just hang them up there and y'all --
A They hang them up. I just cut it.
Q You have gloves on --
A Yes, ma'am.

Q Send them on to somewhere else. How long did you hold the position as a jumbo deboner?
A I don't remember.
Q Did you make more in the deboning than you made at the sanitation?
A Yes, ma'am.
Q How much more?
A About 75 cents.
Q 75 cents an hour?
A Maybe.
Q Did you apply for that or did you just -- how did you get it?
A I asked for it.
Q And how -- did you hold that position the entire time you worked there after that?
A No, ma'am.
Q What -- what was your next position?
A I went to the box room.
Q I'm sorry?
A The box room.

Q What is the box room?
A It's where you just load up the boxes that they were going to use on the floor.
Q Huh?
A You load up boxes on pallets that they're going to use on the floor and send them down to them.
Q Does that pay more than the deboning?
A The same.
Q How did you go from deboning to boxing?
A I put in for it. I bidded for it.
Q Do you remember how long you worked in the box room?
A No, ma'am.
Q Did you have any other positions?
A Yes, ma'am.
Q What was your next position?
A I was supervisor.
Q You were supervisor?

A Yes, ma'am.
Q How long were you a supervisor?
A I can't recall.
Q A week, a month?
A Longer than that, but I can't remember exactly how long.
Q Now, you worked there what, about a total of a year?
A I don't know. A year to a year and a half. I don't remember exactly how long.
Q Did you get a -- were you a lead person or a supervisor?
A I was a supervisor.
Q Now, how did you get that position?
A I bidded for it.
Q And what was -- did -- had you put on your -- did you say to me that you put on your application that you had been convicted and were on probation?
MR. CRUM: Object to the form.
A I can't remember.

Q Huh?
A I couldn't remember.
Q Okay. How long did you work as a supervisor?
A I don't recall, ma'am.
Q Why did you leave the chicken plant?
A I -- I can't even remember now.
Q Were you involuntarily terminated?
A I don't remember, ma'am.
Q Well, you don't remember why you left a supervisory job?
A No, ma'am.
Q Now, when was that?
A Maybe in 2000, whenever I moved down to Dothan.
Q So that's a pretty good job for a convicted felon, isn't it?
MR. CRUM: Object to the form. You can answer, I guess.
A Yes, ma'am.
Q But you don't know why you don't

have that -- didn't have that job anymore; right?
A No, ma'am.
Q Now, where is the chicken plant?
A It's in Baker Hill.
Q Baker Hill? Where is that near?
A Eufaula.
Q And were you living in Eufaula at the time?
A No, ma'am. I was living in Baker Hill.
Q Did you have any period of unemployment after you -- you left the chicken plant?
A Not long.
Q About how long?
A A month, maybe two. Maybe.
Q Maybe what? Two what?
A A month, maybe two.
Q Oh, I see. And where did you work then?
A I went to Nutcracker. Well, it was called Flavor House Foods, Flavor House.

Q What were you making as a supervisor at the chicken plant?
A 26,000 a year.
Q Do you know how much that breaks down an hour?
A No, ma'am.
Q Was it more than you started off at at the Nutcracker -- I mean Nut Flavor -- excuse me -- Flavor House?
A I don't know.
Q Did you have to report to your probation officer that you were leaving the chicken plant?
A I don't know, ma'am.
Q You don't know whether you had to report a change in jobs to your probation officer?
A At that time, no, ma'am.
Q At that time you -- well, do you know now?
A Yes, ma'am.
Q And what -- what -- what is the answer now?

A Yes.
MR. CRUM: Object to the form of the question.
A Yes, you're supposed to report to the probation officer.
Q Now, in 1998 when you were revoked, one of the reasons was because you had changed residence and failed to report it; correct?
A I guess so, ma'am.
Q And failed to report that month to the probation officer; right?
MR. CRUM: You need to answer on what you know.
A I don't know, ma'am. I really don't know why I was revoked.
Q Now, being on probation and getting revoked is the difference between walking the streets a free person and being in -- in prison; right?
MR. CRUM: Object to the form.
A Yes, ma'am.
Q And you're telling me that you

don't know whether or not to keep your freedom you had to report a change in job status?
A I don't know.
Q Huh?
A I don't know, ma'am. I don't recall, ma'am.
Q Well, were you told what your conditions of probation were?
A I can't remember that. I can't remember.
Q Worked at Flavor House and they have this problem with people who work there. They lose their memory.
MS. SWAIN: Objection.
MR. CRUM: Let her ask you a question.
Q You might want to sue them for it.
MR. CRUM: Have you got a -- is that a question?
MS. ROBERTSON: No. I'm just -- I'm just talking about litigation

amnesia.
MR. CRUM: Okay.
BY MS. ROBERTSON:
Q What was your first position at Flavor House?
A I was a label operator.
Q A label operator?
A Well, a machine operator.
Q So you went from off the street to a label operator?
A Yes, ma'am.
Q Did you have to take any skill test?
A No, ma'am.
Q Did you have any experience in being a label operator?
A No, ma'am.
Q Now, what is involved in being a label operator?
A Just making sure the machine runs right and the label goes on the can properly.
Q Well, the jurors probably don't

know much about this. I know I don't. What -- what are you doing out there at Flavor House that you have to put labels on?
A Peanuts, cans of peanuts.
Q And the label operator is the person that makes sure the machine that slaps the label on the can, jar, or what have you does it right?
A Yes, ma'am.
Q All right. Now, what is involved in making sure that all happens?
A It's -- you just make sure you set it up to the standard of the can you're running, make sure the light blue and the coal blue is right.
Q You're going to have to speak up or speak more clearly or something.
A All right. I'm sorry. You have to set the machine up right, make sure it's set up to the can that you're running.
Q See, I don't know what that means. What do you mean "set it up"?
A I don't know how to explain what

you want me to explain.
Q Well, I mean, are you talking about you build it like a tinker toy or are you talking about you -- I -- what do you do to set it up?
A You just turn about three screws and -- well, one screw up top. Set the rails up with two screws on each rail on the bottom. Turn one more screw to match the size.
Q Okay. And what does all that do?
A That makes sure the can can go through the machine.
Q Okay. So it establishes some sort of calibers for the -- for the label and the --
A No. Just make sure the can can roll through the machine.
Q Okay. And then what do you do?
A You put the labels in, you let it up, and you run a can to make sure it runs right.
Q All right. And what is entailed

in making sure that it runs right?
A It has to be on the bottom of the -- the bottom of the can. You have to actually make sure all your belts are tight. If something was wrong, you've got to troubleshoot the problem yourself. If it's the rails are wrong, the wheels are wrong, that's your job to make sure it's right.
Q And you went to doing that just off the street?
A I was trained.
Q Who trained you?
A I can't remember his name.
Q Was he a young fellow, an old fellow?
A I don't remember.
Q Was he still out there when you left?
A No, ma'am.
Q Do you know why he left?
A No, ma'am.
Q All right. How long -- was there any particular machine you were label

operating on?
A I was on line 3 label machine. Line 3 label machine.
Q Well, I mean, don't they have, like, jar lines and can lines and --
A Yes, ma'am.
Q All right. What kind of line were you on?
A Can line.
Q Who was your super -- immediate supervisor?
A If I'm not mistaken, it was Griff. I don't know his last name because it's been so long ago.
Q Was he the person that trained you?
A No, ma'am.
Q And -- and was your uncle the person over -- the manager or supervisor over the label operators?
A That's what they had said. He was over the label operators.
Q Okay. Look on Plaintiff's

FREEDOM COURT REPORTING

Exhibit Number 10 where it says, Are you related to anyone employed by this company?
A Yes, ma'am.
Q And your answer was?
A No.
Q Was that true or false?
A Well, I don't know how to answer that, ma'am, because I'm really not related to him. My wife was, ma'am.
Q Well, you were related to him by marriage.
A Okay.
Q But you were related to him; correct?
MS. SWAIN: Objection.
MR. CRUM: Object to the form.
Q Right?
A Okay, ma'am.
Q Well, when I asked you did -- were you -- at the beginning of this deposition were you related to Bruce Cassady, you -- yes, sir, I -- he was my uncle. He's my uncle.

MS. SWAIN: Objection.
MR. CRUM: That's not what he said.
MS. ROBERTSON: You're mischaracterizing his testimony. That's not what he testified to.
MR. CRUM: Don't say it. Don't answer anything.
THE WITNESS: I'm not.
BY MS. ROBERTSON:
Q Okay. So -- but I asked you were you related to him and you told me yes; right?
MR. CRUM: Did you say are you related to him? I don't know what her -- I object.
A If I'm not mistaken, I told her that was my wife's uncle. That's what I said. My ex-wife's uncle. I did not say I was related to him. I said he was my ex-wife's uncle.
Q Okay. Whatever. So you didn't consider him -- you were related to him by

blood or marriage?
A I -- I don't consider him -- I mean, he was just a guy.
Q But he was the person over the label operators?
A I guess that's right, ma'am.
Q So was he Griff's supervisor?
A Not that I'm aware of. I really don't know.
Q Well, do you know who -- what the chain of command was in the department?
A Not when I first started out there, no, ma'am, I did not.
Q Now, how long did you stay a label operator on the can line?
A Four years. Something. I stayed on the same machine until I moved.
Q When did you move?
A In 2005, 2006, somewhere around in there. It was 2005, if I'm not mistaken.
Q And where did you move?
A I went to line two roaster.
Q Did you take any skill for pay

test?
A To do what? For what?
Q At any time out there while you were being a label operator.
MR. CRUM: Did you ever take a skill for pay test?
A Not that I know of, ma'am. I can't remember.
Q Did you get -- huh?
A I can't remember, ma'am.
Q And you were a label operator on the can line for four years or so; is that right?
A Something like that.
Q And then where did you go?
A To line two roaster.
Q And what did you do there?
A I cooked dry roasted peanuts.
Q Did you get pay -- more pay as a roaster?
A Yes, ma'am.
Q How did you get that job?
A I bidded on the job.

# FREEDOM COURT REPORTING

Q And did they have, like, an application process?
A I don't recall, ma'am.
Q Well, when you say you bidded on it, how did that process work?
A They showed a job on the board and you signed up for it.
Q Do you know what the criteria for you getting it was?
A No, ma'am.
Q Like, were you told whether seniority counted?
A I can't remember now.
Q Skill level counted?
A I don't remember, ma'am.
Q Do you remember how much more you made as a roaster than as a label operator?
A Not really.
Q How long did you stay as a roaster?
A For two months.
Q Who was your boss as a roaster?
MR. CRUM: Are you saying his

direct supervisor?
A I can't remember who it was at the time.
Q Okay. Now, this was in -- between --
A I know, but I can't remember at the time. Sorry.
Q I don't want to know what you can remember at the time. I mean I want to know what you remember now.
A I can't remember now who it was then. I'm sorry.
Q That sounds like a good first line for a country music song. So what -- so what happened after two months at the roaster?
A I was offered the position as a temporary supervisor over the gift pack line.
Q And who offered you that job?
A I can't remember his name. He -- he's done left the company.
Q And that's your explanation for

why you can't remember who it is, he left the company?
A I can't remember his name. He wasn't there long.
Q Well, did you know him? Were you on speaking terms with him?
A He was high up in the company. Everybody was on speaking terms with him. I don't -- I just can't remember the man's name.
Q Do you know how he decided that you should become the temporary whatever, supervisor?
A I bidded on the job and got the job.
Q So that was a job that was posted also?
A Well, yes, ma'am.
Q And -- but you don't know what the criteria was?
A I can't remember now.
Q Were you interviewed for the job?
A No, ma'am.

Q Do you know how many other people bidded for the job?
A Somebody else had it before I got it, ma'am, so I don't know who else bid it.
Q That was apropos of nothing. Do you know how many other people bidded on the job?
A No, ma'am.
MR. CRUM: Just -- just answer her question.
A Sure don't.
MR. CRUM: Just answer her question. That's all right. We've been here a long time.
Q I take it the job had been vacated for some reason or other; right?
A I have no idea, ma'am.
Q Well, what kind -- now, tell me the title again. I forgot. Temporary something supervisor.
A Temporary supervisor over gift pack.
Q Okay. And what did -- what did

you -- what did they do over in gift pack?
A They put peanuts in a -- like a three-pack gift pack that they sell at Wal-Mart or something.
Q Did you have any experience working in that department?
A No, ma'am.
Q Had you acted as a temporary supervisor anywhere else in that plant?
A No, ma'am.
Q Do you have any idea why anybody would have decided you were supervisor material?
A No, ma'am.
Q Do you know if there were any qualifications about whether you could have any write-ups in your file in order to hold that position?
A I don't know, ma'am.
Q All right. How long did that job last?
A Four months.
Q Did you make more money at that

job?
A Yes, ma'am.
Q How much more money?
A I think it was $2.25 more.
Q And I guess by the very title being temporary, was it a seasonal job is the reason it was temporary?
A Yes, ma'am.
Q All right. What happened after the season was over?
A I went to be the team leader on line three.
Q All right. And during the -- the time -- and you don't remember taking any skill level test at all at -- at Flavor House?
A I don't remember.
Q Do you know what skill that you -- whether you were rated as a -- a label operator, what level?
A I don't know, ma'am.
Q Did -- nobody ever mentioned it to you?

A No, ma'am.
Q Do you know if you were at the top of the pay range for the label operators?
A I don't know, ma'am.
Q Well, you seem to have a very little information about a lot of stuff out there. What made you be qualified as the team leader?
A I don't know.
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I don't know.
Q Well, I will just withdraw that -- that editorializing, although that's what I think. What were your qualifications to be a team leader?
A I had been on line three, four, four and a half years. I had ran the label machine, worked with Stephanie on a filler -- ran it or every part of the -- of the machines back there and then figure I had more understanding of the line. And I

could probably help the line, get it running.
Q Were you ever given an evaluation as -- as a label operator or roaster where your attitude was mentioned to be bad?
A I can't remember, ma'am.
Q You don't remember if anybody ever wrote -- wrote you an evaluation that you had a bad attitude?
A I don't remember, ma'am.
Q Did you have a bad attitude?
MR. CRUM: Object to the form.
A Not that I can recall.
Q Wait, wait just one minute.
MS. ROBERTSON: What is wrong with the form of that?
MR. CRUM: Did he have a bad attitude when about what? I mean, it's just a vague general question that means nothing. That's my objection. If you want me to state it, I'd be happy to.
MS. ROBERTSON: Okay. That's for him to tell me if he doesn't understand,

not for you to talk about.
MR. CRUM: I objected to the form of the question.
BY MS. ROBERTSON:
Q Did you have a bad attitude out there?
A Not that I recall, ma'am.
Q So that if somebody else recalls otherwise, you wouldn't have any way of refuting it; right?
MR. CRUM: Object to the form of the question.
MS. SWAIN: Objection.
A I don't remember that, ma'am.
Q So my -- my question is correct. If you don't remember it and somebody else remembers that you had a bad attitude, you would have no way of refuting it because you --
MR. CRUM: Don't answer it.
Q -- don't remember; correct?
MS. SWAIN: Objection.
MR. CRUM: I'm instructing him

not to answer that. It's not even a question. It's just rambling --
MS. ROBERTSON: It is -- no, no. You --
MR. CRUM: It's a double negative on top of it.
MS. ROBERTSON: You've stated your objection.
BY MS. ROBERTSON:
Q Now, answer my question.
MR. CRUM: I'm telling him not to. You can restate the question or you can do whatever you want to.
MS. ROBERTSON: Will you mark that, goldfish?
MR. CRUM: Sure, you can.
BY MS. ROBERTSON:
Q If somebody else says you had a bad attitude out there, would you have any way to refute it?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
MR. CRUM: You can answer, I

suppose.
A I don't think there would be nobody out there to tell you that. Sorry.
Q But if there was, would you have any way to refute it since you can't remember?
MR. CRUM: Object to the form.
A I don't know, ma'am.
Q What do you mean "I don't know"?
A I don't know.
MR. CRUM: Object to the form.
Q Do you not understand the question?
MR. CRUM: Object to the form.
A Yes, ma'am.
Q Yes, ma'am, you don't understand the question?
MR. CRUM: That's what he said.
A I do.
MR. CRUM: Let her ask you a question.
A Yes, ma'am.
Q You do understand the question?

MR. CRUM: Well, I had asked you to state a question. You're just sitting here --
MS. ROBERTSON: Please quit it.
MR. CRUM: -- arguing with the witness. I'm not going to quit objecting to these things that aren't even questions. We're asking you to state a question. It's not -- not complicated.
BY MS. ROBERTSON:
Q If someone said you had a bad attitude, would you have any way, any evidence, to refute that?
MS. SWAIN: Objection.
MR. CRUM: Object to the form of the question.
A I can't refute nothing because I don't know, ma'am. I don't know, ma'am. I don't know.
Q What do you mean you don't know?
A I don't know if I can or not. I don't know. I'm sorry.

Q Were you ever written up for anything at the plant?
A I suppose so.
Q What do you remember being written up for?
A There was two occasions that I can recall.
Q Okay. And those occasions were what?
A One for being in conflict with Linda Thornton. The other one was being in conflict with Joanie Nickerson.
Q Is that what the write-up was, being in conflict with them?
A Yes, ma'am, or not --
Q Huh?
A Yes, ma'am.
Q Okay. Was it having anything to do with cursing or using profanity?
A On one of them, yes, ma'am.
Q On only one of them?
A Yes, ma'am.
Q All right. Which one was that?

A The one with Linda Thornton.
Q So the -- the accusation that Jonnie made, Jonnie Nickerson, did not involve you cursing her?
A Not that I can remember.
Q And how far apart were those two write-ups?
A I don't recall, ma'am.
Q About a month?
A I don't remember, ma'am.
Q Was it soon after that that you got the temporary gift pack job back?
MS. SWAIN: Objection.
A I don't remember.
Q Huh?
A I don't know what --
Q But you did get that job back?
A I don't know what you're asking me.
Q Did -- the temporary gift pack supervisor, did you have that job again?
A In 2007, yes, ma'am.
Q Okay. And when in 2007?

A I think it was August, I think, or it might have been --
Q But it was after these two write-ups; right?
A Yes, ma'am.
MR. CRUM: Make sure you answer what you know.
THE WITNESS: It was after all of them.
Q How did you get the job for the temporary gift package supervisor the second time?
A I bidded on it.
Q You had to bid again?
A Yes, ma'am.
Q Do you know if anyone else bidded on it?
A No, ma'am, I do not.
Q What do you remember about the write-up that involved Jonnie Nickerson?
A I can't remember, ma'am.
Q Did you in fact use curse words in the presence of Jonnie Nickerson?

A No, ma'am, not that I can recall.
Q Now, was Jonnie Nickerson on line three?
A Sometimes, ma'am.
Q And was she on line three after Linda Thornton left?
A I can't remember, ma'am.
Q You don't remember that she came to line three at or about the time you received the write-up involving Linda Thornton?
A I don't remember, ma'am.
MS. ROBERTSON: Let's take a five-minute break.
THE VIDEOGRAPHER: Off at 4:28.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Back on at 4:42.
BY MS. ROBERTSON:
Q I'll show you what's been marked as Exhibit --
THE COURT REPORTER: 16.
MS. ROBERTSON: 16?

THE COURT REPORTER: Uh-huh.
MS. ROBERTSON: Did I start over for him? I did, didn't I?
THE COURT REPORTER: No, you didn't.
MS. SWAIN: No.
MS. ROBERTSON: Oh, good. That's good.
THE COURT REPORTER: You started with 15.
MS. ROBERTSON: That makes my life so much better.
(Plaintiff's Exhibit Number 16 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q I'll show you what's been marked as Plaintiff's Exhibit Number 16 and ask you -- after I show it to your lawyer, and ask you to look at that for me, please, sir.
A (Witness complied.)
Q Now, what is that, sir?
A It's a write-up.

Q For what?
A Let me read it, now.
Q Sure.
A It's for having an altercation with Jonnie Nickerson.
Q Well, I mean, does it say for losing your temper?
A It says for rude and intimidating and disrespectful attitude.
Q Okay. Do you recall what circumstances led up to you getting that write-up?
A No, ma'am, I really don't.
Q Did you agree with that write-up?
A I signed it, yes, ma'am.
(Plaintiff's Exhibit Number 17 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Now, I'll show you what's been marked as Plaintiff's Exhibit Number 17 and ask you -- I know this a little hard to read, but take a look at it, please, sir.

A (Witness complied.)
Q Do you know what that is, please, sir?
A I have -- it says documentation form, ma'am.
Q Do you know that's what brought the -- the incident to the attention of management that led to Plaintiff's Exhibit Number 16?
A No, ma'am.
Q Do you see where she says you were cursing?
A I see it, ma'am.
Q Did anybody ever ask you if you had been cursing at or around Jonnie Nickerson?
A Yes, ma'am.
Q Who asked you that?
A Tommy Nance.
Q Okay. And what did you tell him?
A I did not.
Q What did you tell him?
A That we was fussing about the

label machine because it wasn't running.
Q But you told him you did not curse?
A No, ma'am.
Q Do you know if Jonnie Nickerson got a write-up for this incident?
A I have no idea, ma'am.
MR. CRUM: Make sure she finishes her question.
THE WITNESS: Okay.
Q But you told Tommy Nance that you didn't curse her?
A Yes, ma'am.
(Plaintiff's Exhibit Number 18 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q I'll show you what's been marked as Plaintiff's Exhibit Number 18 and ask you to look at that.
A (Witness complied.)
Q Do you know what that is?
A That's my documentation form.

# FREEDOM COURT REPORTING

121

Q Of the same incident Ms. Wilkerson -- Nickerson was talking about?
A Yes, ma'am.
Q All right. And how did you come to make that documentation?
A Because I guess that's what happened, ma'am. I can't remember exactly what happened.
Q No, no, no. I'm asking you what -- what led to you writing that down.
A My supervisor told me to write down what I put because of what happened.
Q All right. Who was your supervisor?
A Chris Jordan.
Q Well, how was it you knew what he was talking about to write down what happened?
A Because we had gotten in an argument about the label machine and Bruce was standing right there with me so I knew.
Q Bruce who?

122

A Cassady.
Q He was your supervisor?
A No, ma'am.
Q Okay. Well -- so Bruce was standing right there?
A He was there when it happened.
Q All right. I don't see where you listed him as a witness. Did you list him as a witness?
A I put that me and Bruce was working on the label machine.
Q Oh, okay. But where it says people that were present or were witnesses, I don't see where you put Mr. Cassady's name at all.
A I don't remember. I don't know -- I don't know why --
Q Well, I know. Look at the document.
A -- I didn't do it. Sorry.
Q All right. So and -- and -- and -- well, what kind of disagreement did you and Ms. Jonnie have if it wasn't to

123

curse at her or in front of her?
MR. CRUM: Object to the form.
A Because the label machine wasn't working and me and Bruce was trying to get it fixed. I'm guessing. That's what I read in here, ma'am. I -- it's been too long to even think about it.
Q Well, read it again because I'm trying to find out -- you took a write-up that you said you took because you were guilty of it; right?
A I was guilty for talking to her wrong like just speaking, being rude or something like that, telling her that she needed to do that. I accepted that because I shouldn't have been talking like that. But cursing, no, ma'am. You didn't see that in this paper.
Q Okay. So -- so were you told that she had alleged that you had cursed?
A Yes, ma'am.
Q And -- and you said she wasn't telling the truth?

124

A Yes, ma'am.
Q Okay. Do you have any reason to -- why that she would have lied on you?
A I don't know, ma'am.
Q Do you have any -- I mean, do you -- you don't have any notion?
A No, ma'am.
MR. CRUM: Object to the form.
Q Well, do you know if it was the policy at Flavor House to write both people up had all -- who had altercations?
MS. SWAIN: Objection.
MR. CRUM: Object to the form.
A I don't know.
Q Huh?
A I don't know, ma'am.
Q Well, it implies that you lost your temper. Were you hollering at Jonnie?
A I don't remember, ma'am.
Q But you -- you remember that you weren't cursing. Is that all you can remember about the incident?
MR. CRUM: Object to the form.

A I can't remember.
Q Well, what can you remember? Tell me what you can remember.
A Not much of anything, ma'am.
Q So how is it that you remember that you didn't curse her?
A I don't know. I know I didn't. That's all I can say.
Q But you have no independent memory of what happened?
A I didn't curse her, ma'am.
Q Okay. Now, you notice the date on that is July; right?
A Yes, ma'am.
Q I'll show you what's been marked as Plaintiff's Exhibit 18.
THE COURT REPORTER: 19. Are you just marking?
MS. ROBERTSON: No. This is --
THE COURT REPORTER: Oh, okay. yeah.
MS. ROBERTSON: This is from -- this is. Yeah, me too.

MS. SWAIN: Are you sure it's not from --
THE COURT REPORTER: It's not from another --
MS. SWAIN: -- the last go-around?
THE COURT REPORTER: I thought we just marked 18.
THE WITNESS: You just marked that one (indicating).
MS. ROBERTSON: Okay.
THE COURT REPORTER: Is it about Ms. Nickerson?
MS. ROBERTSON: No. This is about the -- the incident with Linda. Maybe it should be 8. It seems like to me it should be 8. That's probably the way it should have been was 8. Well, I'm going to call it 8.
THE COURT REPORTER: 8 in Tommy's deposition?
MS. ROBERTSON: Uh-huh.
THE COURT REPORTER: That's

training documentation for Frank Williams.
MS. ROBERTSON: Yeah. Okay.
BY MS. ROBERTSON:
Q I'll show you what's been marked as Plaintiff's Exhibit 8 and ask you to take a look at that.
MS. SWAIN: That's the one?
MR. CRUM: Is that the same one?
MS. SWAIN: It's the same one.
MR. CRUM: I think it is.
MS. ROBERTSON: No.
MS. SWAIN: The one about --
MR. CRUM: I think it is the one that you just --
MS. ROBERTSON: I see. I thought I -- I was looking for -- I know it's in here if I can find it.
MR. CRUM: I would help, but I don't know what you're looking for.
(An off-the-record discussion was held.)

BY MS. ROBERTSON:
Q I'll show you what has been marked as Plaintiff's Exhibit Number 2 and ask you to take a look at that.
A (Witness complied.)
MS. SWAIN: Ann, for the record, the exhibit numbers are just going straight through between Tommy's and his.
MS. ROBERTSON: Yeah. Yeah, that's a good point. We started --
MS. SWAIN: We made it an exhibit to Tommy's --
MS. ROBERTSON: Yeah, we started -- we made it an exhibit to Tommy's and we're just running them straight through.
MR. CRUM: Go ahead and read it.
A Yes, ma'am.
Q What is that, sir?
A That's a documentation form.
Q About what?
A About -- this one happened

# FREEDOM COURT REPORTING

between me and Linda.
Q Now, how did you come to fill that out?
A Chris Jordan told me to fill out an incident report about what happened between us.
MR. CRUM: Sit up.
THE WITNESS: Sorry.
Q Did you make a complaint about the incident involving Linda?
A I can't recall, ma'am.
Q Do you know if Linda made a complaint about the incident involving yourself?
A I don't know, ma'am.
Q I'll show -- you don't remember if you initiated the -- the -- the grievance or the investigative procedure?
A I don't.
Q I'll show you what's been marked as Plaintiff's Exhibit Number 4.
MR. CRUM: This is what she filled out?

Q Now, were you aware that those were the allegations that Linda Thornton made?
A Can I read this?
Q Sure.
A Thank you.
Q Did you know those were the allegations that Linda made concerning the incident?
A Yes, ma'am.
Q And after reading that, do you think it was she or you that initiated the complaint?
A I guess she initiated the complaint.
Q All right. Did you talk to Tommy Nance about that?
A I can't remember, ma'am.
Q Okay. Do you remember telling anybody whether or not you cursed as Ms. Thornton described?
A I can't remember, ma'am. I don't remember.

Q You don't remember whether you were asked whether or not you cursed?
A No, ma'am. I really --
Q You either cursed Ms. -- Ms. Thornton or cursed in her presence?
A I can't remember if somebody asked me that. I -- you know, I admitted I did it, you know, after -- I knew I probably did it and that was wrong of me. Knew I was wrong.
Q You knew you probably did it?
A Probably -- I probably did cuss her. Now, you know, I'm sorry for that.
Q Did -- did you toss the cans around also?
A No, ma'am.
Q Now, I don't see any mention in your version about cursing or any of that. Did you put that in your version?
A No, ma'am.
Q Why would you not if you were asked to -- to document or give your -- the facts as you remembered them?

MR. CRUM: Object to the form.
A I don't remember, ma'am.
Q Well, you knew, of course -- I assume you knew that that was what was the issue at hand, right, was that --
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
Q -- that you had cursed Linda?
A I don't remember.
Q You don't remember. Is there something wrong with your memory?
A I don't know, ma'am.
Q Did you have plenty of sleep last night?
A Normal.
Q Well, I don't know what that means. Are you an insomniac or not?
A Not that I'm aware of.
Q All right. So you had a good night's sleep. Are you taking any drugs --
A No, ma'am.
Q -- street or prescription that would affect your memory?

A No, ma'am.
Q Do you have any medical condition that would affect your memory?
A No, ma'am.
Q And are you telling me that -- that the write-up that you got concerning Linda Thornton was the first write-up you had got -- had ever gotten at Flavor House?
A I don't recall, ma'am.
Q Well, it was one of the first ones; right?
A I don't remember.
Q You testified that you got two write-ups at --
A I said as far as I know, that's how many I got.
Q Okay. Well -- and so -- but you don't remember whether or not you knew when they asked you about what happened that they were wanting to know whether you had been cursing?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.

Q Now, I notice on your -- did you know if there were any people around when the incident occurred?
A As -- as far as I can remember, it was, I think, Katherine Long. That's the only one I can actually remember.
Q Okay. Did you ask Katherine at the time whether or not you had been hollering at Linda?
A I asked her later that afternoon because I felt bad. I didn't, you know -- and she said yes. And I told her I was real -- I didn't mean to do that.
Q You -- you asked -- you told --
A Katherine.
Q -- Katherine --
A I --
Q You apologized to Katherine?
A No. I told her I was sorry I had acted like that, that she's a real Christian lady and I really didn't mean to do that. That -- that was very ugly of me.
Q Do you think that Christianity

is -- is the key to whether somebody should have to tolerate you hollering and screaming and cursing?
MR. CRUM: Object to the form. And I don't know that you can answer that question.
MS. ROBERTSON: Well, he just said that he was apologizing to Katherine Long because she was a Christian as if her Christianity had some significance. I was just wondering.
Q Did you apologize to Linda Thornton?
A No. We did not speak any more after that incident.
Q You -- but you -- you -- that didn't mean you couldn't apologize to her that day; right?
A I don't know, ma'am.
Q Huh?
A I don't know.
Q What do you mean you don't know?

I mean, she -- she was around the rest of the day; right?
A I can't recall that, ma'am.
Q Are you sure you weren't asking Ms. Long whether -- whether you were hollering to see if there were going to be any witnesses against you?
MS. SWAIN: Objection.
A No, ma'am.
Q Now, you said you took responsibility for the altercation involving Ms. Nickerson; right?
A Yes, ma'am.
Q Well, look at Plaintiff's Exhibit Number 18, which is your documentation form. I think we've already looked at that.
A Yes, ma'am.
Q Well, you see over here where you say, My super -- my supervisors tell me to take -- tell them something to do and I tell them, and if I they don't like it, they turn around and tell something on me because I told them to do their job so I get in

trouble. It doesn't sound like you're taking responsibility in that statement.

MS. SWAIN: Objection.

MR. CRUM: Object to the form. I don't know that it's a question.

A I don't know.

Q Is that right? Are you taking -- are you taking responsibility in that statement? Aren't you saying it's --

MR. CRUM: Responsibility for what?

A For what?

Q For being rude and discourteous, the things that you accepted when you were written up about Ms. Nickerson.

A Well, it don't say that they told me to be rude and discourteous, ma'am, so yes, I took responsibility for that.

Q But you were saying that -- you say -- it says, A lot of the problems I'm having with my employees is my supervisors tell me to tell them something to do. I tell them. And if they don't like it, they

turn around and tell something on me because I told them to do their job. So I get in trouble.

Now, is that your idea of taking responsibly -- responsibility for being rude and discourteous to -- to Ms. Nickerson?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

A I just explained to you, ma'am. I don't -- I knew I was wrong when I was discourteous to her. But this is something totally irrelevant to what that was about. It was other things, ma'am.

Q Well, tell me.

A No, ma'am. Do you really want to know?

Q Yeah.

A I just felt like when my supervisor told me to call -- and they'd tell me to call Bruce Cassady to the label machine and I did, the new employees would get mad because I did what they told me to do.

Q Uh-huh.

A And then they'd go dad-gum yelling and fussing because I dad-gum did what I was supposed to do. That's all I had -- that's all I was meaning about that.

Q You're talking about Jonnie Nickerson went to yelling and complaining because you were doing what you were supposed to do?

A I have no idea, ma'am.

Q Well --

A I don't know.

Q You were writing your documentation as to the incident --

A Because I was aggravated, ma'am.

Q So --

MR. CRUM: Let her finish her question.

THE WITNESS: Okay.

Q You were aggravated --

MR. CRUM: Sit up.

Q -- at whom, Jonnie?

A Myself.

Q Well, my question is: When you were asked about the incident involving yourself and Jonnie Nickerson, you say in that last statement that you tell the -- your employees to do what your supervisor tells you and it aggravates your employees and they -- the employees and they turn around and get you in trouble. Isn't that what you're saying?

A I don't know, ma'am.

Q What do you mean you don't know? Isn't that what you wrote?

A I don't know. I don't know, ma'am.

Q What -- well, tell me what you mean when you say you don't know. You don't remember? You don't have enough intellect to understand the question? What do you mean you don't know?

A I don't remember none of this. It's been so long ago I just don't remember.

Q It was in 19 -- it was in 2006, sir.

A That was two years ago, ma'am.
Q Yeah. And you don't have any memory?
MR. CRUM: Object to the form.
Q Is that right?
MR. CRUM: Let her ask you a question.
Q You're telling the jury that you have no memory of any of this because it happened so long ago, i.e. two years; is that right?
MR. CRUM: You've already asked him multiple questions about it and he's talked about. He's not telling the jury that at all. I object to the mischaracterization. Well, tell me what you meant, then, when you wrote, A lot of the problems I am having with my employees is my supervisor tells me to tell them something to do, I tell them, and if I they don't like it, they turn around and tell something on me because I told them to do their jobs so I get in

trouble.
I -- I -- you're talking about Jonnie Nickerson; right?
A No, ma'am.
Q Well, isn't that what you were told to write a documentation form on?
A I can't recall, ma'am.
Q You can't recall that that's why you were asked to write the documentation form; is that right?
A (No response.)
Q Is that right?
A I can't recall what you're asking.
Q Because your lawyer is suggesting --
A You're -- you're asking me to answer questions I can't give you answers to. I'm sorry, ma'am.
Q All right. Well, you don't -- do you remember writing that?
A I don't remember writing that.
Q Okay. Do you remember anything

about the incident?
A I don't know, ma'am.
Q No. That -- I don't know, ma'am. Do you or do you not remember anything about the incident?
A What incident, ma'am?
Q The one involving Jonnie Nickerson that led to your write-up of Plaintiff's Exhibit Number 16.
A I already told you, ma'am. We was having problems with the label machine. I asked her to pull it back. She didn't. I don't know -- I can't remember exactly what was said, but I know there was no cussing and -- I would have got wrote up for cussing. So, I mean, as far as anything else, I don't know, ma'am. I don't recall anything --
Q That's all you --
A I mean, there's nothing else to it besides that.
Q You've exhausted your memory on that? Was there something about this

incident that was different from disagreements you've had with other employments as a team leader?
A I don't know. I don't recall.
Q So why, then, did you accept Plaintiff's Exhibit Number 16 as accepted it?
A I don't know.
Q Did you ever complain that Linda Thornton was telling people that you were a child molester?
MR. CRUM: Object to the form.
A Yes, ma'am.
Q All right. And to whom did you complain about that?
A Chris Jordan and Melvin Hutchins.
Q Okay. Now, what was your complaint about that?
A Because it shouldn't be -- that ain't nothing for her to go around telling people at work.
Q And -- and why is that?
A Why should she? That don't have

# FREEDOM COURT REPORTING

--

Q Why shouldn't she?

A They -- that don't have nothing to do with work.

Q Do you know what was -- in what context she was talking about it?

A No, I do not.

Q And how did you come to learn that she was telling it?

A I had about five or six people come and tell me that.

Q Do you know that she learned it -- one of the places she learned it was from your uncle, Bruce Cassady?

MS. SWAIN: Objection.

Q No, you don't know that?

MR. CRUM: You just have to answer what you know.

A No, I do not.

Q Well, do you know where she learned it?

A No.

Q Do you know that it has to be

public -- a public announcement? It's a public knowledge.

MR. CRUM: Object to the form.

A I guess.

Q That the -- that the public safety department requires all sex offenders to register?

MR. CRUM: Object to the form.

A Yes, ma'am.

Q And you have to -- you registered?

A Yes, ma'am.

Q And -- and how do you go about registering?

A I go to Houston County courthouse and register.

Q And did you -- did you ever mention that?

A Not to her.

Q Well, to anybody at work.

A I have -- I can't recall. I mean, if I did, it was the people that I was real close to that I had been knowing

forever. So I -- I can't remember exactly who I -- not many people because that's nothing to brag about.

Q Yeah. Well, did you ever mention to her or anybody else that you had spent time in prison?

A No, ma'am.

Q Have you ever talked about that to anybody at work since Linda left?

A No, ma'am.

Q Have you ever had conversations with temp employees in -- on smoke break when they said they had been incarcerated? Did you ever tell them you, too, had been incarcerated?

A Not that I can recall.

Q Well, is it that you did not have that conversation or that you don't recall it?

MS. SWAIN: Objection.

A I don't remember ever having that conversation.

Q And if Jonnie Nickerson says that

you did, is she mistaken or is she lying?

MS. SWAIN: Objection.

A I don't know, ma'am.

Q So you're saying that you never had any conversations about serving time in prison with close -- not -- not co-workers that were close. These were temp workers.

A No.

MR. CRUM: Object to the form.

A Not that I remember.

Q When you -- did you have to get off work to go register as a sex offender?

A I can't remember, ma'am.

Q Well, what were your hours?

A Whenever they needed me to come in until whenever I left. I mean, it usually --

Q I'm talking -- okay. But --

A Usually it's 4:30 to whenever my assignment was up.

Q Well, what was the usual situation?

A I didn't have a usual situation.

I mean, I'm serious. I don't really -- I mean, it's --
Q Well --
A I could get off at two. I could get off at four. I could get off at 5:30. Whenever my job was done that they needed me to do that day.
Q Do you ever recall having to take off work to register as a sex offender?
A I don't remember. I don't remember.
Q Do you ever recall having to ask a supervisor could you leave because you had to go register as a sex offender?
A I don't remember, ma'am.
Q If -- why do you think the state of Alabama makes you register as a sex offender?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I don't know, ma'am. I guess because they want to know where you live and work.

Q They being?
A The state of Alabama and the people that live in it.
Q Okay. They want them to know where you live and where you work; right?
MS. SWAIN: Objection.
Q The state of Alabama; right?
MS. SWAIN: Objection.
A Right, the state of Alabama.
Q So if the state of Alabama wants it and they want the public to know it, what's wrong with Linda Thornton talking about it?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A What's wrong with it?
Q Yeah.
MR. CRUM: Object to the form. If he has a question.
MS. ROBERTSON: Huh?
MR. CRUM: You can answer.
A Well, I think if you dad-gum -- you don't want your criminal background

brung up to you at work either, I mean, if you ever had one, which I doubt you do since you're a lawyer.
Q No.
A But, I mean, you wouldn't want somebody throwing that up in your face when you -- you're trying to just provide for your family. That's all I'm trying to do. I'm not trying to do nothing else, ma'am.
Q Well, you provide for some of your family but not all of them. You don't provide for one of your daughters; right?
MR. CRUM: Object to the form of the question.
MS. SWAIN: Objection.
MR. CRUM: Don't answer that.
THE WITNESS: I'm not.
MR. CRUM: That's not a question.
MS. ROBERTSON: Sure, it's a question.
MR. CRUM: Well, it's not a proper question.
BY MS. ROBERTSON:

Q You don't provide for all of your family, do you?
MS. SWAIN: Objection.
MR. CRUM: He's already said he doesn't know if that's his daughter so it's an improper question.
MS. ROBERTSON: Thank you.
MR. CRUM: You're welcome.
MS. ROBERTSON: I think the jury will be impressed that you can articulate things to try to cover up for your client who is Prince Charming and Mother Teresa rolled into one.
BY MS. ROBERTSON:
Q Did you know that Linda Thornton had complained about your behavior toward her to Melvin Hutchins?
A No, ma'am, I did not.
Q Nobody ever mentioned that to you?
A No, ma'am.
Q Did anybody ever mention to you that -- that she had complained that you

were also threatening behind her saying you were a sex offender?
A No, ma'am.
Q So nobody ever investigated that with you?
A No, ma'am.
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I never heard that.
Q Okay. So nobody -- Mr. Nance didn't call you into his office and ask you if you were making threats to -- about Linda?
A I don't remember, ma'am.
Q Do you -- nobody ever asked you were you telling people that you were going to fuck her up if she -- if you lost your job behind her telling people that you were a sex offender?
A I don't remember that, ma'am.
Q Now, these close people that you may have mentioned that you were a sex offender, one of them would have been Bruce

Cassady; right?
A No, ma'am. I don't -- I hardly ever spoke to Bruce Cassady except for when he ran the label machine.
Q So he didn't know you were a sex offender?
A I don't know, ma'am.
Q What about Butch?
A I don't know, ma'am.
Q You don't know whether he knew you were a sex offender?
A I don't know.
Q Do you think that -- that you were the only person in the plant that knew you were a sex offender?
A I don't know.
Q Did -- did you ever ask or did you ever learn how Linda Thornton knew that you were a sex offender?
A No, ma'am, I did not.
MS. ROBERTSON: Let's take a five-minute break.
MR. CRUM: We're off at 5:20.

(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We're back on. The time is 5:42 p.m.
BY MS. ROBERTSON:
Q Who's paying your lawyer, Mr. Williams?
A Flavor House.
Q Did you select him or did Flavor House select him?
A Flavor House selected him.
Q Why did you leave Flavor House?
A I resigned.
Q Under suggestion by Flavor House?
A Yes, ma'am.
Q All right. And tell me how that came about, please, sir.
A They said I -- I got -- I could either resign or I would be terminated for lying to their lawyers.
Q Lying about what?
A I have no idea, but that's what they told me. That's what I accepted.
Q You mean they told you that you

were being fired for lying to the lawyers but you don't know what you supposedly lied about?
A I can't remember.
Q You can't remember what you lied to the lawyers about or you can't remember what -- if they told you that you -- that you were being asked to resign because you lied to the lawyers or what is it you can't remember?
A All I know, ma'am, is that they told me I could resign or they would terminate me. And the reason was because I lied to the lawyers. And I said I resign.
Q Did you ask them what you supposedly lied about?
A No, ma'am.
Q Had you talked to their lawyers before?
A About -- I think it was a week before.
Q Okay. Was that at or about the time Flavor House was served with Linda's

# FREEDOM COURT REPORTING

157

lawsuit?
A I don't know, ma'am. I don't know if they were served with it, but I was.
Q You had been served with it?
A Yes, ma'am.
Q And they -- and the lawyers called you in to talk to you about the lawsuit?
A They called me in to ask me about what had happened, yes, ma'am.
Q And did they ask you if you had any felony convictions?
A Yes, ma'am.
Q And what did you tell them?
A Yes, ma'am.
Q And then what did -- anything else?
A No, ma'am.
Q So what was it that you lied to them about?
MS. SWAIN: Objection.
A I don't know, ma'am.
Q You didn't ask?

158

A No, ma'am.
Q Well, what else did you talk to them about the week before?
A I can't recall, ma'am.
Q Did you give them the specifics concerning your felony convictions?
A I can't recall, ma'am.
Q Did you tell them you had been convicted of forgery?
A I can't recall, ma'am.
Q You weren't concerned that you were told that you were going to be fired if you didn't resign because you lied to some lawyers?
MR. CRUM: Object to the form.
A I don't know. I don't understand the question, ma'am.
Q I mean, you know, me, personally, about the worst thing you can say to me is that I've lied because I don't lie. And I sure would want to know what it was that I had lied about before I would go quietly into the night of a -- for a job. You did

159

not ask them what lie you supposedly told?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I don't recall. I don't recall, ma'am.
Q Was that some -- that was just an everyday event, losing your job?
MR. CRUM: Objection the form.
MS. SWAIN: Objection.
Q Is that right?
MR. CRUM: Let her ask you a question.
Q Well, I mean, what -- what -- what is it that -- that is so insignificant about that day that you don't recall it?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I don't know.
Q You don't know? I mean, was it -- was it insignificant?
A I don't recall.
MR. CRUM: Hold on just a second, please. Can I just take a second?

160

MS. ROBERTSON: Yeah. Assert the attorney/client privilege, then I really will have a condemnation argument.
MR. CRUM: Just hold on.
MS. SWAIN: You don't have any idea what we're talking about. And we asked for a moment if we could.
MS. ROBERTSON: Take a break and maybe you can go talk to your client about his memory, please.
MR. CRUM: Let's not take a full-fledged break that turns into a really long one.
MS. ROBERTSON: A five minute. I'll sit here. I won't move.
MS. SWAIN: Okay.
MS. ROBERTSON: But, I mean, this is ridiculous. I don't remember, I don't remember.
THE VIDEOGRAPHER: Off, 5:47.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We're back on at 5:49.

161

BY MS. ROBERTSON:
Q You got served with a lawsuit; correct?
A Yes, ma'am. It was in my post office box.
Q Okay. And -- and --
A Or our post office box.
Q And what did you do when you got served with the lawsuit in terms of vis-a-vis the company? Did you tell anybody?
A No. I just read it. And about a day later, they -- they called me and asked me did I get served with payers and I said yes.
Q They being who, Flavor House?
A Yes, ma'am.
Q And -- and -- and what person?
A Mary Ann Boyer.
Q Okay. And -- and you told her yes. And then what did she say?
A She just asked me did I read it and I said yes. She said that I needed --

162

that their lawyers were going to come down and talk to me. That's as far as it went.
Q Is that when you were told that they were going to provide you with a lawyer?
A No, ma'am.
Q When were you told they were going to give you a lawyer, before or after you were told that you were fired because you lied?
A When they asked --
MS. SWAIN: Objection.
A When they asked me to resign or I would be terminated, they said, you know, my resignation would come with the providal of a lawyer.
Q Okay. So they said, You lied to our lawyers, we're going to fire you if you don't resign, and oh, by the way, you're -- we're going to provide you with a lawyer that would cost thousands of dollars otherwise. Is that right?
MS. SWAIN: Objection.

163

MR. CRUM: Object to the form. Just tell her what you remember.
A Yes, ma'am.
Q All right. Tell me, when the lawyers came down to speak with you about the lawsuit, do you remember the names of the people that came?
A No, ma'am.
Q Do you remember how many there were?
A Not really, ma'am. No. No, ma'am.
Q How long did the meeting last?
A I don't recall that.
Q Did it last an hour? Did it last ten minutes? Did it last two hours, like we've been here so far? Did it last -- did it last a week and a half?
A I don't recall, ma'am.
MS. SWAIN: Objection.
Q Do -- do you recall whether or not you recalled anything that they -- when they asked you questions, did you recall any

164

information that you could tell them?
MR. CRUM: Object to the form.
Q I mean, like here today, you're having almost trouble remembering your name. Did you have trouble when you talked to their lawyers about what they asked you?
MS. SWAIN: Objection.
MR. CRUM: I object to -- you know, try not to harass him, if you can.
A I don't recall.
Q Huh?
A I don't recall, ma'am.
Q All right. So tell me what you do remember about the conversation between you and the Flavor House lawyers.
A They called me up there and asked me about the situation.
Q What situation?
A Between what happened with me and Linda Thornton. And I can't remember anything else. If there was anything else, I just -- I -- I don't let that -- let it -- I just don't even remember that stuff. I --

165

Q Have you ever been sued before?
A Not that I know of. I --
Q Well, Ronnie sued you for divorce.
A Okay. Well, I guess so.
Q Anybody -- anybody sue you for child support?
A I don't remember getting sued for child support.
Q Did you filed bankruptcy?
A Yes, ma'am.
Q Why did you file bankruptcy?
A I -- I don't remember.
Q Just had some free time one day?
A I don't remember.
Q Was it because you had some lawsuits pending against you for debts?
A I don't remember, ma'am.
Q You don't remember why you filed bankruptcy?
A There had to be a reason, ma'am.
Q Yeah. But you don't remember what it was?

166

A Not really.
Q Well, did anybody suggest you should file bankruptcy about this?
A No, ma'am.
Q Well, it got you out of those other debts. I was just wondering.
MR. CRUM: Object to the form.
Q So you said they asked you about the situation involving Linda. What situation?
A What expired on that day, you know, what happened between me and her on that day that I recall.
Q What day?
A Whenever she claimed I dad-gum harassed or anything, whatever.
Q Was it your understanding that you -- that her allegations only involved one day?
A That's all. I didn't know nothing else.
Q Had you ever been talked to about an EEOC charge?

167

A No, ma'am.
Q Nobody talked to you about an EEOC charge that Flavor House had received concerning Linda Thornton's complaints?
A I don't recall any of that, ma'am.
MR. CRUM: Sit up.
Q So the -- yeah, it might help your memory. So the first time you ever heard that Linda Thornton were making allegations about discrimination and sexual harassment and retaliation against her was when you got the lawsuit?
MS. SWAIN: Objection.
Q Is that right?
MR. CRUM: Object to the form.
A I don't remember when is the first time I heard about it. I guess that's the only time I've known anything about it is when I seen the lawsuit.
Q Well, what -- so they asked you about the situation involving Linda. That is what happened the -- the day that she

168

left; is that right?
A I don't remember, ma'am.
MS. SWAIN: Objection.
MR. CRUM: Yeah. Object to the form.
Q Well, you remembered that 10 seconds ago. I'm talking about you said you remembered them asking you about the situation that happened that day. Is that the day you're talking about in June?
A I don't remember which day you're talking about, ma'am.
Q You don't remember what day you talked to their lawyers about?
A No, ma'am.
Q Okay. Did they -- and they asked you had you been convicted of a felony?
A Yes, ma'am.
Q And -- and you told them yes, five?
A Yes, ma'am.
Q And it was actually six, forgery and the five rapes and/or sodomies; right?

# FREEDOM COURT REPORTING

A Okay.
MR. CRUM: Don't just -- you need to answer what you know.
A Yes, ma'am. I dad-gum -- I told them I was convicted of two counts -- three counts of rape two, two counts of sodomy one. That's the only thing I've ever dad-gum told anybody. I ain't never thought nothing about the forgery charge. It never even crossed my mind.
Q Why is that?
A I don't know. Because it happened like --
Q Because you didn't have to go to prison for that?
MR. CRUM: Object to the form.
A I don't know. I don't know, ma'am.
Q So you didn't think it was significant that you had stolen a -- a man's money that he had to use to support himself; right?
MS. SWAIN: Objection.

A No. I didn't think that was funny, ma'am.
Q Huh?
A That was wrong, ma'am.
Q But you just forgot about it?
A I forgot the trouble I was in.
Q Anything else that you remember the lawyers asking you about?
A No, ma'am.
Q Did the lawyers suggest that they might not keep you around because of these five felonies that you had confessed -- that you told them that you had done?
A I don't remember, ma'am.
Q Did they ask you about your application and how you had only mentioned about one felony?
A I don't remember, ma'am.
Q All right. So what did -- what did they tell you at the end of that conversation?
A I could go back to work. That's it. I went back to work.

Q And were you still a -- a supervisor at the time or had that temporary position run out?
A No. At the time, I was a temporary supervisor for gift pack.
Q So after you were served with the lawsuit and after you went up there and told them you had been convicted of five counts of rape and/or sodomy, they sent you back to work as a team leader; is that right?
A As a temp supervisor over gift pack.
Q Excuse me. As a temporary supervisor --
A I'm sorry. I'm sorry.
Q So they -- they didn't demote you or anything because of these rapes you had been convicted of?
MS. SWAIN: Objection.
MR. CRUM: Object to the form.
A No, ma'am.
Q Did you receive any sexual harassment training at Flavor House?

A I don't recall, ma'am.
MS. ROBERTSON: We're going to take a five-minute break. And please have a conversation with your client about his lack of memory.
MR. CRUM: He can't remember except what he remembers. I mean --
THE VIDEOGRAPHER: Off at 5:58.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. We're back on at 6:11:56.
BY MS. ROBERTSON:
Q I was asking you before the break if you had had any sexual harassment training from Flavor House.
A I don't recall, ma'am.
Q Have you had any sexual harassment training anywhere or anti-sexual harassment training?
A I can't remember, ma'am, if I have.
Q Before you were made a team leader, do you have to have any courses on

supervision at Flavor House?
A Not that I'm aware of, ma'am.
Q Before you were made a temporary supervisor, did you have to have any training on how to be a supervisor?
A Not that I'm aware of, ma'am.
Q What do you mean not that you're aware of? Who else would be aware of it, sir?
A I don't remember any kind of courses like that.
(Plaintiff's Exhibit Number 19 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q I'm going to show you your interrogatories.
MS. ROBERTSON: Number?
THE COURT REPORTER: 19.
Q And look at page 3 of your interrogatories where I've asked about your -- every employer that you had ever had.

A Okay.
Q Do you see the second paragraph where it says name your employees -- employers? This is dark print.
A That?
Q Right there.
A I see that.
Q All right. Read the last line or two of that paragraph out loud, please, and read it slow so the court reporter can write it down.
A Which one, now, from here or -- I'm just making sure you -- where are you talking about?
Q Starting with my last general supervisors.
A My last general supervisors during my employment there was Chris Jordan, Melvin Hutchins, Sammy Stewart, Eugene Andrews, Ricky Smothers. I continued there for six years, 11 months until the plaintiff's false, untrue, or slanderous allegations against me resulted in my

termination.
Q What did you mean by that?
A Because all I -- all I can recall that I did to her was maybe cuss her, but that's as far as I know I did. Anything else was -- was wrong. That's all I was saying on that.
Q Well, I mean, you were told you were being fired for lying to the lawyers, right, not for what Linda Thornton said; correct?
A Yes.
Q All right. Well -- so how did -- how did her allegations lead to your employment -- your termination?
A I don't know, ma'am. I'm just telling you that's -- they told me that's what I got terminated for.
Q For lying?
A Yes.
Q Okay. So, again, if it was lying that got you fired, how did Linda's allegations have anything to do with that?

A I don't know, ma'am.
Q Tell me when you first worked with Linda Thornton.
A I don't remember that, ma'am. I -- I don't really recall when I first worked with her.
Q Did you work with her more than once? And I don't mean like two days. I'm talking about did you work with her on a machine or a line and then work with her later on?
A If I did, it had to have been when I might have trained her or something, but I really can't recall when. But I -- I might have trained her on the label machine, but that's the only thing that I might have worked with her at.
Q So you don't have any memory at all of working with her the first time?
MR. CRUM: Object to the form.
Q Or -- or I'm -- am I wrong? I'm just -- I just want to make sure I understand.

A Okay. Want me to try to make you understand?

Q Yeah.

A I trained a lot of people and, you know, I really doesn't remember, you know, how long I trained them or what I did, you know, how long. It just -- I trained them and then they went back to their position. I don't even remember if I did train her or what. I might of have, but I really can't remember if -- you know, when and --

Q All right. So assuming that you did work with her earlier than this 2005-2006 time period, you have no memory of it. Is that an accurate statement?

A Not of working --

Q No memory of any of it?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

A Not of working with her.

Q Huh?

THE COURT REPORTER: What was your answer?

THE WITNESS: Not of working with her.

Q Okay. So anything Linda Thornton says that happened, you would have no way of refuting; is that correct?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

A I don't even know what the question is, ma'am.

Q Would you have any way of -- of proving her wrong if you have no memory at all of working with her the first time?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

A I said I don't remember. I don't know if I did nor not so if you say --

Q Well, I'm saying if she said that -- that -- that you told her that you were married to a 9-foot cactus, you wouldn't have any reason to doubt that because you can't remember whether you even worked with her; is that right?

MS. SWAIN: Objection.

MR. CRUM: Object to the form. And I think if there's specific instances of him saying -- her saying he was married to a nine-foot cactus, then those need to be presented so he can try to repeat that and refresh his memory.

MS. ROBERTSON: Well -- so you want me to go through every allegation she's made and refresh his memory, although I just want to make sure that if he doesn't remember it, he doesn't remember it.

MR. CRUM: No, ma'am. I'm not saying you need to go through every allegation that she's --

MS. ROBERTSON: Because I'll do it and we'll be here until --

MR. CRUM: And I don't mind what you do. My point is that I think you're mischaracterizing what he's trying to say.

BY MS. ROBERTSON:

Q Well, I want to know do you ever recall working with Linda Thornton?

A I might of have. That's what I was trying to tell you. I might of have. But I don't set store to who I train. All I do is train them and then they go back to their line. I couldn't tell you if I -- when I trained her, how long I trained her. I really can't recall what, you know --

Q Can you recall any kind of -- your relationship with her?

A There was no relationship. I trained her. That's it.

Q I mean, whether y'all were good friends, good buddies, hated each other.

A I spoke -- I spoke to everybody out there. I didn't have not one enemy. And I didn't have no friends. They was all associates. I spoke to everybody just like I'd speak to you right now, just speaking. All I had was two friends out of that whole plant that I would trust. That's --

MR. CRUM: Let her ask you a

FREEDOM COURT REPORTING

181

question.
Q Who was that?
A That was Stephanie Lamply.
Q Did Steph --
MR. CRUM: That's all right. Just let her ask you a question.
Q Okay. And who else?
A Mary Brooks.
Q Did Mary Brooks know about your rape and sodomy convictions?
A I don't know.
Q I mean, did you ever tell her?
A I -- I can't recall if I did or not. But I've known her for dad-gum nine year, so I don't really, really know.
Q Did you know her immediately -- did you know her while you were in prison?
A No.
Q What about Stephanie Lamply, did you know her while you were in prison?
A No.
Q Are you and Candace having marital problems?

182

A No, ma'am.
Q So is she building a house?
A We built a house.
Q Okay. And -- are you living together now?
A Yes, ma'am.
Q All right. And are y'all going to move into that house together?
A We're already moved into that house.
Q Okay. Well, all right. So you trusted Stephanie and you trusted Mary Brooks out of everybody at the plant; is that right?
A That's who I -- that's who I knew.
Q All right. Can you tell me did you have any other -- any other buddies?
A Not really, no, ma'am. I spoke to everybody, but that's as far as I do.
Q Did you ever refer to my client, Linda Thornton, as a bitch?
A Yes, ma'am.

183

Q When?
A That day that happened.
Q That day what happened?
A The argument between me and her about the label machine.
Q Did you call her a bitch?
A I don't know if I just called her a bitch or I just said, I ain't got time to do this shit, bitch. Now -- you know, and I probably did say that. That's what I said. And I admit I said that and I was wrong.
Q Did you ever refer to my client as a bitch and Jonnie Nickerson call you on it?
MR. CRUM: Object to the form.
A I don't understand the question.
Q Well, after my client had left, did you ever say something about crazy bitch and Jonnie Nickerson saying, Are you talking about me?
A Not that I recall, ma'am.
Q And she -- and she said you said, No, I'm talking about that crazy bitch,

184

Linda Thornton?
A Not that I recall, ma'am.
Q Did you tell Tommy Nance that you had referred to my client as a -- a bitch?
A I don't remember if I did or not, ma'am. I really don't.
Q What was your reason for calling her a bitch?
A Could you specifically ask like what event happened or something like that, ma'am, like in a question?
Q Yeah. I mean, why did you call her a bitch? I don't think -- you didn't consider her a female dog, I take it?
A No, ma'am.
Q Well, why were you calling her a bitch, then?
A I was just aggravated at the time. I was walking off and it aggravated me and I walked off. I called her that and I walked off.
Q Did you ever call a man to his face out there a son of a bitch?

# FREEDOM COURT REPORTING

185

A No.
Q A bastard?
A Not that I recall.
Q So why did you elect to call -- to tell Linda Thornton -- call her a bitch when you got aggravated with her?
MS. SWAIN: Objection. He's answered that question.
A Because I was aggravated. And I was wrong for what I did.
Q Is that how you refer to women that aggravate you?
MR. CRUM: Object to the form.
A No, ma'am.
Q Why -- why Linda, then?
A I don't know, ma'am. I just -- it just happened.
Q Were you ever trained on how to train someone?
A No, ma'am.
Q When did you first start training people?
A Probably about -- I'm going to

186

say about three years after I run the label machine on line three.
Q When you worked with Linda on line three, when you first started working with her, was -- did she have an old or a new label machine?
A Can you refer back to what -- are you talking about maybe when I trained her the first time?
Q No. I'm talking about when -- the second time --
A Oh, yes. It was --
Q Because we don't know whether you worked with her --
A Okay.
Q -- the first time.
A It was an old machine --
Q Okay.
A -- when she first stared.
Q Was it the oldest or raggediest machine, as we say?
A At the time, yes, ma'am, it was the oldest machine out there, oldest label

187

machine out there.
Q Did that change at some point?
A Sometimes within, like, two to three months or something like that or maybe it was -- I don't know exactly how long it was, but they did put a new machine there.
Q Now, did line five have a new machine?
A It was about a year old, maybe.
Q Okay. Are you sure about that?
A Not exactly sure, but it was about a year old. It might have been a little bit more. Not much more.
Q Was -- was it replaced soon after Linda left or at some point after Linda left?
A No, ma'am. It's still out there now, as far as I know.
Q The label machine on five is?
A As far as I know, it still is. I really don't know.
Q Did -- did -- were there problems with the machine on line three because it

188

was raggedy?
A The old one?
Q Yeah.
A Well, there was a -- all I can answer is me and Bruce Cassady didn't have as many problems as everybody else, and that was because I ran that machine for three years and Bruce was just good at the label machines. But everybody else had a lot of problems with it. It wasn't just certain people. I mean everybody had a lot of problems with it.
Q Everybody being whom?
A Whoever came over there to train, whoever came over there, you know, at like night shift. They -- whoever. They just had problems with it.
Q Well, I mean, do you -- other than Linda, do you remember anybody else who worked with the machine that had trouble with it?
MR. CRUM: Object to the form.
A I'm trying to think of his name,

Jody something. That was when he first started. Butch Cassady had problems with it, but that was when I had first started.
Q When you first started working there?
A Yeah, that was when I first started working there.
Q So was it old when you first started working there?
A I don't know how old it was when I first started working there. I really don't know how long it had been there, but, I mean, those machines, they just ran pretty bad but --
Q Tell me what -- what you mean by ran badly or there -- the people had trouble with it.
A I mean, I can't explain how to -- there was just certain little things you had to turn, figure out what to turn, or how to adjust the height of the belt to make it run. I mean, there was just certain tedious things that you had to wait and figure out

what to do with them before it would actually run. And most of the newer machines, they're not that bad to run. I mean, they don't break down as much.
Q Well, did you and Linda ever have any discussions with Melvin and/or Chris Jordan about the machines breaking down or her stopping the machine?
A I don't -- I didn't. I know I don't ever remember having any conversation like that.
Q Do you ever have -- remember having any conversations with Melvin and Chris and -- and Linda concerning dispute resolution?
MR. CRUM: Object to the form.
A Can you explain what you mean by that? I'm sorry. I'm trying to understand what your -- what the question is.
Q I -- I -- I agree with you. I suspect nobody uses the words dispute resolution.
A I don't know.

Q Do you have any recollection of there being a meeting with you and Chris Jordan and Linda Thornton where it was discussed that y'all needed to get along better and not fuss and fight when you ran the machine?
A I don't remember that. That don't mean it wasn't -- didn't happen, but I don't remember nothing like that happening.
Q Do you ever remember having an -- an altercation or a situation where you were hollering at Linda because you told her to -- that she was off the rails or something?
A Not that I can recall.
Q What does that mean --
A Now, I don't remember. The rails are what the cans runs on. I mean, if I told her the -- the cans were off the rail, I would say, Look, the cans are off the rail. You need to move the cans over -- move the rails over or something. There's no reason to holler about something like that because that's easy, something easy to

fix.
Q Well, tell me what was the reason you were hollering at her and cursing her that resulted in you calling her a bitch and you getting written up for using profanity.
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I -- I -- she had went to break. I came -- I was running errands for my supervisor. She had asked me to go to break and I was trying to let another employee let her go to break because I was busy. She insisted I do it, so I came in there. She was having problems with the machine and when I went in there, I was still having problems with the machine. By the time she got back, I had got the machine working, but there was a lot of rework where there was a lot of bad labels on it. And there was a -- some kind of inspection going on, and Chris Jordan, my supervisor, had told me to get stuff -- certain stuff up and I had to go do that. And she came back and she was upset

# FREEDOM COURT REPORTING

193

at me because there was a lot of cans, a lot of stuff, and I -- you know, I couldn't do it. And that escalated into her dad-gum -- her raising her voice at me and then me raising my voice, you know, back and then, you know, I -- I just finally walked off and said, I just can't do your work, bitch, I mean --
Q You didn't say fuck it?
A No.
Q Did you use the word "fuck" during your so-called altercation?
A No, ma'am.
Q Okay. You believed that Katherine Long is a good Christian woman; right?
A Yes, ma'am.
Q I'll show you what's been marked as Plaintiff's Exhibit Number 5. Will you read that.
MS. ROBERTSON: Have you seen that?
Q Do you see where Katherine Long

194

said she heard you use the F word during that altercation?
A Yes, ma'am.
Q So would you like to reconsider your testimony that you didn't use the F word?
A No, ma'am. I don't remember using the F word. That don't mean -- you know, I don't remember using the F word.
Q I will show you what's been marked as Plaintiff's Exhibit Number 6. Do you know Tamekia Cook?
A Yes, ma'am.
Q Who is Tamekia Cook?
A She works on line three.
Q Do you know of any reason that she would lie about the incident involving you and Linda?
A No, ma'am.
Q All right. Well, did -- did she say that you used the F word?
A Yes, ma'am.
Q Okay. Does that refresh your

195

memory that you used the F word?
A No, ma'am. I don't remember saying the F word. I -- I -- I know what I called her and if I said the F word, I don't remember saying the F word.
Q Well, other than calling her a bitch, what else do you recall that was profanity?
A There was nothing else. That's all I remember saying.
Q Is that what you told Tommy Nance?
A I don't remember what I told Tommy Nance, ma'am.
Q Well, you think you might have remembered more that day than you do now?
A I don't know, ma'am.
Q Well, you -- you wouldn't have told him -- would you have told him something other than the truth?
A I told him the truth. There was no reason to lie.
Q All right. And -- and -- then

196

the truth as you knew it was that you called her a bitch but you don't remember anything else?
MS. SWAIN: Objection.
MR. CRUM: Object to the form.
A I don't remember dad-gum calling her nothing else.
Q Or saying or doing anything else?
A I walked off.
Q Threatening, intimidating, whatever those words were, coercive?
A No, ma'am. No, ma'am.
Q Do you recall ever having any conversations with Melvin and Chris and Linda Thornton concerning y'all's relationship, if you will?
A No, ma'am.
Q And I'm -- I'm not suggesting -- I'm -- I'm talking about any kind of relationship. I'm not talking about like romantic. I'm talking about friends, co-workers, you know, supervisors. I'm talking that kind of relationship. I'm not

FREEDOM COURT REPORTING

suggesting that there was a --
A No, ma'am.
Q You never remember having any conversation?
A No, ma'am.
Q Why did y'all have -- did -- did y'all have to carry walkie-talkies?
A Yes, ma'am, team leader and supervisors.
Q All right. And what were the walkie-talkies for?
A I guess so they could keep up with where you are if they had a problem on the line.
Q Who keep up with you?
A All the supervisors and know where everybody is.
Q Did -- did you ever get counseled or corrected for not having your walkie-talkie?
A Yes, ma'am.
Q How many times?
A Quite a few.

Q And why -- why were you not -- didn't have your walkie-talkie?
A Because I was cooking at the time and I was around hot oil and, you know, it was real bulky and I couldn't reach into where the oil was. You know, I was afraid it might fall in there and might bust and -- I counseled, though, for it and I did start wearing it.
Q Is that the reason you gave was you didn't want it around hot oil?
A No. I just didn't want it where it was going to fall off me and bust and all that. That's what I told them. I --
(Plaintiff's Exhibit Number 20 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q I want to show you what's been marked as Plaintiff's Exhibit --
MS. ROBERTSON: What number?
THE COURT REPORTER: 20.
Q -- 20. Do you recall that --

A Yes, ma'am.
Q -- incident?
A Yes, ma'am.
Q Well, you didn't tell them you didn't have your radio because of the hot oil, did you?
A No. Because I told them like it was. The first thing in the morning you can have a radio -- well, I couldn't because it was locked up in the production office. But you were talking about all day long. I mean, I used to didn't have it on all day long. That's what I thought you were talking about, ma'am. So, yes, ma'am, I was wrote up for that and I started keeping it on.
Q So this was -- this was a write-up that you forgot about; right?
A I don't even know if that's a write-up or what because they -- I didn't sign it or nothing. I didn't know if that went in my jacket or what. There was a lot of them.

(Plaintiff's Exhibit Number 21 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q What is that, please, sir?
A I have to read it, ma'am.
Q Plaintiff's Exhibit Number 21.
A They was just telling me what I needed to work on.
Q Okay. And you got the write-up for not having your radio on October of 2006; right?
A Yes, ma'am.
Q Do you know if you had any write-ups in between this one and this one?
MR. CRUM: I just object to the form. I don't know that that's a write-up.
THE WITNESS: I don't know.
MS. SWAIN: Yeah, same objection to the characterization.
A Because I don't think that's a write-up. That -- that -- they was just

letting me know what I needed to work on, ma'am.
Q All right. Well --
A That's not really a write-up.
Q Well, Plaintiff's Number 21 says, I need you to wear a radio every day. At least once you were told that -- after that you were not -- didn't have your radio; correct?
A I don't understand. Is this a different date?
Q Well --
A That's what I'm saying, ma'am.
Q Yeah. This -- this predated -- Plaintiff's Exhibit Number 21 is dated December of 2005.
A Okay.
Q Plaintiff's Exhibit Number 20 is dated October of 2006. You were told in 2005 you needed to have your radio on every day; right?
A Yes, ma'am.
Q So when -- on Plaintiff's Exhibit

Number 20 when you didn't have your radio on, you were being insubordinate; correct?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I don't feel like I was, ma'am.
Q Well, your supervisor told you to do something and you didn't; right? What do you consider that?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A All I consider is that I couldn't get to the radio because it was not where I could get it that morning.
Q Was that a -- a situation that occurred all the time?
A Every morning, ma'am.
Q So you ignored them every morning? Is that what you did?
MR. CRUM: Object to the form. That's not what he said.
MS. SWAIN: Objection.
MS. ROBERTSON: Well, I'm just trying to find out.

A I didn't ignore them, ma'am. I was the first one in every morning. There was nobody else in to let me in and by the time everybody else got in, I was already on the line working and I couldn't just leave the line to go get a radio. That's what I'm trying to say. I -- I couldn't just leave my line running while I was running the filler or running the cook. I mean, I couldn't just leave to go get a radio.
Q I thought you were -- I mean, what -- what job did you have as team leader?
A Whatever is called upon me. I mean, if I have to run the label machine, I have to run the label machine. If I have to run the filler, I have to run the filler. If somebody calls out, I have to do their job. If somebody goes somewhere for the day, I have to do their job. Whatever needs to be done to keep the line running, that was my job.
Q Were you ever corrected for --

for not letting the other people do the work and do --
A Yes, ma'am.
Q -- trying to do it yourself?
A Yes, ma'am.
Q Okay. And -- and what -- what brought that on?
A Because I was trying to make sure the line ran and I -- I worked -- I went in there and helped them out and done the job, you know, instead of actually just letting them learn it.
Q Were you ever corrected for not making sure other people were doing their job?
MR. CRUM: Object to the form.
A I guess they was for not cleaning or not running the label machine like they're supposed to or not running the -- I -- I really probably -- and I don't think I was wrote up. I was probably talked to about it but not wrote up.
(Plaintiff's Exhibit Number

22 was marked for identification
and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number --
A That one right there.
Q -- 22. You were corrected for not making sure Mary Brooks, your best buddy, was doing her job; right?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
Q Well, you -- you just told me that you only had two people out there that you trusted and one of them was Mary Brooks; correct? Correct?
A As far as I know, she was doing her job, ma'am, and I --
Q Well --
A And I explained that to him, too, ma'am.
Q -- I didn't ask you that. But you were written up or a memo was put in your file --
A Yes.

Q -- because you were not seeing that Mary Brooks was doing her job; right?
A Yes, ma'am.
(Plaintiff's Exhibit Number
23 was marked for identification
and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 3 (sic), what is this, please, sir?
MR. CRUM: Just read it. And I -- you know, I don't know. He may or may not have seen some of these things before. I --
MS. ROBERTSON: Well, thank you for coaching him on that. I appreciate it. You're earning your money that Flavor House is paying you.
MR. CRUM: As much as I appreciate that, when you characterize it as write-ups and things --
MS. ROBERTSON: Well, there was a write-up discussion --
MR. CRUM: Let him read it.

MS. ROBERTSON: Whatever because apparently you've gotten by with unshirted murder out there.
MR. CRUM: Don't answer anything. Object to the question.
MS. SWAIN: That's not appropriate.
MS. ROBERTSON: Well, what he did was not appropriate either. I was just responding to it.
BY MS. ROBERTSON:
Q Were you corrected again for not having your telephone -- I mean your radio?
A Apparently so, ma'am. I can't remember that but --
Q All right. Now, that was after Plaintiff's Exhibit Number 21; right?
A Yes, ma'am.
Q But before Plaintiff's Exhibit Number 20; right?
A Yes, ma'am. Apparently so.
Q And you told them in August of 2006 that you didn't have the -- your radio

because you were on the label machine. What does that mean?
A That means I was running the label machine at the time when they came -- when they came in and opened the doors, I was on the machine. I couldn't just get off the line to go get it.
Q Well, had you started work without it? I thought you were supposed to get it at the beginning of the day.
MR. CRUM: What difference does it make if he had his radio or not?
MS. ROBERTSON: Because he's being insubordinate and they don't do anything to him except let him sit out there and harass Linda and then Jonnie. I don't know what it means. They're the ones who are counseling him.
Q Now, it says you walked down to line three and he asked what I was doing about capper on line three. What -- the question was not the issue. It was the expression and the carefree attitude in

# FREEDOM COURT REPORTING

209

which he asked it. Also, I asked him why he didn't have his radio on. At this point, it appeared that the issues addressed the previous day were an issue today. I asked Melvin to meet with me -- with us to bring this out in the open. When I addressed them with Frank Williams, he had excuses -- excuses and reasons for everything. I explained to Frank that whatever happened yesterday did not reflect on his work today. Again, Frank explained that I was mistaken.

Do you recall what issues had been brought forth, as they said, the day before?

MR. CRUM: Object to the form.

A No, ma'am, I do not.

Q Was -- was anything about your radio an issue?

MR. CRUM: Object to the form.

A I don't -- I don't recall, ma'am.

Q What was your concern about a capper?

A I don't remember, ma'am. I don't even remember seeing that, so I really don't

210

remember.

Q It said, Melvin then added that whenever we tried to address any issues with Frank, that Frank would show in his expressions and actions that he was never in the wrong just like he was doing now.

Did they talk to you about that, that you never took responsibility or ownership for anything that you did wrong?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

A Not that I can recall, ma'am.

Q What kind of paperwork were y'all supposed to do?

A End of the day, you put -- make sure your numbers were right, make sure your orders done, make sure all the paperwork's turned in to the people it's supposed to be turned in to.

Q On Plaintiff's 21, in December of 2005, they were reminding you to make sure your paperwork was done; right?

MR. CRUM: Object to the form.

211

A Yes, ma'am.

MR. CRUM: Sit up.

MS. ROBERTSON: 23?

(Plaintiff's Exhibit Number 24 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q I'll show you what's been marked as Plaintiff's -- Plaintiff's Exhibit Number 23 -- oh, wait. I just -- no, that was 23. Excuse me. I already marked this 24. After I showed you all what I've done marked as -- we're at Plaintiff's Exhibit 24.

Had you been asked to -- to make sure your paperwork was done and they were correcting you or conversating with you about not having your paperwork done?

A Yes, ma'am.

Q Did you have any anger management courses at -- in prison?

A Not that I can recall, ma'am.

Q Did you have any courses concerning sex offenders?

212

A Not that I can recall, ma'am.

(Plaintiff's Exhibit Number 25 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q I will show you what's been marked as Plaintiff's Exhibit Number 25. Did you know that part of your restitution was to pay the psychology bill that was incurred by Renae Lamberson?

A No.

MR. CRUM: Object to the form.

(Plaintiff's Exhibit Number 26 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q Plaintiff's Exhibit Number 6, did you -- 26, did you know that your -- part of your restitution was to pay back the psychological bill incurred by Francis Wilkerson?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

FREEDOM COURT REPORTING

213

A No, ma'am.

(Plaintiff's Exhibit Number 28 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q Did you know that part of your restitution was to pay for psychological treatment of Amber Nelson, 28?

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

THE COURT REPORTER: 27. Make this 27, the next one.

A No, ma'am.

MS. ROBERTSON: 20?

THE COURT REPORTER: Make this 27. Then we'll go to 29.

MS. ROBERTSON: Okay.

(Plaintiff's Exhibit Number 27 was marked for identification and attached to the deposition.)

MR. CRUM: Do you want him to look at that?

MS. ROBERTSON: Yeah.

214

BY MS. ROBERTSON:

Q Did you know that part of your restitution was to pay so that Amber Nelson -- who's that, Amber Nelson? -- could have an HIV test and other sexually -- sexual --

MR. CRUM: Object to the form.

MS. SWAIN: Objection.

A No, ma'am.

MS. ROBERTSON: Let's take a five-minute break.

THE VIDEOGRAPHER: We're off at 6:54:49.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: Okay. We're back on at 7:10:08.

BY MS. ROBERTSON:

Q Who is Leslie Allums?

A I don't know a Leslie Allums.

Q Do you know somebody named Allums?

A Yes, ma'am.

Q Who? Leigh Allums?

215

A I know a Leigh Allums.

Q All right. Who is she?

A I don't know her specific position, but she works at Flavor House.

Q Did you put her as a reference on your Sara Lee application?

A Yes, ma'am.

Q So somebody from Flavor House that had just told you you had to leave or resign or be fired recommended you for a job?

MS. SWAIN: Objection.

MR. CRUM: Object to the form.

A No, ma'am. I gave them to her as a reference. They didn't reference me to a job. I -- I gave them as a reference.

Q Right. And -- and -- and for the purpose of -- for what? What -- what kind of reference?

A For a work reference.

Q Why did you tell Sara Lee that you left Flavor House?

A I resigned.

216

Q Did you tell them under what circumstances?

A Not that I recall.

Q Did -- did they ask you whether you had ever been convicted of a felony on their application?

A I don't recall.

Q Do you recall -- well --

A No, I don't recall.

Q Why did you leave Sara Lee?

A Because it was too close to a day care and I had -- I couldn't work there, so I left.

Q How long did you work there?

A I can't remember exactly how long it was, but until I -- when I -- when my -- the guy I reported to, he told me that I could not work there and I left.

Q I see.

A He said he had to investigate it when I went in and they dad-gum -- he told me I couldn't work there and that same day I left.

# FREEDOM COURT REPORTING

Q And you're talking about the guy that you have to report to that you're a sex offender?
MR. CRUM: Object to the form.
A Yes, ma'am.
Q And how close to a day care was this Sara Lee plant?
A I -- I think it's close to 17 or 1,800 feet.
Q Well, I thought you didn't -- did you consider that any of Sara Lee's business that you were a sex offender?
MR. CRUM: Object to the form.
MS. SWAIN: Objection.
A I didn't -- if it didn't come up on my application, no, ma'am, I didn't put it in.
Q All right. And so when you did your interrogatories, you said you worked at Sara Lee. Let me see. When you said you started in September of 2007 and you signed these interrogatories -- I mean, yeah. Your lawyer signed them in February of 2008. So

you at least worked there for September, October, November, December, January, February. Does that sound about right?
MS. SWAIN: Objection.
A I have no idea, ma'am. That's -- it's a possibility.
Q Did you know about the rule that you as a sex offender could not work within a certain distance of a day care center?
A Yes, ma'am, I did.
Q Why did you take the job at Sara Lee if you knew that?
A I didn't know there was a day care there.
MS. ROBERTSON: I think that's all I have.
MS. SWAIN: Okay.
MS. ROBERTSON: Go home and do whatever you want to do.
THE VIDEOGRAPHER: This concludes the deposition. The time is 7:13:50.
DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

FREEDOM COURT REPORTING

A

**Able** 71:17
**accept** 144:5
**accepted** 123:15 137:14 144:6 155:22
**ACCR** 219:21
**accurate** 177:16
**accusation** 114:2
**accusing** 64:1
**act** 55:22
**acted** 105:8 134:20
**acting** 7:4
**action** 1:5 219:16
**actions** 210:5
**activities** 56:21
**acts** 35:21
**added** 210:2
**address** 210:3
**addressed** 209:3 209:6
**adjust** 189:21
**admit** 36:18 183:11
**admitted** 131:7
**advised** 3:11
**affect** 132:23 133:3
**afraid** 198:6
**afternoon** 134:10
**age** 17:12,13,13
**aggravate** 185:12
**aggravated** 139:15,20 184:18,19 185:6,9
**aggravates** 140:6
**ago** 19:21 28:6 79:13,15 96:14 140:21 141:1 141:10 168:7
**agree** 55:20 118:14 190:20
**agreed** 2:2,11,18 8:19
**ahead** 128:18
**ain't** 14:20 30:2 30:4 56:15 57:15 72:20 144:20 169:8 183:8
**Alabama** 1:2,23 2:8 3:5 5:8,19 6:5 7:2,3,5,9 8:1 9:21 10:5 13:7 149:17 150:2,7,9,10 219:3
**allegation** 62:20 63:5,8 64:11 179:9,16
**allegations** 35:19 64:15 130:2,8 166:18 167:11 174:23 175:14,23
**alleged** 123:20
**Allums** 214:18 214:19,21,23 215:1
**altercation** 118:4 136:11 191:11 193:12 194:2
**altercations** 124:11
**Amber** 62:13 63:11,15,19 213:8 214:3,4
**amended** 3:6
**amnesia** 92:1
**Andrews** 174:20
**and/or** 44:22 58:17 168:23 171:9 190:6
**anger** 211:19
**Ann** 5:15 8:5 11:14,16 12:19 128:6 161:19
**announcement** 146:1
**answer** 20:15 23:17 26:14 27:7 31:21 34:2 35:1 36:3 42:13 43:9 48:11 72:4 77:14,21 87:21 89:23 90:13 97:4,7 98:8 104:9,12 109:20 110:1 110:10,23 115:6 135:5 142:18 145:18 150:21 151:16 169:3 178:1 188:5 207:4
**answered** 37:11 37:12 185:8
**answering** 26:11
**answers** 33:1 142:18 219:8
**anticipated** 59:2
**anti-sexual** 172:18
**anybody** 12:20 27:14 46:7 69:1 70:9,17 105:11 108:7 119:14 130:20 146:20 147:5,9 152:22 161:11 165:6,6 166:2 169:8 188:19
**anymore** 88:1
**anywise** 219:16
**apart** 114:6
**apologize** 135:13,18
**apologized** 134:18
**apologizing** 135:8
**apparently** 207:2,14,21
**appear** 43:23
**appeared** 209:3
**application** 24:18 26:1,19 27:10 29:20 30:5 58:16 70:6,13,15 86:20 101:2 170:16 215:6 216:6 217:16
**applied** 73:17
**apply** 84:12
**appreciate** 34:9 206:15,19
**appropriate** 207:7,9
**approximately** 2:10 7:9
**apropos** 104:5
**arguing** 112:5
**argument** 121:21 160:3 183:4
**arrest** 15:6,14 15:17 17:2
**arrested** 18:10 18:13 56:10
**articulate** 152:11
**asked** 12:6 16:22 74:4,7 81:12,13 84:14 97:19 98:11 112:1 119:18 131:2,7,22 133:19 134:10 134:14 140:2 141:12 142:9 143:12 153:15 156:8 160:7 161:13,22 162:11,13 163:23 164:6 164:16 166:8 167:21 168:16 173:21 192:10 208:20 209:1,1 209:4 211:14
**asking** 24:16 26:7,15 33:17 33:19 34:9,11 36:12 37:14 43:10 81:18 82:15 112:8 114:18 121:10 136:4 142:14 142:17 168:8 170:8 172:13
**Assert** 160:1
**assign** 2:23
**assignment** 148:20
**associates** 180:19
**assume** 132:4
**assuming** 177:13
**attached** 61:3 117:15 118:18 120:16 173:14 198:17 200:3 205:2 206:6 211:6 212:4,15 213:4,20
**attend** 30:8
**attended** 30:14
**attention** 119:7
**attitude** 108:5,9

108:11,18 109:5,17 110:19 112:13 118:9 208:23
**attorney/client** 160:2
**August** 115:1 207:22
**avoid** 26:11
**aware** 99:8 130:1 132:18 173:2,6,8,8
**a.m** 66:14

**B**

**B** 4:5
**baby** 13:12
**back** 19:4 46:19 60:10 66:5 79:2 107:22 114:12,17 116:17 143:12 155:2 160:22 170:22,23 171:9 172:11 177:8 180:6 186:7 192:17 192:23 193:5 212:19 214:16
**background** 150:23
**backgrounds** 8:21
**bad** 17:13 39:6 39:11 43:13 45:22 108:5,9 108:11,17 109:5,17 110:19 112:12 134:11 189:14 190:3 192:19
**badly** 189:16
**Baker** 5:4 88:5,6 88:10
**Ballew** 10:11,17
**bankruptcy** 165:10,12,20 166:3
**based** 32:15
**bastard** 185:2
**Bearman** 5:4
**beginning** 7:16 60:11 97:20 208:10
**BEHALF** 6:1
**behavior** 152:16
**believe** 14:3 35:14,18 62:9 67:9
**believed** 193:14
**belt** 189:21
**belts** 95:4
**Berkowitz** 5:5
**best** 37:20 53:1 53:4 72:4 205:7
**better** 16:3 47:4 47:5 57:23 58:3 117:12 191:5
**Betty** 49:3 50:5
**bicycles** 65:3
**bid** 104:4 115:14
**bidded** 85:14 86:17 100:23 101:4 103:14 104:2,6 115:13 115:16
**bill** 212:9,20
**Birmingham** 5:8 5:19
**birthday** 9:15
**bit** 57:12,14 187:13
**bitch** 182:22 183:6,8,9,13 183:18,23 184:4,8,13,17 184:23 185:5 192:4 193:7 195:7 196:2
**blood** 99:1
**blue** 93:14,15
**board** 101:6
**Bobbie** 2:8 7:8 7:23 8:6
**Body** 71:17
**born** 12:7 14:1,2 14:12,18 16:15 17:14 18:3,4 52:23 53:9
**boss** 39:21 101:22
**bottom** 94:9 95:2,3
**box** 5:12 84:21 84:23 85:1,17 161:5,7
**boxes** 85:3,6
**boxing** 85:13
**Boyer** 161:19
**Brad** 53:18,20
**brag** 147:3
**break** 60:5,9 116:14,16 147:12 154:22 155:1 160:8,12 160:21 172:3,9 172:13 190:4 192:8,10,12 214:11,14
**breakfast** 54:14
**breaking** 190:7
**breaks** 89:4
**breath** 82:3
**bring** 209:5
**Broad** 9:20 10:4
**Brooks** 181:8,9 182:13 205:7 205:13 206:2
**brother's** 66:1
**brought** 16:22 119:6 204:7 209:13
**Bruce** 22:21 29:21 70:20 71:7 80:22 97:21 121:21 121:23 122:4 122:10 123:4 138:20 145:14 153:23 154:3 188:5,8
**brung** 151:1
**buddies** 180:15 182:18
**buddy** 205:8
**build** 94:3
**building** 5:17 182:2
**built** 182:3
**bulky** 198:5
**bunch** 26:12
**business** 31:7 217:11
**bust** 198:7,13
**busy** 192:12
**Butch** 28:11 29:13 71:1 154:8 189:2
**BUTLER** 219:4
**B-A-L-L-E-W** 10:13

**C**

**C** 5:1,15
**cactus** 178:20 179:5
**Caldwell** 5:4
**calibers** 94:15
**call** 57:18 126:19 138:19 138:20 153:11 183:6,13 184:12,22 185:4,5
**called** 88:23 157:7,9 161:13 164:16 183:7 184:20 195:4 196:1 203:14
**calling** 184:7,16 192:4 195:6 196:6
**calls** 203:18
**Candace** 10:11 181:22
**cans** 93:4 131:14 191:17,18,19 191:20 193:1
**Cantley** 65:12 65:22
**capper** 208:21 209:21
**care** 16:16 33:2 216:12 217:6 218:9,14
**carefree** 208:23
**Carlen** 11:1,1 17:8
**carry** 197:7
**case** 7:20 78:14
**Cassady** 22:21 23:3,7,11 24:23 25:12,23 27:11,21 28:12 29:13,21 97:22 122:1 138:20 145:14 154:1,3 188:5 189:2
**Cassady's** 25:15 80:23 122:14
**cause** 7:11 219:17
**center** 218:9
**cents** 58:14 84:9 84:10
**certain** 188:10 189:19,22 192:22 218:9

**certainly** 26:13
**CERTIFICA...** 219:1
**Certified** 219:20
**certify** 7:4 219:6 219:14
**chain** 99:11
**change** 82:11,18 82:23 89:16 91:2 187:2
**changed** 90:8
**characterizati...** 200:21
**characterize** 206:19
**charge** 36:16 166:23 167:3 169:9
**charged** 33:10 35:8,22 65:14 65:17
**charges** 32:15 36:17,20 37:21 70:11 78:20
**Charming** 152:12
**Charoen** 72:18
**check** 39:6,7,11 39:12,14,15,20 40:4 55:8
**checks** 39:21
**chicken** 73:9 81:3,4,14,20 82:12 83:7,10 83:16 87:6 88:4,14 89:2 89:13
**child** 11:23 12:4 12:7,10,16,21 12:22 13:1,14 13:21,22 14:17 14:21 15:2 16:7,8,8,11,21 32:18 33:16 144:11 165:7,9
**childhood** 13:2
**children** 11:5,8 14:7 17:9 19:15 32:7,13
**Childs** 5:16
**choose** 44:9
**Chris** 121:16 129:4 144:16 174:18 190:6 190:14 191:2 192:20 196:14
**Christian** 134:20 135:10 193:15
**Christianity** 134:23 135:10
**circumstances** 118:11 216:2
**Civil** 1:5 3:5 7:6
**claimed** 166:15
**clarify** 34:3 43:4 43:8
**Clark** 5:9
**clean** 81:4
**cleaned** 81:14 81:19 83:9
**cleaning** 73:15 73:15 74:1 83:7 204:17
**clearly** 93:17
**client** 152:12 160:9 172:4 182:21 183:12 183:17 184:4
**close** 28:19 29:22,23 52:17 146:23 148:6,7 153:21 216:11 217:6,8
**coaching** 206:15
**coal** 93:15
**Coca-Cola** 55:4 56:13 57:10,16 57:20 58:1,2,6 58:11,17 59:2
**coercive** 196:11
**Coke** 56:17
**college** 30:12 31:7 38:16
**come** 37:22 39:19 68:22 121:5 129:2 145:8,11 148:15 162:1 162:15 217:15
**command** 99:11
**commencing** 2:9 7:9
**Commissioner** 1:20 7:4
**communicatio...** 68:18
**company** 39:18 40:3 67:3 97:2 102:22 103:2,7 161:10
**complain** 144:9 144:15
**complained** 152:16,23
**complaining** 139:7
**complaint** 129:9 129:13 130:13 130:15 144:18
**complaints** 167:4
**completed** 19:22
**compliance** 2:15
**complicated** 112:10
**complied** 117:21 119:1 120:21 128:5
**compound** 42:3 42:10,22
**computer-aided** 219:10
**concern** 209:20
**concerned** 158:11
**concerning** 130:8 133:6 158:6 167:4 190:14 196:15 211:23
**CONCLUDED** 218:22
**concludes** 218:20
**condemnation** 160:3
**condition** 133:2
**conditions** 91:9
**confessed** 170:12
**conflict** 113:10 113:12,14
**confront** 22:9
**confusing** 48:12
**consider** 45:22 98:23 99:2 184:14 202:8 202:11 217:11
**considered** 45:21
**contact** 71:19
**context** 145:6
**continued** 174:20
**contributing** 15:6 74:21 76:22 77:17,20
**conversating** 211:16
**conversation** 147:18,22 164:14 170:21 172:4 190:10 197:4
**conversations** 147:11 148:5 190:13 196:14
**convicted** 23:19 23:22 32:17,20 33:3,4 39:1,4 40:19,23 41:13 44:3,13,18,20 44:21 45:4,8 47:21 56:22 58:18 67:10 74:5,8 77:3,17 77:19 86:21 87:19 158:9 168:17 169:5 171:8,18 216:5
**conviction** 40:19
**convictions** 23:12,15 32:12 41:17 157:12 158:6 181:10
**cook** 54:11,11 54:13 194:12 194:14 203:9
**cooked** 54:13 100:18
**cooking** 198:3
**correct** 33:16 45:5 70:4 90:9 97:14 109:15 109:21 161:3 175:11 178:6 201:9 202:2 205:14,14 219:11
**corrected** 197:19 203:23 204:13 205:6 207:12
**correcting** 211:16
**cost** 162:21
**counsel** 2:4,20 2:22 5:10 7:7 8:3 219:15

**counseled** 197:18 198:8
**counseling** 208:18
**count** 20:16 34:23 56:11
**counted** 101:12 101:14
**country** 102:14
**counts** 23:22 33:5,5,6,6,7,8 36:13 37:1 44:22 61:13 169:5,6,6 171:8
**county** 9:22 18:12,15 19:1 19:3,10 20:4,6 20:8,13,16,17 20:18,21 78:3 146:15 219:4
**couple** 31:22
**course** 82:14,15 132:3
**courses** 172:23 173:11 211:20 211:22
**court** 1:1 2:6,16 3:12,13 7:1 8:2 8:13 68:10 76:12 116:22 117:1,4,9 125:17,20 126:3,7,12,20 126:23 173:19 174:10 177:23 198:22 213:11 213:15 219:20
**courthouse** 146:15
**cover** 152:11
**Cowarts** 9:20,22 10:4 50:10
**co-worker** 39:22 55:8,10
**co-workers** 148:6 196:22
**Cracker** 23:5
**crazy** 183:18,23
**criminal** 67:7 150:23
**criteria** 101:8 103:20
**Crook** 2:8 7:8 7:23 8:7
**crossed** 169:10
**Crum** 6:2,3 8:11 8:11,15,23 16:1 17:18,21 18:9 20:14 23:17 24:7,10 24:16 26:3,5,7 26:13,18 27:6 31:20 32:8,14 32:19 33:2,17 34:1,8 35:1,9 36:1,3,6,10 37:2,11 38:9 40:13 41:10,21 41:23 42:3,7 42:18 43:2,7 43:14,17,22 44:15 45:16 46:2,10 48:9 48:14 53:1,3 55:12,16 56:4 59:12 60:3,21 61:10 62:18 64:22 67:2,6 67:12 68:9 70:12 71:20 72:4 73:1 74:23 77:4,9 77:13,19 79:3 80:3,10,15 81:5,13,19 82:4,7,20 86:22 87:20 90:2,13,21 91:16,20 92:2 97:16 98:2,7 98:14 100:5 101:23 104:9 104:12 107:11 108:12,17 109:2,11,20,23 110:5,11,16,21 110:23 111:7 111:11,14,18 111:20 112:1,5 112:16 115:6 120:8 123:2 124:8,13,23 127:9,11,14,19 128:18 129:7 129:22 132:1,6 133:22 135:4 137:4,10 138:7 139:17,21 141:4,6,12 144:12 145:17 146:3,8 148:9 149:19 150:14 150:18,21 151:13,16,18 151:21 152:4,8 153:7 154:23 158:15 159:2,8 159:11,16,22 160:4,11 163:1 164:2,8 166:7 167:7,16 168:4 169:2,16 171:20 172:6 176:20 177:19 178:7,14 179:2 179:14,19 180:23 181:5 183:15 185:13 188:22 190:16 192:6 196:5 200:16 202:3,9 202:19 204:16 205:9 206:10 206:18,23 207:4 208:11 209:14,18 210:10,23 211:2 212:12 212:22 213:9 213:21 214:7 215:13 217:4 217:13
**curse** 115:22 120:3,12 123:1 125:6,11
**cursed** 123:20 130:20 131:2,4 131:5 132:8
**cursing** 113:19 114:4 119:12 119:15 123:17 124:21 131:18 133:21 135:3 192:3
**cuss** 131:12 175:4
**cussing** 143:14 143:16
**custodies** 51:15
**custody** 51:14 51:18,18
**cut** 83:17,20
**cutting** 83:16
**C-A-R-L-E-N** 11:1
**C-H-A-R-O-E...** 73:4

**D**

**D** 1:21 2:5 3:6 4:1 7:1,19
**dad** 48:23 49:2 52:3,4,11
**daddy** 28:15
**dad-gum** 139:2 139:3 150:22 166:15 169:4,8 181:14 193:3 196:6 216:21
**Dairy** 57:21 58:3,5,10,17 58:21 59:5,16 59:19,21 66:7 71:14 72:14
**dark** 174:4
**date** 7:5,22 52:15 79:20 125:12 201:11
**dated** 24:19 201:15,19
**dates** 53:4 56:19
**dating** 79:21 80:4,5
**daughter** 11:12 11:13,19 14:8 16:18 80:6 152:5
**daughters** 151:12
**day** 2:9 3:9 7:10 68:14,15 81:21 135:19 136:2 149:7 159:15 161:13 165:14 166:11,13,14 166:19 167:23 168:9,10,11,13 183:2,3 195:16 199:11,12 201:6,21 203:20 208:10 209:4,13 210:15 216:11 216:22 217:6 218:9,13
**days** 18:17 67:20 78:4 176:8
**deboner** 83:12

83:14 84:3
**deboning** 84:5 85:10,12
**debts** 165:17 166:6
**December** 201:16 210:20 218:2
**decide** 27:9,20
**decided** 27:4 55:17 103:11 105:12
**defendant** 5:2 8:9
**Defendant(s)** 1:12
**define** 34:10
**degree** 31:7
**Delanor** 9:11
**delinquency** 15:6 74:21 76:22 77:18,20
**delivering** 3:7
**demote** 171:16
**department** 99:11 105:6 146:6
**deposition** 1:14 2:4,13,14 3:2 7:17 61:3 97:21 117:15 118:18 120:16 126:21 173:14 198:17 200:3 205:2 206:6 211:6 212:4,15 213:4,20 218:21,22 219:7
**depositions** 2:17
**describe** 44:20
**described** 130:21
**description** 45:7
**detail** 44:21 45:19
**detailed** 45:7
**detention** 48:7
**difference** 90:18 208:11
**differences** 21:8
**different** 44:22 57:18 81:22 144:1 201:11
**difficulty** 47:1
**direct** 102:1
**disagreement** 122:22
**disagreements** 144:2
**disappointed** 49:14
**disappointment** 49:18
**discourteous** 137:13,17 138:6,11
**discrimination** 167:11
**discuss** 46:7
**discussed** 191:4
**discussion** 127:22 206:22
**discussions** 190:6
**dishonesty** 55:23
**dismissed** 78:14
**dispute** 190:14 190:21
**disrespectful** 118:9
**distance** 218:9
**DISTRICT** 1:1 1:2
**DIVISION** 1:3
**divorce** 19:18,21 20:5,21 21:3,7 22:17 50:17,18 51:5 165:4
**divorced** 51:1
**DNA** 11:20 16:10
**document** 28:11 122:19 131:22
**documentation** 119:4 120:23 121:6 127:1 128:21 136:15 139:14 142:6,9
**dog** 184:14
**doing** 29:13 43:21 93:2 95:9 139:8 196:8 204:14 205:8,15 206:2 208:20 210:6
**dollars** 162:21
**Donelson** 5:4
**doors** 208:5
**Dothan** 1:23 2:8 6:5 7:8 8:1 87:17
**double** 110:5
**doubt** 151:2 178:21
**Draper** 30:21 31:8,13
**drop** 46:21 47:10 52:19
**dropped** 38:22 46:19 47:13,18 49:9 52:4 53:12
**dropping** 49:15
**drugs** 132:20
**dry** 100:18
**duly** 9:5

**E**

**E** 4:1,5 5:1,1 6:2
**earlier** 177:14
**earning** 206:16
**easy** 191:23,23
**edification** 29:18
**editorializing** 107:15
**education** 38:12
**EEOC** 166:23 167:3
**effect** 2:14
**effective** 3:6
**either** 22:14 37:1 52:9 131:4 151:1 155:18 207:9
**elect** 16:13 45:18 46:5 185:4
**Elizabeth** 16:6
**Emma** 80:1
**employed** 57:7 97:2
**employee** 192:11
**employees** 137:21 138:21 140:5,6,7 141:19 147:12 174:3
**employer** 173:22
**employers** 174:4
**employment** 54:22 174:18 175:15
**employments** 144:3
**enemy** 180:17
**entailed** 94:23
**entire** 84:16
**errands** 192:9
**escalated** 193:3
**establish** 47:20
**established** 36:11
**establishes** 94:14
**Eufaula** 11:14 13:7 38:20 54:17,17 73:19 88:7,8
**Eugene** 174:19
**evaluation** 108:3 108:8
**event** 159:7 184:10
**everybody** 103:8 180:16,19 182:13,20 188:6,9,11,13 197:17 203:4
**everyday** 159:7
**evidence** 3:2 112:14
**exact** 52:14
**exactly** 56:19 57:15 72:2 73:22 76:9 81:9 83:1 86:6 86:10 121:8 143:13 147:1 187:5,11 216:15
**examination** 4:2 7:12 9:7
**examined** 9:5
**excuse** 12:2 18:3 42:2 45:21 89:9 171:13 211:11
**excuses** 209:7,8
**exhausted** 143:22
**exhibit** 24:5 60:14 61:1,6,9 61:21 97:1 116:21 117:13 117:18 118:16

118:21 119:8 120:14,19 125:16 127:6 128:3,7,12,15 129:21 136:14 143:9 144:6 173:12 193:19 194:11 198:15 198:20 200:1,7 201:15,18,23 204:23 205:4 206:4,8 207:17 207:19 211:4,9 211:13 212:2,7 212:13,17 213:2,18
**exhibits** 3:10
**expecting** 56:6
**experience** 92:15 105:5
**experienced** 59:1
**expired** 166:11
**explain** 45:19 93:23 94:1 189:18 190:17
**explained** 138:9 205:18 209:9 209:11
**explanation** 34:6 41:6 102:23
**express** 49:17
**expression** 208:23
**expressions** 210:5
**extensive** 8:20
**extent** 23:14
**ex-wife** 15:16 17:6 22:23 28:21
**ex-wife's** 22:22 71:6,8 98:19
98:21
**eye** 71:19

**F**

**F** 5:3 194:1,5,8,9 194:21 195:1,3 195:4,5
**face** 151:6 184:23
**faced** 37:22
**fact** 83:7 115:22
**facts** 131:23
**fail** 71:18
**failed** 90:8,11
**fall** 198:7,13
**false** 97:6 174:22
**familial** 8:21
**family** 8:17 151:8,11 152:2
**fantastic** 43:22
**far** 16:21 114:6 133:15 134:4 143:16 162:2 163:17 175:5 182:20 187:18 187:20 205:15
**father** 13:18 49:21 50:12 51:3,16,21 68:19,21
**February** 217:23 218:3
**feel** 13:20 36:13 202:5
**feet** 217:9
**fellow** 95:14,15
**felon** 58:18 87:19
**felonies** 45:19 74:5,9 170:12
**felony** 40:10 41:1 44:20 58:18 157:12
158:6 168:17 170:17 216:5
**felt** 134:11 138:18
**female** 184:14
**fight** 191:5
**figure** 107:22 189:20,23
**figured** 22:7
**file** 105:17 165:12 166:3 205:22
**filed** 3:13 20:8 20:10 165:10 165:19
**fill** 129:2,4
**filled** 129:23
**filler** 107:21 203:9,17,17
**filling** 48:17
**final** 21:3
**finalized** 19:19 20:3
**finally** 193:6
**find** 73:18 123:9 127:18 202:23
**fine** 8:15,23
**finish** 17:18 48:9 59:12 64:22 139:17
**finishes** 120:8
**fire** 162:18
**fired** 57:23 59:20,21 66:7 66:16 71:13 156:1 158:12 162:9 175:9,22 215:10
**first** 23:6,8 24:8 24:14 37:23 38:1 52:5,8 58:7,12,15 62:7 65:7 74:12 76:17
92:4 99:12 102:13 133:7 133:10 167:9 167:18 176:2,5 176:19 178:13 185:21 186:4,9 186:16,19 189:1,3,4,6,8 189:11 199:8 203:2
**five** 10:7 36:7,13 44:21 60:1 66:11 69:15,23 70:1 145:10 160:14 168:20 168:23 170:12 171:8 187:7,19
**five-minute** 116:14 154:22 172:3 214:11
**fix** 192:1
**fixed** 123:5
**Flavor** 1:10 7:18 8:9 25:15 26:1 28:1 29:14,20 70:10 71:4 88:23,23 89:8 89:9 91:12 92:5 93:3 106:15 124:10 133:8 155:7,8 155:10,11,13 156:23 161:16 164:15 167:3 171:23 172:15 173:1 206:17 215:4,8,22
**floor** 85:4,7
**following** 7:12
**follows** 9:6
**Foods** 88:23
**force** 2:14
**foregoing** 7:6 219:7,11
**forever** 147:1
**forged** 55:7
**forgery** 39:2,5 40:19 45:5 46:13 47:22 55:21 56:11 158:9 168:22 169:9
**forgot** 104:19 170:5,6 199:18
**form** 2:21 18:9 26:3 27:6 31:20 32:8 34:1 35:9 36:1 37:2,13 41:10 41:21 44:15 45:16 46:2,10 55:12,16 56:4 60:21 62:18 67:6,12 74:23 77:4,9,13 80:10,15 86:22 87:20 90:2,21 97:16 107:11 108:12,16 109:2,11 110:21 111:7 111:11,14 112:16 119:5 120:23 123:2 124:8,13,23 128:21 132:1,6 133:22 135:4 136:15 137:4 138:7 141:4 142:6,10 144:12 146:3,8 148:9 149:19 150:14,18 151:13 153:7 158:15 159:2,8 159:16 163:1 164:2 166:7 167:16 168:5

169:16 171:20 176:20 177:19 178:7,14 179:2 183:15 185:13 188:22 190:16 192:6 196:5 200:17 202:3,9 202:19 204:16 205:9 209:14 209:18 210:10 210:23 212:12 212:22 213:9 214:7 215:13 217:4,13
**forth** 209:13
**forward** 38:8
**four** 67:19 69:20 99:16 100:12 105:22 107:18 107:19 149:5
**Francis** 212:20
**Frank** 7:17 8:12 49:3 127:1 209:7,9,11 210:4,4
**Franklin** 1:15 2:4 6:1 7:10,19 9:4,11
**free** 90:19 165:14
**freedom** 8:2 91:2
**Fresh** 57:21 58:3,6,10,17 58:21 59:5,17 59:19,22 66:7 71:14 72:14
**friend** 53:16,17 65:23
**friends** 180:15 180:18,21 196:21
**front** 78:13 123:1
**fuck** 153:17 193:9,11
**full** 2:15 9:9
**fully** 77:7,12
**full-fledged** 160:12
**funny** 170:2
**further** 2:11,18 219:14
**fuss** 191:5
**fussing** 119:23 139:3

G

**GED** 31:4 38:15
**general** 108:19 174:15,17
**getting** 31:4,7 90:18 101:9 118:11 165:8 192:5
**gift** 102:18 104:21 105:1,3 114:12,20 115:11 171:5 171:11
**girl** 45:23
**girlfriend** 41:7 41:14 44:10 45:9 60:16,17 62:5,14
**girls** 38:9 44:7 45:12 64:1 77:11
**give** 39:23 51:17 131:22 142:18 158:5 162:8
**given** 108:3 219:12
**glad** 42:18
**gloves** 83:22
**go** 8:20 16:3 35:3 38:19 42:4 46:19 53:14 58:1 66:5 68:15 85:12 94:12 100:15 128:18 139:2 144:20 146:13,15 148:12 149:14 158:22 160:9 169:14 170:22 179:9,15 180:6 192:10,12,22 203:6,10 208:7 213:16 218:18
**goes** 92:21 203:19
**going** 8:16 17:22 37:19 42:4,8 42:11,12,20 43:3,18 46:8,9 53:22 61:7 69:4 73:7 76:13 82:4,8 85:3,7 93:16 112:6 126:19 128:7 136:6 153:16 158:12 162:1,4,8,18 162:20 172:2 173:16 182:7 185:23 192:20 198:13
**goldfish** 110:15
**good** 87:18 102:13 117:7,8 128:11 132:19 180:14,15 188:8 193:15
**gotten** 121:20 133:8 207:2
**go-around** 126:6
**grade** 38:14,18 38:19 46:20 47:11 49:15
**Green** 51:9 74:18,19
**Greenville** 7:2
**grievance** 129:17
**Griff** 96:13
**Griff's** 99:7
**grounds** 2:23
**guess** 17:22 18:13 26:7 33:18 40:13 54:1 68:14 77:1,5 87:21 90:10 99:6 106:5 121:7 130:14 146:4 149:21 165:5 167:18 197:12 204:17
**guessing** 40:11 123:5
**guilty** 33:12 34:15,18 35:2 36:9,11,19 37:8,16 41:22 45:13 61:14 62:21 64:8 123:11,12
**guy** 99:3 216:17 217:1

H

**H** 4:5
**half** 25:2 26:22 28:18 86:10 107:19 163:18
**hand** 132:5
**hang** 83:18,20
**happen** 191:8
**happened** 18:6 40:7 78:7 102:15 106:9 121:8,9,13,19 122:6 125:10 128:23 129:5 133:19 141:10 157:10 164:19 166:12 167:23 168:9 169:13 178:5 183:2,3 184:10 185:17 209:9
**happening** 191:9
**happens** 93:11
**happy** 68:14 108:21
**harass** 164:9 208:16
**harassed** 166:16
**harassment** 167:12 171:23 172:14,18,19
**hard** 118:22
**Harp** 16:6
**hated** 180:15
**hear** 42:18 43:23
**heard** 81:10 153:9 167:10 167:18 194:1
**hearing** 68:6,9 219:13
**height** 189:21
**held** 127:22
**help** 24:13 43:9 76:13 82:16 108:1 127:19 167:8
**helped** 204:10
**Henry** 20:6,7,13
**high** 38:20 103:7
**Hill** 88:5,6,11
**HIV** 214:5
**hold** 24:10 84:2 84:15 105:17 159:22 160:4
**Holdings** 5:11
**holler** 191:22

**hollering** 124:18 134:9 135:2 136:6 191:12 192:3
**home** 53:22 68:15 218:18
**hot** 198:4,11 199:5
**hour** 58:14 60:4 84:10 89:5 163:15
**hours** 148:14 163:16
**house** 1:10 7:19 8:9 25:15 26:2 28:2 29:14,20 70:10 71:5 74:13 88:23,23 89:9 91:12 92:5 93:3 106:16 124:10 133:8 155:7,9 155:10,11,13 156:23 161:16 164:15 167:3 171:23 172:15 173:1 182:2,3 182:8,10 206:17 215:4,8 215:22
**Houston** 9:23 146:15
**huh** 36:2 63:2 85:5 87:1 91:5 100:9 113:16 114:15 124:15 135:21 150:20 164:11 170:3 177:22
**husband** 13:17
**Hutchins** 144:16 152:17 174:19

**I**

**idea** 13:16 22:10 22:18 28:4 38:4,6 40:5 49:12 50:20 62:23 63:19 64:13 67:22 68:2 75:4 80:16 104:17 105:11 120:7 138:4 139:10 155:21 160:6 218:5
**identification** 61:2 117:14 118:17 120:15 173:13 198:16 200:2 205:1 206:5 211:5 212:3,14 213:3 213:19
**identify** 8:3
**ignore** 203:1
**ignored** 202:17
**Ima** 71:9
**immediate** 96:10
**immediately** 181:16
**implies** 124:17
**impregnated** 14:5
**impressed** 152:10
**improper** 152:6
**inappropriate** 81:16 82:9
**incarcerated** 13:23 30:13,16 147:13,15
**incarceration** 28:23
**incident** 119:7 120:6 121:1 124:22 126:15 129:5,10,13 130:9 134:3 135:16 139:14 140:2 143:1,5 143:6 144:1 194:17 199:2
**incurred** 212:10 212:20
**independent** 125:9
**indicating** 126:10
**information** 107:7 164:1
**Ingram** 30:6,8 31:5 38:16
**initiated** 129:17 130:12,14
**insignificant** 159:14,20
**insisted** 192:13
**insomniac** 132:17
**inspection** 192:20
**instances** 179:4
**instructing** 109:23
**insubordinate** 202:2 208:14
**intellect** 140:17
**intercourse** 61:18 65:8 76:18
**interested** 219:16
**interrogatories** 173:17,21 217:19,22
**interview** 35:11
**interviewed** 28:1,7 103:22
**intimidating** 118:8 196:10
**investigate** 216:20
**investigated** 153:4
**investigative** 129:18
**involuntarily** 87:9
**involve** 83:15 114:4
**involved** 92:18 93:10 115:20 166:18
**involving** 116:10 129:10 129:13 136:11 140:2 143:7 166:9 167:22 194:17
**Irreconcilable** 21:8
**irrelevant** 138:12
**issue** 15:17 132:5 208:22 209:4,17
**issued** 15:5,14 17:2 18:8 74:20 76:21 80:13,13
**issues** 209:3,12 210:3
**i.e** 141:10

**J**

**J** 5:9
**jacket** 199:22
**jail** 16:19 18:12 18:16 19:10 29:3 34:21,22 55:4 56:19 78:3
**Jamie** 20:12
**January** 19:20 20:23 218:2
**jar** 93:7 96:5
**Jean** 17:8 71:9 80:1
**Jennifer** 5:3 8:8 41:15 60:17 61:16 65:6
**JFI** 30:6,8 31:4 38:15
**Joanie** 113:12
**job** 47:5 48:19 48:22 54:6 56:14 57:23 71:4 72:14 73:16 80:22 87:13,18 88:1 91:2 95:8 100:22,23 101:6 102:20 103:14,15,16 103:22 104:2,7 104:15 105:20 106:1,6 114:12 114:17,21 115:10 136:23 138:2 149:6 153:18 158:23 159:7 203:12 203:19,20,22 204:10,15 205:8,16 206:2 215:11,16 218:11
**jobs** 72:1,8,9 89:16 141:23
**Jody** 189:1
**Joey** 8:1
**Jonathan** 14:9 17:17
**Jonathan's** 16:4 16:23
**Jonnie** 114:3,3 115:20,23 116:2 118:5

119:15 120:5 122:23 124:18 139:6,22 140:3 142:3 143:7 147:23 183:13 183:19 208:16
**Jordan** 121:16 129:4 144:16 174:18 190:7 191:3 192:21
**Jr** 7:20 9:11
**judge** 42:5 78:13
**July** 125:13
**jumbo** 83:12,14 84:3
**June** 1:22 2:9 3:9 7:10,22 168:10
**jurors** 92:23
**jury** 141:8,14 152:9
**juvenile** 48:3,7

K

**Katherine** 134:5 134:7,15,16,18 135:9 193:15 193:23
**keep** 42:15 43:18 91:1 170:11 197:12 197:15 203:21
**keeping** 199:15
**key** 135:1
**Kilby** 30:17,18 31:10,13
**kin** 219:15
**kind** 39:14 51:14 65:15 96:7 104:18 122:22 173:10 180:10 192:20 196:19,23 210:13 215:18
**knew** 23:19 25:1 25:10 26:21 27:2,15 58:7 65:5 69:3 121:17,22 131:8,9,11 132:3,4 133:18 138:10 154:10 154:14,18 182:16 196:1 218:12
**know** 13:19 16:21 20:15,15 20:17,18 22:1 22:2 23:11,14 23:18,21,23 24:1,3,15,17 25:19,19,21 27:22 28:22 29:1,5,11,15 29:15,17 31:14 34:2 35:20 37:3,4,7,22 38:1 40:9,14 43:20 44:12 46:6,14,22 47:12 49:13,16 50:15,19 51:2 51:17,19 52:14 53:3,13 54:3 56:10,20 57:4 62:1 63:3,4,7 63:10 64:3,5,6 64:14,17,18,19 65:4,9,10,12 65:20,21 67:23 69:1,4,6,8 70:20 71:2,23 72:3 73:2,3,16 75:1,18,19,22 76:1 77:5 78:16,16,18,21 80:1,3,8,11 81:8 82:16,17 86:9 87:23 89:4,10,14,15 89:20 90:14,15 90:16 91:1,4,6 93:1,1,21,23 95:20 96:13 97:7 98:15 99:9,10 100:7 101:8 102:6,8 102:9 103:5,11 103:19 104:1,4 104:6 105:15 105:19 106:18 106:21 107:2,5 107:10,13 111:8,9,10 112:19,19,20 112:21,22,23 114:16,18 115:7,16 118:22 119:2,6 120:5,22 122:17,17,18 124:4,9,14,16 125:7,7 127:17 127:20 129:12 129:15 130:7 131:7,8,13 132:12,16 133:15,20 134:2,11 135:5 135:20,22,23 137:5,6 138:16 139:12 140:10 140:11,13,13 140:16,19 143:2,3,13,14 143:17 144:4,8 145:5,12,16,18 145:20,23 148:3 149:21 149:22 150:4 150:11 152:5 152:15 154:5,7 154:9,10,12,16 156:2,11 157:2 157:3,22 158:16,18,21 159:18,19 162:14 164:9 165:2 166:12 166:20 169:3 169:12,17,17 175:5,16 176:1 177:5,6,7,11 178:9,17 180:1 180:9 181:9,11 181:15,16,17 181:20 183:7,9 185:16 186:13 187:5,18,20,21 188:15 189:10 189:12 190:9 190:23 193:2,5 193:6 194:9,12 194:16 195:3 195:17 196:22 197:16 198:4,6 199:19,21 200:14,17,19 201:1 204:11 205:15 206:11 206:11 208:17 212:8,18 213:6 214:2,19,20 215:1,3 218:7 218:13
**knowing** 37:9,17 146:23
**knowledge** 146:2
**known** 23:2 27:11,21 28:15 28:20,20 167:19 181:14
**Kress** 5:17

L

**L** 2:1
**label** 25:16,20 25:20 29:16 92:6,7,10,16 92:19,21 93:5 93:7 94:15 95:23 96:2,3 96:20,22 99:5 99:15 100:4,11 101:17 106:20 107:3,19 108:4 120:1 121:21 122:11 123:3 138:20 143:11 154:4 176:15 183:5 186:1,6 186:23 187:19 188:8 203:15 203:16 204:18 208:1,4
**labels** 93:3 94:20 192:19
**lack** 172:5
**lady** 14:20 134:21
**Lamberson** 62:4 62:11 212:10
**Lamply** 181:3 181:19
**Large** 2:7 7:4
**late** 29:3 60:1,1 66:7,12
**laws** 2:16
**lawsuit** 157:1,8 161:2,9 163:6 167:13,20 171:7
**lawsuits** 165:17
**lawyer** 20:10 34:20 37:12,18 37:20 61:7 71:19 81:10 82:15 117:19 142:15 151:3

155:5 162:5,8 162:16,20 217:23
**lawyers** 155:19 156:1,6,9,14 156:18 157:6 158:14 162:1 162:18 163:5 164:6,15 168:14 170:8 170:10 175:9
**lead** 86:12 175:14
**leader** 106:11 107:9,17 144:3 171:10 172:23 197:8 203:13
**leading** 2:21
**learn** 145:8 154:18 204:12
**learned** 145:12 145:13,21
**leave** 57:20 58:1 59:19 87:6 149:13 155:11 203:5,7,10 215:9 216:10
**leaving** 53:22 89:12
**led** 118:11 119:8 121:11 143:8
**Lee** 215:6,21 216:10 217:7 217:20 218:12
**Lee's** 217:11
**left** 59:2,5,6 76:10 87:13 88:13 95:18,20 102:22 103:1 116:6 147:9 148:16 168:1 183:17 187:15 187:16 215:22 216:13,18,23
**legally** 67:3,4
**Leigh** 11:14,16 12:19 214:23 215:1
**Leslie** 214:18,19
**letting** 201:1 204:1,11
**Let's** 66:5 116:13 154:21 160:11 214:10
**level** 101:14 106:15,20
**License** 219:21
**lie** 25:5 26:1,17 26:18 27:5,9 27:20 44:14,16 46:8,9 158:20 159:1 194:17 195:22
**lied** 124:3 156:2 156:5,9,14,16 157:19 158:13 158:20,22 162:10,17
**life** 34:22 37:5 117:12
**light** 93:14
**Linda** 1:6 6:7 7:18 113:11 114:1 116:6,10 126:15 129:1 129:10,12 130:2,8 132:8 133:7 134:9 135:13 144:9 147:9 150:12 152:15 153:13 154:18 164:20 166:9 167:4,10 167:22 175:10 176:3 178:4 180:2 182:22 184:1 185:5,15 186:3 187:15 187:15 188:19 190:5,14 191:3 191:12 194:18 196:15 208:16
**Linda's** 156:23 175:22
**line** 96:2,3,7,9 99:15,22 100:12,16 102:14,19 106:12 107:18 107:23 108:1 116:2,5,9 174:8 176:10 180:7 186:2,4 187:7,23 194:15 197:14 203:5,6,8,21 204:9 208:7,20 208:21
**lines** 96:5,5
**list** 27:17 46:12 58:16 122:8
**listed** 24:23 122:8
**listen** 43:18 71:20 82:7
**litigation** 91:23
**little** 32:7 57:12 57:14 107:7 118:22 187:13 189:19
**live** 9:19 10:3,6 13:6 49:8 51:3 53:14,22 74:11 149:22 150:3,5
**lived** 10:1 48:23 49:5 51:16,21 52:2,5,9 53:16 63:13
**lives** 11:14 50:9 50:9
**living** 76:5 88:8 88:10 182:4
**LLC** 5:16
**load** 85:2,6
**located** 38:7
**locked** 199:10
**lone** 27:16
**long** 10:1,6 18:15,23 23:2 25:11 27:1,3 27:10,21 28:5 28:20 38:15 40:8 48:16 49:8 50:14 52:2 54:18,21 56:18 57:9,15 58:20,23 59:15 59:16 66:15,21 72:11,19 74:1 74:19 75:1 76:5 79:10,13 79:15 81:3,5,9 81:11,13,19,21 84:2 85:16 86:2,6,11 87:3 88:15,16 95:22 96:14 99:14 101:19 103:4 104:14 105:20 123:6 134:5 135:9 136:5 140:21 141:10 160:13 163:13 177:6,7 180:8 187:5 189:12 193:15,23 199:11,13 216:14,15
**longer** 72:13 86:5
**look** 24:4 28:10 40:22 60:14 61:7,10 70:6 96:23 117:20 118:23 120:20 122:18 127:7 128:4 136:14 173:20 191:19 213:22
**looked** 24:14 136:16
**looking** 24:12 37:9,17 127:17 127:20
**lose** 51:18 91:14
**losing** 118:7 159:7
**lost** 72:14 124:17 153:17
**lot** 66:10 107:7 137:20 141:17 177:4 188:9,11 192:18,19 193:1,1 199:22
**lottery** 47:7
**loud** 174:9
**Louis** 5:13
**Love's** 20:12
**lying** 148:1 155:19,20 156:1 175:9,19 175:21

**M**

**machine** 29:16 92:8,20 93:6 93:19 94:13,18 95:23 96:2,3 99:17 107:20 120:1 121:21 122:11 123:3 138:21 143:11 154:4 176:10 176:15 183:5 186:2,6,17,21 186:23 187:1,6 187:8,19,23 188:7,20 190:8 191:6 192:14 192:16,17

203:15,16 204:18 208:1,4 208:6
**machines** 25:17 25:20 107:22 188:9 189:13 190:3,7
**mad** 138:22
**maiden** 10:22,23
**main** 6:4 20:14
**maintain** 51:11
**making** 26:12 59:4,8 89:1 92:20 93:11 95:1 153:12 167:10 174:13 204:14 205:7
**man** 9:12 184:22
**management** 119:8 211:19
**manager** 25:18 25:21 96:19
**manner** 81:15
**man's** 103:9 169:20
**marital** 181:23
**mark** 110:14
**marked** 61:2,5,8 116:20 117:14 117:17 118:17 118:21 120:15 120:18 125:15 126:8,9 127:5 128:3 129:20 173:13 193:18 194:11 198:16 198:20 200:2 205:1 206:5 211:5,8,11,12 212:3,7,14 213:3,19
**marking** 125:18
**marriage** 97:11 99:1
**married** 10:8,10 10:11,16 11:3 13:11 14:15 49:21 50:11,14 52:22 74:17 178:20 179:5
**Mary** 161:19 181:8,9 182:12 205:7,13 206:2
**match** 94:9
**material** 105:13
**math** 53:9
**matter** 7:18 37:19
**ma'am** 10:9,18 11:6 12:17,23 13:13 14:23 15:8 16:9,12 17:3,10,17 18:5,14,20,22 19:6,11,14 20:22 21:2,5 21:16 22:1,4 22:12,19 23:13 25:13 27:19 28:5,13,17 29:1,4,10,12 30:9,11,15 32:16 33:11,14 33:21 34:14,17 35:5 36:4,15 36:21 38:5,11 39:3,9 40:8,17 40:21 41:3,18 44:5,8,16 45:3 45:6,11 46:3 46:11 47:3,6,9 47:23 48:8 49:13,16,22 50:2,7,13,21 51:6,12 52:12 53:13 54:5 55:9,15 56:1,5 56:12,23 57:3 59:3,18 60:18 60:23 61:15,19 62:6,15 63:1,9 63:17,21 64:3 64:9,16 65:11 65:13,19 66:8 67:16 68:5,8 68:11,12,16 69:13,18,21 70:5,8,16,19 71:12 72:16 75:9,11,14,16 75:18,21 76:1 76:4,15 77:22 78:1,17,21 79:19,22 80:7 80:11,16,19 81:1 82:13 83:8,23 84:7 84:18 85:18,20 86:1 87:5,11 87:14,22 88:3 88:10 89:6,14 89:18,21 90:10 90:15,22 91:6 91:7 92:11,14 92:17 93:9 95:19,21 96:6 96:17 97:3,8,9 97:18 99:6,13 100:7,10,21 101:3,10,15 103:18,23 104:4,8,17 105:7,10,14,19 106:2,8,21 107:1,5 108:6 108:10 109:7 109:14 111:8 111:15,16,22 112:19,19 113:15,17,20 113:22 114:8 114:10,22 115:5,15,18,21 116:1,4,7,12 118:13,15 119:5,10,13,17 120:4,7,13 121:4,8 122:3 123:6,17,21 124:1,4,7,16 124:19 125:4 125:11,14 128:19 129:11 129:15 130:10 130:18,22 131:3,16,20 132:2,12,21 133:1,4,9 135:20 136:3,9 136:13,17 137:17 138:9 138:13,15 139:10,15 140:10,14 141:1 142:4,7 142:19 143:2,3 143:6,10,17 144:13 146:9 146:12 147:7 147:10 148:3 148:13 149:15 149:21 151:9 152:18,21 153:3,6,14,20 154:2,7,9,20 155:14 156:11 156:17 157:2,5 157:10,13,15 157:18,22 158:1,4,7,10 158:17 159:5 161:4,17 162:6 163:3,8,11,12 163:19 164:12 165:11,18,21 166:4 167:1,6 168:2,12,15,18 168:21 169:4 169:18 170:2,4 170:9,14,18 171:21 172:1 172:16,20 173:2,6 175:16 176:1,4 178:10 179:14 182:1,6 182:19,23 183:21 184:2,6 184:11,15 185:14,16,20 186:22 187:17 193:13,17 194:3,7,13,19 194:22 195:2 195:14,17 196:12,12,17 197:2,5,8,21 199:1,3,14,14 200:6,13 201:2 201:13,22 202:5,16 203:1 204:3,5 205:16 205:19 206:3 207:14,18,21 209:15,19,22 210:12 211:1 211:18,21 212:1 213:1,13 214:9,22 215:7 215:14 217:5 217:16 218:5 218:10
**McClain** 8:2 41:15 60:17 61:17 65:6
**McNaughton** 1:21 2:6 3:7 7:1 219:19
**mean** 11:18 15:12 18:3 20:7 37:22

39:8,11 52:2 52:10,22 53:3 58:1 62:2 66:9 67:23 68:18 72:7 73:13 79:6 81:20,21 89:8 93:22 94:2 96:4 99:3 102:9 108:18 111:9 112:21 118:6 124:5 134:13,21 135:18,23 136:1 140:11 140:16,19 143:16,20 146:22 148:16 149:1,2 151:1 151:5 155:23 158:18 159:13 159:19 160:17 164:3 172:7 173:7 175:2,8 176:8 180:14 181:12 184:12 188:11,18 189:13,15,18 189:22 190:4 190:17 191:8 191:15,17 193:8 194:8 199:12 203:9 203:11,15 207:13 208:2 217:22
**meaning** 33:22 139:5
**means** 33:21 70:2 93:22 108:19 132:17 208:3,17 219:9
**meant** 141:17
**medical** 133:2
**meet** 209:5
**meeting** 23:9 163:13 191:2
**Melissa** 65:12 65:21,22
**Melvin** 144:16 152:17 174:19 190:6,13 196:14 209:5 210:2
**memo** 205:21
**memory** 91:14 125:10 132:11 132:23 133:3 141:3,9 143:22 160:10 167:9 172:5 176:18 177:15,18 178:12 179:7 179:10 195:1
**mention** 70:9 131:17 146:18 147:4 152:22
**mentioned** 106:22 108:5 152:19 153:22 170:16
**messed-up** 28:14
**met** 23:6,8 29:20
**Metcalf** 11:15 11:17 12:19
**Michelle** 64:4
**MIDDLE** 1:2
**mind** 33:23 169:10 179:19
**mine** 39:13
**minor** 15:7 74:22 76:22 77:18,21
**minute** 24:10 108:14 160:14
**minutes** 60:1,1 163:16
**mischaracteri...** 141:16
**mischaracteri...** 43:3 98:5 179:21
**misleading** 42:10 43:2
**missing** 79:15
**Missouri** 5:13
**mistaken** 19:23 96:12 98:17 99:20 148:1 209:11
**mobility** 59:1
**molester** 144:11
**mom** 48:23 52:2 52:10
**moment** 160:7
**momma** 28:14
**money** 55:22 56:3,7 58:5 105:23 106:3 169:21 206:16
**Montgomery** 31:11
**month** 30:1 49:11 67:19 79:5,7,8 83:3 86:4 88:17,19 90:11 114:9
**months** 30:3 54:22 72:13 74:3 83:2,4 101:21 102:15 105:22 174:21 187:4
**morning** 54:11 54:13 199:8 202:13,16,18 203:2
**Morris** 53:18,20
**mother** 12:9 13:9,11 15:5 15:13,17,18 16:5,20,23 17:1 18:7 29:8 49:2,20 50:8 51:17 68:18,21 69:3 71:7,8 74:14,15 76:6 76:21 80:1,3,4 152:13
**mother's** 51:7 74:13
**mother-in-law** 78:19
**mouth** 42:15
**move** 99:18,21 160:15 182:8 191:20,21
**moved** 10:2 87:16 99:17 182:9
**multiple** 141:13
**murder** 207:3
**music** 102:14

**N**

**N** 2:1 4:1 5:1
**name** 8:1 9:9 10:12,22,23 11:15 12:18 20:11,11 39:17 40:2 51:8 55:21 80:23 95:13 96:13 102:21 103:3 103:10 122:14 164:4 174:3 188:23
**named** 214:20
**names** 9:3 163:6
**Nance** 119:19 120:11 130:17 153:10 184:3 195:12,14
**natural** 50:1,4
**near** 88:6
**necessary** 2:19
**need** 26:5,8 73:1 90:13 169:2 179:6,15 191:20 201:6
**needed** 55:11 56:3 123:15 148:15 149:6 161:23 191:4 200:9 201:1,20
**needs** 203:20
**negative** 110:5
**neither** 219:14
**Nelson** 62:13 63:11,16,19 213:8 214:4,4
**nephew** 21:15 21:17 22:11 70:23
**never** 11:20,23 12:4,6 16:22 16:22 62:19 80:17,20 148:4 153:9 169:8,9 197:3 210:5,8
**new** 138:21 186:6 187:6,7
**newer** 190:2
**Nickerson** 113:12 114:3 115:20,23 116:2 118:5 119:16 120:5 121:2 126:13 136:12 137:15 138:6 139:7 140:3 142:3 143:8 147:23 183:13,19
**night** 132:14 158:23 188:16
**night's** 132:20
**nine** 181:14
**Nineteenth** 5:18
**nine-foot** 179:5

**ninth** 38:14,18 38:19 46:20 47:11 49:15
**noise** 26:12
**Normal** 132:15
**North** 5:6,18 9:20 10:4
**Notary** 2:6 7:3
**notice** 125:12 134:1
**notion** 124:6
**November** 218:2
**number** 1:5 7:16 24:5 60:15 61:1,6,9,21 97:1 117:13,18 118:16,21 119:9 120:14 120:19 128:3 129:21 136:15 143:9 144:6 173:12,18 193:19 194:11 198:15,21 200:1,7 201:5 201:15,18 202:1 204:23 205:4 206:4,8 207:17,20 211:4,9 212:2 212:7,13,17 213:2,18 219:21
**numbers** 128:7 210:16
**Nut** 23:4 89:8
**Nutcracker** 88:22 89:8

**O**

**O** 2:1
**object** 18:9 26:3 27:6 31:20 32:8 34:1 35:9 36:1 37:2,13 41:10,21,23 42:11,15 43:4 43:8 44:15 45:16 46:2,10 55:12,16 56:4 60:21 62:18 67:6,12 74:23 77:4,9,13 80:10,15 82:1 86:22 87:20 90:2,21 97:16 98:16 107:11 108:12 109:11 110:21 111:7 111:11,14 112:16 123:2 124:8,13,23 132:1,6 133:22 135:4 137:4 138:7 141:4,15 144:12 146:3,8 148:9 149:19 150:14,18 151:13 153:7 158:15 159:2 159:16 163:1 164:2,8 166:7 167:16 168:4 169:16 171:20 176:20 177:19 178:7,14 179:2 183:15 185:13 188:22 190:16 192:6 196:5 200:16 202:3,9 202:19 204:16 205:9 207:5 209:14,18 210:10,23 212:12,22 213:9 214:7 215:13 217:4 217:13
**objected** 109:2
**objecting** 112:7
**objection** 26:4 91:15 97:15 98:1 107:12 108:20 109:13 109:22 110:8 110:22 112:15 114:13 124:12 132:7 133:23 136:8 137:3 138:8 145:15 147:20 148:2 149:20 150:6,8 150:15 151:15 152:3 153:8 157:21 159:3,8 159:9,17 162:12,23 163:20 164:7 167:14 168:3 169:23 171:19 177:20 178:8 178:15 179:1 185:7 192:7 196:4 200:20 202:4,10,21 205:10 210:11 212:23 213:10 214:8 215:12 217:14 218:4
**objections** 2:20 2:23
**obligation** 13:21
**occasions** 13:10 113:6,8
**occur** 13:8
**occurred** 56:22 134:3 202:15
**October** 200:11 201:19 218:2
**offender** 80:9 148:12 149:9 149:14,18 153:2,19,23 154:6,11,15,19 217:3,12 218:8
**offenders** 146:6 211:23
**offered** 3:2 102:17,20
**office** 20:12 153:11 161:5,7 199:10
**officer** 35:7,12 89:12,17 90:5 90:12
**offices** 2:7 7:8 7:23
**off-the-record** 127:21
**oh** 14:21 15:18 17:23 24:18 65:1 68:15 73:3 88:20 117:7 122:12 125:20 162:19 186:12 211:10
**oil** 198:4,6,11 199:6
**okay** 9:3 14:2 15:23 16:2 20:19 41:5 43:6 53:2 63:7 63:10 69:10,16 83:9 87:3 92:2 94:11,14,19 96:23 97:12,18 98:11,22 102:4 104:23 108:22 113:8,18 114:23 118:10 119:20 120:10 122:4,12 123:19 124:2 125:12,20 126:11 127:3 130:19 133:17 134:7 139:19 142:23 144:17 148:18 150:4 153:10 156:22 160:16 161:6 161:20 162:17 165:5 168:16 169:1 172:10 174:1 175:21 177:1 178:4 181:7 182:4,11 186:15,18 187:10 193:14 194:23 200:10 201:17 204:6 213:17 214:15 218:17
**old** 9:12 10:14 11:2,9 12:9,12 14:10 15:1 33:9 34:7,13 35:18,19 38:21 40:6 41:19 44:4 47:17,21 48:1 50:17 62:10,23 63:3 63:8 64:12 65:7 95:14 186:5,17 187:9 187:12 188:2 189:8,10
**oldest** 15:19 186:20,23,23
**once** 66:9 176:8 201:7
**ones** 36:5,8 64:7 133:11 208:18
**open** 209:6
**opened** 208:5
**operating** 96:1
**operator** 25:20 92:6,7,8,10,16 92:19 93:5 99:15 100:4,11

101:17 106:20 108:4
**operators** 96:20 96:22 99:5 107:4
**opportunity** 58:4
**oral** 3:9 7:12 34:6,12,16
**order** 78:23 105:17
**orders** 210:17
**original** 3:8
**overdrafted** 39:8
**owe** 75:17
**ownership** 210:8
**o'clock** 66:14

**P**

**P** 2:1 5:1,1
**pack** 102:18 104:22 105:1,3 114:12,20 171:5,12
**package** 115:11
**page** 4:2 24:13 24:14 28:10 173:20
**paid** 11:23 12:4 75:13
**pallet** 57:19
**pallets** 85:6
**Pantazis** 5:16
**paper** 60:22 73:19 123:18
**paperwork** 210:13,22 211:15,17
**paperwork's** 210:17
**paragraph** 174:2,9
**parent** 50:4
**parents** 50:1,23 51:4 53:22
**part** 30:11 75:8 107:21 212:8 212:18 213:6 214:2
**particular** 95:23
**parties** 2:3,22 219:15
**pay** 11:21 12:21 13:14,21 16:7 16:8,13,17,21 58:8 75:7 78:23 79:3,5 85:9 99:23 100:6,19,19 107:3 212:9,19 213:7 214:3
**paycheck** 55:11 55:14,18
**payers** 161:14
**paying** 75:14,15 78:23 79:1 155:5 206:17
**payroll** 39:15,20
**PC** 5:5 7:23
**peanuts** 93:4,4 100:18 105:2
**pending** 165:17
**people** 38:10 49:23 91:13 104:1,6 122:13 124:10 134:2 144:10,21 145:10 146:22 147:2 150:3 153:16,18,21 163:7 177:4 185:22 188:11 189:16 204:1 204:14 205:12 210:18
**period** 51:15,20
68:20 88:12 177:15
**person** 17:1 28:8 28:8 86:13 90:19 93:6 96:15,19 99:4 154:14 161:18
**personal** 27:13
**personally** 158:18
**Phillip** 48:22
**Phillips** 47:15 48:17,22 54:7
**Physically** 30:10
**pick** 56:6
**piece** 60:22
**Pike** 6:3
**place** 20:9 54:1 54:4 55:2 72:22 73:8,11
**placed** 19:4
**places** 145:13
**plaintiff** 5:14 8:6,7
**plaintiff's** 24:4 40:22 60:14 61:1,6,8,21 96:23 117:13 117:18 118:16 118:21 119:8 120:14,19 125:16 127:6 128:3 129:21 136:14 143:9 144:6 173:12 174:22 193:19 194:11 198:15 198:20 200:1,7 201:5,15,18,23 204:23 205:4 206:4,8 207:17 207:19 210:20 211:4,9,9,13 212:2,7,13,17
213:2,18
**Plaintiff(s)** 1:8
**plant** 73:9,15 74:2 81:3,4,14 81:20 82:12 83:7,10 87:7 88:4,14 89:2 89:13 105:9 113:2 154:14 180:22 182:13 217:7
**plead** 34:15,18 37:16
**please** 3:11 9:10 24:6 28:11 32:23 34:10 46:16 71:18 112:4 117:20 118:23 119:2 155:16 159:23 160:10 172:3 174:9 200:5 206:9
**pled** 33:12 35:2 36:9,11 37:8 41:22 45:13 61:12,13 62:21 64:8
**plenty** 132:13
**point** 60:4 128:11 179:20 187:2,15 209:2
**Pokphand** 72:18
**policy** 124:10
**position** 25:15 28:1 83:5,10 84:2,16,20 85:21 86:16 92:4 102:17 105:18 171:3 177:9 215:4
**positions** 82:11 82:19,23 85:19
**possibility** 57:8
218:6
**post** 161:4,7
**posted** 103:16
**predated** 201:14
**pregnant** 19:8 19:13
**prescription** 132:22
**presence** 115:23 131:5
**present** 6:7 122:13
**presented** 179:6
**pretty** 31:23 87:18 189:13
**previous** 209:4
**Prince** 152:12
**print** 174:4
**prior** 3:2
**Priscilla** 51:9
**prison** 24:2 30:12 31:19 32:3,3,15 35:3 69:2,11 74:12 76:7 77:8 90:20 147:6 148:6 169:15 181:17,20 211:20
**prisoners** 32:6
**privilege** 160:2
**pro** 40:12
**probably** 14:6 92:23 108:1 126:17 131:8 131:11,12,12 183:10 185:23 204:20,21
**probation** 18:19 18:21 35:6,12 40:15,18 66:23 67:2,3,7 68:1 68:12 69:11,22 70:3,11,18,21

74:8 86:21 89:12,16 90:5 90:12,17 91:9
**problem** 9:1 91:13 95:6 197:13
**problems** 137:20 141:18 143:11 181:23 187:22 188:6 188:10,12,17 189:2 192:14 192:16
**procedure** 3:5 7:6 129:18
**proceedings** 7:13
**process** 101:2,5
**production** 199:10
**products** 1:10 7:19 8:10 57:18
**profanity** 113:19 192:5 195:8
**proper** 151:22
**properly** 92:22
**prove** 21:12
**providal** 162:15
**provide** 151:7 151:10,12 152:1 162:4,20
**providing** 9:2
**proving** 178:12
**psychiatrist** 68:3
**psychological** 75:23 76:13 212:20 213:7
**psychology** 212:9
**public** 2:7 7:3 146:1,1,2,5 150:11
**pull** 143:12
**purpose** 215:18
**pursuant** 7:5
**put** 25:6,22 26:21 27:3 29:8 40:12,15 41:1 42:8,20 44:2,6,12 45:20,20 46:5 46:9 57:18,19 71:10 85:14 86:19,20 93:3 94:20 105:2 121:13 122:10 122:14 131:19 187:6 205:21 210:15 215:5 217:16
**P-O-K-H-A-N...** 73:5
**P.C** 6:3
**p.m** 2:10 7:10,21 155:3
**P.O** 5:12

**Q**

**qualifications** 105:16 107:16
**qualified** 107:8
**quarter** 58:13
**question** 2:22 15:15 16:2 17:19 26:8,15 32:9 35:10 42:3,10 43:13 48:10 52:7 59:13 64:23 77:21 79:4 82:21 90:3 91:17,21 104:10,13 108:19 109:3 109:12,15 110:2,10,12 111:13,17,21 111:23 112:2,9 112:17 120:9 135:6 137:5 139:18 140:1 140:18 141:7 150:19 151:14 151:18,20,22 152:6 158:17 159:12 178:10 181:1,6 183:16 184:11 185:8 190:19 207:5 208:22
**questions** 2:21 33:1,1 42:22 43:10 72:5 82:9 112:8 141:13 142:18 163:23 219:8
**quietly** 158:22
**Quinn** 5:16
**quit** 38:14,18 46:23 112:4,6
**Quite** 197:23

**R**

**R** 5:1
**radio** 199:5,9 200:11 201:6,8 201:20 202:1 202:12 203:6 203:10 207:13 207:23 208:12 209:2,17
**raggediest** 186:20
**raggedy** 188:1
**rail** 94:8 191:18 191:20
**rails** 94:8 95:7 191:13,16,21
**raising** 193:4,5
**Ralcorp** 5:11
**rambling** 110:2
**ran** 29:16 107:19,21 154:4 188:7 189:13,16 191:5 204:9
**range** 107:3
**rape** 33:4,5,6 36:17,19,21 37:1 41:7 44:22 45:8 60:16 169:6 171:9 181:10
**rapes** 40:20 67:5 168:23 171:17
**raping** 44:6 65:15,17
**rapist** 64:2
**rated** 106:19
**Ray** 16:6
**reach** 198:5
**read** 118:2,23 123:5,8 128:18 130:4 161:12 161:22 174:8 174:10 193:20 200:6 206:10 206:23
**reading** 2:12 130:11
**real** 67:22 134:13,20 146:23 198:5
**realize** 65:19 70:19
**really** 24:3 29:15 38:1 40:9 67:23 72:20 77:5 90:15 97:8 99:8 101:18 118:13 131:3 134:21 138:15 149:1 160:2,13 163:11 166:1 176:5,14 177:5 177:11 180:9 181:15,15 182:19 184:6 187:21 189:11 201:4 204:20 209:23
**reason** 16:17 21:6 22:5 31:16 53:21 81:18 104:16 106:7 124:2 156:13 165:21 178:21 184:7 191:22 192:2 194:16 195:22 198:10
**reasons** 79:14 90:7 209:8
**recall** 28:3,9 48:18 54:20 56:8 57:8 79:19,20 86:3 87:5 91:7 101:3 108:13 109:7 113:7 114:8 116:1 118:10 129:11 133:9 136:3 142:7,8,13 143:17 144:4 146:21 147:16 147:18 149:8 149:12 158:4,7 158:10 159:4,4 159:15,21 163:14,19,21 163:23 164:10 164:12 166:13 167:5 172:1,16 175:3 176:5,14 180:2,9,10

FREEDOM COURT REPORTING

181:13 183:21 184:2 185:3 191:14 195:7 196:13 198:23 209:12,19 210:12 211:21 212:1 216:3,7 216:8,9
**recalled** 163:22
**recalls** 109:8
**receive** 31:3 171:22
**received** 116:10 167:3
**recollection** 50:23 191:1
**recommended** 215:10
**reconsider** 194:4
**record** 7:21 9:10 48:4 128:6
**refer** 182:21 183:12 185:11 186:7
**reference** 24:23 27:13,16,18 215:5,15,15,16 215:19,20
**references** 24:22
**referred** 184:4
**reflect** 209:10
**refresh** 179:7,10 194:23
**refute** 110:20 111:5 112:14 112:18
**refuting** 109:10 109:18 178:6
**register** 146:7 146:16 148:12 149:9,14,17
**registered** 146:11
**registering** 146:14
**rehabilitated** 77:7,12
**reinstated** 19:2
**related** 21:19 22:20 97:2,8 97:10,13,21 98:12,15,20,23
**relating** 2:16
**relationship** 51:11 180:11 180:12 196:16 196:20,23
**remember** 12:11 23:9 32:1 35:16 40:2 45:17 48:2,5 48:20 49:10,19 51:23 52:1,5,8 53:6 54:2,6,9 54:19,23 55:2 55:5,6,19 56:2 56:14,19 57:6 57:9 58:19,22 59:18 61:23 62:2,12 66:4 66:17,20,22 70:22 71:23 72:2,10 73:22 74:4,6,7,10 75:6,10,12 76:9,19 81:8 83:1 84:4 85:16 86:6,10 86:23 87:2,8 87:11,12 91:10 91:11 95:13,16 100:8,10 101:13,15,16 102:2,6,9,10 102:11,21 103:1,3,9,21 106:14,17 108:6,7,10 109:14,16,21 111:6 113:4 114:5,10,14 115:19,21 116:7,8,12 121:8 122:16 124:19,20,22 125:1,2,3,5 129:16 130:18 130:19,22,23 131:1,6 132:2 132:9,10 133:12,18 134:4,6 140:17 140:20,21 142:21,22,23 143:4,13 147:1 147:21 148:10 148:13 149:10 149:11,15 153:14,20 156:4,5,6,10 160:18,19 163:2,6,9 164:14,20,23 165:8,13,15,18 165:19,22 167:17 168:2 168:11,13 170:7,14,18 172:6,20 173:10 176:4 177:5,9,11 178:16,22 179:12,13 184:5 188:19 190:10,12 191:7,9,10,16 194:7,9 195:2 195:5,10,13 196:2,6 197:3 207:15 209:22 209:23 210:1 216:15
**remembered** 131:23 168:6,8 195:16
**remembering** 164:4
**remembers** 109:17 172:7
**reminding** 210:21
**Renae** 62:4 212:10
**Renny** 1:21 2:5 3:6 7:1 219:19
**repeat** 52:7 179:7
**replaced** 187:14
**report** 89:11,16 90:4,8,11 91:2 129:5 217:2
**reported** 37:23 38:2 216:17
**reporter** 2:6 3:12 7:2 8:13 116:22 117:1,4 117:9 125:17 125:20 126:3,7 126:12,20,23 173:19 174:10 177:23 198:22 213:11,15 219:20
**Reporting** 8:3
**represent** 8:4,6 8:9,12
**represented** 76:12
**representing** 8:2
**represents** 8:7 219:11
**requires** 146:6
**residence** 90:8
**resign** 155:18 156:8,12,14 158:13 162:13 162:19 215:10
**resignation** 162:15
**resigned** 155:12 215:23
**resolution** 190:15,22
**respective** 2:3
**responding** 207:10
**response** 142:11
**responsibility** 136:11 137:2,8 137:10,18 138:5 210:8
**responsibly** 138:5
**rest** 34:22 69:14 136:1
**restate** 110:12
**restitution** 75:7 75:19 76:3 79:1,4 212:8 212:19 213:7 214:3
**result** 219:17
**resulted** 174:23 192:4
**retained** 3:12
**retaliation** 167:12
**revoked** 18:21 18:23 90:7,16 90:18
**rework** 192:18
**Richard** 6:2 8:11
**Ricky** 174:20
**ride** 65:2
**ridiculous** 43:1 160:18
**ridiculousness** 42:9,21

FREEDOM COURT REPORTING

**right** 11:7 14:3 16:4,23 17:7 18:6,19 19:15 22:20 24:19 25:2,4 29:3,9 29:21 36:5 37:6 38:12,17 40:10,16,20 41:17,22 43:12 43:12,13 44:14 44:23 45:10,14 46:4,15 47:20 48:14 49:20 50:3 51:7,13 52:1,18 53:11 55:1,8 56:13 57:2 60:20 61:12,14,18 62:17,22 63:20 64:10 65:8 67:11,15 68:13 68:15 69:12,20 70:7 71:13 72:12 73:10 74:16 75:2 76:23 77:3,12 77:18 80:8 81:2 83:5,7,18 88:2 90:12,20 92:21 93:8,10 93:15,18,19 94:22,23 95:1 95:8,22 96:7 97:17 98:13 99:6 100:13 104:13,16 105:20 106:9 106:13 109:10 113:23 115:4 121:5,14,22 122:5,7,21 123:11 125:13 130:16 132:5 132:19 133:11 135:19 136:2 136:12 137:7 141:5,11 142:3 142:10,12,20 144:14 150:5,7 150:9 151:12 154:1 155:15 159:10 162:22 163:4 164:13 167:15 168:1 168:23 169:22 170:19 171:10 174:6,8 175:10 175:13 177:13 178:23 180:20 181:5 182:7,11 182:14,17 193:16 194:20 195:23 197:10 199:18 200:12 201:3,21 202:7 205:5,8 206:2 207:16,17,20 210:16,22 215:2,17 217:18 218:3
**roasted** 100:18
**roaster** 99:22 100:16,20 101:17,20,22 102:16 108:4
**Robertson** 3:8 4:3 5:15 8:5,5 8:16 9:2,8 18:1 26:9 32:22 34:4 36:8 37:14 42:2,4 42:14,23 43:6 43:11,15,20 44:1 60:6,13 61:4 67:4 81:17,23 82:5 82:10 91:22 92:3 98:4,10 108:15,22 109:4 110:3,7 110:9,14,17 112:4,11 116:13,19,23 117:2,7,11,16 118:19 120:17 125:19,22 126:11,14,22 127:3,4,12,16 128:1,10,14 135:7 150:20 151:19,23 152:7,9,14 154:21 155:4 160:1,8,14,17 161:1 172:2,12 173:15,18 179:8,17,23 193:21 198:18 198:21 200:4 202:22 205:3 206:7,14,21 207:1,8,11 208:13 211:3,7 212:5,16 213:5 213:14,17,23 214:1,10,17 218:15,18
**roll** 94:18
**rolled** 152:13
**romantic** 196:21
**Ronnie** 10:20 14:14 15:9,10 15:13 17:8 18:2 19:8,18 22:23 76:16 79:17 165:3
**Ronnie's** 10:21 18:7 29:7
**room** 84:21,23 85:1,17
**rude** 118:8 123:13 137:13 137:17 138:5
**rule** 3:4 218:7
**rules** 2:16 3:5 7:5
**run** 94:21 171:3 186:1 189:22 190:2,3 203:15 203:16,17,17
**running** 93:14 93:20 108:2 120:1 128:16 192:9 203:8,8 203:9,21 204:18,19 208:3
**runs** 92:20 94:21 95:1 191:17

S

**S** 2:1 4:5 5:1,2 5:14
**safety** 146:6
**Samford** 64:4
**Sammy** 174:19
**sanitation** 73:12 73:14 83:6 84:6
**Sara** 215:6,21 216:10 217:7 217:11,20 218:11
**saying** 26:2 28:19 57:22 63:14 65:3 101:23 137:9 137:19 140:9 148:4 153:1 175:7 178:18 179:4,4,15 183:19 195:3,5 195:10 196:8 201:13
**says** 25:1,3 28:11 40:23 44:19 61:12,16 61:19 97:1 110:18 118:8 119:4,11 122:12 137:20 147:23 174:3 178:5 201:5 208:19
**school** 38:20 46:20 47:2,11 47:14,18 49:9 49:15 52:4,19 53:12
**Scott** 5:9
**screaming** 135:2
**screw** 94:7,9
**screws** 94:6,8
**scuffle** 31:22
**season** 106:10
**seasonal** 106:6
**second** 24:13 61:8 115:11 159:22,23 174:2 186:11
**seconds** 168:7
**see** 13:1 14:21 15:18 16:15,19 24:7 53:8 68:3 88:20 93:21 119:11,13 122:7,14 123:17 127:16 131:17 136:6 136:18 174:2,7 193:23 216:19 217:20
**seeing** 21:10,15 21:23 22:10,14 22:15 79:17 206:1 209:23
**seen** 13:9 167:20 193:21 206:12
**select** 155:8,9

FREEDOM COURT REPORTING

**selected** 155:10
**sell** 105:3
**send** 84:1 85:7
**Senior** 5:10
**seniority** 101:12
**sense** 42:11
**sent** 171:9
**sentence** 19:10 69:14 75:8
**sentenced** 35:12 67:15 69:16
**separated** 19:20 20:23 22:13,16
**September** 23:5 217:21 218:1
**serious** 149:1
**serve** 18:15 30:20 67:18
**served** 24:1 36:22,23 78:3 156:23 157:3,4 161:2,9,14 171:6
**serving** 19:9 148:5
**set** 93:13,19,20 93:22 94:5,7 180:5
**sex** 32:7,12,17 33:15 34:6,12 34:16 35:18 41:20 44:3 45:13,23 62:7 62:11,16,19 77:10 80:9 146:6 148:12 149:9,14,17 153:2,19,22 154:5,11,15,19 211:23 217:2 217:12 218:8
**sexual** 61:18 65:8 76:17 167:11 171:22 172:14,17 214:6
**sexually** 214:5
**Shane** 21:18
**Shealy** 6:3
**shift** 66:14,19 188:16
**shit** 183:9
**Shoney's** 54:8 54:10,16
**short** 60:9 116:16 155:1 160:21 172:9 214:14
**show** 61:5 116:20 117:17 117:19 118:20 120:18 125:15 127:5 128:2 129:16,20 173:16 193:18 194:10 198:19 210:4 211:8 212:6
**showed** 101:6 211:12
**shut** 42:15
**sic** 206:9
**Sierra** 11:15
**sign** 199:21
**signature** 2:12
**signed** 39:6,6,11 39:12 101:7 118:15 217:21 217:23
**significance** 135:11
**significant** 169:20
**signing** 55:21
**silliness** 82:8
**simply** 81:15
**sir** 9:10 23:13 24:6,20 28:11 38:13 41:3 45:2 46:16 57:13 75:5 97:22 117:20 117:22 118:23 119:3 128:20 140:23 155:16 173:9 200:5 206:9
**sit** 129:7 139:21 160:15 167:7 208:15 211:2
**sitting** 8:18 112:3
**situation** 148:22 148:23 164:17 164:18 166:9 166:10 167:22 168:9 191:11 202:14
**six** 30:3 54:22 72:13 145:10 168:22 174:21
**size** 83:17 94:10
**skill** 92:12 99:23 100:6 101:14 106:15,18
**slanderous** 174:22
**slaps** 93:7
**sleep** 132:13,20
**slow** 174:10
**smoke** 147:12
**Smothers** 174:20
**Social** 9:17
**sodomies** 40:20 67:5 168:23
**sodomize** 63:15
**sodomy** 33:7,9 33:17 34:10 36:15,16 44:22 62:21 63:6 169:6 171:9 181:10
**somebody** 28:14 63:12 70:13 74:17 104:3 109:8,16 110:18 131:6 135:1 151:6 203:18,19 214:20 215:8
**someone's** 55:21
**son** 15:19 184:23
**song** 102:14
**soon** 19:2 114:11 187:14
**soon-to-be** 78:19
**sorry** 17:20 31:1 48:13 57:1 59:14 65:1 84:22 93:18 102:7,12 111:3 112:23 122:20 129:8 131:13 134:19 142:19 171:15,15 190:18
**sort** 94:15
**sorts** 81:22
**soul** 27:16
**sound** 53:11 75:2 77:6 137:1 218:3
**sounds** 102:13
**SOUTHERN** 1:3
**so-called** 193:12
**speak** 93:16,17 135:15 163:5 180:20
**speaking** 103:6 103:8 123:13 180:20
**specific** 179:3 215:3
**specifically** 184:9
**specifics** 158:5
**spell** 10:12 73:2 73:4
**spend** 34:21,22 48:6
**spent** 147:5
**spoke** 154:3 180:16,16,19 182:19
**St** 5:13
**standard** 93:13
**standing** 121:22 122:5
**stared** 186:19
**start** 117:2 185:21 198:8
**started** 23:4 30:18 58:12,15 73:12 76:17 79:21 80:5 83:3 89:7 99:12 117:9 128:11,15 186:4 189:2,3 189:4,7,9,11 199:15 208:8 217:21
**Starting** 46:18 174:15
**state** 2:7 7:3 8:4 9:9 108:21 112:2,9 149:16 150:2,7,9,10 219:3
**stated** 110:7
**statement** 137:2 137:9 140:4 177:16
**STATES** 1:1
**station** 47:16 48:17
**status** 91:3

**statutory** 41:7 45:8 60:16
**stay** 76:5 99:14 101:19
**stayed** 76:8 99:16
**stealing** 55:22
**stenotype** 219:8
**step** 52:3
**stepbrother's** 21:21
**Steph** 181:4
**Stephanie** 107:20 181:3 181:19 182:12
**stepmom** 52:3 52:11
**stepmother** 50:6 68:19 74:14
**stepson** 19:16 21:21
**Stewart** 174:19
**STIPULATED** 2:2,11,18
**stipulation** 7:7
**stipulations** 8:14
**stolen** 169:20
**stopping** 190:8
**store** 180:5
**straight** 128:8 128:17
**street** 5:6,18 6:4 9:20 10:4 92:9 95:10 132:22
**streets** 90:19
**stuff** 107:7 164:23 192:22 192:22 193:2
**sue** 91:18 165:6
**sued** 165:1,3,8
**suggest** 166:2 170:10
**suggesting** 142:16 196:18 197:1
**suggestion** 155:13
**Suite** 5:7
**sundry** 67:5,11
**super** 96:10 136:19
**supervision** 173:1
**supervisor** 85:22,23 86:2 86:13,14 87:4 89:2 96:11,19 99:7 102:1,18 103:13 104:20 104:21 105:9 105:12 114:21 115:11 121:12 121:15 122:2 138:19 140:5 141:19 149:13 171:2,5,11,14 173:4,5 192:10 192:21 202:6
**supervisors** 136:19 137:21 174:16,17 196:22 197:9 197:16
**supervisory** 87:13
**support** 11:23 12:5,21 13:15 13:21 16:8,21 48:21 165:7,9 169:21
**suppose** 55:13 111:1 113:3
**supposed** 39:22 42:16,19 70:3 79:7 83:17 90:4 139:4,9 204:19 208:9 210:14,18
**supposedly** 156:2,16 159:1
**sure** 17:16 18:2 20:20 30:2,4 36:10 43:14 56:15 57:15 60:6 72:20 92:20 93:6,11 93:12,14,19 94:12,17,21 95:1,4,8 104:11 110:16 115:6 118:3 120:8 126:1 130:5 136:4 151:19 158:21 174:13 176:22 179:11 187:10 187:11 204:8 204:14 205:7 210:16,16,17 210:21 211:14
**Surely** 22:5
**suspect** 190:21
**Swain** 5:3 8:8,8 26:4 91:15 97:15 98:1 107:12 109:13 109:22 110:22 112:15 114:13 117:6 124:12 126:1,5 127:8 127:10,13 128:6,12 132:7 133:23 136:8 137:3 138:8 145:15 147:20 148:2 149:20 150:6,8,15 151:15 152:3 153:8 157:21 159:3,9,17 160:5,16 162:12,23 163:20 164:7 167:14 168:3 169:23 171:19 177:20 178:8 178:15 179:1 185:7 192:7 196:4 200:20 202:4,10,21 205:10 207:6 210:11 212:23 213:10 214:8 215:12 217:14 218:4,17
**sworn** 9:5

**T**

**T** 2:1,1 4:5
**take** 16:15 24:4 55:18 60:5 83:6,11 92:12 99:23 100:5 104:15 116:13 118:23 127:6 128:4 136:20 149:8 154:21 159:23 160:8 160:11 172:3 184:14 214:10 218:11
**taken** 2:5 3:9 16:10 60:9 116:16 155:1 160:21 172:9 214:14 219:7
**talk** 42:5,7 44:9 65:2 71:3 109:1 130:16 157:7 158:2 160:9 162:2 210:7
**talked** 71:6,7 80:17,20 141:14 147:8 156:18 164:5 166:22 167:2 168:14 204:21
**talking** 24:11 27:23 30:1 36:6 71:21 82:2,18 91:23 94:2,4 121:2 121:18 123:12 123:16 139:6 142:2 145:6 148:18 150:12 160:6 168:7,10 168:12 174:14 176:9 183:19 183:23 186:8 186:10 196:19 196:20,21,23 199:11,14 217:1
**Tamekia** 194:12 194:14
**tape** 60:11
**Taylor** 17:12,14 18:3 19:9
**team** 106:11 107:9,17 144:3 171:10 172:22 197:8 203:12
**tedious** 189:22
**telegraphing** 82:1
**telephone** 207:13
**tell** 11:7 12:18 20:16,17 24:5 26:16,18,20 27:2 32:19 33:2,22 35:6 35:17 36:5 39:10,10 42:12 46:15 59:16 60:15 73:1 80:12 104:18

108:23 111:3 119:20,22 125:3 136:19 136:20,20,22 137:22,22,23 138:1,14,20 140:4,15 141:16,20,20 141:22 145:11 147:14 155:15 157:14 158:8 161:10 163:2,4 164:1,13 170:20 176:2 180:4,7 181:12 182:17 184:3 185:5 189:15 192:2 199:4 215:21 216:1
**telling** 66:5 90:23 110:11 123:14,23 130:19 133:5 141:8,14 144:10,20 145:9 153:16 153:18 175:17 200:8
**tells** 140:6 141:19
**temp** 72:1,8,9 147:12 148:7 171:11
**temper** 118:7 124:18
**temporary** 102:18 103:12 104:19,21 105:8 106:6,7 114:12,20 115:11 171:2,5 171:13 173:3
**ten** 163:16
**tend** 43:17
**Teresa** 152:13
**terminate** 156:13
**terminated** 87:10 155:18 162:14 175:18
**termination** 175:1,15
**terms** 103:6,8 161:9
**test** 92:13 100:1 100:6 106:15 214:5
**testified** 9:6 98:6 133:13
**testimony** 1:14 3:9 98:5 194:5 219:12
**tests** 11:20 16:10
**thank** 82:5 130:6 152:7 206:14
**thereto** 3:3 219:9
**they'd** 138:19 139:2
**thing** 20:14 45:22 63:20 158:19 169:7 176:16 199:8
**things** 8:19 35:7 44:17 67:11 81:22 112:7 137:14 138:13 152:11 189:19 189:23 206:12 206:20
**think** 11:13,13 11:18 13:17 19:6,20 20:11 20:12 21:14,22 22:6 25:16 29:10 34:5 37:11 39:17 56:14,15 57:17 61:20 63:22 71:16 76:8 77:14 80:13 106:4 107:16 111:2 115:1,1 123:7 127:11 127:14 130:12 134:5,23 136:16 149:16 150:22 152:9 154:13 156:20 169:19 170:1 179:3,20 184:13 188:23 195:15 200:22 204:20 217:8 218:15
**thinking** 19:22
**Thompson** 71:9 80:2
**Thornton** 1:6 6:7 7:18 113:11 114:1 116:6,11 130:2 130:21 131:5 133:7 135:14 144:10 150:12 152:15 154:18 164:20 167:10 175:10 176:3 178:4 180:2 182:22 184:1 185:5 191:3 196:15
**Thornton's** 167:4
**thought** 22:3,7 22:15 37:20 63:22 78:2 126:7 127:16 169:8 199:13 203:11 208:9 217:10
**thousands** 162:21
**threatening** 153:1 196:10
**threats** 153:12
**three** 25:1 26:22 28:18 33:5,6 74:3 83:4 94:6 106:12 107:18 116:3,5,9 169:5 186:1,2 186:4 187:4,23 188:7 194:15 208:20,21
**three-pack** 105:3
**throwed** 78:8
**throwing** 151:6
**thrown** 78:9
**tight** 95:4
**time** 3:1,1 11:22 24:1 25:14 28:6 29:14,19 36:23 48:6,15 51:4,15,20 52:5 59:23 65:7 66:19 67:1,8 68:20 72:11 78:3 79:10,13,15 84:16 88:9 89:18,19 100:3 102:3,7,9 104:14 106:14 115:12 116:9 134:8 147:6 148:5 155:3 156:23 165:14 167:9,18,19 171:2,4 176:19 177:15 178:13 183:8 184:19 186:9,11,16,22 192:16 198:3 202:15 203:4 208:4 218:21
**times** 31:23 66:11 79:12 197:22
**tinker** 94:3
**title** 104:19 106:5
**today** 164:3 209:4,10
**Today's** 7:21
**told** 12:20 25:7,8 25:10,23 34:20 37:13,18 76:2 76:11 80:21 91:8 98:12,17 101:11 120:2 120:11 121:12 123:19 129:4 134:12,14,19 136:23 137:16 138:2,19,22 141:23 142:6 143:10 155:22 155:23 156:7 156:12 158:12 159:1 161:20 162:3,7,9 168:19 169:4,8 170:13 171:7 175:8,17 178:19 191:12 191:18 192:21 195:11,13,19 195:19,21 198:14 199:7 201:7,19 202:6 205:11 207:22 215:9 216:17 216:21
**tolerate** 135:2
**Tommy** 119:19 120:11 130:16 184:3 195:11

FREEDOM COURT REPORTING

195:14
**Tommy's** 126:20 128:8 128:13,16
**top** 94:7 107:3 110:6
**toss** 131:14
**total** 86:8
**totally** 138:12
**Tower** 5:6
**toy** 94:3
**train** 63:23 177:10 180:5,6 185:19 188:14
**trained** 95:11,12 96:15 176:13 176:15 177:4,6 177:7 180:8,8 180:13 185:18 186:8
**training** 31:4 127:1 171:23 172:15,18,19 173:5 185:21
**transcribed** 219:9
**transcript** 3:8 219:12
**transcription** 219:10
**transferred** 31:12
**treatment** 75:23 213:8
**trial** 3:1 9:3 37:10 78:5,6 78:12,15
**tried** 68:22 72:7 210:3
**trouble** 31:18 32:2,11,15 137:1 138:3 140:8 142:1 164:4,5 170:6 188:20 189:16
**troubleshoot** 95:6
**trucks** 57:19
**true** 41:9,11,12 97:6 219:11
**trust** 180:22
**trusted** 182:12 182:12 205:13
**truth** 123:23 195:20,21 196:1
**try** 43:4 71:18 73:7 80:22 152:11 164:9 177:1 179:6
**trying** 17:21 19:19 43:9,19 57:17 69:2,4,6 69:7 71:16 82:16 123:4,9 151:7,8,9 179:21 180:4 188:23 190:18 192:11 202:23 203:7 204:4,8
**turn** 94:6,9 136:21 138:1 140:7 141:21 189:20,20
**turned** 210:18 210:19
**turns** 160:12
**Twentieth** 5:6
**twice** 66:9
**two** 14:17 19:20 33:4,5,6,6 36:17,19,21 40:15 41:8 44:10 45:9 49:23 63:23 83:2,4 88:17 88:18,19 94:8 99:22 100:16 101:21 102:15 113:6 114:6 115:3 133:13 141:1,10 149:4 163:16 169:5,6 169:6 174:9 176:8 180:21 187:3 205:12

**U**

**U** 2:1
**ugly** 134:22
**Uh-huh** 36:8 45:1 117:1 126:22 139:1
**uncle** 22:22 25:8 25:9 70:20 96:18 97:23,23 98:18,19,21 145:14
**underaged** 77:11
**understand** 15:15 35:10 108:23 111:12 111:16,23 140:18 158:16 176:23 177:2 183:16 190:18 201:10
**understanding** 107:23 166:17
**unemployment** 88:13
**UNITED** 1:1
**unprofessional** 81:15 82:3
**unshirted** 207:3
**untrue** 174:22
**upset** 192:23
**upward** 59:1
**use** 27:12 85:3,7 115:22 169:21 193:11 194:1,5
**uses** 190:21
**usual** 8:13 148:21,23
**usually** 32:6 79:5,6 148:17 148:19

**V**

**v** 1:9
**vacated** 104:16
**vague** 108:19
**various** 40:20 67:5,11
**Ventress** 30:23 31:2
**version** 131:18 131:19
**versus** 7:18
**victims** 75:23
**VIDEOGRAP...** 7:15 60:7,10 116:15,17 155:2 160:20 160:22 172:8 172:10 214:12 214:15 218:20
**videotape** 7:16
**visits** 13:8
**vis-a-vis** 161:10
**voice** 193:4,5

**W**

**Wachovia** 5:6
**wait** 11:16 64:22 108:14,14 189:23 211:10
**waiting** 78:5,6
**waived** 2:13
**wake** 66:13 68:14
**walked** 184:20 184:21 193:6 196:9 208:19
**walkie-talkie** 197:20 198:2
**walkie-talkies** 197:7,11
**walking** 90:19 184:19
**Walter** 74:18,19
**Wal-Mart** 105:4
**want** 16:20 26:10,11,14 42:8,21 48:10 91:18 94:1 102:8,9 108:21 110:13 138:15 149:22 150:4 150:11,23 151:5 158:21 176:22 177:1 179:9,11 180:1 198:11,12,19 213:21 218:19
**wanted** 8:21 22:17 46:22
**wanting** 133:20
**wants** 150:10
**warrant** 15:5,13 17:2 18:7,11 29:8 61:11 71:11 74:20 76:21 80:13
**wasn't** 14:19 31:16 39:12 41:11,12,19 103:4 120:1 122:23 123:3 123:22 188:10 191:8
**way** 21:9 28:15 41:6 43:23 81:18 109:9,18 110:20 111:5 112:13 126:18 162:19 178:5 178:11
**wear** 201:6
**wearing** 198:9

**week** 30:1 68:22 86:4 156:20 158:3 163:18
**weekend** 10:2 68:23
**welcome** 152:8
**went** 18:12 21:9 47:15 57:21 68:1 72:15 73:20 78:13 84:21 88:22 92:9 95:9 99:22 106:11 139:7 162:2 170:23 171:7 177:8 192:8,15 199:22 204:9 216:21
**weren't** 32:18 76:2 124:21 136:4 158:11
**West** 6:4
**Wetumpka** 30:7 31:9
**we'll** 179:18 213:16
**we're** 7:20,22 27:23 42:4 60:7,10 81:2 112:8 128:16 154:23 155:2 160:6,22 162:18,20 172:2,10 182:9 211:13 214:12 214:15
**we've** 30:5 36:10 104:13 136:16 163:17
**wheels** 95:7
**whisper** 81:10
**wife** 14:20 15:11 15:16 21:10,14 21:23 51:22 97:9
**wife's** 98:18
**Wiggins** 5:16
**Wilkerson** 121:2 212:21
**Williams** 1:15 2:5 6:1 7:11,17 7:19 8:12 9:4 9:11,13 10:20 14:9 17:12,13 24:9 49:3,4 50:5 127:2 155:6 209:7
**Wilson** 21:18,19 21:23 22:14,15
**win** 47:7
**withdraw** 107:14
**withdrew** 78:19
**witness** 2:13 7:11 17:20,23 20:19 26:6,16 48:13 53:2 59:14 65:1 67:9 72:6 73:3 82:2 98:9 112:6 115:8 117:21 119:1 120:10,21 122:8,9 126:9 128:5 129:8 139:19 151:17 178:2 200:19 219:13
**witnesses** 122:13 136:7
**woman** 10:14 14:4 15:1,4 17:5 193:15
**women** 185:11
**wondering** 135:12 166:6
**word** 193:11 194:1,6,8,9,21 195:1,3,4,5
**words** 51:22 115:22 190:21 196:11
**work** 40:1 47:15 48:16 54:18 55:14 57:21 58:9,20 59:23 66:15,21 71:15 72:8,12,15,19 73:21 74:1 81:5,11 87:3 88:21 91:13 101:5 144:21 145:4 146:20 147:9 148:12 149:9,23 150:5 151:1 170:22 170:23 171:10 176:7,9,10 177:14 193:7 200:9 201:1 204:1 208:8 209:10 215:20 216:12,14,18 216:22 218:8
**worked** 46:16 54:8,16 55:2,7 56:17 57:10 59:16 66:6 67:1 71:16 72:1,3,9,18 81:7 84:16 85:17 86:7 91:12 107:20 176:2,6,17 178:23 186:3 186:14 188:20 204:9 217:19 218:1
**workers** 148:7
**working** 23:4 54:4 56:21 57:5 66:18 83:3 105:6 122:11 123:4 176:19 177:17 177:21 178:2 178:13 180:2 186:4 189:4,7 189:9,11 192:17 203:5
**works** 194:15 215:4
**world** 27:17
**worst** 158:19
**wouldn't** 8:20 109:9 151:5 178:21 195:18
**write** 121:12,18 124:10 142:6,9 174:10
**write-up** 113:13 115:20 116:10 117:23 118:12 118:14 120:6 123:9 133:6,7 143:8 199:18 199:20 200:10 200:18,23 201:4 206:22
**write-ups** 105:17 114:7 115:4 133:14 200:15 206:20
**writing** 121:11 139:13 142:21 142:22
**written** 113:1,5 137:15 192:5 205:21
**wrong** 20:9 43:16 61:20 78:10 95:5,7,7 108:15 123:13 131:9,10 132:11 138:10 150:12,16 170:4 175:6 176:21 178:12 183:11 185:10 210:6,9
**wrote** 108:8,8 140:12 141:17 143:15 199:15 204:21,22

**X**

**X** 4:1,5

**Y**

**yeah** 11:11 15:12 26:10 49:7 72:6 125:21,23 127:3 128:10 128:10,14 138:17 141:2 147:4 150:17 160:1 165:22 167:8 168:4 177:3 184:12 188:3 189:6 200:20 201:14 213:23 217:22
**year** 31:6 33:9 34:7,13 35:18 35:19 41:19 44:3 49:11 52:14,19 57:11 81:8 86:8,9,9 89:3 181:15 187:9,12
**years** 10:7 14:17 19:21 25:2 26:22 28:18 34:21,23,23 35:4,13 37:5 37:19 40:16 41:8 44:10 45:9 64:11,12 65:7 67:15,17 67:19 69:15,17

69:20,23 99:16 100:12 107:19 141:1,10 174:21 186:1 188:8
**yelling** 139:3,7
**yesterday** 209:10
**young** 76:20 77:2 95:14
**younger** 41:8 44:11 45:9 66:2 76:16
**y'all** 20:4 83:19 180:14 182:7 191:4 197:6,7 210:13
**y'all's** 196:15

**Z**

**Zachary** 17:13

**$**

**$2.25** 106:4
**$25** 79:5,7
**$3.50** 59:9,11

**1**

**1** 7:16 66:14
**1,800** 217:9
**10** 1:22 14:11 24:5 33:9 34:7 34:12,22,23 35:4,13,18,19 40:22 41:19 44:3 60:1,15 61:21 67:15 69:17 97:1 168:6
**10th** 2:8 3:9 7:10 7:22
**10.25** 59:6
**107cv-712-W...** 1:5
**107-CV-712-...** 7:20
**11** 174:21
**117** 4:7
**118** 4:8
**12** 65:7
**120** 4:9
**13** 62:7 64:10,11
**1376** 9:20
**14** 61:17,22 62:16,21
**1408** 10:4
**15** 3:6 4:6 61:2,6 61:9 117:10
**16** 4:7 38:23 47:19 52:20 53:9 60:19 61:22 79:18 116:22,23 117:14,18 119:9 143:9 144:6
**16-year-old** 45:23
**1600** 5:7
**17** 4:8 15:3 118:17,21 217:8
**173** 4:10
**18** 4:9 11:4,14 45:10 46:1 60:20 61:17 120:15,19 125:16 126:8 136:15
**19** 4:10 125:17 140:22 173:13 173:19
**1971** 53:10
**198** 4:11
**1987** 53:11,12
**1988** 3:6
**1990** 56:21 57:5
**1991** 57:2
**1992** 12:8 67:10
**1996** 29:3 69:19
**1997** 14:13
**1998** 29:8 75:3 90:6
**1999** 14:16 17:15,16 18:4 57:1

**2**

**2** 28:10 60:12 128:3
**2:44:10** 7:21
**2:45** 2:10 7:9
**20** 4:11 45:14 198:16,22,23 201:18 202:1 207:20 213:14
**200** 4:12
**2000** 23:5 24:21 70:7 87:16
**2001** 19:5,7 70:3
**2005** 99:19,20 201:16,20 210:21
**2005-2006** 177:15
**2006** 20:1 21:1,4 99:19 140:22 200:12 201:19 207:23
**2007** 114:22,23 217:21
**2008** 1:22 2:9 3:10 7:10,22 217:23
**205** 4:13
**206** 4:14
**21** 4:12 200:2,7 201:5,15 207:17 210:20
**211** 4:15
**212** 4:16,17
**213** 4:18,19
**22** 4:13 205:1,6
**23** 4:14 206:5 211:3,10,10
**2346** 6:4
**24** 4:15 10:15 211:5,11,13
**25** 4:16 12:13,15 58:14 212:3,7
**26** 4:17 12:13,15 212:14,18
**26,000** 89:3
**27** 4:18 213:11 213:12,16,19
**28** 4:19 213:3,8
**29** 213:16

**3**

**3** 96:2,3 173:20 206:8
**3:27** 60:8
**3:43** 60:11
**301** 5:18
**35203** 5:19
**35203-5202** 5:8
**36301** 6:5
**36321** 9:21 10:5
**37** 9:14

**4**

**4** 129:21
**4:28** 116:15
**4:30** 148:19
**4:42** 116:18
**411** 219:21
**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** 9:18
**420** 5:6
**45** 18:17 78:4

**5**

**5** 193:19
**5(d)** 3:4
**5/25/71** 9:16
**5:20** 154:23
**5:30** 149:5
**5:42** 155:3
**5:47** 160:20
**5:49** 160:23
**5:58** 172:8
**50** 34:21 35:5 37:5,19

**6**

**6** 17:13 194:11 212:17
**6:11:56** 172:11
**6:54:49** 214:13
**61** 4:6
**618** 5:12
**63188** 5:13

**7**

**7** 17:13
**7:10:08** 214:16
**7:13:50** 218:21
**71** 52:23
**75** 84:9,10
**76** 47:15

**8**

**8** 126:16,17,18 126:19,20 127:6
**88** 52:17 53:5

**9**

**9** 4:3 17:12
**9-foot** 178:20
**9/22/2000** 24:21
**91** 14:6 57:5
**92** 14:2 69:17
**99** 17:16

State of Alabama
Unified Judicial System ORIG

Form C-64 Rev 10/88

# COMPLAINT AND WARRANT

THE DISTRICT COURT
CASE NO. DC-91-572

...e me the undersigned Judge/Clerk/Magistrate of The District Court of BARBOUR County, Alabama, personally appeared Braxton McLain who being by me first duly sworn deposes and says that he/she has probable cause for believing, and does believe that within twelve months within said County on or about (date) in July and August 1989 one Franklin Williams Jr. did engage in sexual intercourse with Jennifer McLain, who was 14 years of age, the said Franklin Williams, Jr. being 18 years of age in violation of 13A-6-62 of the Code of Alabama

PLAINTIFF'S EXHIBIT 15

against the peace and dignity of the State of Alabama.

Sworn to and Subscribed before me this the 5th day of September, 19 91.

Judge/Clerk/Magistrate of District Court

Complainant's Signature

STATE OF ALABAMA
Barbour COUNTY

## WARRANT OF ARREST

THE DISTRICT COURT

...NY LAWFUL OFFICER OF THE STATE OF ALABAMA:

...are thereof commanded to arrest Franklin Williams Jr. and brin... him/her before the DISTRICT COURT OF BARBOUR COUNTY, to answer the State of Alabama on a charg... of Rape, 2nd Degree- Class B Felony- Court 10-8-91 at 9 A.M. - Eufaula and have you then and there this writ with your return thereon

Dated this 5TH day of September, 19 91.

The Sheriff will take bond in the sum of $

Judge/Clerk/Magistrate of District Court

WARRANT NO.

## WARRANT OF ARREST

THE DISTRICT COURT OF
Barbour COUNTY

THE STATE OF ALABAMA
v.
Franklin Williams Jr.

STATE WITNESSES

Braxton McLain-
Jennifer McLain

Becky Dowling- Human Resources- Euf., AL
Lynn Baker- Human Resources
Ike Moss- DA's Office- Euf., AL

Executed the within Warrant by Arresting the within named Defendant and
Taking Appearance Bond
Committing Defendant to Jail

This 6th day of September, 19 91

Sheriff

By M. J. Moss 08362
Deputy Sheriff

Defendant's Address:

Race: W Sex: M Height:

Weight: Eye Color:

DOB: 5-25-71

DL No.:

S. S. Number:

Employment:

# MEMORANDUM

**DATE:** August 1, 2006

**TO:** Frank Williams

**FR:** Tommy Nance

**RE:** **2nd Step – Written Warning**

INCIDENT OCCURRED ON 7/27/06

On July 27, 2006, there was an incident involving yourself and another employee. You acted in a way not consistent with the expectations of a Team Leader. You must learn to control your temper and direct the employees on the line without displaying actions that could be construed as rude, intimidating, or disrespectful. In order to remain in the Team Leader position, we must see improvement in your employee relations skills.

Failure to follow the company policy has resulted in you receiving this **Written Warning – 2nd Step**. Any future violations will result in additional disciplinary action up to and including termination.

[signature] 8/2/06
Tommy Nance
Human Resources Manager

[signature]
Frank Williams
(Signature acknowledges Receipt of this document only.)

PLAINTIFF'S EXHIBIT
16

**DOCUMENTATION FORM**

Employee Name: Jonnie Nickerson

Investigating Supervisor: Chris Jordan / Ergend Date: 7-27-06

Present: ______

Who was involved: Frank Williams

Witness (s): No witness as far as she knows.

Date of incident: 7-27-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): 9:40am.

*What happened: Jonnie N. was on the label and Frank W. Came out on The line and sed To me over Time I come back The Fucking label michsen is fuck up and saying is to me I Told Him I did't put My Hand on The label meshine

PLAINTIFF'S EXHIBIT

17

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

File- Frank Williams
(TR)

**DOCUMENTATION FORM**

Employee Name: Frank Williams

Investigating Supervisor: Chris Jordan / ~~Frank~~ Eugene Date: 7-27-06

Present: ______

Who was involved: Jonnie Nickerson

PLAINTIFF'S EXHIBIT 18

Witness (s): ______

Date of incident: 7-27-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): ______

What happened: The Lable machine was messing up really Bad. me + Bruce was working on it I turned around and asked Johnnie to help with the rework that was Bad Lables she told me to hold up so I asked her to please go and held. I seen that she was way Behind on her Lable checklist sheet so I left it alone. I explained to her that to keep the Lable machine

Did this result in down time? ______ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

running she would have to push the table and help keep the cans running. She tell me that she could not do more than one thing at a time I explained that it would help. But she will not do it. It has cause alot of problems with the table staying full. Alot of the problems I am having with my Employees is. My Supervisor tell me to tell them something to do I tell them and If they don't Like It they turn around and tell something on me Because I told them to do their Job. So I get in trouble

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LINDA THORNTON, )

*Plaintiff*, )

Vs. ) CIVIL ACTION NO.: 1:07cv712-WKW

FLAVOR HOUSE PRODUCTS, INC., and )
FRANKLIN D. WILLIAMS, Jr., )

*Defendant*. )

**DEFENDANT, FRANKLIN D. WILLIAMS, JR.'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST INTERROGATORIES**

COMES NOW THE DEFENDANT, Franklin D. Williams, Jr. ("Williams"), and hereby files his Supplemental Response to the First Interrogatories of the Plaintiff, stating as follows:

**INTERROGATORIES**

1. State your full name (any other name by which you have been known), work and home address, work and home telephone number, date of birth, social security number, and your other previous home address (if any) within the past five years.

**RESPONSE:** **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is ambiguous, vague, overbroad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation. However, without waiving said objection and in an attempt to respond, this Defendant states:**

**Franklin D. Williams, Jr.**
**1408 North Broad Street**
**Cowarts, Alabama 36321**

**DOB: 5/25/1971**
**SSN: 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**

2. Please identify the names, ages, addresses, telephone numbers, and employers of any and all persons who are related to you by blood or marriage (former and/or current) living in Alabama (and for each identify their relationship to you) and of any person who has resided with you, including any person who currently resides with you.

RESPONSE: **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is ambiguous, vague, overbroad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation. However, without waiving said objection and in an attempt to respond, this Defendant states:**

**Jonathon Williams, brother, Flavor House; Candy Williams, wife, Flavor House; Sandra W. Hutto, sister, lives in Eufaula, Al..; Donna Green, sister, lives in Midland City, Al.; Jennifer Carol, sister, lives in Dothan, Al.; Pricilla Green, mother, lives in Cowarts, Al.; Frank Williams, father, lives in Eufaula, Al.; Betty Williams, step-mother, lives in Eufaula, Al.. Otherwise, the Defendant cannot recollect any other person(s) relative to the above Interrogatory.**

**This response will be supplemented as appropriate.**

3. Please state your educational background and other occupational training history, including the names, locations, and dates of attendance for each high school, college, technical or vocational school, junior college, or other educational institution that you have attended. For each such school or institution listed, please state any degree, diploma, certification, or other indication of completion that you received. If no degree or certificate was received from any institution identified, identify each of the courses taken at that institution.

RESPONSE: **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is vague, ambiguous, overly broad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation.**

**However, without waiving said objection and in an attempt to respond, this Defendant states:**

**I obtained a GED in approximately 1994.**

4. Please identify every employer (or principal, if you have ever worked as an independent contractor) you have had or currently have. Each such employer or principal should be identified by name, address, business telephone number, specific employment dates, the name of your immediate supervisor, the position(s) you held or hold, you job title and responsibilities, your rate of pay with that employer, and the reasons for separation from each such employer or principal.

**RESPONSE:** **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is vague, ambiguous, overly broad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation. However, without waiving said objection and in an attempt to respond, this Defendant states:**

**I am presently employed with Sara Lee, and have been so employed since approximately September 21, 2007. I work there as a pan-setter. Prior to my employment with Sara Lee, I worked for the Defendant, Flavor House Products, Inc., as a team leader. My last general supervisors during my employment there were Chris Jordan, Melvin Hutchins, Sammy Stewart, Eugene Andrews and Ricky Smothers. I continued there for six (6) years and eleven (11) months until the Plaintiff's false, untrue and slanderous allegations against me resulted in my termination.**

**Additionally, prior to the above-listed employment, I worked as a sanitation supervisor in Baker Hill, Al. for C.P. during the early 1990's. This employment lasted approximately a year and three months.**

**I worked as an order puller in Cowarts, Al., for Dairy Fresh during the early to mid-1990's. This employment lasted approximately one year.**

**I worked as an order puller in Dothan, Al. for Coca-Cola Bottling Company (no longer operates in Dothan, Al.) for approximately one and six months.**

**Otherwise, the Defendant cannot recollect any other employers or information regarding said employers, which is relative to the above Interrogatory.**

**This response will be supplemented as appropriate.**

5. Have you ever been convicted of and/or pled guilty or "no contest" to any crime or misdemeanor? If so, for each such conviction, please state the charge against you, the proximate date of the conviction, the jurisdiction and venue of the prosecution, and any fine, sentence, or other punishment imposed upon you for such conviction.

**RESPONSE:** **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is vague, ambiguous, overly broad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation.**

**Furthermore, the above interrogatory appears to seek information which may be privileged from disclosure for a variety of reasons.**

**However, without waiving said objection and in an attempt to respond, this Defendant states:**

**Yes. I was convicted of several sexual offenses in 1992 that occurred in Barbour County, Alabama.**

**Otherwise, no further response to the above interrogatory can be provided, as the information requested is not relevant to this lawsuit.**

**This response will be supplemented as appropriate.**

6. Have you ever been charged with any crime or misdemeanor? If so, for each such charge, please state the nature of the charge against you, the proximate date of the charge, the jurisdiction and venue of the prosecution, and the dispensation of the charge.

**RESPONSE:** **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is vague, ambiguous, overly broad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation.**

**Furthermore, the above interrogatory appears to seek information which may be privileged from disclosure for a variety of reasons.**

**However, without waiving said objection and in an attempt to respond, this Defendant states:**

**Yes. I was convicted of several sexual offenses in 1992 that occurred in Barbour County, Alabama.**

**Otherwise, no further response to the above interrogatory can be provided, as the information requested is not relevant to this lawsuit.**

**This response will be supplemented as appropriate.**

7. Please identify whether you have ever been a plaintiff or a defendant or a named party of any sort (including, but not limited to, personal injury, complaints on your behalf or on behalf of any dependent, employment actions, divorces, child custody actions, and/or bankruptcies). For each such action, please state whether you were the plaintiff or defendant, the name(s) of any lawyer(s) representing you; the name of the opposing party or parties and their counsel; the name, caption, court, docket, or case number, and jurisdiction/venue of the action or proceeding.

**RESPONSE:** **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is vague, ambiguous, overly broad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation.**

**Furthermore, the above interrogatory appears to seek information which may be privileged from disclosure for a variety of reasons.**

**However, without waiving said objection and in an attempt to respond, this Defendant states:**

**Yes.**

**I filed Bankruptcy in approximately 2002 or 2003. Otherwise, to the best of my knowledge and belief, I have had my wages garnished in Houston County, Alabama, by Army Aviation and possibly Southeast Alabama Medical Center. All garnishments have been paid in full.**

**This response will be supplemented as appropriate.**

8. Please identify by name, last known business and home address and telephone number, employer, and synopsis of expected testimony or knowledge, each and every person that you believe has any knowledge of any facts or evidence regarding any of your defenses as set out in your Answer to the Complaint.

**RESPONSE:** **This Defendant, Franklin D. Williams, hereby objects to the above interrogatory, as same is vague, ambiguous, overly broad and unduly burdensome. Otherwise, said request appears to seek information which is neither relevant nor material to the pending litigation.**

**Furthermore, the above interrogatory appears to seek information which may is privileged from disclosure for a variety of reasons. More specifically, the above request appears to violate the attorney-client privilege and requests information which was obtained in the anticipation of litigation. Said request also seeks information which is the work product of this Defendant's attorney and so, such information is not subject to discovery.**

**However, without waiving said objection and in an attempt to respond, this Defendant states:**

**This Defendant believes that the Plaintiff, as well as her family, friends, relatives, co-workers and associates, all have knowledge of the Plaintiff's unfounded and untrue allegations against me.**

**This Defendant also believes that any and all of the past and present employees of the Defendant, Flavor House Products, Inc., would have knowledge of the Plaintiff's own misconduct, her lack of professionalism, her inability to perform her job.**

**Specifically, this would included Catharine Long with Flavor House; Mary Brooke with Flavor House; Tamica Cook with Flavor House; and Linda Parker with Flavor House. Also, please see response to Interrogatory Two (Numbered 2).**

**Otherwise, this Defendant cannot recollect any other information that is relative to the above Interrogatory.**

**This response will be supplemented as appropriate.**

9. Please identify every person from whom you or anyone acting on your behalf has taken an oral, recorded, or written statement about the events set forth in the Complaint or about any facts that you believe may be pertinent or relevant to or relates to your defenses as asserted in your Answer to the Complaint.

**RESPONSE:** **To the best of my knowledge and belief, there are none.**

10. Identify any written notes, diaries, letters documents, records, audio or video tapes, or physical evidence in which you or your counsel retained, which describe, reflect, or relate in any way to the events set forth in the Complaint or about or about any facts that you believe may be pertinent or relevant to or relates to your defenses as asserted in your Answer to the Complaint.

**RESPONSE:** **To the best of my knowledge and belief, there are none.**

The responses to the above interrogatories are true and correct to the best of my knowledge and belief.

Franklin D. Williams, Jr.

STATE OF Alabama )

COUNTY OF Houston )

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Franklin D. Williams, Jr., whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he has sworn and executed the same voluntarily on the day the same bears date.

Given under my hand this the 10th day of June, 2008.

Notary Public

SEAL

My commission expires

CARA U. MORALES NOTARY PUBLIC EXPIRES: 01-17-11 ALABAMA STATE AT LARGE

This the 20th day of February, 2008.

*/s/ Richard E. Crum, Esq.*
Richard E. Crum, Esq.

Attorney for Defendant,
Franklin D. Williams, Jr.

OF COUNSEL:
Shealy, Crum & Pike, P.C.
Post Office Box 6346
Dothan, Alabama 36302-6346
(334) 677-3000

## CERTIFICATE OF SERVICE

I hereby certify I have this served a copy of the foregoing, electronically, properly addressed, to:

Bobbie S. Crook, Esq. (bcrook100@aol.com; ald0071@aol.com)

Christine E. Howard, Esq. (choward@laborlawyers.com; dscott@laborlawyers.com; scandler@laborlawyers.com)

Ann C. Robertson, Esq. (arobertson@wcqp.com; kallen@wcqp.com)

Anderson Butler Scott, Esq. (ascot@laborlawyers.com)

Temple D. Trueblood, Esq. (tdt@wcqp.com; kallen@wcqp.com)

Christopher W. Weller, Esq. (cww@chlaw.com; anne@chlaw.com; cheri@chlaw.com; roxie@chlaw.com)

This the 20th day of February, 2008.

*/s/ Richard E. Crum, Esq.*
Of Counsel



Christopher J. Jordan/NC/Ralcorp
10/26/2006 04:32 PM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Frank Williams

Please place in personnel file:

On Tuesday, October 24, 2006 I had a meeting with Frank Williams. During this meeting I discussed how it appeared he had no since of urgency. I explained that he needed to put on his radio first thing in the morning and notify everyone of what is happening on line 3. This would keep everyone informed and we would know that he is aggressively working on the problems. He stated that he could not wear his radio first thing in the morning because they were locked up in the production office. I instructed him to keep one in the processing supervisors office because they come in the same time he does and this would eliminate that problem.

# Memo

**To:** Frank Williams

**From:** Chris Jordan

**CC:** Melvin Hutchins
Eugene Andrews
Richard Holland

**Date:** 12/13/2005

**Re:** Job Performance

---

I appreciate the job you are doing on Line 3. The numbers are up and we are making standard on a more normal basis. However, the following are a list of concerns that I need you to focus on in the upcoming weeks:

1. Work with the team members on the line on cleanliness. Too many times they are not as active in cleaning the line and usually it is the same couple of employees.

2. I need you to wear a radio every day. This will help Melvin and me in communicating with you about the daily activity of the line.

3. I feel you need to focus more on training the employees rather than doing the work yourself. I understand that until you have a dedicated filler operator your time is taken up running the filler. Don't be afraid to sacrifice a little downtime while a team member is learning a new task.

4. All paperwork must be filled out completely. Please take a few minutes at the end of shift to make certain the paperwork is completed properly. Also, this will make certain when you have a new filler operator that you can instruct them in the proper way to complete all paperwork.

I am confident that that these are minor issues that you can resolve. If you need any assistance please let me know.

PLAINTIFF'S
EXHIBIT
21



Christopher J. Jordan/NC/Ralcorp
05/10/2006 03:23 PM

To Frank D. Williams/NC/Ralcorp@RALCORP
cc Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc S. Leigh Allums/NC/Ralcorp
Subject Re: 5-10.xls

In the future, when line 3 has a drain off I need you to check with me on what time the employees on the line should report to work. If I do not give you a clear and definite answer please do not assume I want them to come in a regular time. Also, when the line has a drain off I need you to make certain that you do everything in your power to have the packaging line running at the scheduled time. If I have overloaded you and this is preventing you from making certain the line starts on time please let me know.

Another concern I have is finding Mary Brooks off the line and talking to other employees. If you have given her clear instructions on what she should do if the line is down then I expect you to come to me for solutions to this problem. The employees that report to you are a direct reflection of you and me. Your doing a good job but we need to focus our efforts in resolving these problems before the busy season hits.







Christopher J.
Jordan/NC/Ralcorp
08/02/2006 03:08 PM

To    Thomas A. Nance/NC/Ralcorp@RALCORP

cc    Ricky L. Smothers/NC/Ralcorp@Ralcorp, Melvin G.
       Hutchins/NC/Ralcorp@Ralcorp

bcc

Subject  Frank Williams

This morning before 7:00 a.m., Eugene Andrews told me on the radio that Frank Williams needed to see me. I walked down to line 3 and he asked what I was doing about a capper on line 3. The question was not the issue but the expression and carefree attitude in which it was asked. Also, I asked him why he didn't have his radio and with the same attitude he said I'm on the label machine.

At this point it appeared that the issues addressed the previous day were an issue today. I asked Melvin Hutchins to meet with us to bring this out in the open. When I addressed them with Frank Williams he had excuses and reasons for everything. I explained to Frank that whatever happened yesterday did not need to reflect on his work today. Again, Frank explained that I was mistaken.

Melvin then added that whenever we tried to address any issues that Frank would show in his expressions and actions that he was never in the wrong just like he was doing now. He also added that we are trying to help him but he has to take ownership of the problems and show some improvement.





Christopher J.
Jordan/NC/Ralcorp
05/12/2007 08:36 AM

To   S. Leigh Allums/NC/Ralcorp@Ralcorp

cc   Deanna M. Lake/BR/Ralcorp@Ralcorp, Melvin G.
     Hutchins/NC/Ralcorp@Ralcorp

bcc

Subject   Frank Williams

Please place in his file as a coaching session:

I had a discussion with Frank Williams on May 11, 2007.  The following issues were addressed:

- As a team leader he is responsible for the line starting up in the morning.  When he is running a piece of equipment such as the label machine or filler he is responsible for all paperwork for the job he is doing no matter what else may come up while setting up the line.  Yesterday he was trying to start up the line and run the label machine.  When I came around to pick up the equipment checklist for line 2 label machine he did not have it completed.

If you have any questions please let me know.

If you are not the intended addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone.  In such case, you should destroy this message and kindly notify the sender by reply email.  Please advise immediately if you or your employer do not consent to internet email for messages of this kind.



PLAINTIFF'S
EXHIBIT
24

PLAINTIFF'S EXHIBIT 25

**BAYARD S. TARPLEY, Ph.D.**
**CLINICAL AND CONSULTING PSYCHOLOGY**

Eufaula Office Park
1135 South Eufaula Avenue
Eufaula, Alabama 36027

(205) 687-2151

Hours By Appointment

Becky Dowling DHR

Patient Lamberson, Renee 91061
DOB 8/10/77 SS No.
Diagnosis DSM III-R 309.40
Insurance DHR

610 Spruce St.
Eufaula, Al. 36027
Shirley Lamberson-Mother

DATE

| DATE | SERVICES RENDERED | CHARGES | CREDITS | BALANCE |
|---|---|---|---|---|
| | | PREVIOUS BALANCE | | |
| 8/27/91 | Office Visit-Intake | 80.00 | | 80.00 |
| 09/02/91 | Office Visit | 80.00 | | 160.00 |
| 10/05/91 | Office Visit | 80.00 | | 240.00 |
| 10/29/91 | Office Visit | 80.00 | | 320.00 |

**BAYARD S. TARPLEY, Ph.D.**
**CLINICAL AND CONSULTING PSYCHOLOGY**

Eufaula Office Park
1135 South Eufaula Avenue
Eufaula, Alabama 36027

(205) 687-2151

Hours By Appointment

Patient Wilkerson, Francis 91068
DOB 04/02/81 SS No. 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
Diagnosis DSM III-R 309.40
Insurance D.A.'s Office

DATE

| DATE | SERVICES RENDERED | CHARGES | CREDITS | BALANCE |
|---|---|---|---|---|
| | | PREVIOUS BALANCE | | |
| 10/05/91 | Intake | 80.00 | | 80.00 |
| 10/18/91 | Office Visit | 80.00 | | 160.00 |

8/2
09/0
10/0
10/2

PLAINTIFF'S EXHIBIT
26

Robert A. Head, M.D. 02708
Ted A. Williams, M.D. 06901

**Southeastern Pediatric Associates, P.A.**
1105 West Main Street -:- Dothan, Alabama 36301
(205) 794-8656
Tax I.D. No. 63-0738893

Stanley R. Forston, Jr., M.D.
John E. Searcy, M.D.

3:30 #240

| DATE OF SERVICE | TICKET TIME | PATIENT NAME | BIRTH DATE | REFERRING DOCTOR | FC | REF. NO. | ACCOUNT NO. | FM |
|---|---|---|---|---|---|---|---|---|
| 10/08/91 | 3:39 PM | AMBER | 5/18/77 | | A | 12189 | 8727-0 | 0 |

AMBER NELSON
508 B HIGHLAND AVE.
EUFAULA, AL 36027
(205)687-7200

Bill To:
Barbour Co. DA
P.O. Box 61
Eufaula, Al. 36027

PRIVATE PAY
Initial

| DATE LAST PAYMENT | CURRENT BALANCE | |
|---|---|---|
| | ACC | .00 |
| | INS | .00 |

☐ EPSDT FOLLOWUP

| SVC # | CPT CODE NEW | ESTAB | DESCRIPTION | CHARGE |
|---|---|---|---|---|
| 100's | | | OFFICE VISITS | |
| 01 | | 90030 | OFF VIS MIN | |
| 02 03 | 90000 | 90040 | OFF VIS B | |
| 04 05 | 90010 | 90050 | OFF VISIT | |
| 06 07 | 90015 | 90060 | OFF VIS INT | |
| 08 09 | 90017 | 90070 | OFF VIS EXT | |
| 10 11 | (90020) | 90080 | OFF VIS COMP | 115 |
| 12 | 99058 | | OFF USED/EMERG | |
| | | | PREVENTIVE CARE | |
| 13 14 | 90754 | 90764 | INF UNDER 1 | |
| 15 16 | 90753 | 90763 | CHILD 1-4 | |
| 17 18 | 90752 | 90762 | CHILD 5-11 | |
| 19 20 | 90751 | 90761 | ADOL 12-18 | |
| 21 22 | 90750 | 90760 | ADULT > 18 | |
| | | | EPSDT SCREENS | |
| 42 | Z5115 | | INITIAL NORMAL | |
| 43 | Z5116 | | INITIAL ABNORMAL | |
| 44 | Z5154 | | PERIODIC NORMAL | |
| | Z5155 | | PERIODIC ABN. | |
| | 90764 | | INTERPER. INF. | |
| | 90763 | | INTERPER. 1-4 YRS. | |
| | 90762 | | INTERPER. 5-11 YRS. | |
| | 90761 | | INTERPER. 12-17 YRS. | |
| | 90760 | | INTERPER. 18-20 YRS. | |
| 455 | 90650 | | 2ND SURGICAL OPINION | |
| | | | IMMUNIZATIONS | |
| 50 | 90701 | | DTP | |
| 51 | 90712 | | ORAL POLIO | |
| 52 | 90707 | | MMR | |
| 53 | 90702 | | PEDIATRIC DT | |
| 54 | 90702 | | ADULT TD | |
| 55 | 90737 | | HIBTITER | |
| 56 | 86585 | | TB SKIN TEST | |
| | | | LABORATORY | |
| 219 | 84645 | | PHENYTOIN | |
| 200 | (85031) | | CBC WITH DIFF | 18 |

V71.5 V71.5 V18.0

| SVC # | CODE | DESCRIPTION | CHARGE |
|---|---|---|---|
| | | LABORATORY | |
| 209 | 85660 | SICKLEDEX | |
| 201 | 86300 | MONOSPOT | |
| 202 | 85580 | PLATELET COUNT | |
| 203 | 85044 | RETIC COUNT | |
| 204 | 85650 | SED RATE | |
| 205 | 87081 | TESTURIA | |
| 206 | (81000) | URINE WITH MICRO | 8 |
| 207 | 81002 | URINE WITH DIPST | |
| 208 | 87088 | URINE C&S | |
| 210 | 86077 | NANO-STREP | |
| 211 | (87060) | THROAT CULTURE | 9 |
| 212 | 82205 | PHENOBARBITAL | |
| 213 | 82137 | THEOPHYLLINE | |
| 215 | 82948 | CHEMSTRIP BG | |
| 216 | 82465 | CHOLESTEROL | |
| 217 | 82947 | GLUCOSE | |
| 221 | 82250 | T. BILIRUBIN | |
| 222 | 87205 | GRAM STAIN | |
| 223 | 82270 | HEMOCCULT | |
| 224 | 36415 | FAO | |
| 225 | 87015 | PINWORM PREP | |
| 260 | | OTHER: (HCG) A703 | 4 |
| | | PROCEDURES | |
| 300 | 36415 | BLOOD DRAWN | |
| 301 | 36410 | BLOOD DRAWN (MD) | |
| 302 | 99000 | HANDLING/PROC | |
| 303 | 53670 | CATHETERIZATION | |
| 304 | 69210 | CERUMEN REMOVAL | |
| 305 | 96408 | CHEMO IV | |
| 306 | 96400 | CHEMO IM | |
| 307 | 40819 | FRENULECTOMY | |
| 308 | 62270 | LUMBAR PUNCTURE | |
| 309 | 69420 | MYRINGOTOMY | |
| 310 | 94750 | PULMONARY FUNC | |
| 314 | 92551 | SCREEN, HEARING | |
| 315 | 82499 | SCREEN VISION | |
| 316 | 17250 | SILVER NITRATE | |
| 317 | 51000 | SUPRAPUBIC ASP | |

| SVC # | CODE | DESCRIPTION | CHARGE |
|---|---|---|---|
| | | TREATMENTS - SPECIFY | |
| 318 | 16000 | INITIAL BURN TX | |
| | 16020 | BURN TX. (SMALL) | |
| | 16025 | BURN TX. (MEDIUM) | |
| | 16030 | BURN T. (LARGE) | |
| 319 | 94640 | INHAL TREAT | |
| 320 | 90788 | IM INJ ANTIB | |
| 321 | 90780 | IV INT. THERAPY | |
| 322 | 36000 | IV PLACE | |
| 130 | 12___ | LACER REPAIR | |
| 131 | 12___ | LAYER CLOS | |
| 323 | 90782 | THERAP INJ. | |
| | 6Z4998 | ADMINISTRATION | |
| 350 | | OTHER: | |
| 351-370 | 99070 | SUPPLIES | |
| | 99070 | (CCU) | 3 |

Office Charges TOTAL A $ 160.00
Medications TOTAL B $ —
TOTAL FEE $ 160.00
AMT. PAID Cash ☐ Check ☐ $ —
Dr. S. Forston Jr.

| Diagnosis | Code | Diagnosis | Code | Diagnosis | Code | Diagnosis | Code | Diagnosis | Code |
|---|---|---|---|---|---|---|---|---|---|
| Abd Pain/Colic | 789.0 | Dysuria | 788.1 | Lymphadenit, Unsp | 289.3 | Strabismus, Conver | 378.0 | Urticaria | 7 |
| Anemia, Iron Def | 280 | Eczema | 691.8 | Lymphadenit, Cerv | 616.0 | Strabismus, Diver | 378.1 | Vaginitis | 61 |
| Arthralgia | 719.4 | Encopresis, Nonorg | 307.7 | Malaise, Fatigue | 780.7 | Teething Syn | 520.7 | Viral Exan (Unspec) | 0 |
| Asthma, Status | 493.1 | Enteritis, Diarrhea | 558.6 | Meningitis, Viral | 047.9 | Upper Resp Inf (URI) | 460 | Viral Syn | 0 |
| Bronchiolitis | 466.1 | Enuresis, Nonorg | 307.6 | Metatarsus Varus | 754.53 | Urethritis, Unspec | 597.80 | Warts | 0 |
| Bronchitis | 466.0 | Epistaxis | 784.7 | Nausea/Vomit | 787.0 | Urinary Tract Inf | 599.0 | Well Child | V |
| Bronchospasm | 466.1 | Ery Inf (5th Dis) | 057.0 | Obesity | 278.0 | | | | |
| Candida, Skin | 112.3 | Failure To Thrive | 783.4 | Obstruct Lac-Duct | 375.55 | | | | |
| Candida, Oral | 112.0 | Feed Prob (Newborn) | 779.3 | Otitis Ext. | 380.12 | | | | |
| Cellulitis, Perior | 373.13 | Fever Unk Origin | 780.6 | Otitis Media | 382.0 | | | | |
| Cellulitis, Unspec | 682.9 | Gastroenter/Viral | 008.8 | O.M. Glue Ear | 381.20 | | | | |
| Chalasia/GE Reflex | 530.1 | Gingivitis, Acute | 523.0 | O.M. Acute Serous | 381.01 | | | | |
| Chickenpox | 052 | Hand-Foot Syn | 074.3 | O.M. Resolved | 382.0 | | | | |
| Concussion, Unspec | 850.9 | Headache | 784.0 | Phimosis, Paraphim | 605 | | | | |
| Cong Heart Dis | 746.9 | Headache, Migraine | 346 | Pharyngitis, Nonspec | 462 | | | | |
| Conjunctivitis | 372.30 | Heart Murmur, Func | 785.2 | Pharyngitis, Strep | 034.0 | | | | |
| Constipation | 564.0 | Hernia, Inguinal | 550 | Pneumonia | 486 | | | | |
| Croup Syndrome | 464.4 | Hernia, Umbilical | 553 | Pneumonia, Resolved | 486 | | | | |
| Dermatitis, Contact | 692.0 | Hip, Unstable | 754.30 | Rash, Nonspecific | 782.1 | | | | |
| Dermatitis, Diaper | 691.0 | Hydrocoele | 603.9 | Rhinitis | 472.0 | | | | |
| Diabetes Mellitus | 250.1 | Impetigo | 684 | Scabies | 133.0 | | | | |
| Diarrhea | 558.9 | Inf Mononucleosis | 075 | Seizure, Febrile | 780.3 | | | | |
| Disorder, A.D.D. | 314.0 | Insect Bites | 919.4 | Seizure, Grand Mal | 345.1 | | | | |
| Disorder, Behavior | 309 | Int Tibial Torsion | 736.89 | Seizure, Petit Mal | 345.0 | | | | |
| Disorder, Learning | 315.2 | Lice, Head | 132.0 | Sinusitis, Acute | 461.8 | | | | |

EXAMINATION Sexual Abuse
VD, HIV — Frank Williams V71.5
214.0 Oral Sex Mother & Child
[illegible]
Previous Intercourse (VDRL H.I.V.)

14 yrs HT 5' WT 135 HC BP 120/70

NAME NELSON, AMBER DATE 10/08/91 DR.

SOUTHEASTERN PED ASSOC, P.A.
1105 WEST MAIN ST.
DOTHAN, ALABAMA 36301

Robert A. Head, M.D.
Ted A. Williams, M.D.
Stanley R. Forston, Jr., M.D.

RX ____ # ____ $ ____
RX ____ # ____ $ ____
RX ____ # ____ $ ____
RX ____ # ____ $ ____

PLAINTIFF'S EXHIBIT 27

**BAYARD S. TARPLEY, Ph.D.**
CLINICAL AND CONSULTING PSYCHOLOGY

Eufaula Office Park
1135 South Eufaula Avenue
Eufaula, Alabama 36027

(205) 687-2151

Hours By
Appointment

Patient Nelson, Amber # 91074
DOB 5/18/77 SS No. 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
Diagnosis
Insurance N/A

DATE

| DATE | SERVICES RENDERED | CHARGES | CREDITS | BALANCE |
|---|---|---|---|---|
| | | PREVIOUS BALANCE | | |
| 10-14-91 | Dr. Intake | 80.00 | | 80.00 |

BALANCE DUE 80.00

PLAINTIFF'S EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
MELVIN HUTCHINS

Commissioner:
Renny D. McNaughton
May 14, 2008
Dothan, Alabama

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Melvin Hutchins, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 14th day of May, 2008, commencing at approximately 9:30 a.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms.

Robertson the original transcript of the oral testimony taken the 14th day of May, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Robertson | 9 |

EXHIBITS

| | |
|---|---|
| No. 1 | 13 |
| No. 2 | 16 |
| No. 3 | 29 |
| No. 4 | 40 |
| No. 5 | 42 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202
205-328-0480

FOR THE PLAINTIFF (S):
Ann C. Robertson
Temple D. Trueblood
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205-314-0500
Also Present:
Linda Thornton
Dee Lake

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 9:30 a.m. on the 14th day of May, 2008, Melvin Hutchins, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins videotape one in the deposition of Melvin Hutchins in the matter of Linda Thornton versus Flavor House Products, Inc., and Franklin D. Williams, case 1-7CV712WKW in the U.S. District Court for the Middle District of Alabama, Southern Division. We are on record at 9:35 a.m. on Wednesday, May 14th, 2008,

at the law office of Bobbie S. Crowe.
Would counsel please identify yourself and state whom you represent.
MS. ROBERTSON: Ann Robertson for the plaintiff.
MS. TRUEBLOOD: Temple Trueblood for the plaintiff.
MS. SWAIN: Jennifer Swain for defendant Flavor House.
THE VIDEOGRAPHER: Would the reporter please swear in the witness.
(Witness Sworn)
THE COURT REPORTER: Usual stipulations?
MS. SWAIN: Read and sign, please.
MS. ROBERTSON: And the agreement about his relatives.
MS. SWAIN: That's fine.

MELVIN HUTCHINS

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. ROBERTSON:
Q Will you state your full name, please, sir?
A Melvin George Hutchins.
Q And what is your home address, please, sir?
A 2904 Selwood Circle, Dothan, Alabama.
Q Can you spell Selwood for me?
A S-E-L-W-O-O-D.
Q And how long have you lived there?
A Approximately six years.
Q And where do you work, Mr. Hutchins?
A Bremner Food Group.
Q All right. And I'm going to ask you to have an agreement with me. It's been several different things over a period of time. We're going to call it Flavor House.
A Okay.
Q Okay? And so if I ask you about

Flavor House, I'm talking about this people that you worked for and the people that owned it before, all those people. We'll just call it Flavor House. Is that okay?

A That's okay.

Q How long have you worked for Flavor House?

A 20 years.

Q And so that -- when were you hired?

A 1988.

Q Do you remember the process by which you were hired?

A I came in to be a processing supervisor and I moved out to -- became packaging supervisor. After I left that, I scheduled the plant for two years. And then I became in charge of both the processing and packaging departments. And then I wound up being first shift superintendent.

Q When did you go from processing packaging -- was it called processing packaging manager? Did it have a title? Do

you know what it was?

A Just supervisor.

Q All right.

A I can't remember the dates.

Q Was it in the last six years?

A Last six years with the superintendent.

Q And how did that come about that you went from processing to packaging to superintendent to first shift superintendent?

A When I first got hired, there was a shortage of supervisors. After I worked the processing department, evidently I -- they was pleased with -- my supervisor was pleased with the work I did and he asked me would I be in -- would I like to go to the packaging department. And that's how I became packaging supervisor.

Q What I'm asking is how did it come about that you went from being the process and packaging manager to the first -- back to the first shift supervisor?

A Once Brenda took over with the job responsibilities or Flavor House took -- Bremner. I'm sorry -- Bremner took over, more or less just aligning my job responsibilities with the job responsibilities at Bremner.

Q Do you remember -- I think I asked you -- about when that was, maybe in the last six years?

A Correct.

Q Was that when Mary Ann Boyer came?

A Uh-huh.

Q You need -- he write -- he's writing down what you say so say yes or no instead of uh-huh or huh-uh.

A I'm sorry.

Q It's just -- it's hard to read.

A Yes.

Q It's not as big a problem because we've got a video, but just --

A Okay.

Q -- it's easier for him to do.

A Not a problem.

Q And as first shift supervisor, what -- what were your duties -- or superintendent? Excuse me.

A First shift superintendent, in charge of four supervisors, basically in charge of everything that went on in production on first shift.

Q And did you have a counterpart for second shift?

A Yes.

Q And who is that -- what was that person?

A Larry Hatcher.

Q And who was y'all's immediate supervisor?

A At first it was Mary Ann. Then it wound -- and it wounded up being, after all the changes were made, Ricky Smothers.

Q Do you remember when those changes made it from being Mary Ann to Ricky Smothers?

A It's been in the last two years,

I think.

Q Now, what is your educational background, please, sir?

A High school diploma.

Q And have you had any training while you were working for Flavor House?

A Quite a bit.

Q And when you would have training, would you sign little pieces of paper that went into your personnel file?

MS. SWAIN: Objection. You can still answer.

Q Let me give you an example. Well, do you know if you sign pieces of paper when you get the training?

MS. SWAIN: Objection.

A We do have a sign-in sheet of who attend the classes.

(Plaintiff's Exhibit Number 1 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q For instance, I will show you

what's been marked as Plaintiff's Exhibit Number 1 to your deposition and ask you is that something I would expect to find -- something like that -- expect to find in your personnel file when you would have received training?

MS. SWAIN: Objection.

Q You're supposed to answer even --

A It depends on if -- if it's for a manager or supervisor, yes, ma'am, you will.

Q Okay. And if it's not for managers and supervisors, is there some other kind of training that you may have gotten that wouldn't have been for management and supervisors?

A Yes. I -- you know, I had training as far as management skills or -- I guess I'm asking -- I guess I need to ask you a question. What -- you just want to know what type of training I've had or --

Q Well, yeah. I was just asking if you thought it would be documented in your file when you've had some kind of training.

A Uh-huh.

Q Such as in Plaintiff's Exhibit Number 1 to your deposition.

A Right.

Q And I understand this is Mr. Williams' training documentation.

A Right, right.

Q But I'm just talking about something that would be like that.

MS. SWAIN: Objection.

A Something -- something like that.

Q Okay. Now, when you say you've had management skill training, when did you have that?

A I don't know the exact date.

Q What did it -- have you had it more than once?

A A couple times.

Q And what did it entail?

A You know, how -- how to become a successful manager, how to basically deal with different situations.

Q What do you mean different

situations?

A How to do deal with difficult people, how to -- how to get the maximum out of employees that work for you or supervisors that work for you, etcetera, etcetera.

Q Now, during your tenure at Flavor House, have you ever participated in the hiring process of -- of operators and/or team leaders?

A I have made recommendations, but that basically came from my supervisor or HR.

Q Okay.

(Plaintiff's Exhibit Number 2 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q Well, I'll show you what's been marked as Plaintiff's Exhibit Number 2 to your deposition and ask you if you've ever seen this before.

A No, ma'am.

Q Were you -- were you a -- what was your position in 2002 at Flavor House?
A First shift superintendent.
Q Okay. In 2000?
A You said 2002.
Q No. 2000. When -- when -- when Mr. -- see, Plaintiff's Exhibit Number 2 says --
A Uh-huh.
Q -- says that -- that it was filled out sometime in --
A I was in charge of production and -- and processing.
Q All right. Would you have become Mr. Williams' supervisor when he was hired?
A No. He would have worked for -- I don't know who he would have worked for at that time. I've forgotten who was the supervisor at that time.
Q Do you know who Bruce Cassady is?
A Uh-huh.
Q Yes?
A Yes.

Q Who is Bruce Cassady?
A Bruce Cassady -- at this time or --
Q Yeah, in 2000, late 2000.
A Bruce Cassady was a -- he worked in the maintenance department.
Q Was he a supervisor or just a worker?
A I don't know what his exact job title was.
Q Okay. Did you participate in any way in the hiring process of Mr. Williams?
A No, ma'am.
Q Excuse me. Did you participate in any way in the hiring process of anybody in 2000?
A Probably so by giving recommendations.
Q Will you look at the second page of -- of Plaintiff's Exhibit Number 2 at the bottom?
A Uh-huh.
Q Do you know if this form was used

in 2000 in the hiring recommendations you would have made?
MS. SWAIN: Objection.
A No, ma'am.
Q When you were hired, did they do a background check on you?
A I -- I don't know.
Q Did -- did you -- do you recognize this piece of application as something you would have filled out?
A Yes, ma'am.
Q Because it says on -- on -- on page 2 it says, I understand that consideration for employment in this position is contingent upon the results of a reference and background check.
A Uh-huh.
Q Is that right?
A Is that what it reads? Yes, ma'am.
Q Yeah. Do you know where JFI Ingram is?
A I sure don't.

Q Any other training you've had besides management skills?
A Leadership training, sexual harassment training, some of the -- that's all I can think of right now.
Q All right. When did you have the leadership training?
A I don't remember the time.
Q Was it in the last two years, the last four years?
A In the last two years.
Q And who taught that?
A I don't remember.
Q Do you recall how long it lasted?
A I think it was over a two-day period. I think it was eight hours.
Q And who -- and where did you actually -- did you attend somewhere off site or did you do it at Flavor House, receive your training?
A At Flavor House.
Q And do you remember who taught it?

A We've had several different people. I -- I don't remember.
Q I mean, have you had leadership training several different times?
A Yes, ma'am.
Q Well, I'm talking about the one in the last -- you said you thought you'd had a session in the last two years. Who taught that?
A I -- I don't remember who taught that.
Q Was it -- do you remember what -- when I say "kind of person," was it a HR type person or lawyer person, somebody from Dale Carnegie? Do you remember --
A I don't remember who it was.
Q It wasn't somebody that taught you to say the person's name that you were referring to every three minutes, was it?
A No, I don't think so.
Q Because I noticed you haven't called me Ann yet.
Do you remember the subjects that you

were taught in leadership training?
A How to be a good leader.
Q And -- and were there any subtopics other than how to be a good leader?
A Yes, ma'am, it was.
Q Well, can you recall any of them?
A No, ma'am, I can't.
Q All right. Now, you said -- you said you had sexual harassment training. When was that?
A Probably in the last two years.
Q And who taught that?
A Been several people. Mary Ann, Alice Clark.
Q Now, who is Alice Clark?
A I think she's a human resource director for the Bremner Ralcorp Corporation.
Q Okay. And did she -- is she -- she's not from Dothan or around here, is she?
A No, ma'am, she's not.

Q And -- and did she teach you in the same session as Mary Ann Boyer?
A It was different sessions for different times.
Q All right. Well, what were the subject matters that Mary Ann Boyer taught you?
A Basically how to deal with it, sexual harassment in the workplace.
Q Well, what did she teach you about how to deal with it?
A Definitely how to -- you know, when -- when it's brought to the attention of supervisors, managers or whatever, get the documentation and definitely take it straight to HR.
Q And at the time I guess Mary Ann Boyer was teaching you to take it to HR, who would have been the HR people?
A We've had several. Tommy Nance was one.
Q Okay. Anybody else that you can recall?

A David Helms.
Q Well, can you give me a definition of sexual harassment?
MS. SWAIN: Objection.
A Sexual harassment can be a form of, you know, derogatory remarks toward an individual, belating someone because of age, sex, race.
Q Okay. That's your definition of sexual harassment?
MS. SWAIN: Objection.
A That's a quick definition of sexual harassment, yes, ma'am.
Q Is a derogatory remark toward somebody because of their age?
A Yes.
Q All right. What do you mean by derogatory remark?
A Lewd remarks, constant badgering.
Q Anything else?
A The list could go on and on, ma'am.
Q Well, I know, but I want you to

exhaust your understanding of sex -- the meaning of sexual harassment.

MS. SWAIN: Objection.

A That's the basic highlights of it.

Q What do you mean by constant badgering?

A Oh, you can pick at someone, so to speak, make fun of them, doing it constantly.

Q Demeaning them because of their gender?

A Uh-huh.

Q Would you consider that part of it?

A I sure do.

Q Have you been taught in your training about sexual harassment the -- the psychology of -- of someone who sexually harasses another?

A I can't say that I have, no, ma'am.

Q Have you been taught that

frequently people that sexually harass the other gender is because of an abuse of power or -- or an -- a -- as opposed to just being sexually attracted to them?

MS. SWAIN: Objection.

A No, ma'am.

Q You have not been taught that sexual harassment is -- is frequently someone abusing power --

MS. SWAIN: Objection.

Q -- toward the other gender?

A No, ma'am.

Q Do you know that just by having a brain?

MS. SWAIN: Objection.

Q Having walking-around sense?

MS. SWAIN: Objection.

A (Witness nodded head.)

Q Would you --

THE COURT REPORTER: You need to answer verbally.

Q You need to say yes.

A Yes, yes, yes.

Q Would you consider that someone who rapes children as being someone who's abusing power?

MS. SWAIN: Objection.

A I would say a sexual offender.

Q Well, suppose --

A Uh-huh.

Q Suppose an individual raped -- a male adult raped a 13 year old. Would you consider that a sexual abuse of power?

MS. SWAIN: Objection.

A Yes.

Q Now, tell me your duties as first shift superintendent.

A Ensuring we're getting out the daily production based on line standards, making sure that we're starting up in a timely manner, managing all of this about -- rather. Making sure that my supervisors are staffed correctly. Just in charge of -- of -- of the daily day-to-day duties in production.

Q And neither I, nor I doubt a

jury, knows what the daily day -- day-to-day jobs are. What -- first of all, what is it y'all do at Flavor House?

A Make -- roast and pack snack nut items.

Q Or as my little two-year-old nephews calls them, khaki snacks. And, like, as the first shift super -- superintendent, as I understand it, there are different lines at Flavor House that produce different things; is that correct?

A That is correct.

Q And how many lines do you -- are you the superintendent over?

A We've got 14.

Q And what do those lines do?

A Cook and pack.

Q So you have a roaster line?

A Uh-huh. And a packaging line.

Q Yes?

A Yes.

Q Do you have a canning line?

A Yes.

Q Do you have a -- what other kinds of lines?
A A bagging.
Q Any others?
A That's it.
Q And --
A A jar line. I'm sorry.
Q And what do they -- what is -- what is -- what's done at the jar line?
A Jar line, you basically fill the -- fill the jars up with nuts at a certain weight, label the product, video jet it, case print it, and stack. And it goes to the warehouse.
(Plaintiff's Exhibit Number 3 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q And I'm going to show you what's been marked as Plaintiff's Exhibit Number 3 to your deposition and ask you what this is, please, sir.
(Witness reviewing document.)

A It's a counseling report for Linda.
Q And do you recall how you first learned about the incident involving the peanuts being thrown at Linda?
MS. SWAIN: Objection.
A Yes, ma'am. Larry Hatcher informed me of this.
Q Do you recall that Linda called you at home about this --
MS. SWAIN: Objection.
Q -- crying?
MS. SWAIN: Objection.
A No, ma'am, I don't recall that.
Q Do you recall that she had been put on night shift temporarily to work for Mr. Hatcher and she ordinarily was on first shift?
A Uh-huh.
Q Yes?
A Yes, ma'am.
Q And don't you remember that she called you crying because somebody had

thrown a bottle of peanuts at her?
MS. SWAIN: Objection.
A No, ma'am, I don't remember that.
Q Do you remember talking to her about it at all?
A I can't say I have -- or remember.
Q You can't remember one way or the other?
A I can't remember whether I talked to her about this specific incident.
Q All right. Well, did you talk to anybody other than Larry Hatcher about the incident?
A Yes. It was some other witnesses involved, other people in -- that was involved with this.
Q But I -- so you talked to other witnesses?
A Other people, yes, ma'am.
Q All right. What was the purpose of you talking to other witnesses?
A Let me -- let me rephrase that.

The other people that were involved, I read their statements. As far as me actually talking to them, I didn't talk to them. But I did read their statements about what happened.
Q Whose statements did you read?
A If I'm not mistaken, it was a maintenance individual that was involved and it was a statement from that individual.
Q Mr. Milsap?
A Uh-huh.
Q Well --
MS. ROBERTSON: Off the record.
(An off-the-record discussion was held.)
BY MS. ROBERTSON:
Q What did Mr. Milsap's statement say?
A I can't recall what it stated. It just -- it just basically said, you know, what led up to that point.
Q What led up to what point, him throwing the peanuts at her?
MS. SWAIN: Objection.

A What -- what happened here, ma'am.

Q Well, tell me what possible excuse anybody could have for throwing peanuts -- a jar of peanuts at somebody?

MS. SWAIN: Objection.

A I don't know. It shouldn't happen.

Q Is it -- is it a safety violation?

A Yes, it is.

Q Would you consider it an assault --

MS. SWAIN: Objection.

Q -- and -- and battery if -- since it hit her?

MS. SWAIN: Objection.

Q Sir?

A I wouldn't go as far as saying it was an assault.

Q Well, tell me your definition -- I mean, you -- when somebody hits you, throws something at you and hits you, you

don't consider that an assault?

MS. SWAIN: Objection.

Q Sir?

A Under different circumstances.

Q What kind of circumstances would it not be an assault?

MS. SWAIN: Objection.

Q How about if he threw it at her and hit her in the chest and said, When I tell you to turn the fucking thing off, you turn it off?

MS. SWAIN: Objection.

Q Would you consider that circumstance to be an assault?

MS. SWAIN: Objection.

A If it were to happen, yes, ma'am.

Q And -- and isn't that what Linda said happened?

A There's two sides to every story. Correct.

Q Okay. Well, as I understand it, he admitted using offensive language; right?

A If I'm not mistaken, yes, ma'am.

Q And -- and he admitted throwing the peanuts at her; right?

MS. SWAIN: Objection.

A I don't remember what -- what was in his statement.

Q Well, do you remember if he was punished at all?

A If I'm not mistaken, he was.

Q Do you remember -- do you recall what -- what punishment he was given?

A He was in maintenance. I'm not -- I'm not aware of what -- what that would have been.

Q Well, tell me -- you were going to tell me how you found about this situation and you said Larry Hatcher.

A Uh-huh. Larry Hatcher -- I -- I can't -- I don't remember what or how he, you know, told me. I don't know if he sent me an e-mail or he left me a note or left me a voice mail message, but that's how I found out about it.

Q And what did -- and what -- and

what was the purpose of him sending you the message or -- or calling you?

A At -- at that time, Larry was not over second shift. Basically, all the things that was taking place on second shift, I was basically over second shift, and he wanted to inform me of what had happened.

Q Was Larry Hatcher present when it supposedly happened?

A I don't know, ma'am.

Q Well, who decided that -- that Linda would get this write-up?

A HR.

Q Leigh Allums?

A Uh-huh.

Q Now, what was her position at the time?

A At that time, she was in charge of HR.

Q Did you have any input into it?

A No, ma'am.

Q Do you know if Mr. Milsap was

suspended?
A I -- I don't know, ma'am.
Q Is that a punishment that -- that you can get at Flavor House, a suspension?
A Yes, ma'am.
Q And when you're suspended, is it with or without pay?
A I think it's without pay.
Q Can you get demoted for -- for -- as kind of a discipline?
A That would have to be an HR decision.
Q I mean, do you know if that is a choice of -- of punishment that -- that can be meted out by HR?
MS. SWAIN: Objection.
A That's -- that's mainly a HR decision.
Q But you -- so --
A I don't know.
Q Okay. And so you don't know if -- if Linda Parrish or Linda Thornton is the one that went to Mr. Hatcher and

reported that she had been hit with the peanuts, do you?
MS. SWAIN: Objection.
A I -- I don't know, ma'am.
Q Who would have been the supervisor in the situation involving -- would Mr. Hatcher have been the supervisor?
A I don't know if it -- I don't know. We had -- we've have a -- I don't know if it would have been Larry or it would have been Betty Brown.
Q The statements that you said you saw relative to Plaintiff's Exhibit Number 3 to your deposition, were they on pieces of paper like Plaintiff's Exhibit Number 3 or were they in some other form?
A I think they was on a documentation form. And it -- I think it was -- was Milsap explaining what happened on it, having his side of the story.
Q Well, did you see a documentation form that Linda had written?
A I'm pretty sure I did.

Q Okay. When a person is disciplined, how -- how are they told of the discipline? Did -- do you know on Plaintiff's Exhibit Number 3 did you give Linda this piece of paper?
A No. I would say it came from Larry Hatcher.
Q Okay. You think Larry Hatcher handed it to or gave it to -- to Linda?
A Yes, ma'am.
Q Did you ever talk to Linda, to your memory, about this incident?
A I can't recall.
Q Did she ever come to you objecting to getting written up for what had happened?
A I can't recall.
Q Tell me what the procedure is when you go on break in terms of clocking in and out.
A Procedure employees get two 20-minute breaks. They are to clock in when they go to break, clock in coming from

break.
Q Clock out going to?
A Uh-huh. And then clock back in going back to work.
Q So they're not supposed to be paid for their breaks; right?
A They are paid.
Q They're paid for their breaks? Well, why do they clock in and clock out?
A They are paid for their breaks.
Q Okay. But -- so why do they clock in and clock out?
A That's procedure.
Q All right. Well, what about --
A Because some people can abuse that.
Q What do you mean by abusing it?
A Come back too late or --
(Plaintiff's Exhibit Number 4 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Tell me what this is, please,

sir, Plaintiff's Exhibit Number 4.
MS. SWAIN: Could I get a copy, Ann?
MS. ROBERTSON: Sure.
(Witness reviewing document.)
A Okay.
Q What is that, please, sir?
A Basically a document stating that --
(An off-the-record discussion was held.)
Q Go ahead. I'm sorry.
A It's just a document I guess basically letting her know that she had clocked in and returned outside and, you know, giving her a -- what I would say a coaching session about what she needs to do.
Q All right. Well -- but look down there. It's not a she. It's Mr. Williams. He was given a coaching session, I guess; right?
A Uh-huh.
Q Sir?
A Yes, ma'am.

Q And he was being coached. And this is in July of '06?
A Uh-huh.
Q You need to say yes or no.
A Yes.
Q And what was he doing wrong?
A Frank was going outside smoking --
Q Okay.
A -- when he should have been in -- should have been on the line.
Q And while he was on the clock?
A Correct.
Q So that was stealing time; correct?
MS. SWAIN: Objection.
Q Sir?
A Yes, ma'am.
(Plaintiff's Exhibit Number 5 was marked and attached to the deposition.)
BY MS. ROBERTSON:
Q What is this, please, sir,

Plaintiff's Exhibit Number 5?
MS. SWAIN: Just let her mark it. She'll -- she'll give you a copy to look at.
(Plaintiff's Exhibit Number 5 was marked for identification and attached to the deposition.)
A His supervisor basically saying that he hadn't clocked out for -- for each break. Basically, he looked at the time sheet and noticed what -- noticed his -- his punch-in times for break.
Q And what's the -- is this another coaching session?
A Got placed in his personnel file. I don't -- I don't know if -- if he's doing a follow-up or --
Q He said, I believe I've told him to do this before.
A And if he had told him to do it before, then the progressive -- the next step would have been -- been taken.
Q Is that similar to what he did in

July of '06 by -- by stealing time by going to the smoking break after clocking in?
MS. SWAIN: Objection.
A No.
Q So they're two different violations; is that correct?
A Uh-huh.
Q Yes?
A Yes, ma'am.
Q And they occurred one in July of '06 and one in October of '06; correct?
A Yes, ma'am.
Q Why was the -- why did -- why are the lead people supposed to have radios?
A So we can contact them. Also, it -- it helps them do their job better. But we all have radios.
Q Okay.
(Plaintiff's Exhibit Number 6 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 6,

what is this, please, sir?
MS. SWAIN: Can I get a copy, Ann?
MS. ROBERTSON: Sure.
(Witness reviewing document.)
A This is a -- basically, I guess sat down with Frank and let him know the do's and don'ts and what he -- what his supervisor expectations are.
Q And -- and told -- he told him he was supposed to get his radio? Does it talk about his radio in that? I guess it doesn't.
A No, ma'am. There's --
Q It's not the right --
A -- not anything on this one.
Q Okay.
(Plaintiff's Exhibit Number 7 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q What about Plaintiff's Exhibit Number 7? What is that?

A Basically telling him he needs to have his radio on and, you know, when Chris calls him and wants to know what's going on with the line, he hasn't answered.
Q All right. Do -- had Mr. Williams been reminded on other occasions to have his radio with him?
A I would say so if -- because Chris wouldn't have sent him this.
Q All right.
(Plaintiff's Exhibit Number 8 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Now, tell me what this is, please, sir, Plaintiff's Exhibit Number 8.
(Witness reviewing document.)
Q Is this -- is that -- was this issued after Plaintiff's Exhibit Number 7 or before? Well --
A This is before.
Q Okay. Let me see the other one. Which one is about the other radio thing?

Plaintiff's Exhibit Number 7 is -- is October of '06. When is Plaintiff's Exhibit Number 8?
A August.
Q And was he also reminded to have his radio then? Also, I asked him why he didn't have his radio and with the same attitude he said -- he said, I'm on the label machine.
A (No response.)
Q Sir?
MS. SWAIN: He's reading the document.
MS. ROBERTSON: Oh.
A Uh-huh.
Q So in August he was -- he was told that he needed to have his radio; correct?
A Uh-huh.
Q And in October he was again told. Was he being insubordinate by not having his radio with him?
MS. SWAIN: Objection.

A No, ma'am, not necessarily.
Q Well, had he been told to keep the radio with him?
A Yes, ma'am.
Q By his supervisor?
A Uh-huh.
Q And -- and he wasn't doing it. So why isn't that insubordination?
MS. SWAIN: Objection.
A Frank -- Frank was trying to get his line running, equipment or whatever, and you know, he just -- I guess he forgot. And Chris was trying to remind him of that, how important it is to have the radio.
Q Well, he'd already had to remind him once; right?
MS. SWAIN: Objection.
A Uh-huh.
(Plaintiff's Exhibit Number 9 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Well, let's take a look at

Plaintiff's Exhibit Number 9. What is this, please, sir?
MS. SWAIN: Can I get a copy, please, Ann?
MS. ROBERTSON: Sure.
A Giving Frank an update about his job performance.
Q And number 2 is I need you to wear a radio every day. This will help Melvin and me in communicating with you about the daily activity of the line; correct?
A Uh-huh.
Q Now, he was told about that in December of '05; correct?
A Uh-huh.
Q He was then have -- he had to be told again about it in August of '06 and October of '06; correct?
A Uh-huh.
Q Do you consider that he was being insubordinate in August and October when he didn't have his radio after he had been

specifically instructed in December of '05 that he should have his radio with him every day?
MS. SWAIN: Objection.
A If I'm not mistaken, I don't even think we had enough radios to go around for the team leaders at that time.
Q Well, then, why were you telling him he should have his radio with him every day?
A Well --
Q I mean, I don't see anywhere where you say, I understand there are not enough radios to go around.
A Right. Well, you've got -- you know, we didn't -- we didn't -- we have -- rephrase this.
We had a radio for -- should have been for both team leaders. And, you know, back in '05, which is a heck of a long way, you know, basically we wanted Frank to basically step up to the plate as far as him being a team leader and tell him some of the

requirements that we need for him to do.
Q Right. And then you had to tell him in August of '06 and then October of '06 that he wasn't doing at least some of that stuff; correct?
MS. SWAIN: Objection.
A Uh-huh.
Q Now, on the -- on the -- Plaintiff's Exhibit Number 8, do you recall the situation surrounding this write-up?
MS. SWAIN: Objection.
A No more than here. It's kind of vague to me.
Q Do you recall what had happened yes -- the yesterday that y'all are referring to?
MS. SWAIN: Objection.
A No, ma'am.
Q Well, down here in the last paragraph it says, Melvin then added that whenever we try to address any issues, that Frank would show in his expressions and actions that he was never in the wrong just

like he was doing now.
Do you agree with that, that he never would accept responsibility for anything that he did wrong?
MS. SWAIN: Objection.
A At this particular time, yes, ma'am.
Q Well, it says that you said that he never accepted responsibility and he was doing it just like he always behaved; is that right?
MS. SWAIN: Objection.
Q Do you agree with what you -- what's there?
(Witness reviewing document.)
A Yes, ma'am.
Q Who is Mary Brook? Do you know?
A She's a label operator on line three.
Q On Plaintiff's Exhibit Number 6, where it says, Another concern I have is finding Mary Brooks off the line and talking to other employees, if you have given her

clear instructions on what she should do if the line is down, then I expect you to come to me for solutions to this problem, do you remember what the problem was? Why -- had y'all observed Mary Brook -- Brooks not doing her job?

A Looks like we observed her talking to other employees when she should have been on the line.

Q Uh-huh. And -- and was --

A Uh-huh.

Q It was Mr. Williams' responsibility to make sure that the workers were doing their job duties, right, and not bothering other employees? Correct?

A Right.

Q What is your understanding of -- of the -- the status of how somebody's employment record has to be in order for them to get -- to be a supervisor?

MS. SWAIN: Objection.

A I -- say that again. I -- I didn't understand the question.

Q Have you ever appointed a supervisor or recommended that a person be made a supervisor?

A No, ma'am.

Q So you don't -- do you know what the status for somebody's personnel record is supposed to be before they can become a supervisor?

A No, ma'am.

Q Who makes those decisions? As -- for instance --

A HR would, I guess.

Q Plaintiff's Exhibit Number 18 to Boyer's deposition shows -- shows that Mr. Franklin Williams was made temporary supervisor in --

A Uh-huh.

Q -- what, July of '07?

A That would have came from my boss.

Q Sir?

A That would have came from Ricky Smothers.

Q Do you -- he would have been the person that would have recommended that?

A That approved it, yes, ma'am.

Q Well, would he have sought any input from you since you were his -- since you were Mr. Williams' supervisor?

A Yes, ma'am, he would have.

Q Would he have -- and do you understand what -- what the status of somebody's personnel record is supposed to be before they get to be a supervisor or get a recommendation for a supervisor?

MS. SWAIN: Objection.

A No, ma'am.

Q You don't understand that?

A I don't -- I don't know what the process is.

Q Well, were you around when Frank Williams quit?

A Yes, ma'am, I sure was.

Q What -- what -- what do you know about Mr. Williams quitting or resigning?

A I don't know the circumstances

behind that.

Q Do you know he was asked to resign?

MS. SWAIN: Objection.

A No, ma'am.

Q No one ever told you that he had been asked to resign?

MS. SWAIN: Objection.

A No, ma'am.

Q Have you ever -- did you ever ask anybody why he was gone?

A No, ma'am.

Q Do -- were you aware that Linda Thornton had filed an EEOC charge?

A Not until we went through this -- this process.

Q Which process, getting ready for the depositions?

A Correct.

Q No one asked you for any input into -- to responding to an EEOC charge?

MS. SWAIN: Objection.

A No, ma'am.

Q Plaintiff's Exhibit Number 13, what is that, sir? That's to -- to Boyer's deposition. Isn't that what it says, Plaintiff's 13 to Boyer's?
A Uh-huh. First step written warning, written counseling, to Frank for using profanity in the presence of other co-workers.
Q Do you know what that was about? Did you participate in -- in -- in any way in that particular incident?
A I can't recall.
Q Do you -- do you remember that he was written up for using profanity in front of other co-workers?
A Yes, ma'am.
Q Do you recall that he was written up a second time for using profanity in front of co-workers?
A I can't recall that, ma'am.
Q I will show you what's been marked as Plaintiff's Exhibit Number 16 to Boyer's deposition. Have -- take a look at

that.
MS. SWAIN: Ann, when you get to a good stopping point, can we take a short break?
MS. ROBERTSON: Sure. Let's --
A No, ma'am.
Q You don't remember that?
A Huh-uh. No, ma'am, I sure don't.
Q And you -- you wouldn't have had any -- any conversation with Mr. Williams about Plaintiff's Exhibit Number 16?
A No, ma'am.
Q Would you have been told that he was getting something like that?
A In this instance, no, ma'am. It came from HR.
Q So you're telling me that as Mr. Williams' supervisor, that you wouldn't know whether he had been written up for cursing employees that were directly -- that were under you?
MS. SWAIN: Objection.
A In this instance, I didn't know

anything about this, ma'am.
Q Okay.
MS. ROBERTSON: All right. Let's take a break.
MS. SWAIN: We're off the record at 10:28 a.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We're back on the record at 10:37 a.m.
BY MS. ROBERTSON:
Q You don't know anything about Plaintiff's Exhibit Number 16?
A No, ma'am, I sure don't.
Q Will you look at Plaintiff's 14 and -- and tell me what you know about that, please, sir, Plaintiff's Exhibit Number 14?
MS. SWAIN: 14 to whose?
MS. ROBERTSON: Oh, that's Ricky Smothers', I think. I mean Chris Jordan's.
MS. SWAIN: Let me see that just for one second.
THE WITNESS: Okay.

MS. SWAIN: All right.
A Linda came to us and basically told us that Frank had been making some statements about him being a child molester, and all of this was coming from -- from -- from her. So I told Chris, Let's go ahead and get all the documentation and let's turn this in to HR.
Q Do you remember she said that -- this immediately met with Melvin Hutchins and Chris Jordan, do you remember where y'all met?
A I don't know if she came up to the -- I think she came up to the production office.
Q Do you remember that you had had some discussions with her about issues involving Frank Williams and line three operations a few days before that?
A I can't recall. No, ma'am, I don't -- I don't remember this.
Q So when she came to y'all, was she upset?

A I can't remember whether she was upset or not.
Q Did you make any notes at the time that she came to you and Chris in the production office to report this?
A No, ma'am. We just had her fill out the documentation form stating what had happened and we immediately alerted HR and turned it over to them.
Q All right. Did you ask her -- when she said that -- that Frank came to her saying that people were saying that she was saying he was a child molester, did you ask her whether or not she had been saying that?
A No, ma'am.
Q When you say you alerted HR, who are you talking about you alerted?
A I think at that time -- I think Tommy Nance was in -- in charge of HR. We took that to him.
Q Do you recall what he said to you about that, about what to do, if anything?
A No, ma'am. I had Chris to --

to -- to get with Tommy.
Q Did you ever talk to Franklin Williams about whether or not he had come to Linda and -- about him being a child molester?
A No, ma'am.
Q I'll show you what's been marked as Plaintiff's Exhibit Number 15 and ask you what you remember about that. On Plaintiff's Exhibit Number 16, this says -- is it 16 or 15 to Chris Jordan? It says -- I think it says you were present; right?
A Present while this documentation formed was being filled out.
Q Right. Do you recall her coming to y'all about him making threats?
MS. SWAIN: Objection.
A No, ma'am.
Q Do you recall taking this to HR, Plaintiff's Exhibit Number 15 to Chris Jordan's deposition, or having --
A Chris would have taken it to HR.
Q All right. Who is Jewel Sively?

A Jewel Silervy is an associate that works in production.
Q I'll show you what's been marked as Plaintiff's Exhibit Number 16. Do you know -- were you present when that document was filled out, plaintiff's exhibit to Chris Jordan's deposition?
A No, ma'am.
Q Can you tell me who filled it out?
A This appears to be Frank Williams' handwriting.
Q Do you say -- do you see where he says that she -- that he was told that Linda was saying he was a child molester and what he did 15 years ago was none of her business?
A Uh-huh.
Q Did you -- did anybody tell you about that document?
A Yes, ma'am.
Q Who told you about that document?
A Chris.

Q Did he tell you that -- that Frank Williams had basically confessed to being a child molester?
MS. SWAIN: Objection.
A No, ma'am.
Q Well, he said what he did 15 years ago wasn't anybody's business; right?
A He didn't tell me that, ma'am.
Q Well, what did he tell you about that document?
A He had an employee that was talking about Frank, some issues with Frank, and I told him -- I said, Let's get some documentation. Let's take it up to the HR.
Q All right. Well, what do you mean some employees were talking about issues with Frank?
A This Jewel Silervy in particular had came to Frank and made some remarks about some issues in his past.
Q Well, I mean, isn't that what my -- Linda came and complained to you about in Plaintiff's 14, that that's what he was

saying?
A Uh-huh. Yes, ma'am.
Q Do -- do you think that -- that -- that Plaintiff's Exhibit Number 16 was -- was a statement that Chris got in response to -- to taking Plaintiff's Exhibit 14 to HR?
MS. SWAIN: Objection.
A I don't know, ma'am.
Q So did Chris tell you that -- well, strike that.
As a result of these -- these pieces of paper, did you learn that Frank Williams was a convicted sex offender?
MS. SWAIN: Objection.
A I didn't know whether this was true or not.
Q Had you heard that before?
A No, ma'am.
Q Did you -- did anybody check it out to find out if it was true or not?
A I -- I don't know, ma'am.
Q Did you ask Mr. Williams if it

was true or not?
A No, ma'am.
Q It appears that Mr. Williams admits that it was true in Plaintiff's Exhibit Number 16, doesn't it?
MS. SWAIN: Objection.
Q And I don't like it. I don't start trouble. What happened 15 years ago is none of her business. And he's talking about her saying he was a child molester?
MS. SWAIN: Objection. What's the question?
Q Isn't that what he's admitting to?
MS. SWAIN: Objection.
A I don't read that, that --
Q Well, what -- how do you read it?
A Some accusations. You've got to -- you've got to figure out what's the truth and what's not.
Q And y'all do background checks out there, right, criminal checks?
MS. SWAIN: Objection.

A Yes, ma'am.
Q Do you know if anybody checked it out then to find out if it were true?
A I have no idea, ma'am.
Q And you know that it's a -- it's a law that if you're a convicted sex offender that they have to post it on the internet so that people can find out and protect their --
A Uh-huh.
Q -- children and themselves from predators like that; right?
MS. SWAIN: Objection.
A If that's the law. I don't know what the law is, ma'am.
Q You -- you didn't know that that was the law, that sex offenders have to register and that they have -- it's made public on a -- on a --
A No, ma'am.
Q -- on a computer?
MS. SWAIN: Objection.
Q Never heard that?

MS. SWAIN: Objection. He's answered the question.
Q Do you know that Frank Williams was -- pled guilty to having deviant sexual relations with a 10 year old?
A No, ma'am.
Q Do you know that he pled guilty to having sexual intercourse with a 13 year old?
A No, ma'am.
Q Do you know that he went to jail -- to prison for four years?
MS. SWAIN: Objection.
A No, ma'am.
Q Do you know he was on probation when y'all hired him?
MS. SWAIN: Objection.
A No, ma'am.
Q And you've never heard that in this whole situation?
A No more than what came out of this right here.
Q And when the EEOC charge was

filed, no one asked you about anything that -- any allegations that my client made in the EEOC charge?
MS. SWAIN: Objection.
A No, ma'am.
Q Were you -- were you -- did you talk to my client after the incident that occurred where Mr. Williams cursed and was found guilty of cursing in front of co-workers?
MS. SWAIN: Objection.
A About this particular incident? I can't -- I can't recall that.
Q No. I'm talking about the one where -- where the -- where he got the warning, the first step warning.
MS. SWAIN: What is the -- what's the question, again?
Q Were you -- did you have any involvement with my client surrounding that incident?
MS. SWAIN: Objection.
A I can't recall whether I met with

her or not.
Q So -- Okay. Did you talk to her before she left the employment of -- of Flavor House?
A No, ma'am.
Q Did you know why she left the employment of Flavor House?
A I had my -- I had my suspicions, but I didn't know.
Q Okay. Well, what -- what were your suspicions?
A She was upset and she didn't want to work with Frank.
Q And why did you have those suspicions?
A Just things that happened in the plant on the -- on her day of leaving.
Q Tell me.
A She wanted to go back to line -- if I'm not mistaken, she wanted to go back to line three.
Q Right.
A She got with Ricky Smothers, my

boss, and basically said why couldn't she go back to line three and Ricky -- Ricky basically told her that we needed her to work on line five. And she was upset and -- and, you know, she needed to leave the line and Bruce Cassady called and stated that Linda was crying and he was over running the label machine. And she was saying that --
Q Wait. Stop.
A Go ahead.
Q Bruce Cassady was over running the label machine?
A Right. He stepped in and ran the label machine for Linda because Linda said she couldn't work on the labeler because she was upset.
Q All right. And he -- he -- did he call -- how did -- did he call you on the --
A Bruce said, I'm on line two's -- I'm on line five's label machine.
Q And what else did he say?
A Wanted to find out why he was on

the machine.
Q And what did you find out?
A He said, Well, Linda's -- she left the line. She was upset. She said she couldn't work so I'm going to help you guys out by keeping the line running.
Q Did -- did you -- did she -- and did he tell you why she was upset?
A No.
Q Other than she didn't want to work with Frank Williams?
MS. SWAIN: Objection.
A No. She didn't say that.
Q Oh, I thought you said it, but we'll just watch the tape and see if that's not what you said.
MS. SWAIN: Objection.
MS. ROBERTSON: To what?
MS. SWAIN: He did not say that Bruce told him that she was upset. He said he understood that she was upset and you're changing what he said to try to get --

73

Q Well, you understood she was upset because she didn't want to work with Frank Williams; right?
A Correct.
MS. SWAIN: And then you asked her -- him a different question.
Q And how did -- how did you find that out?
A Through all of this.
Q All right. And did you talk to her about it?
A No, ma'am.
Q Did you understand why she was upset about working with Frank Williams?
A I didn't understand why she was upset about working on line five's labeler.
Q Did you -- was -- was label (sic) three about to get a new label machine?
A I don't recall that.
Q And -- and there was a -- she had been working on a -- a very raggedy old label machine for some time on line three, had she not?

74

MS. SWAIN: Objection.
A I wouldn't say raggedy. But, yeah, she had been working line three labeler.
Q And she had been told that they were going to get a new label machine on line three; correct?
MS. SWAIN: Objection.
A I don't recall that.
Q Well, y'all had -- y'all got a new label machine on line three, didn't you?
A We got several different label machines.
Q When did you get the new label machine on line three?
A I can't recall the date, ma'am.
Q Well, can you tell me why she was moved off of -- off of line three?
A That was a HR decision.
Q And she obviously didn't want to do it; is that correct?
MS. SWAIN: Objection.
A No, she didn't.

75

Q Tell me in terms of distance how far lane -- line five and line three are from each other.
A I'm not good at distance, but a pretty good piece.
Q What does that mean?
A Maybe from here to the -- the door as you go out up front.
Q Okay. So we're talking 24 feet?
A Yeah. And you've got a line in between.
Q Tell me what you know about the pay for skills situation.
A Pay for skills, that was set up to, you know, award employees that wanted to, you know, earn more money. It was something that we put in place right after Mary Ann got there.
Q All right. And -- and what do you mean wanted to earn more money?
A Different skill sets. You know, learning how to run more than one piece of equipment and be proficient at it.

76

Q All right. And -- and did you have different levels of, say, operators?
A Yes, ma'am, we sure did.
Q How many -- how many levels did you have?
A Four.
Q And -- and each level paid more than the -- the one below; is that correct?
A Yes, ma'am.
Q And how did you decide who should get what rating?
A Their supervisor. The supervisor would make the -- the recommendation as to what they thought.
Q Well, in -- in many cases a supervisor would not have supervised them if they had worked on different operating -- different operating machines; correct?
MS. SWAIN: Objection.
A Not necessarily.
Q Okay. Well, tell me how it was decided. Did y'all have -- did y'all have a meeting?

A We sure did.
Q Who was at the meeting?
A Chris Jordan, Fanny Ash, Betty Brown, Larry Hatcher, Eugene Andrews, Bruce Cassady.
Q Anybody else?
A I want to say Mary Ann was there and Ricky.
Q And -- and did you have a list of what -- what the skill sets were in order to qualify for the different stages?
A We -- we set that. That was the basis of the meeting, to set what the criteria was for the different pay for skill levels.
Q Is that in writing anywhere?
A Yes, ma'am.
Q All right. And what were the criteria?
A I would have -- I don't -- I can't verbatim say what they were, ma'am.
Q Well, was -- so level four you had to have trained someone else on a

machine; correct?
A Train and -- and were able to -- to run all label machines proficiently.
Q Okay. And all -- and tell me the different label machines.
A You've got a can line label machine. You've got a jar line label machine.
Q What? A can line what?
A Can line and a jar line label machine. You've got -- you've got a wrapper.
Q You need to spell that second word for me. I'm not hearing it.
MS. SWAIN: Jar.
A Jar.
Q Jar. I'm sorry. Jar -- can and jar and what else?
A That's it.
Q Okay. Now, Plaintiff's Exhibit Number 9 to Chris Jordan's deposition, what is that, please, sir?
A That's a PAN saying that --

Q What's a PAN?
A Personnel action notice.
Q Okay.
A Bruce is basically saying she can run the label machine. She run it proficiently.
Q It says she had become a complete operator. She does a good job and listens very well. And he signed it and so did you sign it; right?
A Uh-huh.
Q Sir? Yes or no.
A Uh-huh. Yes, ma'am.
Q And that's in '02?
A Uh-huh. Yes, ma'am.
Q When did she -- did she work on a jar line?
A She sure did.
Q When was that?
A I can't remember the dates.
Q And after she worked on a jar line, did she teach Vicki Cook how to be an operator?

A Uh-huh. Yes, ma'am.
Q And when was that?
A I can't remember those dates.
Q Was it before y'all made the assignments to -- as to which kind of operator she would be, what level of operation she would be?
A I don't think so.
Q You don't think so. It was after?
A I -- I don't know.
(Plaintiff's Exhibit Number 10 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's 10 to your deposition, what is that, please, sir?
A This is a yearly increase for -- for -- for Linda.
Q And that was in '03. Do you know what kind of operating she was doing then?
A I can't recall what -- what she was doing or which labeler she was running.

Q Can you tell me why Linda got a -- a level one assignment to -- to the operator?
A Because her supervisor felt that's where she was at.
Q Which supervisor was that?
A Fanny Ash.
Q Well, you had been her supervisor and Bruce Cassady had been her supervisor, had they not?
MS. SWAIN: Objection.
A Bruce had been her supervisor.
Q All right. And Bruce said she was a complete operator.
A For the label machine that she was running at that time.
Q Can you tell me the other operators who were assigned level one at the time you did -- you assigned the first assignments?
A No, ma'am.
Q Was there a list?
A Uh-huh. Yes, ma'am.

Q And where would that list be?
A In their personnel file.
Q There would be a list of -- in whose personnel file?
A It would be -- the level -- what level each operator is will be in their personnel file.
Q I'm -- I'm asking you was there a list of everybody made with a level assignment?
A I can't recall whether we did that or not.
Q So in order for me to find out which ones got which assignments, I'm going to have to have everybody's personnel file?
A Yes, ma'am.
Q Okay.
MS. ROBERTSON: That will be -- I think -- I think that's all I have for him.
MS. SWAIN: Okay. You're done.
THE VIDEOGRAPHER: The deposition is over at 11:01 a.m.

DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

______________________

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

A

**able** 78:2
**abuse** 26:2 27:10 40:15
**abusing** 26:9 27:3 40:17
**accept** 52:3
**accepted** 52:9
**ACCR** 84:21
**accusations** 66:18
**acting** 6:4
**action** 1:5 79:2 84:16
**actions** 51:23
**activity** 49:11
**added** 51:20
**address** 8:6 51:21
**admits** 66:4
**admitted** 34:22 35:1
**admitting** 66:13
**adult** 27:9
**advised** 3:4
**age** 24:7,15
**ago** 63:16 64:7 66:8
**agree** 52:2,13
**AGREED** 2:2 2:11
**agreement** 7:17 8:19
**ahead** 41:11 60:6 71:10
**Alabama** 1:2,23 2:8,21 5:9,18 6:2,3,5,9,21 8:9 84:3
**alerted** 61:8,16 61:17
**Alice** 22:15,16
**aligning** 11:4
**allegations** 69:2
**Allums** 36:15
**amended** 2:22
**Andrews** 77:4
**and/or** 16:9
**Ann** 5:13 7:4 11:11 12:17,21 21:22 22:14 23:2,6,17 41:3 45:3 49:4 58:2 75:18 77:7
**answer** 13:12 14:8 26:21
**answered** 46:4 68:2
**answers** 84:8
**anybody** 18:15 23:22 31:13 33:4 56:11 63:19 65:20 67:2 77:6
**anybody's** 64:7
**anywise** 84:16
**appears** 63:11 66:3
**application** 19:9
**appointed** 54:1
**approved** 55:3
**approximately** 2:10 6:9 8:14
**Ash** 77:3 81:7
**asked** 10:16 11:8 47:6 56:2 56:7,20 69:1 73:5
**asking** 10:20 14:18,21 82:8
**assault** 33:12,20 34:1,6,14
**assign** 2:16
**assigned** 81:18 81:19
**assignment** 81:2 82:10
**assignments** 80:5 81:20 82:14
**associate** 63:1
**attached** 13:21 16:17 29:17 40:21 42:20 43:7 44:21 45:20 46:13 48:21 80:14
**attend** 13:18 20:18
**attention** 23:13
**attitude** 47:8
**attracted** 26:4
**August** 47:4,16 49:18,22 51:3
**award** 75:15
**aware** 35:12 56:13
**a.m** 2:10 6:10,23 59:6,9 82:23

B

**B** 4:5
**back** 10:23 40:3 40:4,18 50:19 59:8 70:19,20 71:2
**background** 13:3 19:6,16 66:21
**badgering** 24:19 25:7
**bagging** 29:3
**Baker** 5:5
**based** 27:16
**basic** 25:4
**basically** 12:6 15:21 16:12 23:8 29:10 32:19 36:4,6 41:8,13 43:8 43:10 45:6 46:1 50:21,21 60:2 64:2 71:1 71:3 79:4
**basis** 77:13
**battery** 33:15
**Bearman** 5:5
**begins** 6:15
**behaved** 52:10
**belating** 24:7
**believe** 43:18
**Berkowitz** 5:6
**better** 44:16
**Betty** 38:11 77:3
**big** 11:20
**Birmingham** 5:9 5:18
**bit** 13:7
**Bobbie** 2:8 6:8 7:1
**boss** 54:20 71:1
**bothering** 53:15
**bottle** 31:1
**bottom** 18:21
**Boyer** 11:11 23:2,6,18
**Boyer's** 54:14 57:2,4,23
**brain** 26:14
**break** 39:19,23 40:1 43:10,12 44:2 58:4 59:4 59:7
**breaks** 39:22 40:6,8,10
**Bremner** 8:17 11:3,3,6 22:18
**Brenda** 11:1
**Brook** 52:17 53:5
**Brooks** 52:22 53:5
**brought** 23:13
**Brown** 38:11 77:4
**Bruce** 17:20 18:1,2,5 71:6 71:11,20 72:20 77:4 79:4 81:9 81:12,13
**Building** 5:16
**business** 63:17 64:7 66:9
**BUTLER** 84:4

C

**C** 5:1,13
**Caldwell** 5:5
**call** 8:21 9:4 71:18,18
**called** 9:22 21:22 30:9,23 71:6
**calling** 36:2
**calls** 28:7 46:3
**canning** 28:22
**Carnegie** 21:15
**case** 6:19 29:13
**cases** 76:15
**Cassady** 17:20 18:1,2,5 71:6 71:11 77:5 81:9
**cause** 6:11 84:17
**certain** 29:12
**CERTIFICA...** 84:1
**Certified** 84:20
**certify** 6:4 84:6 84:14
**changes** 12:19 12:21
**changing** 72:22
**charge** 9:18 12:6 12:7 17:12 27:20 36:19 56:14,21 61:19 68:23 69:3
**check** 19:6,16 65:20

**checked** 67:2
**checks** 66:21,22
**chest** 34:9
**child** 60:4 61:13 62:4 63:15 64:3 66:10
**children** 27:2 67:11
**Childs** 5:15
**choice** 37:14
**Chris** 46:2,9 48:13 59:19 60:6,11 61:4 61:23 62:11,20 62:22 63:6,23 65:5,10 77:3 78:21
**Circle** 8:8
**circumstance** 34:14
**circumstances** 34:4,5 55:23
**Civil** 1:5 2:21 6:6
**Clark** 22:15,16
**classes** 13:18
**clear** 53:1
**client** 69:2,7,20
**clock** 39:22,23 40:2,3,9,9,12 40:12 42:12
**clocked** 41:14 43:9
**clocking** 39:19 44:2
**coached** 42:1
**coaching** 41:16 41:19 43:14
**come** 10:8,21 39:14 40:18 53:2 62:3
**coming** 39:23 60:5 62:15
**commencing** 2:9 6:9
**Commissioner** 1:20 6:4
**communicating** 49:10
**complained** 64:22
**complete** 79:7 81:14
**computer** 67:21
**computer-aided** 84:10
**concern** 52:21
**CONCLUDED** 83:1
**confessed** 64:2
**consider** 25:14 27:1,10 33:12 34:1,13 49:21
**consideration** 19:14
**constant** 24:19 25:6
**constantly** 25:10
**contact** 44:15
**contingent** 19:15
**conversation** 58:10
**convicted** 65:14 67:6
**Cook** 28:17 79:22
**copy** 41:2 43:3 45:2 49:3
**Corporation** 22:19
**correct** 11:10 28:11,12 34:20 42:13,15 44:6 44:11 47:18 49:12,15,19 51:5 53:15 56:19 73:4 74:7,21 76:8 76:18 78:1 84:11
**correctly** 27:20
**counsel** 2:4,13 2:15 6:7 7:2 84:15
**counseling** 30:1 57:6
**counterpart** 12:9
**COUNTY** 84:4
**couple** 15:18
**Court** 1:1 2:6 3:5,6 6:1,20 7:13 26:20 84:20
**co-workers** 57:8 57:15,19 69:10
**criminal** 66:22
**criteria** 77:14,19
**Crook** 2:8 6:8
**Crowe** 7:1
**crying** 30:12,23 71:7
**cursed** 69:8
**cursing** 58:20 69:9

**D**

**D** 1:21 2:5,22 4:1 5:14 6:1,19
**daily** 27:16,21 28:1 49:11
**Dale** 21:15
**date** 6:5 15:15 74:16
**dates** 10:4 79:20 80:3
**David** 24:1
**day** 2:9 3:2 6:10 28:1 49:9 50:3 50:10 70:17
**days** 60:19
**day-to-day** 27:21 28:1
**deal** 15:21 16:2 23:8,11
**December** 49:15 50:1
**decide** 76:10
**decided** 36:12 76:22
**decision** 37:12 37:18 74:19
**decisions** 54:10
**Dee** 5:22
**defendant** 5:3 7:9
**Defendant(s)** 1:12
**definitely** 23:12 23:15
**definition** 24:3,9 24:12 33:21
**delivering** 2:23
**Demeaning** 25:11
**demoted** 37:9
**department** 10:14,18 18:6
**departments** 9:19
**depends** 14:9
**deposition** 1:14 2:4,18 6:16 13:21 14:2 15:3 16:17,21 29:17,21 38:14 40:21 42:21 43:7 44:21 45:20 46:13 48:21 54:14 57:3,23 62:21 63:7 78:21 80:14,17 82:22 83:1 84:7
**depositions** 56:18
**derogatory** 24:6 24:14,18
**deviant** 68:4
**different** 8:20 15:22,23 21:1 21:4 23:3,4 28:10,11 34:4 44:5 73:6 74:12 75:21 76:2,17,18 77:11,14 78:5
**difficult** 16:2
**diploma** 13:4
**directly** 58:20
**director** 22:18
**discipline** 37:10 39:3
**disciplined** 39:2
**discussion** 32:14 41:10
**discussions** 60:17
**distance** 75:1,4
**District** 1:1,2 6:20,21
**Division** 1:3 6:22
**document** 29:23 41:5,8,12 45:5 46:17 47:13 52:15 63:5,20 63:22 64:10
**documentation** 15:6 23:15 38:18,21 60:7 61:7 62:13 64:14
**documented** 14:22
**doing** 25:9 42:6 43:16 48:7 51:4 52:1,10 53:6,14 80:21

80:23
**Donelson** 5:5
**don'ts** 45:8
**door** 75:8
**Dothan** 1:23 2:8 6:8 8:8 22:21
**doubt** 27:23
**do's** 45:8
**duly** 7:21
**duties** 12:3 27:13,21 53:14

**E**

**E** 4:1,5 5:1,1
**earn** 75:16,20
**easier** 11:23
**educational** 13:2
**EEOC** 56:14,21 68:23 69:3
**effective** 2:22
**eight** 20:16
**employee** 64:11
**employees** 16:4 39:21 52:23 53:8,15 58:20 64:16 75:15
**employment** 19:14 53:19 70:3,7
**Ensuring** 27:15
**entail** 15:19
**equipment** 48:11 75:23
**etcetera** 16:5,6
**Eugene** 77:4
**everybody** 82:9
**everybody's** 82:15
**evidence** 2:18
**evidently** 10:14
**exact** 15:15 18:9
**examination** 4:2 6:12 8:1
**examined** 7:21
**example** 13:13
**excuse** 12:4 18:14 33:4
**exhaust** 25:1
**exhibit** 13:19 14:1 15:2 16:15,20 17:7 18:20 29:15,20 38:13,15 39:4 40:19 41:1 42:19 43:1,5 44:19,23 45:18 45:22 46:11,16 46:19 47:1,2 48:19 49:1 51:9 52:20 54:13 57:1,22 58:11 59:12,16 62:8,10,20 63:4,6 65:4,6 66:5 78:20 80:12
**exhibits** 3:3
**expect** 14:3,4 53:2
**expectations** 45:9
**explaining** 38:19
**expressions** 51:22
**e-mail** 35:20

**F**

**F** 5:4
**Fanny** 77:3 81:7
**far** 14:17 32:2 33:19 50:22 75:2
**feet** 75:9
**felt** 81:4
**figure** 66:19
**file** 13:10 14:5 14:23 43:15
82:2,4,7,15
**filed** 3:6 56:14 69:1
**fill** 29:10,11 61:6
**filled** 17:11 19:10 62:14 63:6,9
**find** 14:3,4 65:21 67:3,8 71:23 72:2 73:7 82:13
**finding** 52:22
**fine** 7:19
**first** 9:20 10:10 10:12,23,23 12:2,5,8,17 17:3 27:13 28:2,8 30:3,17 57:5 69:16 81:19
**five** 71:4 75:2
**five's** 71:21 73:16
**Flavor** 1:10 6:18 7:9 8:21 9:1,4 9:7 11:2 13:6 16:7 17:2 20:19,21 28:3 28:10 37:4 70:4,7
**following** 6:12
**follows** 7:22
**follow-up** 43:17
**Food** 8:17
**foregoing** 6:6 84:7,11
**forgot** 48:12
**forgotten** 17:18
**form** 2:14 18:23 24:5 38:16,18 38:22 61:7
**formed** 62:14
**found** 35:15,21
69:9
**four** 12:6 20:10 68:12 76:6 77:22
**Frank** 42:7 45:7 48:10,10 49:6 50:21 51:22 55:18 57:6 60:3,18 61:11 63:11 64:2,12 64:12,17,19 65:13 68:3 70:13 72:11 73:3,14
**Franklin** 6:19 54:15 62:2
**frequently** 26:1 26:8
**front** 57:14,19 69:9 75:8
**fucking** 34:10
**full** 8:3
**fun** 25:9
**further** 2:11 84:14

**G**

**gender** 25:12 26:2,11
**George** 8:5
**getting** 27:15 39:15 56:17 58:14
**give** 13:13 24:2 39:4 43:3
**given** 35:10 41:19 52:23 84:12
**giving** 18:17 41:15 49:6
**go** 9:21 10:17 24:21 33:19 39:19,23 41:11 50:6,14 60:6
70:19,20 71:1 71:10 75:8
**goes** 29:13
**going** 8:18,21 29:19 35:14 40:2,4 42:7 44:1 46:3 72:5 74:6 82:14
**good** 22:2,4 58:3 75:4,5 79:8
**gotten** 14:14
**Greenville** 6:2
**grounds** 2:16
**Group** 8:17
**guess** 14:18,18 23:17 41:12,19 45:6,12 48:12 54:12
**guilty** 68:4,7 69:9
**guys** 72:5

**H**

**H** 4:5
**handed** 39:9
**handwriting** 63:12
**happen** 33:8 34:16
**happened** 32:5 33:1 34:18 36:8,10 38:19 39:16 51:14 61:8 66:8 70:16
**harass** 26:1
**harasses** 25:20
**harassment** 20:4 22:10 23:9 24:3,5,10,13 25:2,18 26:8
**hard** 11:18
**Hatcher** 12:14 30:7,17 31:13

35:16,17 36:9 37:23 38:7 39:7,8 77:4
**head** 26:18
**heard** 65:18 67:23 68:19
**hearing** 78:14 84:13
**heck** 50:20
**held** 32:14 41:10
**Helms** 24:1
**help** 49:9 72:5
**helps** 44:16
**High** 13:4
**highlights** 25:4
**hired** 9:10,13 10:12 17:15 19:5 68:16
**hiring** 16:9 18:12,15 19:1
**hit** 33:16 34:9 38:1
**hits** 33:22,23
**home** 8:6 30:10
**hours** 20:16
**House** 1:10 6:18 7:9 8:21 9:1,4 9:7 11:2 13:6 16:8 17:2 20:19,21 28:3 28:10 37:4 70:4,7
**HR** 16:13 21:13 23:16,18,19 36:14,20 37:11 37:15,17 54:12 58:16 60:8 61:8,16,19 62:19,22 64:14 65:7 74:19
**huh-uh** 11:16 58:8
**human** 22:17
**Hutchins** 1:15
2:5 6:11,17 7:20 8:5,16 60:10

I

**idea** 67:4
**identification** 13:20 16:16 29:16 40:20 43:6 44:20 45:19 46:12 48:20 80:13
**identify** 7:2
**immediate** 12:15
**immediately** 60:10 61:8
**important** 48:14
**incident** 30:4 31:11,14 39:12 57:11 69:7,12 69:21
**increase** 80:18
**individual** 24:7 27:8 32:8,9
**inform** 36:7
**informed** 30:8
**Ingram** 19:22
**input** 36:21 55:5 56:20
**instance** 13:23 54:11 58:15,23
**instructed** 50:1
**instructions** 53:1
**insubordinate** 47:21 49:22
**insubordination** 48:8
**intercourse** 68:8
**interested** 84:16
**internet** 67:8
**involved** 31:16 31:17 32:1,8
**involvement** 69:20
**involving** 30:4 38:6 60:18
**issued** 46:19
**issues** 51:21 60:17 64:12,17 64:20
**items** 28:5

J

**jail** 68:12
**jar** 29:7,9,10 33:5 78:7,10 78:15,16,17,17 78:18 79:17,21
**jars** 29:11
**Jennifer** 5:4 7:8
**jet** 29:12
**Jewel** 62:23 63:1 64:18
**JFI** 19:21
**job** 11:2,4,5 18:9 44:16 49:7 53:6,14 79:8
**jobs** 28:2
**Jordan** 60:11 62:11 77:3
**Jordan's** 59:20 62:21 63:7 78:21
**July** 42:2 44:1 44:10 54:18
**jury** 28:1

K

**keep** 48:2
**keeping** 72:6
**khaki** 28:7
**kin** 84:15
**kind** 14:13,23 21:13 34:5 37:10 51:12 80:5,21
**kinds** 29:1
**know** 10:1 13:14 14:16,20 15:15 15:20 17:17,20 18:9,23 19:7 19:21 23:12 24:6,23 26:13 32:19 33:7 35:19,19 36:11 36:23 37:2,13 37:20,21 38:4 38:8,9,10 39:3 41:13,15 43:16 45:7 46:2,3 48:12 50:16,19 50:21 52:17 54:5 55:16,21 55:23 56:2 57:9 58:19,23 59:11,15 60:13 63:5 65:9,16 65:22 67:2,5 67:14,16 68:3 68:7,11,15 70:6,9 71:5 75:12,15,16,21 80:11,20
**knows** 28:1
**Kress** 5:16

L

**L** 2:1
**label** 29:12 47:9 52:18 71:8,12 71:14,21 73:17 73:18,22 74:6 74:11,12,14 78:3,5,6,7,10 79:5 81:15
**labeler** 71:15 73:16 74:4 80:23
**Lake** 5:22
**lane** 75:2
**language** 34:22
**Large** 2:7 6:4
**Larry** 12:14 30:7 31:13 35:16,17 36:3 36:9 38:10 39:7,8 77:4
**lasted** 20:14
**late** 18:4 40:18
**law** 7:1 67:6,14 67:15,17
**lawyer** 21:14
**lead** 44:14
**leader** 22:2,5 50:23
**leaders** 16:10 50:7,19
**leadership** 20:3 20:7 21:3 22:1
**leading** 2:14
**learn** 65:13
**learned** 30:4
**learning** 75:22
**leave** 71:5
**leaving** 70:17
**led** 32:20,21
**left** 9:16 35:20 35:20 70:3,6 72:4
**Leigh** 36:15
**letting** 41:13
**let's** 48:23 58:5 59:3 60:6,7 64:13,14
**level** 76:7 77:22 80:6 81:2,18 82:5,6,9
**levels** 76:2,4 77:15
**Lewd** 24:19
**License** 84:21
**Linda** 1:6 5:21 6:17 30:2,5,9 34:17 36:13 37:22,22 38:22

39:5,9,11 56:13 60:2 62:4 63:14 64:22 71:7,14 71:14 80:19 81:1
**Linda's** 72:3
**line** 27:16 28:18 28:19,22 29:7 29:9,10 42:11 46:4 48:11 49:11 52:18,22 53:2,9 60:18 70:19,21 71:2 71:4,5,20,21 72:4,6 73:16 73:22 74:3,7 74:11,15,18 75:2,2,10 78:6 78:7,9,10,10 79:17,22
**lines** 28:10,13,16 29:2
**list** 24:21 77:9 81:22 82:1,3,9
**listens** 79:8
**little** 13:9 28:6
**lived** 8:12
**LLC** 5:15
**long** 8:12 9:6 20:14 50:20
**look** 18:19 41:17 43:3 48:23 57:23 59:14
**looked** 43:10
**Looks** 53:7

**M**

**machine** 47:9 71:8,12,14,21 72:1 73:18,22 74:6,11,15 78:1,7,8,11 79:5 81:15
**machines** 74:13 76:18 78:3,5
**mail** 35:21
**maintenance** 18:6 32:8 35:11
**making** 27:17 27:19 60:3 62:16
**male** 27:9
**management** 14:15,17 15:13 20:2
**manager** 9:23 10:22 14:10 15:21
**managers** 14:12 23:14
**managing** 27:18
**manner** 27:18
**mark** 43:2
**marked** 13:20 14:1 16:16,20 29:16,20 40:20 42:20 43:6 44:20 45:19 46:12 48:20 57:22 62:7 63:3 80:13
**Mary** 11:11 12:17,21 22:14 23:2,6,17 52:17,22 53:5 75:18 77:7
**matter** 6:17
**matters** 23:6
**maximum** 16:3
**ma'am** 14:10 16:23 18:13 19:4,11,20 21:5 22:6,8,23 24:13,22 25:22 26:6,12 30:7 30:14,21 31:3 31:20 33:2 34:16,23 36:11 36:22 37:2,5 38:4 39:10 41:23 42:18 44:9,12 45:14 48:1,4 51:18 52:7,16 54:4,9 55:3,7,14,20 56:5,9,12,23 57:16,20 58:6 58:8,12,15 59:1,13 60:20 61:6,15,23 62:6,18 63:8 63:21 64:5,8 65:2,9,19,22 66:2 67:1,4,15 67:20 68:6,10 68:14,18 69:5 70:5 73:12 74:16 76:3,9 77:17,21 79:13 79:15 80:1 81:21,23 82:16
**McNaughton** 1:21 2:6,23 6:1 84:19
**mean** 15:23 21:3 24:17 25:6 33:22 37:13 40:17 50:12 59:19 64:16,21 75:6,20
**meaning** 25:2
**means** 84:9
**meeting** 76:23 77:2,13
**Melvin** 1:15 2:4 6:10,17 7:20 8:5 49:10 51:20 60:10
**memory** 39:12
**message** 35:21 36:2
**met** 60:10,12 69:23
**meted** 37:15
**Middle** 1:2 6:21
**Milsap** 32:10 36:23 38:19
**Milsap's** 32:16
**minutes** 21:19
**mistaken** 32:7 34:23 35:8 50:5 70:20
**molester** 60:4 61:13 62:5 63:15 64:3 66:10
**money** 75:16,20
**moved** 9:15 74:18

**N**

**N** 2:1 4:1 5:1
**name** 8:3 21:18
**Nance** 23:20 61:19
**necessarily** 48:1 76:20
**necessary** 2:12
**need** 11:14 14:18 26:20,22 42:4 49:8 51:1 78:13
**needed** 47:17 71:3,5
**needs** 41:16 46:1
**neither** 27:23 84:14
**nephews** 28:7
**never** 51:23 52:2 52:9 67:23 68:19
**new** 73:18 74:6 74:11,14
**night** 30:16
**Nineteenth** 5:17
**nodded** 26:18
**North** 5:7,17
**Notary** 2:6 6:3
**note** 35:20
**notes** 61:3
**notice** 79:2
**noticed** 21:21 43:11,11
**number** 1:5 13:19 14:2 15:3 16:15,20 17:7 18:20 29:15,20 38:13 38:15 39:4 40:19 41:1 42:19 43:1,5 44:19,23 45:18 45:23 46:11,16 46:19 47:1,3 48:19 49:1,8 51:9 52:20 54:13 57:1,22 58:11 59:12,16 62:8,10,20 63:4 65:4 66:5 78:21 80:12 84:21
**nut** 28:4
**nuts** 29:11

**O**

**O** 2:1
**objecting** 39:15
**Objection** 13:11 13:16 14:7 15:10 19:3 24:4,11 25:3 26:5,10,15,17 27:4,11 30:6 30:11,13 31:2 32:23 33:6,14 33:17 34:2,7 34:12,15 35:3

37:16 38:3 42:16 44:3 47:23 48:9,17 50:4 51:6,11 51:17 52:5,12 53:21 55:13 56:4,8,22 58:22 62:17 64:4 65:8,15 66:6,11,15,23 67:13,22 68:1 68:13,17 69:4 69:11,22 72:12 72:17 74:1,8 74:22 76:19 81:11
**objections** 2:13 2:16
**observed** 53:5,7
**obviously** 74:20
**occasions** 46:7
**occurred** 44:10 69:8
**October** 44:11 47:2,20 49:19 49:22 51:3
**offender** 27:5 65:14 67:7
**offenders** 67:17
**offensive** 34:22
**offered** 2:18
**office** 7:1 60:15 61:5
**offices** 2:7 6:8
**off-the-record** 32:14 41:10
**Oh** 25:8 47:14 59:18 72:14
**okay** 8:22,23 9:4 9:5 11:22 14:11 15:12 16:14 17:4 18:11 22:20 23:22 24:9 34:21 37:21 39:1,8 40:11 41:6 42:9 44:18 45:17 46:22 59:2,23 70:2,10 75:9 76:21 78:4,20 79:3 82:17,21
**old** 27:9 68:5,9 73:21
**once** 11:1 15:17 48:16
**ones** 82:14
**operating** 76:17 76:18 80:21
**operation** 80:7
**operations** 60:19
**operator** 52:18 79:8,23 80:6 81:3,14 82:6
**operators** 16:9 76:2 81:18
**opposed** 26:3
**oral** 3:2 6:12
**order** 53:19 77:10 82:13
**ordinarily** 30:17
**original** 3:1
**outside** 41:14 42:7
**owned** 9:3

**P**

**P** 2:1 5:1,1
**pack** 28:4,17
**packaging** 9:16 9:19,22,23 10:9,18,19,22 28:19
**page** 4:2 18:19 19:13
**paid** 40:6,7,8,10 76:7
**PAN** 78:23 79:1
**Pantazis** 5:15
**paper** 13:9,15 38:15 39:5 65:13
**paragraph** 51:20
**Parrish** 37:22
**part** 25:14
**participate** 18:11,14 57:10
**participated** 16:8
**particular** 52:6 57:11 64:18 69:12
**parties** 2:3,15 84:15
**pay** 37:7,8 75:13 75:14 77:14
**PC** 5:6
**peanuts** 30:5 31:1 32:22 33:5,5 35:2 38:2
**people** 9:1,2,3 16:3 21:2 22:14 23:19 26:1 31:16,20 32:1 40:15 44:14 61:12 67:8
**performance** 49:7
**period** 8:20 20:16
**person** 12:13 21:13,14,14 39:1 54:2 55:2
**personnel** 13:10 14:5 43:15 54:6 55:10 79:2 82:2,4,7 82:15
**person's** 21:18
**pick** 25:8
**piece** 19:9 39:5 75:5,22
**pieces** 13:9,14 38:14 65:12
**place** 36:5 75:17
**placed** 43:15
**plaintiff** 5:12 7:5,7
**plaintiff's** 13:19 14:1 15:2 16:15,20 17:7 18:20 29:15,20 38:13,15 39:4 40:19 41:1 42:19 43:1,5 44:19,23 45:18 45:22 46:11,16 46:19 47:1,2 48:19 49:1 51:9 52:20 54:13 57:1,4 57:22 58:11 59:12,14,16 62:8,10,20 63:4,6 64:23 65:4,6 66:4 78:20 80:12,16
**Plaintiff(s)** 1:8
**plant** 9:17 70:17
**plate** 50:22
**please** 3:4 7:2,11 7:16 8:4,7 13:3 29:22 40:23 41:7 42:23 45:1 46:16 49:2,4 59:16 78:22 80:17
**pleased** 10:15,16
**pled** 68:4,7
**point** 32:20,21 58:3
**position** 17:2 19:15 36:17
**possible** 33:3
**post** 67:7
**power** 26:2,9 27:3,10
**predators** 67:12
**presence** 57:7
**present** 5:20 36:9 62:12,13 63:5
**pretty** 38:23 75:5
**print** 29:13
**prior** 2:18
**prison** 68:12
**Probably** 18:17 22:12
**probation** 68:15
**problem** 11:20 12:1 53:3,4
**procedure** 2:21 6:6 39:18,21 40:13
**proceedings** 6:13
**process** 9:12 10:22 16:9 18:12,15 55:17 56:16,17
**processing** 9:14 9:18,21,22 10:9,14 17:13
**produce** 28:11
**product** 29:12
**production** 12:8 17:12 27:16,22 60:14 61:5 63:2
**Products** 1:10 6:18
**profanity** 57:7 57:14,18
**proficient** 75:23
**proficiently** 78:3

79:6
**progressive** 43:21
**protect** 67:9
**psychology** 25:19
**public** 2:7 6:3 67:19
**punch-in** 43:12
**punished** 35:7
**punishment** 35:10 37:3,14
**purpose** 31:21 36:1
**pursuant** 6:5
**put** 30:16 75:17

**Q**

**qualify** 77:11
**question** 2:15 14:19 53:23 66:12 68:2 69:18 73:6
**questions** 2:14 84:8
**quick** 24:12
**Quinn** 5:15
**quit** 55:19
**Quite** 13:7
**quitting** 55:22

**R**

**R** 5:1
**race** 24:8
**radio** 45:11,12 46:2,7,23 47:6 47:7,17,22 48:3,14 49:9 49:23 50:2,9 50:18
**radios** 44:14,17 50:6,14
**raggedy** 73:21 74:2
**Ralcorp** 22:18
**ran** 71:13
**raped** 27:8,9
**rapes** 27:2
**rating** 76:11
**read** 7:15 11:18 32:1,4,6 66:16 66:17
**reading** 47:12
**reads** 19:19
**ready** 56:17
**recall** 20:14 22:7 23:23 30:3,9 30:14,15 32:18 35:9 39:13,17 51:9,14 57:12 57:17,20 60:20 61:21 62:15,19 69:13,23 73:19 74:9,16 80:22 82:11
**receive** 20:20
**received** 14:6
**recognize** 19:9
**recommendati...** 55:12 76:13
**recommendati...** 16:11 18:18 19:1
**recommended** 54:2 55:2
**record** 6:22 32:13 53:19 54:6 55:10 59:5,9
**reference** 19:16
**referring** 21:19 51:16
**register** 67:18
**relations** 68:5
**relative** 38:13
**relatives** 7:18
**remark** 24:14,18
**remarks** 24:6,19 64:19
**remember** 9:12 10:4 11:7 12:20 20:8,13 20:22 21:2,10 21:12,15,16,23 30:22 31:3,4,7 31:8,10 35:4,6 35:9,18 53:4 57:13 58:7 60:9,11,16,21 61:1 62:9 79:20 80:3
**remind** 48:13,15
**reminded** 46:6 47:5
**Renny** 1:21 2:5 2:22 6:1 84:19
**rephrase** 31:23 50:17
**report** 30:1 61:5
**reported** 38:1
**reporter** 2:6 3:5 6:2 7:11,13 26:20 84:20
**represent** 7:3
**represents** 84:11
**requirements** 51:1
**resign** 56:3,7
**resigning** 55:22
**resource** 22:17
**respective** 2:3
**responding** 56:21
**response** 47:10 65:6
**responsibilities** 11:2,5,6
**responsibility** 52:3,9 53:13
**result** 65:12 84:17
**results** 19:15
**retained** 3:5
**returned** 41:14
**reviewing** 29:23 41:5 45:5 46:17 52:15
**Ricky** 12:19,21 54:22 59:18 70:23 71:2,2 77:8
**right** 8:18 10:3 15:4,7,7 17:14 19:18 20:5,6 22:9 23:5 24:17 31:12,21 34:22 35:2 40:6,14 41:17 41:20 45:15 46:5,10 48:16 50:15 51:2 52:11 53:14,16 59:3 60:1 61:10 62:12,15 62:23 64:7,15 66:22 67:12 68:22 70:22 71:13,17 73:3 73:10 75:17,19 76:1 77:18 79:10 81:13
**roast** 28:4
**roaster** 28:18
**Robertson** 3:1 4:3 5:13 7:4,4 7:17 8:2 13:22 16:18 29:18 32:13,15 40:22 41:4 42:22 44:22 45:4,21 46:14 47:14 48:22 49:5 58:5 59:3,10 59:18 72:18 80:15 82:18
**Rule** 2:20
**Rules** 2:21 6:5
**run** 75:22 78:3 79:5,5
**running** 48:11 71:7,11 72:6 80:23 81:16

**S**

**S** 2:1 4:5 5:1,3 5:12 7:1
**safety** 33:9
**sat** 45:7
**saw** 38:13
**saying** 33:19 43:8 61:12,12 61:13,14 63:15 65:1 66:10 71:8 78:23 79:4
**says** 17:8,10 19:12,13 51:20 52:8,21 57:3 62:10,11,12 63:14 79:7
**scheduled** 9:17
**school** 13:4
**second** 12:10 18:19 36:4,5,6 57:18 59:22 78:13
**see** 17:7 38:21 46:22 50:12 59:21 63:13 72:15
**seen** 16:22
**Selwood** 8:8,10
**sending** 36:1
**sense** 26:16
**sent** 35:19 46:9
**session** 21:8 23:2 41:16,19 43:14
**sessions** 23:3
**set** 75:14 77:12 77:13

**sets** 75:21 77:10 80:17
**sex** 24:8 25:1 65:14 67:6,17
**sexual** 20:3 22:10 23:9 24:3,5,10,13 25:2,18 26:8 27:5,10 68:4,8
**sexually** 25:19 26:1,4
**sheet** 13:17 43:11
**she'll** 43:3,3
**shift** 9:20 10:10 10:23 12:2,5,8 12:10 17:3 27:14 28:8 30:16,18 36:4 36:6,6
**short** 58:4 59:7
**shortage** 10:13
**show** 13:23 16:19 29:19 51:22 57:21 62:7 63:3
**shows** 54:14,14
**sic** 73:17
**side** 38:20
**sides** 34:19
**sign** 7:15 13:9 13:14 79:10
**signed** 79:9
**sign-in** 13:17
**Silervy** 63:1 64:18
**similar** 43:23
**sir** 8:4,7 13:3 29:22 33:18 34:3 41:1,7,22 42:17,23 45:1 46:16 47:11 49:2 54:21 57:2 59:16 78:22 79:12
**site** 20:19
**situation** 35:16 38:6 51:10 68:20 75:13
**situations** 15:22 16:1
**Sively** 62:23
**six** 8:14 10:5,6 11:9
**skill** 15:13 75:21 77:10,14
**skills** 14:17 20:2 75:13,14
**smoking** 42:8 44:2
**Smothers** 12:19 12:22 54:23 59:19 70:23
**snack** 28:4
**snacks** 28:7
**solutions** 53:3
**somebody** 21:14 21:17 24:15 30:23 33:5,22
**somebody's** 53:18 54:6 55:10
**sorry** 11:3,17 29:7 41:11 78:17
**sought** 55:4
**Southern** 1:3 6:22
**speak** 25:9
**specific** 31:11
**specifically** 50:1
**spell** 8:10 78:13
**stack** 29:13
**staffed** 27:20
**stages** 77:11
**standards** 27:16
**start** 66:8
**starting** 27:17
**state** 2:7 6:3 7:3 8:3 84:3
**stated** 32:18 71:6
**statement** 32:9 32:16 35:5 65:5
**statements** 32:2 32:4,6 38:12 60:4
**STATES** 1:1
**stating** 41:8 61:7
**status** 53:18 54:6 55:9
**stealing** 42:14 44:1
**stenotype** 84:8
**step** 43:22 50:22 57:5 69:16
**stepped** 71:13
**STIPULATED** 2:2,11
**stipulation** 6:7
**stipulations** 7:14
**Stop** 71:9
**stopping** 58:3
**story** 34:19 38:20
**straight** 23:16
**Street** 5:7,17
**strike** 65:11
**stuff** 51:5
**subject** 23:6
**subjects** 21:23
**subtopics** 22:4
**successful** 15:21
**Suite** 5:8
**super** 28:8
**superintendent** 9:20 10:7,10 10:11 12:4,5 17:3 27:14 28:9,14
**supervised** 76:16
**supervisor** 9:15 9:16 10:2,15 10:19,23 12:2 12:16 14:10 16:12 17:15,19 18:7 38:6,7 43:8 45:9 48:5 53:20 54:2,3,8 54:16 55:6,11 55:12 58:18 76:12,12,16 81:4,6,8,9,12
**supervisors** 10:13 12:6 14:12,15 16:5 23:14 27:19
**suppose** 27:6,8
**supposed** 14:8 40:5 44:14 45:11 54:7 55:10
**supposedly** 36:10
**sure** 19:23 25:16 27:17,19 38:23 41:4 45:4 49:5 53:13 55:20 58:5,8 59:13 76:3 77:1 79:18
**surrounding** 51:10 69:20
**suspended** 37:1 37:6
**suspension** 37:4
**suspicions** 70:8 70:11,15
**Swain** 5:4 7:8,8 7:15,19 13:11 13:16 14:7 15:10 19:3 24:4,11 25:3 26:5,10,15,17 27:4,11 30:6 30:11,13 31:2 32:23 33:6,14 33:17 34:2,7 34:12,15 35:3 37:16 38:3 41:2 42:16 43:2 44:3 45:2 47:12,23 48:9 48:17 49:3 50:4 51:6,11 51:17 52:5,12 53:21 55:13 56:4,8,22 58:2 58:22 59:5,17 59:21 60:1 62:17 64:4 65:8,15 66:6 66:11,15,23 67:13,22 68:1 68:13,17 69:4 69:11,17,22 72:12,17,19 73:5 74:1,8,22 76:19 78:15 81:11 82:21
**swear** 7:11
**sworn** 7:12,21
**S-E-L-W-O-O...** 8:11

**T**

**T** 2:1,1 4:5
**take** 23:15,18 48:23 57:23 58:3 59:4 64:14
**taken** 2:5 3:2 43:22 59:7 62:22 84:7
**talk** 31:12 32:3 39:11 45:11 62:2 69:7 70:2

73:10
**talked** 31:10,18
**talking** 9:1 15:8 21:6 31:4,22 32:3 52:22 53:8 61:17 64:12,16 66:9 69:14 75:9
**tape** 72:15
**taught** 20:12,22 21:9,10,17 22:1,13 23:6 25:17,23 26:7
**teach** 23:1,10 79:22
**teaching** 23:18
**team** 16:10 50:7 50:19,23
**tell** 27:13 33:3 33:21 34:10 35:14,15 39:18 40:23 46:15 50:23 51:2 59:15 63:9,19 64:1,8,9 65:10 70:18 72:8 74:17 75:1,12 76:21 78:4 81:1,17
**telling** 46:1 50:8 58:17
**Temple** 5:14 7:6
**temporarily** 30:16
**temporary** 54:15
**tenure** 16:7
**terms** 39:19 75:1
**testified** 7:22
**testimony** 1:14 3:2 84:12
**thereto** 2:19 84:9
**thing** 34:10
46:23
**things** 8:20 28:11 36:5 70:16
**think** 11:7 13:1 20:5,15,16 21:20 22:17 37:8 38:17,18 39:8 50:6 59:19 60:14 61:18,18 62:12 65:3 80:8,9 82:19,19
**Thornton** 1:6 5:21 6:18 37:22 56:14
**thought** 14:22 21:7 72:14 76:14
**threats** 62:16
**three** 21:19 52:19 60:18 70:21 71:2 73:18,22 74:3 74:7,11,15,18 75:2
**threw** 34:8
**throwing** 32:22 33:4 35:1
**thrown** 30:5 31:1
**throws** 33:23
**time** 2:17,17 8:21 17:18,19 18:2 20:8 23:17 36:3,18 36:19 42:14 43:10 44:1 50:7 52:6 57:18 61:4,18 73:22 81:16,19
**timely** 27:18
**times** 15:18 21:4 23:4 43:12
**title** 9:23 18:10
**told** 35:19 39:2 43:18,20 45:10 45:10 47:17,20 48:2 49:14,18 56:6 58:13 60:3,6 63:14 63:22 64:13 71:3 72:20 74:5
**Tommy** 23:20 61:19 62:1
**Tower** 5:7
**Train** 78:2
**trained** 77:23
**training** 13:5,8 13:15 14:6,13 14:17,20,23 15:6,13 20:1,3 20:4,7,20 21:4 22:1,10 25:18
**transcribed** 84:9
**transcript** 3:1 84:12
**transcription** 84:10
**trial** 2:17
**trouble** 66:8
**true** 65:17,21 66:1,4 67:3 84:11
**Trueblood** 5:14 7:6,6
**truth** 66:20
**try** 51:21 72:22
**trying** 48:10,13
**turn** 34:10,11 60:7
**turned** 61:9
**Twentieth** 5:7
**two** 9:17 12:23 20:9,11 21:8 22:12 34:19 39:21 44:5
**two's** 71:20
**two-day** 20:15
**two-year-old** 28:6
**type** 14:20 21:14

**U**

**U** 2:1
**uh-huh** 11:13,16 15:1 17:9,21 18:22 19:17 25:13 27:7 28:19 30:19 32:11 35:17 36:16 40:3 41:21 42:3 44:7 47:15,19 48:6,18 49:13 49:16,20 51:7 53:10,11 54:17 57:5 63:18 65:2 67:10 79:11,13,15 80:1 81:23
**understand** 15:5 19:13 28:9 34:21 50:13 53:23 55:9,15 73:13,15
**understanding** 25:1 53:17
**understood** 72:21 73:1
**UNITED** 1:1
**update** 49:6
**upset** 60:23 61:2 70:12 71:4,16 72:4,8,20,21 73:2,14,16
**Usual** 7:13
**U.S** 6:20

**V**

**v** 1:9
**vague** 51:13
**verbally** 26:21
**verbatim** 77:21
**versus** 6:18
**Vicki** 79:22
**video** 11:21 29:12
**VIDEOGRAP...** 6:15 7:10 59:8 82:22
**videotape** 6:16
**violation** 33:10
**violations** 44:6
**voice** 35:21

**W**

**Wachovia** 5:7
**Wait** 71:9
**walking-around** 26:16
**want** 14:19 24:23 70:12 72:10 73:2 74:20 77:7
**wanted** 36:7 50:21 70:19,20 71:23 75:15,20
**wants** 46:3
**warehouse** 29:14
**warning** 57:6 69:16,16
**wasn't** 21:17 48:7 51:4 64:7
**watch** 72:15
**way** 18:12,15 31:8 50:20 57:10
**wear** 49:9
**Wednesday** 6:23
**weight** 29:12
**went** 10:9,21 12:7 13:10 37:23 56:15 68:11

**we'll** 9:3 72:15
**we're** 8:21 27:15 27:17 59:5,8 75:9
**we've** 11:21 21:1 23:20 28:15 38:9
**Wiggins** 5:15
**Williams** 6:19 15:6 17:15 18:12 41:18 46:6 53:12 54:15 55:6,19 55:22 58:10,18 60:18 62:3 63:12 64:2 65:13,23 66:3 68:3 69:8 72:11 73:3,14
**witness** 6:11 7:11,12 26:18 29:23 41:5 45:5 46:17 52:15 59:23 84:13
**witnesses** 31:15 31:19,22
**word** 78:14
**work** 8:15 10:16 16:4,5 30:16 40:4 70:13 71:4,15 72:5 72:11 73:2 79:16
**worked** 9:2,6 10:13 17:16,17 18:5 76:17 79:21
**worker** 18:8
**workers** 53:13
**working** 13:6 73:14,16,21 74:3
**workplace** 23:9
**works** 63:2
**wouldn't** 14:14 33:19 46:9 58:9,18 74:2
**wound** 9:19 12:18
**wounded** 12:18
**wrapper** 78:12
**write** 11:14
**write-up** 36:13 51:10
**writing** 11:15 77:16
**written** 38:22 39:15 57:5,6 57:14,17 58:19
**wrong** 42:6 51:23 52:4

**X**

**X** 4:1,5

**Y**

**yeah** 14:21 18:4 19:21 74:3 75:10
**year** 27:9 68:5,8
**yearly** 80:18
**years** 8:14 9:8 9:17 10:5,6 11:9 12:23 20:9,10,11 21:8 22:12 63:16 64:7 66:8 68:12
**yesterday** 51:15
**y'all** 28:3 51:15 53:5 60:12,22 62:16 66:21 68:16 74:10,10 76:22,22 80:4
**y'all's** 12:15

**0**

**02** 79:14
**03** 80:20
**05** 49:15 50:1,20
**06** 42:2 44:1,11 44:11 47:2 49:18,19 51:3 51:3
**07** 54:18

**1**

**1** 4:6 13:20 14:2 15:3
**1-7CV712WK...** 6:20
**10** 68:5 80:13,16
**10:28** 59:6
**10:37** 59:9
**107cv-712-W...** 1:5
**11:01** 82:23
**13** 4:6 27:9 57:1 57:4 68:8
**14** 1:22 28:15 59:14,16,17 64:23 65:7
**14th** 2:8 3:2 6:10 6:23
**15** 2:22 62:8,11 62:20 63:16 64:6 66:8
**16** 4:7 57:22 58:11 59:12 62:10,11 63:4 65:4 66:5
**1600** 5:8
**18** 54:13
**1988** 2:22 9:11

**2**

**2** 4:7 16:16,20 17:7 18:20 19:13 49:8
**20** 9:8
**20-minute** 39:22
**2000** 17:4,6 18:4 18:4,16 19:1
**2002** 17:2,5
**2008** 1:22 2:9 3:3 6:10,23
**205-314-0500** 5:19
**205-328-0480** 5:10
**24** 75:9
**29** 4:8
**2904** 8:8

**3**

**3** 4:8 29:16,20 38:13,15 39:4
**301** 5:17
**35203** 5:18
**35203-5202** 5:9

**4**

**4** 4:9 40:20 41:1
**40** 4:9
**411** 84:21
**42** 4:10
**420** 5:7

**5**

**5** 4:10 42:20 43:1,6
**5(d)** 2:20

**6**

**6** 44:20,23 52:20

**7**

**7** 45:19,23 46:19 47:1

**8**

**8** 46:12,16 47:3 51:9

**9**

**9** 4:3 48:20 49:1 78:21
**9:30** 2:10 6:9
**9:35** 6:23

# Training Documentation

I, Frank Williams have received training on ccp#WICCP00300, ccp #WICCP 1100, I have received a copy and clearly understand the work instructions.

Signed [signature] Date 3-19-07



  

Nutcracker Brands Inc.

# EMPLOYMENT APPLICATION

DATE 09-22-00

**PERSONAL** (RESUME MAY BE ATTACHED)

NAME: LAST williams FIRST Frank MIDDLE INITIAL D

TEMPORARY ADDRESS CITY STATE ZIP CODE

PERMANENT ADDRESS 2271 South St. Hwy CITY Newton STATE AL ZIP CODE

AREA CODE-TEMPORARY PHONE NUMBER 334 692-3099 AREA CODE-PERMANENT PHONE NUMBER 334692-4334 SOCIAL SECURITY NUMBER 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

WERE YOU EVER EMPLOYED BY RALSTON PURINA, RALCORP HOLDINGS, OR ANY OF THEIR SUBSIDIARIES/AFFILIATES? ☐ YES ☐ NO IF YES, WHEN - WHERE

HAVE YOU EVER BEEN CONVICTED OF ANY FELONY? IF YES, DESCRIBE IN DETAIL (CONVICTIONS WILL NOT AUTOMATICALLY DISQUALIFY JOB CANDIDATES)

☑ YES ☐ NO Sautory Rape my Girlfriend was 2 years Younger than me when I was 18

FOR WHAT POSITION ARE YOU APPLYING? SALARY EXPECTATIONS open DATE AVAILABLE 09-25-00

HOW DID YOU BECOME AWARE OF THE POSITION? Bruce Cassidy

ARE YOU RELATED TO ANYONE EMPLOYED BY THE COMPANY? IF YES, WHO AND WHAT IS YOUR RELATIONSHIP?

☐ YES ☑ NO

WILL YOU WORK OVERTIME, IF REQUIRED? ☑ YES ☐ NO WILL YOU WORK WEEKENDS, IF REQUIRED? ☑ YES ☐ NO

**EDUCATION**

Achieved High School Diploma/GED? ☑ YES ☐ NO

| (Include Education in Progress.) | FROM MO. YR. | TO MO. YR. | DIPLOMA DEGREE DATE | MAJOR | CLASS STANDING OR GRADE POINT AVERAGE |
|---|---|---|---|---|---|
| HIGH SCHOOL/LOCATION JFI Ingram | | | Ged | | |
| TECHNICAL SCHOOL/COLLEGE LOCATION JFI Ingram | 3 92 | 4-94 | AA | Business | 3. 4 |
| | | | | | |
| | | | | | |

PLEASE LIST SPECIAL SKILLS, CERTIFICATIONS OR QUALIFICATIONS YOU POSSESS (SUCH AS FOREIGN LANGUAGE FLUENCY, CPA, COMPUTER SKILLS, ETC.)

N/A

PLAINTIFF'S EXHIBIT 2 Hutchins

RALCORP HOLDINGS, INC. AND ITS SUBSIDIARIES AND AFFILIATES

CONFIDENTIAL FH000814

FLAVOR HOUSE PRODUCTS

X Counseling Report ____ Warning Report

| | | | |
|---|---|---|---|
| Employee: Linda Parrish | Emp. # | Date Submitted for Approval | |
| Department | Shift | Date Violation Occurred | 6-25-04 |
| Shift Supervisor: Larry Hatchen | | Department Manager | Melvin Hutchins |

SITUATION IN BRIEF (State violation according to Discipline & Discharge Policy):

Group I, No. 7 - The use of offensive or abusive language that offends others.

DETAILS (Be specific)(See checklist on back): Date Discussed With Employee

On Friday June 25, 2004 at approximatly 6:00 PM Linda was struck by a bottle of peanuts tossed by John Milsap (Maintinance). She responded by using offensive language to him. He also used offensive language.

6-30-04 — Bottle of peanuts were not "tossed" - the bottle was thrown - striking me in the chest - And then was told that "When I tell you to turn the "f ....." thing off - you turn it off." Very short time to think about what words to say after being hit in the chest with a bottle of peanuts. — Linda Parrish

ACTION TAKEN (Recommendation)(See checklist on back):

Group I Warning.

PLAINTIFF'S EXHIBIT 3 Hutchins

Linda Parrish 06-30-04

Shift Supervisor: Larry Hatchen Date 6-30-04 Witness [signature] Date 6-30-04

| Department Manager | Date | Human Resources | Date | Plant Manager | Date |
|---|---|---|---|---|---|
| Melvin Hutchins | 6-30-04 | [signature] Allums | 7/1/04 | | |

NOTICE: MUST BE APPROVED BY HUMAN RESOURCES AND PLANT MANAGER

During the week of July 3, 2006 it was observed that you clocked in and returned outside to the smoking area. As a team leader it is your responsibility to lead by example.

Effective immediately, you should not clock in more than 5 minutes before your scheduled time. Also, once you clock in you should go immediately to the floor or production office.

Failure to follow these guidelines will result in disciplinary action.

PLAINTIFF'S
EXHIBIT
4
Hutchins

Signature

Frank Williams
Print

7-11-06
Date

7-11-06
Date



Christopher J. Jordan/NC/Ralcorp
10/25/2006 03:23 PM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Brandon A. Hutchins/NC/Ralcorp@RALCORP
bcc
Subject

Please place in personnel file:

I explained to Frank Williams that he should clock out for each break. For the past two days he has clocked out for one break and not two breaks. I believe I have told him to do this before.

PLAINTIFF'S EXHIBIT
5
Hutchins



Christopher J. Jordan/NC/Ralcorp
05/10/2006 03:23 PM

To Frank D. Williams/NC/Ralcorp@RALCORP
cc Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc S. Leigh Allums/NC/Ralcorp
Subject Re: 5-10.xls

In the future, when line 3 has a drain off I need you to check with me on what time the employees on the line should report to work. If I do not give you a clear and definite answer please do not assume I want them to come in a regular time. Also, when the line has a drain off I need you to make certain that you do everything in your power to have the packaging line running at the scheduled time. If I have overloaded you and this is preventing you from making certain the line starts on time please let me know.

Another concern I have is finding Mary Brooks off the line and talking to other employees. If you have given her clear instructions on what she should do if the line is down then I expect you to come to me for solutions to this problem. The employees that report to you are a direct reflection of you and me. Your doing a good job but we need to focus our efforts in resolving these problems before the busy season hits.

PLAINTIFF'S EXHIBIT
6 Hutchins.



Christopher J. Jordan/NC/Ralcorp
10/26/2006 04:32 PM

To S. Leigh Allums/NC/Ralcorp@Ralcorp
cc Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Frank Williams

Please place in personnel file:

On Tuesday, October 24, 2006 I had a meeting with Frank Williams. During this meeting I discussed how it appeared he had no since of urgency. I explained that he needed to put on his radio first thing in the morning and notify everyone of what is happening on line 3. This would keep everyone informed and we would know that he is aggressively working on the problems. He stated that he could not wear his radio first thing in the morning because they were locked up in the production office. I instructed him to keep one in the processing supervisors office because they come in the same time he does and this would eliminate that problem.

PLAINTIFF'S
EXHIBIT
7 Hutchins



file

Christopher J. Jordan/NC/Ralcorp
08/02/2006 03:08 PM

To Thomas A. Nance/NC/Ralcorp@RALCORP
cc Ricky L. Smothers/NC/Ralcorp@Ralcorp, Melvin G. Hutchins/NC/Ralcorp@Ralcorp
bcc
Subject Frank Williams

This morning before 7:00 a.m., Eugene Andrews told me on the radio that Frank Williams needed to see me. I walked down to line 3 and he asked what I was doing about a capper on line 3. The question was not the issue but the expression and carefree attitude in which it was asked. Also, I asked him why he didn't have his radio and with the same attitude he said I'm on the label machine.

At this point it appeared that the issues addressed the previous day were an issue today. I asked Melvin Hutchins to meet with us to bring this out in the open. When I addressed them with Frank Williams he had excuses and reasons for everything. I explained to Frank that whatever happened yesterday did not need to reflect on his work today. Again, Frank explained that I was mistaken.

Melvin then added that whenever we tried to address any issues that Frank would show in his expressions and actions that he was never in the wrong just like he was doing now. He also added that we are trying to help him but he has to take ownership of the problems and show some improvement.

PLAINTIFF'S EXHIBIT
Hutchins

# Memo

**To:** Frank Williams

**From:** Chris Jordan

**CC:** Melvin Hutchins
Eugene Andrews
Richard Holland

**Date:** 12/13/2005

**Re:** Job Performance

---

I appreciate the job you are doing on Line 3. The numbers are up and we are making standard on a more normal basis. However, the following are a list of concerns that I need you to focus on in the upcoming weeks:

1. Work with the team members on the line on cleanliness. Too many times they are not as active in cleaning the line and usually it is the same couple of employees.
2. I need you to wear a radio every day. This will help Melvin and me in communicating with you about the daily activity of the line.
3. I feel you need to focus more on training the employees rather than doing the work yourself. I understand that until you have a dedicated filler operator your time is taken up running the filler. Don't be afraid to sacrifice a little downtime while a team member is learning a new task.
4. All paperwork must be filled out completely. Please take a few minutes at the end of shift to make certain the paperwork is completed properly. Also, this will make certain when you have a new filler operator that you can instruct them in the proper way to complete all paperwork.

I am confident that that these are minor issues that you can resolve. If you need any assistance please let me know.

PLAINTIFF'S
EXHIBIT
9
Hutchins

Request for Employee Status Change

*Please check applicable box*

- ☐ New Hire
- ☐ Transfer (Lateral)
- ☐ Promotion
- ☐ Termination
- ☑ Salary Adjustment
- ☐ Title/Grade Change
- ☐ Other ______
- ☐ Leave of Absence

Effective Date of this Action: 9/29/03

New Department Salary Account No.: ______

| Employee Name (Last) | First | Middle |
|---|---|---|
| Parrish | Linda | |

| Current Job Title | Grade | Department | Location | Reports To: |
|---|---|---|---|---|
| Label Opr. | | Prod. | | |

☐ Exempt ☑ Non Exempt ☑ F/T Regular ☐ P/T Regular ☐ P/T Temporary

| New Job Title | Grade | Department | Location | Reports To: |
|---|---|---|---|---|
| | | | | |

☐ Exempt ☐ Non Exempt ☐ F/T Regular ☐ P/T Regular ☐ P/T Temporary

**Salary Adjustment**

Current Salary Range

| Minimum | Midpoint | Maximum |
|---|---|---|
| | | |

| Current Salary (or Salary for New Employee) | Amount of Change | Percentage | New Salary |
|---|---|---|---|
| Per Month $ ______ | Per Month $ ______ | Merit 3 % | Per Month $ ______ |
| Per Year $ ______ | Per Year $ ______ | | Per Year $ ______ |
| Hourly (if Applicable) $ 10.55 | Hourly (if Applicable) $ ______ | Promotional ______ % | Hourly (if Applicable) $ 10.87 |

**Termination**

| ☐ Voluntary ☐ Involuntary | Reason for Separation | Last Day Worked |
|---|---|---|
| | | |

**Comments**

PLAINTIFF'S EXHIBIT 10 Hutchins

**Approval:**

| Requesting Department Manager/Date | Department Head/Date | Corporate Officer/Date |
|---|---|---|
| Melvin Hutchins 9-29-03 | | [signature] 9-30-03 |

Human Resources Use Only - Do Not Complete This Section

| Social Security No. | Job Number | EEO Code - Job Group | Census Code | Department Number |
|---|---|---|---|---|
| | | | | |

| Company # / Floor # | Source Code | W/C Code | Rate Code | Job Posting # | Replaced |
|---|---|---|---|---|---|
| | | | H ☐ M ☐ | | |

| Separation Pay | Vacation Pay | Term Code | Last Day Paid | Payroll Entry Date |
|---|---|---|---|---|
| ☐ Y ☐ N | ☐ Y ☐ N | | | |

| H.R. Manager Approvals/ Date | Compensation Analyst/Date | H.R. Data Specialist/Date |
|---|---|---|
| | | |

Revised 8/03

FH000166

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107-cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
BRUCE CASSADY

Commissioner:
Renny D. McNaughton
June 11, 2008
Dothan, Alabama

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Bruce Cassady, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 11th day of June, 2008, commencing at approximately 10:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms.

Robertson the original transcript of the oral testimony taken the 11th day of June, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

INDEX

| EXAMINATION BY: | | PAGE NO. |
|---|---|---|
| Ms. Robertson | 7 | |

EXHIBITS

No. 29 28

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202

FOR THE PLAINTIFF (S):
Ann C. Robertson
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Bobbie S. Crook
Attorney at Law
367 S. St. Andrews St.
Dothan, Alabama 36301

Also Present: Linda Thornton

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 10:00 a.m. on the 11th day of June, 2008, Bruce Cassady, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: Okay. This begins videotape number 1 in the deposition of Bruce Cassady in the matter of Linda Thornton versus Flavor House Products and Franklin D. Williams Jr., case number 107-CV-712-WKW. We are on the record at 10:04 a.m. on Wednesday June the 11th, 2008. This deposition is taking place at the offices of Bobbie S.

Crook, PC, Dothan, Alabama. My name is Joey McClain representing Freedom Court Reporting. Would counsel identify yourself and state whom your represent.

MR. ROBERTSON: Ann Robertson and I represent the plaintiff.

MS. SWAIN: Jennifer Swain and I represent defendant Flavor House.

MS. CROOK: Bobbie Crook and I represent the plaintiff.

(Witness Sworn.)

THE COURT REPORTER: You are sworn. Usual stipulations?

MS. SWAIN: We would like to read and sign.

BRUCE CASSADY

(having been duly sworn, was examined and testified as follows:)

EXAMINATION

BY MR. ROBERTSON:

Q And, well, I guess we have this agreement that we usually ask a whole bunch of questions about your family in the Middle

District of Alabama so we'll make sure we won't put somebody's relative or, you know, husband on the jury.

A Uh-huh.

Q To save time, I'm not going to go into a lot of your familial background if you will agree to provide us with a list before trial if it becomes necessary. That would be your relatives, their spouses and where they work.

A Sure.

Q And that's not to aggravate or anything. That's just to make sure if we get to a jury that we can, you know, tell about that. Is that okay with you?

A Sure.

Q Will you state your name, please, sir?

A Timothy Bruce Cassady.

Q Are you the man that named your son Butch?

A I am.

Q I said there's a sick person

involved in that. And where do you work, Mr. Cassady?
A I work at Bremner Food Group.
Q And is that Favor House?
A Yes.
Q And for the purposes of this litigation since it's been different owners, we're just calling it Flavor House.
A Okay. That's fine.
Q Okay. How long have you worked there, please, sir?
A About 21 and a half years.
Q And have you done the same thing the whole time you've been there?
A No.
Q Can you go through briefly the positions you've held?
A I just -- I was a regular general labor person to start off with. I became a label operator somewhere in '87. Do I need to give you the years?
Q Yeah. Tell me -- I don't want -- I don't want to do math this morning. Tell

me when you --
A I started in October of '86.
Q Okay. And -- and you were general laborer until '87?
A Yes, ma'am.
Q Okay. And then what happened?
A Then I become a MRO buyer in April of 1990.
Q What is an MRO buyer?
A Buy maintenance and repair parts.
Q Okay. All right. And then what happened?
A I did that until December of '98.
Q Okay.
A And then I become a -- I worked on the maintenance crew, second shift until April of -- of 2000.
Q All right. And what happened in 2000?
A Then I become -- they brought me back on the floor to help out label operators.
Q What do you mean? Were you like

the manager or the supervisor?
A Well, I was still hourly then.
Q Okay.
A And I helped out label operators, and then they put -- then, I guess, I did that -- just did that for a little while, and then they put me in the label room and called me a label room supervisor.
Q Okay. I'm not sure I heard the term or known about the label room until just now. What is the label room?
A Just where we store labels. One -- at that time there was two guys working in there and then one of them left and then only one was in there until they hired another one several months later. Usually there was two people in there and myself.
Q Yeah. Okay. And -- and you were their supervisor?
A I was their supervisor, yes.
Q Did you do any other duties besides supervise the labels?
A I helped -- I still continued

helping label operators.
Q And when you say you helped them, did you train them?
A Yeah. Trained them.
Q Anything else besides training them?
A Helped them on day-to-day problems they might have.
Q Troubleshooting?
A Yes.
Q Now, when -- maintenance, we're talking about maintenance of the machines; correct?
A I actually worked in the maintenance department.
Q Right. But is that what the maintenance department did?
A Yes. I worked -- mainly me and I guy changed over lines at night is what we did.
Q Okay. Now, how long did you stay being the label room supervisor?
A I -- I -- I'm kind of fuzzy on

13

that year. I want to say it was probably -- I don't remember exact. I want to say November of 2003.

Q And then what happened?

A Then we had a gentleman that had to leave and go -- he went to Iraq for a year. Well, he was there about nine months. And I -- I scheduled in packaging supplies in the front office.

Q Was that a supervisory job?

A No.

Q And then -- is that what you do now?

A No.

Q All right. What was the next position you held?

A Maintenance planner. I did that until February of this year.

Q Now, did you ever -- are any of these jobs hourly jobs?

A I become salary when I was a label room supervisor at some point in time. I don't know exactly when --

14

Q Okay.

A -- they put me to salary.

Q And why did you stop being a label room supervisor and -- and go up to the office?

A They needed -- they needed me to do that.

Q Okay. Who took over the label room supervisor?

A Nobody. The production manager did it.

Q Who was that?

A Melvin Hutchins.

Q All right. So now in 2000 you are the -- what is a maintenance planner?

A I just assisted the -- the MRO buyer and -- and on capital projects and I kept up a down time report for maintenance and just basically a secretary for the maintenance manager basically --

Q Okay.

A --is what it was.

Q Okay. All right. Are you still

15

salary? Is that a salary job?

A Yes.

Q Okay. And then after -- what happened after -- what was your next position?

A February of this year I become production supervisor.

Q And who -- who was directly over you?

A At which job?

Q At the production supervisor.

A Melvin Hutchins is my immediate boss.

Q All right. And who -- does any -- does anybody report to you?

A People on the packaging floor does now.

Q Okay. About how many people is that?

A Right now it's a lot more, but it's usually about 23. I think 23 people.

Q Since you've been -- you were in the label room from -- I mean a label --

16

helped label operators who were in the label room about 2000; is that right?

A 2000 -- April of 2000 I went back on the floor.

Q Is it -- is it the custom or habit of Flavor House to hire label operators off the street with no experience?

MS. SWAIN: Objection.

A They've done it in the past. We have done it when nobody there would want it. Yeah, we have done it.

Q And when you hire somebody off the street as a label operator and they can't operate a label machine, what do you do?

A You train them.

Q All right. Do they get a lesser amount of pay until they are trained, if you will?

A I --

MS. SWAIN: Objection.

A I don't -- I don't know. I don't remember what we -- I don't remember how the

process was working at that time back then.
Q In 2000?
A Yes, ma'am.
Q Do you remember who was hiring for -- hiring label operators at the time?
MS. SWAIN: When you say "at the time," are you talking about 2000?
MR. ROBERTSON: 2000, yeah.
A I don't -- no, I really don't. I mean I don't remember who -- who actually did it. I remember interviewing some people, but I don't -- I don't know who actually -- actually hired them.
Q Were -- were you the person who were interviewing during that time period?
A I -- I did interview a couple of people.
Q Okay. Who else was interviewing people? Do you know?
A I don't know.
Q And after you interviewed these people, to whom did you report the results of the interview?

A I don't -- it -- it would have had to -- I don't really know. I don't remember per se that would -- it -- it could have been Melvin. I don't remember. I just don't.
Q Can you think of any other, not -- not by name but position, to whom you would have reported the results of your interview before a label operator would have been hired?
A No, I really don't know. I don't -- unless it might have been HR, but I don't know. I don't remember.
Q All right. Now, are you related or have you ever been related to Franklin Williams?
A His first wife was --
Q That's Ronnie?
A -- was my stepmother's -- my stepmother was her grandmother.
Q And when did you first meet Ronnie Williams -- excuse me. Strike that. Franklin Williams?

A I don't really know.
Q Do you remember --
A It would have had to -- it would -- I could have met him at -- at my father's house at one time in the early '90s, I guess. I don't know. I don't remember.
Q Were you aware that he had been convicted of several sex offenses?
A I knew he was on probation.
Q And when did you know that?
A I don't -- I don't know a specific time. I mean, I don't -- I don't remember any specific time.
Q Well, you knew -- when you knew he was on probation, did you know he was on probation for what?
A I didn't know. And I still to this day don't know exactly what he was on probation for.
Q But do you know generally what he was on probation for?
A I knew it had something to do with under -- underage.

Q Underage girls?
A Yes. But I don't -- I don't know.
Q And -- and sex; right?
A No, I didn't know that.
Q You just knew it had something to do with underage girls?
A Yes.
Q Okay. Did you know he had been convicted of forgery?
A No.
Q All right. When you say you knew he was on probation, how did you know he was on probation?
A Just in talk from -- might have been -- heard it when I was at my dad's house.
Q And who is your dad?
A My dad is deceased but his name was Brycie Cassady.
Q Brycie?
A Uh-huh.
Q Now, who was Ronnie's mom or step

mom, mom --
A Her mom? Imer Jean. I don't know what her last name is to be honest with you now.
Q Was it -- was it ever Thompson?
A Yes. I think that was her maiden name.
Q Did -- did -- did you have any interaction with Imer Jean?
A She was my stepsister but we wasn't -- we wasn't a fairly close family, to be honest with you.
Q Okay. Now, if Mr. Williams was on probation until sometime in 2001, when do you think you learned that he was on probation?
A I really -- I really don't know. I really don't know. I can't say. To be honest with you, I don't know.
Q And you don't remember how you learned that?
A No, I do not.
Q Do you ever remember having any

conversations with Linda Thornton about Mr. Williams' criminal background?
A No.
Q You don't remember having those?
A No.
Q Are you saying you didn't have them or you don't remember?
A I didn't have them.
Q All right. Now, did you -- did you tell Mr. Williams that he could put you down as a reference when he applied for his job at -- at Nut Cracker?
A Yes.
Q And what -- how did that come about?
A I just -- well, I didn't -- I didn't -- probably -- I probably didn't per se tell him. It probably went through my wife.
Q And who is your wife?
A Susan Cassady.
Q And what do you mean it went through her?

A Because, like I said, I -- I wasn't very close to the family. One of them may have asked my wife if I would -- he -- you know, he could put my name down and I probably said yes.
Q Well, at that time, did you know him?
A Did I know him? I never knew him per se like friends knowed him. I just knowed of him.
Q So what -- when he put your name down as a reference, what -- what was -- what was he -- you going to -- what -- how he --
A I was just going to say I knew of him. I don't -- I don't -- really didn't know his background. I didn't know a whole bunch about him. The guy needed a job, from what I remember, and I was just going to try to help him get a job because he had family.
Q And what -- what family was that?
A His wife and I believe they've got -- they have two boys, but I'm not for

sure exactly how many children they did have.
Q So when you told -- and you believe it was through your -- your wife that they -- that he could put you down as a reference. You did not know him; you only knew of him?
MS. SWAIN: Objection.
Q Is that right?
A Well, I had -- I'd met him at my dad's house --
Q Okay.
A -- earlier in the '90s.
Q All right.
A But I didn't "know him know him."
Q And at that time, is that when you knew he was on probation?
MS. SWAIN: Objection.
A I don't -- I really can't -- I really don't know when I found out he was on probation to be honest with you. I really don't remember. But I don't know. I can't remember. I mean, I don't know.

Q Okay. Did you ever have any conversations with him about him putting you down as a reference?
A No.
Q All right. Now, Plaintiff's Exhibit Number 10, I will show you -- on the second page, now, he put down Bruce Cassady, supervisor, and he said he had known you three and a half years. Now, he said yesterday when he put that down he really didn't know you for three and a half years, he just put that down.
A That's fair, because I didn't really know him.
Q Okay. When he applied for the job, did anybody come to you and ask about him?
A I don't remember. They could have. I don't remember.
Q Well, they could have but you don't remember?
A I don't -- I don't remember. I really don't remember.

Q Okay. I was wrong, what I said yesterday.
MS. CROOK: Objection. Ann, I don't think it's appropriate to suggest that Mr. Cassady is not being truthful.
MR. ROBERTSON: I didn't suggest that.
MS. SWAIN: I think you did.
MR. ROBERTSON: Not on the tape. Nobody knows what I said yesterday.
MS. SWAIN: Well, we all do.
MR. ROBERTSON: Now -- now the jury knows.
MS. SWAIN: Well, and now Mr. Cassady is aware because -- and I don't think it's appropriate to try to suggest that to him.
BY MR. ROBERTSON:
Q Did you interview Mr. Williams for the job?
A I don't remember.
Q Had you ever had -- allowed anybody else to list you as a reference?

A I don't -- I don't know that I did. I don't know that I did or didn't.
Q Subsequent to Plaintiff's Exhibit Number 10, which was in 2000, have you ever had anybody list you as a reference?
A I don't know. I don't remember. I really don't.
Q Now, he says that he became aware of the position through you, Bruce Cassady. Did you tell him or somebody that -- that there was a position open at Flavor House?
A I didn't -- I didn't tell him. I mean, back then we was hiring people left and right.
Q But you didn't tell him?
A I didn't tell him. No, I didn't tell him. He just -- I guess he just knew I worked there.
Q Yeah. But he -- that -- what he said was: How did you become aware of the position, and he put down there --
A Well, I didn't tell him.
Q So if you don't remember whether

you've ever been listed as a -- as a reference, I don't -- I guess -- I don't guess you would ever remember if any -- Flavor House came to you to ask you what you -- they -- that you thought of an applicant?
A I don't remember if they did or didn't.
Q Ever?
A Ever.
Q Did you ever tell Linda that you told Mr. Williams that he should -- to tell the truth about whether he had been convicted of a felony or not?
MS. SWAIN: Objection.
A No.
(Plaintiff's Exhibit Number 29 was marked and attached to the deposition.)
BY MR. ROBERTSON:
Q Plaintiff's Exhibit Number 29, what is that, please, sir?
A Huh?
MS. SWAIN: Can I see what that

is, please, Ann?
MR. ROBERTSON: Yeah.
A Okay. It's a performance review.
Q Yeah. And -- and do you understand or remember under what circumstances you made plaintiff's 29?
A No, I don't remember.
Q Do you ever remember working with Linda Thornton?
A Yes.
Q Was she a good label operator?
A Yes.
Q Was she -- did she know -- have the skills on the label machines?
MS. SWAIN: Objection.
A On -- on -- yes. On the label machine she ran, she sure did.
Q Okay. Were you involved in the pay for skills determinations on what skill level to assign to the label operators?
A I don't -- I don't remember how -- if I was directly with that. No, I don't remember.

Q What about indirectly?
A I -- I could have been. I don't -- I don't remember. I mean, my whole -- pretty much ever since '88 I learned label machines and I dealt with them, and that what's I do --
Q Right.
A -- except for the ten years I was in the parts room.
Q Right. And -- and I take it that you think you would be a good judge of somebody's competency level on the label machine?
A They think I am. I don't know if I am or not but they think I am.
Q Would someone be assigned to train another person on a label machine if they could not adequately -- were not at the top skill level?
MS. SWAIN: Objection.
A We've let people show the basics. And a label machine is -- is a -- it's not a complicated piece of equipment.

Q Right. And do you -- do you recall what kind of label machine Linda was operating at the time you did this performance review?
A Krones Canmatic.
Q I'm sorry?
A Krones, K-R-O-N-E-S.
Q Like a disease.
A Canmatic.
Q And I guess that's a label machine that labels cans?
A Jars.
Q Jars. Well, who would have thought?
A Yeah.
Q All right. So you evaluated her on jars. Now, did you ever work with her while she was working on a label machine on cans?
A I -- yes.
Q Do you remember when?
A I don't remember what year. I don't remember when.

Q Did she know how to operate that label machine?
A She was learning to operate.
Q At that time?
A Yes.
Q Is that the line three or some other line?
A Three, four, and five are can machines.
Q But I'm -- I'm asking you which one she was working when you worked with her?
A It could have been any of them. I mean, I -- I mean, we moved people around. I mean, it could have been any of the three. Like said, I helped everybody out there. I usually worked on every label machine in the plant every day.
Q And do you know what the pay for skills criteria were for rating labels one, two, three, four?
A I don't know the specifics of it, no, ma'am.

Q Do you know the generalities of it?
A I know to become a top level you have to be able to be proficient in both types of label machine with limited help from me.
Q Okay. Do you know that it was also a requirement that you had trained someone else to be a label operator?
A I didn't know that.
Q But you were not -- you can't remember or -- or you were not -- strike that. Do you remember when they started having skills for labels assignments?
MS. SWAIN: Pay for skills?
Q Pay for skills. Excuse me.
A I don't remember what year it was or --
Q No. But I mean about when it was?
A I would -- I -- I don't -- I don't know. It would -- it would have been probably after 2003, I would think, or 2004.

I'm not for sure.
Q Okay. And how did you hear about the pay for skills?
A I don't know who I heard it specifically from. I just heard it. I mean, I don't know.
Q Well, what did you hear?
A That they was setting up pay for skills for operators.
Q Okay. Did they -- and did they say how they were going to assign the skill levels in the beginning?
A I assume they had to come up with skill levels in the beginning and map out a plan.
Q And you -- you don't know that you, the label man, was involved in that at all?
MS. SWAIN: Objection.
Q Strike that. You don't know that you were involved at that at all?
A I don't -- I don't know -- I -- I wasn't involved per se of setting up each

level, but they could ask me questions about each machines and the operation of each machine. But I really don't remember. I mean, at this time I was -- I was either in the front office doing that other job or in the maintenance planner job. I -- I really don't remember --
Q Okay.
A -- how -- how -- what they asked me or when it was or anything like that.
Q Did they ask you your opinion of any particular label operator since you had in fact supervised some of them or evaluated, if not supervised them?
A Yeah. I'm pretty sure they probably did.
Q And do you remember who asked you?
A No, no. I can't -- I couldn't swear on who it was.
Q Well, could you give your best -- do you have any memory but you're just not sure; is that why you couldn't swear on it?

A I -- I get asked a lot of things from a lot of different people every day, and I'm not for sure who would have asked me or why -- you know, when it was or anything. I mean --
Q Do you recall anyone asking you about Linda Thornton's skill levels at or about the time they were doing the pay for skills?
A Not specifically, no, I don't. I can tell you her skill levels but I don't --
Q Okay. Tell me.
A Linda was a good label operator on the Krones label machine, and she was learning the -- the Burt. They're totally two different machines. And she was -- like I said, she was a good operator on the Krones, but she hadn't learned the full range of the Burt machine yet, that I remember.
The machine is not the -- the enemy. It's what you put in the machine is the enemy, the labels. That's what I tell every

operator out there. It's a fact. They're all different and we have tons of them.

Q Okay. Tons of machines or labels?

A Tons of labels. We usually keep at least 50 million labels in house at all times, and they're all different.

Q In -- other than -- when is this, in 2005? Do you know of any -- she was working what, the jar line then; is that right?

MS. SWAIN: I think that's not 2005. Oh, it is. Okay. I'm sorry.

A It -- it --

Q Do you know what level Linda was when she left?

A No, I do not.

Q Do you know if she was a level four?

A Could have been. I don't know. I don't remember. I -- I never her level, to be honest with you.

Q Okay.

A I don't -- I don't know the people that's out there now, their levels. It's not -- the levels of them is for money. I just know I have to help them all the time no matter what level they are. They could be a level 20 and I still have to help them.

Q And why is that?

A Because it's not a perfect science to run the label machine. It's just a -- it's just a machine that constantly has different aspects. The ambient temperature controls it. The label stock controls it. You know, you have different -- you've got paper labels, you've got foil labels. And you've got different kind of aspects of running the machine and it all changes. You've got one bundle of labels, you've got another bundle of labels, they could be completely different. One could be taller, one could be longer. It's just -- it's just all the time something. And if you don't know what you're doing, I mean, you have to have help.

Q And --

A And I learn stuff every day.

Q Right. You never had to take any pay for skills test?

A No. When I started there wasn't but one other guy in the plant that knew how to run it and he went to the maintenance and he taught me how to do it.

Q Okay. Was anybody -- any other troubleshooters like yourself?

A No. There has been one maintenance guy that knew a little bit about it but he's since retired.

Q And who is that?

A Tom Beard.

Q I think that's all I have.

A All right. I appreciate it.

THE VIDEOGRAPHER: This concludes the deposition. The time is 10:36:49.

DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

A
able 33:4
ACCR 40:21
acting 6:4
action 1:5 40:16
adequately 30:18
advised 3:4
aggravate 8:12
agree 8:7
AGREED 2:2 2:11
agreement 7:22
Alabama 1:2,23 2:8,21 5:8,14 5:18 6:2,3,5,9 7:1 8:1 40:3
allowed 26:22
ambient 38:11
amended 2:22
amount 16:18
Andrews 5:17
Ann 5:10 7:5 26:3 29:1
answers 40:8
anybody 15:15 25:16 26:23 27:5 39:9
anywise 40:16
applicant 28:5
applied 22:11 25:15
appreciate 39:17
appropriate 26:4,16
approximately 2:10 6:9
April 10:8,17 16:3
asked 23:3 35:9 35:17 36:1,3
asking 32:10 36:6
aspects 38:11,15
assign 2:16 29:20 34:11
assigned 30:16
assignments 33:14
assisted 14:16
assume 34:13
attached 28:17
Attorney 5:16
aware 19:7 26:15 27:8,20
a.m 2:10 6:10,21

B
B 4:5
back 10:21 16:3 17:1 27:13
background 8:6 22:2 23:17
Baker 5:4
basically 14:19 14:20
basics 30:21
Beard 39:15
Bearman 5:4
beginning 34:12 34:14
begins 6:16
believe 23:22 24:4
Berkowitz 5:5
best 35:21
Birmingham 5:8 5:14
bit 39:12
Bobbie 2:8 5:15 6:8,23 7:9
boss 15:13
boys 23:23
Bremner 9:3
briefly 9:16
brought 10:20
Bruce 1:15 2:4 6:10,17 7:16 8:19 25:7 27:9
Brycie 20:20,21
Building 5:12
bunch 7:22 23:18
bundle 38:17,18
Burt 36:15,19
Butch 8:21
BUTLER 40:4
Buy 10:10
buyer 10:7,9 14:17

C
C 5:1,10
Caldwell 5:4
called 11:8
calling 9:8
Canmatic 31:5,9
cans 31:11,19
capital 14:17
case 6:20
Cassady 1:15 2:5 6:11,17 7:16 8:19 9:2 20:20 22:21 25:7 26:5,15 27:9
cause 6:11 40:17
CERTIFICA... 40:1
Certified 40:20
certify 6:4 40:6 40:14
changed 12:19
changes 38:16
children 24:1
Childs 5:11
circumstances 29:6
Civil 1:5 2:21 6:6
close 21:11 23:2
come 22:14 25:16 34:13
commencing 2:9 6:9
Commissioner 1:20 6:4
competency 30:12
completely 38:19
complicated 30:23
computer-aided 40:10
CONCLUDED 39:20
concludes 39:18
constantly 38:10
continued 11:23
controls 38:12 38:12
conversations 22:1 25:2
convicted 19:8 20:10 28:13
correct 12:13 40:11
counsel 2:4,13 2:15 6:7 7:3 40:15
COUNTY 40:4
couple 17:16
Court 1:1 2:6 3:5,6 6:1 7:2 7:12 40:20
Cracker 22:12
crew 10:16
criminal 22:2
criteria 32:20
Crook 2:8 5:15 6:8 7:1,9,9 26:3
custom 16:5

D
D 1:21 2:5,22 4:1 6:1,19
dad 20:18,19
dad's 20:16 24:11
date 6:5
day 2:9 3:2 6:10 19:18 32:18 36:2 39:2
day-to-day 12:7
dealt 30:5
deceased 20:19
December 10:13
defendant 5:2 7:8
Defendant(s) 1:12
delivering 2:23
department 12:15,17
deposition 1:14 2:4,18 6:17,22 28:18 39:19,20 40:7
determinations 29:19
different 9:7 36:2,16 37:2,7 38:11,13,15,19
directly 15:8 29:22
disease 31:8
District 1:1,2 8:1
DIVISION 1:3
doing 35:5 36:8 38:22
Donelson 5:4
Dothan 1:23 2:8 5:18 6:8 7:1
duly 7:17
duties 11:21

**E**

**E** 4:1,5 5:1,1
**earlier** 24:13
**early** 19:5
**effective** 2:22
**either** 35:4
**enemy** 36:21,23
**equipment** 30:23
**evaluated** 31:16 35:14
**everybody** 32:16
**evidence** 2:18
**exact** 13:2
**exactly** 13:23 19:18 24:1
**examination** 4:2 6:12 7:19
**examined** 7:17
**excuse** 18:22 33:16
**Exhibit** 25:6 27:3 28:16,20
**exhibits** 3:3
**experience** 16:7

**F**

**F** 5:3
**fact** 35:13 37:1
**fair** 25:13
**fairly** 21:11
**familial** 8:6
**family** 7:23 21:11 23:2,20 23:21
**father's** 19:4
**Favor** 9:4
**February** 13:18 15:6
**felony** 28:13
**filed** 3:6
**fine** 9:9
**first** 18:17,21
**five** 32:8
**Flavor** 1:10 6:18 7:8 9:8 16:6 27:11 28:4
**floor** 10:21 15:16 16:4
**foil** 38:14
**following** 6:12
**follows** 7:18
**Food** 9:3
**foregoing** 6:6 40:7,11
**forgery** 20:10
**form** 2:14
**found** 24:20
**four** 32:8,21 37:19
**Franklin** 6:19 18:15,23
**Freedom** 7:2
**friends** 23:9
**front** 13:9 35:5
**full** 36:18
**further** 2:11 40:14
**fuzzy** 12:23

**G**

**general** 9:18 10:4
**generalities** 33:1
**generally** 19:20
**gentleman** 13:5
**girls** 20:1,7
**give** 9:21 35:21
**given** 40:12
**go** 8:5 9:16 13:6 14:4
**going** 8:5 23:13 23:15,19 34:11
**good** 29:11 30:11 36:13,17
**grandmother** 18:20
**Greenville** 6:2
**grounds** 2:16
**Group** 9:3
**guess** 7:21 11:5 19:6 27:17 28:2,3 31:10
**guy** 12:19 23:18 39:6,12
**guys** 11:13

**H**

**H** 4:5
**habit** 16:6
**half** 9:12 25:9 25:11
**happened** 10:6 10:12,18 13:4 15:4
**hear** 34:2,7
**heard** 11:9 20:16 34:4,5
**hearing** 40:13
**held** 9:17 13:16
**help** 10:21 23:20 33:5 38:4,6,23
**helped** 11:4,23 12:2,7 16:1 32:16
**helping** 12:1
**hire** 16:6,12
**hired** 11:15 17:13 18:10
**hiring** 17:4,5 27:13
**honest** 21:3,12 21:19 24:21 37:22
**hourly** 11:2 13:20
**house** 1:10 6:19 7:8 9:4,8 16:6 19:5 20:17 24:11 27:11 28:4 37:6
**HR** 18:12
**Huh** 28:22
**husband** 8:3
**Hutchins** 14:13 15:12

**I**

**identify** 7:3
**Imer** 21:2,9
**immediate** 15:12
**indirectly** 30:1
**interaction** 21:9
**interested** 40:16
**interview** 17:16 17:23 18:9 26:19
**interviewed** 17:21
**interviewing** 17:11,15,18
**involved** 9:1 29:18 34:17,21 34:23
**Iraq** 13:6

**J**

**jar** 37:10
**jars** 31:12,13,17
**Jean** 21:2,9
**Jennifer** 5:3 7:7
**job** 13:10 15:1 15:10 22:12 23:18,20 25:16 26:20 35:5,6
**jobs** 13:20,20
**Joey** 7:2
**Jr** 6:20
**judge** 30:11
**June** 1:22 2:9 3:2 6:10,22
**jury** 8:3,14 26:13

**K**

**keep** 37:5
**kept** 14:18
**kin** 40:15
**kind** 12:23 31:2 38:15
**knew** 19:9,14,14 19:22 20:6,12 23:8,15 24:7 24:17 27:17 39:6,12
**know** 8:2,14 13:23 16:22 17:12,19,20 18:2,11,13 19:1,6,10,11 19:15,17,18,20 20:3,5,9,13 21:3,17,18,19 23:4,6,8,17,17 24:6,15,15,20 24:22,23 25:11 25:14 27:1,2,6 29:13 30:14 32:1,19,22 33:1,3,7,10,22 34:4,6,16,20 34:22 36:4 37:9,15,18,20 38:1,4,13,22
**knowed** 23:9,10
**known** 11:10 25:8
**knows** 26:10,13
**Kress** 5:12
**Krones** 31:5,7 36:14,18
**K-R-O-N-E-S** 31:7

**L**

**L** 2:1
**label** 9:20 10:21 11:4,7,8,10,11 12:1,22 13:22 14:4,8 15:23

15:23 16:1,1,6 16:13,14 17:5 18:9 29:11,14 29:16,20 30:5 30:12,17,22 31:2,10,18 32:2,17 33:5,9 34:17 35:12 36:13,14 38:9 38:12
**labels** 11:12,22 31:11 32:20 33:14 36:23 37:4,5,6 38:14 38:14,17,18
**labor** 9:19
**laborer** 10:4
**Large** 2:7 6:4
**Law** 5:16
**leading** 2:14
**learn** 39:2
**learned** 21:15 21:21 30:5 36:18
**learning** 32:3 36:15
**leave** 13:6
**left** 11:14 27:13 37:16
**lesser** 16:17
**level** 29:20 30:12,19 33:3 35:1 37:15,18 37:21 38:5,6
**levels** 34:12,14 36:7,11 38:2,3
**License** 40:21
**limited** 33:5
**Linda** 1:6 5:20 6:18 22:1 28:10 29:9 31:2 36:7,13 37:15
**line** 32:6,7 37:10
**lines** 12:19
**list** 8:7 26:23 27:5
**listed** 28:1
**litigation** 9:7
**little** 11:6 39:12
**LLC** 5:11
**long** 9:10 12:21
**longer** 38:20
**lot** 8:6 15:20 36:1,2

M

**machine** 16:14 29:17 30:13,17 30:22 31:2,11 31:18 32:2,17 33:5 35:3 36:14,19,21,22 38:9,10,16
**machines** 12:12 29:14 30:5 32:9 35:2 36:16 37:3
**maiden** 21:6
**maintenance** 10:10,16 12:11 12:12,15,17 13:17 14:15,18 14:20 35:6 39:7,12
**man** 8:20 34:17
**manager** 11:1 14:10,20
**map** 34:14
**marked** 28:17
**math** 9:23
**matter** 6:18 38:5
**ma'am** 10:5 17:3 32:23
**McClain** 7:2
**McNaughton** 1:21 2:6,23 6:1 40:19
**mean** 10:23 15:23 17:10 19:12 22:22 24:23 27:13 30:3 32:14,14 32:15 33:19 34:6 35:4 36:5 38:22
**means** 40:9
**meet** 18:21
**Melvin** 14:13 15:12 18:4
**memory** 35:22
**met** 19:4 24:10
**Middle** 1:2 7:23
**million** 37:6
**mom** 20:23 21:1 21:1,2
**money** 38:3
**months** 11:16 13:7
**morning** 9:23
**moved** 32:14
**MRO** 10:7,9 14:16

N

**N** 2:1 4:1 5:1
**name** 7:1 8:17 18:7 20:19 21:3,7 23:4,11
**named** 8:20
**necessary** 2:12 8:8
**need** 9:20
**needed** 14:6,6 23:18
**neither** 40:14
**never** 23:8 37:21 39:3
**night** 12:19
**nine** 13:7
**Nineteenth** 5:13
**North** 5:6,13
**Notary** 2:6 6:3
**November** 13:3
**number** 1:5 6:16 6:20 25:6 27:4 28:16,20 40:21
**Nut** 22:12

O

**O** 2:1
**Objection** 16:8 16:21 24:8,18 26:3 28:14 29:15 30:20 34:19
**objections** 2:13 2:16
**October** 10:2
**offenses** 19:8
**offered** 2:18
**office** 13:9 14:5 35:5
**offices** 2:7 6:8 6:23
**Oh** 37:13
**okay** 6:15 8:15 9:9,10 10:3,6 10:11,14 11:3 11:9,18 12:21 14:1,8,21,23 15:3,18 17:18 20:9 21:13 24:12 25:1,15 26:1 29:3,18 33:7 34:2,10 35:8 36:12 37:3,13,23 39:9
**open** 27:11
**operate** 16:14 32:1,3
**operating** 31:3
**operation** 35:2
**operator** 9:20 16:13 18:9
29:11 33:9 35:12 36:13,17 37:1
**operators** 10:22 11:4 12:1 16:1 16:7 17:5 29:20 34:9
**opinion** 35:11
**oral** 3:2 6:12
**original** 3:1
**owners** 9:7

P

**P** 2:1 5:1,1
**packaging** 13:8 15:16
**page** 4:2 25:7
**Pantazis** 5:11
**paper** 38:14
**particular** 35:12
**parties** 2:3,15 40:15
**parts** 10:10 30:9
**pay** 16:18 29:19 32:19 33:15,16 34:3,8 36:8 39:4
**PC** 5:5 7:1
**people** 11:17 15:16,18,21 17:12,17,19,22 27:13 30:21 32:14 36:2 38:2
**perfect** 38:8
**performance** 29:3 31:4
**period** 17:15
**person** 8:23 9:19 17:14 30:17
**piece** 30:23
**place** 6:23
**plaintiff** 5:9 7:6 7:10

**plaintiff's** 25:5 27:3 28:16,20 29:6
**Plaintiff(s)** 1:8
**plan** 34:15
**planner** 13:17 14:15 35:6
**plant** 32:18 39:6
**please** 3:4 8:17 9:11 28:21 29:1
**point** 13:22
**position** 13:16 15:5 18:7 27:9 27:11,21
**positions** 9:17
**Present** 5:20
**pretty** 30:4 35:15
**prior** 2:18
**probably** 13:1 22:17,17,18 23:5 33:23 35:16
**probation** 19:9 19:15,16,19,21 20:13,14 21:14 21:16 24:17,21
**problems** 12:8
**Procedure** 2:21 6:6
**proceedings** 6:13
**process** 17:1
**production** 14:10 15:7,11
**Products** 1:10 6:19
**proficient** 33:4
**projects** 14:17
**provide** 8:7
**Public** 2:7 6:3
**purposes** 9:6
**pursuant** 6:5
**put** 8:2 11:5,7 14:2 22:10 23:4,11 24:5 25:7,10,12 27:21 36:22
**putting** 25:2

**Q**

**question** 2:15
**questions** 2:14 7:23 35:1 40:8
**Quinn** 5:11

**R**

**R** 5:1
**ran** 29:17
**range** 36:19
**rating** 32:20
**read** 7:14
**really** 17:9 18:2 18:11 19:1 21:17,17,18 23:16 24:19,20 24:21 25:10,14 25:23 27:7 35:3,6
**recall** 31:2 36:6
**record** 6:21
**reference** 22:11 23:12 24:6 25:3 26:23 27:5 28:2
**regular** 9:18
**related** 18:14,15
**relative** 8:2
**relatives** 8:9
**remember** 13:2 16:23,23 17:4 17:10,11 18:3 18:4,13 19:2,6 19:13 21:20,23 22:4,7 23:19 24:22,23 25:18 25:19,21,22,23 26:21 27:6,23 28:3,6 29:5,7,8 29:21,23 30:3 31:21,22,23 33:12,13,17 35:3,7,17 36:20 37:21
**Renny** 1:21 2:5 2:22 6:1 40:19
**repair** 10:10
**report** 14:18 15:15 17:22
**reported** 18:8
**Reporter** 2:6 3:5 6:2 7:12 40:20
**Reporting** 7:3
**represent** 7:4,6 7:8,10
**representing** 7:2
**represents** 40:11
**requirement** 33:8
**respective** 2:3
**result** 40:17
**results** 17:22 18:8
**retained** 3:5
**retired** 39:13
**review** 29:3 31:4
**right** 10:11,18 12:16 13:15 14:14,23 15:14 15:20 16:2,17 18:14 20:4,12 22:9 24:9,14 25:5 27:14 30:7,10 31:1 31:16 37:11 39:3,17
**Robertson** 3:1 4:3 5:10 7:5,5 7:20 17:8 26:6 26:9,12,18 28:19 29:2
**Ronnie** 18:18,22
**Ronnie's** 20:23
**room** 11:7,8,10 11:11 12:22 13:22 14:4,9 15:23 16:2 30:9
**Rule** 2:20
**Rules** 2:21 6:5
**run** 38:9 39:7
**running** 38:16

**S**

**S** 2:1 4:5 5:1,2,9 5:15,17 6:23
**salary** 13:21 14:2 15:1,1
**save** 8:5
**saying** 22:6
**says** 27:8
**scheduled** 13:8
**science** 38:9
**se** 18:3 22:18 23:9 34:23
**second** 10:16 25:7
**secretary** 14:19
**see** 28:23
**setting** 34:8,23
**sex** 19:8 20:4
**shift** 10:16
**show** 25:6 30:21
**sick** 8:23
**sign** 7:15
**sir** 8:18 9:11 28:21
**skill** 29:19 30:19 34:11,14 36:7 36:11
**skills** 29:14,19 32:20 33:14,15 33:16 34:3,9 36:9 39:4
**somebody** 16:12 27:10
**somebody's** 8:2 30:12
**son** 8:21
**sorry** 31:6 37:13
**SOUTHERN** 1:3
**specific** 19:12,13
**specifically** 34:5 36:10
**specifics** 32:22
**spouses** 8:9
**St** 5:17,17
**start** 9:19
**started** 10:2 33:13 39:5
**state** 2:7 6:3 7:4 8:17 40:3
**STATES** 1:1
**stay** 12:21
**stenotype** 40:8
**step** 20:23
**stepmother** 18:20
**stepmother's** 18:19
**stepsister** 21:10
**STIPULATED** 2:2,11
**stipulation** 6:7
**stipulations** 7:13
**stock** 38:12
**stop** 14:3
**store** 11:12
**street** 5:6,13 16:7,13
**strike** 18:22 33:12 34:20
**stuff** 39:2
**Subsequent** 27:3
**suggest** 26:4,6 26:17
**Suite** 5:7

**FREEDOM COURT REPORTING**

**supervise** 11:22
**supervised** 35:13,14
**supervisor** 11:1 11:8,19,20 12:22 13:22 14:4,9 15:7,11 25:8
**supervisory** 13:10
**supplies** 13:8
**sure** 8:1,11,13 8:16 11:9 24:1 29:17 34:1 35:15,23 36:3
**Susan** 22:21
**Swain** 5:3 7:7,7 7:14 16:8,21 17:6 24:8,18 26:8,11,14 28:14,23 29:15 30:20 33:15 34:19 37:12
**swear** 35:20,23
**sworn** 7:11,13 7:17

**T**

**T** 2:1,1 4:5
**take** 30:10 39:3
**taken** 2:5 3:2 40:7
**talk** 20:15
**talking** 12:12 17:7
**taller** 38:19
**tape** 26:9
**taught** 39:8
**tell** 8:14 9:22,23 22:10,18 27:10 27:12,15,16,17 27:22 28:10,11 36:11,12,23
**temperature** 38:11
**ten** 30:8
**term** 11:10
**test** 39:4
**testified** 7:18
**testimony** 1:14 3:2 40:12
**thereto** 2:19 40:9
**thing** 9:13
**things** 36:1
**think** 15:21 18:6 21:6,15 26:4,8 26:16 30:11,14 30:15 33:23 37:12 39:16
**Thompson** 21:5
**Thornton** 1:6 5:20 6:18 22:1 29:9
**Thornton's** 36:7
**thought** 28:5 31:14
**three** 25:9,11 32:6,8,15,21
**time** 2:17,17 8:5 9:14 11:13 13:22 14:18 17:1,5,7,15 19:5,12,13 23:6 24:16 31:3 32:4 35:4 36:8 38:4,21 39:19
**times** 37:7
**Timothy** 8:19
**told** 24:3 28:11
**Tom** 39:15
**tons** 37:2,3,5
**top** 30:19 33:3
**totally** 36:15
**Tower** 5:6
**train** 12:3 16:16 30:17
**trained** 12:4 16:18 33:8
**training** 12:5
**transcribed** 40:9
**transcript** 3:1 40:12
**transcription** 40:10
**trial** 2:17 8:8
**troubleshooters** 39:10
**Troubleshooti...** 12:9
**true** 40:11
**truth** 28:12
**truthful** 26:5
**try** 23:19 26:16
**Twentieth** 5:6
**two** 11:13,17 23:23 32:21 36:16
**types** 33:5

**U**

**U** 2:1
**Uh-huh** 8:4 20:22
**underage** 19:23 20:1,7
**understand** 29:5
**UNITED** 1:1
**Usual** 7:13
**usually** 7:22 11:16 15:21 32:17 37:5

**V**

**v** 1:9
**versus** 6:18
**VIDEOGRAP...** 6:15 39:18
**videotape** 6:16

**W**

**Wachovia** 5:6
**want** 9:22,23 13:1,2 16:10
**wasn't** 21:11,11 23:2 34:23 39:5
**Wednesday** 6:21
**went** 13:6 16:3 22:18,22 39:7
**we'll** 8:1
**we're** 9:8 12:11
**We've** 30:21
**wife** 18:17 22:19 22:20 23:3,22 24:4
**Wiggins** 5:11
**Williams** 6:19 18:16,22,23 21:13 22:2,10 26:19 28:11
**witness** 6:11 7:11 40:13
**work** 8:10 9:1,3 31:17
**worked** 9:10 10:15 12:14,18 27:18 32:11,17
**working** 11:13 17:1 29:8 31:18 32:11 37:10
**wrong** 26:1

**X**

**X** 4:1,5

**Y**

**yeah** 9:22 11:18 12:4 16:11 17:8 27:19 29:2,4 31:15 35:15
**year** 13:1,7,18 15:6 31:22 33:17
**years** 9:12,21 25:9,11 30:8
**yesterday** 25:10 26:2,10

**1**

**1** 6:16
**10** 25:6 27:4
**10:00** 2:10 6:9
**10:04** 6:21
**10:36:49** 39:19
**107-cv-712-W...** 1:5 6:20
**11** 1:22
**11th** 2:8 3:2 6:10 6:22
**15** 2:22
**1600** 5:7
**1988** 2:22
**1990** 10:8

**2**

**20** 38:6
**2000** 10:17,19 14:14 16:2,3,3 17:2,7,8 27:4
**2001** 21:14
**2003** 13:3 33:23
**2004** 33:23
**2005** 37:9,13
**2008** 1:22 2:9 3:3 6:10,22
**21** 9:12
**23** 15:21,21
**28** 4:6
**29** 4:6 28:17,20 29:6

**3**

**301** 5:13
**35203** 5:14
**35203-5202** 5:8
**36301** 5:18
**367** 5:17

**4**

**411** 40:21
**420** 5:6

**5**

**5(d)** 2:20
**50** 37:6

**7**

**7** 4:3

**8**

**86** 10:2
**87** 9:20 10:4
**88** 30:4

**9**

**90s** 19:5 24:13
**98** 10:13

PLAINTIFF'S EXHIBIT

29

TO: LINDA THORNTON
FROM: BRUCE CASSADY
SUBJECT: JOB PERFORMANCE REVIEW
DATE: AUGUST 19TH, 2005

**I, Bruce Cassidy, was given the opportunity to work with you as your supervisor, from June 20th through August 19th, primarily to observe and identify areas of concern, regarding poor line efficiencies, line 1 was experiencing on a consistent basis. I was also given the task of seeing what I could do to help improve the production output on line 1. Areas of concern as it was communicated to me were, poor attitudes, non-caring attitudes, poor communication among team members, and the lack of a sense of urgency.**

**Linda, as it relates to you, I am very pleased with your job performance. Your team effort is to be commended. You have worked well with the other team members. You have displayed a desire and willingness to do everything within your control to achieve the standard output for line 1. Please continue to share the knowledge you possess with other team members. I am very confident you will continue to do your part in achieving an even higher standard of production output. Thanks, for a job well done. I look forward to working with you again in the near future.**

Linda Thornton

**Linda Thornton**

Bruce Cassady

**Bruce Cassidy**

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER 107cv-712-WKW

LINDA THORNTON,

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:
TOMMY NANCY

Commissioner:
Renny D. McNaughton
June 10, 2008
Dothan, Alabama

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of Tommy Nance, may be taken before Renny D. McNaughton, Court Reporter and Notary Public, State at Large, at the offices of Bobbie Crook, Dothan, Alabama, on the 10th day of June, 2008, commencing at approximately 9:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading question and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Renny D. McNaughton, am hereby delivering to Ms. Robertson the original transcript of the

oral testimony taken the 10th day of June, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Robertson | 9 |

EXHIBITS

| Exhibit | Page |
|---|---|
| No. 1 | 17 |
| No. 2 | 48 |
| No. 3 | 52 |
| No. 4 | 66 |
| No. 5 | 67 |
| No. 6 | 68 |
| No. 7 | 72 |
| No. 8 | 95 |
| No. 9 | 125 |
| No. 10 | 103 |
| No. 11 | 103 |
| No. 12 | 104 |
| No. 13 | 137 |
| No. 14 | 140 |

APPEARANCES

FOR THE DEFENDANT (S):
Jennifer F. Swain
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower, 420 North Twentieth Street, Suite 1600
Birmingham, Alabama 35203-5202
J. Scott Clark
Senior Counsel
Ralcorp Holdings, Inc.
P.O. Box 618
St. Louis, Missouri 63188

FOR THE PLAINTIFF (S):
Ann C. Robertson
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203

Also Present: Linda Thornton

I, Renny D. McNaughton, a Court Reporter of Greenville, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Bobbie Crook, Dothan, Alabama, commencing at approximately 9:00 a.m. on the 10th day of June, 2008, Tommy Nance, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins videotape number 1 in the deposition of Tommy Nance in the matter of Linda Thornton versus Flavor House Products and Franklin D. Williams, Jr., case number 107-CV-712-WKW. We are on the record at 9:02 a.m. June the 10th, 2008. This deposition is taking place at the office of Bobbie S. Crook, PC, in

Dothan, Alabama. My name is Joey McClain, representing Freedom Court Reporting. And would counsel identify yourself and state whom you represent.

MS. ROBERTSON: Ann Robertson. I represent the plaintiff, Linda Thornton.

MS. SWAIN: Jennifer Swain. I represent defendant Flavor House Products, Inc.

THE COURT REPORTER: Usual stipulations?

MS. SWAIN: Yeah, that's fine.

MS. ROBERTSON: Plus our -- our agreed-to stipulation about the relatives.

MS. SWAIN: That's fine. Let me ask --

MS. ROBERTSON: Yeah, we'd better ask -- I was about to say we'd better ask him since he's not a party to these proceedings.

MS. SWAIN: Yeah. You can, if you want to, ask for the opportunity to

read your deposition transcript and make any changes you feel are necessary and then sign off on it, so that's your choice.

THE WITNESS: Okay.

MS. ROBERTSON: And -- and, also, we have a -- we have a -- the lawyers and I have an agreement. Ordinarily, I would sit here and ask you about all your relatives in the middle district of Alabama.

THE WITNESS: Okay.

MS. ROBERTSON: Now, you may have none or you may have a bunch. But -- it's a waste of time, but it's necessary if we get to the point of having a jury.

THE WITNESS: Okay.

MS. ROBERTSON: So what we just agreed to is I won't do that here today. If we get to the point where we're going to court, then you will provide her a list of your relatives --

THE WITNESS: Okay.

MS. ROBERTSON: -- and their spouses and -- and where they live and where -- where they work. Okay?

THE WITNESS: Okay.

MS. ROBERTSON: And that's not so I can go around and knock on the door and say, Do you know that man? It's so that I can make sure I don't put your auntie on the jury. Okay?

THE WITNESS: I understand.

MS. SWAIN: Would you like to reserve the right to read and sign your deposition transcript?

THE WITNESS: Yes, please.

MS. ROBERTSON: Is that agreement all right with you about the relatives?

THE WITNESS: Yes.

THE VIDEOGRAPHER: Excuse me. Off the record.

(Off the record.)

EXAMINATION

BY MS. ROBERTSON:

Q State your name, please, sir.

A Thomas Alan Nance.

Q And do you live here in the area of Dothan?

A Yes, ma'am.

Q Where do you live?

A 107 Sterling Ridge Court.

Q And how long have you lived there?

A Two and a half years.

Q Where did you live before that?

A Before that, I was in Gadsden, Alabama.

Q Doing what?

A I was unemployed at that time doing freelance work, HR work.

Q How long did you do freelance work?

A Six months, eight months.

Q Where did you work before that?

A CF Gomma G-O-M-M-A. CF Gomma --

Q And then --

A -- in Jacksonville, Florida.

Q Okay. And -- and what did you do

in that facility or place?

A Human resources manager, training and development manager.

Q And why did you leave there?

A We closed the plant.

Q How long did you work there?

A Two years.

Q Now, what were your duties there?

A Start-up of an automotive facility, hiring, general HR duties, training, development.

Q Well, what -- what -- what does general HR duties entail or did it entail for that facility or that --

A Interviewing new potential employees, hiring, training, orientation, issuing disciplinary actions, terminations.

Q Did you do any training?

A Yes. All new employee orientation training, general training for supervision. I would have to look at the schedule to see what exactly to train, specific classes.

Q Now, they opened a place and closed in two years?

A Yes, ma'am.

Q What -- what -- did they make a automobile or an automobile part?

A Made automotive brake lines for GM and Chrysler.

Q Okay. And what caused you to go to Jacksonville -- Gadsden, Alabama?

A That's my hometown. I moved back there after the plant closed.

Q And what did you do when you say you freelanced?

A I worked with a couple of companies for safety evaluation, safety program evaluations, benefits evaluations.

Q And how did you get the job at Flavor House?

A Applied through the online ad, sent in my application.

Q And after your -- after you applied, what happened?

A There were several rounds of

# FREEDOM COURT REPORTING

13

interviews. I interviewed. Phone interviews and then face-to-face interviews in Dothan.
Q Who did you interview with?
A Initially, the recruiter out of Ralcorp, the phone interview. I forget her name.
Q Okay. And here is what I want to ask. Since Flavor House had several different owners, we just all call it Flavor House.
A Flavor House. Okay.
Q Yeah. Okay. And you don't know what her position was?
A Not right off the top of my head. She was the person in charge of the primary database for candidates and applicants.
Q And then after you had a phone interview with her, you went -- did you say you had a face-to-face?
A If I recall, we went -- after the phone interview, there was a face-to-face interview in -- in Dothan with the -- with

14

the group, the management group there.
Q And those -- which -- made up by whom?
A Mary Ann Boyer, Ricky Smothers. I don't recall. It was a four or five person, six-person interview.
Q Was --
A QA manager, logistics manager. I forget all the names. Mark Samulotscki.
Q Was Melvin Hutchins one of the people?
A Yes, ma'am.
Q Do you remember about how many people it was?
A It was a full day of interviews, five or six. I don't recall exactly how many.
Q Did you interview face to face with each individual or --
A Yes, ma'am. Face to face individually.
Q All right. Let me finish the question because -- or did you have any

15

group interviews?
A Not that I recall. Group interviews, no.
Q Okay. And then after that, what happened?
A I was made a job offer shortly after that.
Q As -- what was -- what -- what was your title?
A Human resources manager.
Q Did you have a written job description?
A Yes, ma'am.
Q And what were your duties as the HR manager?
A I'd have to refer to the written job description. Just general HR duties, hiring, terminations. I don't recall the specific duties without seeing that written job description.
Q I don't think I have a job description, but I have a -- what's called a business and development goals. Maybe I

16

will give you that also. I don't have but one copy.
MS. SWAIN: Okay. Can I look at it before you show it to him?
MS. ROBERTSON: Huh?
MS. SWAIN: Can I take a quick look at it before you show it to him?
MS. ROBERTSON: Sure. Absolutely.
MS. SWAIN: I think this is part -- excuse me -- part of a document as opposed to the entire document.
MS. ROBERTSON: All right. See if I can make it complete. Would that help?
MS. SWAIN: I think this is, like, section four and there should be --
MS. ROBERTSON: See if that's part of it. We will put it all together and staple it.
MS. SWAIN: This looks like the same type of document for another time

period.
MS. ROBERTSON: Well --
MS. SWAIN: Oh, okay. So it is -- okay.
MS. ROBERTSON: Because I -- yeah. What -- that's not using --
MS. SWAIN: Yeah.
MS. ROBERTSON: Okay.
MS. SWAIN: It does -- I does note it on this. It says goal setting document on it.
MS. ROBERTSON: Okay.
(Plaintiff's Exhibit Number 1 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 1, for the record, the second page of the document has a sticker on it. Will you take a look at that, please, sir.
A Okay.
Q And see if that helps you with your job duties or refreshes your memory

about what your job duties were.
A These were specific goals set. This is not an all encompassing job description, no.
Q Yes, sir. I understand that. And I -- and I -- I didn't represent that it was.
A Okay.
Q It -- but it looks like to me that it may suggest at least some of the areas that you were responsible for as the HR manager at Flavor House; is that correct?
A That's correct.
Q And I thought maybe it would help you for us to discuss those areas that you're responsible for.
A Okay.
Q Okay. And does it help you?
A Yes.
Q Okay. Can you give me a little more specifics now as to what your job duties were at Flavor House?
A Well, let me see. You can go by

the goals here, maintain FTE, full-time employee count. Minimize turnover.
Q Well, let's -- let's start with that one. What does that mean?
A Keep the -- keep the employees hired. If there's turnover, then hire back employees.
Q Was there a problem at -- at Dothan Flavor House keeping a full complement of full-time employees.
A Not -- not a problem that I know of. It was just general turnover. So basically when there was turnover, not allowing that turnover to -- allowing the position to be unmanned for a long period of time, making sure they were filled back.
Q Okay. What else?
A Training process, general training process for hourly and salary employees.
Q What kind of training were you responsible for at Flavor House?
A Salary to -- it was mainly

supervisory training, general supervisory skills, employee training. We had safety training. It was delegated to a safety manager. Again, not having the training schedule, I don't know specifically what we trained during that period I was there.
Q Did -- was the training on some sort of schedule? In other words, like you said, general supervisory skills, was there a package or a scheduled kind of training?
A There were training topics scheduled monthly, bimonthly, quarterly, yes.
Q And -- and, like, do you remember the topics that were in those --
A No, I do not.
Q -- packages? What -- did you teach the classes yourself?
A I don't recall teaching the classes myself, no.
Q Who would teach the classes?
A Depending on what training it was, specialists in that field, whether it

was a supervisor or a safety person --
Q Well, I'm talking about --
A And an outside counsel or outside person.
Q I'm sorry. I'm talking about specifically the general supervisory skills classes. It sounds like --
A Some of those were taught by myself. Some of them were taught by outside sources.
Q All right. And do you remember which ones you taught?
A Not without seeing the schedule, no, ma'am.
Q Did you teach any sexual harassment training?
A I don't recall if I taught it or if it was taught by someone else. It would be on the sign-in sheets.
Q Was it taught while you were there?
A I don't recall if it was. It would be in the training schedule if it was.

Q For what period of time were you there?
A October of '05 until December of '06.
Q And you don't recall whether your -- you personally taught a sexual harassment or anti-sexual harassment course?
A Not from memory, no, ma'am. There would be a training record there if it was taught, yes.
Q All right. And did you have any -- while you were there, did you have videos or anything, tools to use for that particular kind of training?
A I -- I don't recall.
Q You don't recall whether or not you had that kind of -- those kind of tools?
A Not from memory, no, ma'am.
Q Under what circumstances would one receive anti-sexual harassment training at Flavor House?
A An individual or as a group?
Q I'm talking about at -- what

would trigger one being offered or -- or -- or required to take anti-sexual harassment training at Flavor House?
A Sexual harassment training --
MS. SWAIN: I'm going to object.
A -- is part of our training process.
Q Okay.
A There was annual training that was listed as annual training. Specifically, an incident. If there was an instance involved, we may have retrained, but it would have been part of our original training process.
Q You said you were there from October to October --
A October to December.
Q Okay. So if there had been some training, it would have been within that period of time; right?
A There should have been annual training, yes.
Q What qualified you to give that

training?
A My previous experience, my previous training. I've had various training courses, supervisory training courses. Train -- the trainer courses throughout my career.
Q Did you have any such training at Flavor House?
A Specific to sexual harassment training?
Q Yes.
A Within our supervisory training program, I believe there was sexual harassment training. Whether I received that specifically separate, I don't recall.
Q Would there be something in your personnel file that would indicate whether you received it or not?
MS. SWAIN: Objection.
A I don't recall if our training records were kept separately or in our files.
Q Well, when you say your "training

# FREEDOM COURT REPORTING

records," would they have been kept by individuals, named? Say Ann Robertson, would she have a training file?

A I don't recall how -- there was a record kept. I don't recall how it was -- it was --

Q So -- but what I'm asking you, sir, is if it wasn't put in the personnel file, some documentation that you received the training, correct, would it have been kept in a separate file with that person's name on it?

A It could have.

MS. SWAIN: Objection.

A It could have, yes, ma'am. I do not recall.

Q Well, where else would it have been kept if it wasn't kept in the personnel file? How -- how else would it have been kept?

MS. SWAIN: Objection.

A I don't know. It's a speculation question. I don't know the answer to that.

Q Well, I mean, you were -- weren't you in charge of -- of keeping records of these training sessions?

A There was a record, a sign-in sheet, for each training. Now, how that was filed, I'm not aware. I don't recall if it was filed individually or in a training file or in a personnel file. I don't recall how it was filed, no.

Q Well, how did you decide whether a person needed that kind of training? Did you not need to know whether or not they had had it before?

MS. SWAIN: Objection.

A We had an annual training program.

Q A what?

A An annual training program that had topics listed. Everyone received training in specific courses throughout the year, the entire plant.

Q So you're telling for -- telling me for every year there would have been

training on each specific topic?

MS. SWAIN: Objection.

A I -- I don't know how to answer that. Again, relative to what the topics were for that year would have been trained.

Q Well, you said there was annual training, and what I'm trying to find out is are you saying that for each year there was repetitive -- the same topics taught?

A Not necessarily the same topics.

Q That's what I'm asking you. How would you know if a person had received the -- say it was time --

A By the training record.

Q Okay. So how would you check the training record if you have no idea where they kept it?

MS. SWAIN: Objection.

Q Sir?

A I don't recall how it was kept.

Q Well, do you --

A I would have -- I would have checked training records to see if training

was needed for an individual or to ensure they had training.

Q Uh-huh.

A An annual training program, we go by the topics and we teach those topics.

Q Okay. And -- and -- but you don't recall how you would check?

A I would look at the training sign-in sheets.

Q Okay. But you don't recall where they were kept or --

A I don't recall how they were kept, if individual or in a training file. Do not know.

Q Is there something that would refresh your memory?

A Probably not.

Q There's nothing that would refresh your memory?

MS. SWAIN: Objection. He's answered that.

Q Can you explain to me why you would have no memory of that even if I could

produce, like, say, a personnel file with a training record in it?

MS. SWAIN: Objection.

A I've had multiple jobs and we store files multiple ways. So as an HR manager, I've had various companies that store files in different ways. I don't recall specifically how Flavor House stores their training records, no.

Q No. I'm asking -- and there's nothing that would refresh your memory?

A No.

Q Okay. What else did you do besides training?

A Disciplinary actions.

Q Before we go on to disciplinary actions, tell me did you do any training on how to investigate anti -- investigate a sexual or racial or what have you harassment complaint?

A I don't recall.

Q Anything that would -- would refresh your memory on that?

A The training topics in our training schedule. If it was there, then it was taught if there's a sign-in sheet.

Q Well, did you have a methodology for -- for investigating such a complaint?

A Yes.

Q Would you tell me what it was?

MS. SWAIN: Objection.

A I collected the documents from individuals and investigated those documents.

Q What do you mean you collected the documents?

A Receive written statements from anyone involved, question those individuals about the situation, collect any additional information, interview additional applicants or additional persons that were named in the investigation.

Q Okay. When you would collect the documents of -- or the written statements, who would get the -- who would decide who would get the written statements?

MS. SWAIN: Objection.

A I don't understand that question.

Q Well, if there was a complaint of sexual harassment that did not come directly to you but came to a supervisor, who would -- would that person decide which people to take the written statements from?

MS. SWAIN: Objection.

A Anyone could report harassment to a member of management, supervision, myself, or another member of management, whoever they were comfortable reporting it to. And at that point, it would be investigated by that process.

Q Yes, sir. That was a good answer, but it wasn't an answer to the question I asked. My question was: If the report came to someone other than you, who decided which statements would be -- or who would get -- be asked to give statements?

MS. SWAIN: Objection.

A I don't know how to answer that question.

Q Okay. Well, you said you would collect the documents and that documents would include written statements of the people that was -- that knew something about the complaint; is that right?

A Yes.

Q Who would decide which people gave the written statements?

MS. SWAIN: Objection.

A I don't see how anyone could decide who gives a written statement.

Q Did you hold up a banner, We've had a sexual harassment complaint; anybody who wants to come give a written statement, please do it? Is that how you got your written statements?

A If -- if -- if someone brought a claim of harassment to me --

Q Yeah.

A -- I would ask for personnel or individuals involved that I should interview that had relevance to that from the person bringing the accusation.

Q Okay.
A And from that, we would investigate those persons, receive their statements if they knew anything of the situation. So, again, it's -- we didn't broadcast that there had been a sexual harassment claim of any sort or any harassment claim.
Q Well, did -- but you told me at one point that you would collect the documents which would usually include the written statements of people that had some knowledge of the complaint.
A Correct, that had been identified either by the person bringing the complaint or by a supervisor who was aware that the person is bringing the complaint.
Q Okay. So that's what I'm saying. So the supervisor would get the statements and bring them to you; right?
MS. SWAIN: Objection.
A That could happen, yes. Not necessarily in that order.

Q And then what would you do?
A We would investigate the complaint.
Q Okay. And how would you investigate the complaint?
A Take the statements and interview the individuals.
Q All right. Did you make notes of the interviews of the individuals?
A Yes.
Q Where were they -- where are they?
MS. SWAIN: Objection.
A Notes are either kept in a file --
Q I'm not talking about hypothetically. I'm talking about in -- when you were doing it in -- at Flavor House.
MS. SWAIN: Are you talking about on a specific occasion?
MS. ROBERTSON: I'm talking about -- no. I'm just talking about how

he kept the records of -- of -- of -- of investigating a sexual harassment complaint. He said he would take notes of the people he interviewed.
Q Did you ever -- did you ever have a sexual harassment complaint?
A I would have to look at my notes to see. I don't recall yes or no.
Q Okay. Well, let me ask you this. Let's assume that this is some kind of grievance or some kind of complaint that may or may not have been sexual harassment. Would it be investigated the same way?
MS. SWAIN: Objection.
A Any complaint brought forward, any statement, was investigated, yes.
Q Okay. Well, for instance, in the case where Linda alleged that Frank Williams cursed her and threw a bag of cans, not at her but threw it, and was yelling and always, you know, acting out, did you interview the witnesses involved in that -- that allegation?

MS. SWAIN: Objection.
A I would have taken the statements -- any statement that I had, I would have interviewed the persons identified, yes.
Q Okay. And you would have taken notes of those -- those --
A Yes.
Q Where are those notes? Where did you keep those notes?
A Those notes were filed in my desk.
Q Okay.
A Separate file.
Q A separate file in your desk?
A Yes, ma'am. Personal notes taken during an investigation.
Q And were they -- how -- how did you keep them, like alphabetically according to the complaint and alphabetically according to the --
A I don't recall if it was by the person or by the date that it occurred in

the -- in the -- it was in a desk drawer. It may have been by the incident name. It might have been by the -- either the person's name or by the date. I believe I kept those chronological by the date of the occurrence.

Q And that would be the only institutional memory of, say, a complaint against, let's just say, Joe Blow, would be this -- this number of notes in your desk?

MS. SWAIN: Objection.

A There would be written documentation of the complaint --

Q Yeah, but where would it --

A -- in the -- in the personnel file.

Q Okay. Well --

A Because they had filed a complaint.

Q In whose personnel file?

A In the individual's.

Q So that would be the institutional memory?

MS. SWAIN: Okay.

A I'm not sure an institutional memory, what that means.

Q Well, obviously you are no there -- longer there; right?

A I'm no longer at Flavor House, no.

Q Okay. And -- and so if -- if somebody else complained about Joe Blow, you know, throwing acid in their face, where would be the institutional memory that he had done that before?

MS. SWAIN: Objection.

Q Because you're not there to remind them, oh, remember he -- like last year he threw acid.

A Again, my -- my -- my -- my personal notes on the investigation are not necessarily the outcome of the investigation. It's my notes that I took. The decisions that were made, any disciplinary or nondisciplinary, any actions that were taken, were part of the personnel

file.

Q Okay. And the only -- the only institutional memory would be in the personnel file of the complainant?

MS. SWAIN: Objection.

Q Or the -- the person against whom the complaint was made?

A Any -- any action taken would be in the personnel file regardless of who was involved in the action, if there was action taken.

Q What if there was no action taken?

A There's no action taken? The statements would go in the personnel files showing --

Q Of whom?

A Of whoever the statement was -- whoever wrote the statement, the copy would be in the personnel file.

Q So let me get this straight. There's a complaint of, say, sexual harassment against Joe Blow in 19 -- I

mean -- excuse me -- 2005. And there's statements taken by Jane Doe, Carol Smo, and others, and there's inconclusive proof that Joe -- Joe Blow did sexual harassment. All right? What would happen would be Jane Doe's statement would go in her personnel file?

MS. SWAIN: Objection.

A I believe individual statements were put into individual files. There may have been -- the whole incident may have been put into individual files. I don't recall. But they -- the statements would have been in the personnel files, either in the -- in the person initially bringing the complaint, maybe the entire -- all statements there, perhaps. I don't recall. But the individual statements were kept in the individual personnel file.

Q And my question is: Then how would one after you left, if somebody complained about Joe Blow in December of '07, know that he had had prior complaints

that -- that -- that could not be proven one way or the other?
MS. SWAIN: Objection.
A Statements would have been in the personnel files.
Q Of whom because you're not sure --
A The person making the statement.
Q You're not sure whether they -- they would put it -- why would you put it in the person against whom the allegations had not --
A There would have been a statement from the person that the allegations were made against as well. So, therefore, a copy would have been in their personnel file as well.
Q Tell me what the -- what the reason or the purpose for that particular method is.
A Because many times you have instances where you have multiple instances over a period of time that lead to a

perpetual problem. Therefore, you want record of that problem as it's happened in the past. One singular instance may not negate action. Multiple instances over a period of time may require action.
Q Okay. Be you're not -- you're not sure that that -- that it's -- that the statements are put in each person's file or are you?
MS. SWAIN: Objection.
A I don't recall.
Q Now, tell me, do you know what happened to your -- your notes where you interviewed the people that gave the written statements?
A I do not know.
Q Can you tell me why those notes were not maintained in -- in whatever fashion everybody else -- all the other stuff was maintained in?
A They would have been filed either chronologically or by the person's name in that investigations file.

Q No. What I'm talking about is you -- you get a written statement from Joe Blow. You question Joe Blow and not only is his written statement incorrect or inaccurate, it's incomplete.
A How do I know a statement is incomplete? It's a statement.
Q Well, after you interviewed him, you determined that it was incomplete because he told you some more stuff. That's what I'm saying. Then how do you -- how did you document that?
MS. SWAIN: Objection.
Q The additional stuff, the misstatements, whatever.
A The original statement is a statement. My investigative notes are separate from that initial statement.
Q But as I'm saying, suppose you bring the person in and over the course of your interviewing him, it turns out that -- that he has additional information. He has different information that you learned that

is pertinent to the investigation. Why would you not maintain that also in his personnel file?
MS. SWAIN: Objection.
A The initial statement was maintained in the file.
Q Well, how --
A If they give additional statements, they would be maintained in the file as well.
Q Well, how do you -- how did they go -- how did the people that would gather these written statements get the statements?
MS. SWAIN: Objection.
A I don't know the answer to that.
Q I mean, would they sit down with a series of questions and ask them and tell them to put the stuff in there? Would they say there's been an allegation that thus and so was done; tell us what you know about that?
A From my recollection, anyone that had a statement to give was given the form

and told to complete that -- to write their statement. There was no questioning in the statement -- statement process. It was collection of the statements.

Q Well, I mean, I'm working on the line. You walk up to me and say, We think you have information about something; write a statement. Is that what they would do?

MS. SWAIN: Objection.

Q I mean, what was done to inform the person about what they should write the statement?

MS. SWAIN: Objection.

A They weren't told to write a statement unless they offered to write a statement. We never asked for additional statements unless they were identified as someone who would have a statement. If a person bringing a complaint mentioned John, Jane, and Mary, we would go to John, Jane, and Mary and say, Would you write a statement about what you saw? They did not have to write a statement. It was at

their -- if they wanted to, they could. If they didn't, they didn't.

Q That's what I'm getting at. So if -- in the instance where Ms. Thornton complained that he yelled and screamed and cursed and threw cans and generally pitched a fit, and she said, I know X, Y, and Z were in -- in range. I don't know what they saw or what they heard, but they should have heard or seen something.

A Uh-huh.

Q You would walk up to the person and say, Here's a written form. If you -- did -- Linda said you saw something that Frank Williams did. Would you please write a statement? Is that what -- basically what would happen?

MS. SWAIN: Objection.

A If someone bringing a complaint mentioned certain people or mentioned names, I would ask those persons to give a statement of what events they saw, yes.

Q Okay. And -- but no specifics

were asked them -- for them to address?

A Other than were you aware that an incident happened? Please write your statement.

Q Okay.

A They were given no direction of what happened, no.

Q All right. Now, in the case -- I'm using the case involving Linda and Frank Williams, that one. It's kind of involved in this case.

A The case, the specific incident?

Q The one where Frank Williams, you know, supposedly threw the cans and was cursing her and yelling and --

A Okay.

Q All right. Did -- do you remember the statement that Frank Williams gave?

A Not from memory, no.

Q Do you remember if he admitted to doing any of that, the things she said he did.

MS. SWAIN: Are you talking about in his -- whether he admitted it in his statement?

MS. ROBERTSON: Yeah.

A I don't -- I don't recall. Again, from memory, I don't recall.

Q Okay.

MS. ROBERTSON: Let's take a break I need to get the documents.

THE VIDEOGRAPHER: We are off at 9:41.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This the beginning of tape 2. The time is 9:53 a.m. We're back on.

(Plaintiff's Exhibit Number 2 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q Plaintiff's Exhibit Number 2. We were -- I was referring to that statement a few minutes ago before we took a break. Have you ever -- have you seen that?

# FREEDOM COURT REPORTING

49

(Brief pause.)
A I believe this was Frank's statement. Yes. I -- I -- I'm sure I saw this at the time of the investigation.
Q His statement about the incident about the continually describing about the yelling, the screaming, the cursing, and throwing cans?
MS. SWAIN: Objection.
A The June 14th incident, yes.
Q Now, tell me where you see that he addresses any of those allegations, for instance, the cursing at her.
MS. SWAIN: Objection.
A This is Frank's statement. I don't see him saying he cursed at her in this statement, no.
Q Well, do you see where he addresses it at all? Does he deny it?
A I don't see that he denies cursing.
Q He just doesn't address it; right?

50

A This is his statement of what happened at the time.
Q Is it -- does it appear to be true?
MS. SWAIN: Objection.
A I don't decide who -- what -- what's -- what's true on the statements until -- it's just a statement. Until the investigation is concluded, any --
Q Well --
A -- any additional notes that I made. And then we determine the outcome of the -- of the investigation.
Q I understand. But if -- if Frank -- if Linda Thornton had accused Frank of cursing repeatedly at her, yelling, hollering and throwing cans, would you have expected a person -- the supervisor to at least have asked him to address those issues?
MS. SWAIN: Objection.
Q Whether he agreed with them, denied them, what have you?

51

A I'm sorry. Repeat that question.
Q I said would you have ask -- thought the supervisor would have asked him to address those allegations, whether he agreed with them, denied them, or had some explanation for agreeing with them?
A Are you asking about the statement?
Q Yeah.
A Would a supervisor have asked Frank about the statement? No. This is just a statement given. There's no questions asked at the statement process.
Q So -- so he -- he just said, Describe the incident involving you and Linda Thornton?
A Correct. Please write a statement concerning this incident on this date.
Q Okay.
A That would have been the gist of it.
Q Now, did you have a conversation

52

with Frank Williams later about that statement?
A I'm sure I did.
Q Do you remember having it?
A Not from memory specifically, no.
Q What would refresh your memory?
A Reading over the statement. I remember the incident. I don't remember the individual conversations I had during the investigation, no.
(Plaintiff's Exhibit Number 3 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Okay. Let me show you what's been marked as Plaintiff's Exhibit Number 3 and ask you to take a look at this.
MS. SWAIN: Is this your --
MS. ROBERTSON: Yeah. And the date it was served on the defendant or the respondent.
Q Now, the Flavor House in Dothan is at 2700 Horace Shepard Road; right?

A I believe so, yes.
Q Did you ever see Plaintiff's Exhibit Number 3 or were you aware that it even existed?
A I believe we did receive a copy of this.
Q Okay. And what did you do with it when you received it?
MS. SWAIN: Objection.
A When we receive complaints, I forward those on to our corporate counsel.
Q Anything else that you do?
A Anything I would have done would have been at the direction of the corporate counsel.
Q You do -- there's a piece of paper that comes with that thing telling you to preserve all the pertinent documents and not to spoil them and do away with them; is that right?
A I don't recall what came with this. This is just one document.
Q Look at the charge and -- and see

if you don't see where it's discussed at length, this incident involving the yelling and the cursing and the throwing of cans.
MS. SWAIN: Objection. Are you referring to the June 14th statement by Linda in here?
MS. ROBERTSON: Yeah.
A I see her statement, yes.
Q Okay. What -- when you -- when you received the charge from -- about Linda Thornton did you do to preserve your personal notes or the notes that you took in your investigation of that incident so that it would be preserved for litigation, if necessary?
MS. SWAIN: Objection.
A All of my investigation notes are filed in my desk.
Q So --
A That's -- that's the only --
Q Did you tell anybody about those notes in your desk when you received --
A I don't know if anyone is aware

of those notes, anyone other than the HR manager. I don't know if anyone else is aware of those. If there's any notes that would have been pulled out, I -- I don't know where they -- where they would have been -- they were in the desk at the time I was working there, yes.
Q Was there any investigation done of that charge when Flavor House received it?
A I don't recall the specific investigation done.
Q I'm not asking about the specifics. I said was any done?
A I don't recall what action we took on this charge. It would have been, again, at the direction of the corporate counsel.
Q So you don't remember if there was any investigation?
A I don't recall, no. I don't recall yes or no.
Q Okay. So you don't have any

independent knowledge of talking to Frank Williams about Plaintiff's Exhibit Number 2?
A I'm sure I investigated and talked with the individuals. I don't recall the specific conversation, no.
Q And would the conversation or notes concerning that conversation be included in your notes surrounding the investigation of Ms. Thornton's allegations?
A All the notes for the 6/14 incident would have been included in my notes in the desk.
Q So -- so your notes concerning what Mr. Williams did or didn't say when you interviewed him would be in those notes?
A Yes.
MS. ROBERTSON: Off the record.
(Whereupon, an off-the-record discussion was held.)
BY MS. ROBERTSON:
Q Well, what -- when you called Mr. Williams in to interview him, what would

have been the purpose of having him come in there?

A During any investigation, the purpose is to reiterate and bring out anything that's in addition to the statements to help make a decision as to what occurred relative to the statements.

Q Do you recall whether you learned anything new from Mr. Williams?

A I don't recall from memory, no.

Q Well, do you remember that Mr. Williams was written up for cursing Ms. Thornton?

MS. SWAIN: Objection.

A I believe there's documentation on any write-ups that occurred.

Q Do you remember whether he admitted to you that he did curse her?

A I don't recall if he admitted that or not from memory, no. I don't recall that.

Q Do you remember if he denied --

A I don't recall, no.

Q Because if he denied it and you have Ms. Thornton's representation and several other witnesses, then not only did he curse her; he lied, did he not?

MS. SWAIN: Objection.

A I can't assume that. I don't recall.

Q Because you don't have any notes; right?

A I had notes. I don't have them now, no.

Q And -- and whatever out there is producing all this memory loss from these people and the deponents, you've got -- apparently got a bad case of it; right?

MS. SWAIN: Objection. Ann, that's not necessary.

A Excuse me?

Q I think -- I think --

MS. ROBERTSON: Off the record.

(Whereupon, an off-the-record discussion was held.)

BY MS. ROBERTSON:

Q So it is unfortunate, is it not, that we don't have those notes here today to help you refresh your memory?

MS. SWAIN: Objection.

A The documentation that we have is what we -- what is presented.

Q To get at the truth, it's unfortunate that we do not have those records that you made.

MS. SWAIN: Objection. Is there a question for him?

Q Well, you were the one who ultimately made the decision, right, as to what to do about it?

A Based on the investigation, there was a collaborative decision, more than likely, made between myself and the general manager, a recommendation for this very action if necessary, yes.

Q Okay. And she -- are we talking about Mary Ann Boyer?

A Yes, ma'am.

Q She didn't sit in on any of these interviews, did she?

A Not on the investigation process, no.

Q Okay. So whatever you learned in the investigation -- investigative process would be the important thing; right?

A What I learned in the investigation --

Q In terms of --

A -- process would have determined the outcome of the investigation, yes.

Q Mr. Nance, why did you leave Flavor House?

A I was asked to leave.

Q Did it have anything to do with missing gift cards at or about the Christmastime that were supposed to go to employees but were missing?

MS. SWAIN: Objection.

A I -- not that I recall. I don't know that.

Q You -- you -- you don't recall

whether stealing might have been implied or --
A Stealing was never implied when I left Flavor House, no.
Q All right. Was there a problem with missing gift cards?
A There were two gift cards that were taken from the front office off of a -- off of gift baskets. Once that was discovered, the baskets were moved into my office from a -- an extra office.
Q When did that happen?
A I don't recall.
Q How long after were you fired?
MS. SWAIN: Objection.
A I don't recall the date I left employment. First of December.
Q Well, what were the gift baskets for or the -- the gift basket?
A Originally, the gift baskets were for drawings at the Peanut Festival. When the winners did not pick those gift baskets up, I believe we had two or three or four

left that were given away to the employees because the original persons that won the gift baskets did not pick those up.
Q How much were these gift cards that were missing? How much were they for?
A I don't recall. 20 or 25 dollars probably would be my guess.
Q Well, what was the reason that you were -- that was given when they asked you to leave?
A That my management style was not -- did not match with what Flavor House wanted at that time.
Q And were you given any more specifics than that?
A Specifically, some tasks that were not completed.
Q Such as?
A Such as the issuance of the new employee handbook.
Q All right. What else?
A I don't remember specific -- specifically past that.

Q Were you given a severance package?
A I believe there was a week or two of severance. I don't recall exactly what it was.
Q Were you terminated -- were you involuntarily terminated or did they ask you to resign or -- with the -- with the --
A I was involuntarily terminated.
Q You were involuntarily terminated and you were given a severance package?
A Yes, ma'am.
Q Did you draw unemployment?
A Yes, ma'am.
Q Was there any investigation concerning these gift cards, these missing gift cards?
A I believe we reviewed the tapes of the corridor leading to the office, but there was never any conclusive evidence of who -- who would have taken those because they were in the room for several weeks that they could have been taken. I don't recall

who all was in and out of that vacant office at the time.
Q Was -- was that office -- did it have -- was it locked, unlocked?
A I don't recall.
Q Did you leave an unpaid credit card bill that -- that was a Flavor House credit card?
A I believe there was a bill, yes.
Q And what was that credit card supposed to be used for?
A That was used for company purchases.
Q Such as?
A Travel, miscellaneous HR expenses.
Q And were you supposed to pay it or was Flavor House supposed to pay it?
A I was responsible for paying that bill monthly.
Q And so -- and why was it unpaid? Did you take the money and use it for something else?

A I don't recall having to pay that bill at the end when I left employment.
Q Well, my question is: What was the reason you hadn't paid it at the time?
A The credit card was current when I left. There may have been an outstanding balance beyond that.
Q Were you ever asked to pay it back?
A Pay it back or pay the bill?
Q Pay the bill.
A I don't recall being asked to pay the -- pay any monies back, no.
Q Were you asked to pay the bill?
A I don't recall being asked to pay the bill. I don't -- I don't recall.
Q Was there any discussion about there being some irregularities with the -- the bill?
A Not to my knowledge, no.
Q In other words, you're saying not with you?
MS. SWAIN: Objection.

A I don't understand.
Q Didn't have any conversations with you about any irregularities?
A Not to my knowledge, no.
Q Well, if you had had the conversation, you would have knowledge of it so I don't understand that answer.
A I don't ever -- I never recall any charges that I made coming into question on the company credit card, no.
(Plaintiff's Exhibit Number 4 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 4, can you tell me -- tell me what this is, please, sir.
THE WITNESS: Jennifer, can you see that?
MS. ROBERTSON: I'm sorry.
MS. SWAIN: Yeah, that's fine.
A This appears to be Linda's statement on the June 14th incident.

Q All right. Do you recall what Mr. Williams said about whether or not he was throwing cans during the incident that Ms. Thornton describes in that exhibit?
A I don't recall other than Frank's statement. From memory, no.
Q And do you recall whether you asked any other witnesses whether or not they saw -- could see whether or not he was throwing cans?
A Not from memory. Again, my notes had, you know, the investigation of what occurred. I don't recall if anyone else said there was cans being thrown or there was anything going on. I don't recall that, no.
(Plaintiff's Exhibit Number 5 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 5.
MS. SWAIN: Which one is that?
Q Do you remember having an

interview with Katherine Long?
A I don't recall the interview, no, investigation. Not from memory.
Q Now, in her statement she -- she says she heard Frank using the F word and -- I'm not looking at the document. I think she said something about not being able to do every damn thing; is that right?
A That is her statement, yes.
Q And then it said except he was doing a lot of yelling, etcetera, etcetera, etcetera. Do -- do you -- did you ask her to expound on that etcetera, etcetera, etcetera when you had an interview with her?
A I probably would have. I don't recall what that would have been without my notes. From memory, I don't recall that.
(Plaintiff's Exhibit Number 6 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 6, this is the Tamekia Cook statement. Do you

remember interviewing Tamekia Cook?
A Not from memory, no.
Q Do you think you took notes on that?
A I'm sure I would have, yes.
Q Well, now, Ms. Cook addresses Frank using the F word also and doing a lot of yelling. Katherine Jones --
MS. SWAIN: Long.
Q -- Long addresses the fact that Frank Williams was using the F word and cursing and saying he couldn't do every damn thing. Of course, Ms. Thornton addresses it along with some other things. Do you have any -- do you have any memory now as we sit here as to why Mr. Williams, when he addressed the issue in his statement, didn't mention any of that?
MS. SWAIN: Objection.
A Again, his statement was his statement. No. I don't tell people what statements to write.
Q But after you find out that they

just either lied or avoided the issue, do you -- do you address that also?
MS. SWAIN: Objection.
A If there were any questions raised in another person's statements, I would have asked those questions of the individuals being questioned, yes.
Q And when he -- why -- why didn't you discipline him for that?
MS. SWAIN: Objection.
A At the end of the investigation, the -- the appropriate disciplinary actions, if needed or if warranted, would have been taken.
Q Did you do any -- did you talk to anybody else in that investigation other than the people I've -- the -- the witnesses I've put in front of you?
A I wouldn't recall from memory who I talked with.
Q Well, would there be a written documentation form -- it's not called written. It's called documentation form --

for anybody that you interviewed or had any information concerning or surrounding the incident that -- that's outlined in these documents, Plaintiff's 6 and 5 and --
A Not that I recall.
Q Well, at -- at the unemployment compensation hearing, you testified that my client, Linda Thornton, was going to be written up for this same -- involving -- surrounding this incident. Do you remember that?
A I remember the -- the unemployment hearing.
Q Yeah. Does that mean you don't remember telling those people under oath that she was about to -- that had she returned to work, she would have been written up for baiting Frank Williams for yelling and screaming and cursing and throwing cans?
MS. SWAIN: Objection to the characterization of his testimony.
A If I made a statement that she

would have been written up, I don't know what it would have been for specifically.
Q Well, what if you said for baiting him, or words to that effect, for -- that caused him to pitch this fit?
MS. SWAIN: Objection to the characterization.
A I don't recall using those words.
Q Well, what words do you recall using?
A From memory, I don't recall any. If you have a written document, I would be happy to go over my testimony at that time.
Q Well, maybe there is some, but they apparently have disappeared.
MS. SWAIN: Objection.
MS. ROBERTSON: Let's take a break.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. We're back on at 10:38 a.m.
(Plaintiff's Exhibit Number 7 was marked for identification

and attached to the deposition.)
BY MS. ROBERTSON:
Q I'll show you what's been marked as Plaintiff's Exhibit Number 7 and represent to you it's a transcript of the unemployment compensation hearing of Linda Thornton. Now, the first page I want to direct your attention to is page 51. Now, you can read as much of it as you need to ahead to get context of it. I will tell you it's your describing the investigation of the incident we've been -- well, been talking about. And -- and -- and you -- on page 50 you say, Okay. But the -- in the final investigation, Ms. Parrish -- that was her maiden name -- make a formal complaint against Mr. Williams? Will you read your answer and just keep reading until you get to that little blue sticker.
(Brief pause.)
Q And you understand the Qs are what I -- what the compensation lady is asking and the As are what you're saying;

right?
A Now, what's the question again? That this is --
MS. SWAIN: I think you're -- I think she wanted you to --
MS. ROBERTSON: Read it.
MS. SWAIN: -- read --
THE WITNESS: Read through here?
MS. SWAIN: What are you asking him to read, Ann?
Q Here. Let's do it this way. I will read. Okay. This is on page 50 starting with line 7. Did she complain that he had called her a derogatory name? And your answer?
A My answer: Not -- not at this time. Previous altercations -- this is a previous altercation.
Q All right. Number 11. Okay. But in the final investigation, did Ms. Parrish make a formal complaint against Mr. Williams?
A My answer was: Let's see. She

did make the statement that he was cursing, yelling at -- yelling at her, calling her MF, GD, MF. Those were her -- that is in her statement.
Q Okay. Did you get any other employees to come who came forward that witnessed -- come -- the -- Mr. Williams making those derogatory comments to Ms. Parrish?
A Yes, ma'am. We had other employees involved in the investigation.
Q Okay. Did they witness -- did they hear the -- him calling her names?
A They heard yelling. They did not hear specific cursing occur.
Q Okay. So the witnesses said they did hear yelling, but they did not hear specifically that Mr. Williams called Ms. Parrish names?
A Yes, ma'am, that's correct.
Q All right. Now, where did you -- where in those statements did you determine that? I'm talking about the statements that

we've been talking about.
A What is this in reference to? What incident is this in reference to? There are multiple incidents.
Q The one we've been talking about for the last 30 minutes, the one involved -- where she said he was screaming and cursing and you've got Tamekia Cook saying the label 3 machine operator -- machine messed up and we had bad labels on the work area and we cleaned some and when Linda got back, some -- some was left on the table and she asked Frank what about this mess and Frank walked off saying curse words. Exact, I don't know. So Linda said something to him. He threw up his hands and said --
MS. SWAIN: Ignore that wording.
THE WITNESS: Okay.
Q All right. I'm talking about this -- these statements are the ones you're referencing. Where does it say that -- that she -- that she didn't -- that you had nobody saying that he cursed?

A I may have been mistaken on this. I don't --

Q I see.

A My statement is they heard yelling. They did not hear specific cursing at her, specifically directed at Linda. That is my statement.

Q What does that mean? They told -- he said fuck it and -- I hear --

A I believe -- I believe the cursing in the statements was cursing. It did not say that he cursed her specifically.

Q I hear Frank say the F word and I can't do every damn thing. Who do you think he was saying when he said I -- I can't do every damn thing? Was he talking to the -- Mr. --

A I can't -- I can't answer what his -- what -- who he was directing that at.

MS. SWAIN: I'm going to object to the question.

Q He was talking to Linda; right?

MS. SWAIN: Objection.

A If that's your assumption.

Q Well, I mean, that's what she said; right?

A That is -- that is her statement.

Q Did anybody -- and -- and this lady said she heard it; right?

MS. SWAIN: Objection.

A This statement says that they heard cursing, yes.

Q That he -- they -- they heard him -- him say I can't do every damn thing.

A That is their statement, yes, ma'am.

Q And in the -- in the context of the conversation with Linda Thornton.

MS. SWAIN: Objection.

Q Where in there is there any statement that -- that -- that he -- those curse words were not directed at Linda Thornton?

MS. SWAIN: Objection.

A Again, you assume they were directed at her. I did not assume that.

Q Okay. Well, why did you -- why did you assume otherwise? As -- in other words, if he's -- if he's yelling at her and says I can't do every damn thing, would you think he was, as I say it, talking to his imaginary grandmother? I mean, who else would he have been talking to?

MS. SWAIN: Objection.

A There are instances when employees curse in the plant.

Q Yeah. But --

A That has occurred.

Q But -- but not in -- in that context.

MS. SWAIN: Objection.

A That's an assumption.

Q All right. Well, you've got her saying he was cursing at her. You've got other employees saying that he was definitely cursing. And it would have only made sense or it -- that he was definitely cursing. Where is it that you have that -- that anybody said that he -- that she -- he

wasn't cursing at her?

MS. SWAIN: Objection.

(Brief pause.)

MS. SWAIN: Is there a question on the table, Ann?

MS. ROBERTSON: Yeah.

Q Where is it that -- in the investigation that anybody said that those curse words were not addressed at her?

MS. SWAIN: Objection.

A This is a statement that they heard curse words. I -- again, their statement states they heard curse words.

Q Yes, sir.

A It did not say where -- who they were directed towards as --

Q But Linda said they were directed at her; right?

A That's Linda's statement, yes, ma'am.

Q Okay. So my question is: Linda said they were directed at her. Other people said they heard him cursing over the

labels and -- and -- and saying things that -- very much in the same context that Linda reported that he said. Where is it in your investigation that -- that anybody said that he didn't direct his curse words at her?

MS. SWAIN: Objection.

A I don't assume any direction of curse words. I take these statements as given and then make my decisions based off of that.

Q So you assumed Linda lied?

MS. SWAIN: Objection.

A There's no assumption in my investigation.

Q Well, you told the -- the -- the lady that there was no -- that he didn't curse at Linda. Linda told you he had cursed at her; right?

MS. SWAIN: Objection.

A That is Linda's statement, yes.

Q Okay. And everybody -- the other witnesses said they heard the curse words;

correct? Where in your investigative information is there anybody saying that what -- that his cursing was not directed at Linda?

MS. SWAIN: Objection.

A These statements are the individual statements.

Q So where did you come up with that conclusion since you had no evidence that the cursing was not at Linda?

A I can only make a decision or a -- an outcome to an investigation based on the facts that are presented to me.

Q Yeah.

A The employees did not specifically say in their statements that the cursing was directed toward Linda. Therefore, I cannot assume that the cursing was directed towards Linda.

Q Nobody --

A I cannot make that assumption.

Q And there -- and -- but you do know that these statements were not --

everybody was -- it was just said write down what you saw or heard. Nobody asked them do you believe that the stuff was addressed to Linda, did they?

A Again, that's an assumption.

Q Well --

A They heard cursing. The cursing is the statement here. It is in the statement. They did heard -- they did hear cursing. I mean, if you follow that line of thinking, Frank's statement does not include that he cursed. The outcome of the investigation is that Frank did curse. He was disciplined for cursing.

Q Okay.

A Therefore, again, following the line of facts, cursing occurred. He was disciplined for cursing. It was not determined in these statements that the cursing was directed towards Linda.

Q On what did you base that decision?

A On the statements given by the

employees.

Q Linda said -- Linda said that the cursing was directed at her. Did you just completely disbelieve her after you had corroborating evidence that there was indeed cursing?

MS. SWAIN: Objection.

A These statements do not say that the cursing was directed at Linda.

Q No, sir. But I'm saying that her statement was that it was directed at her.

A I agree.

Q Did you disbelieve her?

A I believe that her perception was that it was directed at her in her statement, yes.

Q And -- and was there -- was there anybody that had a different perception?

MS. SWAIN: Objection.

A The other employees did not state the cursing was directed towards Linda.

Q They weren't asked, were they?

MS. SWAIN: Objection.

# FREEDOM COURT REPORTING

85

A I don't recall one way or the other.
Q Did you interview Linda Thornton during the investigation of this incident?
A I'm sure I did.
Q When? When did you interview her?
A I don't recall the date. Sometime during the course of the investigation after the initial complaint and before the conclusion.
Q Did you take one of the -- did you take, like, the 13th or 14th off? Were you gone that day?
A Myself?
Q Uh-huh.
A I don't recall.
Q Did you have a child at or about this time, not you but you and your wife?
A My wife did have a child on May 16th, yes.
Q May 16th?
A Yes.

86

Q Do you think you were off during -- on June for something?
A I don't recall being off during this investigation, no.
Q Did -- now that we've discussed it, did -- did Frank Williams specifically deny that he -- or first of all, did Frank Williams admit that he cursed?
MS. SWAIN: I'm going to object. Asked and answered.
A I don't recall if Frank admitted or not.
Q Okay.
A Not from memory. No, I don't recall that.
Q Look at page 54 and start reading -- read that right there (indicating).
A Okay.
MS. SWAIN: Starting with -- here at line 18?
MS. ROBERTSON: Yeah, at or about where that sticker is.

87

(Witness reviewing document.)
A Okay.
Q Do you see where you say that if she returned, she would have been disciplined also?
A Yes, ma'am.
Q What were you going to discipline her for?
A If Linda would have received discipline for that action, more than likely it would have been for general employee conflict.
Q I see. General employee conflict.
A The same type of conflict as documented in previous disciplinary actions, an ongoing issue.
Q So she -- she reports to her supervisor that this -- the convicted child molester is over there pitching a fit, kicking cans -- or excuse me -- throwing cans, dog cussing her, and she was going to be written up for general conflict?

88

MS. SWAIN: Objection.
A Yeah. I'd have -- she did not return to work. There was no disciplinary action issued.
Q Well -- but you told the unemployment compensation lady that if she had come back, she would have been written up; right?
A That is what I said, yes, ma'am.
Q And so -- and -- and so you were -- and on what were you basing that she needed to be written up?
MS. SWAIN: Objection. Asked and answered.
A Again, general -- general conflict. You know, an ongoing issue that's not resolved.
Q So let me see -- get this -- see if I get this right. If Christ is work -- walking along and somebody comes up and starts dog cussing him and reaches out and punches him and this is not the first time he has been punched because some people

didn't agree with him, he would have been -- and he stood there and took it and said, I'm sorry, sir. That would -- he would have been written up for general conflict, too, because he was involved?

MS. SWAIN: Objection. What are you talking about?

MS. ROBERTSON: I'm talking about what would Christ do. He just said if -- if she's involved in the conflict with an employee that she's going to be written up for general conflict. That's incredible and I'm just wanting to make sure I get it straight.

MS. SWAIN: Okay. Well, if you have a question about the case, ask him. We're not going on to what would Christ do in a deposition.

MS. ROBERTSON: Off the record.

(Whereupon, an off-the-record discussion was held.)

Q If somebody is involved in

conflict because their ideas or -- or whatever are not welcomed and somebody pitches a fit and yells at them and curses, stomps on the ground, kicks cans or throws cans, because she's involved, she's also going to get the same discipline?

MS. SWAIN: Objection.

A Any disciplinary actions that would have been taken against Linda would have been based on the facts. If disciplinary had been taken, it would have been based on the fact that she was involved or instigating the conflict, which is a previous disciplinary action showed that Linda was involved in a lot of conflict and lot of -- lot of instigation of conflict.

Q So based -- all right. Page 56, you -- read starting on line 9.

(Witness reviewing document.)

A Okay.

Q All right. Did -- you -- again, you said she was equally at fault in this incident; right?

MS. SWAIN: Objection.

A No, ma'am, I didn't say that.

Q Well, read what you said, please.

A I said they were equally involved in the altercation.

Q Okay.

A They were both involved. They were not necessarily both at fault.

Q But she was going to be written up also. Was she getting some lesser -- was she going to be written up some lesser way than a write-up? I mean, what could be lesser?

A I don't recall Linda ever receiving disciplinary action in this case --

Q Well --

A -- in this specific instance.

Q What you told the unemployment compensation lady was the reason she didn't get written up was because she didn't come back to work. So you couldn't give her the write-up; right? That was the only reason,

at least according to what you told the lady, to keep my client from getting her pennies.

MS. SWAIN: Objection. Is there a question --

THE WITNESS: There's a question, yeah.

Q Yeah. Isn't that what you told -- the only reason she wasn't written up, at least according to you under oath to the unemployment compensation lady, was because she didn't come back to work; right?

A What you're saying is the only reason she didn't get written up is because she didn't come back to work?

Q Isn't that what you said in your testimony, Plaintiff's Exhibit Number 7, page 54, line 20? All right. Let's start at 18. The lady said, Okay. What were the reasons you -- you needed to term -- were -- was there any reason you needed to terminate him? No, ma'am. We disciplined both employees equally as well as she would have

# FREEDOM COURT REPORTING

received disciplinary action had she returned to work that Monday.
So the only reason she didn't return -- that she didn't receive this same discipline was because she didn't come back to work. Isn't that right?
A I didn't say they would receive the same discipline. I said they would be disciplined equally. Both of them would have been addressed and the disciplinary -- if warranted, the disciplinary action would have been issued. There -- it -- it could have been as simple as her receiving a counseling or a discussion or a memo to file. Not necessarily the same disciplinary action, no.
Q We disciplined both employees equally.
A My -- my -- what I mean by discipline them equally is they were both disciplined relevant to the facts equally. One wasn't given harsher discipline and one given less discipline. They were

disciplined equally based on the facts in the case. In other words, there was no preference given to one or the other. That's what I mean by equally.
Q And he received the write-up so she was going to receive a write-up; right?
MS. SWAIN: Objection.
A I -- I don't recall. I believe he received a -- a write-up for his -- you would have to look at the document. I don't recall.
Q For cursing and intimid --
A Okay.
Q -- breaking the policy of intimidating, threatening an employee -- another employee.
MS. SWAIN: Objection.
A I don't recall what the write-up was for. You'd have to show that to me.
Q Okay. I should have known that.
A I prefer to rely on the facts in the statements versus memory.
Q Well, that's -- it's apparent

that that's a good thing given that you have no memory.
MS. SWAIN: Objection. Ann, that's not necessary.
(Plaintiff's Exhibit Number 8 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q While I'm looking for that, look at Plaintiff's Exhibit Number 8. I will ask you a question about that in a minute.
(An off-the-record discussion was held.)
Q While she's making a copy, let's look at Plaintiff's Exhibit Number 8. Can you tell me what this is, please?
A It appears to be a training documentation for Frank Williams.
Q Okay. And do you know what those codes are?
A No, ma'am, I don't.
Q But if -- if Frank Williams had received any sexual harassment training,

there would be something equivalent to this in his personnel file? It appears now that we know that that's where the -- the documentation is kept.
MS. SWAIN: Objection.
A I'm not familiar with this training documentation form at all. This was signed in January after I left in December.
Q Okay.
(Plaintiff's Exhibit Number 9 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's 9, what's that?
A This appears to be a first step counseling for Frank Williams dated June 16th --
Q All right.
A -- for an incident that occurred on 6/14.
Q And it says on June 14th, 2006, you used profanity in the presence of other

# FREEDOM COURT REPORTING

coworkers. This is a violation of plant rule number 16, fighting, threatening, intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property.

Now, does -- now, what was it, now, that you thought that the disciplinary that -- that Linda Thornton was going to receive was going to be for?

MS. SWAIN: I'm going to object to asked and answered at least twice now, maybe three times.

A You know, I don't recall. It would be general conflict or instigational if -- if she received a write-up.

Q Well -- and we have determined, at least under oath you told the lady at the unemployment, that she would have returned one -- a write-up had she returned to work.

A No, ma'am, I didn't. I said they would be disciplined equally, as in one would be disciplined equally.

Q Well, what other -- what other

discipline below a write-up --

A There are -- there are counseling sessions. There are discussions, memos to file.

Q What effect does a write-up -- a written step one counseling form have?

A It's a record of counseling. It's a record of our step process in disciplinary actions.

Q What -- is there anything -- does -- would that have rolled off, as they say, after a year?

A I don't recall the specific rolling off and on period of the disciplinary steps. I believe there was a one-year period that steps would be reduced for -- as specifically written in the documentation in our policy.

Q Well, how many steps do you have to get before you get fired?

MS. SWAIN: Objection.

A I don't recall if it's step three, step four, or what leads to

termination within a certain period of time. It's in the disciplinary policy.

Q So apparently at Flavor House if you paced it right, you could intimidate another employee or interfere with an employee's work about twice a year and not ever get fired; right?

MS. SWAIN: Objection.

Q If you just took your medication sometime --

MS. SWAIN: Objection.

A Well, we follow the disciplinary process, the step process, and it's -- it's a written disciplinary process that's followed for all employees throughout the plant.

Q But if all -- so if all of them only took their medication some of the time, they could get by with pitching a fit once or twice a year and not have -- get fired; right?

MS. SWAIN: Objection.

Q I guess you don't have an answer

to that, which brings up another issue. Did Flavor House have a policy against hiring felons?

MS. SWAIN: Objection. During his employment there what was their policy in regard to hiring convicted --

MS. ROBERTSON: When he was employed there -- all right.

A I don't know of a policy prohibiting the hire of anyone at Flavor House.

Q What about lying? Are you asked if you have been convicted of a felony on the application?

A I would have to look at an application to see what it asks. I don't recall. Over the course of years at Flavor House and business for 18 years, there have been multiple applications so --

Q Well, let -- let's assume without --

A I don't assume.

Q Well, would you please assume for

me and you can take it that there was a policy of asking if a person had been convicted of a felony on the application. Was it -- do you know if it would have been repercussions for not telling the truth about it?

MS. SWAIN: Objection.

A Again, I can't make a speculation or an assumption.

Q Well, you know there was a complaint by my client, do you not, that Frank Williams was a convicted felon?

A I don't recall a complaint about someone's felony status or conviction status.

Q Or that he was a -- either a sex offender or a child molester?

A Again, I don't recall a complaint being filed that someone was a -- a felon or had been convicted of a crime.

Q Well, what -- what -- do you recall anything about that?

A There were statements taken

during investigations about discussions within the plant about Frank's status as a convicted sex offender, yes.

Q Okay. Do you remember how that -- the -- in the context, how that investigation came up?

A I would have to refer back to the statements to find out who initiated that -- that investigation.

Q And, sir, how would you figure that out?

A You should have the statements.

Q Yeah. But I'm asking how -- how can you tell from the statements who initiated the -- the complaint?

A It would be who initially brought the statement in.

Q Well, what if -- and -- and there was some way to -- to denote that on the -- on the statement?

A (No response.)

Q Sir?

A When you read the statements,

you -- you can see who brought the statement is basically someone who's making an accusation, that's generally the person that's bringing the statement or bringing the accusation.

THE VIDEOGRAPHER: Let me go ahead and change tape real quick.

MS. ROBERTSON: All right. let's take a little break.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: Okay. We're back on the record at 11:35. This is the beginning of tape 3.

(Plaintiff's Exhibit Number 11 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q Can you tell me what Plaintiff's Exhibit Number 11 is, please, sir?

MS. ROBERTSON: I'm sorry, Jennifer.

MS. SWAIN: It's okay. Okay.

A This is Linda Thornton's

statement on 2/16.

(Plaintiff's Exhibit Number 12 was marked and attached to the deposition.)

BY MS. ROBERTSON:

Q Okay. Tell me what Plaintiff's Exhibit Number 12 is.

MS. ROBERTSON: Sorry, Jennifer.

A This is Frank Williams' statement of 2/16.

Q All right. Tell me which one of these made a complaint.

A I don't recall which one made the first complaint.

Q Well, I thought you testified before the break that you could tell me by looking at the documents who initiated the complaint. Now, can -- is that still your statement?

MS. SWAIN: Objection.

A I believe I said usually you could tell from the documents that you can -- who initiated the complaint.

Q All right.
A Regardless of who put the complaint in first, it's -- it's a statement about the situation. This is not a complaint, per se. This is a statement of the occurrences.
Q Did you ask Melvin Hutchins to give a statement about anything that -- do you see where Linda references that she had a conversation shortly before with Melvin Hutchins about Frank Williams and issues with the work with him?
MS. SWAIN: Objection.
A I'm sure I would have talked with Frank -- with Melvin Hutchins. Anyone mentioned in the statement I would have discussed, you know, what their involvement or recollection or what was -- what was questioned in the statement. Yes, I would have asked that.
Q Would there be a document form from him?
A There could have been. I don't

recall if there was specifically, no. I don't -- I don't recall that.
Q Do you recall if you followed up with Linda Thornton to find out what the issues that she had discussed with Melvin Hutchins were?
A During the investigation, I'm sure I asked anything relevant to the statement.
Q And do you have any independent memory of that?
A Again, I would have had notes on that. I don't recall from memory.
Q No, sir. I asked you do -- as we sit here today, do you have any independent memory of having a conversation with Linda Thornton about what the issues she's referring to about -- that she had with Melvin Hutchins about Frank Williams?
A I don't rely on memory of specific investigations, no.
Q Well, whether you rely -- you know -- whether you --

A I -- I take -- I take notes based on investigations, and I make determinations based off of those notes.
Q Because, like, I rely on my -- I can remember stuff that we've talked about in depositions that I've taken before even though I have a court reporter that -- so I can rely on what's written down. You know, just by nature, I have -- sometimes my mind absorbs stuff that actually happens to me.
A That's correct.
Q Do you have any independent memory of having a conversation with Linda Thornton about the issues she's referring to that she had discussed with Melvin Hutchins about Frank Williams?
A I recall having multiple conversations with Linda Thornton throughout the course of my employment with Flavor House in regards to multiple issues.
Q Uh-huh.
A Now, to tell you specifically what memory relates to what issue, I can't

rely on my memory for that, no. That's why I have notes.
Q Okay. And where are those notes, sir?
A Again, I've already answered that question. My notes were in my desk drawer when I left Flavor House.
Q Did you maintain a copy of those notes for yourself when you left?
A No, ma'am, I did not.
Q Did you -- did you turn them over to Mary Ann or anybody else when you left?
A No, I did not.
Q Had you turned them over to anyone else who might have been investigating the -- the allegations that Ms. Thornton had made in her EEOC charge?
A I did not turn over notes unless requested by corporate counsel. Any documentation we had was sent to them.
Q I don't want to know whether or not -- you know, the conversations you may or may not have had with corporate counsel.

Did anybody ask you to turn over those notes during the course of an investigation involving my client's EEOC charge? Well, strike that.
Did you turn over any notes that you referred to concerning this investigation that we're talking about now or the one where Ms. Thornton said that Frank was yelling and pitching a fit? Did you turn those over during the time that -- immediately after the EEOC charge came in from Ms. Thornton?
MS. SWAIN: Objection.
A Any request for documentation would have been honored.
Q Okay. Do you recall any -- do you recall turning over any documents to anybody, whether it was corporate counsel or Donald Duck?
A Again, I don't recall specifically what documents were turned over in what case on what dates two years ago. No, I don't.

Q Now, on Plaintiff's Exhibit Number 12, since you can't remember who initiated this conversation concerning Mr. Williams and his felonious past, Plaintiff's 12, it says Jewel -- this is Mr. Williams' statement; correct?
A It appears to be, yes.
Q Jewel Sidely came up to me in the hallway and told me that Linda Thornton was outside telling everyone that I was a child molester and my brother's wife's daughter was my girlfriend. I haven't done a family tree, but that's intriguing. This is harassment and I don't like it. I don't start trouble. What happened 15 years ago is none of her business.
Do you take that as a confession that he is a child molester; he just doesn't like it that my client was talking about it?
MS. SWAIN: Objection.
A I don't take this as a admittance of anything. It's a statement that there was evidently something that occurred 15

years ago. Until I complete an investigation, I don't know what that is.
Q Well, other than that he was a child molester or that his brother's wife's daughter was his girlfriend, what else would he have been saying was none of her business?
MS. SWAIN: Objection.
A Any personal business is not another employee's personal business.
Q You think being a child molester is somebody's -- other -- is -- is their personal business?
MS. SWAIN: Objection.
A It's a matter of public record.
Q Yes. It would be -- at least the State of Alabama takes the position that it's the public's business to -- to know convicted sex offenders; right?
MS. SWAIN: Objection.
A It is a public knowledge, yes.
Q And I -- other -- other than the public -- the State of Alabama makes it a

law that it be public knowledge, it would be those mommas and daddies of those babies he was molesting, wouldn't it?
MS. SWAIN: Objection.
A The discussion of a person's business is not proper workplace discussion. It had no -- no bearing on working at Flavor House, a person's past, a person's personal convictions or anything else. And another employee discussing those openly is a violation of that person's ability to work in a harassment free environment.
Q When you -- did you talk to Mr. Williams about whether or not he had in fact been convicted of child molestation?
A I would have asked Mr. Williams in an investigation anything relevant to this statement, yes.
Q All right. And do you remember what he told you, whether in fact -- whether or not he had been convicted of child molestation?
A I recall there was a discussion

about his past conviction.
Q Okay.
A Specifically what it was, I do not recall other than it was involved in a -- in a either child molestation or some -- some type of sex-related offense.
Q Did he -- did he admit that he had been involved with that?
A He did say there was a past conviction, yes.
Q A conviction?
A I don't recall specifically what the conviction was, no.
Q Did he tell you he had been convicted of forgery and was on probation when he was -- pled guilty to multiple charges of child molestation?
MS. SWAIN: Objection.
MS. ROBERTSON: Look at the probation record. Yeah. He was on probation.
A I don't recall that coming up specifically, no.

Q Did he tell you that he had spent four years of a ten-year sentence in a prison, Kilby I think?
A Again, I don't recall specifically what the conversation was is why I took notes.
Q Did you ask him about that?
A I would have asked anything relevant to the statement that was given.
Q Did he tell you that he was on probation for those convictions of having -- of sodomizing a 10-year-old child --
A I don't recall.
Q -- and having sexual intercourse with a 13-year-old child and a 14-year-old child and a 15-year-old child? Did he tell you that he was on probation when he got the job with Flavor House for those -- that -- those convictions?
MS. SWAIN: Objection.
A I don't recall the issue of probation coming up.
Q Well, what did he tell you that

you told him to go on his merry way?
MS. SWAIN: Objection. He's already answered the question.
A Again, if -- if there was anything additional to add, it would have been in my notes that I took.
Q That's no longer -- nobody knows where they are. They -- somebody -- everybody has forgotten where they were; right?
MS. SWAIN: Objection.
Q And that dust strikes again. Did you ask Frank if he had ever told anybody at the workplace that he had been in prison?
A I don't recall asking Frank specifically if he had been in prison --
Q No, I didn't ask you that.
A -- or if he had told someone he had been in prison. I don't remember the exact conversation we had, again, two years ago.
Q Did you ask him if he had ever told anybody at the workplace that he had

been convicted as a sex offender or a child molester?
A I recall during the conversations that I had with the individuals involved here that some of the discussion was involving who has said what Frank had told individuals, what Linda had told individuals. I don't recall who said specifically I was in prison, I wasn't in prison. I don't recall specifically who said those, no.
Q Well, would it be important to -- to you to know if in fact Frank had been telling people that he had been in prison before and that Frank had told people he had been convicted for child molestation?
A What was the question?
Q Would it have been important in conducting this investigation for you to know whether or not Frank had been telling people the very same things he said she was telling people?
A It would have probably been

# FREEDOM COURT REPORTING

117

relevant as in if he's discussing it, it's open knowledge, yes.

Q Do you know that Frank Williams was still telling people he had been in prison after Linda Thornton was no longer working there?

MS. SWAIN: Objection.

A I don't know what individual conversations Frank would have had with other employees.

Q Do you think it would have been appropriate for him to tell people that but inappropriate for Linda to be -- tell people that?

MS. SWAIN: Objection.

A It's inappropriate for an employee to discuss other employees' past, present, future if it's a derogatory nature.

Q What if they were discussing it in the context about the way they were being treated as a female?

MS. SWAIN: Objection.

A I don't see the relevance of that

118

question. I don't see how that -- redefine your question. Maybe I can answer it better.

Q Do you understand that child molestation is a -- of the opposite sex is, among other things, a -- a sign of complete disrespect for the other sex?

MS. SWAIN: Objection.

A I believe that's your opinion.

Q You don't think -- you don't think that's correct?

MS. SWAIN: Objection.

A I said I believe that's your opinion.

Q No. I'm asking you do you think that. Do you have an opinion?

A I believe that each individual occurrence has to be looked at individually based on the circumstances of that case, a determination made as to why that occurred.

Q Well, sir, tell me, your -- then, your definition of a sexually hostile environment.

119

MS. SWAIN: Objection.

A That could be a multitude of things.

Q Well, are you -- are you understanding or are you familiar with the concept of the totality of the circumstances?

A Yes.

Q That you don't pars the ax, that you don't pars the circumstances, that you take everything as a whole?

A Yes, I do.

MS. SWAIN: Objection.

Q Then why would you have just testified that you take each incident individually?

MS. SWAIN: He's not talk -- you didn't ask him that. When he said that, he wasn't responding to a question about a sexually hostile work environment.

MS. ROBERTSON: I had asked --

MS. SWAIN: You had asked him about child molestation.

120

THE WITNESS: Yes.

Q I had asked you about if -- if she had been talking about him being a child molester in the context of what was happening to her and her belief that he -- I didn't say this, but her belief that he had total disrespect for women, why would you take that out of the context of the other kinds of -- of behavior?

A That wasn't the question you asked.

MS. SWAIN: No.

Q All right. Well, tell me -- now that I've rephrased it, tell me why would you not have taken that?

MS. SWAIN: No, wait, wait. What is the question? Ask it again.

A Ask the question, please.

Q The question is: Did you not think it was important to find out what context that Linda Thornton was saying that Frank Williams had been a child molester and to find out if she was talking about it in

the context of the way she was being treated by Frank Williams?

MS. SWAIN: Objection.

A This investigation involved statements being made, assumed statements being made by Linda, that she was stating that she had been telling people private business, personal business, of Frank's, whether it's public or private. That was what this investigation initiated as, as an investigation based on statements that she was stating that -- private information or personal information.

Q No. Because you don't know who initiated it. She -- she -- she says that she was -- that he was going around telling people that -- that she came up -- that people were being told by her that he was a child molester and she said that was in the context of after the discussion she had had with Melvin Hutchins about the way Frank -- her -- Frank Williams and his conduct on line 3. Right?

MS. SWAIN: Objection.

Q But you don't know what those discussions were --

MS. SWAIN: Objection.

Q -- that she had had with Melvin Hutchins. Do you know that --

MS. SWAIN: Objection. There's no evidence of any discussions.

MS. ROBERTSON: Of course there are.

A Again, I don't -- I don't understand. That's -- I mean, her statement said there were discussions.

Q All right. And did -- and did you know that the discussions were that he was upset because he was having marital problems and he was talking dirty about what was going on with his wife and that he wasn't attending to his work because of -- of his marital problems and that she did not like it and she wanted it to stop? And the next thing you know he's going around saying that she's saying he's a child molester. Do

you know that she told Melvin Hutchins she was concerned about the way he was treating her because he was a child molester?

MS. SWAIN: Objection.

A I can't speak to what discussion she had Melvin Hutchins. You'd have to ask Melvin that.

Q Because you didn't ask Melvin Hutchins and you didn't ask her; right?

MS. SWAIN: Objection.

Q Sir?

A Again, what's the question?

Q Did you ask her what discussions she was referring to in Plaintiff's 11 when she says, Immediately I met with Melvin Hutchins and Chris Jordan with -- about this matter. This is after a previous meeting with Melvin Hutchins on the topic of many concerns with Frank and line three work situation. Did you ask her what she was talking about?

A At the time of the investigation, I probably did. Do I recall that --

Q But you don't have your notes --

A Do I recall that, no.

Q -- and you don't recall it.

A You have to realize, Linda had multiple meetings with multiple people all the time.

Q And --

A This was not a new occurrence for Linda.

Q And she would get in trouble every time she --

A No, she wouldn't.

Q Well, did she --

A We would investigate any allegations that she brought forward and then the correct -- correcting disciplinary actions, if necessary or if warranted, would be taken.

Q Who got in trouble about this child molesting business?

MS. SWAIN: Objection.

Q Didn't you ultimately write her up about it?

A You mean about the discussion of the employee's private --
Q The child molestation.
A -- or personal business?
Q Since when is a convicted -- a felony --
A I said personal business. I corrected myself.
Q A felony conviction is his personal business?
A It is personal to him, yes.
(Plaintiff's Exhibit Number 10 was marked for identification and attached to the deposition.)
BY MS. ROBERTSON:
Q Plaintiff's Exhibit Number 10, look at that. What is that, please, sir?
A This appears to be an employment application for Frank Williams.
Q What in the world is Flavor House asking Frank Williams about his personal business when they ask him has he ever been convicted of a felon?

MS. SWAIN: Objection.
A That's public information -- public conviction -- public conviction record.
Q That's what Linda Thornton was talking about. How is it not personal when she's -- wait -- personal when she's talking about it and not personal when Flavor House is asking him about it?
A It's disruptive to the environment to discuss personal issues in the environment, in -- in the workplace. There's an issue of disruption that it causes to the work force. It's not an issue of public knowledge. It's an issue that it is public knowledge as it is. It's public. But her discussing that is his personal business and it's causing disruption within the work force.
Q What kind of disruption was it causing?
A It can cause loss of productivity. Specifically what did it

cause disruption-wise? Investigations and pulling employees off of lines to do investigations, to discuss allegations. So it does cause a lot of disruption. How you quantify that? Specifically, lost productivity.
Q Anything else?
A Again, how do you want it quantified?
Q Did you happen to check Frank Williams' -- I mean his application, Plaintiff's Exhibit Number 10, when this issue about whether he was a child molester came up?
A I would have probably pulled his personnel file in any investigation that I did --
Q Okay.
A -- with any employee.
Q And what -- did -- what did you read there?
A Relative to?
Q To whether or not he was a

convicted felon.
A He checked yes.
Q Okay. And -- and what did he say he had been convicted of?
A On this application he stated statutory rape.
Q And you understand -- and then what did he say?
A His statement here is my girlfriend was two years younger than me when --
Q When I was 18.
A -- I was 18.
Q Did you do a background check at the time to see if he told you the truth about that?
MS. SWAIN: Objection.
Q Because over here on Plaintiff's -- Plaintiff's 10, see the back -- see the bottom there? It says you -- they're going to do a background check.
A I'm not sure of the policies that

were in place in 2000.
Q No, no, no. Excuse me. Read -- I'm talking about the bottom of the application. You have -- you may not can read it. It's a trial. But see at the very bottom?
A It says, I understand that consideration for employment in this position is contingent upon the results of a reference and a background check.
Q I'm sorry. He has to type it. If you could read it a little slower, please. Slower.
A I understand that consideration for employment in this position is contingent upon a reference and a background check.
Q All right. Does it say anything else?
A I mean, I can read the entire statement, if you'd like me to.
Q Anything to do with the background check or anything about not

telling the truth on the application?
A The first statement, I acknowledge that the information I have supplied is correct to the best of my knowledge and belief without any omission of any kind whatsoever.
Q Up here where it says, I acknowledge that the information that I have supplied is correct to the best of my knowledge and belief without any omissions of any kind whatsoever; I understand that any falsification, misrepresentation, or omission of fact may be grounds for rejection of my application or discharge of any time of my employment, did -- did you -- at the time that there was this issue about whether or not Frank was a child molester -- and apparently -- did you have -- institute a background check to find out if he had completely told the truth about his felony background?
A I did not perform a background check on Frank Williams, no.

Q Why not?
A I did not see the need to based on his five years of employment with the company and his admittance of the charges previously. There was no question as to whether he was guilty or convicted.
Q Of -- of what he said? That's not true, though, what he said. Do you know that --
MS. SWAIN: Objection.
Q -- now?
A I don't know Frank's background. I never ran a background check.
Q Never did anything to find out about it?
A I did not run a background check on Frank based on his acknowledgement that he was convicted previously.
Q Okay. Of child molestation?
MS. SWAIN: Objection.
A I don't recall the specific conviction he stated to me or specifically what's on the form.

Q In Plaintiff's 12, it says, I don't like it -- I don't start trouble. What happened 15 years ago is none of her business. And the -- he says she said that he -- that she was saying he was a child molester. So he admitted to being a child molester?
MS. SWAIN: Objection. You don't need to answer that.
Q Well, let me just -- just for my own edification, would you consider having -- sodomizing a 10-year-old as child molestation?
MS. SWAIN: Objection.
A I'm not a court of law. I'm not going to determine what is or is not a conviction or -- or --
Q No. I didn't ask you was it a conviction. I asked you would you consider your -- if you had a 10-year-old daughter that a 27-year-old man had oral sex with, would you consider that child molestation?
MS. SWAIN: Objection.

A Again, it's not my call. That's my -- I don't write the laws.
Q And you would have no opinion of that as a -- as a father of a child?
A As an opinion, I can give you an opinion, yes.
Q That's what I'm asking for.
A But opinions aren't -- is not the law.
Q Oh. And I -- I didn't remember on your -- on your -- your resume saying got -- that you had gotten a law degree.
A That's correct.
Q And you -- and you just told me --
A And I don't.
Q -- you don't know -- well, then, why would you tell me that your opinion is not the law? I asked you for your own opinion as to whether --
A My opinion is irrelevant. The facts are the facts.
Q Okay. Now -- but do you have an

opinion?
A On what?
Q On whether having oral sex with a 10-year-old is child molestation.
MS. SWAIN: Objection.
A My opinion would -- would be based on the facts determined in an investigation.
Q Assume that Frank Williams pled guilty.
A Again, I'm not assuming anything.
Q Are you refusing to answer my question?
A No, ma'am.
Q Well, then, assume that Frank Williams was convicted of having oral sex with a 10-year-old. Would you, Mr. Tommy Nance, consider that child molestation?
MS. SWAIN: Objection.
A I would abide by what the courts decided. If they convicted him of a specific crime, then that is their opinion as the courts.

Q I'm not asking about what their opinion is. I'm asking your opinion.
A Again, based on the -- an individual situation if I independently evaluated a situation and I had an opinion on it.
Q Okay. Well -- all right. Tell me, sir, circumstances under which having oral sex with a 10-year-old if you're 20 -- over 20 --
MS. SWAIN: Can we take a break?
MS. ROBERTSON: Sure.
THE VIDEOGRAPHER: We're off at 12:05.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. We are back on at 12:14.
MS. ROBERTSON: Is there a question on the table, Mr. court reporter?
(Whereupon, the court reporter read the pending question.)

MS. ROBERTSON: And then he asked --
THE COURT REPORTER: Can we take a break.
MS. ROBERTSON: I kindly let him have a break in the middle of a question.
BY MS. ROBERTSON:
Q Okay. I'll withdraw that question and start over. Tell me, Mr. Nance, under what circumstances can you imagine that it would ever be all right or not child molestation for a 20-something person to have oral sex with a 10-year-old.
MS. SWAIN: Objection.
A I do not believe that child molestation is a good thing, but determination of what child molestation is, again, is a legal issue, the definition of it.
Q Okay. But all I'm asking you is can -- you had said immediately before I let them take a break and take you outside

that -- that you had to look at each individual circumstance and make a decision when I was asking for your opinion, not the laws of -- and you said you had to look at each individual situation. And I want you to tell me, in your wildest imagination can you imagine or can you think of a situation where a 20-something year old having oral sex with a 10-year-old would not be child molestation.

MS. SWAIN: Objection.

A Again, in my opinion, if that occurred, would it be child molestation? I -- I couldn't tell you yes or no, determined on what the court case determines is whether it's declared as child molestation or not.

Q I got you.

(Plaintiff's Exhibit Number 13 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q Tell me what this is, sir.

A This is Linda Thornton's statement from March 1st, '06. It's got a statement of threats being made, comments being made, to another employee.

Q By Frank Williams?

A Linda states that the team leader made -- has told comments against her to another employee.

Q And threats?

A She states very serious comments and threats made, yes.

Q Okay. I just want this to be over with, which I believe is what it would be after last week's meeting with Tommy in HR. These threats and comments were made to an employee in the front office.

Did you receive this? I guess Chris Jordan took the statement. What did you do when you received Plaintiff's Exhibit Number 13?

A Again, form an investigation as usual, question Linda, I'm sure, question the other employee, whoever was mentioned,

the person in the front office.

Q Well, why didn't you get documentation forms from these people?

A Again, if they gave statements, they -- they would have given statements.

Q All right. Well, are there any statements that you can think of that -- that you would have gotten?

MS. SWAIN: Objection.

A I -- I don't have records that were kept. I don't know.

Q Well, would ordinarily Chris Jordan have gone and given the documentation forms to anybody that my client said was a witness?

A A member of management would have given the documentation form and asked for a statement from anyone identified, but they do not have to give a statement.

Q Well, where -- can you think of any place that document -- that statement would be, if not in -- in Linda's file?

A Statements were kept in

individuals' files so I don't know of any other place, no.

(Plaintiff's Exhibit Number 14 was marked for identification and attached to the deposition.)

BY MS. ROBERTSON:

Q Plaintiff's Exhibit Number 14, what is this, sir?

A This is the memo to file, disciplinary action for Linda Thornton related to the February 16th comments.

Q What is the date on it?

A This was issued on March 7th.

Q What, six days after Plaintiff's Exhibit Number 13 came in from Linda Thornton?

A It appears that's when it was signed, yes, when it was issued.

Q Well, tell me how it was that Linda makes a complaint on March the 1st and she ends up getting written up for something that happened in February.

MS. SWAIN: Objection.

A I don't recall the specific time frame for the investigation that occurred. It could have been later due to vacations or absences, due to key people I was talking with. I don't know why the lapse between 2/16 and March 7th. I can't tell you specifically why that occurred, no.
Q Well, it -- it says here in her Plaintiff's Exhibit Number 13 that -- that -- that there had been some meetings with Tommy and HR about this allegation of this child molestation. Do you recall those meetings?
MS. SWAIN: Objection.
A The assumption may be she's referring to the investigative meetings. I -- I don't know what meeting she's referring to.
Q Well, when you said you had determined that -- that she had acted in an inflammatory and -- and I must criticize your English -- I have determined that you acted in a way that was inflammatory and

instigationally. What did she instigate?
A Disruptive behavior.
Q Disruptive behavior which instigated what, Frank making threats?
MS. SWAIN: Objection.
A Linda's discussion of personal business caused conflict in the work force.
Q Did it cause Frank to make her threats?
MS. SWAIN: Objection.
A Again, just the disruptions of the work force is noted. It's --
Q No, no, no, no. She complained that he was making threats about what -- about what he was going to do to her and then --
A Which complaint are you referring to there? Tell me.
Q I'm referring to Plaintiff's Exhibit Number 13. Repeatedly has been told of comments that team leader has made against me after -- one after investigation. Various serious comments and threats made.

She was complaining that Frank was making threats about what he was going to do to her; right?
MS. SWAIN: Objection.
A I don't -- I don't know what those allegations were, what her --
Q You don't remember --
A -- comments were.
Q -- any -- any of -- did you have a conversation with her?
A I investigate every statement that comes in, every documentation form, yes.
Q My question is, did you have a conversation with her after you received Plaintiff's 13 about what kind of threats were being made?
A I don't recall specific conversations I've had about the investigations.
Q I didn't ask you about the specifics. I asked you did you have a conversation.

A We probably did. If a statement was turned in, then there was a follow-up investigation.
Q But you don't remember anything about it?
A That's why I have notes.
Q Which we don't have; is that right?
A (No response.)
Q You don't remember any -- you need to answer out loud for this court reporter.
A There was no answer. The notes aren't here.
Q And you have no memory?
A I don't rely on my memory to differentiate between which specific conversation I had on which specific day over a multitude of a year and multiple conversations but --
Q Well, my -- whether you can remember whether it had anything to do with -- did you ever have a conversation

with Linda about whether Frank was making threats against her?

A I'm sure I did.

Q Okay. And why are you sure you did?

A During the course of the investigation, if she said there are threats being made, I would have questioned her on what those threats were.

Q So you're sure you did but it's not because you remember any conversation, whether it was then or any time. You just are sure you did because she made a complaint and you would have investigated it?

A I would have investigated anything in the statement, yes.

Q Okay. Do you remember what she said the threats were?

A Not from memory, no.

Q Do you remember that he was going around saying he was going to fuck her up if she -- if he lost his job by her saying that

he was a child molester?

MS. SWAIN: Objection.

A I don't recall those specific -- it's not in statements.

Q You have no recollection of -- of her complaining about that?

A No, I do not.

MS. ROBERTSON: That's all I have.

MS. SWAIN: Can we take a short break? I may have a few questions.

THE VIDEOGRAPHER: We're off at 12:34.

(Whereupon, a short break was taken.)

DEPOSITION CONCLUDED

CERTIFICATE

STATE OF ALABAMA:
COUNTY OF BUTLER:

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

RENNY MCNAUGHTON
Certified Court Reporter
License Number: ACCR #:411

FREEDOM COURT REPORTING

**A**

**abide** 134:20
**ability** 112:11
**able** 68:7
**absences** 141:4
**Absolutely** 16:9
**absorbs** 107:10
**ACCR** 147:21
**accusation** 32:23 103:3,5
**accused** 50:15
**acid** 38:10,16
**acknowledge** 130:3,8
**acknowledge...** 131:17
**acted** 141:20,23
**acting** 6:4 35:21
**action** 1:5 39:8 39:10,10,12,14 42:4,5 55:15 59:20 87:10 88:4 90:14 91:15 93:1,11 93:16 140:10 147:16
**actions** 11:17 29:15,17 38:22 70:12 87:16 90:8 98:9 124:17
**acts** 97:4
**ad** 12:19
**add** 115:5
**addition** 57:5
**additional** 30:16 30:17,18 43:14 43:22 44:8 45:16 50:11 115:5
**address** 47:1 49:22 50:19 51:4 70:2
**addressed** 69:17 80:9 83:3 93:10
**addresses** 49:12 49:19 69:6,10 69:13
**admit** 86:8 113:7
**admittance** 110:21 131:4
**admitted** 47:21 48:2 57:18,19 86:11 132:6
**advised** 3:3
**ago** 48:22 109:22 110:15 111:1 115:21 132:3
**agree** 84:12 89:1
**agreed** 2:2,10 8:19 50:22 51:5
**agreed-to** 7:14
**agreeing** 51:6
**agreement** 8:8 9:15
**ahead** 73:10 103:7
**Alabama** 1:2,23 2:8,20 5:8,19 6:2,3,5,9 7:1 8:11 10:12 12:9 111:17,23 147:3
**Alan** 10:1
**allegation** 35:23 44:19 141:11
**allegations** 41:11,14 49:12 51:4 56:9 108:16 124:15 127:3 143:6
**alleged** 35:18
**allowing** 19:14 19:14
**alphabetically** 36:19,20
**altercation** 74:18 91:5
**altercations** 74:17
**amended** 2:21
**Ann** 5:15 7:5 14:4 25:2 58:16 59:22 74:10 80:5 95:3 108:12
**annual** 23:9,10 23:21 26:15,18 27:6 28:4
**answer** 25:23 27:3 31:16,16 31:22 44:15 66:7 73:18 74:15,16,23 77:18 99:23 118:2 132:9 134:12 144:11 144:13
**answered** 28:21 86:10 88:14 97:11 108:5 115:3
**answers** 147:8
**anti** 29:18
**anti-sexual** 22:7 22:20 23:2
**anybody** 32:13 54:21 70:16 71:1 78:5 79:23 80:8 81:4 82:2 84:18 108:12 109:1,18 115:13,23 139:14
**anywise** 147:16
**apparent** 94:23
**apparently** 58:15 72:15 99:3 130:18
**appear** 50:3
**appears** 66:22 95:17 96:2,16 110:7 125:18 140:17
**applicants** 13:17 30:17
**application** 12:20 100:14 100:16 101:3 125:19 127:11 128:5 129:4 130:1,14
**applications** 100:19
**applied** 12:19,22
**appropriate** 70:12 117:12
**approximately** 2:9 6:9
**area** 10:2 76:10
**areas** 18:11,15
**asked** 31:17,20 45:16 47:1 50:19 51:3,10 51:13 60:15 62:9 65:8,12 65:14,15 67:8 70:6 76:13 83:2 84:22 86:10 88:13 97:11 100:12 105:20 106:8 106:14 112:16 114:8 119:21 119:22 120:2 120:11 132:19 133:19 136:1 139:17 143:22
**asking** 25:7 27:11 29:10 51:7 55:13 73:23 74:9 101:2 102:13 115:15 118:15 125:21 126:9 133:7 135:1,2 136:21 137:3
**asks** 100:16
**assign** 2:15
**associates** 97:4
**assume** 35:10 58:6 78:22,23 79:2 81:8 82:18 100:20 100:22,23 134:9,15
**assumed** 81:12 121:5
**assuming** 134:11
**assumption** 78:1 79:16 81:14 82:21 83:5 101:9 141:15
**attached** 17:15 48:18 52:13 66:13 67:19 68:20 73:1 95:7 96:13 103:15 104:3 125:14 137:21 140:5
**attending** 122:19
**attention** 73:8
**auntie** 9:9
**automobile** 12:5 12:5
**automotive** 11:9 12:6
**avoided** 70:1
**aware** 26:6 33:16 47:2 53:3 54:23 55:3

**ax** 119:9
**a.m** 2:9 6:10,21 48:15 72:21

**B**

**B** 4:5
**babies** 112:2
**back** 12:10 19:6 19:16 48:15 65:9,10,13 72:21 76:11 88:7 91:22 92:12,15 93:5 102:7 103:12 128:20 135:17
**background** 128:14,21 129:10,16,23 130:19,21,22 131:12,13,16
**bad** 58:15 76:10
**bag** 35:19
**baiting** 71:18 72:4
**Baker** 5:4
**balance** 65:7
**banner** 32:12
**base** 83:21
**based** 59:16 81:10 82:12 90:10,12,17 94:1 107:1,3 118:19 121:11 131:2,17 134:7 135:3
**basically** 19:13 46:16 103:2
**basing** 88:11
**basket** 61:19
**baskets** 61:9,10 61:18,20,22 62:3
**bearing** 112:7
**Bearman** 5:4
**beginning** 48:14 103:13
**begins** 6:15
**behavior** 120:9 142:2,3
**belief** 120:5,6 130:5,10
**believe** 24:13 37:4 40:9 49:2 53:1,5 57:15 61:23 63:3,18 64:9 77:10,10 83:3 84:14 94:8 98:15 104:21 118:9 118:13,17 136:16 138:13
**benefits** 12:16
**Berkowitz** 5:5
**best** 130:4,9
**better** 7:18,19 118:3
**beyond** 65:7
**bill** 64:7,9,20 65:2,10,11,14 65:16,19
**bimonthly** 20:12
**Birmingham** 5:8 5:19
**Blow** 37:9 38:9 39:23 40:4,22 43:3,3
**blue** 73:19
**Bobbie** 2:7 6:8 6:23
**bottom** 128:20 129:3,6
**Box** 5:12
**Boyer** 14:4 59:22
**brake** 12:6
**break** 48:9,12 48:22 72:18,19 103:9,10 104:16 135:11 135:15 136:4,6 136:23 146:11 146:14
**breaking** 94:14
**Brief** 49:1 73:20 80:3
**bring** 33:20 43:20 57:4
**bringing** 32:23 33:15,17 40:15 45:19 46:19 103:4,4
**brings** 100:1
**broadcast** 33:6
**brother's** 110:11 111:4
**brought** 32:17 35:15 102:16 103:1 124:15
**Building** 5:17
**bunch** 8:14
**business** 15:23 100:18 110:16 111:7,9,10,13 111:18 112:6 121:8,8 124:20 125:4,7,10,22 126:18 132:4 142:7
**BUTLER** 147:4

**C**

**C** 5:1,15
**Caldwell** 5:4
**call** 13:10 133:1
**called** 15:22 56:22 70:22,23 74:14 75:18
**calling** 75:2,13
**candidates** 13:17
**cans** 35:19 46:6 47:14 49:8 50:17 54:3 67:3,10,14 71:20 87:21,22 90:4,5
**card** 64:7,8,10 65:5 66:10
**cards** 60:17 61:6 61:7 62:4 63:16,17
**career** 24:6
**Carol** 40:2
**case** 6:19 35:18 47:8,9,11,12 58:15 89:16 91:16 94:2 109:22 118:19 137:15
**cause** 6:11 126:22 127:1,4 142:8 147:17
**caused** 12:8 72:5 142:7
**causes** 126:14
**causing** 126:18 126:21
**certain** 46:20 99:1
**CERTIFICA...** 147:1
**Certified** 147:20
**certify** 6:4 147:6 147:14
**CF** 10:20,20
**change** 103:7
**changes** 8:2
**characterizati...** 71:22 72:7
**charge** 13:16 26:2 53:23 54:10 55:9,16 108:17 109:3 109:11
**charges** 66:9 113:17 131:4
**check** 27:15 28:7 127:10 128:14,22 129:10,17,23 130:19,23 131:13,16
**checked** 27:23 128:2
**child** 85:18,20 87:19 101:17 110:10,18 111:4,11 112:15,21 113:5,17 114:12,15,16 114:16 116:1 116:16 118:4 119:23 120:3 120:22 121:19 122:23 123:3 124:20 125:3 127:13 130:17 131:19 132:5,6 132:12,22 133:4 134:4,18 136:13,16,18 137:9,13,16 141:12 146:1
**Childs** 5:16
**choice** 8:4
**Chris** 123:16 138:17 139:12
**Christ** 88:19 89:9,17
**Christmastime** 60:18
**chronological** 37:5
**chronologically** 42:22
**Chrysler** 12:7
**circumstance** 137:2
**circumstances**

22:19 118:19 119:7,10 135:8 136:11
**Civil** 1:5 2:20 6:6
**claim** 32:18 33:7 33:8
**Clark** 5:9
**classes** 11:23 20:18,20,21 21:7
**cleaned** 76:11
**client** 71:8 92:2 101:11 110:19 139:14
**client's** 109:3
**closed** 11:5 12:2 12:11
**codes** 95:20
**coercing** 97:3
**collaborative** 59:17
**collect** 30:16,20 32:2 33:10
**collected** 30:9 30:12
**collection** 45:4
**come** 31:4 32:14 57:1 75:6,7 82:8 88:7 91:21 92:12,15 93:5
**comes** 53:17 88:20 143:12
**comfortable** 31:12
**coming** 66:9 113:22 114:22
**commencing** 2:9 6:9
**comments** 75:8 138:3,7,10,15 140:11 142:21 142:23 143:8
**Commissioner** 1:20 6:4
**companies** 12:15 29:6
**company** 64:12 66:10 97:5 131:4
**compensation** 71:7 73:6,22 88:6 91:20 92:11
**complain** 74:13
**complainant** 39:4
**complained** 38:9 40:22 46:5 142:13
**complaining** 143:1 146:6
**complaint** 29:20 30:5 31:3 32:5 32:13 33:13,15 33:17 34:3,5 35:3,6,11,15 36:20 37:8,13 37:19 39:7,22 40:16 45:19 46:19 73:16 74:21 85:10 101:11,13,18 102:15 104:12 104:14,18,23 105:3,5 140:20 142:17 145:14
**complaints** 40:23 53:10
**complement** 19:10
**complete** 16:14 45:1 111:1 118:6
**completed** 62:17
**completely** 84:4 130:20
**computer-aided** 147:10
**concept** 119:6
**concerned** 123:2
**concerning** 51:18 56:7,13 63:16 71:2 109:6 110:3
**concerns** 123:19
**concluded** 50:9 146:15
**conclusion** 82:9 85:11
**conclusive** 63:20
**conduct** 121:22
**conducting** 116:19
**confession** 110:17
**conflict** 87:12,14 87:15,23 88:16 89:4,10,12 90:1,13,15,16 97:14 142:7
**consider** 132:11 132:19,22 134:18
**consideration** 129:8,14
**context** 73:10 78:14 79:14 81:2 102:5 117:20 120:4,8 120:21 121:1 121:20
**contingent** 129:9,16
**continually** 49:6
**conversation** 51:23 56:5,6,7 66:6 78:15 105:10 106:16 107:13 110:3 114:5 115:20
143:10,15,23 144:18,23 145:11
**conversations** 52:9 66:2 107:18 108:22 116:3 117:9 143:19 144:20
**convicted** 87:19 100:6,13 101:3 101:12,20 102:3 111:19 112:15,21 113:15 116:1 116:16 125:5 125:23 128:1,4 131:6,18 134:16,21
**conviction** 101:14 113:1 113:10,11,13 125:9 126:3,3 131:22 132:17 132:19
**convictions** 112:9 114:11 114:19
**Cook** 68:23 69:1 69:6 76:8
**copy** 16:2 39:19 41:15 53:5 95:14 108:8
**corporate** 53:11 53:14 55:17 108:19,23 109:18
**correct** 18:12,13 25:10 33:14 51:17 75:20 82:1 107:11 110:6 118:11 124:16 130:4,9 133:13 147:11
**corrected** 125:8
**correcting** 124:16
**corridor** 63:19
**corroborating** 84:5
**counsel** 2:4,12 2:14 5:10 6:7 7:3 21:3 53:11 53:15 55:18 108:19,23 109:18 147:15
**counseling** 93:14 96:17 98:2,6,7
**count** 19:2
**COUNTY** 147:4
**couple** 12:14
**course** 22:7 43:20 69:13 85:9 100:17 107:19 109:2 122:9 145:6
**courses** 24:4,5,5 26:20
**court** 1:1 2:6 3:4 3:5 6:1 7:2,10 8:21 10:6 107:7 132:15 135:19,21 136:3 137:15 144:11 147:20
**courts** 134:20,23
**coworkers** 97:1
**credit** 64:6,8,10 65:5 66:10
**crime** 101:20 134:22
**criticize** 141:21
**Crook** 2:7 6:8 6:23
**current** 65:5
**curse** 57:18 58:4 76:14 78:19 79:10 80:9,12

81:18,23 83:13
**cursed** 35:19 46:6 49:16 76:23 77:12 81:19 83:12 86:8
**curses** 90:3
**cursing** 47:15 49:7,13,21 50:16 54:3 57:12 69:12 71:19 75:1,15 76:7 77:5,11 77:11 78:9 79:18,20,22 80:1,23 82:3 82:10,17,18 83:7,7,10,14 83:17,18,20 84:3,6,9,21 94:12
**cussing** 87:22 88:21

D

**D** 1:21 2:5,21 4:1 6:1,19
**daddies** 112:2
**damn** 68:8 69:12 77:14,16 78:11 79:4
**database** 13:17
**date** 6:5 36:23 37:4,5 51:19 52:20 61:16 85:8 140:12
**dated** 96:17
**dates** 109:22
**daughter** 110:11 111:5 132:20
**day** 2:8 3:1 6:10 14:15 85:14 144:18
**days** 140:14
**December** 22:3 23:17 40:22 61:17 96:9
**decide** 26:10 30:22 31:6 32:7,11 50:6
**decided** 31:19 134:21
**decision** 57:6 59:14,17 82:11 83:22 137:2
**decisions** 38:21 81:10
**declared** 137:16
**defendant** 5:2 7:8 52:20
**Defendant(s)** 1:12
**definitely** 79:20 79:21
**definition** 118:22 136:19
**degree** 133:12
**delegated** 20:3
**delivering** 2:22
**denied** 50:23 51:5 57:22 58:1
**denies** 49:20
**denote** 102:19
**deny** 49:19 86:7
**Depending** 20:22
**deponents** 58:14
**deposition** 1:14 2:4,17 6:16,22 8:1 9:13 17:15 48:18 52:13 66:13 67:19 68:20 73:1 89:18 95:7 96:13 103:16 104:4 125:14 137:21 140:5 146:15 147:7
**depositions** 107:6
**derogatory** 74:14 75:8 117:18
**Describe** 51:15
**describes** 67:4
**describing** 49:6 73:11
**description** 15:12,17,20,22 18:4
**desk** 36:12,15 37:1,10 54:18 54:22 55:6 56:12 108:6
**determination** 118:20 136:18
**determinations** 107:2
**determine** 50:12 75:22 132:16
**determined** 43:9 60:11 83:19 97:16 134:7 137:15 141:20 141:22
**determines** 137:15
**development** 11:3,11 15:23
**different** 13:10 29:7 43:23 84:18
**differentiate** 144:17
**direct** 73:8 81:5
**directed** 77:6 78:19,23 80:16 80:17,22 82:3 82:17,19 83:20 84:3,9,11,15 84:21
**directing** 77:19
**direction** 47:6 53:14 55:17 81:8
**directly** 31:4
**dirty** 122:17
**disappeared** 72:15
**disbelieve** 84:4 84:13
**discharge** 130:14
**disciplinary** 11:17 29:15,16 38:22 70:12 87:16 88:3 90:8,11,14 91:15 93:1,10 93:11,15 97:7 98:9,15 99:2 99:12,14 124:16 140:10
**discipline** 70:9 87:7,10 90:6 93:4,8,20,22 93:23 98:1
**disciplined** 83:14,18 87:5 92:22 93:9,17 93:21 94:1 97:21,22
**discovered** 61:10
**discuss** 18:15 117:17 126:11 127:3
**discussed** 54:1 86:5 105:17 106:5 107:15
**discussing** 112:10 117:1 117:19 126:17
**discussion** 56:19 58:22 65:17 89:21 93:14 95:13 112:5,6 112:23 116:5 121:20 123:5 125:1 142:6
**discussions** 98:3 102:1 122:3,8 122:13,15 123:13
**disrespect** 118:7 120:7
**disruption** 126:13,18,20 127:4
**disruptions** 142:11
**disruption-wise** 127:1
**disruptive** 126:10 142:2,3
**district** 1:1,2 8:10
**DIVISION** 1:3
**document** 16:11 16:12,23 17:11 17:18 43:12 53:22 68:6 72:12 87:1 90:19 94:10 105:21 139:21
**documentation** 25:9 37:13 57:15 59:6 70:22,23 95:18 96:4,7 98:18 108:20 109:14 139:3,13,17 143:12
**documented** 87:16
**documents** 30:9 30:11,13,21 32:2,2 33:11 48:9 53:18

71:4 104:17,22 109:17,21
**Doe** 40:2
**Doe's** 40:6
**dog** 87:22 88:21
**doing** 10:13,15 34:18 47:22 68:11 69:7
**dollars** 62:6
**Donald** 109:19
**Donelson** 5:4
**door** 9:6
**Dothan** 1:23 2:8 6:8 7:1 10:3 13:3,23 19:9 52:22
**draw** 63:13
**drawer** 37:1 108:6
**drawings** 61:21
**Duck** 109:19
**due** 141:3,4
**dust** 115:12
**duties** 11:8,10 11:13 15:14,17 15:19 17:23 18:1,22

E

**E** 4:1,5 5:1,1
**edification** 132:11
**EEOC** 108:17 109:3,11
**effect** 72:4 98:5
**effective** 2:21
**eight** 10:18
**either** 33:15 34:14 37:3 40:14 42:21 70:1 101:16 113:5
**employed** 100:8
**employee** 11:19 19:2 20:2 62:20 87:11,13 89:11 94:15,16 99:5 112:10 117:17 127:19 138:4,8,16,23
**employees** 11:16 19:5,7,10,20 60:19 62:1 75:6,11 79:10 79:19 82:15 84:1,20 92:23 93:17 99:15 117:10,17 127:2
**employee's** 99:6 111:10 125:2
**employment** 61:17 65:2 100:5 107:19 125:18 129:8 129:15 130:15 131:3
**encompassing** 18:3
**ends** 140:21
**English** 141:22
**ensure** 28:1
**entail** 11:13,13
**entire** 16:12 26:21 40:16 129:20
**environment** 112:12 118:23 119:20 126:11 126:12
**equally** 90:22 91:4 92:23 93:9,18,20,21 94:1,4 97:21 97:22
**equivalent** 96:1
**etcetera** 68:11 68:11,12,13,13 68:14
**evaluated** 135:5
**evaluation** 12:15
**evaluations** 12:16,16
**events** 46:22
**everybody** 42:19 81:22 83:1 115:9
**evidence** 2:17 63:20 82:9 84:5 122:8
**evidently** 110:23
**exact** 76:14 115:20
**exactly** 11:22 14:16 63:4
**examination** 4:2 6:12 9:21
**excuse** 9:18 16:11 40:1 58:18 87:21 129:2
**exhibit** 17:13,17 48:16,20 52:11 52:16 53:3 56:2 66:11,15 67:4,17,21 68:18,22 72:22 73:4 92:17 95:5,10,15 96:11 103:14 103:19 104:2,7 110:1 125:12 125:16 127:12 137:19 138:19 140:3,7,15 141:9 142:20
**exhibits** 3:2
**existed** 53:4
**expected** 50:18
**expenses** 64:16
**experience** 24:2
**explain** 28:22
**explanation** 51:6
**expound** 68:13
**extra** 61:11

F

**F** 5:3 68:5 69:7 69:11 77:13
**face** 14:18,18,20 14:20 38:10
**face-to-face** 13:2 13:20,22
**facility** 11:1,10 11:14
**fact** 69:10 90:12 112:15,20 116:13 130:13
**facts** 82:13 83:17 90:10 93:21 94:1,21 133:22,22 134:7
**falsification** 130:12
**familiar** 96:6 119:5
**family** 110:12
**fashion** 42:19
**father** 133:4
**fault** 90:22 91:8
**February** 140:11,22
**feel** 8:2
**fellow** 97:4
**felon** 101:12,19 125:23 128:1
**felonious** 110:4
**felons** 100:3
**felony** 100:13 101:3,14 125:6 125:9 130:20
**female** 117:21
**Festival** 61:21
**field** 20:23
**fighting** 97:2
**figure** 102:10
**file** 24:17 25:3,9 25:11,19 26:7 26:8 28:13 29:1 34:14 36:14,15 37:16 37:20 39:1,4,9 39:20 40:7,19 41:16 42:8,23 44:3,6,10 93:15 96:2 98:4 127:16 139:22 140:9
**filed** 3:5 26:6,7,9 36:11 37:18 42:21 54:18 101:19
**files** 24:22 29:5 29:7 39:15 40:10,12,14 41:5 140:1
**filled** 19:16
**final** 73:15 74:20
**find** 27:7 69:23 102:8 106:4 120:20,23 130:19 131:14
**fine** 7:12,16 66:21
**finish** 14:22
**fired** 61:14 98:20 99:7,20
**first** 61:17 73:7 86:7 88:22 96:16 104:14 105:3 130:2
**fit** 46:7 72:5 87:20 90:3 99:19 109:9
**five** 14:5,16 131:3
**Flavor** 1:10 6:18

7:8 12:18 13:9 13:10,12 18:12 18:22 19:9,22 22:21 23:3 24:8 29:8 34:18 38:6 52:22 55:9 60:14 61:4 62:12 64:7,18 99:3 100:2,10 100:17 107:19 108:7 112:7 114:18 125:20 126:8
**Florida** 10:22
**follow** 83:10 99:12
**followed** 99:15 106:3
**following** 6:12 83:16
**follow-up** 144:2
**force** 126:14,19 142:7,12
**foregoing** 6:6 147:7,11
**forgery** 113:15
**forget** 13:6 14:9
**forgotten** 115:9
**form** 2:13 44:23 46:13 70:22,23 96:7 98:6 105:21 131:23 138:21 139:17 143:12
**formal** 73:16 74:21
**forms** 139:3,14
**forward** 35:15 53:11 75:6 124:15
**four** 14:5 16:17 61:23 98:23 114:2
**frame** 141:2
**Frank** 35:18 46:15 47:9,13 47:18 50:14,15 51:11 52:1 56:1 68:5 69:7 69:11 71:18 76:13,13 77:13 83:13 86:6,7 86:11 95:18,22 96:17 101:12 104:9 105:11 105:15 106:19 107:16 109:8 115:13,15 116:6,13,15,20 117:3,9 120:22 121:2,21,22 123:19 125:19 125:21 127:10 130:17,23 131:17 134:9 134:15 138:5 142:4,8 143:1 145:1
**Franklin** 6:19
**Frank's** 49:2,15 67:5 83:11 102:2 121:8 131:12
**free** 112:12
**Freedom** 7:2
**freelance** 10:15 10:16
**freelanced** 12:13
**front** 61:8 70:18 138:16 139:1
**FTE** 19:1
**fuck** 77:9 145:22
**full** 14:15 19:9
**full-time** 19:1,10
**further** 2:10 147:14
**future** 117:18

G

**Gadsden** 10:11 12:9
**gather** 44:12
**GD** 75:3
**general** 11:10,13 11:20 15:17 19:12,18 20:1 20:9 21:6 59:18 87:11,13 87:23 88:15,15 89:4,12 97:14
**generally** 46:6 103:3
**getting** 46:3 91:10 92:2 140:21
**gift** 60:17 61:6,7 61:9,18,19,20 61:22 62:3,4 63:16,17
**girlfriend** 110:12 111:5 128:10
**gist** 51:21
**give** 16:1 18:20 23:23 31:20 32:14 44:8,23 46:21 91:22 105:8 133:5 139:19
**given** 44:23 47:6 51:12 62:1,9 62:14 63:1,11 81:10 83:23 93:22,23 94:3 95:1 114:9 139:5,13,17 147:12
**gives** 32:11
**GM** 12:7
**go** 9:6 12:8 18:23 28:4 29:16 39:15 40:6 44:12 45:20 60:18 72:13 103:6 115:1
**goal** 17:10
**goals** 15:23 18:2 19:1
**going** 8:20 23:5 67:15 71:8 77:20 86:9 87:7,22 89:11 89:17 90:6 91:9,11 94:6 97:8,9,10 121:16 122:18 122:22 128:21 132:16 142:15 143:2 145:21 145:22
**Gomma** 10:20 10:20
**good** 31:15 95:1 136:17
**gotten** 133:12 139:8
**grandmother** 79:6
**Greenville** 6:2
**grievance** 35:11
**ground** 90:4
**grounds** 2:15 130:13
**group** 14:1,1 15:1,2 22:22
**guess** 62:7 99:23 138:17
**guilty** 113:16 131:6 134:10
**G-O-M-M-A** 10:20

H

**H** 4:5
**half** 10:9
**hallway** 110:9
**handbook** 62:20
**hands** 76:16
**happen** 33:22 40:5 46:17 61:12 127:10
**happened** 12:22 15:5 42:2,13 47:3,7 50:2 110:15 132:3 140:22
**happening** 120:5
**happens** 107:10
**happy** 72:13
**harassment** 21:16 22:7,7 22:20 23:2,4 24:9,14 29:19 31:4,9 32:13 32:18 33:7,8 35:2,6,12 39:23 40:4 95:23 110:14 112:12
**harsher** 93:22
**head** 13:15
**hear** 75:13,15,17 75:17 77:5,9 77:13 83:9
**heard** 46:9,10 68:5 75:14 77:4 78:6,9,10 80:12,13,23 81:23 83:2,7,9
**hearing** 71:7,13 73:6 147:13
**held** 56:20 58:23 89:22 95:13
**help** 16:15 18:14 18:18 57:6 59:4
**helps** 17:22
**hire** 19:6 100:10

**hired** 19:6
**hiring** 11:10,16 15:18 100:2,6
**hold** 32:12
**Holdings** 5:11
**hollering** 50:17
**hometown** 12:10
**honored** 109:15
**Horace** 52:23
**hostile** 118:22 119:20
**hourly** 19:19
**House** 1:10 6:18 7:8 12:18 13:9 13:11,12 18:12 18:22 19:9,22 22:21 23:3 24:8 29:8 34:19 38:6 52:22 55:9 60:14 61:4 62:12 64:7,18 99:3 100:2,11 100:18 107:20 108:7 112:8 114:18 125:20 126:8
**HR** 10:15 11:10 11:13 15:15,17 18:12 29:5 55:1 64:15 138:15 141:11
**Huh** 16:5
**Human** 11:2 15:10
**Hutchins** 14:10 105:7,11,15 106:6,19 107:15 121:21 122:6 123:1,6 123:9,16,18
**hypothetically** 34:17

**I**

**idea** 27:16
**ideas** 90:1
**identification** 17:14 48:17 52:12 66:12 67:18 68:19 72:23 95:6 96:12 125:13 137:20 140:4
**identified** 33:14 36:5 45:17 139:18
**identify** 7:3
**Ignore** 76:17
**imaginary** 79:6
**imagination** 137:6
**imagine** 136:12 137:7
**immediately** 109:11 123:15 136:22
**implied** 61:1,3
**important** 60:7 116:12,18 120:20
**inaccurate** 43:5
**inappropriate** 117:13,16
**incident** 23:11 37:2 40:11 47:3,12 49:5 49:10 51:15,18 52:8 54:2,13 56:11 66:23 67:3 71:3,10 73:12 76:3 85:4 90:23 96:20 119:15
**incidents** 76:4
**include** 32:3 33:11 83:11
**included** 56:8,11
**incomplete** 43:5 43:7,9
**inconclusive** 40:3
**incorrect** 43:4
**incredible** 89:13
**independent** 56:1 106:10,15 107:12
**independently** 135:4
**indicate** 24:17
**indicating** 86:18
**individual** 14:19 22:22 28:1,13 40:9,10,12,18 40:19 52:9 82:7 117:8 118:17 135:4 137:2,5
**individually** 14:21 26:7 118:18 119:16
**individuals** 25:2 30:10,15 32:21 34:7,9 56:4 70:7 116:4,7,8 140:1
**individual's** 37:21
**inflammatory** 141:21,23
**inform** 45:10
**information** 30:17 43:22,23 45:7 71:2 82:2 121:12,13 126:2 130:3,8
**initial** 43:18 44:5 85:10
**initially** 13:5 40:15 102:16
**initiated** 102:8 102:15 104:17 104:23 110:3 121:10,15
**instance** 23:12 35:17 42:3 46:4 49:13 91:18
**instances** 41:22 41:22 42:4 79:9
**instigate** 142:1
**instigated** 142:4
**instigating** 90:13
**instigation** 90:16
**instigational** 97:14
**instigationally** 142:1
**institute** 130:18
**institutional** 37:8,23 38:2 38:11 39:3
**intercourse** 114:14
**interested** 147:16
**interfere** 99:5
**interfering** 97:3
**interview** 13:4,6 13:19,22,23 14:6,18 30:17 32:21 34:6 35:22 56:23 68:1,2,14 85:3 85:6
**interviewed** 13:1 35:4 36:4 42:14 43:8 56:15 71:1
**interviewing** 11:15 43:21 69:1
**interviews** 13:1 13:2,2 14:15 15:1,3 34:9 60:2
**intimid** 94:12
**intimidate** 99:4
**intimidating** 94:15 97:3
**intriguing** 110:13
**investigate** 29:18,18 33:3 34:2,5 124:14 143:11
**investigated** 30:10 31:13 35:13,16 56:3 145:14,16
**investigating** 30:5 35:2 108:16
**investigation** 30:19 36:17 38:18,20 44:1 49:4 50:9,13 52:10 54:13,17 55:8,12,20 56:9 57:3 59:16 60:3,6,9 60:12 63:15 67:12 68:3 70:11,16 73:11 73:15 74:20 75:11 80:8 81:4,15 82:12 83:13 85:4,10 86:4 102:6,9 106:7 109:2,6 111:2 112:17 116:19 121:4 121:10,11 123:22 127:16 134:8 138:21 141:2 142:22 144:3 145:7

**investigations** 42:23 102:1 106:21 107:2 127:1,3 143:20
**investigative** 43:17 60:6 82:1 141:16
**involuntarily** 63:7,9,10
**involved** 23:12 30:15 32:21 35:22 39:10 47:10 75:11 76:6 89:5,10 89:23 90:5,12 90:15 91:4,7 113:4,8 116:4 121:4
**involvement** 105:17
**involving** 47:9 51:15 54:2 71:9 109:3 116:6
**irregularities** 65:18 66:3
**irrelevant** 133:21
**issuance** 62:19
**issue** 69:17 70:1 87:17 88:16 100:1 107:23 114:21 126:13 126:14,15 127:13 130:16 136:19
**issued** 88:4 93:12 140:13 140:18
**issues** 50:20 105:11 106:5 106:17 107:14 107:20 126:11
**issuing** 11:17

**J**

**J** 5:9
**Jacksonville** 10:22 12:9
**Jane** 40:2,5 45:20,20
**January** 96:8
**Jennifer** 5:3 7:7 66:18 103:21 104:8
**Jewel** 110:5,8
**job** 12:17 15:6 15:11,17,20,21 17:23 18:1,3 18:21 114:18 145:23
**jobs** 29:4
**Joe** 37:9 38:9 39:23 40:4,4 40:22 43:2,3
**Joey** 7:1
**John** 45:19,20
**Jones** 69:8
**Jordan** 123:16 138:18 139:13
**Jr** 6:19
**June** 1:22 2:8 3:1 6:10,21 49:10 54:5 66:23 86:2 96:18,22
**jury** 8:16 9:9

**K**

**Katherine** 68:1 69:8
**keep** 19:5,5 36:10,19 73:18 92:2
**keeping** 19:9 26:2
**kept** 24:21 25:1 25:5,11,18,18 25:20 27:17,20 28:11,13 34:14 35:1 37:5 40:18 96:4 139:11,23
**key** 141:4
**kicking** 87:21
**kicks** 90:4
**Kilby** 114:3
**kin** 147:15
**kind** 19:21 20:10 22:14,17 22:17 26:11 35:10,11 47:10 126:20 130:6 130:11 143:16
**kindly** 136:5
**kinds** 120:9
**knew** 32:4 33:4
**knock** 9:6
**know** 9:7 13:13 19:11 20:5 25:22,23 26:12 27:3,12 28:14 31:22 35:21 38:10 40:23 42:12,16 43:6 44:15,20 46:7 46:8 47:14 54:23 55:2,5 60:22 67:12 72:1 76:15 82:23 88:16 95:19 96:3 97:13 100:9 101:4,10 105:17 106:23 107:8 108:21 108:22 111:2 111:18 116:13 116:20 117:3,8 121:14 122:2,6 122:15,22 123:1 131:8,12 133:17 139:11 140:1 141:5,17 143:5
**knowledge** 33:13 56:1 65:20 66:4,6 111:21 112:1 117:2 126:15 126:16 130:5 130:10
**known** 94:20
**knows** 115:7
**Kress** 5:17

**L**

**L** 2:1
**label** 76:8
**labels** 76:10 81:1
**lady** 73:22 78:6 81:17 88:6 91:20 92:2,11 92:19 97:17
**lapse** 141:5
**Large** 2:7 6:4
**law** 112:1 132:15 133:9 133:12,19
**laws** 133:2 137:4
**lawyers** 8:7
**lead** 41:23
**leader** 138:6 142:21
**leading** 2:13 63:19
**leads** 98:23
**learned** 43:23 57:8 60:5,8
**leave** 11:4 60:13 60:15 62:10 64:6
**left** 40:21 61:4 61:16 62:1 65:2,6 76:12 96:8 108:7,9 108:12
**legal** 136:19
**length** 54:2
**lesser** 91:10,11 91:13
**let's** 19:3,3 35:10 37:9 48:8 72:17 74:11,23 92:18 95:14 100:20 103:8
**License** 147:21
**lied** 58:4 70:1 81:12
**Linda** 1:6 5:20 6:17 7:6 35:18 46:14 47:9 50:15 51:16 54:6,10 71:8 73:6 76:11,15 77:6,22 78:15 78:19 80:17,21 81:3,12,18,18 82:4,10,17,19 83:4,20 84:2,2 84:9,21 85:3 87:9 90:9,15 91:14 97:8 103:23 105:9 106:4,16 107:13,18 110:9 116:7 117:5,13 120:21 121:6 124:4,9 126:5 138:1,6,22 140:10,15,20 145:1
**Linda's** 66:22 80:19 81:21 139:22 142:6
**line** 45:6 74:13 83:10,17 86:21 90:18 92:18

FREEDOM COURT REPORTING

121:23 123:19
**lines** 12:6 127:2
**list** 8:22
**listed** 23:10 26:19
**litigation** 54:14
**little** 18:20 73:19 103:9 129:12
**live** 9:2 10:2,5 10:10
**lived** 10:7
**LLC** 5:16
**locked** 64:4
**logistics** 14:8
**long** 10:7,16 11:6 19:15 61:14 68:1 69:9,10
**longer** 38:5,6 115:7 117:5
**look** 11:21 16:3 16:7 17:19 28:8 35:7 52:17 53:23 86:16 94:10 95:9,15 100:15 113:19 125:17 137:1,4
**looked** 118:18
**looking** 68:6 95:9 104:17
**looks** 16:22 18:9
**loss** 58:13 126:22
**lost** 127:5 145:23
**lot** 68:11 69:7 90:15,16,16 127:4
**loud** 144:11
**Louis** 5:13
**lying** 100:12

M

**machine** 76:9,9
**maiden** 73:16
**maintain** 19:1 44:2 108:8
**maintained** 42:18,20 44:6 44:9
**making** 19:16 41:8 75:8 95:14 103:2 142:4,14 143:2 145:1
**man** 9:7 132:21
**management** 14:1 31:10,11 62:11 139:16
**manager** 11:2,3 14:8,8 15:10 15:15 18:12 20:4 29:6 55:2 59:19
**March** 138:2 140:13,20 141:6
**marital** 122:16 122:20
**Mark** 14:9
**marked** 17:14 48:17 52:12,16 66:12 67:18 68:19 72:23 73:3 95:6 96:12 103:15 104:3 125:13 137:20 140:4
**Mary** 14:4 45:20 45:21 59:22 108:12
**match** 62:12
**matter** 6:17 111:15 123:17
**ma'am** 10:4 12:3 14:12,20 15:13 21:14 22:8,18 25:15 36:16 59:23 63:12,14 75:10,20 78:13 80:20 87:6 88:9 91:2 92:22 95:21 97:20 108:10 134:14
**McClain** 7:2
**McNaughton** 1:21 2:5,22 6:1 147:19
**mean** 19:4 26:1 30:12 40:1 44:16 45:5,10 71:14 77:8 78:2 79:6 83:10 91:12 93:19 94:4 122:12 125:1 127:11 129:20
**means** 38:3 147:9
**medication** 99:9 99:18
**meeting** 123:17 138:14 141:17
**meetings** 124:5 141:10,13,16
**Melvin** 14:10 105:7,10,15 106:5,19 107:15 121:21 122:5 123:1,6 123:7,8,15,18
**member** 31:10 31:11 139:16
**memo** 93:14 140:9
**memory** 17:23 22:8,18 28:16 28:19,23 29:11 29:23 37:8,23 38:3,11 39:3 47:20 48:6 52:5,6 57:10 57:20 58:13 59:4 67:6,11 68:3,17 69:2 69:15 70:19 72:11 86:14 94:22 95:2 106:11,13,16 106:20 107:13 107:23 108:1 144:15,16 145:20
**memos** 98:3
**mention** 69:18
**mentioned** 45:19 46:20,20 105:16 138:23
**merry** 115:1
**mess** 76:13
**messed** 76:9
**met** 123:15
**method** 41:20
**methodology** 30:4
**MF** 75:3,3
**middle** 1:2 8:10 136:6
**mind** 107:9
**Minimize** 19:2
**minute** 95:11
**minutes** 48:22 76:6
**miscellaneous** 64:15
**misrepresenta...** 130:12
**missing** 60:17 60:19 61:6 62:5 63:16
**Missouri** 5:13
**misstatements** 43:15
**mistaken** 77:1
**molestation** 112:15,22 113:5,17 116:16 118:5 119:23 125:3 131:19 132:13 132:22 134:4 134:18 136:13 136:17,18 137:10,13,17 141:12
**molester** 87:20 101:17 110:11 110:18 111:4 111:11 116:2 120:4,22 121:19 122:23 123:3 127:13 130:17 132:6,7 146:1
**molesting** 112:3 124:20
**mommas** 112:2
**Monday** 93:2
**money** 64:22
**monies** 65:13
**monthly** 20:12 64:20
**months** 10:18,18
**moved** 12:10 61:10
**multiple** 29:4,5 41:22 42:4 76:4 100:19 107:17,20 113:16 124:5,5 144:19
**multitude** 119:2 144:19

N

**N** 2:1 4:1 5:1
**name** 7:1 9:23

13:7 25:12 37:2,4 42:22 73:16 74:14
**named** 25:2 30:18
**names** 14:9 46:20 75:13,19
**Nance** 2:4 6:11 6:17 10:1 60:13 134:18 136:11
**NANCY** 1:15
**nature** 107:9 117:18
**necessarily** 27:10 33:23 38:19 91:8 93:15
**necessary** 2:11 8:2,15 54:15 58:17 59:20 95:4 124:17
**need** 26:12 48:9 73:9 131:2 132:9 144:11
**needed** 26:11 28:1 70:13 88:12 92:20,21
**negate** 42:4
**neither** 147:14
**never** 45:16 61:3 63:20 66:8 131:13,14
**new** 11:15,19 57:9 62:19 124:8
**Nineteenth** 5:18
**nondisciplinary** 38:22
**North** 5:6,18
**Notary** 2:6 6:3
**note** 17:10
**noted** 142:12
**notes** 34:8,14

35:3,7 36:7,9 36:10,11,16 37:10 38:18,20 42:13,17 43:17 50:11 54:12,12 54:17,22 55:1 55:3 56:7,8,10 56:12,13,15 58:8,10 59:3 67:11 68:17 69:3 106:12 107:1,3 108:2 108:3,6,9,18 109:1,5 114:6 115:6 124:1 144:6,13
**number** 1:5 6:16 6:20 17:13,17 37:10 48:16,20 52:11,16 53:3 56:2 66:11,15 67:17,21 68:18 68:22 72:22 73:4 74:19 92:17 95:5,10 95:15 96:11 97:2 103:14,19 104:2,7 110:2 125:12,16 127:12 137:19 138:19 140:3,7 140:15 141:9 142:20 147:21

**O**

**O** 2:1
**oath** 71:15 92:10 97:17
**object** 23:5 77:20 86:9 97:10
**Objection** 24:19 25:14,21 26:14 27:2,18 28:20 29:3 30:8 31:1 31:8,21 32:9 33:21 34:13 35:14 36:1 37:11 38:13 39:5 40:8 41:3 42:10 43:13 44:4,14 45:9 45:13 46:18 49:9,14 50:5 50:21 53:9 54:4,16 57:14 58:5,16 59:5 59:11 60:20 61:15 65:23 69:19 70:3,10 71:21 72:6,16 77:23 78:7,16 78:21 79:8,15 80:2,10 81:7 81:13,20 82:5 84:7,19,23 88:1,13 89:6 90:7 91:1 92:4 94:7,17 95:3 96:5 98:21 99:8,11,22 100:4 101:7 104:20 105:13 109:13 110:20 111:8,14,20 112:4 113:18 114:20 115:2 115:11 117:7 117:15,22 118:8,12 119:1 119:13 121:3 122:1,4,7 123:4,10 124:21 126:1 128:17 131:10 131:20 132:8 132:14,23 134:5,19 136:15 137:11 139:9 140:23 141:14 142:5 142:10 143:4 146:2
**objections** 2:12 2:15
**obviously** 38:4
**occasion** 34:21
**occur** 75:15
**occurred** 36:23 57:7,16 67:13 79:12 83:17 96:20 110:23 118:20 137:13 141:2,7
**occurrence** 37:6 118:18 124:8
**occurrences** 105:6
**October** 22:3 23:16,16,17
**offender** 101:17 102:3 116:1
**offenders** 111:19
**offense** 113:6
**offer** 15:6
**offered** 2:17 23:1 45:15
**office** 6:23 61:8 61:11,11 63:19 64:1,3 138:16 139:1
**offices** 2:7 6:8
**off-the-record** 56:19 58:22 89:21 95:12
**oh** 17:3 38:15 133:10
**okay** 8:5,12,17 8:23 9:3,4,9 10:23 12:8 13:8,12,13 15:4 16:3 17:3 17:4,8,12,21 18:8,17,18,20 19:17 23:8,18 27:15 28:6,10 29:13 30:20 32:1 33:1,18 34:4 35:9,17 36:6,13 37:17 38:1,8 39:2 42:6 46:23 47:5,16 48:7 51:20 52:15 53:7 54:9 55:23 59:21 60:5 72:20 73:14 74:12,19 75:5,12,16 76:18 79:1 80:21 81:22 83:15 86:13,19 87:2 89:15 90:20 91:6 92:19 94:13,20 95:19 96:10 102:4 103:11 103:22,22 104:6 108:3 109:16 113:2 127:18 128:3 131:19 133:23 135:7,16 136:9 136:21 138:12 145:4,18
**old** 137:8
**omission** 130:5 130:13
**omissions** 130:10
**once** 61:9 99:19
**ones** 21:12 76:20
**one-year** 98:16
**ongoing** 87:17 88:16

**online** 12:19
**open** 117:2
**opened** 12:1
**openly** 112:10
**operator** 76:9
**opinion** 118:9 118:14,16 133:3,5,6,18 133:20,21 134:1,6,22 135:2,2,5 137:3,12
**opinions** 133:8
**opportunity** 7:23
**opposed** 16:12
**opposite** 118:5
**oral** 3:1 6:11 132:21 134:3 134:16 135:9 136:14 137:8
**order** 33:23
**ordinarily** 8:8 139:12
**orientation** 11:16,20
**original** 2:23 23:13 43:16 62:2
**Originally** 61:20
**outcome** 38:19 50:12 60:12 82:12 83:12
**outlined** 71:3
**outside** 21:3,3,9 110:10 136:23
**outstanding** 65:6
**owners** 13:10

**P**

**P** 2:1 5:1,1
**paced** 99:4
**package** 20:10 63:2,11
**packages** 20:17
**page** 4:2 17:18 73:7,8,14 74:12 86:16 90:17 92:18
**paid** 65:4
**Pantazis** 5:16
**paper** 53:17
**Parrish** 73:15 74:21 75:9,19
**pars** 119:9,10
**part** 12:5 16:11 16:11,20 23:6 23:13 38:23
**particular** 22:14 41:19
**parties** 2:3,14 147:15
**party** 7:20
**pause** 49:1 73:20 80:3
**pay** 64:17,18 65:1,8,10,10 65:11,12,13,14 65:15
**paying** 64:19
**PC** 5:5 6:23
**Peanut** 61:21
**pending** 135:22
**pennies** 92:3
**people** 14:11,14 31:6 32:4,7 33:12 35:4 42:14 44:12 46:20 58:14 69:21 70:17 71:15 80:23 88:23 116:14 116:15,21,22 117:4,12,13 121:7,17,18 124:5 139:3 141:4
**perception** 84:14,18
**perform** 130:22
**period** 17:1 19:15 20:6 22:1 23:20 41:23 42:5 98:14,16 99:1
**perpetual** 42:1
**person** 13:16 14:6 21:1,4 26:11 27:12 31:6 32:22 33:15,17 36:23 39:6 40:15 41:8,11,14 43:20 45:11,19 46:12 50:18 101:2 103:3 136:14 139:1
**personal** 36:16 38:18 54:12 111:9,10,13 112:8 121:8,13 125:4,7,10,11 125:21 126:6,7 126:8,11,17 142:6
**personally** 22:6
**personnel** 24:17 25:8,18 26:8 29:1 32:20 37:15,20 38:23 39:4,9,15,20 40:6,14,19 41:5,16 44:3 96:2 127:16
**persons** 30:18 33:3 36:4 46:21 62:2
**person's** 25:11 37:4 42:8,22 70:5 112:5,8,8 112:11
**pertinent** 44:1 53:18
**phone** 13:1,6,18 13:22
**pick** 61:22 62:3
**piece** 53:16
**pitch** 72:5
**pitched** 46:6
**pitches** 90:3
**pitching** 87:20 99:19 109:9
**place** 6:22 11:1 12:1 129:1 139:21 140:2
**plaintiff** 5:14 7:6
**Plaintiff's** 17:13 17:17 48:16,20 52:11,16 53:2 56:2 66:11,15 67:17,21 68:18 68:22 71:4 72:22 73:4 92:17 95:5,10 95:15 96:11,15 103:14,18 104:2,6 110:1 110:5 123:14 125:12,16 127:12 128:19 128:19 132:1 137:19 138:19 140:3,7,14 141:9 142:19 143:16
**Plaintiff(s)** 1:8
**plant** 11:5 12:11 26:21 79:10 97:1 99:16 102:2
**please** 3:3 9:14 9:23 17:20 32:15 46:15 47:3 51:17 66:16 91:3 95:16 100:23 103:19 120:18 125:17 129:13
**pled** 113:16 134:9
**Plus** 7:13
**point** 8:16,20 31:13 33:10
**policies** 128:23
**policy** 94:14 98:18 99:2 100:2,6,9 101:2
**position** 13:14 19:15 111:17 129:9,15
**potential** 11:15
**prefer** 94:21
**preference** 94:3
**presence** 96:23
**present** 5:20 117:18
**presented** 59:7 82:13
**preserve** 53:18 54:11
**preserved** 54:14
**previous** 24:2,3 74:17,18 87:16 90:14 123:17
**previously** 131:5 131:18
**primary** 13:16
**prior** 2:17 40:23
**prison** 114:3 115:14,16,19 116:9,10,14 117:5
**private** 121:7,9 121:12 125:2
**probably** 28:17 62:7 68:15 116:23 123:23

127:15 144:1
**probation** 113:15,20,21 114:11,17,22
**problem** 19:8,11 42:1,2 61:5
**problems** 122:17,20
**Procedure** 2:20 6:6
**proceedings** 6:13 7:21
**process** 19:18,19 23:7,14 31:14 45:3 51:13 60:3,6,11 98:8 99:13,13,14
**produce** 29:1
**producing** 58:13
**productivity** 126:23 127:6
**Products** 1:10 6:18 7:9
**profanity** 96:23
**program** 12:16 24:13 26:16,18 28:4
**prohibiting** 100:10
**proof** 40:3
**proper** 112:6
**property** 97:5
**proven** 41:1
**provide** 8:21
**public** 2:6 6:3 111:15,21,23 112:1 121:9 126:2,3,3,15 126:16,16
**public's** 111:18
**pulled** 55:4 127:15
**pulling** 127:2
**punched** 88:23
**punches** 88:22
**purchases** 64:13
**purpose** 41:19 57:1,4
**pursuant** 6:5
**put** 9:8 16:20 25:8 40:10,12 41:10,10 42:8 44:18 70:18 105:2
**P.O** 5:12

**Q**

**QA** 14:8
**Qs** 73:21
**qualified** 23:23
**quantified** 127:9
**quantify** 127:5
**quarterly** 20:12
**question** 2:14 14:23 25:23 30:15 31:2,17 31:17,23 40:20 43:3 51:1 59:12 65:3 66:9 74:2 77:21 80:4,21 89:16 92:5,6 95:11 108:6 115:3 116:17 118:1,2 119:19 120:10,17,18 120:19 123:12 131:5 134:13 135:19,23 136:7,10 138:22,22 143:14
**questioned** 70:7 105:19 145:8
**questioning** 45:2
**questions** 2:13 44:17 51:13 70:4,6 146:11 147:8
**quick** 16:6 103:7
**Quinn** 5:16

**R**

**R** 5:1
**racial** 29:19
**raised** 70:5
**Ralcorp** 5:11 13:6
**ran** 131:13
**range** 46:8
**rape** 128:6
**reaches** 88:21
**read** 8:1 9:12 73:9,17 74:6,7 74:8,10,12 86:17 90:18 91:3 102:23 127:21 129:2,5 129:12,20 135:22
**reading** 52:7 73:18 86:17
**real** 103:7
**realize** 124:4
**reason** 41:19 62:8 65:4 91:20,23 92:9 92:14,21 93:3
**reasons** 92:20
**recall** 13:21 14:5 14:16 15:2,18 20:19 21:17,22 22:5,15,16 24:15,20 25:4 25:5,16 26:6,8 27:20 28:7,10 28:12 29:8,21 35:8 36:22 40:13,17 42:11 48:5,6 53:21 55:11,15,21,22 56:4 57:8,10 57:19,20,23 58:7 60:21,23 61:13,16 62:6 63:4,23 64:5 65:1,12,15,16 66:8 67:1,5,7 67:13,15 68:2 68:16,17 70:19 71:5 72:8,9,11 85:1,8,17 86:3 86:11,15 91:14 94:8,11,18 97:13 98:13,22 100:17 101:13 101:18,22 104:13 106:1,2 106:3,13 107:17 109:16 109:17,20 112:23 113:4 113:12,22 114:4,13,21 115:15 116:3,8 116:10 123:23 124:2,3 131:21 141:1,12 143:18 146:3
**receive** 22:20 30:14 33:3 53:5,10 93:4,7 94:6 97:8 138:17
**received** 24:14 24:18 25:9 26:19 27:12 53:8 54:10,22 55:9 87:9 93:1 94:5,9 95:23 97:15 138:19 143:15
**receiving** 91:15 93:13
**recollection** 44:22 105:18 146:5
**recommendati...** 59:19
**record** 6:21 9:19 9:20 17:18 22:9 25:5 26:4 27:14,16 29:2 42:2 56:17 58:20 89:19 98:7,8 103:12 111:15 113:20 126:4
**records** 24:21 25:1 26:2 27:23 29:9 35:1 59:10 139:10
**recruiter** 13:5
**redefine** 118:1
**reduced** 98:16
**refer** 15:16 102:7
**reference** 76:2,3 129:10,16
**references** 105:9
**referencing** 76:21
**referred** 109:6
**referring** 48:21 54:5 106:18 107:14 123:14 141:16,18 142:17,19
**refresh** 28:16,19 29:11,23 52:6 59:4
**refreshes** 17:23
**refusing** 134:12
**regard** 100:6
**regardless** 39:9 105:2
**regards** 107:20
**reiterate** 57:4

**rejection** 130:14
**related** 140:11
**relates** 107:23
**relative** 27:4 57:7 127:22
**relatives** 7:15 8:10,22 9:16
**relevance** 32:22 117:23
**relevant** 93:21 106:8 112:17 114:9 117:1
**rely** 94:21 106:20,22 107:4,8 108:1 144:16
**remember** 14:13 20:14 21:11 38:15 47:18,21 52:4,8,8 55:19 57:11,17,22 62:22 67:23 69:1 71:10,12 71:15 102:4 107:5 110:2 112:19 115:19 133:10 143:7 144:4,10,22 145:11,18,21
**remind** 38:15
**Renny** 1:21 2:5 2:21 6:1 147:19
**Repeat** 51:1
**repeatedly** 50:16 142:20
**repercussions** 101:5
**repetitive** 27:9
**rephrased** 120:14
**report** 31:9,18
**reported** 81:3
**reporter** 2:6 3:4 6:2 7:10 107:7 135:20,22 136:3 144:12 147:20
**reporting** 7:3 31:12
**reports** 87:18
**represent** 7:4,6 7:8 18:6 73:5
**representation** 58:2
**representing** 7:2
**represents** 147:11
**request** 109:14
**requested** 108:19
**require** 42:5
**required** 23:2
**reserve** 9:12
**resign** 63:8
**resolved** 88:17
**resources** 11:2 15:10
**respective** 2:3
**respondent** 52:21
**responding** 119:19
**response** 102:21 144:9
**responsible** 18:11,16 19:22 64:19
**result** 147:17
**results** 129:9
**resume** 133:11
**retained** 3:4
**retrained** 23:12
**return** 88:3 93:3
**returned** 71:17 87:4 93:2 97:18,19
**reviewed** 63:18
**reviewing** 87:1 90:19
**Ricky** 14:4
**Ridge** 10:6
**right** 9:12,16 13:15 14:22 16:13 21:11 22:11 23:20 32:5 33:20 34:8 38:5 40:5 47:8,17 49:23 52:23 53:20 58:9,15 59:14 60:7 61:5 62:21 67:1 68:8 74:1,19 75:21 76:19 77:22 78:3,6 79:17 80:18 81:19 86:17 88:8,19 90:17 90:21,23 91:23 92:12,18 93:6 94:6 96:19 99:4,7,21 100:8 103:8 104:11 105:1 111:19 112:19 115:10 120:13 121:23 122:14 123:9 129:18 135:7 136:12 139:6 143:3 144:8
**Road** 52:23
**Robertson** 2:23 4:3 5:15 7:5,5 7:13,18 8:6,13 8:18 9:1,5,15 9:22 16:5,8,13 16:19 17:2,5,8 17:12,16 25:2 34:22 48:4,8 48:19 52:14,19 54:7 56:17,21 58:20 59:1 66:14,20 67:20 68:21 72:17 73:2 74:6 80:6 86:22 89:8,19 95:8 96:14 100:7 103:8,17 103:20 104:5,8 113:19 119:21 122:9 125:15 135:12,18 136:1,5,8 137:22 140:6 146:8
**rolled** 98:11
**rolling** 98:14
**room** 63:22
**rounds** 12:23
**rule** 2:19 97:2
**Rules** 2:20 6:5
**run** 131:16

**S**

**S** 2:1 4:5 5:1,2 5:14 6:23
**safety** 12:15,15 20:2,3 21:1
**salary** 19:19,23
**Samulotscki** 14:9
**saw** 45:22 46:8 46:14,22 49:3 67:9 83:2
**saying** 27:8 33:18 43:11,19 49:16 65:21 69:12 73:23 76:8,14,23 77:15 79:18,19 81:1 82:2 84:10 92:13 111:6 120:21 122:22,23 132:5 133:11 145:22,23
**says** 17:10 68:5 78:8 79:4 96:22 110:5 121:15 123:15 128:20 129:7 130:7 132:1,4 141:8
**schedule** 11:22 20:5,8 21:13 21:23 30:2
**scheduled** 20:10 20:12
**Scott** 5:9
**screamed** 46:5
**screaming** 49:7 71:19 76:7
**se** 105:5
**second** 17:18
**section** 16:17
**see** 11:22 16:13 16:19 17:22 18:23 27:23 32:10 35:8 49:11,16,18,20 53:2,23 54:1,8 66:19 67:9 74:23 77:3 87:3,13 88:18 88:18 100:16 103:1 105:9 117:23 118:1 128:15,19,20 129:5 131:2
**seeing** 15:19 21:13
**seen** 46:10 48:23
**Senior** 5:10
**sense** 79:21
**sent** 12:20 108:20
**sentence** 114:2
**separate** 24:15

25:11 36:14,15 43:18
**separately** 24:21
**series** 44:17
**serious** 138:10 142:23
**served** 52:20
**sessions** 26:3 98:3
**set** 18:2
**setting** 17:10
**severance** 63:1,4 63:11
**sex** 101:16 102:3 111:19 116:1 118:5,7 132:21 134:3,16 135:9 136:14 137:9
**sexual** 21:15 22:6 23:4 24:9 24:13 29:19 31:4 32:13 33:6 35:2,6,12 39:22 40:4 95:23 114:14
**sexually** 118:22 119:20
**sex-related** 113:6
**sheet** 26:5 30:3
**sheets** 21:19 28:9
**Shepard** 52:23
**short** 48:12 72:19 103:10 135:15 146:10 146:14
**shortly** 15:6 105:10
**show** 16:4,7 52:15 73:3 94:19
**showed** 90:14
**showing** 39:16
**Sidely** 110:8
**sign** 8:3 9:12 118:6
**signed** 96:8 140:18
**sign-in** 21:19 26:4 28:9 30:3
**simple** 93:13
**singular** 42:3
**sir** 9:23 17:20 18:5 25:8 27:19 31:15 66:17 80:14 84:10 89:3 102:10,22 103:19 106:14 108:4 118:21 123:11 125:17 135:8 137:23 140:8
**sit** 8:9 44:16 60:1 69:15 106:15
**situation** 30:16 33:5 105:4 123:20 135:4,5 137:5,7
**six** 10:18 14:16 140:14
**six-person** 14:6
**skills** 20:2,9 21:6
**slower** 129:12 129:13
**Smo** 40:2
**Smothers** 14:4
**sodomizing** 114:12 132:12
**somebody** 38:9 40:21 88:20 89:23 90:2 115:8
**somebody's** 111:12
**someone's** 101:14
**sorry** 21:5 51:1 66:20 89:3 103:20 104:8 129:11
**sort** 20:8 33:7
**sounds** 21:7
**sources** 21:10
**SOUTHERN** 1:3
**speak** 123:5
**specialists** 20:23
**specific** 11:23 15:19 18:2 24:9 26:20 27:1 34:21 47:12 55:11 56:5 62:22 75:15 77:5 91:18 98:13 106:21 131:21 134:22 141:1 143:18 144:17 144:18 146:3
**specifically** 20:5 21:6 23:11 24:15 29:8 52:5 62:16,23 72:2 75:18 77:6,12 82:16 86:6 98:17 106:1 107:22 109:21 113:3 113:12,23 114:5 115:16 116:9,10 126:23 127:5 131:22 141:7
**specifics** 18:21 46:23 55:14 62:15 143:22
**speculation** 25:22 101:8
**spent** 114:1
**spoil** 53:19
**spouses** 9:2
**St** 5:13
**staple** 16:21
**start** 19:3 86:16 92:18 110:15 132:2 136:10
**starting** 74:13 86:20 90:18
**starts** 88:21
**Start-up** 11:9
**state** 2:6 6:3 7:4 9:23 84:20 111:17,23 147:3
**stated** 128:5 131:22
**statement** 32:11 32:14 35:16 36:3 39:18,19 40:6 41:8,13 43:2,4,6,7,16 43:17,18 44:5 44:23 45:2,3,3 45:8,12,15,16 45:18,22,23 46:16,22 47:4 47:18 48:3,21 49:3,5,15,17 50:1,8 51:8,11 51:12,13,18 52:2,7 54:5,8 66:23 67:6 68:4,9,23 69:17,20,21 71:23 75:1,4 77:4,7 78:4,8 78:12,18 80:11 80:13,19 81:21 83:8,9,11 84:11,16 102:17,20 103:1,4 104:1
104:9,19 105:3 105:5,8,16,19 106:9 110:6,22 112:18 114:9 122:12 128:9 129:21 130:2 138:2,3,18 139:18,19,21 143:11 144:1 145:17
**statements** 30:14,21,23 31:7,19,20 32:3,8,16 33:4 33:12,19 34:6 36:3 39:15 40:2,9,13,17 40:18 41:4 42:8,15 44:9 44:13,13 45:4 45:17 50:7 57:6,7 69:22 70:5 75:22,23 76:20 77:11 81:9 82:6,7,16 82:23 83:19,23 84:8 94:22 101:23 102:8 102:12,14,23 121:5,5,11 139:4,5,7,23 146:4
**states** 1:1 80:13 138:6,10
**stating** 121:6,12
**status** 101:14,15 102:2
**statutory** 128:6
**stealing** 61:1,3
**stenotype** 147:8
**step** 96:16 98:6 98:8,22,23 99:13
**steps** 98:15,16

98:19
**Sterling** 10:6
**sticker** 17:19 73:19 86:23
**STIPULATED** 2:2,10
**stipulation** 6:7 7:14
**stipulations** 7:11
**stomps** 90:4
**stood** 89:2
**stop** 122:21
**store** 29:5,7
**stores** 29:8
**straight** 39:21 89:14
**Street** 5:6,18
**strike** 109:4
**strikes** 115:12
**stuff** 42:20 43:10,14 44:18 83:3 107:5,10
**style** 62:11
**suggest** 18:10
**Suite** 5:7
**supervision** 11:21 31:10
**supervisor** 21:1 31:5 33:16,19 50:18 51:3,10 87:19
**supervisory** 20:1,1,9 21:6 24:4,12
**supplied** 130:4,9
**suppose** 43:19
**supposed** 60:18 64:11,17,18
**supposedly** 47:14
**sure** 9:8 16:8 19:16 38:2 41:7,9 42:7 49:3 52:3 56:3 69:5 85:5 89:14 105:14 106:8 128:23 135:12 138:22 145:3,4,10,13
**surrounding** 56:8 71:2,10
**Swain** 5:3 7:7,7 7:12,16,22 9:11 16:3,6,10 16:16,22 17:3 17:7,9 23:5 24:19 25:14,21 26:14 27:2,18 28:20 29:3 30:8 31:1,8,21 32:9 33:21 34:13,20 35:14 36:1 37:11 38:1,13 39:5 40:8 41:3 42:10 43:13 44:4,14 45:9 45:13 46:18 48:1 49:9,14 50:5,21 52:18 53:9 54:4,16 57:14 58:5,16 59:5,11 60:20 61:15 65:23 66:21 67:22 69:9,19 70:3 70:10 71:21 72:6,16 74:4,7 74:9 76:17 77:20,23 78:7 78:16,21 79:8 79:15 80:2,4 80:10 81:7,13 81:20 82:5 84:7,19,23 86:9,20 88:1 88:13 89:6,15 90:7 91:1 92:4 94:7,17 95:3 96:5 97:10 98:21 99:8,11 99:22 100:4 101:7 103:22 104:20 105:13 109:13 110:20 111:8,14,20 112:4 113:18 114:20 115:2 115:11 117:7 117:15,22 118:8,12 119:1 119:13,17,22 120:12,16 121:3 122:1,4 122:7 123:4,10 124:21 126:1 128:17 131:10 131:20 132:8 132:14,23 134:5,19 135:11 136:15 137:11 139:9 140:23 141:14 142:5,10 143:4 146:2,10

**T**

**T** 2:1,1 4:5
**table** 76:12 80:5 135:19
**take** 16:6 17:19 23:2 31:7 34:6 35:3 48:8 52:17 64:22 72:17 81:9 85:12,13 101:1 103:9 107:1,1 110:17,21 119:11,15 120:8 135:11 136:3,23,23 146:10
**taken** 2:5 3:1 36:2,6,16 38:23 39:8,11 39:13,14 40:2 48:12 61:8 63:21,23 70:14 72:19 90:9,11 101:23 103:10 107:6 120:15 124:18 135:15 146:14 147:7
**takes** 111:17
**talk** 70:15 112:13 119:17
**talked** 56:4 70:20 105:14 107:5
**talking** 21:2,5 22:23 34:16,17 34:20,22,23 43:1 48:1 56:1 59:21 73:13 75:23 76:1,5 76:19 77:16,22 79:5,7 89:7,8 109:7 110:19 120:3,23 122:17 123:21 126:6,7 129:3 141:4
**Tamekia** 68:23 69:1 76:8
**tape** 48:14 103:7 103:13
**tapes** 63:18
**tasks** 62:16
**taught** 21:8,9,12 21:17,18,20 22:6,10 27:9 30:3
**teach** 20:18,21 21:15 28:5
**teaching** 20:19
**team** 138:6 142:21
**tell** 29:17 30:7 41:18 42:12,17 44:17,20 49:11 54:21 66:16,16 69:21 73:10 95:16 102:14 103:18 104:6 104:11,16,22 107:22 113:14 114:1,10,16,23 117:12,13 118:21 120:13 120:14 133:18 135:7 136:10 137:6,14,23 140:19 141:6 142:18
**telling** 26:22,22 53:17 71:15 101:5 110:10 116:14,20,22 117:4 121:7,16 130:1
**ten-year** 114:2
**term** 92:20
**terminate** 92:21
**terminated** 63:6 63:7,9,10
**termination** 99:1
**terminations** 11:17 15:18
**terms** 60:10
**testified** 71:7 104:15 119:15
**testimony** 1:14 3:1 71:22 72:13 92:17 147:12
**thereto** 2:18 147:9
**thing** 53:17 60:7

68:8 69:13 77:14,16 78:11 79:4 95:1 122:22 136:17
**things** 47:22 69:14 81:1 116:21 118:6 119:3
**think** 15:21 16:10,16 45:6 58:19,19 68:6 69:3 74:4,5 77:14 79:5 86:1 111:11 114:3 117:11 118:10,11,15 120:20 137:7 139:7,20
**thinking** 83:11
**Thomas** 10:1
**Thornton** 1:6 5:20 6:18 7:6 46:4 50:15 51:16 54:11 57:13 67:4 69:13 71:8 73:7 78:15,20 85:3 97:8 106:4,17 107:14,18 108:17 109:8 109:12 110:9 117:5 120:21 126:5 140:10 140:16
**Thornton's** 56:9 58:2 103:23 138:1
**thought** 18:14 51:3 97:7 104:15
**threatening** 94:15 97:2
**threats** 138:3,9
138:11,15 142:4,9,14,23 143:2,16 145:2 145:7,9,19
**three** 61:23 97:12 98:23 123:19
**threw** 35:19,20 38:16 46:6 47:14 76:16
**throwing** 38:10 49:8 50:17 54:3 67:3,10 71:20 87:21
**thrown** 67:14
**throws** 90:4
**time** 2:16,16 8:15 10:14 16:23 19:16 22:1 23:20 27:13 41:23 42:5 48:14 49:4 50:2 55:6 62:13 64:2 65:4 72:13 74:17 85:19 88:22 99:1,18 109:10 123:22 124:6,11 128:15 130:15 130:16 141:1 145:12
**times** 41:21 97:12
**title** 15:9
**today** 8:19 59:3 106:15
**told** 33:9 43:10 45:1,14 77:9 81:16,18 88:5 91:19 92:1,9 97:17 110:9 112:20 115:1 115:13,18,23
116:6,7,15 121:18 123:1 128:15 130:20 133:14 138:7 142:20
**Tommy** 1:15 2:4 6:10,17 134:17 138:14 141:11
**tools** 22:13,17
**top** 13:15
**topic** 27:1 123:18
**topics** 20:11,15 26:19 27:4,9 27:10 28:5,5 30:1
**total** 120:7
**totality** 119:6
**Tower** 5:6
**train** 11:22 24:5
**trained** 20:6 27:5
**trainer** 24:5
**training** 11:2,11 11:16,18,20,20 19:18,19,21 20:1,2,3,4,7,10 20:11,22 21:16 21:23 22:9,14 22:20 23:3,4,6 23:9,10,14,19 23:22 24:1,3,4 24:4,7,10,12 24:14,20,23 25:3,10 26:3,5 26:7,11,15,18 26:20 27:1,7 27:14,16,23,23 28:2,4,8,13 29:2,9,14,17 30:1,2 95:17 95:23 96:7
**transcribed** 147:9
**transcript** 2:23 8:1 9:13 73:5 147:12
**transcription** 147:10
**Travel** 64:15
**treated** 117:21 121:1
**treating** 123:2
**tree** 110:13
**trial** 2:16 129:5
**trigger** 23:1
**trouble** 110:15 124:10,19 132:2
**true** 50:4,7 131:8 147:11
**truth** 59:8 101:5 128:15 130:1 130:20
**trying** 27:7
**turn** 108:11,18 109:1,5,9
**turned** 108:14 109:21 144:2
**turning** 109:17
**turnover** 19:2,6 19:12,13,14
**turns** 43:21
**Twentieth** 5:6
**twice** 97:11 99:6 99:20
**two** 10:9 11:7 12:2 61:7,23 63:3 109:22 115:20 128:10
**type** 16:23 87:15 113:6 129:11

**U**

**U** 2:1
**Uh-huh** 28:3 46:11 85:16 107:21
**ultimately** 59:14 124:22
**understand** 9:10 18:5 31:2 50:14 66:1,7 73:21 118:4 122:12 128:7 129:7,14 130:11
**understanding** 119:5
**unemployed** 10:14
**unemployment** 63:13 71:6,13 73:6 88:6 91:19 92:11 97:18
**unfortunate** 59:2,9
**UNITED** 1:1
**unlocked** 64:4
**unmanned** 19:15
**unpaid** 64:6,21
**upset** 122:16
**use** 22:13 64:22
**usual** 7:10 138:22
**usually** 33:11 104:21

**V**

**v** 1:9
**vacant** 64:1
**vacations** 141:3
**various** 24:3 29:6 142:23
**versus** 6:18 94:22
**VIDEOGRAP...** 6:15 9:18 48:10,13 72:20 103:6,11

135:13,16 146:12
**videos** 22:13
**videotape** 6:16
**violation** 97:1 112:11
**violence** 97:5

**W**

**Wachovia** 5:6
**wait** 120:16,16 126:7
**walk** 45:6 46:12
**walked** 76:14
**walking** 88:20
**want** 7:23 13:8 42:1 73:7 108:21 127:8 137:5 138:12
**wanted** 46:1 62:13 74:5 122:21
**wanting** 89:13
**wants** 32:14
**warranted** 70:13 93:11 124:17
**wasn't** 25:8,18 31:16 80:1 92:9 93:22 116:9 119:19 120:10 122:19
**waste** 8:15
**way** 35:13 41:2 74:11 85:1 91:11 102:19 115:1 117:20 121:1,21 123:2 141:23
**ways** 29:5,7
**week** 63:3
**weeks** 63:22
**week's** 138:14
**welcomed** 90:2
**went** 13:19,21
**weren't** 26:1 45:14 84:22
**we're** 8:20 48:15 72:20 89:17 103:11 109:7 135:13 146:12
**we've** 32:12 73:12 76:1,5 86:5 107:5
**whatsoever** 130:6,11
**wife** 85:19,20 122:18
**wife's** 110:11 111:4
**Wiggins** 5:16
**wildest** 137:6
**Williams** 6:19 35:18 46:15 47:10,13,18 52:1 56:2,14 56:23 57:9,12 67:2 69:11,16 71:18 73:17 74:22 75:7,18 86:6,8 95:18 95:22 96:17 101:12 104:9 105:11 106:19 107:16 110:4,6 112:14,16 117:3 120:22 121:2,22 125:19,21 127:11 130:23 134:9,16 138:5
**winners** 61:22
**withdraw** 136:9
**witness** 6:11 8:5 8:12,17,23 9:4 9:10,14,17 66:18 74:8 75:12 76:18 87:1 90:19 92:6 120:1 139:15 147:13
**witnessed** 75:7
**witnesses** 35:22 58:3 67:8 70:17 75:16 81:23
**women** 120:7
**won** 62:2
**word** 68:5 69:7 69:11 77:13
**wording** 76:17
**words** 20:8 65:21 72:4,8,9 76:14 78:19 79:3 80:9,12 80:13 81:5,9 81:23 94:2
**work** 9:3 10:15 10:15,17,19 11:6 71:17 76:10 88:3,19 91:22 92:12,15 93:2,5 97:19 99:6 105:12 112:11 119:20 122:19 123:19 126:14,19 142:7,12
**worked** 12:14
**working** 45:5 55:7 112:7 117:6
**workplace** 112:6 115:14,23 126:12
**world** 125:20
**wouldn't** 70:19 112:3 124:12
**write** 45:1,7,11 45:14,15,21,23 46:15 47:3 51:17 69:22 83:1 124:22 133:2
**write-up** 91:12 91:23 94:5,6,9 94:18 97:15,19 98:1,5
**write-ups** 57:16
**written** 15:11,16 15:19 30:14,21 30:23 31:7 32:3,8,11,14 32:16 33:12 37:12 42:14 43:2,4 44:13 46:13 57:12 70:21,23 71:9 71:18 72:1,12 87:23 88:7,12 89:4,12 91:9 91:11,21 92:9 92:14 98:6,17 99:14 107:8 140:21
**wrote** 39:19

**X**

**X** 4:1,5 46:7

**Y**

**Y** 46:7
**yeah** 7:12,18,22 13:13 17:6,7 32:19 37:14 48:4 51:9 52:19 54:7 66:21 71:14 79:11 80:6 82:14 86:22 88:2 92:7,8 102:13 113:20
**year** 26:21,23 27:5,8 38:16 98:12 99:6,20 137:8 144:19
**years** 10:9 11:7 12:2 100:17,18 109:22 110:15 111:1 114:2 115:20 128:10 131:3 132:3
**yelled** 46:5
**yelling** 35:20 47:15 49:7 50:16 54:2 68:11 69:8 71:19 75:2,2 75:14,17 77:5 79:3 109:9
**yells** 90:3
**younger** 128:10

**Z**

**Z** 46:7

**0**

**05** 22:3
**06** 22:4 138:2
**07** 40:23

**1**

**1** 4:6 6:16 17:14 17:17
**1st** 138:2 140:20
**10** 1:22 4:15 125:13,16 127:12 128:19
**10th** 2:8 3:1 6:10 6:21
**10-year-old** 114:12 132:12 132:20 134:4 134:17 135:9 136:14 137:9
**10:38** 72:21
**103** 4:15,16
**104** 4:17
**107** 10:6
**107cv-712-W...** 1:5
**107-CV-712-...**

6:20
**11** 4:16 74:19 103:15,19 123:14
**11:35** 103:12
**12** 4:17 104:3,7 110:2,5 132:1
**12:05** 135:14
**12:14** 135:17
**12:34** 146:13
**125** 4:14
**13** 4:18 137:20 138:20 140:15 141:9 142:20 143:16
**13th** 85:13
**13-year-old** 114:15
**137** 4:18
**14** 4:19 140:4,7
**14th** 49:10 54:5 66:23 85:13 96:22
**14-year-old** 114:15
**140** 4:19
**15** 2:21 110:15 110:23 132:3
**15-year-old** 114:16
**16** 97:2
**16th** 85:21,22 96:18 140:11
**1600** 5:7
**17** 4:6
**18** 86:21 92:19 100:18 128:12 128:13
**19** 39:23
**1988** 2:21

**2**

**2** 4:7 48:14,17 48:20 56:2
**2/16** 104:1,10 141:6
**20** 62:6 92:18 135:9,10
**20-something** 136:13 137:8
**2000** 129:1
**2005** 40:1
**2006** 96:22
**2008** 1:22 2:9 3:2 6:10,21
**25** 62:6
**27-year-old** 132:21
**2700** 52:23

**3**

**3** 4:8 52:12,16 53:3 76:9 103:13 121:23
**30** 76:6
**301** 5:18
**35203** 5:19
**35203-5202** 5:8

**4**

**4** 4:9 66:12,15
**411** 147:21
**420** 5:6
**48** 4:7

**5**

**5** 4:10 67:18,21 71:4
**5(d)** 2:19
**50** 73:14 74:12
**51** 73:8
**52** 4:8
**54** 86:16 92:18
**56** 90:17

**6**

**6** 4:11 68:19,22 71:4
**6/14** 56:10 96:21
**618** 5:12
**63188** 5:13
**66** 4:9
**67** 4:10
**68** 4:11

**7**

**7** 4:12 72:23 73:4 74:13 92:17
**7th** 140:13 141:6
**72** 4:12

**8**

**8** 4:13 95:6,10 95:15

**9**

**9** 4:3,14 90:18 96:12,15
**9:00** 2:9 6:9
**9:02** 6:21
**9:41** 48:11
**9:53** 48:15
**95** 4:13



# RALCORP HOLDINGS, INC.

F'06 Goals

## EMPLOYEE INFORMATION

**NAME OF EMPLOYEE:** Tommy Nance

**BUSINESS UNIT/DEPARTMENT:** Dothan Operations

**JOB TITLE:** HR Manager

**DATE OF LAST REVIEW:** None This is a goal setting document only

Revised: 7/98 - Final

PLAINTIFF'S EXHIBIT

# GOAL SETTING

## BUSINESS/DEVELOPMENTAL GOALS

Goals are to be developed by the individual and the supervisor. Goals should be measurable, obtainable, and challenging and should cascade from those goals established at the corporate and departmental level. The individual and the supervisor must mutually agree to the derived goals. Goals must be developed in coordination with corporate, departmental, and individual business/developmental views in mind. Goals should be modified if they are changed during the review process.

You and your supervisor should discuss the relative importance goal attainment and skill set performance and development will have in determining our overall performance rating for this review period.

### 1. GOAL

Maintain a level FTE (Full Time Employee) base that keeps temps minimized to 10-20, excluding gift pack.

### ACTION STEPS

Working with Production maintains a staffing grid that is monitored weekly that shows where openings exist. Trigger hiring to keep up with the level of attrition.
Monitor the employees that are "at risk", due to attendance or performance as part of the hiring trigger.
Develop a relationship with several community venues beyond the Unemployment office to tap into employees; Career Services, Work Release program, University Career offices, Hispanic, etc…

### 2. GOAL

Primary coordinator for the employee training process, both hourly and Salaried.

### ACTION STEPS

Develop a training program for new salaried hires to cover basic job knowledge. This needs to be completed by QF2 for Sasha, Harrel, Fred, Wiley, Jeff and Donald.
Pick up information already collected by David Helms, solicit more information from the Dept. Managers and submit the training grant application that is available from the Career Services Office.
Enhance the current new employee orientation.
Working with Production creates a cross training/back up training process for critical positions; Roaster, Label machine, Filler, etc…

3. GOAL

Assess and then develop the current HR department into what is best for the Dothan site.

ACTION STEPS

Assess and review both the roles currently filled by Leigh and Vera.
Ensure that all duties that are needed at this site are performed by the department.
Complete the job description assessment, including review of Grade level and discuss with incumbents by Jan 2006.

4. GOAL

Development of an hourly incentive program ready to implement Oct 2006/fiscal 07.

ACTION STEPS

Working as a team with Finance, Operations and Divisional develop an incentive program that will be paid out quarterly and be tied directly to budgeted performance.
This must be drafted and ready for presentation for approval by the end of F'06 QF3.

5. GOAL

Ensure that all Bremner/Ralcorp policy and procedure is implemented at the Dothan facility

ACTION STEPS

Working with Alice Clark and Steve Smith will get an understanding of what has/has not been implemented in the last year. Complete the implementation of those still in place and ensure that administration of existing policy is correct.

. GOAL

Achievement of Plant Safety goals

ACTION STEPS

Vernon James, Plant Safety Manager reports to HR and will have primary responsibility to ensure that all proactive programs are being executed as targeted.
Ensure that appropriate follow up is being conducted on all existing accidents and challenges are being made where possible to keep WC costs minimal.

7. GOAL

| Complete all activities as outlined on HR Dothan Action Plan |
|---|

ACTION STEPS

| See attached document.<br>A few of the items on this document are separately listed as goals above. |
|---|

EMPLOYEE SIGNATURE [signature] DATE 12/15/05

MANAGER SIGNATURE Mary Ann Boyer DATE 12-15-2005



# RALCORP HOLDINGS, INC.

**F'06 Goals**

**EMPLOYEE INFORMATION**

**NAME OF EMPLOYEE:** Tommy Nance

**BUSINESS UNIT/DEPARTMENT:** Dothan Operations

**JOB TITLE:** HR Manager

**DATE OF LAST REVIEW:** None This is a goal setting document only

**Revised: 7/98 - Final**

SECTION 4

## GOAL SETTING

### BUSINESS/DEVELOPMENTAL GOALS

Goals are to be developed by the individual and the supervisor. Goals should be measurable, obtainable, and challenging and should cascade from those goals established at the corporate and departmental level. The individual and the supervisor must mutually agree to the derived goals. Goals must be developed in coordination with corporate, departmental, and individual business/developmental views in mind. Goals should be modified if they are changed during the review process.

You and your supervisor should discuss the relative importance goal attainment and skill set performance and development will have in determining our overall performance rating for this review period.

**1. GOAL**

Maintain a level FTE (Full Time Employee) base that keeps temps minimized to 10-20, excluding gift pack.

**ACTION STEPS**

Working with Production maintains a staffing grid that is monitored weekly that shows where openings exist. Trigger hiring to keep up with the level of attrition.
Monitor the employees that are "at risk", due to attendance or performance as part of the hiring trigger.
Develop a relationship with several community venues beyond the Unemployment office to tap into employees; Career Services, Work Release program, University Career offices, Hispanic, etc…

**2. GOAL**

Primary coordinator for the employee training process, both hourly and Salaried.

**ACTION STEPS**

Develop a training program for new salaried hires to cover basic job knowledge. This needs to be completed by QF2 for Sasha, Harrel, Fred, Wiley, Jeff and Donald Samuel X
Pick up information already collected by David Helms, solicit more information from the Dept. Managers and submit the training grant application that is available from the Career Services Office.
Enhance the current new employee orientation.
Working with Production creates a cross training/back up training process for critical positions; Roaster, Label machine, Filler, etc… QF3↑ End of June

3. **GOAL**

Assess and then develop the current HR department into what is best for the Dothan site.

**ACTION STEPS**

Assess and review both the roles currently filled by Leigh and Vera.
Ensure that all duties that are needed at this site are performed by the department.
Complete the job description assessment, including review of Grade level and discuss with incumbents by Jan 2006. – ??? May 2006
Database Aug 1st

4. **GOAL**

Development of an hourly incentive program ready to implement Oct 2006/fiscal 07.

**ACTION STEPS**

Working as a team with Finance, Operations and Divisional develop an incentive program that will be paid out quarterly and be tied directly to budgeted performance.
This must be drafted and ready for presentation for approval by the end of F'06 QF3. – MAB needs to initiate.

5. **GOAL**

Ensure that all Bremner/Ralcorp policy and procedure is implemented at the Dothan facility

**ACTION STEPS**

Working with Alice Clark and Steve Smith will get an understanding of what has/has not been implemented in the last year. Complete the implementation of those still in place and ensure that administration of existing policy is correct.
Handbook May 15th

6. **GOAL**

Achievement of Plant Safety goals

Tracking well.

**ACTION STEPS**

Vernon James, Plant Safety Manager reports to HR and will have primary responsibility to ensure that all proactive programs are being executed as targeted.
Ensure that appropriate follow up is being conducted on all existing accidents and challenges are being made where possible to keep WC costs minimal.

Training Session for Supervision

Emergency Action Plan Roll Out

7. **GOAL**

| Complete all activities as outlined on HR Dothan Action Plan |
|---|

**ACTION STEPS** -Refer to Action Plan

| See attached document.<br>A few of the items on this document are separately listed as goals above. |
|---|

**EMPLOYEE SIGNATURE** ______________________ **DATE** __________

**MANAGER SIGNATURE** ______________________ **DATE** __________

SECTION 5

# EMPLOYEE'S ASSESSMENT
**(Optional)**

Employees are encouraged to provide their candid assessment of the evaluation and the evaluation process. Please be specific. Forward the completed Assessment form to your locations' HR Dept (29R for St. Louis based employees).

How well do you believe the evaluation accurately reflects your performance during the review period?

Overall reaction to the performance review process. *(Please note those areas which you believe to be strengths and those where improvement is needed.)*

**EMPLOYEE SIGNATURE:** ______________________ **DATE:** ______________

***An Employee may appeal the results of the performance review. The appeal may be made with your Manager, Manager's Supervisor, Department Head or a member of the Human Resource staff.***

**Dothan**
**Human Resources**
**Action Plan**
**FY06**

| Category | Item | Action Steps | Target Complete Date | Status | Comments | Update Comments 04/17/06 |
|---|---|---|---|---|---|---|
| Safety | Conduct Safety Inspections | All employees complete one per week | 1/1/06 | Ongoing | Some teams participating | Per Venon - now at 100%, but will be an ongoing process |
| | Implement Safety Observations | All managers complete one per week | 1/1/06 | Ongoing | Some teams participating | STOP will start April 13 |
| | Develop Master Training agenda | Vernon conducts "Train the Trainer with supervisors who train their employees | 12/5/05 | Complete | Must ensure quality of training as passed on. Vernon to supplement with training videos/material from other locations | Complete |
| | Tool box talks | Conducted weekly on all teams | 12/5/05 | Complete | | Complete |
| | Disciplinary Action | Utilize disciplinary action to drive seriousness of safety violations | 12/5/05 | Ongoing | | Ongoing |
| | Emergency Responders | Identify and train Responders. Treat minor injuries on site. | 2/1/06 | Complete | Team trained in First Aid during November. Will train in CPR by February 1, 06 | Complete |
| | Accident response procedure | Detailed procedure to manage the relationship with the physicians and ER to minimize recordability | 12/5/05 | Complete | Have met with common medical providers regarding company expectations and light duty program. Member of management accompanies all Dr. visits. | Complete |
| | Safety Committee | Re-establish the plant safety committee. Drive interest and participation from all areas of the plant. | 12/5/05 | Ongoing | Currently posting for new members to serve specific terms - specifically hourly employees. Have committees for 1st and 2nd shifts. They meet once/month. Involve them in accident investigations and JIT development, immediately. | Always ongoing |
| | Accident reviews - management team | Accident investigations completed within 24 hours of incident. Management review within 48 hours. | 12/5/05 | Ongoing | | Ongoing |
| | Management Involvement | Participate in observations, inspections, and accident investigations | 12/5/05 | Ongoing | | Ongoing |

**Dothan**
**Human Resources**
**Action Plan**
**FY06**

| Category | Item | Action Steps | Target Complete Date | Status | Comments | Update Comments 04/17/06 |
|---|---|---|---|---|---|---|
| | STOP Program | January 1, 2006 launch. Involve Princeton resources. | 1/31/06 | Ongoing | | STOP will start April 13 |
| Staffing | Master Staffing Plan | Determine FTE to establish optimal staffing levels. Balance temp staffing off that. | 1/31/06 | Ongoing | Working with production and scheduling. | Meeting scheduled for 4/18 to review again |
| | | Determine temporary employee staffing levels. | 12/31/05 | Ongoing | Working with production and scheduling. | Meeting scheduled for 4/18 to review again |
| | | Evaluate temporary staff service | 1/31/06 | Complete | Evaluate moving to Nutcracker temp forces in lieu of using a temp service. Evaluate increased pay levels vs paying agency mark-up. | Meeting scheduled for 4/18 to review again |
| | | Create a Maintenance Staffing plan | 12/15/05 | Complete | Enhanced Ads placed in paper and websites asap (12/18/05 if possible). Conduct a job fair in January in conjunction with production openings. | Complete |
| | Competitive Analysis | Conduct an Area Wage Survey to determine competitive situation | 1/31/06 | In progress | Production and Maintenance | Follow up emails sent - use 3 we have to develop analysis |
| | Develop a Back-Up staffing procedure for skilled positions | Identify positions in need due to incumbent issues | 1/31/06 | Complete | This will be an ongoing process to anticipate upcoming openings. Cross-training procedure | Follow up emails sent - use 3 we have to develop analysis |
| Training | Develop a Master Training Plan | Conduct a Needs Analysis by position | 1/31/06 | Complete | | Plan Complete - training will start first of May |
| | | Skilled position templates developed | 3/31/06 | Complete | | Plan Complete - training will start first of May |
| | | Unskilled position templates developed | 9/30/06 | Complete | | Plan Complete - training will start first of May |

- review w/ Ricky close this week

**Dothan**
**Human Resources**
**Action Plan**
**FY06**

| Category | Item | Action Steps | Target Complete Date | Status | Comments | Update Comments 04/17/06 |
|---|---|---|---|---|---|---|
| | Create a Maintenance Development Program | Review existing Maintenance Progression plan | 1/31/06 | In progress | Determine what components need to be revised | Posible create internal appretice program |
| | | Create a partnership with local resources (Wallace Community College) to create a pipeline and skill set development program | 3/31/06 | In progress | | Posible create internal appretice program |
| Mgt Devel | Conduct a supervisory needs analysis | Analysis completed by 1/1/06 | 1/1/06 | In progress | | on hold - Division |
| | | Training template developed by 1/31/06 | 1/31/06 | In progress | | on hold - Division |
| | | Training in progress by February 06 | 2/15/06 | Complete | | Complete |
| | Monthly training programs | Develop master schedule of topics | 1/1/06 | Complete | Utilize external resources in addition to current resources | Ongoing |
| | Develop supervisory orientation program | Comprehensive orientation program | 3/31/06 | | Developed in conjunction with divisional efforts | ongoing with Division |
| | Coaching/Performance plans | Create and deliver specific performance expectations to those performing at a less than acceptable level | 1/31/06 | On Going as needed | | On going as needed |
| | Staffing involvement | Participate in hourly employee interview process | 2/28/06 | In progress | Must receive interview skills training in advance of their participation | in process / ongoing |
| | Development plan for Dothan HR team | Define job requirements/expectations. Deploy improvement plans where necessary. | 12/31/05 | Complete | | Get approval on job description / review grade |
| Policy Review | Implementation of all Ralcorp/Bremner policies | Review complete | 12/15/05 | In progress | | Complete |
| | | Implementation of all policies | 1/15/06 | Complete | | Complete |

**Dothan**
**Human Resources**
**Action Plan**
**FY06**

| Category | Item | Action Steps | Target Complete Date | Status | Comments | Update Comments 04/17/06 |
|---|---|---|---|---|---|---|
| | Emergency Action Plan | | 2/20/06 | Complete | | Complete/ will revise and review |
| | Plant Security | | 2/16/06 | Complete | | Completed with Glenn Warren |
| | Revised hourly handbook | Policies revised and communicated | 1/31/06 | In progress | | Targeted Reprint by May |
| Culture | Scorecards | Develop an action | 2/28/06 | In progress | | Working on communication and training / ONGOING |
| | | Share results from last meeting | 2/28/06 | Complete | | Complete |
| | Buddy system | Implement formal Buddy system for new hires | 2/28/06 | In progress | Model off Princeton program | Still Developing Program |
| | Improve facilities where possible | Break room, housekeeping, etc. | 9/30/06 | In progress | | On going |
| | Communications | Update/Replace bulletin boards, conduct monthly communication meetings | 1/31/06 | In progress | | On going |

Weapon - Mid June

Aug 1st

Capital Budget
Deadline May 15th
Tollie / Ricky - Lockers

HR Related Issues - Head Up



2

# DOCUMENTATION FORM

Employee Name: Frank williams

Investigating Supervisor: ______ Date: ______

Present: Mary Brooks

Who was involved: me + Linda Thurton

Witness (s): ______

Date of incident: 6-14-06

Where did it take place: Line 3

When did it take place (time and day): 11:15 Am wed.

What happened: Linda was having problems out of Lable machine so she just told me she was going to Break. I Let her go But I was still having trouble with the machine. I finially got it fixed and chris came around and told me to take out a Big Bag of cans that was sitting on Line 3. had a lot of Bad Lables But was trying to work them in Linda came Back off Break. I was going to do what chris had said then go Back and (over)

Did this result in down time? ______ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

-ick and help with the [illegible] when I went to go Linda yelled at me to help her get the rework. I told her that chris had already told me to do something else and I would help her when I got through She told me that was my ~~[illegible]~~ rework and I need to stay and help get it done. I told her I could not I had to do something I was told to do. she got an attitude. I ~~[illegible]~~ put my hand in the air turned around and walked off. I had got very upset so instead of saying something that would get me in trouble I walked away

[signature]

FH000804 a

EEOC FORM 131 (5/01)

# U.S. Equal Employment Opportunity Commission

Department of Human Resources
FLAVOR HOUSE PRODUCTS, INC
2700 Horace Shepard Road
Dothan, AL 36303

PLAINTIFF'S EXHIBIT 3

PERSON FILING CHARGE

Linda Thornton

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
420-2006-05107

## NOTICE OF CHARGE OF DISCRIMINATION

*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act
[ ] The Americans with Disabilities Act
[ ] The Age Discrimination in Employment Act
[ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.
2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.
3. [X] Please provide by **26-OCT-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
4. [ ] Please respond fully by to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **11-OCT-06** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Deidre J. Rivers,**
**ADR Assistant**
*EEOC Representative*
*Telephone* **(205) 212-2146**

**Birmingham District Office**
**Ridge Park Place, Suite 2000**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN [ ] AGE [ ] DISABILITY [X] RETALIATION [ ] OTHER

**See enclosed copy of charge of discrimination.**

FILE COPY

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| September 26, 2006 | Bernice Williams-Kimbrough, District Director | [signature] |

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form | | ENTER CHARGE NUMBER<br>[ X ] EEOC<br>420 2006 05107 |
|---|---|---|
| (State or local Agency, if any) | | and EEOC |
| NAME (Indicate Mr., Ms., or Mrs.)<br>Linda Thornton | | HOME TELEPHONE NO. (Include Area Code)<br>334-693-4488 |
| STREET ADDRESS<br>100 Armstrong Street | CITY, STATE AND ZIP<br>Headland, AL 36345 | COUNTY<br>Henry |
| NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.) | | |
| NAME<br>Flavor House Products, Inc. | NO. OF EMPLOYEES/MEMBERS<br>Over 15 | TELEPHONE NO. (Include Area Code)<br>334-983-5643 |
| STREET ADDRESS<br>2700 Horace Shepard Road | CITY, STATE AND ZIP<br>Dothan, AL 36303 | COUNTY<br>Houston |
| NAME | | TELEPHONE NO. (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |
| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es):<br>[ ] Race [ ] Color [x] Sex [ ] Religion [ ] Age [ ] Disability<br>[] National Origin [x] Retaliation [ ] Other | | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)<br>June 16, 2006 |

**THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):**

Social Security Number: 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 Date of Birth: 5-16-64 Sex: Female Race: Caucasian

I, Linda Thornton, began working for Flavor House Products, Inc. on or about June 25, 2001. While employed at Flavor House, I suffered sexual discrimination and retaliation. The sexual discrimination started during my first year of employment with Flavor House and continued throughout my employment. I was forced to resign my position with Flavor House on or about June 21, 2006, following my complaints to management of sexual discrimination and harassment.

| | |
|---|---|
| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br>09-15-06 Linda Thornton<br>Date Charging Party *(Signature)* | SIGNATURE OF COMPLAINANT<br>Linda Thornton<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) [signature] 11-8-06 |

Page 2 EEOC Charge
Name: Linda Thornton
Social Security #: 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
Date: 9-15-06

So much has happened that I cannot possibly set out everything, but the following is a brief summary of the sexual discrimination and/or harassment that I was subjected to while employed at Flavor House Products, Inc.

During my first year of employment, I repeatedly tried to get a promotion to "Label Operator". I was passed over several times and the position was given to temporary male employees with less or no experience. Unlike the male employees, I was required to provide a resume listing my mechanical experience before I was given the position. The discrimination continued even after I received the position in that I did not receive the training that the male operators/employees received. Additionally, the mechanics, all male, and other male employees made derogatory comments about me working "in a man's job." The mechanics did not like for me to make adjustments to my machine. If I took longer than 5 minutes to make adjustments, they would push me out of the way and make the adjustments or they would call the male supervisor over to make the adjustments. However, the male operators made adjustments that took longer than five minutes and nothing was said. I suffered this discriminatory treatment from the time I was put in the Label Operator position until I was forced to resign. My supervisor was aware of the discriminatory treatment; however, he did nothing to stop the discrimination. I also made numerous complaints to Marianne Boyer, Director of Operations, about the sexually discriminatory work environment that the female employees, including myself, were forced to work in on a daily basis. I told her that the mechanics, who are all male, cursed at and yelled at the female employees and that they called the female employees derogatory names. I reported to her that the mechanics would not allow the female operators to make minor repairs on their machines, but did not say anything when male employees made the same or similar repairs. However, Boyer's typical response to my complaints was to tell me that I would have to "deal with it" as she had learned to "deal with it"and then gave me two examples of discrimination she had do "deal with"in the company.

The first time I worked with Frank Williams was sometime in 2003. He was supposed to help me learn how to run his machine. I worked with him for three to four weeks. During that time, he yelled at me and cursed me. He also called me a "fucking stupid bitch". I complained to Melvin Hutchins, a member of management, but Hutchins told me that Williams was the only one that knew how to run the machine so I would just have to get along with him. I didn't work with Williams again until the beginning of 2006. I applied for a position as Line 3 Label Operator and received the position. Williams was not in the department when I applied; however, he was moved to the department shortly afterwards as the Team Leader. From then until I was forced to resign, Williams treated me in a discriminatory and demeaning manner. He yelled at me and cursed at me every day. Williams constantly talked about his sex life with his wife. He talked about how often he had sex, how they had sex, where they had sex, and how often they had sex. He even said he could tell his wife was cheating on him because of the way she "felt" when they had sex. Williams was also very vocal about the fact that he was a registered sex offender. I complained about Williams and his discriminatory treatment many times. I complained to Hutchins and Chris Jordan, Supervisor. They told me it would be taken care of, but to my knowledge, nothing was ever done as Williams' discrimination continued. A few months before I was forced to leave my employment, I was written up for telling another employee that Williams was a registered sex offender even though Williams made this statement himself almost every day. At first I was called in and told not to discuss Williams history although he discussed it everyday. I was told that the matter would be dropped, but if I discussed his criminal history again, I would be written up. A few days later, another female employee told me that Williams was making threats to hurt me. I reported these threats to management and was written up for discussing Williams history after being told not to talk about it. The employee that told me about the threats was fired shortly afterwards. Williams was the reason I was forced to resign my position with Flavor House.

On or about June 14, 2006, I was operating the label machine on Line Three, my usual position. Williams took over my machine during my break. When I came back, Williams was re-loading my machine with labels. I saw that the

paperwork had not been done while I was on break so I started on it to get caught up. There was also an overflow of re-work that needed to be done and a box full of bad labels that had to be re-done. As the company was having an important audit done that day, I asked Williams to help me with the re-work when he walked by. Williams turned around and shouted at me that he had "better mother-fucking things to do than fucking re-work." Williams continued to yell at me and kept repeating, "God damn mother fucker" at me. I tried to ignore him. Williams walked to the outside of the line and continued to yell at me. While still yelling "God damn mother-fucker" at me, he began picking up pallets and slamming them down. He also picked up a large bag of trash and threw it. By this time, a line mechanic had walked up and I asked him several times to call a supervisor on the radio. He tried to call a couple of supervisors and was told "it will be one minute." Donald Coty, the Mechanic Supervisor, walked by and I asked him to call Melvin Hutchins. By the time Hutchins arrived, Williams had quit yelling and cursing at me, but was still throwing pallets around and glaring at me. Hutchins asked me what the problem was, and I told him that I knew it was not a good time for this because the audit was going on, but this was the last time Williams was going to lose his temper and "go off on me" by cursing and yelling at me and calling me a "God damn mother-fucker" for no apparent reason. Hutchins called Chris Jordan, Packaging Supervisor, and he came over to my line. Jordan inventoried my tool bag and then told me to come to his office that afternoon and write out a statement of what happened. I began crying as I told him about Frank's discriminatory treatment and that I was tired of having to deal with Williams. Jordan assured me the situation would be resolved. Hutchins and Jordan then left to go back to the audit. From the time they left until three o'clock when I went to the front office, Williams stood at my re-work table and glared at me. I was extremely uncomfortable. At three o'clock, I went to Jordan's office and wrote out a statement. I was still very upset and told Jordan that I didn't know what Williams' problem was and he said he didn't care what Williams' problem was and that he would turn in my statement in the morning. I also told Jordan that Williams went and asked Catherine Long, a nearby co-worker, if she thought he had yelled at me, and Ms. Long told him twice that she thought he had yelled at me.

On or about June 15, 2006, I returned to work and tried to do my job while avoiding Williams. My co-workers were called in to the office to provide statements regarding the incident. Williams returned to my re-work table and glared at me the same way he had the day before. He would also walk up close to my machine and stop and stare at me. Williams' demeanor was very intimidating and because I knew that he had a history of violence against women, I was afraid he was going to hurt me. I was so scared of Williams that I took a screwdriver out of my tool bag and began carrying it around in my back pocket. When he was not standing at my re-work table or next to my machine, he would go to the filler machine and talk to Stephanie. He would turn around and glare at me from time to time during his conversation. Melvin Hutchins walked by and I told him that I was not comfortable working with Williams and that I did not feel safe around Williams. Hutchins told me that he had read my statement and agreed that he would not feel safe either. He reassured me that the situation would be resolved. H e told me not to let it get me down and to "pray on it". Later that day, I was moved to the Line 5 label machine; however, this was still in the same department with Williams and only a few feet away. This move afforded me no protection from Williams.

On June 16, 2006, I reported back to work and heard over the radio that Williams was not going to be at work that day. I called Jordan and asked if I was going to be moved back to my regular line, Line 3, since Williams was not going to be there. He said "no". I saw Hutchins later that morning and asked him if the move to Line 5 was permanent. He told me that he needed me on Line 5 right then and could not answer if the move was permanent. I then asked Ricky Smothers, the Supervisor over all Supervisors, if the move was permanent and he told me I would have to talk to Tommy (LNU) in PR. I asked Ricky if he was aware of what happened to me the day before. He said that he had heard bits and pieces of what happened. I asked him if he had read my statement and he said "no". I realized at that point that Williams was not going to be disciplined for his discriminatory behavior and that I was not going to be protected from him. I was so

Page 4 EEOC Charge
Name: Linda Thornton
Social Security #: 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
Date: 09-15-06

upset that I had to clock out and go outside to calm down. Hutchins and Ricky followed me outside and told me to leave the property and come back in an hour to meet Tommy. I told them that I was too upset to drive so they told me I should wait in the car for Tommy to get there so I could talk to him. They did not want the other employees to see me crying and upset. I waited and spoke with Tommy and Marianne Boyer, CEO, about the situation with Williams. Despite my statement and statements from witness, they concluded that I had "baited" Williams. I tried to explain to them again that I did not feel safe working with Williams and that I had started carrying a screwdriver in my back pocket. Recognizing that they were not going to resolve the situation with Frank, I placed my badge on Tommy's desk. Boyer asked me not to quit and to think about it over the weekend. I repeatedly told Boyer that I did not feel safe working with Williams to which she responded several times that if this was a court of law the action they had taken would be acceptable. She accused me of having an issue with sexual discrimination, and even though she told me that the law required them to provide a safe work environment, she told me that Williams would not be terminated. She said I would be moved to Line 5 and Williams would be on Line 3 and that we would stay that way for three months to see which of us had a conflict first. There was no mention of a write up during this conversation. However, it was later stated that if I had returned to work following this incident, I would have been written up although I had done nothing wrong.

The next three scheduled work days I called in sick because I was too afraid to go in and face Williams. A female employee told me that the first two days I was out, Williams asked her where I was. On the third day, Flavor House called back and left a message that I would have to have a doctor's excuse to return to work. I called Leah Allums in Personnel Resources and told her that I would not be returning because I did not feel I would be safe working with Williams. I learned that after my employment ended, Williams was written up for cursing at another female employee.

I believe that I suffered from sexual discrimination, harassment, and retaliation while employed with Flavor House Products, Inc., and that I was discriminated against because of my sex, female. I have been discriminated against because of my sex in job assignments, training, promotions, wages, discipline, discharge, and other terms, conditions, and privileges of employment; and retaliated against in that the conduct was wilful, malicious, and in wanton disregard of my federally protected rights.

Linda Thornton
Charging Party

09-15-06
Date

PLAINTIFF'S EXHIBIT 4

**DOCUMENTATION FORM**

Employee Name: Linda Thornton.

Investigating Supervisor: Chris Jordan Date: 6-14-06

Present: Melvin Hutchins, Frank Hall

Who was involved: Frank Williams.

Witness (s): Catherine Long, Wesley, Tamekia Cook

Date of incident:

Where did it take place: line 3

When did it take place (time and day): 11^00 - 11^05?

What happened: Today on line 3 when I came back from second break. (Frank Williams had Relieved me.) I noted that the paperwork had not been done while I was on break, so I was catching up on the paperwork. Frank was re-loading the machine with labels. There was re-work in a box full of cans, and the table was over-flowing with cans with bad labels. When Frank reloaded the machine he went to walk away - I asked him to help with the re-work - (the audit was going on) he started yelling at me that he had better "mother fucking things to do than worry about that fucking re-work. He continued to holler at me, and I told him to quit yelling & cussing at me. at this time he went from inside of the line to the outside of the line. The entire time, yelling at me. Continued to yell mother fucker. God damn mother fucker Throwing a large bag of cans. as he continued to yell an cuss at me - I continued to request that Wesley would please call for a supervisor. at this time Frank

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? no

Attach an additional sheet if needed for witness statements following the same format.

was still yelling & cussing and I continued to ignore him. Donald Coty walked by and I requested that he please get a supervisor, please call Melvin Hutchins.

MORE →

Finally Frank went on his way. When Melvin came I told him about the situation at hand. Catherine ~~[illegible]~~ Long was standing there and Wesley, and I honestly do not know who else. I ignored Frank Williams yelling God Damn mother Fucker — whether he was calling me that name or just yelling it at me. Regardless — I won't take it again. No One else talks to me that way and he sure won't again. I don't have to tolerate that level of abusive language or name calling. Tameaka asked me later what was he having a fit about.

Also, stated to Catherine "Did I holler at Linda". She stated "Yeah."

PLAINTIFF'S EXHIBIT

5

**DOCUMENTATION FORM**

Employee Name: Catherine Long

Investigating Supervisor: Chris Jordan Date: 6-15-06

Present:

Who was involved: Frank Williams and Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 Label Machine

When did it take place (time and day): Before 1200 Noon

What happened: well Linda just had Came from Brak and she asked Frank to help her Clean off the table By Line 3 label machine. I hear Frank said the F word and I cant do every dam thing. that all I heard except he was doing alot of yelling and ext. ext. ext.

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT

6

# DOCUMENTATION FORM

Employee Name: Tameka Cooke

Investigating Supervisor: Chris Date: 6-15-06

Present:

Who was involved: Frank Williams + Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 label Machine

When did it take place (time and day): Before lunch

What happened: line 3 label machine messed up & we had bad labels on the work area & we cleaned some & when Linda got back from back some was left up there and she asked Frank what about this mess and Frank walked off saying curse words exact I don't Know so Linda said something to him. ~~[illegible]~~ He threw his hands up & said fuck it and went threw the curtains. She was ignoring him but it was words still being said from him.

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

FREEDOM COURT REPORTING

1

AUDIOTAPE TRANSCRIPTION

IN RE:

LINDA THORNTON VS. FLAVOR HOUSE PRODUCTS and FRANKLIN D. WILLIAMS, JR.

CASE NO.: 1:07-CV-712-WKW

COPY

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

UNIDENTIFIED SPEAKER: Law office?

MS. COOK: May I speak to Linda Parrish?

UNIDENTIFIED SPEAKER: Hold on just a moment.

MS. PARRISH: Hello?

MS. COOK: This is the State of Alabama Unemployment Office.

MS. PARRISH: Yes, ma'am.

MS. COOK: I'm calling regarding the appeals hearing for Linda Parrish.

MS. PARRISH: Yes.

MS. COOK: Okay. Is this Linda?

MS. PARRISH: Yes, it is.

MS. COOK: Okay. Hold on one second. The employer representative, I need to give them a call. I think there's more than one person.

MS. PARRISH: Okay.

MS. COOK: Just a second. Let me get that party.

MR. TAYLOR: Good morning, this

is Tracy Taylor. Can I help you?

MS. COOK: Yes, Mr. Taylor, this is Ann Cook, State of Alabama Unemployment Office. I'm --

MR. TAYLOR: How are you today?

MS. COOK: Fine, thank you. I'm calling regarding Linda A. Parrish. She's on the other line, and I need to call Tommy Mance and Frank Williams.

MR. TAYLOR: Yes, ma'am.

MS. COOK: Okay. Hold on a second. Let me get the other parties on the phone.

MR. TAYLOR: Thank you, ma'am.

RECORDING: Thank you for calling Nutcracker Brands, formerly Flavor House Products. If you know your party's extension, you may dial it at any time. For consumer affairs, press four or hang up and dial 1-866-770-1157. For sales and marketing, press five. For all other options, press six.

To dial your party by last name,

press one. For shipping and receiving, press two. For purchasing, press three. For accounting, press four. For human resources, press five. For parts delivery, press six. For the operator, press zero. Please wait.

Thank you for calling Nutcracker Brands, formerly Flavor House Products. If you know your party's extension, you may dial it at any time. For consumer affairs, press four or hang up and dial 1-866-770-1197. For sales and marketing, press five. For all other options, press six. Transferring to an operator; please wait.

UNIDENTIFIED SPEAKER: Nutcracker Brands. May I help you?

MS. COOK: Yes. This is the State of Alabama Unemployment Office. I'm trying to get exten- --

UNIDENTIFIED SPEAKER: Yes, ma'am.

MS. COOK: -- extension 222.

UNIDENTIFIED SPEAKER: Okay, that's Tommy Mance. His door is -- it hasn't been open yet this morning. I am thinking he's either with someone in there or -- or not in yet.

MS. COOK: Well, he's expecting a phone call from the State of --

UNIDENTIFIED SPEAKER: Do you have an appointment with him or --

MS. COOK: He's expecting -- yes, ma'am. He's expecting a phone call from the State of Alabama Unemployment Office.

UNIDENTIFIED SPEAKER: Okay. Let me walk down there and see -- and see if he's coming in. I'm going to stick you on hold for a minute, okay?

MS. COOK: All right.

UNIDENTIFIED SPEAKER: Ma'am?

MS. COOK: Yes?

UNIDENTIFIED SPEAKER: Okay. Hold on just one second. I'm going to transfer you over to him, okay? We have

a terrible connection, though; I can barely hear you. I hope it's better when he picks up. Hold on.

MR. MANCE: Tommy Mance.

MS. COOK: Mr. -- this is the State of Alabama Unemployment Office. I'm calling regarding the appeals hearing for Linda Parrish. I have Ms. Parrish on the other line along with -- who is that? Tracy Taylor.

MR. MANCE: Okay. I have Frank Williams here with me as a witness.

MS. COOK: Okay. Okay. Ms. Linda Parrish, are you there?

MS. PARRISH: Yes.

MS. COOK: Okay. Do you have someone else with you?

MS. PARRISH: Yes.

MS. COOK: Who is it?

MS. PARRISH: My attorney.

MS. COOK: Would you mind giving me the name?

MS. CROOK: I don't represent

you.

MS. PARRISH: She's not representing me in this right here. Bobby Crook.

MS. COOK: Are you tape recording the hearing? It's not allowed if you are. And no other tape is legal except the State of Alabama. So if you're tape recording, you cannot do that.

MS. PARRISH: We're not tape recording.

MS. COOK: Okay. Well, I have on the other line Tracy Taylor, Tommy Mance, and Frank Williams, a witness.

Let me explain this procedure. The hearing is tape recorded. The State of Alabama, it requires that all unemployment hearings are tape recorded, and we're on the record now for appeals case number 088858206. This hearing is being conducted by teleconference. Today's date is August 23rd, 2006. My

name is Ann Cook. I'm an administrative hearing officer for the State of Alabama Department of Industrial Relations, Hearings and Appeals Division, and I will be making the decision in this unemployment case. The claimant is present, Linda Parrish. The employee is Flavor House Products, Incorporated, represented by Tracy Taylor, Tommy Mance, and the witness Frank Williams.

Ms. -- Ms. Parrish unemploy- -- her unemployment claim was filed through the Alabama counsel the week of June 25th, 2006. This claim has been approved for payment of unemployment benefits and the State of Alabama was notified, Flavor House of this eligible determination and advised them if they disagree they have the right to appeal. They must file their appeal within 15 calendar days of the date the notice was sent to them. The note was mailed to Flavor House Products, Incorporated on

July 19th, '06. They did file a timely appeal. Under Alabama law, section 254782, which is the issue regarding voluntary quit, the law states that if you voluntarily leave your last bona fide work without a good work-connected cause, the unemployment claim is denied indefinitely. Good work-connected cause means it stands to reason, just grounds for such action, adequate excuse that would bear the test of reason and knowledge, element of good faith, and to be good cause the reason for leaving has to be job connected. The law requires that if you voluntarily leave you must -- you're denied benefits until you return to other insured or acceptable work and earn ten times the weekly unemployment rate established on this claim.

This is the procedure we will follow, Ms. Parrish: I'll let you give your statement first. I'm going to ask

you some questions, after which the employer representative, Mr. Taylor, and Mr. Mance will be allowed to ask you some questions. After that, I'll take your testimony.

Mr. Taylor, are you a representative, or are you giving testimony?

MR. TAYLOR: Ma'am, I'm acting only as a representative.

MS. COOK: Okay. Mr. Mance, I'll take your testimony, and Ms. Parrish will be allowed to ask you some questions, and then we will allow Mr. Taylor to ask Mr. Mance some questions also before Ms. Parrish then. And, Mr. Williams, we'll take your testimony, and Mr. Mance and Mr. Taylor will be allowed to ask you some questions as well as Ms. Parrish. After that, if there -- if there is any other information that you need to present to me to be considered that is relevant, you will be allowed to

present that.

Are there any questions about this process? Okay. Well, you must be under oath before I take your testimony. I'll --

MS. PARRISH: Yes, ma'am.

MS. COOK: -- administer that to you now. Do you solemnly --

MS. PARRISH: Will you tell me if there is a lawyer present for them?

MS. COOK: I told you there were. Tracy Taylor is a rep.

Mr. Taylor, you work with Talk UC Express; is that correct?

MR. TAYLOR: Yes, ma'am. I'm a lay representative employed by Talk UC Express.

MS. COOK: Okay.

MR. TAYLOR: That's related to and handles unemployment patterns.

MS. COOK: Okay. I understand. Well, no, there is no attorney as far as I know, Ms. Parrish. He's a

representative with the employer representative company, and the name of the company, Talk UC Express. And the other two individuals are Mr. Williams is the witness and, Mr. Mance, what's your title?

MR. MANCE: I'm the human resources manager.

MS. COOK: Okay. Okay. You must be under oath before I -- well, is there another question?

MS. PARRISH: No, ma'am.

MS. COOK: Okay. You must be under oath before I take your testimony. Do you solemnly swear to tell the truth, the whole truth, nothing but the truth, so help you God, Ms. Parrish?

MS. PARRISH: I do.

MS. COOK: And Mr. Mance?

MR. MANCE: I do.

MS. COOK: And Ms. Will- -- Mr. Williams?

MR. WILLIAMS: I do.

MS. COOK: Okay.

EXAMINATION OF MS. PARRISH BY MS. COOK:

Q. Ms. Parrish, are you working now?

A. No, ma'am.

Q. Okay. When you worked for Flavor House Products, Incorporated, where -- where did you work? What location?

A. On the label machine.

Q. I -- where did you work? What location did you work? Where?

A. It's in Alabama.

Q. Where did you work, Ms. Parrish? What city did you work?

A. Dothan, Alabama.

Q. Okay. All right. Your job title, what was that?

A. Label operator.

Q. I'm sorry; you said label operator?

A. Yes, ma'am.

Q. That's L-A-B-E-L?
A. Yes, ma'am.
Q. Okay. And how long did you work for this company?
A. Five years.
Q. Could you give me your hire date?
A. June, 2001.
Q. And what was your last day at work?
A. June 16th, 2006.
Q. Okay. Were you discharged from this job?
A. Yes, ma'am.
Q. Okay. Who terminated you, Ms. Parrish?
A. Maryann Boyer.
Q. I'm sorry; I can't hardly understand you.
A. Maryann Boyer.
Q. And what was her title? What is her title?
A. CEO.

Q. And why did she terminate you?
A. I had no other choice but to be discharged.
Q. Then what -- tell me what did she tell you when she told you were dis- -- you were fired? What reason did she give?
A. There was no action taken against Frank Williams; he would continue to work there.
Q. Okay. No, ma'am. I asked you what reason did she give you? You said -- you said you were fired by the CEO, and what reason did she give you for terminating you?
A. I felt like I was forced to leave --
Q. No, you said you were terminated, and I need you to tell me what did she say when she told you you were fired? What reason did she say?
A. I said I was constructively terminated, which meant I felt unsafe to

work there. I had no other choice but to leave.

Q. Okay. Well, you first -- I first understood you to say you were fired by -- I don't recall the lady's name but you said the CEO. So you're saying now that you were constructively terminated?

A. Yes, ma'am.

Q. Okay. What does that mean? What do you mean by that?

A. I felt unsafe to work with a registered sex offender that had already threatened me.

Q. Okay. What did -- who is -- who are you speaking of, Ms. Parrish?

A. Frank Williams.

Q. Okay. How did he threaten you?

A. He cussed me out, he physically thrown things at me.

Q. When did that happen?

A. On June 14th.

Q. Okay. What -- you say Mr.

Williams cursed you out and he threw something at you. What did he throw at you?

A. He threw pallets and a large garage bag full of cans.

Q. Did he throw it at you or in your direction?

A. In my direction.

Q. Okay. So what did he say to you when he threw it in your direction?

A. He called me a God damn motherfucker.

Q. Were you and him having a disagreement?

A. I asked him to help with rework, and he proceeded to call me a God damn motherfucker.

Q. Okay. Who was your supervisor?

A. Chris Jordan.

Q. And did you report this to your supervisor?

A. Yes, ma'am.

Q. When did you report it?

A. Immediately. As -- I tried for 10 to 15 minutes to get a hold of a supervisor through a mechanic radio.

Q. Okay. Did you have -- this was the first time you had a disagreement with Mr. Williams?

A. No, ma'am.

Q. Okay. Had you made a formal complaint or report that you were having difficulty working with him?

A. Yes, ma'am.

Q. Well, what authority, if any, did Mr. Williams have over you?

A. He was my team leader.

Q. Okay. And where did you get the information that he was a registered sex offender?

A. He freely spoke about it.

Q. I mean, do you have firsthand knowledge that that is correct?

A. Yes, ma'am.

Q. Okay. Where did you get it from?

A. Off of the public safety information center of Alabama.

Q. Okay. So how did that affect you in working with him?

A. He was sexually harassing me.

Q. Okay. How did he do that?

A. He continuously cussed me; he continuously talked about his past.

Q. And who did you say you reported all of this to?

A. I reported it to Chris Jordan, Melvin Hutchins. I wrote out statements and turned in to the PR department.

Q. And what -- when did you do that, Ms. Parrish?

A. When the incident happened and before the incident happened, probably a month before.

Q. I mean, what did you report before the incident happened?

A. That he was harassing me.

Q. Well, that is the incident, is it not?

A. This is a continuous incident.
Q. Well, did you get a response from your employer about your complaint?
A. No. The first -- the first time they said we would just have to work together.
Q. What was your first complaint?
A. When I was called in there I was reprimanded -- reprimanded for saying that he was a convicted sex offender.
Q. Okay. Did you have a documentation of that complaint or that allegation?
A. No, ma'am. They said they pulled it up.
Q. Well, did you have any documentation to substantiate your allegations against Mr. Williams?
A. Yes, ma'am.
Q. And what -- where did you get your information from?
A. From the computer.
Q. Okay. So you have a copy of it?

A. Yes, ma'am.

Q. Okay. So what did that have to do with him working with you?

A. He continuously put down females.

Q. But how did that keep you from being able to work with him?

A. Because I -- I was called a God damn motherfucker every day.

Q. Well, did he call you that, or did he use that terminology?

A. He called me that.

Q. He did that to your face directly; is that correct?

A. Yes, ma'am.

Q. And what reason did he call you a name?

A. Because I was a female.

Q. So he would come directly to your face and use the derogatory term to you?

A. Yes, ma'am.

Q. Okay. Does your company have a

policy against harassment and behavior of that nature? Ms. Parrish?

A. Ma'am?

Q. Does your company have a written policy against workplace violence and harassment?

A. Yes, ma'am.

Q. Okay. Did you follow the procedure in filing the complaint per your handbook?

A. I was told to report it, and that's what I did.

Q. I said, did you follow the procedure in the handbook?

A. I don't have a written procedure in a handbook.

Q. Did you not get a copy of an employee handbook?

A. Yes, ma'am.

Q. What happened to your copy?

A. I have my copy.

Q. Okay. I asked you, did you follow the procedure from your handbook?

A. Yes, ma'am, and that was to report it to my supervisor.

Q. Okay. So did you make a written report that you had been sexually harassed by Mr. Williams?

A. Yes, ma'am.

Q. Do you have a copy of that complaint?

A. Ma'am? Hello?

Q. Do you have a copy of that complaint, Ms. Parrish?

A. No, ma'am.

Q. Okay. Do you have a copy of any of your complaints to the employer?

A. Yes, ma'am.

Q. Okay. What's the date on the one you have?

A. I don't have it with me.

Q. Okay. What --

A. I wrote it and gave it to them on June 14th.

Q. Okay. That was the only complaint you have?

A. No, ma'am.
Q. I mean a written complaint. Is that the only one you made?
A. No, ma'am.
Q. Okay. Do you have copies of any of them?
A. Not with me.
Q. Okay. What happened when you made your complaint to Flavor House? What happened with the complaint?
A. Well, our handbook, number one, does not say that we have to have a written complaint.
Q. What I'm asking you, what happened when you made your complaint? You told me you made written complaints, so did you make verbal complaints also?
A. Yes, ma'am.
Q. Okay. What happened with your verbal and written complaints? What action was taken by the employer?
A. None.
Q. There was --

A. I was moved.

Q. Okay. They moved you to another area?

A. Twenty feet away.

Q. Okay. Did you have to work with Mr. Williams then?

A. Yes, ma'am.

Q. They moved you but you still worked with him; is that what you're saying?

A. Yes, ma'am.

Q. Okay. You say he was a lead person working with you?

A. Yes, ma'am.

Q. Okay. Did you -- was there anywhere else that you -- they could move you to?

A. No, ma'am. I run -- yes, there was. I run label machines, and he was the relief person for them label operators when they go on break.

Q. When you reported the threatening behavior, alleged

threatening behavior you felt from Mr. Williams, did your employer tell you they had taken some type of action in regard to your complaint?

A. No, ma'am.

Q. What did they tell you? How did they resolve this problem?

A. That I would have to get over it.

Q. Okay. So Mr. Williams used profanity in your presence, and you felt that he disliked women; is that correct?

A. Yes, ma'am. And throwing things.

Q. Okay. What happened when you felt you could no longer --

A. Ma'am?

Q. When you felt you could no longer work with Mr. Williams, what did you do?

A. Left.

Q. Did you give a formal notice of resignation?

A. I asked them to remove him when he continued working there and they told me yes.

Q. I said, did you give a notice of resignation?

A. I'm able and willing to come back to work when he leaves.

Q. Did you give a notice of resignation?

A. I told them I could no longer work there as long as he works there.

Q. Did you give a two-week notice?

A. No, ma'am.

Q. Okay. So you -- who did you --

A. I was not allowed that opportunity.

Q. Okay. How did they stop you from giving a two-week notice?

A. They continued to keep Frank Williams there. It was to the point where I had a screwdriver in my back pocket.

Q. Okay. Did you file any charges

with him with the police department?

A. No, ma'am. I wish I would have but at that -- that -- you're -- we cannot get out on the phones that are at the plant.

Q. Well, when you got off work, could you have filed charges then?

A. No, ma'am. I was so upset, I wasn't thinking.

Q. Okay. So you voluntarily quit on June 16th; is that the day you terminated your employment?

A. I did not voluntarily quit; I was forced to quit.

Q. Okay. You were -- you felt forced to quit on 6/16/06; is that correct?

A. Yes, ma'am.

Q. Okay. If one of you has a cell phone, would you mind turning it off so it won't interrupt the hearing?

A. Yes, ma'am, we have that.

Q. Okay. And you say you felt

forced to quit on June 16, '06, because Mr. Frank Williams who was your lead person, you had to continue to work with him and he made derogatory remarks toward you and he threw things in your direction; is that correct?

A. Yes, ma'am.

Q. And, also, did you say the employer, after you reported this to the employer, you felt that they did not resolve the problem and you could not continue to work with him; is that correct?

A. Yes, ma'am.

Q. Were you the only person working with Mr. Williams?

A. No, ma'am.

Q. Were you the only female working with him?

A. No, ma'am, but I understand that he's had more write-ups after me.

Q. I said, were you the only female that worked with him?

A. No, ma'am.

Q. Did anyone else -- did you -- did they experience, as far as you know, the same problem at that time?

A. Yes, ma'am, and since I've been gone also.

Q. Okay. How do you know what happened after you left the business?

A. I worked with -- at Flavor House for five years.

Q. I said, how would you know what happened after you left the business?

A. I have friends at Flavor House.

Q. Well, this is your firsthand direct knowledge; not -- not what, you know, someone told you. I was asking for your knowledge of what happened.

A. Okay.

Q. Okay. So your -- you volun- -- you say you were constructively terminated because you felt you worked in an unsafe work environment because of Mr. Frank Williams, and on June 14th you

made a formal complaint on him and you felt that this complaint was not resolved to your satisfaction and you could not work with him because of information you received about his past and you felt threatened because he used profanity and threw things. So on June 16th, '06, you felt forced to leave your job; is that correct?

A. Yes, ma'am, and he continuously talked about his conviction as being a sex offender.

Q. Was he speaking to you, Ms. Parrish?

A. Yes, ma'am.

Q. Were you involved in a conversation with him?

A. Yes, ma'am -- no. He spoke of his conviction freely out loud in the break room to me, to anyone.

Q. Okay. So could you not get up and leave that conversation?

A. Not if I'm at my machine I

cannot leave.

Q. Okay. Anything else, Ms. Parrish, you want to add to the reason you felt constructively terminated?

A. Yes, ma'am. I would not have quit my job if I did not feel unsafe. I have stayed there for five years. I've tolerated discrimination throughout those five years, including being hit in the chest with a jar of peanuts.

Q. Okay. Ms. -- Ms. Parrish, we're asking about your termination, your separation. So did all that happen when you were separated? Were you hit with peanuts, a jar of peanuts?

A. No, ma'am, it led up to it, the discrimination.

Q. Okay. Did you file an EEOC discrimination charge?

A. I'm going to.

Q. Okay. But as far as this final incident that led to your separation from the company, it involved working

with Mr. Frank Williams and you felt you were in an unsafe work environment and could not continue; is that correct?

A. Yes, ma'am, and I would also like to note that the position that Frank Williams is in, he freely walks around the plant; so, therefore, moving me anywhere did not accomplish anything.

Q. Okay. So you wanted them to terminate him or to --

A. Yes, ma'am.

Q. You wanted the company to terminate Mr. Williams?

A. Yes, ma'am. He -- he freely walks around the plant.

Q. Was that not part of his job?

A. No, ma'am, unless he's relieving for break.

Q. Okay. Okay. Ms. Parrish, anything else?

A. No, ma'am.

MS. COOK: Okay. Mr. Taylor, do you have any questions for Ms. Parrish?

MR. TAYLOR: Yes, ma'am, I do. Thank you.

EXAMINATION OF MS. PARRISH BY MR. TAYLOR:

Q. Ms. Parrish, you've testified that you were discriminated against. How were you discriminated against?

A. I was talked down to. I was called names. In one incident I was even told this is a man's job. And the CEO had told me that just to put up with it; that she also has to deal with it in meetings that she has.

MS. COOK: Okay. Any other questions, Mr. Taylor?

MR. TAYLOR: Yes, ma'am.

Q. (BY MR. TAYLOR:) Mr. Parr -- or Ms. Parrish, you testified that Mr. Williams was harassing you because you were a female. Mr. -- did Mr. Williams tell you that?

A. Mr. Williams would not have

talked to a man that way.

Q. How do you know that?

A. Because I worked with him.

Q. So you base this testimony on your assumption that he was harassing you because you were a female?

A. Yes.

Q. You said he used profanity when he spoke to you. Were you using profanity in the workplace?

A. Yes.

Q. Why is your profanity acceptable and his is not?

A. I have never called anybody a God damn motherfucker.

Q. The choice of the words that he used made it more egregious than your use of profanity?

A. Oh, no. Maybe the choice of him having a fit, throwing things, and his uncontrollable actions.

Q. Well, ma'am, you testified that he threw things. He threw them at you?

A. In my direction.

Q. So he was trying to hit you?

A. That would be a question for him.

Q. Do you believe he was trying to hit you?

A. Yes.

Q. So, ultimately, that's why you felt threatened; because he was throwing things, trying to hit you?

A. Yes. And prior to this incident, he had told somebody that he would get me back.

Q. How do you know that?

A. Because the person, he told me that -- told that to told me. If you'll look right there in my file --

Q. Well, ma'am, how do you know that person was telling the truth?

A. See my complaint and talk with that person.

Q. So you testified you fired -- filed a prior complaint, final

complaint, on June 14. When did you file those complaints?

A. Which one?

Q. It talks about all the complaints you filed. When did you file your first complaint against --

MS. CROOK: That's irrelevant. I'm going to enter an objection at this point. This is all irrelevant. We couldn't get into her past complaints.

MS. COOK: Okay. Ms. -- hold on a second, Ms. -- I didn't get your last name. What's your last name?

MS. CROOK: Crook.

MS. COOK: Bobby what?

MS. CROOK: Crook.

MS. COOK: I can't understand you.

MS. CROOK: C-R-O-O-K.

MS. COOK: Okay. Did I not understand you to say you were not participating in the hearing, that you were just going to listen?

MS. CROOK: I'm here to protect her interest in the case, so I am representing her in this.

MS. COOK: Okay. But you told me you were not participating. Now, it's okay if you want to be a representative in the hearing, but we have to have your identity and know whether you're participating. Are you participating?

MS. CROOK: At this point I guess I'm going to have to participate if he's going to go into all of her past complaints, which she wasn't allowed to go into.

MS. COOK: Okay. But you cannot be disruptive to the hearing, and if you're going to participate be nondisruptive and just -- you can -- this is an informal hearing, it's not in court, so it's not the same. So --

MS. CROOK: I'm just --

MS. COOK: Go ahead, Mr. Taylor,

with your questions.

MR. TAYLOR: Thank you.

Q. (BY MR. TAYLOR:) Ma'am, when did you file your first complaint?

A. I'm not answering that. I told you I did not have my copies with me.

Q. Well, ma'am, let's step away from it and go to that date. On or about when did you file your first complaint?

A. Two to three months prior.

Q. So about March?

A. This is on Frank. Then there was one the year before.

MS. COOK: Okay.

A. So I don't --

MS. COOK: Okay. Mr. -- Mr. Taylor, be more specific about these questions you're asking her.

MR. TAYLOR: Yes, ma'am.

Q. (BY MR. TAYLOR:) You filed your first complaint against Mr. Williams in March of '06?

A. No.

Q. When did you file your first complaint about Mr. Williams?

A. '05 --

Q. The month?

A. That was not my first complaint on Frank. I filed the first of the year before. I've got several.

Q. Ma'am, isn't it true that in the end of '05, probably the last quarter, you had been working on a line, you got into an altercation with another employee?

A. Who might that be?

Q. Have you been in an altercation with another employee besides Mr. Williams? I'm sorry; I didn't hear your answer.

A. Are you talking about when a mechanic hit me with a jar?

Q. Ma'am, I'm not giving you any specifics. Have you had an altercation with another employee?

A. I can't give you --

MS. COOK: Okay. Mr. Taylor -- Mr. Taylor, that appears to be immaterial that -- what you're asking at this point. I don't understand why you want to know that.

MR. TAYLOR: Yes, ma'am. I'll move to my next question.

MS. COOK: Okay.

MR. TAYLOR: Thank you.

Q. (BY MR. TAYLOR:) Ms. Parrish, is it true that at the end of '05 you were moved to line three, the line supervised by Mr. Williams as the team lead?

A. Yes.

Q. That move to that line was a result of an altercation with another employee?

A. No.

Q. You were moved off the line that Mr. Williams supervised as a result of this final altercation; is that true?

A. Under investigation.

Q. And isn't it true that the employer addressed your concerns by moving you from his supervision?

A. No.

Q. So he was supervising the line you were now working on or going to be working on?

A. He could, yes.

Q. There was a team lead assigned to the line that you were going to be working on?

A. Frank Williams is put where they need him.

MS. COOK: Ms. Parrish, could you -- did you understand his question?

MS. PARRISH: Yes, ma'am.

MS. COOK: Okay. Could you respond to his question, please?

MS. PARRISH: Frank Williams goes in that plant --

MS. COOK: That's not what he asked you, Ms. Parrish. Would you

restate your question?

MS. PARRISH: The team leader on line three --

MS. COOK: Would you restate your question, Mr. Taylor?

MR. TAYLOR: Thank you.

Q. (BY MR. TAYLOR:) And the line, ma'am, that you were working on, is there a team leader assigned to that line?

A. No.

Q. So, in fact, Mr. Williams would not be your supervisor on that line because there is no team leader on that line; is that correct?

A. Yes.

MR. TAYLOR: I don't have any further questions. Thank you.

MS. COOK: So, Mr. Mance, do you have any questions?

MR. MANCE: I have no questions.

MS. COOK: Okay. And, Ms. Crook, since I did not know you were

going to represent Ms. Parrish in this hearing until a few minutes ago, I didn't put you in the line to ask questions because I was unaware. Do you have any questions now?

MS. CROOK: No, ma'am.

MS. COOK: Pardon me?

MS. CROOK: No, ma'am.

MS. COOK: Okay. Mr. -- Mr. Mance, do you have any -- well, let me ask you a few questions, Mr. Mance.

EXAMINATION OF MR. MANCE BY MS. COOK:

Q. Ms. Parrish said that she worked for Flavor House for five years; her hire date was June of 2001. Can you give me a specific date?

A. Yes, ma'am. June 25th, 2001.

Q. And her -- when she retired, what was her job title?

A. She was hired in as a laborer position. She had several changes while employed.

Q. Okay.
A. Most recent title was a label operator.
Q. Okay. And what is the very last day Ms. Parrish worked for your company?
A. That would have been 6/16; she came in and turned out actually worked that day. She came in that morning, spoke with Maryann Boyer, our director of operations, and spoke with myself.
Q. And spoke to you about what?
A. About her concerns with the investigation and working on the line with Frank Williams.
Q. Why is she no longer employed with -- what -- does your company have another name at this time?
A. Nutcracker Brands.
Q. Okay.
A. And then --
Q. Okay. Why was Ms. -- what is the reason Ms. Linda Parrish no longer works for your company?

A. She voluntarily resigned on the 21st of June.

Q. Okay. You -- your statement is that she came in on June 16th, which was on a Friday, and she spoke to you and who is the other person?

A. Maryann Boyer, our director of operations.

Q. Okay. And what was the nature of the conversation?

A. The investigation concerning herself and Frank; the altercation they had had on the 14th.

Q. Okay. Why did Ms. Parrish not work on Friday, June 16th?

A. She felt she was too upset to work. We offered her the opportunity to go home and think about it over the weekend. We expected her to be back at work on Monday. She voluntarily left on Friday but she could not work -- we gave her the rest of that day off and expected her back to work on Monday.

Q. And what was Mr. -- what was Mr. Williams's job title or position over Ms. Parrish?

A. Mr. Frank Williams is our team leader on line three.

Q. Okay. Had you received complaints from Ms. Parrish about working with Mr. Williams?

A. Not complaints. There has been altercations previously mentioned, March the --

Q. Are you -- what -- okay. You say you had not received any complaints from Ms. Parrish?

A. Not complaints about working with him, no. There had been altercations between the two individuals previously.

Q. Okay. But her statement I understood earlier was that she had filed verbal complaints about him. So are you --

A. No, ma'am.

Q. You're not characterizing them as formal complaints?

A. No, ma'am, it's not formal complaints. It's documentation about comments that were made between the two of them or among the two among other employees that were investigated. And Ms. Parrish did receive a disciplinary action concerning her involvement in the comments on March -- February 16th.

Q. Okay.

A. And March 7th.

Q. So were they altercations or -- or verbal conflicts between --

A. Verbal conflicts, yes, ma'am.

Q. Okay. Between Ms. Parrish and Mr. Williams there were verbal conflicts and alter- -- verbal --

(Side A of tape ends.)

MS. COOK: Okay. We're back on the record. We went off the record momentarily; I ran out of tape. But do you both agree that when I stopped and

changed my tape, that no testimony took place when I asked Mr. Mance to hold on a second?

MR. MANCE: I agree.

Q. (BY MS. COOK:) Okay. Okay. You said there was no formal complaints, but there were allegations and verbal conflicts with Ms. -- between Ms. Parrish and Mr. Williams?

A. Yes, ma'am. She had made comments, inflammatory nature, about his past and about him in the work force. After investigating that we come to the conclusion that she had made the comments of an inflammatory nature, and she did receive a disciplinary action for the comment.

Q. Okay. What did Ms. -- when you investigated Ms. Parrish, what did she say about those inflammatory comments she made about Mr. Williams?

A. She was -- let's see. Let me read her statement here. She said

another employee had came to her telling her the information about Frank. Again, she did repeat that information to other employees.

Q. Okay.

A. Information --

Q. Did she complain that he had called her a derogatory name?

A. Not at this time, no. This is a previous altercation.

Q. Okay. But in the final investigation, did Ms. Parrish make a formal complaint against Mr. Williams?

A. Let's see. She did make the statement that he was cursing, yelling at -- yelling at her, calling her MF -- GDMF. Those were her -- that is in her statement.

Q. Okay. Did you get any other employees to come -- who came forward that witnessed come -- the -- Mr. Williams making those derogatory comments to Ms. Parrish?

A. Yes, ma'am. We had other employees involved in the investigation.
Q. Okay. Did they witness -- did they hear him calling her names?
A. They heard yelling; they did not hear specific cursing at her.
Q. Okay. So the witnesses said they did hear yelling but did not say specifically that Mr. Williams called Ms. Parrish names?
A. Yes, ma'am, that's correct.
Q. Okay. Did any witnesses witness Mr. Williams throwing things in Ms. Parrish's direction?
A. No, ma'am.
Q. Did you move Ms. Parrish to another area so she would not be under his direct supervision?
A. Yes, ma'am.
Q. And where -- where did you move her to?
A. Moved her to line five label operator. She retained the same pay,

same position, just in a different line away from Mr. Williams so that there would not be any future altercation.

Q. Now, when -- when did that move take place?

A. The move would have taken place on that Friday that was the termination that we had given her; she felt she could not work and decided to go home that day on the 16th.

Q. So the move would have take -- took place on June 16th, but she did not work?

A. Exactly.

Q. Okay.

A. She -- to my knowledge, she actually worked in a different position on the 15th after the altercation happened on the 14th. So she was not working with Frank on the 15th. The day she did work, on the 16th when she came in, she did not report to work on the line; she stayed in the office

discussing it with myself and Maryann Boyer and left from there to go home.

Q. Did she -- did Ms. Parrish tell you she was not returning the next workday?

A. She attempted to turn her badge in; we asked her to take the weekend to think about it. We did not want her to resign at that point. We wanted her to have a chance to understand our investigation process, what we had done. We did not want her to resign on that Friday. We'd offered her the opportunity to think about it over the weekend. She called in Monday stating she was sick. She called in again on Tuesday stating she was sick following our call-in procedure. Wednesday she called in and resigned.

Q. Okay. Okay. So after Ms. Parrish did report the conflict she had with Mr. Williams you attempted to resolve the problem by moving her to

another position, same pay, with no loss in benefits, but she did not report to that position; is that correct?

A. That is correct.

Q. Okay. And in that new position she would not have been under his supervision? Under Mr. Williams's supervision?

A. That is correct.

Q. Did Ms. Parrish tell you that she wanted Mr. Williams to be terminated from the job completely so she would have no --

A. She did --

Q. Pardon me?

A. She did make that statement. She did make that statement, yes, ma'am.

Q. Okay. Was there any reason you needed to terminate him?

A. No, ma'am. We disciplined both employees equally, as well as she would have received disciplinary action had she returned to work that Monday. Mr.

Williams did receive a disciplinary action and then we separated the two. We only have one team lead in the plant that's on line three. It was not feasible to move Frank to another position, so we gave Linda one additional chance after being moved from line one initially in September to line five due to similar altercations with employees - other employees, not Frank. We gave her the opportunity this time to move to line -- I'm sorry, from line three to line five in order to hopefully alleviate those issues with employee conflict.

Q. Okay. All right. Your handbook, your manual. Do you have an employee handbook that you gave Ms. Parrish?

A. Yes, ma'am.

Q. And does it have any section in there that explains how to -- the action to take to resolve conflicts with

employees, coworkers?

A. Yes, ma'am, we have a workplace harassment policy.

Q. Okay. And did Ms. Parrish follow that policy?

A. Yes, ma'am, she did. She did fill out the paperwork for a documentation about the conflict itself.

Q. Okay. And in your investigation, did you say that you found some merit to the allegation and you did attempt to resolve the conflict by moving Ms. Parrish to the other position, which she did not report to?

A. Yes, ma'am. We felt both were equally involved in the altercation, both arguing, both employees argued, both were involved equally, so they were disciplined equally as well as separated so that there would not be any future altercations hopefully.

Q. Did you find Ms. Parrish's safety to be in jeopardy in any way?

A. No, ma'am.

Q. Okay. Is it correct you said you found that she had been harassed or that there was some type of personal conflict between the two of them?

A. I did not determine any harassment to be taking place. I did determine the conflict between the two in the form of an argument, disagreement, had taken place.

Q. Okay. All right. And was there a worker there before Ms. Parrish when she stopped reporting to work?

A. Yes, ma'am.

Q. On the third day when Ms. Parrish did not report to work, did I understand you to say she called in to say she had -- did she say she had quit?

A. Yes, ma'am, she called in and resigned.

Q. Okay. Did she put it in writing, or was it verbal?

A. Verbal in our call-in line.

Q. Okay. That was -- that would be Wednesday, June the 14th?

A. 21st.

Q. The 21st; I'm sorry.

A. 21st, yes, ma'am.

Q. Okay. Okay. Mr. Mance, is there anything additional you want to add to the information regarding the separation?

A. No, ma'am.

MS. COOK: Okay. Mr. Taylor, do you have any questions for Mr. Mance?

MR. TAYLOR: Yes, ma'am, I do. Thank you.

EXAMINATION OF MR. MANCE BY MR. TAYLOR:

Q. Mr. Mance, when was the claimant moved from line one to line three?

A. That would have been in September, 2005.

Q. What was the reason for that move?

A. Altercations with other

employees, just general conflict on the line.

Q. How many altercations took place?

A. One final altercation led to the separation of the two. Previous to that, just general argument, conflict.

Q. How many women work on Mr. Williams's line?

A. I know it would be five.

Q. How many complaints regarding harassment or inappropriate behavior have you received from those ladies?

A. None.

Q. How many altercations with other employees has Mr. Williams been involved in?

A. Mr. Williams has one additional argument with another employee that did result in a disciplinary action between those two employees.

Q. Did the claimant make any allegation that Mr. Williams was trying

to strike her by throwing objects at her?

A. She did make the statement that -- just a moment; let me look at her statement here. No, ma'am, I do not see -- no, sir, I do not see anything in her statement stating that he threw objects at her; just a verbal altercation. In her original statement she completed on 6/14, the alteration happened.

MR. TAYLOR: Thank you. I don't have any further questions for --

MS. COOK: Okay. Ms. Crook, do you have any questions for Mr. Mance?

MS. CROOK: Yes, ma'am, I do.

EXAMINATION OF MR. MANCE BY MS. CROOK:

Q. The altercation that resulted in her being moved in September, according to your testimony -- well, I take that back. I don't want to get to that yet.

You said that she had complained about Frank Williams once before, and

when she did she was written up and he was written up; is that correct?

A. No, ma'am, she had not complained about Frank. There was an altercation about inflammatory comments that had been made. Investigating that, we had statements from all employees involved in those inflammatory comments about Frank. It was one of the employees involved. There was not a complaint made about any type of harassing or anything. It was an issue of conflict, again, between employees; no official complaint that Frank had said anything or done anything to Linda.

Q. Isn't that when she came in and told you guys that he had threatened her and that she was afraid; the first time, during that complaint she made to you, he is a registered sex offender and I'm afraid?

A. That was not her statement, no, ma'am. Her statement -- that's not a

proper statement.

Q. That's not part of her statement that when she first came in and talked to you and she was written up for saying he was a registered sex offender?

A. No, ma'am. On February 16th, I'll be happy to read her statement for you.

Q. Okay.

A. At approximately 10:50 employee came to me stating that Frank Williams had come to them this a.m. stating that I had been telling people that Frank Williams is a child molester. Immediately I met with Melvin Hutchins, Chris Jordan with this matter. This is after a previous meeting with Melvin Hutchins on the topic of many concerns with Frank in line three work situations.

That's her statement on February 16th concerning the issue of inflammatory comments made by Linda.

Q. So she came in and said to you that he was upset because she had told somebody he was a registered sex offender? He didn't come in and complain about that, correct?

A. I do have his statement as well.

Q. Who came in and talked to you about it first is what I'm asking you?

A. When the supervisor brought this to my attention after Linda had spoken with Melvin Hutchins and Chris Jordan, according to the statement here.

Q. And you didn't consider this a complaint by Linda?

A. No, ma'am.

Q. Exactly how far is line five from line three where she was working?

A. It's separated; just an open area within the plant, 20 feet, 30 feet.

Q. So when you say she wouldn't be working with Frank Williams, that's not true. She would still be working with him?

A. No, ma'am, the lines -- the lines are situated in a -- in a fashion that -- that they do not involve each over. Each line is separate.

Q. Is it true that Frank is supposed to fill in on lines when people go to break?

A. No, ma'am. He does fill in some breaks within his line as a floater on line three.

Q. So he would never ever go to line five or line one?

A. It -- it could be possible but not -- not standard, no.

Q. Then when she came in to complain again that he was cursing at her, calling her names and throwing things, she, again, was going to be written up; is that correct?

A. Yes, ma'am, she was involved in that altercation as well.

Q. In your sexual harassment policy in your handbook, is there any

protection against people who are complaining of sexual harassment?

A. Yes, ma'am.

Q. What is that protection?

A. There's no retaliation allowed for any harassment complaint.

Q. Okay.

A. And, again, realize no -- no complaint has been formally made at this point; it's been altercations and conflicts.

Q. Isn't that a matter of interpretation?

A. During the investigation it was found that Linda was equally involved in the conflict with other employees. In several instances she was the instigator in those conflicts.

Q. The incident that happened on June -- yeah, June 14th, who were the witnesses that you talked to?

MS. COOK: That's not necessary, Ms. Crook. We don't need those names.

Q. Well, did Linda give you any names of witnesses she wanted you to talk to?

A. I did the investigation and talked with all witnesses presented.

Q. Did Linda give you the names of witnesses that she wanted you to talk to?

A. Let's see. She did write down names of witnesses on her statement, yes.

Q. And you did talk to all the people whose names she gave you?

A. Yes, ma'am, I have their statements as well.

Q. And were you mistaken when you said that she called the call-in line that she wouldn't be coming back to work?

A. No, ma'am, she called in each day, Monday and Tuesday.

Q. I'm talking about on the 6 -- on the 20 -- I think it was 25th you said

she called in and talked -- called the call-in line?

A. On the 21st she may have called Lee Allen Smith, called the call-in line. I'm not sure.

Q. If she called Lee, that would be personnel resources, correct?

A. That is human resources. Personnel resources is our temporary agency.

Q. Okay. Human resources. And when she called -- assuming that's who she called, did you ask her what Linda said to her?

A. I have here that Linda, a voluntary quit, no notice given.

Q. You have that from where?

A. Is what Lee Allen wrote on the employee status change for the termination.

Q. Did Linda tell you she was afraid to come back to work?

A. She made the statement on Friday

when talking with myself and Maryann Boyer that she could not work in the -- she could not work with Frank Williams. We informed her at that time that we were transferring her to a different line to hopefully alleviate the situation to separate that conflict. We did not find any fault with Frank as far as his ability to work in the plant. Hopefully received disciplinary equally.

Q. Has he ever been written up for cursing at other people?

MS. COOK: That's not relevant, Ms. Crook, about the other person. This is only an employment hearing, and I'm just trying to determine whether or not there is good cause for separating from this employment.

Q. (BY MS. CROOK:) Okay. Just a minute. Could you tell me what you were going to write Linda up for if she had come back to work?

A. She would have been written up

for, again, conflict on the line. Causing conflict on the line.

Q. Did you not believe her when she told you she was asking for help and he just went off on her?

A. Could you clarify that for me? Asking for help meaning?

Q. Well, earlier she testified that she asked him to help her with some redos and he just started cursing at her, calling her names, and throwing things. Did you not believe her when she said that?

A. I believe there was an argument when she came back from break that she had, once again, instigated an argument because of rework left on the table. She was involved in yelling at Frank and asking him to stay and do his rework when he had been instructed by a supervisor to cover the break and then do additional duties beyond that covering of the break. And he actually

informed Linda at the time that he would come back and do that rework once he had finished what the supervisor had told him to do.

Q. And that's what his statement was?

A. Yes, ma'am.

Q. Did he -- did you have witnesses that heard him say that to Linda?

A. I don't know if anyone -- I don't know if anyone was in earshot to hear the exact words.

Q. So it was his word against her word as to what was said; is that right?

A. We have witnesses; I asked them specifically what they said.

Q. You earlier testified that they couldn't hear what was being said; they just heard yelling.

A. Correct.

Q. Are you --

A. I'm looking through the notes now.

Q. Okay.

A. Just an altercation, just yelling, yelling, could hear. Frank's statement was that he was concerned and the rework and he had been told by his supervisor to get out some trash and do some additional duties once he had finished covering the break.

Q. Whose statement are you reading now?

A. This would be from Frank Williams.

MS. CROOK: Okay. That's all I have.

MS. COOK: Okay. Mr. Mance, you brought Mr. Williams in to give testimony?

MR. MANCE: If necessary, yes, ma'am.

MS. COOK: I don't think I have any questions for Mr. Williams because this case is a case of whether or not Ms. Parrish voluntarily quit and her

reasons if she voluntarily quit, and she stated she felt constructively terminated so I don't believe I have any questions for Mr. Williams. Any from you Mr. Taylor?

MR. TAYLOR: No, ma'am, we have no questions for Mr. Williams. Don't believe it's necessary for him to testify.

MS. COOK: Okay. Do you, Ms. Parrish? Do you have any questions for Mr. Williams?

MS. PARRISH: No, ma'am.

MS. COOK: Do you, Ms. Crook?

MS. CROOK: No, ma'am.

MS. COOK: So this hearing is adjourned. Is there -- is there anything else either party wants to say?

MR. TAYLOR: The employer has nothing further. Thank you.

MS. COOK: Okay.

MS. CROOK: No, ma'am.

MS. COOK: Well, thank you all

-- thank you all for your time. I have tape recorded the testimony. We will use this tape later and make a decision on Mrs. Parrish's eligibility for unemployment benefits. Mail that decision to both of you as soon as possible; hopefully within the next two to three weeks. You have to right to appeal if you disagree. Thank you all and have a good day.

MS. CROOK: Thank you.

MR. TAYLOR: Thank you.

(Whereupon, the hearing was adjourned.)

**A**
**ability** 68:9
**able** 21:7 27:6
**acceptable** 9:17 35:12
**accomplish** 33:8
**accounting** 4:3
**acting** 10:9
**action** 9:10 15:8 24:21 26:3 48:9 49:16 54:22 55:2,22 59:20
**actions** 35:21
**add** 32:3 58:8
**additional** 55:7 58:7 59:18 69:22 71:7
**addressed** 42:3
**adequate** 9:10
**adjourned** 72:17 73:13
**administer** 11:7
**administrative** 8:1
**advised** 8:18
**affairs** 3:19 4:11
**affect** 19:3
**afraid** 61:18,21 67:22
**agency** 67:10
**ago** 44:2
**agree** 48:23 49:4
**ahead** 38:23
**Alabama** 2:9 3:3 4:19 5:12 6:6 7:8,18 8:2,13 8:16 9:2 13:14 13:17 19:2
**allegation** 20:13 56:11 59:23
**allegations** 20:18 49:7
**alleged** 25:23
**Allen** 67:4,18
**alleviate** 55:14 68:6
**allow** 10:14
**allowed** 7:6 10:3 10:13,18,23 27:15 38:14 65:5
**alter** 48:18
**alteration** 60:10
**altercation** 40:12,15,22 41:18,23 46:12 50:10 52:3,18 56:16 59:5 60:8,18 61:5 64:21 71:2
**altercations** 47:10,17 48:13 55:9 56:21 58:23 59:3,15 65:10
**Ann** 3:3 8:1
**answer** 40:18
**answering** 39:5
**anybody** 35:14
**appeal** 8:19,20 9:2 73:9
**appeals** 2:12 6:7 7:20 8:4
**appears** 41:3
**appointment** 5:9
**approved** 8:15
**approximately** 62:10
**area** 25:3 51:17 63:19
**argued** 56:17
**arguing** 56:17
**argument** 57:9 59:7,19 69:14 69:16
**asked** 15:11 17:15 22:22 27:1 42:23 49:2 53:7 69:9 70:15
**asking** 24:14 30:16 32:12 39:19 41:4 63:8 69:4,7,19
**assigned** 42:10 43:9
**assuming** 67:12
**assumption** 35:5
**attempt** 56:12
**attempted** 53:6 53:22
**attention** 63:10
**attorney** 6:20 11:22
**AUDIOTAPE** 1:3
**August** 7:23
**authority** 18:12
**a.m** 62:12

**B**
**back** 27:7,21 36:13 46:19,23 48:20 60:21 66:18 67:22 68:22 69:15 70:2
**badge** 53:6
**bag** 17:5
**barely** 6:2
**base** 35:4
**bear** 9:11
**behavior** 22:1 25:23 26:1 59:12
**believe** 36:5 69:3,12,14 72:3,8
**benefits** 8:16 9:16 54:2 73:5
**better** 6:2
**beyond** 69:22
**Bobby** 7:4 37:15
**bona** 9:5
**Boyer** 14:17,20 45:9 46:7 53:2 68:2
**Brands** 3:16 4:8 4:17 45:18
**break** 25:21 31:20 33:18 64:7 69:15,21 69:23 71:8
**breaks** 64:9
**brought** 63:9 71:16
**business** 30:8,12

**C**
**calendar** 8:21
**call** 2:18 3:9 5:7 5:11 17:16 21:10,16
**called** 17:11 20:8 21:8,12 34:10 35:14 50:8 51:9 53:15,16,19 57:17,19 66:17 66:20 67:1,1,3 67:4,6,12,13
**calling** 2:11 3:7 3:16 4:7 6:7 50:16 51:4 64:17 69:11
**call-in** 53:18 57:23 66:17 67:2,4
**cans** 17:5
**case** 1:9 7:21 8:6 38:2 71:22,22
**cause** 9:7,8,13 68:17
**Causing** 69:2
**cell** 28:19
**center** 19:2
**CEO** 14:23 15:13 16:6 34:12
**chance** 53:10 55:7
**change** 67:19
**changed** 49:1
**changes** 44:22
**characterizing** 48:1
**charge** 32:19
**charges** 27:23 28:7
**chest** 32:10
**child** 62:14
**choice** 15:2 16:1 35:16,19
**Chris** 17:19 19:11 62:16 63:11
**city** 13:16
**claim** 8:12,14 9:7,20
**claimant** 8:6 58:17 59:22
**clarify** 69:6
**come** 21:19 27:6 49:13 50:20,21 62:12 63:4 67:22 68:22 70:2
**coming** 5:16 66:18
**comment** 49:17
**comments** 48:5 48:10 49:11,15 49:20 50:23 61:5,8 62:23
**company** 12:2,3 14:4 21:23 22:4 32:23 33:12 45:5,16 45:23

**complain** 50:7 63:5 64:16
**complained** 60:22 61:4
**complaining** 65:2
**complaint** 18:9 20:3,7,12 22:9 23:8,11,23 24:2,9,10,13 24:15 26:4 31:1,2 36:20 36:23 37:1,6 39:4,10,22 40:3,6 50:13 61:11,14,19 63:14 65:6,9
**complaints** 23:14 24:16,17 24:20 37:2,5 37:10 38:14 47:7,9,13,15 47:21 48:2,4 49:6 59:11
**completed** 60:9
**completely** 54:12
**computer** 20:22
**concerned** 71:4
**concerning** 46:11 48:9 62:22
**concerns** 42:3 45:12 62:18
**conclusion** 49:14
**conducted** 7:22
**conflict** 53:21 55:15 56:8,12 57:5,8 59:1,7 61:13 65:16 68:7 69:1,2
**conflicts** 48:14 48:15,17 49:8 55:23 65:11,18
**connected** 9:14
**connection** 6:1
**consider** 63:13
**considered** 10:22
**constructively** 15:22 16:7 30:20 32:4 72:2
**consumer** 3:19 4:10
**continue** 15:10 29:3,12 33:3
**continued** 27:2 27:19
**continuous** 20:1
**continuously** 19:7,8 21:4 31:10
**conversation** 31:17,22 46:10
**convicted** 20:10
**conviction** 31:11 31:19
**Cook** 2:3,8,11 2:14,16,21 3:2 3:3,6,11 4:18 4:23 5:6,10,18 5:20 6:5,13,16 6:19,21 7:5,13 8:1 10:11 11:7 11:11,18,21 12:9,13,19,21 13:1,3 33:22 34:15 37:11,15 37:17,20 38:4 38:16,23 39:15 39:17 41:2,9 42:15,18,22 43:4,19,22 44:7,9,13 48:20 49:5 58:11 60:13 65:22 68:13 71:15,20 72:10 72:14,16,21,23
**copies** 24:5 39:6
**copy** 20:23 22:17,20,21 23:7,10,13
**correct** 11:14 18:20 21:14 26:12 28:17 29:6,13 31:9 33:3 43:15 51:11 54:3,4,9 57:2 61:2 63:5 64:19 67:7 70:20
**counsel** 8:13
**court** 38:21
**cover** 69:21
**covering** 69:23 71:8
**coworkers** 56:1
**Crook** 6:23 7:4 37:7,14,14,16 37:16,19 38:1 38:11,22 43:23 44:6,8 60:13 60:15,17 65:23 68:14,19 71:13 72:14,15,22 73:11
**cursed** 17:1
**cursing** 50:15 51:6 64:16 68:12 69:10
**cussed** 16:19 19:7
**C-R-O-O-K** 37:19

**D**

**D** 1:7
**damn** 17:11,16 21:9 35:15
**date** 7:23 8:21 14:7 23:16 39:8 44:16,17
**day** 14:9 21:9 28:11 45:5,8 46:22 52:10,20 57:15 66:21 73:10
**days** 8:21
**deal** 34:13
**decided** 52:9
**decision** 8:5 73:3,6
**delivery** 4:5
**denied** 9:7,16
**department** 8:3 19:13 28:1
**derogatory** 21:20 29:4 50:8,22
**determination** 8:18
**determine** 57:6 57:8 68:16
**dial** 3:18,20,23 4:10,11
**different** 52:1 52:17 68:5
**difficulty** 18:10
**direct** 30:15 51:18
**direction** 17:7,8 17:10 29:6 36:1 51:14
**directly** 21:14 21:19
**director** 45:9 46:7
**dis** 15:5
**disagree** 8:19 73:9
**disagreement** 17:14 18:5 57:10
**discharged** 14:12 15:3
**disciplinary** 48:8 49:16 54:22 55:1 59:20 68:10
**disciplined** 54:20 56:19
**discriminated** 34:7,8
**discrimination** 32:8,17,19
**discussing** 53:1
**disliked** 26:12
**disruptive** 38:17
**Division** 8:4
**documentation** 20:12,17 48:4 56:8
**door** 5:2
**Dothan** 13:17
**due** 55:9
**duties** 69:22 71:7

**E**

**earlier** 47:20 69:8 70:17
**earn** 9:18
**earshot** 70:11
**EEOC** 32:18
**egregious** 35:17
**either** 5:4 72:18
**element** 9:12
**eligibility** 73:4
**eligible** 8:17
**employed** 11:16 44:23 45:15
**employee** 8:7 22:18 40:13,16 40:23 41:19 50:1 55:14,18 59:19 62:10 67:19

**employees** 48:7 50:4,20 51:2 54:21 55:10,10 56:1,17 59:1 59:16,21 61:7 61:10,13 65:16
**employer** 2:17 10:2 12:1 20:3 23:14 24:21 26:2 29:9,10 42:3 72:19
**employment** 28:12 68:15,18
**ends** 48:19
**enter** 37:8
**environment** 30:22 33:2
**equally** 54:21 56:16,18,19 65:15 68:10
**established** 9:19
**exact** 70:12
**Exactly** 52:14 63:16
**EXAMINATI...** 13:3 34:4 44:13 58:16 60:17
**excuse** 9:10
**expected** 46:19 46:23
**expecting** 5:6,10 5:11
**experience** 30:3
**explain** 7:16
**explains** 55:22
**Express** 11:14 11:17 12:3
**exten** 4:20
**extension** 3:18 4:9,23

**F**

**face** 21:13,20
**fact** 43:12
**faith** 9:12
**far** 11:22 30:3 32:21 63:16 68:8
**fashion** 64:2
**fault** 68:8
**feasible** 55:5
**February** 48:10 62:6,21
**feel** 32:6
**feet** 25:4 63:19 63:19
**felt** 15:16,23 16:12 26:1,11 26:16,18 28:15 28:23 29:10 30:21 31:2,6,8 32:4 33:1 36:9 46:16 52:8 56:15 72:2
**female** 21:18 29:18,22 34:21 35:6
**females** 21:5
**fide** 9:6
**file** 8:20 9:1 27:23 32:18 36:17 37:2,5 39:4,9 40:2
**filed** 8:12 28:7 36:23 37:5 39:21 40:7 47:21
**filing** 22:9
**fill** 56:7 64:6,8
**final** 32:21 36:23 41:23 50:11 59:5
**find** 56:22 68:8
**Fine** 3:6
**finished** 70:3 71:8
**fired** 15:6,13,21 16:5 36:22
**first** 9:23 16:3,4 18:5 20:4,4,7 37:6 39:4,9,22 40:2,6,7 61:18 62:3 63:8
**firsthand** 18:19 30:14
**fit** 35:20
**five** 3:21 4:4,13 14:5 30:10 32:7,9 44:15 51:22 55:9,13 59:10 63:16 64:12
**Flavor** 1:6 3:17 4:8 8:8,17,23 13:8 24:9 30:9 30:13 44:15
**floater** 64:9
**follow** 9:22 22:8 22:13,23 56:5
**following** 53:17
**force** 49:12
**forced** 15:16 28:14,16 29:1 31:8
**form** 57:9
**formal** 18:8 26:22 31:1 48:2,3 49:6 50:13
**formally** 65:9
**formerly** 3:16 4:8
**forward** 50:20
**found** 56:11 57:3 65:15
**four** 3:20 4:3,11
**Frank** 3:9 6:11 7:15 8:10 15:9 16:17 27:19 29:2 30:23 33:1,6 39:13 40:7 42:13,20 45:14 46:12 47:4 50:2 52:20 55:5,10 60:23 61:4,9 61:14 62:11,13 62:19 63:21 64:5 68:3,8 69:18 71:11
**FRANKLIN** 1:7
**Frank's** 71:3
**freely** 18:18 31:19 33:6,14
**Friday** 46:5,15 46:21 52:7 53:13 67:23
**friends** 30:13
**full** 17:5
**further** 43:18 60:12 72:20
**future** 52:3 56:20

**G**

**garage** 17:5
**GDMF** 50:17
**general** 59:1,7
**give** 2:18 9:22 14:6 15:7,12 15:14 26:22 27:4,8,12 41:1 44:17 66:1,6 71:16
**given** 52:8 67:16
**giving** 6:21 10:7 27:18 40:21
**go** 25:21 38:13 38:15,23 39:8 46:18 52:9 53:2 64:7,11
**God** 12:17 17:11 17:16 21:8 35:15
**goes** 42:21
**going** 5:16,22 9:23 32:20 37:8,23 38:12 38:13,18 42:7 42:11 44:1 64:18 68:21
**good** 2:23 9:6,8 9:12,13 68:17 73:10
**grounds** 9:9
**guess** 38:12
**guys** 61:17

**H**

**handbook** 22:10 22:14,16,18,23 24:11 55:17,18 64:23
**handles** 11:20
**hang** 3:20 4:11
**happen** 16:21 32:13
**happened** 19:16 19:17,20 22:20 24:8,10,15,19 26:15 30:8,12 30:17 52:19 60:10 65:19
**happy** 62:7
**harassed** 23:5 57:3
**harassing** 19:5 19:21 34:20 35:5 61:12
**harassment** 22:1 22:6 56:3 57:7 59:12 64:22 65:2,6
**hear** 6:2 40:17 51:4,6,8 70:12 70:18 71:3
**heard** 51:5 70:9 70:19
**hearing** 2:12 6:8

7:6,17,21 8:2 28:21 37:22 38:7,17,20 44:2 68:15 72:16 73:13
**hearings** 7:19 8:4
**Hello** 2:7 23:9
**help** 3:1 4:17 12:17 17:15 69:4,7,9
**hire** 14:6 44:16
**hired** 44:21
**hit** 32:9,14 36:2 36:6,10 40:20
**hold** 2:5,16 3:11 5:17,22 6:3 18:2 37:11 49:2
**home** 46:18 52:9 53:2
**hope** 6:2
**hopefully** 55:13 56:21 68:6,10 73:7
**House** 1:6 3:17 4:8 8:8,17,23 13:8 24:9 30:9 30:13 44:15
**human** 4:3 12:7 67:8,11
**Hutchins** 19:12 62:15,18 63:11

**I**

**identity** 38:8
**immaterial** 41:4
**Immediately** 18:1 62:15
**inappropriate** 59:12
**incident** 19:16 19:17,20,22 20:1 32:22
34:10 36:12 65:19
**including** 32:9
**Incorporated** 8:8,23 13:8
**indefinitely** 9:8
**individuals** 12:4 47:17
**Industrial** 8:3
**inflammatory** 49:11,15,20 61:5,8 62:23
**informal** 38:20
**information** 10:21 18:16 19:2 20:21 31:5 50:2,3,6 58:8
**informed** 68:4 70:1
**initially** 55:8
**instances** 65:17
**instigated** 69:16
**instigator** 65:17
**instructed** 69:20
**insured** 9:17
**interest** 38:2
**interpretation** 65:13
**interrupt** 28:21
**investigated** 48:7 49:19
**investigating** 49:13 61:6
**investigation** 42:1 45:13 46:11 50:12 51:2 53:11 56:10 65:14 66:4
**involve** 64:3
**involved** 31:16 32:23 51:2 56:16,18 59:16
61:8,10 64:20 65:15 69:18
**involvement** 48:9
**irrelevant** 37:7 37:9
**issue** 9:3 61:12 62:22
**issues** 55:14

**J**

**jar** 32:10,15 40:20
**jeopardy** 56:23
**job** 9:14 13:18 14:13 31:9 32:6 33:16 34:11 44:20 47:2 54:12
**Jordan** 17:19 19:11 62:16 63:11
**JR** 1:7
**July** 9:1
**June** 8:13 14:8 14:11 16:22 23:21 28:11 29:1 30:23 31:7 37:1 44:16,18 46:2 46:4,15 52:12 58:2 65:20,20

**K**

**keep** 21:6 27:19
**know** 3:17 4:9 11:23 30:3,7 30:11,16 35:2 36:14,18 38:8 41:6 43:23 59:10 70:10,11
**knowledge** 9:12 18:20 30:15,17 52:16

**L**

**label** 13:11,20 13:21 25:19,20 45:2 51:22
**laborer** 44:21
**ladies** 59:13
**lady's** 16:5
**large** 17:4
**law** 2:1 9:2,4,14
**lawyer** 11:10
**lay** 11:16
**lead** 25:12 29:2 41:15 42:10 55:3
**leader** 18:14 43:2,9,14 47:5
**leave** 9:5,15 15:17 16:2 31:8,22 32:1
**leaves** 27:7
**leaving** 9:13
**led** 32:16,22 59:5
**Lee** 67:4,6,18
**left** 26:21 30:8 30:12 46:20 53:2 69:17
**legal** 7:7
**let's** 39:7 49:22 50:14 66:9
**Linda** 1:6 2:3,12 2:14 3:7 6:8,14 8:7 45:22 55:6 61:15 62:23 63:10,14 65:15 66:1,6 67:13 67:15,21 68:21 70:1,9
**line** 3:8 6:9 7:14 40:11 41:13,13 41:17,21 42:6 42:11 43:3,7 43:10,13,15 44:3 45:13
47:5 51:22 52:1,23 55:4,8 55:8,12,12,13 57:23 58:18,18 59:2,9 62:19 63:16,17 64:4 64:9,10,12,12 66:17 67:2,5 68:6 69:1,2
**lines** 64:1,2,6
**listen** 37:23
**location** 13:10 13:13
**long** 14:3 27:11
**longer** 26:16,19 27:10 45:15,22
**look** 36:17 60:4
**looking** 70:22
**loss** 54:1
**loud** 31:19
**L-A-B-E-L** 14:1

**M**

**machine** 13:11 31:23
**machines** 25:19
**Mail** 73:5
**mailed** 8:22
**making** 8:5 50:22
**man** 35:1
**manager** 12:8
**Mance** 3:9 5:2 6:4,4,11 7:15 8:10 10:3,11 10:15,18 12:5 12:7,19,20 43:19,21 44:10 44:11,13 49:2 49:4 58:6,12 58:16,17 60:14 60:17 71:15,18
**manual** 55:17
**man's** 34:11

**March** 39:12,23 47:10 48:10,12
**marketing** 3:21 4:13
**Maryann** 14:17 14:20 45:9 46:7 53:1 68:1
**matter** 62:16 65:12
**ma'am** 2:10 3:10 3:14 4:22 5:11 5:19 10:9 11:6 11:15 12:12 13:6,23 14:2 14:14 15:11 16:9 17:22 18:7,11,21 20:14,19 21:1 21:15,22 22:3 22:7,19 23:1,6 23:9,12,15 24:1,4,18 25:7 25:11,14,18 26:5,13,17 27:13 28:2,8 28:18,22 29:7 29:14,17,20 30:1,5 31:10 31:15,18 32:5 32:16 33:4,11 33:14,17,21 34:1,17 35:22 36:18 39:3,7 39:20 40:9,21 41:7 42:17 43:8 44:6,8,18 47:23 48:3,15 49:10 51:1,11 51:15,19 54:17 54:20 55:20 56:2,6,15 57:1 57:14,19 58:5 58:10,13 60:5 60:15 61:3,23 62:6 63:15 64:1,8,20 65:3 66:14,20 70:7 71:19 72:6,13 72:15,22
**mean** 16:10,11 18:19 19:19 24:2
**meaning** 69:7
**means** 9:9
**meant** 15:23
**mechanic** 18:3 40:20
**meeting** 62:17
**meetings** 34:14
**Melvin** 19:12 62:15,17 63:11
**mentioned** 47:10
**merit** 56:11
**met** 62:15
**MF** 50:16
**mind** 6:21 28:20
**minute** 5:17 68:20
**minutes** 18:2 44:2
**mistaken** 66:16
**molester** 62:14
**moment** 2:6 60:4
**momentarily** 48:22
**Monday** 46:20 46:23 53:15 54:23 66:21
**month** 19:18 40:5
**months** 39:11
**morning** 2:23 5:3 45:8
**motherfucker** 17:12,17 21:9 35:15
**move** 25:17 41:8 41:17 51:16,20 52:4,6,11 55:5 55:12 58:22
**moved** 25:1,2,8 41:13,21 51:22 55:7 58:18 60:19
**moving** 33:7 42:4 53:23 56:13

**N**

**name** 3:23 6:22 8:1 12:2 16:6 21:17 37:13,13 45:17 50:8
**names** 34:10 51:4,10 64:17 65:23 66:2,6 66:10,13 69:11
**nature** 22:2 46:9 49:11,15
**necessary** 65:22 71:18 72:8
**need** 2:18 3:8 10:22 15:19 42:14 65:23
**needed** 54:19
**never** 35:14 64:11
**new** 54:5
**nondisruptive** 38:19
**note** 8:22 33:5
**notes** 70:22
**notice** 8:21 26:22 27:4,8 27:12,18 67:16
**notified** 8:17
**number** 7:21 24:11
**Nutcracker** 3:16 4:7,17 45:18

**O**

**oath** 11:4 12:10 12:14
**objection** 37:8
**objects** 60:1,7
**offender** 16:13 18:17 20:10 31:12 61:20 62:5 63:4
**offered** 46:17 53:13
**office** 2:2,9 3:4 4:19 5:13 6:6 52:23
**officer** 8:2
**official** 61:14
**Oh** 35:19
**okay** 2:14,16,20 3:11 5:1,14,17 5:21,23 6:11 6:13,13,16 7:13 10:11 11:3,18,21 12:9,9,13 13:1 13:7,18 14:3 14:12,15 15:11 16:3,10,15,18 16:23 17:9,18 18:4,8,15,22 19:3,6 20:11 20:23 21:2,23 22:8,22 23:3 23:13,16,19,22 24:5,8,19 25:2 25:5,12,15 26:10,15 27:14 27:17,23 28:10 28:15,19,23 30:7,18,19 31:21 32:2,11 32:18,21 33:9 33:19,19,22 34:15 37:11,20 38:4,6,16 39:15,17 41:2 41:9 42:18 43:22 44:9 45:1,4,19,21 46:3,9,14 47:6 47:12,19 48:11 48:16,20 49:5 49:5,18 50:5 50:11,19 51:3 51:7,12 52:15 53:20,20 54:5 54:18 55:16 56:4,9 57:2,11 57:21 58:1,6,6 58:11 60:13 62:9 65:7 67:11 68:19 71:1,13,15 72:10,21
**once** 60:23 69:16 70:2 71:7
**open** 5:3 63:18
**operations** 45:10 46:8
**operator** 4:5,15 13:20,22 45:3 51:23
**operators** 25:21
**opportunity** 27:16 46:17 53:14 55:11
**options** 3:22 4:14
**order** 55:13
**original** 60:9

**P**

**pallets** 17:4
**paperwork** 56:7
**Pardon** 44:7 54:15
**Parr** 34:18
**Parrish** 2:4,7,10

2:12,13,15,20 3:7 6:8,9,14,15 6:18,20 7:2,11 8:7,11 9:22 10:13,16,20 11:6,9,23 12:12,17,18 13:3,4,15 14:16 16:16 19:15 22:2 23:11 31:14 32:3,11 33:19 33:23 34:4,6 34:19 41:11 42:15,17,20,23 43:2 44:1,14 45:5,22 46:14 47:3,7,14 48:8 48:16 49:9,19 50:12,23 51:10 51:16 53:3,21 54:10 55:19 56:4,13 57:12 57:16 71:23 72:11,13
**Parrish's** 51:14 56:22 73:4
**part** 33:16 62:2
**participate** 38:12,18
**participating** 37:22 38:5,9 38:10
**parties** 3:12
**parts** 4:4
**party** 2:22 3:23 72:18
**party's** 3:18 4:9
**patterns** 11:20
**pay** 51:23 54:1
**payment** 8:15
**peanuts** 32:10 32:15,15
**people** 62:13 64:6 65:1 66:13 68:12
**person** 2:19 25:13,20 29:3 29:15 36:15,19 36:21 46:6 68:14
**personal** 57:4
**personnel** 67:7,9
**phone** 3:13 5:7 5:11 28:20
**phones** 28:4
**physically** 16:19
**picks** 6:3
**place** 49:2 52:5 52:6,12 57:7 57:10 59:4
**plant** 28:5 33:7 33:15 42:21 55:3 63:19 68:9
**please** 4:6,15 42:19
**pocket** 27:22
**point** 27:20 37:9 38:11 41:5 53:9 65:10
**police** 28:1
**policy** 22:1,5 56:3,5 64:22
**position** 33:5 44:22 47:2 52:1,17 54:1,3 54:5 55:6 56:14
**possible** 64:13 73:7
**PR** 19:13
**presence** 26:11
**present** 8:7 10:22 11:1,10
**presented** 66:5
**press** 3:19,21,22 4:1,2,2,3,4,5,6 4:11,13,14
**previous** 50:10 59:6 62:17
**previously** 47:10 47:18
**prior** 36:11,23 39:11
**probably** 19:17 40:10
**problem** 26:7 29:11 30:4 53:23
**procedure** 7:16 9:21 22:9,14 22:15,23 53:18
**proceeded** 17:16
**process** 11:3 53:11
**Products** 1:6 3:17 4:8 8:8,23 13:8
**profanity** 26:11 31:7 35:8,10 35:12,18
**proper** 62:1
**protect** 38:1
**protection** 65:1 65:4
**public** 19:1
**pulled** 20:15
**purchasing** 4:2
**put** 21:4 34:12 42:13 44:3 57:21

**Q**

**quarter** 40:10
**question** 12:11 36:3 41:8 42:16,19 43:1 43:5
**questions** 10:1,4 10:14,15,19 11:2 33:23 34:16 39:1,19 43:18,20,21 44:4,5,11 58:12 60:12,14 71:21 72:4,7 72:11
**quit** 9:4 28:10 28:13,14,16 29:1 32:6 57:18 67:16 71:23 72:1

**R**

**radio** 18:3
**ran** 48:22
**rate** 9:19
**read** 49:23 62:7
**reading** 71:9
**realize** 65:8
**reason** 9:9,11,13 15:6,12,14,21 21:16 32:3 45:22 54:18 58:21
**reasons** 72:1
**recall** 16:5
**receive** 48:8 49:16 55:1
**received** 31:5 47:6,13 54:22 59:13 68:10
**receiving** 4:1
**record** 7:20 48:21,21
**recorded** 7:17 7:19 73:2
**recording** 3:15 7:6,9,12
**redos** 69:10
**regard** 26:4
**regarding** 2:11 3:7 6:7 9:3 58:8 59:11
**registered** 16:13 18:16 61:20 62:5 63:3
**related** 11:19
**Relations** 8:3
**relevant** 10:23 68:13
**relief** 25:20
**relieving** 33:17
**remarks** 29:4
**remove** 27:1
**rep** 11:12
**repeat** 50:3
**report** 17:20,23 18:9 19:19 22:11 23:2,4 52:22 53:21 54:2 56:14 57:16
**reported** 19:9 19:11 25:22 29:9
**reporting** 57:13
**represent** 6:23 44:1
**representative** 2:17 10:2,7,10 11:16 12:1,2 38:7
**represented** 8:9
**representing** 7:3 38:3
**reprimanded** 20:9,9
**requires** 7:18 9:14
**resign** 53:9,12
**resignation** 26:23 27:5,9
**resigned** 46:1 53:19 57:20
**resolve** 26:7 29:11 53:23 55:23 56:12
**resolved** 31:3

**resources** 4:4 12:8 67:7,8,9 67:11
**respond** 42:19
**response** 20:2
**rest** 46:22
**restate** 43:1,4
**result** 41:18,22 59:20
**resulted** 60:18
**retained** 51:23
**retaliation** 65:5
**retired** 44:19
**return** 9:17
**returned** 54:23
**returning** 53:4
**rework** 17:15 69:17,19 70:2 71:5
**right** 5:18 7:3 8:19 13:18 36:17 55:16 57:11 70:14 73:8
**room** 31:20
**run** 25:18,19

S

**safety** 19:1 56:23
**sales** 3:21 4:12
**satisfaction** 31:3
**saying** 16:7 20:9 25:10 62:4
**screwdriver** 27:21
**second** 2:17,21 3:12 5:22 37:12 49:3
**section** 9:2 55:21
**see** 5:15,16 36:20 49:22 50:14 60:5,6 66:9
**sent** 8:22
**separate** 64:4 68:7
**separated** 32:14 55:2 56:19 63:18
**separating** 68:17
**separation** 32:13,22 58:9 59:6
**September** 55:8 58:20 60:19
**sex** 16:13 18:16 20:10 31:12 61:20 62:5 63:3
**sexual** 64:22 65:2
**sexually** 19:5 23:4
**shipping** 4:1
**sick** 53:16,17
**Side** 48:19
**similar** 55:9
**sir** 60:6
**situated** 64:2
**situation** 68:7
**situations** 62:20
**six** 3:22 4:5,14
**Smith** 67:4
**solemnly** 11:8 12:15
**somebody** 36:12 63:3
**soon** 73:6
**sorry** 13:21 14:18 40:17 55:12 58:4
**speak** 2:3
**SPEAKER** 2:1 2:5 4:16,21 5:1 5:8,14,19,21
**speaking** 16:16 31:13
**specific** 39:18 44:17 51:6
**specifically** 51:9 70:16
**specifics** 40:22
**spoke** 18:18 31:18 35:9 45:9,10,11 46:5
**spoken** 63:10
**standard** 64:14
**stands** 9:9
**started** 69:10
**State** 2:8 3:3 4:19 5:7,12 6:6 7:8,17 8:2,16
**stated** 72:2
**statement** 9:23 46:3 47:19 49:23 50:15,18 54:16,17 60:3 60:5,7,9 61:22 61:23 62:1,2,7 62:21 63:6,12 66:10 67:23 70:5 71:4,9
**statements** 19:12 61:7 66:15
**states** 9:4
**stating** 53:15,17 60:7 62:11,12
**status** 67:19
**stay** 69:19
**stayed** 32:7 52:23
**step** 39:7
**stick** 5:17
**stop** 27:17
**stopped** 48:23 57:13
**strike** 60:1
**substantiate** 20:17
**supervised** 41:14,22
**supervising** 42:6
**supervision** 42:4 51:18 54:7,8
**supervisor** 17:18,21 18:3 23:2 43:13 63:9 69:21 70:3 71:6
**supposed** 64:6
**sure** 67:5
**swear** 12:15

T

**table** 69:17
**take** 10:4,12,17 11:4 12:14 52:5,11 53:7 55:23 60:20
**taken** 15:8 24:21 26:3 52:6 57:10
**talk** 11:13,16 12:3 36:20 66:3,7,12
**talked** 19:8 31:11 34:9 35:1 62:3 63:7 65:21 66:5 67:1
**talking** 40:19 66:22 68:1
**talks** 37:4
**tape** 7:5,7,9,11 7:17,19 48:19 48:22 49:1 73:2,3
**Taylor** 2:23 3:1 3:2,5,10,14 6:10 7:14 8:9 10:2,6,9,15,18 11:12,13,15,19 33:22 34:1,5 34:16,17,18 38:23 39:2,3 39:18,20,21 41:2,3,7,10,11 43:5,6,7,17 58:11,13,16 60:11 72:5,6 72:19 73:12
**team** 18:14 41:14 42:10 43:2,9,14 47:4 55:3
**teleconference** 7:22
**tell** 11:9 12:15 15:4,5,19 26:2 26:6 34:22 53:3 54:10 67:21 68:20
**telling** 36:19 50:1 62:13
**temporary** 67:9
**ten** 9:18
**term** 21:20
**terminate** 15:1 33:10,13 54:19
**terminated** 14:15 15:19,23 16:8 28:12 30:21 32:4 54:11 72:3
**terminating** 15:15
**termination** 32:12 52:7 67:20
**terminology** 21:11
**terrible** 6:1
**test** 9:11
**testified** 34:6,19 35:22 36:22

69:8 70:17
**testify** 72:9
**testimony** 10:5,8 10:12,17 11:4 12:14 35:4 49:1 60:20 71:17 73:2
**thank** 3:6,14,15 4:7 34:2 39:2 41:10 43:6,18 58:14 60:11 72:20,23 73:1 73:9,11,12
**things** 16:20 26:14 29:5 31:7 35:20,23 36:10 51:13 64:18 69:12
**think** 2:18 46:18 53:8,14 66:23 71:20
**thinking** 5:4 28:9
**third** 57:15
**THORNTON** 1:6
**threaten** 16:18
**threatened** 16:14 31:6 36:9 61:17
**threatening** 25:23 26:1
**three** 4:2 39:11 41:13 43:3 47:5 55:4,13 58:18 62:19 63:17 64:10 73:8
**threw** 17:1,4,10 29:5 31:7 35:23,23 60:7
**throw** 17:2,6
**throwing** 26:13 35:20 36:9
51:13 60:1 64:17 69:11
**thrown** 16:20
**time** 3:19 4:10 18:5 20:4 30:4 45:17 50:9 55:11 61:18 68:4 70:1 73:1
**timely** 9:1
**times** 9:18
**title** 12:6 13:19 14:21,22 44:20 45:2 47:2
**today** 3:5
**Today's** 7:23
**told** 11:11 15:5 15:20 22:11 24:16 27:2,10 30:16 34:11,12 36:12,15,16,16 38:4 39:5 61:17 63:2 69:4 70:3 71:5
**tolerated** 32:8
**Tommy** 3:9 5:2 6:4 7:14 8:9
**topic** 62:18
**Tracy** 3:1 6:10 7:14 8:9 11:12
**TRANSCRIP...** 1:3
**transfer** 5:23
**transferring** 4:14 68:5
**trash** 71:6
**tried** 18:1
**true** 40:9 41:12 41:23 42:2 63:22 64:5
**truth** 12:15,16 12:16 36:19
**trying** 4:20 36:2 36:5,10 59:23 68:16
**Tuesday** 53:17 66:21
**turn** 53:6
**turned** 19:13 45:7
**turning** 28:20
**Twenty** 25:4
**two** 4:2 12:4 39:11 47:17 48:5,6 55:2 57:5,8 59:6,21 73:7
**two-week** 27:12 27:18
**type** 26:3 57:4 61:11

**U**

**UC** 11:14,16 12:3
**ultimately** 36:8
**unaware** 44:4
**uncontrollable** 35:21
**understand** 11:21 14:19 29:20 37:17,21 41:5 42:16 53:10 57:17
**understood** 16:4 47:20
**unemploy** 8:11
**unemployment** 2:9 3:4 4:19 5:12 6:6 7:19 8:6,12,15 9:7 9:19 11:20 73:5
**UNIDENTIFI...** 2:1,5 4:16,21 5:1,8,14,19,21
**unsafe** 15:23 16:12 30:22 32:6 33:2
**upset** 28:8 46:16 63:2
**use** 21:11,20 35:18 73:3

**V**

**verbal** 24:17,20 47:21 48:14,15 48:17,18 49:7 57:22,23 60:8
**violence** 22:5
**volun** 30:19
**voluntarily** 9:5 9:15 28:10,13 46:1,20 71:23 72:1
**voluntary** 9:4 67:16
**VS** 1:6

**W**

**wait** 4:6,15
**walk** 5:15
**walks** 33:6,15
**want** 32:3 38:6 41:6 53:8,12 58:7 60:21
**wanted** 33:9,12 53:9 54:11 66:2,7
**wants** 72:18
**wasn't** 28:9 38:14
**way** 35:1 56:23
**Wednesday** 53:18 58:2
**week** 8:13
**weekend** 46:19 53:7,15
**weekly** 9:18
**weeks** 73:8
**went** 48:21 69:5
**we'll** 10:17
**we're** 7:11,20 32:11 48:20
**Williams** 1:7 3:9 6:12 7:15 8:10 10:17 12:4,22 12:23 15:9 16:17 17:1 18:6,13 20:18 23:5 25:6 26:2 26:10,19 27:20 29:2,16 30:23 33:1,6,13 34:20,21,23 39:22 40:3,17 41:14,22 42:13 42:20 43:12 45:14 47:4,8 48:17 49:9,21 50:13,22 51:9 51:13 52:2 53:22 54:11 55:1 59:16,18 59:23 60:23 62:11,14 63:21 68:3 71:12,16 71:21 72:4,7 72:12
**Williams's** 47:2 54:7 59:9
**willing** 27:6
**wish** 28:2
**witness** 6:12 7:15 8:10 12:5 51:3,12
**witnessed** 50:21
**witnesses** 51:7 51:12 65:21 66:2,5,7,10 70:8,15
**women** 26:12 59:8
**word** 70:13,14
**words** 35:16 70:12
**work** 9:6,18 11:13 13:9,12

13:13,15,16 14:3,10 15:10 16:1,12 20:5 21:7 25:5 26:19 27:7,11 28:6 29:3,12 30:22 31:4 33:2 46:15,17 46:20,21,23 49:12 52:9,13 52:21,22 54:23 57:13,16 59:8 62:19 66:19 67:22 68:2,3,9 68:22
**workday** 53:5
**worked** 13:7 25:9 29:23 30:9,21 35:3 44:14 45:5,7 52:17
**worker** 57:12
**working** 13:4 18:10 19:4 21:3 25:13 27:2 29:15,18 32:23 40:11 42:7,8,12 43:8 45:13 47:8,15 52:20 63:17,21 63:22
**workplace** 22:5 35:10 56:2
**works** 27:11 45:23
**work-connected** 9:6,8
**wouldn't** 63:20 66:18
**write** 66:9 68:21
**write-ups** 29:21
**writing** 57:22
**written** 22:4,15 23:3 24:2,13 24:16,20 61:1 61:2 62:4 64:19 68:11,23
**wrote** 19:12 23:20 67:18

**Y**

**yeah** 65:20
**year** 39:14 40:7
**years** 14:5 30:10 32:7,9 44:15
**yelling** 50:15,16 51:5,8 69:18 70:19 71:3,3

**Z**

**zero** 4:6

**0**

**05** 40:4,10 41:12
**06** 9:1 29:1 31:8 39:23
**088858206** 7:21

**1**

**1-866-770-1157** 3:20
**1-866-770-1197** 4:12
**1:07-CV-712-...** 1:9
**10** 18:2
**10:50** 62:10
**14** 37:1
**14th** 16:22 23:21 30:23 46:13 52:19 58:2 65:20
**15** 8:20 18:2
**15th** 52:18,20
**16** 29:1
**16th** 14:11 28:11 31:8 46:4,15 48:10 52:10,12 52:21 62:6,22
**19th** 9:1

**2**

**20** 63:19 66:23
**2001** 14:8 44:16 44:18
**2005** 58:20
**2006** 7:23 8:14 14:11
**21st** 46:2 58:3,4 58:5 67:3
**222** 4:23
**23rd** 7:23
**25th** 8:14 44:18 66:23
**254782** 9:3

**3**

**30** 63:19

**6**

**6** 66:22
**6/14** 60:10
**6/16** 45:6
**6/16/06** 28:16

**7**

**7th** 48:12

# Training Documentation

I, Frank Williams have received training on ccp#WICCP00300, ccp #WICCP 1100, WICCP00400, and WICCP01000. I have received a copy and clearly understand the work instructions.

Signed [signature] Date 1-11-07

PLAINTIFF'S EXHIBIT
8



PLAINTIFF'S EXHIBIT
9

INCIDENT OCCURRED ON 06/14/06

**DATE:** June 16, 2006

**TO:** Frank Williams

**FR:** Melvin Hutchins

**RE:** **Written Counseling – 1st Step**

On June 14, 2006 you used profanity in the presence of other co-workers. *This is a violation of plant work rule #16, fighting, threatening, intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property.*

Failure to follow the company policy has resulted in you receiving this **1st Step – Written Counseling**. Any future violations will result in additional disciplinary action up to and including termination

Melvin Hutchins
Production Manager

Frank Williams
(Signature acknowledges Receipt of this document only.)

# Nutcracker Brands Inc.

FLAVOR HOUSE

Nutcracker®

SOUTHERN ROASTED

## EMPLOYMENT APPLICATION

DATE 09-22-00

PERSONAL (RESUME MAY BE ATTACHED)

NAME: LAST williams FIRST Frank MIDDLE INITIAL D

TEMPORARY ADDRESS CITY STATE ZIP CODE

PERMANENT ADDRESS 2271 South St Hwy CITY Newton STATE AL ZIP CODE

AREA CODE-TEMPORARY PHONE NUMBER 334 692-3079 AREA CODE-PERMANENT PHONE NUMBER 334 692-4334 SOCIAL SECURITY NUMBER 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

WERE YOU EVER EMPLOYED BY RALSTON PURINA, RALCORP HOLDINGS, OR ANY OF THEIR SUBSIDIARIES/AFFILIATES? ☐ YES ☐ NO IF YES, WHEN - WHERE

HAVE YOU EVER BEEN CONVICTED OF ANY FELONY? IF YES, DESCRIBE IN DETAIL (CONVICTIONS WILL NOT AUTOMATICALLY DISQUALIFY JOB CANDIDATES)

☑ YES ☐ NO Sautory Rape my Girlfriend was 2 years Younger than me when I was 18

FOR WHAT POSITION ARE YOU APPLYING? SALARY EXPECTATIONS open DATE AVAILABLE 09-25-00

HOW DID YOU BECOME AWARE OF THE POSITION? Ruce Cassidy

ARE YOU RELATED TO ANYONE EMPLOYED BY THE COMPANY? IF YES, WHO AND WHAT IS YOUR RELATIONSHIP?

☐ YES ☑ NO

WILL YOU WORK OVERTIME, IF REQUIRED? ☑ YES ☐ NO WILL YOU WORK WEEKENDS, IF REQUIRED? ☑ YES ☐ NO

### EDUCATION

Achieved High School Diploma/GED? ☑ YES ☐ NO

| (Include Education in Progress.) | FROM MO. YR. | TO MO. YR. | DIPLOMA DEGREE DATE | MAJOR | CLASS STANDING OR GRADE POINT AVERAGE |
|---|---|---|---|---|---|
| HIGH SCHOOL/LOCATION JFI Ingram | | | Ged | | |
| TECHNICAL SCHOOL/COLLEGE LOCATION JFI Ingram | 2 92 | 4-94 | A A | Business | 3. 4 |
| | | | | | |
| | | | | | |

PLEASE LIST SPECIAL SKILLS, CERTIFICATIONS OR QUALIFICATIONS YOU POSSESS (SUCH AS FOREIGN LANGUAGE FLUENCY, CPA, COMPUTER SKILLS, ETC.)

PLAINTIFF'S EXHIBIT 10

CONFIDENTIAL

PERIENCE

se list all past work history including military and summer work. Use additional paper if necessary. (Please complete fully even if submitting resume.)

RT WITH PRESENT/LAST EMPLOYER

| SENT/LAST EMPLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | |
|---|---|---|---|
| Temps of Dothan | 2256 Reeves St. | | |
| T SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | DATES OF EMPLOYMENT |
| Mike | N/A | | FROM: 08-00 TO: |
| RTING SALARY | PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) |
| 6.00 | $8.50 hr. | | Pipe fitter |

CRIBE YOUR DUTIES AND RESPONSIBILITIES

Connected Pipe, grinded

| PLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | |
|---|---|---|---|
| Personal Resources for Fresh Dairy | | | |
| ST SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | DATES OF EMPLOYMENT |
| Dennis Ellis | Better Job | | FROM: 06-00 TO: 08-00 |
| ARTING SALARY | PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) |
| 7.50 | 7.50 | | |

SCRIBE YOUR DUTIES AND RESPONSIBILITIES

Send milk, pull orders

| MPLOYER | EMPLOYER'S ADDRESS AND PHONE NUMBER | | |
|---|---|---|---|
| Charoen Pokhand | Baker hill | | |
| ST SUPERVISOR/PHONE NUMBER | REASON FOR LEAVING | | DATES OF EMPLOYMENT |
| Jerme Wheeler 687-7190 | Moved | | FROM: 04-98 TO: 06-00 |
| TARTING SALARY | PRESENT/LAST SALARY | PRESENT/LAST BONUS/COMM. | YOUR JOB TITLE(S) |
| 6.50hr. | $28,000 year | | Sanitation / first Supervisor |

ESCRIBE YOUR DUTIES AND RESPONSIBILITIES

oversees all production lines & make sure People where doing their jobs; Payroll check of all my employees

PLEASE PROVIDE THREE BUSINESS REFERENCES OTHER THAN THOSE LISTED ABOVE.

| NAME | TITLE | PHONE NUMBER | LENGTH OF TIME KNOWN |
|---|---|---|---|
| Bruce Cassidy | Supervisor | Flavor House | 3 ½ Years |
| Butch Cassidy | Supervisor | " " | 3½ years |
| Cecil Feltman | Supervisor | Coca Cola | 12 years |

PLEASE READ THE FOLLOWING VERY CAREFULLY BEFORE SIGNING.

I acknowledge that the information I have supplied is correct to the best of my knowledge and belief without any omissions of any kind whatsoever. I understand that any falsifications, misrepresentations or omissions of fact may be grounds for rejection of my application or discharge at any time during my employment.

I understand that consideration for employment in this position is contingent upon the results of a reference and background check. I authorize the Company to investigate all statements made on my application for employment and to discuss the results of its investigations with those responsible for hiring. I further authorize the Company to contact my former employer(s) and any listed references or other persons who can verify information, and I give my consent for former employer(s) and other contacted persons to respond to questions pertaining to information on this application. Further, I release from liability such former employer(s) or other persons contacted by and providing information to the Company.

I understand that nothing in this application is intended to imply or create a contract of employment. I further understand that, if hired, my employment is at-will and can be terminated at any time for any reason, by the Company or me, with or without notice.

I acknowledge and agree that employment in the position for which I have applied may be contingent upon completion of a Company-paid physical examination. In addition, I understand that employment in this position is contingent upon successful completion of a test for the presence of illegal substances.

09-22-00
DATE (MONTH & YEAR)

APPLICANT'S SIGNATURE Frank Willis

**DOCUMENTATION FORM**

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordan Date: 2-16-06

Present: Melvin Hutchins

Who was involved: Frank Williams

Witness (s):

Date of incident: 2-16-06

Where did it take place: In hallway of Plant.

When did it take place (time and day): 2-16-06 Am.

What happened: At approximately 10:50AM an employee came to me stating that Frank Williams had came to them this am, stating that I had been telling people that Frank Williams was a child molester. Immediately I met with M. Hutchins / Chris Jordan with this matter. This is after a previous meeting with M. Hutchins on the topic of many concerns with Frank and line 3 work situations.

Did this result in down time? No If yes how much?

Did this result in product being scrapped? If yes how much? No

Attach an additional sheet if needed for witness statements following the same format.

Mark Beard - present in smoking area

PLAINTIFF'S EXHIBIT 11

FH000005

213

**DOCUMENTATION FORM**

Employee Name: Frank Williams

Investigating Supervisor: Chris Jordan Date: 2-16-06

Present: N/A

Who was involved: Linda Thornton

Witness (s): Jewell Silvey + Tracy Brantley

Date of incident: 2-16-06

Where did it take place: Hall way

When did it take place (time and day): 2-9-06

What happened: Jewell Silvey came up tome in the Hall way + told me that Linda thorton was outside tellins everyone that I was a child molester + my Brother's wife's Daughter was my girl friend this is harrassment and I don't like it I don't start trouble. what happen 15 years ago is none of her Busness

Did this result in down time? no If yes how much?

Did this result in product being scrapped? no If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

PLAINTIFF'S EXHIBIT

12

FH000003

211

Tracey Brantley
Jewell Silerry
Jackie Ward
Vickie Cook

FH000004

**DOCUMENTATION FORM**

Employee Name: Linda Thornton

Investigating Supervisor: Chris Jordon. Date: 3-01-06

Present: M. Hutchins

Who was involved: Frank Williams

PLAINTIFF'S EXHIBIT 13

Witness (s): N/A

Date of incident: Linda was told 2/28/06

Where did it take place: Break Area

When did it take place (time and day): After work

What happened: Repeatly I have been told of comments that team leader has made against me. One after investigation. Very Serious comments and threats made.

I just want this to be over with. Which I believed it would be after last weeks meeting with Tommy in HR. These threats & comments were made to an employee in the front office.

Did this result in down time? N/A If yes how much?

Did this result in product being scrapped? If yes how much? N/A

Attach an additional sheet if needed for witness statements following the same format.

# MEMORANDUM

**DATE:** March 7, 2006

**TO:** Linda Thornton

**FR:** Tommy Nance

**RE:** Memo to File

INCIDENT OCCURRED ON 2/16/06

After investigating the events surrounding the allegations made on 2/16/06, I have determined that you acted in a way that was inflammatory and instigational. This is not the first altercation that has occurred between yourself and Frank Williams. Any continued comments of an inflammatory nature or comments meant to incite controversy will be dealt with in a similar fashion.

Failure to follow the proper procedures has resulted in you receiving this **Memo to File.**

Any future violations will result in additional disciplinary action up to and including termination.

[signature]
Tommy Nance
Human Resources Manager

[signature: Linda Thornton]
Linda Thornton
(Signature acknowledges Receipt of this document only.)

I disagree with entire situation and who made comments. also with my record 4 years of employment this should show.

PLAINTIFF'S EXHIBIT 14

FH000002

22

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

**LINDA THORNTON,**

**Plaintiff,**

**v.**

**FLAVOR HOUSE PRODUCTS, INC. and FRANKLIN D. WILLIAMS, JR.,**

**Defendants.**

**Civil Action No.: 1:07-cv-712-WKW**

**DECLARATION OF MARY ANN BOYER**

1. I am the Director of Operations of the Flavor House Products, Inc. ("Flavor House") facility in Dothan, Alabama. I am over the age of eighteen and have personal knowledge of all matters stated herein.

2. Shortly after I came to Flavor House's Dothan facility in July, 2004, we introduced the "pay for skills" program in an effort to create consistency in pay rates among hourly employees and provide incentive for employees to improve their skill level. Under the pay for skills program, employees were assigned an initial skill rating of between 1 and 4 (with 1 being the lowest and 4 the highest skill level) based on their demonstrated abilities, experience and skill level, with each skill level being tied to a progressively higher hourly rate of pay. Employees could progress to a higher pay for skill level by demonstrating competency at the next level and passing a written test.

3. At the time we introduced the pay for skills program, Linda Thornton was assigned as a level 1 label operator. Although I encouraged Linda to test for higher skill levels at various times prior to March 2006, she did not do so. It was my understanding that Linda chose not to test for higher skills levels because her hourly rate was already higher than the hourly rate

for a level 4 operator. However, I informed Linda that due to how Flavor House allocates wage increases, Linda would eventually fall behind with respect to pay if her skill level were not increased.

4. I am aware that Linda Thornton appealed her pay for skills rating in March 2006. Linda was permitted to take the tests and demonstrate competencies required to move to higher skill levels without having to wait the normally required 6 months between tests. Copies of the tests taken by Linda in 2006 appear in her personnel file as it is maintained by Flavor House in the regular course of its business activities. Linda's personnel file reflects that she took and passed the tests between April 20 and May 10, 2006, and was assigned a level 4 skill rating in May 2006.

5. Flavor House maintains in the regular course of its business activities a record of the initial pay for skills rating assigned in 2004. A true and correct copy of the listing of the pay for skills ratings assigned to label operators at the time the initial ratings were assigned in 2004 as that document is maintained by Flavor House in the regular course of its business activities is attached to this declaration as Exhibit A. The document has been redacted so as not to reflect the pay for skills ratings assigned to employees other than label operators. As this document shows, of the label operators employed by Flavor House at the time the initial pay for skill ratings were assigned, all were assigned to level 1 except for two who were assigned to level 2 and two who were assigned to level 3. All of those assigned to levels 2 and 3 had been employed by Flavor House longer than Linda Thornton, and were believed to have greater experience and competency as label operators. At the time the initial ratings were assigned, Linda was being paid a higher hourly rate than two of the four who were assigned higher pay for skill ratings.

6. I am aware that Linda Thornton has complained in her lawsuit that John Millsaps threw a jar of nuts which hit her. I have reviewed John Millsaps' personnel file as it is maintained by Flavor House in the regular course of its business activities and found that it contains a counseling report issued to Millsaps on June 24, 2004 for this incident. A true and correct copy of the counseling report issued to Millsaps on June 24, 2004 as it is maintained by Flavor House in the regular course of its business activities is attached to this declaration as Exhibit B.

7. I am aware that Linda Thornton and Frank Williams both completed Documentation Forms in February 2006 relating to Linda telling other employees that Frank is a registered sex offender. I am also aware that Jewell Silvey and Tracey Brantley completed Documentation Forms regarding this incident. Copies of these Documentation Forms are maintained in the personnel file of Linda Thornton as it is maintained by Flavor House in the regular course of its business activities. True and correct copies of Jewell Silvey's and Tracey Brantley's Documentation Forms as they are maintained by Flavor House in the regular course of its business activities are attached to this declaration as Exhibit C.

8. I am aware that Linda Thornton complained on June 14, 2006 about an incident involving Frank Williams and that Declaration Forms were obtained from Linda Thornton, Frank Williams, Catherine Long, Wesley McInnis, Tameika Cooke and Mary Brooks regarding this incident. Copies of these Documentation Forms are maintained in the personnel file of Linda Thornton as it is maintained by Flavor House in the regular course of its business activities. A true and correct copy of Mary Brooks' Documentation Form as it is maintained by Flavor House in the regular course of its business activities is attached to this declaration as Exhibit D.

9. It is the regular practice of Flavor House to maintain an electronic record of the attendance of its employees. If an employee is absent from work, a letter code is used to note the reason for the absence. I have reviewed the 2006 attendance records of Tom Beard as those records are maintained by Flavor House in the regular course of its business activities. Tom's 2006 attendance records reflect that he was on FMLA leave from January 31, 2006 through March 31, 2006. A true and correct copy of Tom Beard's 2006 attendance records as those records are maintained by Flavor house in the regular course of its business activities is attached to this declaration as Exhibit E.

9. At the time that Linda Thornton quit her employment at Flavor House in June 2006, 3 of the 5 label operators on her shift (including Linda) were women. Linda was replaced by a female.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on August 8, 2008, at Dothan, Alabama.

Mary Ann Boyer
MARY ANN BOYER

# EXHIBIT A

| Employee | Hire Date | Classification | Department | Current Rates | Shift Differential | Skill Level | BASE Rates | Cents/hr Short | Annual dollars Impact | % Short | Proposed $ | New Rate | % Increase | Total Dollars | Lump Sum | Remain Short | Annualized Shortage Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRESLIN,MICHAEL V | 1/26/2004 | *LABELER* | MANUFACTURING (FH) | $ 9.00 | $0.25 | 1 | $ 10.50 | $ (1.50) | $ (3,120.00) | 14.29% | 1.50 | $10.50 | 16.67% | $3,120.00 | | $ - | $ - |
| PARKER,SARA A | 10/8/2003 | *LABELER* | MANUFACTURING (FH) | $ 9.50 | $0.25 | 1 | $ 10.50 | $ (1.00) | $ (2,080.00) | 9.52% | 1.00 | $10.50 | 10.53% | $2,080.00 | | $ - | $ - |
| MULLINS,PATRICK LAMONT | 11/10/2003 | *LABELER* | MANUFACTURING (FH) | $ 10.00 | $0.25 | 1 | $ 10.50 | $ (0.50) | $ (1,040.00) | 4.76% | 0.50 | $10.50 | 5.00% | $1,040.00 | | $ - | $ - |
| POWELL,BRADLEY FRANK | 10/8/2003 | *LABELER* | MANUFACTURING (FH) | $ 10.25 | | 1 | $ 10.50 | $ (0.25) | $ (520.00) | 2.38% | 0.25 | $10.50 | 2.44% | $ 520.00 | | $ - | $ - |
| PORTER,JAMES T | 9/25/2000 | *LABELER* | MANUFACTURING (FH) | $ 10.66 | | 2 | $ 10.85 | $ (0.19) | $ (395.20) | 1.75% | 0.19 | $10.85 | 1.78% | $ 395.20 | | $ - | $ - |
| BEARD,MARK | 5/2/2000 | *LABELER (FL)* | MANUFACTURING (FH) | $ 11.70 | | 3 | $ 11.20 | $ - | $ - | 0.00% | 0.00 | $11.70 | 0.00% | $ - | $ 485.72 | $ - | $ - |
| BRANTLEY,TRACEY A | 11/17/2003 | *LABELER* | MANUFACTURING (FH) | $ 10.75 | | 1 | $ 10.50 | $ - | $ - | 0.00% | 0.00 | $10.75 | 0.00% | $ - | $ 447.20 | $ - | $ - |
| CASSADY,CHRISTOPHER B | 7/29/2002 | *LABELER* | MANUFACTURING (FH) | $ 10.80 | | 1 | $ 10.50 | $ - | $ - | 0.00% | 0.00 | $10.80 | 0.00% | $ - | $ 449.28 | $ - | $ - |
| CASSADY,TIMOTHY B. | 7/28/1999 | *LABELER (FL)* | MANUFACTURING (FH) | $ 11.33 | $0.25 | 3 | $ 11.20 | $ - | $ - | 0.00% | 0.00 | $11.33 | 0.00% | $ - | $ 471.33 | $ - | $ - |
| PARRISH,LINDA A | 6/25/2001 | *LABELER* | MANUFACTURING (FH) | $ 11.62 | | 1 | $ 10.50 | $ - | $ - | 0.00% | 0.00 | $11.62 | 0.00% | $ - | $ 483.39 | $ - | $ - |
| SANDERS,RODERICK B | 12/23/2002 | *LABELER* | MANUFACTURING (FH) | $ 10.82 | | 1 | $ 10.50 | $ - | $ - | 0.00% | 0.00 | $10.82 | 0.00% | $ - | $ 450.11 | $ - | $ - |
| WILLIAMS,FRANK D | 9/25/2000 | *LABELER* | MANUFACTURING (FH) | $ 11.70 | | 2 | $ 10.85 | $ - | $ - | 0.00% | 0.00 | $11.70 | 0.00% | $ - | $ 486.72 | $ - | $ - |
| | | TOTALS | Average | $ 10.68 | | | $ 10.68 | | $ (7,155.20) | | 3.44 | $ 10.96 | | $7,155.20 | $ 3,274.75 | | |
| | | | | | | | | | | | | Total Labeler Impact | | | $10,429.95 | | $ - |

83

6/23/06

# LABEL OPERATOR
## Can Line
## ANSWERS

1. If the lift does not raise the labels, which of the following statements could be a possible reason?
   a. Hydraulic fluid pressure is too high.
   b. Label basket is too loose.
   c. Curling bar is either loose or not tight.
   **Answer:**

2. If the label is not being picked up, which of the following is not a true statement.
   a. Hot pickup glue is too low.
   b. Hot pickup glue is too high.
   c. Too many glue rollers (wheels).
   d. Speed of machine is too fast.
   **Answer:**

3. If the label machine is running but the label table will not lift the labels up, which of the following is a possible problem?
   a. Check sensor to make sure it is blocked.
   b. Hydraulic pump not turned on.
   c. Belts are too tight.
   **Answer:**

4. What is the ideal air pressure for the cold glue?
   a. 10-20 psi.
   b. 30-40 psi.
   c. 60-70 psi.
   **Answer:**

5. True or False. The room temperature will affect how the label machine performs.
   **Answer:**

6. True or False. Overhead belts should not be cleaned.
   **Answer:**

7. True and False. Guide rails being too tight can cause loose labels.
   **Answer:**

8. True or False. When operating the label machine you should use as many glue rollers (wheels) as possible.
   **Answer:**

9. What does pp mean on the description of the BOM/schecule?
   **Answer:** PRE PRICED

10. How many minutes are there between label checks?
**Answer:** 15 MIN

11. How would you determine if you have the correct label for the order you are about to run?
**Answer:** CHECK THE NAME OF LABE, CHECK UPC CODE

12. If the padding on the label machine is sticky or tacky, what will this cause?
**Answer:** LOOSE LABLES

13. True or (False) If the label is on the top or bottom rim of the can this is acceptable.
**Answer:**

14. If the capper is stripping off labels as the cans go through the machine, which of the following statements is false.
   a. Speed of label machine is too fast.
   b. Too much cold glue.
   (c.) Padding needs to be replaced.
   **Answer:**

15. Which of the following statements is incorrect.
   a. If a flex rail breaks it could cause the cans to jam the machine.
   b. Improper spacing of glue wheels will cause build up of glue on the belts.
   (c.) The label machines cannot be slowed down.
   **Answer:**

16. True or (False) The hot glue needs to set at the same setting every day.
**Answer:**

17. What are the 4 tools most commonly used on a label machine during a changeover? ALLEN PACK, 7/16" WRENCH, CHANLE LOCKS, FLAT TIP SCREWDRI[illegible]

18. (True) or False. Low air pressure will cause problems with the cold glue.
**Answer:**

19. How many E-stops are on the label machine?
**Answer:** ONE

20. If the tension springs break on the rollers what could this cause?
**Answer:** LOOSE LABLES

Patrick Mullins

-2

Level 2 Level 3 8/28/06

# LABEL OPERATOR

**Pay For Sill Test (Level 3)**
**ANSWERS**

**Requirements of a level 3 Label Machine Operator:**

- **Must pass the written and practical test for a Level 3 Label Machine Operator.**
- **Must be able to operate ALL label machines on lines 1, 2, 3, 4, and 5 in an efficient manner. Very little to NO assistance from any other operator or Bruce Cassady should be required.**
- **Any packaging line where you are the assigned label operator, must meet standards on a consistent basis without errors from the label machine operator.**
- **Must be able to changeover all label machines to the various sizes it may run. The changeovers must be done in a timely manner and excessive downtime due to the changeovers will not be acceptable.**
- **Must possess the ability to recognize and solve problems in a timely fashion.**
- **Must have a good working relationship with all team members.**
- **Must possess good communication skills.**
- **Must be a team player.**
- **Must show initiative.**
- **Must have written approval from your packaging supervisor, shift maintenance supervisor, and shift superintendent.**
- **Must have final approval from the Manager of Maintenance and Production.**

**Section A: The following questions will be worth 50% of Level 3 test:**

1. Which of the following could cause loose labels?
    a. Guide rails are too tight.
    b. Glue applicators are too high.
    c. Hydraulic fluid is low.
    d. All the above.

2. Which of the following could cause the labels to fall off the container, or the label edges flag?
    a. The height of the label basket is not correct.
    b. The label basket registration adjustment is not correct.
    c. The wipe down brushes are dirty, worn, or not positioned correctly.

3. True or False. If a large amount of adhesive was just added to the reservoir, it could cause the adhesive temperature to be low.

~~No Pay Change~~

(open and close)

4. The label basket carriage has four adjustments. What are they?
The width adjustments, the height adjustments (Front and back) the basket control up-down are the label control up and down (out)

5. If the JOG pushbutton on the Remote Jog Station is pressed and the machine does not run what should you do? make sure that the proper safety door are down and make sure that the control is in jog mode.

6. What is the maximum level of the glue in the reservoir from the top of the glue pot? Full 75%

7. What is the push plate for on the label basket?
   a. Hold labels in place
   b. Put tension on containers
   c. All the above

8. If glue heaters are turned off, the glue pump can only be turned on again when adhesive reaches its operating temperature. True or False.

9. The labels are slanted or angled on the container, which of the following would correct the problem?
   a. The brush station is not positioned correctly.
   b. There is excessive adhesive on the label and the label is slipping.
   c. The label basket registration adjustment is not correct.
   d. All the above.

10. True or False. Label knives that are too dull cause labels to tear.

**Section B:** The complete changeover of a jar line label machine. This part of the Level 3 test will include start-up with no errors and no assistance.

The operator will be allowed 50 minutes to perform changeover and will count as 25 % towards the Level 3 test.

**Section C:** The complete changeover of a jar line label machine. This part of the Level 3 test will include start-up with no errors and no assistance.

The operator will be allowed 25 minutes to perform changeover and will count as 25 % towards the Level 3 test.

Employee's Signature

Supervisor's Signature

Passed Written Portion (MH) 11-29-06

# LABEL OPERATOR

**Pay For Sill Test (Level 3)**
**ANSWERS**

**Requirements of a level 3 Label Machine Operator:**

- **Must pass the written and practical test for a Level 3 Label Machine Operator.**
- **Must be able to operate ALL label machines on lines 1, 2, 3, 4, and 5 in an efficient manner. Very little to NO assistance from any other operator or Bruce Cassady should be required.**
- **Any packaging line where you are the assigned label operator, must meet standards on a consistent basis without errors from the label machine operator.**
- **Must be able to changeover all label machines to the various sizes it may run. The changeovers must be done in a timely manner and excessive downtime due to the changeovers will not be acceptable.**
- **Must possess the ability to recognize and solve problems in a timely fashion.**
- **Must have a good working relationship with all team members.**
- **Must possess good communication skills.**
- **Must be a team player.**
- **Must show initiative.**
- **Must have written approval from your packaging supervisor, shift maintenance supervisor, and shift superintendent.**
- **Must have final approval from the Manager of Maintenance and Production.**

**Section A: The following questions will be worth 50% of Level 3 test:**

1. Which of the following could cause loose labels?
   a. Guide rails are too tight.
   b. Glue applicators are too high.
   c. Hydraulic fluid is low.
   d. All the above.

2. Which of the following could cause the labels to fall off the container, or the label edges flag?
   a. The height of the label basket is not correct.
   b. The label basket registration adjustment is not correct.
   c. The wipe down brushes are dirty, worn, or not positioned correctly.

3. True or False. If a large amount of adhesive was just added to the reservoir, it could cause the adhesive temperature to be low.

screw
② side to side adjustment
④ Tighten or loosen
height adjustment

4. The label basket carriage has four adjustments. What are they?
③ The left and right height adjustment of the basket ④ The up and down height adjustment of the entire basket (screw)
① The front and back of the label adjustment
③ The tighten or loosening of the basket used with alan wrench

5. If the JOG pushbutton on the Remote Jog Station is pressed and the machine does not run what should you do? Make sure the machine is in jog mode, all safety doors are closed, all e stops are released and not pressed in.

6. What is the maximum level of the glue in the reservoir from the top of the glue pot? 75%

7. What is the push plate for on the label basket?
   a. Hold labels in place
   b. Put tension on containers
   c. All the above

8. If glue heaters are turned off, the glue pump can only be turned on again when adhesive reaches its operating temperature. True or False.

9. The labels are slanted or angled on the container, which of the following would correct the problem?
   a. The brush station is not positioned correctly.
   b. There is excessive adhesive on the label and the label is slipping.
   c. The label basket registration adjustment is not correct.
   d. All the above.

10. True or False. Label knives that are too dull cause labels to tear.

**Section B:** The complete changeover of a jar line label machine. This part of the Level 3 test will include start-up with no errors and no assistance.

The operator will be allowed 50 minutes to perform changeover and will count as 25 % towards the Level 3 test.

**Section C:** The complete changeover of a jar line label machine. This part of the Level 3 test will include start-up with no errors and no assistance.

The operator will be allowed 25 minutes to perform changeover and will count as 25 % towards the Level 3 test.

Employee's Signature

Supervisor's Signature

Level 2 Operator

**Name:** Patrick Mullins **Date:** 12-29-05

# LABEL OPERATOR

**Jar Line**

1. How many E-stops are on the Krones Canmatic?

   7

2. How many safety eyes are protecting the Krones Canmatic?

   4

3. What two adjustments can control the amount of glue flow on the lap roller?

   Scraper, lap roller

4. True of False. The SET UP MODE screen is where the operator can make a height adjustment.

   True

5. Equipment number 1 is used for what size?
   a. 8 oz.
   b. 12 oz.
   c. 16 oz.

6. Equipment number 2 is used for what size?
   a. 8 oz.
   b. 12 oz.
   c. 16 oz.

7. Equipment number 3 is used for what size?
   a. 8 oz.
   b. 12 oz.
   c. 16 oz.

8. True or False. If the height adjustment is not in the proper placement, the lap roller will be out of timing.

   True

9. Which of the following settings can be adjusted in the setup screen of the control panel?
   a. Speed
   b. Equipment number

1-2-06 level I to level II

c. Timing
d. All the above

10. True or False. To complete a changeover an operator needs a 15 mm wrench.

11. Where is the reset button located when there is a main load override malfunction?

inside the Control Panel

12. What is the security code needed for resetting the production counter?

12321

13. What causes a main load override malfunction?

speed too high

14. What happens if you raise one of the doors on the Krones Canmatic?

it automatically shuts off

15. True or False. The scraper cannot be used to adjust the amount of glue on the pick-up side roller?

16. How many different parts are needed for a change over?

a. 10
b. 14
c. 6
d. none of the above

17. Where are the jog chords located on the Krones Canmatic?

1) door 3+4
2) door 2+4

18. True or False. A bent container will not cause a container jam.

19. How many minutes are there between label checks?

15 minutes

20. How would you determine if you have the correct label for the order you are about to run?

by the upc number on the label to match the upc work number on the schedule.



Robert Mullins 10-27-05

-10
50

# LABEL OPERATOR

**Jar Line**

**ANSWERS**

1. How many E-stops are on the Krones Canmatic? 7

2. How many safety eyes are protecting the Krones Canmatic? 5

3. What two adjustments can control the amount of glue flow on the lap roller?
There is an adjustment screw beside the lap roller which increases or decreases the amount of glue being sent. There is a scraper located against the lap roller to remove excess glue from lap roller.

4. True of False. The SET UP MODE screen is where the operator can make a height adjustment. ~~True~~ False

5. Equipment number 1 is used for what size?
   a. 8 oz.
   b. 12 oz.
   c. 16 oz.

6. Equipment number 2 is used for what size?
   a. 8 oz.
   b. 12 oz.
   c. 16 oz.

7. Equipment number 3 is used for what size?
   a. 8 oz.
   b. 12 oz.
   c. 16 oz.

8. True or False. If the height adjustment is not in the proper placement, the lap roller will be out of timing. False

9. Which of the following settings can be adjusted in the setup screen of the control panel?
   a. Speed
   b. Equipment number
   c. Timing
   d. All the above

10. True or False.  To complete a changeover an operator needs a 15 mm wrench.

11. Where is the reset button located when there is a main load override malfunction?
on the inside of the control box

12. What is the security code needed for resetting the production counter?

13. What causes a main load override malfunction?
The glue Pot malfunctioning (getting too hot), Jammed jar in machine causing the
machine to override.

14. What happens if you raise one of the doors on the Krones Canmatic?
The machine stops

15. True or False.  The scraper cannot be used to adjust the amount of glue on the pick-up side roller? False

16. How many different parts are needed for a change over?
   a.  10
   b.  14
   c.  6
   d.  none of the above

17. Where are the jog chords located on the Krones Canmatic?
on the corners of the front and back of the safety doors

18. True or False.  A bent container will not cause a container jam.
False

19. How many minutes are there between label checks?
15 minutes

20. How would you determine if you have the correct label for the order you are about to run?  Check the upc number on the label and compare it to the upc number on the work order you are about to run.

85

# LABEL OPERATOR
## Pay For Skill Test (Level 2)
## Part #1
ANSWERS

Requirements of a Level 2 Label Machine Operator:

- You must pass both a written test and several practical requirements.
- You must be able to run a jar and can line label machine with very minimal assistance from Bruce Cassady or other label machine operators.
- You must be able to change over a jar and can line label machine to the various sizes it may run.
- When running the can and jar line label machines, there must be very little downtime on the label machine, which will prevent the accomplishment of line standards. This task must be done on a consistent basis.
- You must be a team player.
- You must be able to work well with others.
- You must be able to recognize and solve problems in a timely manner.
- You must receive signed approval from your production supervisor, maintenance shift supervisors, and shift superintendents.
- You must receive final approval from the Manager of Maintenance and Production.

1. If the lift does not raise the labels, which of the following statements could be a possible reason?
   a. Hydraulic fluid pressure is too high.
   b. Label basket is too loose.
   c. Curling bar is either loose or not tight.
   Answer: C

X

2. If the label is not being picked up, which of the following is not a true statement.
   a. Hot pickup glue is too low.
   b. Hot pickup glue is too high.
   c. Too many glue rollers (wheels).
   d. Speed of machine is too fast.
   Answer: B

3. If the label machine is running but the label table will not lift the labels up, which of the following is a possible problem?
   a. Check sensor to make sure it is blocked.
   b. Hydraulic pump not turned on.
   c. Belts are too tight.
   Answer: B

4. What is the ideal air pressure for the cold glue?

5-19-08
Level 1 11.47
to
Level 2 11.87

     (a.) 10-20 psi.
b. 30-40 psi.
c. 60-70 psi.
**Answer:**

5. True or False. The room temperature will affect how the label machine performs.
**Answer:** TRUE

6. True or False. Overhead belts should not be cleaned.
**Answer:** FALSE

7. True and False. Guide rails being too tight can cause loose labels.
**Answer:** TRUE

8. True or False. When operating the label machine you should use as many glue rollers (wheels) as possible.
**Answer:** TRUE

9. What does pp mean on the description of the BOM/schecule?
**Answer:** PRE PRICED

10. How many minutes are there between label checks?
**Answer:** 15

11. How would you determine if you have the correct label for the order you are about to run? YOU CHECK THE ITEM NUMBER FOR THE LABLE AGAINST THE
**Answer:** NUMBER ON THE LABLE BOX, THE LABLE IT SELF AND IN THE SPEC. BOOKS

12. If the padding on the label machine is sticky or tacky, what will this cause?
**Answer:** LOOSE OR TORN LABLES

13. True or False. If the label is on the top or bottom rim of the can this is acceptable.
**Answer:** FALSE

14. If the capper is stripping off labels as the cans go through the machine, which of the following statements is false.
a. Speed of label machine is too fast.
(b.) Too much cold glue.
c. Padding needs to be replaced.
**Answer:** A

15. Which of the following statements is incorrect.
a. If a flex rail breaks it could cause the cans to jam the machine.
b. Improper spacing of glue wheels will cause build up of glue on the belts.
c. The label machines cannot be slowed down.
**Answer:** C

16. True or False. The hot glue needs to set at the same setting every day.
Answer: FALSE

17. What are the 4 tools most commonly used on a label machine during a changeover? **Answer:** CHANGE LOCKS; ALLEN PACK, 7/16" WRENCH FLAT TIP SCREWDRIVER

18. True or False. Low air pressure will cause problems with the cold glue.
**Answer:** TRUE

19. How many E-stops are on the label machine?
**Answer:** 1

20. If the tension springs break on the rollers what could this cause?
**Answer:** LOOSE CABLES AND CABLES THAT WILL NOT ALINE CORECTLY ON THE CAN

## Part #2
## Answers

1. How many E-stops are on the Krones Canmatic?
**Answer:** 7

2. How many safety eyes are protecting the Krones Canmatic?
**Answer:** 4

3. What two adjustments can control the amount of glue flow on the lap roller?
**Answer:** PLACEMENT OF THE SCRAPER AND THE SETTING OF THE GLUE SET SCREW

4. True of False. The SET UP MODE screen is where the operator can make a height adjustment.
**Answer: T** TRUE

5. True or False. If the height adjustment is not in the proper placement, the lap roller will be out of timing.
**Answer:** TRUE

6. What is the proper sequence (Steps 1 to 3) for timing the container handling system?

__2__ Transfer stars to Bottle Table.
__3__ Bottle Table to Centering Bell.
__1__ Infeed Screw to Infeed Star.

7. True of False. The reservoir drain valve and plug are the same temperature as the outside of the glue pot.
**Answer:** FALSE

8. True or False. To complete a changeover an operator needs a 15 mm wrench.
**Answer:** FALSE

9. What causes a main load override malfunction?
**Answer:** A JAR THAT HAS FALLEN OVER IN THE INFEED SCREW Label speed is set too high

10. True or False. The brush bristles should not penetrate more than one quarter of an inch into the container.
**Answer:** TRUE

11. What happens if you raise one of the doors on the Krones Canmatic?
**Answer:** MACH. WILL STOP

12. True or False. The scraper cannot be used to adjust the amount of glue on the pick-up side roller?
**Answer:** FALSE

13. Where are the jog chords located on the Krones Canmatic?
**Answer:** DOORS 3 + 4

14. True or False. A bent container will not cause a container jam.
**Answer:** FALSE

15. If the lap end of the label shows no adhesive pattern, it could be the result of which of the following?

   a. Mispositioned brush segments.
   b. Labels not coming to the front of the fingertips.
   c. Lap roller out of position.
   d. All of the above.

   **Answer:** ~~A&C~~ D   only B + C

16. How many minutes are there between label checks?
**Answer:** 15

17. How would you determine if you have the correct label for the order you are about to run?
**Answer:** CHECK THE ANSWER FOR QUESTION 11   Match UPC From Label to BOM Schedule

18. True or False. If any safety device (guard cover, guard door, stop button, etc.) is missing, broken, or malfunctioning, the machine can still be operated.
**Answer:** FALSE

19. What operator action will stop the machine?
    a. Push a Machine Stop button.
    b. Push an E-Stop button.
    c. Open a guard door.
    d. Close the Bottle Stop.
    e. All of the above.
    f. Only A, B and C are correct.

    **Answer**: E

20. Which of the following are safety items that should be reported immediately?

    a. Missing or broken guards/guard doors.
    b. Guard door interlock switch not working.
    c. Emergency Stop button does not immediately stop the machine from rotating.
    d. A co-worker that is not following correct safety procedures or practices.
    e. All the above.
    f. None of the above.

[signature] Employee's Signature

[signature] 5/15/08 Supervisor's Signature

MICHAEL V. BRESLIN
6/23/06

# LABEL OPERATOR

**Can Line**
**ANSWERS**

1. If the lift does not raise the labels, which of the following statements could be a possible reason?
   a. Hydraulic fluid pressure is too high.
   b. Label basket is too loose.
   c. Curling bar is either loose or not tight.
   **Answer:**

2. If the label is not being picked up, which of the following is not a true statement.
   a. Hot pickup glue is too low.
   b. Hot pickup glue is too high.
   c. Too many glue rollers (wheels).
   d. Speed of machine is too fast.
   **Answer:**

3. If the label machine is running but the label table will not lift the labels up, which of the following is a possible problem?
   a. Check sensor to make sure it is blocked.
   b. Hydraulic pump not turned on.
   c. Belts are too tight.
   **Answer:**

4. What is the ideal air pressure for the cold glue?
   a. 10-20 psi.
   b. 30-40 psi.
   c. 60-70 psi.
   **Answer:**

5. True or False. The room temperature will affect how the label machine performs.
   **Answer:**

6. True or False. Overhead belts should not be cleaned.
   **Answer:**

7. True and False. Guide rails being too tight can cause loose labels.
   **Answer:**

8. True or False. When operating the label machine you should use as many glue rollers (wheels) as possible.
   **Answer:**

9. What does pp mean on the description of the BOM/schecule?
   **Answer:** PRE PRICED

10. How many minutes are there between label checks?
**Answer:** 15MIN

11. How would you determine if you have the correct label for the order you are about to run?
**Answer:** CHECK THE NAME OF LABE, CHECK UPC CODE

12. If the padding on the label machine is sticky or tacky, what will this cause?
**Answer:** LOOSE LABLES

13. True or (False) If the label is on the top or bottom rim of the can this is acceptable.
**Answer:**

14. If the capper is stripping off labels as the cans go through the machine, which of the following statements is false.
   a. Speed of label machine is too fast.
   b. Too much cold glue.
   (c.) Padding needs to be replaced.
   **Answer:**

15. Which of the following statements is incorrect.
   a. If a flex rail breaks it could cause the cans to jam the machine.
   b. Improper spacing of glue wheels will cause build up of glue on the belts.
   (c.) The label machines cannot be slowed down.
   **Answer:**

16. True or (False) The hot glue needs to set at the same setting every day.
**Answer:**

17. What are the 4 tools most commonly used on a label machine during a changeover? ALLEN PACK, 7/16" WRENCH, CHANLE LOCKS, FLAT TIP SCREWDRIV

18. (True) or False. Low air pressure will cause problems with the cold glue.
**Answer:**

19. How many E-stops are on the label machine?
**Answer:** ONE

20. If the tension springs break on the rollers what could this cause?
**Answer:** LOOSE LABLES

# EXHIBIT B

# FLAVOR HOUSE PRODUCTS

X Counseling Report ______ Warning Report

| | | | |
|---|---|---|---|
| Employee: Johnny Millsap | Emp. #: | Date Submitted for Approval: | |
| Department: Maintenance | Shift: 2nd | Date Violation Occurred: 6/28/04 | |
| Shift Supervisor: | Department Manager: Cecil Smith | | |

**SITUATION IN BRIEF (State violation according to Discipline & Discharge Policy):**

Johnny threw a jar that bounced off a rail and hit Linda

**DETAILS (Be specific)(See checklist on back):** Date Discussed With Employee:

Linda got mad over the incident

**ACTION TAKEN (Recommendation)(See checklist on back):**

Never throw anything anywhere inside the plant. Counseling report

**COMMENTS:** Another incident will result in further disciplinary action up to and including discharge

**EMPLOYEE:** X John W Millsap

| Shift Supervisor | Date | Witness | Date |
|---|---|---|---|
| | | Donald P Cody | 7-1-04 |

| Department Manager | Date | Human Resources | Date | Plant Manager | Date |
|---|---|---|---|---|---|
| Cecil Smith | 6/30/04 | Leigh Williams | 7/2/04 | | |

**NOTICE: MUST BE APPROVED BY HUMAN RESOURCES AND PLANT MANAGER**

# EXHIBIT C

**DOCUMENTATION FORM**

Employee Name: Tracey Brantley

Investigating Supervisor: ____________________ Date: __________

Present: ____________________

Who was involved: Linda & Jewel

Witness (s): Tracey

Date of incident: ____________________

Where did it take place: ____________________

When did it take place (time and day): ____________________

What happened: Jewel told me that Linda said that She wanted Jewel to look on the Dothan Eagle web site and make a copy of Frank picture and put it in the suggest box. Than I heard Linda said it myself as she was telling Jewel in the smoking area. I did not know if she was joking or not.

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

**DOCUMENTATION FORM**

Employee Name: Jewell Silvey

Investigating Supervisor: ______________________ Date: 2-23-06

Present: ______________________

Who was involved: Linda Thoren

Witness (s): Jewell Silvey, Tracy, Vickie, Jackie

Date of incident: 15th; 16th

Where did it take place: smoking area

When did it take place (time and day): before work, After work

What happened: Linda told me Frank has been in prison for being a sex afender. I asked if the company knew about it, Then Linda said I could look it up on Dothan, Com. Sex offenders and make a copy to put in the suggestion box. I did state that at a certain age it would be child molesting. When Franks little boy came to see him

Did this result in down time? ________ If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

Vickie thought he the little boy was a little girl. Frank turned around and said thats my baby. Apartly Franks little boy came to see him a different day than when everything was said. Vickie just said that because she thought it was funny when Frank turned and said thats my baby. Linda turned the statement around and said the little one must of been his girlfriend. She was talking loaund enough for everyone to hear.

Jewell Silvey

# EXHIBIT D

**DOCUMENTATION FORM**

Employee Name: Mary Brooks

Investigating Supervisor: Chris Jordan Date: 6-15-06

Present:

Who was involved: Frank Williams + Linda Thornton

Witness (s):

Date of incident: 6-14-06

Where did it take place: Line 3 label machine

When did it take place (time and day): Before lunch

What happened: She came back from break (Linda Did Paperwork) Mary Walked off and Did not witness anything. She did state they argue and fuss everyday not just yesterday.

Mary Brooks

Did this result in down time? N/A If yes how much?

Did this result in product being scrapped? If yes how much?

Attach an additional sheet if needed for witness statements following the same format.

# EXHIBIT E

| | | | | | |
|---|---|---|---|---|---|
| Employee: | Tom Beard | D | Death in Family | L | Leave of Absence | 
| Hire Date: | 4/22/1991-01/28/08 | E | Excused | O | Family/Medical Leave |
| Dept.: | Maintenance | J | Jury Duty | Q | Early Quit |

| | |
|---|---|
| T | Tardy |
| U | Unexcused |

| 2006 | Hours Due | Used Jan | Used Feb | Used Mar | Used Apr | Used May | Used Jun | Used Jul | Used Aug | Used Sep | Used Oct | Used Nov | Used Dec | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | 160 | 24 | 0 | 8 | 0 | 24 | 8 | 24 | 8 | 0 | 40 | 0 | 24 | 0 |
| Sick Days | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Attendance | | 0 | 0 | 0 | 0 | 0 | 1 | 0.5 | 1 | 0 | 1 | 2 | 0 | -5.5 |

| January | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | 8 | 8 | | | | | | | | | | | | | | | | | | | | | 8 | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | | | | | | | | | | | O | | | | | | O |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| February | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | O | O | O | | | O | O | O | O | O | | | O | O | O | O | O | | | O | O | O | O | O | | | O | O |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| March | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | 8 | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | O | O | O | | | O | O | O | O | O | | | O | O | O | O | O | | | | | | | | | | O | O | O | O | O |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| April | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| May | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | 8 | | | | | | 8 | 8 | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | D | D | D | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| June | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| July | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | 8 | 8 | 8 | | | | | | | | | | | | | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | | | 0.5 | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| August | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | | 8 | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| September | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| October | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | 8 | 8 | 8 | 8 | 8 | | | | | | | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| November | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | 1 | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| December | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacation | | | | | | | | | | | | | | | | | | | | | | 8 | | | | | 8 | 8 | | | |
| Sick Days | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atttendance | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

**LINDA THORNTON,**

**Plaintiff,**

**v.**

**FLAVOR HOUSE PRODUCTS, INC., and FRANKLIN D. WILLIAMS, JR.,**

**Defendants.**

**Civil Action No.: 1:07cv712-WKW**

**DECLARATION OF LEIGH TAYLOR**

**STATE OF ALABAMA**
**COUNTY OF DALE**

1. My name is Leigh Taylor. I am over nineteen years of age, suffer no incapacities, and have personal knowledge of the facts sets forth in this declaration.

2. I was employed at Flavor House Products, Inc. ("Flavor House") in Dothan, Alabama as an accounts payable associate from September 2004 until April 2006.

3. During the time that I worked at Flavor House, I was acquainted with both Linda Thornton and Frank Williams. I was aware that Linda Thornton and Frank Williams did not like each other.

4. During the time that we were both employed by Flavor House, Linda Thornton told me that Frank Williams was a registered sex offender. I was not aware of this fact before Linda informed me of it.

5. Frank Williams never talked to me about his sex life, nor did I ever hear Frank Williams talk to anyone else about his sex life. I never heard Frank Williams make any sexually

inappropriate comments or engage in any sexually harassing behavior towards Linda Thornton or anyone else.

6. Frank Williams never made any threatening comments to me about Linda Thornton, nor did I ever hear Frank Williams make any threatening comments about Linda Thornton or anyone else. I never heard Frank Williams say that he was "going to get" Linda Thornton, or that he was going to "f--- her up."

7. I was aware that Linda Thornton told Tommy Nance that I had heard Frank Williams make threatening comments about her because Tommy Nance called me into his office to question me about this. I told Tommy Nance that I had not heard Frank Williams make any threatening comments about Linda Thornton or anyone else.

8. I declare under penalty of perjury that the foregoing declaration is true and correct, and I have dated each page and any changes and signed below on this 1 day of May, 2008.

Leigh Taylor