IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDA THORNTON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: |
| | * | 1:07 cv-712-WKW |
| FLAVOR HOUSE PRODUCTS, INC., and | * | |
| FRANKLIN D. WILLIAMS, JR., | * | |
| | * | |
| Defendants. | * | JURY DEMAND |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO
MOTION TO STRIKE AFFIRMATIVE DEFENSES
OF DEFENDANT, FLAVOR HOUSE PRODUCTS, INC.**

COMES NOW the Plaintiff, Linda Thornton, and respectfully submits the following in reply to the Defendant's Response in Opposition to Plaintiff's Motion to Strike Affirmative Defenses of Defendant, Flavor House Products, Inc.:

1.      Defendant Flavor House has responded to Plaintiff's Motion to Strike Affirmative Defenses by claiming that (a) there is no evidence the investigation notes at issue were purposefully lost, destroyed or discarded; (b) that there is no evidence of bad faith by the defendant; and (3) the plaintiff is not prejudiced by the absence of the investigation documents. [Doc. 69, p. 3]. For the reasons as set out herein, the defendant's position is without merit.

2.      First, there is evidence that the investigation notes were lost, destroyed or discarded as it is undisputed by the defendant that they are simply nowhere to be found with no explanation as to what happened to them, why or when. The investigation notes of Tommy Nance are simply gone with no explanation from the defendant, despite the defendant having been put on notice of the plaintiff's claims as early as September 26, 2006. [Doc. 60-4, ¶2]. Their very absence is evidence

that they were lost, destroyed or discarded.

3. Secondly, there is also evidence of bad faith or culpability on the defendant's part as Flavor House, and it's legal counsel, knew of the plaintiff's pending EEOC charges as early as September 2006 and the defendant failed to take adequate steps to insure the preservation of Nance's investigation materials, as evidence by their conspicuous absence and the defendant's inability to account for same.

4. The defendant has submitted the Declaration of Deanna Lake, the individual who replaced Nance as Human Resources Manager at the Dothan, Alabama, facility on December 5, 2006, in which Lake states that since her hire date she has searched for Nance's investigation documents to no avail and that to her knowledge, since the date of her hire no such items were discarded, destroyed or lost. [Doc. 69-3]. Yet, Nance testified at length about the existence and creation of his investigative notes [See Doc. 61] and these documents are still nowhere to be found and have not been produced. Lake's proffered statements provide no explanation for nor shed any light on what actually happened to the investigation documents during the time period from the defendant's notice of plaintiff's claims on September 26, 2006, through Nance's termination date of December 4, 2006, or prior to her tenure with the defendant.

5. Similarly, the Declaration of Scott Clark, the defendant's in-house counsel, provides that he has likewise searched for the investigation documents in the materials he obtained from Nance to no avail, and that to his knowledge no documents of any description written by Nance regarding the plaintiff have been discarded, destroyed or lost. [Doc. 69-4]. Yet, Nance testified at length about the existence and creation of his investigative notes [See Doc. 61] and these documents are still nowhere to be found and have not been produced. Clark's proffered statements provide no

explanation for nor shed any light on what actually happened to the investigation documents during the time period from the defendant's notice of plaintiff's claims on September 26, 2006, through Nance's termination date of December 4, 2006.

6.     The investigation notes of Nance which, per his own deposition testimony as previously submitted [Doc. 61], would reflect the nature of the plaintiff's complaints of sexual harassment or sex discrimination; any efforts made in investigating said complaints; any information or evidence obtained regarding the plaintiff's complaints; any denial or admissions made by defendant Williams in regard to plaintiff's complaints; and the basis for the defendant's final determination regarding the plaintiff's complaints are just missing. And it is now the defendant's position that it has no explanation for the absence of this evidence or what became of these materials. Clearly something happened to the investigation notes resulting in their vanishing. Clark's reference to the one-page "Investigation Notes" document provided to him by Nance setting out the "resolution" of the matter does not explain the absence of Nance's investigation notes and file in it's entirety.[1] [Doc. 69-5].

