IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LINDA THORNTON,                    *

                                 *

      Plaintiff,              *

                                   *

v.                                  *          Civil Action No.:

                                   *          **1:07 cv-712-WKW**

FLAVOR HOUSE PRODUCTS, INC., and  *

FRANKLIN D. WILLIAMS, JR.,       *

                                   *

      Defendants.           *          JURY DEMAND

PLAINTIFF'S RESPONSE BRIEF
IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

Ann C. Robertson
Temple D. Trueblood
WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
_____

Bobbie S. Crook
367 South St. Andrews Street
Dothan, Alabama 36301
(334) 671-8062

## TABLE OF CONTENTS

I.    NON-MOVANT'S STATEMENT OF FACTS ..................................................1

    A.    Introductory Facts..............................................................................1

    B.    Initial Acts of Sexual Harassment and Discrimination by Frank Williams.....2

    C.    Additional Acts of Sexual Harassment and Retaliation.......................3

    D.    Continued Sexual Harassment and Discrimination by Frank Williams..........8

    E.    Frank Williams Threatens the Plaintiff's Physical Safety...............................16

    F.    The June 14, 2006, Incident and the Plaintiff's Constructive Discharge........19

    G.    Disparate Pay Classifications.............................................................25

    H.    The Defendant's "Policies Against Harassment"................................26

II.    BRIEF IN RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY
    JUDGMENT...........................................................................................28

    A.    Summary Judgment Standard .............................................................28

        Clark v. Coats & Clark, 929 F.2d 604 (11th Cir.1991)..................................28, 29
        Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970) ....................................29
        Matsushita Electric Industries Co. v. Zenith Radio Corp.,
            475 U.S. 574, 587 (1986)..........................................................................29
        Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993)...29
        Reeves v. Sanderson Plumbing Products, 120 S.Ct. 2097 (2000)................29, 30

    B.    Flavor House's Motion Is Due to Be Dismissed under the Summary
        Judgment Standard Because Genuine Issues of Material Fact Exist as to
        Plaintiff's Sexual Harassment Claim................................................30

        Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).......................30
        Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).....31
        Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)....................................31

        1.    Genuine issues of material fact exist as to whether the harassment to
            which the plaintiff was subjected was based on her sex...........................31

McCoy v. Macon Water Authority, 966 F.Supp. 1209, 1217
(M.D. Ga.1997)..................................................................**31**
Pospical v. Buying Office, Inc., 71 F. Supp. 2d 1346, 1357
(N. Ga. 1999)..............................................................**31, 34**
Sims v. Montgomery County Commission, 766 F. Supp. 1052, 1073
(M.D. Ala. 1990)..................................................................**33**
Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1332
(S.D. Ala. 1998)........................................................**33, 34**
Equal Employment Opportunity Commission v. Union Camp
Corporation, 7 F. Supp. 2d 1362, 1373-75 (S.D. Ga. 1997)......**33**
Bell v. Crackin Good Bakers, Inc., 777 F.2d 1497, 1503
(11th Cir. 1985)........................................................**33, 34**
Scott v. Pizza Hut of America, Inc., 92 F. Supp. 2d 1320, 1324
(M.D. Fla. 2000)..................................................................**34**
Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1144-1145
(11th Cir. 2008)........................................................**34, 35**
Baskerville v. Culligan Intern. Co., 50 F.3d 428 (7th Cir. 1995).............**36**
Shabica v. Engineering Sales Associates of Southeast, Inc.,
1999 WL 17819 (4th Cir. 1999)........................................**37**

2.      Genuine issues of material fact exist as to the severity or pervasiveness of
the sexual harassment to which the plaintiff was subjected......................**37**

Harris v. Forklift Systems, Inc., 114 S. Ct. 367 (1993)..................... **37**
Oncale v.Sundowner Offshore Services, Inc., 523 U.S. 75,
118 S. Ct. 998, 140 L.Ed.2d 201 (1998)..............................**37, 38**
Gallagher v. Delaney, 139 F.3d 338, 347 (2nd Cir. 1998)......................**38**
Vance v. Southern Bell Telephone and Telegraph Company,
863 F.2d 1503, 1510 (11th Cir.1989)..................................**38**
Carrero v. New York City Housing Authority, 890 F.2d 569, 578
(2d Cir. 1989)..................................................................**38**
Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999)..................**38**
Hathaway v. Runyon, 132 F.3d 1214, 1223 (8th Cir. 1997)..................**38**
Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n. 2 (11th Cir. 1982)..**39**
Hirase-Doi v. U.S. West Communications, Inc.,61 F.3d 777, 782
(10th Cir. 1995)..................................................................**39**
Hall v. Gus Construction Co., Inc., 842 F.2d 1010, 1015
(8th Cir. 1988)..................................................................**39**
Perkins v. US Airways, Inc., 8 F. Supp.2d 1343, 1351(M.D.Fla.1998)..**39**
Frazier v. Smith, 12 F. Supp.1362, 1370 (S.D. Ga. 1998)......................**39**
Malone v. K-Mart Corp., 51 F. Supp. 2d 1287, 1306 n. 12
(M.D. Ala. 1999)..................................................................**39**
Edwards v. Wallace Community College, 49 F.3d 1517, 1521
(11th Cir. 1995)..................................................................**39**
Webb-Edwards v. Orange CountySheriff's Office, 525 F.3d 1013
(11th Cir. 2008)........................................................**41, 42**
Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir.1999)..**41,42,43**

Johnson v. Booker T. Washington Broadcasting Service, Inc.,
    234 F.3d 501, 509 (11th Cir. 2000)..............................................**43**
Gupta v. Florida Bd. of Regents, 212 F.3d 571, 585 (11th Cir. 2000).....**43**
Freytes-Torres v. City of Sanford, 2008 WL 763216, *2
    (11th Cir. 2008).........................................................................**43**

**C.**    **Flavor House's Motion Is Due to Be Dismissed under the Summary
Judgment Standard Because Genuine Issues of Material Fact Exist as to
Plaintiff's Retaliation Claim...............................................................44**

Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007)...........**44**
Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).....**44**
Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)...................................**44**

1.    Under the proper standard set forth in *Burlington Northern and Santa Fe
Ry. Co. v. White*, the plaintiff has submitted sufficient evidence to create a
genuine issue of material fact as to whether she was subjected to an
adverse employment actions and unlawful retaliation...............................**44**

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53,
    126 S.Ct. 2405 (2006)...................................................**44, 45, 47**
Crawford v. Carroll, 529 F.3d 961, 974, n. 13 (11th Cir. 2008)..............**45**
Portera v. Winn-Dixie of Montgomery, Inc., 996 F.Supp. 1418, 1433
    (M.D.Ala. 1998)..........................................................................**46**
Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993).........................................**46**
Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553
    (11th Cir. 1997).........................................................................**46**

2.    Genuine issues of material fact exist as to whether a causal connection
exists between the plaintiff's complaints of sexual harassment and her
constructive discharge....................................................................**48**

Whatley v. Metropolitan Atlanta Rapid Transit Authority,
    632 F.2d 1325, 1328 (5th Cir., Unit B, 1980).....................**48, 49**
Simmons v. Camden County Board of Education, 757 F.2d 1187, 1189
    (11th Cir. 1985).........................................................................**49**

3.    The Defendant has provided no legitimate reason for the plaintiff's
constructive discharge and any reason provided for her discipline is mere
pretext for the defendant's unlawful motives...........................................**49**

Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021
    (11th Cir. 1994).........................................................................**50**
Walker v. NationsBank of Florida, 53 F.3d 1548, 1564
    (11th Cir. 1995).........................................................................**50**

**D.    Defendants' Motions Are Due to Be Dismissed under the Summary Judgment Standard Because Genuine Issues of Material Fact Exist as to Plaintiff's State Law Tort Claims and the Defendants Have Failed to Meet Their Burden of Proof**.................................................................**51**

1.    Genuine issues of material fact exist as to the Plaintiff's claim for outrage....................................................................................**51**

Jeffers v. Russell County Bd. of Educ., 2008 WL 410621, *14 (M.D.Ala. 2008)...........................................................**51, 52**

Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1043 (Ala.1993).........................................................................**51**

American Road Service v. Inmon, 394 So.2d 361, 365 (Ala. 1980)..**51,52**

Quillen v. American Tobacco Co., 874 F.Supp. 1285 (M.D. Ala 1995).................................................................**52, 53**

Martin v. Norfolk Southern Railway Company, 926 F.Supp. 1044 (N.D. Ala 1996)...............................................................**52, 53**

Busby v. Truswal Systems Corp., 551 So. 2d 322 (Ala. 1989)...............**52**

Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 509 (11th Cir. 2000)..........................................**53**

2.    Genuine issues of material fact exist as to the plaintiff's claim for invasion of privacy...............................................................................**54**

Phillips v. Smalley Maintenance Services, 435 So.2d 705 (Ala. 1983)..**54**

Busby v. Truswal Systems Corp., 551 So. 2d 322 (Ala. 1989)...............**54**

Mills v. Wex-Tex Industries, Inc.,991 F.Supp. 1370, 1384 (M.D.Ala. 1997).................................................................**54, 55**

Patterson v. Augat Wiring Sytems, Inc., 944 F.Supp. 1509, 1522-23 (M.D.Ala. 1996).........................................................................**55**

Sphere Drake Ins., P.L.C. v. Shoney's, Inc., 923 F.Supp. 1481, 1490 (M.D.Ala. 1996).........................................................................**55**

Brassfield, v. Jack Mclendon Furniture, Inc., 953 F.Supp. 1438, 1456 (M.D.Ala. 1996).........................................................................**55**

Kelley v. Troy State Univ., 923 F.Supp. 1494, 1503 (M.D.Ala.1996)..................................................................**55, 56**

Johnson v. Wal-Mart Stores, Inc., 987 F.Supp. 1398, 1405-1406 (M.D.Ala. 1997).........................................................................**56**

3.    Summary judgment is due to be denied as to Plaintiff's claims of negligent and/or wanton hiring, supervision, training and retention........................**57**

**III.    CONCLUSION**.................................................................................**57**

**CERTIFICATE OF SERVICE** .............................................................**59**

iv

# I.    NON-MOVANT'S STATEMENT OF FACTS

## A.    Introductory Facts

Plaintiff was hired by Flavor House in June 2001 as a laborer on Line 2. (See Deposition of Linda Thornton, with Exhibits, already submitted as Defendant's Exhibit A, pp. 25:5-7; 26:10-13; 26:17 - 27:9). About a year into her employment she became a label operator on Line 1, and she remained a label operator throughout her employment. (Thornton pp. 26:14-16; 27:15 - 28:12). While she was a label operator on Line 1 the plaintiff's supervisors included Buck Perkins, Fannie Ash, Bruce Cassidy and Chris Jordan. (Thornton pp. 29:7 - 30:18). The plaintiff's supervisors reported to Melvin Hutchins, the Superintendent. (Thornton pp. 31:9-14; and see Deposition of Mary Ann Boyer Vol I, with Exhibits, already submitted as Defendant's Exhibit B, pp. 28:21 - 29:13). Hutchins reported to Ricky Smothers, Maintenance Department head, and to Mary Ann Boyer. (See Deposition of Ricky Smothers, with Exhibits, already submitted as Defendant's Exhibit D, pp. 51:5-10; and see Deposition of Melvin Hutchins, with Exhibits, already submitted as Defendant's Exhibit H, pp. 12:2-23). During the last few years of the plaintiff's employment, Mary Ann Boyer was the Director of Operations at the Dothan, Alabama, plant. (Thornton pp. 31:15-21). At the time the plaintiff's employment ended, the Human Resources Director was Tommy Nance. (Thornton pp. 94:18 - 95:1).

During the first year of the plaintiff's employment, she applied for several Label Operator positions and was passed over repeatedly. (See Declaration of Linda Thornton, submitted herewith as Exhibit A, ¶ 4).   These positions were given to males, who were temporary employees with less or no experience. (Id.). There were no sign up sheets for the positions and employees, including the

plaintiff, had to ask for the position if they wanted it. (Id.). The plaintiff asked Melvin Hutchins,

Manager, and Kenneth Tew, Supervisor, about the positions and was told that she could not have

the position. (Id.). Instead, they would hire male temporary employees or they would hire males

directly off of the street who did not work out. (Thornton Declaration, ¶4). Although he had no

mechanical experience, Frank Williams was hired directly off the street as a Label Operator. (Id.).

The plaintiff had been working for the company for nearly a year and had mechanical experience,

but was still continuously passed over for a Label Operator's position. (Id.). She was told that she

had to take an aptitude test for the position; however, the men were not told they had to take an

aptitude test. (Id.). She was required to submit a resume listing mechanical experience before she

was given a Label Operator's position, but male employees were not required to submit resumes.

(Id.).

**B.    Initial Acts of Sexual Harassment and Discrimination by Frank Williams**

In 2003 Frank Williams, Jr., was assigned to train the plaintiff to run a label machine for 3-4

weeks. (Thornton pp.58:18 - 59:1; 62:1-9). During the training, Williams would call her a "goddamn

mother fucking bitch," or a "stupid bitch"and throw his hands in the air and walk away. (Thornton

pp. 68:16-21; 69:8-19). She told Williams not to call her those things. (Thornton pp. 69:8-19). He

also threw cans at her while hollering, "you stupid, fucking bitch." (Thornton pp. 76:19 - 77:15).

