IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDA THORNTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-CV-712-WKW [WO] |
| | ) | |
| FLAVOR HOUSE PRODUCTS, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court are two motions for summary judgment, one filed by Defendant Franklin D. Williams, Jr. ("Williams") (Doc. # 68), and the other, by Defendant Flavor House Products, Inc. ("Flavor House") (Doc. # 70), which was filed with an accompanying amended brief (Doc. # 77) and evidentiary submission (Doc. # 72).[1] Plaintiff filed a response brief opposing summary judgment (Doc. # 78) with an evidentiary submission (Doc. # 79), to which Flavor House replied (Doc. # 80). After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Williams's motion for summary judgment (Doc. # 68) is due to be granted, and that Flavor House's motion for summary judgment (Doc. # 70) is due to be denied in part, and granted in part.

---

[1] Because Williams's motion for summary judgment relies on Flavor House's summary judgment brief and evidentiary submission, the arguments with respect to Flavor House's motion are attributable to Williams as well.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.      Factual Background**

This dispute arises from Thornton's former employment at Flavor House's Dothan,

Alabama facility, which processes and packages nuts.  (Thornton Dep. vol. 1, 29, Feb. 19,

2008 (Evidentiary Submission Summ. J. Ex. A).)  At the relevant time of her employment,

Thornton operated a machine that affixed labels on jars and cans for nuts.  (Thornton Dep.

vol. 1, 28.)   In 2003, Williams, another Flavor House employee, was assigned to train

Thornton on running a label machine when she was promoted to label operator.  (Thornton

Dep. vol. 1, 58.)  It was at that time that Williams allegedly began harassing Thornton.[2]  She

testified in her deposition that he called her a "godd**n motherf***ing b****" and a "stupid

b****," even though she told him not to, and threw his hands in the air and walked away

from her.[3]  (Thornton Dep. vol. 1, 68-69.)  She testified that he threw cans of peanuts at her

one day when she turned the wrong belt off and jammed the machine.  (Thornton Dep. vol.

1, 76-77.)  She also testified that Williams cursed her out at least every other day.  (Thornton

Dep. vol. 1, 65-66.)  She verbally complained about Williams frequently to Fannie Ashe and

---

[2] The facts are viewed under the appropriate standard of review.  *See infra* pp. 12-15.

[3] Language in the evidence that is profane or particularly vulgar language has been modified.
Because this is a trial court, however, the luxury of presenting the facts euphemistically or generally in
the interest of "brevity and dignity" is not available, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S.
75, 76-77 (1998) (Scalia, J.).  Thus, in order to convey its context and impact, evidence conveying vulgar
ideas or images with less than profane language has not been modified.  This tepid attempt to preserve
civility (or, at the very least, not to contribute to its erosion) is intended to impress upon parties that
incivility in the work place, even if tolerated, is expensive, hurtful and bad business, not to mention, in
some instances, unlawful.

Melvin Hutchins[4] ("Hutchins") (Thornton Dep. vol. 1, 60-65).  Flavor House moved a

different employee into Williams's position but brought Williams back quickly because he

ran the machine better.  (Thornton Dep. vol. 1, 80-81.)  Thornton was told to just get along

with Williams because he was the only one who could run the machine.  (Thornton Dep. vol.

1, 81.)

Problems between Thornton and Williams did not surface again until 2005, after

Thornton had moved to Line 3 as a label operator and Williams was made team leader of

Line 3.  (Mary Ann Boyer Dep. vol. 1 Ex. 2, Mar. 4, 2008 (Evidentiary Submission Summ.

J. Ex. C).)  Williams, along with others, allegedly called Thornton names and pushed and

shoved her to move her away from the machine.  (Thornton Dep. vol. 2, 230-231, Mar. 3,

2008 (Evidentiary Submission Summ. J. Ex. A).)  Thornton testified that Williams also

cursed at her.  (Thornton Dep. vol. 2, 356, 359.)  Williams has admitted that he called

Thornton a "b****" and that he had never called a man a "b****" or "bastard" to his face.

(Franklin Williams Dep. 183, 184-85, June 10, 2008 (Evidentiary Submission Summ. J. Ex.

G).)  Thornton said Williams also talked about other women, including his mother and

daughter, as "b****es."  (Thornton Dep. vol. 2, 270.)  In her unemployment compensation

hearing, Thornton stated that Williams "continuously put down females" and called her a

"God d*** motherf***er" every day, to her face.  (Unemployment Hr'g Tr. 21 (Tommy

---

[4] Fannie Ashe was Thornton's label operator supervisor at the time (Thornton Dep. vol. 1, 29-30), and Melvin Hutchins was the supervisor over Fannie Ashe and other supervisors (Thornton Dep. vol. 1, 31).

Nance Dep. Ex. 7, June 10, 2008 (Evidentiary Submission Summ. J. Ex. J)).)[5] Thornton also stated in a declaration filed with her response brief that she never heard male employees curse at other male employees in the same way they directly cursed at female employees. (Thornton Decl. ¶ 3 (Evidentiary Submission Resp. Ex. A).)

Thornton felt that Williams's comments were threatening. (Thornton Dep. vol. 1, 143.) She specified that his throwing a pallet on the floor repeatedly, and throwing a garbage bag full of cans, while cursing, and in front of others, as she asked the mechanic to call the supervisor, was threatening. (Thornton Dep. vol. 1, 143-44.) In response to the question of whether Williams was "threatening in the sense that he was stating something that he was going to do to [*her*]," Thornton responded that he was threatening when he stated that "he wasn't going to put up with the f***ing shit no more" as he was throwing the pallet or garbage bags. (Thornton Dep. vol 1, 144 (emphasis added).)

The altercation on June 14, 2006, between Thornton and Williams was particularly contentious. Thornton had asked Williams to help her with rework that needed to be done in her work area. (Thornton Dep. vol. 1, 153.) Thornton claims Williams then "flipped out" on her, yelling curse words. (Thornton Dep. vol. 1, 153-54.) This explosion, Thornton testified, was "worse" than anything she had ever seen. (Thornton Dep. vol. 1, 155.) Her account was that he physically threw things, picking up and throwing down the pallet, and throwing the bag, which caused the rework on the table to come flying at her, and he was

---

[5] At the time of the unemployment compensation hearing, Thornton was Ms. Parrish. (Nance Dep. 73.)

"acting crazy . . . continuously staring at me and cussing." (Thornton Dep. vol. 1, 156.) After the incident, Williams paced back and forth and stared at Thornton, and the next day, he stood in front of the rework table "just glaring" at her and then stood in front of her machine glaring at her, and would pace back and forth between the two. (Thornton Dep. vol. 1, 160; *see also* Cooke Documentation Form (Ricky Smothers Dep. Ex. 3, May 12, 2008 (Evidentiary Submission Summ. J. Ex. D)) (detailing with less recollection, some of the same incident, though muting Williams's conduct somewhat); Long Documentation Form (Smothers Dep. Ex. 4) (same); McInnis Documentation Form (Chris Jordan Dep. Ex. 5, May 12, 2008 (Evidentiary Submission Ex. E) (same).) On June 15, Thornton told Hutchins that she did not feel safe working with Williams, and Thornton was moved to Line 5 during the subsequent investigation.[6] (Thornton Dep. vol. 1, 160-61.) On Line 5, she remained a label operator, and her pay did not change. (Thompson Dep. vol. 1, 162, 165.) Flavor House collected documentation from the parties and other employees about the June 14 incident (*see* Br. Supp. Summ. J. 11), and documented a 1st Step Written Counseling for Williams for using "profanity in the presence of other co-workers" (Order on Pretrial Hearing, Doc. # 97 (parties' stipulations)). On June 16, Thornton tried to resign, and during the meeting with personnel, she was hysterical and was carrying a screwdriver to defend herself from Williams if he came near her again. (Thornton Dep. vol. 1, 175.) Thornton quit a few days later. (Thornton Dep. vol. 1, 177-81.)