7.     Contrary to the defendant's assertion, the absence of the investigation materials of Nance is prejudicial to the plaintiff's claims and ability to rebut the defendant's defenses as asserted in this matter. The plaintiff has alleged that the defendant did nothing to stop the sexual harassment and discrimination of which she complained and instead retaliated against her. Now, the very evidence of her complaints and any alleged attempts by the defendant to rectify the situation are simply gone leaving the plaintiff with no way to reproduce or otherwise locate such items and with

---

[1] Nance testified that his investigation notes were not the outcome of the investigation which was placed in the employees' personnel files, but are actual notes he took while conducting the investigation. (Ex. A, pp. 38-39).

Nance's amnesia-like testimony such that the defendant's institutional memory regarding her complaints has simply been wiped clean, with no explanation from the defendant as to why this occurred.

8.      Additionally, the plaintiff is highly prejudiced as she has no alternative means by which she may acquire the "lost" information as the only individual involved in the alleged investigation her complaints, interviewing witnesses, compiling investigative notes, and making determinations from those notes now has no independent recollection of the matter, as evidenced by Nance's deposition testimony.  There simply is no alternative means by which the plaintiff can discover the substance of Nance's alleged investigations of her complaints **and upon what he based his determinations for the decision to implement or not implement any remedial action**.

9.      The defendant attempts to downplay the prejudice suffered by the plaintiff by asserting that it has produced 3,000 pages of documents during discovery in this matter and arguing that it has produced all requested discoverable documents relevant to her claims including multiple "witness statements." Obviously, all requested and discoverable documents have not been produced as the entirety of Nance's investigative file on the plaintiff's complaints is missing. And the volume or number of documents produced by the defendant does not alleviate or somehow counter the fact that the investigation notes and materials of Nance have not been produced. Also, the "witness statements" referred to by the defendant are not investigative documents, but as Nance explained, were simply voluntary statements written by anyone who chose to do so and were not in response to any questioning or specifically identified event or complaint:

> Q.    Well, how do you–how did they go–how did the people that would gather these written statements get the statements?
> MS. SWAIN: Objection.

> A. I don't know the answer to that.
> Q. I mean, would they sit down with a series of questions and ask them and tell them to put stuff in there? Would they say there's been an allegation that thus and so was done; tell us what you know about that?
> A. From my recollection, anyone that had a statement to give was given the form and told to complete that – to write their statement. There was no questioning in the statement–statement process. It was collection of the statements.

(Ex. A, pp. 44-45).

\* \* \*

> Q. I mean, what was done to inform the person about what they should write the statement?
> MS. SWAIN: Objection.
> A. They weren't told to write a statement unless they offered to write a statement. We never asked for additional statements unless they were identified as someone who would have a statement. If a person bringing a complaint mentioned John, Jane and Mary, we would go to John, Jane and Mary and say, Would you write a statement about what you saw? They did not have to write a statement. It was at their–if the wanted to, they could. If they didn't, they didn't.

(Ex. A, pp. 45-46).

\* \* \*

> A. Okay. And –but no specifics were asked of them – for them to address?
> Q. Other than were you aware that an incident happened? Please write your statement.

(Ex. A, pp. 46-47).

The "witness statements" are clearly not investigative documents and in no way reflect any actual investigative procedures that took place nor do they replace or otherwise substitute the investigation notes made by Nance that have disappeared.

10. Moreover, the "witness statements" and other documents produced in this matter do not reflect in any way the basis upon which Nance allegedly came to his determinations regarding the plaintiff's complaints and his decision of whether or not remedial action was warranted and/or the degree of remedial action necessary. Nor do they give any evidence of whether the defendant's

alleged responsive actions were "reasonable" in light of the information discovered during the investigation of plaintiff's complaints. While the plaintiff may ask individuals what they recall telling Nance during the investigation, these individual witnesses cannot recreate Nance's notes nor what he based his determinations upon in concluding the investigation. Also, Nance's investigation notes may have shown discrepancies in the "memory" of Williams and other individuals questioned by Nance.

11.     The defendant asserts that spoilation encompasses the "intentional destruction, mutilation, alteration or concealment of evidence" and argues that sanctions may not be imposed for a claim of spoilation unless a showing of "bad faith" is made. [Doc. 69, p. 4]. However, the definition of "spoilation" has more recently been given a broader scope by courts in this Circuit:

> Spoilation is the destruction or significant alteration of evidence, **or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation**.