This behavior was everyday with Williams; he would cuss her out several times a day. (Thornton

pp.64:13-16; 65:4-19). The plaintiff verbally[1] complained to Fannie Ashe and to Melvin Hutchins

---

[1] The defendant did not always use the written documentation forms for receipt of complaints throughout the entirety of the plaintiff's employment and in the first part of her employment complaints were just made verbally. (Thornton pp. 59:2-23; 187:1-18).

at least every other day about Williams calling her a, "stupid, fucking bitch," throwing cans, the language he used, the way he treated her, and his anger at her. (Thornton pp. 59:8 - 60:21; 62:10 - 63:19; 64:2-12; 66:2-8; 77:16 - 78:17; 82:6-17). Hutchins responded to plaintiff's complaints that she would have to work it out and get along with Williams because he was the only one who could run the machine. (Thornton pp. 82:10-17).She told Ashe and Hutchins that she could not train under Williams, and they eventually moved James Porter to train her after she and Williams had other incidents where he cursed her and threw cans. (Thornton pp. 64:2-6; 78:18 - 79:8; 81:11-12). After about a week, Ashe pulled James off and put Williams back on the machine to train plaintiff and told plaintiff that they would just have to get along. (Thornton pp. 80:20 - 81:6). After the training, the plaintiff did not work with Williams again until late 2005. (Thornton pp. 100:16 - 101:10).

### C.    Additional Acts of Sexual Harassment and Retaliation

On March 31, 2005, the plaintiff made a written complaint that her supervisor, Fannie Ash, was "deliberately knit picking (sic)," her, singling her out about breaks, clean up and vacation days and insisting she clean up after other employees. (Thornton Depo, Ex. 1).  She further stated that the "harassment has increased since I have spoken to Maryann about other issues. I have went thru the chain of command on all matters. The situation is increasingly getting worse." (Thornton Depo, Ex. 1).  The plaintiff testified that the "other issues" of which she had spoken to Maryann was "[t]he sexual discrimination." (Thornton pp. 34:1-8). The plaintiff also met with Hutchins on April 9, 2005, about the issues with Ash, in which it was discussed that Ash was not giving the guys such as Joe McGriff and James Porter points for being late and that Hutchins was "going to start" doing so. (See Exhibit B, submitted herewith).

In September 2005 the plaintiff bid on a position and moved to Line 3 as a label operator. (Thornton pp. 49:10-19; 50:12 - 51:1). When the plaintiff received the Line 3 position, she was told it was a "man's job," and a male mechanic name David Wilkerson asked her "what were they doing putting a woman in a man's position." (See Deposition of Tommy Nance , with Exhibits, already submitted as Defendant's Exhibit J, x. 7, p. 34:6-14; Thornton pp. 200:5-15; 200:23 - 201:10). She told him to leave and he laughed and walked away. (Id.). While the plaintiff was on Line 1 and Line 3, the male mechanics, including Adam Hall, Wesley McInnis, David Wilkerson and Tom Beard, would also come and work on her machine or make adjustments to it if she took longer than five minutes to make the adjustments herself[2]. (Thornton pp. 202:6-13; 227:8-18; 230:7-11; 240:5-16; and see Deposition of Kim Perkins, with Exhibits, already submitted as Defendant's Exhibit F, pp. 125:7 - 126:9).  When the mechanics would curse at her, asking "what the fuck was the problem now?" and "why can't you just run the mother fucker?" (Thornton p. 229:14-22).  Mc Innis, Beard, Hall and Williams called her names and pushed and shoved her out of the way of her machine. (Thornton pp. 230:14 - 231:11). Hutchins witnessed the mechanics shove her out of the way. (Thornton pp. 240:17 -241:12). McInnis told the plaintiff to "take [her] ass right back to the label machine where [she] belonged" and called her "a fucking asshole." (Thornton pp. 230:14 - 232:3). The second shift supervisor stood there and laughed when McInnis did this. (Thornton p. 232:1-11). Perkins heard mechanics David Wilkerson, Wesley McInnis and Adam Hall tell the plaintiff to get out of the way and that "this is a man's job." (Perkins pp. 125:7 - 126:4; 127:2-10). The plaintiff did

---

[2] If the machine required maintenance or was not running properly, the operators would normally attempt to take care of the problem. (Thornton pp. 228:16 - 229:1).  Mechanics were to replace parts or fix things that were mechanically wrong with a machine; they were not to make adjustments to the machines or run them. (Thornton p. 229:2-10).

not like the way the mechanics treated her or spoke to her, telling her that she "did not know what the hell [she] was doing," and to "just keep running the son of a bitch." (Thornton pp. 229:23 - 230:6). Hutchins also called Bruce Cassidy to the plaintiff's machine several times and once he arrived, Cassidy would tell the plaintiff to act as if he were doing something to her machine because he did not know why he was called there. (Thornton pp. 227:15 - 228:13).

Joanie, another female label operator, also complained to the plaintiff about being treated this way by the mechanics. (Thornton pp. 243:20 - 244:4). Kim Perkins, another female operator, also was treated this way by the mechanics: "this was after a mechanic had done got all up in my face screaming and yelling and cussing me like they did all the time." (Perkins p. 32:5-16). In April 2006, mechanic Adam Hall cursed and yelled at Perkins, "got up in [her] face" and told her, "[she] needed to get the hell off that damn machine so they can get somebody else in there that can do the job," and that they "were always fucking up these machines." (Perkins pp. 42:2 - 43:7; 45:22 - 46:6). Plaintiff did not see the male mechanics treat any of the male operators this way; she did not see them push or shove the male operators out of the way. (Thornton pp. 238:23 - 239:12). Although the male mechanics would shove the plaintiff out of the way, curse at her and treat her in a degrading manner when it would take her a few minutes to adjust her machine, they did not treat the male label operators like this when they took more than five minutes to adjust their machines. (Thornton Declaration, ¶ 5). When the male operators took more than five minutes to adjust their machines the mechanics would not call for Hutchins or Cassidy, they would leave the male operators alone unless they called for help. (Id.).

In October 2005, the plaintiff saw her physician and complained of increased stress at work and discussed sexual harassment and "being harassed." (See Deposition of Dr. Bendinger, with

Exhibits, submitted herewith as Exhibit C, pp. 21:11 - 22:10; and see Bendinger Depo., Ex. 1, p. 4).

Shortly after the plaintiff was placed on Line 3, she complained to Hutchins about how she was

treated by the mechanics. (Thornton pp. 239:17 - 240:4; 241:13-22). Thereafter, McInnis told the

plaintiff. "You've started some shit again, haven't you?" (Thornton p. 242:3-7). Plaintiff also

complained to Jordan several times about the way she was treated by the mechanics whenever she

got shoved out of the way and whenever Hutchins called Cassidy to her machine. (Thornton pp.

245:17 - 246:16).  The plaintiff also complained to Cassidy, the mechanics supervisor, at least ten

times about the times he was called to her machine by Hutchins to act as if he were fixing her

machine. (Thornton pp. 246:20 - 248:9). She continued to complain to Cassidy from late 2005 until

her employment ended in 2006. (Thornton p. 248:10-14).

   While on Line 3, the plaintiff also complained to Boyer that she was tired of being moved

out of the way by the mechanics when she was working on her machine. (Thornton pp. 242:8 -

243:2). The plaintiff told Boyer that the mechanics cursed at and yelled at the female employees,

including the plaintiff, and that they called the female employees, including the plaintiff, derogatory

names. (Thornton Declaration, ¶6). The plaintiff reported to Boyer that the mechanics would not

allow female operators, including herself, to make minor repairs on the machines and they would

shove her out of the way and take over her machine, but would not do or say anything when male

employees made the same or similar repairs. (Id.). Boyer's typical response to my complaints was

to tell the plaintiff that she would have to "deal with it" as Boyer had learned to "deal with it."

(Thornton Declaration, ¶ 7).   Boyer responded that it was the "southern" or "gentleman" thing to

do. (Thornton p. 243:2-7; Thornton Declaration, ¶ 7).  Thornton also complained to Boyer about the

way the mechanics talked to her,  about Williams cussing her, and that the mechanics did not treat

6

the male label operators this way. (Thornton p. 243:8-19).  Boyer responded to the plaintiff's complaints by telling her "just to put up with it," and Boyer stated that she had to deal with it also. (Nance Depo, Ex. 7, p. 34:6-14). Boyer then gave the plaintiff examples of how both Boyer and her daughter had had to learn to deal with discrimination. (Thornton Declaration, ¶ 7).

While on Line 3, Tom Beard (male) came in to work and if the plaintiff was not smiling he would ask her what was wrong , "did [she] not have somebody that morning to lick [her] from head to toe, to turn [her] over and lick [her] from [her] back side down in between all your crevices." (Thornton pp. 251:11 - 252:6). Beard also made these comments to other females. (Thornton p. 254:12-16). Beard made these comments to the plaintiff at least fifteen times in the last year of her employment on Line 3 and she reported what Beard was saying to Hutchins. (Thornton pp. 252:7-18; 254:1-23). Hutchins replied, "that was just Tom." (Thornton p. 254:20-23).  The plaintiff also complained to Hutchins when Beard was "hollering" at her at her machine on Line 3 and had moved her away from her machine. (Thornton p. 255:1-18).  After the plaintiff's  complaints to Hutchins, the harassment by Beard did not stop and only got worse. (Thornton Declaration, ¶ 8). The sexually harassing comments continued until Beard went on leave and was no longer in the plant. (Id.).

As she testified, "I complained all the time about the way they treated me as a female," and "I complained about any man that treated me like dirt out there." (Thornton pp. 257:12-14; 260:4-5). She complained that the "guys" were allowed to leave the Line, but the females had to stay and run it. (Thornton p. 258:8-11). She complained about male employees, including Chris Cassidy, making liquid nitrogen bombs and throwing them at her feet while she was on Line 2. (Thornton pp. 257:5-11; 258:12 - 259:16; 412:18 - 413:7). The plaintiff also complained when she was struck in the chest by a jar of peanuts thrown at her by male mechanic, John Milsaps and she was disciplined and was

7

told the male employee was suspended. (Thornton p. 70:11-22). However, Milsaps was actually only given a counseling report just as she was.  (See Exhibit D, submitted herewith).

### D.    Continued Sexual Harassment and Discrimination by Frank Williams

In November 2005, Williams became the Team Leader of Line 3[3]. (Thornton pp. 57:4 - 58:2; 100:16-22; Boyer Vol I, p. 45:13-16; and Boyer Depo. Vol. I, Ex. 2). Once Williams became Team Leader on Line 3, the plaintiff began to have problems with him again. (Thornton pp. 101:18 - 102:4).  Williams was the only person on Line 3 who could relieve the plaintiff during her breaks, but he would stay on the phone in the break room or outside smoking and would not relieve her. (Thornton pp.103:11 - 104:6). She complained to management that Williams would not relieve her and then Williams would retaliate by complaining to management that she was not taking breaks as scheduled. (Thornton p. 105:1-11).

Williams cussed at the plaintiff, yelled at her and was very offensive towards her. (Thornton pp. 356:16-20; 359:3-9). Perkins also heard Williams refer to the plaintiff as a "bitch" and she told the plaintiff about his comments. (Perkins pp. 113:20 - 114:21).  Williams "continuously put down females," and called the plaintiff a "God damn motherfucker" everyday to her face. (Nance Depo., Ex. 7, pp. 20:16 - 21:22). Williams used profanity at work "every day." (Perkins p. 115:12-20). Plaintiff testified, "[i]t's knowledge in that whole plant how he [Williams] treats women. Every female is a bitch. There's just a different name before it or behind it." (Thornton pp. 126:21 - 127:4; 270:15-23). Williams called his own mother a "stupid bitch," and his own daughter a "stupid bitch." (Thornton p. 270:15-23). Plaintiff testified that Williams threatened her when he called her a "stupid,

---

[3] Williams was also made a Temporary Supervisor at Flavor House in October 2005 and again in July 2007. (Boyer Vol. I, p. 45:8-19).

fucking bitch." (Thornton p. 143:13-17). He also threatened her when he continuously threw a pallet on the floor, threw a garbage bag full of cans, and continually cursed her: "mother fucker–you goddamn mother fucker", and stated that he "wasn't going to put up with the fucking shit no more," while she was begging a mechanic to please page a supervisor. (Thornton pp. 143:18 - 144:22).

While the plaintiff often heard Frank Williams and other employees cussing, she never heard the male employees cuss out another male employee, nor did she hear them direct their cursing at another male employee like she heard them cussing directly at the female employees, including herself. (Thornton Declaration, ¶3). The plaintiff never heard Williams or any male employee call any other male employee derogatory names like the names they called female employees such as "bitch," "stupid fucking bitch," "goddamn mother-fucking bitch." (Id.). Williams would direct his hostile and demeaning language directly at the plaintiff and other female employees, but not at the male employees. (Id.). Additionally, Williams never threw things at male employees like he did at female employees. (Id.). Williams admitted that he called the plaintiff a "bitch" at work, and that he did not direct derogatory cursing at the male employees:

Q. Did you ever refer to my client, Linda Thornton, as a bitch?
A. Yes, ma'am.

* * *

Q. Did you ever call a man to his face out there a son of a bitch?
A. No.
Q. A bastard?
A. Not that I recall.

(See Deposition of Franklin D. Williams, Jr., with Exhibits, already submitted as Defendant's Exhibit G, pp. 182:21-23; 184:22 - 185:3). Plaintiff testified she considered it sexual harassment

9

when a male employee cussed at her and when a male employee brags about their past and talks about his sex life. (Thornton pp. 71:12-20; 73:12-16). She testified there is a difference between using curse words in casual conversation in a factory and demeaning someone with curse words. (Thornton p. 76:2-18). The plaintiff admitted to using curse words, but testified that she did not call people "son of a bitch," or "a fucking mother fucker" or tell them about her sex life or hit them with things. (Thornton p. 278:9-21).