---

[6] Thornton testified that she was told the move would last for three months during which time Flavor House would determine who was the problem. (Thornton Dep. vol. 2, 377.)

Thornton also testified to Williams's specific conversations that concerned his sex life, which occurred about three times a week during her employment.[7]  (Thornton Dep. vol. 2, 360-61.)  In her deposition, Thornton said that Williams was "always vocal about his sex life."  (Thornton Dep. vol. 2, 140.)  She claimed that he said the following in her presence: (1) that he knew his wife was cheating "because when [they] f*** – the way she feels inside is loose"; (2) that after his wife left him, and when he started "going with this girl that works at the plant," that he had not slept because they had "f***ed four hours" and they had been together in the backyard in the car so that the children would not see; (3) that this girl had given him a blow job and that if his wife had done that, he would not have divorced her. (Thornton Dep. vol. 1, 140-41.)  When asked after recalling those comments if there was "anything else," Thornton stated: "I'm sure there is.  I just can't – I'm nervous and I can't recall right now."  (Thornton Dep. vol. 1, 141.)  Thornton also complained that when Williams talked, he had a "habit" of "touching" people to get their attention.  (Thornton Dep. vol. 1, 183, 189.)  He would "continous[ly]" touch Thornton on the upper part of her arm despite her protests, and she found this "aggravating."  (Thornton Dep. vol. 1, 183, 189.)  She said that he also had a habit of calling females "girlfriend," though Thornton told him not to call her that.  (Thornton Dep. vol. 1, 183.)

---

[7] Williams allegedly would bring up his sex life "[o]ut of blue."  (Thornton Dep. vol. 2, 360.)

Later, in the declaration she filed with her response brief, Thornton added that Williams also said the following[8]: (1) that he was going to "f***" the personnel resource employee; (2) that he planned to invite that employee to the Christmas party (and that he already had her address) so that there would be two people, his wife and the personnel resource employee, that he was "f***ing," at the same table; (3) that he and his wife would

---

[8] Flavor House moved to strike these portions of Thornton's declaration under a theory that it is a "sham" declaration. (Doc. # 81 at 1.) The motion was denied and construed as supplemental argumentation to Flavor House's reply. (Doc. # 82.)

"[A]n affidavit [or declaration] can be disregarded when it constitutes a sham . . . ." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (citing *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656 (11th Cir. 1984)). A "flat contradiction" between an earlier deposition and an affidavit/declaration that is "unexplained" is "inadequate to raise a genuine issue of fact which was denied to exist by the earlier deposition." *Id.* Importantly, however, "[a] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* "Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility," and issues of credibility with respect to witnesses and weight of evidence "are questions of fact which require resolution by the trier of fact." *Id.* at 954. To hold otherwise "would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the [declarant]) was stating the truth." *Id.* at 953-54. Thus, a declaration is a sham only "'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with [a declaration] that merely contradicts, without explanation, previously given clear testimony." *Id.* at 954 (quoting *Van T. Junkins*, 736 F.2d at 657). Every "discrepancy" in a declaration does not justify a court's refusing to credit it, and a statement needs to be more than "at odds" with statements in an earlier deposition. *Id.* Statements should be "inherently inconsistent" and "create an irreconcilable conflict." *Id.*

In this case, Thornton's deposition and affidavit are not inherently and irreconcilably conflicting with respect to the frequency and substance of the sexual comments she attributes to Williams. Contrary to Flavor House's arguments (Mot. to Strike ¶¶ 2, 4), a statement that Williams made comments of a sexual nature "several times" does not inherently contradict a later statement that the comments occurred every day. The statements may be at "odds," but a trier of fact can determine the credibility of Thornton and the truthfulness of her statements. Similarly, Flavor House may be justifiably suspicious of Thornton's sudden recollection of several additional and damaging comments Williams allegedly made. (Mot. to Strike ¶¶ 3, 4.) Thornton never said in her deposition, however, that the comments she recalled at the deposition were an exclusive description of Williams's conversations. In fact, she noted during her deposition that she was nervous but that she was sure there were other comments that she just could not recall. A failure to recall additional comments does not preclude later recalling those comments. The effect the later recollection has on Thornton's credibility, and the truthfulness of her claims is a credibility determination the trier of fact should make.

"f***" all night until it was time to shower and go to work (stated on several occasions); (4) that his wife was "f***ing a n*****" on the sanitation shift and that though not racist, he believed the races "shouldn't mix"; (5) that his girlfriend did not want a baby girl, but that he would "f***" her enough that she would become pregnant; (6) that his wife said she would have given him blow jobs if she had known that was what he wanted; (7) that he was "always commenting about" how "hard" he would get and for how long; (8) that he had to have sex every day, that he did not enjoy pornography and did not "please" himself sexually, so he had to have sex "all of the time." (Thornton Decl. ¶ 9.)  Thornton claims that "[t]hese comments and others like them were just part of Williams['s] everyday conversation at work." (Thornton Decl. ¶ 9.)  Against Thornton's protests, Williams continued to talk about his sex life, stating on one occasion that he had to talk to Thornton because he could not talk to another friend, whom he called a "whore" who was "f***ing" everyone in the plant. (Thornton Decl. ¶ 9.)

Another former employee, Kimberly Perkins ("Perkins"), also testified to Williams's calling Thornton a b**** "and things like that," and Perkins also told Thornton that Williams had called Thornton a b****.  (Kimberly Perkins Dep. 113-14, June 11, 2008 (Evidentiary Submission Ex. F).)  Perkins noted that Williams used profanity every day.  (Perkins Dep. 115.)  She also testified to his telling "dirty jokes" and comments about the way women looked, specifically, the way temporary employees and personnel resources coordinators looked, though Perkins apparently was not offended by his remarks.  (Perkins Dep. 117-119.)

Williams was not the only person about whom Thornton complained.  She testified in her unemployment compensation hearing that when she assumed the Line 3 position, a male employee told her that it was a "man's job."  (Unemployment Hr'g Tr.; *see also* Thornton Dep. vol. 1, 200-01 (using the words "man's position" instead).)  She also testified to the behavior of male mechanics more generally.  The male mechanics would work on her machine or make adjustments to it if she could not make the adjustments herself in five minutes (Thornton Dep. vol. 1, 202),[9] and when she called for them, they would ask her "what the f*** was the problem now" and "why can't you just run the mother f***er" (Thornton Dep. vol. 1, 229).  One mechanic told her to "take [her] ass right back to the label machine where [she] belong[ed]" and called her a "f***ing ass hole," at which, a second supervisor merely laughed.  (Thornton Dep. vol. 2, 231.)  The male mechanics told her that she "did not know what the hell [she] was doing" and to "just keep running the son of a b****."  (Thornton Dep. vol. 2, 230.)  Thornton added that she never saw male operators treated that way by the male mechanics (Thornton Dep. vol. 2, 238-39), and that the male mechanics supposedly gave the male operators more than five minutes to adjust their machines (Thornton Decl. ¶ 5).  Perkins, also a label operator, testified that the male mechanics treated her in a similar way, screaming and yelling at her (Perkins Dep. 32) and complaining that she "needed to get the hell off that d*** machine so they can get somebody

---

[9] According to Thornton, mechanics replaced parts or fixed mechanical problems, but did not adjust or run the machines.  (Thornton Dep. vol. 2, 229.)

else in there that can do the job" and that she and others are "always f***ing up these machines and [the mechanics] have to come behind . . . and fix them" (Perkins Dep. 42).[10]

Thornton complained to her physician in October 2005 of "increased stress at work" and "being harassed." (Dr. Bendinger Dep. 21, Ex. 1 at 4, June 11, 2008 (Evidentiary Submission Resp. Ex. C).) She also allegedly reported the incidents to several key employees at Flavor House. (*See, e.g.*, Resp. 7-8.) Because Flavor House does not challenge the theory on why it would be liable on the federal claims if the allegations against its employees are proven, and because Flavor House hinges its opposition to Williams's state-law claims on the underlying torts, it is unnecessary at the summary judgment stage to narrate on when and how and to whom Thornton reported her complaints.