*Brown v. Chertoff*, 2008 WL 2473085 at 3 (S.D.Ga.)(emphasis added); citing *Griffin v. GMAC Commercial Finance, L.L.C.*, 2007 WL 521907 at *3 (N.D.Ga.2/15/07); see also *National Grange Mutual Insurance Co. v. Hearth & Home, Inc.*, 2006 WL 5157694 at 3 (N.D.Ga.) ("Spoilation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation"). Additionally, in this Circuit, the district courts "have broad discretion to impose sanctions against spoliators." *Id.*

12.     Similar to the case at bar, in *Brown*, the plaintiff brought claims against the defendant under Title VII for employment discrimination and retaliation and during the litigation moved for sanctions due to the defendant's spoilation of notes made by an agent of the defendant regarding the plaintiff's case file. See 2008 WL 2473085 at 1-3. In *Brown*, the district court held that the

defendant's destruction of the plaintiff's case file prejudiced his ability to establish pretext; the defendant's **negligence** in prematurely destroying the case file **did not excuse its culpability**; and that sanctions for spoilation of the evidence was warranted. *Id.* Specifically, the *Brown* court found that in the context of an employment action:

> All of this must be viewed against the larger backdrop--employment discrimination cases hinge on a plaintiff's ability to show improper considerations motivated an adverse employment action (*i.e.,* termination). So a record documenting those considerations is quite relevant; **the destruction of that very record, then, naturally causes prejudice**...
>
> \* \* \*
>
> Given the relevance of Coleman's notes, some prejudice must follow from their destruction. "If relevant evidence is not produced, for whatever reason, and then is destroyed before either party learns of the existence of that evidence, then the absence of the relevant evidence prejudices the party that would have relied on it to prove its case." Connor, 546 F.Supp.2d at 1376. While the Government insists it is pure speculation that the notes contained any damaging evidence (*e.g*., EEO references), that is not the appropriate inquiry. To require a party to show, before obtaining sanctions, that unproduced evidence contains damaging information would simply turn "spoilation law" on its head. See Residential Funding Corp. v. Degeorge Financial Corp., 306 F.3d 99, 109 (2d Cir.2002) ("Courts must take care not to hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence, because doing so would subvert the ... purposes of the adverse inference, and would allow parties who have ... destroyed evidence to profit from that destruction") (quotes omitted).

*Id.* at 5 (emphasis added).

13.     An argument similar to that presented by the defendant at bar that the plaintiff is not prejudiced because she can talk to individuals who gave witness statements was also raised and addressed by the court in *Brown* where, much like Nance, the author of the missing notes could not recall the substance of them at deposition. 2008 WL 2473085 at 5. The court in *Brown*, however, agreed with the plaintiff that he was still subject to prejudice, stating that the missing, "notes are more reliable than the deponents' memories (time, of course, erodes all human memory)," and that

the available testimony of the individuals involved in the matter, "alleviates only some, but not all, of the prejudice stemming from the spoliation." *Id.* at 6.  Similarly, the plaintiff in the present matter is prejudiced by the loss and/or destruction of Nance's investigation notes coupled with Nance's lack of any independent memory of the plaintiff's complaints and the actions he took or did not take in response thereto.

14. The defendant in *Brown* also argued, as does Flavor House in the present matter, that under the holdings of *Bashir v. Amtrack*, 119 F.3d 929, 931 (11th Cir. 1997), and its progeny, that it's conduct was merely negligent and did not merit sanctions as there was no evidence of "bad faith." 2008 WL 2473085 at 7, and See Doc. 69.  The defendant's argument is no longer supported by the present law of the Eleventh Circuit, as stated succinctly by the *Brown* court:

> But since Flury, bad faith is only one factor to consider. 427 F.3d at 946. Now courts "should weigh the degree of the spoliator's culpability against the prejudice to the opposing party." Id. In evaluating culpability, district courts routinely look to a party's failure to take proper measures to preserve evidence. Ladner v. Litespeed Mfg. Co., 537 F.Supp.2d 1206, 1214 (N.D.Ala.2008) (court examined whether or not there was a "failure to exercise any precautions to safeguard" evidence); National Grange Mut. Ins. Co. v. Hearth & Home, Inc., 2006 WL 5157694 at * 5 (N.D.Ga.12/19/06) (unpublished) (where "plaintiff had access to and control over the evidence and failed to preserve it," culpability rested with plaintiff).