Williams approached the plaintiff out of the blue and told her about his sex life; this happened as often as Williams had sex, or about three times per week. (Thornton pp. 360:5 - 361:1). Williams was constantly bragging about his sex life to the plaintiff or in front of her. (Thornton Declaration, ¶ 9). Williams was "always vocal about his sex life," and made comments and told "sex stories" in the plaintiff's presence[4] including, "I can tell my wife is cheating because when we fuck – the way she feels inside is loose. I know she's cheating." (Thornton pp.140:8 - 141:2; 182:3-14; 359:11-13). He also talked about a female employee he started seeing at the plant after his wife left him[5], stating, "I haven't sleep all night. We fucked for four hours. We even did it in the car in the backyard where the children were inside," and "She gave me a blow job. If my wife did this for me, we wouldn't be divorced." (Thornton p. 141:3-11). Williams discussed, for several months, how he was going to "fuck" the personnel resource girl. (Thornton Declaration, ¶ 9). He told the plaintiff

---

[4] A female employee, Kim Perkins, also heard Williams make comments of a sexual nature including telling dirty jokes at work and talking about the way certain women looked and how big there butts are. (Perkins pp.117:4-15; 119:11-16). Williams made comments about some female personal resource coordinators and how "fine" they were and how he "liked their butts." (Perkins p.120:1-14).

[5] Franklin and his wife separated on January 10 2006, she filed for divorce in April 2006, and their divorce was final in May 2006. (Williams pp. 20:4 - 21:5; and See Exhibit E, submitted herewith).

that he already had her address and planned to invite her to the Christmas party along with his wife so that there would be two people at the same table that he was "fucking."  (Id.). The plaintiff reported this incident to Hutchins.  (Id.). On several occasions, Williams told the plaintiff that he and his wife would "fuck" in the car all night until it was time to get a shower and go to work.  (Thornton Declaration, ¶ 9). Williams stated that his wife was "fucking a nigger" on the sanitation shift. (Id.). He then commented that he was not racist, but that he was not raised to believe that the races should mix. (Id.).  On several occasions, Williams bragged that even though his girlfriend didn't want to have a baby girl, he was going to "fuck" her enough that she would get pregnant.  (Id.). Williams told the plaintiff that his first wife had said that if she had known that he wanted "blow jobs", she would have done that for him. (Thornton Declaration, ¶ 9).  Williams was always commenting about how "hard" he could get and how long he could stay "hard". (Id.).  He also said that he had to have sex everyday. (Id.). He told the plaintiff that he did not enjoy pornography and that he did not "please" himself sexually, and that is why he had to have sex all the time. (Id.). These comments and others like them were just part of Williams' everyday conversation at work. (Thornton Declaration, ¶ 9). When the plaintiff told him that she did not want to hear anything else about his sex life, Williams would ignore her and continue to talk. (Id.).  One time when the plaintiff told him that she did not want to hear about his sex life, Williams told her that he had to talk to her about it because he couldn't talk to his friend Stephanie because she was "fucking" everyone in the plant, "she's a whore, too."  (Id.; and Thornton p 361:12-23).

Williams also continuously touched the plaintiff on her upper arm while he talked to her and she continuously told him to stop touching her. (Thornton pp.182:15 - 183:2; 189:5-20).  He also called the plaintiff and other female employees, "girlfriend," and "bitches," and she told him not to

11

call her that. (Thornton pp. 183:3-5; 188:3-12). The plaintiff was offended that Williams spoke to

her the way he did, and then called her "girlfriend" while touching her. (Thornton p. 188:12-17).

The plaintiff complained to Hutchins, Jordan and Nance about Williams talking about blow

jobs. (Thornton p. 261:16-23). The plaintiff continued to complain to Hutchins about Williams'

behavior, telling Hutchins that she could not take it anymore and could not take Williams' cussing

her anymore. (Thornton p. 378:13-22). Hutchins told the plaintiff he hoped it would be a "tie" with

no winners or losers. (Thornton pp. 111:2-14; 378:13-22). She complained to Jordan, who told her

he wanted to see more team work between she and Williams and less friction. (Thornton pp. 111:15-

18). She was always told that she would have to get along and use team work. (Thornton p. 393:2-

11). Plaintiff cannot recall how many times she complained to Nance, Jordan, Hutchins or Boyer

about Williams; and testified that she complained to any supervisor that would listen to her.

(Thornton pp. 150:1 - 151:15). The number of complaints she made depended on Williams' conduct,

moods and language. (Thornton p. 151:16-21). The plaintiff was complaining at least once a week

and, if necessary, more than once a day (Thornton p. 260:6-11):

> Q.    There were times when you were complaining every day; is that correct?
> A.    If they cussed me out every day, I did. If Frank Williams pushed me, cussed
>        me out, talked about sex, talked about blow jobs, yes ma'am, I complained
>        every day, sometimes twice a day.

(Thornton p. 261:9-15). One of the times that the plaintiff reported Williams' inappropriate sex talk

and cursing to Hutchins was prior to her February 16, 2006, complaint to Hutchins and Jordan that

Williams was telling other employees that she had called him a child molester. (Thornton

Declaration, ¶ 10). She brought these complaints up again when she made her February 16, 2006,

complaint to Hutchins and Jordan. (Id.). When Hutchins or Jordan did not take care of her

complaints, the plaintiff would go to Boyer to complain, but Boyer was not very helpful. (Thornton p. 374:9-20).

Williams was convicted in 1992 on two counts of sodomy in the first degree and three counts of rape in the second degree and was sentenced to ten years. (Williams pp. 33:1-7; 67:10-16; Boyer Vol. I, p. 85:7-17; and Boyer Depo. Vol. I, Ex. 11). These counts included charges of sodomy of a ten year old girl, sodomy of a fourteen year old girl, rape of a fourteen year old girl, and rape of two thirteen year old girls. (Williams pp. 33:8-21; 60:14 - 63:9; and See Exhibits F and G submitted herewith). Williams served a little over four years of his sentence and was on probation until 2001 for his convictions and he is still paying restitution. (Williams pp. 18:6 - 19:7; 67:17-20; 69:16 - 70:5; 75:7-16). Williams became employed with Flavor House in 2000 and did not list his six[6] convictions or the fact of his probation on his application. (Boyer Vol. I, pp. 85:7 - 86:12; Nance Depo, Ex. 10). At the time he was hired, there was no protocol in place at the Dothan plant for a background check to be performed. (Boyer Vol. I, pp. 32:3 - 33:7).

The plaintiff learned of Williams' status as a sex offender during her first year of employment, in 2001[7]. (Thornton p. 388:7-18). When the plaintiff worked with Williams in 2005, he started talking about being a sex offender saying he had seven felony counts. (Thornton Declaration, ¶ 13). She was also told about Williams' sex offended status by Calvin Lynn, a male

_____

[6] In addition to the five rape and sodomy convictions discussed herein, Williams was also convicted of forgery. (Williams pp. 39:1-23; 168:16 - 169:1).

[7] The plaintiff was also aware that Williams had thrown a baseball bat at Linda Jackson, another female employee, and that Jackson had had problems with Williams and had made Hutchins and the supervisors aware of them. (Thornton pp. 321:20 - 323:17; 425:18 - 426:3). Perkins testified that Williams "had serious personality issues with several women," at the plant. (Perkins pp. 123:20 - 124:1).

employee, and by Bruce Cassidy. (Thornton p. 397:11-19). It was the plaintiff's understanding that Williams had convictions for sex offenses against children. (Thornton p. 118:1-15). Williams continuously talked to the plaintiff about his convictions as a sex offender and told the plaintiff that as soon as Alabama got a new governor that he was going to be pardoned. (Nance Depo, Ex. 7, p. 31:7-20; Thornton p. 112:20-22; Thornton Declaration, ¶ 15). The plaintiff knew that Williams was talking about the sexual abuse convictions and she told him not to talk about these crimes. (Thornton Declaration, ¶ 15). She then asked Melvin Hutchins to make Williams stop discussing his criminal history at work. (Id.). Plaintiff testified she found it disturbing for Williams to cuss her out and his being a child molester. (Thornton pp. 124:22 - 125:1). It was a well-known fact at the plant that Williams was a convicted sex offender and everyone discussed it, including Williams. (Thornton p. 112:11-20). Williams told another female employee, Kim Perkins, many times that he had been in jail and told her it was a "sexual thing." (Perkins p. 121:1-17). Williams told people that he was a convicted sex offender, including temporary employees, and bragged about it. (Thornton pp. 115:8 - 116:14; 399:2-7; Thornton Declaration, ¶ 14). When Williams had to register with the State each year he told people he had to leave work early to do so. (Thornton pp. 116:15 - 117:1). It is public knowledge that Williams is a sex offender and he is required to register with the State each year. (Williams pp. 145:9 - 146:16; Thornton p. 126:14-21; Nance p. 111:11-21).

On one occasion, the plaintiff spoke with Mark Beard, a co-worker, who was upset that he did not get promoted while Williams, a convicted sex offender, continued to be promoted. (Thornton pp. 112:1-10; 125:18 - 126:9). Another employee, Jewel Silvey, overheard this discussion and they told her she could look Williams up on the computer as a convicted sex offender. (Thornton pp. 112:23 - 113:7; 126:10-13; 406:3-14). In February 2006, an employee told the plaintiff that Williams

14

was irate that she was talking about his being a child molester. (Thornton p. 119:3-18). On February

16, 2006, the plaintiff went to Hutchins and Jordan and complained in writing about Williams

"making some statements about him being a child molester,"[8] and that she had had a previous

meeting with Hutchins about "many concerns with Frank." (Hutchins p. 59:14 - 60:21; Thornton

pp. 119:9 - 120:4; 121:9-23; and see Deposition of Chris Jordan, with Exhibits, already submitted

as Defendant's Exhibit E, Ex. 14/Thornton Depo. Ex. 11). Hutchins directed Jordan to get

documentation of her complaint and immediately alerted Tommy Nance in Human Resources and

turned the documentation over to him. (Hutchins pp. 60:1-8; 61:3-20). Hutchins also learned at this

time that another employee, Jewel Silvey, had been talking about Williams, had issues with Williams

and had approached Williams and made remarks about some issues in his past. (Hutchins p. 64:9-

20). There is no evidence contained in Silvey's personnel file that at that time she had made any

prior complaints of sexual harassment or discrimination. (See Exhibit H, submitted herewith). Nor

is there any evidence that Silvey was ever disciplined for talking about Williams' criminal

background or for calling him a child molester. (Id.).

The plaintiff later met with Nance about the situation. (Thornton pp. 120:14 - 121:2). Nance

did not perform a background check on Williams at the time the complaint was made to determine

Williams' status as a sex offender. (Nance pp. 130:7 - 131:13). Nance told her not to talk at work

about Williams being a child molester and that he did not want the employees to get worried or

scared because so many employees had children. (Thornton pp. 123:3 - 124:4). Nance also told her

that if she spoke of Williams again that she would be written up. (Thornton p. 124:5-17). Nance told

---

[8] Plaintiff did not call Williams a "child molester." (Thornton p. 125:2-17).

15

the plaintiff that if she kept her mouth shut and she would be fine. (Thornton p. 390:5-17).  A few weeks prior to March 7, 2006, the plaintiff had also complained to Nance about Williams talking about sex and told Nance, "that's all I heard from this man, was about his sex life with his wife, with his girlfriend, how hard he could get, how long he could stay hard." (Thornton pp. 262:1 - 264:18; Thornton Depo, Ex. 12). The plaintiff told Nance about Williams' sex talks, his threats to her and people warning her of his threats. (Thornton p. 264:10-21).

Per Nance's instructions, the plaintiff started keeping her mouth shut, however her blood pressure started increasing[9]. (Thorton p. 390:10-17).  For three months the plaintiff "kept her mouth shut" and had to stand there listening to Williams tell his sex stories and call her names and just walk away. (Thornton pp. 390:18 - 391:18; 393:2-16). In April 2006 she was sent home by Jordan due to her elevated blood pressure at work. (Jordan p. 48:8-18; Jordan Depo., Ex. 12). On April 6, 2006, the plaintiff was sent home from work due to "high blood pressure," and she also took emergency vacation time on April 17, 2006, due to "Blood Pressure problems." (See Exhibit I, submitted herewith). In April 2006 her physician prescribed her Benicar for blood pressure elevation, "probably secondary to work stress," based on the plaintiff's relation to him of having a hard time at work. (Bendinger pp. 32:21 - 33:14; Bendinger Depo, Ex. 1, p. 10).