Thornton alleges that in response to those complaints, Flavor House took retaliatory actions. Three specific write-ups are relevant: (1) one for putting the incorrect date on a schedule, though Thornton claims other employees were not written up; (2) another for hollering at another employee, which Thornton claims was necessary in order to be heard over a machine; and (3) the other for using offensive language against another employee who was also written up for throwing a jar that hit Thornton after bouncing off a rail. (Thornton Dep. vol. 2, 281-83; Mary Ann Boyer Decl. Ex. B (Evidentiary Submission Summ. J. Ex.

---

[10] Thornton also alleges that Tom Beard, a male employee, made a sexually explicit and lewd comment to her when she was not smiling when she came to work. (Resp. 7.) Flavor House argues in its reply that Thornton cannot rely on this allegation because it is time-barred. (Reply 5-6.) It is unnecessary to resolve this challenge at this stage as Beard's comments are not determinative of the outcome of Thornton's sexual harassment claims, and cannot be considered for her state-law claims against Williams or against Flavor House on a theory of ratification (Compl. ¶¶ 64, 70 (alleging Flavor House ratified *Williams's* conduct).)

K).) She also claims Flavor House's reprimand on March 7, 2006, her only formal discipline (Br. Supp. Summ. J. 17-18), was retaliatory. (Resp. 50.)

## B.   Procedural Background

Thornton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 21, 2006. (EEOC Charge (Thornton Dep. vol. 1 Ex. 15).) She stated claims for sexual harassment, discrimination, and retaliation. (EEOC Charge.) Thornton requested a right to sue letter, which she received on May 8, 2007. (EEOC Notice (Thornton Dep. vol. 2 Ex. 23).) Thornton filed this lawsuit on August 6, 2007, alleging violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII") against Flavor House for sexual discrimination,[11] sexual harassment and retaliation (Count I), state-law invasion of privacy against both Defendants (Count II), state-law outrage against both Defendants (Count III), and state-law negligent and/or wanton hiring, supervision, hiring, and retention against Flavor House (Count IV). (Compl. (Doc. # 1).) In addition to the summary judgment motions are two other pending motions. Thornton moves to strike Flavor House's affirmative defenses (Doc. # 63) and to supplement her evidentiary submission in response to the motions for summary judgment (Doc. # 84). Both of these motions will be addressed in a separate order.

---

[11] Thornton has conceded her sexual discrimination claims for disparate pay and promotion, due to the applicable statute of limitations. (Resp. 30 n.14.)

## II.  JURISDICTION AND VENUE

There is subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 for all claims arising under federal law.  There is also original jurisdiction over claims based upon violations of civil rights, s*ee* 28 U.S.C. § 1343, and violations of Title VII specifically, 42 U.S.C. § 2000e-5(f)(3), and jurisdiction over claims under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  Finally, state-law claims can be heard in federal court under supplemental jurisdiction, 28 U.S.C. § 1367(a).  The parties do not contest personal jurisdiction or venue, and the court finds that there are allegations sufficient to support both.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(c), as amended December 1, 2007 (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").[12]  The

---

[12] Effective December 1, 2007, "[t]he language of Rule 56[was] amended . . . to make the rule[ ] more easily understood and to make style and terminology consistent throughout the rules. These changes . . . are stylistic only." Fed. R. Civ. P. 56 advisory committee notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and therefore, all cases citing the prior rule remain equally applicable to the current rule.

party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Celotex*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). If the evidence on which the nonmoving party relies, however, "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (Plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond

14

"his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of a party's own conclusory allegations is not sufficient to oppose a motion for summary judgment . . . ."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

# IV. DISCUSSION

## A. Sexual Harassment (Title VII)

Title VII forbids sex-based discrimination that alters the terms and conditions of employment in one of two ways: either through a tangible employment action such as pay decrease, demotion or termination, or through the "creation of a hostile work environment caused by sexual harassment" that is severe enough to effect an alteration. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007) (citing § 2000e-2(a)(1); *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004)).  To recover for a hostile work environment, an employee must prove that:

> (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her membership in a protected group; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding the employer liable exists.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1143 (11th Cir. 2008).  Flavor House argues that it is entitled to summary judgment because if there was harassment, it was not sex-based (element three) or sufficiently severe or pervasive (element four).  (Br. Supp. Summ. J. 22.)

The "based on" element requires an employee to "essentially show 'that similarly situated persons not of [her] sex were treated differently or better.'" *Reeves*, 525 F.3d at 1143 (one set of internal quotation marks omitted) (alteration in original) (quoting *Baldwin*, 480 F.3d at 1302).  Sex-specific language "satisfies the 'based-on' element in a sexual

16

harassment hostile work environment case even when the language does not target the plaintiff." *Id.* at 1144. Sex-specific language is language that is "more degrading to women than to men," *Baldwin*, 480 F.3d at 1302, and sex-specific language has a discriminatory effect even if it was used indiscriminately and not targeted at women, *Reeves*, 525 F.3d at 1144-45. It is discriminatory regardless of who is targeted because the language itself is inherently offensive to females.[13] *See id.* (applying the logic of *Walker v. Ford Motor Co.*, 684 F.3d 1355 (11th Cir. 1982), which addressed race-specific language).

Words like "b****" and "whore" are sex specific, but so were the "conversations and jokes" in *Reeves* that "permeated the office on a daily basis," pertaining to sexual anatomy, masturbation and pornography. 525 F.3d at 1144. One of the plaintiff's co-workers "frequently used sexually crude language," including phrases, jokes, comments and remarks. *Id.* at 1141. He used phrases like "f***ing b****" and "f***ing whore" when hanging up the phone, and called the only other female employee a "b****" and discussed her "big ass." *Id.* It was also "commonplace" for employees to tell sex jokes. *Id.* The plaintiff additionally heard another co-worker discuss masturbation, sexually explicit songs, and his experience in a hotel with naked women. *Id.* at 1142. The plaintiff's manager used phrases like "lazy, good-for-nothing b****" and "stupid b****," and described the other female employee as "[s]he may be a b****, but she can read" and "[s]he's got a big one." *Id.* (alteration in

---

[13] Flavor House argues that for conduct to be "based on" sex, it must be in the form of "'sexual advances, requests for sexual favors, [or] conduct of a sexual nature.'" (Br. Supp. Summ. J. 22 (quoting an Eleventh Circuit case).) *Reeves* establishes that sex-specific language can be conduct based on sex.