*Id.* at 7; citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir.2005).  Under this Circuit's broader analysis of spoliation claims, the *Brown* court found that the defendant was subject to spoliation sanctions despite the spoliation of evidence having been an alleged result of negligence. In arriving at this conclusion, the court reasoned that the defendant was culpable as it had prior notice of the plaintiff's claims and that mere negligence was not an excuse in light of the prejudice inflicted upon the plaintiff:

> Here, the Government is clearly culpable for the destruction of this evidence. Brown's

> adverse case file was not destroyed until seven months after the current case was filed. Doc. # 119 at 3-4. Even before the current litigation the Government was on notice that it should have preserved relevant evidence such as Brown's adverse case file.
>
> * * *
>
> So the fact that this file was negligently destroyed in a mass purging of case files does not excuse the Government's culpability for its destruction. The level of prejudice to Brown from the spoliation, coupled with the Government's fault merits some form of sanction.

*Id.* at 7-8. A similar holding was made in *National Grange*, finding that negligence failing to preserve the evidence was sufficient for the court to conclude that the non-producing party was culpable, and that this culpability coupled with the significant prejudice caused by the failure to preserve evidence warranted sanctions. 2006 WL 5157694 at 6 and 7.

15.   Similarly, in the present case, Flavor House's alleged negligence[2] in the loss and/or destruction of Nance's investigation notes does not protect it from the court's discretion to impose sanctions for the spoliation of evidence. However, assuming *arguendo*, there was evidence of neglect which resulted in the loss of these materials, the defendant was admittedly put on notice of the plaintiff's claims against it as early as September 2006 and of its duty to preserve these materials. It's failure to do so, coupled with the prejudice suffered by the plaintiff as a result of this failure, merits appropriate spoliation sanctions. *Id.*

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff respectfully moves this Honorable Court to grant her Motion and order sanctions by striking the affirmative defenses of the defendant Flavor House for both the purposes of summary judgment and trial.

---

[2] In the present case, there is no explanation given by the defendant at all for what happened to the investigation notes, such that it cannot even be determined if their loss or destruction was a result of negligence or of actual intent on the part of an agent of the company.

                    Respectfully submitted,

                    <u>s/ Temple D. Trueblood</u>
                    Ann C. Robertson (ROB016)
                    (TRU014)
                    Attorneys for Plaintiff

OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAIZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

CO-COUNSEL:
Bobbie S. Crook, Esq.
367 South St. Andrews Street
Dothan, Alabama 36301
(334) 671-8062

## **CERTIFICATE OF SERVICE**

     I hereby certify that on this the 22nd day of August, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    Jennifer F. Swain
    Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
    1600 Wachovia Tower
    420 North Twentieth Street
    Birmingham, Alabama 35203
    (205) 328-0480

    Steadman S. Shealy, Jr.
    Richard E. Crum
    M. Russ Goodman
    Shealy, Crum & Pike, P.A.
    P.O. Box 6346
    Dothan, AL 36302-6346
    (334) 677-3000

                    <u>s/ Temple D. Trueblood</u>
                    OF COUNSEL

# EXHIBIT A

Case 1:07-cv-00712-WKW-WC   Document 73-2   Filed 08/22/2008   Page 1 of 8

**FREEDOM COURT REPORTING**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

CIVIL ACTION NUMBER   107cv-712-WKW

LINDA THORNTON,

COPY

Plaintiff(s),

v.

FLAVOR HOUSE PRODUCTS, INC.,

Defendant(s).

DEPOSITION TESTIMONY OF:

TOMMY NANCY

Commissioner:

Renny D. McNaughton

June 10, 2008

Dothan, Alabama

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

37

1   the -- in the -- it was in a desk drawer.
2   It may have been by the incident name. It
3   might have been by the -- either the
4   person's name or by the date. I believe I
5   kept those chronological by the date of the
6   occurrence.
7       Q    And that would be the only
8   institutional memory of, say, a complaint
9   against, let's just say, Joe Blow, would be
10  this -- this number of notes in your desk?
11          MS. SWAIN:  Objection.
12      A    There would be written
13  documentation of the complaint --
14      Q    Yeah, but where would it --
15      A    -- in the -- in the personnel
16  file.
17      Q    Okay. Well --
18      A    Because they had filed a
19  complaint.
20      Q    In whose personnel file?
21      A    In the individual's.
22      Q    So that would be the
23  institutional memory?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