**E.    Frank Williams Threatens the Plaintiff's Physical Safety**

Leigh Taylor, an office employee, told the plaintiff that Williams had made harmful threats about her and that he was going to "fuck [her] up" if she ever caused him to lose his job or ever said

---

[9] The plaintiff was diagnosed with high blood pressure while working for Flavor House and had to have her blood pressure checked by Flavor House on two occasions. (Thornton p. 421:6-19; Jordan p. 48:14-18).

anything to him again and that the plaintiff was "stuck of Mary Ann's ass and Melvin's ass and he would fucking het [her]." (Thornton pp. 129:17-23; 130:1-12; 132:3-7; 134:9). Taylor also told the plaintiff that Williams was always talking about sex, his sex life and what he did; and the plaintiff remarked that Williams was a convicted sex offender. (Thornton pp. 133:15-19; 134:10-15). Taylor asked the plaintiff what Williams had done to be convicted and the plaintiff replied that she could not talk about it. (Thornton p. 134:16-22). An African-American female employee also told the plaintiff that Williams was making threats on her and had said he was "sick and tired of [her] ass." (Thornton pp. 265:15 - 266:23). The plaintiff reported this to Hutchins. (Thornton p. 267:1-3).

The plaintiff was upset over the physical threats against her. (Thornton p. 137:12-16) She went to Nance and reported what she had heard from Taylor about Williams' threats against her. (Thornton pp. 129:17-23; 130:1-12; 132:3-7; 135:18 - 136:1). Plaintiff also reported to her supervisors Jordan and Hutchins via a documentation form dated March 1, 2006, that she:

> repeatly (sic) have been told comments that team leader has made against me. One after investigation. Very serious comments and threats made. I just want this to be over with, which I believed it would be after last weeks meeting with Tommy in HR. These threats + comments were made to an employee in the front office.

(Thornton Depo., Ex. 13).

Six days later, Nance gave the plaintiff a written Memo to File on March 7, 2006, stating that after investigating the events of February 16, 2006[10], it was found that plaintiff had acted in an "inflammatory and instigational" way and that any further comments "of an inflammatory nature,"

---

[10] In his deposition Nance could give no explanation for the lapse in time between the February 16, 2006, incident and the plaintiff's March 7, 2006, disciplinary memo. (Nance pp. 140:7 - 141:7).

17

or "meant to incite controversy" would be dealt with and future violations "will result in additional disciplinary action up to and including termination." (Thornton Depo., Ex. 12; Thornton p. 129:7-23). Nance told her he was giving her the write-up because she had had the conversation with Leigh Taylor. (Thornton pp. 132:3 - 133:14). The plaintiff again complained to Nance during this March 7, 2006, meeting, as she had a few weeks prior, about Williams talking about sex and told Nance, "that's all I heard from this man, was about his sex life with his wife, with his girlfriend, how hard he could get, how long he could stay hard." (Thornton pp. 262:1 - 264:18; Thornton Depo., Ex. 12).

Plaintiff testified that she documented each time she was threatened and went up the chain of command, but she was written up and reprimanded when she complained and they were not there to help her. (Thornton p. 149:1-6). She testified that when she made complaints about the men that she was then written up in retaliation or was called into the office and the situation was turned to be her fault so that she was written up or verbally warned. (Thornton pp. 274:10 - 275:11). Plaintiff testified that she got to a point where she was tired of it because she, "went through the chain of command. I followed the policies and procedures. I did that. And when I did that, it just got worse for me." (Thornton p. 75:17-21).

On May 29, 2006, the plaintiff saw her physician and reported problems with stress at work, that she was being harassed, that nothing was being done and she was thinking of quitting her job. (Bendinger pp. 37:3 - 38:3; Bendinger Depo., Ex. 1, p. 12). Her physician then increased her dosage of Paxil. (Id.). While working for Flavor House, the plaintiff was diagnosed with depression and was prescribed antidepressants. (Thornton p. 14:6-16). She was also prescribed Xanax for anxiety. (Thornton pp. 14:21 - 15:17). Plaintiff is prescribed 50-100 mg Zoloft daily. (Thornton pp. 11:20 - 12:4). Her doctor has tried to refer her to a mental health provider, but her insurance was not

18

accepted. (Thornton pp. 288:11 - 290:12).  The plaintiff has also had to go to the hospital ER for

chest pains, which were diagnosed as anxiety. (Thornton pp. 419:13 - 420:21).

### F.     The June 14, 2006, Incident and the Plaintiff's Constructive Discharge

On June 14, 2006, the plaintiff had an incident with Williams when the plaintiff asked

Williams to help her with some re-work on her machine and Williams "flipped out" on the plaintiff,

yelling and cussing at her. (Thornton pp. 151:22 - 154:2; Thornton Depo.,  Ex. 14). The plaintiff

testified this was, "the worst that [she] had seen" and Williams physically swung his arms in the air,

screaming and cussing "Goddamn mother fucker," and physically picking up a pallet and slamming

it back down and picking it up again and slamming it back down. (Thornton pp. 155:11 - 156:8). He

was throwing the pallet in her direction which was blocked by a table between them. (Thornton  pp.

184:4 - 185:14). Williams also threw a bag of cans at the plaintiff which caused the re-work on the

table to "come flying at [her]." (Thornton pp. 156:8-11; 185:15-18). The plaintiff testified, "he was

acting crazy walking inside the curtain, outside the curtain, inside the curtain, outside the curtain,

continuously staring at me and cussing." (Thornton p. 156:9-14).

Donald Coty, a mechanic, was walking by and the plaintiff asked him to get her supervisor

and eventually Jordan and Hutchins came. (Thornton pp. 154:19 - 155:10; 156:15-19). Jordan and

Hutchins told her to come to the office at 3:00, approximately four hours later, and write a statement.

(Thornton p. 157:2-12).  From the time of the incident until 3:00 the plaintiff continued to work and

Williams continued to pace up and down and stare at her. (Thornton pp.157:23 - 158:9). The plaintiff

submitted her written statement to Jordan and went home for the day. (Thornton Depo., Ex. 14;

Thornton p. 159:3-5). She was told there would be an investigation, but no one every contacted her

or interviewed her after this[11]. (Thornton pp. 407:11 - 408:3). Employees Catherine Long and Tamekia Cooke confirmed that Williams had been yelling and cursing. (See Exhibit J, submitted herewith).

The plaintiff returned to work on June 15, 2006, and Williams stood at the re-work table and in front of her machine and glared at her. (Thornton pp. 159:17 - 160:16). Williams would walk from the re-work table back to the plaintiff's machine and turn around and glare at her. (Thornton p. 160:9-16). Before the end of her shift on June 15, 1006, the plaintiff told Hutchins she did not feel safe working around Williams. (Thornton pp. 160:19 - 161:4; 165:22 - 166:3). Hutchins responded that he did not blame her, that he had read her complaint and to "pray about it." (Thornton p. 166:4-12). Shortly thereafter, at the instruction of Hutchins, Jordan moved the plaintiff to Line 5 as a label operator. (Thornton pp. 161:5 - 162:18; 168:9-11; 337:4-12; Jordan 38:14 - 39:12). Hutchins testified this was an "HR decision." (Hutchins p. 74:17-19). Line 5 was located approximately twenty-four feet from Line 3. (Hutchins p. 75:1-11). Williams remained a Team Leader on Line 3 and he also remained the relief person for the label operators, including the plaintiff. (Thornton p. 162:10-15; Nance Depo., Ex. 7, p. 25:8-22). Jordan, as Williams' supervisor, was not aware of any discipline that Williams received. (Jordan pp. 38:14 - 39:5; Jordan Depo., Ex. 6).

After the June 14, 2006, incident the plaintiff began carrying a screwdriver in her back pocket to defend herself if Williams came at her again. (Thornton pp. 175:15 - 176:18; 400:12-15). She told Hutchins, Jordan, Cassidy and "anyone that would listen" to her that she was carrying the screwdriver. (Thornton p. 272:6-23). The plaintiff testified this was her "only protection," because

---

[11] Nance was on vacation for half-days on both June 15, 2006, and June 19, 2006. (See Exhibit K, submitted herewith).

20

"[n]obody else would protect me." (Thornton p. 273:15-19).

On June 16, 2006, the plaintiff went to work on Line 5. (Thornton p. 169:2-4). Thornton asked Jordan if she could work on Line 3 since Williams was not at work, to which Jordan replied he needed her on Line 5. (Thornton p. 170:4-7). She then asked Hutchins the same thing and he said he needer her on Line 5. (Thornton p. 170:7-8). Hutchins testified that Thornton did not want to be moved to Line 5 and wanted to remain on Line 3. (Hutchins pp. 70:18 - 71:72:9; 74:17-23). While on Line 3 the plaintiff was assigned the oldest label machine in the plant and had been looking forward to receiving a new label machine, as evidenced in her May 4, 2006, Daily Label Operator Check Sheet: "Can't wait for the new machine to get here!" (See Exhibit L, submitted herewith; and see Williams pp.186:3 - 187:1). She had worked on an old machine on Line 3 for several months and when the new machine finally came in for Line 3 then management moved her to Line 5, back on an old machine. (Thornton Declaration, ¶ 12). This move took the plaintiff away from the new Line 3 label machine she had been waiting for, but still did not offer her protection from Williams. (Id.). She felt like she was once again being punished. (Id.).

The plaintiff then went to Ricky Smothers and asked if Line 5 was a permanent position and Smothers did not know. (Thornton pp. 170:8-10; 408:1-8). She then asked Hutchins if this was a permanent position and he did not know. (Thornton p. 170:11-13). She then paged Bruce Cassady, a supervisor, and started crying because they had moved her again after what Williams had done and she told Cassidy that she could not take this anymore. (Thornton pp. 169:19 - 170:18). The plaintiff wanted to know the results of the investigation, but no one came to her and no one seemed to know anything. (Thornton p. 409:5-10). She then clocked out and Hutchins and Smothers asked her to leave and come back to talk to Nance. (Thornton p. 171:3-15). The plaintiff was too upset to drive

21

so she just waited at the plant until Nance and Boyer arrived. (Thornton p. 171:11-17).

She then met with Nance and Boyer in the office and Boyer stated she did not understand why they had not told her that the move to Line 5 was permanent because management knew it was a permanent move. (Thornton pp. 172:3-13; 375:9-14). The plaintiff told Boyer and Nance that she had started carrying a screw driver in her back pocket to defend herself against Williams. (Thornton pp. 175:12-22; 271:21 - 272:5). As she testified, the plaintiff felt she was not safe from Williams on Line 5 or anywhere in the plant:

> Q.    Let me ask you this: Did you want the move to be permanent or you wanted the move not to be permanent?
>
> A.    I wanted to be safe. I wanted to be in the position that I bidded for, that I worked for. And I wanted to work in an environment that was safe for me. And no matter where I was in the plant, I would not be safe. Frank Williams was able to roam in the plant.
>
> Q.    So, basically it didn't make any difference what position they put you in?
>
> A.    Not if he could get to me.

(Thornton pp. 172:14 - 173:3).

In this meeting, Boyer told the plaintiff that she would be moved to Line 5 for three months and "they would decide which one of us was the problem." (Thornton p. 377:10-19). Boyer also told the plaintiff in this meeting that it was her understanding that the plaintiff had "baited" Williams and that ever since Boyer had been at the plant that the plaintiff had complained of sex discrimination and she had a problem with sex discrimination. (Thornton pp. 173:4-14; 375:15 - 376:1). The plaintiff replied to Boyer that she had been complaining of sex discrimination and that Boyer had done nothing about it. (Thornton p. 376:1-2). The plaintiff then asked Boyer if Williams would still be employed and Boyer said "yes." (Thornton pp. 175:4-11; 376:1-7). The plaintiff then attempted

22

to resign by placing her badge on the desk. (Thornton pp. 176:21 - 177:8). Boyer told her to think

about it over the weekend. (Thornton pp. 177:9 - 178:16).

The plaintiff thought about it over the weekend and then received a call from a co-worker

telling her that Williams was asking about the plaintiff's whereabouts. (Thornton p. 401:3-15). Each

time the plaintiff tried to go to work after that she would start throwing up, so she called in sick.

(Thornton p. 401:16-21). After being out of work for three days sick, the plaintiff called Leigh

Allums on June 21, 2006, and resigned her employment. (Thornton pp.178:21 - 180:19; Nance

Depo., Ex. 7, p. 46:1-2).  She told Allums she could not work with Williams anymore or for a

company that defends a convicted sex offender that treats women the way Williams does and that

she had had to walk around with a screw driver in her back pocket. (Thornton p. 181:5-18). Allums

said she was sorry and would see her later. (Thornton p. 181:19-22). Plaintiff testified that she felt

like she was "forced out of the plant," because she "could no longer work in an unsafe environment,"

because as a Team Leader, Williams:

> ...wandered the plant. Frank was free at will to travel anywhere he wanted to in that
> plant at any time. It did not matter what label machine they put me on. It did not
> matter how far they put me. They used Frank to relieve label operators for breaks or
> when somebody was out.
> * * *
>
> I was forced to quit because they would not protect me from Frank Williams.
> * * *
>
> I felt that he was a danger, and that's why I left, because I wasn't protected.
> * * *
>
> I felt unsafe at work with a registered sex offender that had threatened me.

23

(Thornton pp. 237:13 - 238:18; 279:6-10; 414:8-15; and Nance Depo., Ex. 7, p. 16:12-14). She testified that even now she only goes to work and home, has difficulty with men she does not know, calls the police for protection at work, has nightmares, and "with the threats Frank made, I think that eventually he'll come after me." (Thornton p. 290:5-20). Plaintiff's last day at work was June 16, 2006. (Thornton p. 25:18-21).