original).  To make matters worse, explicitly sexual radio programming permeated the workplace.  *Id.*  The programming included discussions on breast size, sexual arousal and female indications of arousal, masturbation, erotic dreams, ejaculation, and female pornography, and the advertisements discussed sexual favors, unconventional sexual scenarios and sexual performance.  *Id.*

The language permeating Thornton's work environment is not meaningfully distinguishable from that in *Reeves*.  Williams used similar sex-specific profanity, like "b****," and sometimes, actually directed it at Thornton.  Even more salient, however, is Williams's graphic and crude discussions of his sex life and his sexual predilections and intentions.  Additionally, Williams's conduct was not only in the presence of Thornton. Perkins testified to Williams using the word "b****" and to his "dirty jokes" and comments about specific women's anatomy.[14]  These facts seen in the light most favorable to Thornton sufficiently establish the based-on element of her claim.[15]

---

[14] Williams also used derivations of the word "f***."  Thornton admits that she too used the word "f***."  (*See* Thornton Dep. vol. I, 75-76.)  The Eleventh Circuit in *Baldwin* lumped "f***" and "f***ing" into a set of words that it considered "relatively gender-neutral."  480 F.3d at 1301.  Using the word indiscriminately toward males and females would not be Title VII conduct.  *Id.*  It seems reasonable, however, to assume that using "f***" directly toward a female in an already charged context would change the qualitative contours of that language from when it is used indiscriminately or by a female.

[15] As to Williams's touching, in isolation, it could be perceived as gender-neutral, but in this context and given his relationship with Thornton, the touching is not *not* based on sex, at least as found at this stage in the proceedings.  The testimony that male mechanics seemed particularly exasperated with the *females* running the label operators, is relevant, but not necessary to reach the summary judgment determination.

Flavor House also argues, however, that the conduct was not sufficiently severe or pervasive for an actionable sexual harassment claim.  (Br. Supp. Summ. J. 24.)  "The 'severe or pervasive' element 'tests the mettle of most sexual harassment claims.'"  *Reeves*, 525 F.3d at 1145.  "'Title VII does not prohibit all verbal or physical harassment in the workplace . . . .'"  *Oncale*, 523 U.S. at 80.  It is "not a federal civility code" designed to "'purge the workplace of vulgarity.'"  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (internal quotation marks omitted), 1252 n.10 (11th Cir. 1999) (en banc) (quoting *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 144 (7th Cir. 1997)).  "Unpleasant" or "rude" conduct in the workplace, however undesirable, is not discriminatory sexual harassment.  *See id.* at 1253-54.  Nor does Title VI require "asexuality [or] androgyny in the workplace."  *Oncale*, 523 U.S. at 81.  The "'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex,'" do not fall under Title VII protection, nor do "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted) (quoting *Oncale*, 523 U.S. at 81, 82).

"'[D]iscriminatory intimidation, ridicule, and insult'" must be severe enough to "'create an abusive work environment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  The severity of harassment depends on the "social context in which the particular behavior occurs and is

experienced by its target."[16] *Oncale*, 523 U.S. at 81. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 81-82.

For conduct to be sufficiently severe or pervasive to alter an employee's terms and conditions of employment, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe [or] pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246 (quoting *Harris*, 510 U.S. at 21-22). "'[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.''" *Id.* (quoting *Oncale*, 523 U.S. at 81). The Supreme Court has identified four factors to consider for determining severity or pervasiveness[17]: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Reeves,* 525 F.3d at 1145-46 (citing

---

[16] To illustrate this point, Flavor House quotes the following from a Tenth Circuit case: "We must evaluate [the] claim of gender discrimination in the context of a blue collar environment where crude language is commonly used by male and female employees. Speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments," *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995). (Br. Supp. Summ. J. 25.)

[17] These factors are not, however, an exhaustive list of what may be considered. *See, e.g.*, *Harris*, 510 U.S. at 24 (Scalia, J., concurring); *Miller v. Kenworth of Dothan, Inc.*, 377 F.3d 1269, 1276 (11th Cir. 2002).

*Faragher*, 524 U.S. at 787-88).  "[N]o single factor is determinative, and *either* severity *or*

pervasiveness can satisfy the element, if sufficient."  *Id.* at 1146 (citation omitted).

Conduct that occurs every day weighs the frequency factor in the employee's favor.

*See Reeves*, 525 F.3d at 1146.  Even "'roughly fifteen separate instances of harassment over

the course of four months,'" has been held sufficiently frequent.[18]  *Miller*, 277 F.3d at 1277

n.6 (quoting *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th

Cir. 2000)).   Yet it is "not simply some 'magic number'" of insults that makes an

environment hostile, and "repeated incidents of verbal harassment that continue despite the

employee's objections" are indicative of a hostile environment.  *Id.* at 1276 (quoting *Shanoff

v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)).   In this case, Thornton

testified to Williams's sexual comments occurring three times a week, that he was always

vocal about it, and later, stated that they amounted to everyday conversation.  She also noted

repeated cursing and interactions characterized by inflammatory behavior.  He also touched

her arm continuously.  Thornton's negative interactions with the mechanics were more than

isolated events.  Frequency weighs in favor of Thornton.

Severity is determined by "all the circumstances" and not just each isolated instance.

*Reeves*, 525 F.3d at 1146.  The court in *Reeves* took into account the number of women in

the workplace relative to the number of men.  *Id.*  For the only woman to be exposed to

---

[18] It should be noted that in *Johnson*, the frequency was noted *alongside* the severity of the
conduct and was distinguished from other cases where there were fewer instances and less objectionable
conduct.  234 F.3d at 509.

sexually explicit words and descriptions weighed in favor of severity. *Id.* When the words and descriptions were not directed at the plaintiff, however, that was a counterweight to any severity in favor of the employer. *Id.* In fact, even had the language been specifically directed at the employee, that would not have been determinative. *Id.* at 1146 n.5. But the use of derogatory names in an intimidating manner, shouting at an employee in the course of berating her about her job performance, and arguing with an employee, or being angry with her has been found to "r[i]se above the level of off-handed comments in the course of casual conversation that the Supreme Court has refused to find actionable." *Miller*, 277 F.3d at 1277. Some of Williams's and the mechanics' conduct was directed at Thornton, though the more explicitly sexually conduct does not appear to have been so. Given the totality of the circumstances, however, specifically the public name-calling and harassing behavior directed at Thornton in connection with the repeated sexual comments, the conduct is severe enough *not* to tilt the scales toward Flavor House. The details of this behavior have been recited.

Physically threatening and humiliating conduct is another factor for determining whether the environment was objectively hostile. The Eleventh Circuit has refused to find following an employee around or brushing up against her hip physically threatening or intimidating but the employee in that instance never testified to the following or staring as "stalking," "leering," "intimidating," or "threatening," or to his following her to where she worked and spent most of her time. *Mendoza*, 195 F.3d at 1249 (citing a case where the

22

behavior was "the kind of non-threatening 'utterance' that could not alone support [a] hostile-environment claim," *id.* at 1248). Thornton did find Williams's language threatening, and it was accompanied sometimes by his throwing objects in evident anger. His later glares followed a particularly physical outburst. Williams's repeated use of physical force to express his frustration, his repeated touching, and his use of profane and sexually charged language separates his conduct from conduct that is just offensive or creepy.