38

```
1            MS. SWAIN:  Okay.
2       A    I'm not sure an institutional
3  memory, what that means.
4       Q    Well, obviously you are no
5  there -- longer there; right?
6       A    I'm no longer at Flavor House,
7  no.
8       Q    Okay.  And -- and so if -- if
9  somebody else complained about Joe Blow, you
10 know, throwing acid in their face, where
11 would be the institutional memory that he
12 had done that before?
13           MS. SWAIN:  Objection.
14      Q    Because you're not there to
15 remind them, oh, remember he -- like last
16 year he threw acid.
17      A    Again, my -- my -- my -- my
18 personal notes on the investigation are not
19 necessarily the outcome of the
20 investigation.  It's my notes that I took.
21 The decisions that were made, any
22 disciplinary or nondisciplinary, any actions
23 that were taken, were part of the personnel
```

1  is pertinent to the investigation.  Why
2  would you not maintain that also in his
3  personnel file?
4          MS. SWAIN:  Objection.
5      A   The initial statement was
6  maintained in the file.
7      Q   Well, how --
8      A   If they give additional
9  statements, they would be maintained in the
10 file as well.
11     Q   Well, how do you -- how did they
12 go -- how did the people that would gather
13 these written statements get the statements?
14         MS. SWAIN:  Objection.
15     A   I don't know the answer to that.
16     Q   I mean, would they sit down with
17 a series of questions and ask them and tell
18 them to put the stuff in there?  Would they
19 say there's been an allegation that thus and
20 so was done; tell us what you know about
21 that?
22     A   From my recollection, anyone that
23 had a statement to give was given the form

45

1   and told to complete that -- to write their
2   statement. There was no questioning in the
3   statement -- statement process. It was
4   collection of the statements.
5        Q    Well, I mean, I'm working on the
6   line. You walk up to me and say, We think
7   you have information about something; write
8   a statement. Is that what they would do?
9        MS. SWAIN: Objection.
10       Q    I mean, what was done to inform
11  the person about what they should write the
12  statement?
13       MS. SWAIN: Objection.
14       A    They weren't told to write a
15  statement unless they offered to write a
16  statement. We never asked for additional
17  statements unless they were identified as
18  someone who would have a statement. If a
19  person bringing a complaint mentioned John,
20  Jane, and Mary, we would go to John, Jane,
21  and Mary and say, Would you write a
22  statement about what you saw? They did not
23  have to write a statement. It was at

1   their -- if they wanted to, they could.  If
2   they didn't, they didn't.
3           Q    That's what I'm getting at.  So
4   if -- in the instance where Ms. Thornton
5   complained that he yelled and screamed and
6   cursed and threw cans and generally pitched
7   a fit, and she said, I know X, Y, and Z were
8   in -- in range.  I don't know what they saw
9   or what they heard, but they should have
10  heard or seen something.
11          A    Uh-huh.
12          Q    You would walk up to the person
13  and say, Here's a written form.  If you --
14  did -- Linda said you saw something that
15  Frank Williams did.  Would you please write
16  a statement?  Is that what -- basically what
17  would happen?
18          MS. SWAIN:  Objection.
19          A    If someone bringing a complaint
20  mentioned certain people or mentioned names,
21  I would ask those persons to give a
22  statement of what events they saw, yes.
23          Q    Okay.  And -- but no specifics

47

1 were asked them -- for them to address?

2     A    Other than were you aware that an
3 incident happened?  Please write your
4 statement.

5     Q    Okay.

6     A    They were given no direction of
7 what happened, no.

8     Q    All right.  Now, in the case --
9 I'm using the case involving Linda and Frank
10 Williams, that one.  It's kind of involved
11 in this case.

12     A    The case, the specific incident?

13     Q    The one where Frank Williams, you
14 know, supposedly threw the cans and was
15 cursing her and yelling and --

16     A    Okay.

17     Q    All right.  Did -- do you
18 remember the statement that Frank Williams
19 gave?

20     A    Not from memory, no.

21     Q    Do you remember if he admitted to
22 doing any of that, the things she said he
23 did.