On June 16, 2006, Williams received a First Step Written Counseling for using profanity in the workplace in the presence of other workers in violation of the plant work rule #16 for, "fighting, threatening, intimidating, coercing, interfering with fellow associates, or any other acts of violence on company property." (Nance Depo., Ex. 9). Williams was not demoted, suspended or terminated. (Boyer Vol. I, p. 65:12-23).

The plaintiff applied for unemployment and during an unemployment compensation hearing, Nance testified that had the plaintiff returned to work and not resigned that she would have been disciplined because she "was involved" in the June 14, 2006, incident with Williams of which she had complained:

> Q.    Then when she came in to complaint again that he was cursing her, calling her names and throwing things, she, again, was going to be written up; is that correct?
>
> A.    Yes, ma'am, she was involved in that altercation as well.

(Nance Depo., Ex. 7, p. 54:18-23, and p. 64:15-21, and pp. 68:19 - 69:2; and see Nance pp. 87:3 - 88:17). Boyer testified that at the time the plaintiff left, there was on ongoing investigation on Linda Thornton however Boyer did not know what "specifically it was that led to the investigation," and that she believed it was "something that came up after Linda's last day at work." (See Deposition

24

of Mary Ann Boyer Vol. II, with Exhibits, already submitted as Defendant's Exhibit C, p. 46:6-20, and see Transcript Errata Sheet to Boyer Vol. II, submitted herewith as Exhibit M, pp. 46:14 - 47:20).

### G.    Disparate Pay Classifications

The plaintiff was assigned by Hutchins as a Level One Operator upon the defendant's implementation of a pay-for-skills program[12] while male operators were assigned as Level Four Operators. (Thornton pp. 202:14 - 203:3; 216:5-14; 219:11-16). Initially management just assigned Skill Levels to the operators. (Jordan pp. 13:7 - 14:11). To advance from one skill level to another the plaintiff was told she had to take tests and had to wait six (6) months between the taking of these tests. (Thornton p. 203:14-21).  The male employees were not required to take tests to achieve a Level Four designation as was the plaintiff. (Thornton pp. 202:14 - 203:3). On March 30, 3006, the plaintiff submitted a written appeal to Nance of her assignment as a Level One Operator and requested a direct Level Four assignment. (Thornton Depo., Ex. 16; Thornton pp. 203:22 - 204:12). She testified that she appealed the fact that as a Level One Operator she had to take all four tests to be a Level Four when the man working beside her, Mark Beard, did the same skills that she did and he did not have to take all four tests to be a Level Four Operator. (Thornton pp. 204:8-12; 205:2-16; 206:3-22). If the plaintiff did not take these tests to achieve a Level Four status, her raise would be affected each year in comparison to the male employees already assigned to Level Four status, and she would make less money in the long run. (Thornton pp. 210:1-15; 215:3-16). In April 2006 Nance

---

[12] Under this program, the higher skill levels received a higher rate of pay. (Thornton  p. 203:6-17). An employee's raise was also affected by the Level at which they were classified. (Thornton p. 203:3-7).

informed the plaintiff she would be allowed to waive the six (6) month waiting period between tests, but that she still had to take all four tests to be made a Level Four Operator. (Thornton Depo., Ex. 18; Thornton p. 214:7-18). The plaintiff took all four tests and passed them all and was placed at Level Four. (Thornton p. 214:7-21). She then received an increase in pay on May 15, 2006, to reflect the Level Four skill level. (See Exhibit N, submitted herewith).

The list of Label Operator's provided by the defendant in Exhibit A to Mary Ann Boyer's Declaration is not an accurate list of Label Operators working at the time the "rate for skills" program was implemented. (Thornton Declaration, ¶2). Several of the employees listed as Label Operators on Exhibit A were no longer employed with Flavor House when the "pay for skills" program was put into effect. (Id.). With regards to the "pay for skills" tests provided in Exhibit A, one employee's tests were taken after the plaintiff was no longer at Flavor House, and the other employee had only been a Label Operator for a short period of time when the "pay for skills" came into effect, and unlike the plaintiff, he was not already able to run all of the machines. (Id.).

## H.    The Defendant's "Policies Against Harassment"

Per the company's 2004-2005 Policies Against Harassment, prohibited harassment includes conduct that "has the purpose or effect of: * creating an intimidating, hostile, or offensive environment; * unreasonably interfering with an individual in work performance." (See Exhibit O, submitted herewith). Per this Policy, examples of such inappropriate behavior include verbal harassment such as "derogatory or suggestive comments, demeaning jokes, slurs, threats, etc." and physical harassment such as "assault, unnecessary touching, impeding or blocking movement, physical interference with normal work or movement." (Ex. O).

26

Hutchins testified that, per the training he received from Flavor House, sexual harassment may consist of derogatory remarks, constant badgering, lewd remarks, picking at someone constantly, and demeaning them because of their gender:

Q.    All right. Now you said–you said you had sexual harassment training. When was that?

A.    Probably in the last two years.

*   *   *

Q.    All right. Well, what were the subject matters that Mary Ann Boyer taught you?

C.    Basically how to deal with sexual harassment in the workplace.

*   *   *

Q.    Well, can you give me a definition of sexual harassment ?

MS. SWAIN: Objection.

A.    Sexual harassment can be a form of, you know, derogatory remarks toward an individual, belating (sic) someone because of age, sex, race.

Q.    Okay. That's your definition of sexual harassment ?

MS. SWAIN: Objection.

A.    That's a quick definition of sexual harassment, yes, ma'am.

Q.    Is a derogatory remark toward somebody because of their age?

A.    Yes.

Q.    All right. What do you mean by derogatory remark?

A.    Lewd remarks, constant badgering.

Q.    Anything else?

A.    The list could go on and on, ma'am.

Q.    Well, I know, but I want you to exhaust your understanding of sex–the meaning of sexual harassment.

MS. SWAIN: Objection.

A.    That's the basic highlights of it.

Q.    What do you mean by constant badgering?

A.    Oh, you can pick at someone, so to speak, make fun of them, doing it

27

constantly.

Q.      Demeaning them because of their gender?

A.      Uh-huh.

Q.      Would you consider that part of it?

A.      I sure do.

(Hutchins pp. 22:9-12; 23:5-9; 24:2 - 25:16).

## II.    BRIEF IN RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT[13]

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56, as this Court is aware, provides that summary judgment

is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The procedure

a district court in the Eleventh Circuit must follow in deciding motions for summary judgment is set

out in Clark v. Coats & Clark,  929 F.2d 604 (11th Cir. 1991).  Specifically, the Court in Clark has

set out the standard as follows:

> The moving party bears the initial burden to show the district court, by reference to
> materials on file, that there are no genuine issues of material fact that should be
> decided at trial. Only when that burden has been met does the burden shift to the non-
> moving party to demonstrate that there is indeed an issue of material fact that
> precludes summary judgment.

---

[13] Defendant Flavor House submitted a Motion for Summary Judgment and Brief and
Evidentiary Submission in support thereof. [Doc. 70, 71, 72 and 77]. Defendant Franklin
Williams, Jr., submitted a Motion for Summary Judgment and adopted by reference the Brief and
Evidentiary Submission as submitted by defendant Flavor House. [Doc. 68].  Accordingly, the
plaintiff responds to both defendants' Motions herein.

Id. at 608.

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); See also Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986); Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993). If the moving party carries its burden, the party opposing the motion is required to show the existence of a genuine issue of material fact. Hairston, 9 F.3d at 918. A factual dispute is "genuine" if "a reasonable jury could return a verdict for the non-movant," and there is "a real basis in the record" for the factual dispute. Id. at 919. The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'[the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Id., quoting Anderson, 477 U.S. at 255.

The Supreme Court in Reeves v. Sanderson Plumbing Products, 120 S.Ct. 2097 (2000), again emphasized that the Court in consideration of judgment of a matter of law should review all the evidence, and draw all reasonable inferences in favor of the nonmoving party. The Court advised that:

> "In doing so, however the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-555 (1990); Liberty Lobby, Inc., supra, at 254; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 n. 6 ( 1962). 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' Liberty Lobby, supra at 255. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller at 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that

'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witness.'" Id. at 2110.

For the reasons as set forth herein, the plaintiff has presented sufficient evidence to create genuine issues of material fact as to each of her claims against the defendants such that a reasonable jury could return a verdict for the non-movant, thus justifying a trial of each and every claim. Accordingly, the defendants are not entitled to summary judgment and their Motion for same is due to be denied.

B.    **Flavor House's Motion Is Due to Be Dismissed under the Summary Judgment Standard Because Genuine Issues of Material Fact Exist as to Plaintiff's Sexual Harassment Claim.[14]**

To establish a hostile environment sexual harassment claim, plaintiff must show the following *prima facie* elements: 1) she belongs to a protected class;  2) she was subjected to unwelcome sexual harassment;  3) the harassment was based on her sex; 4) the harassment was severe or pervasive enough to adversely affect a term, condition, or privilege of her employment; and 5) there is a basis for holding her employer liable for the harassment. Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)(en banc). The defendant challenges only the establishment of the third and fourth elements of plaintiff's *prima facie* case: whether the harassment was based on sex, and whether the harassment was sufficiently severe or pervasive.  The defendant does not connect facts to arguments or make legal contentions regarding any of the remaining elements and thus has conceded at summary judgment any argument on same, as "the onus is upon the parties to formulate

----

[14] Plaintiff hereby concedes her disparate pay claim and promotion claim due to the applicable statue of limitations; however the plaintiff submits and addresses the evidence of these sexually discriminatory acts in furtherance of establishing the sexually hostile environment to which she was subjected throughout her employment.  Plaintiff concedes no other claims.

30

arguments." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995); see also

<u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970)(defendant, as the moving party, bears the

initial burden to show to the Court that there are no genuine issues of material fact that should be

decided at trial).

> 1.    <u>Genuine issues of material fact exist as to whether the harassment to which the plaintiff was subjected was based on her sex.</u>

The plaintiff has presented sufficient evidence of record that the harassment to which she was

subjected while employed at Flavor House was based upon her sex, female.  In general, harassment

in the form of sexual solicitations or advances is presumptively "based on sex," and the factual

nature of the case as set forth in detail above  makes this basis quite obvious.  As the district court

succinctly stated in <u>McCoy v. Macon Water Authority</u>,

> In a situation where a male sexually harasses a female, there is the presumption that he does so because she is a female and that he would not do the same to a male. The same is true when a homosexual or bisexual male harasses another male; there is the presumption that the harasser does so because he is sexually attracted to the male victim and would not treat a female in the same manner. The presumption arises from the sexually oriented harassing conduct and is predicated upon the perceived need for sexual gratification. Because of the demand by the harasser for sexual gratification, the victim is singled out because of his or her gender. Thus, there is discrimination based upon the victim's sex in violation of Title VII.

966 F.Supp. 1209, 1217 (M.D. Ga.1997). Courts in the Eleventh Circuit have also found harassing

conduct to be based on sex where the harasser made comments that, on their face, related to gender.

See <u>Pospical v. Buying Office, Inc.</u>, 71 F. Supp. 2d 1346, 1357 (N. Ga. 1999)(use of words "whore"

and "harem" and other comments that "might be found by a trier of fact to convey a view of women

in the workplace as having little value to their CEO beyond what they could achieve with the use of

sex or as mere objects for his sexual gratification.").

In the case at bar, the plaintiff has presented sufficient evidence to trigger a presumption that the harassment to which she was subjected by defendant Williams, Tom Beard, and other male employees of the defendant throughout her employment with Flavor House, was based on the sex of the plaintiff, *i.e.*, female. The harassment was undeniably based on the sex of the plaintiff as it consisted of sexually explicit and inappropriate comments being directed at her or made in her presence by male employees. The plaintiff submitted evidence that while on Line 3, Tom Beard made sexually graphic comments to her and other female employees, including asking the plaintiff, "did [she] not have somebody that morning to lick [her] from head to toe, to turn [her] over and lick [her] from [her] back side down in between all your crevices." (Thornton pp. 251:11 - 252:6; 254:12-16). There is also evidence of record that Williams subjected the plaintiff to continuous, graphic sexual talk about his sex life including bragging about his sex life, telling her how his wife felt "loose" inside when they had sex, getting blow jobs, how often he had sex, how hard he could get, how long he could stay hard, how long he had sex with other female employees, how he wanted to "fuck" other female employees, that he had to have sex all the time because he did not like pornography and did not please himself; and that he was going to "fuck" his girlfriend enough that she would get pregnant. See Statement of Facts, § I (D). Williams also continuously touched the plaintiff on her upper arm while he talked to her despite her telling him to stop touching her[15]. (Thornton pp. 182:15 - 183:2; 189:5-20). Contrary to the defendant's argument, the fact that Williams never asked her out on a date, propositioned her for sex or asked about her sex life is not

---

[15] The defendant's assertion that Williams never touched the plaintiff is contradicted by the record, as set out above.

sufficient grounds, factually or legally, upon which to find that all of the remaining acts of harassment to which the plaintiff was continuously subjected, *i.e.*, graphic talk by Williams about his sex life, graphic sexual questions directed at her and other females by Beard, and Williams' unwelcomed touching of her, were not based on the plaintiff's gender. The defendant seems to argue that unless the sexual harassment includes actual sexual propositions or sexual intimacy, that it cannot be "based on sex." There is no legal basis for such a proposition, nor has the defendant cited to one.