It is objectively reasonable that a woman in Thornton's position would have also felt humiliated. *See Reeves*, 525 F.3d at 1147. It is true that the employees in this particular work environment were arguably accustomed to profane and foul language. The behavior may seem less humiliating taken in this context. Plus, there were other female employees working with Thornton, the sexually explicit language did not concern Thornton herself, and she used profanity on occasion as well. The sexually explicit language, however, was particularly graphic. Also, Williams cursed and threw things at and around Thornton in front of others, in relation to her work. Additionally, the male mechanics' demeaning attitude toward Thornton, was expressed in front of others and concerned her job performance. In *Miller*, the Eleventh Circuit held that the very nature of the co-workers' comments (in that case, ethnic slurs), and the fact that the comments were directed at the employee and were used while reprimanding him in front of others, established the third factor because the conduct was humiliating and degrading. 277 F.3d at 1277. Thornton has shown evidence reaching at least that level of humiliation.

23

Also, this behavior in its totality approximates a case *Mendoza* cites for sufficient sexual harassment.  In that case, the harasser gave glaring and piercing looks, treated the female employees differently, yelled and screamed at and belittled them, "engaged in name calling, derogatory remarks, verbal abuse, finger pointing, and offensive touching with women" but not with men, communicated in a way that was "'extremely hostile, very angry, very aggressive'" and "'demeaning,'" but was at the same time, "'very professional'" with the men.  *Mendoza*, 195 F.3d at 1249 n.8 (citing and quoting *Cross v. Ala. Dep't of Mental Health Retardation*, 49 F.3d 1490, 1495-97 (11th Cir. 1995)).  Though Williams may have never acted very professionally with anyone, on the facts as shown, he acted particularly inappropriate with the females working in a factory dominated by males where the work was with machinery.  It is additionally plausible that the male mechanics' actions in this context, in addition to Williams's, was humiliating.

For the conduct to unreasonably interfere with job performance, it "need not have tangibly affected the plaintiff's job performance in order to be actionable." *Reeves*, 525 F.3d at 1147 (citing *Harris*, 510 U.S. at 22).  In *Reeves*, the conduct had a physical effect on the employee and took time away from her work because she had to complain to her superiors, ask her co-workers to stop, and write notes to keep track of the offensive conduct, and so the court found the factor weighed in favor of the employee.  *Id.*  The conduct at Flavor House was disruptive to Thornton, and it can be assumed, to other employees.  As Flavor House references in its brief, Thornton claims she frequently complained about her work situation.

(Br. Supp. Summ. J. 16.)  She had to be moved and re-situated to accommodate the tension between Williams and her.  Toward the end, the environment was taking a toll on her physical health.  (Thornton Dep. vol. 1, 170-71, 175-81.)

Assessing these factors shows that what Thornton experienced at Flavor House "was not the 'ordinary socializing' . . . that the 'severe or pervasive' element is meant to filter out." *Reeves*, 525 F.3d at 1148 (citation omitted) (quoting *Faragher*, 524 U.S. at 788).  Nor was it merely "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788 (quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992)).   Thus, Flavor House is not entitled to the "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex." *Mendoza*, 195 F.3d at 1251 n.9.

What Thornton experienced is similar to what the plaintiff experienced in *Reeves*, albeit without the radio programming.  Just because the alleged behavior did not involve physically aggressive grabbing, or offering money for sex and showing pornography, *see Mendoza*, 195 F.3d at 1252 n.10 (referencing two cases), does not mean the behavior fails to qualify as harassment.  The behavior Thornton endured, particularly the sexually explicit comments Williams made, was more than "taunting and boorish," *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1027 (11th Cir. 2008), *petition for cert. filed*, 77

U.S.L.W. 3267 (Oct. 20, 2008) (No. 08-547). (*See* Br. Supp. Summ. J. 23.) The "taunting and boorish" conduct in *Webb-Edwards* was the co-worker's telling the plaintiff that she "looked hot" and that she should wear tighter clothing, and that women who dye their hair have issues at home.[19] *Id.* Thornton has presented evidence of frequent sex-specific profanity and graphically sexual language. She has presented evidence of physical throwing and cursing and yelling, on a frequent basis, in public, by someone over her in employment. She has also presented evidence, though it is weaker, of other males treating her differently in her job capacity because she is female. The alleged conduct is enough to put the question of an objectively hostile work environment to the trier of fact.

To prevail on her claims, however, Thornton also must show that she "subjectively perceive[d] the environment to be abusive." *Harris*, 540 U.S. at 21. One of the factors in determining whether an employee actually found the environment abusive is her psychological well-being. *Id.* at 23; *see also Walker*, 684 F.2d at 1359 (holding district court's findings that the plaintiff felt "unwanted" and "uncomfortable" supported finding sexual harassment). Thornton's doctor's note shows that Thornton told him that she was

---

[19] The only comment the court stated could be construed as referring to sexual activity involving the plaintiff – when the plaintiff's co-worker told her husband in "taunting jest" that the co-worker was "eating [her] for lunch" – was "a disgusting attempt at humor" but was not accompanied by any other conduct. *Webb-Edwards*, 525 F.3d at 1028. It also occurred only once. *See id.*

The Eleventh Circuit in *Mendoza* highlighted a Fifth Circuit case to illustrate what "'boorish and offensive'" was. 195 F.3d at 1252 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)). In that Fifth Circuit case, there were "several fairly serious instances of harassment," including comments about the plaintiff's anatomy and attempts to look down her clothing or to touch her. *Id.* (citing *Shepherd*, 168 F.3d at 872). The conduct here is not necessarily less serious than that, and *Reeves* is also a controlling case.

suffering from work stress and felt harassed at work. She also was hysterical by the end of her employment. She was carrying a screwdriver in her back pocket to defend herself against Williams if he came near her. (Thornton Dep. vol. 1, 175.) Assuming no adjudication on Thornton's credibility, her shaky psychological well-being supports finding she subjectively believed she was offended.

In *Miller*, the Eleventh Circuit rejected an argument that the subjective belief had not been established. *Miller*, 277 F.3d at 1277. The plaintiff had testified that he told the perpetrator that he did not like the behavior and wanted it to stop. *Id.* The plaintiff also told co-workers he had consulted with a lawyer about the harassment. *Id.* He also told the perpetrator's supervisor, who was present during the abusive conduct and did nothing about it, to tell the perpetrator to watch what he said. *Id.* The court did find it relevant that the plaintiff had failed to bring the complaints to his immediate supervisor even though the plaintiff had heard at a company meeting that he should do so, but the court nevertheless held that a reasonable jury could still find the plaintiff subjectively perceived abuse. *Id.* Thornton has not only testified that she told Williams and others that she did not like the behavior, she also officially complained about the environment, often. A jury can assess whether Thornton's averments that she perceived sexual harassment are credible, but she has presented enough evidence to proceed to trial.

For the foregoing reasons, therefore, summary judgment is due to be denied on Thornton's sexual harassment claim.

27

**2.      Retaliation (Title VII)**

Title VII prohibits discrimination against any employee who (1) "has opposed any practice made an unlawful employment practice by this subchapter" (opposition clause), or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (participation clause). 42 U.S.C. § 2000e-3(a). "The burden of proof in Title VII retaliation cases is governed by the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993) (citation altered).  A *prima facie* case[20] of retaliation requires proof "(1) that [the employee] engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994).  If the defendant comes forward with legitimate reasons for its action, the plaintiff must provide sufficient evidence that, if reasonably believed by the trier of fact, would prove by a preponderance of the evidence that those reasons are pretextual.  *See Goldsmith*, 996 F.2d at 1163.