In fact, within this Circuit, the harassment does not have to actually be sexual in nature to be considered unlawful sexual harassment. "Conduct of a nonsexual nature which, for example, ridicules women or treats them as inferior, can constitute prohibited sexual harassment." Sims v. Montgomery County Commission, 766 F. Supp. 1052, 1073 (M.D. Ala. 1990); see also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1332 (S.D. Ala. 1998)(harassment was based on gender for summary judgment purposes where the plaintiff testified that the harasser yelled and cursed at her and at other women, but not at men); Equal Employment Opportunity Commission v. Union Camp Corporation, 7 F. Supp. 2d 1362, 1373-75 (S.D. Ga. 1997)(denying defendant's motion for summary judgment on the issue of "based on sex" where the harassment of the only female fire fighter in the station consisted of nonsexual pranks and teasing such as hindering her access to the showers, locking her out of the facility, and "pick[ing] at" her or ignoring her; as well as assigning her undesirable or faulty equipment and assigning her undesirable tasks: "Courts have long made clear . . . that where a work environment is dominated by members of one gender and the workplace environment is hostile to the other gender by treating that other gender as inferior, Title VII affords protection."). The Eleventh Circuit recognized in Bell v. Crackin Good Bakers, Inc., that threatening

33

behavior can also constitute sexual harassment, as long as it is linked to the plaintiff's sex. 777 F.2d 1497, 1503 (11th Cir. 1985).

A plaintiff may also demonstrate that harassment was based on sex by showing that members of the other gender were not treated in the same hostile manner. See Scott v. Pizza Hut of America, Inc., 92 F. Supp. 2d 1320, 1324 (M.D. Fla. 2000)(harassment, which included comments implying that the plaintiff was a prostitute and statements that the plaintiff needed to "go out and get some sex" so that she would not "be so bitchy," was based on sex because "male workers were not subject to these incidents"); Pospical, 71 F. Supp. 2d at 1357 (evidence that harasser "yelled and cursed at female employees but not at male employees" and that male employees were allowed to leave a trade show during a power outage while female employees were required to stay "[gave] rise to an inference that [the harasser] targeted women for ill treatment."); and Tipp, 76 F. Supp. 2d at 1332 (harassment was based on gender for summary judgment purposes where the plaintiff testified that the harasser yelled and cursed at her and at other women, but not at men).

As the Eleventh Circuit held recently in Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1144-1145 (11th Cir. 2008), sex-specific language used by a female employee's male coworkers in the workplace including the term "bitch" and "whore," as well as discussions of male and female sexual anatomy, masturbation, and female pornography, was more degrading to women than to men and thus satisfied the "based on sex" requirement of a plaintiff's Title VII hostile work environment sexual harassment claim against employer, even where the coworkers did not direct the language at the employee.

Without reciting in detail all of the facts as set forth above, the plaintiff has presented evidence that as a female operator she was treated as inferior and in a demeaning, hostile and derogatory manner in comparison to her male co-workers. As set out in detail within the plaintiff's Statement of Facts, there is evidence of record that Williams and the male mechanics employed by Flavor House treated the female employees, including the plaintiff, in a demeaning, derogatory and threatening manner and did not treat the male employees in the same manner. Williams "continuously put down females," and called the plaintiff a "God damn motherfucker" everyday to her face. (Nance Depo., Ex. 7, pp. 20:16 - 21:22). The record shows that Williams called the plaintiff a "goddamn mother fucking bitch," a "stupid bitch," and "you stupid, fucking bitch," on a continuous basis and also threw cans at her. "Bitch" is undisputedly a derogatory and sex-specific term for women and it was directed at the plaintiff. See Reeves, 525 F.3d at 1144-1145. He also called the plaintiff and other female employees, "girlfriend," and "bitches." (Thornton pp. 183:3-5; 188:3-12). The plaintiff testified that Williams did not curse at the male employees as he did her nor did he treat them in such a hostile and threatening manner. Williams admittedly testified that he cursed the plaintiff, calling her a "bitch," but did not address male employees in a similar, derogatory manner.

The plaintiff has also submitted evidence that once she was placed on Line 3, the male mechanics told her it was a "man's job," and questioned why they had placed a woman in a man's position. (Nance Depo., Ex. 7, p. 34:6-14; Thornton pp. 200:5-15; 200:23 - 201:10). The plaintiff has also presented evidence that Williams threw objects at her and also made threats to her physical safety. See Statement of Facts §§ I(E) and (F). There is also evidence of record that the male mechanics cursed at her, called her names, physically pushed her away from her machine, and treated

35

the female operators in a derogatory manner, cursing and yelling at them. See Statement of Facts, § I(C). The Plaintiff has provided testimony that although the male mechanics would shove the plaintiff out of the way, curse at her and treat her in a degrading manner when it would take her a few minutes to adjust her machine, they did not treat the male label operators like this when they took more than five minutes to adjust their machines. (Thornton Declaration, ¶ 5).

The defendant's own policies undermine their position that the harassing conduct to which the plaintiff was subjected was not "based on sex", as under the defendant's own Policy on harassment, examples of inappropriate behavior include "derogatory or suggestive comments," and "unnecessary touching, impeding or blocking movement, physical interference with normal work or movement." (Ex. O). And per Hutchins' testimony, sexual harassment may consist of derogatory remarks, constant badgering, lewd remarks, picking at someone constantly, and demeaning them because of their gender. (Hutchins pp. 22:9-12; 23:5-9; 24:2 - 25:16).

The defendant's reliance on the Seventh Circuit's holding in Baskerville v. Culligan Intern. Co., 50 F.3d 428 (1995) is misplaced as the facts of the present case are easily distinguishable from those presented in Baskerville.  Contrary to the defendant's averment, the court in Baskerville, did not find that the actions complained of were not "based on sex," but focused its analysis on the issue of whether when viewed in a totality over a seven month period the acts rose to the level of actionable sexual harassment, focusing more on the "severe or pervasive" element. Id. at 430-431. Additionally, the court in Baskerville overturned the jury's finding based on the issue of whether the corporate defendant had taken took all reasonable steps to protect the plaintiff and on the court's finding that the company was not strictly liable for sexual harassment. Id. at 433. No such defense to corporate liability has been raised by the defendant at summary judgment in the present matter.

36

Similarly, the defendant's citation to the Fourth Circuit's unpublished opinion in <u>Shabica v. Engineering Sales Associates of Southeast, Inc.</u>, 1999 WL 17819 (1999) for the proposition that the harassment of the plaintiff was not based on sex is equally misleading. Again, in <u>Shabica</u>, the court addressed **not** whether the harassment complained of was "based on sex," but made a finding that the one act of sexual harassment alleged had not met the "severe or pervasive" element of a sexual harassment case. <u>Id.</u> at 2-3. As such, the <u>Shabica</u> and <u>Baskerville</u> holdings have no relevance to the issue of whether the harassment suffered by the plaintiff in the instant matter was "based on sex." Under the applicable law in this Circuit, as set out above, sufficient evidence exists from which a reasonable juror could find that the repeated harassment to which the plaintiff was subjected by Williams, Beard and the male mechanics was based on her gender, female. Thus, the defendant's Motion is due to be denied.

>    2.    Genuine issues of material fact exist as to the severity or pervasiveness of the sexual harassment to which the plaintiff was subjected.

In <u>Harris v. Forklift Systems, Inc.</u>, 114 S. Ct. 367 (1993), the Supreme Court discussed the relevant considerations for determining whether a hostile environment exists:

> [W]e can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on an employee's well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 114 S. Ct. at 371. The Supreme Court affirmed the validity of the "totality of the circumstances" analysis for determining the hostility of the environment in <u>Oncale v.Sundowner</u>

Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 140 L.Ed.2d 201 (1998),

> [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitively to social context [are required].

Oncale, 118 S. Ct. at 1003. The Second Circuit has recognized that, in light of the fact-intensive nature of the hostility determination, the issue is more appropriately left for the jury. Gallagher v. Delaney, 139 F.3d 338, 347 (2nd Cir. 1998)(noting, "The Supreme Court has recognized the difficulty in precisely defining what will or will not, in the virtually infinite number of varying circumstances, constitute a violation of the statute.").

In Vance v. Southern Bell Telephone and Telegraph Company, the Eleventh Circuit held that pervasiveness involves inquiry into the effect of incidents of harassment, and is not merely a matter of counting the number of incidents. 863 F.2d 1503, 1510 (11th Cir. 1989), *reversed on different grounds*. Similarly, the Second Circuit Court of Appeals has asserted, "It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir. 1989). To show that sexual harassment was severe or pervasive, "it suffices to prove that a reasonable person subjected to the harassing conduct would find . . . that the harassing conduct so altered the working condition as to 'make it more difficult to do the job.'" Harris, 510 U.S. at 25 (Ginsberg, J., concurring); see also Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999); Hathaway v. Runyon, 132 F.3d 1214, 1223 (8th Cir. 1997).

In analyzing a sexually hostile environment, sexual harassment that is not directed at the plaintiff can also contribute to a hostile environment if the plaintiff was aware of it.  Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n. 2 (11th Cir. 1982)("The fact that many of the [racial] epithets were not directed at Walker is not determinative.  The offensive language often was used in Walker's presence after he had voiced objections to Ford."); Hirase-Doi v. U.S. West Communications, Inc.,61 F.3d 777, 782 (10th Cir. 1995)("Doi may establish the existence of a genuine issue of material fact as to whether she was subject to a hostile work environment based on evidence of Coleman's sexually offensive conduct towards herself and/or others in her office, provided she was aware of such conduct."); Hall v. Gus Construction Co., Inc., 842 F.2d 1010, 1015 (8th Cir. 1988)("evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile work environment."); Perkins v. US Airways, Inc., 8 F. Supp. 2d 1343, 1351 (M.D. Fla. 1998)("It does not matter that all of the remarks were not directed at Plaintiff as the trier of fact can consider evidence of discriminatory acts at the Tampa facility directed at employees other than Plaintiff which tend to show [racial] animus."); Frazier v. Smith, 12 F. Supp.1362, 1370 (S.D. Ga. 1998)("The fact that some of these remarks were not directed at the plaintiff is not determinative."); Malone v. K-Mart Corp., 51 F. Supp. 2d 1287, 1306 n. 12 (M.D. Ala. 1999)("[A] plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her.")(quoting Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995)).

Without repeating in detail all of the sexually harassing and offensive incidents to which the plaintiff was subjected throughout her employment by multiple male employees, including Williams, Beard and various male mechanics, as already set forth in §§ I (B)(C)(D)(E) and (F) of the plaintiff's Statement of Facts, certainly having a male co-worker graphically describe licking her up and down

39

and in her crevices; being told she was doing a "man's job"; being repeatedly shoved away from her machine by male mechanics; being repeatedly yelled and cursed at in a derogatory manner by male mechanics; and having her Team Leader continuously make lewd, graphic and sexually inappropriate comments to her about his sex life, discuss sex with her, brag about his sexual prowess, call her "bitch" and "girlfriend", inappropriately touch her while talking to her, talk to her about his convictions for sex related crimes, yell and curse at her using sex-based derogatory terms[16], act violently towards her and throw objects at her, and make threats against her physical safety was reasonably severe and humiliating and did not just constitute mere "boorish statements or conduct," "simple teasing," or a mere "isolated incident" as characterized by the defendant. The plaintiff has also presented evidence that she was subjected to a constant and pervasive sexually hostile work environment based on her gender, female, from the inception of her employment with Flavor House up and until her constructive discharge, in that she was initially denied promotional opportunities which were given to less qualified males, she was assigned a lower paying skill level than males, and that each time she complained about sexual harassment or sex discrimination she was simply told to deal with it and that female members of management addressed her complaints by regaling her with examples of their own experiences with sex discrimination in the company.

Further, plaintiff has presented evidence that she was not only humiliated in the workplace,

---

[16] The defendant's argument that the plaintiff could not have subjectively found Williams' treatment of her sexually harassing because the plaintiff testified that she also used curse words at work is belied by the full context of the plaintiff's testimony that while she admitted to using curse words, she did not direct them at people and call people "son of a bitch," or "a fucking mother fucker" or tell them about her sex life or hit them with things. (Thornton p. 278:9-21). She also testified that to her there is a difference between using curse words in casual conversation in a factory and demeaning someone with curse words. (Thornton p. 76:2-18).

but that she was fearful for her own physical safety, that she was afraid to be around Williams, suffered an increase in blood pressure due to the hostile environment at work, was sent home twice from work because of her blood pressure condition, was prescribed medication from her physician to deal with the stress and anxiety she suffered due to the hostile work environment, was tearful and scared, began carrying a screwdriver on her person at work for self defense, and became physically ill when she tried to return to work. Considering the totality of the circumstances in the light most favorable to the plaintiff, a reasonable jury could easily determine that the sexual harassment to which the plaintiff was subjected was physically threatening and/or humiliating and severe and that the effect of the harassment unreasonably interfered with her work performance and caused psychological harm and manifested physical symptoms in the plaintiff.

Also, in analyzing the "objective" component of whether the sexual harassment suffered by the plaintiff was severe or pervasive it is undisputed that under the terms of the defendant's own Policy on Harassment, the conduct alleged by the plaintiff falls perfectly within the examples of harassment: derogatory or suggestive comments; demeaning jokes, slurs, threats, etc.; assault; unnecessary touching; impeding or blocking movement; and physical interference with normal work or movement. (Ex O). Hutchins' understanding that derogatory remarks, constant badgering, lewd remarks, picking at someone constantly, and demeaning them because of their gender constitutes sexual harassment also supports an objective finding that the sexual harassment to which the plaintiff was subjected is reasonably severe or pervasive. (Hutchins pp. 22:9-12; 23:5-9; 24:2 - 25:16).