To satisfy that burden of production for offering a legitimate, non-retaliatory reason for its actions, the employer is not required to persuade the court that those reasons were its

---

[20] "[T]he term 'prima facie case' has two meanings.  Traditionally, it refers to the 'quantum of evidence needed to create a jury question' or 'a case strong enough to go to a jury.'  In the *McDonnell Douglas* context, however, the term relates to a step in the analytical framework and means the 'establishment of the facts required to establish the *McDonnell Douglas* presumption.'" *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1153 n.7 (11th Cir. 2005) (citation omitted).

actual motivation. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)). The employer only needs admissible evidence that would allow the trier of fact to rationally conclude that its actions were *not* motivated by a retaliatory motive. *See id.* (quoting *Burdine*, 450 U.S. at 257). When the employer offers a legitimate, non-retaliatory reason for its actions, the employee on rebuttal must meet the employer's legitimate reason "head on" and not by "simply quarreling with the wisdom of that reason." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). To meet the evidentiary burden on pretext, the employee must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996) (en banc)).

Flavor House argues that Thornton has not met the second and third elements of a *prima face* case. (Br. Supp. Summ. J. 29.) Flavor House contends that the "verbal warnings" Thornton received would not dissuade a reasonable worker from making a discrimination charge, and that the only formal disciplinary action taken against Thornton at the time – the "Memo to File" – had no impact on her employment, in addition to failing to dissuade a reasonable person not to make additional complaints. (Br. Supp. Summ. J. 29-30.) In its

reply, Flavor House also argues that the constructive discharge cannot be a materially adverse employment action.[21]  (Reply 10-11.)

For actionable retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.''" *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Title VII's retaliation provision "prohibit[s] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).  "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*  Plus, the determination is context-specific.  *Id.* (noting that a schedule change or a refusal to invite an employee to lunch are examples of annoyances or petty slights in some cases, but could be retaliation in others).  Constructive discharge, however, "negatively affects an employee's job status, and

---

[21] It is unclear whether Flavor House argues that constructive discharge cannot, as a matter of law, be an adverse employment action for a retaliation claim or that Thornton just has failed to raise sufficient evidence that would amount to constructive discharge.

therefore constitutes an adverse employment action" for purposes of a retaliation claim.[22]

*Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 & n.2 (11th Cir. 2005) (First Amendment

case but citing *Meeks*, 15 F.3d at 1021, supporting the same point in a Title VII case)

(decided prior to *Burlington Northern*, but not inconsistent with it)[23].

Constructive discharge requires proof "that working conditions were so intolerable

that reasonable persons in [the employee's] position would have felt compelled to resign."

*Akins*, 420 F.3d at 1302.   To survive summary judgment, the employee "must produce

substantial evidence that conditions were intolerable."   *Id.*   The standard for constructive

discharge is "quite high."   *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir.

2001); *see Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002)

(Thompson, J.) ("'[D]ifficult or unpleasant work conditions are not so intolerable as to

compel a reasonable person to resign.'" (quoting *Matvia v. Bald Head Island Mgmt., Inc.*,

---

[22] *See also, e.g.*, *Heuer v. Weil-McLain*, 203 F.3d 1021, 1023 (7th Cir. 2000) (Posner, J.) (describing constructive discharge as the "classic example" of an employment action severe enough for retaliation even though it was not a "firing" or "demotion" or "other job action"); *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995) ("Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation."); *Beltrami v. Special Counsel, Inc.*, 170 F. App'x 61 (11th Cir. 2006); *Thomas v. Schafer*, No. 2:05-cv-411, 2008 WL 2441040, at *9 (M.D. Ala. June 16, 2008) (Watkins, J.) ("'Constructive discharge qualifies as an adverse employment decision.'" (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 n.2 (11th Cir. 1997))).

[23] Prior to *Burlington Northern*, courts commonly recognized a variety of adverse actions as sufficiently material to be actionable, including . . . conduct amounting to constructive discharge . . . . Based upon the standard articulated by the Supreme Court in *Burlington Northern*, these actions likely will continue to be deemed adverse action sufficient to support a retaliation claim . . . ." Barbara T. Lindemann & Paul Grossman, *Employment Discrimination Law* 1028 (4th ed. 2007).  In an unpublished case after *Burlington Northern*, *Nettles v. LSG Sky Chefs*, 211 F. App'x 837 (11th Cir. 2006) (per curiam), the Eleventh Circuit discussed "constructive discharge" in a discussion on Title VII discrimination *and* retaliation.  *Id.* at 839.

259 F.3d 261, 272 (4th Cir. 2001)).   Indeed, the standard "is higher than the standard for proving a hostile work environment." *Hipp*, 252 F.3d at 1231.   Additionally, "[a] constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996); *see also Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) ("Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.").   An example of a work environment that justifies constructive discharge is one where an employee was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers." *Poole*, 129 F.3d at 553.[24]

The Eleventh Circuit has also found a material question of fact to substantiate constructive discharge in *Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993) (per curiam).   There, the employee's supervisor made repeated harassing statements directed at the employee and the superior expressed an interest in a relationship with her personally.   *Id.* at 756.   He repeatedly invited her out despite her expressed disinterest, made "direct completely inappropriate and suggestive remarks," hovered about her for hours, and continued to do so even when no longer her supervisor, and once warned, sent messages to her that he missed

---

[24] An example of conduct that does not justify constructive discharge is *Nettles*, 211 F. App'x at 839 (no constructive discharge when employer undermined employee's authority in front of customers, peers, and subordinates, excluded employee from business meeting with chairman and denied employee the opportunity to present at a meeting, denied administrative support to employee for staff trip, evaluated the employee as meeting rather than exceeding expectations, and offering a position on terms and conditions less favorable than offered to others for the same position).

her and that no one would believe her. *Id.* She also faced the real possibility that he would become her supervisor again. *Id.*

On balance, Thornton has not created a issue of material fact with respect to her constructive discharge claim. Her claims are sufficiently severe or pervasive to move past summary judgment on sexual harassment, but not easily. Her situation perhaps would have been more intolerable had Williams propositioned or approached her in a sexual manner, or if Flavor House had showed no interest in resolving the tension and ameliorating her circumstances. Instead, Flavor House had attempted to combat the particularly inflammatory incidents in June 2006 by reassigning Thornton to a different line. There is no evidence that on that line she would suffer a decrease in pay or job responsibilities.[25] After the transfer, Thornton did not work any meaningful time on Line 5, and away from Williams, before she resigned. She argues that he was still close to her when she was on Line 5 and could wander around the work place. (Resp. 47.) Resigning on the basis of the assumptions that he would therefore continue to hurt her or worse, though, is premature. For instance, Flavor House had not yet had much time to design a permanent resolution even though it had started on the process. Indeed, after the June 14 incident, Flavor House had taken affirmative and immediate steps to quell the escalating disagreement by investigating the claim, writing up Williams, and separating the parties as a first step. Based on the record before the court,

---

[25] Thornton only claims that the move from Line 3 to Line 5 deprived her of working on one of the new machines. (Thornton Decl. ¶ 12.)

Thornton's evidence does not amount to constructive discharge, so her retaliation claim cannot rest on that adverse employment action.