The defendant's reliance on the holdings in Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013 (11th Cir. 2008), and Mendoza, and the cases cited therein, is not determinative as to plaintiff's claim. In Webb-Edwards, the facts before the court were that the

plaintiff alleged approximately eight sexually inappropriate comments regarding the tightness of her clothes, that fact that she died her hair, and telling her she "looked hot" made over an eight week period and that once the plaintiff told the harasser to stop the comments, they ceased. 525 F.3d at 1027. Based on these facts, the Webb-Edwards court found that the sexual harassment was not physically threatening or humiliating and that these few comments made about the plaintiff's figure and good looks were not severely hostile or abusive. Id. at 1027-1028. The facts presented to the Webb-Edwards court are a far cry from those presently at bar. In the present case, the plaintiff has presented sufficient evidence that she was subjected to a sexually hostile, demeaning, abusive and threatening environment throughout her employment with the defendant. She has presented evidence that she was subjected to such treatment by various male employees and was subjected on a continuous basis to graphic and lewd sexual talk, demeaning sex-based derogatory cursing and comments, physical contact, physical shoving, questioning of why she was doing a "man's job", and threats to her physical safety. Also, despite the plaintiff's requests that the harassment stop and her continual complaints to management of the sexually hostile environment and treatment, the sexual harassment continued up and until her constructive discharge. Thus, the factual basis for the holding in Webb-Edwards is simply not analogous to the case at bar.

In Mendoza, the Court clearly stated the applicable test was "somewhat fact-intensive," and cautioned district courts to "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." 195 F.3d at 1246. Again, the facts of the instant case are far more numerous, occurred on a continuous basis over a longer period of time, and are more intrusive,

42

repetitive and physically threatening than those presented in <u>Mendoza</u>[5] and are more similar to the "continuous barrage of sexual harassment" addressed by the Eleventh Circuit in <u>Johnson v. Booker T. Washington Broadcasting Service, Inc.</u>, 234 F.3d 501, 509 (11th Cir. 2000). As in <u>Johnson</u>, the facts of the instant case are different from those cases cited by the defendant in which, "fewer instances of less objectionable conduct occurred over longer periods of time." <u>Id.</u>, citing <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 585 (11th Cir. 2000), and <u>Mendoza</u>, 195 F.3d at 1242, 43.

The facts of the case at bar are far more similar to those in <u>Freytes-Torres v. City of Sanford</u>, 2008 WL 763216, *2 (11th Cir. 2008), in which the Eleventh Circuit found the plaintiff had established both a subjective and objective perception of sexual harassment severe or pervasive enough to create a hostile work environment. Much as in the present case, the plaintiff in <u>Freytes-Torres</u>, submitted evidence that she felt offended, disgusted, embarrassed, and humiliated by the harasser's conduct, that she missed work because of it, and that at one point that she was fearful for her safety and thought he was going to rape her. <u>Id.</u> And also similar to the case at bar, the court in <u>Freytes-Torres</u> was faced with evidence that the sexual harassment was frequent and constant, with the plaintiff being subjected to near daily harassment. <u>Id.</u> Thus, as found by the Eleventh Circuit in <u>Freytes-Torres</u> and <u>Johnson</u>, a reasonable juror could find that the plaintiff was subjected to a hostile environment of either severe or pervasive sexual harassment such that summary judgment is due to be denied.

---

[5] In <u>Mendoza</u> the Court found the following acts did not rise to the level of sever or pervasive harassment: one instance in which the harasser told the plaintiff, "I'm getting fired up;" one occasion on which the harasser rubbed his hip against the plaintiff's, rubbed her shoulder, and smiled; two occasions on which the harasser made a sniffing sound while looking at the plaintiff's groin; and the harasser's constantly following and staring at the plaintiff. 195 F.3d at 1247, 1252.

**C.     Flavor House's Motion Is Due to Be Dismissed under the Summary Judgment Standard Because Genuine Issues of Material Fact Exist as to Plaintiff's Retaliation Claim.**

To establish a *prima facie* case of retaliation, plaintiff must show 1) she engaged in protected activity; 2) an adverse employment action was taken against her; and 3) there is some causal connection between the two events. <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1363 (11th Cir. 2007). The defendant challenges only the final two elements: whether she suffered an adverse employment action, and whether there is a causal connection between the plaintiff's protected activity and the adverse employment action. The defendant also argues that it has provided an alleged legitimate reason for the actions in question. [Doc. 77, pp. 28-34]. The defendant does not connect facts to arguments or make legal contentions regarding the remaining element and thus has conceded at summary judgment any argument on same, as "the onus is upon the parties to formulate arguments." <u>Resolution Trust Corp.</u>, 43 F.3d at 599; and <u>Adickes</u>, 398 U.S. at 157(defendant, as the moving party, bears the initial burden to show to the Court that there are no genuine issues of material fact that should be decided at trial).

> 1.     <u>Under the proper standard set forth in *Burlington Northern and Santa Fe Ry. Co. v. White*, the plaintiff has submitted sufficient evidence to create a genuine issue of material fact as to whether she was subjected to an adverse employment actions and unlawful retaliation.</u>

Under the Supreme Court's recent alteration of the standard in <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 S.Ct. 2405 (2006), the scope of Tilte VII's anti-retaliatory intent was broadly expanded to include actions beyond those that are related to employment or occur at the workplace:

purpose reinforces what language already indicates, namely, that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.

548 U.S. at 64. The appropriate standard for analyzing a retaliation claim is whether the plaintiff can,

show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

Id. at 68. As recently recognized in this Circuit, this more liberal standard in "Burlington also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." Crawford v. Carroll, 529 F.3d 961, 974, n. 13 (11th Cir. 2008); quoting Burlington, 126 S.Ct. at 2417.

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether she was subjected to materially adverse actions by her employer which may have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68. The plaintiff has testified that each time she complained she was called into the office and the situation was turned to be her fault so that she was written up or verbally warned written up or reprimanded. (Thornton pp. 149:1-6; 274:10 - 275:11). She further testified that she got to a point where she was tired of it because she, "went through the chain of command. I followed the policies and procedures. I did that. And when I did that, it just got worse for me." (Thornton p. 75:17-21). By May 29, 2006, the plaintiff reported to her physician that due to the problems with stress at work she was thinking of quitting her job. (Bendinger pp. 37:3 - 38:3; Bendinger Depo., Ex. 1, p. 12). Following the plaintiff's February 16, 2006, complaints to Hutchins that Williams was irate and

45

talking about being a child molester, and her complaints to Nance that Williams was physically threatening her, the defendant disciplined the plaintiff on March 7, 2006, for allegedly discussing Williams' status as a sex offender. Shortly thereafter, when the plaintiff complained about the June 14, 2006, incident with Williams and of her fear for her physical safety, the plaintiff was removed from her line and placed on an old machine, was placed under an ongoing investigation, was told they would watch her for three months and see "who was the problem," and, per Nance, she would have been subjected to yet more discipline had she been able to return to work.

In addition to these events, the plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether she was constructively discharged [6], *i.e.*, whether or not, "her working conditions were so intolerable that a reasonable person in her position would be compelled to resign." Portera v. Winn-Dixie of Montgomery, Inc., 996 F.Supp. 1418, 1433 (M.D.Ala. 1998); citing Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993). Without reciting all of the facts as already presented herein, the evidence indicates that the defendant has subjected the plaintiff to ongoing retaliatory employment actions including those affecting her disciplinary record, ability to perform her job, and her emotional and physical well-being. The evidence shows plaintiff was repeatedly subjected to continuous sexual harassment and retaliatory acts; that she repeatedly and consistently complained about these acts and no remedial action was taken; that when she complained about the sexual harassment she was then called into the office and the situation was turned to be her fault so that she was written up or verbally warned written up or reprimanded; that she was humiliated in the

---

[6] See Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997) (holding that even under the Eleventh Circuit's prior stringent standard, constructive discharge qualifies as an adverse employment action).

workplace; that she was fearful for her physical safety and was aware of Williams' past criminal convictions for sexual acts; that she began carrying a screwdriver at work for self defense; that she was sent home by the defendant on two occasions due to her increase in blood pressure because of the events at work; that she suffered from anxiety and increased blood pressure due to the work environment; that she counseled with her physician about not being able to continue her employment; that she became physically ill when she tried to come to work; that she was removed from her line and placed on an old machine; that she was placed under an ongoing investigation by the company; that she was told they would watch her for three months and see who was really the problem; and that she would have been subjected to further discipline had she been able to return to work. Sufficient evidence has been presented from which a jury may reasonably infer a finding of constructive discharge as an adverse employment condition with regard to this claim.   A jury could also find from these facts that a reasonable employee faced with these potential material acts would have felt dissuaded from making or supporting a charge of discrimination. Burlington, 548 U.S. at 68.

For the reasons as already set forth above in §II (B)(2), the defendant's argument that the plaintiff was not constructively discharged because she cannot even meet the "severe or pervasive" standard is without merit. This is a case where not only has the plaintiff sufficiently presented evidence of severe or pervasive sexual harassment, but that she also endured additional harm of such an intolerable nature that she was constructively discharged. The defendant's argument that the plaintiff failed to "act reasonably" before choosing to resign is equally misplaced in light of the facts of record.  As the plaintiff testified, the defendant's choice to move her only twenty-four feet away from Williams did not protect her as he was allowed to wander the plant and was also the individual

who served as her relief. Throughout her employment, the plaintiff had repeatedly complained to management about Williams' sexually lewd and graphic comments, of his sexually derogatory behavior, and of his physical threats to her.  It was the defendant, not the plaintiff, who had failed to "act reasonably" to rectify the situation, despite the plaintiff's repeated cries for help. Furthermore, when the plaintiff was moved to Line 5, she was informed by Boyer that it was the plaintiff's fault for "baiting" Williams, that they were going to watch her for three months to see who was really "the problem", and that all the plaintiff had done since Boyer had been there was complaint of sex discrimination.  At this same time, the company launched an ongoing investigation against the plaintiff and had also planned to subject her to further discipline in response to her recent complaints against Williams. The record is replete with evidence that the plaintiff had repeatedly tried to take reasonable action short of resigning her employment and that due to the defendant's inaction and retaliatory animus she was compelled to resign her employment as it had grown so intolerable that she was suffering physically and emotionally and had resorted to carrying a screwdriver on her person for self defense.

2.    Genuine issues of material fact exist as to whether a causal connection exists between the plaintiff's complaints of sexual harassment and her constructive discharge.

The defendant's argument that no causal relation exists between plaintiff's complaint of sexual harassment and any discipline she received and her constructive discharge is based on a disregard for the summary judgment standard.  To satisfy the "causal link" element, plaintiff merely needs "to establish that the protected activity and the adverse action were not wholly unrelated." Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325, 1328 (5th Cir., Unit B,

1980); Simmons v. Camden County Board of Education, 757 F.2d 1187, 1189 (11th Cir. 1985). The evidence of record is that on June 16, 2006, the plaintiff met with Boyer following her most recent complaint of harassment by Williams and in that meeting Boyer told the plaintiff that ever since Boyer had been at the plant that the plaintiff had complained of sex discrimination and she had a problem with sex discrimination. (Thornton pp. 173:4-14; 375:15 - 376:1). The plaintiff then replied to Boyer that she had been complaining of sex discrimination and that Boyer had done nothing about it. (Thornton p. 376:1-2). The plaintiff then asked Boyer if Williams would still be employed and Boyer said "yes." (Thornton pp. 175:4-11; 376:1-7). When the plaintiff resigned, she told Allums that she could not work with Williams anymore or for a company that defends a convicted sex offender that treats women the way Williams does and that she had been walking around with a screw driver in her back pocket. (Thornton p. 181:5-18). The plaintiff also clearly testified that she felt like she was "forced out of the plant," because she "could no longer work in an unsafe environment,"  because the complaint would not protect her from Williams and that she felt unsafe at work with a registered sex offender that had threatened her. (Thornton pp. 237:13 - 238:18; 279:6-10; 414:8-15; and Nance Depo., Ex. 7, p. 16:12-14). Clearly, genuine issues of material fact exist as to whether the plaintiff was constructively discharged in relation to her complaints of sexual harassment.

        3.      **The Defendant has provided no legitimate reason for the plaintiff's constructive discharge and any reason provided for her discipline is mere pretext for the defendant's unlawful motives.**

The defendant had failed to assert any alleged legitimate reason for the plaintiff's constructive discharge claim. As Flavor House has proffered no "legitimate" reason for the events

49

leading to plaintiff's constructive discharge, the presumption of retaliation remains and the burden does not shift to plaintiff to rebut same. See Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994).