Nor can her retaliation claim rest on the other adverse employment actions. The first affirmative alleged adverse employment action – verbal and written reprimands – is not enough for a *prima facie* case. Thornton presents no evidence other than the conclusory testimony that she was constantly reprimanded after she complained (*see* Resp. 45) and gives insufficient facts to show that based on those requirements, a reasonable person would have been dissuaded from making a charge. Conclusory allegations based on subjective beliefs do not suffice. For certain types of claims, a plaintiff's testimony is a key source of evidence. In this instance, Thornton is more detailed and helpful on her sexual harassment claim, for example. But Thornton's details as to the alleged constant stream of verbal and written reprimands are so sparse and unsubstantiated (*see* Thornton Dep. vol. 1, 175, 275-76) that it would be unreasonable to expect Flavor House to have enough information to determine if it had a legitimate, non-retaliatory reason for its actions.

As Flavor House points out, Thornton only addresses three specific write-ups in her testimony (Br. Supp. Summ. J. 18), all of which can be credibly explained. For the first one, she admits that it was deserved in part, but complains that no one else who had made the same mistake was written up. That is not enough, however, to rebut the legitimate, non-retaliatory reason for the write-up – that Thornton put the incorrect date on the schedule – as pretextual. Thornton has not pointed to any other evidence that employees allegedly not

34

written up were similarly situated, or to any other evidence of pretext.  Thornton received the second specified write-up for hollering at an employee.  Thornton's argument was that it was undeserved because she was competing with the sound of a case packer, but that argument is not enough to show that the reason for the write-up was *pretextual* (as opposed to wrong, unfair or imprudent).  "[F]ederal courts do not sit to second-guess the business judgment of employers. . . . [A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where . . . the reason is one that might motivate a reasonable employer."  *Combs*, 106 F.3d at 1543; *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair.").  The third specified write-up was for using offensive language against a co-employee who Thornton claims threw peanut cans at her, but he received a counseling report as well, which supports Flavor House's argument.  The allegations of reprimands cannot sustain her retaliation claim.

Assuming *arguendo* that Thornton's remaining retaliatory allegation – Flavor House's formal disciplinary action – does satisfy the *prima facie* elements of adverse employment action and causal connection,[26] Thornton's claim still would fail on summary judgment.  The evidence is not sufficient to show Flavor House's legitimate reason for taking that action was pretextual.  Thornton admits to the reason Flavor House gave for disciplining her – that

---

[26] This does not constitute a finding that the remaining alleged retaliatory action satisfies a *prima facie* case.

Thornton had told another co-employee about Williams's sex offender status after being told to cease talking about that issue at work.  (Thornton Dep. vol. 1, 133-34; Thornton Dep. vol. 2, 399.)  She argues that the reason is nevertheless pretextual because another co-employee, Jewel Silvery ("Silvery"), had brought up Williams's sex offender status and Hutchkins was aware of that but did not file a Memo to File against Silvery.  (Resp. 50.)  As Flavor House points out (Reply 13), however, Thornton has pointed to no evidence to show that Flavor House had told Silvery at least once before not to mention Williams's status, *i.e.*, that Silvery was similarly situated.  Flavor House also disputes that there is any evidence that Silvery even told other employees, aside from Williams, about his sex offender status.  (Reply 12.) Flavor House is correct that the evidence Thornton cites fails to sufficiently support her contentions.  Hutchins testified that Williams told him that Silvery had come to Williams and made remarks about Williams's past.  (Melvin Hutchins Dep. 64, May 14, 2008 (Evidentiary Submission Summ. J. Ex. H); *see also* Williams Documentation Form (Chris Jordan Dep. Ex. 16).)  There is no evidence, however, that Silvery told *other* employees about Williams's sex offender status.  Thus, all the alleged retaliatory actions fail to sustain a Title VII retaliation claim.

**3.     Invasion of Privacy**

Flavor House challenges Thornton's invasion of privacy claim as insufficient because the alleged acts of sexual harassment were not intrusive into her personal affairs.  (Br. Supp. Summ. J. 45.)  Alabama recognizes a cause of action for invasion of privacy that arises from

sexual harassment. *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 826 (Ala. 1999) (citing *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705 (Ala. 1983)). Sexually harassing conduct can be alleged under the type of invasion of privacy termed "wrongful intrusion" – the "'intentional interference with another's interest in solitude or seclusion, either as to his person or [as] to his private affairs or concerns.'"[27] *Id.* (quoting *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 323 (Ala. 1989) (per curiam)). To sustain a wrongful-intrusion claim, however, "'[t]here must be something in the nature of prying and intrusion,'" *id.* (quoting *Busby*, 551 So. 2d at 323), even if the intrusion is only into one's "emotional sanctum," *Phillips*, 435 So. 2d at 711. Furthermore, the intrusion must be "'offensive or objectionable to a reasonable person.'" *Id.* (quoting *Busby*, 551 So. 2d at 323). "[E]xtensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands" is an example of intrusion that is sufficient "'to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Id.* (quoting *Phillips*, 435 So. 2d at 711); *see also Baldwin*, 480 F.3d at 1308.

There is nothing *intrusive* about Williams's conduct or statements, aside arguably from the instances where he touched Thornton or threw objects, and neither of those on their own would cause outrage or mental suffering, shame or humiliation that amounts to a claim.

---

[27] Under Alabama law, invasion of privacy can be shown by four types of action: "1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use." *Phillips*, 435 So. 2d at 708 (footnote omitted).

Williams's comments do not address Thornton's personal life in any way; they only concern *his* own personal life.  He never propositions her or humiliates her through intruding into *her* private affairs or concerns or to her person.  To hold that this type of sexual harassment constitutes privacy would in effect, create an independent state-law action for sexual harassment, which Alabama does not recognize, *Stevenson*, 762 So. 2d at 825 n.6.  There must be some distinction between harassment and wrongful intrusion, and that distinction lies in whether the harassment is offensive in a way that *intrudes or pries*, such as by commenting on the plaintiff's *person*, on *her* sexual life, or otherwise *entering into* her physical or emotional space.  Williams's sexual comments and cursing were not intrusive.

Thornton also alleged that Williams touched her on the upper arm and threw objects when he was upset with her.  The standard of offensiveness for privacy claims, however, is almost as high as that required for outrage, *see infra* pp. 40-44.

> [T]he inquiry in an invasion of privacy claim is similar to that made in an outrage claim.  When evaluating an outrage claim a court asks whether the defendant's conduct was 'extreme and outrageous,' while when considering an invasion of privacy claim, the court determines whether the defendant has made a 'wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'  While conduct needed to support an invasion of privacy claim need not be 'extreme and outrageous,' in cases where a viable claim for invasion of privacy exists, the defendant's behavior frequently approaches such a degree.

*Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438, 1456 (M.D. Ala. 1996) (DeMent, J.) (citation omitted).  The distinction between an invasion of privacy claim and outrage claim, therefore, is only in the intrusive nature of the former and in the degree of

38

offensiveness. Outrage that is not extreme will suffice for a privacy claim, as will mental suffering, shame, or humiliation, but these emotional states still set a high bar and invasiveness is the backdrop.

Under that standard, touching an employee's arm to get her attention, absent other physical conduct, is not sufficient to cause outrage, mental suffering, shame or humiliation to a person of ordinary sensibilities. It may cause uneasiness or discomfort, and it may be "aggravating," but to classify such touching as sufficiently offensive would dilute the concepts of outrage, suffering, shame, or humiliation beyond recognition and collapse them into mental responses that are weaker in degree. Williams threw large or breakable objects, but that does not rise to the level of offensiveness contemplated by privacy claims. There are state-law causes of action for physical touching and physically threatening behavior – battery and assault[28] – neither of which was alleged.[29]

---

[28] Battery is intentional touching that is done in a harmful or offensive manner. *E.g.*, *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998). Assault is the "'intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Kmart Corp. v. Perdue*, 708 So. 2d 106, 110 (Ala. 1997) (quoting *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995)).