However, should the court consider the alleged legitimate reason proffered by the defendant in relation to the plaintiff's March 7, 2006, discipline, the plaintiff had submitted sufficient evidence of pretext so as to avoid summary judgment. The defendant asserts that Nance issued the plaintiff a Memo to File on March 7, 2006, because the plaintiff's conduct in discussing Williams' sex offender status was disruptive to the workforce. This proffered reason for the plaintiff's discipline is pretextual as there is evidence that Hutchins was aware of Jewel Silvey bringing up issues she had with Williams' criminal history, yet she did not receive a Memo to File as had the plaintiff. See Walker v. NationsBank of Florida, 53 F.3d 1548, 1564 (11th Cir. 1995)(to show pretext a plaintiff may show that the proffered reason did not actually motivate the employment decision or that they were insufficient to motivate the employment decision).  Also, the plaintiff had previously complained to Hutchins that Williams was discussing his criminal history at work, yet there is no evidence that any disciplinary action was taken against Williams for disrupting the workforce. There is conflicting evidence that the reason now given did not, in fact, motivate the defendant  at the time the discipline was meted out to the plaintiff as the same premise did not result in such action being taken against similarly situated employees engaging in the same allegedly "disruptive" conduct. Id. Thus genuine issues of material fact exist as to whether the defendant's legitimate reason for the March 2006 discipline of the plaintiff is mere pretext for unlawful retaliation.

**D.    Defendants' Motions Are Due to Be Dismissed under the Summary Judgment
Standard Because Genuine Issues of Material Fact Exist as to Plaintiff's State
Law Tort Claims and the Defendants Have Failed to Meet Their Burden of
Proof.**

The defendants erroneously assert that no genuine issues of material fact exist such that
would preclude summary judgment on plaintiff's state law claims of outrage, invasion of privacy,
and negligent and/or wanton hiring, supervision, training or retention.  For the reasons as set forth
below, plaintiff has presented evidence sufficient to create genuine issues of material facts as to each
of these tortious claims as well as to the defendants' liability for same.  Accordingly, the defendants'
Motions are due to be denied as to plaintiff's state law claims.

1.    Genuine issues of material fact exist as to the Plaintiff's claim for outrage.

In order to make a claim for the tort of outrage the plaintiff must make a showing of the
following elements: the defendant's conduct (1) was intentional or reckless; (2) was extreme and
outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected
to endure it. Jeffers v. Russell County Bd. of Educ., 2008 WL 410621, *14 (M.D.Ala. 2008), quoting
Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1043 (Ala.1993).  The tort of outrage is
determined on a case by case basis.  Facts which may not amount to outrage in one situation may
well constitute outrage in another situation, such as, when the person committing the outrageous
conduct has a sufficient degree of control over his victim.    An employee in the work place stands
as a particularly vulnerable target in the scope of the harassing supervisor to whom she reports.

In American Road Service v. Inmon, 394 So.2d 361, 365 (Ala. 1980), the Alabama Supreme
Court defined the tort of outrage as "conduct that goes beyond all possible bounds of decency and

is regarded as atrocious and utterly intolerable in a civilized society."  Moreover, the court found that "anyone who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."  Id. at 362.  Now that it is well-known in the workplace that sexual harassment is clearly against the law, courts are allowing the jury to decide what conduct constitutes outrage in sexual harassment cases.  In Quillen v. American Tobacco Co., 874 F.Supp. 1285 (M.D. Ala 1995), the Court found that despite the "limited nature of the tort," a question of fact existed as to whether the harasser's conduct was outrageous. In Martin v. Norfolk Southern Railway Company, 926 F.Supp. 1044 (N.D. Ala 1996), although the Court determined the plaintiff did not have a claim of same sex harassment, the court sent the outrage claim to the jury. In that same sex harassment case, Judge Nelson stated that "the court is not prepared to hold as a matter of law that the alleged conduct in this case does not constitute conduct "utterly intolerable in a civilized society;" thus, the determination will be left for the jury. Accordingly, summary judgement as to the outrage claim against the individual defendants will not be denied." (Id. at 1051).

The Alabama Supreme Court found that a jury question existed on the issue of the existence of outrageous conduct with regard to sexual harassment claims in Busby v. Truswal Systems Corp., 551 So. 2d 322 (Ala. 1989).  That case involved allegations that the supervisor in question asked the plaintiff to swim in the nude with him; pretended like he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands;  put his arm around the plaintiffs, grabbed the plaintiffs' arms, stroked the plaintiffs' hair, and made sexually suggestive and lewd comments about the sex lives of the plaintiffs and him.  Id.  And, as pointed out more recently in Jeffers, "[o]f the deposition evidence, as laid out in the seventeen allegations of harassment in *Busby*, only one consists of physical

contact: ""putting his arm around the plaintiffs, grabbed their arm, and stroked their neck."" *Id.* The rest consist almost entirely of lewd remarks and gestures." 2008 WL 410621 at 14. Based on a comparison to the conduct in Busby, the <u>Jeffers</u> court found that summary judgment was not warranted for the plaintiff's outrage claims. <u>Id.</u>

As in <u>Busby</u>, the plaintiff was subjected to sexual harassment by a superior employee, her Team Leader. The lewd comments and sexually graphic conduct alleged in this case is similar to that as alleged in <u>Busby</u>; however in the present case the plaintiff has also asserted allegations which were not present in <u>Busby</u> of being subjected to sexually demeaning and derogatory treatment and sexually derogatory cursing, being physically shoved from her work station, and having threats made to her personal safety by a known convicted sexual offender. The plaintiff has presented evidence that the sexual harassment to which she was subjected was intentional, was extreme, and caused her to suffer severe emotional distress resulting in physical symptoms and necessary medical attention. For all of the reasons as set out above, the conduct at issue in this case is as egregious or more egregious than conduct found to have raised a fact question on the issue of outrage in other cases. <u>See</u> <u>Johnson</u>; <u>see</u> <u>also</u> <u>Quillen</u>, 874 F. Supp. at 1285; and <u>Martin v. Norfolk Southern Railway Company</u>, 926 F. Supp. 1044, 1052 (N.D. Ala. 1996).

It is disheartening that defendants allude in their argument that a civilized society would not find that this type of repeated sexual harassment, physical aggression and intimidation in the workplace as "extreme and outrageous."  It is intolerable in a civilized society for an employee to undergo such constant, vulgar and demeaning behavior from her male co-workers and Team Leader and to go to work each day fearful for her own safety, resorting to carrying a screwdriver for protection.  Arguments over how often and how long a woman must endure such harassment and

physical aggression, or how explicit the words directed at her must be for her to be protected by the opinion of civilized society are simply not relevant.

From the evidence as presented by the plaintiff, a jury could reasonably infer from the continuous acts of sexual and physical aggression, as discussed herein, that the male employees, including Williams and Beard, either intended to inflict emotional distress on the plaintiff, or that they knew or should have known that emotional distress was likely to result from their conduct. And, based on the evidence as presented by plaintiff, a jury could also reasonably infer that this conduct was extreme and outrageous. Further, in light of the plaintiff's diagnosis for anxiety, increased blood pressure, and her required medical treatment, a jury could also reasonably conclude that the emotional stress which the plaintiff suffered as a result of this egregious conduct was severe. Accordingly, the defendants' Motions are due to be denied as to these claims.

> 2.    Genuine issues of material fact exist as to the plaintiff's claim for invasion of privacy.

The plaintiff claims invasion of privacy under the "intrusion upon seclusion" theory. In Phillips v. Smalley Maintenance Services, 435 So.2d 705 (Ala. 1983), the Alabama Supreme Court answered an inquiry from the Eleventh Circuit as to the effect of sexual harassment on the tort of invasion of privacy in Alabama. The court specifically held that activities associated with sexual harassment fall under that type of privacy invasion known as "intrusion upon the plaintiff's physical solitude or seclusion." Id. The Busby court found that sexual harassment by a plant supervisor which included obscene and sexually suggestive remarks, gestures, and propositions, was conduct sufficient for the plaintiffs to state a claim for invasion of privacy. 551 So. 2d 322, 324 (Ala. 1989). In furtherance of the holding in Phillips, the district court in Mills v. Wex-Tex Industries, Inc.,

54

specifically found,

> "Under this theory, the invasion of privacy consists of "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." <u>McIsaac v. WZEW-FM Corp., 495 So.2d 649, 651 (Ala.1986)</u>.  Intrusion into the victim's physical privacy is not necessary;  "[o]ne's emotional sanctum is certainly due the same expectations of privacy as one's physical environment."  <u>Phillips, 435 So.2d at 711.</u> Complaints of sexual harassment may sufficiently state a claim for invasion of privacy.  <u>Busby v. Truswal Sys. Corp., 551 So.2d 322, 324 (Ala.1989);</u> <u>Phillips,</u> 435 So.2d at 711.

991 F.Supp. 1370, 1384 (M.D.Ala. 1997).  <u>See also,</u> <u>Patterson v. Augat Wiring Sytems, Inc.,</u> 944 F.Supp. 1509, 1522-23 (M.D.Ala. 1996) (finding that an invasion of privacy claim should survive a motion for judgment on the pleadings and stating that "allegations of sexual harassment are sufficient to state a claim of invasion of privacy"); and <u>Sphere Drake Ins., P.L.C. v. Shoney's, Inc.,</u> 923 F.Supp. 1481, 1490 (M.D.Ala. 1996) (finding that claims of verbal sexual harassment may constitute a viable invasion of privacy claim).

The appropriate standard for analyzing an invasion of privacy claim was set out in <u>Brassfield, v. Jack Mclendon Furniture, Inc.</u>:

> " ... when considering an invasion of privacy claim, the court determines whether the defendant has made a 'wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'  <u>Hogin, 533 So.2d at 530-31.</u>"

953 F.Supp. 1438, 1456 (M.D.Ala. 1996).  The court in <u>Brassfield</u> further states that "conduct needed to support an invasion of privacy claim need not be "extreme and outrageous."  <u>Id.</u>  Based on this analysis, the district court in <u>Kelley v. Troy State Univ.</u>, upheld an invasion of privacy claim where the defendant made sexually explicit remarks and jokes at the expense of women, made degrading personal comments to plaintiff, such as telling her she was having "a blond attack" when

she made an error, and to "show a little leg" when a male colleague was coming to the office; and on several occasions, the defendant struck plaintiff, either with an open hand or a closed fist. 923 F.Supp. 1494, 1503 (M.D.Ala.1996). In Johnson v. Wal-Mart Stores, Inc., the district court found that even where the evidence before it was not as extreme as that in Phillips, that plaintiff's invasion of privacy claim was not due to be dismissed as the evidence before the court established that the defendant had "wrongfully intruded into [the plaintiff's] private activities and that his intrusion cause her mental suffering, shame, and humiliation." 987 F.Supp. 1398, 1405-1406 (M.D.Ala. 1997).

The sexual harassment to which the plaintiff was subjected in this case meets and exceeds the standards as set forth in Johnson, Kelley, Brassfield and Busby. Without reciting all of the egregious, sexually inappropriate comments and actions to which the plaintiff was subjected, the record shows that both Beard and Williams subjected the plaintiff to a constant and continuous barrage of sexually graphic and inappropriate comments, with Beard making inquiries into the plaintiff's sex life and whether she had anyone to "lick her" up and down her body. Williams made sexually explicit comments to the plaintiff on a near daily basis, shared with her the intimate and inappropriate details of his own sex life, subjected her to sexually demeaning and derogatory cursing and actions, threatened her physical person, and bragged about his sex convictions to her. There is also evidence of record that the sexual harassment caused the plaintiff mental and emotional suffering and humiliation. A reasonable jury could certainly decide that Williams did not consider either the plaintiff's body or her private, mental activities to be off limits to him in light of all of his actions and statements, and thus could decide that Williams, and others, intruded into personal areas of the plaintiff's life in a manner likely to cause emotional distress to a person of ordinary sensibilities. Thus summary judgment is due to be denied as to the establishment of plaintiff's

invasion of privacy claim.

      <u>3.</u>    <u>Summary judgment is due to be denied as to Plaintiff's claims of negligent and/or wanton hiring, supervision, training and retention.</u>

The defendant Flavor House's sole argument upon summary judgment regarding the plaintiff's claims of negligent and/or wanton hiring, supervision, training and retention relies solely on it's position that the plaintiff will have no remaining tortuous claims upon which to base her negligence claims. For the reasons as set forth above regarding the plaintiff's claims of outrage and invasion of privacy, it is the plaintiff's position that summary judgment is inappropriate as to both of these torts in light of the multiple genuine issues of material fact created by the evidence of record. Accordingly, the plaintiff has sufficiently established, for summary judgment purposes, state tort claims upon which her negligence claims are predicated such that the defendant's Motion regarding same is without merit and due to be denied.

## III.    CONCLUSION

For the foregoing reasons and facts as set forth herein, the defendants' respective Motions for Summary Judgment are due to be denied, except for those claims as affirmatively conceded herein.

                        Respectfully submitted,

                        <u>s/ Temple D. Trueblood</u>
                        Ann C. Robertson
                        Temple D. Trueblood
                        Attorneys for the Plaintiff

OF COUNSEL:

WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.

The Kress Building

301 19th Street North

Birmingham, Alabama 35203

(205) 314-0500


CO-COUNSEL:

Bobbie S. Crook

367 South St. Andrews Street

Dothan, Alabama 36301

(334) 671-8062

## CERTIFICATE OF SERVICE

I hereby certify that, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jennifer F. Swain

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC

1600 s Wachovia Tower

420 North Twentieth Street

Birmingham, Alabama 35203


Steadman S. Shealy, Jr.

Richard E. Crum

M. Russ Goodman

Shealy, Crum & Pike, P.A.

P.O. Box 6346

Dothan, Alabama 36302-6346


This 3rd day of September, 2008.

s/ Temple D. Trueblood

OF COUNSEL