[29] Thornton relies upon *Kelley v. Troy State Univ.*, 923 F. Supp. 1494 (M.D. Ala. 1996) (Albritton, J.), a case with facts somewhat favorable to her position. (Resp. 55-56.) *Kelly*, however, resolved a motion to dismiss, not a motion for summary judgment, and the court specifically stated that it doubted whether the alleged facts ultimately could sustain an invasion of privacy claim, but declined to dismiss the claim for failing to state a cause of action. *Kelley*, 923 F. Supp. at 1503. Additionally, in *Kelley*, the allegations were that the plaintiff was told to "show a little leg" and was struck with open hand or closed fist, and subject to *personally* degrading comments, in addition to sexually explicit remarks and jokes. *Id.*

39

4.      **Outrage**

Flavor House argues that Williams's conduct is insufficiently extreme to support the claim of outrage.  (*See* Br. Supp. J. 41-44.)  "[O]utrage is a very limited cause of action that is available only in the most egregious circumstances."  *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993) (citing nineteen cases for support that the Alabama Supreme Court "has held in a large majority of the outrage cases reviewed that no jury question was presented").  Outrage, which is a claim for the intentional infliction of emotional distress, requires proof "(1) that the defendant[] either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from [his] conduct; (2) that the defendant['s] conduct was extreme and outrageous; and (3) that the defendant['s] conduct caused emotional distress so severe that no reasonable person could be expected to endure it."  *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000) (citing *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980)).  "By extreme [the court is] refer[ring] to conduct that is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Am. Road. Serv. Co.*, 394 So. 2d at 365.  Both the conduct and the emotional distress must be extreme, and the standard has been applied "'strictly'" by the Alabama Supreme Court.  *Saville v. Houston County Healthcare Auth.*, 852 F. Supp. 1512, 1541 (M.D. Ala. 1994) (Thompson, J.) (quoting *Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1211 (Ala. 1990)).

40

"[M]ere insults, indignities, threats, annoyances [and] petty oppression" are not extreme, *Am. Road Serv. Co.*, 394 So. 2d at 364-65, but "*[e]gregious* sexual harassment can amount to the tort of outrage," *Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119, 121 (Ala. 1998) (emphasis added).  In *Busby*, where the Alabama Supreme Court allowed outrage based on sexual harassment to go forward on summary judgment, the perpetrator had invited the plaintiffs to swim nude with him, told the plaintiffs that he would "put a stick on their machines" so that they could masturbate, expressed his wish to the plaintiffs that they come to work braless and with less clothing, told a plaintiff that she could do her work if she had not stayed up all night having sex, acted as if he were going to pinch one plaintiff's breasts with pliers and his hands, told a plaintiff that he was going to send her across the street to where men were standing because she stayed sexually aroused, asked an employee to accompany him to the restroom to hold his penis because he was very tired, told another plaintiff that her nipples were as large as another woman's breasts, followed one plaintiff to the bathroom and said he was going to help her, and on and on.  551 So. 2d at 324.

In *Brassfield*, the court denied summary judgment and retained an outrage claim because the plaintiff suffered "continuous" and "opprobrious" sexual harassment.  953 F. Supp. at 1453.  The harassment, however, included one of the company's officers asking to have his shoulders rubbed before he would answer work-related questions, calling the plaintiff salesperson his "market wife" in front of visiting sales representatives, asking the plaintiff to perform oral sex on him, asking her to have sex with him, including to have a

*menage a trois* and to have sex in someone's office, asking her to go skinny dipping with him numerous times, kissing her hand and arm without permission, rubbing himself against her, commenting in front of other salespersons that she probably likes being spanked when she has sex, and expressing that he liked her dress because he could see her "tits" when she bent over. *Id.* at 1445, 1447. The court found, however, that similar but distinguishable behavior, however, did *not* amount to outrage. *See id.* at 1454-55. That behavior included the company officer doing the following: requiring the plaintiff to rub his shoulders before answering questions pertaining to work, pulling the plaintiff toward him so that her breasts touched his body, asking her to have sex with him in her apartment, asking her whether her new mattress had been "soil-shielded," asking her to go skinny dipping, saying that he would like to see her in a wet T-shirt, asking her if she forgot to wear her underwear, speculating about her sex life with other salespersons, and denying her request for time off but giving a male employee that time for the same period.[30] *Id.* at 1446. The difference between the sets of behavior seems to be one of degree, frequency and intensity.

---

[30] As Flavor House points out (Br. Supp. Summ. J. 42-43), the court also found that the following conduct was insufficient for an outrage claim: stating that any woman wearing panties could leave early, asking a plaintiff whether she wore panties and saying he could not detect panty lines, asking a plaintiff if the "P" on her necklace was for prostitute, commenting on a nude portrait of her that she had brought to work, stating that his lunch of chicken breasts made him think of her, commenting that if he hired a female salesperson, she would have to take a licking, and speculating on her sex life with other salespersons. *Brassfield*, 953 F. Supp. at 1445, 1446, 1454; *see also id.* at 1447, 1448 (finding insufficient evidence of outrage for a male employee's asking a plaintiff is she wore panties, calling her a "stupid b****" on several occasions, joking about the comment that she was a "market wife," and telling her that he would fill his orders when "he was good and d*** ready" (internal quotation marks omitted)).

Williams's conduct cannot as a matter of law meet the high standard for allowing outrage claims to pass to the jury. There must be some distinction between sexual harassment that suffices for outrage because it is egregious, and sexual harassment that is otherwise insufficient. Explicit sexual discussion in the workplace, as undesirable as it is, nevertheless is not particularly outrageous from a legal standpoint when it is not specific to the plaintiff's body, or the defendant's interest in the plaintiff. Additionally, the sexual discussion did not contain overtly intolerable discussion. It is naive to pretend that such conversations do not take place, in this type of workplace or even those less "blue collar"; even if such conversations are sometimes illegal as a matter of federal law, they are not necessarily atrocious or utterly intolerable.[31] Williams's cursing, angry actions, and touching – though distasteful – simply does not rise to the level sufficient to create a jury issue on whether his conduct amounted to an intentional tort for causing extreme emotional distress.[32]

## 5.   Negligence

A party alleging negligent or wanton hiring, supervision, training, and retention must prove the underlying wrongful conduct of employees. *See, e.g.*, *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065 (citing *Stevenson*, 762 So. 2d 820). Because the underlying torts Thornton explicitly relied upon for her negligence claim were the state-law claims of outrage

---

[31] The outcome may be different if the sexual acts described are particularly violent or disturbing.

[32] A case less hostile to Thornton's claim, *Rice v. United Ins. Co. of Am.*, 465 So. 2d 1100 (Ala. 1984), addressed an outrage claim at the motion to dismiss, not summary judgment, stage and explicitly emphasized the standard of review in its analysis. *Id.* at 1101.

and invasion of privacy (Resp. 57), and because those claims are due to be dismissed, the negligence claim is also due to be dismissed.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that Williams's motion for summary judgment (Doc. # 68) is GRANTED and all claims against Williams are DISMISSED with prejudice.

As to Flavor House's motion for summary judgment (Doc. # 70), it is ORDERED:

(1) that the motion with respect to the sexual harassment claim is DENIED; and

(2) that the motion with respect to all other claims is GRANTED.

DONE this 19th day of December, 2008.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE